EXHIBIT

A

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 31280812
Date: May 24 2010 6:26PM
Mark Harper, Clerk

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

|  |  |  |
|---|---|---|
| TASER INTERNATIONAL, INC., *et al.*, | : : : | |
| Plaintiffs, | : : | CIVIL ACTION FILE NO.: 2008-EV-004739-B |
| v. | : : | JURY TRIAL DEMANDED |
| MORGAN STANLEY & CO., INC., *et al.*, | : : | |
| Defendants. | : : | ***FILED UNDER SEAL*** |

**PLAINTIFFS' MOTION FOR RELIEF CONCERNING DEFENDANT UBS SECURITIES' VIOLATION OF THIS COURT'S ORDER;**

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS IMPROPERLY WITHHELD AS PRIVILEGED OR ALTERNATIVELY, TO APPOINT SPECIAL MASTER TO CONDUCT AN *IN CAMERA* REVIEW**

**AND**

**PLAINTIFFS' MOTION FOR RELIEF CONCERNING DEFENDANTS' VIOLATION OF THE COURT'S PROTECTIVE ORDER**

Plaintiffs file this Motion to remedy Defendants' failure to abide by well-established discovery rules and this Court's Orders.  Rather than file three separate motions, for the Court's convenience, Plaintiffs are filing a single omnibus motion.

First, Defendant UBS Securities ("UBS") has willfully and without excuse violated **this Court's Order** to provide information about inaccurate and unreliable trading data it produced.  Specifically, Defendant UBS Securities admits

769575.1

that, although it is required by federal law to maintain accurate records of its

trading in TASER and other securities (documents known as blue sheets), it has

failed to do so.  In fact, in 2006, UBS was censured and sanctioned for "submitting

inaccurate trading information on electronic blue sheets" which "undermined the

integrity of the information utilized by the [NYSE] and other regulators during the

course of investigations into questionable trading activity."  *See* Exhibit A at 1-2, 4

(NYSE Hearing Panel Decision 05-159).  And, UBS **admits** that

**REDACTED**

*See* Exhibit B (UBS Securities,

LLC's Amended Objections and Responses to Plaintiffs' Third Interrogatories).

Given the inaccuracy of its blue sheets, Plaintiffs sought to determine, *inter

alia*, whether UBS maintains trading data in any other database or form and to

obtain that correct data.  UBS finally, after threatened with a motion to compel,

agreed to provide the information Plaintiffs requested **by a date certain**, which the

parties agreed would be included in an Order of this Court.  Thus, on April 14,

2010, this Court entered an Order requiring UBS to provide certain information no

later than May 12 and May 21.  **UBS willfully ignored both of those deadlines,**

letting them pass without providing the Court ordered information (and having still

not provided it weeks later).  Plaintiffs move to remedy UBS's violations of its

agreements and this Court's Order.

Second, Defendants are withholding numerous documents under purported privilege claims.  The withheld documents are relevant to this case and include documents concerning regulatory investigations where Defendants were found to have engaged in precisely the type of illegal conduct Plaintiffs allege here.  For example, Defendants are withholding documents relating to investigations where the Financial Industry Regulatory Authority ("FINRA")[1] found that:

- REDACTED

                                      *See* Exhibit C at BAS TSINTL28 (emphasis added).

             REDACTED                   *Id.* at BAS TSINTL29 (emphasis added).

- Defendant Deutsche Bank Securities failed to "comply with certain requirements of Reg SHO, FINRA Rules, NASD Rules and other SEC Rules **during the period covering, in whole or part, January 3, 2005 through approximately September 30, 2009.**"  Exhibit D at DBSI-T1811772 (emphasis added). Deutsche Bank's violations included "accept[ing] short sale orders…without having borrowed the securities" and "provid[ing] inaccurate information on the Firm's blue sheet reports." *Id.* at DBSI-T1811773.  FINRA concluded that Deutsche Bank "**experienced a systemic operational**

---

[1] "Created in July 2007 through the consolidation of NASD and the member regulation enforcement and arbitration functions of the New York Stock Exchange," FINRA is "the largest independent regulator for all securities firms doing business in the United States."  www.finra.org/aboutfinra

> **deficiency that persisted for a significant period of time.**"
> *Id.* at DBSI-T1811782 (emphasis added).

Having lost the argument that they can withheld information relating to these

investigations because they involve a stock other than TASER (*see* February 9,

2010 Order), Defendants are now trying to hide this information under the guise of

privilege.

Although under established Georgia law, "[t]he party asserting the attorney-

client privilege has the burden to establish its applicability," *Zielinski v. Clorox*

*Co.*, 270 Ga. 38, 40 (1998), Defendants have not taken any steps to meet their

burden with regard to allegedly privileged material.  To meet their burden,

Defendants must meet five strict elements of proof and must show that the

documents were not disclosed to regulators.  *See* Section II-A.  Here, Defendants

refuse to provide any information, instead stating only that a document is

privileged because it is "regarding regulatory inquiry."

On numerous occasions, Plaintiffs requested that the Defendants follow

established Georgia law and provide the information necessary to support their

privilege claims.  Defendants refused.  Rather than immediately come to the Court,

Plaintiffs proposed a common sense, workable solution:  that the parties jointly

agree to the appointment of a Special Master to review *in camera* the documents

placed on privilege logs by Plaintiffs **and** Defendants to determine whether the

privilege was properly invoked, with each party paying their pro rata share of

769575.1

4

costs. Yet, Defendants would not agree to allow a Special Master to review their allegedly privileged documents. Defendants' refusal to provide the required information supporting their privilege claims or agree to the appointment of a Special Master raises questions as to the legitimacy of Defendants' privilege claims and leaves Plaintiffs with no other choice but to file this Motion.

Third, Defendants are willfully violating this Court's Protective Order by improperly designating thousands of non-confidential documents as "highly confidential" or "confidential." Under the terms of the Court's Protective Order, documents may be designated as "confidential" or "highly confidential" if they contain such confidential information as trade secrets or personal financial information. Defendants, however, have abused the confidentiality designation, designating hundreds of thousands of documents as confidential, **including public materials such as newspaper articles, internet website printouts and government releases**. These improper designations have forced Plaintiffs to file this Motion under seal, inundating the Court with hard copy pleadings (since the electronic system cannot be used for filings under seal) and unnecessarily complicating filings and proceedings. Defendants cannot violate this Court's Order, particularly when such violations unnecessarily burden Plaintiffs and this Court. Plaintiffs request that the Court order Defendants to re-review their

confidentiality designations and, within thirty days, certify that they have complied with the Court's Order.

## I.  Motion for Relief for UBS's Violation of the Court's April 14, 2010 Order.

There can be no legitimate debate that trading data will play an important role in this litigation.  Yet, UBS has produced          REDACTED

(*see* Exhibit B), and refuses to provide timely answers to Plaintiffs' questions about those inaccuracies and how to remedy them.  UBS's delay is materially prejudicing Plaintiffs' ability to conduct discovery in this case, including delaying Plaintiffs' review and analyses of trading data and preventing Plaintiffs from conducting further discovery (and fully responding to Defendants' discovery).

In December 2009, **nearly six months ago**, Plaintiffs asked UBS to produce data from its affiliates UBS AG Stamford Branch and UBS Financial Services and to answer questions about its trade runs.[2]  UBS initially refused to provide this information.[3]  However, when Plaintiffs indicated that they would bring UBS's

---

[2] *See* Exhibit E, which consists of the following conferrals:  February 24, 2010 Email from E. Eager to A. Clubok and J. Landis; February 17, 2010 Email from E. Eager to J. Landis and D. Gomez; February 5, 2010 Email from E. Eager to J. Landis; January 21, 2010 Email from E. Eager to J. Landis; January 14, 2009 Letter from E. Eager to J. Landis; December 16, 2009 Letter from E. Eager to J. Landis.

[3] *See* Exhibit F, which consists of January 7, 2010 Letter from J. Landis to E. Eager and December 11, 2009 Letter from J. Landis to E. Eager.

conduct to the Court's attention through a motion to compel, UBS agreed to

provide the obviously-discoverable information Plaintiffs requested and agreed

that the parties' agreement would be reflected in a **Court Order.** On April 14,

2010, this Court entered an Order requiring that[4]:

> (1) On or before May 12, 2010, UBS will provide Plaintiffs a written representation that "its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters, it would not cure any inaccuracies in the blue sheets."

> (2) On or before May 21, 2010, UBS will produce data from UBS Financial Services and/or UBS AG Stamford Branch or "provide plaintiffs a representation that after a diligent search the entity did not borrow, lend or transfer TASER equities or derivatives . . . (or a similar representation depending on the results of UBS's inquiry)."

*Id.* at 3-4.

UBS has simply ignored these deadlines, failing to provide any written

representation on May 12 or producing affiliate data or representation by May 21.

UBS never notified Plaintiffs that it was going to miss the deadlines or ask for an

extension. And, weeks later, Plaintiffs have still not received any of this

information.

UBS's failure to provide this information has, for at least six months,

impacted Plaintiffs ability to litigate this case. Indeed, without full and accurate

---

[4] *See* Exhibit G (April 14, 2010 Court Order) at 2.

769575.1

data, in readable and useable form, Plaintiffs' experts cannot analyze the data and complete much of their analysis. That, in turn, affects Plaintiffs' ability to further focus their discovery requests, identify appropriate traders and deponents and respond to Defendants' discovery.

To ensure no further prejudice, this Court should order UBS to comply with this Court's Order by no later than May 29, 2010 and certify to this Court that it has done so. In addition, the Court should consider other appropriate sanctions for UBS's failure to preserve and produce accurate data and their unwillingness to provide a full and complete alternative data source. Finally, because UBS failed to comply with a Court order, Plaintiffs request that the Court order UBS "to pay reasonable expenses, including attorney's fees, caused by [UBS's] failure" to comply with this Court's order.[5] Upon the Court's request, Plaintiffs will submit an itemized record showing the expenses they incurred in conferring on this issue, as well as drafting this portion of this Motion to Compel.

## II. Motion to Compel Production of Documents on Privilege Logs, Or in the Alternative, to Appoint A Special Master As to All Defendants.

Defendants refuse to produce a substantial number of documents relating to regulatory investigations and their short-selling activities on the ground that they are allegedly privileged. While Plaintiffs take no issue with legitimate invocations of privilege, Plaintiffs are concerned that Defendants are asserting baseless

---

[5] O.C.G.A. § 9-11-37(b).

769575.1

8

privilege claims to hide damaging evidence.  Plaintiffs' concern stems from the fact that many of the purportedly privileged documents: (1) were neither sent to nor received from an attorney; (2) were disclosed to, in some cases, dozens of employees and/or (3) were prepared as part of a mandatory response to a regulatory inquiry.  When Plaintiffs asked Defendants to justify their privilege claims in light of these facts and pursuant to Georgia law, Defendants refused.  Tellingly, Defendants also refused to allow a Special Master to review the purportedly privileged documents *in camera*.

Plaintiffs set forth below the law demonstrating that Defendants have the burden of proving that a document is privileged, and how Defendants have failed to meet that burden.

## A.    General Principles Relating to Privilege

In Georgia, "[t]he party asserting the attorney-client privilege has the burden to establish its applicability." *Zielinski v. Clorox Co.*, 270 Ga. 38, 40 (1998); *McKesson Corp. v. Green*, 279 Ga. 95, 96 (2005) (burden of proving attorney-client privilege "lies on party claiming the privilege").   The circumstances regarding each communication govern the burden that the party seeking to invoke the privilege must meet.  Defendants have not met their burden under any of the circumstances present here.

### i.   Communications from Employees Must Meet the *Marriott* Test to Constitute Privileged Material.

For decades, Georgia courts have followed the rule articulated in *Marriott Corp. v. American Academy of Psychotherapists, Inc.*, 157 Ga. App. 497 (1981) with respect to determining whether the attorney-client privilege protects a communication from an employee.  In *Marriott*, the Court held that a company asserting privilege over an employee's communication must establish five elements for the privilege claim to be upheld:

> The attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Id.* at 505.  "The corporation has the burden of showing that the communication at issue meets **all** of the above requirements."  *Id.* (emphasis added).

As described in more detail below, Defendants have provided little, if any, of the facts required to establish that their purportedly privileged communications meet the *Marriott* test.  As a result, Defendants have failed to meet their burden.

769575.1

10

### ii.   Communications from In-House Counsel are Subject to Strict Requirements to Demonstrate Privilege.

Defendants also must establish that communications from in-house counsel to employees are privileged. *See Zielinski*, 270 Ga. at 40. To meet that burden, Defendants must show that the communication was for legal (as opposed to business or personal) advice:

> the attorney-client privilege extends **only** to confidential communications made for the purpose of facilitating the rendition of **legal** services to the client. Thus, **where the attorney acts merely as a business adviser[,] the privilege is inapplicable**. The privilege would never be available to allow a corporation to funnel its papers and documents into the hands of its lawyers for custodial purposes and thereby avoid disclosure. It seems well settled that the requisite professional relationship is **not** established when the client seeks **business or personal advice**, as opposed to legal assistance.

*Ga. Cash Am. Inc. v. Strong*, 286 Ga. App. 405, 412 (2007) (*quoting Southern Guaranty Ins. Co. v. Ash*, 192 Ga. App. 24, 28-29 (1989) (emphasis added).

An attorney's communication is not privileged unless the corporation can show that it was not disclosed to anyone outside the corporation or to any person within the corporation who did not "need to know" its contents. *Southern Guar. Ins. Co.*, 192 Ga. App. at 28 (*citing Diversified Indus. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1977)). Moreover, when a communication with in-house counsel is

at issue, the communication is privileged "only upon a **clear showing** that [the officer] gave [the advice] in a professional legal capacity."[6]

Again, as described further below, Defendants failed to provide the information required to meet these burdens.

### iii.   Documents Relating to a Regulatory Inquiries are Generally Not Privileged.

Defendants also refuse to produce a substantial number of documents relating to regulatory investigations into their short-selling and related activities. But, as discussed below, for a privilege to apply to such documents, Defendants must show, *inter alia*: (1) that the document or its contents were never conveyed to a regulator; (2) that the Defendant prepared the document because of litigation, and not because it was required to do so by regulation, **and** (3) that the persons preparing the information never contemplated that it would be disclosed to regulators.  Defendants do not even attempt to meet these burdens.

---

[6] *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984) (emphasis added); *Avianca, Inc. v. Corriea*, 705 F. Supp. 666, 676 (D.D.C. 1989) ("Where the communication is with in-house counsel for a corporation, particularly where that counsel also serves a business function, the corporation must **clearly demonstrate** that the advice to be protected was given in a professional legal capacity."); *Avianca, Inc. v. Corriea*, 705 F. Supp. 666, 676 (D.D.C. 1989) ("Where the communication is with in-house counsel for a corporation, particularly where that counsel also serves a business function, the corporation must **clearly demonstrate** that the advice to be protected was given in a professional legal capacity."); *In re Asousa P'ship*, 2005 WL 3299823 (Bankr. E.D. Pa. Nov. 17, 2005) (same); *Kramer v. Raymond Corp.*, 1992 WL 122856 (E.D. Pa. May 29, 1992) (same).

769575.1

***Information Provided To Regulators.*** Information provided to a regulator, such as the SEC, is neither attorney-client privileged nor subject to work-product protection, even if that information is provided pursuant to a confidentiality agreement. *See McKesson v. Green*, 279 Ga. 95 (2005). In fact, even if information is never disclosed to a regulator, it is not privileged if it was being prepared in response to a regulatory inquiry and it is contemplated that the information may be disclosed to the regulator. *See McKesson HBOC, Inc. v. Adler*, 254 Ga. App. 500, 501-02 (2002).

For example, in *McKesson HBOC*, McKesson formed an audit committee to cooperate with an SEC investigation. The Court held that the documents created by that committee were not privileged because the committee contemplated turning them over to regulators: "Since McKesson contemplated that the documents would be provided to a third party almost from the inception of its investigation... the documents are **not** subject to the attorney-client privilege." *Id.* at 504 (emphasis added); *see also McKesson v. Green*, 279 Ga. at 96 (documents turned over to regulatory not covered by work product doctrine).

This binding precedent shows that if the Defendants prepared information with the contemplation it would be turned over to a regulator, or if the information was in fact turned over to a regulator, it cannot be withheld as either an attorney-client communication or work-product. Yet, Defendants refuse to disclose whether

they anticipated that any of the emails, documents, or information would be turned over to a regulator, or was in fact turned over to a regulator. That refusal precludes them from meeting their burden to prove a privilege applies.

*Information Gathered In Response to a Regulatory Inquiry.* Defendants must comply with SEC, FINRA and other regulatory agency regulations, including regulations that **require** them to respond to regulatory inquiries. *See, e.g.,* Exhibit H (FINRA Rule 8210 ("No member or person shall fail to provide information or testimony or to permit an inspection and copying of books, records, or accounts."). Indeed, if a Defendant refused to respond to a regulatory inquiry, it could be "suspend[ed]" or "expel[led]" from the securities exchanges. *See, e.g.,* Exhibit I FINRA Rule 8310.

Documents and information gathered in response to a regulatory inquiry are not privileged for two reasons. First, as stated above, "[t]o the extent a communication is made for the purpose of disclosure to a third party, it is not protected by the attorney-client privilege in Georgia." *McKesson HBOC*, 254 Ga. App. at 502-03. Likewise, Georgia law is clear that information provided to an attorney with the understanding that "the attorney would transmit the information to others," is **not** privileged. *See, e.g., Tenet Healthcare Corp. v. Louisiana Forum Corp.*, 273 Ga. 206, 208 (2000).

Second, "[d]ocuments prepared in the ordinary course of business or **pursuant to regulatory requirements** are not classified as attorney work product." *Syngenta Crop Protection, Inc. v. U.S. E.P.A.*, No. 1:02CV00334, 2002 WL 31778791, at *5 (M.D.N.C. Nov. 5, 2002). Indeed, "well established case law has refused to protect that information which a party has acquired because of a public or business duty simply because a litigation involving that information is probable or in existence." *People ex. rel. Wheeler v. Southern Pacific Transp. Co.*, No. Civ. S921117LKKGGH, 1993 WL 816066, at *4 (E.D. Cal. Sept. 3, 1993). As the Court of Appeals for the Second Circuit has reasoned:

> It should be emphasized that the "because of" formulation . . . withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation. It is well established that the work product privilege does not apply to such documents. **Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created "because of" actual or impending litigation.**

*United States v. Adelman*, 134 F.3d 1194, 1195 (2d Cir. 1998) (emphasis added); *see also RLI Ins. Co. v. Conseco, Inc.*, 477 F. Supp. 2d 741, 747 (E.D. Va. 2007) (no privilege applies if a document would have been "created in essentially similar form irrespective of the litigation").

Under these rules, courts have consistently held that "materials prepared in the ordinary course of business or pursuant to regulatory requirements...are not

documents prepared in anticipation of litigation." *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992).  Thus, for example, when documents were "[w]ritten ultimately to comply with SEC regulations," they do not "contemplate litigation in the sense required to bring [them] within the work product doctrine." *United States v. El Paso Co.*, 682 F.2d 530, 543-44 (5th Cir. 1982).  Similarly, documents "drafted to comply with SEC rules of disclosure and other regulatory requirements" are not privileged.  *See Stenovich v. Wachtell, Lipton, Rosen & Katz*, 756 N.Y.2d 367 (N.Y. Supp. 2003); *see also United States v. Gulf Oil Co.*, 760 F.2d 292 (Temp. Emer. Ct. App. 1985) (documents created to comply with securities laws not work product).[7]

**B.    Defendants Refuse to Provide the Information Required by *Marriott, McKesson HBOC*, and Other Cases to Evaluate Whether the Withheld Documents are Privileged.**

Given the legal rules set forth above, Plaintiffs requested that Defendants produce privilege logs containing information sufficient to meet their burden of proving that each of the withheld documents is privileged.  After repeated requests, and in some cases months after production, Defendants finally produced

---

[7] The above federal decisions relating to the scope of privilege are deemed by Georgia courts as "highly respectable and persuasive authority." *Atlantic Coast Line R. Co. v. Gause*, 116 Ga. App. 216, 221 (1967); *McKesson HBOC, Inc.*, 254 Ga. App. at 503 (federal privilege law is "persuasive authority").

incomplete privilege logs.[8]  Unfortunately, those logs are insufficient for Defendants to meet their burden of establishing that the listed documents are privileged.

First, the privilege logs are only partially complete; *i.e.*, they identify only some of the documents Defendants are refusing to produce.  Defendants claim that they will produce additional privilege logs at some later time.  Until then, Plaintiffs do not know the true volume of documents that are being withheld.[9]

Second, even for those withheld documents that are identified on the incomplete privilege logs, the information Defendants provided is inadequate.  Indeed, instead of providing the information required in *Marriott, McKesson* and other cases to meet their burden of proving that a privilege applies, Defendants' privilege logs contain only conclusory statements with little or no factual support.[10]

---

[8] *See* Exhibit J (Banc of America Securities privilege log); Exhibit K (Bear Stearns' privilege log); Exhibit L (Credit Suisse privilege logs); Exhibit M (Deutsche Bank's privilege logs); Exhibit N (Goldman Sachs privilege and redaction logs) Exhibit O (Merrill Lynch privilege logs); Exhibit P (Morgan Stanley privilege log); Exhibit Q (UBS privilege log).

[9] To the extent Defendants argue that their privilege logs do not contain a substantial number of documents, that argument ignores the fact that the logs are incomplete.  Regardless, even if Defendants are withholding a single document, they still need to meet their burden of proving why it is being withheld.

[10] Defendants have asked Plaintiffs questions about some of the entries in Plaintiffs' privilege logs.  Plaintiffs have answered those questions, and are unaware of any issues Defendants have with Plaintiffs privilege designations.  Nonetheless,

For one example, Merrill Lynch claims emails and attachments that were neither sent to nor received from an attorney are privileged based solely on its assertion that they are "[b]etween business people requesting legal advice regarding compliance with Reg SHO." *See* Exhibit O (Merrill Lynch Supplemental Privilege Log at entries 1 and 2). Of course, Merrill never explains how an email **to a non-attorney** can somehow be a "request[] for legal advice." Nor does Merrill provide any information as to whether the email or attachments contain trading data, business information or other non-privileged materials (requiring that the document, at a minimum, be redacted instead of entirely withheld). Merrill similarly fails to provide any of the information required by *Marriott*, such as whether all of the persons receiving the communication "needed to know" the allegedly privileged information. Without this information, neither Plaintiffs nor the Court can determine whether the document is truly privileged. The other Defendants have made similar designations, and each have refused to provide the *Marriott* information so that Plaintiffs can evaluate the claims of privilege.

Defendants (except DBSI) have also withheld hundreds of documents based solely on the conclusory assertion that they relate to, concern or regard a regulatory inquiry. *See, e.g.,* Exhibit J at entry # 1; Exhibit K at entry # 22; Exhibit N. at

---

Plaintiffs have offered to have their privileged documents reviewed *in camera* to demonstrate to Defendants that Plaintiffs' privilege claims are proper.

unnumber page 1; Exhibit O at entry # 53; Exhibit P at entry # 4; Exhibit Q at

entry # 25.  This assertion is useless in determining whether the assertion of

privilege is valid, and Defendants' privilege logs provide little if any additional

information to allow Plaintiffs or this Court to evaluate whether Defendants'

purportedly privileged communications meet the requirements set forth above.  For

example:

- **Nearly all** of Bear Stearns' privilege log entries describe nothing more than emails and attachments that are "regarding regulatory inquiry."  *See* Exhibit K.  Bear Stearns provides no information as to whether it was required to prepare the information irrespective of litigation, whether the persons who received the document "needed to know" its contents or whether any of the information was actually provided to regulators.  Further, although many of the withheld documents have attachments, Bear Stearns fails to provide any information as to what any attachments contain (including whether they contain non-privileged facts such as trading data), who received the attachments and whether they were forwarded to regulators.

- Credit Suisse's Feb. 1, 2010 Log Entry Nos. 9-11, 22-23 state that it is withholding as work product an "Email and attachment" based solely on the assertion that the documents are "relating to response to regulatory inquiry."  *See* Exhibit L.  But, for the work product protection to apply, Credit Suisse must show that the document was created not because of a regulatory inquiry, but rather because of litigation.  *McKesson HBOC,* 254 Ga. App. at 501-02.  Moreover, if the information was contemplated to be turned over to the regulators, or was in fact turned over to regulators, it is not privileged.  *Id.*  Credit Suisse also fails to provide any information concerning the contents of the attachment or the identity of the persons who created or received it.

- BAS claims that an email and undescribed attachment sent to **more than 50 employees** is privileged because it is "regarding FINRA inquiry."  BAS, however, provides no information as to why **50** people "need[ed] to know" the contents of this email.  *See* Exhibit K at entry 20.  *See Marriott*, 157 Ga. App. at 505.  BAS also fails to state whether the documents or the

information they contain was turned over to regulators, and it fails to provide any information as to the contents of the attachment and the persons who created or received it.

Similarly, Goldman Sachs is withholding dozens of documents based solely on its claim that each of the documents includes "[i]nformation collected for/provide to counsel to facilitate legal advice concerning regulatory requests" *See* Exhibit N.  While Goldman attempts to use the right buzz words to make it appear that the document is privileged, it fails to provide much of the information necessary to determine whether the privilege applies.  For example, Goldman fails to state: (1) Whether the information was ever provided to a regulator? (2) Whether Goldman gathered the information pursuant to regulations irrespective of litigation? (3) What the email attachment includes and who received it, including whether it was forwarded to others in the ordinary course of business? (4) Whether the attachment includes non-privileged business information such as trading data pulled from a routine report? (5) Why all of the recipients of the email and attachment (including, in some cases, 10 or more people) "needed to know" its contents; and (6) Whether the entire "email string" includes legal advice, or are there portions of the string between non-attorneys?

Of course, to the extent that only <u>portions</u> of the withheld documents contain privileged information, the documents cannot be entirely withheld.  The document

must still be produced with the privileged portions redacted.[11]   Indeed, "if relevant facts are incorporated into an otherwise attorney-client protected document, the document still will be subject to disclosure after redaction of the privileged material." *Williams v. Sprint/United Mgmt. Co.*, 2006 WL 266599, at *7 (D. Kan. Feb. 1, 2006).   Yet, Defendants bluntly refuse to answer Plaintiffs' questions about whether the withheld documents contain only legal advice:

> Finally, you ask BAS to "confirm that the email and the attachments contain nothing but legal advice."  As this is not the standard by which privilege is judged under Georgia or any other law, there are no grounds for such a request.

