E
X
H
I
B
I
T

B

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

TASER INTERNATIONAL, INC.,
*et al.,*

      Plaintiffs,

v.

MORGAN STANLEY & CO., INC.,
*et al.,*

      Defendants.

Civil Case No.
2008-EV-004739-B

*** FILED UNDER SEAL ***

## UBS SECURITIES LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR RELIEF CONCERNING UBS'S ALLEGED VIOLATION OF THIS COURT'S ORDER

UBS Securities, LLC ("UBS") hereby responds to Plaintiffs' Motion for Relief Concerning Defendant UBS Securities, LLC's Violation of this Court's Order (hereinafter, "the Motion"), which Plaintiffs submitted as part of an omnibus motion filed May 24, 2010.[1] Without notice to UBS, Plaintiffs filed the Motion claiming that UBS did not provide a written representation regarding certain trading data and did not produce certain other trading data within the time required by a stipulated Court order. Plaintiffs' accusations are not in good faith, and the Motion should be denied in its entirety for reasons explained more fully below. But there are at least three critical points that Plaintiffs have failed to tell the Court that bear emphasis at the outset:

*First,* with respect to every piece of information that is the subject of the Motion, UBS advised Plaintiffs prior to their unannounced filing that they would be receiving the information shortly. Indeed, in the few weeks since Plaintiffs filed the Motion, UBS has provided Plaintiffs

---

[1]   Defendants have jointly filed a separate response to address the two additional issues raised in Plaintiffs' omnibus motion of May 24, 2010.

with all that was requested and even *more*.  Plaintiffs, therefore, cannot in good faith contend

that they have been prejudiced in any way or that their Motion was necessary in the first place.

*Second,* aside from the information that is the subject of this Motion, UBS has produced

a massive amount of discovery in this case, including over 160,000 documents amounting to

more than 1.2 million pages and 150 gigabytes of native file data.  Included in this is a

significant amount of trading data in addition to the blue sheets[2] Plaintiffs complain about.  For

example, UBS completed production of data from its Order Management System on November

13, 2009 (with the vast majority of this order data being provided to Plaintiffs by September 15,

2009).  This order data contains all orders of TASER placed through UBS from the relevant time

period, whether executed or not, as well as any amendments or cancellations to such orders.

UBS's order data contains over 145 fields, including the date and time of any order, amendment

or execution; the account number of the entity placing the order; and a buy or sell indicator

identifying whether a particular trade was a short or long sale.  UBS also produced on September

15, 2009 trading data known as stock record data.  The stock record data shows each account's

intra-day activity in TASER, as well as its end-of-day position.[3]

Despite having had this voluminous amount of data and documents for months, Plaintiffs

continue to refuse to identify the most basic information about their own claims in this case,

specifically which trades are allegedly "abusive naked short selling" (which UBS vigorously

denies ever occurred).  (*See* 6/10/10 Defs.' Joint Motion to Compel Pls.'s Interrrogatory

---

[2]   "[B]lue sheets provide, *inter alia,* information identifying the account holder for whom specific trades were executed, indicating whether the transaction was a buy or a sell and long or short." (Ex. A to Pls.' Motion at 3.)

[3]   In addition, since December 15, 2009, Plaintiffs have had CNS Accounting Summaries produced by The Depository Trust & Clearing Corporation.  This data, which Defendants shared the costs for, shows the position of every single broker-dealer that transacted in TASER at the end of each trading day and that settled their trades via CNS, including whether that broker had a deficit or surplus of TASER securities on its books.  UBS subsequently produced UBS-specific CNS Accounting Summaries on January 29, 2010.

Responses.)   UBS respectfully submits that Plaintiffs' current Motion is an effort to divert attention from Plaintiffs' obligation to respond to discovery requests, and that the "blue sheet" and "affiliate" issues that have been raised are part of a now year-long pattern of avoiding their own discovery obligations.

*Third*, the "blue sheet" issue as presented by Plaintiffs is highly misleading.   As explained below, "blue sheets" are documents that are not required to be *maintained,* but instead are required by regulators to be *created* at their request.   Discovery rules do not require parties to create such documents in civil litigation, but UBS did so in a good faith effort to try to move this case forward.   UBS voluntarily disclosed that some inadvertent system errors had occurred in connection with *other* blue sheets it created for regulators.   To be clear, however, no regulator has ever seen, let alone criticized the TASER blue sheets that UBS created for Plaintiffs in this litigation, which makes UBS's so-called admissions regarding blue sheets irrelevant and misleading.

As the record confirms, UBS has made and continues to make every effort to work cooperatively and in good faith with Plaintiffs to provide them with information consistent with (and beyond) UBS's discovery obligations.   Yet at each turn, Plaintiffs have resorted to abusive tactics that appear designed to unduly burden Defendants rather than obtain information relevant to the litigation.   Plaintiffs' Motion is the latest example of this practice.   There is simply no basis for Plaintiffs' request that the Court sanction UBS, particularly since they now have all the information that is the subject of the Motion and far more.   Plaintiffs have nevertheless refused to withdraw the Motion, and UBS therefore respectfully requests that this Court deny the Motion in its entirety.

## I.   PLAINTIFFS HAVE MISCHARACTERIZED THE ISSUES RELATING TO BLUE SHEETS.

Plaintiffs claim that UBS violated a court order by refusing to "provide timely answers" about "how to remedy" alleged inaccuracies in electronic documents known as blue sheets, inaccuracies which Plaintiffs contend "materially prejudic[e]" their ability to litigate this case and to "fully respond[] to Defendants' discovery." (Pls.' Motion at 6.)  Plaintiffs' argument is misleading and without support.

As an initial matter, Plaintiffs' Motion appears to intentionally mischaracterize what blue sheets are.  As Plaintiffs are well aware, and as UBS has reiterated on numerous occasions, UBS does not "maintain" blue sheets (nor do other Defendants, as far as we are aware).  Instead, as noted in Exhibit A to Plaintiffs' own motion (but noticeably absent in the motion itself), "[b]lue sheets are documents that are *generated* by member organizations [i.e., brokerage firms like UBS] at the request of regulators in connection with investigations of questionable trading." (Ex. A to Pls.' Motion at 2 (emphasis added).)  There is no similar requirement under the discovery rules for such documents to be created by civil litigants, and indeed it is UBS's understanding that at least some other Defendants have not done so in this case.  Nevertheless, in response to Plaintiffs' requests, and in an effort to work cooperatively, UBS agreed to create and then produce TASER blue sheets, a production which it completed approximately nine months ago. (Aff. of Jeffrey M. Gould, Esq. (hereinafter "Gould Aff."), ¶ 2; Ex. A. (9/14/09 Letter from D. Gomez to S. Rosenwasser.)  No regulator has ever seen, let alone criticized, these blue sheets.

Nor is it the case that UBS refused to "provide timely answers" about "how to remedy" potential inaccuracies in the TASER blue sheets.  On the contrary, in the spirit of full disclosure, long ago UBS disclosed to Plaintiffs that certain coding errors had inadvertently caused inaccuracies in *other* blue sheets that it had previously created and produced for regulators and

that it was possible that some of these same errors *could* affect the blue sheets created for this litigation.  (Gould Aff., Ex. B at n.2 (Defendants' June 19, [2009] Positions Concerning Plaintiffs' [First] Requests for Production of Documents Nos. 1-16.)  UBS explained at that time, and has reiterated on numerous occasions, that Plaintiffs should use the two other sets of trading data already produced (stock record and order data) as the operative data sets, and as a comparison if there arose a need to address any information that might be inaccurate on the blue sheets.  (Gould Aff., Ex. B at n.2; Ex. C (11/13/09 Letter from D. Gomez to S. Rosenwasser).) Notwithstanding this fact, Plaintiffs seized on the potential for inaccuracies in the TASER blue sheets, to demand that UBS produce yet another set of trading data known as trade blotters, *i.e.*, daily records that contain the details of TASER trades.

Because trade blotters are typically generated from the same data as blue sheets, UBS explained that it did not believe that the trade blotters would remedy any blue sheet inaccuracies. When Plaintiffs persisted in their request for trade blotters, UBS asked Plaintiffs to "identify specifically any relevant information that they believe is on the blue sheets, but cannot be gleaned from the stock records and order data."  (Gould Aff., Ex. D (12/11/09 Letter from J. Landis to E. Eager); Ex. E (1/7/10 Letter from J. Landis to E. Eager).)  Plaintiffs claimed that they needed full account name information that did not appear on the stock record and order data.  (Gould Aff., Ex. F (2/2/2010 Email from J. Landis to E. Eager).)  UBS offered to resolve this issue by investigating whether it could provide a key with that information (*id.*), yet Plaintiffs declined to take UBS up on this offer.  (Gould Aff., Ex. G (2/9/10 Email exchange between J. Landis and E. Eager.)  To this date, Plaintiffs have not identified a single inaccuracy in UBS's TASER blue sheets that could not be corrected by UBS's stock record and order data,

and that has had any impact on Plaintiffs' ability to identify and analyze the alleged illegal TASER short sales in this case.

Instead, without offering any plausible explanation why the three trading data sets already produced were inadequate, Plaintiffs persisted in their request for the TASER trade blotters. Accordingly, in a stipulated order, UBS agreed to try to determine in good faith whether TASER blue sheets were created from the same data that appears on TASER trade blotters; if the blue sheets and trade blotters contained the same data, then UBS agreed to provide a representation to that effect, and Plaintiffs agreed that UBS need not produce what would be admittedly duplicative trade blotters. (Ex. G to Pls.' Motion.) Although UBS believed, and continues to believe, that Plaintiffs' request for trade blotters is a duplicative and burdensome request, when UBS conducted further investigation into the data sources, it determined that it could not represent with 100 percent certainty that the millions of pieces of data contained in the trade blotters were an exact mirror image of the millions of pieces of data contained in the TASER blue sheets that UBS had created for Plaintiffs.

Without conferring with UBS, Plaintiffs filed this Motion, claiming that UBS had failed to timely make the required representation that the two data sets derived from the same data. But the stipulated order does not require UBS to make a representation that is potentially false. It also does not require UBS to produce the trade blotters. There is simply no basis for Plaintiffs' claim that UBS violated the blue sheet/trade blotter provision of that order. When UBS discussed the issue with Plaintiffs, Plaintiffs insisted that their only concern was to receive additional trading data. Therefore, in an effort to resolve the issue, UBS produced the trade blotter data on June 7, 2010. (Gould Aff., Ex. H (6/7/10 Letter from J. Gould to S. Rosenwasser).)

Despite possessing four sets of UBS trading data relating to TASER securities, Plaintiffs refused to withdraw their Motion with respect to the trade blotters unless UBS signed on to a cursory proposed order declaring that UBS had violated the stipulated order and requiring that UBS produce even more data.  Plaintiffs' ultimatums are a far cry from UBS's good faith efforts to provide Plaintiffs the information they claim to need.  Instead, Plaintiffs are clearly engaged in an effort to harass UBS and avoid complying with their own discovery obligations.

## II.    UBS HAS DILIGENTLY WORKED TO OBTAIN DATA FROM NON-DEFENDANT AFFILIATES.

Lumped together with their argument about blue sheets, Plaintiffs also complain that UBS violated the stipulated order by failing to produce TASER trading data from two affiliates, or by failing to confirm that the affiliates had no such data.  In doing so, Plaintiffs contend, again without explanation, that this alleged violation has impacted their ability to litigate this case and respond to Defendants' discovery.  Plaintiffs' argument is without merit.  As an initial matter, the affiliate trading data is not even relevant to Plaintiffs' case.  No UBS affiliate is a named defendant in this case (the only UBS defendant in this case is UBS Securities, LLC), and there is no plausible argument why UBS Securities LLC must produce affiliate trading data—which does not even exist from one of the two affiliates—before Plaintiffs will even begin to identify the allegedly illegal short sales that Plaintiffs contend UBS (not UBS affiliates) engaged in, as Defendants' interrogatories request.[4]

Nevertheless, UBS agreed to obtain and provide certain information regarding two UBS affiliates, UBS Stamford AG and UBS Financial Services, to the extent it exists, allowing Plaintiffs to avoid a lengthy subpoena process for non-parties.  Specifically, the stipulated order required that UBS conduct a diligent search into whether the two UBS affiliates transacted in

---

[4]   Defendants jointly filed a Motion to Compel Plaintiffs' Responses to Interrogatories on June 10, 2010.

TASER securities, a search which UBS completed.  (Ex. G to Pls.' Motion.)  The stipulated order also required UBS to provide a representation that an affiliate did not transact in TASER securities, if UBS learned as much in its search.  (*Id.*)  The order set no deadline for that representation, but UBS confirmed to Plaintiffs on June 16, 2010 that one affiliate, UBS AG Stamford Branch, did not transact in TASER securities (and therefore has none of the requested data).  (Gould Aff., Ex.  I (6/16/10 Email from J. Gould to S. Rosenwasser).)  In addition, the order required UBS, if it learned that an affiliate did transact in TASER securities, to produce by May 21, 2010, daily trade blotters, blue sheets, daily/weekly stock positions, loan/borrow records, and listed OTC derivatives, "to the extent [that evidence] exists."  (Ex. G to Pls.' Motion.)  One business day after that deadline, UBS informed Plaintiffs that it was still working on the affiliate trading data.  (Gould Aff., ¶ 12.)  Hours later, without giving UBS any notice that it believed this Court's intervention was necessary, and despite informing UBS that their only concern was receiving the trading data, Plaintiffs filed this Motion.  UBS continued its efforts to obtain the trading data from its affiliate and has produced that data to Plaintiffs.

Plaintiffs' Motion is not in good faith.  It has always been understood that the parties will work diligently and in good faith to meet agreed-upon deadlines; UBS is not aware of any prior instance where a party has refused to allow the other additional time to complete a production, particularly when doing so involves collecting and reviewing complicated data, and particularly when the other side has notified the other that it is working diligently to produce the requested information.  Moreover, the stipulated order required UBS to produce only data that already existed in specific forms, including blue sheets.  (Ex. G to Pls.' Motion.)  While the second affiliate, UBS Financial Services, had transacted in TASER securities, it did not have much of the data listed in the stipulation (such as blue sheets) in pre-existing form.  Nevertheless,

UBS went a step beyond what it was required to do, and generated additional documents similar to the listed categories. UBS completed production of trading data related to UBS Financial Services on June 21, 2010. (Gould Aff., Ex. J (6/21/10 Letter from J. Gould to S. Rosenwasser).) While UBS produced these documents after the May 21, 2010 date originally agreed to by UBS, Plaintiffs received more documents than UBS was required to produce, and it received these documents sooner than they would have had UBS not agreed to voluntarily collect and produce data from its affiliates and Plaintiffs been forced to follow the normal procedure and issue third-party subpoenas to these entities. In short, Plaintiffs have simply failed to establish any prejudice to them whatsoever.

## III.  PLAINTIFFS' REQUEST FOR SANCTIONS IS WITHOUT MERIT AND SHOULD BE DENIED.

There is no basis for Plaintiffs' claim that UBS should be sanctioned for a purported failure "to preserve and produce accurate data and their unwillingness to provide a full and complete alternative data source." (Pls.' Motion at 8.) To begin with, Plaintiffs do not even attempt to support their inflammatory accusation that UBS did not "preserve" data.[5] It is equally implausible that UBS should be sanctioned for being unwilling to provide an "alternative" data set. Even before it produced the trade blotter data, UBS had produced *two* trading data sets other than blue sheets. UBS specifically informed Plaintiffs that they could use these data sets to correct any potential errors in the blue sheets. And even though UBS was not required to do so by the stipulated order, UBS subsequently provided Plaintiffs with the trade blotter data—a *fourth* data set. UBS has now also provided Plaintiffs with trading data for its affiliate UBS Financial Services, including data that it was not required to produce under the stipulated order.

