EXHIBIT

C

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| TASER INTERNATIONAL, INC., *et al.*, | : : : | |
| Plaintiffs, | : | CIVIL ACTION FILE NO.: 2008-EV-004739-B |
| v. | : : | |
| MORGAN STANLEY & CO., INC., *et al.*, | : : | JURY TRIAL DEMANDED |
| | : | **FILED UNDER SEAL** |
| Defendants. | : | |

### PLAINTIFFS' REPLY IN SUPPORT OF
### MAY 24, 2010 OMNIBUS DISCOVERY MOTION

Plaintiffs have unfortunately been forced to file several motions against Defendants due to their failure to comply with multiple Court Orders. Notably, Defendants **do not dispute** that they have violated this Court's Orders. Instead, they claim they should be excused from their violations, providing, at best, strained rationales for their non-compliance. But, Defendants' excuses do not pass muster. Regardless, even if they were valid, Defendants have an obligation to seek relief from this Court's Orders **prior** to violating them. Illegitimate excuses made after violations, and after Plaintiffs have suffered prejudice, are insufficient. This Court must impose consequences upon Defendants to prevent them from continuing to violate Court Orders.

## I.   UBS ADMITS IT VIOLATED THIS COURT'S ORDER.

In the first section of Plaintiffs' motion, Plaintiffs seek sanctions for UBS's failure to comply with a number of provisions of the Court's April 14, 2010 Order. UBS does *not* claim it complied with the Order. Instead, it quibbles with the necessity of the Order and offers excuses for its non-compliance. UBS's quibbling and excuses come too late: if UBS had a valid reason it could not have abided by the Order (which it does not), it should have sought relief before violating it. *See Gropper v. STO Corp.*, 276 Ga. App. 272, 276 (2005) (failure to seek relief from Court in advance of violating Court Order basis for sanction of dismissal). Because there is no dispute that UBS violated this Court's April 14, 2010 Order, sanctions are warranted. The **only** issue is what form those sanction should take.

### A.   UBS Failed to Provide the Court-Ordered Certification.

UBS **does not dispute** that it failed to abide by this Court's Order requiring it to certify by May 14, 2010 that "its trade blotters are derived from the same data as its blue sheets."[1] April 14, 2010 Order at 3. That failure is significant, and mandates sanctions. Indeed, the certification at issue was the result of **eight months** of conferrals in which Plaintiffs sought UBS's trade blotters, and UBS refused to produce them claiming that they were duplicative of blue sheets it already produced. Plaintiffs informed UBS that based **solely** on its representations

---

[1] As discussed below, trade blotters and blue sheets include detailed data about TASER transactions, including price, number of shares and parties involved.

that the trade blotter and blue sheet data were the same, Plaintiffs would not move

to compel production of the trade blotters.  But, to ensure that UBS was being

candid, Plaintiffs conditioned their agreement not to move to compel on UBS

agreeing to certify that its assurances regarding the trade blotters were accurate.

But, when this Court's Order required UBS to make that certification, UBS

changed its story and said that it could not certify its prior representations were

correct.  Only then did UBS finally produce the trade blotters – **eight months** after

it should have.  Misrepresentations and a violation of a Court Order that delays

production of important data by eight months warrant sanctions.

   As part of their efforts to show Defendants' improper trading activities,

Plaintiffs sought and Defendants agreed to produce documents known as "blue

sheets", which contain detailed information about stock trades such as the price,

date, number of shares and the parties involved.  Contrary to UBS's claim that

"'blue sheets' are documents that are not required to be maintained,"[2] SEC and

other regulations **require** all Defendants (including UBS) to maintain accurate

blue sheets.[3]  In fact, the New York Stock Exchange ("NYSE") previously

sanctioned UBS for failing to maintain accurate blue sheets, noting that "[t]he

---

[2] *See* UBS Securities LLC's Opposition to Plaintiffs' Motion for Relief Concerning UBS's Alleged Violation of this Court's ("Response Br.") Order at 3 (emphasis omitted).

[3] *See, e.g,.* Exhibit 1 (FINRA Rule 01-60); Exhibit 2 (SEC Rule 17a-25).

receipt and review of blue sheets are an **essential component** of Exchange investigations into matters such as potential insider trading or market manipulation."[4]  Of course, whether blue sheets were not required by regulators is entirely irrelevant: UBS was required to produce them as a result of UBS's own voluntary agreement to do so.[5]

Since early in this case, Plaintiffs have been concerned that UBS's blue sheets data may be inaccurate.  Plaintiffs' concern first arose when they learned that UBS had been sanctioned for maintaining inaccurate blue sheets, including being sanctioned $500,000 by the NYSE for, *inter alia*, "**submitting inaccurate trading information on electronic blue sheets.**"[6]  Plaintiffs concerns were heightened when UBS disclosed last summer that its **TASER** blue sheets could be inaccurate:  "UBS has informed Plaintiffs that 'certain data issues…could affect some of the blue sheets which UBS Securities, LLC ('UBS') has agreed to produce…..'"[7]

After learning that UBS's TASER blue sheets may be inaccurate, Plaintiffs served interrogatories, asking UBS to identify which blue sheets contained

---

[4] *See* Exhibit 3 at 3 (NYSE Exchange Hearing Panel Decision 05-159) (emphasis added).

[5] *See* July 16, 2009 Order at Attachment A.

[6] *See* Exhibit 3 at 1 (NYSE Heading Panel Decision 05-159).

[7] *See* July 16, 2009 Order at Attachment A at 2.

inaccuracies and what exactly was inaccurate about them.  In its verified response,

UBS disclosed that '

<strong>REDACTED</strong>

[8]

UBS stated that:

- <strong>REDACTED</strong>

- <strong>REDACTED</strong>

- <strong>REDACTED</strong>

Exhibit 7 at 11, 16, 18-19 (emphasis added).[9]

<strong>REDACTED</strong>

, UBS argues that such inaccuracies are of no consequence

---

[8] *See* Plaintiffs' Omnibus Motion, Ex. B at 6 (UBS's Amended Objections and Responses to Plaintiffs' Third Interrogatories).

[9] The **only** blue sheets UBS produced in this case are for **TASER** trades.

because "no regulator has ever seen, let alone criticized the TASER blue sheets." *See* Response Br. at 3. UBS apparently believes that inaccurate information is not a problem unless it is caught by regulators. But the fact that this information is potentially inaccurate, whether caught by regulators or not, is troubling. First, it impacts Plaintiffs' ability to analyze UBS's trading records and to prosecute this case. Second, it is also troubling that UBS is aware of inaccuracies but has not made regulators aware of the fact that these crucial documents are flawed. Indeed, UBS appears to admit that it is hiding known violations from the SEC and others.

Accordingly, since at least **eight months ago,** Plaintiffs sought an alternate source of UBS's TASER transaction data - its trade blotters.[10] *See* Exhibit 4 (Affidavit of Steven Rosenwasser) at attachment A (11/5/09 Rosenwasser email). For months, UBS objected to producing the trade blotters, insisting that they came from the same flawed data source as the blue sheets, would have the same inaccuracies, and thus there was no reason to produce them.[11] Plaintiffs,

---

[10] Trade Blotters contain, *inter alia*, information about TASER transactions that is the same as the information contained on blue sheets, though often from another data source.

[11] *See, e.g.,* Exhibit 4 ¶ 23 ("During the conferral process, UBS repeatedly represented to Plaintiffs' counsel that the blue sheets and trade blotters were derived from the same data source, such that production of the trade blotters would not cure the blue sheet inaccuracies."); *Id.* at attachment B at 2 (2/25/10 Landis email) ("the trade blotters are derived from the same place/system such that producing the trade blotters would not cure any inaccuracies in the blue sheets")

understanding that there is no purpose for obtaining duplicative and equally inaccurate data, agreed that they would not pursue the trade blotters through a motion to compel or otherwise **if** UBS certified that its trade blotters and blue sheets contained identical data.  Because Plaintiffs were agreeing not to seek important data based on UBS's representation, Plaintiffs insisted that the certification requirement be enforceable as a Court Order so there would be consequences if UBS was not being candid.[12]

Desperate to avoid a motion to compel, and also wanting to get relief from other discovery matters, UBS agreed.  Thus, for more than a month, Plaintiffs and UBS conferred over language relating to the certification.[13]   Ultimately, **UBS agreed to the following language and Court Order**:

> Within thirty days of this agreement [*i.e.,* by May 14, 2010], UBS **will** provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters, it would not cure any inaccuracies in the blue sheets.

_____

[12] UBS's claim that all of the information in the blue sheets and trade blotter exists in other reports (e.g., order management system and stock record data) is incorrect. While some of the data in those other reports is the same as the blue sheets and trade blotters, other data is not.  For example, as Plaintiffs explained to UBS, the order management and stock record data does not include account name and in many cases is incomplete.  *See* Exhibit 4 at attachment C (12/16/09 Eager letter). Indeed, as one example, UBS_TASER-967 is 149 columns wide, and approximately 65 of the columns are unpopulated.  *Id.* at 2.

[13] *See* Exhibit 4 at attachment D-H (2/24/10 Eager Email); (2/25/10 Landis Email); (2/25/10 Rosenwasser Email); (2/26/10 Landis Email); (3/15/10 Landis Email); (4/9/10 Landis Email).

April 14, 2010 Order at 3 (emphasis added).

Despite UBS's prior repeated assurances about the data source for trade blotters and the Court's April 14, 2010 Order, on May 14, 2010, UBS did **not** make the Court-ordered certification. Instead, UBS let the May 14, 2010 deadline pass without providing the certification and without informing Plaintiffs or the Court why it was not provided.

On or about May 27, 2010, well after the deadline had passed, Plaintiffs asked UBS when the certification would be provided.[14]  Only then did UBS state **for the first time** that "it determined that it could not represent [that its trade blotters are derived from the same data as its blue sheets] with 100 percent certainty." *Id.*; *see also* Response Br. at 6. UBS's post-deadline revelation was shocking because UBS had for months refused to produce trade blotters based on its repeated representations that its trade blotters and blue sheets were identical. Only after UBS violated the Court's Order by refusing to provide the agreed-upon certification did UBS finally admit that its prior representations were false, and then agree to produce the trade blotters. But, amazingly, UBS did not produce the trade blotters in lieu of the certification on May 14, 2010. Instead, it waited almost another month before producing them.[15]

---

[14] *See* Exhibit 4 at attachment M (5/27/10 Rosenwasser Email).

[15] *Id.* at attachment I (6/7/10 Gould Letter).

780325.1

8

Although Plaintiffs recognize that UBS could not make an incorrect certification, UBS's conduct in representing to Plaintiffs for months that the blue sheets and blotters came from the same data warrants sanctions.  At best, UBS, made representations without knowing if they were true.  At worst, UBS attempted to commit fraud on Plaintiffs and this Court.  This conduct has delayed the case and Plaintiffs ability to analyze UBS's trades in TASER.

**B.      UBS Failed to Produce Affiliate Data by the Court-Ordered Deadline.**

As with its failure to make the trade blotter certification, UBS **does not deny** that it violated the Court-ordered deadline to produce its affiliates' trading data.  Instead, it now argues that the data is not relevant, or that Plaintiffs would have had a harder time obtaining the data through the subpoena process.  Neither position relieves UBS from the consequences of its failure to do what the Court ordered it to do:  to produce its affiliate data by a date certain.

In the course of Plaintiffs' factual investigation, Plaintiffs discovered that data from UBS affiliates was necessary to fully analyze certain trades.  That data is necessary because, *inter alia*, Plaintiffs discovered that some Defendants "park" TASER positions with their affiliates to hide the fact that they are failing to deliver TASER shares.  For example, Defendant Goldman Sachs "removed [**5.1 million** TASER short positions] from Goldman Sach's stock record and 'parked' [them] in

780325.1

9

[its affiliate] Goldman Sachs International's stock record in order to mask the true short position in TASER's securities."[16]  Plaintiffs would not have been able to uncover these hidden shares had they not obtained affiliate data from Goldman Sachs International (which Goldman agreed to produce in this case).

Given the need for discovery of affiliate trading in TASER, Plaintiffs reminded Defendants of their obligation to obtain relevant discovery from their affiliates.[17]  Since at least November 2009 (eight months ago), Plaintiffs requested that UBS produce TASER trading data from two identified affiliates: UBS Stamford and UBS Financial Services.[18]  After months of negotiation, to stave off a motion to compel, UBS agreed to either produce the affiliate data or provide a representation that it did not exist.  Again, to ensure that UBS did not breach its agreement without consequence, Plaintiffs insisted that the agreement be set forth in an Order, and UBS agreed.  Thus, on April 14, 2010, the Court ordered:

> If after a diligent search, there is evidence that UBS Financial Services and/or UBS AG Stamford Branch borrowed, loaned, located or provided a locate, bought, sold or transferred TASER equities or derivatives...**UBS will produce the following data (to the extent it exists) for that entity no later than May 21, 2010:**

---

[16] Plaintiffs' Amended Responses to Defendants' Second Set of Interrogatories at 58-59.

[17] *See, e.g., Steele  Software Sys., Corp. v. Dataquick Information Sys., Inc.*, 237 F.R.D. 561 (D. Md. 2006).

[18] *See* Exhibit 4 at attachment K (11/13/09 Rosenwasser email).

(a)    Daily trade blotters
(b)    Blue sheets
(c)    Daily/weekly stock positions
(d)    Loan/Borrow Records and
(e)    Listed by OTC derivatives.

If after a diligent search, there is no evidence that UBS Financial Services and/or UBS AG Stamford Branch borrowed, located or provided a locate, loaned or transferred TASER equities or derivatives…then UBS will provide plaintiffs a representation that after a diligent search the entity did not borrow, lend or transfer TASER equities or derivatives.....

April 14, 2010 Order at 3-4.  As with the certification, UBS reviewed and agreed to the language in the Court Order before it was submitted to the Court.  *Infra* at 8.

Once again, UBS simply ignored the Court's Order.  By May 21, 2010, UBS had neither provided a stipulation nor produced the trading data.  Further, UBS did **not** contact Plaintiffs or the Court prior to May 21 to seek relief from the Court's Order.  Rather, UBS told Plaintiffs that the information would not be provided only **after** the Court-ordered deadline had passed.[19]  Then, UBS waited almost another month before producing the data.

UBS has no legitimate excuse for its failure to comply with this Court's Order.  Indeed, UBS's only "defense" is its incorrect claim that the Court Order only "required that UBS conduct a diligent search."  Response Br. at 7.  But the language of the Court's Order, which **UBS negotiated and agreed to**, does not say anything about a diligent search.  Rather, it unequivocally states that UBS "will"

---

[19] *See* Exhibit 4 at attachment L (5/24/10 Eager email).

780325.1

11

provide a certification or produce the data by May 21, 2010.  April 14, 2010 Order at 3.

### C.   UBS's Repeated Violations Warrant Sanctions.

Because UBS does not dispute its violations of this Court's Order, the only question before the Court is the appropriate sanction.  "[T]he court . . . may make such orders in regard to the failure as are just," including striking some or all of UBS's pleadings, taking Plaintiffs' allegations as fact, and/or awarding Plaintiffs the attorneys' fees.  O.C.G.A. § 9-11-37(b)(2).

UBS's failure to comply with the April 14, 2010 Order without valid excuse constitutes a willful violation.  Under Georgia law, willfulness requires mere conscious indifference, not malicious intent: "There is no requirement that the plaintiff display and the trial court find actual willfulness. The sanction of dismissal for failure to comply with discovery provisions of the Civil Practice Act **requires only a conscious or intentional failure to act, as distinguished from an accidental or involuntary non-compliance."** *Rouse v. Arrington*, 283 Ga. App. 204, 207 (2007) (emphasis added).[20]   Indeed, Georgia courts have consistently held that "a conscious indifference to the consequences of failure to comply with the Orders of this Court...has been equated with 'willful misconduct." *Swindell v. Swindell*, 233 Ga. 854, 856 (1975).   Where willfulness is present, harsh sanctions

---

[20] *See also Loftin v. Gulf Contracting Co.*, 224 Ga. App. 210, 214-15 (1997) (conscious or intentional failure to act may constitute the necessary willfulness).

are appropriate.  *See Loftin v. Gulf Contracting Co.*, 224 Ga. App. 210, 214-15 (1997) (drastic sanctions are appropriate for willful or conscious disregard of an order compelling discovery).

Further, Georgia law makes clear that UBS had an obligation to prospectively seek relief from this Court's orders ***prior to*** violating the Court's Order.  For example, in *Gropper v. STO Corp.*, 276 Ga. App. 272, 276, 623 S.E.2d 175, 180 (2005), the plaintiff was ordered to produce documents by a specific date, but failed to do so, "blaming in part a computer problem." *Id.* at 274, 623 S.E.2d at 178.  In addition, "[c]ounsel did not file a motion" seeking an extension of time. *Id.*  Even though the plaintiff partially produced documents by the deadline, the trial court held that his failure to abide by the terms of the scheduling order or prospectively seek an extension of time warranted the severe sanction of dismissal.  The Georgia Court of Appeals affirmed. *Id.*

Here, it is clear that UBS's violation was willful because UBS (1) misrepresented the data source of its trade blotters in an effort to justify its improper refusal to produce them; (2) specifically negotiated and agreed to the language of the Order it violated; (3) violated more than one provision of the Order (*i.e.*, the violations were not isolated incidents); (4) does not and cannot argue that its violations were caused by accident or involuntary non-compliance; and (5) failed to seek relief from this Court for its failure to comply.

Ignoring these uncontroverted facts, UBS claims that no sanction is warranted because it has now partially complied with the Order, a month after it was required under the Order, by producing some of the affiliate data.  But, late compliance does not moot a motion for sanctions.  Under Georgia law, "once the motion for sanctions has been filed, the opposite party may not preclude their imposition by making belated response . . . in the interim between the filing of a motion for sanctions and the hearing on the motion."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Echols*, 138 Ga. App. 593, 595 (1976); *see also Houston General Ins. Co. v. Stein Steel & Supply Co.*, 134 Ga. App. 624, 626 (1975) ("once the motion for sanctions has been filed, the opposite party may not preclude their imposition by making belated response at the hearing").  Otherwise, UBS would have no incentive to comply with any discovery orders until **after** they had been violated and a motion for sanctions had been filed.

Although prejudice is not necessary to award sanctions for the violation of a court order under O.C.G.A. §9-11-37(b)(2), Plaintiffs have been prejudiced by UBS's conduct.  All parties agree that the trading data at issue in this case is complex and voluminous.  UBS's delay in informing Plaintiffs of its inability to make the certification coupled with its refusal to produce the trade blotters for eight months has prevented Plaintiffs from analyzing a significant portion of UBS's trading data.  Thus, analysis of much of the trading data that could and

780325.1

14

should have started last November can only start now.  Further, Plaintiffs relied on UBS's repeated assurances that the blue sheet data was the same as the trade blotter data, and conducted preliminary analyses of that data.  Now, Plaintiffs now have to redo those analyses to the extent the trade blotter data differs from what Plaintiffs have already received.

Further, if UBS is allowed to violate the Court's Orders with impunity, UBS, and possibly other Defendants, will be emboldened to further flaunt this Court's authority during the remainder of the discovery period and thereafter.

Given the above, Plaintiffs request that the Court: (1) permit Plaintiffs (and not UBS) to take fact discovery of UBS during the expert discovery period; (2) enter a factual finding that the reports, documents and data UBS failed to timely produce creates a genuine issue of fact on the claims raised in the Complaint; (3) set a trial date for the first available trial calendar after expert discovery to ensure no additional delay; (4) award Plaintiffs their fees incurred in bringing this motion; and (5) enter other relief that the Court deems appropriate to deter UBS from continuing to engage in its willful violation of the Court's Orders.  Such sanctions are well within the Court's discretion.  *See, e.g.*, *Freeman v. Foss*, 298 Ga. App. 498, 501 (2009).

## II.    THE COURT SHOULD APPOINT A SPECIAL MASTER TO RESOLVE PRIVILEGE DISPUTES.

### A.    This Court Has the Authority to Appoint A Special Master.

In the second section of their motion, Plaintiffs request that the Court appoint a Special Master to review the documents all parties have designated as privileged.  Contrary to Defendants' claim, the Court has clear authority to require the parties to submit their privileged documents to be reviewed by a Special Master, even if Defendants do not consent.  Uniform State Court Rule 46(A)(1) provides that "[u]nless a statute provides otherwise, upon the motion of any party or upon the court's own motion, the court of record may appoint a master . . . (b) to address pretrial and post-trial matters that the court cannot efficiently, effectively or promptly address."  Indeed, privilege review is precisely the sort of task that is well-suited to a Special Master because it would alleviate an otherwise substantial burden on the Court.

Plaintiffs have a good faith basis to question Defendants' logs for at least two reasons.  First, Plaintiffs have evidence that the Defendants are making improper privilege designations.  For example, UBS and Merrill Lynch invoked the Protective Order's "claw-back" provision to reclaim documents that had previously been produced on the ground that a re-review showed the documents

were allegedly privileged.[21]   Plaintiffs had already reviewed some of these documents and, therefore, Plaintiffs know that at least some of the clawed-back documents contain portions of unprivileged information, including correspondence and data from the SEC and other third parties such as NASD, SIFMA or other securities associations.

To prove that those Defendants improperly claimed privilege on documents they clawed back, in their motion, Plaintiffs asked UBS and Merrill Lynch to certify to this Court that no portion of any of the claw-backed documents contain emails or data from the third parties such as the SEC or securities associates.[22] Tellingly, **both of those Defendants refused to provide a certification**.[23]  Thus, Plaintiffs have no choice but to request that UBS and Merrill produce to the Court *in camera* all of the documents (emails and attachments) they have clawed back. A review of those documents will show that they include emails and other information from third parties such the SEC and NASD which, by definition, are not privileged (Plaintiffs note that, upon recollection, the non-privileged emails are

---

[21] *See* Exhibit 4 at attachment M (5/18/10 Eckles Letter); (1/6/10 Landis Letter); (5/20/10 Gould Letter).

[22] Plaintiffs' Omnibus Motion at 22.

[23] Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Production of Documents Improperly Withheld As Privileged ("Opp'n to Mot. to Compel") at 17.

not the first or second email, but later in the email chain or as an attachment). This will prove that Defendants are making improper privilege designations, and that UBS and Merrill Lynch have not been candid with this Court.

Second, Plaintiffs have cause to question the numerous entries in Defendants' logs concerning their regulatory compliance. Plaintiffs' original motion sets forth the case law establishing why many of Defendants' communications with and about regulatory investigations are not privileged. When Plaintiffs attempted to obtain more information about Defendants' claim of privilege as it pertains to regulatory inquiries, Defendants refused to answer Plaintiffs' questions.[24] Indeed, on and around April 20, 2010, Plaintiffs sent emails to each Defendant requesting that they answer specific questions about their privilege logs.[25] Defendants refused. For example:

- UBS – UBS **never responded** to Plaintiffs' April 20, 2010 conferral.

- Deutsche Bank – Defendants' response admits that Deutsche Bank did not respond to Plaintiffs' **April 20, 2010** conferral letter until **June, 21, 2010**. Opp'n to Mot. to Compel at 14. Thus, Deutsche Bank refused to respond to Plaintiffs' conferral for more than two months, and only did so after Plaintiffs filed

---

[24] These questions merely requested basic information such as whether the information was disclosed to a regulator and the identities of persons who received the documents because Defendants' original privilege assertions were so vague that Plaintiffs could not determine whether the documents at issue were privileged or not.

[25] Exhibit 4 at attachment N.

this Motion.  And, even when Deutsche Bank responded, it refused to answer Plaintiffs' specific questions.[26]

- Goldman Sachs – Defendants' response admits that Goldman Sachs refused to respond to Plaintiffs' April 20, 2010 conferral email until **June 7, 2010** – nearly two months after it was sent, and only after Plaintiffs filed this motion.  Further, at that time, Goldman stated that it was "not required" to respond to Plaintiffs' questions, and refused to do so.  *Id.* at 15.

- Bear Stearns – Defendants' response acknowledges that "on **June 8, 2010,** Bear Stearns responded to Plaintiffs' [**April 20, 2010 letter**]."  Opp'n to Mot. to Compel at 14 (emphasis added).  Thus, Bear Stearns refused to respond to Plaintiffs' conferral for two months, and only did so after Plaintiffs filed this motion.  Further, Bear Stearns' "response" failed to answer the specific questions posed.[27]

- Merrill Lynch and Banc of America – Merrill Lynch and Banc of America took nearly one month to respond to Plaintiffs' April 20, 2010 conferral letter.  That delay was particularly inappropriate given that they refused to answer Plaintiffs' questions, stating that they do "not believe there is any Georgia statute or case law that requires disclosure of the further information you now request."

**B.    Defendants' Argument About the Number of Documents They Are Withholding Is Misleading and Incorrect.**

In an attempt to avoid any review of their privileged documents, Defendants

make much ado about the number of privileged documents they have **currently**

identified on their privilege logs.  This argument is both misleading and wrong.

---

[26]  Exhibit 4 at attachment O (6/21/10 Markell Letter).

[27]  Exhibit 4 at attachment P (6/8/10 Friedman Letter).

780325.1

First, Defendants argue that the number of documents withheld as privileged can somehow constitute proof of their privileged nature.  But, what Defendants fail to reveal is that they have only informed the Court about the number of documents on their **current** privilege logs.  Defendants do not disclose to the Court that they are currently withholding **thousands** of documents that have never been placed on any privilege log, and thus about which Plaintiffs and the Court have no information.  As just some examples:

- Merrill Lynch -- Merrill Lynch's current privilege log lists only 209 documents.  But, in a recent filing, Merrill Lynch acknowledged that it is actually withholding **over 7600** documents privilege grounds.[28]

- UBS – UBS's current privilege log lists only 334 documents.  But, UBS recently informed Plaintiffs that it is withholding "**thousands**" of documents on privilege grounds.[29]

- Credit Suisse – Credit Suisse's credit privilege log lists only 17 documents.  But, Credit Suisse recently informed Plaintiffs that it is withholding "**thousands**" of documents on privilege grounds.[30]

Moreover, although Defendants completed their Non-TASER document production, many have refused to provide Plaintiffs with a date certain for the

---

[28] *See* Merrill Lynch's Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Production of Documents Improperly Withheld as Privileged at 2.

