E
X
H
I
B
I
T

2

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 33396975
Date: Sep 22 2010 8:04PM
Mark Harper, Clerk

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| TASER INTERNATIONAL, INC., *et al.*, | |
| Plaintiffs, | Civil Case No. 2008-EV-004739-B |
| v. | |
| MORGAN STANLEY & CO., INC., *et al.*, | ***FILED UNDER SEAL*** |
| Defendants. | |

## DEFENDANT DEUTSCHE BANK SECURITIES INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEUTSCHE BANK SECURITIES INC. FOR UNDISPUTED VIOLATION OF THE COURT'S JULY 16, 2009 SCHEDULING ORDER

Defendant Deutsche Bank Securities Inc. ("DBSI") hereby responds to Plaintiffs' inappropriately captioned "Motion For Sanctions Against Deutsche Bank Securities, Inc. For Undisputed Violation Of The Court's July 16, 2009 Scheduling Order" ("Plaintiffs' Motion").[1] Plaintiffs continue to treat discovery as a game of "gotcha," advancing a hyper-technical – and incorrect – argument that DBSI "willfully violated the Court's Order" by not producing "corrected" blue sheet data within ten days of learning of an "inaccuracy" therein.[2] Plaintiffs'

---

[1]  Contrary to the title of Plaintiffs' Motion, DBSI does in fact dispute the grounds on which Plaintiffs' base their Motion.

[2]  A "blue sheet" is an industry term of art referring to regulatory requests for certain trading data. Although this data is now collected electronically, in the past, the Securities and Exchange Commission ("SEC") requested this information "by mailing questionnaire forms (known as 'blue sheets' because of the color on which the forms were printed) to broker-dealers to be manually completed and mailed back to the Commission. In the late 1980s, as the volume of trading and securities transactions dramatically increased, the Commission and the securities self-regulatory organizations ('SROs') worked together to develop and implement a system with a universal electronic format, commonly known as the 'electronic blue sheet' or 'EBS' system, to replace the manual process." *See* SEC Release No. 34-44494 at 2.

Motion at 2, 5. The purported "inaccuracy" in question is an inadvertent failure, caused by a flaw in computer program logic, to extract certain data for a relatively small number of data cells pertaining to two minor data points in one of many documents reflecting trading data created for Plaintiffs in this litigation. Notwithstanding that this information was not included in the blue sheet data provided, the material that has in fact been produced to Plaintiffs provided them with abundant information showing DBSI's trading in TASER International Inc. ("TASER") common stock for a more-than-six-year period. None of this information is claimed to be incorrect, and the information omitted from prior versions of the blue sheets is of little, if any, relevance to this case. Plaintiffs themselves fail to make any showing of relevance to the subject matter of this case or prejudice to them in discovery.

More specifically:

- DBSI now has provided to Plaintiffs supplemental blue sheet data containing the inadvertently omitted information, and has done so well before any discovery deadlines;

- The information omitted was the result of an inadvertent flaw in computer program logic;

- DBSI has caused no delay to the Court's schedule or Plaintiffs' investigation of their claims;

- The additional information provided to Plaintiffs consisted of minor additional data points associated with a small number of transactions for which Plaintiffs already have an abundant amounts of information in several other forms;

- Plaintiffs have not alleged that any transactions (including but not limited to those in the blue sheets in issue) were manipulative or caused them harm;

- Plaintiffs have not explained how their failure to receive these minor data points earlier has prejudiced them, particularly given the volume of trading data provided to Plaintiffs in other formats; and

- Plaintiffs have yet to explain how these data points are relevant to their claims.

In addition, the sanctions Plaintiffs seek – a unilateral three month discovery extension, a finding that the minor inadvertent data production issue "creates an issue of fact" preventing summary judgment on Plaintiffs' claims; and a requirement that DBSI pay both Plaintiffs' fees for filing their motion and Plaintiffs' portion of the Special Master's fees for considering the dispute – are grossly disproportionate and unrelated to the conduct about which they complain. *See* Plaintiffs' Motion at 6-7. Because the material in question now has been provided well in advance of discovery deadlines, no depositions of DBSI representatives or employees have yet been taken, and Plaintiffs do not even attempt to claim (let alone establish) prejudice, Plaintiffs' complaint does not warrant the drastic and unrelated sanctions of a unilateral discovery extension and denial of summary judgment (before DBSI even has filed such a motion).

This motion is simply another example of Plaintiffs' continuing pattern of abusive discovery and motion practice through which they claim that every perceived flaw in DBSI's (or any other defendant's) production of documents – now totaling over 580,000 documents and the equivalent of approximately 7 million pages for DBSI alone in response to 101 document requests – is a sanctionable event. Neither the Court nor the Special Master should condone these types of abusive discovery tactics.

## POINT I

### PLAINTIFFS MISCHARACTERIZE BOTH DBSI'S DILIGENT DISCOVERY EFFORTS AND THE PARTIES' COMMUNICATIONS

Contrary to the hyperbolic rhetoric in Plaintiffs' moving papers, DBSI has worked diligently and in good faith to provide Plaintiffs with the vast amount of trading data they have

requested in this matter. To date, DBSI has produced to Plaintiffs over 580,000 documents, totaling the equivalent of approximately 7 million pages, including approximately 390,000 lines of trading data provided in an electronic spreadsheet format and 7,245 pages of additional trading data (containing numerous additional lines of trading data). That is in addition to all the other information DBSI has produced in response to interrogatories and requests for admission.[3] Moreover, as demonstrated below, DBSI has not "willfully violated the Court's Order" nor has it ever "made false representations to Plaintiffs" concerning the blue sheet data produced. *See* Plaintiffs' Motion at 5. Plaintiffs' inflammatory statements to the contrary are belied by the record.

In response to Plaintiffs' numerous and burdensome discovery requests, DBSI agreed to extract and produce historical blue sheet data specifically related to trading activity for TASER common stock over a more-than-six-year period of January 1, 2003 through May 31, 2009. As DBSI explained to Plaintiffs in connection with the negotiations concerning document production, the spreadsheet containing the blue sheet data is not a regularly maintained document, but was created by DBSI solely for purposes of this litigation. DBSI agreed to create this blue sheet data spreadsheet for purposes of this litigation in good-faith and in the spirit of cooperation, despite the fact that DBSI was not required to do so under the applicable rules of civil discovery. This blue sheet data spreadsheet was generated by extracting data from a centralized database, using a procedure similar to that used in response to similar requests from

---

[3]   To date, Plaintiffs have served seven (7) separate sets of requests for the production of documents on DBSI (totaling one hundred and one (101) individual document requests), four sets of requests for admissions (totaling one hundred and eighty-eight (188) numbered requests), six (6) sets of interrogatories (totaling fifty-eight (58) interrogatories, including subparts), and three separate notices to depose designated corporate representatives of DBSI.

regulators.[4]   On September 14, 2009, pursuant to the Court's July 16, 2009 Order, DBSI

produced a version of this blue sheet data which redacted confidential information.[5]   On

November 14, 2009, DBSI produced an unredacted version of the blue sheet data. *See* Halper

Aff., Ex. B (November 13, 2009 letter from Martin L. Seidel to Steven J. Rosenwasser). DBSI

later discovered that certain data had been inadvertently truncated in the November 13, 2009

production and produced a third version of the blue sheet data on January 28, 2010.  DBSI

advised Plaintiffs that the January 28, 2010 blue sheet data production was intended to replace

the November 13, 2009 data production. *See* Halper Aff., Ex. C (January 28, 2010 letter from

Martin L. Seidel to Steven J. Rosenwasser).

Importantly, the blue sheet data is only one of several forms of TASER trading

data extracted from DBSI's centralized systems and provided to Plaintiffs for the purposes of this

litigation.  On September 14, 2009 and November 13, 2009, DBSI produced approximately

---

[4]   Following the implementation of the electronic blue sheet (or EBS) system, when the SEC or SROs request blue sheet data "[f]irms generally use software to scan their account records and download the appropriate information into the standard EBS format, and then transmit the data to the Securities Industry Automation Corporation ("SIAC").  In turn, SIAC routes the file electronically to the Commission's mainframe computer."  SEC Release No. 34-44494 at 2.  For the purposes of this litigation, DBSI extracted the blue sheet data through a manual process using program logic designed to collect the same data that would be collected and sent to SIAC through an otherwise automated process used in response to a regulatory request.

[5]   In connection with the blue sheet data, among other documents, DBSI's production cover letter indicated that "[a]lthough DBSI believes that the documents created for the purpose of this litigation are reasonably accurate, DBSI cannot represent that they are complete or that there are not some inadvertent errors in the generation, collection or preparation of these documents."  *See* Affidavit of Jason M. Halper, dated September 22, 2010 (the "Halper Affidavit" or "Halper Aff."), Ex. A (September, 14, 2009 letter from Martin L. Seidel to Steven J. Rosenwasser, at pg. 2).  That letter further stated that DBSI would provide Plaintiffs with "further updates or corrections" to the extent that missing information or errors are discovered.  *Id.*  This is consistent with Paragraph 7 of the January 11, 2010 Stipulation and Order: "DBSI represents that the information contained on the Blue Sheets it produced to Plaintiffs is a fair and accurate representation of the information as it exists in DBSI's records."   Contrary to Plaintiffs mischaracterizations, DBSI never "certified to the Plaintiffs its blue sheets were correct and complete." *See*, *e.g.*, Plaintiffs' Motion at 1.  Rather, DBSI only indicated that the data produced was a fair and accurate representation of the data in DBSI's records, and that it would work to correct any data extraction issues discovered.  DBSI has done exactly that.

236,898 additional lines of trading data in electronic spreadsheet format and 7,245 additional

pages of TASER trading data (which contain numerous additional lines of trading data).  At great

burden and expense, DBSI collected and produced TASER trading data from three separate order

management and order execution systems in electronic spreadsheet format.[6]  Collectively, this

order management and execution system data contains approximately 227,818 lines of trading

data and 87 data fields indicating, among other things: (1) the date and time of specific trades,

(2) whether the order was executed, canceled or amended, (3) the quantity of shares executed,

(4) the account placing the order, and (5) whether the trade was a purchase or sale, including an

indication of whether a particular sale was a short sale.  Additionally, on these same dates, DBSI

produced portions of its stock record data – DBSI's official books and records for trading of

common stock – pertaining to TASER trades during the six-year period at issue.  DBSI also

produced TASER-related CNS accounting summary data from its centralized systems and CNS

consolidated trade summary data for TASER securities.[7]  The CNS accounting summary data

indicates, among other things, (1) DBSI's opening position with CNS pertaining to TASER

shares, including whether that position is long or short, (2) the net position of all TASER trades

settled through CNS, (3) the net position of all TASER trade-related activity with CNS, (4) the

closing position of TASER related trades, and (5) the associated market value of those positions.[8]

---

[6]   The documents containing this trading data from DBSI's primary order management and execution
systems were also created for the purpose of this litigation.

[7]   "CNS" refers to the National Securities Clearing Corporation's ("NSCC") continuous net settlement
System.  Securities trading generally does not involve actual physical delivery of stock between a seller
and a buyer.  Most trades are instead cleared and settled electronically through a federally-approved
clearinghouse (e.g., the NSCC), which effectively acts as a middle-man in securities transactions.  Stock
buyers, acting through their brokers, make payment to the NSCC.  Stock sellers (including short sellers),
acting through their brokers, deliver stock to the NSCC.  NSCC uses a continuous net settlement system
(CNS), which is essentially an accounting system that nets on an aggregate basis the payment and
delivery obligations of a broker's customers.

