# EXHIBIT  A

138129.1

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| TASER INTERNATIONAL, INC., *et al.*, | : : : | |
| Plaintiffs, | : : | CIVIL ACTION<br>FILE NO.: 2008-EV-004739-B |
| v. | : : | |
| MORGAN STANLEY & CO., INC., *et al.*, | : : : | JURY TRIAL DEMANDED |
| Defendants. | : | |

### PLAINTIFFS' AMENDED RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES AND THIRD REQUEST FOR PRODUCTION OF DOCUMENTS TO ALL PLAINTIFFS

TASER and the Individual Plaintiffs (i.e., all Plaintiffs excluding TASER) (TASER and the Individual Plaintiffs are collectively referred to herein as "Plaintiffs") hereby submit their Amended Objections and Responses to Defendants' Second Set of Interrogatories and Third Request for Production of Documents to All Plaintiffs as follows.  Plaintiffs reserve the right to enter additional objections and responses, and to supplement their responses as necessary.  The failure to object to any of the Interrogatories or Requests for Production does not waive any general or specific objection or privilege.

### OBJECTIONS TO THE GENERAL INSTRUCTIONS

1.      Plaintiffs object to the General Instructions to the extent that they are unduly burdensome or seek to impose greater obligations on them than those

imposed by the Georgia Civil Procedure Act or any applicable Order from the Court.  Plaintiffs will only provide responses and information (including supplementation) in accordance with obligations set forth in the Georgia Civil Practice Act or as ordered by the Court in this action.

2.      Plaintiffs object to the General Instructions to the extent that they seek information outside of Plaintiffs' own knowledge.  Plaintiffs will not provide information that is privileged and/or within the knowledge of their attorneys, consultants or investigators.

## OBJECTIONS TO THE DEFINITIONS

1.      Plaintiffs object to the definitions of "TASER" and "you" and "your" on the ground that they are overly broad and vague.  For example, the definition provided defines TASER, you and your as including agents, representatives and other third parties unrelated to this case.  Plaintiffs further object to these definitions on the ground that they include "attorneys," thereby making the definitions seek information protected by the attorney-client and work-product privileges.  Plaintiffs further object to the definitions to the extent they seek information outside of Plaintiffs' possession, custody or control.  To the extent that Plaintiffs provide any information or documents in response to the Interrogatories or the Requests for Production, Plaintiffs will assume that the definition of

"TASER," "you" or "your" does not include its attorneys or other third parties that it does not control.

     2.     Plaintiffs object to the definition of "identify" as overly broad, unduly burdensome and seeking to require Plaintiffs to provide more information than required by the Georgia Civil Practice Act and applicable law.  Plaintiffs will only provide that information that is required pursuant to the Georgia Civil Practice Act.

     3.     Plaintiffs object to the Interrogatories to the extent they ask for personal contact information for individuals identified in response to the Interrogatories, which information is not relevant.

     4.     Plaintiffs further object to the definitions to the extent they seek to impose obligations upon Plaintiffs in excess of the Georgia Civil Practice Act.

## GENERAL OBJECTIONS

The following objections apply to each and every Interrogatory or Request for Production and shall have the same force and effect as if set forth in full in response to each.  The absence of a reference to a general objection shall not be construed as a waiver of any general objection to a specific Interrogatory or Request for Production.

     1.     Plaintiffs object to the Interrogatories and Requests for Production to the extent that they are unreasonably cumulative or duplicative, or seek information that is already in Defendants' possession or that is obtainable from

another source that is more convenient, less burdensome, or less expensive.  In particular, Plaintiffs note that most, if not all, of the information sought is within the Defendants' own possession and: (a) has not yet been produced; (b) all of the keys, legends, dictionaries or other information necessary to read, analyze and/or understand the information has not been provided; and/or (c) Plaintiffs have not yet been afforded sufficient time to review and analyze all of the information.

2.      Plaintiffs object to each Interrogatory and Request for Production on the grounds that it seeks information the Plaintiffs previously produced to the Defendants.  Plaintiffs also object to the Interrogatories and Requests for Production because they seek to contravene the key word searches that TASER and Defendants previously agreed to and seek the production of documents or information broader than the agreed upon searches.

3.      Plaintiffs object to the Interrogatories and Requests for Production to the extent they seek information neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiffs object to the Interrogatories and Requests for Production to the extent that they seek to impose greater obligations on Plaintiffs than those imposed by the Georgia Civil Procedure Act or any applicable Order from the Court.

5.      Plaintiffs object to the Interrogatories and Requests for Production to the extent they seek information that is protected by applicable privileges or immunities from disclosure, including, without limitation, the attorney-client privilege, accountant-client privilege and the work-product doctrine.  Inadvertent disclosure, if any, of information subject to any privilege, including without limitation the attorney-client privilege or work-product doctrine, is not intended to, and shall not, waive any such privilege or doctrine.

6.      Plaintiffs object to the Interrogatories and Requests for Production to the extent they seek expert and/or damages information in advance of the time agreed on by the parties as memorialized in the Scheduling Order or any Order from the Court in this case.  Expert and/or damages information will only be provided in accordance with the Scheduling Order or any other Order in this case.

7.      Plaintiffs object to the Interrogatories and Requests for Production because Plaintiffs have not received all documents from Defendants upon which their responses to the Interrogatories and Requests for Production may be based. As noted in the Parties' December 13, 2009 Stipulation, Plaintiffs are not required to provide responses where the information from which their response would be derived has not yet been produced.  Moreover, Plaintiffs note that Defendants have produced tens of millions of pages since November of 2009 until today's date, and a substantial portion of those pages were produced on or around December 31,

809005.1
Highly Confidential Pursuant to Protective Order

2009 (*i.e.*, they were not produced in a rolling fashion as originally contemplated by the Parties).

8.      Plaintiffs further object to the Interrogatories and Requests for Production on the grounds that Defendants have marked significant portions of their document productions as "confidential" or "highly confidential" such that the Individual Plaintiffs and some TASER executives, managers and employees are not permitted to review the documents at issue and cannot be involved in providing any response.

9.      Plaintiffs object to providing any response at this time because, as Defendants DBSI, Merrill and BAS have noted, any response Plaintiffs provide to other Defendants' discovery prior to the time all Defendants complete their document productions may be incomplete because Plaintiffs had not received or had adequate time to review documents/data from them which may bear on the liability or damages of other Defendants.

## RESPONSES TO SECOND SET OF INTERROGATORIES

**INTERROGATORY No. 1.**   **For each Plaintiff, please identify:  (a) each transaction in TASER stock engaged in during the Relevant Time Period in which that Plaintiff alleges it suffered losses as a result of any Defendant's "illegal short selling," as that term is used in Paragraph 2 of the Complaint, specifically identifying for each such transaction the number of shares sold, the price at which they were sold, the price paid for, or cost basis of such shares, and the loss incurred in connection with each such transaction; (b) the amount of monetary loss that each Plaintiff claims to have incurred in connection with its holdings of TASER stock as a result of such "illegal short**

selling," and (c) the amount of damages that each Plaintiff believes it suffered as a result of such "illegal short selling," regardless of whether that Plaintiff believes it suffered an actual monetary loss.

## RESPONSE NO. 1

Plaintiffs object to this Interrogatory on the grounds that it is vague and ambiguous because it is unclear whether the phrase "each transaction in TASER stock engaged in" refers to each of the Plaintiffs' transactions in TASER stock or any of Defendants' transactions in TASER stock which caused the Plaintiffs harm (or both).  For purposes of this Interrogatory, Plaintiffs have construed this phrase as seeking information concerning the Plaintiffs' own transactions in TASER stock and not relating to Defendants' transactions in TASER stock.  Accordingly, Plaintiffs will not provide any information regarding Defendants' transactions in TASER securities which harmed the Plaintiffs pursuant to this Interrogatory which, in any event, is already in the Defendants' possession.

Plaintiffs object to this Interrogatory on the grounds that it is more than one Interrogatory pursuant to O.C.G.A. § 9-11-33.

Plaintiffs object to the extent this Interrogatory seeks information that is privileged or attorney work product.

Plaintiffs object to this Interrogatory on the grounds that the amount of damages and monetary loss suffered by each Plaintiff is a topic for expert discovery and, pursuant to the Court's Scheduling Order, expert discovery has not

yet commenced.  Plaintiffs' responses to this Interrogatory will be supplemented by and through expert discovery.

Plaintiffs object this Interrogatory on the grounds that a response can only be provided after reviewing the materials produced by the Defendants, many of which have not been entirely produced or which bear confidentiality designations on them such that the Plaintiffs cannot individually review the requisite documents in order to provide a response as to what his, her or its "amount of damages" or "amount of monetary loss" is.

Plaintiffs object to this Interrogatory on the grounds that Plaintiffs do not have all of the necessary information in order to provide a full and complete response and that the Interrogatory is therefore premature.  *See* December 15, 2009 Stipulation and Order at ¶ 13 (all Defendants except UBS).  *See also* December 21, 2009 Stipulation and Order at ¶ 12 (same regarding Defendant UBS).  In particular, Defendants have not produced all of the responsive documents and data, and they have not provided all of the information necessary to fully read, understand and analyze the documents and data.

Further, as noted and stipulated by Defendants Credit Suisse, Bear Stearns and Goldman Sachs, "any response Plaintiffs provide to other Defendants' discovery prior to September 1, 2010 may be incomplete because Plaintiffs had not received or had adequate time to review documents/data from DBSI which may

bear on the liability or damages of other Defendants." Stipulation and Order (5/12/10) at ¶ 1(d). Moreover, Plaintiffs are not able to provide a full response even as to information that may have already been produced by the Defendants. Plaintiffs note that tens of millions of pages have been produced by the Defendants and most of that production occurred in June 2010 (in contravention of the parties' agreement and the Court's Order that the Defendants produce documents on a rolling basis). Given the volume of documents and other information provided, Plaintiffs have not had sufficient time to review and analyze all of the information produced to date and it is unreasonable to expect that they have yet done so.

Further, even if information had previously been provided, Plaintiffs may not be able to currently understand or appreciate the significance of that information where a Defendant has not provided all of the data responsive to Plaintiffs' document requests. For example, raw data is meaningless without communications that occurred at the same time. Conversely, without certain raw data, communications may appear to be irrelevant when they are in fact highly relevant and responsive to this Interrogatory. As stated by the SEC: "Proof of a manipulation almost always depends on inferences drawn from a mass of factual data. Findings must be gleaned from patterns of behavior, from apparent irregularities, and from trading data. When all of these are considered together, they can emerge as ingredients in a manipulative scheme designed to tamper with

free market forces." SEC Initial Decision Release No. 82 Administrative Proceeding File No. 3-8511: In the Matter of Sharon M. Graham, Stephen C. Voss, and James J. Pasztor, December 28, 1995, citing Pagel, Inc., 48 S.E.C. 223, 226 (1985).

Subject to and without waiving the foregoing objections, Plaintiffs respond to this Interrogatory as follows:

By engaging in illegal and manipulative conduct, including abusive naked short sales, Defendants created artificial and/or counterfeit security entitlements, which are effectively treated the same as actual, authorized and issued TASER securities. For example, the artificial and/or counterfeit security entitlements can be bought, sold, borrowed and loaned. The creation of artificial and/or counterfeit security entitlements dilutes the value, rights and benefits of actual, authorized and issued TASER securities by, *inter alia*, creating excess supply. In addition, Defendants' illegal and manipulative conduct artificially limits the demand for TASER securities because, *inter alia*, it caused TASER to become described and/or known as a security that is subject to manipulation, which dissuades and deters potential investors.[1]

---

[1] The SEC has recognized that "unwarranted reputational damage" from naked short selling can harm a security. *See, e.g., SEC Release No. 34-58774, 73 Fed. Reg. 61666, 61669-70 (Oct. 17, 2008)*.

809005.1
Highly Confidential Pursuant to Protective Order

10

By both artificially increasing the supply of and decreasing the demand for TASER securities, the Defendants have caused the price of TASER stock to be lower during the relevant time period than it otherwise would have been in the absence of Defendants' pattern of illegal and manipulative conduct.  Indeed, "the [Securities & Exchange] Commission has repeatedly recognized that naked short selling can depress stock prices." *See Office of Inspector General, Practices Related to Naked Short Selling Complaints and Referrals, Report No. 450, March 18, 2009.*

As a result, based upon current information and belief and subject to amendment upon completion of lay and expert analyses of Defendants' data and documents, **Plaintiffs were harmed by Defendants' conduct in each instance in which any Plaintiff sold TASER securities since no later than 2004** (additional lay and/or expert analyses of Defendants' documents and data is necessary before Plaintiffs can identify a more specific time period when the harm occurred).  In addition, one or more Plaintiffs may have sold additional TASER stock with greater frequency and/or in greater share amounts if they could have done so at a non-manipulated and thus higher price.  Accordingly, Defendants' conduct may have caused one or more Plaintiffs to lose the availability of funds derived from TASER securities sales at a non-manipulated price (including, but not limited to the time value of money) and caused them to lose the rights and benefits associated

with selling TASER securities at a time of their choosing at a non-manipulated price.

