found that DBSI "failed to make an affirmative determination that the firm could borrow the securities or otherwise provide for their delivery by the settlement date."[118]

o   In May 2007, NASD fined DBSI again, finding that DBSI "failed to make/annotate an affirmative determination that the firm would receive delivery of the security on the customer's behalf, or that the firm could borrow the security on the customer's behalf for delivery by settlement date."[119]

o   On September 10, 2008, NYSE Arca sanctioned and fined DBSI for similar violations, finding that DBSI:

> violated Rule 203(b)(1) of Reg SHO by effecting an unquantified but significant number of short sales on at least five of its 19 proprietary trading desks in securities that were not on the <u>Firm's Easy-To-Borrow List</u> *without having* <u>borrowed the securities</u> or <u>entered into bona fide arrangements to borrow the securities,</u> or having <u>reasonable grounds to believe that the securities could be borrowed for delivery when due;</u> … violated Rule 200(g) of Reg SHO in that at least two of the five proprietary trading desks incorrectly marked an unquantified but significant number of proprietary <u>short sale orders as long;</u> … violated NYSE Arca Equities Rules 6.18(a) and (c) by failing to adequately supervise certain traders on at least five proprietary trading desks and failing to

---

[118] NASD NTM Disciplinary Actions November 2005, DBSI Securities Inc. NASD Case #20050002625-01.

[119] NASD NTM Disciplinary Actions May 2007, DBSI Securities Inc. NASD Case #20041000088-01.

809005.1
Highly Confidential Pursuant to Protective Order

maintain and enforce written supervisory procedures concerning proprietary short sales *in a manner reasonably designed to achieve compliance with relevant regulations*.[120]

o DBSI was also sanctioned for conduct relating to the issuance of proxy materials during the time period of March 1998 through November 2003, conduct which may indicate illegal naked short selling in this case. *See In the Matter of Deutsche Bank Securities Inc.*, Decision 05-45 (Feb. 2, 2006) (New York Stock Exchange, Inc.). In particular, DBSI:

> (a) failed to timely reconcile stock records on beneficial ownership in connection with proxy voting; (b) issued duplicate requests for proxy voting instructions for securities held in certain omnibus accounts, which resulted in duplicate votes in some instances; (c) failed to transmit accurate information to its proxy services provider on numerous occasions; (d) voted more shares than it was entitled to vote ("over-voting") in proxy matters in numerous instances; and (e) did not adequately retain certain proxy solicitation records. [DBSI] also failed to reasonably supervise and control its business activity, and failed to establish a separate system of follow-up and review, to comply with the Exchange Rules and the federal securities laws, in that Respondent: (a) failed to reasonably supervise its proxy operations to prevent over-voting; (b) failed to provide for and implement written operations and supervisory procedures for its Proxy Department; and (c) failed to provide for

---

[120] NYSE ARCA Equities Disciplinary Action Hearing Board Decision: 08-AE-02, September 10, 2008.

809005.1
Highly Confidential Pursuant to Protective Order

and implement written procedures for the oversight of its proxy service provider.

o   Since the filing of this lawsuit, Defendants continue to be investigated for their conduct related to short selling in TASER.  For example, in March of 2009, the SEC continued its five year investigation into TASER's trading, requesting additional records from Merrill Lynch and Goldman Sachs spanning years 2004 to 2008.[121]

o   NASD investigators conducted a serious and continuously growing examination into Goldman Sachs' TASER trades from at least October 22, 2004 to February 6, 2006.[122]  On February 6, 2006, NASD sent a non-reportable letter of caution to Goldman Sachs regarding possible rule and law violations.[123]  Although this cautionary letter was later withdrawn by Cameron Funkhouser, the Senior Vice President of Market Regulation at the NASD nevertheless cautioned Goldman Sachs that "should Goldman Sachs fail to comply with the short sale rules in the future, the firm may be subject to disciplinary action."[124]

---

[121] GS_TASER 002822 – 2863 and ML-TASR0058091 – 58109.
[122] GS_TASER 002887.
[123] GS_TASER 003008.
[124] GS_TASER 003013.

809005.1
Highly Confidential Pursuant to Protective Order

o  Bear Stearns "accepted customer short sale orders and failed to make
   an affirmative determination that the firm would receive delivery of the
   securities on the customers' behalf or that the firm could borrow the
   securities on the customers' behalf for delivery by the settlement date.
   The findings stated that the firm effected short sales in securities for its
   proprietary accounts and failed to make an affirmative determination
   that the firm could borrow the securities or otherwise provide for
   delivery of the securities by settlement date."[125]

o  Credit Suisse was fined £1.75m by the United Kingdom's Financial
   Services Authority for failing to accurately report 40 million trades
   between November 2007 and November 2008.  Credit Suisses'
   reporting failures included the failure to report all 30 million of its
   transactions on the London Stock Exchange.

o  UBS has been fined by regulatory agencies for numerous reporting
   deficiencies and for the naked short selling activities alleged in this
   case.  For example, UBS was fined by NASD for reporting violations
   in March 2007, in particular for "submitt[ing] reports to OATS (Order
   Audit Trail System), that contained inaccurate, incomplete or
   improperly formatted data, and erroneously submitt[ing] Execution

---

[125] NASD Disciplinary Actions November 2007 (FINRA Case #20041000121-01).

809005.1
Highly Confidential Pursuant to Protective Order

Reports it routed away for handling and/or execution to OATS."[126]

UBS was also fined in May 2007 in a different NASD action for similar violations.[127]  In August 2008, FINRA (f/k/a NASD) again found that UBS reported inaccurate information to OATS and the ACT (Automated Confirmation Transaction Service).[128]  The August 2008 FINRA finding stated:

> Without admitting or denying the findings, [UBS] consented to the described sanctions and to the entry of findings that *it accepted customer short sale orders in securities and, for each order, failed to make an affirmative determination that the firm would receive delivery of the security on the customer's behalf or that the firm could borrow the security on the customer's behalf for delivery by settlement date*. The findings stated that *the firm effected short sales in securities for its proprietary account and failed to make an affirmative determination or to annotate an affirmative determination that the firm could borrow the securities or otherwise provide for delivery by settlement date*. The findings also stated that *the firm executed short sale orders and failed to properly mark the order tickets as short*; in addition, the firm executed short sale transactions and failed to report them to the NMC with a short sale modifier.[129]

---

[126] NASD NTM Disciplinary Actions March 2007, NASD Case #2004200014401.
[127] NASD NTM Disciplinary Actions May 2007, NASD Case #20050002993-01.
[128] FINRA Disciplinary Actions August 2008, FINRA Case #20041000004-01.
[129] *Id.*

809005.1
Highly Confidential Pursuant to Protective Order

- In addition to its improper activities relating to naked short selling, UBS has also engaged in a wide variety of actions in violation of the law and is under active investigation by various governmental agencies.[130] Investigations against UBS have been ongoing throughout the last decade, alleging illegal reporting to regulators, U.S. stock exchanges, and the I.R.S. by arranging illicit reporting through offshore accounts to avoid paying U.S. taxes[131], hiding the identity of account holders, money laundering and systematic efforts to violate US laws. For example, a former UBS banker admitted to law enforcement officials that he secretly visited U.S. clients to manage accounts hidden from the IRS, used encrypted computers to conceal client data, received counter-surveillance training to deflect U.S. inquiries, and opened accounts in the names of offshore corporations to conceal their true owners.[132] Internal UBS documents, produced to the United States Senate, show that UBS took actions, according to U.S. Senator Carl Levin, "to help U.S. clients hide assets and income from Uncle Sam and preserve the secrecy

---

[130] UBS 20-FA 2008 Annual Report filed with the SEC, May 21, 2009.
[131] As announced on 18 February 2009, UBS settled the U.S. cross-border case with the U.S. DOJ and the SEC by entering into a Deferred Prosecution Agreement with the DOJ and a Consent Order with the SEC. United States Securities and Exchange Commission Form 20-F/A Amendment No. 1 Filed by UBS, May 2009.
[132] Keynote Address by Senator Carl Levin at the Conference on Increasing Transparency in Global Finance: A Development Imperative, September 16, 2009.

809005.1
Highly Confidential Pursuant to Protective Order

needed to thwart U.S. tax enforcement."[133]  Other examples of investigations into UBS for illegal activities include:

- o UBS is currently under criminal investigation relating to tax shelters and tax-oriented transactions in which it engaged and promoted between 1996 and 2000.

- o UBS has received subpoenas from the U.S. Department of Justice, Antitrust Division and SEC seeking information relating to derivative transactions entered into with municipal bond issuers and to the investment of proceeds of municipal bond issuances.

- o UBS has been advised that the SEC is considering bringing a civil action against UBS regarding the bidding of various financial instruments associated with municipal securities.

- o UBS was sued by three state regulatory authorities and was the subject of investigations by the SEC and other regulators, relating to UBS's role in the marketing and sale of Auction Rate Securities to clients.

- o UBS entered into settlements in principle with the SEC, the New York Attorney General (NYAG) and other state agencies represented by the

---

[133] Opening Statement of Senator Carl Levin at Permanent Subcommittee on Investigations Hearing on Tax Haven Banks and U.S. Tax Compliance: Obtaining the Names of U.S. Clients with Swiss Accounts, March 4, 2009.

809005.1
Highly Confidential Pursuant to Protective Order

North American Securities Administrators Association (NASAA), including the Massachusetts Securities Division (MSD), wherein, among other things, UBS agreed to pay penalties of $150 million relating to its role in Auction Rate Securities.

o UBS has been responding to a number of governmental inquiries and investigations relating to its cross border private banking services to U.S. private clients during the years 2000 – 2008. In particular, the Department of Justice has been examining whether certain UBS clients received advice from UBS on how to evade their tax obligations by avoiding restrictions on their securities investments.

o On February 18, 2009, UBS entered into a Deferred Prosecution Agreement with the Department of Justice and a Consent Order with the SEC whereby UBS will pay a total of $780 million, representing disgorgement of UBS's profits from maintaining a U.S. cross border business; U.S. federal backup withholding tax, interest, penalties; and restitution for unpaid taxes associated with certain account relationships involving fraudulent sham and nominee offshore structures.

o UBS has received summons from the IRS regarding accounts maintained by U.S. citizens at UBS in Switzerland.  The IRS

commenced a civil summons enforcement action against UBS regarding these summons.

- o UBS is currently responding to a number of governmental inquiries and investigations, and is involved in a number of litigations, arbitrations and disputes, related to the subprime crisis, sub-prime securities, and structured transactions involving sub-prime securities.

- o In relation to the Madoff investment fraud, UBS, UBS (Luxembourg) SA and certain other UBS subsidiaries are responding to inquiries by a number of regulators, including FINMA (Swiss Financial Market Supervisory Authority) and the Luxembourg Commission de surveillance du secteur financier (CSSF).

- In 2005 over 80 million votes were received for TASER's annual shareholders meeting, even though only approximately 60 million shares were outstanding.

- Defendants also engaged in improper activities regarding the voting of TASER securities:

  - o For example, Defendant Deutsche Bank admits that "[d]uring the Time Period, [it] voted more shares for [itself] and/or [its]

clients'/customers' accounts th[a]n [it] had on deposit at the DTCC on the record date."[134]

o   Defendant Goldman Sachs Execution & Clearing admits that it "submitted 2,901 shares more votes to the Tabulator for TASER with respect to the May 1, 2003 annual TASER Shareholders' meeting than GSEC had on deposit at the DTCC."[135]

o   Defendants Deutsche Bank and Goldman Sachs Execution & Clearing also have admitted that they "voted more TASER shares for [themselves] and [their] clients collectively th[a]n [they] held in deposit at the DTCC on the record date."[136]

o   Defendant Credit Suisse also engaged in improper voting activity. First, Credit Suites admits that "as of the record date in 2006, it had two client accounts with a long position in TASER.  According to the

---

[134] Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 32.

[135] Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 32.

[136] Requests for Admission to Defendants at Request No. 40; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 40.

809005.1
Highly Confidential Pursuant to Protective Order

data provided by Broadridge, the number of shares hold in those

accounts, which exceeded the number of shares held on deposit at

DTCC as of the record date, were voted in TASER's 2006

shareholders' vote."[137]  Moreover, Credit Suisse has admitted that

"based upon records produced by plaintiffs, it is possible that in 2005

more TASER shares were voted by Credit Suisse Securities than were

held on deposit at DTCC as of the record date."[138]

- Defendants manipulated the supply of TASER shares on the market by

  borrowing more shares than they lent, without any legal purpose for doing so.

  *See, e.g.*, GSCO_TASER 000016.

- Defendants claimed to own more shares of TASER than they held at the

  DTCC.

  o For example, on May 22, 2007, Defendant Morgan Stanley's DTCC

    position was 1,792,404 shares of TASER,[139] but Morgan Stanley

    claimed 10,803,207 beneficially owned shares even though Morgan

---

[137] Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to
Plaintiffs' Third Requests for Admission to Defendants at Request No. 40.

[138] *Id.*

[139] MS_TASR_00003267.

809005.1
Highly Confidential Pursuant to Protective Order

Stanley's Summary Stock Position Data does not show positions equaling the 10.8 million shares claimed.[140]

o Similarly, on six dates between October 13, 2006 through January 14, 2007, Morgan Stanley claimed millions more beneficially owned shares of TASER than they had on deposit at the DTCC. [141]

• Defendants mismarked short sales as long sales.[142]

o For example, Merrill Lynch Professional blue sheets contain several transactions marked as short sales that were reported to the marketplace as long sales of TASER securities.  On September 23, 2004, an account of _____, at Merrill Lynch Professional, *short sold* 12,500 TASER shares to _____.  In the Equity Trade Journal, the transaction is listed as a *long* cross trade for

---

[140] MS_TASR_00003266 – 3268.

[141] For these examples, see the DTCC position in Morgan Stanley's stock record (MS_TASR_00003266 – 3268) and the NOBO/OBO reports for the following dates: October 13, 2006, October 24, 2007, December 31, 2007, January 11, 2008 and January 14, 2008.

