# EXHIBIT  F

# NEW YORK STOCK EXCHANGE LLC

**HEARING BOARD DECISION 10-NYSE-11**                          May 3, 2010
GOLDMAN SACHS EXECUTION & CLEARING, L.P.
MEMBER ORGANIZATION

\* \* \*

**Violated Rule 204T(a) of Regulation SHO by failing to timely close out fail-to-deliver positions in certain equity securities; violated Rule 204T(b) of Regulation SHO by accepting certain customer short sale orders in equity securities for which it had an open fail-to-deliver position while it and customer were in "penalty box", as customer had not first borrowed such securities or entered into bona fide arrangement to borrow the securities; violated Rule 204T(c) of Regulation SHO by failing to timely notify its customers that it had an open fail-to-deliver position that had not been closed out in accordance with Rule 204T(a); violated NYSE Rule 342 by failing to reasonably supervise and implement adequate controls, including separate system of follow-up and review, reasonably designed to achieve compliance with Rule 204T of Regulation SHO — Consent to censure and a $450,000 fine. The amount to be paid to NYSE Regulation by Firm shall be reduced by the amount paid by Firm pursuant to agreement to pay civil monetary penalty of $225,000 in related proceedings instituted by the SEC.**

Appearances:

For the Division of Enforcement                    For Respondent
Robert a. Marchman, Esq.                           Beth Stekler, Esq.
Steven Brostoff, Esq.                              Harry J. Weiss, Esq.
Lara Posner, Esq.
Thomas Bruno, Esq.
Michael W. Bautz, Esq.
Christopher DeLaRosa

\* \* \*

A Hearing Officer on behalf of the New York Stock Exchange LLC ("NYSE" or the "Exchange") considered a Stipulation of Facts and Consent to Penalty entered into between NYSE Regulation, Inc.'s Division of Enforcement ("Enforcement") and Goldman Sachs Execution & Clearing, L.P. ("Respondent", "GSEC" or the "Firm"), an NYSE member

GS_T 000196

2

organization.  Without admitting or denying guilt, Respondent consented to a finding by a
Hearing Officer that it:

I.   Violated Rule 204T(a) of Regulation SHO by failing on approximately 68 occasions
     to timely close out fail-to-deliver positions in certain equity securities.

II.  Violated Rule 204T(b) of Regulation SHO on approximately 385 occasions by
     accepting certain customer short sale orders in equity securities for which it had an
     open fail-to-deliver position while GSEC and the customer were in the "penalty box",
     as the customer had not first borrowed such securities or entered into a bona fide
     arrangement to borrow the securities.

III. Violated Rule 204T(c) of Regulation SHO on approximately 68 occasions by failing
     to timely notify its customers that the Firm had an open fail-to-deliver position that
     had not been closed out in accordance with Rule 204T(a).

IV.  Violated NYSE Rule 342 by failing to reasonably supervise and implement adequate
     controls, including a separate system of follow-up and review, reasonably designed to
     achieve compliance with Rule 204T of Regulation SHO, as described above.

For the sole purpose of settling this disciplinary proceeding, without adjudication of any issues of
law or fact, and without admitting or denying any allegations or findings referred to in the
Stipulation of Facts and Consent to Penalty, Respondent stipulates to certain facts, the substance
of which follows:*

## Background and Jurisdiction

1. GSEC, formerly known as Spear, Leeds & Kellogg, L.P., is a limited partnership
   formed under the laws of the State of New York, with its principal place of business
   located in Jersey City, New Jersey.  GSEC is a registered broker-dealer and has been
   a member of the NYSE since 1982.

2. The Firm's main lines of business include securities clearing and trade execution.

3. By memorandum dated February 6, 2009, the Member Trading Unit of NYSE
   Regulation's Division of Market Surveillance ("MKS") referred to Enforcement
   instances in which the Firm potentially violated Rule 204T ("Rule 204T") of
   Regulation SHO under the Securities Exchange Act of 1934 ("Exchange Act") by
   failing to timely notify certain of its NYSE, NYSE Amex LLC ("NYSE Amex") and
   NYSE Arca, Inc. ("NYSE Arca") market makers that they may be subject to the pre-
   borrow requirements of Rule 204T.

