# EXHIBIT 4

**State Court of Fulton County**
**\*\*\*EFILED\*\*\***
LexisNexis Transaction ID: 28339005
Date:  Dec  3 2009  4:57PM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

TASER INTERNATIONAL, INC.,    :
*et al.,*                        :
                               :
      Plaintiffs,           :      CIVIL ACTION
                               :      FILE NO.: 2008-EV-004739-B
v.                            :
                               :
MORGAN STANLEY & CO., INC., :      JURY TRIAL DEMANDED
*et al.,*                        :
                               :
      Defendants.

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

## I.   Introduction

Plaintiffs contend that the Defendants have engaged in an illegal and unlawful ***pattern*** of abusive naked short selling to manipulate the price of TASER stock in violation of Georgia RICO and other statutes.  Contrary to Defendants' claim, Plaintiffs do not allege that the pattern of unlawful abusive naked short selling is limited to TASER, but rather allege that the Defendants have engaged in that conduct with respect to other securities as well. *See, e.g,.* Sixth Amended Complaint ¶ 8 (four-page table listing instances where Defendants were fined by regulators for engaging in unlawful conduct that involves securities other than TASER).

Plaintiffs have served discovery requesting that the Defendants produce documents showing they engaged in abusive naked short selling and have been sanctioned by regulators for that conduct.[1]  Defendants have refused to produce most of those documents.  Plaintiffs have also sought documents discussing the illegality of abusive naked short selling and the harm such conduct causes.  Defendants refuse to produce most of those documents as well.  In both cases, Defendants claim that Plaintiffs are not entitled to discover any document (or portion thereof) that involves any security other than TASER, even if that document specifically addresses a claim or defense in this case.  Defendants' claim that documents discussing a specific security other than TASER has "no relevance to this litigation."  Defendants' Brief at 2.  Defendants are incorrect.

First, Plaintiffs' RICO claim alleges that the Defendants have engaged in a "pattern" of unlawful abusive naked short sales and market manipulation.  *See* Sixth Amended Complaint ¶¶ 93-132.  Under well established Georgia RICO law, evidence that a defendant engaged in the ***same or similar misconduct (i.e., abusive naked short sales) against victims <u>other than the plaintiff</u>*** is not just discoverable, but admissible to prove the pattern element of Plaintiffs' RICO claim.  *See* Section

---

[1] Plaintiffs' Motion to Compel involves a subject matter for which the Defendants are withholding documents.  Because the motion involves a subject matter, it applies to all discovery that Plaintiffs have served.  For that reason, Plaintiffs will not burden the Court by reciting verbatim each and every document request it has served.  If the Court would like a copy of Plaintiffs' document requests or other discovery, Plaintiffs will be glad to provide them.

III(A).  Indeed, Georgia law is clear that an illegal act directed at a victim ***other than the plaintiff*** constitutes a predicate act under Georgia's RICO statute:  "There is no requirement that plaintiff suffer direct harm from each and every alleged predicate act introduced to show a pattern of racketeering activity." *InterAgency, Inc. v. Danco Fin. Corp.*, 203 Ga. App. 418, 424 (1992).  For that reason, Georgia courts have recognized that "a RICO claim . . . by its very nature often requires proof of dealings with individuals and entities not named as parties to the suit on trial." *Id.* at 423.  Thus, in the context of this case, if Plaintiffs can show that the Defendants also engaged in abusive naked short selling with respect to a security other than TASER, that conduct would demonstrate both a pattern of racketeering and constitute a predicate act.

Second, even if Plaintiffs did not assert a RICO claim, documents involving non-TASER securities are discoverable for several reasons, including:

(1)   Defendants contend that their conduct was neither intentional nor malicious.[2]  Emails and other documents showing that the Defendants engaged in abusive naked short sales of TASER *after* being warned and sanctioned by regulators for engaging in similar conduct with respect to other securities is relevant to disprove that defense and establish their  intent.

---

[2] *See, e.g.,* Answer of Bear Stearns Entities, Twelfth, Thirteenth and Fourteenth Affirmative Defenses.  Each of the other defendants raised the same affirmative defense.

(2)     Defendants contend that any failure to deliver TASER stock was inadvertent

or in error.  Evidence that defendants consistently failed to deliver other

securities is relevant to disprove that defense.

(3)     Defendants contend that their conduct was "in full compliance with

applicable federal laws and regulations."[3]  Emails and other documents

showing or discussing the illegality of abusive naked short selling (even if in

the context of a non-TASER security) are relevant to disprove that defense.

(4)     Defendants contend that abusive naked short selling does not cause harm.[4]

Emails and other documents stating that abusive naked short selling causes a

stock's price to fall or other harm (even if in the context of a stock other than

TASER) are relevant to disprove that defense.

(5)     Defendants contend that they "acted in good faith in conformity with the

rules, regulations and pronouncements of the SEC."[5]  Emails and other

documents discussing how abusive naked short selling violates SEC rules

(including agency investigations and sanctions relating to other stocks) are

relevant to disprove that defense.

---

[3] *See, e.g.,* Answer of Bear Stearns Entities, Thirteenth Affirmative Defense.  Each
of the other defendants raised the same affirmative defense.
[4] *See, e.g.,* Answer of Bear Stearns Entities, Ninth and Tenth Affirmative Defenses
(stating that plaintiffs cannot establish "injury in fact" and that "plaintiffs were not
damaged by Bear Stearns Entities' conduct").  Each of the other defendants raised
the same affirmative defense.
[5] *See, e.g.,* Answer of Bear Stearns Entities, Twelfth Affirmative Defense.

718795.1

(6)     In a civil case, same or similar conduct evidence can be used to show "a

general practice or course of conduct or display intent, motive, knowledge or

bad faith." *Kent v. White*, 238 Ga. App. 792, 794 (1999).

For these reasons, documents involving non-TASER securities are not only

relevant, but potentially critical to this case.  This is perhaps best shown by

example.  Through searches of public records, Plaintiffs have identified instances

in which the Defendants have been sanctioned by regulators for engaging in

precisely the type of conduct alleged here.  For example, in 2006, Credit Suisse

and Goldman Sachs were fined $600,000 for, *inter alia*, "accepting short sale

orders and effecting those orders without having borrowed securities," for

engaging in short sales "when [they] did not know or have reasonable grounds to

believe that [they] would be able to deliver securit[ies] on the date deliver was

due," for improperly marking sell orders and for "failing to provide appropriate

procedures of supervision and control."  *See* Exhibit A.

According to Defendants, these sanctions "have no relevance to this

litigation."  Defendants' Brief at 2.  That is incorrect.  For one, the conduct

underlying the sanctions itself constitutes predicate acts regardless of which

security was involved.  *See* Section III(A).  Further, there are undoubtedly emails

and other documents relating to these sanctions that are relevant to this case.  For

example, there are likely emails from regulators informing the Defendants that this

type of conduct is illegal (disproving the defense that the conduct is legal or that the Defendants "acted in good faith" believing the conduct was permissible). There may also be emails from the regulators discussing how the Defendants' conduct harmed the stock at issue (emails that would tend to disprove Defendants' claim that this conduct is harmless). Finally, there may be internal emails evidencing a Defendant's decision to continue the behavior because the revenues they stood to gain far exceed any likely fine (emails showing malice and the need for punitive damages). Or, even if there are no emails discussing a decision to continue the behavior, these sanctions and accompanying emails are relevant to show that the Defendants knowingly and intentionally continued to engage in this conduct after expressly being told by regulators that it is illegal.