*See* Exhibit R at 2 (5/18/10 Elias Letter).

## C.   Defendants' "Clawing Back" Non-Privileged Documents Confirm the Need for *In Camera* Review.

Plaintiffs' concern about Defendants hiding documents through improper privilege designations is heightened by some Defendants' efforts to claw back documents as privileged, when they clearly are not.  The Protective Order permits a party to "claw back" a document that it claims is privileged and inadvertently produced.  *See* Exhibit S (Protective Order) ¶ 21.  Some Defendants have used that "claw back" provision to require Plaintiffs to destroy documents that Plaintiffs had

---

[11] *See, e.g., Hardy v. New York News, Inc.*, 114 F.R.D. 633, 643-44 (S.D.N.Y. 1987) ("When the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected simply because legal considerations are also involved."); *F.C. Cycles Int'l v. Fila Sport, S.p.A*, 184 F.R.D. 64, 71 (D. Md. 1998); *TVT Records, Inc. v. Island Def Jam Music Group*, 214 F.R.D. 143, 146 (S.D.N.Y. 2003).

already reviewed and confirmed were not privileged, including documents that contain or reference communications with third parties such as NASD, the SEC and/or securities associations.[12]

Unfortunately, Plaintiffs are not authorized to attach as exhibits any of the improperly clawed back documents because Plaintiffs are required to destroy them under the terms of the Protective Order.  However, to prove the point, Plaintiffs ask UBS and Merrill Lynch to certify to this Court that **no portion** of **any** documents they clawed back contains: (1) information, documents or emails from third parties such as NASD, FINRA, SEC or securities associations or (2) information the Defendant at any time disclosed to such third parties.[13]  Any refusal to certify will prove the legitimacy of Plaintiffs' concerns.

---

[12] Plaintiffs had reviewed some of the "clawed back" documents prior to a Defendant claiming that they were privileged, and thus are aware of the contents of those documents from their prior review.  Plaintiffs have abided by the Protective Order, notwithstanding Defendants' improper claims of privilege.

[13] Plaintiffs are not referring to instances where an attorney provides her own mental strategies or impressions, but rather, for example, relays facts or documents obtained from or statements made by third party.  Also, in UBS's May 20, 2010 "claw back" letter, it indicated that it would re-produce some of the documents in redacted form.  Plaintiffs disagree that any redactions are appropriate and are conferring with UBS on that subject.  Regardless, UBS previously clawed back documents that contained non-privileged information.  To Plaintiffs' knowledge, UBS has not re-produced the clawed back documents in redacted form. Given Plaintiffs' inability to provide those documents to the Court for its review Plaintiffs ask UBS to certify to the Court that its prior claw back contained none of the information referenced above.

**D.     Defendants Refused to Provide The Required Information.**

Plaintiffs have tried to resolve this issue without Court intervention. Specifically, Plaintiffs proposed that that the parties jointly request that the Court appoint a Special Master solely for the purpose of analyzing the appropriateness of the parties' privilege claims.  Under Plaintiffs' proposal, all parties (including Plaintiffs) would provide the Special Master with the documents on their privilege logs to allow the Special Master to conduct an *in camera* review to determine whether the privilege was properly asserted.[14]

Plaintiffs' proposal would avoid this Court spending time and resources on motions practice, eliminate any need for the Court to review all parties documents *in camera* to evaluate privilege claims, expedite resolution of the privilege issue and ensure that **no** party is abusing the privilege designation.  For these reasons, if Defendants were comfortable with their privilege designations, they should welcome such a process, saving them and the Court time and expense.  But

---

[14] Plaintiffs proposed that Plaintiffs and Defendants have a 10 day period to agree on a Special Master, and if no agreement is reached, Plaintiffs and Defendants each submit 2 proposed Special Masters to the Court, and the Court shall select one. Then, Plaintiffs and Defendants (collectively) would submit a single brief of no more than 30 pages to the Special Master, explaining their position on any privilege issues applicable to this case.  Within 10 business days, the parties would then each submit a reply brief of no more than 15 pages.  Further, to ensure that the Special Master process does not unnecessarily assume any of this Court's time and resources, Plaintiffs proposed that the Special Master's decision be final and binding on the parties (i.e., not appealable at any time).

**Defendants have rejected Plaintiffs' proposal**, speaking volumes about the legitimacy of their privilege designations.

Rather than agree to a Special Master, Defendants insisted that the parties continue to confer. Although Plaintiffs were skeptical that continual conferrals would work, and despite Plaintiffs' concern that Defendants were using the conferral process to delay resolution of this issue, Plaintiffs continued to confer further. Thus, from April 19 through April 21, Plaintiffs sent each Defendant a detailed letter outlining numerous deficiencies in its privilege log, asking for specific information necessary to evaluate Defendants' privilege claims. *See* Exhibit T (4/19/10-4/21/10 Emails from Rosenwasser to each Defendant). For example, with respect to the documents Defendants claimed were privileged as relating to regulatory inquiries, Plaintiffs asked Defendants to answer such questions as:

> Was the substance of the communication or any information contained in the email later provided, in whole or in part, to the regulatory agency?
>
>     *    *    *    *
>
> Would your client have responded to the [regulatory] inquiry regardless of whether there was litigation was anticipated?
>
>     *    *    *    *
>
> Does any portion of the email contain non-legal advice, such as trading, locate, borrowing or lending data?

*Id.*

Despite promising to cooperate with Plaintiffs and to act in good faith, Defendants waited nearly a month and then **refused** to answer Plaintiffs' questions.  For example, Merrill Lynch wrote Plaintiffs that they are "currently unwilling to provide such information."  *See* Exhibit U at 4 (5/17/10 Eckles letter). Similarly, Banc of America Securities responded by **refusing to answer whether any of the information in the privileged document was "disclosed to the agency at any point in time."**  *See* Exhibit R at 2 (5/18/10 Elias Letter) (emphasis added).  Other Defendants have simply failed to respond.  Indeed, more than **five weeks** after sending a conferral letter, Plaintiffs have still not received a response from Defendants Bear Stearns, UBS, Goldman Sachs and Morgan Stanley.  While some of those Defendants informed Plaintiffs last week that a response would be forthcoming, it has not come.  Defendants are using the conferral process to delay.

> **E.    Defendants' Refusal to Provide the Necessary Information to Ascertain the Validity of their Privilege Claims Warrants Court Intervention or Appointment of an Agreed-Upon Special Master.**

Defendants refusal to provide Plaintiffs with the information necessary to ascertain whether the withheld documents are actually privileged, presents the Court with three options.

First, this Court can hold that Defendants have waived their claims of privilege.  "The law is well settled that failure to produce a privilege log or

production of an inadequate privilege log may be deemed waiver of the privilege." *Thelen Reid & Priest, LLP v. Marland*, 2007 WL 578989, at *10 (N.D. Cal. Feb. 21, 2007); *Burlington Northern & Santa Fe Ry. Co. v. United States Dist. Court*, 408 F.3d 1142 (9th Cir. 2005) (same); *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688 (M.D. Fla. 2005). Thus, the Court can order Defendants to produce the documents on their privilege log.

As a second option, the Court can conduct an *in camera* review of the documents that Defendants have insufficiently designated as privileged. Plaintiffs do not advocate this approach because, among other things, it would place an undue burden on this Court.

The third—and most workable—option is the Court can recommend that Defendants agree to the appointment of a Special Master who can review all of the parties' purportedly privileged documents *in camera*. Plaintiffs believe that appointing a Special Master, and permitting limited briefing on privilege as described above (*supra at* fn. 13) is the most efficient and effective way to resolve the privilege disputes. It also ensures that the parties are receiving the appropriate documents in discovery, while at the same time protecting from disclosure those documents that are truly privileged.

### III.   Motion to Address All Defendants' Violations of the Protective Order

As the Court is aware, Plaintiffs filed this pleading under seal. Plaintiffs did not do so voluntarily, but rather were forced to do so because Defendants have and continue to violate this Court's Protective Order by designating public and other non-confidential documents as "confidential" or "highly confidential." Because Defendants' improper designations frustrate the purposes of the Court's Protective Order and cause the parties and the Court needless burden and expense, Defendants should be ordered to correct their confidentiality designations.

Last summer, the parties negotiated at length over the terms of a proposed Protective Order. Initially, the Defendants requested the right to broadly designate documents as "confidential" and "highly confidential." Plaintiffs, however, were concerned that the Defendants would abuse the confidentiality designation, thereby creating an undue burden on Plaintiffs and the Court with respect to filings under seal. After much negotiation, Plaintiffs and Defendants **agreed** on terms for a Protective Order, and submitted it to the Court for submission as a Court Order. *See* Exhibit V (8/27/09 Letter to Court with Order). The Court entered that Order on April 15, 2010. *See* Exhibit S.

The Protective Order defines what constitutes a "confidential" or "highly confidential" document:

> Discovery Material may be designated as CONFIDENTIAL
> INFORMATION if it includes information that is entitled to

confidential treatment under applicable law, including, without limitation, <u>trade secrets</u>, <u>non-public financial information</u>, <u>non-public information concerning ongoing business activities</u>, <u>non-public personnel or customer related information</u>, <u>private personal information</u> or other <u>proprietary or competitively sensitive information</u> . . .

Discovery Material may be marked as HIGHLY CONFIDENTIAL if it includes information that is especially sensitive, proprietary, private, or otherwise highly confidential in nature...The HIGHLY CONFIDENTIAL designation shall only be used for Discovery Material believed in good faith to contain: (i) <u>social security numbers</u>; (ii) <u>tax-payer identification numbers</u>; (iii) <u>account identifying information</u>; (iv) <u>a party's highly confidential business strategies</u>; or (v) information that, if disclosed, could cause <u>substantial enough harm</u> to the Designating Party's business or economic interests such that it warrants protection beyond that provided by the CONFIDENTIAL INFORMATION designation.

*Id.* ¶¶ (3)(a), (4)(a) (emphasis added).

Although Defendants agreed to these definitions, and they were entered as a Court Order, the Defendants have willfully abused the confidentiality designation, designating **hundreds of thousands** of documents as confidential or highly confidential.  Although Plaintiffs cannot list the numerous improper designations, the following are representative of improper designations:[15]

---

[15] To avoid burdening this Court with an extensive amount of paper, Plaintiffs are not attaching all of these examples as exhibits to this brief.  If the Court desires to review any or all of these documents, Plaintiffs will be glad to provide them.

- Designating as "highly confidential" or "confidential" email newswires, blogs and advertisements mass mailed from third parties;[16]

- Designating news articles as "highly confidential" or "confidential";[17] and

- Designating federal and state statutes, laws and regulations as "highly confidential" or "confidential."[18]

---

[16] *See, e.g.,* DBSI-T72025; DBSI-T1038957; DBSI-T1038944; BAS TSINTL ESI 6965895; BAS TSINTL ESI 6965810; CSS TSRGA E 312108; CSS TSRGA E374486-87; CSS TSRGA E 374523; CSS TSRGA E 374529; GSE T 122-126; GSE T 70033; DBSI-T282090; BAS TSINTL ESI6981318; BAS TSINTL ESI 6981105; BAS TSINTL 6976130; BAS TSINTL ESI 6975532; ML TSINTL ESI2604906-62; UBS_TSR1173229-35; UBS_TSR1158988-95; UBS_TSR1159013-14; UBS_TSR1174117-19; UBS_TSR1171873; UBS_TSR1173913-15; UBS_TSR1173960-72; UBS_TSR1171938-46; UBS_TSR1215099-112; UBS_TSR1266778-82; UBS_TSR1255142-51; UBS_TSR1257887-88; DBSI-T282090-92; DBSI-T 1332884-87; DBSI-T1332888-92; DBSI-T1332893-96; DBSI-T1332897-900; DBSI-T1333305-08; DBSI-T1333309-11; DBSI-T1333328-31; DBSI-T874499-502; DBSI-T1388715-17; DBSI-T1389474-77; DBSI-T1391571-74; DBSI-T1391575; DBSI-T1333325-27.

[17] *See, e.g,* DBST-T1178209; DBSI-T1539358; BAS TSINTL6244898; ML TSINTL ESI 2462761-70; ML TSINTL ESI 2359126-35; ML TSINTL ESI 2470055-65; ML TSINTL ESI 2511989-98; ML TSINTL ESI 2601229-36; ML TSINTL ESI 2457983-89; ML TSINTL ESI 2388915-24; MS TASR 2821521-26; UBS_TSR1173821-31; UBS_TSR1156951-52; UBS_TSR1214960-61; CSS TSRGA E 801872; CSS TSRGA E 374486; GSE T 70112; GSE T 70236; GSE T70760-63; GSE T70813-15; GSE T70873-75; UBS_TSR1239920-22; DBSI-T1055180-87; DBSI-T1178252-55; DBSI-T1178256-57; DBSI-T1178459-63; DBSI-T1362550; DBSI-T1481334; DBSI-T281278-81; DBSI-T874499-502; DBSI-T.

[18] *See, e.g,* BAS TSINTL 6982222; BAS TSINTL ESI6981676; CSS TSRGA E 612479-514; GSE T57492-585; GSE T 1141590; GSE T 1126919.001; MS TSINTL ESI747168-203;  ML TSINTL ESI747276-311; ML TSINTL ESI748146-81; ML TSINTL ESI748183-217; ML TSINTL ESI 748219-53; ML TSINTL ESI

Plaintiffs would not complain if Defendants inadvertently designated a few newspaper articles or similar documents as confidential. But, the violations here do not involve a few random documents, but rather appear to be thousands upon thousands of documents.

The true reason that Defendants have abused the confidentiality designation is that many of the documents that they falsely claim are "confidential" contradict their own public statements about this case. For example, Defendants have **publicly** filed pleadings in this case representing that their conduct was "in full compliance with applicable federal laws and regulations" and that the conduct Plaintiffs challenge is "conduct Congress and the SEC elected to permit."[19] Defendants are now using false claims of confidentiality to hide the documents that show those representations are untrue.

For example, Defendant Banc of America Securities ("BAS") produced a 2008 FIRNA letter

REDACTED

---

748255-89; ML TSINTL ESI 748291-325; ML TSINTL ESI 748327-61; ML TSINTL ESI 748363-73; ML TSINTL ESI 2290499-533; MS TASER 2361-73; UBS_TSR1171716-67; UBS_TSR1156521; UBS_TSR1215100-12; UBS_TSR1269361-82; UBS_TSR1255270-71; DBSI-T 535417-51; DBSI 546266-58; DBSI-T 546360-400.

[19] *See, e.g,* Bear Stearns' Answer to Third Amended Complaint at 22; Defendants' Brief in Support of Motion to Dismiss Based on Federal Preemption at 4.

**REDACTED**

See Exhibit C at BASTSINTL29 (emphasis added).  This conclusion was based on FINRA's finding that

**REDACTED**

Recognizing that this document belies its public statements and is undermines its defenses, BAS designated it as confidential.  But, the letter is from FINRA (a third party), and BAS has no control over how it is disseminated.  In fact, FINRA has a written policy that it

**REDACTED**

" relating to its investigations.  See Exhibit W at ML-TASR63232.  Moreover, the Letter does not contain any account, financial or personal information.  The only reason BAS designated the document as confidential is because it is harmful to BAS's defense and, in fact, supports Plaintiffs' claims.

Merrill Lynch has also improperly designated as confidential findings from FINRA's investigation into

**REDACTED**

.  See Exhibit X.  Like BAS's letter, Merrill's FINRA findings contain no financial, account or personal information.  Instead, it contains FINRA's conclusions that:

- **REDACTED**

-

**REDACTED**

●

*Id.*  As with BAS, FINRA found that Merrill's                    **REDACTED**

          ' its obligation to          **REDACTED**                              *Id.*

There is nothing confidential about a regulator determining that Merrill broke the

law.

By violating this Court's Protective Order, Defendants are not only using the

Court process to publicly disseminate false information, they are also adversely

impacting Plaintiffs and the Court in several ways.  Among other things,

Defendants' misconduct requires Plaintiffs to file pleadings, like this one, under

seal, even though none of the documents cited herein is actually confidential.  As a

result of having to file under seal, Plaintiffs cannot utilize the electronic filing

system, meaning that the Plaintiffs have to provide the Court with duplicative hard

copy versions of their filing.  Plaintiffs do not believe the Defendants should be

able to impose this unnecessary time, expense and inconvenience upon the Court.

Further, Defendants' misconduct creates duplicative documents, creates

administrative issues relating to deposition transcripts, increases costs and makes

any future transmission of the record to the Court of Appeals substantially more difficult and expensive.[20]

Plaintiffs have conferred with Defendants repeatedly about this issue. Defendants, however, refuse to rereview their confidentiality designations. Instead, they say that Plaintiffs must contact Defendants before filing any motion and identify all of the exhibits in the motion, after which Defendants will state whether they will stand by their confidentiality designation. That process is untenable for several reasons. First, when Plaintiffs tried that process with this motion, many of the Defendants maintained their improper designations, forcing Plaintiffs to file this motion under seal. Second, Plaintiffs should not be required to provide Defendants advance notice of the motions they intend to file or the evidence they intend to submit with their motions. Third, the Court's Protective Order already governs this dispute, and the Defendants simply should not be permitted to ignore a Court Order.

---

[20] Defendants' improper confidentiality designations also run counter to the common law presumption of a right of public access to judicial records. *E.g.*, *Nixon v. Warner Communs., Inc.*, 435 U.S. 589, 597 (1978). "The mere fact that judicial records may reveal potentially embarrassing information is not in itself sufficient reason to block public access." *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 10 (1st Cir. 1998). Indeed, "secrecy eliminates one of the important checks on the integrity of the system [and] applies no differently in a civil setting. In either the civil or the criminal courtroom, secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption. . . . Openness in the courtroom discourages perjury and may result in witnesses coming forward with new information regardless of the type of the proceeding." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983).

769575.1

To avoid Defendants' continuing violations of the Protective Order, Plaintiffs request that the Court enter an Order requiring the Defendants to immediately re-review their confidentiality designations and, within thirty days, certify to the Court that it has removed all improper designations.

Because Defendants failed to comply with a Court order, Plaintiffs request that the Court order Defendants "to pay reasonable expenses, including attorney's fees, caused by Defendants' failure" to comply with this Court's order.[21] Upon the Court's request, Plaintiffs will submit an itemized record showing the expenses they incurred in conferring on this issue, as well as drafting this portion of the Motion to Compel.

---

[21] O.C.G.A. § 9-11-37(b).

Respectfully submitted this 24th day of May, 2010.

John E. Floyd
Georgia Bar No. 266413
Steven J. Rosenwasser
Georgia Bar No. 614908
Nicole G. Iannarone
Georgia Bar No. 382510
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3417
(404) 881-4100 Tel.
(404) 881-4111 Fax

James W. Christian
State Bar No. 04228700
Gary M. Jewell
State Bar No. 10664800
Scott R. Link
State Bar No. 12390900
Christian, Smith, & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas  77002
(713) 659-7617 Tel.
(713) 659-7641 Fax
(admitted pro hac vice)

**ATTORNEYS FOR PLAINTIFFS**

769575.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of May, 2010, a true and correct copy of the foregoing **PLAINTIFFS' MOTION FOR RELIEF CONCERNING DEFENDANT UBS SECURITIES' VIOLATION OF THIS COURT'S ORDER; PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS IMPROPERLY WITHHELD AS PRIVILEGED OR ALTERNATIVELY, TO APPOINT SPECIAL MASTER TO CONDUCT AN IN CAMERA REVIEW, AND PLAINTIFFS' MOTION FOR RELIEF CONCERNING DEFENDANTS' VIOLATION OF THE COURT'S PROTECTIVE ORDER** was served via hand delivery to:

> **Attorneys for Defendants:**
> Richard H. Sinkfield, Esq.
> Rogers & Hardin
> 2700 International Tower, Peachtree Center
> 229 Peachtree Street, N.E.
> Atlanta, GA  30303-1601

and via U.S. mail to:

> **Attorneys for Banc of America Securities, LLC:**
> Andrew J. Frackman, Esq.
> O'Melveny & Myers LLP
> 7 Times Square
> New York, NY  10036

769575.1

**Attorneys for Morgan Stanley & Co. Incorporated:**
Robert F. Wise, Jr., Esq.
William J. Fenrich, Esq.
Melissa T. Aoyagi, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017

**Attorneys for Bear Stearns:**
Stephen L. Ratner, Esq.
Harry Frischer, Esq.
Brian L. Friedman, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY  10036

**Attorneys for The Goldman Sachs Group, Inc.:**
Richard C. Pepperman II, Esq.
Richard H. Klapper, Esq.
Tracy Richelle High, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

**Attorneys for Deutsche Bank Securities Inc.:**
Heather L. Fesnak, Esq.
Peter J. Isajiw, Esq.
Gregory A. Markel, Esq.
Martin L. Seidel, Esq.
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY  10281

**Attorneys for UBS Securities, LLC:**
Andrew B. Clubok, Esq.
Daniel Gomez, Esq.
Jeffrey G. Landis, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC  20005-5793

769575.1

37

Maria Ginzburg, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

**Attorneys for Credit Suisse USA, Inc.:**
Fraser L. Hunter, Jr., Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY  10022

**Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc.:**
Paul M. Eckles, Esq.
Shepard Goldfein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY  10036

Richard S. Horvath, Jr., Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center
Suite 3800
San Francisco, CA  94111-4144

This 24th day of May, 2010.

Steven J. Rosenwasser
Georgia Bar No. 614908

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit B

144910.1

# FILED UNDER SEAL

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit C

144910.1

# FILED UNDER SEAL

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit D

FINANCIAL INDUSTRY REGULATORY AUTHORITY
LETTER OF ACCEPTANCE, WAIVER AND CONSENT
NO. 20080144505

TO:    Department of Enforcement
        Financial Industry Regulatory Authority ("FINRA")

RE:    Deutsche Bank Securities Inc., Respondent
        CRD#2525

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, the Respondent submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against the Respondent alleging violations based on the same factual findings described herein.

I.

ACCEPTANCE AND CONSENT

A.    The Respondent hereby accepts and consents, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

BACKGROUND

Deutsche Bank Securities Inc. ("DBSI" or the "Firm"), member NYSE, FINRA and SIPC, is a registered broker-dealer with its principal office in New York, New York, and serves as the investment banking and securities arm of Deutsche Bank AG in the United States. DBSI provides a comprehensive range of advisory, financial, securities research, and investment services to corporate and private clients. The Firm also provides investment banking services to corporate clients.

RELEVANT DISCIPLINARY HISTORY

*NYSE Arca Equities, Inc. v. Deutsche Bank Securities Inc., Equities Enforcement Dec. No. 08-AE-02, 2008 WL 4190451 (September 10, 2008)*

In a settled matter between DBSI and NYSE Arca Equities, the Firm consented to findings that it failed to comply with certain requirements of Reg SHO and NYSE

**HIGHLY CONFIDENTIAL**                    **DBSI-T001811771**

Area Equities Rules related to the Firm's proprietary short selling activity. Specifically, between January 2005 through approximately October 2006, the Firm effected an unquantified but significant number of short sales on at least five of its 19 proprietary trading desks in securities that were not on the Firm's Easy-To-Borrow List without having borrowed the securities or entered into bona-fide arrangements to borrow the securities, or having reasonable grounds to believe that the securities could be borrowed for delivery when due, and without the proper documentation of such. Further, at least two of the Firm's proprietary trading desks did not properly adhere to the independent trading unit aggregation requirements and one trader on each of these two proprietary trading desks did not correctly mark an unquantified but significant number of proprietary sell orders. As a result, certain proprietary short sales were incorrectly marked long, and some of these orders were improperly executed on downticks. The Firm also failed to adequately supervise certain traders on at least five of its proprietary trading desks and failed to maintain and enforce written supervisory procedures concerning proprietary short sales in a manner reasonably designed to achieve compliance with the relevant provisions of Reg SHO and NYSE Area Equities Rules. Also, one individual worked on the Firm's proprietary trading desks and was compensated for trading securities without being registered with NYSE Area Equities. The Firm consented to a censure and a fine of $575,000.

## OVERVIEW

Effective September 7, 2004, the SEC adopted 17 CFR Part 242 ("Reg SHO") under the Securities Exchange Act of 1934 ("Exchange Act") and designated January 3, 2005 as the commencement date for compliance. Reg SHO was, among other things, designed to control the harmful effects on market prices and the volatility caused by naked short selling. With this primary goal in mind, Reg SHO was designed to: (i) create uniform order marking requirements for sales of equity securities; (ii) reduce the number of potential failures to deliver (hereinafter referred to as a "fail" or "fail to deliver") by means of a "locate" requirement; and (iii) limit the time in which a broker-dealer can permit a fail to deliver (hereinafter referred to as a "fail" or "fail to deliver") to persist for securities on the various SRO threshold security lists ("threshold securities").[1]

As set forth below, the Firm failed at times to comply with certain requirements of Reg SHO, FINRA Rules, NASD Rules and other SEC Rules during the period covering, in whole or in part, January 3, 2005 through approximately September 30, 2009 (the "Relevant Period").

---

[1] Threshold Securities are equity securities that have an aggregate fail to deliver position for: (i) five consecutive settlement days at a registered clearing agency (*e.g.*, National Securities Clearing Corporation ("NSCC")); (ii) totaling 10,000 shares or more; and (iii) equal to at least 0.5% of the issuer's total shares outstanding.

2

HIGHLY CONFIDENTIAL

As discussed further below, in certain instances the Firm:

1) accepted short sale orders from its clients and subsequently released them for execution through its direct market access ("DMA") platform without having borrowed the securities or entered into bona-fide arrangements to borrow the securities, or having reasonable grounds to believe that the securities could be borrowed for delivery when due, and without the proper documented compliance of such;

2) marked client sell orders as "long" when it did not have the reasonable grounds to believe that these clients owned the security and would deliver it by settlement date in that the Firm did not monitor client long sales to determine whether they required borrowed shares for delivery or resulted in fails. Furthermore, the Firm effected "long" sales and used borrowed shares to make delivery and/or failed to deliver the securities on the date delivery was due;

3) had unfulfilled close-out obligations in threshold securities, failed to utilize the Archipelago Exchange threshold security list to monitor its close-out obligations, effected short sales in threshold securities while a close-out obligation was pending without borrowing the security or entering into a bona-fide arrangement to borrow the security, and did not apply the method as prescribed in Frequently Asked Question ("FAQ") 5.8[2] to close-out aged threshold fails;

4) provided inaccurate information on the Firm's blue sheet reports by erroneously reflecting position movements between related client accounts as buy and sell transactions and, in certain instances erroneously reported short sales as long sales;

5) did not monitor, effect buy-ins or file extensions for client long sale orders in non-RVP/DVP prime brokerage accounts where the Firm had not obtained possession of the securities from the client within 10 business days after the settlement date;

6) in connection with the points above, failed to implement procedures and systems reasonably designed to ensure compliance with the relevant sections of Reg SHO, the Rules of the NASD and FINRA, and other securities laws and regulations; and

7) failed to maintain accurate books and records by booking long sales to short

---

[2] To clarify the process for aging and closing-out threshold fails that had been in existence since the inception of Reg SHO, the SEC issued FAQ 5.8 on March 17, 2006 to provide further details on the accounting methodology to be utilized by a firm in aging and closing-out threshold fails. After the issuance of FAQ 5.8 on March 17, 2006, there was no basis a firm could assert for aging and closing-out its fails in threshold securities other than as set forth in FAQ 5.8.