---

[5]  Such an assertion is entirely disingenuous given that, as Plaintiffs are well aware, blue sheets are not documents that are "maintained" by UBS—they are documents that UBS specifically created at Plaintiffs' request for purposes of this litigation.

Plaintiffs cite no case to support awarding sanctions in such circumstances. On the contrary, Georgia courts routinely refuse to impose sanctions on a party who makes diligent efforts to provide requested information and where there is no evidence of willful or intentional disregard for a court's orders. *See, e.g., Lightsey v. Potter*, No. 1:04-CV-3110-ODE, 2006 WL 3804695, at *5 (N.D. Ga. Dec. 22, 2006) (slip copy) (denying sanctions where defendant did not timely comply with court order requiring him to produce documents by a set date, because the "evidence before the Court shows that Defendant's violation was inadvertent" and "Defendant quickly complied with the order" thereafter); *Gilbert v. Montlick & Assocs., P.C.*, 248 Ga. App. 535, 541, 546 S.E.2d 895, 902-03 (Ga. Ct. App. 2001) (affirming trial court's denial of sanctions for failure to produce documents as ordered by trial court, where there was evidence of at least an attempt by defendant to provide the information requested, and "no finding of a wilful (sic.) or intentional failure to comply with court's order"). In *Gilbert*, the defendant failed to *ever* produce the documents at issue. Here, not only did UBS diligently seek to collect the requested information in good faith, but it also generated additional documents beyond what was required by the stipulation and produced the information within mere days of the target date at no prejudice to Plaintiffs. *See Lightsey*, 2006 WL 3804695, at *4.

Plaintiffs offer no evidence that UBS acted "willful[ly], in bad faith or in conscious disregard of an order." *Gen. Motors Corp.* v. *Conkle*, 226 Ga. App. 34, 486 S.E.2d 180, 185 (Ga. Ct. App. 1997); *see also Gilbert*, 248 Ga. App. at 541. Quite the opposite is true. As the record makes clear, UBS negotiated with Plaintiffs in good faith over their cumulative data requests, agreed to make additional searches and inquiries, answered burdensome interrogatories regarding the data produced, and worked diligently to collect and produce duplicate data sets and data from affiliate entities. *See Harrell v. Ga. Dept. of Human Res.*, 300 Ga. App. 497, 501, 685

10

S.E.2d 441, 445 (Ga. App. 2009) (reversing award of sanctions because trial court abused its discretion in awarding sanctions without first examining the circumstances of the alleged discovery order violation). Under no circumstances can UBS's diligence be considered a willful violation or conscious disregard of a Court order.

And if it were, Plaintiffs themselves are guilty of the same purported "misconduct." Just recently—after Plaintiffs had already filed their Motion—Plaintiffs themselves produced certain documents three days after a court-ordered deadline. (12/15/09 Stipulation & Order at ¶ 7; Gould Aff., Ex. K (6/4/10 Letter from E. Eager to R. Sinkfield).) Plaintiffs did not notify Defendants in advance that they would miss the deadline set forth in the stipulated order. Instead, on June 4, 2010 and without prior notice, Plaintiffs produced documents which they claimed to have identified "while conducting a quality review of its document production." (Gould Aff., Ex. K.) Of course, Defendants took Plaintiffs at their word, and elected not to burden the Court with unnecessary motion practice regarding documents ultimately produced, nor have they sought other relief or sanctions for Plaintiffs' failure to meet this Court-ordered deadline.

## IV.   PLAINTIFFS' DISCOVERY PRACTICES CONSTITUTE A PATTERN OF ABUSE.

It is painfully apparent that instead of litigating their claims on the merits, Plaintiffs are determined to turn this litigation into a discovery battle, in which they not only burden Defendants with irrelevant and duplicative requests but also seek to prejudice this Court against Defendants with misleading, inflammatory discovery motions. To date, UBS has produced over 1.2 million pages of documents,[6] including voluminous trading records concerning TASER

---

[6]   To date, UBS has produced over 160,000 documents amounting to more than 1.2 million pages. Included in these productions are more than 70,000 native files that are each produced with a single bates number and which comprise more than 150 gigabytes. (Gould Aff., ¶ 15.)

stock.[7] Plaintiffs have served on UBS alone 85 document requests (including subparts), at least their permissible limit of 50 interrogatories (including subparts), 188 requests for admissions, and four 30(b)(6) deposition notices containing a non-exhaustive list of more than 100 individual topics (including subparts).   This does not include the countless "informal" email discovery requests levied by Plaintiffs on a near daily basis, many of which appear designed solely to harass UBS and drive up its costs.  For example, in one email from April, 21 2010, Plaintiffs demanded that UBS "identify the contents" of the majority of documents on UBS's privilege log. (Gould Aff., Ex. L (4/21/10 Email from S. Rosenwasser to J. Landis and A. Clubok).)  In another email from May 6, 2010 Plaintiffs identified by name various "reports" that other Defendants appear to generate and demanded that UBS confirm whether it utilized similar reports.  (Gould Aff., Ex. M (5/6/10 Email from S. Rosenwasser to J. Landis and A. Clubok).)

Ratcheting up their abusive approach to discovery, Plaintiffs have now filed six discovery motions in the last 30 days, none of which has any merit and all of which reflect Plaintiffs' refusal to confer in good faith with Defendants.  This type of motion practice must end.  Given that UBS has already produced the data Plaintiffs complain about in this Motion, and that UBS has acted in good faith in an effort to comply with all Court orders, Plaintiffs' request for expenses and attorney's fees should be denied.  *See* O.C.G.A. 9-11-37(b).

## CONCLUSION

In view of the foregoing, Defendants respectfully ask the Court to deny Plaintiffs' Motion and order any other relief deemed appropriate by the Court.

---

[7]   This includes both the "TASER" and "Non-TASER" documents.  UBS has worked diligently to review tens of millions of pages of documents hitting on the agreed upon search terms and produce responsive non-privileged documents in accordance with the parties' agreements.   Particularly with respect to the "Non-TASER" documents, UBS made significant rolling productions every month beginning in February 2010 and completed its production by the agreed upon June 1, 2010 date.  Accordingly, UBS is one of only two Defendants not subject to Plaintiffs' Motion for Relief and Sanctions related to production of "Non-Taser" documents, filed on June 2, 2010.

Dated:  June 23, 2010

_Richard H. Sinkfield_
Georgia Bar No. 649100
Dan F. Laney, III
Georgia Bar No. 435290
*Attorneys for Defendant UBS Securities, LLC*

ROGERS & HARDIN LLP
2700 International Tower
  Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303-1601
Phone:  404-522-4700
Fax:  404-525-2224


Andrew B. Clubok
Admitted Pro Hac Vice
Jeffrey G. Landis
Admitted Pro Hac Vice
Jeffrey M. Gould
Admitted Pro Hac Vice

*Attorneys for Defendant UBS Securities, LLC*

KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Phone: 202-879-5000
Fax:  202-879-5200

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June, 2010, a true and correct copy of the foregoing **UBS SECURITIES LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR RELIEF CONCERNING UBS'S ALLEGED VIOLATION OF THIS COURT'S ORDER** ("Motion") was electronically filed with the Clerk of Court using the Court's electronic filing system, which will serve the following attorneys of record, who are registered participants in the Court's electronic notice and filing system, by automatically sending the attorneys an e-mail notification of such filing:

> John E. Floyd, Esq.
> Steven J. Rosenwasser, Esq.
> Bondurant, Mixson & Elmore, LLP
> 3900 One Atlantic Center
> 1201 West Peachtree Street, N.W.
> Atlanta, Georgia 30309.

In addition, a true and correct copy of the Motion was served on the following attorney of record via U.S. Mail postage prepaid and addressed as follows:

> James W. Christian, Esq.
> Christian, Smith & Jewell LLP
> 2302 Fannin, Suite 500
> Houston, Texas 77002

This 23th day of June, 2010.

James W. Cobb
Georgia Bar No. 420133

ROGERS & HARDIN LLP
2700 International Tower
  Peachtree Center
229 Peachtree Street, NE
Atlanta, GA 30303-1601
Tel. (404) 522-4700
Fax (404) 525-2224

# FILED

# UNDER

# SEAL

**IN THE STATE COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| |
|---|
| TASER INTERNATIONAL, INC., *et al.,* |
| Plaintiffs, |
| v. |
| MORGAN STANLEY & CO., INC., *et al.,* |
| Defendants. |

Civil Case No.
2008-EV-004739-B

**AFFIDAVIT OF JEFFREY M. GOULD IN SUPPORT OF**
**UBS SECURITIES LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR RELIEF**
**CONCERNING UBS'S ALLEGED VIOLATION OF THIS COURT'S ORDER**

DISTRICT OF COLUMBIA

Personally appeared before the undersigned, duly authorized to administer oaths in this district, Jeffrey M. Gould, who being first duly sworn, deposes and states as follows:

1.      I am Jeffrey M. Gould.  I am an associate with the law firm of Kirkland & Ellis LLP and counsel for Defendant UBS Securities, LLC ("UBS") in this action.  I am over 18 years of age and have personal knowledge of the matters set forth in this affidavit.  I submit this affidavit in support of UBS Securities LLC's Opposition to Plaintiffs' Motion for Relief Concerning UBS's Alleged Violation of This Court's Order.

2.      In response to Plaintiffs' requests, and in an effort to work cooperatively, UBS agreed to create and then produce TASER blue sheets, which it completed approximately nine months ago in September 2009.

3.      Attached to this affidavit as Exhibit A is a true and correct copy of the letter sent by D. Gomez to S. Rosenwasser on September 14, 2009.

4.      Attached to this affidavit as Exhibit B is a true and correct copy of Defendants' June 16, [2009] Positions Concerning Plaintiffs' [First] Requests For Production Of Documents Nos. 1-16.

5.      Attached to this affidavit as Exhibit C is a true and correct copy of the letter sent by D. Gomez to S. Rosenwasser on November 13, 2009.

6.      Attached to this affidavit as Exhibit D is a true and correct copy of the letter sent by J. Landis to E. Eager on December 11, 2009.

7.      Attached to this affidavit as Exhibit E is a true and correct copy of the letter sent by J. Landis to E. Eager on January 7, 2010

8.      Attached to this affidavit as Exhibit F is a true and correct copy of the February 2, 2010 e-mail from J. Landis to E. Eager.

9.      Attached to this affidavit as Exhibit G is a true and correct copy of the February 9, 2010 e-mail exchange between J. Landis and E. Eager.

10.      Attached to this affidavit as Exhibit H is a true and correct copy of the letter sent by J. Gould to S. Rosenwasser on June 7, 2010.

11.      Attached to this affidavit as Exhibit I is a true and correct copy of the June 16, 2010 e-mail from J. Gould to S. Rosenwasser.

12.      On May 24, 2010, UBS informed Plaintiffs that it was still working to search for and collect trading data for the affiliates.

13.      Attached to this affidavit as Exhibit J is a true and correct copy of the letter sent by J. Gould to S. Rosenwasser on June 21, 2010.

2

14.     Attached to this affidavit as Exhibit K is a true and correct copy of the letter sent from E. Eager to R. Sinkfield on June 4, 2010.

15.     To date, UBS has produced over 160,000 documents amounting to more than 1.2 million pages. Included in these productions are more than 70,000 native files that are each produced with a single bates number and which comprise more than 150 gigabytes.

16.     Attached to this affidavit as Exhibit L is a true and correct copy of the April 21, 2010 e-mail from S. Rosenwasser to J. Landis and A. Clubok.

17.     Attached to this affidavit as Exhibit M is a true and correct copy of the May 6, 2010 e-mail from S. Rosenwasser to J. Landis and A. Clubok.


FURTHER AFFIANT SAYETH NOT


SIGNATURE ON NEXT PAGE

_____
Jeffrey M. Gould

Sworn to and subscribed
before me this 23ʳᵈ day
of June, 2010.

_____
Notary Public

My commission expires     **Karen A. Taylor**
                          **Notary Public, District of Columbia**
                          **My Commission Expires 07-31-2014**

4

# Exhibit A

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Daniel J. Gomez
To Call Writer Directly:
(202) 879-5958
daniel.gomez@kirkland.com

655 Fifteenth Street, N.W.
Washington, D.C. 20005

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

September 14, 2009

**VIA FEDERAL EXPRESS AND
ELECTRONIC MAIL**

Steven J. Rosenwasser, Esq.
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400.

Re:    *Taser International, et al. v. Morgan Stanley & Co., et al.*

Dear Mr. Rosenwasser:

Enclosed please find documents produced in accordance with the agreement reached by the parties as memorialized by Attachment A to the Scheduling Order as entered on July 16, 2009. All documents in this portion of the production have been designated "Highly Confidential" pursuant to the Stipulation and [Proposed] Protective Order Regarding Confidential Information. Also enclosed are organization charts produced pursuant to the Interrogatory Compromise reached by the parties on August 13, 2009. All documents in that portion of the production have been designated as "Confidential" pursuant to the Stipulation and [Proposed] Protective Order Regarding Confidential Information.

UBS is producing all responsive data from their trading systems from January 1, 2003 to and extending through May 31, 2009 in the form of blue sheet runs for equities trading in TASER common stock. These documents have been bates labeled UBS_TASER-0000892 to UBS_TASER-0000909.

UBS is also producing some responsive data from their stock position records from January 1, 2003 to and extending through May 31, 2009 in the form of their daily stock record. These documents have been bates labeled UBS_TASER-0000886 to UBS_TASER-0000891. The remainder of this data will be produced shortly, we expect by tomorrow.

UBS is also producing some responsive data from their WORM database from June 26, 2006 to and extending through May 31, 2009. This WORM database is a storage database for the order management system data that is responsive to Plaintiffs' requests. These documents

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco

**KIRKLAND & ELLIS LLP**

have been bates labeled UBS_TASER-0000967 to UBS_TASER-0001036.  The remainder of this data will be produced shortly, we expect by tomorrow.

UBS is also producing blue sheet runs for the trading of listed options in TASER common stock from January 1, 2003 to and extending through May 31, 2009.  These documents have been bates labeled UBS_TASER-0000631 to UBS_TASER-0000885.

After conducting a reasonably diligent search, UBS has not located any relevant "eligible OTC derivative instruments . . . relating to TASER securities, in which the OTC derivatives dealer has any direct or indirect interest or which it has written or guaranteed."

Finally, UBS is producing historical organizational charts as per the Interrogatory Compromise reached by the parties on August 13, 2009.  These documents have been bates labeled UBS_TASER-0000910 to UBS_TASER-0000958.

Documents within bates range UBS_TASER-0000910 to UBS_TASER-0001036 that are not found on the enclosed DVDs will be produced shortly, we expect by tomorrow.

UBS reserves the right to supplement this production as necessary. If you have any questions concerning the enclosed, please do not hesitate to contact me.