[29] Exhibit 4 at attachment Q (6/30/10 Landis Email).

[30] *Id.* at attachment R (7/6/10 Knostandt Email).

production of their privilege log.  For example, Credit Suisse informed Plaintiffs that it will only **start** "rolling" a new privilege log to Plaintiffs on August 1, and it provides no deadline as to when Plaintiffs will receive a completed log.[31]  Other defendants, like DBSI, completed their Non-TASER Document production six weeks ago, yet they have not produced a new privilege log and also refuse to commit to a date certain for providing one.[32]  Thus, **thousands** of documents are being withheld, and neither the Plaintiffs nor the Court know anything about those documents.  While the failure to produce a timely privilege log, standing alone, warrants the Court to find that the Defendants have waived the privilege,[33] Plaintiffs are asking for the substantially less drastic relief of a Special Master.[34]

Second, Defendants' argument about the number of documents on their privilege log is irrelevant.  Regardless of whether a party is withholding ten documents or ten thousand documents, it still bears the burden of proving the privileged nature of the documents.  Indeed, whether the number of documents at issue is large or small, Plaintiffs' proposal is sound.  If there are few documents in question, the burden of providing them to a Special Master would be minimal.

---

[31] *Id.*

[32] *Id.* at attachment S (7/1/10 Markel Letter).

[33] Plaintiffs' Omnibus Motion at 25-26.

[34] If the Court deems it appropriate, as an alternative form of relief, Plaintiffs have requested that the Court deem the privilege waived.

780325.1

21

Conversely, if the number is large, then a Special Master would be the most efficient way to have the parties' dispute resolved. Regardless, there is no harm in submitting the documents to a Special Master for review. On the other hand, Plaintiffs may be materially prejudiced if they are denied important documents that Defendants are hiding under improper privilege claims.

Defendants have also attempted to deflect attention from their problems by claiming that Plaintiffs are making improper privilege designations. That argument makes no sense since Plaintiffs have proposed that **all** parties submit their documents to a Special Master. Plaintiffs seek nothing more than a **two-way** exchange of more information to confirm the privileged nature of the documents on the parties' privilege logs. If Defendants properly designated documents as privileged, they should welcome a process that: (1) efficiently and effectively resolves the parties' privilege disputes and (2) allows an independent third party to confirm that all parties' privilege designations are proper. Defendants' refusal to engage in that process is telling.

## III.   DEFENDANTS ARE IN VIOLATION OF THE APRIL 15, 2010 PROTECTIVE ORDER.

In the third section of Plaintiffs' motion, Plaintiffs seek relief for Defendants' violations of this Court's Protective Order. As with the other portions of this Motion, there is **no dispute** that the Defendants violated the Order. The only question is the appropriate relief.

780325.1

Prior to the production of documents, Plaintiffs and Defendants negotiated at length over the terms of a Protective Order.  Defendants initially pressed for a virtually unlimited right to designate documents "Confidential," which Plaintiffs vigorously opposed due to the time and costs associated with unnecessary confidentiality designations and because of Defendants' improper motive to limit the public's right to information about this case.  After weeks of discussions, Plaintiffs and Defendants **mutually agreed** to language for a Protective Order that included, *inter alia*, strict definitions as to the type of documents that can be designated as confidential.  *See* April 15, 2010 Protective Order at 2-6.

Although Defendants expressly agreed to the terms of the Protective Order, they have repeatedly violated its terms.  Among other things, Defendants have designated **thousands** of documents as confidential when they are clearly not entitled to that designation.   Defendants **do not deny** that they have improperly designated thousands of documents as confidential.  Instead, they try to create a red herring by arguing that "it is Plaintiffs who have violated that order by failing properly to challenge these designations in the matter required by the order."  Response Br. at 18.  This attempt to avoid the substantive issue fails for at least two independent reasons.

First, Plaintiffs did confer with Defendants on this very point.[35]

Second, the procedure the parties agreed upon to challenge confidentiality designations presumes that the designating party operates in good faith. If a producing party designated every document as confidential, it would not make sense to require the party receiving the documents to review each and every one to make confidentiality challenges (*i.e.*, to require the receiving party to basically conduct the confidentiality review). Yet, that is effectively what has occurred here. Defendants have abused the Protective Order by improperly designating thousands of documents as confidential, and they have refused to remedy that violation unless **Plaintiffs** first go through and identify each and every one of Defendants' violations. This is not how the Protective Order was drafted, is inconsistent with State Court Rule 21, and violates the Court's Order.

Defendants also try to mislead the Court into believing that Plaintiffs have only identified isolated or limited instances of violations of the Protective Order. For example, Merrill argues that "Plaintiffs are able to identify only 17 documents" that were improperly designated as confidential.[36] Of course, Plaintiffs only provided the Court with exemplars in their initial Motion because, as stated above, Plaintiffs should not be required to undertake the burden of conducting

---

[35] *See* Exhibit 4 at attachment T (4/28/10 Rosenwasser email); (5/17/10 Rosenwasser email).
[36] *See* Merrill Lynch's Memorandum of Law in Opposition to Plaintiffs' motion for Relief Concerning Defendants' Violations of the Court's Protective Order at 14.

Defendants' confidentiality review for them.  But, to demonstrate that Plaintiffs have not overstated the scope of Defendants' violations, Plaintiffs attach hereto as Exhibit 5 a list of over 2000 improperly designated documents, which again represents only a portion of the improper confidentiality designations.

Defendants have not only violated the Protective Order by improperly designating thousands of obviously non-confidential documents (e.g,. newspaper articles) as confidential, but also by improperly using confidentiality designations to seal documents that contradict their public pronouncements about this case. Indeed, while Defendants have stated publicly (including in **public** pleadings they have filed in this case) that plaintiffs' claim have no merit, they are trying to force Plaintiffs to file regulatory findings disproving those public statements under seal.

For example, Merrill Lynch refused to remove the confidentiality designation from a regulatory finding that it:

**REDACTED**

*See* Exhibit 6 (ML-TASER63229-30).  This regulatory finding does not mention any particular stocks, accounts, financial information or other

confidential matters, and thus it does not meet the definition of confidentiality in the Protective Order (language that Merrill Lynch agreed to). Merrill Lynch simply wants this document sealed because it disproves its defense, and contradicts its public statements.

Similarly, Plaintiffs have alleged that Defendants have mismarked order tickets, blue sheets and other documents in an effort to effectuate and conceal their scheme. UBS has now

**REDACTED**

Plaintiffs requested that UBS remove that designation, and thus far it has refused. In fact, with respect to UBS's responses, Plaintiffs attempted to follow the process Defendants suggested by asking UBS to remove the designation **five days** prior to filing this response (far longer than the "few hours" Defendants requested). But, UBS stated it could not provide an answer in that period of time – proving why Defendants' process of conferring on confidentiality right before filing motions is untenable. Regardless, there is nothing confidential about UBS admitting numerous instances where its blue sheets were incorrect. UBS simply wants to hide that information.

Finally, Defendants argue that it would be burdensome for them to go back and re-review their documents to comply with the Protective Order. But, the only reason such a review is necessary is because of the Defendants' failure to abide by

the Court's Order in the first place. **Had Defendants done what they agreed to do, and what the Court ordered, they would not be in this position.** Moreover, Plaintiffs warned Defendants after they produced only a small number of documents that they were improperly designation non-confidential documents as confidential. Defendants chose to ignore that warning, and did so at their own peril. If Defendants later concluded that it was too burdensome or difficult to follow the terms of the Protective Order they agreed to and this Court entered, they were not entitled to simply ignore it. Instead, they were required to seek relief from this Court. Defendants must stop their pattern of ignoring Court Orders they disagree with or find burdensome.

To remedy Defendants violations of the Protective Order, the Court should order Defendants to correct the designation of documents already produced, and to comply with the Protective Order moving forward. In addition, the Court should order Defendants to pay Plaintiffs' costs associated with this motion since it was necessitated by Defendants' violation of the Protective Order.

Respectfully submitted this 12th day of July, 2010.

/s/ Steven Rosenwasser
John E. Floyd
Georgia Bar No. 266413
Steven J. Rosenwasser
Georgia Bar No. 614908
Nicole G. Iannarone
Georgia Bar No. 382510
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3417
(404) 881-4100 Tel.
(404) 881-4111 Fax

James W. Christian
State Bar No. 04228700
Gary M. Jewell
State Bar No. 10664800
Scott R. Link
State Bar No. 12390900
Christian, Smith, & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas  77002
(713) 659-7617 Tel.
(713) 659-7641 Fax
(admitted pro hac vice)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this day, a true and correct copy of the foregoing

**PLAINTIFFS' REPLY IN SUPPORT OF MAY 24, 2010 OMNIBUS**

**DISCOVERY MOTION** was electronically filed with the Clerk of Court using

the Court's electronic filing system which will automatically send an email

notification of such filing to the following attorneys of record who are registered

participants in the Court's electronic notice and filing system:

> **Attorneys for Defendants:**
> Richard H. Sinkfield, Esq.
> Rogers & Hardin
> 2700 International Tower, Peachtree Center
> 229 Peachtree Street, N.E.
> Atlanta, GA  30303-1601
>
> **Attorneys for Banc of America Securities, LLC and**
> **Merrill Lynch, Pierce, Fenner & Smith, Inc.:**
> Andrew J. Frackman, Esq.
> O'Melveny & Myers LLP
> 7 Times Square
> New York, NY  10036
>
> **Attorneys for Morgan Stanley & Co. Incorporated:**
> Robert F. Wise, Jr., Esq.
> William J. Fenrich, Esq.
> Melissa T. Aoyagi, Esq.
> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, NY  10017

780325.1

**Attorneys for Bear Stearns:**
Stephen L. Ratner, Esq.
Harry Frischer, Esq.
Brian L. Friedman, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY  10036

**Attorneys for The Goldman Sachs Group, Inc.:**
Richard C. Pepperman II, Esq.
Richard H. Klapper, Esq.
Tracy Richelle High, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

**Attorneys for Deutsche Bank Securities Inc.:**
Heather L. Fesnak, Esq.
Peter J. Isajiw, Esq.
Gregory A. Markel, Esq.
Martin L. Seidel, Esq.
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY  10281

**Attorneys for UBS Securities, LLC:**
Andrew B. Clubok, Esq.
Jeffrey G. Landis, Esq.
Daniel Gomez, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC  20005-5793

Maria Ginzburg, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

**Attorneys for Credit Suisse USA, Inc.:**
Fraser L. Hunter, Jr., Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY  10022

This 12th day of July, 2010.

/s/ Steven Rosenwasser
Steven J. Rosenwasser
Georgia Bar No. 614908

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date:  Jul 12 2010  6:41PM
Mark Harper, Clerk

1

# NASD Notice to Members 01-60

---

**ACTION REQUESTED**

# Intermarket Surveillance Group

## New Requirements For Electronic Blue Sheets Submissions

---

**SUGGESTED ROUTING**

*The Suggested Routing function is meant to aid the reader of this document. Each NASD member firm should consider the appropriate distribution in the context of its own organizational structure.*

- Legal & Compliance
- Operations
- Senior Management

---

**KEY TOPICS**

- Blue Sheets

## Executive Summary

This *Notice to Members* discusses new uniform provisions regarding the automated reporting requirement for Electronic Blue Sheets (EBS).

Effective August 8, 2001 all members were required to:

(1) electronically submit to the Securities and Exchange Commission (SEC or Commission), upon request, customer and proprietary transactions via the EBS system, and (2) provide to the SEC, upon request, a current contact person for blue sheet data.

Effective January 7, 2002 all members will be required upon request to report via the EBS system:

1. Prime Brokerage Identifiers
2. Average Price Account Identifiers
3. Depository Institution Identifiers

All members are strongly encouraged to test their ability to provide these new categories of information with either the Securities Industry Automation Corporation (SIAC) or the NASD Form Filings system in order to be in compliance by the effective dates.

Member firms that use a "service bureau" to transmit electronic blue sheets on their behalf are required to ensure that service bureaus comply with applicable SEC and SRO rules and regulations on their behalf.

This *Notice* was prepared by the following self-regulatory organizations (SROs) acting jointly as members of the Intermarket Surveillance Group (ISG):

American Stock Exchange, Inc. (Amex)

Boston Stock Exchange, Inc. (BSE)

Chicago Board Options Exchange, Inc. (CBOE)

Chicago Stock Exchange, Inc. (CHX)

Cincinnati Stock Exchange, Inc. (CSE)

International Securities Exchange (ISE)

NASD Regulation, Inc. (NASDR)

New York Stock Exchange, Inc. (NYSE)

Pacific Exchange, Inc. (PCX)

Philadelphia Stock Exchange, Inc. (PHLX)

## New Uniform Provisions

Recently, the SEC adopted Rule 17a-25 under Section 17 of the Securities Exchange Act of 1934 (Exchange Act).[1]

Rule17a-25:

**Provision 1:** codifies the requirement that broker/dealers must electronically submit to the Commission, upon request, information concerning customer and proprietary transactions via the EBS system;

**Provision 2:** requires broker/dealers to provide to the Commission, on request, and keep current, information concerning the firm's contact for blue sheet data; and,

**Provision 3:** adds three reportable data elements not currently required by the EBS system utilized by the SROs:

i.    prime brokerage identifiers;

ii.   average price account identifiers; and

iii.  depository institution identifiers.

# NASD Notice to Members 01-60

Provisions 1 and 2 on the previous page became effective on August 8, 2001 while Provision 3 will be effective on January 7, 2002.

As provided by SRO rules,[2] members and member organizations must currently provide the data required in Provision 1 on the previous page to the SROs through the EBS system. Firms also use the EBS system to respond to SEC requests for information. Rule 17a-25 requires broker/dealers to submit the required information to the Commission upon request in a format specified by the broker/dealer's designated SRO under Rule 17d-1 of the Exchange Act.

As a result of the new requirements in Provision 3 on the previous page, SIAC will add the three additional fields to the EBS system file. The chart below describes the format and location of the three new fields in the EBS system file. See Attachment A for the complete EBS system file[3] layout. The fields are located in record "5" of each blue sheet transaction.

- The prime broker field is to be populated with the clearing number of the account's prime broker.

- The average price account field will be used to identify

whether the account is the average price account itself or the recipient of transactions for an average price account. This field will be populated with the following values:

1 = recipient of average price transaction

2 = average price account itself

- The depository institution identifier is to be populated with the identifying number assigned to the account by the depository institution.

All members are strongly encouraged to test their enhanced blue sheet information with SIAC before sending actual blue sheet information with the new data elements. Please contact SIAC's Network Support Department at (212) 383-5401 for testing information. Firms that utilize SIAC's PC Data Entry system must obtain an updated version of the blue sheet data entry software from SIAC's PC Service Center at (212) 383-2062. Members that use the PC Data Entry system need not test. NASD members that submit EBS data via the Form Filings system should test their enhanced blue sheet information via Form Filings before sending actual blue sheet information with the new data elements. Those

members should contact the CASH Help Desk at (800) 321-NASD (6273) for testing information.

To comply with Provision 2 on the previous page, updated firm blue sheet contact information can be submitted to the SEC by providing Joseph Cella, Chief, Office of Market Surveillance, or Mark Lineberry, Branch Chief with the following:

Full name, title, address, telephone number(s), facsimile number(s), and electronic mail address(es) for each person designated by the member, broker, or dealer as a SEC contact.

They can be reached by writing to:

*Securities and Exchange Commission*
*450 5th Street NW*
*Washington, DC 20549-1001*

or via e-mail at *cellaj@sec.gov* or *lineberrym@sec.gov*, respectively.

Questions concerning provisions of Rule 17a-25 should be directed to Alton Harvey, Office Chief, at (202) 942-4167, or Anitra Cassas, Special Counsel, at (202) 942-0089, Division of Market Regulation, Securities and Exchange Commission, 450 5th Street, NW, Washington, DC 20549-1001.

| From Col | To Col | LNG | Field Name | Format | Justify | Cobol Picture | Default Value |
|---|---|---|---|---|---|---|---|
| 62 | 65 | 4 | Prime Broker | Alphanumeric | Left | X(4) | Spaces |
| 66 | 66 | 1 | Average Price Account | Alphanumeric | —— | X(1) | Spaces |
| 67 | 71 | 5 | Depository Institution Identifier | Alphanumeric | Left | X(5) | Spaces |

# NASD Notice to Members 01-60

## Questions/Further Information

Questions concerning this *Notice* may be directed to:

**Amex**
Eric Miller          (212) 306-1552

**BSE**
Brian Colby          (617) 235-2158

**CBOE**
Pat Sizemore         (312) 786-7752

**CHX**
Dan Liberti          (312) 663-2057

**CSE**
Jeffrey T. Brown     (312) 786-8893

**ISE**
James Sampson        (212) 897-0235

**NASDR**
Jim Dolan            (240) 386-5007

**NYSE**
Aldo Martinez        (212) 656-8532

**PCX**
Tim Miller           (415) 835-4848

**PHLX**
Edward Deitzel       (215) 496-5298

## Endnotes

1   *See* SEC Release No. 34-44494.

2   Amex – Rule 153A, CBOE – Rule 15.7, CSE – 8.2, 5.3, ISE – Rule 1404, NASD – Rule 8211, 8212 and 8213, NYSE – Rule 342.20, 410A, 476 (a) (11), PCX – Rule 10.2(c), PHLX – Rule 785

3   The NASD's Form Filing system for submitting EBS data is also being modified to add the three new reportable data elements. All NASD members submitting EBS data via Form Filings will be required to include all relevant information pertaining to the three new data elements with each EBS submission beginning on January 7, 2002.

© 2001, National Association of Securities Dealers, Inc. (NASD). All rights reserved. Notices to Members attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

Attachment A
1 of 9

# RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

**** THIS RECORD MUST BE THE FIRST RECORD OF THE FILE ****

| FIELD POSITION FROM | TO | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 3 | 3 | FILLER | A | LJ | X(3) | HDR |
| 4 | 5 | 2 | FILLER | A | LJ | X(2) | .S |
| 6 | 10 | 5 | DTRK-SYSID | N | LJ | 9(5) | 12343 |
| 11 | 12 | 2 | FILLER | A | LJ | X(2) | .E |
| 13 | 14 | 2 | FILLER | N | LJ | 9(2) | 00 |
| 15 | 16 | 2 | FILLER | A | LJ | X(2) | .C |
| 17 | 20 | 4 | DTRK-ORIGINATOR | A | LJ | X(4) | -- |
| | | | Please call SIAC for assignment (212) 383-2210 | | | | |
| 21 | 22 | 2 | FILLER | A | LJ | X(2) | .S |
| 23 | 26 | 4 | DTRK-SUB-ORIGINATOR | A | LJ | X(4) | -- |
| | | | Please call SIAC for assignment (212) 383-2210 | | | | |
| 27 | 27 | 1 | FILLER | A | LJ | X(1) | B |
| 28 | 33 | 6 | DTRK-DATE | N | LJ | 9(6) | MMDDYY |
| | | | Contains submission date. | | | | |
| 34 | 34 | 1 | FILLER | A | LJ | X(1) | B |
| 35 | 59 | 25 | DTRK-DESCRIPTION | A | LJ | X(25) | FIRM TRADING INFORMATION |
| | | | Required to identify this file. | | | | |
| 60 | 80 | 21 | FILLER | A | LJ | X(21) | B |

Field Format - Code
alphanumeric = A
numeric = N
packed = P
binary = B

Default Values - Code
Blanks = B
Zero = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

## RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

| FIELD POSITION FROM | TO | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | HEADER RECORD CODE<br>Value: Low Values OR ZERO | A | -- | X | -- |
| 2 | 5 | 4 | SUBMITTING BROKER NUMBER<br>If NSCC member use NSCC clearing number. If not a NSCC member, use clearing number assigned to you by your clearing agency. | A | LJ | X (4) | B |
| 6 | 40 | 35 | FIRM'S REQUEST NUMBER<br>Tracking number used by the firm to record requests from an organization. | A | -- | X (35) | B |
| 41 | 46 | 6 | FILE CREATION DATE<br>Format is YYMMDD | A | -- | X (6) | -- |
| 47 | 54 | 8 | FILE CREATION TIME<br>Format is HH:MM:SS | A | -- | X (8) | -- |
| 55 | 55 | 1 | REQUESTOR CODE<br>Requesting Organization Identification.<br>Values: The same codes in Exchange Code Field in RECORD SEQUENCE NUMBER ONE. | A | -- | X | -- |
| 56 | 70 | 15 | REQUESTING ORGANIZATION NUMBER<br>Number assigned by requesting organization | A | LJ | X (15) | B |
| 71 | 80 | 10 | FILLER | A | -- | X (10) | B |

Field Format - Code
alphanumeric = A
numeric      = N
packed       = P
binary       = B

Default Values - Code
Blanks = B
Zero   = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

# RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

| FIELD POSITION FROM | TO | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | RECORD SEQUENCE NUMBER ONE<br>The first record of the transaction. Value: 1 | A | -- | X | -- |
| 2 | 5 | 4 | SUBMITTING BROKER NUMBER<br>Identical to Submitting Broker Number in Header Record | A | LJ | X (4) | -- |
| 6 | 9 | 4 | OPPOSING BROKER NUMBER<br>The NSCC clearing house number of the broker on the other side of the trade. | A | LJ | X (4) | B |
| 10 | 21 | 12 | CUSIP NUMBER<br>The cusip number assigned to the security. Left justified since the number is nine characters at present (8+ check digit) but will expand in the future | A | LJ | X (12) | B |
| 22 | 29 | 8 | TICKER SYMBOL<br>The symbol assigned to this security. | A | LJ | X (8) | B |
| 30 | 35 | 6 | TRADE DATE<br>The date this trade executed. Format is YYMMDD. | A | -- | X (6) | B |
| 36 | 41 | 6 | SETTLEMENT DATE<br>The date this trade will settle. Format is YYMMDD | A | -- | X (6) | B |
| 42 | 53 | 12 | QUANTITY<br>The number of shares or quantity of bonds or option contracts. | N | RJ | 9 (12) | Z |
| 54 | 67 | 14 | NET AMOUNT<br>The proceeds of sales or cost of purchases after commissions and other charges. | N | RJ | S9(12)V99 | Z |
| 68 | 68 | 1 | BUY/SELL CODE<br>Values: 0 = Buy, 1 = Sale, 2 = Short Sale, 3 = Open Long, 4 = Open Short, 5 = Close Long, 6 = Close Short. | A | -- | X | B |

Field Format - Code
alphanumeric = A
numeric        = N
packed         = P
binary         = B

Default Values - Code
Blanks   = B
Zero      = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

Case 1:10-cv-03108-JEC   Document 14-4   Filed 10/12/10   Page 40 of 149

# RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

| FIELD POSITION | | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| FROM | TO | | | | | | |
| | | | A = Buy Cancel, B = Sell Cancel, C = Short Sale Cancel, D = Open Long Cancel, E = Open Short Cancel, F = Close Long Cancel, G = Close Short Cancel. Values 3 to 6 and D to G are for options only | | | | |
| 69 | 78 | 10 | PRICE<br>The transaction price.  Format:  $$$$ CCCCCC. | N | RJ | 9(4)V(6) | Z |
| 79 | 79 | 1 | EXCHANGE CODE<br>Exchange where trade was executed.<br>Values:<br>A = New York Stock Exchange<br>B = American Stock Exchange<br>C = Chicago Stock Exchange<br>D = Philadelphia Stock Exchange<br>E = Pacific Stock Exchange<br>F = Boston Stock Exchange<br>G = Cincinnati Stock Exchange<br>I = International Securities Exchange<br>K = CBOE<br>L = London Stock Exchange<br>M = Toronto Stock Exchange<br>N = Montreal Stock Exchange<br>O = Vancouver Stock Exchange<br>R = NASDAQ<br>S = Over-the-Counter<br>T = Tokyo Stock Exchange<br>X = Securities Exchange Commission<br>Z = Other | A | -- | X | B |
| 80 | 80 | 1 | BROKER/DEALER CODE<br>Indicate if trade was done for another Broker/Dealer.  Values:  0 = No; 1 = Yes | A | -- | X | B |

Field Format - Code
alphanumeric = A
numeric = N
packed = P
binary = B

Default Values - Code
Blanks = B
Zero = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

# RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

| FIELD POSITION FROM | TO | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | RECORD SEQUENCE NUMBER TWO<br>Value: 2 | A | – | X | – |
| 2 | 2 | 1 | SOLICITED CODE<br>Values: 0 = No; 1 = Yes | A | – | X | B |
| 3 | 4 | 2 | STATE CODE<br>Standard Postal two character identification. | A | – | X (2) | B |
| 5 | 14 | 10 | ZIP CODE/COUNTRY CODE<br>Zip Code – five or nine character (zip plus four)<br>Country code – for future use. | A | LJ | X (10) | B |
| 15 | 22 | 8 | BRANCH OFFICE/REGISTERED<br>REPRESENTATIVE NUMBER<br>Each treated as a four character field. Both are<br>left justified. | A | LJ | X (8) | B |
| 23 | 28 | 6 | DATE ACCOUNT OPENED<br>Format is YYMMDD | A | – | X (6) | B |
| 29 | 48 | 20 | SHORT NAME FIELD<br>Contains last name followed by comma (or<br>space) then as much of first name as will fit. | A | LJ | X (20) | B |
| 49 | 78 | 30 | EMPLOYER NAME | A | LJ | X (30) | B |
| 79 | 79 | 1 | TIN 1 INDICATOR<br>Values: 1 = SS#; 2 = TIN | A | – | X | B |
| 80 | 80 | 1 | TIN 2 INDICATOR<br>Values: 1 = SS#; 2 = TIN – for future use. | A | – | X | B |