[8]   Since December 15, 2009, Plaintiffs have also had the CNS accounting summaries produced by the
Depository Trust & Clearing Corporation, a parent corporation of the NSCC, which Defendants assumed

DBSI's CNS consolidated trade summary data for TASER securities shows, among other things, (1) the date of trades through CNS, (2) the market of execution of those trades, (3) the amount of shares bought or sold, and (4) the debit or credit amount of those shares as applied to DBSI's CNS account.

These data sets contain the majority (if not all) of DBSI's TASER trading activity over the more-than-six-year period in question. Not surprisingly, in their sanctions Motion, Plaintiffs ignore that this enormous amount of data was extracted and produced by DBSI. Instead, in their Motion and subsequent conferrals with DBSI, Plaintiffs focus on insignificant (and in some instances imaginary) issues with just one of DBSI's several trading data sets – the blue sheet data.

Plaintiffs expressed vague generalized concerns regarding DBSI's first production of blue sheet data in September 2009.[9] These complaints largely focused on blank cells in certain columns of the spreadsheet. *See, e.g.,* Plaintiffs' Motion, Exhibit 1, Tabs A and D. In response to these vague complaints, DBSI advised Plaintiffs that, as a general matter, blank cells in the blue sheet data spreadsheet indicated that no data was extracted for that field when the spreadsheet was created. *See* Plaintiffs' Motion, Exhibit 1, Tab B at ¶ 5. Additionally, DBSI explained that not all of the different types of trading activity reflected in the rows of the blue sheet data spreadsheet would necessarily result in information being populated for all the columns of the spreadsheet. DBSI, therefore, requested that Plaintiffs provide examples of specific rows of trading data where Plaintiffs believed DBSI's blue sheet data was not accurate. *See* Plaintiffs' Motion, Exhibit 1, Tab C ("You asked us to provide you with examples of the

---

a portion of the cost for collection. This data provides similar information for all broker-dealers that engage in TASER transactions through CNS, including DBSI.

[9]   DBSI understands that Plaintiffs expressed similar vague and generalized complaints to other Defendants, in what amounts to "form" complaints about discovery issues.

missing information. We are working on getting examples to you."); *see also* Tab I. Plaintiffs failed to do so. Rather, in February Plaintiffs reiterated their vague complaints about purportedly missing data in certain columns of the spreadsheet. *See* Plaintiffs' Motion, Exhibit 1, Tab D; *see also* Tab G. When Plaintiffs did not provide specific rows of trading data that they were allegedly concerned about, DBSI endeavored on its own to address Plaintiffs' concerns by sampling rows of blue sheet data to determine if data was available in the centralized system from which DBSI extracts blue sheet data, but was inadvertently excluded from the produced blue sheet. Following this review, DBSI informed Plaintiffs through the meet and confer process that its initial review of data did not reveal that blank cells reflected any "missing information" – i.e., information that existed in DBSI's relevant database but was not provided in the blue sheet data. *See* Halper Aff., Ex. D (August 9, 2010 email from Jason M. Halper to Steven J. Rosenwasser), at ¶ 5.

Plaintiffs eventually provided DBSI with a list of alleged discrepancies between DBSI's blue sheet data and certain trading data in the NASDAQ Equity Trade Journal ("ETJ") obtained from a third party. These "discrepancies" involved trades appearing in the ETJ data but not DBSI's blue sheet data, or *vice versa*. Initially, Plaintiffs made only vague and general allegations concerning apparent inconsistencies between DBSI's blue sheet data and the ETJ data. *See, e.g.*, Plaintiffs' Motion, Exhibit 1, Tab G at ¶ 2. DBSI generally compared the blue sheet data to the ETJ data identified by Plaintiffs and found no apparent inconsistencies, as it advised Plaintiffs. *See* Halper Aff., Ex. D (August 9, 2010 email from Jason M. Halper to Steven J. Rosenwasser), at ¶ 4. While certain trades appeared on the blue sheets but not the ETJ. DBSI explained that this does not reflect an inaccuracy but rather that the blue sheet data reflected internal account activity and trading on exchanges that do not appear on the NASDAQ ETJ data. Plaintiffs did not provide DBSI with specific examples of purported trades reflected

on the ETJ but not the blue sheets until the end of the day on Friday, August 20, 2010, the last business day before they filed the present motion on Monday, August 23, 2010. *See* Halper Aff., Ex. E (August 20, 2010 email from Elizabeth G. Eager to Jason M. Halper). DBSI promptly reviewed these trades and quickly determined that the "inconsistencies" Plaintiffs alleged in fact did not exist. Rather, Plaintiffs were apparently reviewing and relying on the wrong data set -- the blue sheet data produced on November 13, 2009, not the supplemental replacement data provided on January 28, 2010. DBSI was able to match the transactions Plaintiffs believed to be missing from DBSI's blue sheet data to the data produced on January 28, 2010, and informed Plaintiffs of this fact by letter.[10] *See* Halper Aff., Ex. F (September 3, 2010 Letter from Gregory A. Markel to Steven J. Rosenwasser), at ¶ 6.

In addition, before receiving and analyzing Plaintiffs' "examples", DBSI had continued its review of data samples for the columns of the blue sheet spreadsheet that contained blank cells. Based on this continued review of data, in mid-July DBSI determined that in a very small number of cases in the more than 154,000 lines of blue sheet data produced, data was available in DBSI's relevant databases but not included in the blue sheets. This issue affected two of the forty-three columns of the spreadsheet, (1) the Depository Institution Identifier[11] ("Depo_Ins_Identifier") field and (2) the Account Type Identifier[12] ("Account_Type_Identifier") field. Specifically, on July 15, 2010, DBSI informed Plaintiffs that it discovered:

---

[10]   Another alleged inconsistency between the blue sheet and ETJ data was based on Plaintiffs' apparent misinterpretation of the ETJ data. *See* Halper Aff., Ex. F (September 3, 2010 Letter from Gregory A. Markel to Steven J. Rosenwasser), at 6.

[11]   The Depository Institution Identifier field lists the identifying number assigned to an account by the relevant depository institution, if applicable and available.

[12]   The Account Type Identifier field lists a code indicating generally whether an account is an agency or proprietary account.

> data extraction problems affected the collection of data from two
> minor fields in the Blue Sheets that were created for this litigation
> and previously provided to [Plaintiffs]. The effected fields are
> (1) the Depository Institution Identifier ("Depo_Ins_Identifier")
> field and (2) the Account Type Identifier
> ("Account_Type_Identifier") field. For the Depo_Ins_Identifier
> field, we are advised that there may be data in DBSI's systems that
> was not pulled to populate that field. For the
> Account_Type_Identifier, we are advised that some, but not all, of
> the fields in the Blue Sheet we provided to plaintiffs may be
> missing data.

*See* Halper Aff., Ex. G (July 15, 2010 email from Gregory A. Markel to Steven J. Rosenwasser).

DBSI informed Plaintiffs of this issue within ten days of its discovery, in accordance with the

Stipulation and Order dated January 11, 2010. DBSI has worked diligently to rectify this data

issue and, given Plaintiffs' proclivity for filing sanctions motions based on discovery

imperfections no matter how minor, DBSI endeavored to review the newly-collected data in an

attempt to limit the possibility of additional data extraction issues prior to production to

Plaintiffs. DBSI is providing supplemental blue sheet data containing the missing fields to

Plaintiffs simultaneously with filing this brief.[13]

Accordingly, contrary to Plaintiffs' contention, DBSI has at all times worked

diligently and in good faith to provide Plaintiffs with the vast amount of trading data they have

requested in this matter and has not "willfully violated the Court's Order" or "made false

representations to Plaintiffs" concerning the blue sheet data it prepared and produced for

purposes of this litigation. Plaintiffs' Motion at 5.

---

[13]    Based on the supplemental blue sheet data production, it appears that the January 28, 2010 blue sheet data did not contain available data for approximately 7% of the cells for the Account_Type_Identifier field and approximately 0.5% of cells for the Depo_Ins_Identifier field. For both data fields, these figures represent a *de minimis* data extraction issue when compared to the total amount of data extracted over a more-than-six-year period, which exceeds 154,000 lines of information in the blue sheet alone.

## POINT II

### DBSI HAS ACTED IN GOOD FAITH TO PROVIDE PLAINTIFFS WITH THE TRADING DATA THEY SEEK AND SANCTIONS ARE NOT WARRANTED

There is no basis for Plaintiffs' claim that DBSI should be sanctioned for "willfully violat[ing]" the Court's July 16, 2009 Scheduling Order. Plaintiffs' Motion at 5. Based on the above, DBSI has worked diligently to extract and produce the multiple trading data sets Plaintiffs demanded. And, in each instance where a data extraction issue was discovered, DBSI worked diligently to correct it, and produce supplemental data as quickly as practicable. Plaintiffs point to no case law supporting the imposition of sanctions where the defendant has diligently worked in good faith to comply with discovery requests and court orders. Instead, the cases cited by Plaintiff reflect the imposition of sanctions only in extreme instances of a pattern of willful and intentional misconduct. *See Freeman v. Foss*, 298 Ga. App. 498, 680 S.E.2d 557 (2009) (sanctions imposed where defense counsel delayed trial date multiple times as a result of repeated intentional misrepresentations that he would provide expert discovery); *Swindell v. Swindell*, 233 Ga. 854, 213 S.E.2d 697 (1975) (sanctions imposed where defendant made no effort to comply with discovery request until after the court ruled on plaintiffs' motion to compel). Georgia courts have refused to impose sanctions where, like here, the circumstances demonstrate that the defendant acted in good faith and where there was no evidence of willful or intentional disregard for court orders. *See Gilbert v. Montlick & Assocs., P.C.*, 248 Ga. App. 535, 541-542, 546 S.E.2d 895, 903 (2001) (affirming the trial court's refusal to impose sanctions where "there is evidence of at least an attempt" by defendants to comply with discovery requests and no evidence of "willful or intentional failure to comply with the court's order."); *see also Harrell v. Georgia Dep't of Human Res.*, 300 Ga. App. 497, 501, 685 S.E.2d 441, 445 (2009)

(reversing sanctions based on abuse of discretion in awarding sanctions without "examin[ing] the circumstances [of the alleged discovery violation] retrospectively . . . .")

Not only has DBSI made every reasonable effort to comply with the Plaintiffs' broad and burdensome document requests and the terms of the parties' stipulations and Court orders regarding the production of blue sheet data, but all the relevant considerations weigh strongly against the imposition of sanctions.  Unlike *Freeman*, cited by Plaintiffs, there has been no delay to the Court's schedule or Plaintiffs' own investigation.  The additional information provided to Plaintiffs consisted of minor additional data points associated with a small number of transactions for which Plaintiffs already had abundant information in several other forms.  Plaintiffs have not alleged that these (or any other) specific transactions were manipulative or caused them harm.  Plaintiffs have also not explained how the lack of these two minor data points for a small number of transactions has prejudiced them in any way, particularly given the volume of trading data already provided in other formats.  Indeed, Plaintiffs have yet to explain how these additional data points have any relevance to their claims, except in the vaguest of terms.