Pursuant to O.C.G.A. § 9-11-33(c), Plaintiffs direct Defendants to Plaintiffs' productions of documents wherein they have provided all of their information regarding each of their transactions in TASER stock, including the number of shares sold, the price at which they were sold, the price paid for, or cost basis of such shares. Those documents can be located at Bates numbers: TSR-ALMEROTH-00000001 – TSR-ALMEROTH-00000072; TSR-BAKERJ-00000001 – TSR-BAKERJ-00000396; TSR-BAKERR-00000001 – TSR-BAKERR-00000531; TSR-BATCHELORD-00000001 – TSR-BATCHELORD-00000036; TSR-BATCHELORN-00000001 – TSR-BATCHELORN-00000034; TSR-BOYER-00000001 – TSR-BOYER-00000486; TSR-BURNSIDE-00000001 – TSR-BURNSIDE-00000769; TSR-COLLENTINE-00000001 – TSR-COLLENTINE-00000187; TSR-CONNELLY-00000001 – TSR-CONNELLY-00000787; TSR-CULVER-00000001 – TSR-CULVER-00000435; TSR-DUNAGIN-00000001 – TSR-DUNAGIN-00000243; TSR-FAIRES-00000001 – TSR-FAIRES-00000374; TSR-HASKELLD-00000001 – TSR-HASKELLD-00000158; TSR-HASKELLR-00000001 – TSR-HASKELLR-00000252; TSR-HASKELLS-00000001 – TSR-HASKELLS-00000203; TSR-KELLEYK-00000001 – TSR-KELLEYK-00000074; TSR-KELLEYM-00000001 – TSR-

KELLEYM00000049; TSR-LEWIS-00000001 – TSR-LEWIS-00000064; TSR-LISENBY-00000001 – TSR-LISENBY-00000255; TSR-MAJ-00000001 – TSR-MAJ-00000257; TSR-MILLER-00000001 – TSR-MILLER-00001368; TSR-RICHARDSON-00000001 – TSR-RICHARDSON-00000168; TSR-ROCHE-00000001 – TSR-ROCHE-00000039; TSR-SCOTTC-00000001 – TSR-SCOTTC-00000042; TSR-SCOTTJ-00000001 – TSR-SCOTTJ-00000140; TSR-SCOTTPA-00000001 – TSR-SCOTTPA-00000040; TSR-SCOTTPE-00000001 – TSR-SCOTTPE-00000055; TSR-SMITHP-00000001 – TSR-SMITHP-00000249; TSR-SMITHR-00000001 – TSR-SMITHR-00000149; TSR-SMITHT-00000001 – TSR-SMITHT-00000152; TSR-STUCKER-00000001 – TSR-STUCKER-00000208; TSR-ZELTEN-00000001 – TSR-ZELTEN-00001108; TASER00000991-TASER00000994; TASER00007732-TASER000007763; TSR-ALMEROTH-00000073 – TSR-ALMEROTH-00000083; TSR-BAKERJ-00000399- TSR –BAKERJ-00000415; TSR-BATCHELORN-00000035 – TSR-BATCHELORN-00000039; TSR-BATCHELORD-00000037 – TSR-BATCHELORD-00000041; TSR-BOYER-00000487 – TSR-BOYER-00000537; TSR-BURNSIDE-00000770 – TSR-BURNSIDE-00000880; TSR-COLLENTINE-00000188 – TSR-COLLENTINE-00000194; TSR-CONNELLY-00000788 – TSR-CONNELLY-00000891; TSR-DUNAGIN-00000244 – TSR-DUNAGIN-00000273; TSR-FAIRES-00000431 – TSR-FAIRES-00000510; TSR-HASKELLD-00001248 –

TSR-HASKELLD-00001260; TSR-HASKELLR-00001664 – TSR-HASKELLR-00001705; TSR-HASKELLS-00000204 – TSR-HASKELLS-00000214; TSR-KELLEYK-00000135 – TSR-KELLEYK-00000136; TSR-KELLEYM-00000050 – TSR-KELLEYM-00000051; TSR-LISENBY-00000256 – TSR-LISENBY-00000262; TSR-MAJ-00000292 – TSR-MAJ-00000342; TSR-RICHARDSON-00000169 – TSR-RICHARDSON-00000172; TSR-ROCHE-00000040 – TSR-ROCHE-00000044; TSR-SCOTTPA-00000041 – TSR-SCOTTPA-00000046; TSR-SCOTTPE-00000056 – TSR-SCOTTPE-00000060; TSR-SMITHP-00000250 – TSR-SMITHP-00000269; TSR-SMITHR-00000151– TSR-SMITHR-00000166; TSR-SMITHT-00000153 – TSR-SMITHT-00000170; TSR-STUCKER-00000211 – TSR-STUCKER-00000233; TSR-HASKELLR-00001329 - TSR-HASKELLR-00001332; TSR-CULVER-00000436 – TSR-CULVER-00000462; TSR-ROCHE-00000040 – TSRROCHE-00000044; TSR-SCOTTJ-00000141 - TSR-SCOTTJ-00000153; TSR-SCOTTPA-00000041 – TSR-SCOTTPA-00000046; TSR-SCOTTPE-00000056 – TSR-SCOTTPE-00000060; and TSR-ZELTEN-00001110 – TSR-ZELTEN-00001153.

With regard to Plaintiff TASER and any Individual Plaintiff who is also an officer or director of TASER, the information requested may also be located within their reports and filings (including annual reports and Forms 4) with the Securities and Exchange Commission ("SEC"), which have been previously produced for the

entire Time Period, even though they are a matter of public record, and can be readily accessed by the Defendants.

In addition, a purchase or sale in TASER stock did not have to occur for Defendants' conduct to have caused damage to any Plaintiff, and particularly with respect to Plaintiff TASER.  For example, as stated above, the Defendants' conduct resulted in the creation of artificial and/or counterfeit security entitlements, which are treated the same as TASER securities.  As a result, the Defendants effectively issued new TASER securities that TASER did not authorize and for which TASER never received payment (yet, TASER suffered the harm of dilution). Consequently, TASER securities have traded and continue to trade as though more shares were issued that TASER actually authorized.  TASER has suffered all of the harms associated with the issuance of additional outstanding shares by an unauthorized third party, including, but not limited to, dilution, reputation damage, failure to receive payment for the new "shares" and failure to maintain all rights, benefits, control and value over its tangible and intangible property.  Moreover, TASER has suffered harm in that, if it endeavored to try and buy the artificially created securities entitlements out of the market, it would have to assume the cost of those purchases.  Each of the harms described above during the relevant time period.

Plaintiffs further respond that based upon a preliminary analysis of the partial information that has been produced to date, and subject to amendment and/or addition during expert discovery, Defendants' conduct potentially caused Plaintiffs harm in at least the additional following ways:

(1)   The creation of artificial and/or counterfeit securities entitlements diluted Plaintiffs' voting rights and the control and authority of TASER's Board;

(2)   By engaging in abusive naked short sales, particularly at or around times when TASER announced positive news, Defendants created artificial impediments to TASER's stock price appreciation;

(3)   The manipulation may have discouraged analysts or others to follow TASER stock, which may have affected demand;

(4)   Plaintiffs lost some of the rights, benefits, value and/or control over the tangible and intangible rights associated with TASER securities and/or treasury stock;

(5)   Plaintiffs lost the potential full value associated with lending TASER securities and obtaining interest associated therewith;

(6)   By creating artificial or counterfeit security entitlements, Defendants misappropriated and/or engaged in theft of TASER's name, likeness, goodwill and property (both tangible and intangible);

809005.1
Highly Confidential Pursuant to Protective Order

(7)    By creating the false impression of sales, Defendants created further downward pressure on TASER's stock price by, *inter alia*, the sales themselves and providing a perceived credibility to negative market rumors;

(8)    Abusive naked short selling creates an incentive to disseminate false news or information about TASER securities, which can detrimentally affect the company's stock price;

(9)    Because a Defendant's cost to deliver failed shares is marked to market each day, each Defendant has an incentive to lower TASER's stock price as much as possible to reduce its obligation and collateral requirements;

(10)    To the extent a Defendant was short TASER in its proprietary accounts, it had an incentive to lower TASER's stock price as much as possible;

(11)    By driving down the price of TASER stock, Defendants reduced the value of stock issuances, stock grants and stock options;

(12)    But for Defendants' illegal conduct which drove down the price of TASER stock, Defendants' conduct may have affected Plaintiffs' ability to sell their shares for their true value, resulting in the delay of sales (including but not limited to losses resulting from the time value of money) or selling shares for sums less than they were worth;

(13)   Defendants' naked short selling resulted in market manipulation;[2] and

(14)   Defendants' naked short selling infringed on the rights of actual

shareholders of TASER stock.[3]

The type and amount of damages each Plaintiff suffered as a result of

Defendants' conduct is the subject of expert testimony and will be addressed

during expert discovery.  Accordingly, Plaintiffs reserve their right to supplement

their response to this Interrogatory as discovery continues and through expert

discovery.  Rather than restate Plaintiffs' experts' position in this Interrogatory,

Plaintiffs' expert discovery is hereby incorporated into this response.

---

[2] *See, e.g.*, GSE_T 01146058.

[3] *Id.*

809005.1
Highly Confidential Pursuant to Protective Order

**Interrogatory No. 2.**     **For each Defendant, please identify (a) each trading day during the Relevant Time Period where You believe that Defendant participated in "illegal short selling," as that term is used in Paragraph 2 of the Complaint, with respect to TASER stock; and (b) each transaction during the Relevant Time Period where You believe that Defendant participated in "illegal short selling," as that term is used in Paragraph 2 of the Complaint, with respect to TASER stock.**

## RESPONSE NO. 2

Plaintiffs object to this Interrogatory on the grounds that it is more than one Interrogatory pursuant to O.C.G.A. § 9-11-33.

Plaintiffs object this Interrogatory on the grounds that a response can only be provided after reviewing the materials produced by the Defendants, many of which have not been entirely produced or which bear confidentiality designations on them such that the Plaintiffs cannot individually review the requisite documents in order to provide a response.  Among other things, the Defendants have not properly responded to Interrogatory No. 5 contained in Plaintiffs' Second Interrogatories such that Plaintiffs are not able to supply all of the information requested in this Interrogatory.

Plaintiffs object to this Interrogatory on the grounds that Plaintiffs do not have all of the necessary information in order to provide a full and complete response and that the Interrogatory is therefore premature.  *See* December 15, 2009 Stipulation and Order at ¶ 13 (all Defendants except UBS).  *See also* December 21, 2009 Stipulation and Order at ¶ 12 (same regarding Defendant UBS).  In particular,

809005.1
Highly Confidential Pursuant to Protective Order

Defendants have not produced all of the responsive documents and data, and they have not provided all of the information necessary to fully read, understand and analyze the documents and data.

Further, as noted and stipulated by Defendants Credit Suisse, Bear Stearns and Goldman Sachs, "any response Plaintiffs provide to other Defendants' discovery prior to September 1, 2010 may be incomplete because Plaintiffs had not received or had adequate time to review documents/data from DBSI which may bear on the liability or damages of other Defendants." Stipulation and Order (5/12/10) at ¶ 1(d). Moreover, Plaintiffs are not able to provide a full response even as to information that may have already been produced by the Defendants. Plaintiffs note that tens of millions of pages have been produced by the Defendants and most of that production occurred in June 2010 (in contravention of the parties' agreement and the Court's Order that the Defendants produce documents on a rolling basis). Given the volume of documents and other information provided, Plaintiffs have not had sufficient time to review and analyze all of the information produced to date and it is unreasonable to expect that they have yet done so.

Further, even if information had previously been provided, Plaintiffs may not be able to currently understand or appreciate the significance of that information where a Defendant has not provided all of the data responsive to Plaintiffs' document requests. For example, raw data is meaningless without

communications that occurred at the same time.  Conversely, without certain raw

data, communications may appear to be irrelevant when they are in fact highly

relevant and responsive to this Interrogatory.  As stated by the SEC: "Proof of a

manipulation almost always depends on inferences drawn from a mass of factual

data.  Findings must be gleaned from patterns of behavior, from apparent

irregularities, and from trading data. When all of these are considered together,

they can emerge as ingredients in a manipulative scheme designed to tamper with

free market forces."  SEC Initial Decision Release No. 82 Administrative

Proceeding File No. 3-8511: In the Matter of Sharon M. Graham, Stephen C. Voss,

and James J. Pasztor, December 28, 1995, citing Pagel, Inc., 48 S.E.C. 223, 226

(1985).

       In addition, Plaintiffs cannot fully respond to this interrogatory at this time

because Defendant UBS has admitted that the blue sheets it produced to Plaintiffs

in this case are incomplete and inaccurate.  Moreover, when Plaintiffs sought to

obtain accurate information by asking UBS to produce trade blotters and/or trade

runs, UBS refused on the grounds that the information in the trade blotters and/or

trade runs was identical to the information in the blue sheets.  However, when UBS

was required to certify that fact under a Court Order, it changed its position and

stated that it cannot represent that the trade blotters and trade runs are identical to

the blue sheets.  It then offered for the first time in late May to produce that

information, and it was only produced recently. Moreover, the trade blotters UBS produced appear to be missing categories of data that Plaintiffs understand are generally maintained in the ordinary course of business, including short sale indicator, capacity, exchange, average price indicator and contra broker. Thus, UBS's data appears to be incomplete. Additionally, Plaintiffs have not had sufficient time to review and analyze the data UBS did provide in its trade blotters, and thus Plaintiffs cannot fully respond as to UBS.

Plaintiffs also object to Interrogatory No. 2 to the extent it seeks a legal conclusion or attorney work product, and on the ground that it is overly broad and unduly burdensome. Indeed, Plaintiffs cannot be expected to, and are not required to, write down each fact (including date, person and place) showing Defendants' liability, particularly when such evidence is contained within the millions of documents and items of data Defendants have produced. Consequently, Plaintiffs' response will be a general summary as opposed to a list of every item of evidence. Finally, in some cases, information produced by Defendants does not appear to be accurate or complete such that Plaintiffs are not able to provide a response at this time. For example, according to Credit Suisse's blue sheets (CSS-TASER14339-85601), on December 21, 2007, Credit Suisse's total short sale volume was 23,455 shares. But, according to Equity Trade Journals produced by NASDAQ, Credit Suisse sold short 55,204 shares that day. Credit Suisse and other Defendants have

been sanctioned by regulators for "submitting inaccurate trading information on electronic blue sheets." *See* NYSE January 31, 2006, press release: "NYSE Regulation Announces Settlements with 20 Firms for Systemic Operational Failures and Supervisory Violations."