[142] *See* NYSE January 31, 2006 press release: "NYSE Regulation Announces Settlements with 20 Firms for Systemic Operational Failures and Supervisory Violations" ("The inaccurate blue sheets [from several Defendants] were submitted over a significant period of time and resulted from deficiencies that were systemic in nature.  Inaccuracies included the reporting of ***short equity sales as long sales***.").  *See also* NYSE Exchange Hearing Panel Decision 05-159.

12,500 shares from                to        .  On May 16, 2005,

an account of                at Merrill Lynch Professional *short sold*

15,000 shares to                which is marked in the

Equity Trade Journal as a *long* cross transaction from          to

o  UBS has, on at least three instances, marked a short sale of TASER
   common stock as a long sale.[143]

   ▪ UBS has stated, under oath, that "execution-level short sale

     trades in the firm's [UBS's] 'Average Price Account' were

     coded as long sales on the firm's blue sheets. ... UBS believes

     that this issue may have affected UBS's blue sheets from July

     2006 to April 20, 2009."[144]

   ▪ In addition, UBS has stated that "short sale transactions related

     to an arbitrage strategy designated        were being reported

---

[143] UBS Securities, LLC's Objections and Responses to Plaintiffs' Second
Amended Requests for Admission to Each Defendant at Request No. 59 ("UBS
states, however, that, to date, it has identified three instances in which an
unintended coding error resulted in a short sale of TASER common stock
inadvertently being marked as a long sale.").

[144] UBS Securities, LLC's Amended Objections and Responses to Plaintiffs' Third
Interrogatories (As Amended by the Parties) to Defendant UBS Securities, LLC at
6.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

on the [UBS] blue sheets as long sell transaction. ... UBS
believes that this issue may have affected UBS's blue sheets
from the 3rd Quarter of 2007 to May 18, 2009."[145]

o   There are also discrepancies between the NASDAQ Equity Trade
Journal and the blue sheet production from Banc of America which
suggest improper transactions and/or concealment.

- For example, on January 4, 2005, the Equity Trade Journal
shows                          *sold short* 22,300 shares to a
. at 6:07 PM, after the market close.  In Banc of
America's blue sheets, this trade is *sold long* for the account of
to a                          .

- On January 13, 2005 the Equity Trade Journal shows
*sold short* 13,937 shares to a                          at 5:04
PM.  In Banc of America's blue sheets, this trade is *sold long*
for the account of                          to a

---

[145] UBS Securities, LLC's Amended Objections and Responses to Plaintiffs' Third
Interrogatories (As Amended by the Parties) to Defendant UBS Securities, LLC at
7.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

- ▪ According to the Equity Trade Journal on November 4, 2005,
  ⁞sold short 62,600 shares to a blank contra
  party.  In            ⁞'s blue sheets, this trade is *sold long*
  for the account of                    to a            ⁞    .

- ▪ On June 30, 2006, there are five trades totaling 37,300 shares
  *sold short* in the Equity Trade Journal, but in Banc of
  America's blue sheets there are only four trades marked short,
  totaling 2,758 shares, none of which are listed as traded on the
  NASDAQ market.

- Defendants submitted inaccurate blue sheets, short interest reports or other
  documents to regulators.  *See, e.g.,* NYSE Hearing Board Decision 09-
  NYSE-5, 6.

- Defendants' blue sheets appear to be inaccurate and may have been a means
  by which Defendants attempted to conceal illegal activity.  Each of the
  improperly recorded transactions in TASER is suspect.

**REDACTED**

- o   For example, UBS admits that its blue sheets for certain time periods are inaccurate.[146]  UBS's counsel has admitted that from January 1, 2003 through the end of June 2006, UBS cannot identify which of its blue sheets are accurate or inaccurate.  *See* November 13, 2009 Letter from D. Gomez to S. Rosenwasser.  It also appears that several additional UBS blue sheets after June of 2006 are inaccurate.  UBS has admitted "that some of the information that comprises blue sheets may have reflected incorrect information during the relevant time period."[147]

- o   Banc of America's blue sheets likewise contain inaccuracies.  For example, on August 20, 2004, Banc of America's blue sheets show price discrepancies.  On that date, TASER's trading high was $27.75.

---

[146] *See Defendants' June 16 Positions Concerning Plaintiffs' Requests For Production Of Documents Nos. 1-16* at n.2 ("there may be certain data issues that could affect some of the blue sheets which UBS Securities, LLC ('UBS') has agreed to produce in this litigation stemming from historical errors (that have since been corrected) in the blue sheet systems used by UBS. For more information about such issues, UBS refers plaintiffs to Exchange Hearing Panel Decision 05-159 (Jan. 3, 2006). UBS believes that the other documents it has agreed to produce, including the stock records and the data from its order management systems, will provide accurate information that responds to this request, that may not have been correct on the blue sheets.").

[147] UBS Securities, LLC's Objections and Responses to Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request No. 63.

However Banc of America's blue sheets show eleven transactions
totaling 210,800 TASER shares trading as high as $50.

o Defendant Merrill Lynch also appears to have inaccurate blue sheets.
For example, on May 10, 2004, an account of                  at Merrill
Lynch Professional short sold 15,000 shares to
on the NASDAQ market.[148]  In the NASDAQ Equity
Trade Journal, however,                  was a party to only five
transactions totaling 5,300 TASER shares.

o DBSI also appears to have inaccurate and incomplete blue sheets.
First, DBSI's equity blue sheet production does not indicate the
opposing broker in the majority of the trades produced.  The opposing
broker column is blank for 94% of the TASER transactional volume
in the blue sheets produced by DBSI.  In addition, DBSI's equity blue
sheet production shows only two trades transacted on the NASDAQ
market for 112,200 shares of TASER during the over six year record
produced by DBSI, neither of which are reported on NASDAQ's
Equity Trade Journal.[149]  However, the Equity Trade Journal shows

---

[148] ML-TSINTL0069214 – 69215.
[149] DBSI-TASER 003209 (*See* April 5, 2005 transactions, showing (1) 101,387
shares sold sort at $9.98; and (2) 10,813 shares sold short at $9.98, which are not
shown in the Equity Trade Journal).

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

DBSI participating in 124,289 transactions on the NASDAQ market during the period, totaling 31.5 million TASER shares. There are numerous other inaccuracies between DBSI's blue sheets and the NASDAQ Equity Trade Journal. Although DBSI's blue sheets show little volume of TASER short sales executed on NASDAQ, there is a substantial volume of TASER short sales executed by DBSI on NASDAQ that were not, but should have been, reported on DBSI's blue sheets. For example:

- On September 16, 2005, DBSI's blue sheets show 3 transactions totaling 7,900 TASER shares executed on the National Stock Exchange. However, the Equity Trade Journal shows that DBSI executed 8 transactions totaling 122,100 TASER shares that are not included on DBSI's blue sheets.

- On June 20, 2008, DBSI's blue sheets only show 28,412 TASER shares transacted while the Equity Trade Journal shows that DBSI actually transacted 128,752 shares of TASER.

- On June 27, 2008, DBSI's blue sheets list no short sales in TASER stock but the Equity Trade Journal shows that DBSI sold short 18,026 TASER shares to NASDAQ Execution Services.

809005.1
Highly Confidential Pursuant to Protective Order

- On February 11, 2009, DBSI's blue sheets show that DBSI executed TASER short sales for 15,910 shares on the National Stock Exchange, but the Equity Trade Journal shows that DBSI actually sold 45,900 TASER shares short to a blank contra party.

- Similarly, prices reported in Merrill Lynch Pax blue sheets do not match the market prices on several occurrences. For example, from November 18, 2005 through December 1, 2005 there are 52 blue sheet reported trades above the highest market price, which was $7.50. These trades were transacted as high as $46.37. Just on these nine trading days, 473,740 shares, or over $6.1 million in transactional value, were reported in Merrill Lynch Pax blue sheets as transacted above the highest price reported for the day.[150] These trades were not reported to the market because the highest price of TASER for these nine days was $7.50, not as high as $46.37.

- The NYSE fined member firms, including Defendants UBS, Goldman Sachs, Merrill Lynch and Credit Suisse, for violating NYSE Rule 410A, NYSE Rule

---

[150] ML-TSINTL0069216 - 69217.

342 and NYSE Rule 401 by "submitting inaccurate trading information on electronic blue sheets."[151]  As held by the NYSE:

> Blue sheets are documents that are generated by firms at the request of regulators in connection with investigations of questionable trading.  The blue sheets provide information such as the identity of an account holder for whom specific trades were executed and whether a transaction was a buy or a sell and long or short.   Since 1989, firms have submitted blue sheets in an electronic format to all regulators including the NYSE.
>
> Blue sheets are an *essential component of NYSE investigations* into insider trading, *market manipulation* and other potential violations.  Firms must get their operations in order, then periodically test their internal systems to be sure this *vital information* is accurate," said Susan L. Merrill, chief of enforcement, NYSE Regulation.  "We cannot allow the failure of firms to respond accurately and completely to regulatory requests for information to *impede our investigations*.
>
> The inaccurate blue sheets were submitted over a significant period of time and resulted from deficiencies that were systemic in nature.  Inaccuracies included the reporting of *short equity sales as long sales*.  Additionally, some Firms continued to have ongoing deficiencies in blue sheet reporting even though NYSE Regulation alerted them to these problems.[152]

- Merrill Lynch was also fined by the AMEX on January 17, 2006 for

  submitting "erroneous blue sheet trade information to the Exchange in

---

[151] NYSE January 31, 2006 press release: "NYSE Regulation Announces Settlements with 20 Firms for Systemic Operational Failures and Supervisory Violations."  *See also* NYSE Exchange Hearing Panel Decision 05-159.
[152] *Id.*

809005.1
Highly Confidential Pursuant to Protective Order

response to requests made in the context of ongoing Exchange investigations."[153]

- A significant number of UBS's blue sheets contain inaccuracies, incorrect and/or incomplete information.  For example:

  o Although UBS has only produced blue sheets dating back to August 8, 2003, the NASDAQ Equity Trade Journal shows UBS trading activity as early as January 3, 2003.

  o UBS's blue sheets[154] and data contained in the Equity Trade Journal do not match for numerous dates, including December 1, 2004, January 6, 2005 and January 24, 2005.  On each of these dates, the UBS blue sheets underreport the number of trades and volume of TASER shares UBS transacted as reflected in the Equity Trade Journal.  For example, on December 1, 2004, the UBS blue sheets reported 131 trades for a volume of 222,186 shares, while the Equity Trade Journal shows UBS as a party to 12,036 trades for a total volume of 4,614,701 TASER shares.

---

[153] American Stock Exchange LLC Disciplinary Panel Decision, Case No. 05-95, In the Matter of Merrill Lynch, Pierce Fenner & Smith, Incorporated, January 17, 2006.
[154] UBS_TASER0000893 - 894.

809005.1
Highly Confidential Pursuant to Protective Order

o   Although UBS claims that its blue sheets are correct after June of

2006, blue sheets for June 4, 2008, July 15, 2008 and September 18,

2008[155] do not match UBS's transactions as listed in the Equity Trade

Journal.  For example, on June 4, 2008, UBS blue sheets show three

trades marked short for a total of 255 shares.  The Equity Trade

Journal shows UBS short sold 69 trades totaling almost 14,000 shares

of TASER.  On July 15, 2008, the Equity Trade Journal shows UBS

*short selling* 36,836 TASER shares in four transactions to

'.  UBS's blue sheets show that these four trades for

36,836 shares are *sold long* by UBS to .

On September 18, 2008, UBS blue sheets show one short sale for

4,700 TASER shares.  The Equity Trade Journal for that date shows

UBS short sold 48 trades totaling 25,000 TASER shares.  One of the

*short sales* in the Equity Trade Journal, for 20,000 shares, is listed as a

*long sale* to                                      ' in the blue sheets produced

by UBS.

o   UBS blue sheets indicate that UBS has engaged in significant trading

of TASER securities on markets other than the NASDAQ.  For

example, UBS blue sheets reflect that, on December 1, 2004, UBS

---

[155] UBS_TASER0000904 - 908.                    **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

traded 131 trades for 222,000 TASER shares.  Of these 131 trades, 55
trades were reported to be transacted on the New York Stock
Exchange, NYSE Arca or the Chicago Stock Exchange.  These trades
constituted 40% of UBS's TASER trades on that date.  Since UBS's
blue sheets reported 131 trades for a volume of 222,186 shares, while
the Equity Trade Journal shows UBS as a party to 12,036 trades for a
total volume of 4,614,701 TASER shares, it appears that UBS traded
large volumes of shares off the NASDAQ market.

- DBSI's blue sheets likewise do not match the NASDAQ Equity Trade
  Journal on numerous occasions:

   o On September 16, 2005, DBSI's blue sheets show 3 transactions
     totaling 7,900 TASER shares, executed on the National Stock
     Exchange.  The Equity Trade Journal shows DBSI traded 8
     transactions totaling 122,100 shares of TASER executed by DBSI that
     are not reported in DBSI's blue sheets.

   o On June 20, 2008, the Equity Trade Journal shows DBSI transacted
     128,752 TASER shares, but DBSI's blue sheets show only 28,412
     TASER shares transacted.

o On June 27, 2008, the Equity Trade Journal shows DBSI sold short
18,026 shares to                                      , but DBSI's blue sheets
list no short sales.

o On February 11, 2009, the Equity Trade Journal shows DBSI sold
short 45,900 shares to                          but DBSI's blue sheets
show total short sale volume was only 15,910 shares, all of which
were executed on the National Stock Exchange.

o DBSI's illegal conduct with regard to naked short selling includes
DBSI, on its blue sheets, significantly underreporting short sales that
DBSI executed on NASDAQ, which also may be indicative of
underreporting of transactions in other markets.


- As another example of inaccurate blue sheets, on several dates, Bear Stearns'
blue sheets[156] do not match the NASDAQ Equity Trade Journal.[157]

o On March 28, 2005, the Equity Trade Journal shows that
                              , short sold 116,406 shares worth $1.5 million to
                              . The blue sheets for the same date show the sale of
the 116,406 shares as a long sale from                    to                  .

---

[156] Bear-T00027746-48 (Bear Stearns' blue sheets).
[157] NASDAQ00000081-89 (Equity Trade Journals for the entire Time Period).