---

\* Hearing Officer Note:  The facts, allegations, and conclusions contained in paragraphs 1 to 44 are taken
from the executed Stipulation of Facts and Consent to Penalty between Enforcement and Respondent.
No changes have been made to the stipulated paragraphs by the Hearing Officer.

3

4. By letter dated February 12, 2009, which the Firm received, Enforcement notified the Firm that it was conducting a formal investigation of MKS' referral.

5. Thereafter, by memorandum dated May 27, 2009, the Financial Industry Regulatory Authority's ("FINRA") Risk Oversight & Operations Regulation Division referred to Enforcement a number of exceptions contained in the February 27, 2009 Financial/ Operational and Sales Practice Examination of the Firm, which stated, among other things, that the Firm potentially violated Rule 204T by failing to timely close out certain fail-to-deliver positions.

6. By letter dated June 25, 2009, which the Firm received, Enforcement notified the Firm that it was conducting a formal investigation of FINRA's referral.

### Prior Discipline

7. In 2006, the Firm consented to findings that it violated Rules 200(g), 203(a), 203(b)(1), and 203(b)(3) under Regulation SHO during the period of January through August 2005, as well as Exchange Act Rules 17a-3 and 17a-4, and NYSE Rules 440 and 342. Goldman Sachs Execution & Clearing, L.P., Decision No. 06-128 (NYSE Hearing Board June 28, 2006). The Firm failed to ensure that certain customer sell transactions for securities that were exempt from the tick/price test of Exchange Act Rule 10a-1 were properly marked "short exempt." In addition, the Firm failed (i) to monitor customer short sales to ascertain whether previous borrowings arranged by the customers had resulted in timely deliveries; and (ii) to monitor customer long sales to ascertain whether such sales repeatedly required borrowed shares for delivery or resulted in failures to deliver. In addition, the Firm improperly marked certain sales for one of its own accounts as "long" when the transactions were actually short sales, and failed to properly calculate and age its fails in threshold securities by failing to combine its positions on two clearing platforms. Lastly, the Firm failed to reasonably supervise its business activities because it did not have adequate policies and procedures with respect to Regulation SHO. The Firm consented to a censure and a $350,000 fine.

### Overview

8. From on or about December 9, 2008 to on or about January 22, 2009 (the "Relevant Period"), the Firm violated Rule 204T on certain occasions by failing to timely close out fail-to-deliver positions in equity securities; accepting short sale orders in certain equity securities for which it had an open fail-to-deliver position that had not been timely closed out in accordance with Rule 204T without first borrowing the securities or entering into a bona fide arrangement to borrow the securities (also referred to as the "pre-borrow" requirement); and failing to notify certain customers that GSEC had open fail-to-deliver positions in certain equity securities that had not been timely closed out in accordance with Rule 204T. In addition, during the period of September 24, 2008 to January 22, 2009 the Firm failed to reasonably supervise and implement

GS_T 000198

4

adequate controls to achieve compliance with Rule 204T, in violation of NYSE Rule 342.

## Regulatory Framework

Regulation SHO[1] and Short Selling

9.   Regulation SHO was adopted to update existing short sale regulations in light of numerous market developments since short sale regulations were first adopted in 1938.  The term "short selling" refers to the sale of a security that the seller does not own, or any sale that is consummated by the delivery of a security that was borrowed by, or for the account of, the seller.  To settle the transaction, the short seller effectively will borrow securities, usually from a broker-dealer or custodian.  The short seller may later "close out" the short position by purchasing equivalent securities on the open market.  A "fail-to-deliver" occurs when a clearing firm fails to satisfy its net delivery obligation to a registered clearing agency in a particular security on a particular settlement date.