As this one example shows, conduct relating to non-TASER securities is clearly reasonably calculated to lead to the discovery of admissible evidence and thus discoverable in this case. Allowing Defendants to withhold this evidence would not only unfairly prejudice Plaintiffs, but likely constitute reversible error.

Finally, Defendants suggest that providing evidence of involving non-TASER securities would require a burdensome review of documents relating to every short sale transaction in America. This claim is also incorrect. As explained below, Plaintiffs and all Defendants (except UBS) have already negotiated the scope of the documents that each defendant will review. *If the Court grants*

***Plaintiffs' Motion, the Defendants will <u>not</u> be required to review a single***

***document beyond what they have already agreed to review***.  The only question

presented here is whether documents identified in that review that pertain to the

improper short selling of non-TASER securities will be placed in the "produce"

pile or the "nonresponsive" pile.

## II.    Defendants Ignore The Standard for Discovery.

The Defendants' response only contains one argument – relevance.

Defendants, however, ignore O.C.G.A. § 9-11-26 which describes the proper scope

of discovery:

> Parties may obtain discovery regarding any matter, not privileged,
> <u>which is relevant to the subject matter involved in the pending</u>
> <u>action, whether it relates to the claim or defense of the party</u>
> <u>seeking discovery or to the claim or defense of any other party</u>. . . .
> It is not ground for objection that the information sought will be
> inadmissible at the trial if the information sought appears reasonably
> calculated to lead to the discovery of admissible evidence.

O.C.G.A. § 9-11-26(b)(1) (emphasis added).

Rather than focus on this discovery standard, defendants have raised an

assortment of other objections to plaintiffs' document requests, including that: (1)

plaintiffs lack standing to request documents concerning non-TASER securities;

(2) RICO does not apply to the conduct at issue (an argument they already lost in

their motion to dismiss); (3) that the discovery sought *could* yield the production of

inadmissible documents and (4) plaintiffs should not be entitled to this discovery

until they identify the specific misconduct that they believe the documents will uncover. Defendants' arguments range from attempts to relitigate their motion to dismiss to speculation about what the requested documents might or might not contain. *None* of these arguments have any bearing on whether the requested documents are "relevant to the subject matter" or "relate[] to the claim or defense" of any party in this case. Defendants ignore the relevant standard because they have no legitimate basis to claim that the documents are irrelevant.[6]

## III.  Evidence Concerning Non-TASER Securities Is Relevant.

### A.  The Evidence Is Relevant to Plaintiffs' RICO Claim.

Defendants' claim that information about non-TASER securities has "no relevance to this litigation" ignores Plaintiffs' RICO claim and is belied by the RICO statute itself. To prove their RICO claim, Plaintiffs must show that defendants engaged in a pattern of racketeering activity. O.C.G.A. § 16-14-4. The Georgia RICO statute sets out what activity may constitute a "pattern of racketeering activity" for the purpose of establishing a RICO claim:

---

[6] Defendants make several claims about what the requested documents do *not* contain: For example, "[T]he document requests at issue . . . do not bear on whether any Defendant engaged in *criminal* conduct." Defendants' Brief at 9 (emphasis in original). That is incorrect. Documents showing that defendants engaged in unlawful and improper short selling *are* evidence of criminal conduct, particularly documents showing that defendants knowingly and intentionally engaged in improper short sales.

718795.1

'Pattern of racketeering activity' means: Engaging in at least two acts of racketeering activity . . . that have the ***same or similar intents, results, accomplices, victims or methods of commission*** . . .

O.C.G.A. § 16-14-3(8)(A) (emphasis added).

In enacting the RICO statute, the General Assembly intended to punish defendants who engage in multiple acts of certain types of illegal conduct and it broadly defined the pattern requirement in order to accomplish that objective. It would be contrary to the purpose and intent of the statute to narrowly define discovery and to preclude plaintiffs from obtaining pattern evidence. For that reason, courts have consistently permitted discovery of evidence of "similar...methods of commission" of unlawful acts, even if those acts were directed at persons other than the plaintiff.

For example, in *Interagency v. Danco Financial Corp.*, 203 Ga. App. 418, the plaintiff brought a RICO claim alleging that the defendant made numerous misrepresentations with respect to the sale of a business. To demonstrate a pattern and the existence of predicate acts, the plaintiff introduced ***at trial*** evidence that the defendant made similar misrepresentations to other persons who were not parties to the lawsuit. *Id.* at 423.

On appeal, the defendant argued that admitting evidence of similar conduct with respect to other victims was improper because they occurred after the lawsuit was filed and because "the acts did not demonstrate any injury or harm to

plaintiff." *Id.* at 422. The Georgia Court of Appeals rejected that argument,

holding that evidence relating to other victims was relevant to the RICO claim

"which by its very nature often requires proof of dealings with individuals and

entitles not named as parties to the suit on trial." *Id.* at 423.   The Court

continued:

> *[T]here is no requirement that plaintiff suffer direct harm from each and every alleged predicate act introduced to show a pattern of racketeering activity.* The direct involvement with plaintiff is not the interrelatedness or "interconnectedness" required by the Georgia statute. It is the "pattern" which must be shown, . . . not that plaintiff was injured by each incident of which the pattern was comprised.

*Id.* at 424 (emphasis added) (citations omitted). Of course, if the evidence was

admissible at trial, it certainly is discoverable.

Similarly, in *Jones v. Childers*, 18 F.3d 899 (11th Cir. 1994) the plaintiff

brought securities fraud claims and introduced evidence that the defendant

committed similar fraud with respect to other victims who were not parties to the

suit. The Court held that while the evidence of multiple wrongful acts committed

against the plaintiffs was <u>not</u> enough to establish a pattern, the plaintiff was

nonetheless able to establish a RICO pattern by relying on evidence of wrongful

conduct aimed at other victims:

> While, as discussed above, the two violations perpetrated against [the plaintiffs] do not, in and of themselves, provide a sufficient basis for finding 'continuity,' *the totality of the evidence as to [the defendant's] business practices with respect to [other clients] sufficiently establishes a pattern of criminal activity*.

718795.1

*Id.* at 913 (emphasis added).  The Court also held that "the other sales [to other victims] constituted *predicate acts* on the same level as the sale of Telron I and II to the [plaintiffs]."  *Id.* at 914 (emphasis in original).