3

accounts and failing to maintain certain trade data for orders entered by a client through the BRUT Electronic Communication Network ("ECN").

<u>FACTS AND VIOLATIVE CONDUCT</u>

I.   <u>The Firm Violated Reg SHO's Locate Requirement by Allowing Certain Client Short Sale Orders to Proceed For Execution Without Conducting Sufficient Follow-up to Ensure That a Valid Locate Had Been Previously Obtained and Documented</u>

Rule 203(b)(1) of Reg SHO states that, subject to certain exceptions, a "broker or dealer may not accept a short sale order in an equity security from another person, or effect a short sale in an equity security for its own account, unless the broker or dealer has: (i) Borrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) Reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) Documented compliance with this paragraph (b)(1)."

Reg SHO requires a broker-dealer to have reasonable grounds to believe the security can be borrowed so that it can be delivered in time for settlement before effecting a short sale in that security. Identifying a source from which to borrow such security is generally referred to as obtaining a "locate." Reg SHO requires that such locate be obtained and documented prior to effecting the short sale.

**The Firm Disabled a System That Verified Locate Information, Prior to Execution, For Client Short Sale Orders Entered Through a Direct Market Access Platform**

During the Relevant Period, the Firm provided its clients with access to the Firm's DMA platform. The DMA platform's order/execution system ("OES") was directly linked to the Firm's availability and locate system ("Locate System") through which clients made locate requests for shares of securities and received approvals. Locate approvals recorded in the Firm's Locate System were transmitted back to the client and linked to the OES.

The OES and DMA platforms were configured so that when a customer entered a short sale order through the DMA platform, the OES would perform an automated check of the Firm's Locate System. If the OES recognized a locate code previously authorized by the Firm for that particular customer and security in the Locate System (i.e., a valid locate code), OES would release the order for execution. However, if the OES did not find a valid locate code, the order would be automatically blocked (the "Automated Block").

During the Relevant Period, however, the Firm's systems sometimes experienced outages that prevented the OES from importing locate data from the Locate System. As a result, while these system outages were ongoing, client short sale

4

   DBSI-T001811774

orders placed through DMA for execution in OES were automatically rejected and could not be executed, even where the client might have previously obtained a valid locate and that locate was properly documented in the Locate System.

In response to these instances of system outages and the rejected client short sale orders, the Firm disabled the Automated Block, thereby allowing client short sale orders to automatically proceed for execution without first confirming the presence of an associated locate. The Firm's procedures required that clients obtain a locate prior to submitting a short sale order through the DMA platform. Nonetheless, by disabling the Automated Block, the Firm created the possibility that a short sale order entered through DMA could be released for execution without a valid locate having first been obtained.

The Firm disabled the Automated Block for an individual client, a number of clients, or for all of its clients, depending on the severity of the system outages on a particular day. Further, until January 2008, the Firm maintained incomplete logs of the instances in which the Automated Block was disabled, and therefore it cannot be determined how often or for how long these outages occurred. Nonetheless, based on the information contained in those logs, it is clear that between March 2006 and January 2008, the Automated Block was lifted at least several times, on average, per month. For example, during the period of 30 trading days between May 17th and June 28th, 2007, the Automated Block was disabled a total of 24 of those days for all clients and for the entire day. While the disabling of the Automated Block occurred less frequently over time, there are still occurrences, even today, when the Firm disables the Automated Block because of technological outages.

The Firm failed to conduct a meaningful post-trade date ("T+1") review to ascertain whether client short sale orders it accepted through DMA and released for execution while the Automated Block was disabled had an associated locate. While the Firm's post-trade date review improved over time, the Firm did not implement a supervisory system that required the comparison of short sale orders entered through DMA during those times with the entries in its Locate System on a T+1 basis until September 2009.

The primary function of the Automated Block was to ensure that client short sale orders entered through DMA had an associated valid locate documented in the Firm's Locate System. Nonetheless, even though the Firm was aware that this system was periodically disabled over a period of more than four years, the Firm failed to devise or implement a replacement procedure to fulfill its regulatory obligation. As a result, the Firm created the possibility that short sales could be entered and executed through DMA even if no locate had been obtained and/or documented in the Firm's Locate System.

A review of a limited sample of short sale orders revealed that some short sales entered through DMA during times that the Automated Block was disabled were,

HIGHLY CONFIDENTIAL

DBSI-T001811775

in fact, released for execution without any evidence in the Firm's Locate System that a locate had actually been obtained. Specifically, out of nine stocks reviewed for time periods ranging from four to six weeks, approximately five short sale orders (out of a total of approximately 240) were executed even though no locate was recorded in the Locate System. Given that during the Relevant Period, hundreds of thousands of short sale orders were released on a daily basis through the Firm's DMA platform, the actual number of short sale orders that were or may have been released without required locates having first been obtained is unquantified.

**The Firm's Easy-to-Borrow List Was Not Properly Constructed**

As permitted under Reg SHO, the Firm maintained a daily list of securities that were easy to borrow (the "ETB List"). If a security was on the ETB List, it was not necessary for a customer to procure a specific locate prior to the entry of a short sale in that security. Rather, the customer was not required to enter a locate code and the DMA platform interfaced with the Firm's Locate System and recognized that the security was on the Firm's ETB List.

During the period January 2005 to approximately April 2007, the Firm's procedures for the compilation of its ETB List were deficient and, as a result, in certain instances securities appeared on the ETB List even though they were hard to borrow and/or threshold securities. The Firm changed its procedures for the compilation of its ETB List in approximately April 2007, thereby eliminating the possibility that a security could wrongly appear on the ETB List due to the same deficiency.

**Summary of Rule 203(b)(1) Violations**

Based upon the foregoing conduct, the Firm violated Rule 203(b)(1) of Reg SHO during the Relevant Period by, in certain instances, accepting short sale orders from clients through its DMA platform without ensuring that a valid locate had been previously obtained. For the period January 3, 2005 to December 14, 2008, this violative conduct also constitutes a violation of NASD Conduct Rule 2110, and for the period December 15, 2008 to September 30, 2009, this violative conduct also constitutes a violation of FINRA Rule 2010, both of which require that a firm, in the conduct of its business, observe high standards of commercial honor and just and equitable principles of trade.[3]

---

[3] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules including the change of NASD Rule 2110 to FINRA Rule 2010, effective December 15, 2008.

HIGHLY CONFIDENTIAL                    DBSI-T001811776

II.   **The Firm Violated Reg SHO's Provisions Concerning Certain Long Sale Orders Accepted From its Clients**

Rule 200(g) of Reg SHO provides, in pertinent part:

> A broker or dealer must mark all sell orders of any security as "long," "short," or "short exempt."[4] (1) An order to sell shall be marked "long" only if the seller is deemed to own the security being sold pursuant to paragraphs (a) through (f) of this section and either: (i) The security to be delivered is in the physical possession or control of the broker or dealer; or (ii) it is reasonably expected that the security will be in the physical possession or control of the broker or dealer no later than the settlement of the transaction.

Rule 203(a)(1) of Reg SHO provides, in pertinent part:

> *Long sales.* (1) If a broker or dealer knows or has reasonable grounds to believe that the sale of an equity security was or will be effected pursuant to an order marked "long," such broker or dealer shall not lend or arrange for the loan of any security for delivery to the purchaser's broker after the sale, or fail to deliver a security on the date delivery is due.

Pursuant to Reg SHO Rules 200(g) and 203(a), a firm must have "reasonable grounds" to both believe that a customer who marks a sale order as "long" owns the shares of that security at the time the order is accepted and that it is reasonably expected that the customer will deliver them to the firm in time for settlement of the sale transaction. A firm may not rely exclusively on customer representations that they are selling securities "long" when they do not have the securities in their accounts at the time of sale, without taking further steps to detect whether those representations are reliable. Furthermore, Reg SHO generally prohibits a firm from settling its delivery obligations arising from such long sales by using borrowed shares.

Together, Rules 200(g) and 203(a)(1) of Reg SHO require that a firm must: (i) properly mark orders as either short or long, (ii) make reasonableness determinations as to whether any fails to deliver resulted from long sales, and (iii) refrain from utilizing borrowed shares to settle its delivery obligations arising from long sales, unless the broker or dealer knows or has been reasonably informed by the seller that the seller owns the security and will deliver it to the broker or dealer prior to the scheduled settlement of the transaction and the seller fails to make such delivery.

During the period January 3, 2005 to approximately December 2008, in those instances when clients sold a security and marked the orders as "long" but did not

---

[4] Effective October 5, 2007, broker-dealers are no longer permitted to mark sales "short exempt." Instead, all short sales must now be marked "short."

HIGHLY CONFIDENTIAL                              DBSI-T001811777

hold that security in an account at the Firm, the Firm's systems and procedures failed to ascertain whether the customer properly marked such sell orders as "long." Instead, in the specific instances when the Firm accepted sell orders marked "long" from clients who did not hold the long position at the Firm but were long elsewhere, the Firm's systems automatically booked such long sales to a short account (the "Tech Short Issue").

Thus, in instances in which the Tech Short Issue occurred, the Firm impermissibly utilized borrowed shares[5] to effect delivery on long sales in that the long sales were automatically booked to a short account. For example, during a sample month of July 2007, the Firm impermissibly utilized borrowed shares to settle approximately 2,500 long sales (out of approximately six million long sale transactions). Given that the Tech Short Issue persisted for several years, the Firm impermissibly used or may have used borrowed shares to effect delivery on an unquantified number of long sales.

The Firm resolved the Tech Short Issue with a programming adjustment beginning in late 2008 (and that issue was completely resolved in February 2009) and implemented a process by which customer representatives follow-up on a T+1 basis with each customer that executes a long sale in a security in which the customer does not hold the position at the Firm, and the long sales are monitored as part of the Firm's long-sale monitoring process.

Further, in the absence of a procedure to ascertain whether customers properly marked long sale orders, the Firm lacked the reasonable grounds required by Reg SHO in order to mark such client sell orders as "long," in violation of Rule 200(g).

Based upon the foregoing conduct, the Firm violated Rules 200(g) and 203(a)(1) of Reg SHO during the period January 3, 2005 to approximately December 2008 by failing to have the reasonable grounds in order to mark client sell orders as "long." The Firm also utilized borrowed shares for delivery and/or failed to deliver securities relating to such client long sales. This violative conduct also constitutes a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

III.    The Firm's Threshold Securities Violations

Rule 203(b)(3) of Reg SHO requires that a firm, which is a participant of a registered clearing agency, with any outstanding fail to deliver position in a threshold security of thirteen consecutive settlement days immediately close out such fail by purchasing securities of like kind and quantity. Rule 203(b)(3)(iii) further provides that during the time in which such firm has a fail to deliver

---

[5] The limited exceptions under which borrowed shares could be used to meet a net settlement obligation arising from long sales was not applicable here.

HIGHLY CONFIDENTIAL                    DBSI-T001811778

position in a threshold security for thirteen consecutive settlement days or more, such firm shall not accept a short sale order in the threshold security from another person, or effect a short sale in the threshold security in its own account, without having borrowed the security or entered into a bona-fide arrangement to borrow the security, until the firm closes out the fail to deliver by purchasing securities of like kind and quantity.

During the Relevant Period, the various self regulatory organizations ("SRO") published a daily list of the threshold securities that were listed on their markets, or for which the SRO bore the primary surveillance responsibility. Reg SHO required that a firm monitor its fails in these threshold securities that had been open for 13 consecutive settlement days ("aged" threshold fails). Further, Reg SHO required that if an aged threshold fail position was not closed out through the purchase of securities of like kind and quantity by the morning of the 14th settlement day, firms were prohibited from effecting further short sales in that security without first borrowing the security or entering into a bona-fide arrangement to borrow the security.

During the period January 3, 2005 to December 30, 2007, the Firm's system to monitor fails to deliver in threshold securities inadvertently failed to account for the threshold list provided by the Archipelago Exchange. Consequently, the Firm's fails in securities appearing on the Archipelago Exchange threshold list were not monitored for aging and close-out purposes. As a result, certain aged fails in securities on the Archipelago Exchange's threshold list were not closed out as required and/or the Firm executed short sales in these threshold securities while it had an aged threshold fail without first borrowing or arranging to borrow the securities as required.

Furthermore, during the period beginning March 18, 2006 through at least the beginning of 2007, the Firm did not apply the method as prescribed in FAQ 5.8 to close-out aged threshold fails.

Based upon the foregoing conduct, the Firm violated Rule 203(b)(3) of Reg SHO during the period January 3, 2005 to December 30, 2007 by failing to monitor its fails in threshold securities listed on the Archipelago Exchange, and consequently, the Firm failed to close out such fails as required and/or executed short sales in these securities while an aged threshold fail was pending without having first borrowed or arranged to borrow the security as required. The Firm also did not apply the method as prescribed in FAQ 5.8 to age and close-out fails in threshold securities during the period March 18, 2006 through at least the beginning of 2007. The foregoing violative conduct also constitutes a violation of NASD Conduct Rule 2110.

9

DBSI-T001811779

## IV.   Inaccurate Blue Sheet Submissions

NASD Rule 8211 requires that a firm submit certain trade data in an automated format to the regulators with certain designated information included. These submissions are called "blue sheets" and are generated by firms at the request of regulators in connection with investigations of questionable trading. It is the responsibility of firms to reasonably ensure that the information submitted to regulators via blue sheets is accurate, and the firm's reliance on a third party vendor to assist with the preparation of the firm's blue sheets does not alter the firm's duty to comply.

During the period January 3, 2005 to approximately September 2008, the Firm erroneously reported position movements between related client accounts as buy and sell transactions for blue sheet reporting purposes. Furthermore, during the period January 3, 2005 to approximately September 2008, for short sales executed in the accounts of customers with multiple prime brokers that executed at the Firm but instructed the Firm to send the position to another prime broker, the Firm failed to ensure that the short sale indicators properly flowed to Automatic Data Processing, Inc. ("ADP"), the Firm's blue sheet vendor, thereby inaccurately reporting these short sales on its blue sheet submissions as long sales.

Based upon the foregoing conduct, the Firm violated NASD Rule 8211 in making inaccurate blue sheet submissions during the period January 3, 2005 to approximately September 2008 by reporting position movements between related client accounts as buy and sell trades, and reporting short sales executed for certain clients as long sales. The foregoing violative conduct also constitutes a violation of NASD Conduct Rule 2110.

## V.   Firm Failed to Obtain Possession and Control of Securities Relating to Client Sales Marked as "Long"

Rule 15c3-3(m) of the Exchange Act provides, in pertinent part:

> *Completion of sell orders on behalf of customers.* If a broker or dealer executes a sell order of a customer (other than an order to execute a sale of securities which the seller does not own) and if for any reason whatever the broker or dealer has not obtained possession of the securities from the customer within 10 business days after the settlement date, the broker or dealer shall immediately thereafter close the transaction with the customer by purchasing securities of like kind and quantity. . .

Rule 15c3-3(m) is concerned with whether a firm obtains possession of securities in connection with long sales executed by clients who do not have a long position in the security in their account at the Firm to cover the trade. Rule 15c3-3(n) provides that a firm may make an application for an extension of time to the 10 business day period of time to buy-in a security. A firm must either buy-in such

10

DBSI-T001811780

security pursuant to Rule 15c3-3(m) or file an extension pursuant to Rule 15c3-3(n).

With respect to the aforementioned Tech Short Issue, where Firm clients held a long position in a security outside of the Firm, the Firm booked such client long sales into short accounts and failed to recognize these trades as long sales, instead perceiving them as short. Consequently, during the period January 3, 2005 to approximately December 2008, the Firm failed to monitor or manage fails on these long sale orders for Rule 15c3-3 purposes. As a result, the Firm did not immediately close out these transactions by effecting buy-in purchases in securities of like kind and quantity or filing extensions for customer long sale orders in these accounts where the Firm had not obtained possession of the securities from the customer within 10 business days after the settlement date, as required by Rule 15c3-3.

Based upon the foregoing conduct, the Firm violated Rule 15c3-3(m) and (n) during the period January 3, 2005 to approximately December 2008 in that the Firm did not monitor, effect buy-ins or file extensions for client long sale orders where the Firm had not obtained possession of the securities from the customer within 10 business days after the settlement date. This violative conduct also constitutes a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

VI.     Firm's Books and Records Violations

Under Exchange Act Rule 17a-3(a)(1), firms are required to make and keep current daily records of all receipts and disbursements of cash and all other debits and credits. NASD Rule 3110(a) requires that firms make and preserve books, accounts, records, memoranda, and correspondence in conformity with applicable laws, rules, regulations, and statements of policy promulgated thereunder, and with the Rules of the NASD, and as prescribed by Exchange Act Rule 17a-3.

As a result of the Tech Short Issue, the Firm made an inaccurate entry in its books and records each time the Firm accepted a sell order marked "long" from a client but booked such long sale to a short account during the period January 3, 2005 to approximately December 2008.

Furthermore, beginning in approximately January 3, 2005 through at least the beginning of 2007, the Firm allowed one of its institutional clients to execute trades through the BRUT ECN for direct access trading to the markets. However, the Firm failed to ensure that it maintained the required data for trades executed by this particular client through the BRUT ECN. Specifically, because the client executed trades directly to the market on a platform outside of DBSI, DBSI did not receive execution data for those trades. The Firm discovered this issue during the summer of 2006 and then sought and obtained written copies of the daily

11

executions from the client. By early 2007, the Firm disabled the client's access to the BRUT ECN so that all of the client's trades occurred within DBSI.

Based upon the foregoing conduct, the Firm violated Exchange Act Rule 17a-3 and NASD Rule 3110(a) during the period January 3, 2005 to approximately December 2008 in that it incorrectly booked customer long sale orders to short accounts when the customer did not maintain a long position at the Firm. Also, during the period January 3, 2005 to at least the beginning of 2007, the Firm failed to maintain trade data relating to a customer for whom it allowed direct market access through the BRUT ECN. This violative conduct also constitutes a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

## VII.   The Firm Failed to Reasonably Supervise

NASD Rule 3010 requires that firms establish, maintain and enforce a supervisory system, including written supervisory procedures related to a firm's business, that are reasonably designed to ensure compliance with the applicable securities laws and regulations, and with the applicable Rules of the NASD.

In light of the foregoing, the Firm failed to reasonably supervise during the Relevant Period in that it failed to establish, maintain and enforce a supervisory system, including written supervisory procedures, with respect to the requirements of Reg SHO, NASD and FINRA Rules, and SEC Rules discussed herein.

As discussed herein, the Firm experienced a systemic operational deficiency that persisted for a significant period of time: specifically, the Firm experienced outages that prevented the OES from importing locate data from the Locate System; and the Firm disabled the Automated Block in response to those outages without implementing a replacement system or having in place a meaningful post-trade review to verify the existence of a locate in connection with short sale orders entered and released through the Firm's DMA platform. As a result, the Firm failed to adequately supervise its compliance with Reg SHO's "reasonable grounds" locate requirement. Furthermore, the Firm had no written procedures for instances when the Firm experienced issues that necessitated the disabling of the Automated Block, nor did the Firm document each instance and the identities of the customers for whom the Automated Block was lifted.

The Firm failed to implement written supervisory procedures as well as an adequate system of follow-up and review in connection with its compilation of its ETB list. As a result of this supervisory deficiency, short sales in hard to borrow and/or threshold securities were executed in reliance upon inaccurate information from the ETB list.

DBSI also failed to supervise compliance with certain other aspects of Reg SHO.

HIGHLY CONFIDENTIAL                    DBSI-T001811782

Rules 200(g) and 203(a)(1) require that the Firm have a reasonable basis to believe that shares are actually owned by the customer at the time of the entry of a long sale order. In instances where the Firm accepted long sale orders from customers and the securities were not custodied at the Firm, thus implicating the Tech Short Issue, those transactions were re-characterized as short sales so that borrowed shares could be used to make delivery for those orders. Similarly, as described in detail above, the Firm failed to properly supervise its implementation of procedures relating to the close-out of aged fails in securities residing on the Archipelago Exchange threshold list.

Based upon the foregoing conduct, the Firm violated NASD Rule 3010 during the Relevant Period by failing to have an adequate supervisory system, including written supervisory procedures, to ensure reasonable compliance with Rule 15c3-3(m), Rule 17-a3, Rule 200(g), Rule 203(a)(1), Rule 203(b)(1), Rule 203(b)(3) and NASD Rules 3110 and 8211. This violative conduct also constitutes a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 during the period December 15, 2008 to September 30, 2009.

FINRA considered that, throughout the Relevant Period, DBSI undertook numerous improvements to its Reg SHO compliance systems, including information technology improvements that currently minimize the need to lift the Automated Block and improvements to the Firm's ETB process.

B.   The Respondent also consents to the imposition of the following sanctions:

A Censure and a fine of $575,000.

The Respondent agrees to pay the monetary sanction(s) upon notice that this AWC has been accepted and that such payment(s) are due and payable. The Respondent has submitted an Election of Payment form showing the method by which it proposes to pay the fine imposed.

The Respondent specifically and voluntarily waives any right to claim that it is unable to pay, now or at any time hereafter, the monetary sanction(s) imposed in this matter.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

## II.

## WAIVER OF PROCEDURAL RIGHTS

The Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

13

HIGHLY CONFIDENTIAL                         DBSI-T001811783

A.   To have a Complaint issued specifying the allegations against the Respondent;

B.   To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.   To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.   To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, the Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

The Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## III.

## OTHER MATTERS

The Respondent understands that:

A.   Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.   If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against the Respondent; and

C.   If accepted:

1.   This AWC will become part of the Respondent's permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against the Respondent;

14

HIGHLY CONFIDENTIAL
DBSI-T001811784

2.   This AWC will be made available through FINRA's public disclosure program in response to public inquiries about my disciplinary record;

3.   FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

4.   The Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. The Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects the Respondent's right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.   The Respondent may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. The Respondent understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

The undersigned, on behalf of the Firm, certifies that a person duly authorized to act on its behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that he/she has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce the Firm to submit it.

_01/12/2010_
Date (mm/dd/yyyy)

Deutsche Bank Securities, Inc.

By: _Joseph Polzitto_
[Name] JOSEPH POLZZOTTO
[Title] Managing Director

By: _Robert E Rice_
[Name] ROBERT E RICE
[Title] Managing Director

15

HIGHLY CONFIDENTIAL

DBSI-T001811785

Reviewed by:

Barry Rashkover, Esq.
Counsel for Respondent
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5850

16

HIGHLY CONFIDENTIAL

DBSI-T001811786

Accepted by FINRA:

2 - 16 · 10
_____
Date

Signed on behalf of the
Director of ODA, by delegated authority

_____
Suzanne Elovic
Chief Counsel
FINRA Department of Enforcement
14 Wall Street, 14th Floor
New York, New York 10005
Tel: (646) 315-7361
Fax: (202) 689-3416

17

HIGHLY CONFIDENTIAL

DBSI-T001811787

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit E

144910.1



**Elizabeth G. Eager**

| | |
|---|---|
| **From:** | Elizabeth G. Eager |
| **Sent:** | Wednesday, February 24, 2010 3:06 PM |
| **To:** | 'Andrew Ciubok'; 'Jeffrey Landis' |
| **Cc:** | Steven J. Rosenwasser |
| **Subject:** | TASER/ UBS Proposal |

Andy and Jeff,

It was good speaking with you this morning.  During our call, we discussed a compromise to address issues relating to: (1) UBS's claim for costs relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date; (2) Plaintiffs' request for trade runs/trade blotters; (3) Plaintiffs 30(b)(6) Notice and (4) Plaintiffs' Third Interrogatories to UBS.   Specifically, we discussed the following proposal:

Costs – UBS would agree to waive and never seek any fees, costs or expenses relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date.

Plaintiffs' Third Interrogatories – UBS would agree to answer the interrogatories as follows:

- Interrogatory Number One:  UBS will identify all dates and/or time periods of which UBS is presently aware in which the blue sheets it created, maintained and/or submitted to the SEC, whether or not they report transactions in TASER securities, contained or you have reason to believe may have contained inaccurate data. Your response would not pertain to currently unknown instances where there may have been an isolated typographical or data entry error.
- Interrogatory Number Two:  For the dates and/or time periods identified in Interrogatory # 1, UBS will identify by bates number, the blue sheets that do or may contain inaccurate data.  UBS will identify what information or data is or may be inaccurate on each blue sheet.  If UBS does not know the specific data, but knows the type of data (e.g. short interest, long position, trade time, etc.), it will provide that information.  If UBS has corrected data, UBS will identify the corrected data, including but not limited to, identifying the bates number(s) of the documents containing the corrected data.
- Interrogatory Number Three: UBS will identify all instances during the period of January 1, 2003 through May 31, 2009, in which any inquiry, investigation or adverse action concerning the inaccuracy of documents (including, but not limited to, blue sheets and order tickets) was initiated against you by a governmental entity, securities exchange or clearing company.  UBS will state whether information relating to TASER or a transaction involving TASER is on the document(s), report(s), or list(s) that were being investigated and will state the findings and result of the inquiry, investigation or adverse action such as whether UBS was cautioned, fined or sanctioned.  "Inquiry, investigation, or adverse action" includes any communication by or with a governmental entity, securities exchange, or clearing company for the purpose of conducting, participating in, or complying with a factual investigation.  The parties agree that UBS is not required to identify inquiries, investigations or adverse actions where the governmental entity, securities exchange or clearing company identified a substantive violation that did not in any way involve short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets and claimed that with regard to the substantive violation UBS's "books and records" were inaccurate.
- Interrogatory Number Four: UBS will identify each and every blue sheet that was the subject of the caution, sanction, fine, or adverse action, whether or not the blue sheet reported transactions in TASER securities.