Sincerely,

Daniel J. Gomez

Enclosures

cc (without enclosures):       Defense Counsel

2

# Exhibit B

DEFENDANTS' JUNE 16 POSITIONS CONCERNING PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS NOS. 1-16

| NO. | REQUEST | AGREED TO PRODUCE WITHIN 30 DAYS | AGREED TO PRODUCE WITHIN 60 DAYS | ITEMS NOT COVERED BY REQUEST | OBJECTIONS |
|---|---|---|---|---|---|
| 1 | All Blotters (or other records of original entry) showing itemized daily record of purchase and sales of TASER securities, including:<br><br>(a) the account for which each such transaction was effectuated;<br>(b) the name and amount of securities;<br>(c) the unit and aggregate purchase or sale price;<br>(d) the trade date;<br>(e) and the name or other designation of the person from whom purchased or received or to whom sold or delivered.<br><br>See 17 C.F.R. 240.17a-3(a)(1). | Yes, trade reports, trade runs, trade history report, or blue sheet runs [3] for cash equities trading in TASER common stock from Jan. 1, 2003 through May 31, 2009 and, for some Defendants, daily stock position or activity reports, Holder's File, stock record reports, or stock position data from June 1, 2007 through May 31, 2009.[3] | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock position data from Jan. 1, 2003 through May 31, 2007. Additional time is required to produce the records for this period largely due to the burden associated with gathering and producing records for this extensive time period, which is beyond the period for which such records must be maintained in an "easily accessible location." | | |

| | PARTIES' REQUESTS | REQUESTS ... NOT COVERED ... OBJECTIONS |
|---|---|---|
| 2 | A memorandum of each brokerage order, and of any other instruction given or received for the purchase or sale of TASER securities, whether executed or unexecuted, and showing:<br><br>(a) the terms and conditions of the order or instructions and of any modification or cancellation thereof;<br>(b) the account for which entered;<br>(c) the time the order was received;<br>(d) the time of entry;<br>(e) the price at which executed;<br>(f) the identity of each associated person, if any, responsible for the account;<br>(g) the identity of any other person who entered or accepted the order on behalf of the customer or, if a customer entered the order on an electronic system, a notation of that entry and, to the extent feasible, the time of execution or cancellation.<br><br>See 17 C.F.R. 240.17a-3(a)(6). | Based upon the differences among Defendants' respective order ticket records or order management system data, retrieval of this information is highly individualized; accordingly, Defendants' individual responses to this Request are set forth in Appendix A. |

2

| NO. | PLAINTIFF'S REQUEST | RESPONSE TO PRODUCE DOCUMENTS WITHIN 30 DAYS |
|-----|--------------------|---------------------------------------------|
| 3 | A memorandum of each purchase and sale of TASER securities, for the account of the member, broker, or dealer showing the price and, to the extent feasible, the time of execution; and, in addition, where the purchase or sale is with a customer other than a broker or dealer, a memorandum of each order received, showing the time of receipt, the terms and conditions of the order and of any modification thereof, the account for which it was entered, the identity of each associated person, if any, responsible for the account, the identity of any other person who entered or accepted the order on behalf of the customer or, if a customer entered the order on an electronic system, a notation of that entry. *See* 17 C.F.R. 240.17a–3(a)(7). | Based upon the differences among Defendants' respective order ticket records or order management system data, retrieval of this information is highly individualized; accordingly, Defendants' individual responses to this Request are set forth in Appendix A. |

3

| No. | PLAINTIFFS' REQUEST | AGREED TO PRODUCE WITHOUT OBJECTION | AGREED TO PRODUCE WITH LIMITATION | WILL NOT PRODUCE/OBJECTIONS | OBJECTIONS |
|---|---|---|---|---|---|
| 4 | Copies of confirmations of all purchase and sales of TASER securities, including all repurchase and repurchase agreements, and copies of notices of all other debits and credits for securities, cash and other items for the account of customers and partners of defendant. *See* 17 C.F.R. 240.17a-3(a)(8). | Yes, trade reports, trade runs, trade history reports, or blue sheet runs for cash equities trading in TASER common stock from Jan. 1, 2005 through May 31, 2009. | | While the trade report/trade run/trade history/blue sheet run reports that Defendants will produce in response to this request largely mirror the information contained on trade confirmations, such trading data may not contain (a) commission information (for some Defendants) and (b) disclosures or "trailers" that appear on client-facing trade confirmations. | Information reflected on trade confirmations is substantially similar to the information provided by the trade run/trade history/blue sheet runs that Defendants have already agreed to produce (Defendants can provide sample trade confirmations that will demonstrate the largely duplicative nature of the information.) Because pulling trade confirmations can be burdensome—for example, for many Defendants, collecting trade confirmations first requires identification of the relevant trades and a largely manual compilation of the relevant confirmations—Defendants object to producing confirmations at this time and the disproportionate burden such an exercise would entail in light of the largely duplicative nature of the information. Nonetheless, Defendants remain willing to meet and confer to the extent Plaintiffs are able to narrow their request for confirmations to those relating to particular trades. |

4

| REQUEST NUMBER | DOCUMENT REQUEST | RESPONSES/OBJECTIONS |
|---|---|---|
| 5 | Time-sequenced records of each transaction relating to TASER securities effected through the internal broker-dealer system, including date and time executed, price, size, counterparty identification information and method of execution (if internal broker-dealer system allows alternative means or locations for execution, such as routing to another market, matching with limit orders or executing against the quotations of the broker or dealer sponsoring the system). See 17 C.F.R. 240.17a-3(a)(16)(i). | This request seeks documents related to transactions done on an Alternative Trading Systems ("ATS") established pursuant to SEC Regulation ATS.  Some Defendants did not employ such a trading system during the relevant time period.  For those Defendants that did employ such a system, based upon the differences among Defendants' respective order ticket records or order management system data, retrieval of this information is highly individualized; accordingly, Defendants' individual responses to this Request are set forth in Appendix A. |

5

| No. | PLAINTIFFS' REQUESTS | DEFENDANTS AGREED TO PRODUCE WITHIN 60 DAYS | AGREE TO PRODUCE WITHIN 90 DAYS | ITEMS NOT COVERED | OBJECTIONS |
|---|---|---|---|---|---|
| 6 | All ledger accounts (or other records) reflecting TASER securities in transfer. See 17 C.F.R. 240.17a-3(a)(4)(i). | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock position data from June 1, 2007 through May 31, 2009. | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock position data from Jan. 1, 2003 through May 31, 2007. Additional time is required to produce the records for this period largely due to the burden associated with gathering and producing records for this extensive time period, which is beyond the period for which such records must be maintained in an "easily accessible location." | For some Defendants (e.g., BAS, Merrill Lynch), daily stock position or activity reports, Holder's File, stock record reports, or stock position data respond to this request.<br><br>For others (e.g., Bear Stearns, MSCO, UBS), certain information concerning "securities in transfer" may not be provided on the daily stock position or activity reports, Holder's File, stock record reports, or stock position data, but may be available on the monthly account statements. | Defendants remain willing to meet and confer with Plaintiffs concerning Plaintiffs' interpretation of the phrase "securities in transfer" to determine whether additional documents may be responsive to this request.<br><br>For Defendants for whom monthly account statements provide the additional detail sought by this request, the additional detail appears to be irrelevant to Plaintiffs' allegations. The monthly account statements provide largely duplicative information (when compared with the stock position data/stock record) and are burdensome to collect/produce, as they are not organized by security, can amount to thousands of pages per-client, per-month, and must be redacted manually to remove references to other securities not at issue in this action.<br><br>Nonetheless, Defendants remain willing to meet and confer with Plaintiffs concerning the potential production of specific account statements, to the extent that Plaintiffs are able to identify particular periods and specific accounts in which they are interested in obtaining this detailed information. |

| NO. | PLAINTIFFS' REQUEST | AGREE TO PRODUCE WITHIN 60 DAYS? | AGREE TO PRODUCE WITHIN 90 DAYS? | WILL/IS NOT COVERED | OBJECTIONS |
|---|---|---|---|---|---|
| 7 | All ledger accounts (or other records) reflecting TASER securities borrowed and TASER securities loaned. See 17 C.F.R. 240.17a-3(a)(6)(iii). | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock position data. | Yes, (a) daily stock position or activity reports, Holder's File, stock record reports, or stock position data; and/or (b) Loanet reports from Jan. 1, 2003 through May 31, 2009.  Additional time is required to produce the records for this period largely due to the burden associated with gathering and producing records for this extensive time period, which is beyond the period for which such records must be maintained in an "easily accessible location." Further, for those Defendants who will provide Loanet reports, additional time is required to permit Defendants to fulfill any confidentiality obligations owed to parties identified in the Loanet reports. | | |

7

| No. | Request | | | | | Objection |
|---|---|---|---|---|---|---|
| 8 | All ledger accounts (or other records) reflecting moneys borrowed and moneys loaned (together with a record of collateral therefore and any substitutions in such collateral) relating to loans made using TASER securities as collateral. See 17 C.F.R. 240.b-3(a)(4)(v). [sic] | | | | | The request seeks information pertaining to bank loans, which are irrelevant to Plaintiffs' allegations. Furthermore, Plaintiffs appear to have fashioned this request by modifying the cited rule by inserting the phrase "relating to loans made using TASER securities as collateral"; the cited rule neither references nor contemplates loans using TASER or any individual securities as collateral. Based upon the lack of relevance to Plaintiffs' allegations, Defendants object to producing information in responses to this request. Defendants are willing to meet and confer with Plaintiffs concerning Plaintiffs' interpretation of this request. |

8

| NO. | DOCUMENTS REQUESTED | AGREED TO PRODUCE/PRODUCED WITHIN JULY | AGREED TO PRODUCE WITHIN JULY | ITEM NOT COVERED | OBJECTION |
|---|---|---|---|---|---|
| 9 | A securities record or ledger reflecting separately for each TAASR security as of the clearance dates all long or short positions (including securities in safekeeping and securities that are subjects of repurchase or reverse repurchase agreements) carried by defendant for its account or for the account of its customers or partners or others and showing the location of all securities long and the offsetting position to all securities short, including long security count differences and short security count differences classified by the date of the physical count and verification in which they were discovered, and in all cases the name or designation of the account in which each position is carried. See 17 C.F.R. 240.17a-3(a)(5). | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock-position data from June 1, 2007 through May 31, 2009. | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock-position data from Jan. 1, 2003 through May 31, 2007. Additional time is required to produce the records for this period largely due to the burden associated with gathering and producing records for this extensive time period, which is beyond the period for which such records must be maintained in an "easily accessible location." | | |

9

| NO. | PLAINTIFFS' REQUEST | AGREED TO PRODUCE WITH NON-WAIVER | AGREED TO PRODUCE OR WILLING TO MEET AND CONFER | WILLING TO PRODUCE OR AGREED TO PRODUCE | OBJECTIONS |
|---|---|---|---|---|---|
| 10 | For each customer or partner of defendant, as well as for each defendant, all ledgers accounts (or other records) itemized separately of all purchases, sales, receipts and deliveries of TASER securities for such account. *See* 17 C.F.R. 240.17a-3(a)(3). | Yes, (a) daily stock position or activity reports, Holder's File, stock record reports, or stock position data from June 1, 2007 through May 31, 2009; and/or (b) trade reports, trade runs, trade history reports, or blue sheet runs for cash equities trading in TASER common stock from Jan. 1, 2003 through May 31, 2009. | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock position data from Jan. 1, 2003 through May 31, 2007. Additional time is required to produce the records for this period largely due to the burden associated with gathering and producing records for this extensive time period, which is beyond the period for which such records must be maintained in an "easily accessible location." | For others (e.g., BAS, Bear Stearns, MSCO, UBS), detailed information concerning "all" "receipts and deliveries" of TASER securities may not be provided on the daily stock position or activity reports, Holder's File, stock record reports, or stock position data, but is available on monthly account statements. | Defendants remain willing to meet and confer with Plaintiffs concerning Plaintiffs' interpretation of the phrase "all receipts and deliveries" to determine whether additional documents may be responsive to this request.<br><br>While monthly account statements may contain some additional data beyond that contained on the stock position data/stock records, they are largely duplicative. Given that monthly account statements are not organized by security, can amount to thousands of pages per-client, per-month, and must be redacted manually to remove references to other securities not at issue in this action, the burden associated with gathering and producing these data for all accounts transacting in TASER for the entire time period far outweighs the Plaintiffs' interest in gathering any additional detail that the account statements might contain. As a result, Defendants will not agree to produce monthly account statements.<br><br>Nonetheless, Defendants are willing to meet and confer concerning the potential production of specific account statements, to the extent that Plaintiffs are able to identify particular periods and/or specific accounts in which they are interested in obtaining additional information the account statements might contain. |

10

| | | | | Objection |
|---|---|---|---|---|
| 11 | A record in respect of each margin account from which stock has been pledged or otherwise loaned TASER securities, indicating the name and address of the beneficial owner of the account and the signature of such owner. See 17 C.F.R. 240.17a-3(a)(9)(iii). | Yes, (a) daily stock position or activity reports, Holder's File, stock record reports, or stock position data from June 1, 2007 through May 31, 2009; and/or (b) trade reports, trade runs, trade history reports, or blue sheet runs for cash equities trading in TASER common stock from Jan. 1, 2003 through May 31, 2009. | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock position data from Jan. 1, 2003 through May 31, 2007. Additional time is required to produce the records for this period largely due to the burden associated with gathering and producing records for this extensive time period, which is beyond the period for which such records must be maintained in an "easily accessible location." | The signature of the beneficial owner on the accounts are reflected in margin agreements, but not in the stock record/stock position data or trade runs/trade histories/blue sheet runs.<br><br>For some Defendants, the stock record reports do not contain client names and/or addresses. For some Defendants, the trade history does not contain client addresses. | Defendants object to producing margin agreements as the primarily additional information to be gained from these documents is the signature of the beneficial owner, which lacks relevance to Plaintiffs' allegations. Further, to collect and produce these documents would impose a substantial burden on Defendants, who would first have to identify relevant records/stock position data and/or the trading data, and would then have to cross reference this list against the list of all margin accounts of that firm, and pull the relevant agreements. Defendants remain willing to meet and confer with Plaintiffs concerning the potential production of margin agreements for particular margin accounts that Plaintiffs are able to identify based upon Plaintiffs' review of this information, to the extent Plaintiffs are able to articulate the relevance of this information to their claims. |
| 12 | A record of all puts, calls, spreads, straddles and other options relating to TASER securities in which a defendant has any direct or indirect interest or which a defendant has granted or guaranteed. The record shall include, at a minimum, an identification of the security and the number of units involved. See 17 C.F.R. 240.17a-3(a)(10). | | | | Defendants object to the provision of this information, which appears to be irrelevant to Plaintiffs' allegations and, additionally, as the request is worded, may be burdensome to collect/produce for at least some Defendants. Defendants remain willing to meet and confer with Plaintiffs to better understand the basis for Plaintiffs' request. |

11

| NO. | DESCRIPTION OF RECORDS | AGREED TO PRODUCE WITHIN 60 DAYS | AGREED TO PRODUCE WITHIN 30 DAYS | ITEMS NOT COVERED | OBJECTIONS |
|---|---|---|---|---|---|
| 13 | A record of all eligible OTC derivative instruments (as defined in Rule 3b-13), relating to TASER securities, in which the OTC derivatives dealer has any direct or indirect interest or which it has written or guaranteed. The record shall contain, at a minimum, an identification of the security or other instrument, the number of units involved and the identity of the counterparty. See 17 C.F.R. 240.17a-3(a)(10). | | | | Defendants object to the provision of this information, which appears to be irrelevant to Plaintiffs' allegations and may be otherwise burdensome to collect/produce for Defendants. Defendants remain willing to meet and confer with Plaintiffs to better understand the basis for Plaintiffs' request. |
| 14 | All blotters (or other records of original entry) showing all receipts and deliveries of TASER securities (including certificate numbers), including the account for which each such transaction was effected, the name and amount of securities, the unit and aggregate purchase or sale price, the trade date, and the name or other designation of the person from whom purchased or received or to whom sold or delivered. See 17 C.F.R. 240.17a-3(a)(1). | Yes, (a) daily stock position or activity reports, Holder's File, stock record reports, or stock position data from June 1, 2007 through May 31, 2009; and/or (b) trade reports, trade runs, trade history reports, or blue sheet trade runs for cash equities trading in TASER common stock from Jan. 1, 2003 through May 31, 2009. | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock position data from Jan. 1, 2003 through May 31, 2007. Additional time is required to produce the records for this period largely due to the burden associated with gathering and producing records for this extensive time period, which is beyond the period for which such records must be maintained in an "easily accessible location." | The certificate numbers sought in this request are not contained in the information provided. | |
| 15 | All blotters (or other records of original entry) showing all receipts of cash and all other debits and credits related to TASER securities, including the account for which each such transaction was effected, the name and amount of securities, the unit and aggregate purchase or sale price, the trade date, and the name or other designation of the person from whom purchased or received or to whom sold or delivered. See 17 C.F.R. 240.17a-3(a)(1). | Yes, (a) daily stock position or activity reports, Holder's File, stock record reports, or stock position data from June 1, 2007 through May 31, 2009; and/or (b) trade reports, trade runs, trade history reports, or blue sheet trade runs for cash equities trading in TASER common stock from Jan. 1, 2003 through May 31, 2009. | Yes, daily stock position or activity reports, Holder's File, stock record reports, or stock position data from Jan. 1, 2003 through May 31, 2007. Additional time is required to produce the records for this period largely due to the burden associated with gathering and producing records for this extensive time period, which is beyond the period for which such records must be maintained in an "easily accessible location." | The stock record/blue sheet runs will not contain information "showing all receipts of cash and all other debits and credits related to TASER securities"; however, the rest of the information requested is available on the responsive records identified hereto. | Defendants object to this request as written because it seeks information that cannot in many instances be isolated on an individual security basis. Defendants remain willing to meet and confer with Plaintiffs concerning the information that Plaintiffs are seeking, and the manner in which Plaintiffs are interpreting this request. |

[1] Defendants' agreements to produce information are subject to each Defendant's written objections and responses to Plaintiffs' First Request for Production of Documents, as well as any further particularized objections set forth in this column. Because Defendants have not completed their investigation and discovery relating to this case, these responses are based upon, and necessarily limited by, information now available to Defendants, and Defendants reserve the right to supplement their productions with additional materials responsive to these requests, based upon information that they learn in the future. Further, Defendants are currently investigating the nature and extent of client confidentiality considerations that might delay, if not prevent, the provision of account-identifying information (i.e., account name and address for the period in question) within the time periods set forth above.