Field Format - Code
alphanumeric = A
numeric = N
packed = P
binary = B

Default Values - Code
Blanks = B
Zero = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

# RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

| FIELD POSITION FROM | TO | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | RECORD SEQUENCE NUMBER THREE | A | -- | X | -- |
|   |   |   | Value: 3 |   |   |   |   |
| 2 | 10 | 9 | TIN ONE | A | LJ | X (9) | B |
|   |   |   | Taxpayer Identification Number |   |   |   |   |
|   |   |   | Social Security or Tax ID Number. |   |   |   |   |
| 11 | 19 | 9 | TIN TWO | A | LJ | X (9) | B |
|   |   |   | Taxpayer Identification Number #2 |   |   |   |   |
|   |   |   | Reserved for future use. |   |   |   |   |
| 20 | 20 | 1 | NUMBER OF N&A LINES | A | -- | X | B |
| 21 | 50 | 30 | NAME AND ADDRESS LINE ONE | A | LJ | X (30) | B |
| 51 | 80 | 30 | NAME AND ADDRESS LINE TWO | A | LJ | X (30) | B |

Field Format - Code
alphanumeric = A
numeric     = N
packed      = P
binary      = B

Default Values - Code
Blanks  = B
Zero    = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

# RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

| FIELD POSITION FROM | TO | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | RECORD SEQUENCE NUMBER FOUR | A | -- | X | -- |
|  |  |  | Value: 4 |  |  |  |  |
| 2 | 31 | 30 | NAME AND ADDRESS LINE THREE | A | LJ | X (30) | B |
| 32 | 61 | 30 | NAME AND ADDRESS LINE FOUR | A | LJ | X (30) | B |
| 62 | 62 | 1 | PROPRIETARY-CUSTOMER INDICATOR | A | -- | X | B |
|  |  |  | 1 = Trade was for a proprietary account of submitting broker/dealer or another broker/dealer |  |  |  |  |
|  |  |  | 2 = Trade was for customer of submitting broker/dealer or another broker/dealer |  |  |  |  |
| 63 | 80 | 18 | ACCOUNT NUMBER | A | LJ | X (18) | B |
|  |  |  | Account number |  |  |  |  |

Field Format - Code
alphanumeric = A
numeric      = N
packed       = P
binary       = B

Default Values - Code
Blanks  = B
Zero    = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

## RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

| FIELD POSITION FROM | TO | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | RECORD SEQUENCE NUMBER FIVE Value: 5 | A | -- | X (1) | -- |
| 2 | 31 | 30 | NAME AND ADDRESS LINE FIVE | A | LJ | X (30) | B |
| 32 | 61 | 30 | NAME AND ADDRESS LINE SIX | A | LJ | X (30) | B |
| 62 | 65 | 4 | PRIME BROKER | A | LJ | X (4) | B |
| | | | Clearing number of the account's prime broker. | | | | |
| 66 | 66 | 1 | AVERAGE PRICE ACCOUNT | N | -- | 9 (1) | Z |
| | | | 1 = recipient of average price transaction. | | | | |
| | | | 2 = average price account itself. | | | | |
| 67 | 71 | 5 | DEPOSITORY INSTITUTION IDENTIFIER | A | LJ | X (5) | B |
| | | | Identifying number assigned to the account by the depository institution. | | | | |
| 72 | 80 | 9 | FILLER | A | -- | X (9) | B |

Field Format - Code
alphanumeric = A
numeric      = N
packed       = P
binary       = B

Default Values - Code
Blanks  = B
Zero    = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

Attachment A
9 of 9

## RECORD LAYOUT FOR SUBMISSION OF TRADING INFORMATION

| FIELD POSITION FROM | TO | FIELD LENGTH | FIELD NAME/DESCRIPTION/REMARKS | FIELD FORMAT | JUSTIFY | PICTURE CLAUSE | DEFAULT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | TRAILER RECORD DATE<br>One record per submission. Must be the last record on the file. Value: High Values or "9" | A | -- | X | -- |
| 2 | 17 | 16 | TOTAL TRANSACTIONS<br>The total number of transactions. This total excludes Header and Trailer Records. | N | RJ | 9 (16) | B |
| 18 | 33 | 16 | TOTAL RECORDS ON FILE<br>The total number of 80 byte records. This total includes Header and Trailer Records, but not the Datatrak Header Record (i.e., does not include the first record on the file). | N | RJ | 9 (16) | Z |
| 34 | 80 | 47 | FILLER | A | -- | X (47) | B |

Field Format - Code
alphanumeric = A
numeric = N
packed = P
binary = B

Default Values - Code
Blanks = B
Zero = Z

Justify
RJ = Right Justification of Data
LJ = Left Justification of Data

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010  6:41PM
Mark Harper, Clerk

2



Home | Previous Page

## U.S. Securities and Exchange Commission

**Final Rule:**
**Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers**

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 200 and 240**

**[Release No. 34-44494; File No. S7-12-00]**

**RIN 3235-AH69**

**Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is adopting Rule 17a-25 under Section 17 of the Securities Exchange Act of 1934 ("Exchange Act"), to require brokers and dealers to submit electronically to the Commission, upon request, information on customer and firm securities trading. Rule 17a-25 is designed to improve the Commission's capacity to analyze electronic submissions of transaction information, thereby facilitating Commission enforcement investigations and other trading reconstructions.

**EFFECTIVE DATE:** [Insert date 30 after publication in the Federal Register], except §240.17a-25(b), which shall become effective on [insert date 180 days after publication in the Federal Register].

**FOR FURTHER INFORMATION CONTACT:** Alton Harvey, Office Chief, at (202) 942-4167; or Anitra Cassas, Special Counsel, at (202) 942-0089, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549-1001.

**SUPPLEMENTARY INFORMATION:**

### I. Introduction

On May 2, 2000, the Commission proposed for comment Rule 17a-25[1] under the Exchange Act to require brokers and dealers to submit electronically to the Commission, upon request, information on customer and firm securities trading.[2] The rule is designed to more fully account for evolving trading strategies used primarily by institutional and professional traders, thereby improving the Commission's ability to analyze trading in complex market-wide reconstructions and enforcement investigations. Based on the Commission's experience in analyzing securities transaction information, and after careful consideration of the comments submitted in

response to the proposed rule, the Commission is adopting Rule 17a-25 with certain changes discussed below.

## II. Background

The securities industry has witnessed tremendous change in the past two decades, both in the types of market participants and in the variety of trading strategies and products. In particular, increasing numbers of institutional and professional traders now conduct their securities trading through multiple accounts maintained at different broker-dealers. These market participants include institutional investors such as pension funds, insurance companies, foundations, endowments, mutual funds, and hedge funds.

To identify buyers and sellers of securities in enforcement or other regulatory inquiries, the Commission staff regularly sends requests for securities trading records to the most active clearing firms in the relevant security. Firms are requested to submit, within ten business days, information concerning transactions by all proprietary and customer accounts that bought or sold a security during a specified review period.

For several decades, the Commission requested this information by mailing questionnaire forms (known as "blue sheets" because of the color on which the forms were printed) to broker-dealers to be manually completed and mailed back to the Commission. In the late 1980s, as the volume of trading and securities transactions dramatically increased, the Commission and the securities self-regulatory organizations ("SROs") worked together to develop and implement a system with a universal electronic format, commonly known as the "electronic blue sheet" or "EBS" system, to replace the manual process.[3]

The universal EBS format permits the Commission and the SROs to conduct timely and thorough surveillance and enforcement inquiries. Firms generally use software to scan their account records and download the appropriate information into the standard EBS format, and then transmit the data to the Securities Industry Automation Corporation ("SIAC"). In turn, SIAC routes the file electronically to the Commission's mainframe computer.[4]

In general, the Commission uses the EBS system to obtain securities transaction information for one of two purposes: (1) to assist in the examination for and investigation of possible federal securities law violations, primarily involving insider trading or market manipulation; and (2) to conduct market reconstructions, primarily following significant market volatility. Since its inception, the EBS system has performed effectively as an enforcement tool for analyzing trading in one or two securities over a limited time period. When used for large-scale investigations or market reconstructions involving numerous stocks during peak trading volume periods, however, the information provided by the EBS system has been insufficient. Specifically, the Commission has found it difficult to effectively aggregate EBS transaction information by market participants.[5] To ensure the continued effectiveness of the Commission's enforcement and regulatory programs that rely on EBS information, the Commission proposed Rule 17a-25.

As proposed, Rule 17a-25 would require broker-dealers to electronically

submit securities transaction information, including identifiers for prime brokerage arrangements, average price accounts, and depository institutions, in a standardized format, when requested by the Commission staff for enforcement and other regulatory purposes. In addition, the rule would require broker-dealers to submit, and keep current, contact person information for EBS requests. Proposed Rule 17a-25 was largely patterned after existing SRO rules.[6]

### III. Summary of Comments

The Commission received comments from the Securities Industry Association ("SIA") and the Pacific Exchange ("PCX") on the proposed rule.[7] The SIA generally stated that it understood the Commission's need for proposed Rule 17a-25, but noted that there would be difficulties in implementing certain aspects of the proposal. The PCX asked for clarification on the application of the proposed rule to NASD Regulation's new web-based EBS system.[8]

### A. Transaction Information

The SIA had a concern with respect to the standard transaction information required under subsection (a)(2) of the proposed rule. One of the data elements required under subsection (a)(2)(ii) of proposed Rule 17a-25 and existing SRO rules[9] is the employer's name of a customer who bought or sold a security that is under review. The SIA indicated that many firms would not be able to readily access this information on their EBS-related systems.[10] As a result, these firms would either have to manually enter this information, or redesign their recordkeeping systems to automatically insert the customer's employer identification.

The SIA also expressed concern about the additional information required under subsection (b) of the proposed rule. The SIA noted that, although the Proposing Release made it clear that subsection (b)(1)(i) of proposed Rule 17a-25 is designed for prime broker arrangements, the generic language might cover other types of transactions that involve shifting a position from one firm to another. These transactions include "give-ups" (the executing broker-dealer provides the clearing number of another broker-dealer when reporting a transaction for the comparison process) and "step-outs" (the executing broker-dealer provides the clearing number of another broker-dealer after submission of a transaction for the comparison process). The SIA requested rule language tailored more closely to prime brokerage arrangements.[11]

Subsection (b)(1)(ii) of proposed Rule 17a-25 requires the prime broker to indicate the clearinghouse number or alpha symbol of each executing broker-dealer that forwarded part or all of the transaction. The SIA indicated that information concerning prime brokerage arrangements is typically easier for executing brokers to automatically pull up on their systems than for prime brokers. As a result, prime brokers would be required to implement more systems changes than executing brokers.[12]

The SIA also asked for clarification on the amount of information required by subsection (b)(2) of Rule 17a-25, which pertains to average price account identifiers. Citing formatting difficulties and programming costs, the SIA urged the Commission to allow a single identifier to denote that an account is part of an average price account arrangement, rather than

requiring broker-dealers to generate separate identifiers for the master account and each sub-account.[13]

## B. Other Information

In the Proposing Release, the Commission solicited comments on the feasibility of requiring EBS reports to include execution times or other indicators, such as "order sequence numbers" for transactions effected through an automated order routing system. In response, the SIA identified a number of practical problems in implementing these data elements, and suggested that the cost of reformatting broker-dealers' systems or building new systems would outweigh the regulatory need for this information.[14]

Finally, the SIA stressed that delays in implementing Rule 17a-25 may be required due to other systems challenges facing the securities industry over the coming months, such as preparations for the full implementation of decimal pricing.[15]

## IV. Discussion and Basis for Adoption

Today, the Commission is adopting Rule 17a-25 substantially as proposed, with certain changes designed to reflect the comments. The rule applies to all exchange members, brokers and dealers subject to Rule 17a-3 of the Exchange Act.[16] Rule 17a-25 will not impose any additional recordkeeping requirements for broker-dealers; broker-dealers already maintain all of the information required for the EBS reports pursuant to Section 17(a)(1) and Rules 17a-3 and 17a-4 under the Exchange Act.[17]

Rule 17a-25 is intended to accomplish three objectives. First, the rule codifies the requirement that brokers and dealers must electronically submit to the Commission, upon request, information on customer and proprietary securities transaction information. Second, the rule should improve the effectiveness of the Commission's enforcement and regulatory programs by enhancing certain aspects of the EBS system to take into account evolving trading strategies used primarily by institutional and professional traders. Specifically, subsection (b) of Rule 17a-25 requires firms, upon request, to supply three additional data elements that will assist the Commission in aggregating securities transactions by entities trading through multiple accounts at more than one broker-dealer.[18] Finally, by requiring broker-dealers to provide current contact person information, the proposed rule should help ensure that the Commission can effectively direct its EBS requests to broker-dealers.

## A. Standard Transaction Information

Subsection (a) of the proposed rule requires submission of the same standard customer and proprietary transaction information the SROs request in connection with their market surveillance or enforcement inquiries.[19] For a proprietary transaction, the broker-dealer must include the following information: (1) clearing house number or alpha symbol used by the broker-dealer submitting the information; (2) clearing house number(s) or alpha symbol(s) of the broker-dealer(s) on the opposite side to the trade; (3) security identifier; (4) execution date; (5) quantity executed; (6) transaction price; (7) account number; and (8) identity of the exchange or market where each transaction was executed. Under the proposed rule, if a transaction was effected for a customer account (as

opposed to a proprietary account), the broker-dealer would have been required to also include the customer's name, customer's address, name of the customer's employer, the customer's tax identification number, and other related account information. As noted below, the Commission has modified certain of these requirements in response to comments. Finally, if the transaction was effected for a customer of another firm or broker-dealer, the broker-dealer must state whether the other broker-dealer was acting as principal or agent on the transaction.

The SIA cited two concerns regarding submission of this standard transaction information. First, the SIA noted the practical difficulties faced by firms in readily obtaining the name of the customer's employer on their EBS-related systems. The Commission believes that the identity of a customer's employer, if accurate, would be extremely useful for many investigations, particularly those involving insider trading. However, the Commission, if necessary, can obtain this information from the specific broker-dealer and customer during follow-up inquiries. Accordingly, the Commission is deleting this requirement from subsection (a)(2)(ii) of Rule 17a-25, as adopted.

Second, the SIA asked for clarification as to whether the tax identification number is that of the customer or the customer's employer.[20] Subsection (a)(2)(ii) of Rule 17a-25, as adopted, makes it clear that it is intended to capture the customer's tax identification number, not that of the customer's employer.

**B.  Additional Transaction Information**

Subsection (b) of proposed Rule 17a-25 requires broker-dealers, upon request by Commission staff, to provide prime brokerage identifiers, average price account identifiers, and depository institution identifiers. As described in detail below, these additional data elements are needed to aggregate trading by customers that use multiple accounts maintained at different broker-dealers. The Commission is adopting these additional data elements in Rule 17a-25(b) with certain modifications suggested by the SIA.

The SIA asked for additional information on how the Commission estimated that less than 100 broker-dealers would have to make modifications to their existing EBS software. The Commission estimates that EBS requests for prime-brokerage and average price account information will be made almost exclusively to active clearing broker-dealers. The Commission based its estimate of less than 100 clearing firms upon our experience with the EBS system -- specifically, the Division of Market Regulation's requests for information for market reconstructions in 1994 and 1997, and the Division of Enforcement's daily use of the EBS system for the last decade. Accordingly, the Commission continues to believe that its estimates are reasonable.

**1. Prime Brokerage Identifiers**

It is common for an institutional or professional trader to route buy or sell orders through different broker-dealers, who, in turn, forward executed orders to a single broker-dealer-the "prime broker." The prime broker maintains a master account for the institution or professional trader, which simplifies recordkeeping and oversight of trading activity.

Because broker-dealers use different means to identify prime brokerage accounts in EBS submissions, the Commission has had difficulty identifying instances where a transaction was reported twice -- by the executing broker-dealer and by the prime broker. As a result, when the Commission performed trading analyses, it may have inadvertently double-counted some trades.

To better analyze this increasingly frequent activity and to avoid inadvertently double-counting these transactions, the Commission proposed two new data elements to uniformly identify prime brokerage transactions. First, under subsection (b)(1)(i) of Rule 17a-25, if a reporting broker-dealer effects trades for a customer, and forwards the account's transactions to a prime broker, then the EBS submission will have to include an identifier for this type of transaction as specified by its designated SRO under Rule 17d-1 of the Exchange Act.[21] The SIA expressed concern that the language in subsection (b)(1)(i) of the proposed rule may cover other types of transactions that involve shifting a position from one firm to another, such as "give-ups" or "step-outs." The Commission reiterates that subsection (b)(1)(i) is intended to account for prime brokerage arrangements.[22]

Second, as proposed, subsection (b)(1)(ii) of Rule 17a-25 would have required a prime broker receiving transactions from multiple executing broker-dealers to include in its EBS submission the clearing house number or alpha symbol used by each of the executing brokers. Both the SIA and the SROs[23] raised concerns, however, that this reporting requirement would pose formatting problems.

The Commission believes that the reporting framework as proposed in subsection (b)(1)(ii) of Rule 17a-25 would have provided the Commission staff with the optimal crosschecking capabilities for transactions involving prime brokerage arrangements. Nevertheless, in response to the concerns raised by the SIA and the SROs, the Commission has modified the language in subsection (b)(1)(ii) of Rule 17a-25, as adopted, to require prime brokers to report using an identifier for this type of transaction as specified by their designated SRO under Rule 17d-1 of the Exchange Act.[24] The Commission will work with the SROs to develop a universal identifier that will help the Commission identify a prime brokerage arrangement.

## 2. Average Price Account Identifiers

Broker-dealers often use "average price accounts" as a mechanism to buy or sell large amounts of a given security for their customers. Under this arrangement, a broker-dealer's average price account may buy or sell a security in small increments throughout a trading session, and then transfer the accumulated long or short position to one or more accounts for an average price or volume-weighted average price after the market close.

Similar to transactions involving prime brokerage arrangements, there currently is no uniformity in how broker-dealers identify these transactions in EBS submissions. As a result, the Commission's trading analyses may have inadvertently double-counted these transactions -- once in the EBS submission for the firm's average price account, and again in the EBS submission for the accounts receiving positions from the average price account. Therefore, the Commission proposed two new data elements in

subsection (b)(2) of Rule 17a-25 to uniformly identify average price account transactions.

As proposed, under subsection (b)(2)(i), an EBS report for a customer account receiving average price transactions would have had to include identifiers for each relevant average price account. Under subsection (b)(2)(ii), as proposed, an EBS report for a firm's average price account would need to include identifiers for each of the accounts receiving positions from the average price account.

Both the SIA and the SROs[25] cited formatting difficulties and programming costs if subsection (b)(2) was adopted as proposed. While the Commission believes that the reporting framework as proposed in subsection (b)(2) of Rule 17a-25 would have provided the optimal crosschecking capabilities for transactions involving average price accounts, the Commission has modified the language in subsections (b)(2)(i) and (b)(2)(ii) to require a firm to distinguish average price account arrangements with an identifier for this type of transaction as specified by the broker-dealer's designated SRO under Rule 17d-1 of the Exchange Act.[26] The Commission will work with the SROs to develop simple universal identifiers that will help the Commission identify an average price account arrangement.

### 3. Identifiers Used by Depository Institutions

The Commission did not receive any comments on subsection (b)(3) of proposed Rule 17a-25, which requires a broker-dealer that processes a trade for an account through a depository institution to report the account's depository identifier. The inclusion of a depository account identifier in EBS reports should greatly expedite efforts by the Commission staff to aggregate trading when conducting complex trading reconstructions.

### C. Information to Facilitate EBS Requests

The Commission did not receive any comments on paragraph (c) of proposed Rule 17a-25. Paragraph (c) requires broker-dealers to submit to the Commission, upon request, certain information about their contact persons, and to keep this information current. The Commission proposed this portion of the rule because it has encountered a recurring problem, due to frequent staff turnover and reorganizations at broker-dealers, in directing EBS requests to the appropriate personnel at broker-dealers. The Commission contemplates initially asking only those broker-dealers that have recently received EBS requests from the Commission to supply current contact information.[27]

### D. Other Information

In the Proposing Release, the Commission specifically requested comment on other types of information that could be useful in analyzing trading in more complex market-wide trading reconstructions and enforcement investigations. For example, the Commission noted that execution times would be useful in trading reconstructions, particularly those that focus on trading during sharp market swings. To date, however, execution times have not been included in EBS reports because this information generally has not been available through the broker-dealer account records systems that are used to prepare EBS reports (although execution time information may be available in other broker-dealer recordkeeping systems).

The Commission also noted in the Proposing Release that some representatives of the securities industry have previously indicated to the Commission staff that, at least for transactions effected through automated order-routing systems, "order sequence" identifiers might be used for EBS reports in lieu of actual execution times.[28] The inclusion of order sequence identifiers in EBS reports would enable the Commission staff to derive order entry times for particular trades. Once such trades are isolated, the transactions' order sequence numbers could be matched with timed order entry reports captured by either the broker-dealer's internal systems or with timed audit trails and related SRO reports.

The SIA identified a number of problems with expanding the EBS system to include execution times or order sequence identifiers. For example, the SIA noted that many clearing firms that handle proprietary accounts of an introducing broker do not typically keep this type of information about the introducing firm. Further, many broker-dealers do not have an automated link between the order file, where this type of information would be kept, to the trade file, which interfaces with the EBS system.[29]

The Commission continues to believe that, in view of the large number of trades that are routed and executed using automated systems, the capture of the appropriate order sequence identifiers in EBS reports could greatly expedite trading reconstructions in which precise timing of particular trading activity is critical. Nevertheless, due to the current configuration of broker-dealers' systems, broker-dealers would incur certain costs and practical difficulties in capturing execution times or order sequence identifiers. Accordingly, the Commission is not modifying Rule 17a-25 to require this type of information at this time.

**E. Exemptions**

The Commission notes that it has traditionally been flexible when working with small broker-dealers who need to supply transaction reports. In cases in which a small broker-dealer does not already have the capacity to submit the information over the EBS system, the Commission staff has accepted manual transmissions. Proposed Rule 17a-25 is neither intended to, nor will it, change this flexible approach in obtaining necessary transaction reports from small broker-dealers. In addition, the Commission may rely on its general exemptive authority under Section 36 of the Exchange Act[30] to exempt particular broker-dealers when the application of the reporting requirements of Rule 17a-25 would not be necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the rule.[31]

**F. Format**

Broker-dealers will submit the information required under Rule 17a-25 in the format specified by the broker-dealer's SRO that is designated under Rule 17d-1 of the Exchange Act, unless otherwise specified by Commission rule. At the current time, we understand that the SROs intend to have their technical specifications revised by 120 days before the effective date for Rule 17a-25(b). In the absence of the necessary SRO technical specifications to implement this paragraph by 120 days before the effective date, the Commission will promulgate rules specifying the technical filing format for EBS submissions.[32]

The PCX asked how the implementation of the NASDR's new web-based EBS system would alter the scope and goals of Rule 17a-25. The Commission believes that the framework for Rule 17a-25 provides sufficient flexibility to allow broker-dealers to report transactions in whatever EBS formats are established by their designated SROs. In particular, the Commission's computer systems are prepared to accommodate the new NASDR system.

## V. Effective Date

The provisions of Rule 17a-25 will be effective on [insert 30 days after publication in the Federal Register], except for subsection (b) of Rule 17a-25, which shall become effective on [insert 180 days after publication in the Federal Register].

The SIA requested that, in adopting and implementing Rule 17a-25, the Commission be mindful of the ongoing systems challenges in the securities industry, including conversion of the trading cycle from a three-day to a one-day cycle and the full implementation of decimal pricing in stocks and options. The Commission is cognizant of the technological challenges that will be faced by the securities industry over the next few months. Thus, the Commission is delaying the effective date of subsection (b) of Rule 17a-25, and is committed to working with the SROs and the securities industry in developing a strategy for reformatting the EBS system in a manner that does not disrupt other critical systems initiatives in the coming months.

## VI. Paperwork Reduction Act

As described in the Proposing Release, Rule 17a-25 contains "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995,[33] and the Commission submitted them to the Office of Management and Budget ("OMB") for review. OMB approved the collection of information, and assigned control number 3235-0540. The collection of information is in accordance with the clearance requirements of 44 U.S.C. 3507.

The title for the collection of information is: Rule 17a-25, Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers. The final rule does not contain substantive or material modifications to the collections of information originally set forth in the Proposing Release. The collection of information obligations imposed by Rule 17a-25 is mandatory. The retention periods for the collection of information are already specified in Rule 17a-4 of the Exchange Act.[34] The information filed pursuant to Rule 17a-25 will be kept confidential, subject to the provisions of the Freedom of Information Act, 5 U.S.C. 552. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number.

The Commission solicited public comment on the collection of information requirements contained in the Proposing Release. As discussed below, the SIA submitted one comment concerning the number of broker-dealers that will have to modify their EBS-related software to capture and report the new data elements pursuant to subsection (b) of Rule 17a-25.

## A. Summary of Collection of Information Under Rule 17a-25

Rule 17a-25 requires broker-dealers to electronically submit securities transaction information, including identifiers for prime brokerage arrangements, average price accounts, and depository institutions, in a standardized format when requested by the Commission staff for enforcement and other regulatory purposes. In addition, the rule will also require broker-dealers to submit, and keep current, contact person information for EBS requests.

### B. Use of Information

The Commission will use the information collected pursuant to proposed Rule 17a-25 for enforcement inquiries or investigations and trading reconstructions, as well as for inspections and examinations.