Accordingly, the present Motion appears to be yet another example of Plaintiffs attempting to seize on a garden-variety discovery issue, one common in cases where the parties extract massive historical data sets for purposes of the litigation, and to mischaracterize that conduct as evidence of nefarious, sanctionable activity.  In response to Plaintiffs' extensive and burdensome discovery requests, DBSI has produced an enormous volume of information.  And, Plaintiffs' own actions in ignoring DBSI's productions and analyzing the wrong blue sheet for months reflect that their true goal in filing this motion is not to obtain necessary discovery – which already has been provided – but to place undue discovery burdens on Defendants through

abusive discovery practices.[14]   Plaintiffs' conduct and improper motion practice should not be condoned.[15]

In short, DBSI is producing (simultaneously with the filing of this brief) the data at issue in Plaintiffs' Motion, which consisted of minor additions to trading data that has been in Plaintiffs' possession for months but not reviewed by Plaintiffs in that entire time.   DBSI has acted in good faith to comply with all of Plaintiffs' discovery requests (both formal and informal), the parties' stipulations and Court orders.   Plaintiffs have not been prejudiced and their request for sanctions – which are disproportionate and unrelated to the discovery issue in question – in the form of extended fact discovery, a Court finding foreclosing on DBSI's ability to move for summary judgment, and fees and expenses, should be denied.

---

[14]   For example, despite this enormous volume of trading data provided to Plaintiffs, they have yet to identify any specific trade which they claim was manipulative.   And, when Plaintiffs did substantively review trading data sets, it appears that their review was limited to discovering apparent inconsistencies between various data sets provided, not manipulative trading activity.

[15]   Accordingly, Plaintiffs' claim that the extreme and extraordinary sanctions they seek here are warranted because "Plaintiffs have once lost months necessary to read and analyze important data" rings hollow. *See* Plaintiffs' Motion at 2.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Sanctions Motion against DBSI.

Dated:     September 22, 2010
           New York, New York

                                     Respectfully submitted,


                                     /s/ Jason M. Halper
                                     Gregory A. Markel
                                     Admitted *Pro Hac Vice*
                                     Jason M. Halper
                                     Admitted *Pro Hac Vice*
                                     Israel Dahan
                                     Admitted *Pro Hac Vice*
                                     Peter J. Isajiw
                                     Admitted *Pro Hac Vice*

                                     *Attorneys for Deutsche Bank Securities Inc.*

                                     CADWALADER, WICKERSHAM & TAFT LLP
                                     1 World Financial Center
                                     New York, New York  10281
                                     Tel: (212) 504-6000
                                     Fax: (212) 504-6666

Richard H. Sinkfield, Esq.
Georgia Bar No. 649100
Dan F. Laney, III
Georgia Bar No. 435290
ROGERS & HARDIN LLP
2700 International Tower
229 Peachtree St, NW
Atlanta, Georgia  30307
Ph: 404 522-4700
Fax: 404-525-2224

*Attorneys for Defendants*

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

TASER INTERNATIONAL, INC., et al.,                    Civil Case No.
                                                      2008-EV-004739-B
     Plaintiffs,

v.

MORGAN STANLEY & CO., INC., GOLDMAN,
SACHS &CO., INC., GOLDMAN SACHS
EXECUTION & CLEARING, L.P., BEAR STEARNS
& CO., INC., K/N/A JP MORGAN SECURITIES, INC.,
BEAR STEARNS SECURITIES CORP., K/N/A JP
MORGAN CLEARING CORP., MERRILL LYNCH,
PIERCE, FENNER & SMITH, INC., DEUTSCHE
BANK SECURITIES, INC., CREDIT SUISSE
SECURITIES (USA) LLC, BANC OF AMERICA
SECURITIES, LLC, UBS SECURITIES, LLC, and
JOHN DOES 1-10,

     Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2010, true and correct copies

of Defendant Deutsche Bank Securities Inc.'s Opposition to Plaintiffs' Motion for Sanctions

Against Deutsche Bank Securities Inc. for Undisputed Violation of the Court's July 16, 2009

Scheduling Order, and the supporting Affidavit of Jason M. Halper, dated September 22, 2010

(with the exhibits attached thereto), were served via U.S. Mail postage prepaid upon the

following attorneys of record:

ATTORNEYS FOR PLAINTIFFS

    John E. Floyd, Esq.
    Steven J. Rosenwasser, Esq.
    Bondurant, Mixson & Elmore, LLP
    3900 One Atlantic Center
    1201 West Peachtree Street, N.W.
    Atlanta, Georgia  30309

James W. Christian, Esq.
Christian, Smith & Jewell LLP
2302 Fannin, Suite 500
Houston, Texas 77002

John O'Quinn, Esq.
The O'Quinn Law Firm
440 Louisiana Street, Suite 2300
Houston, Texas 77002

And via electronic mail upon the following attorneys of record:

ATTORNEYS FOR DEFENDANTS

Richard H. Sinkfield, Esq.
Rogers & Hardin LLP
2700 International Tower
229 Peachtree Street, NW
Atlanta, GA 30303
rsinkfield@rh-law.com

Brian L. Friedman, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
blfriedman@proskauer.com

Richard H. Klapper, Esq.
Sullivan and Cromwell LLP
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
klapperr@sullcrom.com

Robert F. Wise, Jr., Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
robert.wise@dpw.com

Andrew Frackman, Esq.
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
afrackman@omm.com

Fraser L. Hunter, Jr., Esq.
Wilmer Cutler Pickering Hale and
Dorr LLP
399 Park Avenue
New York, NY 10022
fraser.hunter@wilmerhale.com

Andrew B. Clubok, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
aclubok@kirkland.com

This 22nd day of September, 2010

Peter Isajiw
Admitted *Pro Hac Vice*

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000
peter.isajiw@cwt.com

*Attorneys for Defendant Deutsche Bank Securities Inc.*

Richard H. Sinkfield, Esq.
Georgia Bar No. 649100
Dan F. Laney, III
Georgia Bar No. 435290
ROGERS & HARDIN LLP
2700 International Tower
229 Peachtree Street, NW
Atlanta, GA 30307
Ph: 404-522-4700
Fax: 404-525-2224

*Attorneys for Defendants*

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 33396975
Date:  Sep 22 2010  8:04PM
Mark Harper, Clerk

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

TASER INTERNATIONAL, INC.,                    :
*et al.*,                                                       :
                                                                    :
           Plaintiffs,                                      :          CIVIL ACTION
                                                                    :          FILE NO.: 2008-EV-004739-B
v.                                                                 :
                                                                    :
MORGAN STANLEY & CO., INC.,             :
*et al.*,                                                       :
                                                                    :
           Defendants.                                   :

**AFFIDAVIT OF JASON M. HALPER IN SUPPORT OF
DEUTSCHE BANK SECURITIES INC.'S OPPOSITION TO PLAINTIFFS' MOTION
FOR SANCTIONS AGAINST DEUTSCHE BANK SECURITIES INC. FOR
UNDISPUTED VIOLATION OF THE COURT'S JULY 16, 2009 SCHEDULING ORDER**

           Jason M. Halper, being duly sworn, deposes and says:

           1.           I am a member of the Bar of the State of New York and of the law firm

Cadwalader, Wickersham & Taft LLP ("Cadwalader"), counsel to defendant Deutsche Bank

Securities Inc. ("DBSI").  I was admitted to practice before this Court *pro hac vice* by Order

dated August 30, 2010.

           2.           I submit this affidavit in support of DBSI's Opposition to Plaintiffs'

Motion for Sanctions Against DBSI for Undisputed Violations if the Court's July 16, 2009

Scheduling Order.

           3.           Attached hereto as Exhibits A – G are true and correct copies of the

following documents:

                       A           Letter, dated September 14, 2009, from Martin L. Seidel to Steven
                                    J. Rosenwasser.

USActive 20681003.1

B Letter, dated November 13, 2009, from Martin L. Seidel to Steven J. Rosenwasser.

C Letter, dated January 28, 2010, from Martin L. Seidel to Steven J. Rosenwasser.

D Email, dated August 9, 2010, from Jason M. Halper to Steven J. Rosenwasser, Peter Isajiw, and Gregory A. Markel.

E Email, dated August 20, 2010, from Elizabeth G. Eager to Jason M. Halper, Peter Isajiw, and Gregory A. Markel.

F Letter, dated September 3, 2010, from Gregory A. Markel to Steven J. Rosenwasser (FILED UNDER SEAL).

G Email, dated July 15, 2010, from Gregory A. Markel to Steven J. Rosenwasser.

Dated: September 22, 2010
   New York, New York

Jason M. Halper

Sworn to before me this
22nd day of September, 2010

Notary Public

CHRISTINE L. ESSLER
Notary Public, State of New York
No. 01ES6196852
Qualified in Kings County
Commission Expires November 24, 2012

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 33396975
Date:  Sep 22 2010  8:04PM
Mark Harper, Clerk

# EXHIBIT A

CADWALADER

Cadwalader, Wickersham & Taft LLP
New York  London  Charlotte  Washington  Beijing

One World Financial Center, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

September 14, 2009

**VIA FEDEX**

Steven J. Rosenwasser
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417

Dear Steven:

We represent Deutsche Bank Securities Inc. ("DBSI") in the captioned matter. Pursuant to our agreement contained in Attachment A of the Scheduling Order entered July 16, 2009, enclosed please find a compact disk containing DBSI's initial production of documents and data in response to Requests 1 through 15 of Plaintiffs' First Requests for Production of Documents field May 27, 2008 (the "Request"). The enclosed documents are bates numbered DBSI-TASER 000978 to DBSI-TASER 003177. More specifically:

• DBSI-TASER 003174 is a Blue Sheet run for equities trading in TASER common stock from January 1, 2003 through May 31, 2009;

• DBSI-TASER 000978 to DBSI-TASER 002878 are daily stock record reports for equities trading in TASER common stock from January 1, 2007 through May 31, 2009;

• DBSI-TASER 003173, DBSI-TASER 003175, DBSI-TASER 003177, and DBSI-TASER 002879 to DBSI-TASER 003172 are data containing responsive information from DBSI's primary order execution and order management systems from January 1, 2007 through May 31, 2009. DBSI-TASER 003173 also contains additional responsive information from January 1, 2003 through May 31, 2006;

• DBSI-TASER 003176 is a Blue Sheet run for trading of listed options in TASER common stock from January 1, 2003 through May 31, 2009.

CADWALADER

Steven J. Rosenwasser
September 14, 2009

Please note that these documents are marked "HIGHLY CONFIDENTIAL" pursuant to the Stipulation and Protective Order Regarding Confidential Information (the "Confidentiality Stipulation") entered in the captioned matter.

In response to the Request, DBSI has endeavored to conduct a reasonable search for responsive information related to trading of common stock of TASER International, Inc. ("TASER") from January 1, 2003 through May 31, 2009 in accounts identified as prime brokerage, proprietary or institutional accounts. DBSI objects to the production of information related to any other type of account or trading activity as irrelevant to the claims and defenses in the captioned matters. Without waiving any such objection and pursuant to our agreement with respect to the Request, we represent that since February 2003, retail trades by clients of DBSI's Private Client Services ("PCS") business division have been cleared through Pershing LLC ("Pershing"), using Pershing's CNS account. These transactions appear on Pershing's stock record and any locates for short sales of TASER stock in any PCS account or any stock lending activity related to TASER stock in any such PCS account would have been obtained or enforced through Pershing. As such, any TASER shares held in such PCS accounts were not available to DBSI to loan, lend or borrow in connection with its non-PCS trading activity. Accordingly, pursuant to our agreement, DBSI has not endeavored to collect and produce documents related to PCS retail accounts and trading activity. The inadvertent inclusion of such information in the enclosed documents, if any, should not be considered a waiver of that objection.

Moreover, DBSI objects to the production of information concerning any security other than TASER common stock. The production of a listed option Blue Sheet pursuant to our agreement should not be considered a waiver of that objection.