Bear Stearns also appears to have inaccurate blue sheets. As one example, on March 28, 2005, the Equity Trade Journal shows Bear Stearns selling short 116,406 shares worth $1.5 million to                    but Bear Stearns' blue sheets show the sale of the shares as a long sale from            to            . Moreover, although Bear Stearns has provided blue sheets to NASD in response to regulatory requests which include account names and addresses,[4] in their blue sheet production to Plaintiffs, many trades list the account name and address as "Information Unavailable."[5] Plaintiffs have requested information linking account numbers to account names from Bear Stearns, but Bear Stearns has not agreed to produce this information.

Similarly, UBS has informed Plaintiffs that its blue sheets may contain inaccurate information from January 1, 2003 through the end of June 2006, but UBS cannot identify which blue sheets are inaccurate (or if any are accurate).

**REDACTED**

---

[4] *See* Bear-T00027826.
[5] Bear-T00027746-27747.
809005.1
Highly Confidential Pursuant to Protective Order

In addition, DBSI has provided documents and data that is inconsistent with the Equity Trade Journals and has not provided Plaintiffs with a complete explanation as to why their blue sheets do not show an opposing broker for 94% of the trades.

Trading information inaccuracies and incomplete productions for Credit Suisse, Bear Stearns, UBS, DBSI and other Defendants may make it difficult, if not impossible, to completely analyze all of the data. Moreover, the inaccuracies and incomplete information provided, as well as the open questions relating to data and documents Defendants produced and for which Plaintiffs have not yet received answers, may result in an incomplete response to this Interrogatory. Accordingly, Plaintiffs expressly reserve the right to amend and supplement when and if correct and complete information becomes available.

Subject to and without waiving the foregoing objections, Plaintiffs respond to this Interrogatory as follows:

Defendants have engaged in a pattern of unlawful and manipulative activity, including abusive naked short selling, with respect to TASER and other securities. As Plaintiffs have explained to Defendants, abusive naked short selling involves numerous components and types of improper behavior, as well as acts of concealment. Plaintiffs have generally identified the types of conduct that can constitute or be a component or abusive naked short selling in the attachment to

their April 15, 2010 email entitled "Yesterday's Agreement." That attachment is hereby incorporated by reference.

Based upon the current review of the data, and subject to amendment upon review of Defendants' data and documents and expert analyses, Defendants' pattern of improper conduct and/or the harm it caused became persistent in 2004/2005 (additional lay and/or expert analyses of Defendants' documents and data is necessary before Plaintiffs can identify a more specific time period when the conduct and/or its harm became persistent). Defendants' pattern of unlawful and manipulative activity and/or its associated harm continued until at least the filing of this lawsuit in April of 2008.

More specifically, and by way of example, Defendants' failures to deliver TASER securities is evident in 2004, with the total number of failures in the CNS system climbing above 8 million shares in December 2004. The CNS fails do not account for all of the failures to deliver TASER securities, as there were additional failures outside of the NSCC system.

In January 2005, the U.S. Securities and Exchange Commission implemented Regulation SHO ("SHO") to curb illegal abusive naked short selling. The new rules under Regulation SHO created threshold securities lists, which mandated exchanges in conjunction with the National Securities Clearing Corporation ("NSCC") to publish lists of securities in the national clearing and

settlement system that had significant failures to deliver stock for proper

settlements to purchasers.  Excessive fails to deliver of TASER stock for

settlement in the NSCC system caused TASER to be placed on the publicly

disseminated NASDAQ Regulation SHO threshold security list.  TASER had

persistent fails to deliver and was on the threshold security list for 379 consecutive

trading days beginning when the original list was published in January 2005.  The

pattern of failing to deliver TASER's shares for proper settlement continued within

the NSCC system on virtually a daily basis through July 2008.

Throughout the five plus years that TASER was failing to be delivered at the

NSCC, there was a lack of excess shares to be traded, borrowed or loaned for short

selling in the public marketplace, and the Defendants were aware of this fact.  *See,*

*e.g.,* MS_TASR00037089R-37094R (rating lack of supply of TASER "Hot" and

"Super Hot" from November 26, 2004 through the end of their available record of

May, 29, 2009); UBS_TASER0021290 – 21367 (TASER "Impossible to Borrow"

from June 6, 2005 to September 21, 2005); UBS_TASER0016146 – 21289 (UBS's

easy to borrow list contained TASER on only 18 days out of 1,614 days during the

Time Period); UBS_TASER0000003 (UBS' compliance manual for Supervisory

Procedures Applicable to Regulation SHO states that, "Securities Lending will

ensure that T+ 13 securities (and Threshold securities) will not be added to the

Easy to Borrow List."); Bear-T00030684; Bear-T00031036 (listing TASER as

Highly Confidential Pursuant to Protective Order
26

hard to borrow for almost all times during the Relevant Time Period); BAS

TASER 1663 – 1666 (TASER listed on "Good to Borrow" list on only two dates

for the Relevant Time Period); UBS_TASER0016146–21289 (TASER on easy to

borrow list for only 18 days during Relevant Time Period); DBSI-TASER 003213

– 003219 (TASER listed as "Special," "Hard to Borrow" and "Not Good

Collateral" from October 13, 2006 through May 29, 2009); GS_TASER000251

(compliance manual stating that a Regulation SHO security should always be

considered a hard to borrow stock); Bear-T00030684 and Bear-T00031036 (listing

TASER as "Hard to Borrow" nearly every day from January 2, 2003 through

May 29, 2009).

Despite the repeated failures to deliver and/or receive TASER securities and

TASER securities' continued unavailability for stock loans, Defendants engaged in

a pattern of permitting, facilitating or engaging in unlawful and manipulative

abusive naked short sales of TASER securities (which included not only unlawful

short sales, but facilitating and aiding and abetting those sales through, among

other things, failing to locate or have reasonable grounds to believe that it could

borrow or obtain securities for delivery by the settlement date, false or sham

locates, mismarked tickets, failure to conduct buy ins, etc.).[6] The Defendants also took unlawful steps to conceal their illegal conduct.

The Defendants' conspiracy and/or its harmful effects occurred during the relevant Time Period (though, as stated above, it became more persistent in 2004/2005). As a result, Defendants' conduct is not appropriately tied to a single trading day or transaction. Some illustrative examples of the Defendants' conspiracy and unlawful conduct during the relevant time period, and/or evidence of their aiding and abetting that unlawful conduct, are as follows:[7]

- Defendants repeatedly failed to deliver and/or receive TASER and other securities as required by SEC and other agency rules, SROs, federal and/or state securities laws and/or their own compliance manuals, policies and procedures. *See, e.g.,* GS_TASER2945; MS_TASR_8492; MS_TASR9083; MS_TASR9673; MS_TASR9726; MS_TASR37429; CSS-TASER-E168134; MS_TASR_2633657. For example, with respect to CNS fails:

  o From 2004 to 2008, out of approximately 252 trading days per year, Goldman Sachs failed to deliver/receive TASER securities as follows:

---

[6] *See* GSE_T 01146053-77.

[7] The bullet points below are examples and do not constitute an exhaustive list. Further, in many instances, Plaintiffs are providing a few cites in an effort to demonstrate the conduct. These citations are not meant to, and do not in any way contain, an exhaustive list of the documents and data supporting Plaintiffs' claims. Rather, they are for illustrative purposes only.

809005.1
Highly Confidential Pursuant to Protective Order

- 2004 – approximately 250 days

- 2005 – approximately 245 days

- 2006 – approximately 188 days

- 2007 – approximately 145 days

- 2008 – approximately 108 days

o   In fact, from late 2004 until early 2005, **_Goldman Sachs failed to deliver over 5 million TASER shares_**.

o   From 2004 to 2008, out of approximately 252 trading days per year, Credit Suisse failed to deliver/receive TASER securities as follows:

- 2004 – approximately 177 days

- 2005 – approximately 171 days

- 2006 – approximately 122 days

- 2007 – approximately 86 days

- 2008 – approximately 64 days[8]

---

[8] _See_ Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Second Requests for Admission to Each Defendant at Request No. 39 ("Admitted that Credit Suisse Securities was in a net failure to _deliver_ position to CNS in TASER as follows: 2004- on approximately 26 days[;] 2005 – on approximately 28 days[;] 2006 – on approximately 9 days[;] 2007 – on approximately 20 days[;] 2008 – on approximately 22 days[.]  Admitted that Credit Suisse was in a net fail to _receive_ position from CNS in TASER as follows: 2004- on approximately 151 days[;] 2005- on approximately 143 days[;] 2006 – on approximately 113 days[;] 2007 – on approximately 66 days[;] 2008 – on approximately 42 days").

809005.1
Highly Confidential Pursuant to Protective Order

- From 2004 to 2007, out of approximately 252 trading days per year, Morgan Stanley failed to deliver/receive TASER securities as follows:[9]

    - 2004 – approximately 228 days

    - 2005 – approximately 195 days

    - 2006 – approximately 135 days

    - 2007 – approximately 134 days

- From 2004 to 2007, out of approximately 252 trading days per year, Merrill Lynch failed to deliver/receive TASER securities as follows:

    - 2004 – approximately 244 days

    - 2005 – approximately 250 days

    - 2006 – approximately 244 days

    - 2007 – approximately 154 days

- As shown above, from 2004 to 2006, Merrill Lynch failed to deliver/receive TASER securities almost every trading day each year, with some failures exceeding 750,000 shares

- From 2004 to 2007, out of approximately 252 trading days per year, Deutsche Bank failed to deliver/receive TASER securities as follows:

---

[9] In many cases, the failures involved transactions between and among different Defendants. *See, e.g.,* MS_TASR_37429 (showing a failure of 227,400 shares with a Goldman affiliate and a failure of 19,200 shares with Merrill Lynch).

809005.1
Highly Confidential Pursuant to Protective Order

- 2004 – approximately 186 days

- 2005 – approximately 182 days

- 2006 – approximately 130 days

- 2007 – approximately 103 days

o From 2004 to 2008, out of approximately 252 trading days per year, UBS failed to deliver/receive TASER securities as follows:

- 2004 – approximately 187 days

- 2005 – approximately 181 days

- 2006 – approximately 149 days

- 2007 – approximately 101 days

- 2008 – approximately 81 days

o From 2004 to 2005, out of approximately 252 trading days per year, Banc of America failed to deliver/receive TASER securities as follows:

- 2004 – approximately 127 days

- 2005 – approximately 73 days

o From 2004 to 2005, out of approximately 252 trading days per year, Bear Stearns  has admitted that it failed to deliver/receive TASER securities as follows:

- 2004 – approximately 115 days

- 2005 – approximately 86 days[10]

o In many instances, one or more Defendants had consistent failures to receive, indicating that the Defendant knew that TASER securities were not settling and thus the Defendant should have, *inter alia*, required a buy-in. The failure to request a buy-in further demonstrates Defendants' agreement and conspiracy to permit and/or facilitate naked short selling and other improper and/or manipulative activity. At a minimum, it demonstrates that the Defendant aided and abetted the conspiracy.

o In 2009, after this lawsuit was filed, every Defendant failed to deliver/receive on less than 5 trading days our of approximately 252 trading days per year, proving that their prior conduct was not inadvertent and that the failures to deliver/receive could have been prevented.[11]

---

[10] Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request No. 45.

[11] Each of the Defendants admitted the following Request for Admission on their own behalf : "In 2009, none of the Defendants had a net fail to deliver or net to receive position in TASER commons stock for more than five trading days." UBS Securities, LLC's Objections and Responses to Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request No. 46 ("Admitted as to

809005.1
Highly Confidential Pursuant to Protective Order

- According to SEC Fails-to-Deliver Archive data -

  www.sec.gov/foia/docs/failsdata-archive.htm - on December 6, 2004, there

  were 8,102,052 CNS fails to deliver in TASER Securities, equating to

  13.66% of the shares outstanding at that time.

---

UBS during the relevant period in 2009 (i.e. January 1, 2009 – May 31, 2009).
Specifically, UBS did not have a net fail to deliver or net failure to receive position
in TASER common stock for more than five trading days between January 1, 2009
and May 31, 2009."); Defendant Banc of America Securities LLC's Responses and
Objections to Plaintiffs' Amended Second Requests for Admission at Request No.
46 ("Admitted as to BAS for the relevant period in 2009 (i.e., January 1, 2009-
May 31, 2009)."); Defendant Morgan Stanley & Co. Incorporated's Objections and
Responses to Plaintiffs' Amended Second Requests for Admission to Defendants
at No.46 (same regarding Morgan Stanley); Defendant Merrill Lynch, Pierce,
Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Amended
Second Requests for Admission at Request No. 46 (same regarding Merrill
Lynch); Defendant Deutsche Bank Securities Inc.'s Objections and Responses to
Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request
No. 46 (same regarding Deutsche Bank); Defendant Credit Suisse Securities
(USA) LLC's Objections and Responses to Plaintiffs' Second Requests for
Admission to Each Defendant at Request No. 46 (same regarding Credit Suisse);
Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman
Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for
Admission to Defendants at Request No. 46 (same regarding Goldman Sachs
defendants); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities
Corp.'s Objections and Responses to Plaintiffs' Second Amended Requests for
Admission to Each Defendant at Request No. 46 (same regarding Bear Stearns).