809005.1
Highly Confidential Pursuant to Protective Order

123                        **REDACTED**

- o  On April 12, 2006, the Equity Trade Journal shows that
     sold 75,000 shares short to a _____ .  The Bear Stearns
     blue sheets for this date show the 75,000 shares as being sold long
     from _____ to _____ (and then the trade is cancelled).

- o  On February 27, 2007, the Equity Trade Journal shows that
     ' sold 133,000 shares short as principal to a _____ .
     The Bear Stearns blue sheets for this date show the 133,000 shares as
     purchased long in a transaction between _____

- Defendants' options blue sheets contain inaccuracies and omissions,
  illustrating Defendants' misconduct and showing the incomplete and
  misleading nature of the Defendants' data.  For example, the March 30, 2004
  Options Clearing Corporation record does not show a
          trade for 13 contracts in TASER, but that trade is reported in Bear
  Stearns' blue sheets.[158]  Similarly, some of Bear Stearns' trades with
       and _____ are not reported in the Bear Stearns options blue

---

[158] Bear-T00027748.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

sheets produced to Plaintiffs, but are included in the Options Clearing Corporation record. Moreover, UBS's options blue sheets also appear inaccurate. *See also* November 13, 2009 Letter from D. Gomez to S. Rosenwasser (noting that UBS's options blue sheets contained "duplicate trades that are the result of the query system that UBS used to pull the options blue sheets.").

- Defendants also produced inaccurate and incomplete reports. For example, ' Loanet reports reflect only borrows by and not loans for the month. In December of 2004, had at least 1.8 million TASER shares on loan, but Loanet reports only reflect TASER borrows and do not show any of these loans.

- Defendants used option contracts or other derivatives to mask naked short selling or fails to deliver. *See, e.g.*, GS_TASER 002869; GSCO_TASER 000013 – 14; GS_TASER 0001409.

- Defendants failed to request or require buy-ins for TASER and other securities that a Defendant failed to deliver, including each Defendant permitting the other to fail to deliver beyond the permitted time frame or

REDACTED

otherwise improperly account for an illegal short sale. *See, e.g.,* MS_TASR37477.

- Defendants sought to create artificial and/or counterfeit TASER security entitlements because, *inter alia*, TASER stock was hard to borrow and thus commanded a high interest rate when loaned (*i.e.*, the Defendants could use the artificial security entitlements they created to earn high interest rates).

- Defendants failed to deliver shares because they were instead using them for stock loans. *See, e.g.,* ML-TSINTL-ESI371963.

- Defendants permitted, facilitated and/or participated in short sales without knowing whether shares would be borrowed and delivered for legal settlement. *See, e.g.*, GSE_T68193; GSE_T176910; CSS-TSRGA-E98519.

- Defendants failed to deliver TASER while it was a threshold security. *See, e.g.,* GS_TASER2945.

- Defendants permitted, facilitated and/or participated in short sales for or with clients they knew or should have known were engaged in improper trading or

acts relating to improper trading.  *See, e.g.*,  GSE_T69192-93; *AMEX v. Scott H. Arenstein and SBA Trading, LLC*, Case No. 07-71 [AMXC07013] (July 20, 2007); *In the Matter of SBA Trading LLC and Scott Arenstein*, File No. 09-0008 (September 24, 2009) (Business Conduct Committee of the Chicago Board Options Exchange, Inc.); American Stock Exchange Announces Two Disciplinary Actions For Violations Of Regulation SHO Short Sale Rules, July 31, 2007;  GS_TASER 002822 – 002863; GS_TASER 002895 – 002897; GS_TASER 002891.

- o  Merrill Lynch permitted its clients to engage in short sales of TASER stock with full knowledge that those clients had previously failed to deliver.  For example, from July 20, 2007 through January 2, 2008, while TASER was a Regulations SHO threshold security, Merrill Lynch Professional permitted its client

  to open 61 new TASER short positions that failed in delivery. On each of the days Merrill Lynch allowed            to establish a new short position,            had already failed to deliver on a prior position.  On or about the thirteenth day, when a mandatory close out of            fail positions were required by Regulation SHO, Merrill Lynch instead booked an options trade for           . Merrill Lynch's conduct in permitting clients who consistently failed

to deliver to continue to enter into short transactions based upon the

customer's representation that the customer has obtained a locate

violates Regulation SHO:

> The executing broker may rely on a customer's representation that an order to sell short a security is supported by a locate obtained by the customer from the stock loan department of the executing broker, or any other identified entity that is authorized to loan stock, as long as reliance on such representation is reasonable. However, where a broker-dealer knows or has reason to know that a *customer's prior assurances resulted in failures to deliver*, assurances from such customer *would not provide the reasonable grounds required* for a locate.[159]

o   And, because the            short positions that failed were

established during the time that TASER was a threshold

security,[160] even if the market maker exception applied (which

---

[159] The SEC Division of Market Regulation: Responses to Frequently Asked Questions Concerning Regulation SHO. Question 4.3 (emphasis added).

[160] The short sale trades by            that failed do not appear to be executed in the available records of Merrill Lynch.  For example, the original short equity transaction for            fail position of 48,170 shares starting March 3, 2006, is not executed in any of the blue sheet production from Merrill Lynch, nor does it appear to be executed on the NASDAQ exchange.  The option trade that exempted fail positions of            starting on July 20, 2007 cannot be fully examined at this time because Plaintiffs have yet to receive Options Clearing Corporation data for this time period and Merrill Lynch Pax and Merrill Lynch Pro have not yet produced their options data to Plaintiffs at this time.  Moreover, it appears that there are several documents related to the            transactions that have not been produced by Merrill Lynch.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

it does not), Merrill Lynch's conduct nevertheless violates

Regulation SHO because the position in TASER was not

created before TASER became a threshold security.[161]

o Merrill Lynch also facilitated trades between

                   and            identical to trades that NYSE

Arca and NYSE Amex found were sham transactions.

o Merrill Lynch facilitated trades for SBA Trading and its owner, Scott

Arenstein, both of whom have been fined and sanctioned for illegal

activity by the American Stock Exchange and the Chicago Board of

Options regulatory divisions and were barred from the securities

industry for 5 years.  The AMEX concluded that SBA Trading a) was

targeting Regulation SHO securities; b) was not acting as a bona fide

market maker; c) did not have a market maker exemption for their

illegal trading; and d) illegally failed to deliver shares of threshold

securities for settlement.  *See* AMEX v Scott H. Arenstein and SBA

Trading, LLC, Case No. 07-71 [AMXC07013] Decision, July 20,

2007 ("Based on the stipulated facts, the Chair concludes that

---

[161] Federal Register, Vol. 69, No. 151, August 6, 2004, Rules and Regulations,
page 48019 ("Any fails to deliver from short sales that are not effected to hedge
pre-existing options positions, and that remain for thirteen consecutive settlement
days, *are subject to the mandatory close out requirement*.") (emphasis added).

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

Respondents Arenstein and SBA Trading violated: ... SEC Rule 203(b)(3) and Article V, Sections 4(h) and (i) of the Exchange Constitution in that Respondents *engaged in a series of transactions that circumvented Respondents' delivery obligations in Reg SHO threshold securities* that had been allocated to Respondents by their clearing firm.").

- The Defendants permitted their clients to engage in transactions identical to transactions for which those clients were sanctioned by regulators.

  o Merrill Lynch client Hazan Capital Management and its owner, Steven Moses Hazan, were fined and barred by NYSE Amex and NYSE Arca on August 5, 2009 for illegal transactions designed to disguise failure to deliver positions in Regulation SHO Threshold Securities. Hazan Capital and Steven Hazan used various complex transactions to avoid closing out their threshold security short positions:

    > In order to avoid being bought-in, Respondents entered into a series of transactions that circumvented Respondents' obligation to actually deliver securities to close out their short position pursuant to Regulation SHO. Specifically, Respondents, utilizing the services of an options floor broker, executed a series of complex transactions that appeared to close out their fail to deliver position by purchasing securities of like kind and quantity...

Respondents repeatedly engaged in these or other types of transactions after receiving a Regulation SHO Buy-In Notification from their clearing firm and these transactions caused the buy-in date to be reset.

…

These transactions were executed approximately every 13 settlement days until the options positions either expired or were closed out. These transactions enabled Respondents to maintain impermissible short positions in a number of Regulation SHO threshold securities for extended periods of time. [162]

o   Merrill Lynch's blue sheet records show a pattern of identical transactions by                in TASER stock which Merrill Lynch should not have permitted and should have taken action to stop.[163] For example, on March 16, 2006,                sold 362,700 shares to                ,[164] restarting the settlement date for the original fail position for the same amount of TASER shares.[165]  Similar transactions between                and                also occurred on February 28, 2006, April 10, 2006 and May 24, 2006.  Merrill

---

[162] NYSE AMEX LLC and NYSE ARCA, Inc., Hearing Board Decision 09-AMEX-21, Hearing Board Decision 09-AMEX-22, Hearing Board Decision 09-ARCA-5, Hearing Board Decision 09-ARCA-6, for Steven M. Hazan and Hazan Capital Management, L.L.C., August 4, 2009.
[163] ML-TSINTL0069213.
[164] ML-TSINTL0069216 – 69227.
[165] ML-TSINTL0069213.

Lynch Pax division's records from August 2005 through May 2006 contain these transactions. Hazan and SBA Trading were the parties to the sham transactions investigated by regulators as described above.

o Merrill Lynch also assisted        in undertaking sham transactions identical to those undertaken by Hazan which the SEC found violated Regulation SHO:

> HCM [Hazan Capital Management] also willfully violated Rule 203(b)(3) of Reg SHO by engaging in a series of sham reset transactions that employed short-term, paired stock and option positions, which enabled HCM to circumvent its close out obligations in Reg SHO threshold securities. HCM *also assisted other options market makers who were executing their own sham reset transactions by acting as a counterparty to the sham transactions* and in doing so violated the locate requirement.[166]

o Merrill Lynch's records reflect similar illegal activity by        . For example,        had a fail to deliver in the record of 107,049 shares on November 9, 2005 as did        And also had a fail position of 107,049 shares. For the next two trading days, November 10th and 14th, 2005, these six participants each

---

[166] SEC Administrative Proceeding File No. 3-13570 In the Matter of: Hazan Capital Management, LLC and Steven M. Hazan, Respondents, Release No. 60441 (August 5, 2009) (emphasis added).

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

maintained a fail position of 107,049 TASER shares. This pattern is seen throughout Merrill Lynch's fail record.[167] While other records are required to fully understand these identical fail to deliver positions, this activity appears to mirror the findings of the SEC that suggest that paired positions were being employed by Merrill Lynch and their clients to assist "other options market makers who were executing their own sham reset transactions by acting as a counterparty to the sham transactions."

o  Merrill Lynch also allowed its client _____ to engage in rolling locates. For example, from November 2006 through March 2009, Merrill Lynch client _____ requested and received large rolling locates from Merrill Lynch. Merrill Lynch's locate records show on five consecutive trading dates from November 21, 2007 through November 28, 2007 that _____ requested three blocks of shares amounting to 1.2 million TASER shares on each day. _____ requested such large locates for shares to sell short on consecutive trading days from June 2006 through March 2009.

o  Merrill Lynch client Third Millennium was also fined by the Chicago Board Options Exchange for "effect[ing] 47 short-term FLEX

---

[167] ML-TASR0052925.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

transactions in conjunction with stock purchases to circumvent

Regulation SHO closeout obligations.[168]

- Defendants, for themselves or their clients/customers, shorted more TASER

  securities than were located.

- Defendants created false and misleading information to be distributed to

  regulators and the investing public.  For example, by December 31, 2007,

  Merrill Lynch's books show that its client            had fail positions

  exceeding 900,000 TASER shares. TASER's fail position at the NSCC was

  only 203,301 at the same time,[169] indicating that Merrill Lynch internalized

  the fails and utilized ex-clearing to hide the fails from the NSCC and the

  DTCC.  Between July 20, 2007 through January 2, 2008 (the time period

  during which            increased its fail position to over 900,000 TASER

  shares),            established new fail to deliver positions on 61 days,

  with some open TASER positions lasting over 100 days. [170]  These fail

  positions appear to have been open longer than 100 days, but the record is not

---

[168] Business Conduct Committee Of The Chicago Board Options Exchange,
Incorporated, In the Matter of Third Millennium Trading, LLC, July 6, 2009.

[169] DTCC00000060.

[170] ML-TSINTL0069213.                    **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

currently complete for these TASER transactions. These fails to deliver, which Merrill Lynch was required to have been reported, were not contained in any of the stock records of the three Merrill Lynch divisions who have produced records to date and may have deprived TASER and its shareholders of their rights and protection of Regulation SHO by facilitating the removal of TASER from the Regulation SHO Threshold Security List on January 2, 2008. These and similar omissions and misstatements permitted the creation and release of false and misleading information to the securities market.

- Defendants claimed beneficial ownership of TASER securities far greater than their actual DTCC ownership of TASER securities. For example, in May of 2007, Morgan Stanley claimed to own 11,767,234 TASER shares when the DTCC reflected that its actual ownership was only 2,646,970. Similarly, in May of 2007, Merrill Lynch claimed to own 2,809,889 TASER shares when the DTCC reflected that its actual ownership was only 1,443,995.

- Defendants used intra company loans in order to facilitate and mask illegal naked short sales. *See, e.g.*, MS_TASR00037089R-37094R;

MS_TASR_00006709 – 6715; MS_TASR_00006809 – 6811;

MS_TASR_00098391 – 00098838; MS_TASR_00098830.

o  Defendant Morgan Stanley's stock record shows that Morgan Stanley

   appears to have engaged in a significant number of rolling TASER

   loans to

   in order to conceal improper TASER short sale activity.

   ▪  For example, on settlement date May 21, 2007, the

      loan amounted to 4.5 million TASER shares, but on May 22,

      2007, that loan was reduced to 901,380 TASER shares.  But

      Morgan Stanley's record does not reflect a decrease of 3.6

      million TASER shares.  By May 23, 2007, the TASER loan

      was 754,503, and then it increased to 4.8 million TASER shares

      on May 24, 2007.