10.  One of the goals of Regulation SHO was to address problems associated with failures to deliver, including potentially abusive "naked" short selling, by establishing uniform "locate" and "close out" requirements.[2]  Manipulative naked short selling could be used to drive down a company's stock price and undermine the confidence of investors who may be reluctant to commit capital to an issuer they believe to be the subject of such manipulative conduct.[3]

Rule 204T

11.  Rule 204T was adopted on September 17, 2008[4] to address the Securities and Exchange Commission's (the "Commission") ongoing concern, as evidenced by the Commission's July 15, 2008 Emergency Order[5], regarding unnecessary or artificial price movements based on unfounded rumors regarding the stability of financial institutions and other issuers exacerbated by "naked" short selling and to prevent issuers that had become temporarily weakened from being taken advantage of by persons engaging in potentially abusive short selling of their securities.[6]

---

[1] Securities Exchange Act Release No. 34-50103 (July 28, 2004) 69 FR 48008 (August 6, 2004) ("Regulation SHO Adopting Release").

[2] Division of Market Regulation: Key Points About Regulation SHO (April 11, 2005).

[3] See SEC Release No. 34-58775 (October 17, 2008).

[4] See SEC Release No. 34-58572 (September 17, 2008).

[5] See Securities Exchange Act Release No. 34-58166 (July 15, 2008).

[6] See Securities Exchange Act Release No. 34-58572 (September 17, 2008). The provisions of Rule 204T (now Rule 204) became permanent on July 31, 2009.  See Securities Exchange Act Release No. 34-

5

12.  Rule 204T(a) stated, in relevant part, that if a clearing firm "has a fail to deliver
     position [ ] in any equity security for a long or short sale transaction in that equity
     security, the [clearing firm] shall, by no later than the beginning of regular trading
     hours on the settlement day following the settlement date [T+4], immediately close
     out its fail to deliver position by borrowing or purchasing securities of like kind and
     quantity."

13.  However, pursuant to exemptions in Rule 204T(a)(l) and (3) the clearing firm had
     until no later than the beginning of regular trading hours on the third consecutive
     settlement day following the settlement date (T+6) to close out the fail-to-deliver
     position by purchasing securities of like kind and quantity where either: (1) the
     clearing firm could demonstrate on its books and records that such fail-to-deliver
     position resulted from a long sale or (2) such fail-to-deliver position was attributable
     to bona fide market making activities by a registered market maker, options market
     maker or other market maker obligated to quote in the over-the-counter market.

14.  Rule 204T(b) provided that, if a clearing firm had a fail-to-deliver position that had
     not been closed out in accordance with Rule 204T(a), the clearing firm or any broker
     or dealer from which the clearing firm receives trades for clearance and settlement,
     including any market maker that would otherwise be entitled to rely on the exception
     provided in Rule 203(b)(2)(iii) of Regulation SHO[7], could not accept a short sale
     order in the equity security from another person, or effect a short sale order in such
     security for its own account, to the extent that the broker or dealer submits its short
     sales to the clearing firm for clearing and settlement, without first borrowing the
     security, or entering into a bona fide arrangement to borrow the security, until the
     clearing firm closed out the fail-to-deliver position by purchasing securities of like
     kind and quantity and the purchase had cleared and settled.

15.  Finally, pursuant to Rule 204T(c), the clearing firm was required to notify any broker,
     dealer or market maker from which it received trades for clearance and settlement: (1)
     that the clearing firm had a fail-to-deliver position that had not been closed out in
     accordance with Rule 204T(a); and (2) when the purchase that the clearing firm made
     to close out the fail-to-deliver position had cleared and settled.

16.  Significantly, pursuant to the above, until such purchase had cleared and settled, the
     clearing firm and any broker, dealer or market maker from which it received trades in
     that security for clearance and settlement was in the "penalty box" and, as a result,
     could not effect a short sale in that security without first borrowing the security, or
     entering into a bona fide arrangement to borrow the security. Generally, this would
     disrupt a market maker's ability to effectively make a market. If such circumstances
     involve a qualified market maker on a floor-based exchange, such as the NYSE or
     NYSE Amex, the exchange may have to reallocate that security for which the market

_____

60388 (July 31, 2009).