In *Mosley v. State*, 253 Ga. App. 710 (2002), a securities salesperson was convicted of RICO violations based on violations of the Georgia Securities Act. The conviction was based on evidence that the defendant had committed a  pattern of predicate acts against multiple victims (as opposed to a pattern of conduct aimed at the same person or involving the same security).  The Court of Appeals affirmed the conviction, affirming the finding that the offenses against multiple victims constituted a "pattern of racketeering activity."  *Id.* at 712.  Likewise, in *Saxon v. State*, 266 Ga. App. 547 (2004), the Court of Appeals affirmed the RICO conviction of two defendants based on crimes committed against multiple victims.

In short, Georgia law is clear that evidence of similar conduct (i.e., abusive naked short selling) aimed at other securities is relevant to prove both a pattern of racketeering activity and the existence of predicate acts.  Thus, abusive naked short selling aimed at other victims (i.e., securities) is clearly relevant to this case.

718795.1

**B. Evidence Concerning Non-TASER Securities Is Relevant to Prove Plaintiffs' Other Claims and Refute Defendants' Defenses.**

There are numerous additional reasons why documents involving securities other than TASER are discoverable.

First, documents relating to other securities are relevant to refute many of the Defendants' affirmative defenses. O.C.G.A. § 9-11-26 (permitting discovery into the "claim *or defense* of any party"). For example, Defendants contend that their conduct was done "in full compliance with applicable federal laws" and that they "acted in good faith in conformity with the rules, regulations and pronouncements of the SEC."[7] Emails showing that the Defendants were sanctioned by the SEC and other regulators for engaging in the very conduct at issue here is relevant to disprove those claims. The fact that sanctions deal with a security other than TASER is irrelevant – the pertinent fact is that the Defendants were sanctioned for the **specific conduct** which Defendants now contend is legal. Moreover, the fact that the Defendants continued to engage in the specific conduct even after being put on notice that it was illegal (and after being fined for it) demonstrates the criminal intent underlying Plaintiffs' RICO claim and malice warranting punitive damages.

---

[7] *See, e.g.,* Answer of Bear Stearns Entities, Twelfth, Thirteenth and Fourteenth Affirmative Defenses.

718795.1

Second, Defendants raise an affirmative defense that abusive naked short selling does not cause harm.[8]  Correspondence to or from the SEC discussing how abusive naked short selling is harmful is directly relevant to disprove that claim. Again, it is the conduct that is important, not the security that was victimized by it.

Third, Defendants contend that any abusive naked short selling was inadvertent or a trading error.  Evidence that the Defendants engaged in abusive naked short selling with respect to other securities is relevant to disprove that defense.  For example, according to the SEC, 99% (by dollar value) of all trades should settle on time.  *See* SEC Exchange Act Release No. 34-58774, 73 Fed. Reg. 61666, 61668 n.9.  Yet, Defendants have already produced extensive **redacted** lists that appear to show that the Defendants consistently fail to settle trades of non-TASER securities on time.  Plaintiffs believe that if these lists are unredacted (as would occur if the Court grants Plaintiffs' motion), the lists will show that Defendants' failure to deliver TASER shares is not an isolated incident, but rather a pattern for purposes of RICO and an intentional course of conduct.  Indeed, "[f]requently the defendant's state of mind regarding one act is illustrated by other acts of a similar nature that indicate a general practice or course of conduct or display intent, motive, knowledge or bad faith." *Kent v. White*, 238 Ga. App. 792,

---

[8] *See, e.g.,* Answer of Bear Stearns Entities, Ninth and Tenth Affirmative Defenses (stating that plaintiffs cannot establish "injury in fact" and that "plaintiffs were not damaged by Bear Stearns Entities' conduct").

794 (1999).  To that end, "similar transaction" evidence is routinely admitted by Georgia courts to show intent or course of conduct."  *See, e.g., Pareja v. State*, No. S09G0960, 2009 WL 3517541 (Ga. Nov. 2, 2009) (affirming admissibility of similar transaction evidence); *Payne v. State*, 285 Ga. 137 (2009) (same); *Kellett v. Kumar*, 281 Ga. App. 120 (2006) (same); *Wood v. D.G. Jenkins Homes,Inc.*, 255 Ga. App. 572 (2002) (trial court abused its discretion in excluding "similar transaction" evidence); *David v. State*, 264 Ga. App. 128 (2003) (affirming admissibility of similar transaction evidence in a RICO case).

Fourth, evidence that the Defendants knew that abusive naked short selling was illegal and continued to engage in that conduct is relevant to show willfulness, bad faith and malice warranting punitive damages.  *See Tookes v. Murray*, 297 Ga. App. 765, 768 (2009) (punitive damages require a showing of "willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the resumption of conscious indifference to consequences").

## IV.   Granting Plaintiffs' Motion Will Not Increase Defendants' Burden.

Defendants imply that Plaintiffs' discovery is unduly burdensome and amount to an audit of the all the short sales in America.  Again, that is incorrect.

After much negotiating, Plaintiffs and all of the Defendants (except UBS) have reached an agreement as to the set of documents that Defendants will review for potential production in this case.  Specifically, the parties have agreed that the

defendants will search (1) a limited set of agreed-upon employees' emails (2) and will conduct that search using focused keywords.  In other words, instead of reviewing all of the emails in an employees' email box, Defendants will review only those emails containing agreed-upon terms that are relevant to the claims and defenses in this case (e.g., terms such as "short and abusive").  Significantly, in their motion to compel, Plaintiffs are not asking the defendants to expand or change that agreement.  Instead, Plaintiffs are simply requesting that if a Defendant locates a responsive document in its review of the agreed-upon documents, that the Defendant not be permitted to withhold that document from production on the ground that it involves a specific security other than TASER.  **Put differently, granting Plaintiffs' motion will not require Defendants to review any more documents than they have already agreed to review**.

In fact, rather than creating an extra burden, Plaintiffs' motion should accelerate discovery in this case.  Defendants have undertaken to redact all non-TASER-specific information from their document production.  If Plaintiffs' Motion is granted, the Defendants will not have to assume substantial time and resources redacting virtually every document they produce in this case.

Respectfully submitted this 3rd day of December, 2009.


/s/ Steven Rosenwasser
John E. Floyd
Georgia Bar No. 266413
Steven J. Rosenwasser
Georgia Bar No. 614908
Nicole G. Iannarone
Georgia Bar No. 382510
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3417
(404) 881-4100 Tel.
(404) 881-4111 Fax


James W. Christian
State Bar No. 04228700
Gary M. Jewell
State Bar No. 10664800
Scott R. Link
State Bar No. 12390900
Christian, Smith, & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas  77002
(713) 659-7617 Tel.
(713) 659-7641 Fax
(admitted pro hac vice)


*ATTORNEYS FOR PLAINTIFFS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, a true and correct copy of the foregoing

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**

**PRODUCTION OF DOCUMENTS** was served via electronic file and serve

which will provide notice to the parties as follows:

**Attorneys for Defendants:**
Richard H. Sinkfield, Esq.
Rogers & Hardin
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303-1601

**Attorneys for Banc of America Securities, LLC:**
Andrew J. Frackman, Esq.
Benjamin D. Petrosky, Esq.
Brendan J. Dowd, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, NY  10036