Trade Runs/Trade Blotters – UBS will provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters it would be producing the same data that is in the blue sheets (i.e., it would cure any inaccuracies in the blue sheets).  The representation will also state that, to the best of the company's knowledge, the only other database containing information that may cure inaccuracies on the bluesheets are the stock record and order management systems, which have been produced.

30(b)(6) Notice - Plaintiffs will withdra___ __e pending the 30(b)(6) notice as to all t___ __. With respect to topic 9, UBS agrees to continue researching the issue of duplicate trades in its option blue sheets. If requested by plaintiffs, UBS agrees to provide a written, verified response regarding "UBS's ability to remove duplicate trades from the option blue sheets, including, but not limited to, any factual support for any alleged burden to remove duplicate trades." With respect to topics 10 and 14, UBS will provide a written, verified response. With respect to topic 13, UBS will send a written response that that it has accessed and searched for ESI from "the 2 decommissioned systems referenced in [its] August 26, 2009 email."

Reservation of Rights - Plaintiffs reserve the right to reopen any and all noticed topics for deposition. In the event that occurs, UBS's agreement to waive costs is void. However, the parties shall meet and confer on this issue before any waiver takes place.

Please let us know if UBS agrees with this proposal.

Liz

**Elizabeth G. Eager**

| | |
|---|---|
| **From:** | Elizabeth G. Eager |
| **Sent:** | Wednesday, February 17, 2010 4:09 PM |
| **To:** | 'Jeffrey Landis'; 'Daniel Gomez' |
| **Cc:** | Steven J. Rosenwasser |
| **Subject:** | TASER/ UBS Conferral Call Follow Up |

Jeff and Dan,

Thanks for taking the time to talk about outstanding issues with regard to UBS in the TASER case today. I am sending this email to summarize our discussion. Please let me know if this email is inaccurate in anyway.

We have included in this email the columns for the blue sheets about which we are interested. We hope that you will be able to produce a sample of UBS's trade blotter so that we can determine if it would be an adequate substitute for the blue sheets.

**BLUE SHEET INTERROGATORIES**

First we discussed what we all have been referring to as the "Blue Sheet" interrogatories. With regard to Interrogatory 1, as Steven explained, there are two categories of information that Plaintiffs are interested in (1) the identification of specific blue sheets that you know have inaccuracies and (2) any period of time when we are aware of system errors, processing errors or have other concerns about blue sheets. You raised your concern that the interrogatory is overly broad because there may be errors with specific columns of information on the blue sheets that are not relevant to the case. You asked us to get back to you with specific columns for which we would want to know if there were errors in the blue sheets.

We are interested in the following columns on the blue sheets:
(1) For columns in the blue sheets for equities: Submitting Broker Number, Opposing Broker Number, Trade Date, Quantity, Net Amount, Buy/Sell Code, Price, Exchange Code, Broker/Dealer Code, Solicited Code, Branch Office/Registered Representative Number, Short Name Field, Name and Address Line One, Name and Address Line Two, Name and Address Line Three, Name and Address Line Four, Name and Address Line Five, Name and Address Line Six, Prime Broker, Average Price Account and Depository Institution Identifier.

(2) For columns in the blues sheets for options: Submitting Broker Number, Opposing Broker Number, Trade Date, Quantity, Net Amount, Buy/Sell Code, Price, Exchange Code, Broker/Dealer Code, Solicited Code, Branch Office/Registered Representative Number, Short Name Field, Name and Address Line One, Name and Address Line Two, Name and Address Line Three, Name and Address Line Four, Name and Address Line Five, Name and Address Line Six, Prime Broker, Average Price Account, Depository Institution Identifier, Derivative Symbol, Expiration Date, Call/Put Indicator, Strike Dollar and Strike Decimal.

We considered whether we need the name and address line fields, and after review we determined that the information important to us. Thus, our proposal is that you identify by bates numbers any blue sheets *of which you are presently aware* that contain inaccurate information with regard to the columns listed above and the date periods for which you have reason to suspect that the blue sheets are inaccurate. (When we say have reason to suspect, we recognize that one can never be 100% positive that data entry is correct. We are not asking you to identify blue sheets on this basis, but instead to identify those periods when you have a suspicion of inaccuracy beyond general data entry concerns.)

Next, we discussed interrogatories 3 and 4. We indicated that these interrogatories do not apply to "routine" blue sheet requests so long as the "routine" blue sheet request did not give rise to a more detailed investigation/ inquiry. In other words, if the SEC asked UBS for blue sheets, UBS provided the blue sheets, and UBS never heard more about the issue from the SEC, then we consider the inquiry to be "routine" and not covered by the interrogatory.

**TRADE BLOTTERS AND TRADE RUNS**

We then talked about trade blotters and trade runs. You stated that you were still having trouble understanding what we meant by these terms and how they were different. Steven listed for you various UBS manuals that use the term "trade blotter" including UBS_TASER_225, 260, 297, 332, 367 and 430. We suggested that you ask the client if you can produce a sample page of a trade blotter to us so that we can determine if the trade blotter would be responsive to the request. You stated that you were happy to ask, but that you are not committing to producing a sample trade blotter at this time.

Since the phone call, we have done a little more research on this subject, and Rule 17a-3(a)(1) requires brokers and dealers to keep trade blotters.

Blotters (or other records of original entry) containing an itemized daily record of all purchases and sales of securities, all receipts and deliveries of securities (including certificate numbers), all receipts and disbursements of cash and all other debits and credits. Such records shall show the account for which each such transaction was effected, the name and amount of securities, the unit and aggregate purchase or sale price (if any), the trade date, and the name or other designation of the person from whom purchased or received or to whom sold or delivered.

Rule 17a-3(a)(1). It is our understanding that today's systems capture additional information including: trade date, settlement date, cusip, security symbol, security name, buy/sell indicator, long/short indicator, cancel indicator, exchange, broker number, branch, account number, account name, account address, transaction number, account type, price, quantity, amount, commission, manager, sales personnel id, registered representative number, registered representative name, contra broker number, contra account number, contra account name, contra account address, agency/principal indicator, blotter codes, average price indicator, solicited/unsolicited indicator, reference number and currency.

## 30B6

Finally, we discussed the 30(b)(6) notice. Steven went through the notice and indicated the following with respect to each topic:
Topics 1-5: Plaintiffs would be willing to withdraw their requests
Topic 6: Plaintiffs would be willing to take off but could raise later/ have right to reopen
Topic 7: Plaintiffs would be willing to withdraw their request
Topic 8a: Plaintiffs would be willing to take off but could raise later/ have right to reopen
Topic 8b: Plaintiffs would be willing to withdraw their request
Topic 8c: If we reach an agreement on the interrogatories/ trade runs/ trade blotter issue, Plaintiffs would be willing to withdraw this topic
Topic 8d: If we receive trade data from the affiliates we would be willing to withdraw this request
Topic 9: If this information is covered by the interrogatories, Plaintiffs would be willing to withdraw this topic
Topic 10: If this information is covered by the interrogatories, Plaintiffs would be willing to withdraw this topic

You noted that your client wants certainty that upon reaching an agreement we will not later seek discovery on the same topics. Steven said that we would be willing to add a caveat that if we raised the topics again we would include an explanation about why circumstances have changed and why we are entitled to reopen the topics.

You stated that right now you were ready to go forth with a 30(b)(6) witness on March 2 with regard to Topics 1-5, 7 and maybe 13-14. You requested that we table the deposition now and move forward with trying to resolve the blue sheet interrogatory/ trade runs/ trade blotter issues. Steven indicated that he thought we need to get a little closer to a deal before we pushed back the 30(b)(6) deposition.

Hopefully, we can resolve these issues by early next week. If you are able to produce a sample trade blotter, it could be extremely beneficial because it would allow us to determine if production of a trade blotter is an adequate substitute. With regard to the other issues Steven laid out in his agenda that we did not reach, we agreed that we would try to reconvene the call later in the week to address the topics.

Liz

**Elizabeth G. Eager**

| | |
|---|---|
| **From:** | Elizabeth G. Eager |
| **Sent:** | Friday, February 05, 2010 1:41 PM |
| **To:** | 'Jeffrey Landis' |
| **Cc:** | Steven J. Rosenwasser; 'Daniel Gomez' |
| **Subject:** | Follow up on Phone Call |

Jeff,

I am following up on our phone call earlier today to memorialize the issues we discussed on the call. Thank you for taking the time for the phone call. We continue to make good progress on the outstanding issues.

(1) We discussed Plaintiff's 30(b)(6) deposition notice for UBS. We made a proposal of topics that we would be willing to withdraw in exchange for you giving up your request for costs. Steven indicated that we would be willing to give up topics 1-5 and 7; 10, 12-15 if we received sufficient written responses on the topics; and 8-9 and 11 if we received sufficient information through our inquiries with you.

(2) We discussed the issue of inaccurate blue sheets both with regard to stocks and options. We previously informed you that the Stock Record and Order Data were not sufficient substitutes for the bluesheets because they do no contain account names. Steven provided you with additional reasons why plaintiffs believe the order data and stock records are not a sufficient substitute for the blue sheets.

Steven requested that you instead produce the P&S trade blotters and trade runs. We are going to get back to you (hopefully today) about why we need both documents and with a sample trade run.

(3) Searches for agency investigations/ inquires, searches for communications with SEC on naked short selling and production of affiliate data. You indicated that you are working on these issues.

(4) Privilege on the documents you clawed back. We discussed the nature of your privilege assertions for both documents. We asked you to look again at the documents regarding your privilege claim.

Please let me know if you have any questions, or if you disagree with this summary of the phone call.

Thanks,
Liz

1

**Elizabeth G. Eager**

| | |
|---|---|
| **From:** | Elizabeth G. Eager |
| **Sent:** | Thursday, January 21, 2010 1:37 PM |
| **To:** | 'Jeffrey Landis' |
| **Cc:** | Steven J. Rosenwasser |
| **Subject:** | TASER/ UBS Phone Call Follow Up |

Jeff,

I am following up on our phone conversation this morning. To memorialize our conversation, we discussed the following issues. (I'm going to use the numbers from my January 14, 2010 letter for the topics for consistency).

(1) We discussed the monthly Loannet data. You stated that your understanding was that the data for part of 2004 was accessible but that the data for the rest of 2004 and all of 2003, if it existed, would be either on tape backup or microfiche. We reached an agreement that if you would produce the data for 2004 that is accessible we would withdraw our request for the data for 2003 and the rest of 2004. You indicated that it was your hope to produce this data by the end of next week, but the parties are not treating that date as a firm deadline. With regard to the data for 2003 and the early part of 2004, Plaintiffs retain the right to request the data in the future and you retain the right to object to any such production.

(3,3a) We discussed whether UBS had withheld otherwise responsive documents solely because they referred to TASER options and derivatives. You indicated that to the best of your knowledge UBS did not withhold otherwise responsive, non-privileged documents solely because they referred to TASER options and derivatives (as opposed to TASER common stock). We consider this issue resolved.

(4) We discussed your search for hard-to-borrow lists that referenced TASER. You said it was your understanding that UBS did not create hard to borrow lists in 2003. You said that UBS was searching the hard to borrow lists for 2004-May 31, 2009 for responsive documents (i.e., those with TASER, TASR, or the CUSIP). You hoped to produce half of these documents by next week.

(5) You are looking into getting us samples of reports. There is nothing to discuss here until the samples are produced.

(6) We discussed blue sheets and trade runs. In my last letter, we raised the issue that the order data and daily stock records lacked account name information. You were going to look into this issue. We are going to get back to you about whether there is any information other than account name information that the order data and daily stock records are lacking that we contend make them inadequate substitutes for the blue sheets.

(7) We discussed the issue of duplicate entries on the option blue sheets. Steven expressed our concern that we could not be sure whether entries represented different trades or were duplicates. You stated that you thought this was how UBS gave the information to the regulators but that you would look further into this issue and possible fixes.

(8-9) We combined issues 8 and 9. Issue 8 as previously raised is no longer at issue.

The issue is whether you will produce trading data for three affiliates: Paine Webber, UBS Financial Services, and UBS AG Stamford Branch. We explained why we thought that a request for data from these entities was included in our document requests.

Steven explained that we had requested trading data regarding affiliates from five other defendants and that those defendants had either agreed to provide the trading data or provided a certification that the affiliate did not trade TASER. We are making the same request of UBS that it either provide us trading data or a certification with regard to the three entities listed above.

1

For your reference, here are the representations that we have received:
BAS provided us a representation regarding two entities;
Credit Suisse provided us a representation regarding two entities;
DBSI has provided us a conditional representation regarding two entities although it is continuing to research the issue. (On the phone we told you that DBSI had provided representations. I reviewed the stipulation we entered with DBSI and wanted to be clear that the representation at this point is conditional as they continue to research the issue. The conditional representation is paragraph 5 of the stipulation that was filed with the Court on or around 1/10/10.); Merrill has agreed to provide data for two entities and has provided us a representation for another entity; and Goldman Sachs has agreed to provide data for one entity and they are considering our request for data from another entity.
We have no made requests for data from related entities to Bear Stearns or Morgan Stanley.

For your reference, here is an example of a representation we received from another defendant "[Defendant] certifies that [entity] engaged in no transactions involving TASER stock, TASER options or TASER derivatives during the relevant time period.

You are going to consider our request.

(10, 11 and 14)  These are requests for data codes that we have made.  You stated that you are working on these issues.

(16) You explained that because "Fail on Sale Committee" was an ad hoc committee for which the members regularly changed our suggestion that you check whether a committee member was a custodian for the entire time period is not feasible.  You are looking into whether there were other less burdensome ways to verify that we have received all responsive copies of the Fail on Sale reports.

(17) Matt Kiernan.  You agreed to the time period suggested in my January 14 email (April 1, 2006 through May 31, 2009).  This issue is resolved.

Steven also raised three other issues on the phone call that were not the subject of our conferral letters.

(A) Our request for communications regarding responses to inquiries and investigations made by the SEC, FINRA, and other SROs.  Plaintiffs take the position that this request is included in Request 5 in the Second Set of Requests for Production and Request 25 in the First Set.

Steven explained that our main concern is that to be sure that the custodian list includes the individuals who would have been involved in responding to these inquiries/ investigations.  He explained that to the extent there are custodians that have not already been identified we would ask that you search their email boxes for responsive documents from the day before the first communication was received regarding the inquiry or investigation through seven days after the inquiry closed.  (To the extent that there is no communication "closing" an inquiry, the end date would be seven days after the last communication.)  We would request that you use TASER, TASR and the CUSIP as the keywords when searching for responsive documents.  To the extent your custodian list already includes these individuals, there would be nothing further for you to do as you already would have searched their ESI using these keywords.

(B) We discussed Bloombergs.  You explained that for the 2 individuals who used Bloombergs in the first group of custodians, you produced their responsive Bloombergs (to the extent there were any) on 1/15 or will produce them in today's production.

(C) We discussed TASER-related documents.  You stated that UBS's production should be complete with today's production except to the extent you produce documents while doing the privilege review.

(D) We discussed production of applic___ n documents.  You explained that UBS c___ ut run keyword searches on application data.  Plaintiffs offered to treat applications documents like we have the traders emails. In other words, we are willing to withdraw our request for application documents now but we reserve the right to request application documents later in the production.  We hope that to the extent we request application data we would narrow it to specific custodians for a specific time period.  You would have the right to object to any future request from plaintiffs for applications, and you are in no way consenting that plaintiffs have a right to any application data, etc.

(E) We raised the issue of the 30(b)(6) deposition and that we still need a date and a place for the deposition from you.

If my summary above is inaccurate in anyway, please let me know.

Thanks,
Liz

**BONDURANT, MIXSON & ELMORE, LLP**
ATTORNEYS AT LAW
3900 ONE ATLANTIC CENTER
1201 WEST PEACHTREE STREET, N.W.
**ATLANTA, GEORGIA 30309-3417**
(404) 881-4100
TELECOPIER (404) 881-4111

ELIZABETH G. EAGER

Writer's Direct Dial
(404) 881-4186
eager@bmelaw.com

January 14, 2010

**VIA EMAIL**

Jeffrey Landis, Esq.
Kirkland & Ellis
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
jlandis@kirkland.com

Re:   *Taser International, Inc., et al. v. Morgan Stanley & Co., et al.,*
      in the State Court of Fulton County, State of Georgia,
      Case No. 2008-EV-004739-B

Dear Jeff:

Thank you for responding to my December 13, 2009 email. We are making progress on resolving the outstanding issues related to UBS's production. With the goal of resolving the remaining issues, I respond to your January 7, 2010 email. For the sake of clarity, I will continue to use numbers that we have been using for each of these issues.

(1)   You state that we reached an agreement that UBS would only produce Loannet reports from May 2005 forward on June 24, 2009. I have reviewed emails from around that date and cannot find reference to such an agreement.[1] Moreover, Attachment A to the Scheduling Order, which was submitted on June 24, 2009, contemplated UBS producing Loannet monthly reports from January 1, 2003 forward.[2] If you have correspondence showing an agreement to limit production of Loannet reports, please provide a copy of it.

You note that SEC regulations only require UBS to preserve this data for three years. Leaving aside the question of what the regulations require, does UBS have Loannet data for the period prior to May 1, 2005?

(3)   Thank you for looking into whether UBS has manuals that specifically address derivatives. You are correct that Attachment A does not explicitly address the production of information regarding derivatives. However, since then defendants have agreed to produce data on options, and we have operated as if Attachment A covered options.

---

[1] The emails are attached hereto as Exhibit A.

[2] *See* Attachment A at 11.

728188.1

BONDURANT, MIXSON & ⌐⌐LMORE, LLP

Jeffrey Landis, Esq.
Page Two
January 14, 2010

(3a)   To raise a new (but related) issue, can you confirm that UBS has produced data regarding TASER options and derivatives?  Can you also confirm that in your production of TASER-related documents you have not labeled otherwise responsive documents as non-responsive solely because the documents refer to TASER options or derivatives (as opposed to TASER common stock)?

(4)   The issues we raised regarding the impossible to borrow lists are resolved. When you provide an update or produce documents regarding the hard-to-borrow lists, please let us know for what time period you searched these lists.  If you do not search the entire time period at issue in this case, please let us know what time period(s) you did not search and why you did not search the period(s).

(5)   Thank you for looking into the "short interest" and "executed buy-in" reports.

(6)   You have proposed the order data and daily stock records as adequate substitutes to the blue sheets.  But, these reports do not contain the same information as the blue sheets. Blue sheets list the parties involved in a trade.  Neither the order data reports nor the daily stock record, considered individually or collectively, contains this information.  Accordingly, we request you produce the trade runs.  If you disagree, please provide an explanation of how we are supposed to discern the account name for each and every executed trade based on the data that you have produced.

(7)   Your response lays out a detailed history of the parties' discussion regarding UBS's options blue sheets.  Leaving aside a debate of who said what when, you concede that Plaintiffs *at the latest* asked UBS whether it could remove duplicate trades from the blue sheets on November 13, 2009.  Two months have passed since then.  Has UBS found a "reasonably practicable" way to remove the duplicate trades?  If so, what is that method?  If not, is UBS still looking for a way to remove the trades?  If UBS is still searching for a method, how long does UBS intend to continue to search?  Will UBS produce its trade blotters instead?

(8)   You stated that so long as Plaintiffs raise the issue in good faith you would attempt to answer whether any particular entity is a UBS Securities, LLC "affiliate."  Is Paine Webber a UBS Securities LLC "affiliate?"  (Given that plaintiffs are only asking about one entity, there should be no issue about whether plaintiffs are asking this question in good faith.)

(9)   In response to Plaintiffs' request for trading data from UBS Financial Services and UBS AG Stamford Branch,[3] you first lay a characterization of the parties discussions.

---

[3] In my last letter I mentioned UBS Securities in the context of this issue.  That was my error.  As we are all aware, UBS Securities, LLC is the entity that is the defendant in this case. We have raised our issues with UBS Securities, LLC's data production in other parts of this

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Three
January 14, 2010

Regardless of whether your characterization is correct—and plaintiffs in no way concede that it is—plaintiffs are entitled to trading data from UBS Financial Services and UBS AG Stamford Branch. You ask us to identify in which document request we ask for such data and case law that would require you to produce the data. I am happy to do so.

Our first document requests clearly seek documents from UBS Financial Services and UBS AG Stamford Branch. We defined the term UBS to include affiliates, like these two entities. According to the instructions for the document requests, the requests apply to "UBS Securities LLC, . . . [and] any of [its] parents, subsidiaries, divisions, **affiliates**, predecessors, assigns, or successors . . . ." *See* Plaintiffs' First Requests for Production of Documents to Each Defendant at 2 (emphasis added). Plaintiffs seek five categories of trading data from these entities, each of which is requested in Plaintiffs First Requests for Production.

- Daily Trade Blotters;[4]
- Blue Sheets;[5]
- Daily/ weekly stock positions;[6]
- Loan/borrow records;[7] and
- Listed OTC and derivatives.[8]

---

letter. As it specifically pertains to issue 9, there is no issue regarding UBS Securities, LLC. The issue solely concerns UBS Financial Services and UBS AG Stamford Branch.

[4] *See* Plaintiffs' First Requests for Production of Documents to Each Defendant at 7 ("All Blotters (or other records of original entry) showing itemized daily record of purchase and sales of TASER securities . . . .").

[5] While the document requests do not request blues sheet by name, the document requests seek the information that is contained in the blue sheets, including the date, price, transaction size and list of parties involved. *See, e.g., id.* at 8-9.

[6] These documents are sought in a number of Plaintiffs' document requests. *See, e.g., id.* at 7-10.

[7] *See id.* at 10 ("All ledger accounts (or other records) reflecting TASER securities borrowed and TASER securities loaned. *See* 17 C.F.R. 240.17a-3(a)(4)(iii).").

[8] *See id.* at 11-12 ("A record of all puts, calls, spreads, straddlers and other options relating to TASER securities in which a defendant has any direct or indirect interest or which a defendant has granted or guaranteed. . . . A record of all eligible OTC derivative instruments (as defined in Rule 3b-13), relating to TASER securities, in which the OTC derivatives dealer has any direct or indirect interest or which it has written or guaranteed.").

728188.1

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Four
January 14, 2010

Indeed, UBS itself has produced most – if not all – of this data for its own trades pursuant to Attachment A of the Scheduling Order. Your production of this data undercuts any argument that you could make that it is not relevant. However, if you have specific objections to producing any of these documents, please let us know what those objections are.

Because the trading data from UBS Financial Services and UBS AG Stamford Branch are in the possession, custody or control of UBS Securities, LLC, you must produce the documents.[9] Courts have held that a party has possession, custody or control of its affiliate's documents even when the affiliate maintains physical custody of the documents. *See Steele Software Sys., Corp. v. Dataquick Information Sys., Inc.*, 237 F.R.D. 561 (D. Md. 2006). "'Control' has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought on demand." *Id.* (internal quotation marks and citations omitted).

Ultimately, we will be successful in showing that because of the relationships between UBS Securities, LLC and UBS Financial Services and between UBS Securities, LLC, and UBS AG Stamford Branch documents in the physical custody of either affiliate are in UBS Securities, LLC's possession, custody and control. If you wish to press this issue, we will serve discovery on the relationships between UBS Securities, LLC and each of the entities. But, in the interest of resolving discovery disputes and to spare you client extra expense, we ask you voluntarily produce the trading data for each of the affiliates.

(10)     Thank you for your confirmations on account types 1, 2 and 5 and looking into the meaning of types 8 and 9. We would appreciate a confirmation about types 8 and 9 as soon as possible because it effects our ability to read and understand the data and because we first raised the issue in October.

(11)     As with issue 10, we appreciate you looking into the meaning of the codes for the PRC/ENTRY field. And again, we would like to resolve this issue quickly because we need the information to read and understand the data and because it has been outstanding for several months.

(12)     Thank you. This issue is resolved.

(13)     Thank you for highlighting where you previously addressed this issue. This issue is resolved.

(14)     Thank you for looking into the issue of whether UBS actually uses the "Suggested" branch numbers in the Broadridge Financial Solutions, Inc. manual. (UBS_TASR_1559).

---

[9]  *See* O.C.G.A. § 9-11-34(a)(I).

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Five
January 14, 2010

In an October 20, 2009 email, Steven asked you to identify accounts and prefixes for twelve specific types of accounts. We have again reviewed the chart of accounts and request the following information:

- Provide the account number for wash accounts;
- For average price accounts, provide the account numbers (the chart show that the accounts are in the 000 and 001 branches but we also need the account numbers);
- For firm stock/loan borrow/fail to deliver/receive accounts, verify that 098 5000 and 6000 range is used for borrows and that 000-00003-07 is used for clearing fails. To the extent, you have only supplied the 098 branch number, provide exact account numbers;
- For CNS stock/loan/borrow/fail/fail to deliver/receive accounts, verify that the account number is 098-"broker number;"
- For segregated securities, verify that 000 is the branch number and provide the exact account number; and
- For firm accounts and proprietary/market-making accounts, provide the account numbers.

We no longer need more information regarding institutional, individual customer and hedge fund accounts.

(16)    To the extent that you want to prioritize the production of TASER ESI before verifying you have produced all "Fail on Sale" reports, we agree. However, we will not agree to identify what Fail on Sale Reports you have failed to produce. Your request turns discovery obligations on its head. Even if we identify months for which no "Fail on Sale" report is produced, we have no way of knowing if that report was not produced because it was nonresponsive. Even if Plaintiffs identified every missing "Fail on Sale" reports, you would still need to verify whether each report is responsive.

There is a solution that would be less burdensome for both of us. According to the UBS manuals, the Fail on Sale Committee reviewed the report, and it appears that the report was widely circulated via email.[10] If you could verify that at least one custodian received the Fail on Sale report via email for the entire time period, we would be satisfied.[11]

---

[10] *See* UBS-TASER1 (discussing Fail on Sale Committee and monthly report); UBS_TSR42348 (distributing monthly fail on sale report to over fifty individuals).

[11] We would of course reserve the right to question why the Fail on Sale report for any month was not produced.

728188.1

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Six
January 14, 2010

(17)    Because we have only limited information on Mr. Kiernan at this point, we cannot identify with certainty the period during which he should be designated as a custodian. UBS, as Mr. Kiernan's employer, is in a better position to identify the period for which he should be identified as a custodian. However, in an effort to resolve this issue, we request that you identify him as a custodian for at least the period from April 1, 2006 through May 31, 2009. To identify whether a longer time period is appropriate, please let us know when Mr. Kiernan was first employed at UBS. If you believe that Mr. Kiernan should not be designated as a custodian for the entire period when he was employed at UBS, please let us know the basis for your position.