[2] As plaintiffs' counsel are aware, there may be certain data issues that could affect some of the blue sheets which UBS Securities, LLC ("UBS") has agreed to produce in this litigation stemming from historical errors (that have since been corrected) in the blue sheet systems used by UBS. For more information about such issues, UBS refers plaintiffs to Exchange Hearing Panel Decision 05-159 (Jan. 3, 2006). UBS believes that the other documents it has agreed to produce, including the stock records and the data from its order management systems, will provide accurate information that responds to this request, that may not have been corrected on the blue sheets. UBS is available to meet and confer with plaintiffs to more fully discuss this and related issues.

[3] Defendants are generally prepared to produce information for institutional, retail accounts, to the extent such accounts exist, and other accounts cleared by Defendants with the exception of Morgan Stanley & Co., Incorporated ("MSCO") and Deutsche Bank Securities Inc. ("DBSI"). MSCO objects to the production of retail data due to the burden associated with compiling and producing these materials and the lack of relevance to Plaintiffs' allegations. First, MSCO's retail data is primarily maintained separately from the institutional data, making it extremely burdensome for MSCO to collect retail data in response to many of Plaintiffs' requests. Second, it appears that the vast majority of the retail data that MSCO would collect are completely irrelevant to Plaintiffs' allegations. MSCO is prepared to meet and confer with Plaintiffs concerning these objections. DBSI objects to the production of retail data. Transactions by DBSI's retail clients are completed through a separate business division that maintains separate books and records. DBSI is willing to meet and confer with Plaintiffs concerning the limitations regarding its production of retail documents.

13

## APPENDIX A : PLAINTIFFS' REQUESTS FOR PRODUCTION NOS. 2, 3, 5

A.  Banc of America Securities LLC

1.  Agree to produce within 60 days?

Yes, blue sheets from January 1, 2003 through May 31, 2009.

2.  Items not covered: The blue sheets will not include unexecuted orders, nor will they reflect the time the order was received or the time of entry. Similarly, the blue sheets only reflect part of the information concerning the terms and conditions of the order or instructions and of any modification or cancellation thereof.

3.  Objections:

Banc of America Securities, LLC ("BAS") objects to Requests 2, 3, and 5 to the extent that they require BAS to produce all order tickets, or other data pulled from BAS's Order Management Systems, for the entire period on the grounds that the burden and expense of producing the requested documents clearly outweighs the relevancy, if any, to the claims asserted in this case.

As to the specific burden, BAS has executed or cleared tens of thousands of trades in the common stock of Taser from 2003 through May 2009. To obtain order tickets for this period, BAS would need to query a number of different trading systems and for many—if not all—of these trading systems, data that may respond to this request would have to be restored from multiple different sources.

Thus, BAS proposes that Plaintiffs (1) review the blue sheets that BAS will produce and (2) identify a reasonably limited subset of transactions that Plaintiffs believe relate to the claims alleged in this action. In return, BAS agrees to meet and confer with Plaintiffs to establish a reasonably limited subset of transactions for which BAS will produce order tickets.

BAS also objects to Request No. 5 to the extent it is vague, ambiguous, and is unduly burdensome in that the burden and expense of producing the requested documents clearly outweighs the relevancy, if any, to the claims asserted in this case. In particular, BAS notes that Plaintiffs can obtain time-sequenced reports concerning transactions in the common stock of Taser from the NASDAQ's Order Audit Trail System ("OATS"). This OATS data will include information related to the handling or execution of orders, including records of all times of these events in hours, minutes, and seconds. This OATS data would also be industry-

wide and would include, in one source, the buyers and sellers of
the common stock of Taser. To the extent this OATS data would
not satisfy Plaintiffs' request, BAS respectfully asks that Plaintiffs
identify: (1) what information they are seeking in this request that
would not be available in the NASDAQ's OATS data, and (2) why
that information is relevant to the claims in this action.

B.    Bear, Stearns Co., Inc. (k/n/a J.P. Morgan Securities Inc.) and Bear
      Stearns Securities Corp. (k/n/a J.P. Morgan Clearing Corp.)

    1.    Objections:

          Bear, Stearns & Co. Inc (n/k/a JP Morgan Securities, Inc.) and
          Bear, Stearns Securities Corp. (n/k/a JP Morgan Clearing Corp.)
          (collectively "Bear Stearns") object to the production of order
          tickets for all transactions for a six year period for the reasons set
          forth in Bear Stearns' Response to Plaintiffs' First Request For
          Production of Documents for Request Nos. 2, 3 and 5, which is
          incorporated by reference. In particular, given the way that Bear
          Stearns stores its order information in an electronic database, such
          request is unduly burdensome. Such information or "order tickets"
          are maintained in daily electronic files. In order to locate order
          tickets that specifically relate to transactions in TASER, each day's
          electronic file must be searched manually to locate the TASER
          related order ticket(s) for that day. Once the relevant order data is
          located within the day's electronic file, in order to retrieve it for
          production, the data will need to be manually extracted for
          printing. Bear Stearns has approximately 1,000,000 transactions
          involving TASER common stock on its trading records responsive
          to Request No. 1. As a result, it would be tremendously
          burdensome to locate, retrieve and print, as described above, the
          order tickets for such a large volume of transactions. In order to
          retrieve the volume of order tickets requested by Plaintiffs, Bear
          Stearns would need to hire a large number of temporary workers to
          devote the thousands of hours required to retrieve the order tickets
          and to arrange for the onsite accommodations and technological
          support necessary for those workers.

          As outlined above, it would be overly burdensome as well as very
          costly and time consuming to retrieve and print all of the order
          tickets requested by Plaintiffs. Bear Stearns is prepared to
          consider and discuss with Plaintiffs a reasonable request for the
          production of order tickets for certain specific transactions and/or
          limited time periods, after Plaintiffs review the trading records
          produced by Bear Stearns. If Plaintiffs continue to insist on the
          production of all order tickets, despite the significant burden and

2

costs associated with such a request, the expense related to such a production of the order tickets should be borne by the Plaintiffs.

C.   Credit Suisse Securities (USA) LLC

    1.   Agree to produce within 60 days?

       Yes, responsive materials from early-2004 through May 31, 2009.

    2.   Agree to produce within 120 days?

       Yes, responsive materials from January 1, 2003 through early-2004.

D.   Deutsche Bank Securities, Inc.

    1.   Objections to Request Nos. 2 and 3:

       In response to Requests 2 and 3, DBSI objects to the production of the order management and/or order execution system data requested for a six-year period as unduly burdensome. Such a production would require DBSI to gather and extract data related to each transaction involving TASER common stock from multiple order management and/or order execution systems. To do so, DBSI would be required to: (1) retrieve daily reports that are routinely generated from multiple order management and/or execution systems and stored as optical files in DBSI's archival system; (2) gather information by searching multiple, separate databases to generate responsive reports; and/or (3) restore information, data and/or system environments that are archived or no longer in use for at least some part of the six-year period.

       Gathering this information for documents that are stored in DBSI's archival system is an extremely time consuming and labor intensive process with respect to more than six years of trading data. DBSI's archival system is a final form optical archive and retrieval system. It processes and stores images and/or computer generated reports onto a dedicated server with near-line storage for long term retrieval. Gathering documents from DBSI's archival system is a manual process that requires DBSI to first locate each record by date and name, then individually retrieve each record, then individually search each record for responsive information, and then output and redact all non-relevant information from each record. To do so for records spanning a six-year time frame within 60 or 120 days would require DBSI to devote substantial resources and personnel, including temporary personnel, at significant costs.

3

To do so would also require ramp-up time that must be factored into the time required for production.

Similarly, gathering this information though queries of multiple databases and/or through restoration of archived data and/or system environments for a six-year time frame would require DBSI to expend substantial resources at significant costs.  Such an effort also would require DBSI to divert the time of IT personnel from their regular responsibilities and to obtain and/or devote other significant resources, including server space currently used for business purposes.

Nonetheless, DBSI remains willing to meet and confer with Plaintiffs about the possibility of producing reports and/or data from certain of DBSI's primary order management and/or order execution systems related to cash equities trading of Taser common stock to the extent Plaintiffs are willing to narrow their requests to particular transactions or a more reasonable timeframe. If Plaintiffs continue to insist on the production of all order management and/or order execution system data, despite the significant burden and costs associated with such a request, the expense related to such a production should be borne by the Plaintiffs.

  2. Objections to Request No. 5:

   DBSI objects to the production of documents responsive to Request No. 5 on the ground that it did not employ an alternative trading system during the relevant time period.

E. Goldman, Sachs & Co. ("GS&Co.") and Goldman Sachs Execution & Clearing, L.P. ("GSEC")

  1. Agree to produce within 60 days?

   Yes, GS&Co. and GSEC are prepared to produce order ticket data from January 1, 2007 through May 31, 2009.

  2. Agree to produce within 120 days?

   Yes, GS&Co. and GSEC are prepared to produce order ticket data from January 1, 2003 through December 31, 2006.

F. Merrill Lynch, Pierce, Fenner & Smith Incorporated

  1. Agree to produce within 60 days?

   Yes, blue sheets from January 1, 2003, through May 31, 2009.

4

2.  Items not covered:  The blue sheets will not include unexecuted orders, nor will they reflect the time the order was received or the time of entry.  Similarly, the blue sheets only reflect part of the information concerning the terms and conditions of the order or instructions and of any modification or cancellation thereof.

3.  Objections:  Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") objects to Requests 2, 3, and 5 to the extent they require Merrill Lynch to produce all order tickets, or other data pulled from Merrill Lynch's Order Management Systems, for the entire time period on the grounds that the burden and expense of producing the requested documents clearly outweighs the relevancy, if any, to the claims asserted in this case.  In particular, Merrill Lynch has executed or cleared 3,725,136 trades in the common stock of Taser from 2003 through 2008.  In addition, Merrill Lynch would need to query at least 50 different trading systems to gather order tickets for all of these 3.725 million trades.  Accordingly, it would be unduly burdensome for Merrill Lynch to gather all order tickets for these 3.725 million trades from these different trading systems.  Instead, Merrill Lynch proposes that Plaintiffs (1) review the blue sheets that Merrill Lynch will produce and (2) identify a reasonably limited subset of transactions that Plaintiffs believe relate to the claims alleged in this action.  In return, Merrill Lynch agrees to produce order tickets for this reasonably limited subset of transactions.

Merrill Lynch also objects to these requests to the extent they are vague, ambiguous, and are unduly burdensome in that the burden and expense of producing the requested documents clearly outweighs the relevancy, if any, to the claims asserted in this case.  In particular, Merrill Lynch notes that Plaintiffs can obtain time-sequenced reports concerning transactions in the common stock of Taser from the NASDAQ's Order Audit Trail System ("OATS").  This OATS data will include information related to the handling or execution of orders, including records of all times of these events in hours, minutes, and seconds.  This OATS data would also be industry-wide and would include, in one source, the buyers and sellers of the common stock of Taser.  To the extent this OATS data would not satisfy Plaintiffs' request, Merrill Lynch respectfully asks that Plaintiffs identify:  (1) what information they are seeking in this request that would not be available in the NASDAQ's OATS data, and (2) why that information is relevant to the claims in this action.

G.  Morgan Stanley & Co. Incorporated (MSCO)

1.  Agree to produce within 60 days?

5

Yes, MSCO is prepared to produce order ticket data and order-related information concerning cash equities trading in TASER common stock from January 1, 2003 through May 31, 2009.[1]

H.   UBS Securities, LLC

    1.   Agree to produce within 60 days?

Yes, UBS hereby agrees to produce data from their order management systems reflecting the requested information from May 31, 2007 through May 31, 2009.

    2.   Items not covered:

       (a)   Request No. 2:  Data reflecting information from January 1, 2003 through May 31, 2007.

       (b)   Request No. 3:  Data reflecting information from January 1, 2003 through May 31, 2007.

       (c)   Request No. 5:  Data reflecting information from January 1, 2003 through May 31, 2007.

    3.   Objections:

UBS Securities, LLC ("UBS") objects to the provision of information from January 1, 2003 through May 31, 2007.  In accordance with 17 C.F.R. 240.17a-4(b), UBS is not required to keep data from their order management system in an easily accessible format for more than two years, and UBS is not required to keep this information at all for more than a three years.  As such, UBS agrees to the production of data from their order management systems for a two year time period, from May 31, 2007 through May 31, 2009.

---

[1] As noted in the main response, MSCO is not prepared to produce retail information in response to any request, including the requests seeking order-related information.

# Exhibit C

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Daniel J. Gomez
To Call Writer Directly:
(202) 879-5958
daniel.gomez@kirkland.com

655 Fifteenth Street, N.W.
Washington, D.C. 20005

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

November 13, 2009

<u>VIA FEDERAL EXPRESS AND
ELECTRONIC MAIL</u>

Steven J. Rosenwasser, Esq.
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400.

Re:   *Taser International, et al. v. Morgan Stanley & Co., et al.*

Dear Mr. Rosenwasser:

On behalf of UBS Securities, LLC ("UBS"), I write to provide information regarding our production of November 13, 2009. Enclosed please find documents produced in accordance with the agreement reached by the parties as memorialized by Attachment A to the Scheduling Order as entered on July 16, 2009, documents produced in response to Plaintiffs' First Request for the Production of Documents to All Defendants, documents produced in response to Plaintiffs' Second Request for the Production of Documents to All Defendants, and documents that we believe may answer some of the questions you have asked about data we have previously produced. Documents in this production have been stamped as either, "Not Confidential" "Confidential" or "Highly Confidential" pursuant to the Stipulation and Protective Order Regarding Confidential Information ("Protective Order"). This data represents a significant amount of information, collected from a variety of sources at UBS, and illustrates our willingness to provide you with information responsive to your requests in a timely fashion.