### C. Respondents

As explained in the Proposing Release, although Rule 17a-25 will apply to all of the approximately 7,700 broker-dealers that are currently registered with the Commission, most provisions would apply only to the 5,500 broker-dealers who do business with the general public. The Commission further estimated in the Proposing Release that the requirement for submission of identifiers for prime brokerage arrangements, average price accounts, and depository institutions would affect a significantly smaller number of broker-dealers, estimated at less than 100 firms.

In its comment letter, the SIA asked for further explanation of the basis for the Commission's estimate that less than 100 firms would need to perform a one-time modification of their EBS-related software to capture and report the new data elements. As previously discussed, the Commission has used the EBS system for over a decade. For example, the Division of Market Regulation used the EBS reports for market reconstructions in 1994 and 1997, and the Division of Enforcement sends out EBS requests almost on a daily basis. Based on this experience, the Commission estimated the number of active clearing firms that regularly receive EBS requests. Accordingly, the Commission continues to believe that its estimate of less than 100 firms is reasonable.

### D. Total Annual Reporting and Recordkeeping Burden

As stated in the Proposing Release, Rule 17a-25 should not impose additional burdens on the vast majority of broker-dealers. The Commission staff will work with the few broker-dealers who might not have EBS systems in place to develop cost-effective means of obtaining requested securities transaction information, whether using the EBS system or other mechanisms. In addition, if electronic reporting of securities transaction information is not feasible or is unreasonably expensive for a particular small broker-dealer, the Commission may use its general exemptive authority under Section 36 of the Exchange Act.

### 1. Burden-Hours for Broker-Dealers[35]

As discussed in the Proposing Release, the annual hour burden of the proposed rule for individual broker-dealers varies widely because of differences in the levels of activities of the respondents and because of differences in the current recordkeeping systems of the respondents. However, it is estimated that electronic response firms would spend

approximately 8 minutes and manual response firms would spend 1 1/2 hours responding to an average blue sheet request. Based on its experience with the EBS system, the Commission estimates that it sends approximately 14,000 electronic blue sheet requests per year, of which approximately 350 are sent to manual response firms. Accordingly, the annual aggregate hour burden for electronic response firms is estimated to be 1,820 hours (13,650 x 8 ÷ 60). The annual aggregate hour burden for manual response firms is estimated to be 525 hours (350 x 90 ÷ 60).

In addition, the Commission estimates that it will request 1,400 broker-dealers to supply the contact information identified in proposed Rule 17a-25(c), and the submission should take each broker-dealer approximately 5 minutes to prepare. To be conservative, the Commission estimates that each of these broker-dealers will revise the contact information twice a year, and each revision will also take approximately 5 minutes to prepare (10 minutes total). The annual aggregate burden for supplying the information requested in proposed Rule 17a-25(c) is 350 hours (1400 x 15 ÷ 60).

Overall, the annual aggregate burden for all respondents to the collection of information requirements of Rule 17a-25 is estimated to be 2,695 hours (1,820 + 525 + 350).

## 2. Capital Cost to Broker-Dealers and SROs[36]

As stated in the Proposing Release, the Commission estimates that less than 100 broker-dealers will have to perform a one-time modification of their EBS-related software to capture and report new data elements. On average, each of these broker-dealers will incur capital or start-up costs of $150,000 to modify their EBS systems. The Commission also estimates that there will be no additional costs associated with the operation and maintenance of the modified EBS systems. Accordingly, the total cost burden for broker-dealers to modify their EBS systems is estimated to be $15 million (100 x $150,000).

In addition, based on its discussions with the SROs, the Commission estimates that three SROs will each incur approximately $29,500 in capital costs to make their systems compatible with the broker-dealers. The Commission also estimates that the SROs will not incur additional costs for the operation and maintenance of the modified EBS systems.

## VII. Costs and Benefits of the Rule

The Commission identified several benefits and costs to investors and market participants in the Proposing Release. To assist the Commission in its evaluation of the costs and benefits that may result from Rule 17a-25, commenters were requested to provide analyses and data relating to the costs and benefits associated with the proposal. As previously noted, the SIA questioned the Commission's estimate of the number of broker-dealers that must modify their existing EBS software to capture prime brokerage identifiers, average price account identifiers, and depository institution identifiers. However, as explained above, the Commission continues to believe that its estimates, including its costs estimates, are reasonable.

The Commission is not making any changes to Rule 17a-25, as adopted, which will increase the cost estimates for broker-dealers or SROs. In particular, subsection (a) of Rule 17a-25 merely codifies existing SRO

Electronic Submission of Securities Transactio⌢rmation by Exchan...                    ⌢ http://www.sec.gov/rules/final/34-44494.htm

requirements for EBS. The estimated annual aggregate hour burden for all respondents to the collection of information requirements is 2,695 hours. The total annualized cost burden for those broker-dealers to modify their existing EBS software is estimated to be $15 million in capital or start-up costs. And the estimated total annualized cost burden for SROs is $88,500. The Commission believes that neither the broker-dealers nor the SROs will incur additional costs for the operation and maintenance of the modified EBS systems.

The Commission continues to believe that any costs to market participants are justified by the overall benefits of Rule 17a-25. The rule will significantly assist the Commission's ability to conduct timely and accurate trading analyses for market reconstructions and complex enforcement inquiries or investigations, as well as inspections and examinations. The current system severely limits the Commission's ability to aggregate transactions effected by entities that use multiple accounts at broker-dealers, and can produce trading compilations that double-count these transactions. Augmented trading analyses will improve the Commission's ability to monitor the securities markets, and, thereby, promote investor protection.

### VIII.  Consideration of Burden on Competition, and Promotion of Efficiency, Competition, and Capital Formation

Section 23(a)(2) of the Exchange Act[37] requires the Commission, when promulgating rules under the Exchange Act, to consider the impact any rule would have on competition, and not adopt any rule that would impose a burden on competition that is not necessary or appropriate in furtherance of the Exchange Act. Section 3(f) of the Exchange Act[38] requires the Commission, when engaging in rulemaking that requires it to consider or determine whether an action is necessary or appropriate in the public interest, to consider whether the action will promote efficiency, competition, and capital formation. In the Proposing Release, the Commission solicited comments on the effects of Rule 17a-25 on competition, efficiency, and capital formation. The Commission did not receive any comments regarding these specific issues.

The Commission has considered Rule 17a-25 in light of the standards cited in Sections 3(f) and 23(a)(2) of the Exchange Act, and believes that the rule will not impose any significant burden on competition not necessary or appropriate in furtherance of the Exchange Act. As discussed in the cost-benefit section, only some broker-dealers will incur capital or start-up costs to modify their EBS-related software. However, the Commission believes the modifications are necessary to promote efficiency in the blue-sheeting process, and promote investor protection.

### IX. Summary of Final Regulatory Flexibility Act Analysis

A Final Regulatory Flexibility Analysis ("FRFA") has been prepared in accordance with Section 4 of the Regulatory Flexibility Act ("RFA"), to provide a description and estimate of the number of small entities that will be affected by Rule 17a-25. The following summarizes the FRFA.

The Commission estimates that approximately 12% of registered broker-dealers, or approximately 1,000 broker-dealers, qualify as small broker-dealers.[39] As discussed more fully in the FRFA, Rule 17a-25 will affect

these small broker-dealers because all broker-dealers will be required to submit securities transaction information to the Commission, upon request. However, the Commission believes that only a relatively few EBS requests are sent to small broker-dealers. Generally, EBS requests are sent to large clearing firms or those broker-dealers that self-clear. These entities fall outside the definition of a small broker-dealer.

In addition, the Commission's experience with the EBS system over the last ten years indicates that entities that trade through multiple accounts at different firms generally do not effect their trades through "small" broker-dealers. Accordingly, the Commission does not believe that any small broker-dealer will be required to modify its EBS-related software to capture and report the new data elements in subsection (b) of Rule 17a-25.

The FRFA further states that proposed Rule 17a-25 would not impose any additional recordkeeping requirements for small broker-dealers. The elements of trade information required for EBS reports to the Commission are already maintained by broker-dealers pursuant to Rules 17a-3 and 17a-4 of the Exchange Act and SRO rules. When small broker-dealers receive the occasional EBS request, they will incur some costs when they report transaction information pursuant to requests by the Commission staff for enforcement purposes. The Commission believes, however, that any new costs associated with Rule 17a-25 will be minimal because broker-dealers are already required to have in place adequate systems and procedures to submit transaction reports to the appropriate SRO. Moreover, the Commission staff has traditionally been flexible when working with small broker-dealers who need to supply transaction reports. In cases in which a small broker-dealer does not already have the capacity to submit information over the EBS system, the Commission staff has accepted manual transmissions. Proposed Rule 17a-25 is not intended to change this flexible approach in obtaining necessary transaction reports from small broker-dealers.

The FRFA also discusses the various alternatives considered by the Commission in connection with the proposed rule that might minimize the effect on small entities. These include, among others, creating differing compliance or reporting requirements or timetables that take into account the resources available to small entities, and whether such entities could be exempted from the proposed rule, or any part thereof. The Commission has drafted the proposal to be consistent with the concerns of small entities. For example, as discussed above, the Commission has often permitted small broker-dealers to submit the transaction information manually, rather than electronically. The Commission may also use its exemptive authority under Section 36 of the Exchange Act. A wholesale exemption from the proposed rule for small broker-dealers, however, would prevent the Commission from fully protecting investors and maintaining the fair and orderly operation of the nation's securities markets.

The Commission received no comments on the Initial Regulatory Flexibility Analysis ("IRFA") prepared in connection with the Proposing Release. A copy of the FRFA may be obtained by contacting Anitra Cassas, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549-1001; (202) 942-0089.

### X. Statutory Authority

Rule 17a-25 under the Exchange Act is being adopted pursuant to 15 U.S.C. 78a et seq., particularly Sections 17(a) and 23(a) of the Act, unless otherwise noted.

**List of Subjects**

**17 CFR Part 200**

Administrative practice and procedure, Authority delegations (Government agencies).

**17 CFR Part 240**

Broker-dealers, Reporting and recordkeeping requirements, Securities.

**Text of the Final Rule and Amendments**

In accordance with the foregoing, Title 17, Chapter II of the Code of Federal Regulations is amended as follows:

PART 200 - ORGANIZATON; CONDUCT AND ETHICS; AND INFORMATION AND REQUESTS

1. The authority citation for Part 200 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 77s, 78d-1, 78d-2, 78w, 78ll(d), 78mm, 79t, 77sss, 80a-37, 80b-11, unless otherwise noted.

* * * * *

2. Section 200.30-3 is amended by adding paragraph (a)(69) to read as follows:

**§200.30-3 Delegation of authority to Director of Division of Market Regulation.**

* * * * *

(a) * * *

(74) Pursuant to section 36 of the Act (15 U.S.C. 78mm) to review and, either unconditionally or on specified terms and conditions, grant, or deny exemptions from rule 17a-25 of the Act (§240.17a-25 of this chapter).

* * * * *

3. Section 200.30-4 is amended by adding paragraph (a)(12) to read as follows:

**§200.30-4 Delegation of authority to Director of Division of Enforcement.**

* * * * *

(a) * * *

(12) Pursuant to Section 36 of the Securities Exchange Act of 1934 (15 U.S.C. 78mm) to review and, either unconditionally or on specified terms and conditions, grant, or deny exemptions from rule 17a-25 of the Act

(§240.17a-25 of this chapter), provided that the Division of Market Regulation is notified of any such granting or denial of an exemption.

* * * * *

4. Section 200.30-18 is amended by redesignating paragraphs (h) and (i) as paragraphs (i) and (j); and by adding new paragraph (h) to read as follows:

**§200.30-18 Delegation of authority to Director of the Office of Compliance Inspections and Examinations.**

* * * * *

(h) Pursuant to Section 36 of the Exchange Act (15 U.S.C. 78mm) to review and, either unconditionally or on specified terms and conditions, grant, or deny exemptions from rule 17a-25 of the Act (§240.17a-25 of this chapter), provided that the Division of Market Regulation is notified of any such granting or denial of an exemption.

* * * * *

PART 240 -- GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

5. The authority citation for Part 240 continues to read, in part, as follows: **Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78f, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78o, 78p, 78q, 78s, 78u-5, 78w, 78x, 78ll(d), 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4 and 80b-11, unless otherwise noted.

* * * * *

6. Section 240.17a-25 is added to read as follows:

**§240.17a-25 Electronic submission of securities transaction information by exchange members, brokers, and dealers.**

(a) Every member, broker, or dealer subject to §240.17a-3 shall, upon request, electronically submit to the Commission the securities transaction information as required in this section:

(1) If the transaction was a proprietary transaction effected or caused to be effected by the member, broker, or dealer for any account in which such member, broker, or dealer, or person associated with the member, broker, or dealer, is directly or indirectly interested, such member, broker or dealer shall submit the following information:

(i) Clearing house number, or alpha symbol of the member, broker, or dealer submitting the information;

(ii) Clearing house number(s), or alpha symbol(s) of the member(s), broker(s) or dealer(s) on the opposite side of the transaction;

(iii) Identifying symbol assigned to the security;

(iv) Date transaction was executed;

(v) Number of shares, or quantity of bonds or options contracts, for each specific transaction; whether each transaction was a purchase, sale, or short sale; and, if an options contract, whether open long or short or close long or short;

(vi) Transaction price;

(vii) Account number; and

(viii) The identity of the exchange or other market where the transaction was executed.

(2) If the transaction was effected or caused to be effected by the member, broker, or dealer for any customer account, such member, broker, or dealer shall submit the following information:

(i) Information contained in paragraphs (a)(1)(i) through (a)(1)(viii) of this section;

(ii) Customer name, address(es), branch office number, registered representative number, whether the order was solicited or unsolicited, date account opened, and the customer's tax identification number(s); and

(iii) If the transaction was effected for a customer of another member, broker, or dealer, whether the other member, broker, or dealer was acting as principal or agent on the transaction.

(b) In addition to the information in paragraph (a) of this section, a member, broker, or dealer shall, upon request, electronically submit to the Commission the following securities transaction information for transactions involving entities that trade using multiple accounts:

(1) (i) If part or all of an account's transactions at the reporting member, broker, or dealer have been transferred or otherwise forwarded to one or more accounts at another member, broker, or dealer, an identifier for this type of transaction; and

(ii) If part or all of an account's transactions at the reporting member, broker, or dealer have been transferred or otherwise received from one or more other members, brokers, or dealers, an identifier for this type of transaction.

(2) (i) If part or all of an account's transactions at the reporting member, broker, or dealer have been transferred or otherwise received from another account at the reporting member, broker, or dealer, an identifier for this type of transaction; and

(ii) If part or all of an account's transactions at the reporting member, broker, or dealer have been transferred or otherwise forwarded to one or more other accounts at the reporting member, broker, or dealer, an identifier for this type of transaction.

(3) If an account's transaction was processed by a depository institution, the identifier assigned to the account by the depository institution.

(c) Every member, broker, or dealer shall, upon request, submit to the Commission and, keep current, information containing the full name, title,

address, telephone number(s), facsimile number(s), and electronic-mail address(es) for each person designated by the member, broker, or dealer as responsible for processing securities transaction information requests from the Commission.

(d) The member, broker, or dealer should comply with the format for the

electronic submission of the securities transaction information described in paragraphs (a) and (b) of this section as specified by the member, broker, or dealer's designated self-regulatory organization under §240.17d-1, unless otherwise specified by Commission rule.

By the Commission.

Jonathan G. Katz
Secretary

June 29, 2001

**Footnotes**

[1] §240.17a-25.

[2] See Securities Exchange Act Release No. 42741 (May 2, 2000), 65 FR 26534 (May 8, 2000) ("Proposing Release").

[3] For the last decade, the SROs have required their member firms to use the EBS system to submit customer and proprietary trading data for use in connection with market surveillance and enforcement inquiries, particularly investigations into insider trading and market manipulation. See, e.g., Securities Exchange Act Release Nos. 25859 (June 27, 1988), 53 FR 25029 (July 1, 1988) (approving both the New York Stock Exchange (NYSE) and the American Stock Exchange's (Amex) rules for the electronic submission of transaction information); 26235 (November 1, 1988), 53 FR 44688 (November 4, 1988) (approving the Chicago Board Options Exchange's (CBOE) rule for the electronic submission of transaction information); 26539 (February 13, 1989), 54 FR 7318 (February 17, 1989) (approving the National Association of Securities Dealer's (NASD) rule for the electronic submission of transaction information); and 27170 (August 23, 1989), 54 FR 37066 (September 6, 1989) (approving the Philadelphia Stock Exchange's (Phlx) rule for the electronic submission of transaction information).

[4] If an SRO's surveillance or enforcement staff issues the request, SIAC routes the EBS data from the broker-dealer to the appropriate SRO.

[5] Aggregation of EBS transaction data is rarely a problem for trading reconstructions conducted by Enforcement and OCIE staff because most such inquiries or investigations involve trading in a limited number of stocks over a relatively short time frame. The EBS data transmissions under these circumstances are almost always small enough to permit the Commission staff to use standardized desk-top applications or even manual reviews to eliminate potential double-counting of some transactions. For massive market reconstructions performed by Market Regulation staff, however, the magnitude of the

EBS data transmissions precludes the effective use of desk-top applications or manual reviews. As a result, market reconstructions normally require that mainframe computer applications be used for aggregation purposes. The new data elements set forth in Rule 17a-25 will permit the staff to develop mainframe computer applications to sort through massive EBS data transmissions to avoid double counting transactions for market reconstructions.

[6]  See, e.g., NYSE Rule 410A; Amex Rule 153A; CBOE Rule 15.7; NASD Rule 8211; and Phlx Rule 785.

[7]  See Letter from Bernard L. Madoff, Chair, SIA Ad hoc Committee on Electronic Bluesheeting, SIA, to Jonathan G. Katz, Secretary, Commission, dated June 15, 2000; and E-mail from Sarah E. Althoff, PCX, dated May 4, 2000.

[8]  The PCX indicated that certain clearing firms have opted out of the SIAC EBS system, and now exclusively use the NASDR's new web-based EBS system. The PCX asked if this change alters the scope and goals of proposed Rule 17a-25.

[9]  See supra note 4.

[10]  SIA Letter, at 5-6.

[11]  SIA Letter, at 4-5.

[12]  SIA Letter, at 5.

[13]  Id.

[14]  SIA Letter, at 6-7.

[15]  SIA Letter, at 3.

[16]  17 CFR 240.17a-3.

[17]  Section 17(a)(1) of the Exchange Act requires registered broker-dealers to make, keep, furnish, and disseminate records and reports prescribed by the Commission "as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of" the Exchange Act. 15 U.S.C. 78q(a)(1). Rules 17a-3 and 17a-4 under the Exchange Act specify minimum requirements with respect to the records that must be maintained by broker-dealers, as well as the periods during which these records and other documents relating to a broker-dealer's business must be preserved. 17 CFR 240.17a-3 and 240.17a-4.

[18]  As noted in the Proposing Release, the Commission believes that an enhanced EBS system will provide a more efficient and cost-effective way to conduct timely and accurate reviews of the activities of large traders for regulatory or enforcement purposes, than would further efforts to design and implement the large trader reporting system authorized by the Market Reform Act of 1990, and incorporated into section 13(h) of the Exchange Act. 15 U.S.C. 78m(h). See Proposing Release, at 7.

[19]  See supra note 2.

[20]  SIA Letter, at 6.

21   17 CFR 240.17d-1.

22   If a broker-dealer has a question concerning whether a transaction should be reported under Rule 17a-25(b), as adopted, the broker-dealer can request interpretive guidance from the Commission staff.

23   Commission staff discussed **THE FEASIBILITY OF CAPTURING THE PRIME BROKERAGE IDENTIFIERS, AVERAGE PRICE ACCOUNT IDENTIFIERS, AND DEPOSITORY INSTITUTION IDENTIFIERS, INCLUDING COST ESTIMATES, WITH THE INTERMARKET SURVEILLANCE GROUP AND THE SIA ON MAY 10, 2000 AND MAY 16, 2000, RESPECTIVELY.**

24   17 CFR 240.17d-1.

25   See supra note 23.

26   17 CFR 240.17d-1.

27   The Commission has determined that the most efficient means of obtaining EBS contact information from the appropriate broker-dealers is by request, rather than imposing a general reporting obligation on all broker-dealers. Thousands of broker-dealers who clear their trades through other firms never receive EBS data requests from the Commission. In addition, firms who do not trade with the public or are otherwise inactive traders are rarely asked to supply transaction information. Accordingly, the Commission believes it would be most cost-effective to maintain its list of EBS contacts based on the staff's experience with the types of broker-dealers that are likely to be recipients of future EBS requests.

28   Firms use these identifiers to trace orders routed through automated systems. These identifiers are also routinely captured by some audit trail systems and other recordkeeping systems, such as the NYSE's daily program trading reports from member firms. The Commission further noted in the Proposing Release that other types of information captured by the SROs' audit trail systems, such as the NASD's Order Audit Trail System, may also be useful to the Commission in its trading analyses. For example, these systems generally capture the date and time of origination or receipt of the order, and information on when the order is transmitted to another department within the member firm, to another member firm, or to a non-member. The SIA noted, however, that connecting information maintained under OATS to the EBS system would raise difficulties and costs. SIA Letter, at 6-7.

29   Id.

30   15 U.S.C. 78mm. Procedures for filing applications for orders for exemptive relief under Section 36 are found in the Commission's Rules of General Application, 17 CFR 240.0-12.

31   The Commission is amending Rules 30-3, 30-4, and 30-18 of its Rules of Practice to add new paragraphs (a)(69), (a)(12), and (h), respectively. 17 CFR 200.30-3, 200.30-4, and 200.30-18. These paragraphs delegate the authority to the Directors of the Division of Market Regulation, the Division of Enforcement, and the Office of Compliance Inspections and Examinations to grant or deny, in whole or in part, exemptions from the requirements of Rule 17a-25. The Office of Compliance Inspections and Examinations uses the EBS

system as part of its inspections and examinations.

[32] If the Commission sets the technical filing requirements for EBS submissions, we anticipate adopting these requirements using a similar approach to that used by the Commission in specifying the technical formatting requirements for electronic filings through the EDGAR system. Securities Act Release No. 7858 (May 16, 2000), 65 FR 34079 (May 26, 2000).

[33] 44 U.S.C. 3501 et seq.

[34] 17 CFR 240.17a-4.

[35] The time burden was derived from information supplied by several broker-dealers.

[36] The costs estimates were derived using information supplied by the broker-dealers and the SROs.

[37] 15 U.S.C. 78w(a)(2).

[38] 15 U.S.C. 78c(f).

[39] For purposes of the regulatory flexibility analysis, a broker-dealer is considered a small entity if its total capital is less than $500,000, and it is not affiliated with a broker-dealer that has $500,000 or more in total capital. 17 CFR 240.0-10.

*http://www.sec.gov/rules/final/34-44494.htm*

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010  6:41PM
Mark Harper, Clerk

3

# NEW YORK STOCK EXCHANGE, INC.

**EXCHANGE HEARING PANEL DECISION 05-159**          January 3, 2006
UBS SECURITIES LLC
MEMBER ORGANIZATION

\* \* \*

> **Violated NYSE Rule 410A by failing to submit accurate trading information through submission of electronic blue sheets; violated NYSE Rule 401 by submitting inaccurate trading information on electronic blue sheets; violated NYSE Rule 342 by failing to establish and maintain appropriate systems and procedures for supervision and control of areas responsible for complying with electronic blue sheet reporting requirements and failing to establish separate system of follow-up and review to reasonably ensure compliance with NYSE Rules relating to preparation and submission of electronic blue sheets – Consent to censure, fine of $500,000, requirement to conduct validation of all required blue sheet data elements, and undertaking to inform NYSE in writing that validation has been completed.**

**Appearances:**

For the Division of Enforcement
Susan Light, Esq.
Suzanne R. Elovic, Esq.
Steven M. Tanner, Esq.

For Respondent Firm
Rhonda Byun

\* \* \*

A Hearing Panel of the New York Stock Exchange, Inc. (the "NYSE" or the "Exchange") met to consider a Stipulation of Facts and Consent to Penalty entered into between the NYSE's Division of Enforcement ("Enforcement") and UBS Securities LLC ("Respondent Firm" or "UBS" or "Respondent"), a member organization. Without admitting or denying allegations, facts, conclusions or findings referred to in the Stipulation of Facts and Consent to Penalty, Respondent Firm consented to a finding by the Hearing Panel that it:

I.  Violated NYSE Rule 410A by failing to submit accurate trading information through the submission of electronic blue sheets in response to one or more requests for such information by the NYSE.

II. Violated NYSE Rule 401 by failing to adhere to the principles of good business practice in the conduct of its business affairs in that it submitted inaccurate trading

2

information on electronic blue sheets in response to one or more requests for such information by the NYSE.

III.   Violated NYSE Rule 342 by failing to establish and maintain appropriate systems and procedures for the supervision and control of areas responsible for complying with electronic blue sheet reporting requirements and failing to establish a separate system of follow-up and review to reasonably ensure compliance with NYSE Rules relating to the preparation and submission of electronic blue sheets.

For the sole purpose of settling this disciplinary proceeding, Enforcement and Respondent Firm stipulate to certain facts, the substance of which follows:[1]

## Background and Jurisdiction

1.   UBS is a Delaware limited liability corporation with its principal place of business in Stamford, Connecticut.  UBS is registered with the SEC and is a member organization of the Exchange.  Respondent is a multi-service brokerage firm that, among other things, trades securities for institutional customers.

2.   Enforcement notified the Respondent that it was investigating certain matters as described below that were referred to Enforcement by the Exchange's Division of Market Surveillance ("MKS").

3.   Thereafter, the Respondent provided information in connection with Enforcement's investigation.

## Overview

4.   This action concerns submissions by Respondent of inaccurate Electronic Blue Sheets ("blue sheets") in violation of Exchange Rules 410A and 401 and the failure of Respondent to properly supervise the preparation of its blue sheet submissions in violation of Exchange Rule 342.  The blue sheets were submitted to the Exchange and other regulators in response to regulatory inquiries over a significant period of time.  The inaccuracies in the blue sheet submissions resulted from deficiencies in the Respondent's blue sheet systems.  The inaccuracies were systemic in nature and included the reporting of short equity sales as long sales.  Additionally, notwithstanding being alerted to these problems by the Exchange, the Respondent has continued to have ongoing deficiencies in its blue sheet reporting.