Some of the data being produced with this letter was derived from DBSI's proprietary internal databases. Accordingly, and as we have previously advised you, some of the enclosed documents were created for the purpose of this litigation by exporting the relevant data responsive to the Request into an Excel file, Access database, comma-delimited text file (.csv), a text file (.txt) or other similar file. Although DBSI believes that the documents created for the purpose of this litigation are reasonably accurate, DBSI cannot represent that they are complete or that there are not some inadvertent errors in the generation, collection or preparation of these documents. We will provide further updates or corrections if we discover missing information or errors.

DBSI has worked diligently, and continues to work diligently, to comply with your broad requests for documents and information. DBSI has made a good faith effort to locate and produce documents responsive to your Request in the time available; however, our collection

C A D W A L A D E R

Steven J. Rosenwasser
September 14, 2009

and review is ongoing and DBSI reserves the right to supplement this production if additional
responsive documents are located.  DBSI's production of materials should not be deemed a
waiver of any objections to your Request.  By producing the enclosed documents, DBSI does
not concede that the Request or the materials produced are relevant to the captioned matter nor
does DBSI concede that these materials are proper subjects of discovery.  DBSI reserves the
right to object in the future to any subsequent discovery requests relating to these areas.

Very truly yours,

Martin L. Seidel

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 33396975
Date:  Sep 22 2010  8:04PM
Mark Harper, Clerk

# EXHIBIT B

# C A D W A L A D E R

Cadwalader, Wickersham & Taft LLP
New York  London  Charlotte  Washington  Beijing

One World Financial Center, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

November 13, 2009

**VIA FEDEX**

Steven J. Rosenwasser
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417

Re:   TASER International Inc., et al. v. Morgan Stanley & Co., Inc., et al., Civil
      Case No. 2008-EV-004739-B

Dear Steven:

We represent Deutsche Bank Securities Inc. ("DBSI") in the captioned matter. Pursuant to our
agreement contained in Attachment A of the Scheduling Order entered July 16, 2009, enclosed
please find a compact disk containing DBSI's production of documents and data in response to
Requests 1 through 15 of Plaintiffs' First Requests for Production of Documents filed May 27,
2008, as well as non-objected to documents responsive to Requests 16 through 54 of the First
Request and Plaintiffs' Second Request for Production of Documents (collectively the
"Requests"). We have also resolved certain client confidentiality issues and, as a result, we are
producing unredacted versions of the trading data previously produced in redacted form on
September 14, 2009. However, we are still working to resolve certain remaining
confidentiality concerns regarding the production of certain securities lending data.
Accordingly, we have produced redacted versions of those documents containing information
that is potentially subject to the remaining confidentiality concerns. We are diligently working
to resolve these concerns and will produce unredacted versions of these documents as soon as
they are resolved, which we hope to be within the next few weeks.

The enclosed documents are bates numbered DBSI-TASER 003208 to DBSI-TASER 008985.
More specifically:

- DBSI-TASER 003209 is an unredacted Blue Sheet run for equities trading in TASER
  common stock from January 1, 2003 through May 31, 2009, which was previously
  produced in redacted form on September 14, 2009 as DBSI-TASER 003174. DBSI-
  TASER 003209 is intended to replace DBSI-TASER 003174.

# C A D W A L A D E R

Steven J. Rosenwasser
November 13, 2009

- DBSI-TASER 005809 to DBSI-TASER 008277 are daily stock record reports for equities trading in TASER common stock from January 1, 2003 through December 31, 2006.

- DBSI-TASER 003208, DBSI-TASER 003210, and DBSI-TASER 003212 are unredacted versions of DBSI's primary order execution and order management systems data previously produced on September 14, 2009. DBSI-TASER 003208 is intended to replace DBSI-TASER 003173; DBSI-TASER 003210 is intended to replace DBSI-TASER 003175; and DBSI-TASER 003212 is intended to replace DBSI-TASER 003177.

- DBSI-TASER 003225, DBSI-TASER 003226 and DBSI-TASER 003228 to DBSI-TASER 005808 are data containing additional responsive information from DBSI's primary order execution and order management systems from January 1, 2003 through December 31, 2006.

- DBSI-TASER 003211 is an unredacted Blue Sheet run for trading of listed options in TASER common stock from January 1, 2003 through May 31, 2009, which was previously produced in redacted form on September 14, 2009 as DBSI-TASER 003176. DBSI-TASER 003211 is intended to replace DBSI-TASER 003176.

- DBSI-TASER 003213 through DBSI-TASER 003219 and DBSI-TASER 003227 contain securities lending data related to TASER common stock from January 1, 2003 through May 31, 2009. Included in these documents are Locate Exception data, Loan Contract data, Securities Attributes data and Locate data. Please note that DBSI was unable to retrieve Securities Attributes data prior to 2006. Based on our investigation to date, DBSI does not believe such data exists in our centralized systems.

- DBSI-TASER 003224 contains ADP Aged Fail data related to TASER common stock from January 1, 2003 through May 31, 2009.

- DBSI-TASER 008278 through DBSI-TASER 008463 are supplemental productions of the tables of contents and relevant sections of certain U.S. compliance policies and procedures and written supervisory procedures produced pursuant to the parties agreement.

- DBSI-TASER 008972 through DBSI-TASER 008985 are Blue Sheet requests DBSI received from the United States Securities and Exchange Commission (SEC) between

C A D W A L A D E R

Steven J. Rosenwasser
November 13, 2009

January 1, 2003 through May 31, 2009 that specifically relate to TASER common
stock.

- DBSI-TASER 003221 contains CNS Consolidated Trade Summary data related to
  TASER common stock from January 1, 2003 through May 31, 2009.

- DBSI-TASER 003223 contains CNS Accounting Summary data related to TASER
  common stock from January 1, 2003 through May 31, 2009.

- DBSI-TASER 003222 contains Reg SHO Reported Transaction data related to TASER
  common stock from January 1, 2003 through May 31, 2009.

- DBSI-TASER 003220 contains Break Reporting Transaction data related to TASER
  common stock from January 1, 2003 through May 31, 2009.

- DBSI-TASER 008465 through DBSI-TASER 008971 contains FINRA Short Position
  Information related to TASER common stock from January 1, 2003 through May 31,
  2009.  Please note that, due to technical issues beyond DBSI's control, the FINRA
  Short Position Information for May 16, 2006 could not be retrieved at this time.  We
  will provide this information to you in a supplemental production once it becomes
  available.

- DBSI-TASER 008464, attached as Exhibit A to this letter, lists the domestic Self-
  Regulatory Organizations dealing with equities or derivatives trading to which DBSI
  belongs.

Please note that these documents are marked "HIGHLY CONFIDENTIAL" or
"CONFIDENTIAL", as appropriate, in accordance with the parties' agreed upon protective
order.  In accordance with our agreement, please restrict access to this information to attorneys
and other necessary staff at your law firm until the parties' agreed upon protective order is
entered by the Court.  Once the protective order is entered by the Court, the information
contained herein will be subject to the terms of that protective order.

In response to the Requests, DBSI has endeavored to conduct a reasonable search for
responsive information related to trading of common stock of TASER International, Inc.
("TASER") from January 1, 2003 through May 31, 2009 in accounts identified as prime
brokerage, proprietary or institutional accounts.  DBSI objects to the production of information
related to any other type of account or trading activity as irrelevant to the claims and defenses

CADWALADER

Steven J. Rosenwasser
November 13, 2009

in the captioned matters. The inadvertent inclusion of such information in the enclosed documents, if any, is not and should not be construed as a waiver of that objection.

Moreover, DBSI objects to the production of information concerning any security other than TASER common stock. The production of a listed options Blue Sheet pursuant to our agreement should not be considered a waiver of that objection. In that regard, DBSI has not specifically endeavored to collect and produce any other listed options data or information. The inadvertent inclusion of such information in the enclosed documents, if any, is not and should not be construed as a waiver of that objection.

Some of the data being produced with this letter was derived from DBSI's proprietary internal databases. Accordingly, and as we have previously advised you, some of the enclosed documents were created for the purpose of this litigation by exporting the relevant data responsive to the Request into an Excel file, Access database, comma-delimited text file (.csv), a text file (.txt) or other similar file. Although DBSI believes that the documents created for the purpose of this litigation are reasonably accurate, DBSI cannot represent that they are complete or that there are not some inadvertent errors in the generation, collection or preparation of these documents. We will provide corrections if we discover missing information or errors.

DBSI has worked diligently, and continues to work diligently, to comply with your broad requests for documents and information. DBSI has made a good faith effort to locate and produce documents responsive to your Requests in the time available; however, our collection and review is ongoing and DBSI reserves the right to supplement this production if additional responsive documents are located. DBSI's production of materials should not be deemed a waiver of any objections to your Requests. By producing the enclosed documents, DBSI does not concede that the Requests or the materials produced are relevant to the captioned matter nor does DBSI concede that these materials are proper subjects of discovery. DBSI reserves the right to object in the future to any subsequent discovery requests relating to these areas.

Very truly yours,

Martin Seidel /HH

Martin L. Seidel

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 33396975
Date:  Sep 22 2010  8:04PM
Mark Harper, Clerk

# EXHIBIT C

# CADWALADER

Cadwalader, Wickersham & Taft LLP
New York  London  Charlotte  Washington  Beijing

One World Financial Center, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

January 28, 2010

VIA FEDERAL EXPRESS

Steven J. Rosenwasser
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417

Re:   TASER International Inc., et al. v. Morgan Stanley & Co., Inc., et al., Civil
      Case No. 2008-EV-004739-B

Dear Steven:

We represent Deutsche Bank Securities Inc. ("DBSI") in the captioned matter. Pursuant to our agreement dated November 13, 2009 as amended on January 11, 2010, and our ongoing discussions, enclosed please find two DVDs containing documents Bates labeled DBSI-T 0011753837 through DBSI-T 001216842. The documents Bates labeled DBSI-T 001175838 through DBSI-T 001216842 are produced in response to the non-objected to requests for documents in Plaintiffs' First and Second Request for Production of Documents (collectively the "Requests"). In addition, we have discovered that DBSI-TASER 003209, previously produced to Plaintiffs on November 13, 2009, was inadvertently truncated in the production process. Therefore, we are producing DBSI-T 001175837, which includes information inadvertently excluded from DBSI-TASER 003209. DBSI-T 001175837 is intended to replace DBSI-TASER 003209. The enclosed documents are marked "HIGHLY CONFIDENTIAL" or "CONFIDENTIAL", as appropriate, in accordance with the parties' agreed upon Stipulation and [Proposed] Protective Order Regarding Confidential Information.

In response to the Requests, DBSI has endeavored to conduct a reasonable search for responsive information related to trading of common stock of TASER International, Inc. ("TASER") from January 1, 2003 through May 31, 2009 in accounts identified as prime brokerage, firm or institutional accounts. DBSI objects to the production of information related to any other type of account or trading activity as irrelevant to the claims and defenses in the captioned matters. Additionally, DBSI maintains its objections to Request Nos. 23, 24 and 31 of Plaintiffs' First Requests for Production of Documents to Each Defendant on the ground that these requests seek information that is irrelevant and not reasonably calculated to

# C A D W A L A D E R

Steven J. Rosenwasser
January 28, 2010

lead to the discovery of admissible evidence. Accordingly, DBSI has withheld from its
production certain documents that contain highly confidential, non-public and proprietary
information regarding its profits, revenues and losses. To the extent you wish to discuss this
matter further through a meet-and-confer process, we would be happy to do so. The
inadvertent inclusion of such information in the enclosed documents, if any, is not and should
not be construed as a waiver of that objection.

Moreover, DBSI objects to the production of information concerning any security other than
TASER common stock. In that regard, DBSI has redacted information related to securities
other than TASER from its production. The inadvertent inclusion of such information in the
enclosed documents, if any, is not and should not be construed as a waiver of that objection.