809005.1
Highly Confidential Pursuant to Protective Order

- Defendants' failure to deliver and/or receive TASER securities was not an isolated incident, but rather was part of a larger intentional and ongoing pattern and practice involving other securities.  *See, e.g.,* UBS_TASER1077; UBS_TSR33893.  For example, according to UBS's Fail on Sale Reports, failures to deliver to/from UBS sometimes exceeded one billion dollars worth of securities.  *See, e.g.,* UBS_TSR47527.  Those failures included transactions involving Goldman Sachs & Co., Morgan Stanley, Credit Suisse, Deutsche Bank, Bear Stearns, Banc of America and Merrill Lynch.  *Id.*

- As Plaintiffs have indicated, the identification of improper transactions involving or relating to naked short selling requires expert analyses and information, which is not required at this time under the Scheduling Order and given, among other things, Defendants' failure to produce documents and data in a timely manner and their failure to provide it in a complete, useable and readable form.  Nonetheless, Plaintiffs provide below examples of what they currently believe to be improper transactions, which are based on current knowledge and subject to further analysis.  Plaintiffs will identify additional transactions during expert discovery and reserve the right to amend the following list as well as the other transactions identified in response to this Interrogatory:

(a)   June 25, 2004: Defendant Goldman Sachs Execution (0690) as

clearing broker, permitted, facilitated or engaged in two transactions

where [          ] sold 232,000 shares short and failed to deliver. [12]

These trades were marketed as long and sold through the NASDAQ

even though they were actually short sales.  These short sales were not

covered, and were a substantial portion of Goldman Sachs

Execution's increase of its fail position by 315,023 shares of TASER

on June 25, 2004.[13]

(b)   On July 20, 2004: Defendant Goldman Sachs Execution as clearing

broker, permitted, facilitated or engaged in a transaction where [   ]

[          ] sold 800,000 shares short that failed in delivery.[14]  These

trades were marketed as long and sold through the NASDAQ even

though they were actually short sales.  These short sales were not

covered, and they were a substantial portion of Goldman Sachs

Execution's increase of its fail position by 873,899 shares of TASER

on July 20, 2004.[15]  This suspect transaction also included a sham

**REDACTED**

---

[12] GSEC_TASER 000005.
[13] DTCC00000019.
[14] GSEC_TASER 000005.
[15] DTCC00000020.

809005.1
Highly Confidential Pursuant to Protective Order

options contract which consisted of an improper married put and call

for 8,000 contracts (representing 800,000 shares of TASER)[16];

(c)     On December 23, 2004, Defendant Goldman Sachs Execution as

clearing broker, permitted, facilitated or engaged in a transaction

where [_____] sold 1,000,000 shares short in two transactions.[17]

These trades were marketed as long and sold through the NASDAQ

even though they were actually short sales.  These shorts were not

covered, and they were a substantial portion of Goldman Sachs

Execution's increase of its fail position by 987,418 shares of TASER

on December 23, 2004[18];

(d)     Defendant Goldman Sachs Execution facilitated, engaged in and/or

permitted its client [_____] to engage in sales of TASER stock

from March 18, 2004 through May 13, 2005.  Throughout this time

period, [_____] maintained a continuous short position in

TASER securities at Goldman Sachs Execution.[19]  Thus,

[_____] sales of TASER stock between March 18, 2004 and May

13, 2005 involved abusive naked short selling;

**REDACTED**

---

[16] GSEC_TASER00015.
[17] GSEC_TASER 000005.
[18] DTCC00000024.
[19] GSEC_TASER 000042.

809005.1
Highly Confidential Pursuant to Protective Order

(e)     Between March 18, 2004 and May 13, 2005, Defendant Goldman

Sachs Execution facilitated, engaged in and/or permitted its client

_____        to engage in 184 transactions involving TASER

securities (*e.g.* each of                's transactions in TASER in that

time period) that contributed to                's continuous short

position[20];

(f)     In total, Goldman Sachs Execution facilitated, permitted and profited

from allowing                to sell 7.9 million more shares of TASER

common stock than                purchased;

(g)     On October 27, 2005, Defendant Merrill Lynch, permitted, facilitated

and/or engaged in a transaction where

sold 215,000 shares short.  These trades were marketed as long and

sold through the NASDAQ even though they were actually short

sales.  Also on this date, Defendant Merrill Lynch, permitted,

facilitated and/or engaged in a transaction where                sold

150,000 shares short.  These trades were also marked as long even

though they were actually short sales that failed to be delivered.[21]

These two short sale transactions were not covered and they were a

REDACTED

_____

[20] GSEC_TASER 000005.
[21] ML-TSINTL0069216 – 69227.
809005.1
Highly Confidential Pursuant to Protective Order

substantial portion of Merrill Lynch's increase of its fail position by 358,300 shares of TASER on October 27, 2005; [22]

(h)     On July 29, 2005:  Defendant Merrill Lynch, permitted, facilitated and/or engaged in a transaction where

sold 295,023 shares short that failed to be delivered.[23]  These trades were marketed as long and sold through the NASDAQ even though they were actually short sales.  These short sales were not covered and they were a substantial portion of Merrill Lynch's increase of its fail position by 293,723 shares of TASER on July 29, 2005;[24]

(i)     On August 24, 2005: Defendant Merrill Lynch, permitted, facilitated and/or engaged in a transaction where

sold 295,100 shares short that failed to be delivered.[25]  These trades were marketed as long and sold through the NASDAQ even though they were actually short sales.   These short sales were not covered and they were a substantial portion of Merrill Lynch's increase of its fail position by 297,800 shares of TASER on August 24, 2005.[26] This transaction also included a sham options contract which consisted of

**REDACTED**

---

[22] DTCC00000035.
[23] ML-TSINTL0069216 – 69227.
[24] DTCC00000033.
[25] ML-TSINTL0069216 – 69227.
[26] DTCC00000033.

an improper married call for 2,951 contracts (representing 295,100

shares of TASER);[27]

(j)     For the foregoing trades involving                    and

Defendant Merrill Lynch acted as executing broker,

prime broker and clearing firm for both the equity and options

transactions of                    and                . As

such, it permitted, facilitated, engaged in and/or profited from these

transactions;

(k)     After Regulation SHO was implemented on January 3, 2005, Merrill

Lynch Pax had a fail position in TASER at the NSCC from January

19, 2005 through June 20, 2006, a total of 356 trading days.  This fail

position peaked at approximately 1.7 million shares on January 19,

2006.[28]  TASER was a Regulation SHO Threshold Security during

this entire period of time.  On January 19, 2006, Merrill Lynch Pax

had a fail position of 1,687,892 TASER shares at the NSCC.[29]  Merrill

Lynch's records show that the short positions of only three of its

clients,

, accounted for 87% of Merrill Lynch's fail

---

[27] ML-TSINTL0087536 – 87556.
[28] DTCC 00000001 – 83.                    **REDACTED**
[29] DTCC00000037.

809005.1
Highly Confidential Pursuant to Protective Order

position on this date.[30] TASER's total fails to deliver at the NSCC on January 19, 2006 were 2,021,126 shares for all market participants.[31] The growing fail positions at Merrill Lynch Pax from these three short sellers, after the implementation of Regulation SHO, were deliberate failures to deliver;

(l)   Defendant Merrill Lynch also engaged in abusive naked short selling with regard to transactions undertaken outside the NSCC. For example, Merrill Lynch undertook activity which, if reported to the NSCC, would have resulted in TASER continuing to be listed as a Regulation SHO Threshold Security. From July 20, 2007 through January 2, 2008, Merrill Lynch facilitated, engaged in or permitted its client ̦            to hide is failed short position in TASER securities. During this time period, ⁞            established new fail to deliver positions on 61 days, with some of those positions lasting over one hundred days.[32] Merrill Lynch's records show that            fail position grew to 900,000 shares of TASER by December 31, 2007. ML-TSINTL0069213. However, TASER's <u>total</u>

---

[30] ML-TSINTL0067501.
[31] DTCC00000037.
[32] Some of these fail positions may have been pending longer than one hundred days. Due to the in complete nature of the records at issue, the entire length of some of these fail positions cannot currently be calculated.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

40

fail position at the NSCC on December 31, 2007 was only 203,301 shares.  DTCC00000060.  Rather than report the 900,000 fails, Merrill Lynch internalized them such that they were hidden from the NSCC and regulators.

(m)     Defendant Merrill Lynch facilitated, engaged in or permitted its clients to participate in willful violations of Regulation SHO.  On August 5, 2009, the SEC reported the results of its investigation of Merrill Lynch client Hazan Capital Management, finding that Hazan Capital Management had conspired with others to participate in sham transactions specifically targeting Regulation SHO Threshold Securities.  TASER was such a security.  As held by the SEC, Hazan Capital Management

> willfully violated Rule 203(b)(3) of Reg SHO by engaging in a series of sham reset transactions that employed short-term, paired stock and option positions, which enabled [Hazan] to circumvent its closeout obligations in Reg SHO threshold securities.  HCM *also assisted other options market makers who were executing their own sham reset transactions by acting as a counterparty to the sham transactions* and in doing so violated the locate requirement.

*See* SEC Administrative Proceeding File No. 3-13570 (Aug. 5, 2009) (emphasis added).

(n)     Merrill Lynch's records show that Merrill Lynch permitted, facilitated

and/or engaged in the same activity condemned by the SEC.  As one

example, Merrill Lynch's Threshold Fail Tracking System Data

shows that                                  had a fail to deliver position of

107,409 TASER shares on November 9, 2005.  Merrill Lynch clients

_____ (paired fails) had identical fail to deliver positions on this

date.  For the next two trading days, November 10th and 14th, these six

participants each maintained a fail position of 107,049 TASER shares.

Similar activity can be found in Merrill Lynch's records on June 16,

2005 through June 24, 2005, October 21, 2005 through October 25,

2005 and November 10, 2005 through November 15, 2005.[33]

(o)     Credit Suisse admits that, outside of CNS, there has been at least one

instance where it failed to deliver TASER common stock, and that

failure persisted for more than 13 consecutive settlement days.  *See*

Amended Responses and Objections of Defendant Credit Suisse

Securities (USA) LLC to Plaintiffs' Amended Second Interrogatories

to Each Defendant, Response to Interrogatory 5(h).

**REDACTED**

---

[33] ML-TASR0052925.

809005.1
Highly Confidential Pursuant to Protective Order

(p)     Credit Suisse admits that on July 27, 2005 it engaged in a short sale of

TASER securities in its proprietary account        "without first

conducting a locate as required under the federal securities laws."  See

Amended Responses and Objections of Defendant Credit Suisse

Securities (USA) LLC to Plaintiffs' Amended Second Interrogatories

to Each Defendant, Response to Interrogatory 5(c).

(q)     Credit Suisse's blue sheets show long-term short positions.  For

example, Credit Suisse client                  sold short 512,500

TASER shares from March 1, 2005 through March 29, 2005, covered

42,700 shares on April 25, 2005 and didn't cover any other TASER

shares through Credit Suisse until August 18, 2008 through September

23, 2008, three and a half years after the short sales took place.  CSS-

TASER0014339-0085601.  Similar to other Defendants' treatment of

large short positions,                  's short position is not showing

in the Credit Suisse stock record provided to the Plaintiffs.

- The Defendants' persistent and ongoing pattern and practice of improper

activity concerning and relating to naked short sales and other violations of

the law or regulations are also evidenced in each Defendants' response to

Plaintiffs' Third Interrogatories to all Defendants Except UBS; Plaintiffs'

Third Interrogatories to UBS; and Plaintiffs' Fourth Interrogatories to UBS,

as well as the documents cited therein or produced contemporaneously
therewith.  Those responses and documents are incorporated herein by
reference as if fully stated herein.

- Defendants' own documents and reports list instances in which transactions
  in TASER securities were not performed, facilitated or completed in
  accordance with Defendants' internal rules and regulations and/or securities
  laws, rules and regulations.  It is equally, if not less, burdensome for
  Defendants to locate those instances in their own reports than it is for
  Plaintiffs to search the productions and identify them.   Thus, Plaintiffs will
  not list each instance in which Defendants' own reports list an
  improper/illegal TASER transaction.  However, as some examples:

  (1)   According to Morgan Stanley's SAFE/SGUD reports:

      (a)   Morgan Stanley's fail report for February 23, 2005 shows a fail
            between Morgan Stanley and
                              of 227,400 shares of TASER established on
            January 28, 2005, that remained failed for 21 days and was
            recorded as a "MS Short" in Morgan Stanley's reports. [34]
            Morgan Stanley did not deliver these shares to

---

[34] US Equity Broker and Customer SAFE/SGUD Fails VB.

This was a fail to deliver from Morgan Stanley when the Defendants' daily borrow lists and the Regulation SHO NASDAQ threshold security list indicated that TASER was virtually impossible to borrow to settle short sales.  Regulation SHO was in effect to protect TASER security transactions in the U.S. marketplace from fails due to abusive short sales such as these.

(b)     On or around December 3, 2004,

failed to deliver 19,200 shares of TASER to Morgan Stanley within 13 days, and the fail was outstanding for at least 138 days;

(c)     On or about May 26, 2005

failed to deliver 103,400 shares of TASER to Morgan Stanley within 13 days because it was "short" and had an "insufficient position";

(d)     On or about March 26, 2005, there was a failure to receive 100,000 TASER shares from                    that was 14 days old because "BROKER WAS SHORT"; and

**REDACTED**

 (e) On or about May 26, 2005,

   failed to deliver 63,300 shares of TASER to Morgan Stanley for

   more than 13 days because "client short".

(2) According to Goldman internal reports:

 (a) On or about March 2, 2005, Goldman provided improper

   locates for TASER;

 (b) On or about February 15, 2005, Goldman provided improper

   locates for TASER;

 (c) On or about April 4, 2005, Goldman provided improper locates

   for TASER;

 (d) On or about April 6, 2005, Goldman provided improper locates

   for TASER;

 (e) On or about May 16, 2005, Goldman provided improper locates

   for TASER;

 (f) On October 24 and 25, Goldman facilitated a short sale of

   TASER from   where the ticket was mismarked;

 (g) On June 20, 2008, Goldman facilitated a short sale of TASER

   from   where the tickets were mismarked;

REDACTED

809005.1
Highly Confidential Pursuant to Protective Order

(h)   On or about July 15, 2004, Goldman facilitated a short sale of 10,000 TASER securities for          when only 500 shares of TASER were located;

(i)   On or about August 2, 2005, Goldman facilitated a short sale of 2,317 TASER securities for          when only 350 shares of TASER were located;

(j)   On or about April 15, 2005, Goldman facilitated a short sale of 9,000 TASER securities for          when only 5,000 shares of TASER were located; and

(k)   On or about May 12, 2005, Goldman facilitated a short sale of 200,000 TASER securities for          when only 20,000 shares were located.