   ▪  These apparent rolling loans between

      should be reflected in the stock record, with real

      TASER shares moving into and out of Morgan Stanley's stock

      records.  However, Morgan Stanley's stock record does not

      reflect these changes.

   ▪  On settlement date May 21, 2007, when

      almost 4.5 million shares,              had

TASER shares on deposit at the DTCC and had only borrowed

2,860,002 TASER shares from other dealers.[171]

o          's Loanet Reports also show

loaning millions of shares to                        These intra

company loans also appear to be rolling loans.  They are short term

loans (days) are renewed when they expire with a new loan contract

for a similar number of shares.  One example of this can be found in

September/October of 2007.[172]

- On September 21, 2007,                  loans approximately 5

  million TASER shares, worth $78.2 million (amount of shares

  per contract change slightly) to

  On September 28, 2007 this loan contract was closed and a new

  loan contract was written for 5 million shares that closed on

  October 1, 2007.  When the loan closed on October 1, 2007, a

  new loan contract was written for 5 million shares that closed

  on October 12, 2007.  On October 12, 2007 a new loan contract

  was issued for 5 million shares that closed on October 15, 2007.

  This pattern continues and                      's record reflects

---

171 ·    _    ·    ..                  ·.

172 ;                         ) and ,

809005.1

Highly Confidential Pursuant to Protective Order

REDACTED

other loan contracts that appear to be similarly rolled for long periods of time.[173]

- These loans are causing no movement of real TASER shares on deposit at the DTCC between the two accounts.                    TASER position at the DTCC during the time period examined, September/October 2007, only ranged between zero and 125,000 shares.

- Rolling TASER loans like this could be for several illicit purposes by                    , including: (a) disguising fails internally to prevent detection by regulators; (b) supplying additional shares in the marketplace to manipulate TASER securities; and (c) avoiding a required buy-in of shares in the open market by                    , which would put enormous pressure on the upward pricing of TASER, costing                    and other firms that are short TASER a substantial amount of money.

---

[173] For additional documentation regarding loans between Inc. and                    , see

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

- Credit Suisse engaged in substantial purchases and sales with          (*i.e.*, cross trades).  For example, from 2004 through 2009, Credit Suisse transacted with itself 6,157 times, for a total of approximately 17.2 million TASER shares. Credit Suisse also engaged in numerous trades with                    (*e.g.*, in 2006, there were approximately 2.2 million shares involved in such trades). The implications of these trades are being examined.

- Defendants may have improperly used options and/or derivatives involving TASER.

- Defendants improperly failed to deliver and receive TASER stock on the CNS, NSCC and/or in ex-clearing.

  o Between January 1, 2003 and May 31, 2009, Merrill Lynch, Deutsche Bank and Goldman Sachs each admit that "there have been at least two instances in which [they] had a net failure to deliver TASER common stock for 13 consecutive settlement days."[174]

---

[174] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 1; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 1; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution &

- o Between January 1, 2003 and May 31, 2009, Defendants UBS, Banc of America, Morgan Stanley, Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs, and Bear Stearns admit that "there have been at least two instances in which [they] had a net failure to receive in TASER common stock for 13 consecutive settlement days."[175]

- o Banc of America, Merrill Lynch and Credit Suisse have admitted that "[o]n at least two occasions, [they] agreed to loan TASER common

---

Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 1.

[175] UBS Securities, LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Each Defendant at Request No. 3; Defendant Banc of America Securities LLC's Responses and Objections to Plaintiff's Third Requests for Admission at Request No. 3; Defendant Morgan Stanley & Co. Incorporated's Objections and Responses to Plaintiffs Third Requests for admission to Defendants at Request No. 3; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 3; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 3; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 3; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 3; Defendant Bear, Stearns & Co., Inc.'s And Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 3.

809005.1
Highly Confidential Pursuant to Protective Order

stock while, at the same time [they] agreed to make the loan, [they] ha[d] a net failure to deliver TASER common stock."[176]

o Goldman Sachs has admitted that, "[o]n at least two occasions, [Goldman Sachs] ha[s] had a net CNS fail to deliver position in TASER common stock of 100,000 shares or greater for more than 13 consecutive settlement days."[177]

- Defendants engaged in short sales of TASER securities – including while it was on the threshold list – without having reasonable grounds to believe it could obtain and deliver those securities by the settlement date.

- Some Defendants engaged in short sales of TASER securities in their own proprietary accounts, and thus sought to profit from any artificial drop in TASER's price.

---

[176] Defendant Banc of America Securities LLC's Responses and Objections to Plaintiffs' Amended Second Requests for Admission at Request No. 70; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Amended Second Requests for Admission at Request No. 70; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Second Requests for Admission to Each Defendant at Request No. 70.

[177] Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 62.

o   For example, Credit Suisse admits that it has "engaged in a short sale of TASER common stock in a proprietary account without first obtaining a locate."[178]

o   Morgan Stanley, Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs and Bear Stearns all admit that, between January 1, 2003 and May 31, 2009, "as an executing broker, [they] engaged in short sales of TASER common stock for or in [their] proprietary account at a time when [they] had existing net fails to deliver TASER common stock."[179]

---

[178] Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 9; *id.* at 10.

[179] Defendant Morgan Stanley & Co. Incorporated's Objections and Responses to Plaintiffs Third Requests for admission to Defendants at Request No. 14; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 14; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 14; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 14; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 14 ("GS&Co.: Admitted."); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 14.

o   Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs and

    Bear Stearns all admit that, between January 1, 2003 and May 31,

    2009, "as a clearing broker, [they] engaged in short sales of TASER

    common stock for or in [their] proprietary account at a time when

    [they] had existing net fails to deliver TASER common stock."[180]

o   Merrill Lynch, Deutsche Bank, Credit Suisse and Goldman Sachs

    have admitted that between January 1, 2003 and December 31, 2009,

    as an executing and clearing broker, "[they] engaged in short sales of

    TASER common stock for or in [their] proprietary account at a time

    when [they] had existing net fails to deliver TASER common stock

    that persisted for more than 13 consecutive settlement days.[181]

---

[180] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 15; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Request for Admission to Defendants at Request No. 15; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 15; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 15 ("GS&Co.: Admitted."); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 15.

[181] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaitniffs' Third Requests for Admission at Request No. 16 -17; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs'

809005.1
Highly Confidential Pursuant to Protective Order

- o Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs and Bear Stearns admit that , "as a clearing broker, [they] engaged in short sales of TASER common stock for or in [their] proprietary account at a time when [they] had net existing fails to deliver in that stock."[182] These same Defendants, along with Morgan Stanley, engaged in the same conduct as an executing broker.[183]

---

Third Requests for Admission to Defendants at Request No. 16-17; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 16-17; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 16-17 ("GS&CO.: Admitted.")

[182] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 43; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 43; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 43; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 43 ("GS&Co.: Admitted."); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 43.

[183] Defendant Morgan Stanley & Co. Incorporated's Objections and Responses to Plaintiffs Third Requests for Admission to Defendants at Request No. 44; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 44; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 44; Defendant Credit

809005.1
Highly Confidential Pursuant to Protective Order

- o Merrill Lynch, Deutsche Bank, Credit Suisse and Goldman Sachs have admitted that, as an executing and clearing broker, "[they] engaged in short sales of TASER common stock for or in [their] proprietary account at a time when [they] had net existing fails to deliver in that stock for at least 13 consecutive settlement days."[184]

- Defendants improperly purported to rely upon market maker exemptions and locates to effectuate speculative or investment short selling decisions between TASER market makers in violation of NASD Notice to Members 94-68. *See* GS_TASER001419-1425 (⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀filled locate requests for 12.1 million

---

Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 44; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 44 ("GS&Co.: Admitted."); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 44.

[184] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 45-46; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 45-46; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 45-46; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 45-46 ("GS&Co.: Admitted").

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

shares of TASER on July 16, 2008 to Goldman Sachs despite having on deposit with the DTCC only 55 shares on July 15 and 2,224 shares on July 16).

- Defendants misrepresented to clients, customers, borrowers and/or lenders that, when conducting short sales or engaging in stock loans or borrows, that the Defendants would abide by all applicable rules and regulations, including short selling, borrowing, delivery and settlement rules and regulations. Defendants' misrepresentations regarding this subject may be found in, *inter alia*, their respective securities lending agreements, stock loan agreements, prime brokerage agreements and margin account agreements.

- Defendants received payments from clients and others for tasks they agreed to, but did not, actually undertake.

- Defendants violated their duties, responsibilities and obligations to know their customer and to report suspicious transactions.

- Defendants allowed clients and customers who had a history of failing to deliver securities to sell short.

- Defendants misrepresented to clients, customers and others that they would borrow stock for purposes of effectuating a short sale, when in fact they did not borrow stock or did not borrow a sufficient amount of stock.  In many instances, those misrepresentations were made in an effort to obtain money.

Moreover, as stated above, Defendants' failure to deliver and related conduct is not limited to TASER securities, but rather is part of a pattern of unlawful and improper conduct of illegal naked short selling which includes improper transactions of the nature described above in the securities of other companies.  *See, e.g.*,  *SEC v. Goldman Sachs Execution & Clearing, L.P.*, File No. 3-12590 (2007); *Goldman Sachs Execution & Clearing, L.P. f/k/a Spear, Leeds & Kellogg, L.P.*, NYSE Hearing Board Decision: 07-033, March 14, 2007; NASD Fines Morgan Stanley Firms $2.9 Million for Widespread Violations of NASD Rules Number and Scope of Violations Indicate Extensive Reporting Problems at Both Firms, NASD NTM Disciplinary Actions October 2006; *In The Matter of Morgan Stanley & Co., Inc.*, Case No. 05-185 (AMEX March 13, 2007).

Defendants also acted improperly, unlawfully and illegally to the extent they acted as purported market makers in TASER securities.  Defendants, as market makers and otherwise, have a duty to protect investors and issuers of stock from

809005.1
Highly Confidential Pursuant to Protective Order

fraud and to protect the integrity of the self-regulated marketplace.  Because of their positions as gatekeepers to the public markets, Defendants have a responsibility to ascertain that they are not selling unregistered securities.[185] Defendants also had a duty to inquire about, report and, where appropriate, prevent suspicious activity in the trading of TASER.  At a minimum, Defendants were not permitted to allow, facilitate and/or engage in trading that they knew was improper.  *See, e.g.,* SEC Press Release August 5, 1999 ("The Commission's Order finds that Bear Stearns took actions that directly facilitated Baron's widespread fraudulent activity.  *A firm's status as a clearing broker does not immunize it from the consequences of participating in a fraud*.  To the contrary, a clearing firm, or any other market participant, that engages in conduct enabling a boiler room like Baron to defraud investors or millions of dollars is fully responsible for its actions.").

Defendants violated these and other duties by failing to comply with industry standards and codes of conduct, and by permitting, facilitating, engaging in and/or aiding and abetting improper TASER transactions, including naked short selling.

---

[185] SEC v. Joseph W. Pellechia, File No. 3-9718 (1999), available at http://www.sec.gov/litigation/admin/34-41035.txt.

809005.1
Highly Confidential Pursuant to Protective Order

For example, Defendants were put on notice of irregular trading in TASER by Regulation SHO daily threshold lists and their own daily stock loan lists describing TASER as a hard or impossible stock to borrow to complete settlement of short sale trades.  Once Defendants received notice that TASER securities were not settling on time and could not be readily borrowed, they had a duty to carefully make every effort to ensure that short sales could and would be delivered for settlement and that stock market manipulation was not occurring.  They did not do so.  Instead, Defendants continued to permit, facilitate and/or engage in improper and unlawful transactions, including naked short selling.

Defendants' improper conduct also includes the failure to properly provide or obtain a locate for TASER securities that either the Defendants or their customers sought to sell short.  A locate is the affirmative determination that shares can, in fact, be borrowed and delivered for legal settlement of short sale transactions.  Locates are required by Regulation SHO and were also required by other rules before the implementation of Regulation SHO, such as NASD Rule 3370 and NYSE Rule 440B.  *See, e.g., Ko Securities, Inc. and Terrance Y. Yoshikawa*, Securities Exchange Act Release No. 48550 (September 26, 2003) (holding that an affirmative determination, *i.e.*, a "locate," must be made before the

securities are sold short regardless of whether the short seller repurchases securities on the same day)."[186]

Circumventing the borrowing of securities to complete legal settlement by simply obtaining a locate for securities to be borrowed, but not actually borrowing the securities and delivering the securities is a violation of Regulation SHO and prior securities regulations.  Regulation SHO specifically states that the rule prohibits a broker dealer from effecting a short sale for a customer or for their own account, unless the security has been borrowed, or there is a firm arrangement to borrow the security to complete settlement.  Regulation SHO contains language that the dealer must have reasonable grounds to believe that the locate is backed by securities that can be borrowed and delivered on the settlement date of the short sale.

Securities reported on hard to borrow lists, as TASER was throughout the Time Period (as discussed above), are difficult to borrow.  Therefore, the availability of very large quantities of shares to borrow of a threshold security on the broker dealers hard to borrow lists, like TASER, should have been extremely suspect at the time the locates were provided.  Nevertheless, Defendants continued to provide and rely upon locates for TASER.  Each time a Defendant knew or had

---

[186] Securities and Exchange Commission, 17 CFR Parts 240, 241 and 242, Release No. 34-50103; File No. S7-23-03, Final rule; Interpretation of Regulation SHO, Federal Register, Vol. 69, No. 151, Friday, August 6, 2004 page 48014.

809005.1
Highly Confidential Pursuant to Protective Order

reason to know that TASER shares would not or could not be delivered for settlement, that Defendant engaged in activity constituting, among other violations, illegal naked short selling.

Taking into account TASER's market conditions (*i.e.*, its threshold security status, restricted NASDAQ security status in 2004, large numbers of fails to deliver just within the NSCC system, very large amounts of short sales, excessive trading volumes and a virtual industry-wide hard to borrow designation) each Defendant should have been or was on notice of suspicious activity regarding short selling in TASER that was present in their own books and records.  According, by permitting, failing to recognize or failing to stop this activity in accordance with the law, Defendants actively participated in manipulation of the market in TASER securities or aided or abetted market manipulation.