[7] Pursuant to Rule 203(b)(2)(iii) market makers engaged in bona-fide market making activities in a
particular security are exempt from locating shares prior to effecting a short sale in that security.

GS_T 000200

6

maker is in the "penalty box" to another market maker. This reallocation could result, among other things, in the halting of trading on the respective trading floor in that security until reallocation could be effected.

## **Violations**

### The Firm's Procedures To Satisfy Its Rule 204T Obligations During the Relevant Period

17.   In response to the emergency adoption of Rule 204T, during the Relevant Period the Firm developed procedures and employed various reports on an interim basis to satisfy its Rule 204T obligations. These reports were designed to help GSEC identify and close out fail-to-deliver positions by no later than the beginning of regular trading hours on the prescribed day (generally T+4, unless a Rule 204T(a)(1) or (3) exemption applied, in which case it would be T+6).

18.   During the Relevant Period, the Firm's Operations Department ("Operations") and Client Services Department ("Client Services") performed the key functions for complying with Rule 204T. Specifically, Operations generated various reports identifying the Firm's potential close-out obligations, while Client Services was responsible for determining the Firm's final close-out requirements and placing the order to effect any necessary purchases to close out any open fail-to-deliver positions.

19.   Each day, at approximately 8:45 a.m., Operations manually downloaded from the Firm's systems the Firm's potential T+4 and T+6 obligations for that day and electronically forwarded the information to Client Services. These functions were performed manually while the Firm was developing a system-based process to respond to Rule 204T.

20.   Client Services used the T+4 and T+6 information to make a final determination of the Firm's close-out obligations for that settlement day. Client Services did so by offsetting, in separate calculations, the potential T+4 and T+6 obligations by: (1) shares borrowed; (2) pre-fail credits[8]; (3) shares eligible for T+6 market maker exemptions; and (4) other exemptions.[9]

21.   Upon determining the Firm's T+4 and T+6 close-out obligations each day, Client Services informed a trade execution group within the Firm of the securities and amounts that needed to be bought to satisfy the Firm's Rule 204T obligations.

---

[8] Rule 204T(e) exempted broker-dealers from the pre-borrow penalty if the firm had made a *bona fide* purchase of securities on or after the date of the trade but no later than the end of regular trading hours on the settlement date for the transaction sufficient to cover that firm's entire open short position, and that the firm could demonstrate that it had a net long or net flat position on its books and records on that settlement day. This is known as the "pre-fail credit."

[9] "Other" included additional offsets claimed by the Firm including, but not limited to, the 35-day extension for restricted stocks pursuant to Rule 204T(a)(2).

GS_T 000201

7

22. Client Services then electronically forwarded its calculations and information about purchases that had been effected to Operations. Operations used the information to manually track the actions taken on that day's T+4 obligations and to calculate the amount of the potential close-out obligation on the corresponding T+6. That number was then stored on the Firm's books and records and was forwarded to Client Services by Operations two settlement days later as part of that day's potential T+6 obligations.

The Firm Failed To Purchase Sufficient Shares To Close Out Certain Fail-To-Deliver Positions December 9, 2008

23. On December 9, 2008, the Firm failed to buy sufficient amounts of shares to close out its T+6 fail-to-deliver positions in 22 securities. Specifically, the Firm purchased too few shares in eight securities and did not effect a close-out, although one was required, in 14 securities. The number of shares affected ranged from 75 shares to 36,709 shares.