**Attorneys for Morgan Stanley & Co. Incorporated:**
Robert F. Wise, Jr., Esq.
William J. Fenrich, Esq.
David B. Steinberg, Esq.
Melissa T. Aoyagi, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY  10017

718795.1

17

**Attorneys for Bear Stearns:**
Stephen L. Ratner, Esq.
Harry Frischer, Esq.
Brian L. Friedman, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY  10036

**Attorneys for The Goldman Sachs Group, Inc.:**
Richard C. Pepperman II, Esq.
Richard H. Klapper, Esq.
Tracy Richelle High, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

**Attorneys for Deutsche Bank Securities Inc.:**
Heather L. Fesnak, Esq.
Peter J. Isajiw, Esq.
Gregory A. Markel, Esq.
Martin L. Seidel, Esq.
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY  10281

**Attorneys for UBS Securities, LLC:**
Andrew B. Clubok, Esq.
Jeffrey G. Landis, Esq.
Daniel Gomez, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC  20005-5793

Maria Ginzburg, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

718795.1

**Attorneys for Credit Suisse USA, Inc.:**
Fraser L. Hunter, Jr., Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY  10022

**Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc.:**
Paul M. Eckles, Esq.
Shepard Goldfein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY  10036

Richard S. Horvath, Jr., Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center
Suite 3800
San Francisco, CA  94111-4144

This 3rd day of December, 2009.


/s/ Steven Rosenwasser
Steven J. Rosenwasser
Georgia Bar No. 614908

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA  30309-3417
Tel.: (404) 881-4100
Fax: (404) 881-4111

718795.1

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 28339005
Date: Dec 3 2009 4:57PM
Mark Harper, Clerk

EXHIBIT

A

NEW YORK STOCK EXCHANGE LLC

**NYSE HEARING BOARD DECISION 06-128**                     June 28, 2006
GOLDMAN SACHS EXECUTION & CLEARING, L.P.
MEMBER ORGANIZATION

\* \* \*

Violated NYSE Rule 200(g) of Regulation SHO in that it failed to ensure that all sell orders were properly marked as "long," "short," or "short exempt"; violated Rule 203(a) of Regulation SHO in that it effected customer sell orders marked long when it did not know or have reasonable grounds to believe that it would be able to deliver the security on the date the delivery was due and that short sales were not misrepresented as long sales; violated Rule 203(b)(1) of Regulation SHO in that it accepted customer short sale orders and effected those orders without having reasonable grounds to believe that the securities could be borrowed so that they could be delivered on the date delivery was due; violated Rule 203(b)(3) of Regulation SHO in that it failed to accurately account for its fails to deliver in threshold securities at registered clearing agencies by failing to aggregate its fails which occurred under separate clearing numbers and by inaccurately redesignating certain fails as one day old after a buy-in occurred in a security; violated Section 17(a) of the Securities Exchange Act of 1934 and Rules 17a-3 and 17a-4 thereunder, and NYSE Rule 440 in that it did not accurately record the age of its fails in threshold securities at registered clearing agencies and did not properly mark proprietary sell orders as "long," "short," or "short exempt"; violated NYSE Rule 342 in that it failed to provide for appropriate procedures of supervision and control to ascertain that (a) customer and proprietary sell orders were properly marked as "long," "short," or "short exempt," (b) it only effected customer sell orders marked long when it knew or had reasonable grounds to believe that it would be able to deliver the security on the date the delivery was due and short sales were not misrepresented as long sales, (c) when it accepted and effected short sale orders it had reasonable grounds to believe that the securities could be borrowed so that they could be delivered on the dates delivery was due, (d) it accurately accounted for its fails to deliver in threshold securities at registered clearing agencies, and (e) it maintained accurate books and records with respect to the age of its fails in threshold securities at registered clearing agencies and with respect to marking proprietary sell orders as "long," "short," or "short exempt" – Consent to censure and $350,000 fine.

2

**Appearances:**

For the Division of Enforcement                          For Respondent
Susan Light, Esq.                                        Norman Feit, Esq.
Steven F. Korostoff, Esq.
Jeanne R. Elmadany, Esq.

\* \* \*

A Hearing Officer on behalf of the New York Stock Exchange LLC ("NYSE") considered a Stipulation of Facts and Consent to Penalty entered into between NYSE Regulation, Inc.'s Division of Enforcement ("Enforcement") and Goldman Sachs Execution & Clearing, L.P. ("Respondent," or "GSEC," or the "Firm"), an NYSE member organization.  Without admitting or denying guilt, Respondent consented to a finding by the Hearing Officer that it:

I.    Violated Rule 200(g) of Regulation SHO in that it failed to ensure that all sell orders were properly marked as "long," "short," or "short exempt."

II.   Violated Rule 203(a) of Regulation SHO in that it effected customer sell orders marked long when it did not know or have reasonable grounds to believe:

     a.    that it would be able to deliver the security on the date the delivery was due; and

     b.    that short sales were not misrepresented as long sales.

III.  Violated Rule 203(b)(1) of Regulation SHO in that it accepted customer short sale orders and effected those orders without having reasonable grounds to believe that the securities could be borrowed so that they could be delivered on the date delivery was due.

IV.   Violated Rule 203(b)(3) of Regulation SHO in that it failed to accurately account for its fails to deliver in threshold securities at registered clearing agencies:

     a.    by failing to aggregate its fails which occurred under separate clearing numbers; and

     b.    by inaccurately redesignating certain fails as one day old after a buy-in occurred in a security.

V.    Violated Section 17(a) of the Securities Exchange Act of 1934 and Rules 17a-3 and 17a-4 thereunder, and NYSE Rule 440 in that it:

     a.    did not accurately record the age of its fails in threshold securities at registered clearing agencies; and

3

b.   did not properly mark proprietary sell orders as "long," "short," or "short exempt."

VI.   Violated NYSE Rule 342 in that it failed to provide for appropriate procedures of supervision and control to ascertain that:

a.   customer and proprietary sell orders were properly marked as "long," "short," or "short exempt";

b.   it only effected customer sell orders marked long when it knew or had reasonable grounds to believe that:

i.   it would be able to deliver the security on the date the delivery was due; and

ii.   short sales were not misrepresented as long sales;

c.   when it accepted and effected short sale orders it had reasonable grounds to believe that the securities could be borrowed so that they could be delivered on the dates delivery was due;

d.   it accurately accounted for its fails to deliver in threshold securities at registered clearing agencies;

e.   it maintained accurate books and records with respect to:

i.   the age of its fails in threshold securities at registered clearing agencies; and

ii.   marking proprietary sell orders as "long," "short," or "short exempt.".

For the sole purpose of settling this disciplinary proceeding, Enforcement and Respondent stipulate to certain facts, the substance of which follows:[*]

## Background and Jurisdiction

1.   Goldman Sachs Execution & Clearing, L.P., formerly Spear, Leeds & Kellogg, L.P., is an affiliate of The Goldman Sachs Group, Inc.   GSEC provides securities clearing and execution services to broker-dealers (including equity and options market makers and specialists, as well as introducing brokers) and institutional and certain retail

---

[*] Hearing Officer Note:  The facts, allegations, and conclusions contained in paragraphs 1 to 35 are taken from the executed Stipulation of Facts and Consent to Penalty between Enforcement and Respondent. No changes have been made to the stipulated paragraphs by the Hearing Officer.