I look forward to hearing from you and please do not hesitate to contact me if you have any questions.

Very truly yours,

*Elizabeth G. Eager*

Elizabeth G. Eager

EGE:jmt

Enclosure

cc:    John E. Floyd, Esq.
       Steven J. Rosenwasser, Esq.
       Nicole G. Iannarone, Esq.

728188.1

# EXHIBIT   A

138129.1

**Elizabeth G. Eager**

| | |
|---|---|
| **From:** | Steven J. Rosenwasser |
| **Sent:** | Thursday, June 25, 2009 3:10 PM |
| **To:** | 'Andrew Clubok' |
| **Cc:** | Alison Prout; 'Daniel Gomez'; Nicole G. Iannarone; Steven J. Rosenwasser |
| **Subject:** | Conferral (UBS) |

Andrew,

Following up on my email of earlier today, I thought it useful to give you an outline of the issues remaining with respect to request numbers 1 through 15. The remaining issues are as follows:

1.      In general statement number 1, plaintiffs indicate our position that we are entitled to at least a single run/report of responsive information from each database/system. We want to discuss whether you are producing such information and, if not, confer on the issue.

2.      General statement number 2 expressly contemplates conferral to make sure we are obtaining the correct information.

3.      General statement number 6 - we want to discuss whether you have any informtion held by third party vendors and, if so, whether you are obtaining and producing it.

4.      General statement number 7- we need to know your position on account identifying information.

5.      Request numbers 1, 4, 9 and 11 - we would like clarity on what you are producing, including whether we are obtaining information from each database/system (see point 1 above). We also want to discuss Holder's files and weekly stock position reports (in particular, whether you have them, what they contain and whether you are producing them).

6.      Request numbers 2, 3 and 5 - we wanted to confer regarding the limited time frame you have agreed to produce responsive information for; we believe we are entitled to information back to 1/1/2003.

8.      Request numbers 6 and 15 - same as requests 1, 4, 9 and 11. In addition, we would like to discuss the bookkeeping journals and batch recap reports. Specifically, what documents you have, what they contain and what you will produce.

9.      Request number 7- we want to discuss what LoanNet information you possess and will agree to produce.

10.      Request number 10 - same as requests 1, 4, 9 and 11. In addition, we would like to discuss the Cage III overnight reports and aged fail reports. Specifically, what documents you have, what they contain and what you will produce.

11.      Request numbers 12 and 13 - we need to discuss what information regarding derivatives you will produce.

Please let me know if I can provide any additional information.

Steven

**From:** Andrew Clubok [mailto:aclubok@kirkland.com]
**Sent:** Wednesday, June 24, 2009 3:47 PM
**To:** Steven J. Rosenwasser
**Cc:** Wise, Bob; RSinkfield@rh-law.com; Daniel Gomez
**Subject:** Re: taser discovery requests

Steve:

It was nice to speak with you. As we discussed, I'm emailing to confirm what we will put in Attachment A, Request 7, with respect to UBS:

Responsive Data or Information concerning securities lending and borrowing from January 1, 2003 through May 31, 2009, contained in the Loanet Monthly Security History reports, to the extent such data is currently readily accessible. To the extent any such data is not readily accessible, the parties will meet and confer.

I think that's the language we agreed upon, please just confirm.

Thanks,

Andy Clubok

*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************************

**Elizabeth G. Eager**

| | |
|---|---|
| **From:** | Daniel Gomez [dgomez@kirkland.com] |
| **Sent:** | Thursday, July 02, 2009 5:51 PM |
| **To:** | Steven J. Rosenwasser |
| **Cc:** | Andrew Clubok; Nicole G. Iannarone; Steven J. Rosenwasser |
| **Subject:** | Re: UBS Conferral Follow Up |

Steven,

It was nice speaking with you as well. We mostly agree with what you stated below, with a few minor clarifications. Instead of responding, we made edits in track changes format so you could see exactly what we thought needed to be clarified. We hope that this is useful.

Thanks,
Dan

Daniel Gomez *
KIRKLAND & ELLIS LLP
655 15th Street, N.W. ▪ Washington, D.C. 20005
Tel (202) 879-5958 ▪ Dir Fax (202) 654-9439
dgomez@kirkland.com

* Admitted only in PA and practice is supervised by principals of the firm.

---

| | |
|---|---|
| "Steven J. Rosenwasser" <rosenwasser@bmelaw.com> | To "Andrew Clubok" <aclubok@kirkland.com>, "Daniel Gomez" <dgomez@kirkland.com> |
| | cc "Nicole G. Iannarone" <iannarone@bmelaw.com>, "Steven J. Rosenwasser" |
| 07/02/2009 01:47 PM | <rosenwasser@bmelaw.com> |
| | Subject UBS Conferral Follow Up |

Andrew and Daniel,

It was good speaking with you today regarding UBS's responses to our first requests for production. In order to ensure that there is no miscommunication between the parties, I am writing to confirm our conversation. During the call, we discussed the following:

1.      With respect to General Statements Nos. 1 and 2 of Attachment 1, you indicated that UBS will produce Blue Sheets from ADP/Broadridge, as well as daily stock reports. I asked whether UBS maintained any internal databases containing the information on the blue sheets (e.g., database from which the company internally creates trade runs or reports regarding trading, borrowing or loaning of Taser stock, either long or short), and you indicated that you needed to research the issue and get back to me. I also asked that you please send me a sample of any additional reports/runs you discover so we can determine whether we would like UBS to produce them. You indicated that, in concept, you were amenable to the idea. We agreed that when you had more information we would confer on the issue again.

2.      With respect to General Statement No. 6, you indicated that the only third-party vendors UBS uses that has relevant information are ADP and LoanNet. You agreed to produce information from both sources (though noting that the LoanNet information you are providing come from the company's own files). You also asked that we agree to pay the approximately $7,000 ADP is charging ~~you~~ for ~~blue sheets~~ the daily stock record. I indicated that we disagreed that we were responsible for those costs,

1

but would re-examine our position and let you know if it changes.  Needless to say, it is expected that this will be resolved prior to production.

3.      With respect to General Statement No. 7, you indicated that UBS's tentative position is to produce account identifying information subject to our agreement to keep it confidential.  Please let us know when you have a final position.

4.      With respect to Request Nos. 1, 4, 9 and 11 of our First Requests for Production, we discussed the same issues as set forth with respect to General Statements Nos. 1 and 2.  I also inquired as to whether UBS has weekly stock position reports and, if so, whether they differ in any way (other than the dates) from the daily reports.  You indicated that you are looking into that issue and will provide the answer when obtained, and would be willing to provide us a copy of a sample ~~monthly~~weekly report.

6.      With respect to Request Nos. 2, 3 and 5, we asked for order ticket information back to January 1, 2003.  You indicated that at some point UBS changed order management systems, and that while the information stored on the current system is accessible, information from the prior systems may not be.  I asked that you please let us know: (a) when UBS switched to the current system and (b) what systems existed prior to the current one, how accessible the information is on the prior systems and, if you contend that a system is inaccessible, to please provide facts supporting for that contention.  I also noted that the order tickets were particularly important to double check the accuracy of the blue sheets.  You indicated that UBS would look into the systems and storage information ~~and get back to us on our next call.~~

7.      With respect to Request Nos. 6 and 15, you indicated that UBS was still looking into whether it has batch recap reports, and asked us to send you a sample report if we had one along with any other information we may have that would help UBS identify this report.  We agreed.

8.      With respect to Request No. 7, you indicated that UBS will produce monthly LoanNet information, and we asked that UBS produce daily LoanNet information.  You indicated that you would research whether daily information exists and, if so, how difficult it would be to obtain.  You stated that if it was not difficult to obtain, you would produce it.  You also stated that you will provide us with a sample of both the monthly and dailys.

9.      With respect to Request No. 10, you indicated that UBS was still looking into whether it has Cage III overnight reports, and asked us to send you a sample report if we had one.  We agreed.  While we are looking for a sample, I thought it worthwhile to clarify that Cage III reports are the
start of the day reports that show all overnight DTCC automated clearing activity and show the start of day DTCC positions.  We also asked that you please produce aged fail reports.  You indicated that you will investigate what aged fail reports UBS has, and will send us a sample of each, if it can be done without unreasonable burden, so we can determine which reports we would like you to produce.

10.     With respect to Request Nos. 12 and 13, we asked for derivative information.  You indicated that you were looking into whether ADP could produce blue sheet or similar information on listed options.  We then asked whether UBS maintained internal information on listed options, and you indicated that you would investigate that issue.  With respect to OTC derivatives, I asked that you please investigate whether UBS has ever created or traded OTC derivatives Taser.  You agreed, and asked that we conduct a similar investigation, and I promised to let you know if anybody on our team becomes aware of any specific OTC derivatives that were created or traded.  I have spoken with our team and have been informed that because OTC derivatives are private transactions, any information as to their use and terms would be in your possession.

11.     With respect to a litigation hold, you indicated that UBS has had one in place relating to short sales since before the lawsuit was filed.

12.     We discussed e-discovery very generally and set up a call for July 16 at 11am to discuss requests 16-54.  Upon our request, you stated that you would gain some more understanding of UBS's data systems so we can discuss electronic discovery more concretely during our call on July 16.

13.     We discussed and agreed that this meet and confer would not be considered a Rule 6.4 meet and confer for the purposes of requests 16-54.

Please let me know if any of the above is incorrect.

Thank you again for your cooperation, and have a great holiday weekend.

Steven

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**BONDURANT, MIXSON & ELMORE, LLP**
ATTORNEYS AT LAW
3900 ONE ATLANTIC CENTER
1201 WEST PEACHTREE STREET, N.W.
**ATLANTA, GEORGIA 30309-3417**
(404) 881-4100
TELECOPIER (404) 881-4111

ELIZABETH G. EAGER

Writer's Direct Dial
(404) 881-4186
eager@bmelaw.com

December 16, 2009

**VIA E-MAIL & U.S. MAIL**

Jeffrey Landis, Esq.
Kirkland & Ellis
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
jlandis@kirkland.com

Re:    *Taser International, Inc., et al. v. Morgan Stanley & Co., et al.,*
       in the State Court of Fulton County, State of Georgia, Case
       No. 2008-EV-004739-B

Dear Jeff:

      This letter is in response to your December 11, 2009 e-mail.  As you did, I will
generally respond to the issues in the order that you raised them in your letter.  As you can see,
I have numbered each topic.  When we refer to these issues in the future, please refer to the
issue number as well as the topic.

      I am going to take one issue out of order, however.   We need to have a phone call to
discuss our request for documents showing executed buy-ins and short interest reports.  You
said you are available the week of December 21, 2009.  We propose a call at 10:00 a.m. on
December 21, 2009, and we will call you.  Please confirm that you are available on that date.
As we have told you before, we are ready, willing and able to discuss all of the issues whenever
you are.  If you are prepared, we can discuss the other issues in this letter as well.

      (1)      In your letter you stated that the parties reached an oral agreement that UBS
would only produce Loannet reports from May 2005 forward.  We have been unable to find a
record of this conversation or agreement.  Can you please let us know the date of the
conversation when we reached the agreement and why UBS is unable to produce Loannet
reports from before May 2005?

      (2)      Thank you for your confirmation that the T&N report was not used prior to
January 1, 2005.  We have no further questions about this report at this time.

      (3)      Regarding compliance manuals, our review reveals that the compliance manuals
you produced do not address derivatives.  By way of example, a search for the term
"derivative" in the database of documents produced by UBS resulted in only one "hit" from a

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Two
December 16, 2009

compliance manual. Does UBS have a separate manual that address trading of derivatives, options and futures? If UBS does, we respectfully request that you produce such manual(s). To the extent UBS has objected to producing manuals regarding trading of derivatives, options or futures, UBS's objection is not well taken. UBS's procedures regarding derivatives are directly related to Plaintiffs' allegations that Defendants, including UBS, "enter[ed] into fictitious option contracts to conceal naked short sales."[1] Moreover, UBS agreed to produce information regarding derivatives as set forth in Attachment A to the Scheduling Order.

(4)      You stated that there are "no impossible to borrow lists containing TASER beyond what UBS has already produced." Your position on this issue has changed since our last correspondence, and I want to make sure I understand it. In your November 13, 2009 e-mail, you stated that "data for the first six months of 2009, along with the data from 2003 and 2004 and the data on the Hard to Borrow Lists are stored on magnetic tapes" and that UBS was in process of restoring the tapes. Please confirm that the data for the 2003, 2004 and 2009 Impossible to Borrow lists was (1) restored, (2) reviewed and (3) the review revealed that TASER did not appear on any Impossible to Borrow lists for 2003, 2004 and 2009. From your November 13, 2009 e-mail, it also appears that UBS maintains a separate "Hard to Borrow" list. Is this understanding accurate? Have you searched all Hard to Borrow lists for the entire time period for references to TASER? Have you produced all Hard to Borrow lists for the entire time period that reference TASER? If you have not searched the Hard to Borrow lists or have not produced all TASER documents, when can we expect the documents?

(5)      For dates when we are available to discuss buy-ins and short interest reports see the second paragraph of this letter.

(6)      Please produce trade run data. We have, of course, reviewed the data you produced regarding the daily stock record and order data. Because the records are incomplete and do not contain all of the data in the trade runs, they are inadequate substitutes, which is why we have requested the trade runs.

To illustrate my point I am going to use UBS_TASER_967[2] to explain why the order data produced is incomplete. The spreadsheet is 149 columns wide, and approximately 65 of the columns are unpopulated. The spreadsheet contains 58,382 lines of data, reflecting 13,536 trades that appear to be executed orders based on the column "Order Event Type Code" filtered for "EX."

---

[1] Sixth Amended Complaint ¶ 8.

[2] We selected this spreadsheet simply because it is the first one produced.

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Three
December 16, 2009

| Category of Information | Column in Spreadsheet | Number of Executed Trades for Which Column is Populated | Percentage of Executed Trades for Which Column is Populated |
|---|---|---|---|
| Account Number | S | 0 | 0% |
| Account Name | CP | 0 | 0% |
| Commission | AL | 0 | 0% |
| Contrabroker | BT | 295 | 2.18% |
| MPID | CO | 7381 | 54.5% |

As you can see, important information is missing from the order data. The stock record data only shows us trades that are settling at UBS, and we know that there are trades that would appear on UBS's trade runs that did not settle at UBS. This would occur if, for example, UBS executed a trade for a hedge fund that was priming elsewhere. Because of the omissions from the order data and the limited scope of the stock record, we need the trade runs.

(7)     We have asked you whether you can remove duplicate trades from the option bluesheets. You admit the bluesheets contain duplicate entries and are looking into this issue of whether it is "reasonably practicable" to remove the duplicate entries. Steven first raised this issue in September 2009. Right now, it is impossible for us to tell whether one trade was listed multiple times or whether multiple identical trades have each been listed once. Nearly three months has passed and you still do not have an answer to this question. We need this information to determine what data should actually be included in the options bluesheets. If you cannot find a "reasonably practicable" way to remove the duplicate entries, we request that you produce the trade blotters.

(8)     We have asked whether the trade data for January, May, June and July 2003 includes trades in TASER by affiliates of UBS. Your response is that this data includes affiliates to the extent the affiliate was a client of UBS Securities, LLC. We interpret your answer to mean that the trade data does not include all trades for all affiliates. Please tell us if this interpretation is incorrect and identify the affiliates and other business entities for whom we have trading data.

The following issues that Steven raised in earlier e-mails still remain open.

(9)     Related to the issue of trade data for affiliates of UBS, you have not responded to our inquiries about whether you will produce trading data for Financial Services, UBS AG Stamford Branch and UBS Securities. As you may recall, we have raised this issue in e-mails on November 13, 2009, November 30, 2009 and December 7, 2009.

721067.1                                    3

**BONDURANT, MIXSON & ELMORE, LLP**

Jeffrey Landis, Esq.
Page Four
December 16, 2009

(10)   You never responded to Steven's question (#2) in his October 21, 2009 e-mail that asked you to confirm that type 1=cash; 2=margin; 5=short and 8,9= fail to deliver. Please provide an answer.

(11)   You have not responded to Steven's question (#10) in the same e-mail asking about what the various codes in the stock record are in "PRC/ENTRY." We have reviewed the manual that you produced on the "Daily Stock Record," and it does not address this issue. Please provide an answer.

(12)   You also have not responded to Steven's question (#12) in the same e-mail asking about the data format in the price and net amount columns of the bluesheets. We have reviewed the data dictionary for the bluesheets, and it does not address this issue. Please provide an answer.

(13)   On September 24, 2009, Steven sent an e-mail asking about the raw format for the data that you had produced. He followed up on this topic with Daniel on October 1, 2009 explaining that the data you produced contains no decimals for important entries (like trade price). While Daniel responded to other questions involving the data on November 13, 2009, his answer did not address this issue. Please provide an answer.

(14)   Steven has sent you multiple e-mails regarding account numbers and branch numbers. You produced a manual from Broadridge Financial Solution, Inc. (UBS_TASER_1559). This manual contains an appendix with a chart of accounts with "Suggested branch" numbers. Can you confirm that these are the branch numbers actually used for UBS? Additionally, you can never answered Steven's question asking you to identify which accounts are institutional accounts, individual customer accounts and hedge fund accounts. Please provide an answer.

(15)   On December 9, 2009, you sent me an e-mail following up with the final custodian list I had sent you. You noted that I had inputted incorrect end dates for the time periods for Burke and Marciante. You are correct those dates should be 11/30/06 and 3/6/08, respectively. You stated that the beginning dates for Greenbaum, Buscemi, Citera, Madaio, McDade, Centrangalo and Nancick should be November 1, 2003 not January 1, 2003. We agree to those dates. We have, however, reserved the right to request documents back to January 1, 2003, and we explicitly reserve those rights as to these custodians. I would refer you to Steven's e-mail on November 23, 2009 at 2:41 for more on this topic.

(16)   We have one new data question. In your production of ESI you have produced some instances of the Fail on Sale report (example: UBS_TSR42329). We want to confirm that you will be producing all versions of this report that refer to TASER, TASR or the CUSIP throughout the time period even if they were not sent to or received by a custodian.

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Five
December 16, 2009

    (17)    We also request that you add Matt Kiernan as a custodian based on our review of the data you presented so far. We make this request in good faith based on our belief that he would have responsive documents concerning TASER. Mr. Kiernan receives the "fail on sale" report and apparently is responsible for following up on fails. From our review of the documents, he is listed in the report as "owner" of at least one UBS Securities, LLC account, which we believe means he is responsible for following up on fails for that account.[3] At least once during the period he was "owner" of and responsible for this account, the account had a fail in TASR.[4] According to the documents, because he was owner of the account, Mr. Kiernan was responsible for following up for the reasons for the the fail. Thus, documents in Mr. Kiernan's possession are clearly responsive, and we ask that you designate him as a custodian. I also note that Mr. Kiernan was not identified in any compliance manual or organizational chart that was produced so we had no way of identifying him earlier.

    I look forward to hearing from you and please do not hestitate to contact me if you have any questions.

Very truly yours,

*Elizabeth G. Eager*

Elizabeth G. Eager

EGE:jmt

cc:    John E. Floyd, Esq.
        Steven J. Rosenwasser, Esq.
        Nicole G. Iannarone, Esq.

---

[3] UBS_TSR4023.

[4] *See* UBS_TSR40234.

721067.1

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit F

144910.1

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey Landis
To Call Writer Directly:
(202) 879-5984
jeffrey.landis@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

January 7, 2010

**VIA EMAIL**

Elizabeth Eager
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

Re:     *Taser International, et al.* v. *Morgan Stanley & Co., et al.*

Dear Liz:

I write in response to your letter of December 16, 2009 which was in response to my letter of December 11 addressing certain of plaintiffs' data questions. For ease of reference, I will address the outstanding issues in your December 16 letter using the "issue numbers" you identify in that letter. As you know, several of the issues have already been resolved.

(1) In your letter you asked the date that the parties reached an oral agreement that UBS would only produce Loannet reports from May 2005 forward. My understanding is that this agreement was reached on or around June 24, 2009. The context of the agreement was that under 17 CFR s. 240.17a-4(b)(1), UBS is only required to preserve Loannet data for three years, the first two years in an easily accessible place. Notwithstanding this, we agreed to produce the Loannet reports from May 2005 forward.

(3) You originally asked whether there are any "compliance manuals on derivatives" that UBS is "not producing." In my December 11 letter I explained that UBS has not withheld otherwise responsive documents merely because they reference or discuss derivatives. I further suggested that plaintiffs review the manuals that UBS has produced and, after conducting such review, let us know if plaintiffs still believe they need additional manuals on derivatives. In your December 16 letter you now ask whether "UBS has a separate manual that address[es] trading of derivatives, options and futures." We will look into this question. You also state in your letter that "UBS agreed to produce information regarding derivatives as set forth in Attachment A to the Scheduling Order." Please provide the specific provision of the Scheduling Order that you are referring to — through which you contend that UBS agreed to produce information regarding derivatives.

Chicago     Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai

Elizabeth Eager
January 7, 2010
Page 2

(4)   In my December 11 letter, I stated that that there are no impossible to borrow lists containing Taser beyond what UBS has already produced.  We had previously stated in our November 16 letter that it was our understanding that the impossible to borrow data for 2003, 2004 and the first six-months of 2009 would have been housed on magnetic tapes that needed to be restored, and that we were in the process of restoring those tapes.  In your December 16 letter you asked UBS to confirm that it restored and reviewed the data from 2003, 2004 and the relevant portion of 2009, and  that such review revealed that Taser did not appear on any. impossible to borrow lists for those years.  With respect to the years 2003 and 2004, it was determined during the restoration process that UBS did not utilize impossible to borrow lists for those years.  With respect to the first six-months of 2009, we reviewed the impossible to borrow lists for that time period and Taser does not appear on such lists.  You also ask several questions regarding UBS's "hard to borrow" lists.  We are currently in the process of identifying available hard to borrow lists that reference Taser.  We hope to produce such lists shortly and will keep you updated.

(5)   You asked that we have a phone call on December 21, 2009 to discuss plaintiffs' request for "documents showing executed buy-ins and short interest reports."  We indicated that we were amenable to such a call and we discussed the issue on December 18, 2009.  During that call, plaintiffs asked that UBS produce a sample executed buy-in report and a sample short interest report.  Plaintiffs would then evaluate the reports to determine if they wanted UBS to produce such reports on a larger scale (with UBS reserving its right to object to such a request if made).  I explained that UBS is amenable to such an approach to the extent the requested reports actually existed and are accessible.  To that end, I believe we will be able to provide you with a sample "short interest report" shortly.   We are still looking into the "executed buy-in" report.

(6)   Plaintiffs originally argued that they needed "trade runs" because of the potential inaccuracies in certain of UBS's blue sheets.  In my December 11 letter I asked that plaintiffs "identify specifically any relevant information that they believe is on the blue sheets, but cannot be gleaned from the stock records and order data so that we can more fully evaluate your request."  Your December 16 letter recites various statistics regarding the order data ("The spreadsheet is 149 columns wide. . . . The spreadsheet contains 58,382 lines of data. . . .").  It also complains that the stock record data "only shows us trades that are settling through UBS."  I do not read your letter, however, to identify any information that would be on UBS's blue sheets but cannot be gleaned from a combination of the stock record and order data.  Please let me know if I am mistaken, and particularly if it is plaintiffs' understanding that UBS's blue sheets would show trades settling through entities other than UBS.

(7)   As you know, we have been discussing the issue of duplicate trades in UBS's option blue sheets.  In connection with those discussions, in my December 11 letter I informed you that UBS is looking into whether it is reasonably practicable to produce option blue sheets without these 'duplicate trades.'"  Notwithstanding that fact, your December 16 letter suggests that UBS has somehow not been cooperative on this issue.  This includes by asserting that "[n]early three months has passed and you still do not have an answer to this question."  But such a suggestion

Elizabeth Eager
January 7, 2010
Page 3

is misleading.   In late September, Steven sent us an email noting that Plaintiffs were
encountering trades that appeared to be identical in terms of price, quantity and account name on
those option blue sheets and asked "whether these are duped trades or legitimate multiple trades
at the same price and quantity." After looking into the issue, in our November 13 letter, we fully
answered Steven's question, explaining that it was our understanding that these were duplicate
trades that were the result of the system used to pull the option blue sheets.  It was only in your
November 19 email that you asked whether UBS will be "producing clean blue sheets removing
the duplicate trades." UBS then agreed to look into whether it was reasonably practicable to pull
such information.

        (8)   Plaintiffs previously asked whether, when UBS indicated that no Taser trades
occurred during the months of January, May, June and July of 2003, that included "affiliates" of
UBS Securities LLC.  In my December 11 letter, I explained that it was our understanding that
"the stock record data would include positions of any affiliates of UBS Securities LLC to the
extent that such affiliates were customers of UBS Securities LLC." In your December 16 letter
you ask that UBS confirm your interpretation of this response "to mean that the trade data does
not include all trades for all affiliates."  As we explained, the stock record data includes trades of
any affiliates of UBS Securities LLC to the extent such affiliates were customers of UBS
Securities LLC. This explanation speaks for itself and I am not sure that there is anything that
needs to be "confirmed." It bears noting, however, that UBS Securities LLC is the only UBS
entity that is a defendant in this action and the UBS entity to whom plaintiffs' document requests
are directed.   Your December 16 letter also requests that UBS "identify the affiliates and other
business entities for whom we have trading data." As an initial matter, as I explained in my
December 11, 2009 letter, it is our understanding that "business units" of UBS Securities LLC do
not trade independently, and therefore would not have positions that would be reflected in the
stock record data.  As far as identifying the affiliates for whom plaintiffs have trading data, that
is information that can be gleaned from the trading data itself which UBS has produced and is
thus equally available to plaintiffs.  That being the case, we do not intend to undertake such an
exercise.  Of course, to the extent that in reviewing the trading data, plaintiffs have questions
about whether a particular entity is a UBS Securities LLC "affiliate," we will attempt to answer
such questions to the extent they are raised in good faith.