First, UBS is producing documents in accordance with the agreement reached by the parties as memorialized by Attachment A to the Scheduling Order as entered on July 16, 2009 ("Attachment A").

UBS is producing Monthly Loanet Reports in the form of Monthly Security History Reports from May of 2005 to and through May 31, 2009. These documents have been bates labeled UBS_TASER-0012268 to UBS_TASER-0013596 and have been stamped as Highly Confidential pursuant to the Protective Order.

| Chicago | Hong Kong | London | Los Angeles | Munich | New York | Palo Alto | San Francisco |

UBS is also producing Daily Loanet Reports in the form of Open Contracts by Security Reports from May of 2005 to and through May 31, 2009. These documents have been bates labeled UBS_TASER-0001685 to UBS_TASER-0012267 and have been stamped as Highly Confidential pursuant to the Protective Order.

Under the provisions of Attachment A, UBS is also scheduled to produce stock record data from January 1, 2003 to and through May 31, 2007. In an effort to provide the Plaintiffs with responsive information on a timely basis, UBS began producing this information to Plaintiffs on September 14, 2009 and completed production by September 15, 2009 - almost 2 months before production was technically due under the provisions of Attachment A. These documents bear bates stamps UBS_TASER-0000886 to UBS_TASER-0000891, UBS_TASER-0000959 to UBS_TASER-0000964, and UBS_TASER-0001554 to UBS_TASER-0001555 and were stamped as Highly Confidential pursuant to the Protective Order.

Although not obligated to under Attachment A, UBS is also producing data from its Order Management Systems from January 1, 2003 to and through June 25, 2006. These documents are included within bates ranges UBS_TASER-0021439 to UBS_TASER-0021658 and have been stamped as Highly Confidential Pursuant to the Protective Order.

UBS is also producing documents in response to Plaintiffs' First Request for the Production of Documents to All Defendants, and documents produced in response to Plaintiffs' Second Request for the Production of Documents to All Defendants

UBS is producing documents sufficient to show each self-regulatory organization of which UBS is a member. These documents have been bates labeled UBS_TASER-0013597 to UBS_TASER-0013598 and have been stamped as Confidential pursuant to the Protective Order.

UBS is also producing T+N reports to the extent that they reflect information on Taser stock from January of 2005 to and through May 31, 2009. These documents have been bates labeled UBS_TASER-0021368 to UBS_TASER-0021438 and have been stamped as Highly Confidential pursuant to the Protective Order.

UBS is also producing CNS Accounting Summaries from January 1, 2003 to and through May 31, 2009. These documents have been bates labeled UBS_TASER-0013599 to UBS_TASER-0015066 and have been stamped as Highly Confidential pursuant to the Protective Order.

UBS is also producing additional relevant policy and procedure manuals to the extent they concern prime brokerage, short sales of common stock, common stock lending and clearance, and delivery and settlement of short sales of common stock. These documents have been bates labeled UBS_TASER-0001619 to UBS_TASER-0001684 and UBS_TASER-0021673 to UBS_TASER-21740 and have been stamped as Highly Confidential pursuant to the Protective Order.

UBS is also producing information from its Impossible to Borrow lists from 2005 to 2009. These documents have been bates labeled UBS_TASER-0021290 to UBS_TASER-0021367 and have been stamped as Highly Confidential pursuant to the Protective Order. UBS currently understands that the data from the first six months of 2009, along with the data from

2

2003 and 2004 and the data on the Hard to Borrow Lists are stored on magnetic tapes. While UBS is in the process of restoring these tapes, they could not be restored in time for production today. They should be ready shortly, and we will endeavor to let you know when you can expect them.

UBS is also producing information from its Easy to Borrow lists from January 1, 2003 to May 31, 2009. These documents bear bates numbers UBS_TASER-0015117 to UBS_TASER-0021289 UBS understands that certain data issues may have affected the Easy to Borrow Lists during the time period involved in this matter that resulted in certain securities being incorrectly listed as Easy to Borrow. The Easy to Borrow lists that are being produced today are accurate. However, after an investigation UBS has determined that two trades were executed on TASR while TASR was incorrectly listed as Easy to Borrow. Information on those trades are being produced and are bates stamped as UBS_TASER-0021671 to UBS_TASER-0021672 and have been stamped as Highly Confidential pursuant to the Protective Order.

UBS is also producing document retention policies that it maintained during the relevant period, including litigation holds relating to the Taser matter. These have been bates stamped as UBS_TASER-0015067 to UBS_TASER-0015116 and have been stamped as Highly Confidential pursuant to the Protective Order.

It is our current understanding that UBS did not issue any analyses, ratings or recommendations regarding TASER securities during the relevant time period, and thus we do not believe that we possess any documents responsive to Request Number 32 of Plaintiff's First Requests for the Production of Documents to All Defendants.

In reviewing our production, we see that you made agreements with other Defendants in this action for the production of additional documents including locate logs, documents sufficient to show executed buy-ins in Taser, and short interest reports. While we do not believe UBS is under any obligation to produce those documents, in the interest of cooperation and providing you with responsive information, upon request we would be willing to discuss a reasonable time period for production of those documents.

We have properly raised objections related to the burdens associated with producing additional documents, however we believe that we reached an agreement in principle regarding their production. Therefore, it is our understanding that other documents responsive to Plaintiffs' First and Second Request for Production of Documents to All Defendants, along with the Exception reports that Plaintiff has requested under the Interrogatory Compromise are stored via e-mail, and therefore may be produced after e-Discovery has been completed. To the extent that this process does not satisfy these requests, we would be willing to discuss with Plaintiffs what other responsive documents, if any, can be produced under a reasonable time frame, without waiving any proper objections.

I also write to further respond to several of your questions regarding various data that UBS has produced in this matter to date. As an initial matter, in your most recent email regarding data produced by UBS you allege that you still have "numerous unanswered questions" that "have been outstanding for some time." You then go on to identify several emails that you have sent that you suggest have gone unanswered.   As you are no doubt aware,

3

however, we have already responded to many of the questions raised in these emails. For example you refer to an October 1, 2009 email "about account names" in which you asked us to "please data [sic] that includes [account names]." As I informed you in my October 30, 2009 letter, it is our understanding that UBS's daily and weekly stock position records do not contain such information. Similarly, you refer to a September 21, 2009 email in which you ask us to produce "a chart of accounts." This information was produced to you on October 30, 2009 and bears bates labels UBS_TASER-0001556 to UBS_TASER-0001618. We have also responded to — or produced data that responds to — questions raised in your other email of October 1 regarding "the data [UBS] produced," and your emails of September 22, October 15, and October 21.

Your most recent email regarding data issues also states that you have not received stock record data for January, May, June and July of 2003 which you allege "was due months ago." Again, this is simply incorrect. Under Schedule A to the July 16 Scheduling Order, the deadline to produce stock record data from prior to May 31, 2007 is 120 days after entry the Scheduling Order — which would be today. Notwithstanding that fact, as is always our practice, UBS endeavored to, and did, produce stock record data from prior to May 31, 2007 on September 14 and 15, nearly 2 months before it was required to do so. Nevertheless, we have looked into the four months from 2003 that you identify, and it is our understanding that there were no trades of Taser during those months.

You have also noted that in examining the options blue sheet data we produced, you are encountering trades that appear to be identical in terms or price, quantity and account name. You "wanted to know whether these are duped trades or legitimate multiple trades at the same price and quantity." It is our understanding that these are duplicate trades that are the result of the query system that UBS used to pull options blue sheets.

In addition, in connection with the blue sheet issues raised by NYSE Exchange Hearing Panel Decision 05-159 (the "Panel Decision"), which we have previously discussed, you asked that we identify which of the blue sheets UBS has produced "are inaccurate." It is our understanding that the specific issues raised in the Panel Decision affected UBS's equity blue sheets during the relevant period from January 1, 2003 through the end of June 2006, with the exception of the account type indicator issue described in the Panel Decision which was resolved in early 2007. It is our understanding that this does not mean that every blue sheet during that time period actually contained inaccuracies — just that it is possible that they *may* have contained inaccuracies. Unfortunately, it is our understanding that there is no practical way to identify specific trades/blue sheets within this time period that are in fact inaccurate. It is our understanding, however, that Plaintiffs are able to get the exact same information available in the blue sheets, by looking at the stock records that UBS has produced and order data that has produced and is producing. Because this data did not have the same issues as the blue sheets, it therefore contains correct information. We believe that a review of the stock records and order data may also obviate your need for the "trade runs" requested in your November 12, 2009 email. To the extent that after reviewing UBS's stock record and order data you have any questions regarding the foregoing we are happy to discuss.

UBS is also producing data dictionaries in response to your data questions and in response to Plaintiff's First Request for the Production of Documents to All Defendants. The

data dictionary for UBS's bluesheets has been bates labeled UBS_TASER-0021660 to UBS_TASER0021670 and has been stamped as Not Confidential under the Protective Order. Data dictionaries for the Order Management System Data collected from UBS's WORM database has been bates labeled UBS_TASER-0021659 and has been stamped as Highly Confidential under the Protective Order. Finally, data dictionaries for the Order Management System Data produced today are included in UBS_TASER-0021439 to UBS_TASER-0021658 and have been stamped as Highly Confidential.

Finally, in your emails of September 24 and October 1 you request that we produce various data already produced in different format. It is our understanding that the data was produced in the format that such data is produced when transferred to Excel, and that particularly given the volume of data involved it would be unduly burdensome for UBS to re-pull this data in some other format. We suggest that going forward, to the extent that you want data in a particular format, you tell us beforehand so we can investigate whether it is feasible before dedicating the time and resources to pulling the data in a different format. Of course to the extent your requested format is feasible, we are happy to oblige such requests.

We believe that we have now responded to the majority of your outstanding data questions. We are continuing to look at the remaining questions you have raised and will keep you updated as to our progress.

Please let us know if you have any questions regarding the foregoing.

UBS reserves the right to supplement this production as necessary. If you have any questions concerning the enclosed, please do not hesitate to contact me.

Sincerely,

Daniel J. Gomez

cc: Andrew B. Clubok
Jeffrey G. Landis
taser.short@davispolk.com (without enclosures)

5

# Exhibit D

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey Landis
To Call Writer Directly:
(202) 879-5984
jeffrey.landis@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

December 11, 2009

**Via Electronic Mail**

Elizabeth Eager
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

Re:   *Taser International, et al. v. Morgan Stanley & Co., et al.*

Dear Liz:

I write in response to your emails of November 18 and November 19, 2009 in which you posed several questions regarding data produced by UBS in the above-captioned matter. For ease of reference, I will respond to the issues you raised in the order that you raised them.

In your November 18 email you acknowledged that UBS produced monthly and daily loanet reports from May 2005 through May 2009, but asked that we confirm that Plaintiffs have all such reports dating back to January 2003. It is my understanding that during the negotiations on this issue, the parties orally agreed that UBS would only produce loanet reports dating back to May 2005.

In that same email you asked UBS to confirm that the T+N Report was not used prior to January 1, 2005. It is our understanding that the T+N Report was not used prior to that date.

With respect to compliance manuals you asked whether there are any "compliance manuals on derivatives" that UBS is "not producing." As your email acknowledges, in UBS's objections and responses to Plaintiffs' second set of document requests, UBS agreed to produce manuals to the extent they concern "prime brokerage, short sales or common stock, common stock lending and clearance and delivery and settlement of short sales of common stock." In doing so, UBS has not withheld otherwise responsive documents merely because they reference or discuss derivatives. To the extent after reviewing the manuals UBS has produced, you believe that Plaintiffs are entitled to additional manuals based on Plaintiffs' requests and UBS's objections thereto, we are willing to discuss the issue.

You asked when we expect to produce impossible to borrow lists for 2003, 2004 and 2009. It is our understanding that there are no impossible to borrow lists containing Taser beyond what UBS has already produced.

Elizabeth Eager
December 11, 2009
Page 2

You also asked when we would be available to discuss the production of locate logs, documents sufficient to show executed buy-ins in Taser and short interest reports. We are generally available the week of December 21 or after the new year. Please let us know which you prefer.

Your November 18 email also reiterates your request for "trade runs." As you know, Plaintiffs originally argued that they needed "trade runs" because of the potential inaccuracies in certain of UBS's blue sheets. In our November 13, 2009 letter we explained that Plaintiffs can get any relevant information that would be on UBS's blue sheets by looking at UBS's stock record and order data. We further suggested that if, after reviewing such stock record and order data, Plaintiffs had any additional questions we would be happy to discuss the issue further. In your November 18 response you assert - without any explanation - that the stock records and order data "do not contain all the information that the blue sheets have." We ask that you identify specifically any relevant information that you believe is on the blue sheets, but cannot be gleaned from the stock records and order data so that we can more fully evaluate your request. Also, please confirm that you have in fact fully reviewed the stock records and order data that UBS has produced before making this request.

In your November 19 email you inquired about UBS's option blue sheets. Specifically, in your September 24 email you noted that Plaintiffs were encountering trades that appeared to be identical in terms of price, quantity and account name on those option blue sheets and asked "whether these are duped trades or legitimate multiple trades at the same price and quantity." We explained in our November 13 letter that it was our understanding that these were duplicate trades that were the result of the system used to pull the option blue sheets. In your November 19 email you asked whether UBS will be "producing clean blue sheets removing the duplicate trades." We are looking into whether it is reasonably practicable to produce option blue sheets without these "duplicate trades" and will get back to you.

In addition to the foregoing, we also have looked into several of the other data questions Plaintiffs have posed. First, Steven asked whether, when UBS indicated that no Taser trades occurred during the months of January, May, June and July of 2003, that included "proprietary, institutional and retail accounts" and "affiliates, business units and departments." Our understanding is that the stock record data produced in this matter does include proprietary and institutional accounts, to the extent such accounts traded in Taser during the relevant period. The defendant in this action, UBS Securities LLC, does not handle "retail" accounts, although all clients who traded with UBS Securities LLC would be included in the stock record data, whether individual or institutional. It is our understanding that the stock record data would include positions of any affiliates of UBS Securities LLC to the extent that such affiliates were customers of UBS Securities LLC. With respect to "business units" and "departments" within UBS Securities LLC, it is our understanding that any such "business units" or "departments" do not trade independently, and therefore would not have positions that would be reflected in the stock record data. To the extent that our understanding on these issues change, we will let you know.

Finally, in Steven's December 7 email he stated that Plaintiffs needed answers to issues raised in his November 11 email that still remain open. I responded that Steven's November 11 email referred back to various other emails containing data questions and pointed out that I believed

Elizabeth Eager
December 11, 2009
Page 3

our letters of October 30 and November 13 responded to most (if not all) of those questions.  I
further suggested that rather than copying and pasting previous emails, Plaintiffs identify exactly
which data questions they believed were still outstanding.  In response, Steven stated he "believe[d]
we still need answers to my email of October 21."  We went back and looked and again it appears
that UBS has responded to the questions raised in Steven's October 21 email.  For example, that
email requests a "chart of accounts" which was produced on October 29, 2009.  Similarly, on
November 13, 2009, UBS produced the data dictionary/legend/key and CNS accounting summaries
requested in Plaintiffs' October 21 email.  We believe the remaining questions posed in that email
are answered by the chart of accounts and data dictionaries already produced by UBS.  To the
extent that you believe that is not the case, please identify **specific questions** from Steven's October
21 email that you believe remain unanswered.   Please be advised that going forward we do not
intend to dedicate our limited time and resources to attempting to decipher which questions
Plaintiffs believe are unanswered because Plaintiffs elect to simply copy and paste old emails or
generally refer back to emails that refer back to other emails that refer back to still other emails.

        Please let us know if you have any questions about any of the foregoing.