## Electronic Blue Sheets

5.   Blue sheets are documents that are generated by member organizations at the request of regulators in connection with investigations of questionable trading.  The blue

---

1   The facts, allegations, and conclusions contained in paragraphs 1-21 are taken from the executed Stipulation of Facts and Consent to Penalty between Enforcement and Respondent.  No changes have been made to the stipulated paragraphs by the Hearing Panel, with the exception of the change in paragraph 19, which is explained in footnote 2 below.

3

sheets provide, *inter alia,* information identifying the account holder for whom specific trades were executed, indicating whether the transaction was a buy or a sell and long or short. The receipt and review of blue sheets are an essential component of Exchange investigations into matters such as potential insider trading or market manipulation, and potential violations of Rule 105 of Regulation M, under the Securities Exchange Act of 1934, which prohibits the covering of a short sale with securities obtained in a public offering, if the short sale occurred within five days of the date when the offering was priced.

6.  Since in or about 1989, members and member organizations have submitted these blue sheets in an electronic format to all regulators including the Exchange.

7.  It is the responsibility of members and member organizations to reasonably ensure that the information submitted to regulators via blue sheets is accurate.

### Background of the Investigation

8.  In or around August 2003, MKS requested certain blue sheet information from the Respondent.

9.  Shortly thereafter, MKS discovered inaccuracies in the blue sheet submission received from Respondent. As a result, MKS commenced an investigation of Respondent. The investigation revealed that the Respondent had submitted inaccurate blue sheets to the Exchange.

10.  As a result, MKS referred its findings to the Division of Enforcement on February 18, 2005.

### The Use of Outside Vendors to Perform Required Functions

11.  The Respondent contracted with an outside vendor to perform certain functions involved in generating and submitting blue sheets to the regulators. The systems and/or procedures of that vendor were deficient, thus causing some of the information on the blue sheet submissions to be inaccurately reflected.

12.  Member firms are responsible for establishing procedures and controls that are reasonably calculated to ensure compliance with the federal securities laws and Exchange rules. While member firms may contract with outside vendors for the provision of blue sheet or other securities related services, compliance with such laws and rules is the sole responsibility of the member organizations. That responsibility may not be assigned or delegated to others.

### Violative Conduct

13.  Respondent's blue sheet systems (including the systems of its third party vendor) caused certain short sale transactions to erroneously be identified as long sale transactions in its blue sheet submissions to the Exchange. The inaccurate

4

information submitted by the Respondent undermined the integrity of the information utilized by the Exchange and other regulators during the course of investigations into questionable trading activity.

14.    The systemic deficiencies in Respondent's blue sheet system occurred for various intervals over a period of five years, during which multiple blue sheets containing inaccurate information were submitted to the Exchange and/or other regulators.

15.    Respondent experienced numerous types of failures with its blue sheet system, including, but not limited to short sales being reported as long sales.  Different business areas of the Firm experienced different coding errors that caused transactions to be inaccurately reflected on the blue sheets.  Certain inaccuracies were caused by coding errors in the Respondent's internal systems, and other inaccuracies were caused by  coding errors in the system of an outside vendor with which the Firm contracted.  In addition, other short sale reporting deficiencies were caused by errors such as netting together short and long sales.  In certain instances, transactions were completely omitted from the blue sheets.

16.    Additionally, the Respondent reported during the course of the investigation that its blue sheet deficiencies had been corrected.  Although those deficiencies had been corrected, the Respondent subsequently discovered that other systemic deficiencies caused it to continue to submit blue sheets containing erroneous information in certain instances.

17.    To date, Respondent has been unable to correct some of the blue sheet systems deficiencies.

18.    Prior to notification by the Exchange to the Respondent of its blue sheet problems, the Respondent did not maintain adequate written supervisory procedures relating to blue sheet submissions nor had the Respondent established a separate system of follow-up and review to determine that the blue sheet submissions contained accurate information.

### Applicable Exchange Rules

19.    Exchange Rule 410A requires a member or member organization to submit from time to time, trade data elements in the automated format prescribed by the Exchange in regard to a transaction or transactions that are the subject of a particular request for information made by the Exchange.  The required data elements include, in relevant part, whether each transaction was a purchase, sale or short sale; the date the transactions was executed, if the transaction was effected for a member broker-dealer customer, whether the broker-dealer was acting as principal or agent; and whether the transaction was a proprietary transaction effected or caused to be effected by the member for an account in which the member held an interest.[2]

---

[2]  Hearing Panel Note:  The final clause in paragraph 19 was modified slightly from its equivalent in the Stipulation of Facts and Consent to Penalty ("effected or caused to be effected for the member or an

5

20.   Exchange Rule 401 requires that every member, allied member and member organization shall adhere to the principles of good business practice with respect to the conduct of his or its business affairs at all times.

21.   Exchange Rule 342 requires that every member and member organization provide for appropriate procedures for supervision and control over their business activities and compliance with securities laws and regulations.  Additionally, every member and member organization is required to establish a system of follow-up and review to assure the proper exercise of responsibility and authority.  Additionally, Exchange Rule 342.23 requires that every member and member organization develop and maintain adequate controls over each of its business activities, and that such controls must provide for the establishment of procedures for independent verification and testing of those business activities.

## DECISION

The Hearing Panel, in accepting the Stipulation of Facts and Consent to Penalty, found Respondent Firm guilty as set forth above by unanimous vote.

## PENALTY

In view of the above findings, the Hearing Panel, by unanimous vote, imposed the penalty consented to by Respondent Firm of a censure, a fine of $500,000, a requirement that Respondent Firm conduct a validation of all required blue sheet data elements in accordance with ISG Regulatory Memorandum, ISG 2005-01, and an undertaking to inform the NYSE in writing that Respondent Firm has completed its validation.

For the Hearing Panel

Peggy Kuo – Chief Hearing Officer
Panelists:
John Cirrito
Joseph C. Gawronski

---

account in which the member had an interest") in order to conform with the precise language of NYSE Rule 410A(a).

State Court of Fulton County
\*\*\*EFILED\*\*\*
LexisNexis Transaction ID: 32089722
Date:  Jul 12 2010  6:41PM
Mark Harper, Clerk

4

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| TASER INTERNATIONAL, INC., | : | |
| *et al.*, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | FILE NO.: 2008-EV-004739-B |
| v. | : | |
| | : | |
| MORGAN STANLEY & CO., INC., | : | JURY TRIAL DEMANDED |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

## AFFIDAVIT OF STEVEN ROSENWASSER

Before me, the undersigned officer, duly authorized to administer oaths in the State

of Georgia, came Steven Rosenwasser, who after being first duly sworn on oath,

states as follows:

1.

I am over the age of eighteen (18), am of sound mind and otherwise

competent to testify, and am giving this Affidavit based upon my personal

knowledge, observations and belief.

2.

I am a partner at the law firm of Bondurant, Mixson & Elmore, LLP, which

represents the Plaintiffs in this matter.

781134.1

3.

Attached as Attachment A is a true and correct copy of a November 5, 2009 email from me to counsel for UBS.

4.

Attached as Attachment B is a true and correct copy of a February 25, 2010 email from counsel for UBS.

5.

Attached as Attachment C is a true and correct copy of a December 16, 2009 letter from Elizabeth G. Eager to counsel for UBS.

6.

Attached as Attachment D is a true and correct copy of a February 24, 2010 email from Elizabeth G. Eager to counsel for UBS.

7.

Attached as Attachment E is a true and correct copy of a February 25, 2010 email from me to counsel for UBS.

8.

Attached as Attachment F is a true and correct copy of a February 26, 2010 email from counsel for UBS.

781134.1

9.

Attached as Attachment G is a true and correct copy of a March 15, 2010email from counsel for UBS.

10.

Attached as Attachment H is a true and correct copy of a April 9, 2010 email from counsel for UBS.

11.

Attached as Attachment I is a true and correct copy of the May 27, 2010 email from me to counsel for UBS.

12.

Attached as Attachment J is a true and correct copy of a June 7, 2010 letter from counsel for UBS.

13.

Attached as Attachment K is a true and correct copy of a November 13, 2009 email from me to counsel for UBS.

14.

Attached as Attachment L is a true and correct copy of the May 24, 2010 email from Elizabeth G. Eager to counsel for UBS.

781134.1

15.

Attached as Attachment M is a true and correct copies of a May 18, 2010 letter from Merrill Lynch, January 6, 2010 letter from counsel for UBS and the May 20, 2010 letter from counsel for UBS.

16.

Attached as Attachment N are true and correct copies of emails to each of the Defendants requesting additional information about their privilege logs.

17.

Attached as Attachment O is a true and correct copy of a June 21, 2010 letter from counsel for Deutsche Bank.

18.

Attached as Attachment P is a true and correct copy of a June 8, 2010 letter from counsel for Bear Stearns.

19.

Attached as Attachment Q is a true and correct copy of a June 30, 2010 email from counsel for UBS.

20.

Attached as Attachment R is a true and correct copy of a July 6, 2010 email from counsel for Credit Suisse.

781134.1

21.

Attached as Attachment S is a true and correct copy of a July 1, 2010 letter from counsel for Deutsche Bank.

22.

Attached as Attachment T are true and correct copies of April 28, 2010 and May 17, 2010 emails from me to Defendants' counsel.

23.

During the conferral process, UBS repeatedly represented to Plaintiffs' counsel that the blue sheets and trade blotters were derived from the same data source, such that production of the trade blotters would not cure the blue sheet inaccuracies.

FURTHER AFFIANT SAYETH NOT.

Steven J. Rosenwasser

Sworn to and subscribed before me
this 12th day of July, 2010.

Notary Public

My Commission Expires: 9-8-11

781134.1

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

A

## Steven J. Rosenwasser

| | |
|---|---|
| **From:** | Steven J. Rosenwasser |
| **Sent:** | Thursday, November 05, 2009 3:53 PM |
| **To:** | 'Andrew Clubok' |
| **Cc:** | 'Jeffrey Landis'; 'Daniel Gomez' |
| **Subject:** | Data |

Andy, Jeff and Dan,

I am following up with our prior requests regarding UBS' blue sheets . First, we previously asked that, as set forth in the scheduling order, you identify which blue sheets are inaccurate.  We need that information as soon as possible.

Second, we are already discovering instances in which the blue sheets are erroneous.  For exapmle, on Nov. 4, 2003, the UBS blue sheets report 1 trade with a volume of 500 shares, but the ETJ shows 87 trades for 20,450 shares.  For this reason, we need to obtain your trade runs.  Please let us know if you agree to produce them.

Steven

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010  6:41PM
Mark Harper, Clerk

**B**

## Steven J. Rosenwasser

| | |
|---|---|
| **From:** | Jeffrey Landis [JLandis@kirkland.com] |
| **Sent:** | Thursday, February 25, 2010 3:46 PM |
| **To:** | Elizabeth G. Eager |
| **Cc:** | Andrew Clubok; Steven J. Rosenwasser |
| **Subject:** | Re: TASER/ UBS Proposal |

Liz

A few clarifications regarding the suggested compromise we discussed yesterday are in red below. Assuming you are okay with these, we will take this proposal to our client for approval. Give me a call if you want to discuss.

Jeff

Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005

"Elizabeth G. Eager" <eager@bmelaw.com>

02/24/2010 03:06 PM

To "Andrew Clubok" <aclubok@kirkland.com>, "Jeffrey Landis" <JLandis@kirkland.com>
cc "Steven J. Rosenwasser" <rosenwasser@bmelaw.com>
Subject TASER/ UBS Proposal

Andy and Jeff,
It was good speaking with you this morning. During our call, we discussed a compromise to address issues relating to: (1) UBS's claim for costs relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date; (2) Plaintiffs' request for trade runs/trade blotters; (3) Plaintiffs 30(b)(6) Notice and (4) Plaintiffs' Third Interrogatories to UBS. Specifically, we discussed the following proposal:

Costs - UBS would agree to waive and never seek any fees, costs or expenses relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date.

As Andy explained yesterday (and as I explained on our previous call), the agreement would be that we would not seek costs associated with the review/processing/searching etc for the Taser and non-taser keywords (Paragraphs 2 and 4 of our Dec. 21 stipulation) or any documents already produced. This is slightly different than what you wrote above, but consistent with what we have been saying throughout.

Plaintiffs' Third Interrogatories- UBS would agree to answer the interrogatories as follows:
• Interrogatory Number One: UBS will identify all dates and/or time periods of which UBS is presently aware in which the blue sheets it created, maintained and/or submitted to the SEC, whether or not they report transactions in TASER securities, contained or you have reason to believe may have contained inaccurate data. Your response would not pertain to currently unknown instances where there may have been an isolated typographical or data entry error.

It may be just another way of saying the same thing, but as we discussed yesterday, our response would be limited to systemic or process errors as opposed to one-off or non-systemic/process problems.

• Interrogatory Number Two: For the dates and/or time periods identified in Interrogatory # 1, UBS will identify by bates number, the blue sheets that do or may contain inaccurate data. UBS will identify what information or data is or may be inaccurate on each blue sheet. If UBS does not know the specific data, but knows the type of data (e.g. short interest, long position, trade time, etc.), it will provide that information. If UBS has corrected data, UBS will identify the corrected data, including but not limited to,

1

identifying the bates number(s) of the documents containing the corrected data.

ok

- Interrogatory Number Three: UBS will identify all instances during the period of January 1, 2003 through May 31, 2009, in which any inquiry, investigation or adverse action concerning the inaccuracy of documents (including, but not limited to, blue sheets and order tickets) was initiated against you by a governmental entity, securities exchange or clearing company. UBS will state whether information relating to TASER or a transaction involving TASER is on the document(s), report(s), or list(s) that were being investigated and will state the findings and result of the inquiry, investigation or adverse action such as whether UBS was cautioned, fined or sanctioned. "Inquiry, investigation, or adverse action" includes any communication by or with a governmental entity, securities exchange, or clearing company for the purpose of conducting, participating in, or complying with a factual investigation. The parties agree that UBS is not required to identify inquiries, investigations or adverse actions where the governmental entity, securities exchange or clearing company identified a substantive violation that did not in any way involve short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets and claimed that with regard to the substantive violation UBS's "books and records" were inaccurate.

Again, this may be just another way to say the same thing, but this interrogatory would be limited to inquires/investigations/adverse actions where the focus of the investigation was the inaccuracy of documents.  It would not include inquiries/investigations/adverse actions regarding other substantive issues merely because there was also a books and records violation tacked on, unless the underlying inquiry/investigation/adverse action involved short selling, Reg SHO, inaccurate blue sheets or mismarked tickets.  Also, as a practical matter, I am not sure how we could ever know whether Taser was on any document being investigated without re-creating the entire investigation. So for example, if there was some investigation into whether UBS's 13-F forms were accurate, we are not going to go back and review those forms and see if Taser was on them.  It seems to me the better approach is that if there are one or two particular investigations (if there are any) that you are interested in and are relevant, we are happy to work with you to see what is reasonably doable with respect to determining whether any of the documents being investigated contained information regarding Taser.

- Interrogatory Number Four: UBS will identify each and every blue sheet that was the subject of the caution, sanction, fine, or adverse action, whether or not the blue sheet reported transactions in TASER securities.

I don't think that we are conceptually opposed to this with the caveat that our ability to potentially identify any blue sheets that were the "subject of the caution, fine, sanction, fine or adverse action" is dependant on whether such blue sheets were previously identified during the course of the inquiry/investigation/adverse action.  So for example, to the extent during the course of a particular investigation (if any) either specific blue sheets or a date range of blue sheets were identified as being the subject of the action we will identify that for you.  If they were not, however, we do not intend to perform an additional audit to determine what blue sheets were "the subject" of the action etc.

Trade Runs/Trade Blotters- UBS will provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters it would be producing the same data that is in the blue sheets (i.e., it would cure any inaccuracies in the blue sheets).  The representation will also state that, to the best of the company's knowledge, the only other database containing information that may cure inaccuracies on the bluesheets are the stock record and order management systems, which have been produced.

To be clear, I think the correct way to say this is that the trade blotters are derived from the same place/system such that producing the trade blotters would not cure any inaccuracies in the blue sheets.

30(b)(6) Notice - Plaintiffs will withdraw the pending the 30(b)(6) notice as to all topics.  With respect to topic 9, UBS agrees to continue researching the issue of duplicate trades in its option blue sheets.  If requested by plaintiffs, UBS agrees to provide a written, verified response regarding "UBS's ability to remove duplicate trades from the option blue sheets, including, but not limited to, any factual support for any alleged burden to remove duplicate trades." With respect to topics 10 and 14, UBS will provide a written, verified response.  With respect to topic 13, UBS will send a written response that that it has accessed and searched for ESI from "the 2 decommissioned systems referenced in [its] August 26, 2009 email."

We are happy to provide a written response on 10 and 14 (although as I mentioned yesterday, I think we already provided a written response on 10).  I am not sure that such responses can or should be verified, however, because both topics relate to what has been produced in this litigation which I don't know is something the company can really "verify."

<u>Reservation of Rights</u>- Plaintiffs reserve the right to reopen any and all noticed topics for deposition.  In the event that occurs, UBS's agreement to waive costs is void.  However, the parties shall meet and confer on this issue before any waiver takes place.

Please let us know if UBS agrees with this proposal.

Liz


```
*****************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*****************************************************************
```

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date:  Jul 12 2010  6:41PM
Mark Harper, Clerk

C

**BONDURANT, MIXSON & ELMORE, LLP**
ATTORNEYS AT LAW
3900 ONE ATLANTIC CENTER
1201 WEST PEACHTREE STREET, N.W.
**ATLANTA, GEORGIA 30309-3417**
(404) 881-4100
TELECOPIER (404) 881-4111

ELIZABETH G. EAGER

Writer's Direct Dial
(404) 881-4186
eager@bmelaw.com

December 16, 2009

<u>VIA E-MAIL & U.S. MAIL</u>

Jeffrey Landis, Esq.
Kirkland & Ellis
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
jlandis@kirkland.com

Re:  *Taser International, Inc., et al. v. Morgan Stanley & Co., et al.,*
in the State Court of Fulton County, State of Georgia, Case
No. 2008-EV-004739-B

Dear Jeff:

This letter is in response to your December 11, 2009 e-mail.  As you did, I will generally respond to the issues in the order that you raised them in your letter.  As you can see, I have numbered each topic.  When we refer to these issues in the future, please refer to the issue number as well as the topic.

I am going to take one issue out of order, however.   We need to have a phone call to discuss our request for documents showing executed buy-ins and short interest reports.  You said you are available the week of December 21, 2009.  We propose a call at 10:00 a.m. on December 21, 2009, and we will call you.  Please confirm that you are available on that date. As we have told you before, we are ready, willing and able to discuss all of the issues whenever you are.  If you are prepared, we can discuss the other issues in this letter as well.

(1)     In your letter you stated that the parties reached an oral agreement that UBS would only produce Loannet reports from May 2005 forward.  We have been unable to find a record of this conversation or agreement.  Can you please let us know the date of the conversation when we reached the agreement and why UBS is unable to produce Loannet reports from before May 2005?

(2)     Thank you for your confirmation that the T&N report was not used prior to January 1, 2005.  We have no further questions about this report at this time.

(3)     Regarding compliance manuals, our review reveals that the compliance manuals you produced do not address derivatives.  By way of example, a search for the term "derivative" in the database of documents produced by UBS resulted in only one "hit" from a

**BONDURANT, MIXSON & ELMORE, LLP**

Jeffrey Landis, Esq.
Page Two
December 16, 2009

compliance manual.  Does UBS have a separate manual that address trading of derivatives, options and futures?  If UBS does, we respectfully request that you produce such manual(s).  To the extent UBS has objected to producing manuals regarding trading of derivatives, options or futures, UBS's objection is not well taken.  UBS's procedures regarding derivatives are directly related to Plaintiffs' allegations that Defendants, including UBS, "enter[ed] into fictitious option contracts to conceal naked short sales."[1]  Moreover, UBS agreed to produce information regarding derivatives as set forth in Attachment A to the Scheduling Order.

     (4)     You stated that there are "no impossible to borrow lists containing TASER beyond what UBS has already produced."  Your position on this issue has changed since our last correspondence, and I want to make sure I understand it.  In your November 13, 2009 e-mail, you stated that "data for the first six months of 2009, along with the data from 2003 and 2004 and the data on the Hard to Borrow Lists are stored on magnetic tapes" and that UBS was in process of restoring the tapes.  Please confirm that the data for the 2003, 2004 and 2009 Impossible to Borrow lists was (1) restored, (2) reviewed and (3) the review revealed that TASER did not appear on any Impossible to Borrow lists for 2003, 2004 and 2009.  From your November 13, 2009 e-mail, it also appears that UBS maintains a separate "Hard to Borrow" list.  Is this understanding accurate?  Have you searched all Hard to Borrow lists for the entire time period for references to TASER?  Have you produced all Hard to Borrow lists for the entire time period that reference TASER?  If you have not searched the Hard to Borrow lists or have not produced all TASER documents, when can we expect the documents?

     (5)     For dates when we are available to discuss buy-ins and short interest reports see the second paragraph of this letter.

     (6)     Please produce trade run data.  We have, of course, reviewed the data you produced regarding the daily stock record and order data.  Because the records are incomplete and do not contain all of the data in the trade runs, they are inadequate substitutes, which is why we have requested the trade runs.

     To illustrate my point I am going to use UBS_TASER_967[2] to explain why the order data produced is incomplete.  The spreadsheet is 149 columns wide, and approximately 65 of the columns are unpopulated.  The spreadsheet contains 58,382 lines of data, reflecting 13,536 trades that appear to be executed orders based on the column "Order Event Type Code" filtered for "EX."

---

[1]  Sixth Amended Complaint ¶ 8.

[2]  We selected this spreadsheet simply because it is the first one produced.

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Three
December 16, 2009

| Category of Information | Column in Spreadsheet | Number of Executed Trades for Which Column is Populated | Percentage of Executed Trades for Which Column is Populated |
|---|---|---|---|
| Account Number | S | 0 | 0% |
| Account Name | CP | 0 | 0% |
| Commission | AL | 0 | 0% |
| Contrabroker | BT | 295 | 2.18% |
| MPID | CO | 7381 | 54.5% |

As you can see, important information is missing from the order data. The stock record data only shows us trades that are settling at UBS, and we know that there are trades that would appear on UBS's trade runs that did not settle at UBS. This would occur if, for example, UBS executed a trade for a hedge fund that was priming elsewhere. Because of the omissions from the order data and the limited scope of the stock record, we need the trade runs.

(7)     We have asked you whether you can remove duplicate trades from the option bluesheets. You admit the bluesheets contain duplicate entries and are looking into this issue of whether it is "reasonably practicable" to remove the duplicate entries. Steven first raised this issue in September 2009. Right now, it is impossible for us to tell whether one trade was listed multiple times or whether multiple identical trades have each been listed once. Nearly three months has passed and you still do not have an answer to this question. We need this information to determine what data should actually be included in the options bluesheets. If you cannot find a "reasonably practicable" way to remove the duplicate entries, we request that you produce the trade blotters.

(8)     We have asked whether the trade data for January, May, June and July 2003 includes trades in TASER by affiliates of UBS. Your response is that this data includes affiliates to the extent the affiliate was a client of UBS Securities, LLC. We interpret your answer to mean that the trade data does not include all trades for all affiliates. Please tell us if this interpretation is incorrect and identify the affiliates and other business entities for whom we have trading data.

The following issues that Steven raised in earlier e-mails still remain open.

(9)     Related to the issue of trade data for affiliates of UBS, you have not responded to our inquiries about whether you will produce trading data for Financial Services, UBS AG Stamford Branch and UBS Securities. As you may recall, we have raised this issue in e-mails on November 13, 2009, November 30, 2009 and December 7, 2009.

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Four
December 16, 2009

(10)    You never responded to Steven's question (#2) in his October 21, 2009 e-mail that asked you to confirm that type 1=cash; 2= margin; 5=short and 8,9= fail to deliver.  Please provide an answer.

(11)    You have not responded to Steven's question (#10) in the same e-mail asking about what the various codes in the stock record are in "PRC/ENTRY."  We have reviewed the manual that you produced on the "Daily Stock Record," and it does not address this issue.  Please provide an answer.

(12)    You also have not responded to Steven's question (#12) in the same e-mail asking about the data format in the price and net amount columns of the bluesheets.  We have reviewed the data dictionary for the bluesheets, and it does not address this issue.  Please provide an answer.

(13)    On September 24, 2009, Steven sent an e-mail asking about the raw format for the data that you had produced.  He followed up on this topic with Daniel on October 1, 2009 explaining that the data you produced contains no decimals for important entries (like trade price).  While Daniel responded to other questions involving the data on November 13, 2009, his answer did not address this issue.  Please provide an answer.

(14)    Steven has sent you multiple e-mails regarding account numbers and branch numbers.  You produced a manual from Broadridge Financial Solution, Inc. (UBS_TASER_1559).  This manual contains an appendix with a chart of accounts with "Suggested branch" numbers.  Can you confirm that these are the branch numbers actually used for UBS?  Additionally, you have never answered Steven's question asking you to identify which accounts are institutional accounts, individual customer accounts and hedge fund accounts.  Please provide an answer.

(15)    On December 9, 2009, you sent me an e-mail following up with the final custodian list I had sent you.  You noted that I had inputted incorrect end dates for the time periods for Burke and Marciante.  You are correct those dates should be 11/30/06 and 3/6/08, respectively.  You stated that the beginning dates for Greenbaum, Buscemi, Citera, Madaio, McDade, Centrangalo and Nancick should be November 1, 2003 not January 1, 2003.  We agree to those dates.  We have, however, reserved the right to request documents back to January 1, 2003, and we explicitly reserve those rights as to these custodians.  I would refer you to Steven's e-mail on November 23, 2009 at 2:41 for more on this topic.