DBSI has worked diligently, and continues to work diligently, to comply with your broad
requests for documents and information. DBSI has made a good faith effort to locate and
produce documents responsive to your Requests in the time available; however, our collection
and review is ongoing and DBSI reserves the right to supplement this production if additional
responsive documents are located. DBSI's production of materials should not be deemed a
waiver of any objections to your Requests. By producing the enclosed documents, DBSI does
not concede that the Requests or the materials produced are relevant to the captioned matter
nor does DBSI concede that these materials are proper subjects of discovery. DBSI reserves
the right to object in the future to any subsequent discovery requests relating to these areas.

Very truly yours,

Martin L. Seidel

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 33396975
Date:  Sep 22 2010  8:04PM
Mark Harper, Clerk

# EXHIBIT D

## Isajiw, Peter

| | |
|---|---|
| **From:** | Halper, Jason |
| **Sent:** | Monday, August 09, 2010 7:05 PM |
| **To:** | 'Steven J. Rosenwasser'; Isajiw, Peter; Markel, Gregory |
| **Cc:** | 'Elizabeth G. Eager' |
| **Subject:** | RE: follow up on conferral |

Dear Steven and Liz:

We appreciate your conferring with us to address both Plaintiffs' 30(b)(6) Notice and their numerous further requests for additional information relating to the documents produced and written discovery responses served by DBSI. I will respond separately to 30(b)(6) issues in light of the revised draft notice which you sent to us earlier today, although as indicated in my earlier email (also from today) we disagree with your characterization of the meet and confer process regarding this discovery or the reasons for any perceived delays.

With regard to Plaintiffs' requests for additional information and/or further clarification regarding various items, we note the following as discussed during our call:

1. Request for clarification regarding Redaction to Email Attachments bearing Bates numbers DBSI-T006787623-57 - As discussed, these documents were inadvertently redacted and will be produced early next week. We also noted that we are conducting an on-going quality control review of our productions and, to the extent we discover any other documents that were inadvertently and/or incorrectly redacted, we will produce them in unredacted form.

2. Request for a "Chart of Accounts" - As discussed, we are working on compiling this information and intend to produce it by next week.

3. Request for clarification with respect to the definitions in the Daily SHO requirement v trading reports - As we discussed during our call, we are endeavoring to draft a "data dictionary" with respect to the terms used in such reports. This document is being created for the purpose of this litigation, and at your request. We will send you this document once it is completed.

4. Requests for clarification regarding perceived inconsistencies between DBSI's Blue Sheets and NASDAQ ETJ's on 12/21/07, 6/27/08 and 9/19/08 - We explained during the call our general understanding with regard to the difference in scope or content of DBSI's Blue Sheets and NASDAQ ETJ's (which, for instance, capture only a portion of DBSI's transactions on a given day) and the consequent differences that may potentially be reflected in the data depicted therein. We also explained that our comparison of the Blue Sheets to the NASDAQ ETJ's for each of the above dates indicated that the volume of trading reflected on the NASDAQ ETJ's was lower than the volume of trades reflected on the Blue Sheet, which is to be expected. You indicated that you understood this general difference. We will also review the data on the particular dates you have indicated are of interest to you.

On the call you asked again why the Blue Sheets do not indicate the time of transactions. We have talked about this several times, and as we understand it, time of transactions is not typically a data point required on blue sheets. Accordingly, we have provided you with the order management data which includes the time of transactions.

Finally, in connection with your questions regarding the listed options blue sheet, you agreed to provide us with examples of entries on the options blue sheet that do not appear on the Options Clearing Corp. production.

Please be aware that we disagree that it took DBSI "three months to first ask for examples" with respect to certain of the foregoing matters (as well as paragraph 5 below). We have attempted to obtain answers in response to your numerous requests for information regarding plaintiffs' sweeping document requests, which often has resulted in further questions from you, in response to which at times we have asked for examples to help us respond to your inquiry (which you said on the call you understood). Any suggestion that we misled you or have

not been diligent in responding to your requests for "clarification" is mistaken and, for example, belied by our efforts as reflected in this email.

5.  Request for clarification with respect to the "Opp Broker" field on Blue Sheets - As discussed, in researching your general inquiry we understand as a general matter that there are many types of entries on the blue sheets for which there exists no "opposing broker" data.  Contrary to your assertions below, when you first raised this issue, we asked Plaintiffs to identify any specific blue sheet entries for which they had concerns regarding the absence of information in the "Opp Broker" column so that we could address them.  Plaintiffs did not identify any specific entries.  Nonetheless, and as we discussed, we researched a sampling and did not find any instance where there existed "Opp Broker" data in DBSI's systems that was not reflected in the Blue Sheets created for this litigation.  Again, if Plaintiffs have particular lines of data they would like us to look into, we would consider it. Additionally, we will continue to look into the issue in connection with providing you a supplemental blue sheet.

6. Requests for information with respect to CNS Exit documents and RVP/DVP issues - As discussed, we are researching these issues with the client and will get back to you with any information we may have as soon as practicable.  We also indicated, however, that we believe that CNS exit and RVP/DVP information is of marginal or no relevance, as well as extremely burdensome to collect, and are looking into this matter further by way of compromise as an accommodation to you.

7.  Request for clarification with respect to Second Set of Interrogatories - As discussed during our call, we talked about your request for clarification of DBSI's answers to Interrogatories 5 (c), (d), (i), and (j).  As to 5(c) and (d), we again clarified that the existence of TASER transactions on various reports related to Regulation SHO compliance monitoring does not constitute a finding that a violation of any securities laws, rules or regulations has occurred.  As for the settlements referenced in the responses to 5(i) and (j), we again explained that DBSI's entry into the settlements was not a determination that the alleged conduct occurred.

In connection with Interrogatory 5(m), for which DBSI also already provided a response, we understand that Plaintiffs now ask a question different than the one to which we agreed to respond in the interrogatory.  As you know, and as we explained in our conferral just before your vacation, the parties' responses to the Second Amended Interrogatories were heavily negotiated.  Initially, DBSI objected to Interrogatory 5(m) on several grounds and offered to meet and confer with Plaintiffs in order to come to an understanding of the information sought.  Other defendants responded to the interrogatory, but did so in the context of intentional mismarking, which we understand to be relevant to your intentional market manipulation allegations.  During the course of the negotiations regarding the amended interrogatories, you agreed that "[a]s to interrogatory 5(m), all Defendants have responded except DBSI, which will respond on the same basis as the other defendants."  See May 7, 2010 order Section II Interrogatory Nos. 5(k) and (m).  DBSI did just that.

Now, Plaintiffs appear to seek additional information regarding any unintentional mismarking of orders or other technical systems issues related to marking of orders that may have occurred over more than 6 years.  We indicated that, among other things, it would be impossible to respond to such an inquiry without conducting an audit of DBSI's records and that, to the extent any such information is reasonably available to DBSI and was responsive to the Third Interrogatory requests, it is contained in the AWC's and other documents relating to regulatory inquiries and already produced by DBSI.

8. Further Requests for Clarification and Production in connection with Profit and Loss Information - As discussed during our call and in the past, DBSI does not historically maintain books and records data on profits and losses on a per security basis.  We also explained that we have provided Plaintiffs with a significant amount of data related to securities lending via production of Loannet Reports and iDelta Open Loan Contract data, and, as we mentioned during the call, are researching with the client whether there is any additional data we can extract and compile or otherwise derive in response to your request for profit and loss data.  Further, we mentioned during our call that, based on our investigations to date, many of the categories listed in the "Profit and Loss Data" sheet sent by Plaintiffs do not apply to DBSI, such as the activities listed in the bullets under "Locates".  We understand based on your email below that Plaintiffs would like us to further investigate and/or clarify this issue, based on the documents referenced below (DBSI-T 00191-2238-64 at '49; DBSI-T 003248790; DBSI-T005255656, DBSI-T006223294), and whether profit and loss data relating to rehypothecation will be provided. We will research these additional inquiries.

9. Additional Request for Production of Emails from Traders - We appreciate the document references Plaintiffs have submitted to support their request for trader custodians for additional email searches.  As discussed, we will try to ascertain their relevance.  We also discussed DBSI's view that Plaintiffs are required to identify specific

allegedly manipulative trades at issue so that any search for trader emails would be efficient and tied to purportedly relevant trades.  We understand that Plaintiffs disagree with that position.

10.  Requests for Clarification with respect to other Miscellaneous Issues -  We believe we reviewed and addressed the issues raised in your May 6 email.  We believe the issues in items (1) and (2) of that email are addressed above.  For items (3) and (4), related to producing unredacted IDelta data, you agreed that DBSI did so months ago, on January 8, 2010.  As for item (5), related to the production of the SO12 Recap Report, we discussed that we previously provided you with samples of this report and that you agreed to withdraw your request for that report.  For reference, we provided the sample via email on December 4, 2009.  You responded that you were willing to hold your request for this report in abeyance on December 11, 2009.  As for items (6) through (9), we just want to make clear that the reports you reference appear to be those of another defendant, not DBSI.  We indicated that to the extent DBSI had reports that contain what we understand to be similar information, we would not have withheld them from production if they were responsive to Plaintiffs' requests.  With respect to issue 10, we indicated that if the data referenced in (a), (b), (c), (d) and (f) was not in any particular cell in a blue sheet, it is because that data was not pulled from DBSI's systems when creating the blue sheet.  Based on our sampling efforts, we have not found instances where data existed in DBSI's systems but was not populated in the appropriate fields on the blue sheets provided to you.  We continue to look into the issue in connection with our production of supplemental blue sheet data.  We have already addressed (e) in prior emails.

Additionally, we believe your description of our response to issue 10(f) requires further clarification.  We indicated that the "Sub_Broker_No" (a.k.a. the Submitting Broker Number) field was the field that would indicate the NSCC member clearing number of the broker submitting a blue sheet to the regulators (if it were actually submitted).  We also indicated that the information in that field in connection with DBSI would always identify DBSI.  However, we do not believe we ever made any "representation that it cannot be placed on the blue sheets/trading data" provided to you.

11.  We are looking into the issue you raised regarding the password protected excel file.

We appreciate your meet and confer efforts and will get back to you on any open issues as reflected above.  Thanks very much.


Jason M. Halper
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Tel:  212.504.6605
Fax: 212.504.6666
jason.halper@cwt.com
www.cadwalader.com
please consider the environment before printing this email.

---

From: Steven J. Rosenwasser [mailto:rosenwasser@bmelaw.com]
Sent: Friday, August 06, 2010 5:45 AM
To: Halper, Jason; Isajiw, Peter; Markel, Gregory
Cc: Elizabeth G. Eager
Subject: follow up on conferral

Jason and Peter,

I am emailing to follow up on our phone call of yesterday.  Please let us know if you disagree with our summary of the phone call or if you feel the summary is inaccurate in any way.

We tentatively scheduled a call to discuss the 30b6 notice tomorrow morning.  You indicated that the time may

need to be pushed back if you have not obtained approval from the client by then. We look forward to hearing from you and will make ourselves available tomorrow if you need to push back the time of the call. Of course, the more advance notice we receive from you about when you need to have the call, the easier it will be to schedule. Please note that we continue to believe that the conferral process is taking too long (it has now been over 2 months), and that if we cannot reach agreement in the very near future we will unfortunately be left with no other choice but to declare an impasse.

We discussed the following open issues.

CHART OF ACCOUNTS. You indicated you would be producing this later this week or early next week.