(3)   According to Bear Stearns' internal reports:

(a)   On or about May 24, 2004, Bear Stearns facilitated, permitted and/or engaged in a short sales of TASER for which it could not borrow the securities (BEAR T48514 and BEAR T48521)

(4)   Similarly, Defendants' own documents show:

(a)   From at least May 2004 to May 2007, UBS permitted and/or facilitated short sales for          using inaccurate Easy-to-Borrow

**REDACTED**

lists.  This occurred for over one million short sale orders which included, upon information and belief, TASER securities;

(b)     On or around March 8, 2005, BAS had a fail position in TASER that was at least 20 days old from

(c)     On or around August 17, 2007, Merrill Lynch participated, facilitated or otherwise was involved in Reg. SHO violations with respect to TASER securities;

(d)     On or around August 20, 2007, Merrill Lynch participated, facilitated or otherwise was involved in Reg. SHO violations with respect to TASER securities;

(e)     On or around August 22, 2007, Merrill Lynch participated, facilitated or otherwise was involved in Reg. SHO violations with respect to TASER securities;

(f)     Between at least March 2006 and January 2008, Deutsche Bank permitted certain accounts/clients to engage in short sales of TASER stock without first conducting a locate when it disabled its Automatic Block;

(g)     In or around January 28, 2005, Credit Suisse engaged in a short sale of TASER stock when a locate had not been secured and TASER was "impossible to borrow";

(h) Until at least June 2006, short sale orders in UBS's Pinpoint order management system may not have had appropriate locate information as required by Regulation SHO;

(h)     As found by NASD, from January 19, 2005 through May 20, 2005, Merrill Lynch had a fail to deliver position in TASR while the stock was a threshold security.  ML-TSINTL-593578-80.  Those fails included, but are not limited to, the following:

| Date | Amount |
|---|---|
| 1/19/05 | 15,620 |
| 1/20/05 | 26,012 |
| 1/21/05 | 47,212 |
| 1/24/05 | 22,258 |
| 1/25/05 | 25,258 |
| 1/26/05 | 59,758 |
| 1/27/05 | 49,655 |
| 1/28/05 | 47,905 |
| 1/31/05 | 54,605 |
| 2/1/05 | 49,253 |
| 2/2/05 | 63,853 |
| 2/3/05 | 90,030 |
| 2/4/05 | 91,930 |
| 2/7/05 | 60,130 |
| 2/8/05 | 56,630 |
| 2/9/05 | 57,630 |
| 2/10/05 | 62,952 |
| 2/11/05 | 39,716 |
| 2/14/05 | 47,616 |
| 2/15/05 | 41,916 |
| 2/16/05 | 10,527 |
| 2/17/05 | 56,077 |
| 2/18/05 | 61,777 |
| 2/22/05 | 52,309 |

| | |
|---|---|
| 2/23/05 | 14,409 |
| 2/24/05 | 197,929 |
| 2/25/05 | 194,229 |
| 2/28/05 | 185,829 |
| 3/1/05 | 189,729 |
| 3/2/05 | 174,629 |
| 3/3/05 | 165,379 |
| 3/4/05 | 166,779 |
| 3/7/05 | 180,679 |
| 3/8/05 | 208,879 |
| 3/9/05 | 213,879 |
| 3/10/05 | 215,379 |
| 3/11/05 | 221,829 |
| 3/14/05 | 218,329 |
| 3/15/05 | 208,279 |
| 3/16/05 | 205,379 |
| 3/17/05 | 196,879 |
| 3/18/05 | 191,879 |

(j)     As found by NASD, as of February 4, 2005, Merrill Lynch had

a close-out obligation in TASR under Reg. SHO that it did not

meet.  ML-TSINTL-594578-80;

(k)     On November 7, 2006, Defendant UBS facilitated, permitted

and/or engaged in a short sale of 80,000 shares of TASER with

Defendant                         in which no locate was provided.  At

the time of this transaction, TASER was *not* on the easy to

borrow list;

(l)     On numerous dates, including, but not limited to, March 30,

2007, February 14, 2008, April 25, 2008, April 29, 2008, May

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

1, 2008, May 6, 2008 and June 27, 2008, TASER was listed on
Defendant UBS's Authorized Not Covered report, which tracks,
inter alia, instances where UBS failed to deliver a threshold
security;

(m)   Defendant UBS provided locates for TASER while, at the same
time, it failed to deliver to CNS.  This occurred, for example,
on or around June 27, 2008;.

(n)   Between July 20, 2007 and at least August 17, 2007, Defendant
Merrill Lynch facilitated, permitted and/or engaged in
Regulation SHO violations relating to TASER involving

(o)   On or about August 27, 2004, Merrill Lynch facilitated,
permitted and/or engaged in short sales of TASER in violation
of locate requirements and at a time when TASER stock was
not on the available to borrow list;

(p)   Defendant UBS's documents show that on or about January 18,
2005, Defendant UBS permitted, facilitated and/or engaged in a
short sale of TASER for account          without first making an
affirmative determination;

**REDACTED**

(q)    On or about January 11, 2005, Defendant UBS permitted,
facilitated or engaged in a short sale of 116,614 shares of
TASER with                           UBS allowed that trade
through its IQ system, which did not prevent short sales when
no affirmative determination was made (and, in this case, there
was no affirmative determination).  UBS was later sanctioned
by regulators for this precise conduct, which violates
Regulation SHO;

(r)    According to Defendant UBS's own documents, UBS engaged
in unauthorized short sales of TASER securities for
                              on numerous days, including, but not
limited to, August 8, 2006 (UBS_TSR1175205), August 9,
2006 (UBS_TSR1175199), January 29, 2007
(UBS_TSR301196), April 2, 2007 (UBS_TSR44351), April 9,
2007 (UBS_TSR45931), April 11, 2007 (UBS_TSR44086),
April 25, 2007 (UBS_TSR45929), May 1, 2007
(UBS_TSR42551), May 7, 2007 (internally UBS_TSR42393),
May 19, 2007 (UBS_TASR327865),  June 6, 2007
(UBS_TSR385664), June 17, 2007 (UBS_TSR42806), June
20, 2007 (UBS_TSR376927), June 28, 2007

(UBS_TSR44829), July 27, 2007 (UBS_TSR376147), July 30,
2007 (UBS_TSR337310),August 2, 2007 (UBS_TSR398014),
August 7, 2007 (UBS_TSR385507),  August 10, 2007
(UBS_TSR387460),  August 14, 2007 (UBS_TSR399683),
August 15, 2007 (UBS_TSR387458), August 17, 2007
(UBS_TSR372634), August 19, 2007 (UBS_TSR372634),
September 14, 2007 (UBS_TSR376199), September 26, 2007
(UBS_TSR392163), October 29, 2007 (UBS_TSR317657),
November 9, 2007 (UBS_TSR389290), November 12, 2007
(UBS_TSR392140), November 18, 2007 (UBS_376129),
November 26, 2007 (UBS_TSR339564), December 2, 2007
(UBS_TSR339554),  December 13, 2007
(UBS_TASR401068), December 26, 2007 (UBS_TSR349444),
May 13, 2008 (UBS_TSR734190), May 14, 2008
(UBS_TSR343062), May 15, 2008 (UBS_TSR334882),May
23, 2008 (UBS_TSR734462), May 29, 2008
(UBS_TSR734466), May 30, 2008 (UBS_TSR734005), June 6,
2008 (UBS_TSR733977), September 25, 2008
(UBS_TSR734431).   UBS's internal documents describe an

unauthorized short sale as including instances where no locate
was obtained;

(s)   According to DBSI's documents, on or about August 9, 2005,
Defendant DBSI facilitated, permitted and/or engaged in an
improper short sale of TASER stock while TASER was on the
threshold list;

(t)   According to Defendant DBSI's own documents, on or about
December 4, 2008, DBSI disabled the locate block to permit its
client               to engage in a short sale of TASER stock
without a locate;

(u)   According to Defendant DBSI's own documents, on or about
November 17, 2007, DBSI facilitated, permitted and/or
engaged in an improper short sale of TASER stock;

(v)   According to Defendant DBSI's own documents, on April 19,
2004, DBSI had failures to receive in TASER stock that were
over 13 days old;

(w)   According to Defendant Bear Stearns' documents, on June 14,
2007, Bear Stearns had a fail position in TASER securities that
was greater than 13 days old;

**REDACTED**

(x)     According to Defendant Bear Stearns' own documents, on May

8, 2007, Bear Stearns had a failure to receive position in

TASER that was greater than 13 days old;

(y)     According to Defendant Credit Suisse's documents, Credit

Suisse permitted, facilitated and/or engaged in the short sale of

TASER securities without conducting a locate, and while the

stock was not easy to borrow.  That conduct occurred on at least

the following days:  May 25, 2007, April 15, 2007, February 7,

2008,  February 15, 2008,  March 14, 2008, March 20, 2008,

April 24, 2008,  April 25, 2008, May 30, 2008, June 2, 2008,

June 16, 2008, June 17, 2008, June 19, 2008, July 2, 2008, July

31, 2008,  August 5, 2008, August 15, 2007, August 19, 2008,

August 25, 2008, September 4, 2008,  September 10, 2008,

September 15, 2008, November 7, 2008, November 12, 2008,

November 13, 2008, November 14, 2008, November 17, 2008,

November 18, 2008, November 20, 2008, November 24, 2008,

November 25, 2008, December 1, 2008,  December 3, 2008,

December 4, 2008, December 11, 2008, January 15, 2009,

January 20, 2009, February 2, 2009, February 3, 2009 and

February 10, 2009;

809005.1
Highly Confidential Pursuant to Protective Order

(z)    According to Credit Suisse's documents, Defendant Credit Suisse permitted, facilitated and or engaged in TASER short sales without conducting a locate on at least the following days:  June 29, 2004, November 30, 2004, December 1, 2004, September 1, 2005, July 9, 2007, August 8, 2007, and August 15, 2007;

(aa)    Defendant Goldman Sachs' documents reveal that TASER was listed on its REDI Locate Broker Validation Report, which shows instances in which a short sales was permitted with an invalid broker ID code.  TASER transactions using invalid locate codes occurred on at least the following dates: August 12, 2005, August 15, 2005, September 14, 2005, September 27, 2005, October 26, 2005, October 27, 2009, October 28, 2005, October 31, 2005, November 1, 2005, November 7, 2005, November 10, 2005, November 11, 2005, November 15, 2005, November 16, 2005, November 17, 2005,  February 3, 2006, March 9, 2006, March 14, 2006, March 15, 2006, March 16, 2006, March 17, 2006, March 20, 2006, March 21, 2006, March 24, 2006, March 27, 2006, March 28, 2006, March 29, 2006, March 30, 2006, March 31, 2006, April 4, 2006, April 5, 2006,

May 3, 2006, May 25, 2006. Plaintiffs respond further by reference to these reports in Goldman's production, with the burden equal on Plaintiffs and Defendants to ascertain the remaining dates;

(bb)   According to Defendant Banc of America Securities' documents, on or about December 6, 2004, Banc of America Securities permitted, engaged in and/or facilitated a short sale of TASER securities without first locating sufficient shares to cover that short;

(cc)   According to Defendant Banc of America Securities' documents, Banc of America Securities permitted, engaged in or facilitated unapproved short sales of TASER on at least the following days: June 26, 2007 and June 25, 2008; and

(dd)   Defendant Credit Suisse's own documents acknowledge that, on or about April 26, 2006, it was in violation of Reg SHO with respect to TASER securities.

- Defendants' failures to deliver/receive were not limited to CNS failures, but also included ex-clearing fails.

809005.1
Highly Confidential Pursuant to Protective Order

- Defendants misreported or otherwise concealed their abusive short selling activity by transferring large short positions of TASER securities off of the Defendants' main books.

  o As an example, Goldman Sachs International's stock records reflect large short positions in the accounts of                     and                .[35] Although Goldman Sachs & Co. executed these trades,[36] the positions were removed from Goldman Sach's stock record and "parked"[37] in Goldman Sachs International's stock record in order to mask the true short position in TASER's securities.  Goldman Sachs' records for its reporting of uncovered short positions to regulators and the marketplace reflect these improper activities.[38]

  o In particular, on January 22, 2008, Goldman Sachs International's stock record reflects that                     had a position of 5.1 million short shares of TASER which was built up over a four year

---

[35] GS_T 00000001.
[36] GSCO_TASER 000001.
[37] When parking shares, brokerage firms are attempting to cover undeclared short positions left over from transactions whose stock was not delivered by the settlement date. Rather than performing a buy-in transaction, these firms collude with one another and, by delaying the settlement process, inflate the number of shares available for trade in the secondary market. Source: Forbes Investopedia.
[38] GSCO_TASER_001616 – 1719.

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

period.[39]  Although the Defendants, including Goldman Sachs, are responsible for reporting short positions to regulators (who then report those positions to the marketplace), Goldman Sachs' International division failed to meet its obligations and did not report these 5.1 million short TASER shares to regulators at that time.  When the 5.1 million short TASER shares position was later transferred from Goldman Sachs International back into Goldman Sachs & Co.'s stock record on January 23, 2008, the short position was then reported to FINRA, the regulator in charge of receiving short position reports from the Defendants and reporting those positions to the marketplace.[40]

o  As a direct result of Defendant Goldman Sachs' four year old 5.1 million short share position in TASER coming into Goldman Sachs & Co's stock record, where it was netted against all other Goldman Sachs activity, TASER's total short interest increased by 5.5 million shares between short interest reporting dates January 15, 2008 and January 31, 2008.[41]  Of the 5.5 million TASER short interest increase, 3.9 million shares were directly attributable to

---

[39] GS_T 00000001.
[40] GSCO_TASER 001680.
[41] GSCO_TASER 000016.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

Goldman Sachs' position for             after it was netted with Goldman Sachs clients' other short positions.  In addition, Goldman Sachs' Short Position Info Report[42] submitted to FINRA for reporting date January 31, 2008, disclosed a 3.9 million share short position that           held in TASER.

o  Goldman Sachs engaged in similar abusive naked short selling activity with regard to short shares for        .  On October 24, 2007, four years after a        short position of 3 million TASER shares had been parked at Goldman Sachs International,[43]  this short position of 3 million TASER shares was moved to Goldman Sachs & Co.'s stock record.[44]  Thus, Goldman Sachs parked another TASER short position for four years before reporting it to FINRA as required.[45]

o  At its peak, Goldman Sachs International's undisclosed short positions in TASER was 8.4 million shares on September 11, 2007.[46]  At the same time, the reported total TASER short positions in the market were 13.3 million shares.  By parking shares offshore and

---

[42] GSCO_TASER 001680.
[43] GS_T 00000001.
[44] GSCO_TASER 000016.
[45] GSCO_TASER 001674.     **REDACTED**
[46] GS_T 00000001.