For example, DBSI's locate records reflect unusual and suspect locate activity.[187]  Beginning at the time Regulation SHO went into effect, January 3, 2005,                              was requesting locates for 1,305,600 shares of TASER securities from DBSI.  By January 5, 2005,                              was requesting 1,627,300 shares.                              requested 1,751,700 shares on January 10th, 3,130,800 shares on January 12th, and 5,232,300 shares on January 13th.                              locate requests peaked on January 21, 2005 at

---

[187] DBSI-TASER 003213 – 3219.                              **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

5,439,000 shares.  DBSI was not filling these large requests from

during this period.  During January 2005,

requested locates for a total of 69.5 million shares, more than all of the shares

TASER had outstanding for trading.

Because TASER was a threshold security at this time, DBSI knew or should

have known from its own books and records, that: a) it could not supply shares of

TASER for the locates, b) millions of shares were virtually impossible to obtain of

TASER, and c) that Regulation SHO may have been violated by a client possibly

short selling millions of shares without a locate, then trying to acquire shares it

sold without a proper borrow and delivery of the security.

The                                   locate requests remained in the high hundreds

of thousands of shares to over 1 million shares until May 16, 2005, all during a

period when TASER's shares were virtually impossible to obtain.  On May 16,

2005,                                   's locate request increased from 943,600 shares to

5,031,200 shares, peaking on May 19, 2005 at 6,758,800 shares.

continued to request locates on millions of shares of TASER until

June 30, 2005.  On July 1, 2005                                   sought 557,400 TASER

shares.  DBSI's stock record shows that                                   continued to

request large locates of TASER throughout the remaining Time Period.  In sum,

during the Time Period,                                   requested locates for 1 billion

shares of TASER, which is significantly out of proportion to the 60 million shares TASER had outstanding.

DBSI's stock record also shows suspect transactions by its client

.  From April 2005 through May 29, 2009, requested 400,000 shares nearly every day from DBSI, whether or not they received fills.  For example, from September 26 through September 28, 2005, received fills for the 400,000 share request, totaling 1.2 million shares, but continued to request the same amount of shares for almost two years.

Moreover,                                         requested locates for 3,794,001 TASER shares nearly every day from August 3, 2007 through October 2, 2007.  These requests were only partially filled by 25,000 shares each day from August 3 through September 7.   DBSI's records show requested 1,453,841 TASER shares every day from May 20, 2008 through July 18, 2008.                  ' request for these shares was filled in part on only one occasion, for 25,000 shares.  These large locate requests were a pattern for

From September 18, 2008 through November 7, 2008, ` requested from 1.3 to 2.4 million shares each day from DBSI, but did not receive fills for any of its requests.

From July 1, 2008 through May 29, 2009 (230 trading days),           requested 300,000 TASER shares on 229 trading days.  These requests were filled in full on 157 trading days and were partially filled on another 58 trading days, totaling 49.6 million shares of TASER.  Thus, there were only 14 days in this period where           did not receive a locate for any of the 300,000 shares requested, but           continued to request the locates for the 300,000 shares even though they were fully filled on 68% of the trading days.  From November 11, 2008 through May 29, 2009,           received fills for 300,000 TASER shares each day, but DBSI's loan data shows the highest loan during that period was for only 16,000 shares.[188]  DBSI's DTCC position peaked during the period at 164,180 shares of TASER.  In December 2008, the records of DBSI show filled locates totaling 1 to 2.5 million shares each day, while the DTCC shows DBSI had less than 61,000 shares on deposit during this entire month.  DBSI redacted the lender information in its locate records, making it impossible to fully evaluate these suspect locates.

Defendants were also put on notice of irregular TASER trading activity through the stock's abnormal trading volume.  For example, in December 2004, failures to deliver TASER shares just within the NSCC system alone peaked at 8.1 million shares, with those failures attributable to Defendants such as Goldman

---

[188] DBSI-TASER 003213 – 3219.          **REDACTED**

Sachs. The short interest in TASER, which, in a market free of illegal and manipulative conduct, is assumed to be the **legally** shorted shares in the marketplace, was reported at 30 million shares or more than half of the 59 million shares TASER had outstanding in December 2004. Historically, a security's short interest averages between 2 and 3.5% of shares outstanding for stocks trading on the NYSE and NASDAQ. The consistently large number of fails and short interest in TASER during this time shows that TASER shares were in a constricted state of available supply.

Although Defendants knew that TASER securities were in a constricted state of supply, they continued to permit, facilitate and/or engage in extensive short selling of TASER securities for themselves and/or their clients. As a result, in December 2004 – when short interest was at approximately 30 million shares and the fails to deliver at the NSCC alone averaged approximately 5.4 million shares - 184 million shares of TASER securities (three times the number of shares outstanding in December 2004) were traded. This could not have occurred without Defendants' participation and unlawful conduct.

This pattern is seen again in January of 2005. In that month, there were approximately 107 million shares of TASER (twice the amount that were issued) sold short. Defendants, as market makers, took steps designed to conceal this fact. Although the fails to deliver in TASER appeared to decline at the NSCC by 60%

from December 2004 to January 2005, and the reported short interest declined 30% during the same time period, this apparent change was caused by Defendants' actions. For example, Defendant Goldman Sachs appears to have removed large fails to deliver from the NSCC system, accounting for the majority of the decline in the average daily fails of TASER within the NSCC.

Moreover, the extraordinary trade volumes in TASER illustrate the Defendants' illegal conduct. For example, on January 13, 2005, there were over 214,000 trades for 70 million shares of TASER stock, which constitutes 10.6 million more shares than were actually issued by TASER and, on average, over 9 trades of TASER stock executed every second during regular market hours. On this one day, 33% of all legally issued TASER shares were sold short in 59,000 transactions representing a value of $415,000,000. Between January 7, 2005 and January 13, 2005, TASER's trade volume was 249 million shares, a transactional value of over $4,500,000,000. In these five days, TASER's outstanding, validly issued 59.3 million shares turned over four times, which would result in an annual turnover rate of 211 times the TASER shares outstanding. This magnitude of trading is far greater than the average NYSE traded company's annual turnover, 1.03 times, and the NASDAQ average turnover, 2.6 times per year during the same time frame. Moreover, during this same time, Defendants' illegal actions

contributed to over 65 million newly traded short sales in TASER through 213,000 reported trades worth approximately $1,200,000,000.

In the month prior to a forward split effected on April 29, 2004, UBS[189] traded 91 million TASER shares or 42% of the total TASER trade volume on the NASDAQ market, when TASER had only 28.5 million shares outstanding.  The 91 million TASER shares transacted represented 3.2 times the total TASER shares outstanding.  During December 2004, UBS traded 48 million TASER shares or 25% of the total volume traded on the NASDAQ, with 24% of the volume as transactions involving a short sale.  In January 2005, UBS traded 94.4 million shares or 21% of the total TASER volume traded on the NASDAQ and over 1.5 times TASER's shares outstanding.  Of the total volume traded by UBS, 25% or 23.6 million shares were transacted short, which was 40% of TASER's shares outstanding.  In 2007, UBS traded 18% of the NASDAQ volume or 156 million shares, amounting to $2 billion worth of TASER shares.  From January 3, 2006 through July 31, 2009, the NASDAQ market alone shows UBS trading 17.3% of the share volume for TASER.

Merrill Lynch also engaged in significant volumes of TASER trades on behalf of its clients, and, in particular, on behalf of its largest trading client

---

[189] UBS also includes Schwab Capital Markets which was acquired by UBS.  *See* UBS Press Release, August 31, 2004, UBS to Acquire Charles Schwab's Capital Markets Division.

⸺     . According to the Equity Trade Journal, from January through June 2003, the "base" period prior to the manipulation period,          traded 1.8 million TASER shares or less than 1% of the total volume traded on the NASDAQ during the first six months of 2003. From July through December 2003, while TASER had a very stable supply of only 3 million shares outstanding,          traded 16.8 million shares.

From January 1, 2004 through February 10, 2004,          traded 7.5 million shares or 29% of the total TASER volume traded on the NASDAQ, while TASER had only approximately 4.2 million shares outstanding. This is a significant 29 day trading period because, of the 4.2 million shares outstanding, approximately 900,000 shares were owned by insiders, institutions owned 1.2 million shares and 1.15 million shares were reportedly delivered to cover short sales, leaving a very small number of shares available for free trading.

TASER's stock split 3 for 1 on February 11, 2004. During the period from February 11, 2004 through April 28, 2004, when TASER had between 12 and 14 million shares outstanding,          traded 81 million TASER shares during this 54 trading day period.

TASER's stock split 2 for 1 on April 29, 2004. From April 29, 2004 through November 26, 2004,          transacted 240 million shares or 21% of the total TASER volume traded on the NASDAQ market. Throughout these seven

months, TASER had only 29 million shares outstanding.  During the period

sold 28.6 million shares short to                    , a heavily advertised large retail

brokerage that caters to individual investors.

   TASER's stock split again 2 for 1 on November 29, 2004.  From November

29, 2004 through December 31, 2004,          traded 46.6 million TASER shares or

20% of the total volume traded on the NASDAQ, while TASER had 59.3 million

shares outstanding.          largest contra party remained             and

       sold 6.3 million shares of TASER short to              .  This trading

executed by         totaling 46.6 million TASER shares is only from the

NASDAQ, and additional activity may have taken place on other exchanges that

have not yet produced information in this case.

   During the entire year of 2004,          traded 375 million TASER shares,

acting in a capacity as principal for 68% of the trades.  In 2005,          continued

to trade high volumes of TASER shares.  For the year 2005,          traded 322

million shares or 21% of the total TASER volume traded on the NASDAQ market.

The volume of trades by          in a threshold security should have indicated a

potential problem to Merrill Lynch.

   The heavy trading discussed above is not expected to occur in a normal

supply and demand market that is free from the influence of illegal and

manipulative conduct (such as the market resulting from Defendants' illegal

actions here).  Indeed, absent the abundance of "supply" provided and created by Defendants' conduct in illegal short selling and fails to deliver of TASER stock, the trading in the market of TASER should have slowed down dramatically in January 2005 until the supply of shares issued by TASER and registered for sale by the SEC were brought into balance for settlement with the requirements of Regulation SHO.  TASER securities, however, were not quickly brought into balance because of Defendants' decision to continue to permit, facilitate and engage in unlawful short sales after being put on notice of irregular TASER trading.

Defendant market makers' willingness to conceal the large amount of short interest and to transact such heavy volumes exists at other points during the Time Period and illustrates the existence of illegal conduct.  Further, by permitting, facilitating and/or engaging in the direct participation in or facilitation of manipulation of TASER shares through this activity, Defendants were not bona fide market makers.  Accordingly, their actions in failing to possess shares for sale and failing to properly locate, borrow and deliver stock for settlement of short sale transactions results in violations of the law that harmed Plaintiffs.[190]

---

[190] *See* GSE_T01146066 ("Examples that would not constitute a 'bona-fide' market making" include "Activity that is related to speculative selling strategies of the broker-dealer and is disproportionate to the broker-dealer's usual market making patterns or practices" and "Transactions whereby the market maker enters

809005.1
Highly Confidential Pursuant to Protective Order

Plaintiffs note that the preceding response is based on a preliminary review of the limited data produced by Defendants to date and that additional data is necessary to understand the full extent of the improper trading.  For example, with respect to those Defendants for whom a response is being provided, there is important transactional activity that is missing, such as transactional activity from Goldman Sachs International and Goldman Sachs Funds Management.  That information is potentially important because                                           and                                           entered into a loan and borrow contract for shares of TASER on January 20, 2004 that appears to remain in effect today.  This contract has resulted in intra-company loans, at times exceeding 8 million shares borrowed/loaned between these accounts.[191]

In addition, information from other Defendants is necessary to understand the full conspiracy with regard to all of the Defendants.  For example, several transactions DBSI undertook in TASER stock are suspect and may evidence DBSI and the other Defendants' participation in illegal naked short selling activity:

- On October 22, 2004, Credit Suisse' blue sheets show an account of                                           sold long 50,000 shares at

---

into an arrangement with another broker-dealer or customer to use the market maker's exception to avoid compliance with the locate requirement").

[191] GS_TASER 001427-1429.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

$40.36 to opposing broker        .  Credit Suisse' blue sheets show

purchased 50,000 shares at $40.36, worth over $2 million, from a

               .  Both of these transactions were marked as a

"client request" in the Execution Trade Type column and both were

prime brokered by Credit Suisse.[192]

- On October 22, 2004, DBSI's blue sheets show an account

               with Credit Suisse as the prime broker sold

long 50,000 shares at $40.36 to an                    DBSI's

record also shows an account of Morgan Stanley as prime broker for

the account of                                which

purchased 50,000 shares at $40.36 from an opposing broker of

Both of these trades were executed Over-the-Counter.[193]

- In Morgan Stanley's Trade Runs, account

purchased 50,000 shares at $40.36 from contra broker        from an

account that was listed as a                    account.

This trade was marked as an ex-clearing transaction.  Also, Morgan

Stanley's records show account

---

[192] CSS-TASER 0014682.
[193] DBSI-TASER 003209.

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

purchased 50,000 shares at $40.36 from a

which was marked as an average price trade.[194]

- Activity in Credit Suisse' stock record for this settlement date show

in a new "short settlement position" of

50,000 shares and show an account for

short 50,000 shares.[195]

- DBSI's stock record for the settlement date shows 50,000 TASER

shares received from Credit Suisse into          account

and then          transferred the 50,000 shares to an account

of          The

record shows a delivery of the 50,000 shares to Morgan Stanley.[196]

- The 50,000 shares that were supposedly delivered to

in the DBSI record do not show up in the Morgan Stanley Summary

Stock Position Data.  The       accounts at Morgan Stanley that each

purchased 50,000 shares do not appear in Morgan Stanley's Summary

Stock Position Data.  The purchases do not appear to be held in any

other account.[197]

---

[194] MS_TASR_00003243 − 3261.
[195] CSS-TASER 0003191.
[196] DBSI-TASER 006506.                    **REDACTED**
[197] MS_TASR_00003266.