24. The insufficient close-out of the fail-to-deliver positions (in the 22 securities) was the result of an oversight by an Operations employee who did not properly download the T+6 data in preparing the December 9, 2008 potential close-out information for Client Services. Because the data was not downloaded correctly, Operations provided Client Services with certain information for December 8, 2008, rather than December 9, 2008. Thus, the T+6 calculations performed by Client Services were based upon incorrect information. As a result, for certain securities, the Firm bought in shares for which it had no T+6 obligation or bought too many shares where it had a T+6 obligation. For the 22 securities noted above, in violation of Rule 204T(a), the Firm failed to buy a sufficient number of shares to cover its T+6 close-out obligations (in whole or in part).

25. The Firm became aware of its error after the beginning of regular trading hours on December 9, 2008. In response, the Firm manually recreated the applicable report and, if the recalculated obligation exceeded the amount that GSEC had bought at market open, purchased the additional quantity of shares. Notwithstanding its corrective action, the Firm and its broker, dealer and market maker clients were in the "penalty box" (i.e., could not effect a short sale in the securities without first borrowing the security or entering into a bona fide arrangement to borrow the security) because the close-out had not occurred by the beginning of regular trading hours.[10] They would remain in the "penalty box" until those purchases settled on December 12, 2008.

---

[10] In light of the potential impact on the ability of certain market maker clients to carry out their obligations, GSEC spoke with the SEC and NYSE and was advised that its clients that were registered market makers could be excluded from the pre-borrow requirement until market open on December 11, 2008.

GS_T 000202

8

26. On December 10, 2008, the Firm notified the relevant brokers, dealers and market makers that it had a fail-to-deliver position that had not been closed out in accordance with Rule 204T(a). Because certain of GSEC's market maker clients were able to pre-fail credit certify, no NYSE or NYSE Amex security had to be reallocated. However, because the NYSE Arca Lead Market Makers in two securities were not able to pre-fail credit certify, they remained in the "penalty box" and were not able to make a market in those securities until the Firm's purchases settled on December 12, 2008.

27. By failing to timely satisfy its T+6 close-out obligations in 22 securities as noted above, the Firm violated Rule 204T(a).

28. Moreover, and as described above, by failing to timely notify certain customers that it had an open fail-to-deliver position that had not been closed out in accordance with Rule 204T(a), the Firm also violated Rule 204T(c).

January 6 - 22, 2009

29. From January 6, 2009 to January 22, 2009, the Firm, on approximately 46 occasions, failed to timely close out a T+6 obligation. The failure was the result of an error by an Operations employee in calculating the Firm's potential T+6 obligations based on the information provided by Client Services. Specifically, while modifying the functionality of the spreadsheet, the employee manually removed the number of shares attributable to the market maker exemption from the spreadsheet provided by Client Services. Because the data that was removed was a component of a mathematical formula, this unintentionally caused Operations' calculations to undertrack the Firm's T+6 obligation and resulted in the Firm closing out too few shares on T+6.

30. The erroneous T+6 calculations were first made with respect to settlement date (T+3) January 6, 2009, and continued to January 22, 2009, resulting in the Firm's failure to buy sufficient amounts to satisfy its T+6 obligations in at least 46 instances.

31. Moreover, the Firm accepted approximately 385 short sales without a pre-borrow in the affected securities for its customers while the Firm and the relevant customers were in the "penalty box."

32. For instance, on January 16, 2009, the Firm had a T+4 fail-to-deliver position of 1,440 shares in a particular security. The entire fail-to-deliver position was attributable to the NYSE Designated Market Maker ("DMM") for that security. As a result of the DMM's status as a market maker, the Firm was entitled to the two-day market maker exemption of Rule 204T(a)(1) and could maintain that fail-to-deliver position without a close out requirement until January 22, 2009 (T+6).

33. Because Operations miscalculated the T+6 close-out obligation, the Firm failed to purchase shares to close out the 1,440 share fail-to-deliver position by the beginning of regular trading hours on January 22, 2009. A customer apprised the Firm of a

GS_T 000203

9

potential problem concerning the Firm's calculation. The Firm, while investigating its customer's inquiry, discovered the problem at approximately 3:00 p.m. on January 22, 2009 and notified its broker, dealer and market maker clients. It was the first time that the DMM firm assigned to that security learned that it was in the "penalty box" and, since it was unable to pre-fail credit certify, the trading in the security had to be halted and the security was reallocated to another DMM firm.