4

clients.

2.   Effective September 7, 2004, the U.S. Securities and Exchange Commission ("SEC") adopted Regulation SHO under the Securities Exchange Act of 1934 ("Exchange Act"), and the commencement date for compliance with its provisions was January 3, 2005.

3.   In the second quarter of 2005, after Regulation SHO had been in effect for approximately four months, the NYSE's Division of Member Firm Regulation ("MFR") performed a special examination of the operational and supervisory standards, and written policies and procedures established and maintained by the Firm with respect to Regulation SHO.  MFR issued a report of that examination, MFR's 2005 Special Regulation SHO Examination Report (the "Report"), that included exceptions reflecting that the Firm failed to have and/or failed to adequately implement supervisory policies and procedures with regard to Regulation SHO, and was not in compliance with certain provisions of Regulation SHO.  The Report was referred to Enforcement.

4.   By letter dated November 1, 2005, Enforcement advised the Firm that it was investigating, among other things, possible violations of NYSE Rules, Regulation SHO and/or other federal securities laws contained in MFR's Report.

## Overview

5.   Regulation SHO was designed to, among other things, establish uniform locate and delivery requirements in order to address problems associated with failures to deliver,[1] including potentially abusive "naked" short selling selling ("naked" short selling generally refers to selling short without having borrowed the securities to make delivery), and create uniform marking requirements for sales of all equity securities.

6.   Regulation SHO has three primary purposes:  to create uniform order marking requirements for sales of all equity securities; to reduce the number of potential failures to deliver by means of the "locate" requirement; and to limit the time in which a broker can permit failures to deliver to persist in securities in which a substantial number of fails have occurred ("threshold securities") by means of a buy-in requirement.

7.   The commencement date for compliance with the provisions of Regulation SHO was January 3, 2005.  Among other things, Regulation SHO defines ownership of securities, specifies requirements for the aggregation of long and short positions, and requires broker-dealers to mark sales in all equity securities "long," "short," or "short

---

[1]  When a seller does not deliver the securities sold to the buyer by settlement date as required it is referred to as a "failure to deliver", "fail to deliver" or fail.  The resulting open position is referred to as a "fail position" or "fail."

exempt." Regulation SHO also requires short sellers in all equity securities to locate securities and/or pre-borrow before selling, and also imposes more stringent delivery requirements on broker-dealers for threshold securities.

## Summary of Violative Conduct

8.   As set forth below, GSEC failed to comply with the requirements of Regulation SHO in certain respects during the period January 3, 2005 to August 2005 (the "relevant period"). The Firm failed to ascertain that orders were properly marked "long", "short" or "short exempt" in various instances. With respect to customer orders, the Firm failed to ascertain that sell transactions for securities that were not in the Regulation SHO pilot program, but were exempt from the tick/price test under Section 10(a) of the Exchange Act and Rule 10a-1 thereunder were properly marked short exempt. The Firm failed to monitor customer short sales to ascertain that previous borrowings arranged by the customers had resulted in timely deliveries and therefore that the Firm had reasonable grounds to rely on customers' assurances. Similarly, the Firm failed to monitor customer "long" sales to ascertain whether such sales repeatedly required borrowed shares for delivery or resulted in fails to deliver and consequently whether the Firm had reasonable grounds to believe customers would deliver securities to it prior to the scheduled settlement of the transactions.

9.   The Firm also improperly marked certain sales for one of its own accounts as long sales when those transactions were short sales. In addition, the Firm failed to properly calculate and age its fails in threshold securities by treating its positions under multiple participant numbers separately. Further, the Firm failed to reasonably supervise in that it did not have adequate policies and procedures to provide for compliance with these sections of Regulation SHO, and failed to maintain accurate books and records with respect to these matters.

## GSEC Failed to Ascertain that Orders were Properly Marked "Short Exempt"

10.   Exchange Act Rule 10a-1 sets forth tick/price restrictions on the circumstances under which a person may effect a short sale. Exchange Act Rules 10e-1 through 10e-13 provide exceptions to these tick/price restrictions on short sales.

11.   Rule 200(g) of Regulation SHO requires that a broker or dealer must mark all sell orders of any equity security as "long," "short," or "short exempt." A short sale order must be marked "short exempt" if the seller is relying on an exception from the tick test of Rule 10a-1, or the price test of an exchange or national securities association. The accurate marking of sell orders is essential for locate, stock borrow, and execution purposes.

12.   During the relevant period, GSEC did not have reasonable procedures to ascertain that transactions for securities that were not in the pilot program, but were exempt from the tick/price test under Section 10(a) of the Exchange Act and Rule 10a-1

6

thereunder, were properly marked "short exempt." Rather than fulfilling the obligation placed on it as the broker-dealer by Regulation SHO to properly mark sell orders, GSEC relied solely on its customers to mark these orders properly.

### GSEC Failed to Have Reasonable Grounds to Believe Securities Could Be Borrowed for Delivery on the Date Delivery Was Due Prior to Effecting Short Sales Based on Customers' Assurances

13.     Rule 203(b)(1) of Regulation SHO states: A broker or dealer may not accept a short sale order in an equity security from another person, or effect a short sale in an equity security for its own account, unless the broker or dealer has: (i) Borrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) Reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) Documented compliance with...paragraph (b)(1).

14.     Rule 203 requires that the executing broker has the responsibility to perform the locate and document it, prior to effecting a short sale, and must have a reasonable basis to believe that the security can be delivered on the settlement date. Reasonableness is based on the facts and circumstances of a particular transaction.

15.     Pursuant to Regulation SHO the executing broker may rely on a customer's representation that an order to sell short a security is supported by a locate obtained by the customer from the stock loan department of the executing broker, or any other identified entity that is authorized to loan stock, as long as reliance on such representation is reasonable. This may provide the "reasonable grounds" required by Rule 203(b)(1)(ii).

16.     However, where a broker-dealer knows or has reason to know that a customer's prior assurances resulted in failures to deliver, assurances from such customer may not provide the "reasonable grounds" required for a locate by 203(b)(1)(ii).

17.     The documentation required by Rule 203(b)(1)(iii) should include the source of securities cited by the customer. The broker-dealer also should be able to demonstrate that there are "reasonable grounds" to rely on the customer's assurances, *e.g.*, through documentation showing that previous borrowings arranged by the customer resulted in timely deliveries in settlement of the customer's transactions.

7

18. An executing broker may not reasonably assert that it did not know or have reason to know whether a customer's prior short sale trades resulted in delivery failures if the executing broker made no reasonable effort to obtain such information.[2]

19. GSEC executed customers' short sales based on customers' assurances as a basis for "reasonable grounds" to believe that securities could be borrowed for delivery on the date delivery is due.