        (9)   With respect to trading data for Financial Services, UBS AG Stamford Branch and
UBS Securities, you state that plaintiffs have raised the issue of whether UBS will produce such
data "in e-mails on November 13, 2009, November 30, 2009 and December 7, 2009." Again,
this statement is misleading.  As I have explained to Steven previously, plaintiffs' initial
November 13 email merely stated that "we need to discuss" data related to the entities you
identify." It was only in Steven's email of November 30 that plaintiffs mentioned anything
about production of data related to such entities.  In response, I requested that plaintiffs explain
exactly what data it is that they are seeking, why they believe they need that data and on what
basis they believe they are entitled to such data so that UBS could fully evaluate this request.
While Steven responded by providing additional detail on the specific information plaintiffs are
seeking and why plaintiffs want that information, conspicuously absent was an identification of

Elizabeth Eager
January 7, 2010
Page 4

the bases on which plaintiffs believe they are entitled to such data. To that end, we again request that you identify on what bases you believe you are entitled to trading data from entities that are not parties to this litigation. This would include at a minimum identifying the specific document request in which plaintiffs request such data as well as any applicable rule or case law that would require the production of such data.

(10)   You asked that with respect to the stock record data that UBS has produced, we "verify that account type 1 = cash, 2 = margin, 5 = short and 8,9 = fail to receive and deliver." It is our understanding that account type 1 = cash, account type 2 = margin, account type 5 = short. We are still confirming the meaning of account types 8 and 9.

(11)   You have asked what the various codes are in the "PRC/ENTRY" field in the stock record data UBS produced. We had been hopeful that these codes would appear in the Daily Stock Record manual. Given that we now know they do not, however, we are looking into this issue.

(12)   You asked about the data format in the price and net amount columns of the bluesheets. According to your letter, "we have reviewed the data dictionary for the blue sheets, and it does not address this issue." With respect to the format of the price amounts, I refer you to the blue sheet data dictionary at UBS-TASER-0021668. As explained on that page, the last six digits in the price amount column represent cents. Any digits before the last six digits represent dollars. So for example, in row three of bates page UBS-TASER-0000894, the price is listed as 30170000. This translates to $30.17. This information is also easily derived from financial websites. For example, the above trade was made on January 3, 2005. A look at Yahoo finance reveals that Taser traded between $29.88 and $32.25 that day, indicating a trading price of $30.17 as opposed to $3.017 or $310.70. With respect to net amount, the last two digits in that column represent cents and any digits before the last two digits represent dollars. So using the same row discussed above, a net amount of 174986 translates to $1749.86.

(13)   With respect to the format of certain data UBS produced, you assert that Steven sent emails on this topic on September 24 and October 1, and that "while Daniel [Gomez] responded to other question involving the data on November 13, 2009, his answer did not address this issue." That is incorrect. Dan's letter of November 13, 2009 specifically addressed this issue, explaining that:

> Finally, in your emails of September 24 and October 1 you request that we produce various data already produced in different format. It is our understanding that the data was produced in the format that such data is normally produced, and that particularly given the volume of data involved it would be unduly burdensome for UBS to re-pull this data in some other format. We suggest that going forward, to the extent that you want data in a particular format, you tell us beforehand so we can investigate whether it is feasible before dedicating the time

Elizabeth Eager
January 7, 2010
Page 5

and resources to pulling the data in a different format.  Of course to the extent your requested format is feasible, we are happy to oblige such requests.

(14)   Without referring to specific questions or emails you assert that "Steven has sent multiple emails regarding account numbers and branch numbers."  You then go on to ask a new question regarding one of the manuals UBS produced.  Specifically you note that the manual bates numbered UBS_TASER 1559 contains an appendix with a chart of accounts with 'Suggested Branch' numbers and ask that UBS "confirm that these are the branch numbers actually used for UBS."  We are in the process of looking into this question.  You also state (again without referring to specific emails) that we "have never answered Steven's question asking you to identify which accounts are institutional accounts, individual customer accounts and hedge fund accounts."  Please explain exactly what you mean by "institutional accounts," "individual customer accounts," and "hedge fund accounts" so that we can better determine whether UBS keeps such information in the normal course b eyond what has already been provided to you in the Chart of Accounts.

(16)   We are evaluating your request that UBS produce all versions of the "Fail on Sale" report that refer to Taser, TASR or the CUSIP throughout the relevant time period even if they were not sent to or received by a custodian.  Assuming we do agree to produce such documents, however, we think that the most efficient procedure is to wait until after the production of ESI is complete to evaluate if there are any relevant reports that you still believe have not been produced.

(17)   You request that we add Matt Kiernan as a custodian based on your review of the data produced thus far.  Based on your review, is there a particular time period that plaintiffs are interested in?  Otherwise, consistent with our previous practice we will propose what we believe is a reasonable time period.

Please do not hesitate to contact me if you have any questions regarding the foregoing.

Sincerely,

Jeffrey Landis

JL /ghj

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey Landis
To Call Writer Directly:          (202) 879-5000                                    Facsimile:
(202) 879-5984                                                                          (202) 879-5200
jeffrey.landis@kirkland.com       www.kirkland.com

December 11, 2009

**Via Electronic Mail**

Elizabeth Eager
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

Re:   *Taser International, et al.* v. *Morgan Stanley & Co., et al.*

Dear Liz:

I write in response to your emails of November 18 and November 19, 2009 in which you posed several questions regarding data produced by UBS in the above-captioned matter. For ease of reference, I will respond to the issues you raised in the order that you raised them.

In your November 18 email you acknowledged that UBS produced monthly and daily loanet reports from May 2005 through May 2009, but asked that we confirm that Plaintiffs have all such reports dating back to January 2003. It is my understanding that during the negotiations on this issue, the parties orally agreed that UBS would only produce loanet reports dating back to May 2005.

In that same email you asked UBS to confirm that the T+N Report was not used prior to January 1, 2005. It is our understanding that the T+N Report was not used prior to that date.

With respect to compliance manuals you asked whether there are any "compliance manuals on derivatives" that UBS is "not producing." As your email acknowledges, in UBS's objections and responses to Plaintiffs' second set of document requests, UBS agreed to produce manuals to the extent they concern "prime brokerage, short sales or common stock, common stock lending and clearance and delivery and settlement of short sales of common stock." In doing so, UBS has not withheld otherwise responsive documents merely because they reference or discuss derivatives. To the extent after reviewing the manuals UBS has produced, you believe that Plaintiffs are entitled to additional manuals based on Plaintiffs' requests and UBS's objections thereto, we are willing to discuss the issue.

You asked when we expect to produce impossible to borrow lists for 2003, 2004 and 2009. It is our understanding that there are no impossible to borrow lists containing Taser beyond what UBS has already produced.

Elizabeth Eager
December 11, 2009
Page 2

You also asked when we would be available to discuss the production of locate logs, documents sufficient to show executed buy-ins in Taser and short interest reports. We are generally available the week of December 21 or after the new year. Please let us know which you prefer.

Your November 18 email also reiterates your request for "trade runs." As you know, Plaintiffs originally argued that they needed "trade runs" because of the potential inaccuracies in certain of UBS's blue sheets. In our November 13, 2009 letter we explained that Plaintiffs can get any relevant information that would be on UBS's blue sheets by looking at UBS's stock record and order data. We further suggested that if, after reviewing such stock record and order data, Plaintiffs had any additional questions we would be happy to discuss the issue further. In your November 18 response you assert - without any explanation - that the stock records and order data "do not contain all the information that the blue sheets have." We ask that you identify specifically any relevant information that you believe is on the blue sheets, but cannot be gleaned from the stock records and order data so that we can more fully evaluate your request. Also, please confirm that you have in fact fully reviewed the stock records and order data that UBS has produced before making this request.

In your November 19 email you inquired about UBS's option blue sheets. Specifically, in your September 24 email you noted that Plaintiffs were encountering trades that appeared to be identical in terms of price, quantity and account name on those option blue sheets and asked "whether these are duped trades or legitimate multiple trades at the same price and quantity." We explained in our November 13 letter that it was our understanding that these were duplicate trades that were the result of the system used to pull the option blue sheets. In your November 19 email you asked whether UBS will be "producing clean blue sheets removing the duplicate trades." We are looking into whether it is reasonably practicable to produce option blue sheets without these "duplicate trades" and will get back to you.

In addition to the foregoing, we also have looked into several of the other data questions Plaintiffs have posed. First, Steven asked whether, when UBS indicated that no Taser trades occurred during the months of January, May, June and July of 2003, that included "proprietary, institutional and retail accounts" and "affiliates, business units and departments." Our understanding is that the stock record data produced in this matter does include proprietary and institutional accounts, to the extent such accounts traded in Taser during the relevant period. The defendant in this action, UBS Securities LLC, does not handle "retail" accounts, although all clients who traded with UBS Securities LLC would be included in the stock record data, whether individual or institutional. It is our understanding that the stock record data would include positions of any affiliates of UBS Securities LLC to the extent that such affiliates were customers of UBS Securities LLC. With respect to "business units" and "departments" within UBS Securities LLC, it is our understanding any such "business units" or "departments" do not trade independently, and therefore would not have positions that would be reflected in the stock record data. To the extent that our understanding on these issues change, we will let you know.

Finally, in Steven's December 7 email he stated that Plaintiffs needed answers to issues raised in his November 11 email that still remain open. I responded that Steven's November 11 email referred back to various other emails containing data questions and pointed out that I believed

Elizabeth Eager
December 11, 2009
Page 3

our letters of October 30 and November 13 responded to most (if not all) of those questions. I further suggested that rather than copying and pasting previous emails, Plaintiffs identify exactly which data questions they believed were still outstanding. In response, Steven stated he "believe[d] we still need answers to my email of October 21." We went back and looked and again it appears that UBS has responded to the questions raised in Steven's October 21 email. For example, that email requests a "chart of accounts" which was produced on October 29, 2009. Similarly, on November 13, 2009, UBS produced the data dictionary/legend/key and CNS accounting summaries requested in Plaintiffs' October 21 email. We believe the remaining questions posed in that email are answered by the chart of accounts and data dictionaries already produced by UBS. To the extent that you believe that is not the case, please identify **specific questions** from Steven's October 21 email that you believe remain unanswered. Please be advised that going forward we do not intend to dedicate our limited time and resources to attempting to decipher which questions Plaintiffs believe are unanswered because Plaintiffs elect to simply copy and paste old emails or generally refer back to emails that refer back to other emails that refer back to still other emails.

Please let us know if you have any questions about any of the foregoing.

Sincerely,

*Jeffrey Landis*

Jeffrey Landis

cc:   Andrew Clubok
      Steven Rosenwasser

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date: May 24 2010 6:26PM
Mark Harper, Clerk

# Exhibit G



State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 30580033
Date: Apr 14 2010 3:53PM

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 30522075
Date: Apr 12 2010 12:03PM
Mark Harper, Clerk

*See Related Order*

# IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| TASER INTERNATIONAL, INC., *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>MORGAN STANLEY & CO., INC., *et al.*,<br><br>    Defendants. | Civil Case No.<br>2008-EV-004739-B |

## STIPULATION AND ORDER BETWEEN PLAINTIFFS AND UBS SECURITIES, LLC

Plaintiffs and UBS Securities, LLC ("UBS") agree and stipulate to the terms below with respect to the following issues: (1) UBS's claim for costs relating to any gathering, searching, processing, reviewing or other fees, expenses and/or costs associated with UBS's production of data, spreadsheets, emails or other documents already produced by UBS as of the date of this agreement or any data, spreadsheets, emails or other documents that have been or will be produced from the "agreed upon custodians" in response to any discovery served as of the date of this agreement;[1] (2) Plaintiffs' request for "trade runs"/"trade blotters;" (3) Plaintiffs' pending Second Amended Notice to Take 30(b)(6) Deposition of UBS; (4) Plaintiffs' Third Interrogatories to UBS; (5) Plaintiffs' request for trading data from certain "affiliates" of UBS; and (6) UBS's production deadline for production of documents that hit on the non-TASER keywords.

Costs – Subject to the Reservation of Rights below, UBS agrees to waive and never seek any fees, costs or expenses for gathering, searching, processing, reviewing or producing any data, spreadsheets, Emails or other documents already produced by UBS as of the date of this agreement or any data, spreadsheets, emails or other documents that have been or will be

---

[1] This stipulation pertains only to data, spreadsheets, documents or other information that has either already been produced or will be produced from the agreed-upon custodians using the agreed-upon keywords. The stipulation does not apply to any additional custodians or keywords Plaintiffs may request after the date of this Agreement.

740873

produced from the "agreed upon custodians" using the "TASER" and "non-TASER" keywords as referenced in paragraphs 2 and 4 of the December 21, 2009 Stipulation and Order Between Plaintiffs and UBS in response to any discovery served as of the date of this agreement.

<u>Plaintiffs' Third Interrogatories</u> — UBS agrees to answer the interrogatories by April 30 as follows:

*   Interrogatory Number One: UBS will identify all dates and/or time periods during the relevant time period of which UBS is presently aware in which the blue sheets it created, maintained and/or submitted to the SEC contained, or UBS has reason to believe may have contained, inaccurate data (regardless of whether the inaccuracy pertains to TASER). UBS's response would be limited to systemic or process errors as opposed to "one-off" or non-systemic or process errors except for: (1) intentional mismarkings (if any) and (2) any one-off or non-systemic or processing errors that you are aware of that apply to TASER. If UBS later becomes aware of other errors or inaccuracies, it shall timely inform Plaintiffs of the error or inaccuracy.

*   Interrogatory Number Two: For the dates and/or time periods identified in Interrogatory # 1, UBS will identify by bates number, the blue sheets that do or may contain inaccurate data. UBS will identify what information or data is or may be inaccurate on each blue sheet. If UBS does not know the specific data, but knows the type of data (e.g. short interest, long position, trade time, etc.), it will provide that information. If UBS has corrected data, UBS will identify the corrected data, including but not limited to, identifying the bates number(s) of the documents containing the corrected data.

*   Interrogatory Number Three: UBS will identify all instances during the period of January 1, 2003 through May 31, 2009, in which any inquiry, investigation or adverse action concerning the inaccuracy of documents of the type that have been or will be produced in this action (including, but not limited to, blue sheets and order tickets) was initiated against it by a governmental entity, securities exchange, SRO or clearing company, where the focus of such inquiry, investigation or adverse action was the inaccuracy of such documents or involved short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets.   The parties agree that UBS is not required to identify inquiries, investigations or adverse actions where the governmental entity, securities exchange, SRO or clearing company identified a substantive violation that did not in any way involve short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets and claimed that with regard to the substantive violation UBS's "books and records" were inaccurate. For inquiries, investigations or adverse actions relevant to the claims at issue in this litigation, to the extent the information is available, UBS will state whether information relating to TASER or a transaction involving TASER is on the document(s), report(s), or list(s) that were being investigated. UBS will state the findings and result of the inquiry, investigation or adverse action such as whether UBS was cautioned, fined or sanctioned.

\*    Interrogatory Number Four: UBS will identify each and every blue sheet that was the subject of the caution, sanction, fine, or adverse action, whether or not the blue sheet reported transactions in TASER securities. This interrogatory requires UBS to provide information that is currently known to it, meaning it is only required to identify specific blue sheets or a date range of blue sheets that were identified as being the subject of the action. UBS is not required to perform additional investigation to determine what blue sheets were "the subject" of the caution, sanction, fine or adverse action if they are not already known or were not made known to UBS. If UBS later becomes aware of additional responsive information, it shall timely inform Plaintiffs of the error or inaccuracy

<u>Trade Runs/Trade Blotters</u> — Within thirty days of this agreement, UBS will provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters, it would not cure any inaccuracies in the blue sheets. The representation will also state that, to the best of the company's knowledge, the only other database containing information that may cure inaccuracies on the bluesheets are the stock record and order management systems, which have been produced.

<u>Discrepancies Between OMS/Blue Sheets/ETJs</u> — Plaintiffs and UBS have been conferring as to the reasons why there are, in some cases, inconsistencies between UBS's order management system/stock records, UBS's blue sheets and the equity trade journals ("ETJ"). Plaintiffs and UBS will continue to work together in good faith to try and determine the reasons for the inconsistencies. Such cooperation shall include, but not be limited to, UBS explaining (to the extent it is able) why Plaintiffs are finding discrepancies between UBS's order management/stock record/blue sheet data and the ETJs with respect to the June 4 data the parties exchanged.

<u>30(b)(6) Notice</u> — Subject to the Reservation of Rights below, Plaintiffs will withdraw and never seek the pending 30(b)(6) notice as to all topics. With respect to topic 9, UBS agrees to continue researching the issue of duplicate trades in its option blue sheets. If requested by Plaintiffs, UBS agrees to provide a written, verified response regarding "UBS's ability to remove duplicate trades from the option blue sheets, including, but not limited to, any factual support for any alleged burden to remove duplicate trades." With respect to topics 10 and 14, UBS will provide a written response within 20 days of this Agreement. With respect to topic 13, UBS will send a written response within 10 days that it has accessed and searched for ESI from "the 2 decommissioned systems referenced in [its] August 26, 2009 email."

<u>Affiliate Data</u> — The following pertains to data from UBS Financial Services and UBS AG Stamford Branch.

If after a diligent search, there is evidence that UBS Financial Services and/or UBS AG Stamford Branch borrowed, loaned, located or provided a locate, bought, sold or transferred TASER equities or derivatives, excluding broad based index options such as options off of the S&P 500, to or from UBS Securities, LLC between January 1, 2003 and May 31, 2009, UBS will produce the following data (to the extent it exists) for that entity by no later than May 21, 2010:

740873

- Daily trade blotters
- Blue sheets
- Daily/ weekly stock positions
- Loan/ Borrow Records and
- Listed OTC derivatives.

If after a diligent search, there is no evidence that UBS Financial Services and/or UBS AG Stamford Branch borrowed, located or provided a locate, loaned or transferred TASER equities or derivatives, excluding broad based index options such as options based off of the S&P 500, to or from UBS Securities, LLC between January 1, 2003 and May 31, 2009, then UBS will provide plaintiffs a representation that after a diligent search the entity did not borrow, lend or transfer TASER equities or derivatives, excluding broad based index options such as options based off of the S&P 500, to or from UBS Securities, LLC (or a similar representation depending on the results of UBS's inquiry).

Plaintiffs will not take the position that by producing this data, UBS Financial Services or UBS AG Stamford Branch is subject to general discovery in this case.

Deadline for Document Production by UBS –The parties agree that the deadline for UBS to complete its production of non-TASER keyword documents shall be extended from April 22, 2010 to June 1, 2010.

Reservation of Rights – Plaintiffs reserve the right to reopen any and all noticed topics for deposition. In the event that occurs, UBS's agreement to waive costs is void. However, the parties shall meet and confer on this issue before any waiver takes place.

Hon. Patsy N. Porter
Judge, State Court of Fulton County

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit H



Print

## 8210. Provision of Information and Testimony and Inspection and Copying of Books

**(a) Authority of Adjudicator and FINRA Staff**

For the purpose of an investigation, complaint, examination, or proceeding authorized by the FINRA By-Laws or rules, an Adjudicator or FINRA staff shall have the right to:

(1) require a member, person associated with a member, or person subject to FINRA's jurisdiction to provide information orally, in writing, or electronically (if the requested information is, or is required to be, maintained in electronic form) and to testify at a location specified by FINRA staff, under oath or affirmation administered by a court reporter or a notary public if requested, with respect to any matter involved in the investigation, complaint, examination, or proceeding; and

(2) inspect and copy the books, records, and accounts of such member or person with respect to any matter involved in the investigation, complaint, examination, or proceeding.

**(b) Other SROs and Regulators**

(1) FINRA staff may enter into an agreement with a domestic federal agency, or subdivision thereof, or foreign regulator to share any information in FINRA's possession for any regulatory purpose set forth in such agreement, provided that the agreement must require the other regulator, in accordance with the terms of the agreement, to treat any shared information confidentially and to assert such confidentiality and other applicable privileges in response to any requests for such information from third parties.

Any such agreement with a foreign regulator must also meet the following conditions:

(A) the other regulator party to the agreement must have jurisdiction over common regulatory matters; and

(B) the agreement must require the other regulator to reciprocate and share with FINRA information of regulatory interest or concern to FINRA.

(2) FINRA staff may exercise the authority set forth in paragraph (a) for the purpose of an investigation, complaint, examination, or proceeding conducted by another domestic or foreign self-regulatory organization, association, securities or contract market, or regulator of such markets with which FINRA has entered into an agreement providing for the exchange of information and other forms of material assistance solely for market surveillance, investigative, enforcement, or other regulatory purposes.

**(c) Requirement to Comply**

No member or person shall fail to provide information or testimony or to permit an inspection and copying of books, records, or accounts pursuant to this Rule.

**(d) Notice**

A notice under this Rule shall be deemed received by the member or person to whom it is directed by mailing or otherwise transmitting the notice to the last known business address of the member or the last known residential address of the person as reflected in the Central Registration Depository. If the Adjudicator or FINRA staff responsible for mailing or otherwise transmitting the notice to the member or person has actual knowledge that the address in the Central Registration Depository is out of date or inaccurate, then a copy of the notice shall be mailed or otherwise transmitted to:

(1) the last known business address of the member or the last known residential address of the person as reflected in the Central Registration Depository; and

(2) any other more current address of the member or the person known to the Adjudicator or FINRA staff who is responsible for mailing or otherwise transmitting the notice.

**(e) Electronic Interface**

In carrying out its responsibilities under this Rule, FINRA may, as appropriate, establish programs for the submission of information to FINRA on a regular basis through a direct or indirect electronic interface between FINRA and members.

**(f) Inspection and Copying**

A witness, upon proper identification, may inspect the official transcript of the witness' own testimony. Upon written request, a person who has submitted documentary evidence or testimony in a FINRA investigation may procure a copy of the person's documentary evidence or the transcript of the person's testimony upon payment of the appropriate fees, except that prior to the issuance of a complaint arising from the investigation, FINRA staff may for good cause deny such request.

---

Amended by SR-FINRA-2008-021 eff. Dec. 15, 2008.
Amended by SR-FINRA-2008-056 eff. Nov. 6, 2008.
Amended by SR-NASD-98-57 eff. March 26, 1999.
Amended by SR-NASD-97-81 eff. Jan. 16, 1998 (formerly Rule 4615).
Amended by SR-NASD-97-28 eff. Aug. 7, 1997.
Amended by SR-NASD-96-46 eff. May 9, 1997.
Amended by SR-NASD-96-14 eff. Aug. 13, 1996.
Amended eff. Apr. 15, 1992.
Sec. 4 redesignated Sec. 5 eff. Sept. 1, 1969.

Selected Notices: 86-36, 92-19, 96-58, 99-16, 08-57.

---

©2008 FINRA. All rights reserved.

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit I

144910.1



Print

## 8310. Sanctions for Violation of the Rules

### (a) Imposition of Sanction

After compliance with the Rule 9000 Series, FINRA may impose one or more of the following sanctions on a member or person associated with a member for each violation of the federal securities laws, rules or regulations thereunder, the rules of the Municipal Securities Rulemaking Board, or FINRA rules, or may impose one or more of the following sanctions on a member or person associated with a member for any neglect or refusal to comply with an order, direction, or decision issued under the FINRA rules:

(1) censure a member or person associated with a member;

(2) impose a fine upon a member or person associated with a member;

(3) suspend the membership of a member or suspend the registration of a person associated with a member for a definite period or a period contingent on the performance of a particular act;

(4) expel a member, cancel the membership of a member, or revoke or cancel the registration of a person associated with a member;

(5) suspend or bar a member or person associated with a member from association with all members;

(6) impose a temporary or permanent cease and desist order against a member or a person associated with a member; or

(7) impose any other fitting sanction.

### (b) Assent to Sanction

Each party to a proceeding resulting in a sanction shall be deemed to have assented to the imposition of the sanction unless such party files a written application for appeal, review, or relief pursuant to the Rule 9000 Series.

---

Amended by SR-FINRA-2008-021 eff. Dec. 15, 2008.
Amended by SR-NASD-98-80 eff. June 23, 2003.
Amended by SR-NASD-97-81 eff. Jan. 16, 1998.
Amended by SR-NASD-97-28 eff. Aug. 7, 1997.
Amended by SR-NASD-95-39 eff. Oct. 10, 1996.
Amended eff. Sept. 1, 1969; July 9, 1984; May 27, 1988; Aug. 16, 1988; Nov. 1, 1991; Apr. 15, 1992.

Selected Notice: 87-22, 88-75, 91-19, 91-52, 92-31, 96-28, 03-35, 08-57.

---

©2008 FINRA. All rights reserved.