                                        Sincerely,

                                        Jeffrey Landis


cc:     Andrew Clubok
        Steven Rosenwasser

# Exhibit E

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey Landis
To Call Writer Directly:
(202) 879-5984
jeffrey.landis@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

January 7, 2010

## VIA EMAIL

Elizabeth Eager
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

Re:   *Taser International, et al. v. Morgan Stanley & Co., et al.*

Dear Liz:

I write in response to your letter of December 16, 2009 which was in response to my letter of December 11 addressing certain of plaintiffs' data questions. For ease of reference, I will address the outstanding issues in your December 16 letter using the "issue numbers" you identify in that letter. As you know, several of the issues have already been resolved.

(1) In your letter you asked the date that the parties reached an oral agreement that UBS would only produce Loannet reports from May 2005 forward. My understanding is that this agreement was reached on or around June 24, 2009. The context of the agreement was that under 17 CFR s. 240.17a-4(b)(1), UBS is only required to preserve Loannet data for three years, the first two years in an easily accessible place. Notwithstanding this, we agreed to produce the Loannet reports from May 2005 forward.

(3) You originally asked whether there are any "compliance manuals on derivatives" that UBS is "not producing." In my December 11 letter I explained that UBS has not withheld otherwise responsive documents merely because they reference or discuss derivatives. I further suggested that plaintiffs review the manuals that UBS has produced and, after conducting such review, let us know if plaintiffs still believe they need additional manuals on derivatives. In your December 16 letter you now ask whether "UBS has a separate manual that address[es] trading of derivatives, options and futures." We will look into this question. You also state in your letter that "UBS agreed to produce information regarding derivatives as set forth in Attachment A to the Scheduling Order." Please provide the specific provision of the Scheduling Order that you are referring to — through which you contend that UBS agreed to produce information regarding derivatives.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

Elizabeth Eager
January 7, 2010
Page 2

(4)  In my December 11 letter, I stated that that there are no impossible to borrow lists containing Taser beyond what UBS has already produced.  We had previously stated in our November 16 letter that it was our understanding that the impossible to borrow·data for 2003, 2004 and the first six-months of 2009 would have been housed on magnetic tapes that needed to be restored, and that we were in the process of restoring those tapes.  In your December 16 letter you asked UBS to confirm that it restored and reviewed the data from 2003, 2004 and the relevant portion of 2009, and  that such review revealed that Taser did not appear on any, impossible to borrow lists for those years.  With respect to the years 2003 and 2004, it was determined during the restoration process that UBS did not utilize impossible to borrow lists for those years. With respect to the first six-months of 2009, we reviewed the impossible to borrow lists for that time period and Taser does not appear on such lists.  You also ask several questions regarding UBS's "hard to borrow" lists.  We are currently in the process of identifying available hard to borrow lists that reference Taser.  We hope to produce such lists shortly and will keep you updated.

(5)  You asked that we have a phone call on December 21, 2009 to discuss plaintiffs' request for "documents showing executed buy-ins and short interest reports."  We indicated that we were amenable to such a call and we discussed the issue on December 18, 2009.  During that call, plaintiffs asked that UBS produce a sample executed buy-in report and a sample short interest report.  Plaintiffs would then evaluate the reports to determine if they wanted UBS to produce such reports on a larger scale (with UBS reserving its right to object to such a request if made).  I explained that UBS is amenable to such an approach to the extent the requested reports actually existed and are accessible.  To that end, I believe we will be able to provide you with a· sample "short interest report" shortly.  We are still looking into the "executed buy-in" report.

(6)  Plaintiffs originally argued that they needed "trade runs" because of the potential inaccuracies in certain of UBS's blue sheets.  In my December 11 letter I asked that plaintiffs "identify specifically any relevant information that they believe is on the blue sheets, but cannot be gleaned from the stock records and order data so that we can more fully evaluate your request."  Your December 16 letter recites various statistics regarding the order data ("The spreadsheet is 149 columns wide. . . . The spreadsheet contains 58,382 lines of data. . . .").  It also complains that the stock record data "only shows us trades that are settling through UBS."  I do not read your letter, however, to identify any information that would. be on UBS's blue sheets but cannot be gleaned from a combination of the stock record and order data.  Please let me know if I am mistaken, and particularly if it is plaintiffs' understanding that UBS's blue sheets would show trades settling through entities other than UBS.

(7)  As you know, we have been discussing the issue of duplicate trades in UBS's option blue sheets.  In connection with those discussions, in my December 11 letter I informed you that UBS is looking into whether it is reasonably practicable to produce option blue sheets without these 'duplicate trades.'"  Notwithstanding that fact, your December 16 letter suggests that UBS has somehow not been cooperative on this issue.  This includes by asserting that "[n]early three months has passed and you still do not have an answer to this question."  But such a suggestion

Elizabeth Eager
January 7, 2010
Page 3

is misleading.   In late September, Steven sent us an email noting that Plaintiffs were
encountering trades that appeared to be identical in terms of price, quantity and account name on
those option blue sheets and asked "whether these are duped trades or legitimate multiple trades
at the same price and quantity." After looking into the issue, in our November 13 letter, we fully
answered Steven's question, explaining that it was our understanding that these were duplicate
trades that were the result of the system used to pull the option blue sheets.  It was only in your
November 19 email that you asked whether UBS will be "producing clean blue sheets removing
the duplicate trades."  UBS then agreed to look into whether it was reasonably practicable to pull
such information.

(8)   Plaintiffs previously asked whether, when UBS indicated that no Taser trades
occurred during the months of January, May, June and July of 2003, that included "affiliates" of
UBS Securities LLC.  In my December 11 letter, I explained that it was our understanding that
"the stock record data would include positions of any affiliates of UBS Securities LLC to the
extent that such affiliates were customers of UBS Securities LLC." In your December 16 letter
you ask that UBS confirm your interpretation of this response "to mean that the trade data does
not include all trades for all affiliates."  As we explained, the stock record data includes trades of
any affiliates of UBS Securities LLC to the extent such affiliates were customers of UBS
Securities LLC.  This explanation speaks for itself and I am not sure that there is anything that
needs to be "confirmed."  It bears noting, however, that UBS Securities LLC is the only UBS
entity that is a defendant in this action and the UBS entity to whom plaintiffs' document requests
are directed.   Your December 16 letter also requests that UBS "identify the affiliates and other
business entities for whom we have trading data."  As an initial matter, as I explained in my
December 11, 2009 letter, it is our understanding that "business units" of UBS Securities LLC do
not trade independently, and therefore would not have positions that would be reflected in the
stock record data.  As far as identifying the affiliates for whom plaintiffs have trading data, that
is information that can be gleaned from the trading data itself which UBS has produced and is
thus equally available to plaintiffs.  That being the case, we do not intend to undertake such an
exercise.  Of course, to the extent that in reviewing the trading data, plaintiffs have questions
about whether a particular entity is a UBS Securities LLC "affiliate," we will attempt to answer
such questions to the extent they are raised in good faith.

(9)   With respect to trading data for Financial Services, UBS AG Stamford Branch and
UBS Securities, you state that plaintiffs have raised the issue of whether UBS will produce such
data "in e-mails on November 13, 2009, November 30, 2009 and December 7, 2009."  Again,
this statement is misleading.  As I have explained to Steven previously, plaintiffs' initial
November 13 email merely stated that "we need to discuss" data related to the entities you
identify."  It was only in Steven's email of November 30 that plaintiffs mentioned anything
about production of data related to such entities.  In response, I requested that plaintiffs explain
exactly what data it is that they are seeking, why they believe they need that data and on what
basis they believe they are entitled to such data so that UBS could fully evaluate this request.
While Steven responded by providing additional detail on the specific information plaintiffs are
seeking and why plaintiffs want that information, conspicuously absent was an identification of

Elizabeth Eager
January 7, 2010
Page 4

the bases on which plaintiffs believe they are entitled to such data. To that end, we again request that you identify on what bases you believe you are entitled to trading data from entities that are not parties to this litigation. This would include at a minimum identifying the specific document request in which plaintiffs request such data as well as any applicable rule or case law that would require the production of such data.

(10)   You asked that with respect to the stock record data that UBS has produced, we "verify that account type 1 = cash, 2 = margin, 5 = short and 8,9 = fail to receive and deliver." It is our understanding that account type 1 = cash, account type 2 = margin, account type 5 = short. We are still confirming the meaning of account types 8 and 9.

(11)   You have asked what the various codes are in the "PRC/ENTRY" field in the stock record data UBS produced. We had been hopeful that these codes would appear in the Daily Stock Record manual. Given that we now know they do not, however, we are looking into this issue.

(12)   You asked about the data format in the price and net amount columns of the bluesheets. According to your letter, "we have reviewed the data dictionary for the blue sheets, and it does not address this issue." With respect to the format of the price amounts, I refer you to the blue sheet data dictionary at UBS-TASER-0021668. As explained on that page, the last six digits in the price amount column represent cents. Any digits before the last six digits represent dollars. So for example, in row three of bates page UBS-TASER-0000894, the price is listed as 30170000. This translates to $30.17. This information is also easily derived from financial websites. For example, the above trade was made on January 3, 2005. A look at Yahoo finance reveals that Taser traded between $29.88 and $32.25 that day, indicating a trading price of $30.17 as opposed to $3.017 or $310.70. With respect to net amount, the last two digits in that column represent cents and any digits before the last two digits represent dollars. So using the same row discussed above, a net amount of 174986 translates to $1749.86.

(13)   With respect to the format of certain data UBS produced, you assert that Steven sent emails on this topic on September 24 and October 1, and that "while Daniel [Gomez] responded to other question involving the data on November 13, 2009, his answer did not address this issue." That is incorrect. Dan's letter of November 13, 2009 specifically addressed this issue, explaining that:

> Finally, in your emails of September 24 and October 1 you request that we produce various data already produced in different format. It is our understanding that the data was produced in the format that such data is normally produced, and that particularly given the volume of data involved it would be unduly burdensome for UBS to re-pull this data in some other format. We suggest that going forward, to the extent that you want data in a particular format, you tell us beforehand so we can investigate whether it is feasible before dedicating the time

Elizabeth Eager
January 7, 2010
Page 5

and resources to pulling the data in a different format. Of course to the extent your requested format is feasible, we are happy to oblige such requests.

(14)   Without referring to specific questions or emails you assert that "Steven has sent multiple emails regarding account numbers and branch numbers." You then go on to ask a new question regarding one of the manuals UBS produced. Specifically you note that the manual bates numbered UBS_TASER 1559 contains an appendix with a chart of accounts with 'Suggested Branch' numbers and ask that UBS "confirm that these are the branch numbers actually used for UBS." We are in the process of looking into this question. You also state (again without referring to specific emails) that we "have never answered Steven's question asking you to identify which accounts are institutional accounts, individual customer accounts and hedge fund accounts." Please explain exactly what you mean by "institutional accounts," "individual customer accounts," and "hedge fund accounts" so that we can better determine whether UBS keeps such information in the normal course b eyond what has already been provided to you in the Chart of Accounts.

(16)   We are evaluating your request that UBS produce all versions of the "Fail on Sale" report that refer to Taser, TASR or the CUSIP throughout the relevant time period even if they were not sent to or received by a custodian. Assuming we do agree to produce such documents, however, we think that the most efficient procedure is to wait until after the production of ESI is complete to evaluate if there are any relevant reports that you still believe have not been produced.

(17)   You request that we add Matt Kiernan as a custodian based on your review of the data produced thus far. Based on your review, is there a particular time period that plaintiffs are interested in? Otherwise, consistent with our previous practice we will propose what we believe is a reasonable time period.

Please do not hesitate to contact me if you have any questions regarding the foregoing.

Sincerely,

Jeffrey Landis

JL /ghj

# Exhibit F

| | | |
|---|---|---|
| Jeffrey Landis/Washington DC/Kirkland-Ellis | To | "Elizabeth G. Eager" <eager@bmelaw.com> |
| 02/02/2010 11:21 AM | cc | "Steven J. Rosenwasser" <rosenwasser@bmelaw.com>, Andrew Clubok/Washington DC/Kirkland-Ellis |
| | bcc | |
| | Subject | Re: Taser/ UBS Confirming phone call |

Liz,

Just wanted to confirm our discussion of earlier this morning regarding the "blue sheet" interrogatories.  We agreed that UBS's responses to the "Blue Sheet" interrogatories would now be due on 2/10/10.  Plaintiffs' response to the 2nd set of interrogatories and 3rd set of requests for production as to UBS will now be due 3/2/10.

We also discussed that plaintiffs were going to try to determine if there is any issue other than account name information that they contend makes the order data and stock record data inadequate substitutes for the blue sheets, so that we can determine whether there is a feasible way to provide information necessary to bridge any "gap" (such as a key).

Jeff

Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005



| | | | |
|---|---|---|---|
| "Elizabeth G. Eager" <eager@bmelaw.com> | | To | "Jeffrey Landis" <JLandis@kirkland.com> |
| 01/11/2010 05:14 PM | | cc | "Steven J. Rosenwasser" <rosenwasser@bmelaw.com> |
| | | Subject | Taser/ UBS Confirming phone call |

Jeff,

I just wanted to confirm our phone calls of today.  We agreed to the following extensions:

- UBS's response to "Blue Sheet" set of interrogatories.  Originally due 1/13/10 now due 2/3/10 and
- Plaintiffs' response to the 2nd Set of Interrogatories and 3rd Set of Requests for Production as to UBS. Originally due 2/2/10 and now due 2/23/10.

Please let me know if these dates are in any way inaccurate.

Thanks,
Liz

Elizabeth G. Eager, Esq.
Bondurant, Mixson & Elmore, LLP

3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
404-881-4186 (direct)
404-881-4111 (fax)

Confidentiality Notice: This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

# Exhibit G



"Elizabeth G. Eager"
<eager@bmelaw.com>
02/09/2010 05:28 PM

To   "Jeffrey Landis" <JLandis@kirkland.com>

cc   "Daniel Gomez" <dgomez@kirkland.com>, "Steven J.
Rosenwasser" <rosenwasser@bmelaw.com>, "Andrew
Clubok" <aclubok@kirkland.com>

bcc

Subject   RE: Call

Jeff,

I have responses on both of the issues raised in your email.  First, about the stock records and equity trade journals.  We recognize that in many cases the stock record may not compare to the NASDAQ ETJ because other markets are in play during the day that can change the net result.  But here is an example that leads us to believe the stock record data is unreliable like the blue sheets.  On 1/22/04 the ETJ shows 26 trades for 5,610 shares, the blue sheets show 1 trade for 1,000 shares and the stock record shows 4 movements in 3 different accounts for 1,000 shares. If we had accurate blue sheets, we could maybe figure out the stock record data.  However, there are more trades in the market than are listed on the blue sheets.  The blue sheets are inaccurate with the marketplace data and do not appear to be able to explain the stock record.

For the sample of the trade runs, I couldn't get you an actual sample.  However, I was able to get you a list of the headings that we would expect to find: trade date, settlement date, cusip, security symbol, security name, buy/sell indicator, long/short indicator, cancel indicator, exchange, broker number, branch codes, account number, account name, account address, transaction number, account type, price, quantity, amount, commission, manager, sales personnel id, registered representative number, registered representative name, contra broker number, contra account number, contra account name, contra account address, clearing broker information, clearing instructions, agency/principal indicator, blotter codes, average price indicator, solicited/unsolicited indicator, reference number and currency.

Let me know if you have any follow up questions.