(16)    We have one new data question.  In your production of ESI you have produced some instances of the Fail on Sale report (example: UBS_TSR42329).  We want to confirm that you will be producing all versions of this report that refer to TASER, TASR or the CUSIP throughout the time period even if they were not sent to or received by a custodian.

BONDURANT, MIXSON & ELMORE, LLP

Jeffrey Landis, Esq.
Page Five
December 16, 2009

      (17)    We also request that you add Matt Kiernan as a custodian based on our review of the data you presented so far. We make this request in good faith based on our belief that he would have responsive documents concerning TASER. Mr. Kiernan receives the "fail on sale" report and apparently is responsible for following on fails. From our review of the documents, he is listed in the report as "owner" of at least one UBS Securities, LLC account, which we believe means he is responsible for following up on fails for that account.[3] At least once during the period he was "owner" of and responsible for this account, the account had a fail in TASR.[4] According to the documents, because he was owner of the account, Mr. Kiernan was responsible for following up for the reasons for the the fail. Thus, documents in Mr. Kiernan's possession are clearly responsive, and we ask that you designate him as a custodian. I also note that Mr. Kiernan was not identified in any compliance manual or organizational chart that was produced so we had no way of identifying him earlier.

      I look forward to hearing from you and please do not hestitate to contact me if you have any questions.

                 Very truly yours,

                 Elizabeth G. Eager

EGE:jmt

cc:    John E. Floyd, Esq.
      Steven J. Rosenwasser, Esq.
      Nicole G. Iannarone, Esq.

---

[3] UBS_TSR4023.

[4] *See* UBS_TSR40234.

721067.1

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date:  Jul 12 2010  6:41PM
Mark Harper, Clerk

D

## Steven J. Rosenwasser

| | |
|---|---|
| **From:** | Elizabeth G. Eager |
| **Sent:** | Wednesday, February 24, 2010 3:06 PM |
| **To:** | 'Andrew Clubok'; 'Jeffrey Landis' |
| **Cc:** | Steven J. Rosenwasser |
| **Subject:** | TASER/ UBS Proposal |

Andy and Jeff,

It was good speaking with you this morning. During our call, we discussed a compromise to address issues relating to: (1) UBS's claim for costs relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date; (2) Plaintiffs' request for trade runs/trade blotters; (3) Plaintiffs 30(b)(6) Notice and (4) Plaintiffs' Third Interrogatories to UBS. Specifically, we discussed the following proposal:

Costs - UBS would agree to waive and never seek any fees, costs or expenses relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date.

Plaintiffs' Third Interrogatories - UBS would agree to answer the interrogatories as follows:

- Interrogatory Number One: UBS will identify all dates and/or time periods of which UBS is presently aware in which the blue sheets it created, maintained and/or submitted to the SEC, whether or not they report transactions in TASER securities, contained or you have reason to believe may have contained inaccurate data. Your response would not pertain to currently unknown instances where there may have been an isolated typographical or data entry error.
- Interrogatory Number Two: For the dates and/or time periods identified in Interrogatory # 1, UBS will identify by bates number, the blue sheets that do or may contain inaccurate data. UBS will identify what information or data is or may be inaccurate on each blue sheet. If UBS does not know the specific data, but knows the type of data (e.g. short interest, long position, trade time, etc.), it will provide that information. If UBS has corrected data, UBS will identify the corrected data, including but not limited to, identifying the bates number(s) of the documents containing the corrected data.
- Interrogatory Number Three: UBS will identify all instances during the period of January 1, 2003 through May 31, 2009, in which any inquiry, investigation or adverse action concerning the inaccuracy of documents (including, but not limited to, blue sheets and order tickets) was initiated against you by a governmental entity, securities exchange or clearing company. UBS will state whether information relating to TASER or a transaction involving TASER is on the document(s), report(s), or list(s) that were being investigated and will state the findings and result of the inquiry, investigation or adverse action such as whether UBS was cautioned, fined or sanctioned. "Inquiry, investigation, or adverse action" includes any communication by or with a governmental entity, securities exchange, or clearing company for the purpose of conducting, participating in, or complying with a factual investigation. The parties agree that UBS is not required to identify inquiries, investigations or adverse actions where the governmental entity, securities exchange or clearing company identified a substantive violation that did not in any way involve short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets and claimed that with regard to the substantive violation UBS's "books and records" were inaccurate.
- Interrogatory Number Four: UBS will identify each and every blue sheet that was the subject of the caution, sanction, fine, or adverse action, whether or not the blue sheet reported transactions in TASER securities.

Trade Runs/Trade Blotters - UBS will provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters it would be producing the same data that is in the blue sheets (i.e., it would cure any inaccuracies in the blue sheets). The representation will also state that, to the best of the company's knowledge, the only other database containing information that may cure inaccuracies on the bluesheets are the stock record and order management systems, which have been produced.

30(b)(6) Notice - Plaintiffs will withdraw the pending the 30(b)(6) notice as to all topics.  With respect to topic 9, UBS agrees to continue researching the issue of duplicate trades in its option blue sheets.  If requested by plaintiffs, UBS agrees to provide a written, verified response regarding "UBS's ability to remove duplicate trades from the option blue sheets, including, but not limited to, any factual support for any alleged burden to remove duplicate trades."  With respect to topics 10 and 14, UBS will provide a written, verified response.  With respect to topic 13, UBS will send a written response that that it has accessed and searched for ESI from "the 2 decommissioned systems referenced in [its] August 26, 2009 email."

Reservation of Rights - Plaintiffs reserve the right to reopen any and all noticed topics for deposition.  In the event that occurs, UBS's agreement to waive costs is void.  However, the parties shall meet and confer on this issue before any waiver takes place.

Please let us know if UBS agrees with this proposal.

Liz

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

E

## Steven J. Rosenwasser

**From:**        Steven J. Rosenwasser
**Sent:**        Thursday, February 25, 2010 4:55 PM
**To:**          'Jeffrey Landis'; Elizabeth G. Eager
**Cc:**          Andrew Clubok
**Subject:**     RE: TASER/ UBS Proposal

thanks Jeff. Our thoughts are below yours in all capitals. I think we are saying the same thing.

**From:** Jeffrey Landis [mailto:JLandis@kirkland.com]
**Sent:** Thursday, February 25, 2010 3:46 PM
**To:** Elizabeth G. Eager
**Cc:** Andrew Clubok; Steven J. Rosenwasser
**Subject:** Re: TASER/ UBS Proposal

Liz

A few clarifications regarding the suggested compromise we discussed yesterday are in red below.  Assuming you are okay with these, we will take this proposal to our client for approval.  Give me a call if you want to discuss.

Jeff

Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005
"Elizabeth G. Eager" <eager@bmelaw.com>

02/24/2010 03:06 PM

To "Andrew Clubok" <aclubok@kirkland.com>, "Jeffrey Landis" <JLandis@kirkland.com>
cc "Steven J. Rosenwasser" <rosenwasser@bmelaw.com>
Subject TASER/ UBS Proposal

Andy and Jeff,
It was good speaking with you this morning. During our call, we discussed a compromise to address issues relating to: (1) UBS's claim for costs relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date; (2) Plaintiffs' request for trade runs/trade blotters; (3) Plaintiffs 30(b)(6) Notice and (4) Plaintiffs' Third Interrogatories to UBS.   Specifically, we discussed the following proposal:

Costs - UBS would agree to waive and never seek any fees, costs or expenses relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date.

As Andy explained yesterday (and as I explained on our previous call), the agreement would be that we would not seek costs associated with the review/processing/searching etc for the Taser and non-taser keywords (Paragraphs 2 and 4 of our Dec. 21 stipulation) or any documents already produced.   This is slightly different than what you wrote above, but consistent with what we have been saying throughout.

I AM NOT SURE WHAT THE DIFFERENCE BETWEEN THE POSITIONS IS, IF THERE IS ONE.  MAYBE TO ASK THE QUESTION DIFFERENTLY, FOR WHAT DOCUMENTS AND DATA ARE YOU NOT WAIVING COSTS?

Plaintiffs' Third Interrogatories- UBS would agree to answer the interrogatories as follows:

1

- Interrogatory Number One: UBS will identify all dates and/or time periods of which UBS is presently aware in which the blue sheets it created, maintained and/or submitted to the SEC, whether or not they report transactions in TASER securities, contained or you have reason to believe may have contained inaccurate data. Your response would not pertain to currently unknown instances where there may have been an isolated typographical or data entry error.

It may be just another way of saying the same thing, but as we discussed yesterday, our response would be limited to systemic or process errors as opposed to one-off or non-systemic/process problems.

WE AGREE, EXCEPT TO ADD THAT YOU WOULD HAVE TO ALSO IDENTIFY (1) ANY INTENTIONAL MISMARKS AND (2) ANY ONE OFF OR OTHER ERRORS OF ANY TYPE THAT YOU ARE AWARE OF THAT APPLY TO TASER.

- Interrogatory Number Two: For the dates and/or time periods identified in Interrogatory # 1, UBS will identify by bates number, the blue sheets that do or may contain inaccurate data. UBS will identify what information or data is or may be inaccurate on each blue sheet. If UBS does not know the specific data, but knows the type of data (e.g. short interest, long position, trade time, etc.), it will provide that information. If UBS has corrected data, UBS will identify the corrected data, including but not limited to, identifying the bates number(s) of the documents containing the corrected data.

ok

- Interrogatory Number Three: UBS will identify all instances during the period of January 1, 2003 through May 31, 2009, in which any inquiry, investigation or adverse action concerning the inaccuracy of documents (including, but not limited to, blue sheets and order tickets) was initiated against you by a governmental entity, securities exchange or clearing company. UBS will state whether information relating to TASER or a transaction involving TASER is on the document(s), report(s), or list(s) that were being investigated and will state the findings and result of the inquiry, investigation or adverse action such as whether UBS was cautioned, fined or sanctioned. "Inquiry, investigation, or adverse action" includes any communication by or with a governmental entity, securities exchange, or clearing company for the purpose of conducting, participating in, or complying with a factual investigation. The parties agree that UBS is not required to identify inquiries, investigations or adverse actions where the governmental entity, securities exchange or clearing company identified a substantive violation that did not in any way involve short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets and claimed that with regard to the substantive violation UBS's "books and records" were inaccurate.

Again, this may be just another way to say the same thing, but this interrogatory would be limited to inquires/investigations/adverse actions where the focus of the investigation etc was the inaccuracy of documents. It would not include inquiries/investigations/adverse actions regarding other substantive issues merely because there was also a books and records violation tacked on, unless the underlying inquiry/investigation/adverse action involved short selling, Reg SHO, inaccurate blue sheets or mismarked tickets. Also, as a practical matter, I am not sure how we could ever know whether Taser was on any document being investigated without re-creating the entire investigation. So for example, if there was some investigation into whether UBS's 13-F forms were accurate, we are not going to go back and review those forms and see if Taser was on them. It seems to me the better approach is that if there are one or two particular investigations (if there are any) that you are interested in and are relevant, we are happy to work with you to see what is reasonably doable with respect to determining whether any of the documents being investigated contained information regarding Taser.

WE ARE VERY CLOSE, UNTIL THE SENTENCE STARTING WITH "ALSO, AS A PRACTICAL MATTER...." WHICH IS VERY DIFFERENT THAN WE DISCUSSED. WE THINK THAT THE INTERROGATORY WOULD BE LIMITED TO INQUIRIES/INVESTIGATIONS/ADVERSE ACTIONS/ETC WHERE ONE OF THE FOCUSES OF THE INVESTIGATION WAS THE INACCURACY OR FALSIFICATION OF DOCUMENTS. IT WOULD NOT, HOWEVER, INCLUDE SUCH INQUIRIES WHERE THE MAIN FOCUS IS ON A SUBSTANTIVE ISSUE OTHER THAT INACCURACY/FALSIFICATION AND A BOOKS AND RECORDS VIOLATION WAS TACKED ON, UNLESS THE OTHER SUBSTANTIVE ISSUE INVOLVED SHORT SELLING, REG SHO, INACCURATE BLUE SHEETS OR MISMARKED TICKETS. I THINK WE ARE SAYING THE SAME THING.


- Interrogatory Number Four: UBS will identify each and every blue sheet that was the subject of the caution, sanction, fine, or adverse action, whether or not the blue sheet reported transactions in TASER securities.

I don't think that we are conceptually opposed to this with the caveat that our ability to potentially identify any blue sheets that

were the "subject of the caution, fine, sanction, fine or adverse action" is dependant on whether such blue sheets were previously identified during the course of the inquiry/investigation/adverse action.  So for example, to the extent during the course of a particular investigation (if any) either specific blue sheets or a date range of blue sheets were identified as being the subject of the action we will identify that for you.  If they were not, however, we do not intend to perform an additional audit to determine what blue sheets were "the subject" of the action etc.

WE UNDERSTAND THAT YOU WILL PROVIDE INFORMAITON CURRENTLY KNOWN TO UBS, AND WILL NOT BE CONDUCTING SOME NEW AUDIT.

Trade Runs/Trade Blotters- UBS will provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters it would be producing the same data that is in the blue sheets (i.e., it would cure any inaccuracies in the blue sheets).  The representation will also state that, to the best of the company's knowledge, the only other database containing information that may cure inaccuracies on the bluesheets are the stock record and order management systems, which have been produced.

To be clear, I think the correct way to say this is that the trade blotters are derived from the same place/system such that producing the trade blotters would not cure any inaccuracies in the blue sheets.

OK, IF YOU ARE ALSO AGREEING WITH THE LAST SENTENCE IN OUR PROPOSAL.

30(b)(6) Notice - Plaintiffs will withdraw the pending the 30(b)(6) notice as to all topics.  With respect to topic 9, UBS agrees to continue researching the issue of duplicate trades in its option blue sheets.  If requested by plaintiffs, UBS agrees to provide a written, verified response regarding "UBS's ability to remove duplicate trades from the option blue sheets, including, but not limited to, any factual support for any alleged burden to remove duplicate trades."  With respect to topics 10 and 14, UBS will provide a written, verified response.  With respect to topic 13, UBS will send a written response that that it has accessed and searched for ESI from "the 2 decommissioned systems referenced in [its] August 26, 2009 email."

We are happy to provide a written response on 10 and 14 (although as I mentioned yesterday, I think we already provided a written response on 10).  I am not sure that such responses can or should be verified, however, because both topics relate to what has been produced in this litigation which I don't know is something the company can really "verify."

Reservation of Rights- Plaintiffs reserve the right to reopen any and all noticed topics for deposition.  In the event that occurs, UBS's agreement to waive costs is void.  However, the parties shall meet and confer on this issue before any waiver takes place.

Please let us know if UBS agrees with this proposal.

Liz

****************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
****************************************************************

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 32089722
Date:  Jul 12 2010  6:41PM
Mark Harper, Clerk

F

## Steven J. Rosenwasser

| | |
|---|---|
| **From:** | Jeffrey Landis [JLandis@kirkland.com] |
| **Sent:** | Friday, February 26, 2010 4:33 PM |
| **To:** | Steven J. Rosenwasser |
| **Cc:** | aclubok@kirkland.com; dgomez@kirkland.com; Elizabeth G. Eager |
| **Subject:** | Re: TASER/ UBS Proposal |

The only other substantive thing (which I actually put below #4 instead of #3) was:

With respect to the sentence beginning with "Also as a practical matter...," I am not sure why you would even want to know whether Taser was on a document being investigated if the investigation has nothing to do with the underlying issues in this case. To the extent an investigation focused on the inaccuracy of documents is relevant to the claims here, we will make a good faith attempt to determine whether Taser was on the documents being investigated. Obviously there could potentially be investigations that you think are relevant that we do not, but to the extent that happens, because we are going to identify the investigation in either event, we can work in good to resolve such a dispute should it come up. I suspect that this will turn out to be a non-issue. And since you ultimately still have the right to seek 30(b)(6) testimony if you are dissatisfied with our answers (in which case we could seek costs), this approach does not prejudice plaintiffs at all.

I need to discuss your proposal below with Andy. I will note, however, that we have been clear that our agreement would be for the taser keyword searches we finished in January and the non-taser keyword searches we are doing for end of April (and data previously produced), not anything else.

Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005

| | |
|---|---|
| "Steven J. Rosenwasser" <rosenwasser@bmelaw.com> | To <JLandis@kirkland.com> |
| | cc <aclubok@kirkland.com>, "Elizabeth G. Eager" <eager@bmelaw.com>, <dgomez@kirkland.com> |
| 02/26/2010 04:18 PM | Subject Re: TASER/ UBS Proposal |

Thanks. With respect to point one, we can agree that your waiver includes all document requests served except the most recent single document request if it requires extensive ediscovery and would not include any more than 5 new custodians on the first 3 sets of requests.

Im on a blackberry, were there any other comments?

-----------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Jeffrey Landis <JLandis@kirkland.com>
To: Steven J. Rosenwasser
CC: Andrew Clubok <aclubok@kirkland.com>; Elizabeth G. Eager; Daniel Gomez <dgomez@kirkland.com>
Sent: Fri Feb 26 16:10:09 2010
Subject: RE: TASER/ UBS Proposal

Steven - my comments in red below your comments in all capitals. Let me know if agree and we will take this proposal to our client. Thanks.

Jeff

Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005

"Steven J. Rosenwasser" <rosenwasser@bmelaw.com>

02/25/2010 04:54 PM
To
    "Jeffrey Landis" <JLandis@kirkland.com>, "Elizabeth G. Eager" <eager@bmelaw.com>
cc
    "Andrew Clubok" <aclubok@kirkland.com>
Subject
    RE: TASER/ UBS Proposal

thanks Jeff. Our thoughts are below yours in all capitals. I think we are saying the same thing.

From: Jeffrey Landis [mailto:JLandis@kirkland.com<mailto:JLandis@kirkland.com> ]
Sent: Thursday, February 25, 2010 3:46 PM
To: Elizabeth G. Eager
Cc: Andrew Clubok; Steven J. Rosenswasser
Subject: Re: TASER/ UBS Proposal

Liz

A few clarifications regarding the suggested compromise we discussed yesterday are in red below. Assuming you are okay with these, we will take this proposal to our client for approval. Give me a call if you want to discuss.

Jeff

Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005

"Elizabeth G. Eager" <eager@bmelaw.com>

02/24/2010 03:06 PM

To
    "Andrew Clubok" <aclubok@kirkland.com>, "Jeffrey Landis" <JLandis@kirkland.com>
cc
    "Steven J. Rosenwasser" <rosenwasser@bmelaw.com>
Subject
    TASER/ UBS Proposal

Andy and Jeff,

It was good speaking with you this morning. During our call, we discussed a compromise to address issues relating to: (1) UBS's claim for costs relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date; (2) Plaintiffs' request for trade runs/trade blotters; (3) Plaintiffs 30(b)(6) Notice and (4) Plaintiffs' Third Interrogatories to UBS. Specifically, we discussed the following proposal:

Costs - UBS would agree to waive and never seek any fees, costs or expenses relating to any gathering, searching, processing, reviewing or other costs associated with any document requests Plaintiffs served to date.

As Andy explained yesterday (and as I explained on our previous call), the agreement would be that we would not seek costs associated with the review/processing/searching etc for the Taser and non-taser keywords (Paragraphs 2 and 4 of our Dec. 21 stipulation) or any documents already produced. This is slightly different than what you wrote above, but consistent with what we have been saying throughout.

I AM NOT SURE WHAT THE DIFFERENCE BETWEEN THE POSITIONS IS, IF THERE IS ONE. MAYBE TO ASK THE QUESTION DIFFERENTLY, FOR WHAT DOCUMENTS AND DATA ARE YOU NOT WAIVING COSTS?

I am thinking of a situation where you ask us to produce documents for another 40 custodians that may technically be "associated with" plaintiffs' First or Second document requests. As written in Liz's email, we would be foreclosed from seeking costs for such review which was not what we discussed. Similarly, you recently served an additional document request. Obviously at this point, I do not see a scenario where we would seek costs associated with that one document request, but to the extent you make some unreasonable demand in connection with that request (not saying you would do that), we would not want to be foreclosed from seeking costs by this agreement.

Plaintiffs' Third Interrogatories- UBS would agree to answer the interrogatories as follows:
· Interrogatory Number One: UBS will identify all dates and/or time periods of which UBS is presently aware in which the blue sheets it created, maintained and/or submitted to the SEC, whether or not they report transactions in TASER securities, contained or you have reason to believe may have contained inaccurate data. Your response would not pertain to currently unknown instances where there may have been an isolated typographical or data entry error.

It may be just another way of saying the same thing, but as we discussed yesterday, our response would be limited to systemic or process errors as opposed to one-off or non-systemic/process problems.

WE AGREE, EXCEPT TO ADD THAT YOU WOULD HAVE TO ALSO IDENTIFY (1) ANY INTENTIONAL MISMARKS AND (2) ANY ONE OFF OR OTHER ERRORS OF ANY TYPE THAT YOU ARE AWARE OF THAT APPLY TO TASER.

We are fine with this (subject to client approval).

· Interrogatory Number Two: For the dates and/or time periods identified in Interrogatory # 1, UBS will identify by bates number, the blue sheets that do or may contain inaccurate data. UBS will identify what information or data is or may be inaccurate on each blue sheet. If UBS does not know the specific data, but knows the type of data (e.g. short interest, long position, trade time, etc.), it will provide that information. If UBS has corrected data, UBS will identify the corrected data, including but not limited to, identifying the bates number(s) of the documents containing the corrected data.

ok

· Interrogatory Number Three: UBS will identify all instances during the period of January 1, 2003 through May 31, 2009, in which any inquiry, investigation or adverse action concerning the inaccuracy of documents (including, but not limited to, blue sheets and order tickets) was initiated against you by a governmental entity, securities exchange or clearing company. UBS will state whether information relating to TASER or a transaction involving TASER is on the document(s), report(s), or list(s) that were being investigated and will state the findings and result of the inquiry, investigation or adverse action such as whether UBS was cautioned, fined or sanctioned. "Inquiry, investigation, or adverse action" includes any communication by or with a governmental entity, securities exchange, or clearing company for the purpose of conducting, participating in, or complying with a factual investigation.

The parties agree that UBS is not required to identify inquiries, investigations or adverse actions where the governmental entity, securities exchange or clearing company identified a substantive violation that did not in any way involve short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets and claimed that with regard to the substantive violation UBS's "books and records" were inaccurate.

Again, this may be just another way to say the same thing, but this interrogatory would be limited to inquires/investigations/adverse actions where the focus of the investigation etc was the inaccuracy of documents.  It would not include inquiries/investigations/adverse actions regarding other substantive issues merely because there was also a books and records violation tacked on, unless the underlying inquiry/investigation/adverse action involved short selling, Reg SHO, inaccurate blue sheets or mismarked tickets.  Also, as a practical matter, I am not sure how we could ever know whether Taser was on any document being investigated without re-creating the entire investigation.  So for example, if there was some investigation into whether UBS's 13-F forms were accurate, we are not going to go back and review those forms and see if Taser was on them.  It seems to me the better approach is that if there are one or two particular investigations (if there are any) that you are interested in and are relevant, we are happy to work with you to see what is reasonably doable with respect to determining whether any of the documents being investigated contained information regarding Taser.

WE ARE VERY CLOSE, UNTIL THE SENTENCE STARTING WITH "ALSO, AS A PRACTICAL MATTER...." WHICH IS VERY DIFFERENT THAN WE DISCUSSED.  WE THINK THAT THE INTERROGATORY WOULD BE LIMITED TO INQUIRIES/INVESTIGATIONS/ADVERSE ACTIONS/ETC WHERE ONE OF THE FOCUSES OF THE INVESTIGATION WAS THE INACCURACY OR FALSIFICATION OF DOCUMENTS.  IT WOULD NOT, HOWEVER, INCLUDE SUCH INQUIRIES WHERE THE MAIN FOCUS IS ON A SUBSTANTIVE ISSUE OTHER THAT INACCURACY/FALSIFICATION AND A BOOKS AND RECORDS VIOLATION WAS TACKED ON, UNLESS THE OTHER SUBSTANTIVE ISSUE INVOLVED SHORT SELLING, REG SHO, INACCURATE BLUE SHEETS OR MISMARKED TICKETS.  I THINK WE ARE SAYING THE SAME THING.

·   Interrogatory Number Four: UBS will identify each and every blue sheet that was the subject of the caution, sanction, fine, or adverse action, whether or not the blue sheet reported transactions in TASER securities.

I don't think that we are conceptually opposed to this with the caveat that our ability to potentially identify any blue sheets that were the "subject of the caution, fine, sanction, fine or adverse action" is dependant on whether such blue sheets were previously identified during the course of the inquiry/investigation/adverse action.  So for example, to the extent during the course of a particular investigation (if any) either specific blue sheets or a date range of blue sheets were identified as being the subject of the action we will identify that for you.  If they were not, however, we do not intend to perform an additional audit to determine what blue sheets were "the subject" of the action etc.

WE UNDERSTAND THAT YOU WILL PROVIDE INFORMAITON CURRENTLY KNOWN TO UBS, AND WILL NOT BE CONDUCTING SOME NEW AUDIT.

With respect to the sentence beginning with "Also as a practical matter...," I am not sure why you would even want to know whether Taser was on a document being investigated if the investigation has nothing to do with the underlying issues in this case.  To the extent an investigation focused on the inaccuracy of documents is relevant to the claims here, we will make a good faith attempt to determine whether Taser was on the documents being investigated.   Obviously there could potentially be investigations that you think are relevant that we do not, but to the extent that happens, because we are going to identify the investigation in either event, we can work in good to resolve such a dispute should it come up.  I suspect that this will turn out to be a non-issue.  And since you ultimately still have the right to seek 30(b)(6) testimony if you are dissatisfied with our answers (in which case we could seek costs), this approach does not prejudice plaintiffs at all.