REDACTIONS IN 006747245-57. You indicated that you would be producing this document without redactions.

EXIT FROM CNS EMAIL. You are still looking into this. As you know, this issue has been outstanding for several weeks, and may impact our analysis of your data. We would appreciate a response in the next 10 days.

DVP/ RVP ISSUES. We again explained why DVP/RVP accounts are relevant, and noted that this issue has also been outstanding for some time. You indicated that you are still looking into it. Given the time that this matter has been outstanding, we ask for a response in the next 10 days.

TRADERS. You asked us to identify the BATES ranges where Julie Huhn, Harry Murn and Matthew Brezovec (improperly spelled as Bersovic before) are identified as trading TASER. DBSI-T 001810775 identified Julie Huhn as a trader in TASER. DBSI-TASER 00377; DBSI-T 001229841 at 1229852; DBSI-T 001809023 at 001809034; DBSI 001809024 at 001809057; DBSI-T 001809453 at 0010809464 identified Harry Murn as trading TASER. DBSI-TASER 005494 and DBSI-T 01229589 identified Matt Brezovec as trading in TASER. Please let us know if there are additional individuals you are asking for such information about.

In April, Plaintiffs identified seven individuals that we were interested in. Over three months after we requested you identify these individuals as traders, you asked us to identify where in your production we found references to these individuals. Plaintiffs are disappointed in the speed of your conferrals on this topic since these questions could have been resolved months ago. Nevertheless, in an effort to move along the negotiations, the following documents indicate that the individuals we identified were involved in TASER transactions:

- Andrew Bieler. DBSI-T 00397838 at '43-'45
- Martin Rafferty
- Richard Sapanski. DBSI-T 001179626 -30
- Ash Sethi
- Harry Murn. See paragraph above.
- John Ripley. DBSI-T 001179626 -30
- David Baker. DBSI-T 00397838 at '43-'45

The document references we have provided are illustrative of why we are interested in these individuals and believe they traded TASER shares. The list of references we provided is not exhaustive. Because DBSI employs or employed these individuals it is in the better position to determine if they are reasonably likely to have responsive information. Of course, if you wish to discuss these matters further, we would be happy to do so. Plaintiffs do expect, however, that DBSI will act diligently and get back to Plaintiffs quickly on these issues. The issue of traders has been outstanding for months. Your position is that Plaintiffs are supposed to identify specific trades we are interested in and that because we have not done so it is taking longer. Plaintiffs disagree. While we agreed to endeavor to provide information where practical (something we have done), we did not agree to absolve Defendants of their responsibility to identify people with knowledge. DBSI - not plaintiffs - are

9/20/2010

in the position to know which DBSI employees traded TASER stock.

Finally, we asked that you please identify individuals who traded TASER stock in proprietary accounts.

BLUESHEETS AND ETJ INCONSISTENCIES
We followed up again on the inconsistencies and apparent errors we have identified in blue sheets. With respect to the time of transactions, you indicated that DBSI does not maintain that information in the ordinary course other than on the order management system.

With respect to opposing broker, you asked us to provide examples of instances when it does not appear. We are confused by that response, since the column is blank 94% of the time, and thus DBSI can easily find examples. Nonetheless, we will provide some shortly.

With respect to instances where the blue sheets have fewer trades than the ETJs, you asked for examples. But, DBSI has had that information in plaintiffs' interrogatory responses for some time. Please see, among other places, pages 115-18 for examples.

We asked why the blue sheets show options not on the OCC data, and you again asked for examples, which we agreed to provide.

I note that our conferrals on these matters is now three months old. We do not understand why it took DBSI three months to first ask us for examples (as opposed to leading us to believe you were researching the questions and would provide answers).

SECOND AMENDED INTERROGATORIES
We discussed your response to 5c and 5d. These parts of the interrogatory ask you to identify instances of known violations related to locates/ having reasonable grounds. Your response indicated that TASER stock appears on surveillance and monitoring reports that track potential violations of Reg SHO and other securities laws, but failed to state whether the fact that TASER was on those reports indicated a violation. During the call you clarified DBSI's position to be that while TASER appeared on these reports, DBSI does not know whether there was or was not a violation.

Next, we discussed your response to 5i,j. Your response indicated that there were AWCs, sanctions and hearing decisions concerning failures to close open positions in violation of Reg SHO or other securities laws. You indicated that while DBSI was sanctioned for the conduct, it does not know whether it did or did not occur.

Finally, we discussed your response to 5m, involving ticket mismarkings. You only responded as to intentional mismarkings. Plaintiffs are not asking you to do an audit, but we want to know if DBSI has knowledge of any systemic problems that may have caused mismarkings on its order tickets and/or blue sheets. We indicated that we expect you to provide an answer based on reasonably available information. You will get back to us as to whether you will supplement your answer.

PROFIT AND LOSS DATA
You indicated that profit and loss data is contained in data from loanet and idelta. You are looking into other types of data. You indicated on the phone that DBSI did not do pay for holds, term locates or similar transactions. Based on our review of DBSI documents, it appears DBSI may in fact use pay for holds. Plaintiffs request you review DBSI-T 001912238-64 at '49; DBSI-T 003248790; DBSI-T005255656, DBSI-T006223294. It appears that 003248790 shows that one of the tab buttons for trade input in idelta is a "Pay-to-Hold." Similarly, DBSI-T 05255656 discusses preborrows after the Emergency Order in 2008 and references a "Pay to Hold account." DBSI-T006223294 includes a list of accounts with radio buttons by each account type, and "Pay to

9/20/2010

Hold" is one of the options.

Please clarify whether DBSI will be producing profit and loss data related to rehypothecation transactions. It is our understanding that DBSI engages in rehypothecation of securities. *See* DBSI-T 000425536-38 indicating 600 of TASER was rehypothecation.

## DAILY SHO REQUIREMENT V TRADING REPORTS
You indicated you are working on this issue.

## REQUEST FOR ADMISSIONS AND FAIL TRACKING
You indicated you are looking into this issue and will get back to us next week.

## PRODUCTION OF CORRECTED BLUE SHEETS
You indicated you are still working on this issue and will likely have it resolved in the next two weeks. Plaintiffs indicated that under the Court's Order you were required to produce corrected blue sheets within 10 days of discovering the error. Plaintiffs reserve all rights related to this issue.

## MAY 6 DATA QUESTIONS
You indicated that you to the extent you keep reports that contain the data in issues 6-9, you would have produced them. For issue 10, you indicated that when data fields are empty it means that the data was not pulled. You are correcting the Depo Type Identifier field. For other fields it means that the information was not recorded. You indicated that for issue (f) the field would always be DBSI. We reiterated our request that if DBSI has this information, it must be produced. As of now, we are not moving or taking any other action based on your representation that it cannot be placed on the blue sheets/trading data you provided us.

## 30b6
In advance of the call tomorrow, you raised two issues. First, for the Third Interrogatories, if you change the scope of the interrogatory to conduct at issue you will be adding one additional investigation related to overvoting, which was a NYSE Hearing Panel Decision. Additionally, in a rereview of materials, you came upon a two-page letter from AMEX that falls within the scope of the 3rd Interrogatories. You will send us this document. Plaintiffs request that we add these two investigations to the topics in the 30b6.

## PASSWORD ON EXCEL FILE.
We are unable to open DBSI-T 001936179, which is an excel file and attached to this email, because it is password protected. Please produce an alternate version of this document with the password protection. (This same spreadsheet is also password protected at DBSI-T 002610486) Also, please let us know if you know of any other password protected documents.

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 33396975
Date:  Sep 22 2010  8:04PM
Mark Harper, Clerk

# EXHIBIT E

Isajiw, Peter

| | |
|---|---|
| From: | Elizabeth G. Eager [eager@bmelaw.com] |
| Sent: | Friday, August 20, 2010 5:51 PM |
| To: | Halper, Jason; Isajiw, Peter; Markel, Gregory |
| Cc: | Steven J. Rosenwasser |
| Subject: | TASER DBSI Blue Sheet Transaction Questions |

Greg, Jason, and Peter,

Plaintiffs are emailing regarding DBSI's blue sheets. When we previously spoke on the phone, you requested that Plaintiffs identify examples where (1) the blue sheets have fewer trades than the ETJs; (2) the opposing broker code was missing; and (3) options transactions were not reported to the OCC.

Blue Sheets and ETJs

On September 16, 2005, DBSI's blue sheets show 3 transactions totaling 7,900 TASER shares executed on the National Stock Exchange. The ETJ, however, shows that DBSI executed 8 transactions totaling 122,100 TASER shares.

On June 20, 2008, DBSI's blue sheets show transactions for 28,412 TASER shares. The ETJ shows DBSI actually transacted 128,752 shares of TASER.

On February 11, 2009, DBSI's blue sheets show that DBSI executed TASER short sales for 15,910 shares on the National Stock Exchange, but the Equity Trade Journal shows that DBSI actually sold 45,900 TASER shares to a blank counter party.

Plaintiffs' Responses to the Second Interrogatories at around page 116 identify additional transactions. Plaintiffs request you provide an explanation for these discrepancies.

Opposing Broker Code Missing

Plaintiffs stand by our position that the opposing broker code is blank for 94% of the TASER transactional volume in the blue sheets produced by DBSI. Plaintiffs understand the opposing broker code should generally be populated when DBSI is trading with another broker. Because the field is blank, Plaintiffs cannot determine if the field should be populated or if these transactions represented shares being transacted within DBSI's own accounts.

For example, June 25, 2004, shows 3 transaction reported with an opposing broker for 390 shares. On June 13, 2005, there were no opposing brokers reported for the day. On August 18, 2006, there are 11 transactions reported with an opposing broker for 4,800 shares. On December 19, 2008, no opposing brokers were reported for the day. However, on each of these days DBSI's blue sheets show hundreds of thousands of shares being transacted.

After looking at the transactions for that day, Plaintiffs request that DBSI let us know whether the opposing broker information for these days is correct.

Options Not Posted to the OCC

The options transactions discussed below were not reported in the Options Clearing Corporation data (from

page 183 of the Responses to the Second Interrogatories). Plaintiffs request you provide an explanation regarding the failure to report these transactions.

"DBSI similarly appears to have engaged in apparent sham option transactions involving TASER securities through Trivium Funds, which conduct constitutes illegal naked short selling activities. DBSI's option blue sheet production reflects several accounts associated with the Trivium Funds, each of which were involved in the following suspicious options transactions with DBSI's assistance. The execution of these transactions was not reported in the Options Clearing Corporation data. On at least two particular occasions, DBSI facilitated apparent improper options transactions involving Trivium funds.

First, on November 3, 2006, accounts affiliated with Trivium purchased the following series of options transactions from Goldman Sachs Execution. The record produced to the plaintiffs by Goldman Sachs Execution does not show these options transactions. Deutsche Bank New York Options Offset sold the same options contracts to Goldman Sachs Execution. The price of these options contracts were between $0.14 and $0.15. All of the options transactions had a strike price of $55.00 and expired on February 16, 2008, 16 months after the option trade date. TASER's trading price was below $9.00 on this trade date. This option was significantly, in industry terms, 'out of the money.' In total, Trivium Offshore Fund Ltd (Bermuda), Trivium Onshore Fund (New York), MFP Managers for Trivium Segregated Portfolio (Cayman) and Trivium Institutional Onshore Fund (New York) collectively *purchased* options totaling 4,000 contracts (representing 400,000 shares) of TASER from Goldman Sachs Execution. Deutsche Bank AG London For the Benefit of Trivium Offshore Fund, Deutsche Bank AG London For the Benefit of Trivium Onshore Fund, Deutsche Bank AG London For the Benefit of MFP Managers for Trivium Segregated Portfolio and Deutsche Bank AG London For the Benefit of Trivium Institutional Onshore Fund collectively *purchased* options totaling 4,000 contracts of TASER from Goldman Sachs Execution. Deutsche Bank New York Options Offset *sold* options totaling another 4,000 contracts of TASER to Goldman Sachs Execution.