809005.1
Highly Confidential Pursuant to Protective Order

failing to report them, Goldman Sachs, through its International division, concealed its unlawful activity.

o   In the middle of September 2007, Goldman Sachs reported to regulators that its TASER short positions were 3.1 million shares.[47] However, the Goldman Sachs & Co. and Goldman Sachs International short positions in TASER were in fact 11.4 million shares, almost 4 times the amount reported by Goldman Sachs. It is also possible that other abusive undisclosed short positions may be held in the records of Goldman Sachs Asset Management and other Goldman Sachs affiliates that have not been produced to the Plaintiffs.

o   Goldman Sachs balanced out its stock records each day to conceal these improper transactions. Each day, a loan was recorded internally between                                                                    [48] More investigation is required to determine if this was in fact an actual loan of TASER shares between these Goldman Sachs divisions or if the loans were merely a book entry designed to cover up the activity.   For over four years, these book entries of loans and borrows matched the TASER short positions Goldman Sachs

---

[47] GSCO_TASER 001671.
[48] GS_TASER_001427 – 1429.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

International held.[49]  Although Defendant Goldman Sachs was aware
that it was required to report an 8.4 million short share position in
TASER to FINRA, Goldman Sachs instead moved the short positions
to another division to conceal them.[50]

o   At the time that Goldman Sachs permitted, facilitated or engaged in
        [ ]'s total short position of 5.1 million shares in
    TASER, a hard to borrow Regulation SHO threshold security,

---

[49] GS_TASER_001427- 1429.

[50] For similar short interest reporting violations see:  Morgan Stanley & Co.,
Incorporated, FINRA Monthly Disciplinary Actions, October 2009, FINRA Case
#2007008266401; Goldman Sachs Execution & Clearing, L.P, March 20, 2009,
AMEX Hearing Board Decision 09-AMEX-4; Goldman Sachs Execution &
Clearing, L.P, March 20, 2009, NYSE Hearing Board Decision 09-NYSE-6.
Goldman Sachs & Co., March 20, 2009, NYSE Hearing Board Decision 09-
NYSE-5.; UBS Financial Services Inc., FINRA Monthly Disciplinary Actions,
April 2008, FINRA Case #20041000031-01; Bear Stearns Securities Corporation,
NASD Monthly Disciplinary Actions, April 2007, FINRA Case #20041000025-01,
AMEX Case Nos. 06-293 and 06-321 (AMXC07001); Morgan Stanley DW, Inc.,
NASD Disciplinary Actions, November 2006, NASD Case #20050024147-01,
NYSE Hearing Board Decision 06-155; Deutsche Bank Securities, Inc., NASD
Disciplinary Actions, June 2004, NASD Case #CMS040065; Deutsche Bank
Securities, Inc., NASD Disciplinary Actions, June 2004, NASD Case
#CMS040066; Deutsche Bank Securities, Inc., December 18, 2003, NYSE
Exchange Hearing Panel Decision 03-221; Goldman, Sachs & Co., Inc., NASD
Disciplinary Actions, January 2003, NASD Case #CMS020229; Morgan Stanley
DW, Inc., NASD Disciplinary Actions, May 2002, NASD Case #CMS020050
Merrill Lynch Professional Clearing Corp, NASD Disciplinary Actions, January
2002, NASD Case #CMS010184; Morgan Stanley & Co., NASD Press Release,
December 2006, NYSE Exchange Hearing Panel Decision 00-166 and
Credit Suisse First Boston Corporation, NASD Disciplinary Actions April 2000,
NASD Case #CMS990030.

Goldman Sachs knew that                    was threatening to leave

Goldman Sachs.  Specifically,                    told Goldman Sachs

that it did not desire to provide a locate at the time it submitted a short

sale order and that                    did not wish to disclose any of

its locates that it allegedly obtained from sources other than Goldman

Sachs.[51]

o   Goldman Sachs engaged in, permitted or facilitated similar

transactions with its client                    .  Goldman Sachs'

records show that from February 13, 2004 through July 27, 2007,

Goldman Sachs permitted                    , through five different

accounts, to sell 3.2 million more TASER shares than they

purchased.[52]  Goldman Sachs & Co.'s stock record showed a short

position of only 500,000 shares for            on July 27, 2007.[53]

o   Goldman Sachs Execution's Trade History Report shows that

Goldman Sachs permitted                    to be in an oversold

position of an additional 353,870 TASER shares, which they sold

from January 28, 2004 through July 27, 2007, for accounts Goldman

---

[51] GSE_T 01421280 – 1421281.
[52] GSCO_TASER 000001.
[53] GSCO_TASER 000016.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

Sachs & Co. for                              UBS PaineWebber for

          and Morgan Stanley for                              [54]

o  From settlement date August 3, 2004 to October 23, 2007, Goldman

   Sachs International housed a large undisclosed

   short position in TASER stock.[55]  Of this total short position, 83%

   was obtained after the implementation of Regulation SHO.  The short

   position peaked at nearly 3 million shares short on August 1, 2007 and

   remained unchanged through October 23, 2007.  The following day,

   October 24th, the short position was transferred to

   accounts at Goldman Sachs & Co.[56] and Goldman Sachs did not

   report this large short position to FINRA until it was nearly four years

   old.


•  Defendants facilitated, engaged in or permitted                    and

                  to cover the above described four year old short positions,

   starting on January 2, 2008.

      o  Defendant UBS appears to have supplied 3.3 million TASER shares,

         or 94% of the cover, for                    's 3.5 million open

54 GSEC_TASR00005 — 14.
55 GS_T 00000001.
56 GSCO_TASER 000016

809005.1
Highly Confidential Pursuant to Protective Order

                              **REDACTED**

TASER positions maintained at Goldman Sachs. [57]  However, during this time period, January 2, 2008 through February 21, 2008, UBS only held 400,000 TASER shares in its DTCC account.

o  Defendant Goldman Sachs Execution's records show that, on January 24, 2008, Defendants Goldman Sachs and Morgan Stanley provided with 72,778 TASER shares. [58]

o  Defendant Morgan Stanley's trade runs show that 706,000 shares were used by                    to cover its TASER position between January 24, 2008 and February 20, 2008.  Defendant UBS sold 96% of the shares              purchased through Morgan Stanley.[59]

o  Defendant UBS's blue sheets (which, as described above, are inaccurate), show                  's purchase of over 6.1 million TASER shares from January 2, 2008 through February 21, 2008. Although UBS's actual involvement in this transaction cannot be completely reconciled until Plaintiffs review UBS's recently produced trade runs, it is estimated that UBS engaged in, facilitated or permitted

---

[57] GSCO_TASER 000001.
[58] GSEC_TASR00005 – 14.            **REDACTED**
[59] MS_TASR_00003243 – 3261.

809005.1
Highly Confidential Pursuant to Protective Order

to purchase at least 3.1 million TASER shares to cover the four year old short positions. [60]

o   These extremely large purchases, which were facilitated by many Defendants, indicate that the Goldman Sachs reported short position was much larger than Goldman Sachs' records show.  In particular, although Goldman Sachs' records show a 3.5 million TASER short position by _____, [61] other Defendants facilitated, engaged in or permitted _____ to purchase 7.4 million shares to cover short positions.

- Other Defendants also engaged in, facilitated or permitted suspicious transactions involving both _____ and _____.

  o   Because Defendant UBS has admitted that its blue sheets are inaccurate, it is not possible to determine exactly how many short sales of TASER stock UBS permitted, engaged in or facilitated for _____.  The record shows 925,500 shares were sold short through UBS from January 3, 2005 through July 24, 2007 by Morgan Stanley for _____, Goldman Sachs for

---

[60] UBS_TASER0000904 – 908.
[61] GSCO_TASER 000016.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

, UBS PaineWebber for

However, some of these were average price trades, accounted for twice in the record.[62] After Plaintiffs filed a motion to for UBS's violation of a Court order, UBS has finally agreed to provide its trade runs due to the inaccuracies in their blue sheets.  It can be estimated that there was a minimum of 462,000 TASER shares sold short by                at UBS. Plaintiffs cannot fully evaluate these trades until UBS provides the required data.

o  Defendant Morgan Stanley was also involved in, permitted or facilitated suspicious transactions with              . From February 25, 2004 through May 29, 2008,              and its affiliates sold short a net of 2 million TASER shares through Morgan Stanley[63], but the Morgan Stanley Summary Stock Position records do not reflect any short positions held by              accounts.[64] Morgan Stanley only showed              on its stock record on the first day of each month from January 3, 2005 through May 1, 2009.  Moreover, even though              was shown on those

---

[62] UBS_TASER0000892 – 909.

[63] MS_TASR_00003243 – 3262.          **REDACTED**

[64] MS_TASR_00003266 – 3268.

809005.1
Highly Confidential Pursuant to Protective Order

dates, Morgan Stanley did not reflect any of                        's positions with regard to TASER.

o From August 5, 2004 through January 2, 2008, Defendant Morgan Stanley permitted, engaged in or facilitated                    and its affiliates selling short a net of 685,000 TASER shares[65], but Morgan's Stanley Summary Stock Position Data shows                        accounts with zero shares.[66]  Even though both                        's TASER short positions are excluded from the Morgan Stanley records, these positions do appear to be held within Morgan Stanley's books at some location because                   appears to have purchased shares to cover these positions through Morgan Stanley.

o Multiple Defendants also engaged in, facilitated and permitted                        to allegedly cover the four year old short positions from May 30, 2008 through October 8, 2008.  Goldman Sachs' records show that                   provided 1.2 million shares (or 28% of the TASER short position) and                   provided 2 million shares

---

[65] MS_TASR_00003243 – 3262

[66] MS_TASR_00003266 – 3268.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

(or 44% of the TASER short position).[67]  During this time,

held less than 100,000 TASER shares in its DTCC account

and it appears that              's clearing firm,            , did not

supply the shares from its inventory at the DTCC because its position

held relatively stable during the covering period.[68]

o   Defendant Bear Stearns' records show that Bear Stearns permitted or

facilitated                      's acquisition of 562,500 TASER shares

through three Bear Stearns accounts:

;                                        .  Defendants

Goldman Sachs, Morgan Stanley or UBS prime brokered these

transactions.  The contra side to these short sale cover

trades was unpopulated for each of the purchases in the Bear Stearns

record.[69]

o   Defendant Morgan Stanley permitted, engaged in or facilitated

's purchase of 2.5 million of TASER shares to cover the

four year long open short position in TASER.  The source of 76% of

**REDACTED**

---

[67] GSCO_TASER 000001, from May 30, 2008 through October 8, 2008.
[68] DTC TASER Security Position Reports - May 30, 2008 through October 8, 2008.
[69] Bear-T00027746 – 27747, from July 31, 2008 through September 26, 2008.
809005.1
Highly Confidential Pursuant to Protective Order

these shares was 887,000 from               , 633,000 from          and

376,000 from                                        .[70]

o   Defendant Merrill Lynch's blue sheets show that               through

accounts at Goldman Sachs, Morgan Stanley and UBS Financial

covered 130,000 TASER shares.  The contra party is blank for all

purchases.[71]

o   Goldman Sachs Execution's records show that several defendants,

including Goldman Sachs, Morgan Stanley and UBS Paine Webber

engaged in, facilitated or permitted                    to obtain

784,000 TASER shares (43% of which were sold from Goldman

Sachs Execution) to allegedly cover the four year short position in

TASER.[72]

o   Because Defendant UBS's blue sheets are inaccurate and Plaintiffs

have not had an adequate opportunity to review UBS's trade runs, it

cannot be determined exactly how many TASER shares UBS

permitted accounts owned by                to purchase.  The

record shows               purchasing 3.4 million TASER shares

**REDACTED**

---

[70] MS_TASR_00003243 – 3262, from May 30, 2008 through October 8, 2008.
[71] ML-TASR0052916 – 52922, from July 1, 2008 through September 10, 2008.
[72] GSEC_TASR00005 – 14, from June 4, 2008 through August 27, 2008.

809005.1
Highly Confidential Pursuant to Protective Order

from May 30, 2008 through October 8, 2008.[73]  It is currently estimated that there was a minimum of 1.7 million shares of TASER purchased through UBS.

o  Although the Defendants' records only reflect a short position of in the amount of 4.5 million TASER short shares, [74] it appears that there was a much larger                    TASER short position which was being covered through the 10.1 million TASER share purchases through the above-listed Defendants.

o  The Defendants' actions related to                         and 's purchase of TASER shares to allegedly cover the long-standing short positions raise questions as to whether these shares were actually used to cover or whether purchases of TASER shares were simply moved around but the short positions remained intact (and were not disclosed to regulators).

o  For example, Defendant UBS's records show that UBS netted out 's short positions in TASER to zero at the end of each day.  UBS's records do not show          holding any TASER short positions.  The covering transactions in UBS's records

---

[73] UBS_TASER0000904.
[74] GSCO_TASER 000016.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

for                         appear to be offsetting existing loans that are

shown in the stock record, but no accounts of          show a short

position in the UBS stock record. [75]

o   Defendant Goldman Sachs & Co.'s stock record reflects identical

activity (as discussed more fully above).  Goldman Sachs & Co.

executed                   's transactions, but for over four years,

those transactions were held outside of the Goldman Sachs & Co.'s

stock record at Goldman Sachs International.  Nevertheless, the loans

for those positions also appeared in the Goldman Sachs & Co. record.

o   Defendant Morgan Stanley's stock record reflects similar activity.