809005.1
Highly Confidential Pursuant to Protective Order

- In the NASDAQ Equity Trade Journal, the only transaction posted from the above series of trades was a cross transaction by         where         sold short 50,000 shares at $40.36. This trade was executed after the market closed, at 4:41 PM. DBSI acted as agent for both sides of the transaction and it was marked "not for clearing submission."[198]

- In the above transactions, the Defendants' blue sheets and trade runs indicate the transactions were long shares of TASER, when the trades reported on the NASDAQ were listed as a short sale. These transactions appear to be designed for the sole purpose of disguising the nature and value of the shares being sold. Further information is required to fully evaluate these transactions.

Information and data may also not have been produced by UBS. For example, Plaintiffs have inquired as to whether UBS has produced all of the TASER data relating to trades or transactions involving SCHB (a wholly-owned market marker). Plaintiffs informed UBS that according to NASDAQ's equity trade journals, from November 2004 through January 2005, there were over

---

[198] For additional examples of these types of transactions for accounts of HBK Investments, *see* DBSI's blue sheet records on September 23, 2004 and October 4, 2004. The transactions on September 23, 2004 are with prime brokers Goldman Sachs and Morgan Stanley for 25,000 shares. The transactions on October 4, 2004 are with prime brokers Citigroup and Morgan Stanley for 10,000 shares.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

130,000 TASER transactions involving SCHB. UBS has not yet responded to Plaintiffs' requests that it confirm that it has produced all SCHB TASER trading and transaction data.

Additionally, while UBS has produced some trading data from its affiliate UBS Financial Services, the information appears to be incomplete and is missing important fields of information, which Plaintiffs understand are generally maintained in the ordinary course of business. The data produced by UBS does not appear to include the short sale indicator, capacity, average price indicator, contra broker, account address information, clearing broker, or registered representative. Plaintiffs requested complete data from UBS but have not yet received it.

UBS also engaged in suspicious settlements within the NSCC's CNS System for which additional documentation is needed. On December 30, 2004, UBS transacted 5.1 million shares of TASER in the Equity Trade Journal, with 1.3 million shares transacted short. However, on settlement date in the CNS Accounting Summary, the UBS accounts were flat, *i.e.* they owed no shares and no one owed them shares.[199] Four trading days later, the same unusual market/settlement phenomenon occurs. On January 6, 2005, UBS traded 1.6 million shares of TASER in the Equity Trade Journal, with 466,000 shares transacted short. However, the CNS Accounting Summary shows the UBS

---

[199] DTCC 00000026.

809005.1
Highly Confidential Pursuant to Protective Order

accounts were flat on settlement date.[200]  These activities are suspicious due to the lack of supply of TASER shares available during the Time Period.  Due to the low supply of TASER shares and UBS's heavy trading of TASER, it is extremely unlikely and unusual that UBS would be flat at the end of any day.  The full record of UBS' trading is required in order to understand this trading activity and the flat accounts.

Further information and discovery is also required as to UBS's relationship with and large volume of short sales to certain retail brokerage houses.  The Equity Trade Journal shows that UBS consistently engaged in heavy volumes of TASER trading throughout the Time Period.  For example, in December 2004, UBS traded 26.3 million TASER shares (55% of UBS's total TASER volume that month) with             large retail brokerage houses that are heavily advertised to small individual investors.  UBS purchased 13.6 million shares long and less than 10,000 shares short from             , but UBS sold the two retail brokerages 8 million shares short.  It appears to be quite unusual that UBS would be such a heavy short seller to investors at these retail brokerage houses, which are mostly comprised of average American investors.  Further documentation is required to understand the nature of

**REDACTED**

---

[200] DTCC 00000026.

809005.1
Highly Confidential Pursuant to Protective Order

these agreements and why there is such an imbalance of short TASER shares being sold by UBS to these discount retail firms.

UBS and            together are the largest traders of TASER in 2004 and 2005 and are both large trading partners to            . Remarkably, in just January 2005, after the implementation of Regulation SHO, which was designed to curb abusive short selling, UBS and            bought 543,000 shares, which were sold short from            , but sold over 15 million shares short to in these 20 trading days.

In the NASDAQ Equity Trade Journal in January 2005,            executed 93,652 transactions with            but in Merrill Lynch's blue sheets for January 2005, Knight is listed as executing only 233 transactions with            . In the Equity Trade Journal,            traded 45 million shares of TASER with            but in Merrill Lynch's blue sheets,            traded only 29.3 million TASER shares with            .

Of the 233 total trades in Merrill Lynch's blue sheets between            , there were 48 block trades comprising 29.1 million shares of the reported 29.3 million shares in Merrill Lynch's blue sheets.  Shorted shares by            in the Equity Trade Journal totaled 9.1 million shares, but Merrill Lynch's blue sheets show only a total of 31,679 shorted shares.  Merrill Lynch's blue sheets, which were transmitted to regulators, do not reflect the reality

of trades undertaken by Merrill Lynch and its clients and created misleading and incorrect information that was disseminated to others.

In addition, further information is necessary from Goldman Sachs.  Plaintiffs have requested data from GSFM and additional data related to

account(s).  Between 2003 and 2007, GSFM filled affirmative determinations for more than 8.8 million TASER shares.  GFSM provided locates for hedge funds expressly identified in Plaintiffs' these interrogatory responses, including                                     .  It also provided them to

in 2007.  Moreover, Goldman's trade history report for options shows that         traded over 1 million TASER shares. But, Goldman has not producing any trading data from GSFM. Additionally, there are over 814 transactions in Goldman's TASER trade history report where the account                          was on the opposite side of the

account in transactions.  Plaintiffs have requested additional information on these trades, but Goldman has not yet provided it.


Banc of America's blue sheet production likewise appears to be incomplete or does not contain certain information.  For example, Banc of America's blue sheets show transactions for 128 million TASER shares from January 2, 2003

REDACTED

through March 16, 2009.[201]  This volume of shares was not transacted through Banc of America as trades in the marketplace.  The NASDAQ Equity Trade Journal, the only market that Plaintiffs have received trade-by-trade information from to date, shows Banc of America trading only 12.3 million shares in the same time period.  It appears that the majority of the trading by Banc of America was executed at trading venues other than the NASDAQ, the primary market where TASER trades.  Moreover, Banc of America's blue sheets show transactions of 9 million TASER shares with a name                         in the column for the account.[202]  The blue sheet column indicating the exchange where these transactions were executed is 90% empty.

These instances show why complete records from each of the Defendants must be provided before Plaintiffs are able to provide a full and complete response to this Interrogatory with regard to any single Defendant.

Other than the missing affiliate records, certain records appear to be missing data fields that are required to properly account for transactions.  These missing data fields are collected by other dealers in their normal course of business.  For example,              options trades are found in the Goldman Sachs Execution

**REDACTED**

---

[201] BAS-TASER_0001644 – 1649.
[202] BAS-TASER_0001644 – 1649.

& Clearing Legacy FOC Trade History Report for options.[203]  From March 30, 2004 through August 4, 2005,                   traded 351 options trades for 305,515 contracts, representing 30,551,500 shares of TASER.  93% of the contracts were traded between June 21, 2004 and January 24, 2005.  These reports appear incomplete because they do not contain normal options fields that are collected by other dealers in their normal course of business.  Cancelled transactions have not been removed from these numbers because there is no column indicating cancelled trades.  Columns M through V appear to be missing in these databases.  Examples of the missing columns can be found in Goldman Sachs Execution & Clearing Legacy SLK Trade History Report for options: GSEC_TASR 000017.  The examination of the Goldman Sachs options activity remains incomplete without this information.

Bear Stearns has also produced incomplete information even though it appears that the information is available.  For example, the Bear Stearns blue sheets produced to Plaintiffs list many trades where the account name and address fields state "Information Unavailable."  However, the fields listed in Bear Stearns' production to Plaintiffs as "Information Unavailable" have been provided to NASD in response to regulatory requests.  *See* Bear-T00027826.

---

[203] Part 1, dates 3/22/2004 – 5/30/2007: GSEC_TASR000015; Part 2, dates 6/1/2007 – 5/20/2009: GSEC_TASR000016.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

Bear Stearns has also engaged in suspicious trading activity which cannot be entirely examined on the basis of the current record.  For example, Bear Stearns'

traded over 80

million TASER shares from April 7, 2004 through May 27, 2008, representing purchases of 40.1 million shares and sales of 40.1 million shares of TASER.  The cessation of trading is significant as it is the very day this lawsuit was filed.  Of these transactions, 22.1 million TASER shares were sold short, worth $321.4 million.  As Bear Stearns' Daily Stock Records do not reflect an imbalance of 17.9 million shares waiting to be delivered, it is unclear, based upon the current record, why this short position was necessary.

Moreover, Bear Stearns' metrics with regard to TASER trading appear to be out of balance such that further inquiry and documents are necessary to fully evaluate them.  According to trading information provided by NASDAQ, Bear Stearns engaged in 13,000 transactions in TASER stock with

for 11.9 million shares, worth $231.9 million,  Bear Stearns sold short 3.4 million

TASER shares to                   .  These trades were undertaken in Bear

Stearns' capacity as                              [204]

---

[204] Merrill Lynch likewise engaged in suspect              transactions for which additional information is required.  According to the NASDAQ Equity Trade Journal, Merrill Lynch traded 22.1 million shares with a
In total, Merrill Lynch purchased 10.9 million long shares from a

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

Bear Stearns also traded with         as buyer and seller in 2,305 transactions of TASER stock, totaling 1.8 million shares, with 83% of the volume transacted as short sales.   The vast majority, nearly 99% of these trades, involved Bear Stearns trading with

In total, Bear Stearns purchased 15.7 million TASER shares from and sold 14.8 million TASER shares to its four biggest trading partners (

). Only 11% of these shares purchased were short sales, but Bear Stearns sold short 9.8 million TASER shares (66% of the 14.8 million shares sold to its largest trading partners).

As another example, Morgan Stanley's Trade Runs show unusual transactions for hedge funds, including for                          , a large hedge fund and client of both Morgan Stanley and Goldman Sachs.  On August 28, 2007,

short sold a total of 175,466 shares at $13.72 to a                    Then,

short sold 175,466 shares at $13.72 to        This trade is

with zero short shares purchased, but Merrill Lynch sold 7 million short shares to a                   Banc of America also has a number of transactions involving                every 1 out of 5 shares Banc of America listed in the Equity Trade Journal.  As with other Defendants who traded with
, these transactions appear to be out of balance on the short side of the trades and require further inquiry.

marked as an ex-clearing transaction.[205]  No         affiliated accounts were

posted with positions in Morgan Stanley's stock record for these trades.[206]  Only

the NASDAQ has produced exchange trade by trade data, which does not show

these trades, therefore the full audit trail for these transactions is not available and

conclusions about these transactions are pending further discovery.

   As another example, on April 25, 2007,

                              short sold 103,252 shares at $8.09 to

   short sold 5,146 shares at $8.08 to a                    and

                  short sold 103,252 shares at $8.09 and 5,146 shares at

$8.08 to                   , a total of 108,398 shares.  These trades were

marked as ex-clearing transactions.  Then

              short sold 108,398 shares at $8.09 to

                  purchased 108,398 long shares at $8.09

from                        [207]

   Morgan Stanley's Trade Runs show other illustrations of unusual trading by

hedge funds.  For example, on July 12, 2007,              sold long 300,000

shares at $15.72 to              This trade is marked as an ex-clearing

_____

[205] MS_TASR_00003243 – 00003261.
[206] Summary Stock Position Data, MS_TASR_00003266 – 3268.
[207] MS_TASR_00003243 – 3261.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

transaction. On the same day.



sold a total of 300,000 shares long at $15.72

to a [              ].[208]  None of the [              ] affiliated accounts were

accounted for in Morgan Stanley's stock record for these trades.[209]

On January 2, 2008, [              ] sold 80,000 long shares at $14.19

to [              ]. This trade is marked as an ex-clearing

transaction.  On the same day,

sold a total of

80,000 shares long at $14.19 to a [              ].[210]  None of the

affiliated accounts were accounted for in Morgan Stanley's stock record

for these trades.[211]

Similarly, there is movement in Morgan Stanley's Daily Stock Activity

Report that is not reported in their Trade Runs[212] or their stock record.[213]  For

example, this movement involves five account numbers beginning with [              ].[214]

On twenty nine trading days ranging from April 9, 2007 through August 22, 2007,

---

[208] MS_TASR_00003243 − 3261.
[209] MS_TASR_00003266 − 3268.
[210] MS_TASR_00003243 − 3261.
[211] MS_TASR_00003266 − 3268.
[212] MS_TASR_00003243 − 3261.
[213] MS_TASR_00003266 − 3268.
[214] MS_TASR_00003263.

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

the record shows Morgan Stanley debiting TASER shares from these accounts and crediting TASER shares to these accounts totaling 1.6 million shares on a rolling basis with each account either being debited or credited the same quantity of shares for each activity date.

On May 22, 2007, accounts prefaced "⸱          ⸴" were being offset by account ⸴, which is the account for

These appear to be offsetting journal entries that are accounting for TASER stock transactions that do not show up in the Morgan Stanley stock positions record. Considering just the            ⸴          account data on May 22, 2007, almost 4 million TASER shares are included by Morgan Stanley that are not accounted for in Morgan Stanley's Summary Stock Position Data.

Considering this record, it appears that there are TASER transactions not connected to Morgan Stanley's stock record, indicating that the full record has not been produced, and Plaintiffs thus cannot fully respond to this Interrogatory at this time. Similarly, there are transactions between Morgan Stanley and ⸴ that may reflect illegal short sales, but documents from ⸴ have not yet been produced.

This hedge fund activity at Morgan Stanley does not appear to reconcile with their stock record.  It is yet to be explained where or how Morgan Stanley is accounting for these types of trades.  Morgan Stanley has been asked about the

trading with blank contra parties, but has not responded to date.  Morgan Stanley is not the only Defendant with a pattern of trading for certain clients with an unknown/blank contra party to the trades.