34. Prior to the reallocation, and with the open fail-to-deliver position, the Firm accepted, without a pre-borrow, eight short sales orders in that security from the original DMM firm, which was unaware at the time that it was in the "penalty box."

35. By failing to timely close out certain T+6 obligations in the 46 instances noted above, the Firm violated Rule 204T(a).

36. In addition, the Firm failed to timely notify its customers that it had an open fail-to-deliver position that had not been closed out in accordance with Rule 204T(a) in the instances described above in violation of Rule 204T(c).

37. Moreover, and as described above, by accepting short sale orders in the affected securities from its customers without a pre-borrow when both the Firm and its customers were in the "penalty box", the Firm violated Rule 204T(b).

## Failure To Supervise

38. The procedures and the reports used by the Firm to address its Rule 204T obligations were insufficient in that they placed undue reliance upon manual calculations, a significant portion of which were performed by one individual, without sufficient oversight or verification of accuracy. Without such oversight, the Firm had insufficient means to prevent or timely detect the errors that caused the violations of Rule 204T discussed herein.

39. Specifically, during the Relevant Period one person, an Operations employee, was responsible for providing information regarding the Firm's potential close out obligations to Client Services. No other individual played a role in forwarding the information to Client Services. Moreover, no individual reviewed the Operations employee's preparation and forwarding of this information to Client Services. As a result, on December 9, 2008, the Operations employee's error was not timely corrected as it was not detected until after the opening of trading that day.

40. The Firm relied solely upon this manual procedure until December 9, 2008 when it learned of its employee's error. In response, the Firm instituted a checklist and management review to ensure that the proper information was forwarded to Client Services. In addition, the Firm programmed its systems to automatically purge stale information from the reports forwarded to Client Services by Operations.

GS_T 000204

10

41. Likewise, during the Relevant Period, the same Operations employee was responsible for calculating the Firm's T+6 close-out obligations. No other individual played a role in performing this calculation. Moreover, no individual reviewed the Operations employee's calculations. The failure of the Firm to purchase sufficient amounts to cover its fail-to-deliver obligations resulting from the Operations employee's error went undetected from January 6, 2009 to January 22, 2009.

42. The Firm relied solely upon the manual calculations of its Operations employee until on or about January 22, 2009, when it learned of its employee's error. In response, the Firm assigned another Operations employee to perform a second review of the T+6 calculations. Thereafter, beginning in or about May 2009, the Firm introduced automation to its Rule 204T process. Specifically, functions that were previously performed by Operations on a manual basis were automated. In addition, the Firm began to allocate close-out responsibility to some of its broker-dealer clients pursuant to Rule 204T(d).

43. The Firm's process, which was developed in response to the Commission's September Emergency Order, relied too heavily on the manual calculations of one individual to ensure the accurate determination of fail-to-deliver positions and close-out obligations without reasonable oversight designed to ensure the accuracy of the results.

44. In light of the above, the Firm violated NYSE Rule 342 by failing to reasonably supervise and implement adequate controls, including a separate system of follow-up and review, reasonably designed to achieve compliance with Rule 204T.

## DECISION

The Hearing Officer, in accepting the Stipulation of Facts and Consent to Penalty, found that Respondent committed the offenses as set forth above.

## PENALTY

In view of the above findings, the Hearing Officer, imposed the penalty consented to by Respondent of a censure and a $450,000 fine. The amount to be paid to NYSE Regulation by the Firm shall be reduced by the amount paid by the Firm pursuant to an agreement to pay a civil monetary penalty of $225,000 to the United States Treasury in related proceedings instituted by the Securities and Exchange Commission.

For the Hearing Board

Peggy Kuo - Chief Hearing Officer