20. During the relevant period, GSEC did not track customers' assurances in order to verify that previous borrowings arranged by its customers resulted in timely deliveries in settlement of customers' transactions. If a customer failed to deliver on a short sale, GSEC would make good on the delivery, but not track the fail back to the particular customer, in most instances. Under these circumstances, GSEC could not rely on its customers' assurances as the "reasonable grounds" required by Rule 203(b)(1)(ii), as described above.

21. GSEC executed customer short sales in certain instances, when it had not borrowed the security, or entered into a bona-fide arrangement to borrow the security and did not have reasonable grounds based on customer representations to believe that the security could be borrowed so that it could be delivered on the date delivery is due.

**GSEC Failed to Properly Calculate and Age its Fails in Threshold Securities**

22. Rules 203(b)(3) and 203(b)(3)(iii) of Regulation SHO state:

(3) if a participant of a registered clearing agency has a fail to deliver position at a registered clearing agency in a threshold security for 13 consecutive settlement days, the participant shall immediately thereafter close out the fail to deliver position by purchasing securities of like kind and quantity....

(3)(iii) if a participant of a registered clearing agency has a fail to deliver position at a registered clearing agency in a threshold security for 13 consecutive settlement days, the participant and any broker or dealer for which it clears transactions, including any market maker that would otherwise be entitled to rely on the exception provided in paragraph (b)(2)(iii) of this section, may not accept a short sale order in the threshold security from another person, or effect a short sale in the threshold security for its own

---

[2] If the executing broker discovered that the customer's prior assurances resulted in a single failure to deliver, the executing broker should consider the relevant facts and circumstances to determine whether it would be reasonable to rely on the customer's assurances for other transactions. For example, it may be reasonable for an executing broker to rely on the customer's assurances if the circumstances of the fail in a prior transaction were unusual, or if previous locates relying on the customer's assurances resulted in timely deliveries of securities to settle the customer's transactions and the fail in the prior transaction was an anomaly.

8

account, without borrowing the security or entering into a bona-fide arrangement to borrow the security, until the participant closes out the fail to deliver position by purchasing securities of like kind and quantity.

23. During the relevant period, GSEC maintained two clearing platforms at The Depository Trust Company ("DTC") and tracked its fails in threshold securities separately for these two clearing platforms.

24. Despite the number of clearing platforms it may have at a registered clearing agency, for the purpose of calculating its fails under Regulation SHO, each broker-dealer is still a single participant in the registered clearing agency, and therefore must combine its positions to calculate its fails in threshold securities. Therefore, GSEC was required to combine its fails on its two clearing platforms to determine its obligations with regard to fails in threshold securities, in order to ensure fails were closed out as required and the Firm did not become subject to pre-borrowing restrictions.

25. Also, during the period of approximately March 23, 2005 to June 17, 2005, GSEC erroneously aged its fails in threshold securities in certain respects. During this period, due to an error in the Firm's coding logic for taking trade date credit for certain buy-ins, the Firm inadvertently re-aged certain fails in threshold securities (corresponding to the quantity of the buy-in) as one day old when those fails were actually as old as the Firm's oldest fail in the security, i.e. two to 13 days old. As a result, GSEC's books and records did not accurately reflect the age of these fails.

### GSEC Failed to Ascertain that Customers
### Were Not Misrepresenting Short Sales as Long Sales

26. Rule 203(a) of Regulation SHO provides, in pertinent part:
*Long sales.* (1) If a broker or dealer knows or has reasonable grounds to believe that the sale of an equity security was or will be effected pursuant to an order marked "long," such broker or dealer shall not lend or arrange for the loan of any security for delivery to the purchaser's broker after the sale, or fail to deliver a security on the date delivery is due.

(2) The provisions of paragraph (a)(1) of this section shall not apply: (i) To the loan of any security by a broker or dealer through the medium of a loan to another broker or dealer; [or] (ii) If the broker or dealer knows, or has been reasonably informed by the seller, that the seller owns the security, and that the seller would deliver the security to the broker or dealer prior to the scheduled settlement of the transaction, but the seller failed to do so....

9

27.     Depending on the circumstances, it may be unreasonable for a broker-dealer to treat a sale as long where orders marked "long" from the same customer repeatedly require borrowed shares for delivery or result in "fails to deliver."

28.     During the relevant period, GSEC did not monitor customer "long" sales to ascertain whether such sales repeatedly required borrowed shares for delivery or resulted in fails to deliver, and whether fails relating to long sales resulted from a pattern of certain customers repeatedly failing to deliver in securities on settlement date or special (acceptable) circumstances.

29.     GSEC cannot reasonably ascertain that it will be able to make delivery when due without borrowing securities to do so, if it does not have a reasonable basis to believe that the selling customer will deliver the security to it prior to the scheduled settlement of the transaction.  During the relevant period, GSEC did not have such a reasonable basis because it did not review its customers' performances, i.e., timely delivery of the securities, in connection with previous assurances. Under these circumstances, GSEC could not rely on its customers' assurances as the "reasonable grounds" required by Rule 203(a) of Regulation SHO, as described above.

30.     Further, because GSEC did not monitor long sales resulting in fails, it could not reasonably ascertain that its customers were not misrepresenting short sales as long sales.

### GSEC Failed to Maintain Accurate Books and Records in that It Improperly Marked Short Sales as Long Sales

31.     During the relevant period, GSEC used its own capital to buy-in aged customer fails in threshold securities in instances where it had provided the customer with the locate for the short sale.  GSEC recorded these buy-ins in an account designated as the "Hard Stock" account.[3]

32.     GSEC employees provided the information for the sell orders from the Hard Stock account including marking the orders as long, short or short exempt.

33.     During the relevant period, GSEC employees improperly marked certain sales of securities from the Hard Stock account as long sales.  The sales should have been marked as short sales because GSEC did not possess the securities at the time they were sold from the Hard Stock account thereby rendering GSEC's books and records inaccurate.

---

[3]     The Hard Stock account was maintained at GSEC.  However the orders for the account were executed at Goldman Sachs & Co. Inc.

10

**GSEC Failed to Reasonably Supervise**

34.   NYSE Rule 342 requires that every member organization provide for appropriate procedures for supervision and control over its business activities and compliance with securities laws and regulations.  Additionally, every member organization is required to establish a system of follow-up and review to assure the proper exercise of responsibility and authority.  Additionally, NYSE Rule 342.23 requires that every member organization develop and maintain adequate controls over each of its business activities, and that such controls must provide for the establishment of procedures for independent verification and testing of those business activities.

35.   GSEC failed to reasonably supervise in that it did not provide for appropriate procedures of supervision and control of its business activities with respect to the aspects of Regulation SHO discussed herein.

## DECISION

The Hearing Officer, in accepting the Stipulation of Facts and Consent to Penalty, found Respondent guilty as set forth above.

## PENALTY

In view of the above findings, the Hearing Officer imposed the penalty consented to by Respondent of a censure and a fine of $350,000.