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit J

144910.1

*Taser Int'l, Inc., et al. v. Morgan Stanley Co., et al.*
Banc of America Securities LLC - Privilege Log (4/7/2010)

Confidential

| ENTRY NUMBER | DOCUMENT TYPE | DATE | AUTHOR | RECIPIENT(S) | CC | BCC | PRIVILEGE | SUBJECT MATTER |
|---|---|---|---|---|---|---|---|---|
| 1 | E-mail with attachments | 5/2/2003 15:08 | Avena, Vincent | Rauzi, Richard - Legal | Pesce, Christopher J.; Goetz, Wendy | | Attorney-Client; Attorney Work Product | From business person to legal department responding to request for information necessary to provide legal advice in connection with regulatory inquiry. |
| 2 | E-mail with attachments | 5/7/2004 11:33 | Lang, Carl | Horvath, Robert J (Skadden Arps); Avena, Vincent | | | Attorney-Client; Attorney Work Product | From client to attorney responding to request for information necessary to provide legal advice. |
| 3 | E-mail with attachments | 6/27/2005 19:05 | Mattioni, Brian | Cimino, Toni; Camerino, Christian; Poliac, Oana; Ramamurthy, Radhika; Snook, Martyn; Wyttenbach, Eric S; Murray-Rust, Robert; Valmassei, Mia; Jacobsen, Mark; Wesley, Joseph C; Yee, King | Cherry, Elin; Kletter, Justin M; Margolin, Andrew S - Legal; Mulligan, Robert J; Radest, Michael B | | Attorney-Client; Attorney Work Product | Between business people and legal department forwarding work product prepared at direction of counsel in response to regulatory inquiry. |
| 4 | E-mail with attachments | 7/1/2005 10:19 | Mattioni, Brian | Magliocco, Aquilino; Nakis, Michael J | Camerino, Christian; Cherry, Elin; Cimino, Toni; Maher, David; Margolin, Andrew S; Mulligan - Legal, Robert J; Radest, Michael B; Ramamurthy, Radhika; Poliac, Oana; Wesley, Joseph C; Yee, King | | Attorney-Client | Between business people and legal department gathering information at request of counsel necessary to provide legal advice regarding NASD inquiry. |
| 5 | E-mail with attachments | 2/3/2006 8:35 | Magliocco, Aquilino | Nakis, Michael J; Denhardt, David H; Maher, David; Konefal, Richard; Straubel, Mark C; Kletter, Justin M; Cherry, Elin; Cimino, Toni | Lamke, Jim; Margolin, Andrew S - Legal | | Attorney-Client; Attorney Work Product | Between business people and legal department gathering information at request of counsel necessary to provide legal advice regarding NASD inquiry. |
| 6 | E-mail with attachments | 6/28/2006 13:48 | Magliocco, Aquilino | aquilino.magliocco@bofasecurities.com; Christian.Camerino@bofasecurities.com; david.h.denhardt@bofasecurities.com; david.maher@bofasecurities.com; Brian.Mattioni@bofasecurities.com; Toni.Cimino@bofasecurities.com; rkonefal@bofasecurities.com; mark.c.straubel@bofasecurities.com; justin.m.kletter@bofasecurities.com; andrew.s.margolin@bofasecurities.com; sanjay.sachdeva@bofasecurities.com; Reena.Jhala@bofasecurities.com; Magliocco, Aquilino; Camerino, Christian; Denhardt, David H; Maher, David; Mattioni, Brian; Cimino, Toni; Konefal, Richard; Straubel, Mark C; Kletter, Justin M; Margolin, Andrew S - Legal; Sachdeva, Sanjay; Jhala, Reena | | | Attorney-Client; Attorney Work Product | Between business people and legal department gathering information at request of counsel necessary to provide legal advice regarding NASD inquiry. |
| 7 | E-mail with attachments | 7/24/2006 18:09 | Maher, David | justin.m.kletter@bofasecurities.com; andrew.s.margolin@bofasecurities.com; Christian.Camerino@bofasecurities.com; david.h.denhardt@bofasecurities.com; mark.c.straubel@bofasecurities.com; Kletter, Justin M; Margolin, Andrew S - Legal | Camerino, Christian; Cimino, Toni; Denhardt, David H; Straubel, Mark C | | Attorney-Client; Attorney Work Product | Between business people and legal department gathering information at request of counsel necessary to provide legal advice regarding NASD inquiry. |
| 8 | E-mail with attachments | 8/30/2006 13:38 | Samy, Kumar | Richard.Rauzi@bankofamerica.com; vavena@bofasecurities.com; Rauzi, Richard - Legal | | | Attorney-Client; Attorney Work Product | From business person to legal department responding to request for information necessary to provide legal advice in connection with regulatory inquiry. |
| 9 | E-mail with attachments | 9/13/2006 15:24 | Samy, Kumar | Richard.Rauzi@bankofamerica.com; vavena@bofasecurities.com; derrick.cusick@bofasecurities.com; dg.bofagef-us-tech@bofasecurities.com; Rauzi, Richard -Legal; Avena, Vincent; Cusick, Derrick | | | Attorney-Client; Attorney Work Product | From business person to legal department responding to request for information necessary to provide legal advice in connection with regulatory inquiry. |
| 10 | E-mail with attachments | 9/13/2006 15:24 | Samy, Kumar | Richard.Rauzi@bankofamerica.com; vavena@bofasecurities.com; derrick.cusick@bofasecurities.com; dg.bofagef-us-tech@bofasecurities.com; Rauzi, Richard -Legal; Avena, Vincent; Cusick, Derrick | | DG BOFAGEF-US-TECH | Attorney-Client; Attorney Work Product | From business person to legal department responding to request for information necessary to provide legal advice in connection with regulatory inquiry. |

Confidential

Taser Int'l, Inc., et al. v. Morgan Stanley Co., et al.
Banc of America Securities LLC - Privilege Log (4/7/2010)

| ENTRY NUMBER | DOCUMENT TYPE | DATE | AUTHOR | RECIPIENT(S) | CC | BCC | PRIVILEGE | SUBJECT MATTER |
|---|---|---|---|---|---|---|---|---|
| 11 | E-mail with attachments | 9/21/2006 15:52 | Samy, Kumar | Richard.Rauzi@bankofamerica.com; vavena@bofasecurities.com; derrick.cusick@bofasecurities.com; dg.bofagef-us-tech@bofasecurities.com; Rauzi, Richard -Legal; Avena, Vincent; Cusick, Derrick | DG BOFAGEF-US-TECH | | Attorney-Client; Attorney Work Product | From business person to legal department responding to request for information necessary to provide legal advice in connection with regulatory inquiry. |
| 12 | E-mail with attachments | 9/22/2006 11:23 | Samy, Kumar | derrick.cusick@bofasecurities.com; vavena@bofasecurities.com; Richard.Rauzi@bankofamerica.com; dg.bofagef-us-tech@bofasecurities.com; Cusick, Derrick; Avena, Vincent; Rauzi, Richard - Legal | | | Attorney-Client; Attorney Work Product | From business person to legal department responding to request for information necessary to provide legal advice in connection with regulatory inquiry. |
| 13 | E-mail with attachments | 9/22/2006 11:23 | Samy, Kumar | derrick.cusick@bofasecurities.com; vavena@bofasecurities.com; Richard.Rauzi@bankofamerica.com; dg.bofagef-us-tech@bofasecurities.com; Cusick, Derrick; Avena, Vincent; Rauzi, Richard | DG BOFAGEF-US-TECH | | Attorney-Client; Attorney Work Product | From business person to legal department responding to request for information necessary to provide legal advice in connection with regulatory inquiry. |
| 14 | E-mail with attachments | 5/25/2007 12:27 | Whalen, Nick - Legal | MSorial@bofasecurities.com; claudia.s.lewis@bofasecurities.com; Richard.Rauzi@bankofamerica.com; Sorial, Medhat; Lewis, Claudia S; Rauzi, Richard - Legal | | | Attorney-Client; Attorney Work Product | From legal department to business people attaching work product generated in response to NYSE inquiry. |
| 15 | E-mail with attachments | 11/8/2007 9:24 | D'Angelo, Michael A | Dennelly, Richard E -Legal | | | Attorney-Client | From business person to legal department responding to request for information necessary to provide legal advice. |
| 16 | E-mail with attachments | 1/15/2008 11:43 | Whalen, Nick - Legal | heather.a.murphy@bofasecurities.com; mark.c.straubel@bofasecurities.com; jibu.koshy@bankofamerica.com; Murphy, Heather A; Straubel, Mark C; Koshy, Jibu | Richard.Rauzi@bankofamerica.com; Rauzi, Richard - Legal | | Attorney-Client; Attorney Work Product | From legal department to business people providing legal advice and attaching attorney work product in connection with FINRA inquiry. |
| 17 | E-mail with attachments | 1/28/2008 11:41 | Koshy, Jibu | Whalen, Nick -Legal; Murphy, Heather A | Straubel, Mark C | | Attorney-Client; Attorney Work Product | From business person to legal department attaching work product prepared at direction of counsel in response to FINRA inquiry. |
| 18 | E-mail with attachments | 3/12/2008 11:26 | Whalen, Nick - Legal | Murphy, Heather A; Straubel, Mark C; Murphy, Heather A; Straubel, Mark C | | | Attorney-Client; Attorney Work Product | From legal department to business people attaching attorney work product in connection with FINRA inquiry. |
| 19 | E-mail with attachments | 5/7/2008 10:43 | Jalili, Houtan P | Kletter, Justin M -Legal; Straubel, Mark C | | | Attorney-Client; Attorney Work Product | From business person to legal department providing information necessary to provide legal advice in connection with FINRA inquiry. |
| 20 | E-mail with attachments | 5/9/2008 11:23 | Magliocco, Aquilino | Jalili, Houtan P; Margolin, Andrew S -Legal; Mattioni, Brian; Cimino, Toni; Yee, King; Kletter, Justin M -Legal; Chen, Edwin Y; Denhardt, David H; Maher, David; Straubel, Mark C; Camarino, Christian; Sachdeva, Sanjay; Reichert, Keith; Lupia, Laura E; Seeley, Paul M; Devine, Frank; Akkaya, Melek; Tesi, Chris -Compliance; Fugazzi-Riga, Theresa; Jalili, Houtan P; Margolin, Andrew S -Legal; Mattioni, Brian; Cimino, Toni; Yee, King; Kletter, Justin M -Legal; Chen, Edwin Y; Denhardt, David H; Maher, David; Straubel, Mark C; Camarino, Christian; Sachdeva, Sanjay; Reichert, Keith; Lupia, Laura E; Seeley, Paul M; Devine, Frank; Akkaya, Melek; Tesi, Chris -Compliance; Fugazzi-Riga, Theresa | | | Attorney-Client | From business person to legal department providing information requested by counsel regarding FINRA inquiry. |

*Taser Int'l, Inc., et al. v. Morgan Stanley Co., et al.*
Banc of America Securities LLC – Privilege Log (4/7/2010)

Confidential

| ENTRY NUMBER | DOCUMENT TYPE | DATE | AUTHOR | RECIPIENT(S) | CC | BCC | PRIVILEGE | SUBJECT MATTER |
|---|---|---|---|---|---|---|---|---|
| 21 | E-mail with attachments | 5/9/2008 11:23 | Magliocco, Acqilino | Jalili, Houtan P; Margolin, Andrew S -Legal; Mattioni, Brian; Cimino, Toni; Yee, King; Kletter, Justin M -Legal; Chen, Edwin Y; Denhardt, David H; Maher, David; Straubel, Mark C; Camerino, Christian; Sachdeva, Sanjay; Reichert, Keith; Lupia, Laura E; Seeley, Paul M; Devine, Frank; Akkaya, Melek; Tesi, Chris -Compliance; Fugazzi-Riga, Theresa; Jalili, Houtan P; Margolin, Andrew S -Legal; Mattioni, Brian; Cimino, Toni; Yee, King; Kletter, Justin M -Legal; Chen, Edwin Y; Denhardt, David H; Maher, David; Straubel, Mark C; Camerino, Christian; Sachdeva, Sanjay; Reichert, Keith; Lupia, Laura E; Seeley, Paul M; Devine, Frank; Akkaya, Melek; Tesi, Chris -Compliance; Fugazzi-Riga, Theresa | | | Attorney-Client | From business person to legal department providing information necessary to provide legal advice in connection with FINRA inquiry. |
| 22 | E-mail with attachments | 6/17/2008 9:30 | Bowler, Edward | Lewis, Claudia S; Lee, Arthur X; Lewis, Claudia S; Lee, Arthur X | | | Attorney-Client | Between business people forwarding request from counsel for information necessary to provide legal advice regarding the TASER short selling litigation. |
| 23 | E-mail | 7/18/2008 15:04 | Brody, Sean P | Bowler, Edward; Bowler, Edward | | | Attorney-Client | Between business people gathering information at request of counsel necessary to provide legal advice in connection with the TASER short selling litigation. |
| 24 | E-mail | 7/21/2008 13:40 | Brody, Sean P | Madura, Michael J; Madura, Michael J | Bowler, Edward; Bowler, Edward | | Attorney-Client | Between business people gathering information at request of counsel necessary to provide legal advice in connection with the TASER short selling litigation. |
| 25 | E-mail | 7/21/2008 13:50 | Bowler, Edward | Brody, Sean P; Madura, Michael J; Brody, Sean P; Madura, Michael J | Boozer, Gregory; Boozer, Gregory | | Attorney-Client | Between business people gathering information at request of counsel necessary to provide legal advice in connection with the TASER short selling litigation. |
| 26 | E-mail | 7/21/2008 13:51 | Bowler, Edward | Nenichka, Joseph; Hogue, Acacia L; Nenichka, Joseph; Hogue, Acacia L | Brody, Sean P; Brody, Sean P | | Attorney-Client | Between business people gathering information at request of counsel necessary to provide legal advice in connection with the TASER short selling litigation. |
| 27 | E-mail | 7/22/2008 8:20 | Madura, Michael J | Bowler, Edward; Brody, Sean P; Bowler, Edward; Brody, Sean P | Boozer, Gregory; Boozer, Gregory | | Attorney-Client | Between business people gathering information at request of counsel necessary to provide legal advice in connection with the TASER short selling litigation. |
| 28 | E-mail with attachments | 9/29/2008 10:45 | Rauzi, Richard - Legal | Lee, Arthur X; Madura, Michael J; Lee, Arthur X; Madura, Michael J | Blanco, Michele -Legal; Patel, Babu; Blanco, Michele -Legal; Patel, Babu | | Attorney-Client | From legal department to business people requesting information necessary to provide legal advice regarding the TASER short selling litigation. |
| 29 | E-mail with attachments | 9/29/2008 10:46 | Rauzi, Richard - Legal | Lewis, Claudia S. | Blanco, Michele -Legal | | Attorney-Client | From legal department to business person requesting information necessary to provide legal advice regarding the TASER short selling litigation. |
| 30 | E-mail with attachments | 9/29/2008 10:48 | Rauzi, Richard - Legal | Avena, Vincent; Avena, Vincent | | | Attorney-Client; Attorney Work Product | From legal department to business person requesting information necessary to provide legal advice regarding the TASER short selling litigation. |

*Taser Int'l, Inc., et al. v. Morgan Stanley Co., et al.*
Banc of America Securities LLC – Privilege Log (4/7/2010)

Confidential

| ENTRY NUMBER | DOCUMENT TYPE | DATE | AUTHOR | RECIPIENT(S) | CC | BCC | PRIVILEGE | SUBJECT MATTER |
|---|---|---|---|---|---|---|---|---|
| 31 | E-mail with attachments | 9/29/2008 10:46 | Patel, Babu | Bowler, Edward; Slavin, Maria; Bowler, Edward; Slavin, Maria | Fiduccia, Frank; Fiduccia, Frank | | Attorney-Client; Attorney Work Product | Between business people forwarding request from counsel for provide legal advice in connection with the TASER short selling litigation. |
| 32 | E-mail with attachments | 9/29/2008 12:11 | Fiduccia, Frank | Rauzi, Richard -Legal | | | Attorney-Client | Between business people forwarding request from counsel for information necessary to provide legal advice regarding the TASER short selling litigation. |
| 33 | E-mail | 9/30/2008 6:45 | Aveaa, Vincent | Rauzi, Richard -Legal | | | Attorney-Client; Attorney Work Product | From business person to legal department responding to request for information necessary to provide legal advice in connection with TASER short selling litigation. |
| 34 | E-mail with attachments | 3/25/2009 15:38 | Straubel, Mark C | Margolin, Andrew S -Legal; Margolin, Andrew S -Legal | | | Attorney-Client; Attorney Work Product | From business person to legal department providing information necessary to provide legal advice. |

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit K

144910.1

February 17, 2010
CONFIDENTIAL

TASER INTERNATIONAL, INC., v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO., INC. and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

| Document Number | Document Type | Date | Author | Recipient(s) | Other Recipients (CC) | BCC | Description | Privilege |
|---|---|---|---|---|---|---|---|---|
| 1 | Email with attachments | 3/21/2005 10:20 | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> La Micela, Joseph - | Lowe, Peter (Exchange) <PLOWE@bear.com> | Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com>; Brunson, Bob (Exchange) <brunson@bear.com> | | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 2 | Email with attachment | 7/31/2006 10:29 | La Micela, Joseph - Communication of Counsel (Exchange) <jlamicela@bear.com> | Brunson, Bob (Exchange) <brunson@bear.com> | | | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 3 | Email with attachment | 7/17/2005 16:51 | La Micela, Joseph - Communication of Counsel (Exchange) <jlamicela@bear.com> | Harasek, Steve (Exchange) <SHARASEK@bear.com>; Lowe, Peter (Exchange) <PLOWE@bear.com>; Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com>; Brunson, Bob (Exchange) <brunson@bear.com> | | | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 4 | Email | 11/29/2004 11:49 | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Berdecia, Noel (Exchange) <NBERDECIA@bear.com> | | | Email string regarding response to regulatory inquiry | Attorney-Client Privilege |
| 5 | Email with attachment | 11/29/2004 11:48 | Berdecia, Noel (Exchange) | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 6 | Email with attachment | 2/4/2005 8:56 | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com>; Brunson, Bob (Exchange) <brunson@bear.com>; Lowe, Peter (Exchange) <PLOWE@bear.com> | | | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 7 | Email | 2/14/2005 14:40 | Seeley, Paul Confidential Memo-Counsel (Exchange) | Berdecia, Noel (Exchange) <NBERDECIA@bear.com> | | | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |

4

February 17, 2010
CONFIDENTIAL

TASER INTERNATIONAL, INC., v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO. INC. and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

| # / Type | Date | From | To | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| 8 Email with attachment | 12/7/2004 15:30 | La Micela, Joseph - Confidential Memo Counsel (Exchange) <Jlamicela@bear.com> | Brunson, Bob (Exchange) <bbrunson@bear.com> | | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 9 Email with attachment | 5/25/2006 14:36 | La Micela, Joseph - Communication of Counsel (Exchange) <Jlamicela@bear.com> | | Harasek, Steve (Exchange) <SHARASEK@bear.com>; Lowe, Peter (Exchange) <PLOWE@bear.com>; Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com>; Brunson, Bob (Exchange) <bbrunson@bear.com> | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 10 Email with attachments | 3/21/2006 11:03 | Seeley, Paul Confidential Memo-Counsel (Exchange) | Bardecia, Noel (Exchange) <NBERDECIA@bear.com> | | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 11 Email with attachment | 3/14/2005 11:11 | Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Bardecia, Noel (Exchange) <NBERDECIA@bear.com> | | Email string regarding response to regulatory inquiry conducted at the direction of counsel | Attorney Work Product Privilege |
| 12 Email | 5/26/2006 14:42 | Borovsquiy, Ana (Exchange) | Bardecia, Noel (Exchange) <NBERDECIA@bear.com> | | Email string regarding response to regulatory inquiry conducted at the direction of counsel | Attorney Work Product Privilege |
| 13 Email | 5/11/2006 12:22 | McCarthy, Denis - Communication of Counsel (Exchange) <DMccarthy1@bear.com> | Distell, Gary - Communication of Counsel (Exchange) <GDISTELL@bear.com> | Sherrick, Eileen (Exchange) <esherrick@bear.com> | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 14 Email | 5/11/2006 12:43 | Seeley, Paul (Exchange) <paul.seeley@bear.com> | Distell, Gary - Communication of Counsel (Exchange) <GDISTELL@bear.com> | | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 15 Email | 5/11/2006 12:24 | Distell, Gary – Communication of Counsel (Exchange) | Seeley, Paul (Exchange) <paul.seeley@bear.com> | | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |

TASER INTERNATIONAL, INC., v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO, INC. and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

February 17, 2010
CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| 16 Email | 10/22/2005 14:04 | la Micela, Joseph - Communication of Counsel (Exchange) <Jlamicela@bear.com> | Distell, Gary - Communication of Counsel (Exchange) <GDISTELL@bear.com>; Delon, Marlene - Communication of Counsel (Exchange) <MDelon@Bear.com> | Email regarding response to regulatory inquiry meeting | Attorney Work Product Privilege; Attorney-Client Privilege |
| 17 Email with attachments | 3/21/2005 10:33 | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com> | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 18 Email with attachment | 3/16/2005 15:37 | Harasek, Steve [Exchange] <MDelon@bear.com> | Santangelo, Frank (Exchange) <RSANTANGELO@bear.com> | Email regarding regulatory inquiry and forwarding communication of counsel | Attorney-Client Privilege |
| 19 Email | 4/6/2005 15:22 | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 20 Email | 4/6/2005 15:24 | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 21 Email | 4/6/2005 15:22 | Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 22 Email | 4/6/2005 15:21 | Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 23 Email | 4/6/2005 15:28 | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 24 Email | 4/6/2005 15:16 | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 25 Email | 4/6/2005 15:15 | Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |

TASER INTERNATIONAL, INC., v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO. INC and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

February 17, 2010
CONFIDENTIAL

| # | Type | Date | From | To | Description | Privilege |
|---|------|------|------|-----|-------------|-----------|
| 26 | Email | 4/6/2005 15:15 | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 27 | Email | 4/6/2005 15:12 | Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 28 | Email | 4/6/2005 15:11 | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 29 | Email with attachment | 4/6/2005 14:59 | Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 30 | Email with attachment | 4/6/2005 14:12 | Delon, Marlene - Confidential Memo Counsel (Exchange) | Sealey, Paul Confidential Memo-Counsel (Exchange) <paul.sealey@bear.com>; Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email with draft response for regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 31 | Email | 3/31/2005 12:18 | Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 32 | Email | 3/31/2005 12:15 | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com> | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 33 | Email | 3/31/2005 11:55 | Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 34 | Email | 3/31/2005 11:53 | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |

TASER INTERNATIONAL, INC. v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO. INC and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

February 17, 2010
CONFIDENTIAL

| # | Type | Date / From | To | CC | BCC | Description | Privilege |
|---|------|-------------|-----|-----|-----|-------------|-----------|
| 35 | Email | 3/31/2005 11:40 Delon, Marlene – Confidential (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com>; Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Gribben, Catherine - Confidential Memo Counsel (Exchange) <<Csribben@bear.com> | | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 36 | Email | 3/24/2005 11:04 Bernstein, Jeff (Exchange) <JBERNSTEIN@bear.com> | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | | | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 37 | Email | 3/21/2005 15:40 Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com> | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 38 | Email with attachment | 3/21/2005 15:35 Delon, Marlene - Confidential Memo Counsel (Exchange) | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | | Email with draft response for regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 39 | Email with attachments | 3/21/2005 14:58 Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | | | Email string with draft response for regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 40 | Email with attachments | 3/21/2005 14:20 Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | | Email with draft response for regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 41 | Email | 3/17/2005 10:00 Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Bernstein, Jeff (Exchange) <JBERNSTEIN@bear.com> | | Delon, Marlene - Confidential Memo Counsel (Exchange) <mdelon@bear.com> | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 42 | Email | 5/26/2005 14:36 Borovsquiy, Ana (Exchange) <ABOROVOSQUIY@bear.com> | Berdecia, Noel (Exchange) <NBERDECIA@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com>> La Micela, Joseph - Communication of Counsel (Exchange) <Jlamicela@Bear.com> | | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |

TASER INTERNATIONAL, INC., v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO. INC, and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

February 17, 2010
CONFIDENTIAL

| # | Type | Date / From | To | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| 43 | Email | 4/6/2005 15:31 Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | | Email string regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 44 | Email | 4/6/2005 15:31 Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com> | | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 45 | Email | 4/6/2005 15:27 Delon, Marlene - Confidential Memo Counsel (exchange) | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 46 | Email | 4/6/2005 15:26 Delon, Marlene - Confidential Memo Counsel (Exchange) | Distell, Gary Confidential Memo-Counsel [Exchange] <GDISTELL@bear.com> | | Email string regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 47 | Email with attachment | 3/16/2005 17:02 Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com>; Borovsquiy, Ana (exchange) <ABOROVSQUIY@bear.com> | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 48 | Email with attachment | 3/16/2005 16:59 Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com>; Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 49 | Email with attachment | 3/16/2005 16:58 Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com>; Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Email with response for regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 50 | Email with attachment | 3/16/2005 16:57 Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com>; Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |

TASER INTERNATIONAL, INC., v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO. INC. and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

February 17, 2010
CONFIDENTIAL

| # | Type | Date | From | To | Cc | Description | Privilege |
|---|---|---|---|---|---|---|---|
| 51 | Email with attachment | 3/16/2005 15:37 | Delon, Marlene – Confidential Memo Counsel [Exchange] <MDelon@bear.com> | Seeley, Paul Confidential Memo-Counsel [Exchange] <paul.seeley@bear.com>; Lowe, Peter [Exchange] <PLOWE@bear.com>; Harasek, Steve [Exchange] <SHARASEK@bear.com> | Bernstein, Jeff [Exchange] <BERNSTEIN@bear.com>; Distell, Gary Confidential Memo-Counsel [Exchange] <GDISTELL@bear.com> | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 52 | Email with attachment | 3/1/2005 15:45 | Borovoquly, Ana (Exchange) <ABOROVSQUIY@bear.com> | Seeley, Paul Confidential Memo-Counsel [Exchange] <paul.seeley@bear.com> | Lowe, Peter [Exchange] <PLOWE@bear.com> | Email regarding response to regulatory request. | Attorney Work Product Privilege; Attorney-Client Privilege |
| 53 | Email | 12/29/2004 20:35 | Distell, Gary Confidential Memo-Counsel [Exchange] <GDISTELL@bear.com> | Delon, Marlene – Confidential Memo Counsel (Exchange) <MDelon@bear.com>; Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 54 | Email with attachment | 12/30/2004 9:00 | Distell, Gary Confidential Memo-Counsel [Exchange] <GDISTELL@bear.com> | Seeley, Paul Confidential Memo-Counsel [Exchange] <paul.seeley@bear.com> | Delon, Marlene – Confidential Memo Counsel [Exchange] <MDelon@Bear.com>; Gribben, Catherine – Confidential Memo Counsel [Exchange] <CGribben@bear.com> | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 55 | Email | 12/15/2004 15:04 | Delon, Marlene – Confidential Memo Counsel (Exchange) | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com>; La Micela, Joseph – Confidential Memo Counsel (Exchange) <jlamicela@bear.com> | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email regarding response to regulatory request. | Attorney Work Product Privilege; Attorney-Client Privilege |

February 17, 2010
CONFIDENTIAL

TASER INTERNATIONAL, INC, v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO. INC. and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 56 | Email | 12/9/2004 19:11 | La Micela, Joseph - Confidential Memo Counsel (Exchange) <llamicela@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com> | Distell, Gary Confidential Memo-Counsel (Exchange) <GDISTELL@bear.com> | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 57 | Email with attachments | 3/11/2005 14:24 | Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com> | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 58 | Email with attachment | 10/29/2004 12:23 | Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Dcrosa, Melanie (Exchange) <MDerosa@bear.com>; Berdecia, Noel (Exchange) <NBERDECIA@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com>; Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com>; Lowe, Peter (Exchange) <PLOWE@bear.com>; Johnson, Theodis (Exchange) <THJohnson@bear.com> | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 59 | Email with attachment | 10/29/2004 10:57 | Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com>; Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com>; Johnson, Theodis (Exchange) <THJohnson@bear.com> | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |
| 60 | Email with attachment | 10/22/2004 10:30 | Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Delon, Marlene - Confidential Memo Counsel (Exchange) <MDelon@Bear.com>; Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com>; Johnson, Theodis (Exchange) <THJohnson@bear.com> | Email regarding response to regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |

TASER INTERNATIONAL, INC., v. MORGAN STANLEY CO., INC. et al.
BEAR, STEARNS CO. INC. and BEAR, STEARNS SECURITIES CORP. PRIVILEGE LOG