Liz

Elizabeth G. Eager, Esq.
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
404-881-4186 (direct)
404-881-4111 (fax)
Confidentiality Notice: This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

**From:** Jeffrey Landis [mailto:JLandis@kirkland.com]

**Sent:** Tuesday, February 09, 2010 5:14 PM
**To:** Elizabeth G. Eager
**Cc:** Daniel Gomez; Steven J. Rosenwasser; Andrew Clubok
**Subject:** Call

Liz

        Just wanted to confirm our call from earlier this afternoon.  As we discussed we are scheduled to make our next production of documents tomorrow.  We are on track to make that production, but given the pending storm that is about to hit DC, we may have trouble getting the production finalized and out the door tomorrow.  You agreed that to the extent we are not able to get the production out tomorrow because of the storm we can have an extra day or two if needed.  Thanks for your understanding.  We will keep you updated.

        With respect to the "blue sheet interrogatories" which were due tomorrow, I explained that it is our view that these should be treated similarly to the corresponding blue sheet 30(b)(6) topics.  And that to the extent that in connection with an agreement on costs and the 30(b)(6) deposition, UBS agrees to produce the "trade runs" that plaintiffs have asked for to resolve any blue sheet issues, it should similarly moot the need for any response to these interrogatories.  I suggested that accordingly, the most sensible approach would be to table these interrogatory responses indefinitely while we negotiate on the 30(b)(6)/costs/trade run issues.  You explained that Plaintiffs view is that at some point they are likely to want some "admissible evidence" on the blue sheet issue, but that plaintiffs would agree to push the due date for these interrogatories back to Friday at which time we would take stock of where we are in our negotiations and go from there.

        Finally, on our call last week, Steven stated that one of the reasons plaintiffs believe they need the "trade runs" is because plaintiffs are finding that certain of the data produced by UBS is not matching up with the Equity Trade Journals obtained by plaintiffs.  On our call this afternoon, I asked that you provide us with a specific example or two from the data.  You said you would look into it.  We are also still waiting on a sample "trade run" you guys said you would get us on our call last week.

        Let me know if any of the foregoing is not correct.  Thanks.

Jeff

Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005
**********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited

and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
********************************************************

# Exhibit H



# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey M. Gould
To Call Writer Directly:
(202) 879-5138
jeffrey.gould@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

June 7, 2010

<u>Via Electronic Mail (without enclosure)</u>
<u>And Federal Express</u>

Steven Rosenwasser, Esq.
Bondurant, Mixon & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

Re:    *Taser International, et al. v. Morgan Stanley & Co., et al.*

Dear Steven:

On behalf of UBS Securities, LLC ("UBS"), enclosed please find one CD containing materials Bates numbered UBS_TSR1296222 through UBS_TSR1296243. This production consists of trade blotters reflecting information on TASER trades from January 1, 2003 to May 31, 2009. Please note that this production has been labeled as "Highly Confidential" pursuant to the Stipulation and Protective Order Regarding Confidential Information agreed to by the parties and entered by the Court on April 15, 2010.

As we have previously discussed, we intend to seek costs for the collection, processing and production of these trade blotters.

Please be advised that this production is subject to, and not a waiver of, UBS's specific and general objections to plaintiffs' document requests, interrogatories, and our ongoing discussions regarding discovery. We reserve the right to amend and supplement our discovery response as necessary.

If you have any questions concerning the enclosed, please do not hesitate to contact me.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

Steven Rosenwasser, Esq.
June 7, 2010
Page 2

Respectfully submitted,

Jeffrey M. Gould

Enclosure

cc:    Andrew B. Clubok

# Exhibit I

Jeffrey Gould/Washington
DC/Kirkland-Ellis

06/16/2010 07:55 PM

To   "Steven J. Rosenwasser" <rosenwasser@bmelaw.com>

cc   Andrew Clubok/Washington DC/Kirkland-Ellis@K&E, Jeffrey
Landis/Washington DC/Kirkland-Ellis@K&E

bcc

Subject   Affiliate Data

Steven,

In the Stipulation and Order Between Plaintiffs and UBS Securities, LLC dated April 14, 2010, UBS
agreed to look into whether UBS AG Stamford engaged in certain trading related activities in TASER
securities or derivatives with UBS Securities, LLC. Based on a reasonably diligent inquiry, UBS is
currently not aware of any instances in which UBS AG Stamford borrowed, loaned, located or provided a
locate, bought, sold or transferred TASER equities or derivatives, excluding broad based index options
such as options off of the S&P 500, to or from UBS Securities, LLC between January 1, 2003 and May 31,
2009.  Accordingly, UBS is not producing data or information for UBS AG Stamford. You have taken the
position throughout this litigation that you cannot properly analyze UBS's data because UBS has not
produced data for UBS AG Stamford.  UBS has repeatedly explained to you that affiliate data is irrelevant
to the issues in this case, and the fact that UBS AG Stamford did not deal in TASER equities or
derivatives during the relevant time period further confirms that position.  We will now consider this issue
closed, and we request that you immediately withdraw the portion of your May 24 Motion to Compel
pertaining to UBS AG Stamford.

UBS is still working to collect and produce certain information from UBS Financial Services, and will be
producing that information as soon as practicable.  As we have repeatedly explained to you, UBS
Financial Services is an affiliate entity that is not a Defendant in this case, and over which UBS Securities,
LLC holds no special authority or power to collect data or documents.  Nevertheless, we have been
working diligently to attain this irrelevant information to produce in this litigation (although we of course
reserve our right to object on relevance grounds to its admissibility at trial).  In any event, we hope to be
able to produce this information by June 23, the date our response to Plaintiffs' Motion to Compel is due.
But regardless of whether our production is days before or days after our June 23 response to your
Motion, we see no need for or point in Plaintiffs continuing with their Motion when we have agreed to
produce information and are doing our best to produce it soon.  Because Plaintiffs' Motion on this point
does nothing to advance any issue in this case, we request that you withdraw this portion of your Motion,
as well.

Please let us know if Plaintiffs are willing to withdraw the portion of their Motion pertaining to affiliate data

Thanks,
Jeff

Jeffrey M. Gould
Kirkland & Ellis LLP
655 15th St., NW | Suite 1200
Washington, DC 20005
(Direct) 202-879-5138
(FAX) 202-879-5200

# Exhibit J



# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey M. Gould
To Call Writer Directly:
(202) 879-5138
jeffrey.gould@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

June 21, 2010

**Via Electronic Mail (without enclosure)**
**And Federal Express**

Steven Rosenwasser, Esq.
Bondurant, Mixon & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

Re:   *Taser International, et al. v. Morgan Stanley & Co., et al.*

Dear Steven:

On behalf of UBS Securities, LLC ("UBS"), enclosed please find one CD containing materials Bates numbered UBS_TSR1296704 through UBS_TSR1305910. This production consists of data and information relating to UBS Financial Services.

This production consists of the following:

1. Electronic trade runs for UBS Financial Securities reflecting transactions in TASER equities and options for January 1, 2003 through May 31, 2009. UBS Financial Services does not have the capacity to produce useable; electronic blue sheets or trade blotters to non-regulator third parties. Accordingly, UBS Financial Services has generated these electronic trade runs specifically to produce in the above-captioned matter. This is the same manner in which UBS Financial Services produces electronic trading data when requested by other non-regulator third parties, including by subpoena in litigation. With this production, we now consider Plaintiffs' request for blue sheets and trade blotters from UBS Financial Services satisfied.

2. Records reflecting UBS Financial Services' loans and borrows of TASER securities from January 2004 through May 2009. For all but five months in this time frame, UBS has produced Loanet data. Because Loanet data was not readily available for January 2004, January 2005, February 2007, June 2007, and March 2008, for these months UBS has extracted and is producing loan/borrow records from rebate billing reports, which reflect UBS Financial Services' loans and borrows of TASER securities to and from UBS

Chicago   Hong Kong   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai

Steven Rosenwasser, Esq.
June 21, 2010
Page 2

Securities LLC.  Loan/borrow records for UBS Financial Services were unavailable for 2003 and have not been provided for that year.  With this production, we now consider Plaintiffs' request for loan/borrow records for UBS Financial Services satisfied.

3. Daily and weekly stock position reports.  UBS is producing both daily and weekly stock position reports in the manner in which they are capable of being generated by UBS Financial Services.  With this production, we now consider Plaintiffs' request for daily/weekly stock positions from UBS Financial Services satisfied.

UBS has also confirmed that UBS Financial Services does not trade in Listed OTC derivatives involving TASER, and thus it is not producing any such data.  We now consider Plaintiffs' request for Listed OTC derivatives from UBS Financial Services satisfied.

Please note that this production, including documents contained therein, has been labeled as "Highly Confidential" pursuant to the Stipulation and Protective Order Regarding Confidential Information agreed to by the parties and entered by the Court on April 15, 2010. Please be advised that this production is subject to, and not a waiver of, UBS's specific and general objections to plaintiffs' document requests, interrogatories, and our ongoing discussions regarding discovery.  We reserve the right to amend and supplement our discovery response as necessary.

UBS's production of trading data for UBS Financial Services resolves the only remaining open issue in the UBS-specific portion of Plaintiffs' May 24, 2010 Motion to Compel.  In that motion, Plaintiffs complain that as of the date of the motion: (1) UBS had not provided a representation that trade blotters and blue sheets reflect identical data, and (2) UBS had not produced affiliate data from UBS AG Stamford Branch and UBS Financial Services.  When UBS determined recently that it was unable to provide the requested representation regarding trade blotters and blue sheets, it promptly produced the trade blotters on June 7.  When UBS determined recently that UBS AG Stamford Branch had not transacted in TASER securities, it promptly notified Plaintiffs of that fact on June 16, thereby satisfying any need to produce data. When UBS determined recently that UBS Financial Services had transacted in TASER securities, it diligently set out to collect the requested data and has provided it to you in the enclosed production of today.  There is nothing further to discuss with the Court on the UBS-specific portion of Plaintiffs' motion, and we request that you withdraw it immediately.

As we have explained on numerous occasions, we are concerned about Plaintiffs' insistence on pressing unnecessary and already resolved issues with the Court.  It is becoming increasingly clear that Plaintiffs prefer to manufacturer disputes and deficiencies for the purpose of prejudicing the Court against UBS, rather than focusing on the merits of their case.  All



Steven Rosenwasser, Esq.
June 21, 2010
Page 3

Defendants are extremely concerned about these discovery practices, and must apprise the Court of what is happening.

At the end of the day, however, we do not think the Court will appreciate any of this. Our view is that the Court expects the parties to work together cooperatively to the greatest extent possible to move discovery forward without bringing or maintaining unnecessary motions that seem designed for purposes other than a sincere effort to obtain necessary discovery. Accordingly, we respectfully request that Plaintiffs immediately withdraw the UBS-specific portion of their motion as there are no issues for the Court to resolve. Please let us know if you will agree to do so.

Sincerely,

Jeffrey M. Gould

Enclosure

cc:    Andrew B. Clubok
       All Defense Counsel (without enclosure)

# Exhibit K

**BONDURANT, MIXSON & ELMORE, LLP**
ATTORNEYS AT LAW
3900 ONE ATLANTIC CENTER
ELIZABETH G. EAGER       1201 WEST PEACHTREE STREET, N.W.      WRITER'S DIRECT CONTACT
**ATLANTA, GEORGIA 30309-3417**      (404) 881-4186
(404) 881-4100      eager@bmelaw.com
TELECOPIER (404) 881-4111

June 4, 2010

<u>VIA HAND DELIVERY</u>

Richard H. Sinkfield, Esq.
Rogers & Hardin LLP
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, Georgia  30303-1601

      Re:     *Taser International, Inc., et al. v. Morgan Stanley & Co., et al.*,
           In the Fulton County State Court; Case No. 2008-EV-004739-B

Dear Richard:

      Enclosed please find documents bearing Bates numbers TASER00182346 – TASER00182680 and TSR-CULVER-00000436 – TSR-CULVER-00000462.  Some of these documents are designated Confidential or Highly Confidential pursuant to the Protective Order. These documents are being produced in accordance with the Court's November 13 Scheduling Order and the parties' agreements concerning the production of documents.  We understand that you will provide this letter and the accompanying materials to counsel for each of the Defendants.

      The documents being produced by TASER include documents responsive to Defendants' Second Requests for Production to TASER.  While conducting a quality control review of its document production, TASER became aware that these documents had not been produced.  All of the documents being produced are publicly available documents, and TASER has objected to producing publicly available documents and Defendants never stated any disagreement or concern with that objection.  Despite—and without waiving—this objection, TASER is producing the documents.

      Should you have any questions or concerns, please do not hesitate to contact me.

                     Very truly yours,

                     *Elizabeth G. Eager*

                     Elizabeth G. Eager

Enclosures

772851.1

# Exhibit L



| | |
|---|---|
| "Steven J. Rosenwasser"<br><rosenwasser@bmelaw.com><br><br>04/21/2010 08:14 AM | **To** "Jeffrey Landis" <JLandis@kirkland.com>, "Andrew Clubok"<br><aclubok@kirkland.com><br>**cc** "Nicole G. Iannarone" <iannarone@bmelaw.com>, "Elizabeth<br>G. Eager" <eager@bmelaw.com><br>**bcc**<br>**Subject** Privilege Log Conferral |

Andy and Jeff,

Good morning. I am writing as a follow up to our recent conversations regarding the Defendants' privilege logs. Per the Defendants' request, rather than seeking a Special Master at this time, we are willing to endeavor to try and narrow the documents at issue. To that end, below please find our follow up conferral on UBS's privilege log. The number on the left refers to the privilege log entry, and the description thereafter is our conferral.

<u>General Matter</u>

In many instances, you refer to a NASD, FINRA, SEC or other regulatory inquiry or investigation. In order to determine whether the privilege applies to any such inquiries, we need the following information for each entry referring to an inquiry: (a) name of agency involved; (b) dates of investigation/inquiry; (c) stocks involved in inquiry; (d) subject matter being investigated and (e) whether <u>any</u> of the information in the email or attachment was disclosed to the agency <u>at any point in time</u>.

<u>Individual Entries</u>

Entry 1 - Your description of the document describes this as an email chain, yet you only list one person. Please identify all persons on the email chain. Further, you reference an attachment stating that it is "providing information to counsel." Please state who prepared the attachment, identify the type of information it contained and name all persons who reviewed the information on the attachment. Further, please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Also, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice. If not, please explain why the non-legal advice is privileged. Finally, with respect to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation.

Entry 2 - Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged. Also, please confirm that the email and the attachments contain nothing but legal advice (i.e., there is no trading data, references to comments by third parties, general business information or business advice).

Entry 3 - Please identify the amendment you are referring to, including whether it had passed as of the date of the email. If the amendment had not passed, please explain how this email

constitutes legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Also, please confirm that the email and the attachments contain nothing but legal advice (i.e., there is no trading data, references to comments by third parties, general business information or business advice).

Entry 4 - Please see entry 3.

Entry 5 - Please indicate when S. Anderson gave the purported legal advice, and who was present when it was given (or received the earlier email containing that advice). With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Also, please confirm that the email and the attachments contain nothing but legal advice (i.e., there is no trading data, references to comments by third parties, general business information or business advice).

Entry 6 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged.

Entry 7 - Please see entry 6.

Entries 8 through 13 - Please explain the context of the "representation" relating to stock lending. Was there pending litigation or a regulatory inquiry? If so, please identify it. Further, please explain why the "information" provided (particularly facts such as trading data, communications with third parties, business matters) are privileged. Or, alternatively, confirm that the email and attachments contain only legal advice and no underlying facts. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 14 - You reference an attachment stating that it is "providing information to counsel." Please state who prepared the attachment, identify the type of information it contained and name all persons who reviewed the information on the attachment. Further, please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Also, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. If not, please explain why the non-legal advice is privileged. Finally, with respect to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation.

Entry 15 - Please identify all persons who receive email at "DL-TPRA-Stamford." With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 16 - See Entry 15.

Entry 17 - See Entry 15.