Trade Runs/Trade Blotters- UBS will provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters it would be producing the same data that is in the blue sheets (i.e., it would cure any inaccuracies in the blue sheets.  The representation will also state that, to the best of the company's knowledge, the only other database containing information that may cure inaccuracies on the bluesheets are the stock record and order management systems, which have been produced.

To be clear, I think the correct way to say this is that the trade blotters are derived from the same place/system such that producing the trade blotters would not cure any inaccuracies in the blue sheets.

OK, IF YOU ARE ALSO AGREEING WITH THE LAST SENTENCE IN OUR PROPOSAL.

We are fine with the last sentence (again subject to client approval).

4

30(b)(6) Notice - Plaintiffs will withdraw the pending the 30(b)(6) notice as to all topics. With respect to topic 9, UBS agrees to continue researching the issue of duplicate trades in its option blue sheets. If requested by plaintiffs, UBS agrees to provide a written, verified response regarding "UBS's ability to remove duplicate trades from the option blue sheets, including, but not limited to, any factual support for any alleged burden to remove duplicate trades." With respect to topics 10 and 14, UBS will provide a written, verified response. With respect to topic 13, UBS will send a written response that that it has accessed and searched for ESI from "the 2 decommissioned systems referenced in [its] August 26, 2009 email."

We are happy to provide a written response on 10 and 14 (although as I mentioned yesterday, I think we already provided a written response on 10). I am not sure that such responses can or should be verified, however, because both topics relate to what has been produced in this litigation which I don't know is something the company can really "verify."

Reservation of Rights- Plaintiffs reserve the right to reopen any and all noticed topics for deposition. In the event that occurs, UBS's agreement to waive costs is void. However, the parties shall meet and confer on this issue before any waiver takes place.

Please let us know if UBS agrees with this proposal.

Liz

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this

communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

G

## Steven J. Rosenwasser

| | |
|---|---|
| **From:** | Jeffrey Landis [JLandis@kirkland.com] |
| **Sent:** | Monday, March 15, 2010 5:55 PM |
| **To:** | Steven J. Rosenwasser |
| **Cc:** | Andrew Clubok; Elizabeth G. Eager; Daniel Gomez |
| **Subject:** | Re: UBS proposal on 30b6 rogs.DOC |
| **Attachments:** | UBS proposal on 30b6 rogs K&E Comments.DOC |

Steven/Liz

Attached are our revisions to the draft proposal you circulated. As always, this is all still subject to client approval, but we wanted to get you something sooner rather than later to move things along.  Thanks.

Jeff



Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005

"Steven J. Rosenwasser" <rosenwasser@bmelaw.com>

03/13/2010 04:28 AM

To "Jeffrey Landis" <JLandis@kirkland.com>, "Andrew Clubok" <aclubok@kirkland.com>
cc "Elizabeth G. Eager" <eager@bmelaw.com>
Subject UBS proposal on 30b6 rogs.DOC



Jeff and Andy,

I realized we inadvertently omitted a production deadline for the affiliate data from the last draft.  So,here is a revised draft with an April 30 deadline.

Thanks,

Steven[attachment "UBS proposal on 30b6 rogs.DOC" deleted by Jeffrey Landis/Washington DC/Kirkland-Ellis]

****************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
****************************************************************

Plaintiffs and UBS Securities, LLC ("UBS") agree and stipulate to the terms below with respect to the following issues: (1) UBS's claim for costs relating to any gathering, searching, processing, reviewing or other fees, expenses and/or costs associated with UBS's review and production of documents that hit on "TASER" and "non-TASER" keywords for the agreed upon custodians; (2) Plaintiffs' request for "trade runs"/ "trade blotters;" (3) Plaintiffs' pending Second Amended Notice to Take 30(b)(6) Deposition of UBS; (4) Plaintiffs' Third Interrogatories to UBS; (5) Plaintiffs' request for trading data from certain "affiliates" of UBS; and (6) UBS's production deadline for production of documents that hit on the non-TASER keywords.

| | Deleted: |
| --- | --- |
| | Deleted: any discovery or document requests Plaintiffs served to date |
| | Deleted: Notice regarding costs, trade data, affiliate data and blue sheet interrogatories; |
| | Deleted: 30(b)(6) |
| | Deleted: and |

Costs - Subject to the Reservation of Rights below, UBS agrees to waive and never seek any fees, costs or expenses for any gathering, searching, processing, reviewing or producing any documents or data related to UBS's review and production of documents that hit on "TASER" and "non-TASER" keywords for the "agreed upon custodians" as referenced in paragraphs 2 and 4 of the December 21, 2009 Stipulation and Order Between Plaintiffs and UBS Securities, LLC.

| | Deleted: relating to |
| --- | --- |
| | Deleted: in response to any document requests or other discovery Plaintiffs have served as of the date of this agreement. |
| | Deleted: This waiver is limited to the keywords and custodians the parties have agreed upon as of the date of this Agreement. |

Plaintiffs' Third Interrogatories – UBS agrees to answer the interrogatories as follows:

* Interrogatory Number One:  UBS will identify all dates and/or time periods during the relevant time period of which UBS is presently aware in which the blue sheets it created, maintained and/or submitted to the SEC contained or you have reason to believe may have contained inaccurate data (regardless of whether the inaccuracy pertains to TASER).  UBS's response would be limited to systemic or process errors as opposed to "one-off" or non-systemic or process errors except for:  (1) intentional mismarkings (if any) and (2) any one-off or non-systemic or processing errors that you are aware of that apply to TASER.  If UBS later becomes aware of other errors or inaccuracies, it shall inform Plaintiffs of the error or inaccuracy.

| | Deleted: – though, if UBS is aware as to which security or securities were affected by the inaccurate info, it shall so indicate |
| --- | --- |
| | Deleted: within ten days of learning |

* Interrogatory Number Two:  For the dates and/or time periods identified in Interrogatory # 1, UBS will identify by bates number, the blue sheets that do or may contain inaccurate data.  UBS will identify what information or data is or may be inaccurate on each blue sheet.  If UBS does not know the specific data, but knows the type of data (e.g. short interest, long position, trade time, etc.), it will provide that information.  If UBS has corrected data, UBS will identify the

corrected data, including but not limited to, identifying the bates number(s) of the documents containing the corrected data.

* Interrogatory Number Three: UBS will identify all instances during the period of January 1, 2003 through May 31, 2009, in which any inquiry, investigation or adverse action concerning the inaccuracy of documents of the type that have been or will be produced in this action (including, but not limited to, blue sheets and order tickets) was initiated against it by a governmental entity, securities exchange, SRO or clearing company, where the focus of such inquiry, investigation or adverse action was the inaccuracy of such documents. The parties agree that UBS is not required to identify inquiries, investigations or adverse actions where the governmental entity, securities exchange, SRO or clearing company identified a substantive violation that did not in any way involve short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets and claimed that with regard to the substantive violation UBS's "books and records" were inaccurate. For inquiries, investigations or adverse actions relevant to the claims at issue in this litigation, to the extent the information is available, UBS will state whether information relating to TASER or a transaction involving TASER is on the document(s), report(s), or list(s) that were being investigated. UBS will state the findings and result of the inquiry, investigation or adverse action such as whether UBS was cautioned, fined or sanctioned.

| | Deleted: you |
| | Deleted: (including, but not limited to, blue sheets and order tickets) |
| | Deleted: and |
| | Deleted: "inquiry, investigation or adverse action" includes any communication by or with a governmental entity, securities exchange, SRO or clearing company for the purpose of conducting, participating in, or complying with a factual investigation |
| | Deleted: The parties agree that UBS is not required to identify inquiries, investigations or adverse actions where the governmental entity, securities exchange, SRO or clearing company identified or investigation a substantive violation that did not in any way involve short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets and claimed that with regard to the substantive violation UBS's "books and records" were inaccurate. |

* Interrogatory Number Four: UBS will identify each and every blue sheet that was the subject of the caution, sanction, fine, or adverse action, whether or not the blue sheet reported transactions in TASER securities. This interrogatory requires UBS to provide information that is currently known to it, meaning it is only required to identify specific blue sheets or a date range of blue sheets that were identified as being the subject of the action. UBS is not required to perform additional investigation to determine what blue sheets were "the subject" of the caution, sanction, fine or adverse action. If UBS later becomes aware of additional responsive information, it shall inform Plaintiffs of the error or inaccuracy

| | Deleted: within ten days of learning |

Trade Runs/Trade Blotters- Within thirty days of this agreement, UBS will:

| | Deleted: ten |

750193.1

(1) Provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters, it would not cure any inaccuracies in the blue sheets. The representation will also state that, to the best of the company's knowledge, the only other database containing information that may cure inaccuracies on the bluesheets are the stock record and order management systems, which have been produced; AND

*Deleted: /trade runs*

*Deleted: /trade runs it would be producing the same data that is in the blue sheets (i.e.*

*Deleted: )*

(2) Stipulate that, to the best of its knowledge, information and data it provided to the exchanges (e.g. ETJs) and ECNs during the relevant time period that has been produced in this litigation is accurate as to TASER and that UBS is not currently aware of any inaccuracies in the information and data that it provided to the exchanges and ECNs as to TASER.

*Deleted: Provide a representation*

*Deleted: the*

30(b)(6) Notice - Subject to the Reservation of Rights below, Plaintiffs will withdraw and never seek the pending the 30(b)(6) notice as to all topics. With respect to topic 9, UBS agrees to continue researching the issue of duplicate trades in its option blue sheets. If requested by plaintiffs, UBS agrees to provide a written, verified response regarding "UBS's ability to remove duplicate trades from the option blue sheets, including, but not limited to, any factual support for any alleged burden to remove duplicate trades." With respect to topic 14, UBS will provide a written response within 20 days of this Agreement. With respect to topic 13, UBS will send a written response within 10 days that it has accessed and searched for ESI from "the 2 decommissioned systems referenced in [its] August 26, 2009 email."

*Deleted: s 10 and*

Affiliate Data – The following pertains to data from UBS Financial Services and UBS AG Stamford Branch.

If after a diligent search, there is evidence that UBS Financial Services and/or UBS AG Stamford Branch borrowed, loaned, located or provided a locate, bought, sold or transferred TASER equities or derivatives, excluding broad based index options such as options off of the S&P 500, to or from UBS Securities, LLC between January 1, 2003 and May 31, 2009, UBS will produce the following data (to the extent it exists) for that entity by no later than April 30, 2010:

- Daily trade blotters
- Blue sheets
- Daily/ weekly stock positions
- Loan/ Borrow Records and

- Listed OTC derivatives.

If after a diligent search, there is no evidence that UBS Financial Services and/or UBS AG Stamford Branch borrowed, located or provided a locate, loaned or transferred TASER equities or derivatives, excluding broad based index options such as options based off of the S&P 500, to or from UBS Securities, LLC between January 1, 2003 and May 31, 2009, then UBS will provide plaintiffs a representation that after a diligent search the entity did not borrow, lend or transfer TASER equities or derivatives, excluding broad based index options such as options based off of the S&P 500, to or from UBS Securities, LLC (or a similar representation depending on the results of UBS's inquiry).

Plaintiffs will not take the position that by producing this data, UBS Financial Services or UBS AG Stamford Branch is subject to general discovery in this case.

Deadline for Document Production by UBS- The parties agree that the deadline for UBS to complete its production of non-TASER keyword documents shall be extended from April 22, 2010 to June 1, 2010. ............................................  `Formatted: Font: Not Bold`

Reservation of Rights- Plaintiffs reserve the right to reopen any and all noticed topics for deposition.  In the event that occurs, UBS's agreement to waive costs is void.  However, the parties shall meet and confer on this issue before any waiver takes place.

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

H

## Steven J. Rosenwasser

| | |
|---|---|
| **From:** | Jeffrey Landis [JLandis@kirkland.com] |
| **Sent:** | Friday, April 09, 2010 11:26 AM |
| **To:** | Steven J. Rosenwasser; Elizabeth G. Eager |
| **Cc:** | Andrew Clubok; Daniel Gomez |
| **Subject:** | stipulation |
| **Attachments:** | 4 9 10 UBS Stipulation on 30b6 rogs.DOC |

Steven and Liz

Attached is a draft stipulation that I believe reflects where we stand after our call this morning.  One thing I wanted to flag that I don't think we specifically discussed this morning (but I think is consistent with our previous conversations), is that I took out the provision we had previously been contemplating about the ETJs/exchanges.   As has become clear from our discussions, the issue does not appear to be the "accuracy" of data provided by UBS to the exchanges, rather it seems to be reconciling the ETJs with the other data sets produced by UBS (and other defendants for that matter).  As Andy and I have both stated, we are happy to continue to work with you cooperatively on understanding how these data sets fit together and share information with you etc as we have been.  We can try to put such an agreement in the stipulation if you want, but it seems to me like the kind of issue where it may be difficult to craft specific enough language to make in meaningful.  Let us know what you think.

Jeff


Jeffrey Landis
Kirkland & Ellis LLP
202-879-5984
202-879-5200
655 Fifteenth Street, N.W.
Washington, D.C. 20005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiffs and UBS Securities, LLC ("UBS") agree and stipulate to the terms below with respect to the following issues: (1) UBS's claim for costs relating to any gathering, searching, processing, reviewing or other fees, expenses and/or costs associated with UBS's production of data, spreadsheets, emails or other documents already produced by UBS as of the date of this agreement or any data, spreadsheets, emails or other documents that have been or will be produced from the "agreed upon custodians" in response to any discovery served as of the date of this agreement; [1]   (2) Plaintiffs' request for "trade runs"/ "trade blotters;" (3) Plaintiffs' pending Second Amended Notice to Take 30(b)(6) Deposition of UBS; (4) Plaintiffs' Third Interrogatories to UBS; (5) Plaintiffs' request for trading data from certain "affiliates" of UBS; and (6) UBS's production deadline for production of documents that hit on the non-TASER keywords.

Costs - Subject to the Reservation of Rights below, UBS agrees to waive and never seek any fees, costs or expenses for gathering, searching, processing, reviewing or producing any data, spreadsheets, Emails or other documents already produced by UBS as of the date of this agreement or any data, spreadsheets, emails or other documents that have been or will be produced from the "agreed upon custodians" using the "TASER" and "non-TASER" keywords as referenced in paragraphs 2 and 4 of the December 21, 2009 Stipulation and Order Between Plaintiffs and UBS in response to any discovery served as of the date of this agreement.

Plaintiffs' Third Interrogatories – UBS agrees to answer the interrogatories by April 30 as follows:

* Interrogatory Number One: UBS will identify all dates and/or time periods during the relevant time period of which UBS is presently aware in which the blue sheets it created, maintained and/or submitted to the SEC contained, or UBS has reason to believe may have contained, inaccurate data (regardless of whether the inaccuracy pertains to TASER). UBS's response would be limited to systemic or process errors as opposed to "one-off" or non-systemic or process errors except for: (1) intentional mismarkings (if any) and (2) any one-off or non-systemic or processing errors that you are aware of that apply to TASER. If UBS later becomes aware of other errors or inaccuracies, it shall timely inform Plaintiffs of the error or inaccuracy.

---

[1] This stipulation pertains only to data, spreadsheets, documents or other information that has either already been produced or will be produced from the agreed-upon custodians using the agreed-upon keywords. The stipulation does not apply to any additional custodians or keywords Plaintiffs may request after the date of this Agreement.

\*      Interrogatory Number Two: For the dates and/or time periods
identified in Interrogatory # 1, UBS will identify by bates number, the
blue sheets that do or may contain inaccurate data. UBS will identify
what information or data is or may be inaccurate on each blue sheet.
If UBS does not know the specific data, but knows the type of data
(e.g. short interest, long position, trade time, etc.), it will provide that
information. If UBS has corrected data, UBS will identify the
corrected data, including but not limited to, identifying the bates
number(s) of the documents containing the corrected data.

\*      Interrogatory Number Three: UBS will identify all instances during
the period of January 1, 2003 through May 31, 2009, in which any
inquiry, investigation or adverse action concerning the inaccuracy of
documents of the type that have been or will be produced in this
action (including, but not limited to, blue sheets and order tickets) was
initiated against it by a governmental entity, securities exchange, SRO
or clearing company, where the focus of such inquiry, investigation
or adverse action was the inaccuracy of such documents or involved
short selling, Reg. SHO, inaccurate blue sheets or mismarked tickets.
The parties agree that UBS is not required to identify inquiries,
investigations or adverse actions where the governmental entity,
securities exchange, SRO or clearing company identified a substantive
violation that did not in any way involve short selling, Reg. SHO,
inaccurate blue sheets or mismarked tickets and claimed that with
regard to the substantive violation UBS's "books and records" were
inaccurate. For inquiries, investigations or adverse actions relevant to
the claims at issue in this litigation, to the extent the information is
available, UBS will state whether information relating to TASER or a
transaction involving TASER is on the document(s), report(s), or
list(s) that were being investigated. UBS will state the findings and
result of the inquiry, investigation or adverse action such as whether
UBS was cautioned, fined or sanctioned.

\*      Interrogatory Number Four: UBS will identify each and every blue
sheet that was the subject of the caution, sanction, fine, or adverse
action, whether or not the blue sheet reported transactions in TASER
securities. This interrogatory requires UBS to provide information
that is currently known to it, meaning it is only required to identify
specific blue sheets or a date range of blue sheets that were identified

as being the subject of the action.  UBS is not required to perform additional investigation to determine what blue sheets were "the subject" of the caution, sanction, fine or adverse action if they are not already known or were not made known to UBS.  If UBS later becomes aware of additional responsive information, it shall timely inform Plaintiffs of the error or inaccuracy

Trade Runs/Trade Blotters - Within thirty days of this agreement, UBS will provide a written representation that its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters, it would not cure any inaccuracies in the blue sheets.  The representation will also state that, to the best of the company's knowledge, the only other database containing information that may cure inaccuracies on the bluesheets are the stock record and order management systems, which have been produced.

30(b)(6) Notice - Subject to the Reservation of Rights below, Plaintiffs will withdraw and never seek the pending the 30(b)(6) notice as to all topics.  With respect to topic 9, UBS agrees to continue researching the issue of duplicate trades in its option blue sheets.  If requested by plaintiffs, UBS agrees to provide a written, verified response regarding "UBS's ability to remove duplicate trades from the option blue sheets, including, but not limited to, any factual support for any alleged burden to remove duplicate trades." With respect to topics 10 and 14, UBS will provide a written response within 20 days of this Agreement.  With respect to topic 13, UBS will send a written response within 10 days that it has accessed and searched for ESI from "the 2 decommissioned systems referenced in [its] August 26, 2009 email."

Affiliate Data – The following pertains to data from UBS Financial Services and UBS AG Stamford Branch.

If after a diligent search, there is evidence that UBS Financial Services and/or UBS AG Stamford Branch borrowed, loaned, located or provided a locate, bought, sold or transferred TASER equities or derivatives, excluding broad based index options such as options off of the S&P 500, to or from UBS Securities, LLC between January 1, 2003 and May 31, 2009, UBS will produce the following data (to the extent it exists) for that entity by no later than May 21, 2010:

- Daily trade blotters
- Blue sheets
- Daily/ weekly stock positions

- ▪ Loan/ Borrow Records and
- ▪ Listed OTC derivatives.

If after a diligent search, there is no evidence that UBS Financial Services and/or UBS AG Stamford Branch borrowed, located or provided a locate, loaned or transferred TASER equities or derivatives, excluding broad based index options such as options based off of the S&P 500, to or from UBS Securities, LLC between January 1, 2003 and May 31, 2009, then UBS will provide plaintiffs a representation that after a diligent search the entity did not borrow, lend or transfer TASER equities or derivatives, excluding broad based index options such as options based off of the S&P 500, to or from UBS Securities, LLC (or a similar representation depending on the results of UBS's inquiry).

Plaintiffs will not take the position that by producing this data, UBS Financial Services or UBS AG Stamford Branch is subject to general discovery in this case.

<u>Deadline for Document Production by UBS</u>- The parties agree that the deadline for UBS to complete its production of non-TASER keyword documents shall be extended from April 22, 2010 to June 1, 2010.

<u>Reservation of Rights</u>- Plaintiffs reserve the right to reopen any and all noticed topics for deposition. In the event that occurs, UBS's agreement to waive costs is void. However, the parties shall meet and confer on this issue before any waiver takes place.

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

**Steven J. Rosenwasser**

| | |
|---|---|
| **From:** | Steven J. Rosenwasser |
| **Sent:** | Thursday, May 27, 2010 2:25 PM |
| **To:** | 'Andrew Clubok'; 'Jeffrey Gould' |
| **Cc:** | Elizabeth G. Eager; Nicole G. Iannarone |
| **Subject:** | follow up |

Andy and Jeff,

Good afternoon. I am following up on outhe portion of our call today regarding Plaintiffs' pending Motion to Compel for violation of the Court's Order.   During our call, we discussed the following:

1.       UBS's requirement to provide Plaintiffs with a certication that "its trade blotters are derived from the same data as its bluesheets, such that if UBS produced its trade blotters, it would not cure any inaccuracies in its blue sheets" - As you know, since Plaintiffs were aware that UBS's blue sheet information is incomplete and inaccurate, last year we asked UBS to produce trade blotters so that Plaintiffs had accurate information. UBS repeatedly refused to produce that information, representing that the information in the trade blotters was derived from the same information as the blue sheets, and thus there was no reason to produce the blotters. To confirm that fact, and to avoid a motion, you agreed in a Court Order to represent and certify that the information in the blotters and the blue sheets is identical. Now, many months later and after the Court ordered deadline has passed, you indicate for the first time that UBS cannot make that representation, and that it is willing to produce its trade blotters. We are disappointed that after this many months and your repeated representations, we are first learning this fact now. In any event, since our goal is to obtain the accurate information, we are willing to accept your proposal to provide the trade blotters instead of what would otherwise be an admittedly inaccurate representation. In addition, we are willing to withdraw our motion to compel on this topic if UBS agrees to the following: (a) you will produce trade blotters for TASER equities and options for the Time Period no later than June 24, 2010; (b) the production will made in Excel format; (c) you will agree that you cannot make the representation set forth in the prior Order, and acknowledge that the trade blotters contain trading information that Plaintiffs have not previously received and thus did not have available for review or analyses; and (d) agree never to seek any costs, expenses or fees associated with gathering, processing and producing the trade blotters.

2.       Affiliate Data - we understand that you are still looking into this issue and at this point do not have an anticipated date of production.  We stand by our position in the motion and, even if we agree to (1) above, will maintain our motion on this point.

Steven

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

J

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey M. Gould
To Call Writer Directly:
(202) 879-5138
jeffrey.gould@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

June 7, 2010

<u>**Via Electronic Mail (without enclosure)**</u>
<u>**And Federal Express**</u>

Steven Rosenwasser, Esq.
Bondurant, Mixon & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

Re:   <u>*Taser International, et al. v. Morgan Stanley & Co., et al.*</u>

Dear Steven:

On behalf of UBS Securities, LLC ("UBS"), enclosed please find one CD containing materials Bates numbered UBS_TSR1296222 through UBS_TSR1296243. This production consists of trade blotters reflecting information on TASER trades from January 1, 2003 to May 31, 2009. Please note that this production has been labeled as "Highly Confidential" pursuant to the Stipulation and Protective Order Regarding Confidential Information agreed to by the parties and entered by the Court on April 15, 2010.

As we have previously discussed, we intend to seek costs for the collection, processing and production of these trade blotters.

Please be advised that this production is subject to, and not a waiver of, UBS's specific and general objections to plaintiffs' document requests, interrogatories, and our ongoing discussions regarding discovery. We reserve the right to amend and supplement our discovery response as necessary.

If you have any questions concerning the enclosed, please do not hesitate to contact me.

Chicago   Hong Kong   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai

Steven Rosenwasser, Esq.
June 7, 2010
Page 2

Respectfully submitted,

Jeffrey M. Gould

Enclosure

cc:    Andrew B. Clubok

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010  6:41PM
Mark Harper, Clerk

K

## Steven J. Rosenwasser

| | |
|---|---|
| **From:** | Steven J. Rosenwasser |
| **Sent:** | Friday, November 13, 2009 2:02 PM |
| **To:** | 'Andrew Clubok' |
| **Cc:** | 'Jeffrey Landis'; 'Daniel Gomez' |
| **Subject:** | UBS Data |

Gentlemen:

At your convenience, we need to discuss data from Financial Services - 0221, UBS AG Stamford Branch/As Custodian for UBS AG London Branch - 2507 and UBS Securities LLC/Securities Lending - 5284

Thanks

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

L

## Steven J. Rosenwasser

| | |
|---|---|
| **From:** | Elizabeth G. Eager |
| **Sent:** | Monday, May 24, 2010 10:03 AM |
| **To:** | 'Andrew Clubok'; 'Jeffrey Landis'; 'jeffrey.gould@kirkland.com'; 'Daniel Gomez' |
| **Cc:** | Steven J. Rosenwasser |
| **Subject:** | Additional Item for the Phone Call Today |

Andy, Jeff, Jeff and Dan,

For the phone call today, we want to make you aware that Plaintiffs intend to discuss the production of data from UBS Financial Services and UBS AG Stamford Branch and the May 21 deadline for production of that data.

Thanks,
Liz

1

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010  6:41PM
Mark Harper, Clerk

M

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

DIRECT DIAL
(212) 735-2578
DIRECT FAX
(917) 777-2578
EMAIL ADDRESS
PAUL.ECKLES@SKADDEN.COM

FIRM/AFFILIATE OFFICES
―――
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
―――
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

May 18, 2010

**By Email and FedEx**

Steven J. Rosenwasser, Esq.
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309

　　　　　　　　RE:　　*TASER International, Inc., et al. v. Morgan Stanley &*
　　　　　　　　　　　*Co., Inc., et al.*, Civil Case No. 2008-EV-004739-B

Dear Steven:

　　　　I write on behalf of Merrill Lynch, Pierce, Fenner & Smith
Incorporated ("Merrill Lynch").  Merrill Lynch recently discovered that it
inadvertently produced certain privileged documents as part of its April 23, 2010 and
April 30, 2010 productions.