Second, on February 13, 2008, Trivium related accounts executed similar options as the above described transactions. DBSI executed these transactions for Trivium just two days before the option expired. DBSI's blue sheets show that Trivium Offshore Fund Ltd (Bermuda), Trivium Onshore Fund (New York) and MFP Managers for Trivium Segregated Portfolio (Cayman) collectively *purchased* options totaling 461 contracts of TASER from Goldman Sachs Execution. Deutsche Bank AG London For the Benefit Of Trivium Offshore Fund, Deutsche Bank AG London For the Benefit Of Trivium Onshore Fund and Deutsche Bank AG London For the Benefit Of MFP Managers for Trivium Segregated Portfolio collectively *purchased* options totaling 461 contracts of TASER from Goldman Sachs Execution. Deutsche Bank New York Options Offset *sold* options totaling 461 contracts of TASER to Goldman Sachs Execution. In Goldman Sachs Execution records, Redi-Execution Allocation Off Set Account *purchased* 461 options contracts in one transaction from DBSI. Redi-Execution Allocation Off Set Account also *purchased* 13 option transactions totaling 461 option contracts from a blank contra party.[6] The price of these options contracts was $0.60. All of the options transactions had a strike price of $12.50 and expired 3 days after the transactions on February 16, 2008. TASER's average price on this trade date was $12.37."

We appreciate your time and attention to these matters.

Thanks,
Liz

_____

[6] GSEC_TASR00017.

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 33396975
Date:  Sep 22 2010  8:04PM
Mark Harper, Clerk

# EXHIBIT F

# *FILED UNDER SEAL*

# CADWALADER

Cadwalader, Wickersham & Taft LLP
New York London Charlotte Washington Beijing

One World Financial Center, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

September 3, 2010

VIA E-MAIL AND FED EX

Steven J. Rosenwasser
Bondurant Mixson & Elmore LLP
3900 One Atlantic Center
1201 W. Peachtree Street NW
Atlanta, GA  30309

> TASER International Inc., et al. v. Morgan Stanley & Co., Inc., et al., Civil
> Case No. 2008-EV-004739-B – Plaintiffs' Questions Regarding DBSI
> Document Productions

Dear Steven:

Set forth below is information which we believe addresses the questions you have raised regarding various aspects of DBSI's discovery responses in this action, including its substantial document productions and responses to Plaintiffs numerous written discovery requests.[1]  As you can appreciate given the volume of material at issue, the task of attempting to voluntarily provide you with answers to your questions is time consuming and burdensome.  Nonetheless, we have attempted to do so in the spirit of cooperation and in the hope of avoiding unnecessary discovery disputes.  If you have any questions following your review of this letter and the related documents addressed herein, please let us know.

## 1. Exits from CNS

We have reviewed our trading data and are not currently aware of any instance of an "exit from CNS" involving TASER securities.  Please let us know if you are aware of information to the contrary for a specific trade or date, and we will look into the matter further.

## 2. DVP/RVP Issues

As we have previously advised you in the meet and confer process, we have included CNS and broker-to-broker fail to deliver positions in our data analysis when responding to Plaintiffs'

---

[1] The headings and numbering convention used below are taken from Plaintiffs August 25, 2010 email titled "TASER DBSI Open Issues."  *See August 25, 2010 email from Elizabeth Eager to Jason Halper.*

Gregory A. Markel   Tel +1 212 504 6112   Fax +1 212 504 6666   gregory.markel@cwt.com
USActive 20528820.2
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

CADWALADER

Steven J. Rosenwasser
September 3, 2010

written discovery requests.  We have excluded one type of failure to deliver from these analyses because the burden of analyzing those transactions over a six-and-a-half year period is substantial and in our view this information has limited relevance, if any, to the parties' claims and defenses.

Specifically, we have not analyzed failures to deliver in institutional type 9 "receipt versus payment (RVP)"/"delivery versus payment (DVP)" accounts typically referred to as "cash on delivery (COD)"/"cash on receipt (COR)" accounts.  It is our understanding that these accounts are typically used by institutional clients who, for various reasons, do not custody their shares with a broker-dealer, yet trade through a broker-dealer.  Our understanding is that typically, these accounts are not used for short sales.  Significantly, we understand that transactions in these accounts, like the majority of equity transactions in DBSI accounts, are settled through CNS.  Therefore, if a DBSI institutional type 9 client fails to deliver securities to DBSI in these accounts, DBSI will still maintain a net settlement obligation to CNS for the executed transaction.  If a failure to deliver in one of these accounts contributes to that net delivery obligation to CNS for DBSI that is not met, it will be reflected in DBSI's fail-to-deliver position with CNS, which we have already analyzed.  Additionally, it is our understanding that DBSI does not provide contractual settlement to that client until the shares are delivered.  In light of the foregoing, we do not believe this information is relevant nor is it reasonably accessible.  Failures to deliver in these accounts are not aged in a report used in the ordinary course of business, and, therefore, determining when DBSI had a failure to deliver in this type of account in effect requires an audit of activity in institutional type 9 accounts involving the analysis of more than six years of trading data.

3.  Traders Email Searches

We are currently researching the names of the people you provided to determine if they are likely to have responsive information.  Based on our research so far, it appears that some of the individuals you have identified may not be actual traders.  We are working with the client to confirm the roles of the individuals you identified.  We are also researching to determine whether there are any individuals who may have engaged in "proprietary trading" during the six year period.  We anticipate providing more information in the upcoming weeks.

However, DBSI believes that given the volume of documents reviewed and produced to date, the parties should agree to some limitations on these emails searches in order to limit the burden on DBSI yet provide Plaintiffs with the information they seek.  To that end, DBSI proposes that to reduce the burden of future email searches that all trader email searches be limited to non-*de minimis* short selling activity that occurred while DBSI had a net delivery obligation to CNS in TASER stock.  Additionally, DBSI proposes that program or index-

CADWALADER

Steven J. Rosenwasser
September 3, 2010

driven trading be excluded from the scope of review given that these types of trading do not appear to be relevant to Plaintiffs' claims of intentional market manipulation of TASER stock. We are happy to discuss these proposals with you in the upcoming weeks.

4. Responses to Second Interrogatories

As we explained in our meet and confer, we believe DBSI already has satisfied its obligation to respond to Interrogatory No. 5(m), and that Plaintiffs' request for more information in response to this interrogatory is an inappropriate attempt to expand DBSI's discovery burdens in a way that is inconsistent with the parties' agreement on this issue and a Court order.

As you know, the parties negotiated the scope of responses to the Second Amended Interrogatories. Initially, DBSI objected to this interrogatory on various grounds, and agreed to meet and confer with Plaintiffs to narrow the broad scope of the original interrogatory. Other Defendants initially responded, but limited their responses to known instances of intentional mismarking. Although objecting at first, Plaintiffs ultimately accepted this limitation imposed by other Defendants. And, after negotiation, as memorialized in a stipulation that was so-ordered by the Court, Plaintiffs agreed to resolve their dispute with DBSI over Interrogatory 5(m) by having DBSI similarly limit its answer to known instances of intentional mismarking (i.e., DBSI "would answer in the same way as other Defendants").

DBSI has done just that.   Plaintiffs' request for additional information about "systemic problems" that may have caused mismarking of order tickets and/or blue sheets is a new and substantially more burdensome request for additional information that DBSI believes is inappropriate and was not called for by the scope of the negotiated response. Given the parties' negotiated agreement and the Court order regarding the scope of DBSI's responses to this request, DBSI does not believe that Plaintiffs should be permitted to expand that scope after the fact through the meet and confer process. We also note that this new request for information is in part duplicative of Plaintiffs' Third Set of Interrogatories, where DBSI responded by identifying any known "mismarking" issues that resulted in a settlement, fine, sanction, censure or regulatory Letter of Caution or Cautionary Action. In addition to identifying these matters, DBSI has produced numerous documents related to each such matter, including, in some instances, documents from the files of outside counsel retained in connection with these matters. Accordingly, we do not believe any additional response to Plaintiffs' Second Amended Interrogatory 5(m) is necessary or warranted.

CADWALADER

Steven J. Rosenwasser
September 3, 2010

5. Profit and Loss Data

As we explained to you in prior meet and confers, DBSI does not maintain historical books and records information on securities lending revenue on a per-security basis. As we have also explained, we already have provided Plaintiffs with a significant amount of data concerning DBSI securities lending revenue in the form of stock loan monthly payable/receivable reports, and the iDelta open loan contract data. In addition, we advised you that based on the information gathered to date, DBSI did not participate in many of the practices in your bullet point list. You have pointed us to documents that you believe indicate the contrary and we are working with our client to review this material. Additionally, as we advised you, we are working with the client to determine if there are any reasonable ways to derive additional securities lending profit and loss data on a per-security basis.

6. Definitions in the Daily SHO Requirements v. Trading Reports

We have already fulfilled this request by creating and providing to you a "data dictionary" for the document at issue, Bates numbered DBSI-T 007174234 on August 13, 2010. *See August 13, 2010 letter from Jason Halper to Steven Rosenwasser.* We note that this document was created for the purpose of this litigation and at your request.

7. Requests for Admissions and Fail Tracking

DBSI does not believe that the report you identified Bates numbered DBSI_T1192095-97 is inconsistent with DBSI's responses and objections to requests for admission dealing with client or customer failure-to-deliver positions and CNS netting. It is our understanding that the failures to deliver and/or receive reflected in this report are not CNS positions. We understand that these reports track failures to deliver or receive securities related to prime brokerage transactions that are not affirmed by noon on the day after a trade is executed. As such, they are not eligible to be cleared through CNS on that day. Because these reports do not track CNS failures, DBSI does not believe these reports are inconsistent with its responses and objections to the requests for admissions.

8. 30(b)(6) Notice Concerning Regulatory Investigations

As we have discussed numerous times over the past few months, and as reflected in related correspondence, DBSI believes that the topics in Plaintiffs' 30(b)(6) notice not only are overly broad and unduly burdensome, as well as in many instances inappropriate for a corporate representative deposition, but also of little relevance to your securities market manipulation or RICO claims (which remain extremely vague given that plaintiffs still have failed to identify

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

CADWALADER

Steven J. Rosenwasser
September 3, 2010

the allegedly manipulative transactions at issue). None of the regulatory matters at issue involves securities fraud, market manipulation, abusive naked short selling, theft by taking, theft by deception, violations of the Georgia Computer Systems Protection Act, conversion, money had or received claims, or any purported RICO predicate acts (or, for that matter, any purportedly criminal conduct). Additionally, many are minor administrative violations discovered through general market exams, resulting in either no fines, or *de minimis* fines – some less then $10,000. And none is specifically focused on TASER trading activity.

As you have acknowledged during our discussions, certain of the topics seek information that constitutes lists of dates or names spanning a more-than-six-year time period, thereby constituting information more appropriately sought through other discovery devices, such as document requests or interrogatory responses. We have, by way of compromise and as part of an overall resolution of the notice, offered to provide you with verified written responses in lieu of a deposition as a means to provide the information at issue. We also already have provided you with documents relating to these matters, including correspondence between the relevant regulator and DBSI or, in some instances, outside counsel retained to represent DBSI in these matters. These documents contain detailed information regarding the "topics" at issue.