Morgan Stanley reports no positions for

Nevertheless, a              short position appears to have

existed at Morgan Stanley because, as Morgan Stanley's records

show, Morgan Stanley purchased shares to 'cover' a

short position in TASER. [76]

o   Defendants Morgan Stanley and UBS may be using the same strategy

of moving large short positions outside of their main stock record like

---

[75] UBS_TASER0000886 – 891.
[76] MS_TASR_00003266 – 3268.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

Defendant Goldman Sachs and could be "parking" the positions at an affiliate.

o   The market during the time of this covering activity undertaken by the Defendants for                    and                    does not appear to reflect the short squeeze that would have taken place at this time if the Defendants' purchasing of TASER to cover the short positions was legitimate,[77] suggesting that these covering transactions were in fact a process through which these Defendants parked positions in order to conceal large abusive short positions in TASER.

- While concealing their actual short positions (such as Goldman Sachs' four year concealed positions described above), Defendants lobbied the U.S. government and industry regulators for rules designed to limit restrictions on

---

[77] As one example, on February 14, 2008, TASER's total volume was 6.6 million shares. According to Defendants' records,                    purchased 2.3 million TASER shares on this date (34% of the total volume trading volume). While this activity should have driven TASER's stock price up, the price declined by 8%.

On the following day, February 15, 2008, TASER's total volume was 2.6 million shares.                    purchased approximately 1.3 million TASER shares or an astounding 50% of the total trade volume. The price of TASER increased this day by 17 cents for just over a 1% gain for the day.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

short selling.[78]  Naked short selling without loaning and borrowing legal

shares instead adds phantom shares that are fraudulent and manipulative.

For example, the four year TASER short positions that Goldman Sachs

permitted, facilitated or engaged in for                      and

were so long term that they had dilutive and disruptive effects on

TASER's stock price.  In fact, they were strategically placed abusive short

positions that disrupted the marketplace while Defendants purposely hid them

from regulators to circumvent short sale rules and regulations.


- The Defendants also used other methods and means to move short sale

  positions in TASER off of the stock record.  For example, Defendant

  Goldman Sachs was aware that its client              intended to artificially

  reduce his short positions at Goldman Sachs by moving the short positions to

  another location and Goldman Sachs facilitated, engaged in or participated in

  such conduct.[79]  Then, on or about December 29, 2004,

  affiliate hedge fund,                          , entered into a

  derivative swap contract  in the amount of $34,490,000  (contract number

---

[78] Letter from Morgan Stanley & Co., Goldman Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith and Citigroup Global Markets, to Jonathan Katz, U.S. Securities and Exchange Commission, Re: Short Sales, dated February 27, 2004. http://www.sec.gov/rules/proposed/s72303/4firms02272004.htm.

[79] GSE_T 00803762.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

_) for shares that were short within days prior to the implementation of Regulation SHO.[80] The contra party to this transaction was _. This contract was in effect from December 29, 2004 through January 18, 2006. This contract caused _ short position to appear technically long (*i.e.*, to appear as if TASER had issued the shares for sale). _ position for _ in the Stock Record Reports decreased from 1.6 million shares short to 700,000 shares short.[81] This contract appears to be related to a 2 million share decrease in fails to deliver by Goldman Sachs at the NSCC. This allowed the short position to appear long, in effect, disguising the short position and fails from regulators. This synthetic position reduced the number of shares shorted by _ in the Goldman Sachs & Co. record because Goldman Sachs transferred the short position to the _ account at Goldman Sachs International. On the date that Goldman Sachs executed the swap contract for the synthetic long position and moved the short position to Goldman Sachs International, Goldman Sachs entities were in a large fail to deliver position with regard to TASER.[82] Goldman Sachs' activities regarding abusive short selling for _ might not have been

---

[80] GS_TASER 002869.
[81] GSCO_TASER 000013 – 14.
[82] DTCC00000026.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

limited to TASER securities, but may also have included the following long-term Regulation SHO threshold stocks:  OmniVision Technologies, Inc., Overstock.com, Inc., Krispy Kreme Doughnutes, Inc. and NovaStar Financial, Inc.[83]

- Moreover, Goldman Sachs permitted, facilitated or engaged in other methods to conceal           true short position in TASER.  As one example, a Term Transaction Confirmation between Goldman Sachs and           executed on August 15, 2005 showed a contract that remained in effect until September 15, 2005 for almost 2 million shares of TASER.  This transaction allowed           "to maintain open any short positions you may have in such security in your account at Goldman Sachs".[84]  Prior to this contract, Goldman Sachs' stock record shows that           accounts were short 2.3 million shares of TASER and the           account discussed above was short 1.1 million TASER shares in Goldman Sachs International's stock record. [85]

---

[83] GSE_T 00803762.
[84] GSE_T 00950832 – 950833.
[85] GS_T 00000001.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

- Defendants permitted clients with a history of failing to deliver (or otherwise acting unlawfully) to engage in short sales of TASER and other securities without reasonable grounds to believe the client could deliver the security.[86]

- Defendants violated NASD rules requiring the prompt receipt and delivery of securities, including, but not limited to, UBS failing to abide by the affirmative determination rule.

- Defendants violated NASD Rule 282, 3010, 3310 and 3370.

- Defendants violated NASD Rule 11830.

- Defendants violated 17 CFR 240.15c3-3.

- Goldman Sachs' Trade History Reports in 2004 and 2005 reflect

    shorting TASER securities while, at the same time, Goldman Sachs'

    Stock Record Reports and CNS Accounting Summaries show

---

[86] GSE_T 01146068 ("In order to be deemed to have met such close-out requirements [for threshold securities], the participant must not know or have reason to know that the counterparty from whom the participant purchases securities will not deliver the securities.").

failing to deliver millions of shares of TASER. *See, e.g.,* GSEC_TASER

000005, GSEC_TASER 000042, GSEC_TASER 000044 – 45,

GSCO_TASER 000013 – 14, CNS Accounting Summary for 0005;

GSCO_TASER 000479 – 529, 0501; GSEC_TASER 004132 – 4171 and

GSEC_T 000023-32, 0690: GSEC_TASER 002605 – 2655.  Goldman knew

about          trading activity, and nonetheless continued to permit, facilitate

and profit from it.[87]


- Defendants facilitated illegal transactions on behalf of their clients. *See*

  GSEC_TASER_000042, GSEC_TASR00015, GSEC_TASR00005,

  GSCO_TASER_000017-001603, GSEC_TASER 002181-005231 (detailing

  illegal activity Goldman Sachs conducted on behalf of                  ).


- Defendants relied upon "locates" from other Defendants and banks that they

  knew would not likely deliver the located shares if requested. *See, e.g.,*

  GS_TASER 001419 – 1425.


---

[87] *See* GSE_T01146065 (reasonable grounds for reliance upon a customer's
assurance that a locate was received only if the source of reliance is documented
and "prior assurances from such customer did not result in fails to deliver.").

- Defendants moved fails out of the NSCC but did not deliver shares for settlement. *See, e.g.*, GSCO_TASER 000479 – 529, 0501: GSEC_TASER 004132 – 4171; GSEC_T 000023-32, 0690; GSEC_TASER 002605 – 2655; GSCO_TASER 00050; GSEC_TASER 002629; GSEC_TASER 004145; GSEC_TASER 000042; GSEC_TASER 000044; GSCO_TASER 000013.

- Defendants charged clients, customers, banks or others fees, commissions and/or interest for "loaning" TASER or other securities that Defendants never loaned (and in some cases did not even possess).

- Defendants violated Information Circulars 90-25 and 98-1135.

- Defendants charged clients, customers, banks or others fees, commissions and/or interest for opening or maintaining a short position and/or borrowing securities to effectuate a short transaction in instances where the broker failed to borrow the stock for the short transaction and/or open short position.[88] This includes, but is not limited to:

---

[88] With respect to any claim that customers do not borrow stock, please see MS_TASR13356 which belies that claim.

- o Charging for carrying a short position when the broker never borrows shares to cover the short or fails to timely deliver the shares to the buyer (including, but not limited to, charging a negative rate);

- o Charging for carrying a short position, even though the firm does not have that position covered on their LoanNet or equivalent reports;

- o Charging for open short positions when the broker did not borrow shares, and its excess securities available for loan is less than the amounts shorted.

- o Charging a borrow fee,[89] loan fee[90] or other fee to open or maintain an open short position or to effectuate a short sale when: (a) the broker does not borrow outside of the firm and the firm has a net fail position; (b) the broker does not borrow shares and its excess securities available for loan is less than the amount shorted; or (c) the sum of the shares borrowed by the broker and its excess securities available for loan are less than the amount shorted.

- Defendants may have attempted to make short sales appear as long sales through offshore trading.

---

[89] *See, e.g,* MS_TASR13755.

[90] *See, e.g,.*  MS_TASR2425.

- For example, Goldman Sachs' Trade History Report on July 20, 2004 reflects that                          short sold 50,384 shares at $30.65 to                    and then purchased 50,384 shares at the same price from

                              short sold 49,616 shares at $30.65 to                          and then purchased 49,616 shares at the same price from                    . These two            accounts totaled a short sale of 100,000 shares and purchase of 100,000 shares.  Then,                    , from their Goldman Sachs & Company Account, sold 100,000 shares long at $30.65 to                    and purchased 100,000 shares long at $30.65 from                    .[91]  This example of share movements for hedge funds implies that this may be a way to make short shares appear to be long shares as if TASER issued them and they were registered for sale by the SEC.  The            trades in the Goldman Sachs Trade History Report do not match to the Stock Record.  *See* GSCO_TASER0000013.

- Merrill Lynch similarly engaged in suspect transactions involving            .  For example, on April 23, 2007, Merrill Lynch Professional

---

[91] GSCO_TASR000001.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

records show the following transactions undertaken for

and hedge fund                    accounts to make short sales appear as

long:[92]

- ■          (for the account of

), *short sold* 97,500 shares at an

average of $8.30 in just over 300 transactions to          and

broker      , which is not a recognized NSCC broker number.

(for the account of

*purchased* 97,500 shares at $8.30 in 306

transactions from

- ■          for the account          *purchased* 2,500

shares at $8.30 in one transaction from

.or account          then

*sold long* 2,500 shares at $8.30 in 13 transactions to

- ■          for the account of

*short sold* 100,000 shares at $8.30, in just over

300 transactions to

- ■          for the account of

*purchased* 100,000 shares at an average price of

---

[92] ML-TSINTL0069214 – 69215.

809005.1
Highly Confidential Pursuant to Protective Order

82                    **REDACTED**

$8.30, with Merrill Lynch Professional 0551 as the executing and contra broker to the transaction.  Although these shares were reported in Merrill Lynch Professional's blue sheets to be transacted on the NASDAQ market, they are not listed in the Equity Trade Journal.

- ▪     , the founder of     , *sold long* 100,000 shares at $8.30 with Merrill Lynch Professional 0551 as the executing and contra broker to the transaction.  Although this trade was reported by Merrill Lynch Professional to be transacted on the NASDAQ market, it is not listed in the Equity Trade Journal.          account at Merrill Lynch addresses to its prime broker Goldman Sachs.

- ▪ Goldman Sachs Trade History Report for April 23, 2007[93] shows

       , *short sold* 59,774 shares and

       *short sold* 40,226 shares, a total of 100,000 shares at $8.30 to          .  This trade is not reported in the records produced by Morgan Stanley in this case.

---

[93] GSCO_TASER 000001.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

- Defendants improperly provided locates for TASER securities on the same dates for which they were failing to deliver TASER securities (*i.e.*, Defendants were saying they could provide TASER securities to support short sales at the same time they did not even have sufficient TASER securities to cover past sales).  Defendants engaged in this conduct with respect to other securities as well.

- Defendants engaged in short sales of TASER and other securities when they had existing net failures to deliver[94]:

  o Banc of America, Morgan Stanley, Merrill Lynch, Credit Suisse, Goldman Sachs and Bear Stearns admit that, during the Time Period of January 1, 2003 through May 31, 2009, "as an executing broker, [they] engaged in short sales of TASER common stock for or on behalf of [their] clients/customers at a time when [they] had existing fails to deliver TASER common stock."[95]

---

[94] Having admitted engaging in the following conduct, Defendants should be well aware when it occurred and the specific trades to which it relates.

[95] Defendant Banc of America Securities LLC's Responses and Objections to Plaintiff's Third Requests for Admission at Request No. 18; Defendant Morgan Stanley & Co. Incorporated's Objections and Responses to Plaintiffs Third

809005.1
Highly Confidential Pursuant to Protective Order

○ Banc of America, Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs and Bear Stearns admit that, during the Time Period of January 1, 2003 through May 31, 2009, "as a clearing broker, [they] engaged in short sales of TASER common stock for or on behalf of [their] clients/customers at a time when [they] had existing fails to deliver TASER common stock."[96]

---

Requests for Admission to Defendants at Request No. 18; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 18; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 18; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 18; Defendant Bear, Stearns & Co., Inc.'s And Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 18.

[96] Defendant Banc of America Securities LLC's Responses and Objections to Plaintiff's Third Requests for Admission at Request No. 19; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 19; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 19; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 19; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 19; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 19.

809005.1
Highly Confidential Pursuant to Protective Order

- o Merrill Lynch, Credit Suisse, Goldman Sachs and Bear Stearns admit that, between January 1, 2003 and May 31, 2009, "as an executing broker, [they] engaged in short sales of TASER common stock for on behalf of [their] clients/customers at a time when [they] had existing net fails to deliver TASER common stock that persisted for more than 13 consecutive settlement days."[97]

- o Merrill Lynch, Deutsche Bank, Credit Suisse and Bear Stearns have admitted that, between January 1, 2003 and May 31, 2009, "as an clearing broker, [they] engaged in short sales of TASER common stock for on behalf of [their] clients/customers at a time when [they]

---

[97] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 20; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 20 ("Admitted that, during the single instance where there was a fail to deliver TASER common stock that persisted for more than 13 consecutive settlement days, which occurred outside of CNS, Credit Suisse Securities engaged in short sales of TASER common stock on behalf of clients"); Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 20; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 20.

had existing net fails to deliver TASER common stock that persisted for more than 13 consecutive settlement days."[98]

o Merrill Lynch, Credit Suisse, Goldman Sachs and Bear Stearns have admitted that between January 1, 2003 and May 31, 2009, as clearing and executing brokers, they "engaged in short sales … the next business day after a time perioud during which [they] had a net fail to deliver in TASER common stock for at least 13 consecutive days."[99]

o Merrill Lynch, Credit Suisse and Goldman Sachs have admitted that, "[d]uring the Time Period, and as an executing broker, [they] engaged

---

[98] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 21; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 21; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 21; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 21.