Banc of America likewise participated in suspect transactions on behalf of its hedge fund clients.  For example, on February 12, 2004,

sold short 81,900 shares at $58.43 to

ʿthen sold long the 81,900 shares at $58.16 back to

On June 25, 2004, a different account of ⸱

transacted the same type of trade.                    short sold 31,900

shares at $40.31 to

Then, the                                                           sold long

the 31,900 shares back to ʾ                    at $41.69.

On November 26, 2004, hedge fund                    ⸱sold short

15,000 TASER shares at $46.94 with ⸱              as the contra broker.

purchased and sold the 15,000 shares long at $46.94, with

⸱ Banc of America account                    purchased the

15,000 shares long at $46.94.  For additional examples of these types of

Highly Confidential Pursuant to Protective Order

**REDACTED**

transactions of                     see Banc of America's records for January 7th,

10th, 11th and 13th, 2005.

On January 13, 2005,                                    *sold short* 25,300

shares at $21.51 to                          Then,

Group *sold long* the 25,300 shares at $21.19 to                  . For

additional examples of these transactions between

see November 17, 2004, December 7, 2004, January 10, 2005 and

January 12, 2005.

On March 28, 2005,                          *sold short* 12,800 shares at $13.23 to

for the account of

Then,

*sold long* 12,800 shares at $13.23.

On March 17, 2006,                          *sold short* 140,300 shares at

$10.12, with                       as its own contra broker.  These shares were

transacted *long* through three other accounts within the books and records of

before being sold to                   a)

purchased and *sold long* 140,300 shares at $10.12, with Banc

of America as the contra broker for both the purchase and sale transactions; b)

REDACTED

purchased and *sold long* the 140,300 shares at $10.12; and c)

purchased 140,300 shares at $10.12 and then *sold long* the 140,300 shares at $10.18 with Bear Stearns as the contra broker.  In Bear Stearns blue sheets there is a *long sale* for 140,300 shares at $10.18 for

. Bear Stearns is listed as both the executing broker and the contra broker, but Banc of America is listed as the prime broker for the transaction.[215]  This series of transactions appears to show Banc of America creating short shares that were sold long after the shares were washed through accounts.

Merrill Lynch also engaged in suspicious trades involving mutual funds.  Prior to July 24, 2003, institutional money manager                 bought and sold a small amount of TASER's stock in three trades through Merrill Lynch.  On July 24, 2003, on behalf of

began a buy and hold strategy in TASER.  In Merrill Lynch blue sheets,                 sold 70,000 shares at $15.68 for $1,097,502 to

[216]  The NASDAQ Equity Trade Journal shows the sale was then split by Merrill Lynch's largest trader,             into four blocks.             sold the 70,000

---

[215] Bear-T00027747.

[216] ML-TASR0052916 – 52922.

**REDACTED**

shares long to a                  at an average share price of $15.68.  The

following day, July 25, 2003, Merrill Lynch sold 12,400 shares to           at

$16.00 for $198,400.  The trade had the same characteristics as the 70,000 share

block.                  sold to a                  12,400 shares at $16.00.  In this

case, the                  to           is known to be                  .

According to the Equity Trade Journal and Merrill Lynch's blue sheet records,

           purchased 70,000 long shares.  However, Merrill Lynch failed to

deliver these shares to           as is evidenced by the fail account[217] in Merrill

Lynch's Position Stock Record.[218]  These particular trades failed to deliver,

resulting in the sale of stock not owned as if TASER had issued the securities when

it in fact had not.

There are similar trades in the Merrill Lynch record between mutual funds

and institutions that are executed with blank contra parties.

Bear Stearns likewise engaged in unusual options trades for hedge fund

clients.  On March 30, 2004,                  , through Bear Stearns as the

executing broker, and a                  conducted the following series of

options trades in a                  : a) purchased 10 contracts

and 3 contracts (both of which were cancelled); and b) sold 10 contracts and 3

---

[217] Merrill Lynch's failures to deliver or receive TASER common stock within the
CNS system is Account #

[218] ML-TASR0002020-2069                    **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

contracts (both of which were cancelled).                          through Bear Stearns as

executing broker and contra party then executed the following options trades: a)

purchased 13 contracts (uncancelled); and b) sold 13 contracts (uncancelled).

then sold 1,300 TASER shares long to                          as if the shares

were owned by            , issued by TASER and registered for sale by the SEC,

although these shares do not appear to have been registered or issued.  Bear

Stearns' stock record also reflects that            had a short position of 1,300

shares on the trade settlement date.  Bear Stearns executed the above transactions

knowing that the shares it purported to purchase were not long.

Banc of America likewise engaged in options trades designed to unlawfully

mask short sales.                          was the largest options trader in Banc of

America's options blue sheet record.[219]  On at least two occasions, options trades

for                          were hedged with an equity transaction that was illegally

sold long in Banc of America's equity blue sheets.

On May 31, 2006,                          entered into a call option contract

representing 555,000 shares and entered into a put option contract representing

555,000 shares, both on the NYSE Amex.[220]

, was the contra broker to Banc of America for both transactions.  The Banc of

---

[219] BAS-TASER_0001644 – 1649.

[220] Banc of America's options blue sheet record: BAS-TASER_0001644 – 1649.

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

America blue sheets also show an equity trade *sold long* by         for 555,000 TASER shares, worth $5.1 million, on the NYSE. Shares sold as a hedge against an option contract are shares not owned by the seller. Therefore, they are short shares that cannot be sold long. This constitutes violations of Regulation SHO Rule 200.

The OCC record does not show the above transactions, which indicates that the option trades were cancelled.[221] However, it does show six transactions comprising the same 555,000 shares at the same price for both put and call options between Banc of America and Merrill Lynch. Although Banc of America's options blue sheets should show these options trades, they do not. The OCC shows a "Clearing Member Trade Agreement" between Merrill Lynch and for these trades.

The OCC data shows these same trades executed again by Merrill Lynch and . The options data of Merrill Lynch (which has not been fully produced) should reflect these transactions. These Merrill Lynch offsetting transactions were market neutral such that there was no risk associated with the trading. Without market risk there should be no hedge to the option position and the 555,000 shares should not have been sold because the option trades could not be legally hedged.

---

[221] Transactional History Data: OCC00000001 – 136.

Next, a purported hedge was created for the 550,000 shares and purchased long 550,000 shares from                              ,                              Banc of America's blue sheets do not show the 555,000 share transaction, but do show an equity trade *sold long* by a                     account for                    of 555,000 TASER shares, worth $5.1 million to broker

At this time, it appears that through this series of complex sham options transactions, Banc of America created 1,110,000 shares of TASER through the use of non bona fide transactions and sold these shares long, as if TASER issued and the SEC had registered the shares for sale.

Another example of shares hedged with options transactions is on January 16, 2008.  Banc of America records show                     entered into a call option representing 543,900 shares and entered into a put option representing 543,900 shares.                     was the contra broker to both of these options trades.                     *sold long* 543,900 TASER shares, worth $6 million, to Banc of America account                     who sold the shares long to                     in the equity blue sheets.  Additional documents are needed to fully evaluate this trade, but it appears that the shares that should have been sold short were instead sold long and that the 543,900 illegal long shares were sold twice through                     **REDACTED**

DBSI similarly appears to have engaged in apparent sham option transactions involving TASER securities through            , which conduct constitutes illegal naked short selling activities.  DBSI's option blue sheet production[222] reflects several accounts associated with the            , each of which were involved in the following suspicious options transactions with DBSI's assistance.  The execution of these transactions was not reported in the Options Clearing Corporation data.[223]  On at least two particular occasions, DBSI facilitated apparent improper options transactions involving            funds.

First, on November 3, 2006, accounts affiliated with            purchased the following series of options transactions from            [224]  The record produced to the plaintiffs by            does not show these options transactions.[225]            sold the same options contracts to            .  The price of these options contracts were between $0.14 and $0.15.  All of the options transactions had a strike price of $55.00 and expired on February 16, 2008, 16 months after the option trade date.  TASER's trading price was below $9.00 on this trade date.  This option

---

[222] DBSI-TASER 003211.

[223] OCC00000124.

[224] Notably, Goldman Sachs Execution's documents, GSEC_TASR00015 – 17, do not show these options transactions.

[225] Goldman Sachs Execution's Trade History Reports for options: GSEC_TASR00015 – 17.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

was significantly, in industry terms, 'out of the money.'  In total,



collectively *purchased* options totaling 4,000 contracts (representing

400,000 shares) of TASER from

collectively *purchased*

options totaling 4,000 contracts of TASER from

*sold* options totaling another 4,000

contracts of TASER to

Second, on February 13, 2008,        related accounts executed similar

options as the above described transactions.  DBSI executed these transactions for

just two days before the option expired.  DBSI's blue sheets[226] show that

collectively *purchased*

options totaling 461 contracts of TASER from

---

[226] DBSI-TASER 003211.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

collectively *purchased* options totaling 461 contracts of TASER from

*sold* options totaling

461 contracts of TASER to                          In

*purchased* 461

options contracts in one transaction from

also *purchased* 13 option transactions totaling 461 option contracts

from a                    .[227]   The price of these options contracts was $0.60.  All

of the options transactions had a strike price of $12.50 and expired 3 days after the

transactions on February 16, 2008.  TASER's average price on this trade date was

$12.37.

DBSI also appears to have engaged in improper conduct by netting short

sale transactions.  As one example, from January 8, 2008 to February 7, 2008,

sold short 448,542 shares of TASER, worth over $5

million.  On the settlement date at the beginning of these transactions,

position in DBSI's stock records was zero,[228] and for 16 of these 21 days,

DBSI's records reflected a position of zero, despite of the fact that almost 450,000

[227] GSEC_TASR00017.
[228] DBSI-TASER 001791 – 1794.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

shares had been sold short.[229]  On the five days the position was shown in DBSI's stock record, DBSI journaled it out the next day to bring the position back down to zero.  These transactions were booked in a DBSI short sale account and netted to another account in order to produce the zero balance.  More information is required from DBSI in order to determine what happened with these transactions after they were netted in DBSI's records.  This does not appear to be the only account that DBSI is netting positions on behalf of in their stock record.

Additional red flags at DBSI are found in another type of interaction between               within the records of DBSI.  In DBSI's equity blue sheet records,            constantly balances its purchases and sales with        .  These balancing transactions exhibit the same characteristics each time.

For example, on September 29, 2004,    *purchased* 54,700 TASER shares in 113 transactions at an average price of $35.38, worth $1.9 million.  These trades were executed on the NYSE Arca.

            *sold* 54,700 TASER shares at $35.38 in one transaction. This transaction was executed Over-the-Counter.

*purchased* 54,700 TASER shares at $35.38 in one transaction.  This transaction

**REDACTED**

---

[229] DBSI-TASER 001870 – 1872.

809005.1

Highly Confidential Pursuant to Protective Order

was executed Over-the-Counter.  None of these transactions had an opposing broker reported.

As another example, on February 13, 2006, sold short 62,300 TASER shares at $9.91 in one transaction.  This transaction was executed Over-the-Counter.  *purchased* 62,300 TASER shares at $9.91 in one transaction.  This transaction was executed Over-the-Counter.  *sold short* 62,300 TASER shares at an average price of $9.91 in 82 transactions.  These trades were executed on the NYSE Arca.  None of these transactions had an opposing broker reported.

Similar transactions involving this apparent improper activity with continue nearly every day in DBSI's records from September 27, 2004 through July 11, 2007, a total of 360 trading days.  Moreover, DBSI's stock record does not reflect delivery or receipt of shares for any of these trades.  They appear to be journal entries that net to a zero balance position each day.  The transactional value through the account exceeds $100 million.  Because DBSI did not produce the requested 'chart of accounts' for its stock record, further information is required to fully evaluate each of these suspect transactions.

This conduct of the Defendants results in violations of Section 5 of the Securities Act, Regulation SHO Rule 200(g) and Section 10(a) of the Exchange

Act and Rule 10a-1(a) thereunder. The above-described transactions also appear to be an improper attempt to marry an equity sale of stock to an option trade. Illegal married options have been executed for many different trades in TASER, with the end result of a creation of TASER shares which did not exist prior to the option transaction. As the SEC held:

> We find the use of married put transactions as a part of these strategies <u>particularly troubling</u> because they represent an attempt to facilitate the <u>very kind of abuse that Rules 10a-1 and 105 are designed to prevent</u>…
>
> We are issuing this guidance to address married puts that are used as part of an attempt to create a "long" position for the purpose of circumventing Rules 10a-1 and 105. Such transactions usually have some or all of the following characteristics (or a variation of them):
>
> - the purchase of an at- or in-the-money non-standardized put option with a brief (1 to 5 day) expiration period,
>
> - the <u>contemporaneous purchase</u> of an equivalent number of shares of the same security,
>
> - the <u>contemporaneous sale</u> of the stock acquired with a married put, in essence <u>divorcing the stock position from the put option</u>,
>
> - the <u>repeated</u> use of a "facilitator" that <u>sells both the puts and the "long" position</u> (often by ***<u>selling the stock short to the counterparty</u>***),
>
> - the "netting out" of the transaction between the facilitator and the counterparty, <u>often at the end of the day the married put was purchased</u>, and
>
> - the payment of a standardized fee, not calculated in accordance with a standard options pricing model, <u>to the facilitator for the transaction</u>.

809005.1
Highly Confidential Pursuant to Protective Order

The net result of these transactions is that there is minimal or <u>no economic risk to the married put purchaser or the party facilitating the married put.</u>  These married puts are distinguishable from other paired positions of stock and options where each component is <u>intended to offset the risk of the other</u>. In those cases, both sides of the position are held for a period of time, and the stock and options are priced at market levels.

Married puts with the characteristics described above are <u>sham transactions</u> that do not give rise to security ownership under Rule 3b-3.  Therefore, sellers who use these types of married puts may violate Rule 10a-1 and Rule 105.  Moreover, if sham married puts are used as part of a fraudulent or manipulative scheme, the conduct may also violate the Commission's anti-fraud and anti-manipulation provisions, including, but not limited to, Sections 9(a) and 10(b) of the Exchange Act."[230]

Moreover, Bear Stearns' blue sheets show that

ᛁ, on behalf of                          and other clients, engaged in 7,479 option

transactions in TASER through Bear Stearns from March 29, 2004 through April

24, 2008.  These contracts, representing 17 million TASER shares and valued at

$34 million, were all later cancelled.  Although the options transactions are listed

in Bear Stearns' records as executed on a national exchange, they were cancelled

on Bear Stearns books with a code for "Other" exchange.