For the Hearing Board

Peggy Kuo - Chief Hearing Officer

# NEW YORK STOCK EXCHANGE LLC

**NYSE HEARING BOARD DECISION 06-112**                    June 28, 2006
CREDIT SUISSE SECURITIES (USA) LLC
MEMBER ORGANIZATION

\* \* \*

Violated Rule 203(b)(1) of Regulation SHO by accepting short sale orders
and effecting those orders without having borrowed securities or entered into
bona-fide arrangements to borrow them or without having reasonable
grounds to believe that securities could be borrowed so that they could be
delivered on dates delivery was due; violated Rule 203(a) of Regulation SHO
by effecting sales pursuant to orders marked long when it did not know or
have reasonable grounds to believe that it would be able to deliver security
on date the delivery was due or that customers were not representing short
sales as long sales; violated NYSE Rule 342 by failing to provide for
appropriate procedures of supervision and control to ascertain that prior to
effecting customer short sale orders it had borrowed securities, (a) entered
into bona-fide arrangements to borrow them, or had reasonable grounds to
believe that securities could be borrowed so that they could be delivered on
dates delivery was due and (b) when effecting customer sell orders marked
long, it knew or had reasonable grounds to believe that (i) it would be able to
deliver security on date delivery was due and (ii) short sales were not
misrepresented as long sales – Consent to censure and $250,000 fine.

Appearances:

For the Division of Enforcement                    For Respondent
Susan Light, Esq.                                  Stephen M. Cutler, Esq.
Steven F. Korostoff, Esq.                          Fraser L. Hunter, Jr., Esq.
Jeanne R. Elmadany, Esq.

\* \* \*

A Hearing Officer on behalf of the New York Stock Exchange LLC ("NYSE") considered a
Stipulation of Facts and Consent to Penalty entered into between NYSE Regulation, Inc.'s
Division of Enforcement ("Enforcement") and Credit Suisse Securities (USA) LLC
("Respondent," "CS," or the "Firm"), an NYSE member organization. Without admitting or
denying guilt, Respondent consented to a finding by the Hearing Officer that it:

2

I.   Violated Rule 203(b)(1) of Regulation SHO in that it accepted short sale orders and effected those orders without having:

    a.   borrowed the securities, or entered into bona-fide arrangements to borrow the securities; or

    b.   reasonable grounds to believe that the securities could be borrowed so that they could be delivered on the dates delivery was due.

II.   Violated Rule 203(a) of Regulation SHO in that it effected sales pursuant to orders marked long when it did not know or have reasonable grounds to believe that it:

    a.   would be able to deliver the security on the date the delivery was due; and/or

    b.   that customers were not representing short sales as long sales.

III.   Violated NYSE Rule 342 in that it failed to provide for appropriate procedures of supervision and control to ascertain that:

    a.   prior to effecting customer short sale orders it had borrowed the securities, entered into bona-fide arrangements to borrow the securities, or had reasonable grounds to believe that the securities could be borrowed so that they could be delivered on the dates delivery was due.

    b.   when effecting customer sell orders marked long it knew or had reasonable grounds to believe that:

        i.   it would be able to deliver the security on the date the delivery was due; and

        ii.   short sales were not misrepresented as long sales;

For the sole purpose of settling this disciplinary proceeding, Enforcement and Respondent stipulate to certain facts, the substance of which follows:[*]

### Background and Jurisdiction

1.   Credit Suisse Securities (USA) LLC is a wholly owned subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group (headquartered in Switzerland). CS is a global investment bank that serves institutional and high net worth individual clients. CS' businesses include securities underwriting, sales and

---

[*] Hearing Officer Note: The facts, allegations, and conclusions contained in paragraphs 1 to 28 are taken from the executed Stipulation of Facts and Consent to Penalty between Enforcement and Respondent. No changes have been made to the stipulated paragraphs by the Hearing Officer.

3

trading, investment banking, private equity, financial advisory services, investment research, and asset management.   CS, a member of all principal exchanges, is also a primary dealer in US government securities and a Prime Broker.

2.   Effective September 7, 2004, the U.S. Securities and Exchange Commission ("SEC") adopted Regulation SHO under the Securities Exchange Act of 1934 ("Exchange Act"), and the commencement date for compliance with its provisions was January 3, 2005.

3.   In the second quarter of 2005, after Regulation SHO had been in effect for approximately four months, the NYSE's Division of Member Firm Regulation ("MFR") performed a special examination of the operational and supervisory standards, and written policies and procedures established and maintained by the Firm with respect to Regulation SHO.  MFR issued a report of that examination, MFR's 2005 Special Regulation SHO Examination Report (the "Report"), that noted exceptions regarding the Firm's implementation of Regulation SHO.  The Report was referred to Enforcement.

4.   By letter dated November 1, 2005, Enforcement advised the Firm that it was investigating, among other things, possible violations of NYSE Rules, Regulation SHO and/or other federal securities laws related to the exceptions noted in MFR's Report.

## Overview

5.   Regulation SHO was designed to, among other things, establish uniform locate and delivery requirements in order to address problems associated with failures to deliver,[1] including potentially abusive "naked" short selling ("naked" short selling generally refers to selling short without having borrowed the securities to make delivery), and create uniform marking requirements for sales of all equity securities.

6.   Regulation SHO has three primary purposes: to create uniform order marking requirements for sales of all equity securities; to reduce the number of potential failures to deliver by means of the "locate" requirement; and to limit the time in which a broker can permit failures to deliver to persist in securities in which a substantial number of fails have occurred ("threshold securities") by means of a buy-in requirement.

7.   The commencement date for compliance with the provisions of Regulation SHO was January 3, 2005.  Among other things, Regulation SHO defines ownership of securities, specifies requirements for the aggregation of long and short positions, and requires broker-dealers to mark sales in all equity securities "long," "short," or "short exempt."  Regulation SHO also requires short sellers in all equity securities to locate

---

[1]   When a seller does not deliver the securities sold to the buyer by settlement date as required it is referred to as a "failure to deliver", "fail to deliver" or fail.  The resulting open position is referred to as a "fail position" or "fail."

4

securities and/or pre-borrow before selling, and also imposes more stringent delivery requirements on broker-dealers for threshold securities.

### Summary of Violative Conduct

8.    As set forth below, CS failed to comply with the requirements of Regulation SHO in certain respects during the period covering, in whole or in part, January 3, 2005 to September 2005 (the "relevant period").  The Firm failed to obtain locates for certain short sales it effected for its DMA and/or algorithmic trading clients.  In addition, the Firm failed to monitor customer "long" sales to ascertain whether such sales repeatedly required borrowed shares for delivery or resulted in fails to deliver and consequently whether the Firm had reasonable grounds to believe customers would deliver securities to it prior to the scheduled settlement of the transactions.  Further, the Firm failed to reasonably supervise in that it did not have adequate policies and procedures to provide for compliance with these aspects of Regulation SHO.

### CS Failed to Obtain Locates for Short Sales

9.    Rule 203(b)(1) of Regulation SHO states:

A broker or dealer may not accept a short sale order in an equity security from another person, or effect a short sale in an equity security for its own account, unless the broker or dealer has:  (i) Borrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) Reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) Documented compliance with this paragraph (b)(1).