February 17, 2010
CONFIDENTIAL

| | | | | | | |
|---|---|---|---|---|---|---|
| 63 | Email with attachment | 10/21/2004 15:22 | Delon, Marlene – Confidential Memo Counsel (Exchange) <MDelon@bear.com> | Lowe, Peter (Exchange) <PLOWE@bear.com>; Borovsquiy, Ana (Exchange) <ABOROVSQUIY@bear.com> | Seeley, Paul Confidential Memo-Counsel (Exchange) <paul.seeley@bear.com>; Greco, Charlie (Exchange) <CGRECO@bear.com> | Email regarding regulatory inquiry | Attorney Work Product Privilege; Attorney-Client Privilege |

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit L

144910.1

*Taser International, et al. v. Morgan Stanley Co., et al.*
Credit Suisse Securities (USA) LLC Privilege Log (February 1, 2010)

| # | Document Date | Author/Originator | Recipients | CC | Description of Document | Privilege/Protection Claimed |
|---|---|---|---|---|---|---|
| 1 | 6/29/2004 | Kim, Charlie^ | Delaney, Sean^; Gaver, Brian; Montgelino, Chris^; Arnold, Ed^; Sanders, James; Connolly, Matthew^; Miller, Maura^ | | Email and attachments containing and reflecting attorney-client communications and work product regarding regulatory inquiry | Attorney-Client; Work Product |
| 2 | 6/30/2004 | Kim, Charlie^ | Montaigno, Chris^; Miller, Maura^ | Delaney, Sean^; Parameshwar, Amitsha | Email and attachments for facilitation of legal advice from counsel regarding regulatory inquiry | Attorney-Client; Work Product |
| 3 | 8/2/2004 | Delaney, Sean B.^ | Miller, Maura^ | | Email and attachments containing communication from counsel regarding regulatory rules | Attorney-Client |
| 4 | 4/16/2005 | Dalmer, Julia | Dalmer, Julia; Delaney, Sean B.^, Ahmad, Raza | Miller, Maura^ | Email and attachment reflecting communication with counsel in response to internal inquiry | Attorney-Client |
| 5 | 4/25/2005 | McNulty, Marilyn^ | Meyer, Allen^; Breslow, Stuart^; Connolly, Matthew^; Delaney, Sean^; Guarneri, Louise^; Prella, Frank^; Sanders, James; Powell, Donna^; Egan, Michael^; Setlor, Gideon^; Montagnino, Chris^; Gaver, Brian; Hanau, Donna^; Hutchen, Andrew^; Russo, Lori^; Goldberg, Ira; Palafara, Patrick^; Pugliese, Lauren; Yi, Scott; LiCalzi, Jacqueline | | Email and attachments relating to various regulatory matters and ongoing litigations | Attorney-Client; Work Product |
| 6 | 5/23/2005 | Kim, Charlie^ | Palmer, Scott^; Miller, Maura^ | | Email and attachments containing work product regarding response to regulatory inquiry | Work Product |
| 7 | 6/3/2005 | McNulty, Marilyn^ | Meyer, Allen^; Breslow, Stuart^; Connolly, Matthew^; Delaney, Sean^; Guarneri, Louise^; Prella, Frank^; Sanders, James; Powell, Donna^; Egan, Michael^; Setlor, Gideon^; Montagnino, Chris^; Gaver, Brian; Hanau, Donna^; Hutchen, Andrew^; Russo, Lori^; Goldberg, Ira; Palafara, Patrick^; Pugliese, Lauren; Yi, Scott; LiCalzi, Jacqueline; Ludwig, Michael | | Email and attachments relating to various regulatory matters and ongoing litigations | Attorney-Client; Work Product |
| 8 | 2/27/2006 | McNulty, Marilyn^ | Meyer, Allen^; Graham, Colleen^; Delaney, Sean B.^, Guarneri, Louise^; Prella, Frank^; Powell, Donna^; Egan, Michael^; Gaver, Brian^; Hanau, Donna^; Hutcher, Andrew^; Russo, Lori^; Goldberg, Ira; Pugliese, Lauren^; LiCalzi, Jacqueline; Ludwig, Michael^; Bernard, Mary; Bair, Benjamin | | Email and attachments relating to various regulatory matters and ongoing litigations | Attorney-Client; Work Product |
| 9 | 11/2/2006 | Bretler, Jason^ | Schulman, Steve M. | | Email and attachment relating to response to regulatory inquiry | Work Product |
| 10 | 11/2/2006 | Schulman, Steve M. | Cal, Bing | | Email and attachment relating to response to regulatory inquiry | Work Product |
| 11 | 11/3/2006 | Schulman, Steve M. | Marlowe, Sean | | Email and attachment relating to response to regulatory inquiry | Work Product |
| 12 | 11/14/2006 | Miller, Maura^ | Lazar, Howard | | Email and attachment reflecting work product to respond to regulatory inquiry | Work Product |
| 13 | 11/14/2006 | Mangroo, Robby^ | Miller, Maura^ | | Email and attachment reflecting work product to respond to respond to regulatory inquiry | Work Product |

* Denotes Lawyer/In-house Counsel
^ Denotes persons in the Legal and Compliance Department, who may work directly on or assist in litigation, regulatory and other legal matters, as well as in a compliance capacity

Taser International, et al. v. Morgan Stanley Co., et al.
Credit Suisse Securities (USA) LLC Privilege Log (February 1, 2010)

| Document No. | Date | From/Author | To/Recipient | CC | Privileged Description | Privilege Type |
|---|---|---|---|---|---|---|
| 14 | 5/31/2007 | Beeler, Jason^ | Miller, Maura^ | Ludwig, Michael^; Julian, Michael^ | Email and attachment containing attorney-client communication and work product regarding regulatory inquiry | Attorney-Client; Work Product |
| 15 | 5/31/2007 | Schulman, Steve M. | Beeler, Jason^ | | Email and attachments relating to response to regulatory inquiry | Work Product |
| 16 | 4/4/2008 | Woodall, Mark | Prella, Frank^; Solgan, Christopher^; Fisher, John^ | | Email and attachments containing communication from counsel | Attorney-Client |
| 17 | 4/4/2008 | Graham, Colleen^ | Guarneri, Louisa^; Prella, Frank^; Miller, Maura^ | | Email and attachments containing communication from counsel | Attorney-Client |
| 18 | 6/30/2008 | Kumar, Ashok | Mahon, John; Vannusan, Charles; Granath, Antone; Wong, Terry; Raghuraman, Vishwanthan; Wang, Yi | Schlangler, Jonine^ | Email and attachment related to discussions about ongoing litigation | Work Product |
| 19 | 3/3/2009 | Meng, Jun | Weisser, Lindsey^ | | Email and attachments relating to communications regarding regulatory inquiry | Attorney-Client |
| 20 | 3/3/2009 | Weisser, Lindsey^ | Mangroo, Robby^ | | Email and attachments relating to communications regarding regulatory inquiry | Attorney-Client |
| 21 | 3/9/2009 | Lazar, Howard | Rosskit, Victor | Ludwig, Michael^; Parker, Lara^; Miller, Maura^; Scheeble, Timothy; Findlay, Marybeth^; O'Shea, Richard | Email and attachment to facilitate efforts by counsel to respond to regulatory inquiry | Attorney-Client; Work Product |
| 22 | 4/27/2009 | Covelli, Mike | Weisser, Lindsey^ | Mangroo, Robby^; Scali, Michael^ | Email and attachment relating to regulatory inquiry | Work Product |
| 23 | 4/28/2009 | Leonard, Michael^ | Fisher, John^ | | Email and attachments relating to regulatory inquiry | Work Product |
| 24 | 5/21/2009 | Shen, CJ | Nagy, David^ | Shukis, Rohit^; Weisser, Lindsey^ | Email and attachments containing attorney-client communications regarding regulatory inquiry | Attorney-Client; Work Product |
| 25 | 5/22/2009 | Nagy, David^ | Zelman, Ross; Stevens, Andrew | Shukis, Rohit^; Shen, CJ; Weisser, Lindsey^ | Email and attachment containing attorney-client communications regarding regulatory inquiry | Attorney-Client; Work Product |

* Denotes Lawyer/In-house Counsel
^ Denotes persons in the Legal and Compliance Department, who may work directly on or assist in litigation, regulatory and other legal matters, as well as in a compliance capacity

**Taser International, et al. v. Morgan Stanley Co., et al.**
**Credit Suisse Securities (USA) LLC Amended Privilege Log (May 6, 2010)**

| # | Date | Author | Recipient(s) | CC | Description | Privilege |
|---|---|---|---|---|---|---|
| 1 | 6/28/2004 | Kim, Charlie^ | Delaney, Sean^; Gaver, Blair; Montagano, Chris^; Arnold, Ed^; Sanders, James^; Connolly, Matthew^; Shaw, Maura^ | | Email and attachment containing and reflecting attorney-client communications and work product regarding NASD inquiry | Attorney-Client; Work Product |
| 2 | 6/30/2004 | Kim, Charlie^ | Montagano, Chris^; Hirtz, Maura^ | | Email and attachment relating to legal advice from outside counsel regarding NASD inquiry | Attorney-Client; Work Product |
| 3 | 8/2/2004 | Preda, Frank^ | Fenner-Lalbso, Terry; Samuel, Lisa; Wood, Christopher; Schindler, Teresa | | Emails and attachments containing attorney-client communications and work product regarding SEC regulation | Attorney-Client; Work Product |
| 4 | 4/19/2005 | Delaney, Julia | Delaney, Julie; Delaney, Sean B.^; Ahmed, Raza | | Email and attachment related to communication with outside counsel regarding implementation of Reg SHO pilot compliance programs | Attorney-Client; Work Product |
| 5 | 6/30/2005 | McNally, Matlyn^ | Meyer, Allan^; Braslow, Stuart^; Connolly, Matthew^; Delaney, Sean^; Guarneri, Louise^; Prefle, Frank^; Powell, Donna^; Egan, Michael^; Schor, Gideon^; Montagano, Chris^; Gaver, Blair; House, Donna^; Hatzler, Andrew^; Bauer, Lori^; Goldberg, Inc; Pelzien, Patrick^; Pagliese, Lauren; Yi, Scott; LaCala, Jacqueline; Ludwig, Michael^ | | Email and attachments relating to various ongoing regulatory matters and litigations | Attorney-Client; Work Product |
| 6 | 2/27/2006 | McNally, Matlyn^ | Meyer, Allan^; Graham, Coleen^; Delaney, Sean B.^; Guarneri, Louise^; Prefle, Frank^; Powell, Donna^; Egan, Michael^; Gaver, Blair^; House, Donna^; Hatzler, Andrew^; Bauer, Lori^; Goldberg, Inc; Pagliese, Lauren^; LaCala, Jacqueline; Ludwig, Michael^; Barnett, Blair; Benjamin | | Emails and attachments relating to various ongoing regulatory matters and litigations | Attorney-Client; Work Product |
| 7 | 5/31/2007 | Bexler, Jason^ | Ludwig, Michael^; Julian, Michael^ | | Emails and attachment containing work product regarding NASD investigation | Work Product |
| 8 | 5/31/2007 | Schulman, Steve M. | Bexler, Jason^ | | Emails and attachment containing work product regarding NASD investigation | Work Product |
| 9 | 4/4/2008 | Woodall, Mark^ | Prefle, Frank^; Stegna, Christopher^; Fisher, John^ | | Email and attachment containing privileged communication with counsel regarding regulatory proposal | Attorney-Client |
| 10 | 4/4/2008 | Graham, Colleen^ | Giannola, Louise^; Prefle, Frank^; Fisher, John^; Miller, Maura^ | | Email and attachment containing privileged communication with counsel regarding regulatory proposal | Attorney-Client; Work Product |
| 11 | 3/9/2009 | Lazar, Howard | Rossini, Victor | | Email and attachment to facilitate efforts by counsel to respond to regulatory inquiry | Attorney-Client; Work Product |
| 12 | 8/22/2008 | Hernandez, Noel | Ludwig, Michael^; Mangogo, Robby^; Fisher, John^; Mahon, John | | Emails and attachments containing work product related in response to NASD inquiry | Work Product |
| 13 | 8/12/2008 | Gadepali, Viswanath | Miller, Maura^; Tasso, Thomas; Rustogi, Sanjay; Kont, Mark^ | Niskanch, Roxxx; Fisher, John^; Schools, Timothy^; Weisser, Lindsay^ | Emails and attachments containing work product at the direction of counsel regarding response to FINRA inquiry | Work Product |
| 14 | 4/26/2005 | Delaney, Sean^ | Rodriguez, Diana; Mahon, John; Hernandez, Noe | Montagano, Chris^; Tordita, Desiree A^; Miller, Maura^ | Email and attachment containing work product directed by counsel related to NYSE inquiry | Work Product |
| 15 | 6/25/2008 | Miller, Maura^ | Covelli, Mike; Scheiba, Timothy^ | Parker, Larry; Meng, Jen | Emails and attachments containing work product at the direction of counsel regarding response to FINRA inquiry | Work Product |
| 16 | 7/2/2008 | Miller, Maura^ | Covelli, Mike; Weisser, Lindsay^ | | Emails and attachments containing work product at the direction of counsel regarding response to FINRA inquiry | Work Product |
| 17 | 7/16/2008 | Covelli, Mike | Miller, Maura^; Weisser, Lindsay^ | | Emails containing work product at the direction of counsel regarding response to FINRA inquiry | Work Product |

* Denotes Lawyer/In-House Counsel
^ Denotes persons in the Legal and Compliance Departments, who may work directly on or assist in litigation, regulatory and other legal matter, as well as in a compliance capacity

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit M

144910.1

# FILED UNDER SEAL

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 31280812
Date:  May 24 2010  6:26PM
Mark Harper, Clerk

# Exhibit N

CONFIDENTIAL TREATMENT REQUESTED BY GOLDMAN SACHS

**LOG OF DOCUMENTS PRODUCED IN REDACTED FORM[4]**

Goldman Sachs v. November 24, 2009 through February 9, 2010 Productions

*Time International, et. al. v. Morgan Stanley Co., et. al.*

| Beginning Bates | End Bates | Redacted Pages Start | Redacted Pages End | Date | Document Type | Author | Recipients | Copyees | Other Participants in E-mail Chain | Subject Matter | Privilege |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GSE_T_00006565 | GSE_T_00006623 | GSE_T_00006557 | GSE_T_00006557 | 9/21/2008 | E-mail | Yang, Susan | Sanfina, David; Breckenridge, Jonathan*; Bonu, Ralanc; Latif, Nyree; McWilliams, Kelly; Wade, Richard; Bott, Patrick; Reed, Kelly; Benton, John*; Rosenbloom, Sam; Vaefen, Linda | Fischer, Matthew; Latif, Nyree; Mink, Ron; Springer, Kenneth; Kelly, Srikant; Browne, Matthew; Davies, Philip | | Requesting advice of counsel concerning a FINRA request. | Attorney-Client |
| GSE_T_00006701/00000792 | GSE_T_00000710/00000710 | GSE_T_00006701/00000710 | GSE_T_00000750.0/0 | 10/29/2008 | E-mail string with multiple attachments (draft worksheets) | Cheuk, Simon | Derval, Wilmick | Szeley, Michael; Fradskot, Paul | Nassau, Brent; Anmatte, Peter; Goldmarie, Eric*; Yunga, Susan; Sanfina, David; Breckenridge, Jonathan*; Bonu, Ralanc; Latif, Nyree; McWilliams, Kelly; Lam, Lily; Cheuk, Simon; Factory.Support@amtdpeai01.nyf.w.gs.com; gs-Reg-SHO-reports; fio-minichroy | Information collected for/provided to counsel to facilitate legal advice concerning a FINRA request. | Attorney-Client |
| GSE_T_00006599 | GSE_T_00007001 | GSE_T_00007001 | GSE_T_00007001 | 9/21/2008 | E-mail | Yang, Susan | Sanfina, David; Breckenridge, Jonathan*; Bonu, Ralanc; Latif, Nyree; McWilliams, Kelly; Wade, Richard; Bott, Patrick; Reed, Kelly; Benton, John*; Rosenbloom, Sam; Vaefen, Linda | Fischer, Matthew; Latif, Nyree; Mink, Ron; Springer, Kenneth; Kelly, Srikant; Browne, Matthew; Davies, Philip | | Requesting advice of counsel concerning a FINRA request. | Attorney-Client |
| GSE_T_00016315.0/00016066.0 | GSE_T_00016066.0/00016318.0 | GSE_T_00016066.0 | GSE_T_00016318.0/0 | 10/08/2004 | E-mail string with multiple attachments (e-mail) | Coulton, K. Susan | Nguyen, Freddie | Wolf, Steve; Carroll, Paul; Marx, Stephen; Valentin, Steven; Carroll, Stan; Lang, Jeff; Gurdlick, Guy; Malelle, James; Abram, Kevin; Sigismondi, Peter; Breckenridge, Jonathan*; Kendre, Steven; Nussel, David | | Information collected for/provided to counsel to facilitate legal advice concerning questions regarding Regulation SHO. | Attorney-Client |
| GSE_T_00016315.0/00016066.0 | GSE_T_00016066.0/00016320.0 | GSE_T_00016066.0/00016320.0 | GSE_T_00016320.0/0 | 10/08/2004 | (e-mail) | Gurdlick, Guy | Nguyen, Freddie | Wolf, Steve; Carroll, Paul; Marx, Stephen; Valentin, Steven; Carroll, Stan; Lang, Jeff; Malelle, James; Abram, Kevin; Sigismondi, Peter; Breckenridge, Jonathan*; Kendre, Steven; Nussel, David | | Information collected for/provided to counsel to facilitate legal advice concerning questions regarding Regulation SHO. | Attorney-Client |
| GSE_T_00054449 | GSE_T_00054449 | GSE_T_00054449 | GSE_T_00054452 | 8/31/2007 | E-mail string | Springer, Kenneth | Schulz, Christian*; Snider, Beth (WP)**; McWilliams, Kelly; Kelly, Srikant | Fischer, Matthew; Nassau, Brad; Eckert, Paul; Klima, James | | Reflects advice of counsel concerning a regulatory request. | Attorney-Client |

Unless noted otherwise, the listed individuals are employees of Goldman Sachs.

*denotes in-house counsel

**denotes outside counsel

CONFIDENTIAL TREATMENT REQUESTED BY GOLDMAN SACHS

LOG OF DOCUMENTS PRODUCED IN REDACTED FORM[1]

Goldman Sachs's November 24, 2009 through February 8, 2010 Productions

Texas International, et. al. v. Morgan Stanley & Co., et. al.

| Beginning Bates | End Bates | Redacted Pages Start | Redacted Pages End | Date | Document Type | Author | Recipients | Copyees | Other Participants in E-mail Chain | Subject Matter | Privilege |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GSB_T 00055461 | GSB_T 00055461 | GSB_T 00055479 | GSB_T 00055461 | 12/9/2008 | E-mail string | Sraley, Michael | Nassau, Brad; Fischer, Matthew; McWilliams, Kelly | Auwarter, Peter; Breckenridge, Jonathan*; Coldstamin, Eric; Moore, Matthew | | Requesting advice of counsel concerning a FINRA request. | Attorney-Client |
| GSB_T 00301177 | GSB_T 00301181 | GSB_T 00301177 | GSB_T 00301177 | 6/6/2007 | E-mail with multiple attachments (e-mail) | Isac, Kathleen | Mathews, Jeffrey | | | Requesting advice of counsel (Russoff, David*) concerning regulatory procedures. | Attorney-Client |
| GSB_T 00301177 | GSB_T 00301181 | GSB_T 00301179 | GSB_T 00301179 | 5/6/2007 | (e-mail) | Kwong, Michelle | gs-mkt-snmkrs; Malin, Scott; Subramh, Thomas; Weinstein, Howard; Adams, Kevin; Bualra, Patrick; Albert, Aaron; Bahin, Rebecca; Solomon, Noah | Engelhardt, Laura; Cahill, Adam | | Requesting advice of counsel (Russoff, David*) concerning regulatory procedures. | Attorney-Client |
| GSB_T 00046588 | GSB_T 00046588 | GSB_T 00046588 | GSB_T 00046030 | 5/29/2008 | E-mail string | Weber, David | Blando, Dennis; Watson, Brent | | McElwan, Lisa; Lucci, Daniel; Johnston, Peter; Hesselmann, Tom; Dupuy, Mary | Reflects advice of counsel (Breckenridge, Jonathan*) concerning regulatory rules. | Attorney-Client |
| GSB_T 00947411 | GSB_T 00947416 | GSB_T 00947413 | GSB_T 00947414 | 5/20/2004 | E-mail with attachment (committee minutes) | gs-compliance-ny | Auwarter, Peter; Benton, John*; Bolinaar, Marjorie; Coldstamin, Eric*; Cowper, Alistair; Fernandez, Joey; Gillies, Laura; Kellogg, Jim; Kessler, Steve; Kong, Wendy; Likeropoulos, George; Lin, Bonnie*; McHugh, Sean; Ray, James; Thackeray, Cory | | eq-gs-ny-cc; Brenton, Julia | Reflects advice of counsel (GS Legal Department*) concerning account reviews. | Attorney-Client |
| GSB_T 00947495 | GSB_T 00947500 | GSB_T 00947497 | GSB_T 00947498 | 6/2/2004 | E-mail with attachment (committee minutes) | gs-compliance-ny | Auwarter, Peter; Benton, John*; Bolinaar, Marjorie; Coldstamin, Eric*; Cowper, Alistair; Fernandez, Joey; Gillies, Laura; Kellogg, Jim; Kessler, Steve; Kong, Wendy; Likeropoulos, George; Lin, Bonnie*; McHugh, Sean; Ray, James; Sliend, Eugene; Sussman, Rich; Thackeray, Cory | | Roopnarine, Anolie; eq-gs-cc; Brenton, Julie; Chow, Judy | Information collected for/provided to counsel to facilitate legal advice concerning customer reviews. | Attorney-Client |
| GSB_T 00947599 | GSB_T 00947604 | GSB_T 00947601 | GSB_T 00947602 | 6/16/2004 | E-mail with attachment (committee minutes) | gs-compliance-ny | Auwarter, Peter; Benton, John*; Bolinaar, Marjorie; Coldstamin, Eric*; Cowper, Alistair; Fernandez, Joey; Gillies, Laura; Kellogg, Jim; Kessler, Steve; Kong, Wendy; Likeropoulos, George; Lin, Bonnie*; McHugh, Sean; Ray, James; Sliend, Eugene; Sussman, Rich; Thackeray, Cory | | Roopnarine, Anolie; eq-gs-cc; Brenton, Julie; V/a, Vivian; Chow, Judy | Information collected for/provided to counsel to facilitate legal advice concerning customer reviews. | Attorney-Client |

Unless noted otherwise, the listed individuals are employees of Goldman Sachs.
* Denotes in house counsel
** Denotes outside counsel

CONFIDENTIAL TREATMENT REQUESTED BY GOLDMAN SACHS

LOG OF DOCUMENTS PRODUCED IN REDACTED FORM[4]

Goldman Sachs November 24, 2009 through February 8, 2010 Productions

Itria International, et al. v. Morgan Stanley Co., et al.

| Beginning Bates | End Bates | Redacted Pages Start | Redacted Pages End | Date | Document Type | Author | Recipients | Cypress | Other Participants in E-mail Chain | Subject Matter | Privilege |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GSE_T 00950405.001 | GSE_T 00950406.001 | GSE_T 00950427.001 | GSE_T 00950406.001 | 2/15/2006 | E-mail | Boroujy, Beverly | Cahill, Adam; Rospunino, Amelia; Kelton, Anette*; Columbia, Court; Rosoff, David; Murphy, Eric; Borges, Jacqueline; Reilly, James; Mohensi, Jeffrey; Murphy, John (Compliance); Brechenridge, Jonathan*; Bruno, Joseph; Chow, Judy; Jack, Kathleen; Ben-Cassan, Marc; Liu, Rosanna; Lopez, Philip; Cherry, Tina; Wong, Stephen (Compliance); Regelman, Roger; Kong, Patrick; Yap, Robert (Compliance); Kong, Wendy | | Auwarter, Peter; Muslin, Igor; Evans, Michael | Information provided to/collected for counsel to facilitate legal advice concerning regulatory request. | Attorney-Client |
| GSE_T 00950405.001 | GSE_T 00950412.001 | GSE_T 00950411.001 | GSE_T 00950411.001 | 2/6/2006 | E-mail | Boroujy, Beverly | Wong, Stephen; Beggbaus, Roger*; Kong, Patrick; Ben-Cassan, Marc; Yap, Kong, Patrick; Bruno, Joseph; Brechenridge, Jonathan*; Mohensi, Jeffrey; Jack, Kathleen; Bruno, Michael; Cahill, Adam; Rospunino, Amelia; Miller, Guy*; Kelton, Anette; Columbia, Court; Rosoff, David; Murphy, Eric; Borges, Jacqueline; Chow, Judy; Auwarter, Peter; Lopez, Philip; Max, Robert | | | Information provided to/collected for counsel (GS Legal Department*) to facilitate legal advice concerning regulatory request. | Attorney-Client |
| GSE_T 00950434 | GSE_T 00950440 | GSE_T 00950438 | GSE_T 00950438 | 2/21/2006 | E-mail string | Mikell, Mark | O'Malley, Steven | | Chow, Judy; Karlin, Dennis; Auwarter, Peter; Frentze, Joe; Pith, Frank; Zarzecki, Chris; Auwarter, Peter; Bruno, Robert; Prondville, James | Reflecting advice of counsel (Breckenridge, Jonathan*) concerning regulatory request. | Attorney-Client |
| GSE_T 00950583 | GSE_T 00950587 | GSE_T 00950587 | | 5/26/2004 | E-mail with attachment (committee minutes) | gss-compliance-org | Auwarter, Peter; Breton, John*; Hollister, Marjorie; Colchanin, Eric*; Cooper, Abbie; Reilly, James; Ellinger, Laura; Kellogg, Jim; Kessler, Steve; Kong, Wendy; Liberopoulos, George; List, Bonnie*; McHugh, Stan; Ray, James; Sheud, Eugenia; Sussman, Rick; Thackaray, Cory | | | Information collected for/provided to counsel concerning customer reviews. | Attorney-Client |
| GSE_T 00950672 | GSE_T 00950674 | GSE_T 00950673 | GSE_T 00950673 | 10/12/2004 | E-mail string | Colchamin, Eric | Breckenridge, Jonathan* | | Conti, James; Gross, Amy; Aliberti, Richard; Auwarter, Peter; Kellogg, James; Nobla, David; Nikolas, Eric; Miller, David | Requesting advice of counsel concerning transaction. | Attorney-Client |

Unless noted otherwise, the listed individuals are employees of Goldman Sachs.
*Denotes in-house counsel
**Denotes outside counsel