Entry 18 - With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Further, please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Also, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. If not, please explain why the non-legal advice is privileged. Please provide the titles of each person who received the email (the title should be at the time they received the email). If the title is not available, please describe the person's position so we can determine whether they needed to know the purported legal advice.

Entry 19 - See Entry 18.

Entry 20 - Please see Entry 14.

Entry 21 - With respect to the regulatory inquiry, please provide the information requested under "General Matter" above. Further, please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Also, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. If not, please explain why the non-legal advice is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please confirm that none of the information in the email or attachment was disclosed to the regulatory agency or any other third party at any time. As to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation. Finally, please identify the title (or, if not available, general job duties) of each of the receipients so we can ascertain whether they needed to know the contents of the email.

Entry 22 - Please explain how an email between two attorneys is entirely privileged. Is it your position that Mr. Moskowitz's statements exactly mirror counsel's statements and that his email contains none of his own opinions, impressions or thoughts? Also, does the email and attachment contain no underlying facts. As to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation. Finally, please indicate when Mr. Anders and Edwards provided the legal advice that you claim is privileged, and who was present when that advice was given (or cc'ed on the email in which it was given).

Entry 25 - Please see entry 21.

Entry 28 - Please see entry 21.

Entry 29 - Please see entry 14.

Entry 30 - Please see entry 14.

Entry 31 - Please see entry 21.

Entry 32 - Please see entry 21.

Entry 34 - Please explain how an email from Ed Buscemi to Citera contains mental impressions of Citera? Further, you indicate that this email provides information to J. Cohn, but he is not listed as a recipient. Further, please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Also, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. Please identify the amendment you are referring to, including whether it had passed as of the date of the email. If the amendment had not passed, please explain how this email constitutes legal advice.

Entry 36 - Please see entry 21. Also, please identify all receipients of email at "SH-ETD-DCG-NA", including their titles and why they needed to know the information.

Entry 37 - Please see entry 21.

Entry 38 - Please see entry 21.

Entry 39 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Please explain whether the audit was a routine audit or for some other reason. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 40 - Please see entry 14.

Entry 41 - Please see entry 21.

Entry 42 - You reference an attachment stating that it is "providing information to counsel." Please state who prepared the attachment, identify the type of information it contained and name all persons who reviewed the information on the attachment. Further, please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Also, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice (i.e., there is no trade data, references to communications with third parties, business advice or business matters). If not, please explain why the non-legal advice is privileged.

Entry 43 - Please see entry 21.

Entry 44 - Please see entry 42. Also, you reference an email chain - are all participants in the chain listed?

Entry 45 - Please see entry 42.

Entry 46 - Please see entry 42.

Entry 47 - Please see entry 21.

Entry 48 - Please explain how this email and attachment provide information to an attorney, when no attorney is listed on the log.  Further, with respect to the purported advice from Pearle, please identify when it was given and who was present when it was given.  Also,  please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged.  Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 49 - Please see entry 21.

Entry 50 - Please see entry 21.

Entry 51 - Please see entry 21.

Entry 52 - Please see entry 34.

Entry 53 - Please see entry 3.

Entry 54 - Please see entry 21.

Entry 55 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged.  Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 56 - Please explain how this email provides information to Romaine when he is not listed as a recipient.  Please see entry 21.

Entry 57 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged.  Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 58 - Please see entry 57.

Entry 60 - Please see entry 21.

Entry 61 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 62 - Please see entry 21.

Entry 63 - Please see entry 21.

Entry 65 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. As to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation.

Entry 66 - Please see entry 21.

Entry 67 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please identify who requested that the information be prepared.

Entry 68 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 69 - Please explain how requested the legal advice and for what purpose. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice.

Entry 70 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that <u>all</u> of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 71 - Please see entry 21.

Entry 72 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged

Entry 73 - Please explain how this email and attachment were providing information to Cohn and Munro when they are not listed as recipients. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain in what capacity Cohn and Munro were providing representation (e.g., in preparation for litigation, routine compliance, regulatory inquiry).

Entry 75 - Please see entry 21. Further, please explain how this email requests legal advice when the direct receipients (i.e., not the cc's) are not attorneys.

Entry 76 - Please explain how this email and attachment are meant to provide information to Aluise, when Aluise is not listed as a recipient of the email or attachment. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 77 -  Please explain how this email and attachment are meant to provide information to counsel, when counsel is not listed as a recipient of the email or attachment. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 79 - Please explain how the email chain and attachment provides information to Wendell, when Wendell is not listed on the chain. Further, please state whether it is UBS's position that all of the information on each of the emails and attachments contains legal advice (i.e., there is no trade data, business information or referrals to outside communications). With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 80 - Please indicate when Pearle provided the legal advice, and who was present or received the advice at that time. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the

attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 81 - Please see entry 80.

Entry 82 - Please see entry 21.

Entry 83 - Please see entry 21.

Entry 85 - Please see entry 80.

Entry 86 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain how the email was for the purpose of providing Citera information, when he is not listed as a recipient.

Entry 87 - Please identify all persons who receive email at "DL-RCG-email-list." Please provide their titles (or, if not available, job duties) and explain why they needed to know the information in the email and attachments. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 88 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. With respect to the "representation," please indicate whether it was particularly with respect to a potential lawsuit, regulatory inquiry or routine compliance.

Entry 89 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 90 - Please identify all persons who receive email at "DL-RCG-email-list." Please provide their titles (or, if not available, job duties) and explain why they needed to know the information in the email and attachments. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents,

including all parties that sent or received it, what it contains and why it is privileged.

Entry 91 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 92 - Please see entry 21. Also, please identify all persons who receive email at "DL-SKE-GSD-NA." Please provide their titles (or, if not available, job duties) and explain why they needed to know the information in the email and attachments.

Entry 93 - Please explain what you mean by "representation regarding securities regulations." Was there a potential or actual regulatory inquiry? If so, please see entry 21. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. As to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation.

Entry 94 - Please see entry 21.

Entry 95 - Please identify all persons who receive email at "DL-RCG-email-list." Please provide their titles (or, if not available, job duties) and explain why they needed to know the information in the email and attachments. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain what you mean by "representation regarding the booking or execution of trades." Was there a potential or actual regulatory inquiry? If so, please see entry 21.

Entry 96 - Please see entry 21.

Entry 97 - Please see entry 21.

Entry 100 - Please identify the amendment you are referring to, including whether it had passed as of the date of the email. If the amendment had not passed, please explain how this email constitutes legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Also, please confirm that the email and the attachments contain nothing but legal advice (i.e., there is no trading data, references to comments by third parties, general business information or business advice). Please explain what you mean by "representation regarding amendment to securities regulation." What was counsel's role?

Entry 104 - Please see entry 21.

Entries 105 through 115 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged.  Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 116 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged.  Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.  As to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation.

Entry 118 - Please identify the amendment you are referring to, including whether it had passed as of the date of the email.  If the amendment had not passed, please explain how this email constitutes legal advice.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.  Also, please confirm that the email and the attachments contain nothing but legal advice (i.e., there is no trading data, references to comments by third parties, general business information or business advice).  Please explain what you mean by "representation regarding amendment to securities regulation." What was counsel's role?

Entry 121 - Please see entry 21.

Entry 122 - Please see entry 21.

Entry 123 - Please identify the amendment you are referring to, including whether it had passed as of the date of the email.  If the amendment had not passed, please explain how this email constitutes legal advice.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.  Also, please confirm that the email and the attachments contain nothing but legal advice (i.e., there is no trading data, references to comments by third parties, general business information or business advice).  Please explain what you mean by "representation regarding amendment to securities regulation." What was counsel's role?

Entry 124 - Please identify all persons who receive email at "DL-TPRA-Stamford."  With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason.  Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged.  Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it

contains and why it is privileged.

Entry 125 - Please explain how this email was for the purpose of providing information to counsel, when counsel is not listed as a recipient. Please explain what you mean by "representation regarding regulatory compliance." What was counsel's role? Was there an inquiry or investigation? With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 126 - With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Also, please confirm that the email and the attachments contain nothing but legal advice (i.e., there is no trading data, references to comments by third parties, general business information or business advice).

Entry 128 - Please see entry 125.

Entry 129 - Please see entry 21.

Entry 130 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc.) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 131 - See entry 21.

Entry 132 - See entry 21.

Entries 133 through 141 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. As to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation.

Entry 142 - See entry 21.

Entry 143 and 144 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain what you mean by "representation regarding the booking or execution of trades." What was counsel's role? Was this routine compliance or in response to a potential or actual regulatory inquiry?

Entry 145 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entries 146 through 149 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain what you mean by "representation regarding the booking or execution of trades." What was counsel's role? Was this routine compliance or in response to a potential or actual regulatory inquiry?

Entries 150 and 151 - Please see entry 21.

Entry 152 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entries 153, 154 and 155 - Please see entry 21.

Entry 156 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain what you mean by "representation regarding the booking or execution of trades." What was counsel's role? Was this routine compliance or in response to a potential or actual regulatory inquiry?

Entry 157 - Please see entry 21.

Entry 158 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain what you mean by "representation regarding the booking or execution of trades." What was counsel's role? Was this routine compliance or in response to a potential or actual regulatory inquiry?

Entry 159 - Please identify the audit, including who conducted it, why it was conducted and whether any of the information contained in the email or attachment was disclosed to any third party. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 160 - Please explain how a non-lawyer (Capello) can transmit legal advice? Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain what you mean by "representation regarding securities regulation." What was counsel's role? Was this routine compliance or in response to a potential or actual regulatory inquiry?

Entry 161 - Please see entry 160.

Entry 163 - Please explain how Mr. Monteiro's email is "providing information to counsel" when counsel is not one of the 5 persons to whom the email was sent, but rather was only cc'ed. Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 164 - Please see entry 21.

Entry 167 - Please indicate when Mr. Citera provided the legal advice, and who was present when it was provided (or received the email containing it). Further, confirm that Mr. Capello's email does not contain any of his own opinions, conclusions, impressions or thoughts. Also, confirm that the email does not contain any facts such as trading data or business advice.

Entries 169, 170 and 171 - Please see entry 21.

Entry 172 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 173 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all

the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entries 174, 175 and 176 - Please see entry 21.

Entry 177 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. Please explain how this was for the purpose of legal advice, when counsel was only a cc, not a direct recipient.

Entries 178 and 179 - Please see entry 21.

Entries 180, 181, 182 and 184 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 183 - Please see entry 21.

Entry 184 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 185 -Please see entry 21.

Entry 186 and 187 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 193 - Please see entry 21.

Entry 194 - Please see entry 21.

Entry 195 - With respect to the audit, please state whether it was a routine audit done in the ordinary course of business or for some other reason. Also, please explain why the underlying

information (i.e., facts such as p&l, trading data, etc..) are privileged. Please identify, by title, all the cc's and explain why they needed the know the information that you contend is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 196 - Please see entry 21.

Entries 199 and 200 - Please see entry 21.

Entry 203 - Please see entry 21.

Entries 207, 208 and 209 - Please see entry 21.

Entry 213 - Please see entry 21.

Entry 214, 215 and 216 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged. As to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation.

Entry 219 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Further, please indicate whether it is UBS's position that all of the email and the attachment contains legal advice. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

We appreciate your cooperation.

Steven

# Exhibit M



"Steven J. Rosenwasser"
<rosenwasser@bmelaw.com>

05/06/2010 10:51 AM

To  "Andrew Clubok" <aclubok@kirkland.com>, "Jeffrey Landis"
    <JLandis@kirkland.com>
cc  "Nicole G. Iannarone <iannarone@bmelaw.com>, "Elizabeth
    G. Eager" <eager@bmelaw.com>
bcc

Subject  UBS Conferral Re: Data/Document Issues

Andy and Jeff,

I am emailing to follow up on certain issues with regard to UBS's production. By raising these
issues now, Plaintiffs in no way prejudice their right to raise issues about other deficiencies later.
Additionally, this email is without prejudice to our rights to seek appropriate relief from the
Court for any violation of an order from the Court.

(1) Plaintiffs have previously requested that you produce a complete "chart of accounts" to allow
us to fully understand journal entries in some of your stock records. Please let us know whether
you agree to produce one and when we can expect it?

(2) With respect to UBS affiliates, based on the data we have received, UBS Equity Zurich was
involved in TASER transactions. Thus, we ask that you please UBS Equity Zurich trading
records involving TASER. These would include all purchases, sales, loans, borrows, locates and
transfers. Let us know if you agree.

(3) A number of defendants used a S012 Recap Report, but we have been unable to locate a
similar report in your pdocution. Thus, can you please confirm that UBS does not use such a
report. If you cannot make that confirmation, please confirm that you have produced all
instances in which it was created during the relevant Time Period.

(4) You produced a sample of the July 2006 Locate Report. That report is responsive to our
document requests, yet we cannot locate that report for most months. Please let us know why
that report was not produced and when you anticipate producing it.

(5) Did UBS create or utilize a report known as the "CNS Consecutive Days Short Fail Report
for Reg SHORT Threshold CUSIPS – Intra Day Report?" We have seen that other defendants
utilized this report which includes the following columns: CUSIP; See Description; Security
Type; P/E Age; GF Quantity; Min Liability; Today's Net Opening CNSA Pos Long/ Shrt (-) and
CNSE Pos Long/ Short (-); Today's Settling Trade Buy/ Sell (-); Today's Net Position CNSA
Prior to Night and CNSE Prior to Night Cycle Long/ Shrt (-); Today's Night Cycle Alloc Long/
Shrt (-); Today's Day Cycle Alloc Long/ Shrt (-); Today's BOD CNS Pos; Tomorrow's Sett
Trades Purchase/ Sold (-); and Tomorrow Projected CNS Pos Lng/Shrt (-). Please let us know if
UBS created this report, or a report with many of these fields, during the time period. If UBS
created such a report, please identify it by name and confirm that all such reports have been
produced.

(6) Did UBS create letters to alter those to whom they have love security to return a specific

quantity of that securirty (other defendants have called such letters "Loan Termination & Buy In Notices")?   The letter generally lays out the quantity of security under the loan contract, the date of the loan, and the amount of the contract.  If UBS did send these notices, please produce all instances of the notice as it pertains to TASER and explain why they have not already been produced.

(7) It does not appear that UBS has produced documents related to derivative transactions in TASER securities.  Please explain why we have not received that data and produce it immediately.

(8) Did UBS create or utilize a report known as the "SAFE or SGUD Fails" report?  We have seen that other defendants utilized this report which includes the following columns:  CUSIP; symbol; security type; temperature; type; age; quantity; amount; account name; t/d; s/d; source; trade ID; O/I affirmed; DK Ind; market exposure; and comments. Please let us know if UBS created this report, or a report with many of these fields, during the time period.  If UBS created such  a report, please identify it by name and confirm that all such reports have been produced.

(9)  Did UBS create or utilize a report similar to or known as the "Threshold Fail Tracking System Data"?  We have seen that other defendants utilized this report which includes the following columns:  Report Date; Security Name; CUSIP; Account Number; At Risk; Start Date; Days Aged; Ticker; Exchange Code; Acct; Account Name; IPS Symbol; Comments; Threshold Start Date; Orig Qty; Location; and BuyIn_Date. Please let us know if UBS created this report, or a report with many of these fields, during the time period.  If UBS created such  a report, please identify it by name and confirm that all such reports have been produced.

(10) In UBS's blue sheets, the column "contra_broker_num" is defined as "Contra side broker number."  What is the definition when the field is not populated?

(11) In UBS's blue sheets, the column "prime_brk" is defined as "Clearing number of the account's prime broker."  What is the definition when the field is not populated?

We appreciate your time and attention to these matters.  A number of issues are raised in this issue, and please contact us as you have answers to these questions—you do not need to wait until you have resolved all of the issues.

Thanks,

Steven