　　　　Pursuant to Paragraph 21 of the Protective Order entered by the Court
on April 15, 2010, Merrill Lynch is hereby notifying Plaintiffs that the documents
listed below are subject to a claim of privilege and are thus protected from
disclosure.  Merrill Lynch requests that Plaintiffs return, destroy and delete within
five (5) business days of receipt of this notice any copies, summaries or extracts of
these documents.  Merrill Lynch further requests that Plaintiffs not "review, use, or
disclose such items for any purpose . . . ."  As Merrill Lynch is notifying Plaintiffs of
these inadvertent disclosures within 90 days of being made aware of such
disclosures, inadvertent production of these documents shall not be used by Plaintiffs
as evidence that any applicable privilege has been waived.  Proper entries for these
documents will be included on the privilege log that Merrill Lynch submits in

Steven J. Rosenwasser, Esq.
May 18, 2010
Page 2

connection with its production of documents responsive to the "non-Taser" search terms.

Documents beginning with the Bates numbers listed below contain attorney-client privileged and/or work product information and should have been withheld from Merrill Lynch's production:

- ML-TSINTL-ESI8852407
- ML-TSINTL-ESI8855704
- ML-TSINTL-ESI8856148
- ML-TSINTL-ESI8856742
- ML-TSINTL-ESI8857771 through ML-TSINTL-ESI8857774
- ML-TSINTL-ESI8857908
- ML-TSINTL-ESI8858083 through ML-TSINTL-ESI8858088
- ML-TSINTL-ESI8858106 through ML-TSINTL-ESI8858107
- ML-TSINTL-ESI8858120
- ML-TSINTL-ESI8858285
- ML-TSINTL-ESI8858348
- ML-TSINTL-ESI8858593 through ML-TSINTL-ESI8858594
- ML-TSINTL-ESI8858612 through ML-TSINTL-ESI8858613
- ML-TSINTL-ESI8859053 through ML-TSINTL-ESI8859054
- ML-TSINTL-ESI8859845 through ML-TSINTL-ESI 8859846
- ML-TSINTL-ESI8860966 through ML-TSINTL-ESI8860967
- ML-TSINTL-ESI8860968 through ML-TSINTL-ESI8860967
- ML-TSINTL-ESI8860968 through ML-TSINTL-ESI8860969

Steven J. Rosenwasser, Esq.
May 18, 2010
Page 3

- ML-TSINTL-ESI8860970 through ML-TSINTL-ESI8860971

- ML-TSINTL-ESI8860981

- ML-TSINTL-ESI8861138

- ML-TSINTL-ESI8861140 through ML-TSINTL-ESI8861141

- ML-TSINTL-ESI8861187 through ML-TSINTL-ESI8861188

- ML-TSINTL-ESI8861292

- ML-TSINTL-ESI8861841

- ML-TSINTL-ESI8861844 through ML-TSINTL-ESI8861446

- ML-TSINTL-ESI8863493

- ML-TSINTL-ESI8863512 through ML-TSINTL-ESI8863514

- ML-TSINTL-ESI8863619 through ML-TSINTL-ESI8863620

- ML-TSINTL-ESI8863653 through ML-TSINTL-ESI8863654

- ML-TSINTL-ESI8863941

- ML-TSINTL-ESI8864061 through ML-TSINTL-ESI8864062

- ML-TSINTL-ESI8864064

- ML-TSINTL-ESI8864382

- ML-TSINTL-ESI8865167

- ML-TSINTL-ESI8865964 through ML-TSINTL-ESI8865966

- ML-TSINTL-ESI8867127 through ML-TSINTL-ESI8867128

- ML-TSINTL-ESI8867131

- ML-TSINTL-ESI8867148

- ML-TSINTL-ESI8867156 through ML-TSINTL-ESI8867157

Steven J. Rosenwasser, Esq.
May 18, 2010
Page 4

- ML-TSINTL-ESI8867176

- ML-TSINTL-ESI8867518 through ML-TSINTL-ESI8867519

- ML-TSINTL-ESI8881608

Please confirm that these documents have been destroyed and/or returned to us within five (5) business days of receipt of this notice as required by the Protective Order. Please be advised that this letter does not limit, in any way, Merrill Lynch's rights with respect to other inadvertently produced documents that are subject to the attorney-client privilege, the work product doctrine, or other applicable privileges and immunities.

Please feel free to contact me if you have any questions.

Very truly yours,

*Paul M. Eckles/es*

Paul M. Eckles

cc:     Defense counsel (via e-mail)

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey Landis
To Call Writer Directly:
(202) 879-5984
jeffrey.landis@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

January 6, 2010

**Via Electronic Mail**

Steven Rosenwasser, Esq.
Bondurant, Mixon & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

Re:   *Taser International, et al. v. Morgan Stanley & Co., et al.*

Dear Steven:

Pursuant to Paragraph 21 of the Stipulation and [Proposed] Protective Order Regarding Confidential Information, agreed to by the parties and awaiting entry by the Court, I am writing to provide written notice of the inadvertent production of two sets of documents (UBS_TSR0034180 - UBS_TSR0034185 and UBS_TSR0077656 - UBS_TSR0077659) containing certain attorney-client privileged and/or attorney work-product material, and to request the return, or destruction, of all copies (including all paper and electronic copies or summaries) of those documents in your possession.  The Bates ranges UBS_TSR0034180 - UBS_TSR0034185 and UBS_TSR0077656 - UBS_TSR0077659 will hereafter be unused in UBS Securities, LLC's production.

Please send us a written confirmation when the documents have been returned and/or destroyed.

Sincerely,

Jeffrey Landis

cc:   Andrew Clubok

Chicago    Hong Kong    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Jeffrey M. Gould
To Call Writer Directly:
(202) 879-5138
jeffrey.gould@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

May 20, 2010

**VIA ELECTRONIC MAIL**

Steven Rosenwasser, Esq.
Bondurant, Mixon & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3400

> Re: _Taser International, et al. v. Morgan Stanley & Co., et al._

Dear Steven:

I write on behalf of UBS Securities, LLC ("UBS"). Pursuant to Paragraph 21 of the Stipulation and Protective Order Regarding Confidential Information, agreed to by the parties and entered by the Court on April 15, 2010, I am writing to provide written notice of the inadvertent production of documents containing certain attorney-client privileged and/or attorney work-product material. UBS requests that Plaintiffs immediately return, destroy and delete within (5) business days of receipt of this notice any copies, summaries or extracts of these documents. Consistent with the Protective Order, UBS further requests that Plaintiffs not "review, use, or disclose such items for any purpose. . ." As UBS is notifying Plaintiffs of these inadvertent disclosures within 90 day of being made aware of such disclosures, inadvertent production of these documents shall not be used by Plaintiffs as evidence that any applicable privilege has been waived. Proper entries for these documents will be included on privilege logs that UBS submits in connection with its production of documents responsive to "non-Taser" search terms.

This letter applies to documents bearing the following Bates numbers and ranges:

- UBS_TSR1155410-1155438

- UBS_TSR1155528-1155565

- UBS_TSR1156470-1156509

- UBS_TSR1158745-1158806

Steven Rosenwasser, Esq.
May 18, 2010
Page 2

- UBS_TSR1172678-1172711

- UBS_TSR1173772-1173798

These Bates numbers and ranges will hereafter be unused in UBS Securities, LLC's productions.  To the extent that any of the above-listed documents contains responsive, non-privileged information, we will be producing redacted versions to you shortly.

Several of the documents referenced herein relate to your April 8, 2010 email to Jeff Landis regarding UBS's Significant Compliance Issues reports.  In that email, you asked us to confirm that we will be producing additional reports of this nature.  I can confirm that we will produce additional Significant Compliance Issues reports containing responsive, non-privileged information, if any.

Please send us a written confirmation when the documents have been returned and/or destroyed.

Sincerely,

Jeffrey M. Gould

Enclosure

cc:    Andrew B. Clubok
       All defense counsel

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 32089722
Date: Jul 12 2010 6:41PM
Mark Harper, Clerk

N

| | |
|---|---|
| **From:** | Steven J. Rosenwasser |
| **To:** | "Dowd, Brendan"; "belias@omm.com"; |
| **cc:** | Elizabeth G. Eager; |
| | Nicole G. Iannarone; |
| **Subject:** | Privilege Log Conferral |
| **Date:** | Tuesday, April 20, 2010 11:06:17 AM |

Brendan and Brad,

Good morning. I am writing as a follow up to our recent conversations regarding the Defendants' privilege logs. Per the Defendants' request, rather than seeking a Special Master at this time, we are willing to endeavor to try and narrow the documents at issue. To that end, below please find our follow up conferral on Bank of America's privilege log. The number on the left refers to the privilege log entry, and the description thereafter is our conferral.

General Matter

In many instances, you refer to a NASD, FINRA, SEC or other regulatory inquiry or investigation. In order to determine whether the privilege applies to any such inquiries, we need the following information for each entry referring to an inquiry: (a) name of agency involved; (b) dates of investigation/inquiry; (c) stocks involved in inquiry; (d) subject matter being investigated and (e) whether any of the information in the email or attachment was disclosed to the agency at any point in time.

Individual Entries:

Entry 1 - With respect to the regulatory inquiry, please provide the information requested in the "General Matter" section above. Further, please explain why the underlying information (e.g., facts, trading data, communications with third parties) provided is itself privileged. Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged. Also, please state whether you would have responded to the regulatory inquiry in the normal course of business and as part of your compliance process, regardless of whether litigation was anticipated. As to your claim of work product, please state: (a) when you first anticipated litigation; (b) who you anticipated

bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation. Finally, please confirm that the email and the attachments contain nothing but legal advice.

Entry 2 - Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged. Also, please confirm that the email and the attachments contain nothing but legal advice.

Entry 3 - With respect to the regulatory inquiry, please provide the information requested in the "General Matter" section above. Further, please explain why the information provided is itself privileged; i.e., why facts, trading data or conveying of communications with others is privileged. Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged. Also, please state whether you would have responded to the regulatory inquiry in the normal course of business and as part of your compliance process, regardless of whether litigation was anticipated. As to your claim of work product, please state: (a) when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation. Finally, please confirm that the email and the attachments contain nothing but legal advice.

Entry 4 - With respect to the regulatory inquiry, please provide the information requested in the "General Matter" section above. Further, please explain why the information provided is itself privileged; i.e., why facts, trading data or conveying of communications with others is privileged. Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged. Also, please state whether you would have responded to the regulatory inquiry in the normal course of business and as part of your compliance process, regardless of whether litigation was anticipated. As to your claim of work product, please state: (a) when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation. Please confirm that the email and the attachments contain nothing but legal advice. Finally, please provide the titles of each of the senders/recipients of the email at the time it was sent.

Entry 5 - See entry 4.

Entry 6- See entry 4.

Entry 7 - See entry 4.

Entry 8 - See entry 4

Entry 9 - See entry 4

Entry 10 - See entry 4

Entry 11 - See entry 4

Entry 12 - See entry 4

Entry 13 - See entry 4

Entry 14 - See entry 4

Entry 15 - Please explain why the information provided is itself privileged; i. e., why facts, trading data or  conveying of communications with others is privileged.  Please confirm that the email and the attachments contain nothing but legal advice.  Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged.

Entry 16 - See entry 4

Entry 17 - See entry 4

Entry 18 - See entry 4

Entry 19 - See entry 4

Entry 20 - See entry 4

Entry 21 - See entry 4

Entry 22 - Please explain why the underlying factual information, such as trading data or communications with third parties, is privileged. Alternatively, please confirm that the email and the attachments contain only legal advice, and nothing else (including no trading data or discussions with clients or third parties).

Entry 23 - See Entry 22.

Entry 24 - See Entry 22.

Entry 25 - See Entry 22.

Entry 26 - See Entry 22.

Entry 27 - See Entry 22.

Entry 31 - See Entry 22.

Entry 32 - See Entry 22.

Entry 33 - See Entry 22.

Entry 34 - See Entry 22.

We appreciate your cooperation,

Steven

| From: | Steven J. Rosenwasser |
|---|---|
| To: | "Friedman, Brian L."; |
| cc: | Nicole G. Iannarone; |
| | Elizabeth G. Eager; |
| Subject: | Privilege Log Conferral |
| Date: | Monday, April 19, 2010 10:41:39 AM |

Brian,

Good morning.  I am writing as a follow up to our recent conversations regarding the Defendants' privilege logs. Per the Defendants' request, rather than seeking a Special Master at this time, we are willing to endeavor to try and narrow the documents at issue.   To that end, below please find our follow up conferral on Bear Stearns' privilege log.

First, Plaintiffs do not believe that Bear Stearns' descriptions, in the "description" column, are sufficient to permit us to ascertain whether the privilege has been properly invoked.  For example, with respect to nearly all of the entries, Bear Stearns simply states that the document is an "email string regarding regulatory inquiry."  While the fact that the email involves  a regulatory inquiry is relevant, we need additional facts to determine whether the email is privileged.  For example:

1.      Was the substance of the communication or any information contained in the email later provided, in whole or in part, to the regulatory agency?
2.      Did your client contemplate that any information contained within the email would be provided to a third party, such as the regulatory agency?
3.      Would your client have responded to the inquiry regardless of whether there was litigation anticipated?
4.      Does any of the email convey business, as opposed to legal, advice?
5.      Does any portion of the email contain non-legal advice, such as trading, locate, borrowing or lending data?
6.      Please identify the regulatory inquiry referred to (i.e., what agency was involved, what was the issue, which security or securities)?
7.      When the inquiry was made by the regulatory agency, did your internal rules, regulations, policies or procedures require you to investigate and respond?

Second, many of the documents contain attachments. *See, e.g,* entries 1-3, 5-6, 8-12, 17-18, 29-30, 38-40, 47-52, 54, 57-61. Can you please explain why each of the attachments is privileged? The simple fact that they were sent to an attorney does not, standing alone, render them privileged. Please describe the attachment and why you contend its privileged. Also, please identify all persons who ever reviewed or received attachments? Were the attachments, or any part thereof,

ever sent to a regulatory agency? Was there any contemplation that they may be?

Third, in entry numbers 11 and 12, the email is between two non-lawyers. You claim it is because it was conducted at the "direction of counsel." Please provide the facts you have supporting that claim. Further, please explain why the information contained within the email is privileged; e.g., if it is trading data, the basic information is not privileged.

Fourth, in entry number 18, you state that the email is privileged because it forwards communication of counsel. The fact that an attachment contains a communication from counsel does not necessarily mean that the cover email is privileged. Please explain why you contend the cover email is privileged. Also, with respect to the document being forwarded, please identify all authors and receipients of the document, and explain why you contend its privileged.

Thanks,

Steven

| From: | Steven J. Rosenwasser |
|-------|----------------------|
| To: | "Hunter, Fraser"; |
| cc: | Nicole G. Iannarone; |
| | Elizabeth G. Eager; |
| Subject: | Privilege Log Conferral |
| Date: | Wednesday, April 21, 2010 8:23:14 AM |

Fraser,

Good morning. I am writing as a follow up to our recent conversations regarding the Defendants' privilege logs. Per the Defendants' request, rather than seeking a Special Master at this time, we are willing to endeavor to try and narrow the documents at issue. To that end, below please find our follow up conferral on Credit Suisse's privilege log. The number on the left refers to the privilege log entry, and the description thereafter is our conferral.

General Matter

In many instances, you refer to a NASD, FINRA, SEC or other regulatory inquiry or investigation. In order to determine whether the privilege applies to any such inquiries, we need the following information for each entry referring to an inquiry: (a) name of agency involved; (b) dates of investigation/inquiry; (c) stocks involved in inquiry; (d) subject matter being investigated and (e) whether any of the information in the email or attachment was disclosed to the agency at any point in time.

Individual Entries

Entry 1 - With respect to the regulatory inquiry, please provide the information requested under "General Matter" above. Further, please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged. Also, please indicate whether it is Credit Suisse's position that all of the email and the attachment contains legal advice (i.e., there is no trading data, business advice, information on business operations, references to communications with third parties). If not, please explain why the non-legal advice is privileged. With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and

why it is privileged.   Please confirm that none of the information in the email or attachment was disclosed to the regulatory agency or any other third party at any time.  As to your claim of work product, please: (a) state when you first anticipated litigation; (b) who you anticipated bringing the litigation; (c) why you anticipated litigation and (d) the subject matter of the anticipated litigation.  Finally, please identify the title (or, if not available, general job duties) of each of the receipients so we can ascertain whether they needed to know the contents of the email.

Entry 2  - Please see entry 1.

Entry 4 - Please explain why the underlying information and facts (e.g., trade data, references to statements made by third parties, business operations information) are privileged.  Also, please indicate whether it is Credit Suisse's position that all of the email and the attachment contains legal advice (i.e., there is no trading data, business advice, information on business operations, references to communications with third parties).  If not, please explain why the non-legal advice is privileged.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 5 - Please explain why this email is privileged in its entirety? Is it Credit Suisse's position that there is no public or non-responsive information on this document? Also, is it your position that the mere fact that a regulatory agency is inquiring or investigating Credit Suisse a privileged fact? Are you contending that the status of an inquiry/investigation is privileged? What about litigations, are you contending the simple fact of litigation or its status is privileged?

Entry 6 - Please see entry 1.

Entry 7 - Please see entry 5.

Entry 8 - Please see entry 5.

Entries 9 through 15 - Please see entry 1.

Entries 16 and 17 - Please explain why the underlying information and facts

(e.g., trade data, references to statements made by third parties, business operations information) are privileged.  Also, please indicate whether it is Credit Suisse's position that <u>all</u> of the email and the attachment contains legal advice (i.e., there is no trading data, business advice, information on business operations, references to communications with third parties).  If not, please explain why the non-legal advice is privileged.  With respect to the attachment, please identify its contents, including all parties that sent or received it, what it contains and why it is privileged.

Entry 18 - Please see entry 5.

Entries 19 through 25 - Please see entry 1.

We appreciate your cooperation,

Steven

| | |
|---|---|
| **From:** | Steven J. Rosenwasser |
| **To:** | "Seidel, Martin"; |
| **cc:** | Elizabeth G. Eager; |
| | Nicole G. Iannarone; |
| **Subject:** | Privilege Log Conferral |
| **Date:** | Tuesday, April 20, 2010 3:16:43 PM |

Martin,

Good afternoon. I am writing as a follow up to our recent conversations regarding the Defendants' privilege logs. Per the Defendants' request, rather than seeking a Special Master at this time, we are willing to endeavor to try and narrow the documents at issue. To that end, below please find our follow up conferral on DBSI's privilege log. The number on the left refers to the privilege log entry, and the description thereafter is our conferral.

Entry 1 - Please state whether all of the email and the attachment contains legal advice (as opposed to trading data, business operations, facts or comments/ memorializations of conversations with third parties). Also, please confirm that none of the information contained within the email or attachment was ever disclosed, in whole or in part, to a third party such as a regulatory agency. As to your claim for work product, please: (a) state when you first anticipated litigation; (b) who you anticipated the litigation to be brought by; (c) the subject matter of the anticipated litigation; and (d) your bases for claiming litigation was anticipated. Finally, please provide more information about the attached report, including who created it, why it was created, who it was disseminated to (at any point in time), its contents and why you contend any underlying facts or trading data are privileged.

Entry 2 - Please state when Mr. Jordan provided the legal advice and who was present when it was given. Please confirm that the advice contained in the email is identical in substance to what Mr. Jordan stated. Please state whether all of the email and the attachment contains legal advice (as opposed to trading data, business operations, facts or comments/memorializations of conversations with third parties). Also, please confirm that none of the information contained within the email or attachment was ever disclosed, in whole or in part, to a third party such as a regulatory agency. As to your claim for work product, please: (a) state when you first anticipated litigation; (b) who you anticipated the litigation to be brought by; (c) the subject matter of the anticipated litigation; and (d) your bases for claiming litigation was anticipated. Finally, please provide more information about the attached report, including who created it, why it was created, who it

was disseminated to (at any point in time), its contents and why you contend any underlying facts are privileged.

Entries 3 through 8 - Please see Entry 1.

We appreciate your cooperation,

Steven

| From: | Steven J. Rosenwasser |
|---|---|
| To: | "Reynard, Andrew H."; |
| | "Pepperman, Richard"; |
| cc: | Nicole G. Iannarone; Elizabeth G. Eager; |
| Subject: | Privilege Log Conferral |
| Date: | Tuesday, April 20, 2010 3:04:39 PM |

Good afternoon. I am writing as a follow up to our recent conversations regarding the Defendants' privilege logs. Per the Defendants' request, rather than seeking a Special Master at this time, we are willing to endeavor to try and narrow the documents at issue. To that end, below please find our follow up conferral on Goldman's privilege log. The number on the left refers to the privilege log entry (i.e., the entry 1 refers to the first entry on the log), and the description thereafter is our conferral.

General Matter

In many instances, you refer to a NASD, FINRA, SEC or other regulatory inquiry or investigation. In order to determine whether the privilege applies to any such inquiries, we need the following information for each entry referring to an inquiry: (a) name of agency involved; (b) dates of investigation/inquiry; (c) stocks involved in inquiry; (d) subject matter being investigated and (e) whether any of the information in the email or attachment was disclosed to the agency at any point in time.

Individual Entries In Log of Documents Withheld From Production:

Entry 1 - Please identify the counsel who provided the advice and when it was provided. Please indicate whether this document was created as part of a normal part of compliance operations and/or monitoring. Please state each of the senders/receipients title at the time the email was sent, and why he/she needed to know the legal advice. Please confirm that all of the email and attachment includes legal advice, as opposed to business operations or business advice. Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged. Please indicate whether any portion of the email or attachment was ever disclosed to other individuals and, if so, to whom.

Entry 2 - With respect to the NASD inquiry, please provide the information

requested in the "General Matter" section above. Further, please explain why the underlying information (e.g., facts, trading data, communications with third parties) provided is itself privileged. Also, please state whether you would have responded to the regulatory inquiry in the normal course of business and as part of your compliance process, regardless of whether litigation was anticipated. Please indicate whether any information contained within the email was disclosed at any time to NASD. Finally, please confirm that the email contains nothing but legal advice.

Entry 3 - With respect to the NASD inquiry, please provide the information requested in the "General Matter" section above. Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged. Further, please explain why the underlying information (e.g., facts, trading data, communications with third parties) provided is itself privileged. Also, please state whether you would have responded to the regulatory inquiry in the normal course of business and as part of your compliance process, regardless of whether litigation was anticipated. Please indicate whether <u>any</u> information contained within the email or attachment was disclosed <u>at any time</u> to NASD. Please explain what steps were taken to ensure that the recipients of the information knew to keep it confidential.
Finally, please confirm that the email and attachment contains nothing but legal advice (i.e., there is no trading data, comments relating to discussions with third parties, business operations information, or policies/procedures information).

Entry 4 - Please see Entry 3.

Entry 5 - Please see Entry 3.

Entry 6 - Please see Entry 3.

Entry 7 - Please see Entry 3.

Entry 8 - Please see Entry 3.

Entry 9 - Please see Entry 3. Also, please identify the attorney(s) whose advice Mr. O'Malley is conveying, when that advice was given and who was

present when it was given.  Further, please provide the title of each person who received this email and explain why they needed to know the legal advice.

Entry 10 - Please see Entry 9.

Entry 11 - Please see Entry 1.

Entry 12 - Please see Entry 3.

Entry 13 - Please see Entry 3.

Entry 14 - Please see Entry 3.

Entry 15 - Please see Entry 3.

Entry 16 - Please see Entry 3.

Entry 17 - Please see Entry 3.

Entry 18 - Please see Entry 3.

Entry 19 - Please see Entry 3.

Entry 20 - Please see Entry 3.

Entry 21 - Please see Entry 3.

Entry 22 - Please see Entry 3

Entry 23 - Please see Entry 3.

Entry 24 - Please see Entry 3.

Entry 25 - Please see Entry 3.

Entry 26 - Please see Entry 3.

Entry 27 - Please see Entry 3.

Entry 28 - Please see Entry 3.

Redaction Log

Entry 1 - Please explain how Ms. Yung is seeking the advice of counsel, when numerous other individuals are cc'ed on the email.  Please identify the titles of each recipient and explain why they needed to know the legal advice.  Please confirm that the redacted part of the email contains only a request for legal advice, and no other information.  For example, confirm that there is no discussion of the FINRA request or any trading data.

Entry 2 - Please explain why the underlying information (e.g., facts, trading data, communications with third parties) provided is itself privileged.  Facts are not privileged.  With respect to the FINRA inquiry, please provide the information requested in the "General Matter" section above.  Please identify all of the persons who received the emails at the addresses factory.support@nmclpsa01.ny.fw.gs.com, gs-reg-sho-reports; and ficc-unixclr-ny.  Finally, please confirm that the redacted part of the email/attachment contains nothing but legal advice (i.e., there is no trading data, comments relating to discussions with third parties, business operations information, or policies/procedures information).

Entry 3 - See entry 1.

Entry 4 - Please explain why the underlying information (e.g., facts, trading data, communications with third parties) provided is itself privileged.  Please identify the counsel that requested the information.  Please identify the titles of each recipient and explain why they needed to know the legal advice.  Please explain what steps were taken to ensure that the recipients of the information knew to keep it confidential.  Finally, please confirm that the redacted part of the email/attachment contains nothing but legal advice (i.e., there is no trading data, comments relating to discussions with third parties, business operations information, or policies/procedures information).  Please identify the contents of the attachment, including listing all parties that sent or received it, what it contains and why it is privileged.