Notwithstanding the above, we have continued to work with you, and our client, in an effort to provide Plaintiffs, through some discovery device, with the information at issue in the noticed topics, including by document productions, verified written responses and a corporate representative deposition. However, as we have informed you, there are limits to the ability or obligation of a corporate representative to educate himself in preparation for a 30(b)(6) deposition, and the notice far exceeds those limits and obligations by seeking a deposition on nearly 150 topics covering a six-and-a-half year period, where much of the information has little, if any, relevance. That is, in part, why DBSI has urged that Plaintiffs accept receipt of the information at issue through alternative discovery devices.

Moreover, although we requested that Plaintiffs not formally serve a notice setting a firm deposition date while the parties continued to negotiate, Plaintiffs did so anyway. As you explained to us, you did so in order to apply deadline pressures to the negotiations. That being the case, while we respectfully disagree with Plaintiffs' view that these negotiations have been unreasonably delayed -- indeed the delay is a direct result of the overbroad and unreasonable nature of the noticed topics themselves – we do not perceive any harm or prejudice to Plaintiffs as a result of the time taken by the meet and confer process, particularly given that discovery is ongoing and Plaintiffs have yet to take any depositions in the case. In the event we cannot reach an acceptable compromise, DBSI reserves all its rights and remedies.

CADWALADER

Steven J. Rosenwasser
September 3, 2010

9. Password on Excel Files such as DBSI-T 001936179

The password for this file is msi.

10. RVP/DVP Information

We believe this "open item" is duplicative of item (2) above, and that no additional response is necessary.

11. August 20 Email on the Opposing Broker Code, Option Transactions; and Inconsistencies between DBSI's Records and the Nasdaq Equity Trade Journals ("ETJ")

We have looked at the apparent inconsistencies between DBSI's blue sheet data and the Nasdaq ETJ data as described in Plaintiffs' August 20 email. We have also reviewed the apparent inconstancies between these data sets as described in Plaintiffs' Amended Responses to Defendants' Second Set of Interrogatories (around pages 116 through 124), served August 16, 2010. We believe these apparent inconsistencies are the result of Plaintiffs either reviewing the wrong data sets, or misinterpreting the data being reviewed.

We note that Plaintiffs' Amended Responses to Defendants' Second Set of Interrogatories only cite to DBSI-TASER 003209 when referencing DBSI's blue sheet data. *See, Plaintiffs' Amended Responses to Defendants' Second Set of Interrogatories* at n. 149. On January 28, 2010, DBSI provided Plaintiffs with DBSI-T 001175837, which was a replacement data set for DBSI-TASER 003209. DBSI's January 28, 2010 production cover letter stated:

> In addition, we have discovered that DBSI-TASER 003209, previously produced to Plaintiffs on November 13, 2009, was inadvertently truncated in the production process. Therefore, we are producing DBSI-T 001175837, which includes information inadvertently excluded from DBSI-TASER 003209. DBSI-T 001175837 is intended to replace DBSI-TASER 003209.

*See January 28, 2010 Letter from Martin Seidel to Steven Rosenwasser.* We have matched the purportedly missing transactions from the ETJ data, as described in your email and interrogatory responses as occurring on September 16, 2005, June 20, 2008, and June 27, 2008, with DBSI's data in DBSI-T 001175837. Accordingly, we believe that Plaintiffs may not be reviewing the proper data set. As for Plaintiffs' assertion that the ETJ shows a 45,900 share transaction on February 11, 2009 that is not reflected in DBSI's blue sheet data, we believe that this is based on a misreading of the data sets provided. The ETJ data shows this trade to be an

CADWALADER

Steven J. Rosenwasser
September 3, 2010

"as of" trade executed on February 10, 2009. We were able to match this trade to DBSI blue sheet data on February 10, 2009.

If Plaintiffs' relied on DBSI-TASER 003209 in drafting their interrogatory responses, we ask that you please review DBSI-T 001175837 and revise those responses as necessary.[2]

We are working with our client to review the additional concerns raised by your August 20, 2010. We anticipate responding to these additional issues in the upcoming weeks.

## 12. August 23 Email Regarding Redactions in DBSI-T1436047

This document was reproduced in unredacted form with the same Bates number on May 17, 2010. The production disk that contained the unredacted document was labeled "Overlay of Un-Redacted Records."

## 13. August 24 Email Regarding Blank Documents

The particular document you pointed to, DBSI-T 7174175, appears to be a .giff file that was attached to an email, not a substantive document. We understand that when the email was processed, the image, as an embedded file, was produced as an attachment. The .giff image is blank.

## 14. August 18 Email on the Chart of Accounts

As we explained to you in prior meet and confers, and in our August 13, 2010 letter:

> DBSI utilizes several different account numbering conventions
> in the normal course of business. As relevant here, however,
> DBSI uses a Broadridge ADP Brokerage Processing System,

---

[2] Additionally, DBSI previously advised Plaintiffs several times that it had produced unredacted data related to securities locates and lending as of January 8, 2010. *See, e.g. June 29, 2010 letter from Greg Markel to Steven Rosenwasser.* By email July 6, 2010, Plaintiffs agreed to remove from their interrogatory responses all allegations that DBSI's failure to produce such unredacted data prevented Plaintiffs from fully evaluating DBSI's data. *See July 6, 2010 email from Nichole Iannarone to Greg Markel.* We appreciate Plaintiffs' cooperation but note that it appears a reference to the redacted data was inadvertently included in Plaintiffs August 16, 2010 Amended Responses to Defendants' Second Set of Interrogatories and we ask that it be removed. *See Id.* at 154 ("DBSI redacted the lender information in its locate records, making it impossible to fully evaluate these suspect locates.").

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

CADWALADER

Steven J. Rosenwasser
September 3, 2010

> referred to as the ADP account numbering conventions, as its
> books and records account numbering convention for equity
> transactions. Accordingly, the account numbering conventions
> contained in the trading data collected and provided to you for
> the purpose of this litigation is based on ADP account numbering
> as that data is kept in the ordinary course of business. We
> understand that DBSI does not maintain a "Chart of Accounts"
> for the ADP accounts. Accordingly, we are providing you with
> the guidelines to ADP account number ranges listed below.

*See August 13, 2010 letter from Jason Halper to Steven Rosenwasser.* You have pointed us to documents that you believe indicate that DBSI does maintain a "chart of accounts" for ADP account numbering convention, and we are working with our client to review this material.

Additionally, we note that your August 18, 2010 email references documents Bates stamped DBSI-T 0006530082-126[3] and specifically, DBSI-T 0006530122. These documents were subject to a claw back request sent to Plaintiffs on August 12, 2010. *See August 12, 2010 Letter from Jason Halper to Steven Rosenwasser.* On August 18, 2010, the same day Plaintiffs sent the "chart of accounts" email, Plaintiffs indicated that they received the claw back letter on August 13, 2010 and "because [Plaintiffs] did not receive the letter until August 13, [Plaintiffs] intend to complete the process of removing all copies of the documents from all of our systems by August 20." *See August 18, 2010 email from Elizabeth Eager to Jason Halper.* On August 19, Plaintiffs responded that they have deleted these bates ranges, and any duplication of these materials from their system and any other system onto which it had been duplicated and that Plaintiffs would "not review, use or disclose . . . for any purpose" these documents. *See August 19, 2010 letter from Tanya Reed to Jason Halper.* Given the overlap in correspondence, while we assume that Plaintiffs have already done so, we again ask that Plaintiffs ensure that they have destroyed all copies of these documents and any summaries thereof.

15. DBSI Privilege Log

On Friday, August 13, 2010, DBSI produced a supplemental privilege log containing entries 22 through 491. We are working diligently to finish our privilege review but as we have explained in the past, Plaintiffs' broad requests for documents relating to various regulatory

---

[3] We note that, in what appears to be a typographical error in the August 18, 2010 email from Elizabeth Eager to Jason Halper, Plaintiffs seem to have referenced the first bates range as DBSI-T 0006830082-126 (making the 5 an 8 where bolded).

CADWALADER

Steven J. Rosenwasser
September 3, 2010

matters over a more-than-six-year period, covering 72 custodians, resulting in the production of approximately 580,000 records and millions of pages, has created an enormous privilege review effort. As we also explained in the past, our understanding is that Georgia law does not impose time frames for production of privilege logs and we have never requested that Plaintiffs commit to a date certain for production of their logs. We expect Plaintiffs to work diligently to complete their logs, and we will do the same.

We anticipate and hope that this information resolves a substantial number of questions Plaintiffs have raised regarding DBSI's discovery responses. To the extent outstanding questions or issues remain, we would be happy to discuss them with you. Nonetheless, please be aware that DBSI has undertaken to provide you with this information, at significant cost and effort, to facilitate the discovery process and in an attempt to avoid needless motion practice. DBSI reserves all its rights and remedies in this regard, including to seek Court intervention where appropriate.

Very truly yours,

Gregory A. Markel

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 33396975
Date: Sep 22 2010 8:04PM
Mark Harper, Clerk

# EXHIBIT G

Isajiw, Peter

---

From: Markel, Gregory
Sent: Thursday, July 15, 2010 11:18 AM
To: 'Steven J. Rosenwasser'
Cc: 'Elizabeth Eager (eager@bmelaw.com)'; Isajiw, Peter; Halper, Jason

Steven:

I write to follow-up on our telephone call yesterday morning and in response to your email . .

With respect to first point raised in your email, as I indicated to you on our call, as part of our continued good faith efforts in collecting and producing responsive documents, we have discovered that data extraction problems affected the collection of data from two minor fields in the Blue Sheets that were created for this litigation and previously provided to you. The effected fields are (1) the Depository Institution Identifier ("Depo_Ins_Identifier") field and (2) the Account Type Identifier ("Account_Type_Identifier") field. For the Depo_Ins_Identifier field, we are advised that there may be data in DBSI's systems that was not pulled to populate that field. For the Account_Type_Identifier, we are advised that some, but not all, of the fields in the Blue Sheet we provided to plaintiffs may be missing data. For both, we are re-pulling the data so that the data available in DBSI's systems is reflected in a new spreadsheet that we will provide to you shortly. In all fairness, we do not believe that this omitted data has prejudiced plaintiffs or hinders your review of the TASER trading activity particularly given that we provided other trading data from order management systems. Moreover, the applicable stipulation regarding this issue contemplates that problems could exist with respect to Blue Sheets because it provides for disclosure of any such issue within ten business days after a party learns of the issue. We have complied with that provision by our disclosure during yesterday's conversation and are proceeding promptly to provide you with supplemental Blue Sheets.

As for your request for the production of trade runs, as we have previously informed you, every time we ask our client for what you call "trade runs " they have responded that the Blue Sheets provide that type of information. If there is something specific that you believe would be on a "trade run" that is not contained in the Blue Sheet data or other trading data we provided, please let us know and we will consider that request. As for the "other data" we agreed to provide in response to your May 6, 2010 email, we are preparing a letter containing that information and hope to send to you shortly.

With respect to your second point, as I explained on our call, we are working diligently to provide you with our substantive responses to plaintiffs' AWC 30(b)(6) Notice and Exhibit A in advance of our meet and confer today.

With respect to your third point, you are correct that DBSI's responses to the lobbying interrogatory would not change if it considered Utah, as well as the SEC and Treasury (not just Congress). As for your request that we change our responses to eliminate the limitation to Congress, we note that our responses are not limited to Congress.

We will provide you with our proposal re the 30 b 6 as soon as our client has signed off on it and we have told them that it would be desirable for you to have time to review it before our call.

9/20/2010

Best Regards,

Greg

9/20/2010