[99] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 41-42; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 41-42; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 41-42; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 41-42.

in short sales of TASER common stock for or on behalf of [their]

clients/customers at a time when [they] had net existing fails to

deliver in that stock for at least 13 consecutive settlement days."[100]

The same Defendants, along with Deutsche Bank and Bear Stearns,

engaged in the same conduct as clearing brokers.[101]

- Defendants provided locates for TASER and other securities at times when

  the stock was on their NG, do not locate or equivalent list.  *See, e.g.,*

---

[100] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 47; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 47; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 47.

[101] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 48; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 48; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 48; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 48; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 48.

GSE_T199294; Bear-T00027788-27794 (Bear Stearns providing locates for 50,000 shares on each day from August 8, 2005 through December 15, 2005 when TASER was listed on Bear Stearns' hard to borrow list); *id*. (Bear Stearns providing locates for 100,000 to 300,000 shares to          nearly every day from August 8, 2005 through December 28, 2005 when TASER was listed on Bear Stearns' hard to borrow list).

- Defendants' improper actions occurred in, among other places, Atlanta, Georgia.  For example, Bear Stearns filled TASER locate requests for its          office on a regular basis from January 26, 2006 through February 14, 2007, the same time that TASER was on Bear Stearns' hard to borrow list. These locates were requested and filled for 30,000 and 50,000 share blocks of TASER stock.  Bear Stearns employees Christopher Niglio, Madelyn Lando and MVELASCO approved these locates.

  o The transactions undertaken by Bear Stearns within this date range also indicate improper standing locates in violation of Bear Stearns' compliance manuals.  For example, Bear Stearns' locate logs show that one of its          employees,          requested approval for locates of 50,000 TASER shares almost every day from December 4, 2006 through February 14, 2007.  Each of these locate requests were

filled and approved by Bear Stearns' Christopher Niglio.  *See* Bear-T
00027788-27794.  Many of these locates appear to be made as standing
automated locates for a 5 to 8 day duration.  For example, on
December 4, 2006, a request to locate 50,000 shares was filled at 8:13
a.m.  This locate remained in effect for 6 days and was filled for the
next five days for 50,000 shares at 4:30 a.m., suggesting that a
standing, automatic locate was provided.  This pattern indicates that
Bear Stearns maintained a prearranged locate for short selling large
blocks of TASER through Bear Stearns' trading desk in            .  These
standing automated locates appear in the first half of 2006, at a time
period when TASER was a Regulation SHO threshold security such
that these locates could not be automatically approved by Bear
Stearns.[102]  In total,                     received locates for
7,360,000 shares of TASER stock from January 26, 2006 through
February 14, 2007.  At this time, however, these apparently improper
patterns cannot be fully investigated because the        trading
activity does not appear to be included in the blue sheets produced to
Plaintiffs by Bear Stearns.

---

[102] *See* Bear-T00000077 ("Daily, Stock Loan ITG ensures that the Threshold
securities and Penalty items are blocked from the Department's automatic approval
system.").

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

    o   Bear Stearns' Atlanta office's actions in trying to short sell hard to

       borrow stocks was not limited to short sales in TASER.  *See, i.e.*, Bear-

       T00217944-217947 (requesting "hard ones" and "tough ones.").

- Throughout 2004, TASER was a restricted stock on NASDAQ.  Defendants

  violated rules and regulations associated with and applicable to restricted

  stocks, including UPC 71.

- Defendants claimed to receive locates from other Defendants (or non-party

  banks) on dates when those other Defendants (or non parties) did not possess

  sufficient TASER securities to cover the alleged locate. *See, e.g.*, GS_TASER

  001419 – 1425.  For example:

    o   In 2007,               provided locates for approximately 7

       million TASER shares when it had no real shares of TASER on deposit

       at the DTCC and they did not appear to be lending/borrowing shares

       from

    o   In Goldman Sachs' Securities Lending Locate Logs,[103] on eight

       consecutive trading days in March 2009,

                  were the exclusive providers of locates

---

[103] GS_TASER 001419 – 1425.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

for 13-14 million TASER securities to Goldman Sachs and a small group of hedge funds.[104] Yet, during these eight days, the average amount of actual TASER shares on deposit at the DTCC for                    was 534,000, the average for                        was 996,000, and the average for                  was 2.4 million.  Similar findings exist with respect to other Defendants.  *See, e.g.,* CSS-TASER0292381 (showing that on March 25, 2009 and March 26, 2009, Credit Suisse relied on locates in the amount of 5.5 million TASER shares from                  when                     had less than 2.3 million real TASER shares on deposit at the DTCC); *id.* (showing that on March 18, 2009, Credit Suisse relied on locates from                     in the amount of 4.3 million TASER shares, far in excess of            DTCC position of 1 million TASER shares); *id.* (showing that on April 14, 2009, Credit Suisse relied on locates from                   in the amount of 4.8 million TASER shares when           only had 1.1 million TASER shares on deposit at the DTCC).

---

[104] On March 13, 2009, locates for 14.1 million shares, worth $59.8 million were filled solely by                      .  The following trade day, March 16, 2009, locates for 13.9 million shares were filled exclusively by                      .  From March 17 – 19, 2009, locates for approximately 12.5, 13 and 12.6 million shares, respectively, were filled only by                      .  Then, on March 20, 2009, March 23, 2009 and March 24, 2009, locates for 12.5, 12.7 and 12.8 million shares, respectively, were filled solely by                      .

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

o   Similarly, on 23 consecutive trading days from December 4, 2008

through January 12, 2009, Goldman Sachs relied on

                    to fill locates in Goldman Sachs' records, averaging 12.9

million TASER shares each day.[105]   During this same 23 day period,

Credit Suisse relied on locates from                              's parent,

             , to fill locates in Credit Suisse's records, averaging 3

million TASER shares each day.[106]   While these affiliated entities were

providing locates to Credit Suisse and Goldman Sachs for a total of

nearly 16 million TASER shares every day (worth $80 million), their

real shares of TASER on deposit at the DTCC only averaged 1.3

million TASER shares.

o   The Defendants could not have reasonably considered these locates to

be bona fide given their size and claimed ready availability each day.

In Credit Suisse's Loanet reports, there were no Credit Suisse borrows

or loans with                    or                              during either

December 2008 or January 2009.[107]   In Goldman Sachs Borrow &

**REDACTED**

---

[105] GS_TASER 001427 – 1429.
[106] CSS-TASER 0292381.
[107] CSS-TASER0288831 – 288838.

809005.1
Highly Confidential Pursuant to Protective Order

Loan Contract records, there were no borrows or loans with

or ⬛                        ⬛ during the same months.[108]

- Defendants were aware of and permitted, facilitated or engaged in locate

  requests that could not be legitimate.  For example, Merrill Lynch's

  documents show that               ⬛ was requesting 1 billion TASER

  shares every trading day from July 6, 2006 through May 29, 2009, the end of

  the available record.[109]  These requests for locates totaled 736 billion shares

  of TASER.  Considering TASER only had approximately 62 million shares

  outstanding, these locate requests are suspicious at best.


- The Defendants have been sanctioned by regulators dozens of times for

  conduct relating to and constituting their illegal naked short selling activity,

  including sanctions of several million dollars.  In some cases, the sanctions

  have included conduct nearly identical, if not identical, to that alleged here.

  As just a few examples:

  - On February 27, 2009, after this lawsuit was filed, Goldman Sachs

    Execution & Clearing received an Amended Examination Report from

---

[108] GS_TASER 001427 – 1429.
[109] ML-TASR0058514 – 58515.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

FINRA finding the following exceptions regarding Goldman Sach's short sale activities. *See* GSE_T01145642-48.  In particular:

- "The firm did not have adequate controls in place to monitor and supervise National Securities Clearing Corporation-Continuous Net Settlement (hereinafter CNS) Fails to Deliver for purposes of complying with SEA Rule 204T.  The firm utilized two reports to monitor CNS Fails to Deliver that relate to Rule 204T: (1) 204T long sale report and (2) 204T short sale report. ***These reports for the time period of September 17 through October 3, 2008 contained information that was deemed to be incomplete and insufficient.***  For the majority of securities under review, the firm's 204T short sale and long sale reports did not identify the amount of shares that were long or short.  Additionally, the reports failed to identify which customer the Fail to Deliver was related to."[110]

- "The review of 12 CNS Fail to Deliver securities for the period of September 22 through November 29, 2008 disclosed that the

---

[110] *Id.* at GSE_T01145645 (emphasis added).

809005.1
Highly Confidential Pursuant to Protective Order

firm failed to close-out the CNS Fail to Deliver on a timely basis" for several securities.[111]

- "The firm failed to properly monitor DVP/RVP customers for patterns of long sales that fail for the purpose of determining whether its reliance on those customers' representations that they are 'long' is reasonable…the firm may not have had a reasonable basis for marking such customer sell orders 'long.'"[112]

- Goldman Sachs was not in compliance with SEA Rule 204T (Emergency Order) because it "executed sales short sales of 4,643 shares of Banc of America Securities (BAC)"[113]

o On July 24, 2006, the NYSE censured and fined Credit Suisse for "accepting short sale orders and effecting those orders without having borrowed securities or entered into bona-fide arrangements to borrow them or without having reasonable grounds to believe that the securities could be borrowed so that they could be delivered on dates

---

[111] *Id.*

[112] *Id.* at GSE_T 01145646.

[113] *Id.*

809005.1
Highly Confidential Pursuant to Protective Order

delivery was due." *See* NYSE Hearing Decision 06-112, July 24, 2006.

o "Between January 2005 through approximately October 2006 (the "Relevant Period"), DBSI, with respect to at least five of its 19 proprietary trading desks (the "Five Desks") failed to comply with certain NYSE Arca Equities Rules and Regulations and Regulation SHO ("Reg SHO") requirements with respect to its execution and supervision of short sale orders....Specifically, the Firm effected an unquantified but significant number of short sales on at least the Five Desks in securities that were not on the Firm's Easy-to-Borrow List without having borrowed the securities or entered into bona-fide arrangements to borrow the securities, or having reasonable grounds to believe that such securities could be borrowed for delivery when due." *See* NYSE Arca Equities, Inc., Enforcement Decision No. 08-AE-02.

o DBSI was also sanctioned for violating regulations requiring them to keep accurate books and records.[114]  As held by the NYSE in a December 18, 2003 decision:

---

[114] June 2004: NASD Case #CMS040065 and NASD Case #CMS040066, October 2004: NASD Sanctions 18 Firms for Order Audit Trail (OATS) Reporting and Supervision Violations, FINRA Newsroom, October 4, 2004, April 2006: NASD Case #20050004905-01, February 2007: NASD Case #20050014655-01,

809005.1
Highly Confidential Pursuant to Protective Order

[DBSI] violated Exchange Rule 421 in that the Firm submitted inaccurate reports of short positions… violated SEC Rule 17a-3 and Exchange Rule 440 in that it did not make and keep current required books and records relating to the reconciliation of ledgers and the identification and creation of suspense accounts… violated Exchange Rule 440.20 in that it did not identify unreconciled ledger differences on its books and records… and violated Exchange Rule 342 in that the Firm failed to reasonably supervise and control the actions of its employees, and failed to establish a separate system of follow-up and review, to ensure compliance with Exchange Rules.[115]

o   Bear Stearns "failed to report to the NASDAQ Market Center the correct symbol indicating whether it executed transactions in eligible securities in a principal, riskless principal or agency capacity. The findings stated that the firm failed to report to the NASDAQ Market Center the correct symbol indicating whether the transaction was a "buy," "sell," "sell short," "sell short exempt" or "cross" for a transaction in eligible securities, and failed to report the contra side executing broker in transactions in eligible securities."[116]

---

August 2007: NASD Case #20060054835-01, November 2007: FINRA Case #20060047177-01 and FINRA Case #20060060150-01, and April 2009: FINRA Case #2006005064401.

[115] NYSE Exchange Hearing Panel Decision 03-221, DBSI Securities Inc., December 18, 2003.

[116] NASD NTM Disciplinary Actions September 2006, (NASD Case #20042000210-01).

809005.1
Highly Confidential Pursuant to Protective Order

- o   Banc of America agreed to sanctions being entered into against it by regulators for inaccurate and incorrect reporting:

  > Without admitting or denying the findings, the firm consented to the described sanctions and to the entry of findings that it accepted customer short sale orders in securities and, for each order, failed to make/annotate an affirmative determination that the firm would receive delivery of the security on the customer's behalf, or that the firm could borrow the security on the customer's behalf for delivery by settlement date. The findings stated that the firm failed to report to the Trade Reporting and Compliance Engine (TRACE) the correct contra-party's identifier for transactions in TRACE-eligible securities. (FINRA Case #20041000170-01).[117]

- o   DBSI consented to the entry of a censure and fine of $37,500 for having a fail-to-deliver position in a threshold security at a registered clearing agency for thirteen consecutive settlement days and failing immediately thereafter to close out the fail-to-deliver position by purchasing securities of like kind and quantity and continuing to have a fail-to-deliver position which it failed to close out as required for ten consecutive days thereafter.  *See* FINRA Case #20050018280-01.

- o   DBSI has been found in violation of securities regulations requiring an affirmative determination for short sales.  In November 2005, NASD

---

[117] NASD DISCIPLINARY ACTIONS, February 2008
http://www.finra.org/web/groups/rules_regs/documents/notice_to_members/p0380
11.pdf.

809005.1
Highly Confidential Pursuant to Protective Order