Defendants have also engaged in transactions in their own internal accounts

that do not appear to be legitimate.  For example, Bear Stearns' blue sheets show

---

[230] SEC Interpretive Release, Commission Guidance on Rule 3b-3 and Married Put Transactions 17 CFR Part 241 Release No. 34-48795, available at http://sec.gov/rules/interp/34-48795.htm.

that an account titled                                        · engaged in 118

distinct TASER options trades from April 12, 2004 through April 22, 2005,

representing almost $12 million in options contracts, each of which was

cancelled.[231]  Although these transactions were executed on the NYSE, AMEX or

PHLX markets, they were all cancelled on "Other" exchanges.  Each cancelled

option contract was executed by Bear Stearns and            also acted as the

contra party.

Moreover, inaccuracies in data provided by the Defendants cannot currently

be fully investigated without the provision of underlying data.  As one example,

Bear Stearns' blue sheets report prices for stock far different than the market price

on the same date.  On December 27, 2004 and December 29, 2004, Bear Stearns'

blue sheets contain twenty five trades below the lowest market price, which was

$27.55.  These trades, totaling 868,500 shares of TASER, transacted as low as $5,

and appear to be in error.[232]  Absent the production of Bear Stearns' trade runs,

these apparent inaccuracies cannot be confirmed or resolved.  Alternatively, if

these are actual transactions and not blue sheet reporting errors, they must be

internalized transactions that were not reported to the marketplace.[233]

**REDACTED**

---

[231] Bear-T00027748.

[232] Bear-T00027746-27747.

[233] *See, e.g.*, SEC v. Sharon M. Graham, Stephen C. Voss and James J. Pasztor
(December 28, 1995) ("Purchasers in over-the-counter as well as the Exchange

In further response to this Interrogatory, Plaintiffs state that the information requested may be obtained by Defendants and is within Defendants' possession or may be located in the documents identified above, and, pursuant to O.C.G.A. § 9-11-33(c), the burden of deriving or ascertaining the answer is substantially the same for Defendants and the Plaintiffs.

Plaintiffs expressly reserve the right to supplement their response to this Interrogatory as discovery continues and when expert discovery commences. Rather than restate Plaintiffs' experts' position in this Interrogatory, Plaintiffs' expert discovery is hereby incorporated into this response.

**Interrogatory No. 3.     Please identify each public relations firm used by plaintiff TASER during the Relevant Time Period, and the dates during which TASER was a client for each of those firms.**

**RESPONSE NO. 3**

Plaintiffs object to this Interrogatory as overly broad and not reasonably tailored to lead to the discovery of admissible information in that it is not limited to the factual matters at issue in this case and is, in fact, not limited to any topic for which a public relations firm may have been hired at all.  Plaintiffs further object to this Interrogatory on the grounds that the definition "public relations firm" is

---

market are entitled to believe that the Exchange market price which governed the price charged them represents a price established in an independent market free of artificial devices.  This would by implication require that all transactions be reported and be subject to, as well as effect, the competitive market.") (internal citations and quotations omitted).

overly broad in that it may be read to include attorneys and others who advocate on behalf of their clients. No attorneys or law firms will be identified in response to this Interrogatory. Plaintiffs also object to this Interrogatory on the grounds that the information sought is already in the possession of Defendants to the extent that non-privileged communications between TASER and its public relations firm(s) was previously produced, Defendants can obtain the identification of any such firm from documents already in their possession pursuant to O.C.G.A. § 9-11-33(c).

The Individual Plaintiffs object to this Interrogatory and state that they will not provide any answer other than their objections because the Interrogatory does not appear to be directed towards them and they do not have the information necessary to respond to this Interrogatory.

Subject to its objections as stated above, TASER responds to this Interrogatory as follows: TASER has worked with the following public relations firms during the applicable time period:

- Public Strategies, Inc., P.O. Box 846, San Antonio, TX 78293 (November 2001 – October 2005);

- Dittus Communications, 1150 17th Street, NW, Suite 701, Washington, DC 20036 (March 2005 – July 2008);

- Ashton Partners, LLC, 33 N. LaSalle, Suite 1800, Chicago, IL 60602 (December 2007 – present);

- Moses Anshell, 20 W. Jackson St., Phoenix, AZ 85003 (June 2007 – present);

- Kragie Newell Advertising LLC, 2633 Fleur Drive, Des Moines, IA 50321

  (August 2008 – present).

**Interrogatory No. 4**   **For each Plaintiff, please describe (including date, place, and person, where applicable) each fact that You believe supports the allegation that the Plaintiff was directly injured by a predicate act allegedly committed by each Defendant under the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-15-1** *et seq.*

## RESPONSE NO. 4

Plaintiffs respond by reference to and incorporating herein all of their

objections (including General and specific) to Interrogatory Nos. 1 and 2 as if fully

restated herein.

Plaintiffs also object to Interrogatory No. 4 to the extent it seeks a legal

conclusion or attorney work product, and on the ground that it is overly broad and

unduly burdensome.  Indeed, Plaintiffs cannot be expected to, and are not required

to, write down each fact (including date, person and place) showing Defendants'

liability, particularly when such evidence is contained within the millions of

documents and items of data Defendants have produced.  Consequently, Plaintiffs'

response will be a general summary as opposed to a list of every item of evidence.

Subject to these objections, Plaintiffs respond by reference to and

incorporating their substantive responses to Interrogatory Nos. 1 and 2 as if fully

set forth herein.  Plaintiffs further respond by stating that the Defendants' predicate

809005.1
Highly Confidential Pursuant to Protective Order

acts include, but are not limited to, violations of the Georgia Securities Act, theft

by taking under O.C.G.A. § 16-8-2, theft by deception under O.C.G.A. § 16-8-3,

violations of the Georgia Computer Systems Protection Act under O.C.G.A. § 16-

9-93, acts involving theft and dealing in securities defined as racketeering activity

by O.C.G.A. § 16-14-3(9)(B) and false swearing and perjury under O.C.G.A. §§

16-10-70 and 16-10-71.

Plaintiffs expressly reserve the right to supplement their response to this

Interrogatory as discovery continues and when expert discovery commences.

## RESPONSES TO THIRD REQUESTS FOR PRODUCTION OF DOCUMENTS

**1.     All documents relating to any transaction or instance of alleged "illegal short selling" identified in response to Interrogatory Nos. 1 and 2.**

## RESPONSE NO. 1

Plaintiffs object to this Request on the grounds that it is overly broad,

burdensome and oppressive because it is duplicative of previous Requests served

upon Plaintiffs.  Plaintiffs also object to this Request because many of the

responsive documents are already in the possession of the Defendants, either

because they are Defendants' own documents or Plaintiffs have previously

produced them to the Defendants, and Plaintiffs will not reproduce those

documents to Defendants which Defendants already have.  TASER objects to this

Request on the grounds that the Defendants agreed to search terms for TASER's electronic information and TASER has previously conducted the searches and produced the responsive, non-privileged information responsive to those searches. To the extent that this Request seeks to require TASER to undertake another search in addition to the key word searches already undertaken, TASER objects to doing so. Moreover, the Plaintiffs object to this Request because it seeks the production of documents concerning expert discovery in advance of the deadlines set by the Court. Finally, Plaintiffs object to this Request because the definition of "all documents" is overly broad and includes, for instance, privileged communications and attorney work product undertaken in the prosecution of this lawsuit. No such privileged materials will be provided. Plaintiffs are willing to confer with Defendants to the extent that Defendants believe that there are documents which would be responsive to this Request that are not privileged, expert discovery, already within the Defendants' possession or not otherwise captured by the keyword searches already undertaken.

**2.     All Communications with any public relations firm identified in response to Interrogatory No. 3 during the Relevant Time Period regarding short selling, the price of TASER common stock or the possible effect of any event, announcement or occurrence on the price of TASER common stock.**

**RESPONSE NO. 2**

The Individual Plaintiffs object to this Request on the grounds that it does not appear to be directed towards them and they accordingly need not respond. The Individual Plaintiffs also incorporate TASER's objections below as if fully stated herein.

TASER objects to this Request on the grounds that it is overly broad, burdensome and oppressive because it is duplicative of previous Requests served upon Plaintiffs.  TASER further objects to this Request because many of the responsive documents are already in the possession of the Defendants because TASER has previously produced them to the Defendants and TASER will not reproduce those documents to Defendants which Defendants already have. TASER objects to this Request on the grounds that the Defendants agreed to search terms for TASER's electronic information and TASER has previously conducted the searches and produced the responsive, non-privileged information responsive to those searches.  To the extent that this Request seeks to require TASER to undertake another search in addition to the keyword searches already undertaken, TASER objects to doing so.  Finally, TASER objects to this Request because the definition of "all Communications" is overly broad and includes, for instance, privileged communications and attorney work product undertaken in the prosecution of this lawsuit.  No such privileged materials will be provided.

TASER also objects to this Request on the grounds that it seeks the production of

809005.1
Highly Confidential Pursuant to Protective Order

documents from third parties (and not just TASER itself) and Defendants have not undertaken to or provided any such documents from any third party in response to Plaintiffs' requests.  TASER is willing to confer with Defendants to the extent that Defendants believe that there are documents which would be responsive to this Request that are not privileged, already within the Defendants' possession or not otherwise captured by the keyword searches already undertaken.

     3.    **All other documents that support or relate to your response to the above Interrogatories.**

## RESPONSE NO. 3

Plaintiffs object to this Request on the grounds that it is overly broad, burdensome and oppressive because it is duplicative of previous Requests served upon Plaintiffs.  Plaintiffs also object to this Request because many of the responsive documents are already in the possession of the Defendants, either because they are Defendants' own documents or Plaintiffs have previously produced them to the Defendants, and Plaintiffs will not reproduce those documents to Defendants which Defendants already have.  TASER objects to this Request on the grounds that the Defendants agreed to search terms for TASER's electronic information and TASER has previously conducted the searches and produced the responsive, non-privileged information responsive to those searches. To the extent that this Request seeks to require TASER to undertake another search

in addition to the key word searches already undertaken, TASER objects to doing so.  Moreover, Plaintiffs object to this Request because it seeks the production of documents concerning expert discovery in advance of the deadlines set by the Court.  Finally, Plaintiffs object to this Request because the definition of "all documents" is overly broad and includes, for instance, privileged communications and attorney work product undertaken in the prosecution of this lawsuit.  No such privileged materials will be provided.  TASER further objects to this Request on the grounds that it is duplicative of Request No. 2 and incorporates its response to Request No. 2 as if fully stated herein.  Plaintiffs are willing to confer with Defendants to the extent that Defendants believe that there are documents which would be responsive to this Request that are not privileged, expert discovery, already within the Defendants' possession or not otherwise captured by the keyword searches already undertaken.

Respectfully submitted this 16th day of August, 2010.

John E. Floyd
Georgia Bar No. 266413
Steven J. Rosenwasser
Georgia Bar No. 614908
Nicole G. Iannarone
Georgia Bar No. 382510
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.

Atlanta, Georgia  30309-3417
(404) 881-4100 Tel.
(404) 881-4111 Fax

James W. Christian
State Bar No. 04228700
Gary M. Jewell
State Bar No. 10664800
Scott R. Link
State Bar No. 12390900
Christian, Smith, & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas  77002
(713) 659-7617 Tel.
(713) 659-7641 Fax
(admitted pro hac vice)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2010, a true and correct copy

of the foregoing **PLAINTIFFS' AMENDED RESPONSES TO**

**DEFENDANTS' SECOND SET OF INTERROGATORIES AND THIRD**

**REQUEST FOR PRODUCTION OF DOCUMENTS TO ALL PLAINTIFFS**

was served via U.S. Mail and email to:

> **Attorneys for Defendants:**
> Richard H. Sinkfield, Esq.
> Rogers & Hardin
> 2700 International Tower, Peachtree Center
> 229 Peachtree Street, N.E.
> Atlanta, GA  30303-1601

and via U.S. mail to:

> **Attorneys for Banc of America Securities, LLC:**
> Andrew J. Frackman, Esq.
> Benjamin D. Petrosky, Esq.
> Brendan J. Dowd, Esq.
> O'Melveny & Myers LLP
> 7 Times Square
> New York, NY  10036
>
> **Attorneys for Morgan Stanley & Co. Incorporated:**
> Robert F. Wise, Jr., Esq.
> William J. Fenrich, Esq.
> David B. Steinberg, Esq.
> Melissa T. Aoyagi, Esq.
> Davis Polk & Wardwell
> 450 Lexington Avenue
> New York, NY  10017
> **Attorneys for Bear Stearns:**
> Stephen L. Ratner, Esq.

780300.1
Highly Confidential Pursuant to Protective Order

Harry Frischer, Esq.
Brian L. Friedman, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY 10036

**Attorneys for The Goldman Sachs Group, Inc.:**
Richard C. Pepperman II, Esq.
Richard H. Klapper, Esq. .
Tracy Richelle High, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

**Attorneys for Deutsche Bank Securities Inc.:**
Heather L. Fesnak, Esq.
Peter J. Isajiw, Esq.
Gregory A. Markel, Esq.
Martin L. Seidel, Esq.
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY 10281

**Attorneys for UBS Securities, LLC:**
Andrew B. Clubok, Esq.
Emily P. Hughes, Esq.
Jeffrey G. Landis, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005-5793

Maria Ginzburg, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

780300.1
Highly Confidential Pursuant to Protective Order

**Attorneys for Credit Suisse USA, Inc.:**
Fraser L. Hunter, Jr., Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY 10022

Ryan P. Phair, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

**Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc.:**
Paul M. Eckles, Esq.
Shepard Goldfein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036

Richard S. Horvath, Jr., Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center
Suite 3800
San Francisco, CA 94111-4144

This 16th day of August, 2010.

Nicole G. Iannarone
Georgia Bar No. 382510

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3417
Tel.: (404) 881-4100
Fax: (404) 881-4111

780300.1
Highly Confidential Pursuant to Protective Order