10.    The broker-dealer may locate the securities (also referred to as obtaining a locate) in a number of ways, including but not limited to obtaining a representation from the selling customer that it has located the securities, and locating the securities through the broker-dealer's stock loan department.

11.    The broker-dealer executing the short sale must document that the securities have been located.  If the broker-dealer executes a short sale based on a customer's representation that the customer has obtained the locate, the documentation maintained by the broker-dealer should include the source of the securities cited by the customer and support for the reasonableness of reliance on the customer.

12.    Prior to and during the period January 3, 2005 through June 2005, CS provided direct market access[2] ("DMA") and algorithmic trading execution services to its clients.

---

[2]  Direct Market Access (DMA) is the automated process by which a broker-dealer's client, typically a large institutional client, routes a securities order directly to an execution venue, therefore avoiding intervention by a third-party.  Execution venues include exchanges, alternative trading systems, and electronic communication networks.  DMA clients typically cannot trade on ECNs or stock exchanges

5

13.     Prior to and during the period January 3, 2005 through June 2005, CS' DMA and/or algorithmic trading clients effected numerous short sales on a daily basis.

14.     Prior to and during the period January 3, 2005 through June 2005, CS was required to obtain a locate for each short sale it accepted from and executed for a client, including but not limited to DMA and/or algorithmic trading clients.[3]

15.     Prior to and during the period January 3, 2005 through June 2005, the information transfer protocol which CS utilized to obtain orders from its DMA and/or algorithmic trading clients did not require a client to provide a locate in connection with a short sale order.

16.     In early January 2005, but after the effective date of Regulation SHO, CS began to obtain locates for short sale orders it accepted from its DMA and/or algorithmic trading clients but only for short sale orders in securities which appeared on the Firm's Easy-to-Borrow list. From January 2005 to March 2005, CS continued to accept and execute short sale orders from certain of its DMA and/or algorithmic trading clients in securities that did not appear on the Firm's Easy-to-Borrow list without obtaining locates.

17.     In March 2005, CS began to reject non-algorithmic DMA short sale orders in securities which did not appear on the Firm's Easy-to-Borrow list and for which the client had not provided a locate. From March 2005 through June 2005, CS continued to accept and execute short sale orders from certain of its DMA algorithmic trading clients in securities that did not appear on the Firm's Easy-to-Borrow without obtaining locates. Beginning in June 2005, CS required that locates be obtained for all DMA algorithmic orders prior to execution.

18.     A review of short sales executed on April 22, 2005, revealed that CS accepted and executed 18 short sales for certain of its DMA algorithmic trading customers in securities not on the Firm's Easy-to-Borrow list on that date without a locate being obtained.

19.     Regulation SHO requires that broker-dealers perform and document locates for short sales. CS failed to obtain and document locates for certain of its DMA clients' short sale orders as required.

---

under their own names. Even when they decide to trade their order themselves, without broker assistance, they must still enter the market under some broker's ID. With DMA, they are using a broker's infrastructure, but they are controlling the order.

[3] Prior to December 2004, NYSE Rule 440C required that member organizations locate the security for delivery prior to effecting a short sale.

6

### CS Failed to Ascertain that Customers
### Were Not Misrepresenting Short Sales as Long Sales

20. Rule 203(a) of Regulation SHO provides, in pertinent part:

*Long sales.* (1) If a broker or dealer knows or has reasonable grounds to believe that the sale of an equity security was or will be effected pursuant to an order marked "long," such broker or dealer shall not lend or arrange for the loan of any security for delivery to the purchaser's broker after the sale, or fail to deliver a security on the date delivery is due.
(2) The provisions of paragraph (a)(1) of this section shall not apply: (i) To the loan of any security by a broker or dealer through the medium of a loan to another broker or dealer; [or] (ii) If the broker or dealer knows, or has been reasonably informed by the seller, that the seller owns the security, and that the seller would deliver the security to the broker or dealer prior to the scheduled settlement of the transaction, but the seller failed to do so...

21. Depending on the circumstances, it may be unreasonable for a broker-dealer to treat a sale as long where orders marked "long" from the same customer repeatedly require borrowed shares for delivery or result in "fails to deliver."

22. During the relevant period, CS did not monitor customer "long" sales to ascertain whether such sales repeatedly required borrowed shares for delivery or resulted in fails to deliver, and whether fails relating to long sales resulted from a pattern of certain customers repeatedly failing to deliver in securities on settlement date without special (acceptable) circumstances.

23. CS could not reasonably ascertain that it would be able to make delivery when due without borrowing securities to do so, if it did not have a reasonable basis to believe that the selling customer would deliver the security to it prior to the scheduled settlement of the transaction. Such a determination could only be made by reviewing the customers' performances, i.e., timely delivery of the securities, in connection with those assurances. Therefore, CS could not rely on its customers' assurances as the "reasonable grounds" required by Rule 203(a) of Regulation SHO.

24. Further, because CS did not monitor long sales resulting in fails, it could not ascertain that its customers were not misrepresenting short sales as long sales.

### CS Failed to Reasonably Supervise

25. NYSE Rule 342 requires that every member organization provide for appropriate procedures for supervision and control over their business activities and compliance with securities laws and regulations. Additionally, every member

7

organization is required to establish a system of follow-up and review to assure the proper exercise of responsibility and authority. Additionally, NYSE Rule 342.23 requires that every member organization develop and maintain adequate controls over each of its business activities, and that such controls must provide for the establishment of procedures for independent verification and testing of those business activities.

26.     CS failed to reasonably supervise in that it did not provide for appropriate procedures of supervision and control of its business activities with respect to the aspects of Regulation SHO discussed herein.

## Other Considerations

27.     In determining to resolve this matter on the basis set forth herein, Enforcement took into consideration certain actions by CS, including: (i) prior to the effectiveness of Regulation SHO, CS began to work on a technological solution to ensure that locates were obtained prior to execution of all DMA and/or algorithmic orders. However, because the Firm's initial attempt to ensure locates were obtained, which was implemented in January 2005, caused orders to be stalled in the system it had to be withdrawn; (ii) in March 2005, CS successfully implemented a technological solution to reject non-algorithmic DMA short sale orders in securities that did not appear on the Firm's Easy-to-Borrow list and for which the client had not provided a locate; and (iii) in June 2005, CS successfully implemented a technological solution that required locates be obtained for all DMA algorithmic orders prior to execution.

28.     In addition, Enforcement considered that: (i) CS procured the information transfer protocol it utilized from a widely-used third party vendor; (ii) prior to and during the period January 3, 2005 through June 2005, some of CS' DMA and/or algorithmic trading clients provided locates in connection with short sales even though CS' transfer protocol did not at the time require the client to do so; and (iii) CS conducted surveillance of locates, including DMA and/or algorithmic orders where locates had not been provided prior to execution.

## DECISION

The Hearing Officer, in accepting the Stipulation of Facts and Consent to Penalty, found Respondent guilty as set forth above.

8

## PENALTY

In view of the above findings, the Hearing Officer imposed the penalty consented to by Respondent of a censure and a $250,000 fine.

For the Hearing Board


Peggy Kuo - Chief Hearing Officer