IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| TASER INTERNATIONAL, INC., *et al.*, | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 1:10-CV-03108-JOF |
|  | : |  |
| v. | : |  |
|  | : |  |
| MORGAN STANLEY & CO., INC., *et al.*, | : |  |
| Defendants. | : |  |
|  | : |  |

**DEFENDANT MERRILL LYNCH PROFESSIONAL CLEARING CORP.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ...........................................................................................3

    A.  Plaintiffs' Allegations and Procedural History ........................................3

    B.  The National System ...........................................................................4

        1.  Congress vested the SEC with the authority to implement a national clearance and settlement system...........................................4

        2.  DTC and NSCC.......................................................................4

        3.  CNS .......................................................................................5

        4.  Failures to Deliver and the Stock Borrow Program ............................6

        5.  Federal Regulation of the Clearance and Settlement of Short Sales...........................................................................8

    C.  The "Phantom" Share Litigations................................................9

        1.  The First-Wave Cases ...........................................................9

        2.  Second-Wave Cases .............................................................10

ARGUMENT ..............................................................................................11

  I.  This Court has federal-question jurisdiction under 28 U.S.C. § 1331. ........11

    A.  Whether the National System allows for the creation of counterfeit shares is a disputed federal issue.............................................11

    B.  Whether the National System allows for the creation of counterfeit shares is a substantial federal issue. ......................................13

        1.  Federal courts already have recognized that allegations like those presented here raise an important federal issue. ......................13

        2.  All of Plaintiffs' state-law claims would be resolved by a finding that failures to deliver within CNS do not create counterfeit shares.................................................................16

        3.  Resolution of the counterfeit-share issue will control several other cases and may foreclose additional counterfeit-share litigation.................................................................17

# TABLE OF CONTENTS
## (*continued*)

**Page**

C.  The exercise of jurisdiction will maintain the congressionally-approved balance between federal and state jurisdiction. ........................17

II.  This Court has exclusive jurisdiction under 15 U.S.C. § 78aa....................18

A.  Plaintiffs allege violations of the Exchange Act and rules and regulations promulgated under the Exchange Act............................18

B.  Plaintiffs' state-law claims arise from alleged violations of duties created under section 10(b) of the Exchange Act. ........................23

CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adventure Outdoors, Inc. v. Bloomberg*,
   552 F.3d 1290 (11th Cir. 2008) ........................................................................11, 13

*Austin v. Ameriquest Mortg. Co.*,
   510 F. Supp. 2d 1218 (N.D. Ga. 2007) ...................................................................21

*Avenius v. Banc of Am. Secs. LLC*,
   2010 Cal. App. Unpub. LEXIS 7847 (Cal. Ct. App. 9/30/10) ................................11

*Avenius v. Banc of Am. Secs. LLC*,
   No. CGC-06-453422 (Cal. Super. Ct.) ...................................................................10

*Avenius v. Banc of Am. Secs. LLC*,
   2006 U.S. Dist. LEXIS 95236 (N.D. Cal. 12/30/06)...............................................20

*Ayres v. GMC*,
   234 F.3d 514 (11th Cir. Ga. 2000) ........................................................................12

*Browne v. NASD, Inc.*,
   2006 U.S. Dist. LEXIS 90657 (N.D. Tex. 12/14/06).............................................18

*Calif. ex rel. Lockyer v. Dynegy, Inc.*,
   375 F.3d 831 (9th Cir. 2004).................................................................................22

*Capece v. DTCC*,
   2005 U.S. Dist. LEXIS 42039 (S.D. Fla.10/11/05)......................................9, 15, 23

*Cohen v. Stevanovich*,
   2010 U.S. Dist. LEXIS 66010 (S.D.N.Y. 6/23/10) .................................................10

*Coker v. DaimlerChrysler Corp.*,
   220 F. Supp. 2d 1367 (N.D. Ga. 2002) ...................................................................21

*D'Alessio v. N.Y. Stock Exch., Inc.*,
   258 F.3d 93 (2d Cir. 2001) ......................................................................................25

# TABLE OF AUTHORITIES
## (*continued*)

Page

*Empire HealthChoice Assur., Inc. v. McVeigh*,
547 U.S. 677 (2006) ..................................................................13

*Fairfax Fin. Holdings, Ltd. v. S.A.C. Capital Mgmt., LLC*,
2007 U.S. Dist. LEXIS 39214 (D.N.J. 5/15/07).......................25

*Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (U.S. 2005) .................................................11, 17

*Graham Commer. Realty, Inc. v. Shamsi*,
75 F. Supp. 2d 1371 (N.D. Ga. 1998) ......................................21

*Hawkins v. NASD*,
149 F.3d 330 (5th Cir. 1998) ...................................................24

*In re Ben Carter*,
618 F.2d 1093 (11th Cir. 1980)................................................12

*Kinsey v. Nestor Exploration, Ltd.-1981A*,
604 F. Supp. 1365 (E.D. Wash. 1985) .....................................19

*Landers v. Morgan Asset Mgmt.*,
2009 U.S. Dist. LEXIS 30891 (W.D. Tenn. 3/31/09)...............22

*Lowe v. NASDR*,
1999 U.S. Dist. LEXIS 19489 (D.D.C. 12/14/99) ...................24

*Meinders v. Refco Sec., Inc.*,
865 F. Supp. 721 (D. Colo. 1994) ............................................21

*Nanopierce Techs., Inc. v. DTCC*,
123 Nev. 362 (2007)...................................................................9

*Neighborhood Mortg., Inc. v. Fegans*,
2007 U.S. Dist. LEXIS 63241 (N.D. Ga. 8/28/07) ..................21

# TABLE OF AUTHORITIES
## (*continued*)

Page

*Opulent Fund, L.P. v. Nasdaq Stock Mkt., Inc.*,
  2007 U.S. Dist. LEXIS 79260 (N.D. Cal.10/12/07)................................23

*Ormet Corp. v. Ohio Power Co.*,
  98 F.3d 799 (4th Cir. 1996).........................................................18

*Overstock.com, Inc. v. Morgan Stanley & Co., et al.*,
  No. CGC-06-453422 (Cal. Super. Ct.)..........................................10

*Pet Quarters, Inc. v. DTCC*,
  559 F.3d 772 (8th Cir. 2009)........................................................9

*Scouten v. Amerisave Mortgage*,
  2004 U.S. Dist. LEXIS 30682 (N.D. Ga. 12/16/04) ..................21

*Shimoda-Atlantic, Inc. v. FINRA*,
  2008 U.S. Dist. LEXIS 37900 (W.D. Ark. 5/8/08)....................23

*Signalife, Inc. v. Vianale, et al.*,
  No. BC-397448 (Cal. Super. Ct.) ...............................................10

*Sparta Surgical Corp. v. NASD*,
  159 F.3d 1209 (9th Cir. 1998)..............................................19, 22

*Sullivan & Long v. Scattered Corp.*,
  47 F.3d 857 (7th Cir. 1995).........................................................19

*T&E Pastorino Nursery v. Duke Energy Trading & Mktg., LLC*,
  123 Fed. Appx. 813 (9th Cir. 2005) .........................................22

*Whistler Invs., Inc. v. DTCC*,
  539 F.3d 1159 (9th Cir. 2008)......................................................9

*Whitehall Wellington Invs., Inc. v. NASD*,
  2000 U.S. Dist. LEXIS 18607 (S.D. Fla. 12/7/00)....................24

# TABLE OF AUTHORITIES
### (*continued*)

**Page**

**Statutes**

15 U.S.C. § 78aa ....................................................................................passim

15 U.S.C. § 78j .................................................................................................20

15 U.S.C. § 78j(a)(1) ........................................................................................19

15 U.S.C. § 78o-3(b) .........................................................................................19

15 U.S.C. § 78q-1 .........................................................................................4, 17

28 U.S.C. § 1331 .....................................................................................1, 11, 19

**Regulations**

17 C.F.R. § 242.203 ..........................................................................................19

17 C.F.R. § 242.203(b)(1) ...................................................................................8

17 C.F.R. § 242.203(b)(3) ...................................................................................8

17 C.F.R. § 240.15c3-3 ................................................................................19, 20

42 Fed. Reg. 3916 ...............................................................................................4

46 Fed. Reg. 3104 ...............................................................................................6

68 Fed. Reg. 35037 .........................................................................................4, 5

68 Fed. Reg. 62972 .............................................................................................4

69 Fed. Reg. 48008 .........................................................................................6, 8

69 Fed. Reg. 70852 .............................................................................................6

**Rules**

NASD Rule 3310 ..........................................................................................20, 23

# TABLE OF AUTHORITIES
### (*continued*)

Page

NASD Rule 3370 .............................................................................................8, 20, 23

NASD Rule 11830 ...............................................................................................20, 23

NYSE Rule 440C.10 ..................................................................................................8

SEC Rule 10b-5 ...........................................................................................18, 19, 20

NASD Uniform Practice Code Section 71 .................................................................20

## Other Authorities

DTCC Corrects Misrepresentations on Naked Short Selling Litigation,
   http://www.dtcc.com/news/press/releases/2006/litigation.php .................................9

Roddy Boyd, Overstock Lobbies to Fight Short Selling,
   THE NEW YORK POST, 11/23/07 .................................................................................8

S. Rep. No. 94-75, 1975 U.S.C.C.A.N. 179 .........................................................4, 17

SEC Division of Market Regulation:  Responses to Frequently Asked
   Questions Concerning Regulation SHO, http://www.sec.gov/divisions/
   marketreg/mrfaqregsho1204.htm ..........................................................................5, 8

Defendant Merrill Lynch Professional Clearing Corp. ("Merrill Pro") submits this memorandum in opposition to Plaintiffs' Motion for Remand, Fees and Costs.

## PRELIMINARY STATEMENT

This Court has jurisdiction here under two different federal statutes:  28 U.S.C. § 1331, which grants the Court jurisdiction over claims arising under federal law, and 15 U.S.C. § 78aa, which grants the Court *exclusive* jurisdiction over alleged violations of Securities Exchange Act of 1934 (the "Exchange Act").

This action, styled as a state-law complaint, is one of several copycat actions filed by the same plaintiffs' lawyers around the country.  It is part of a second wave of cases challenging the National Clearance and Settlement System (the "National System")—specifically the National Securities Clearing Corporation's Continuous Net Settlement system ("CNS")—on the basis that its accounting methods allow for the creation of so-called "phantom" or "counterfeit" shares.  In the first-wave cases, plaintiffs sued the corporations responsible for administering the National System, asserting only state-law claims in an effort to avoid federal court.  But federal courts repeatedly rejected those efforts, recognizing that whether the National System allows for the creation of counterfeit shares is a substantial federal question.  In this second of wave cases, plaintiffs again attack the National System, this time by suing the prime brokers that use it.  And again, Plaintiffs attempt to avoid federal jurisdiction by asserting what are nominally state-law claims.  But underlying each of

those state-law claims is the same substantial federal question raised in the first-wave cases:  Does the National System allow for the creation of counterfeit shares?

This federal question is of such vital importance that the Securities and Exchange Commission submitted *amicus* briefs in three first-wave cases to emphasize its view that the National System does *not* allow for the creation of counterfeit shares.  The SEC responded to allegations identical to those here for good reason:  a finding that CNS allows for the creation of counterfeit shares would call the entire National System into question.  Thus, any such finding may only come from a federal court.

This action also must remain in federal court because Plaintiffs allege violations of regulations promulgated under the Exchange Act, over which Congress conferred exclusive jurisdiction to federal courts.  While Plaintiffs cite decisions in which federal courts have remanded state-RICO actions based on federal predicate acts (almost all mail or wire fraud), Plaintiffs do not cite a single case addressing the federal court's exclusive jurisdiction over Exchange Act claims.  This is because the federal courts have uniformly held that state courts do not have jurisdiction over alleged violations of the Exchange Act and its associated regulations, regardless of whether those violations are asserted as state-law causes of action.

The congressional policy favoring federal jurisdiction over Exchange Act

issues is so strong that Congress also gave federal courts exclusive jurisdiction over *all* claims seeking to enforce *duties* created by the Exchange Act or regulations promulgated thereunder.  Here all of Plaintiffs' claims are premised on Defendants' alleged failure to locate, borrow, and deliver shares to CNS in accordance with Defendants' duties under Regulation SHO and other federal regulations.  Thus, the Georgia state court lacks jurisdiction, and Plaintiffs' remand motion must be denied.

## BACKGROUND

### A.  Plaintiffs' Allegations and Procedural History

Plaintiffs commenced this action against Merrill Pro by filing a Seventh Amended Complaint (the "Complaint") in the State Court of Fulton County, Georgia. Merrill Pro filed a notice of removal on September 28, 2010, that all Defendants joined.  Plaintiffs now ask the Court to remand this action to state court.

Defendants are New York-based broker-dealers that execute and clear securities transactions on behalf of their customers and themselves.  Virtually all of these transactions are cleared through the congressionally-approved CNS.  Plaintiffs' core allegation is that the Defendants facilitated "naked short selling" in TASER common stock (*i.e.*, short selling[1] without determining that the stock can be borrowed

---

[1] A short sale is the sale of a security that the seller does not own.  The short seller ordinarily borrows the security to deliver it to the purchaser and later purchases it to return to the lender.  Short selling may be used to profit from a price drop, provide market liquidity, or hedge the risk of a long position in the same or a related security.

and delivered by the settlement date) by intentionally failing to borrow and deliver

TASER shares to CNS.  (*See* Compl. ¶¶ 1–7.)  These "failures to deliver" allegedly

created millions of "counterfeit" shares that flooded the market and reduced the value

of Plaintiffs' "legitimate" TASER shares.  (*Id.* ¶¶ 1–4, 14.)

**B.  The National System**

    1.  Congress vested the SEC with the authority to implement a national
        <u>clearance and settlement system.</u>

The National System was established by Congress in 1975 when it added

Section 17A to the Exchange Act.  *See* 15 U.S.C. §§ 78q-1.  Congress wanted to

create "uniform standards and procedures for clearance and settlement," 15 U.S.C.

§ 78q-1(a)(1)(D), and therefore directed the SEC to "regulate[] . . . every facet of the

securities handling process . . . clearing agencies, depositories, corporate issuers, and

transfer agents," S. Rep. No. 94-75, 1975 U.S.C.C.A.N. 179, 233 (Ex. B).

    2.  <u>DTC and NSCC</u>

The Depository Trust Company ("DTC") and National Securities Clearing

Corporation ("NSCC") are SEC-registered clearing agencies.  *See* 68 Fed. Reg.

35037, 35041 (6/4/03) (Ex. C); 42 Fed. Reg. 3916, 3938 (1/13/77) (Ex. D).[2]  They

---

*See* 68 Fed. Reg. 62972, 62973 (11/6/03) (Ex. A).  All exhibits cited herein are
attached to the October 25, 2010 Declaration of Brad E. Elias.

[2] DTC and NSCC are operating subsidiaries of the Depository Trust and Clearing
Corporation ("DTCC"), a holding company referenced throughout the Complaint
(*see, e.g.*, Compl. ¶ 4).

function as the backbone of the securities industry, maintaining accounts for their

member financial institutions and providing automated clearing and settlement

services.  Although Plaintiffs do not distinguish between DTC and NSCC (*see*

Compl. ¶ 4), they perform very different functions.  DTC is the nation's securities

depository, a vault serving as the record-owner of $40 trillion in securities.  The

beneficial owners of the securities are reflected only in DTC records.  This system

permits the transfer of securities from buyer to seller with a simple book-entry

adjustment to DTC records and eliminates the need to transfer paper stock certificates

when a trade is executed.  (*See* Ex. C at 35041.)  NSCC, in contrast, operates the

electronic CNS system, which tracks delivery obligations among buyers and sellers.

*See* SEC Division of Market Regulation: Responses to Frequently Asked Questions

Concerning Regulation SHO, http://www.sec.gov/divisions/marketreg/

mrfaqregsho1204.htm (Ex. E).

    3.  <u>CNS</u>

    In the typical securities transaction, a buying broker and a selling broker agree

to a sale on the "trade date."  The buying broker is then credited by NSCC with an

entitlement to receive the securities three days later on the "settlement date."  The

buying broker does not yet own the shares on the trade date, because DTC ownership

records have not changed.  On the settlement date, the selling broker "delivers"

shares to NSCC by instructing NSCC to debit its DTC account, and the buying broker

delivers payment to NSCC.  *See* 69 Fed. Reg. 70852, 70854–55, 70856 n.55

(12/7/04) (Ex. F).  NSCC, in turn, "delivers" shares to the buying broker by crediting

its DTC account and transfers the sale proceeds to the selling broker.  *Id.*  To

facilitate the voluminous daily transactions, CNS nets down each broker's daily

position in each security to a single obligation to deliver or receive that security and a

corresponding single obligation for payment or receipt of funds.  Thus, if a broker's

clients sell a total of 3,000 shares and buy a total of 1,000 shares, that broker would

have a "delivery obligation" to CNS of 2,000 shares on the settlement date.

    4.   <u>Failures to Deliver and the Stock Borrow Program</u>

        Sometimes a broker does not have sufficient shares in its DTC account to

satisfy its delivery obligation to CNS.  As a result, the buying brokers' DTC accounts

are not credited with the shares they expected to receive and the trades remain open.

This constitutes a "failure to deliver."  Notably, the SEC has noted that failures to

deliver occur for numerous reasons other than naked short selling.  *See* 69 Fed. Reg.

48008, 48016 n.85 (8/6/04) (Ex. G).  When a failure to deliver occurs, the SEC-

approved Stock Borrow Program ("SBP") may be triggered.  *See* 46 Fed. Reg. 3104

(1/7/81) (Ex. H).  The SBP allows CNS to satisfy broker's failures to deliver by

automatically borrowing securities that other brokers have voluntarily made available

for loan.  The borrowed securities are then used by the automated systems to make

deliveries to brokers entitled to receive delivery.  Critically, shares that are loaned

under the SBP are debited from the loaning broker's DTC account, and the loaning broker can no longer sell or re-lend these shares until the shares are returned to its DTC account.  Because not all securities are made available for loan, failures to deliver often remain unresolved by the SBP.

The central thesis of Plaintiffs' claims is that where the SBP does not come into operation, and a failure to deliver remains open, the CNS system creates "counterfeit" or "artificial" shares.  (*See* Compl. ¶ 4.)  Plaintiffs also allege that the SBP itself creates "counterfeit" shares because customers are not informed that shares they believe that they own have been borrowed and sold to someone else.  (*See id.* ¶ 80.)  The SEC has explicitly rejected both of these theories:

> **Question 7.1:  Do naked short sale transactions create "counterfeit shares?"**
>
> Answer:  . . . ***Naked short selling has no effect on an issuer's total shares outstanding*** . . . . ***Similarly, CNS has no effect on an issuer's total shares outstanding.  With regards to the contention that the U.S. clearance and settlement system, and specifically NSCC's CNS system, creates counterfeit shares, this is not the case.***  CNS [does] not reflect ownership positions until such time as delivery of shares are actually made. Ownership positions are reflected on the records of The Depository Trust Company ("DTC").
>
> **Question 7.2:  Does NSCC's stock borrow program ("SBP") create "counterfeit shares?"**
>
> Answer:  . . . The shares loaned by NSCC members for use in the SBP must be on deposit at DTC and are debited from members' accounts when the securities are used to make delivery.  Once a member's shares are used for delivery to another member, the lending member no longer has the right to sell or relend those shares until such time as the shares

are returned to its DTC account.  ***Accordingly, NSCC's SBP does not create "counterfeit shares."***

(Ex. E.)[3]

    5.  <u>Federal Regulation of the Clearance and Settlement of Short Sales</u>

Until 2005, short selling was regulated primarily by self-regulatory organizations, including the National Association of Securities Dealers and the New York Stock Exchange.  *See* NASD Rule 3370 (Ex. K), NYSE Rule 440C.10 (Ex. L). In 2004 the SEC adopted Regulation SHO to impose uniform national requirements on short selling.  (*See* Ex. G at 48009).  It has two main components.  Rule 203(b)(1) imposes a "locate" requirement, which provides that a short-selling broker-dealer must have reasonable grounds to believe that the security can be borrowed and delivered by the settlement date.  *See* 17 C.F.R. § 242.203(b)(1).  Rule 203(b)(3) creates a "threshold security list" consisting of securities with high rates of failures to deliver.  *See* 17 C.F.R. § 242.203(b)(3).  The SEC expressly permitted broker-dealers with failures to deliver in threshold securities to continue to trade in those securities for thirteen days before requiring the broker-dealers to "close-out" those fails.  *Id.*

---

[3]  In their Complaint, Plaintiffs quote statements of former SEC Chairman Harvey Pitt without disclosing that he made them several years after leaving the agency.  *See* http://www.financialsensearchive.com/fsn/2007/HarveyPitt.pdf (Ex. I).  He also made those comments during a speech to a group called the "Coalition Against Phantom Trading," a lobbying organization founded by Overstock.com, a plaintiff in another second-wave case.  *See* Roddy Boyd, Overstock Lobbies to Fight Short Selling, THE NEW YORK POST, 11/23/07 (Ex. J).

**C.  The "Phantom" Share Litigations**

1.   The First-Wave Cases

In January 2003, plaintiffs' lawyers, including some of Plaintiffs' counsel here,[4] began filing lawsuits against DTC and NSCC alleging that the National System and the SBP harm stockholders by facilitating the creation of "counterfeit shares." All of the fourteen first-wave cases have since been dismissed, either by a court or plaintiffs themselves.  *See, e.g.*, DTCC Corrects Misrepresentations on Naked Short Selling Litigation, http://www.dtcc.com/news/press/releases/2006/litigation.php (Ex. M); *Pet Quarters, Inc. v. DTCC*, 559 F.3d 772, 781 (8th Cir. 2009); *Whistler Invs., Inc. v. DTCC*, 539 F.3d 1159, 1167 (9th Cir. 2008); *Capece v. DTCC*, 2005 U.S. Dist. LEXIS 42039, at *9 (S.D. Fla.10/11/05); *Nanopierce Techs., Inc. v. DTCC*, 123 Nev. 362, 373 (2007).

The allegations in all of the first-wave cases closely mirror those in this action. In *Pet Quarters*, for example, Plaintiffs alleged that the defendants "create[d] tens of millions of unissued and unregistered shares."  (*See Pet Quarters* Compl. ¶ 1 (Ex. N).)  They also alleged that defendants were "(1) artificially increasing the supply of an issuer's shares in the marketplace, (2) driving down the price of the stock of the issuer, (3) decreasing the value of the shareholders' holdings in an issuer's stock; and

---

[4]  The O'Quinn Law Firm and Christian, Smith & Jewell, both of which have represented Plaintiffs in this action and in *Avenius*, also represented plaintiffs in several first-wave cases, including *Pet Quarters* and *Nanopierce*.

(4) causing multiple owners who purchased shares in separate transactions to own the same shares."  (*Id.* ¶ 7; s*ee also Capece* Compl. ¶ 44 (identical allegations) (Ex. O).)

2.   Second-Wave Cases

When it became apparent that the DTC and the NSCC would not be held liable for the alleged creation of "counterfeit" shares, the same consortium of plaintiffs' lawyers began a second wave of cases, bringing actions like this one in which they sue the broker-dealers that utilize the National System.  *See Avenius v. Banc of America Securities LLC, et al*.  No. CGC-06-453422 (Cal. Super. Ct.); *Overstock.com, Inc. v. Morgan Stanley & Co., et al.*, No. CGC-06-453422 (Cal. Super. Ct.); *Signalife, Inc. v. Vianale, et al.*, No. BC-397448 (Cal. Super. Ct.); *Cohen v. Stevanovich*, 2010 U.S. Dist. LEXIS 66010 (S.D.N.Y. 6/23/10).

Like the first-wave cases, the second-wave cases have been largely unsuccessful, with no plaintiff yet prevailing on this new theory of liability.  *Cohen* was dismissed for failure to state a claim, and two demurrers have been granted in *Signalife*.  *See Cohen*, 2010 U.S. Dist. LEXIS 66010; (Orders Granting Demurrers in *Signalife* (Exs. P and Q)).  And plaintiffs' contingency-fee counsel in *Avenius*, including Plaintiffs' counsel here, unsuccessfully sought to withdraw after reevaluating their case's merits.  *See Avenius v. Banc of Am. Secs. LLC*, 2010 Cal. App. Unpub. LEXIS 7847 (Cal. Ct. App. 9/30/10) (affirming denial of motion to withdraw); (*see also* Letter from *Avenius* plaintiff Michael Mather at 5 (Ex. R)).

Thus, the opportunity for Plaintiffs' counsel to establish that CNS failures to deliver create counterfeit shares is dwindling.

## ARGUMENT

## I.   This Court has federal-question jurisdiction under 28 U.S.C. § 1331.

Federal courts have long recognized that federal-question jurisdiction will lie over state-law claims that implicate significant federal issues.  *See Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  This principle "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Id.*  Federal-question jurisdiction exists where:  (i) relief under state law depends on the resolution of a disputed federal issue, (ii) the federal interest in the issue is substantial, and (iii) exercising jurisdiction would not disrupt the congressionally-approved balance between federal and state jurisdiction.  *Id.* at 313–14; *see also Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290 (11th Cir. 2008) (applying same test).  Because all three requirements are met here, this Court has jurisdiction, and Plaintiffs' motion to remand should be denied.

### A.   Whether the National System allows for the creation of counterfeit shares is a disputed federal issue.

There is no dispute that state-law claims can raise federal issues.  *See, e.g.*,

*Ayres v. GMC*, 234 F.3d 514, 518 (11th Cir. Ga. 2000) (finding federal jurisdiction over Georgia RICO claim premised on federal-law violations). In assessing jurisdiction, the court "looks to the substance of the complaint, not the labels used in it." *In re Ben Carter*, 618 F.2d 1093, 1101 (11th Cir. 1980) (finding federal jurisdiction over state-law claims resting on alleged breach of federal statutory duty).

While Plaintiffs here carefully articulate their claims in terms of Georgia law, even a cursory review of the Complaint reveals that it would be impossible to adjudicate any of their claims without directly confronting the substantial federal question of whether the National System allows for the creation of counterfeit shares. The Court will necessarily be asked to determine whether CNS failures to deliver create counterfeit shares that harm stockholders. This is because the counterfeit-share allegation lies at the heart of every cause of action in the Complaint:

- *RICO and Securities Fraud*: "defendants have counterfeited and sold TASER stock that is not properly authorized, issued or registered" and "have created, loaned and sold counterfeit TASER stock in an effort to manipulate the market for that stock . . . ." (Compl. ¶¶ 107, 109.)

- *Computer Systems Protection Act*: "defendants have used computers, computer networks and electronic data to create, loan and sell counterfeit TASER stock." (*Id.* ¶ 141.)

- *Conversion*: by creating counterfeit shares, "defendants have committed an unauthorized assumption and exercise of the right of ownership over personal property belonging to plaintiffs." (*Id.* ¶173.).

- *Money-had-and-received*: "creation, issuance, and sale of stock and/or securities entitlements in TASER that the defendants neither legitimately

owned nor had an intention of locating, receiving or delivering to the purchase."  (*Id.* ¶ 177.)

Thus, if the SEC is correct and failures to deliver within the National System do not create counterfeit shares, then all of Plaintiffs' state-law claims would fail.

**B.  Whether the National System allows for the creation of counterfeit shares is a substantial federal issue.**

In *Empire HealthChoice Assur., Inc. v. McVeigh*, the Supreme Court considered four *Grable* factors when assessing the substantiality of a federal issue raised by state-law claims:  (i) its importance (*i.e.*, not trivial); (ii) its necessity for resolution of the case *(i.e.*, not incidental to the outcome); (iii) its effect on other cases (*i.e.*, not anomalous or isolated); and (iv) the governmental nature of the defendant.  547 U.S. 677, 700–01 (2006).  *See also Adventure Outdoors*, 552 F.3d at 1300 (discussing federal substantiality analysis under *Grable*).  The first three factors weigh heavily in favor of finding a substantial federal interest in Plaintiffs' counterfeit-share allegations, and the fourth factor is no deterrent.

1.  Federal courts already have recognized that allegations like those presented here raise an important federal issue.

As numerous federal courts have already recognized, an allegation that the National System allows for the creation of counterfeit shares implicates a substantial federal interest.  In *Pet Quarters*, for example, the plaintiffs sued the DTC and NSCC under Arkansas law, alleging that the defendants facilitated the creation of counterfeit

shares in CNS.  *See* 545 F. Supp. 2d at 849.  After removal, the court denied the plaintiffs' motion to remand, reasoning that if Pet Quarters prevailed in establishing that the SBP facilitated the creation of counterfeit shares, the program "would have to be reexamined." (*Pet Quarters* 7/10/07 Order at 4 (Ex. S).)  The court recognized that "if the SBP was disrupted, Congress's intent would be frustrated.  This raises a substantial question of federal law sufficient to convey jurisdiction of this case."  (*Id.*)

The *Pet Quarters* logic applies with equal force here.  If Plaintiffs are correct that CNS failures to deliver create counterfeit shares, the entire National System, including the SBP, "would have to be reexamined."  Plaintiffs' counterfeit-shares theory also would call into question the SEC-approved three-day settlement period— which is effectively a three-day failure to deliver—because Plaintiffs acknowledge that CNS credits the buyer with "own[ing]" shares on the trade date, while delivery to the buyer's DTC account is still pending.  (Compl. ¶ 4.)  Thus, under Plaintiffs' theory, counterfeit shares exist immediately, and Plaintiffs' allegations regarding the ill effects of failures to deliver after the settlement date (*e.g.*, the buyer can sell shares that he has not received and does not "own") apply with equal force during the three days between trade and settlement.  But Congress and the SEC have rejected the need for immediate delivery of shares upon purchase.

*Capece* also provides helpful analysis.  There the plaintiffs sued the DTC and

NSCC for negligence in Florida state court.  *See* 2005 U.S. Dist. LEXIS 42039, at *9.

Addressing the plaintiffs' remand motion under Eleventh Circuit law, the court

observed that "[t]he 'substantial federal interest' doctrine requires removal of a

putative state law complaint when the resolution thereof requires inquiry into areas in

which the federal government has a substantial and comprehensive interest."  *Id.* at

*23.  The court denied remand because "resolution of Plaintiffs' claim is dependent

upon the scope and requirement of federal law" and "requires examination of the

technicalities of the SBP."  *Id.* at *25–*26.  As in *Capece*, Plaintiffs' claims here also

require an examination of the technicalities of the National System, including the

SBP.  (*See, e,g.*, Compl. ¶¶ 4, 80 (describing operation of CNS and SBP).)  The Court

cannot assess Plaintiffs' assertion that CNS and the SBP permit creation of

counterfeit shares without scrutinizing those systems for design flaws.

Because finding such a flaw would call the entire National System into

question, the SEC has taken particular interest in allegations like these.  For example,

the SEC submitted *amicus* briefs in *Nanopierce* and *Whistler* expressly rejecting

Plaintiffs' theory that either CNS or the SBP creates counterfeit shares:

> [N]either the continuous net settlement system nor the stock borrow
> program creates artificial securities.  The number of securities issued and
> outstanding is determined by the security issuer and is reflected in the
> issuer's records of registered ownership; nothing that happens in the
> course of clearing and settling trades, including any action taken by
> NSCC, can change that number.

(Brief of the SEC *Amicus Curiae*, *Nanopierce Tech, Inc. v. DTCC*, at 14 (Ex. T).)

> Plaintiffs also err when they claim that the stock borrow program creates "phantom securities." The stock borrow program simply shifts the consequences of the failure to deliver from a buyer to a lender that has indicated that it is willing to wait. The party failing to deliver continues to have an obligation to deliver the shares. This shift of consequences does not (and cannot) increase the number of securities issues, any more than a buyer's decision to either wait or initiate a buy-in can do so.

(Brief of the SEC *Amicus Curiae*, *Whistler Invs. Inc. v. DTCC*, at 16 (Ex. U).)

The SEC also submitted an *amicus* brief in *Pet Quarters*, rejecting the contention that CNS or the SBP results in the creation of "phantom shares" and stressing that those systems "do not result in more shares being credited to DTC participants' accounts than have been issued by the issuer and are being held by DTC." (Brief of the SEC *Amicus Curiae*, *Pet Quarters, Inc. v. DTCC*, at 10 (Ex. V).) The SEC's rejection of the central thesis of Plaintiffs' claims demonstrates both the federal nature and the national importance of this issue.

2. All of Plaintiffs' state-law claims would be resolved by a finding that failures to deliver within CNS do not create counterfeit shares.

A decision by a federal court that failures to deliver within CNS do not create counterfeit shares would resolve all of Plaintiffs' claims. As explained above, each cause of action is premised on the existence of counterfeit shares. And Plaintiffs' entire theory of harm rests on the contention that Defendants flooded the market with counterfeit TASER shares, increasing supply and driving down TASER's share price.

Were the Court to find that the National System does not create counterfeit shares, even where failures to deliver exist, Plaintiffs would have no cognizable damages.

>   3.   Resolution of the counterfeit-share issue will control several other cases and may foreclose additional counterfeit-share litigation.

This Court's finding that the National System cannot create counterfeit shares would resolve other second-wave cases premised on the counterfeit-share theory— *Avenius*, *Overstock*, and *Signalife*.  The finding also would dissuade the plaintiffs' bar from adding to the five second-wave cases that have already been filed.  Absent a federal ruling on this issue, plaintiffs' counsel likely will continue to file state-court actions until they find a forum willing to embrace their SEC-rejected theory.

**C.   The exercise of jurisdiction will maintain the congressionally-approved balance between federal and state jurisdiction.**

Asserting federal jurisdiction over this nominal state-law challenge to the National System and SBP is fully consistent with congressional judgment regarding the proper balance between state and federal courts.  Congress expressly directed the creation of the National System, 15 U.S.C. § 78q-1(a)(2)(A)(i), and directed the SEC to regulate "every facet" of that system (Ex. B at 233).  Plaintiffs' efforts to fracture the congressionally mandated uniformity with state-law claims should be rejected. *See Grable*, 545 U.S. at 319.  As stated in *Ormet Corp. v. Ohio Power Co.*:

>   Where the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for

> uniformity becomes a substantial federal interest, justifying the exercise
> of jurisdiction by federal courts.

98 F.3d 799, 807 (4th Cir. 1996).  The state-law claims present a *de facto* challenge to

the SEC's expert policy judgment that the National System (i) is the best method for

securities clearance in the United States; and (ii) does not create counterfeit shares.

## II.  This Court has exclusive jurisdiction under 15 U.S.C. § 78aa.

Section 27 of the Exchange Act provides that "[t]he district courts of the

United States . . . shall have exclusive jurisdiction of violations of this title or the

rules and regulations thereunder, and of all suits in equity and actions at law brought

to enforce any liability or duty created by this title or the rules and regulations

thereunder."  15 U.S.C. § 78aa(a); *see also Browne v. NASD, Inc.*, 2006 U.S. Dist.

LEXIS 90657, at *17 (N.D. Tex. 12/14/06) ("Exclusive jurisdiction is conferred . . .

by Congress in an effort to guard the application of federal law and to facilitate a

more uniform interpretation thereof.").  Based on this statutory language, this Court

has exclusive jurisdiction over this action because (i) Plaintiffs allege violations of

the Exchange Act and Rule 10b-5, Regulation SHO, and other regulations

promulgated thereunder; and (ii) Plaintiffs' claims seek to "enforce [a] duty created

by" Regulation SHO and other regulations promulgated under the Exchange Act.

### A.  Plaintiffs allege violations of the Exchange Act and rules and regulations promulgated under the Exchange Act.

Plaintiffs expressly allege that Defendants violated the Exchange Act, as well

as Rule 10b-5, Regulation SHO, Rule 15c3-3, and various NASD Rules (*see* Compl.

¶¶ 6, 76, 112–20).  These are all regulations promulgated under the Exchange Act.

*See* 15 U.S.C. §  78j(a)(1); 15 U.S.C. § 78o-3(b).  And no state court has jurisdiction

over these claims.  *See* 15 U.S.C. § 78aa(a); *Sparta Surgical Corp. v. NASD*, 159 F.3d

1209, 1212 (9th Cir. 1998) (removal jurisdiction lay "not under 28 U.S.C. § 1331, but

under 15 U.S.C. § 78aa which vests exclusive jurisdiction over claims concerning

duties created by exchange rules in the federal courts"); *Kinsey v. Nestor Exploration,*

*Ltd.-1981A*, 604 F. Supp. 1365, 1369 (E.D. Wash. 1985) (finding exclusive

jurisdiction over state claims predicated on federal securities violations).  Not only do

Plaintiffs allege that Defendants violated these federal regulations, but the alleged

violations form the backbone of the Complaint.  For example, the requirements to

locate, borrow, and deliver securities when executing a short sale—which are the core

of Plaintiffs' claims—come from Regulation SHO or its predecessor rules.  *See* 17

C.F.R. § 242.203 (imposing locate and delivery requirements); *Sullivan & Long v.*

*Scattered Corp.*, 47 F.3d 857, 863 (7th Cir. 1995) (noting that before Regulation

SHO, "plaintiffs do not point us to, and we have not been able on our own to find, a

law that requires . . . short sellers to borrow the stock that they are selling short").

    The presence of Plaintiffs' Exchange Act allegations distinguishes this case

from *all* of the cases Plaintiffs cite.  In *Avenius*, for example—the case on which

Plaintiffs most heavily rely—the plaintiffs explicitly disavowed reliance on any

federal statute or regulation, explaining on remand briefing that

> the passing references in Plaintiffs' Complaint to requirements or
> regulations governing short sales are strictly by way of background.
> *Violations of federal rules and regulations are not an element of
> Plaintiffs' state law market manipulation claims*.  Whether Defendants
> complied with Reg. Sho is *irrelevant* to Plaintiffs' causes of action.

(10/03/06 *Avenius* Pls.' Reply to Defs.' Opp. to Mot. to Remand at 8 (emphasis

added) (Ex. W); *see also id.* at 7 ("Plaintiffs' mention of requirements and regulations

in their Complaint is merely for background purposes.").)  Based on this argument

the federal court remanded, noting that plaintiffs "do not assert, rely on, or attempt to

enforce any [Exchange Act] rules or regulations . . . [or] seek to enforce any right or

liability created by the Exchange Act."  2006 U.S. Dist. LEXIS 95236, at *11 (N.D.

Cal. 12/30/06).  Precisely the opposite is true here.  Plaintiffs not only assert and rely

on various Exchange Act rules and regulations, they employ those alleged violations

as predicate acts under the Georgia RICO statute.  And in their Seventh Amended

Complaint, Plaintiffs *added* explicit allegations that Defendants violated "Regulation

SHO" and "Uniform Practice Code Section 71, 17 C.F.R. 240.15c3-3, 15 U.S.C.

§78j, Rule 10b-5 and NASD Rules 3310, 3370, 11830."  (Compl. ¶76.)  These

allegations are not just background facts, and *Avenius* is simply not on point.

Plaintiffs' Exchange Act allegations also distinguish this case from the myriad

cases Plaintiffs cite, *nearly all of which address Georgia RICO claims predicated on*

*federal mail and/or wire fraud violations*—statutes for which Congress has *not* conferred exclusive jurisdiction on the federal courts.[5]  *See Neighborhood Mortg., Inc. v. Fegans*, 2007 U.S. Dist. LEXIS 63241, at *2 (N.D. Ga. 8/28/07) (Forrester, J.) (mail fraud, wire fraud, and bank fraud predicate acts); *Austin v. Ameriquest Mortg. Co.*, 510 F. Supp. 2d 1218, 1226 (N.D. Ga. 2007) (mail and wire fraud predicate acts); *Coker v. DaimlerChrysler Corp.*, 220 F. Supp. 2d 1367, 1371 (N.D. Ga. 2002) (mail and wire fraud predicate acts); *Scouten v. Amerisave Mortgage*, 2004 U.S. Dist. LEXIS 30682 (N.D. Ga. 12/16/04) (addressing wire fraud and interstate transportation of money known to have been taken by fraud); *see also Graham Commer. Realty, Inc. v. Shamsi*, 75 F. Supp. 2d 1371, 1373 (N.D. Ga. 1998) (addressing "ten federal criminal statutes").

Indeed, federal courts have not hesitated to deny remand where plaintiffs expressly or implicitly allege violations of the Exchange Act.  For example, in *Sparta* the Ninth Circuit affirmed a remand denial "[b]ecause [plaintiff's] complaint sought relief based upon violation of exchange rules [and therefore] subject matter jurisdiction was specifically vested in the federal district court under the Exchange Act."  159 F.3d at 1211.  The Court also held that "the rule that state law claims

---

[5]  Plaintiffs also cite a single case denying remand where an Exchange Act violation was an alleged predicate act, *see Meinders v. Refco Sec., Inc.*, 865 F. Supp. 721, 723 (D. Colo. 1994).  But the court analyzed the jurisdictional question only under 28 U.S.C. § 1331 and did not consider its exclusive jurisdiction under 15 U.S.C. § 78aa.

cannot be alchemized into federal causes of action by incidental reference has no

application when relief is partially predicated on a subject matter committed

exclusively to federal jurisdiction." 159 F.3d at 1212–13 (citations omitted).

Similarly, in *D'Alessio v. N.Y. Stock Exch., Inc.*, the Second Circuit affirmed a

remand denial because "the gravamen of [the plaintiff's] state law claims [for, *inter*

*alia*, breach of contract and negligent misrepresentation] is that [defendant] . . .

conspired to violate the federal securities laws and other rules promulgated by the

NYSE." 258 F.3d 93, 101–02 (2d Cir. 2001). Plaintiffs' allegations here are

identical—that Defendants conspired to violate the federal securities law and failed to

perform their duties under Regulation SHO and other federal regulations to locate,

borrow, and deliver TASER shares to CNS. The Court therefore has exclusive

jurisdiction. *See T&E Pastorino Nursery v. Duke Energy Trading & Mktg., LLC*, 123

Fed. Appx. 813, 814 (9th Cir. 2005) (affirming remand denial where "[p]laintiffs'

claim for relief is 'partially predicated on a subject matter committed exclusively to

federal jurisdiction'"); *Calif. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839–43

(9th Cir. 2004) (affirming jurisdiction because plaintiff was suing to enforce

obligations created by federal tariffs that fell within the Federal Power Act's

exclusive jurisdiction provision); *Landers v. Morgan Asset Mgmt.*, 2009 U.S. Dist.

LEXIS 30891, at *24 (W.D. Tenn. 3/31/09) (denying remand where plaintiffs "have

not only borrowed standards of conduct imposed by federal law, but have pleaded violations of federal law as grounds for finding that Defendants were negligent").

While Plaintiffs might try to distinguish some of these cases as being brought against self-regulatory organizations, courts repeatedly have rejected this distinction in assessing jurisdiction.  *See, e.g.*, *Opulent Fund, L.P. v. Nasdaq Stock Mkt., Inc.*, 2007 U.S. Dist. LEXIS 79260, at *10 (N.D. Cal.10/12/07) ("The text of Section 27 plainly confers exclusive subject matter on the federal courts in all cases, making no distinction between for-profit and regulatory activity."); *Capece*, 2005 U.S. Dist. LEXIS 42039, at *26 ("Plaintiffs also note that the defendant in *Sparta*, the NASD, was a public non-profit entity as opposed to a private corporation.  Again, whether the entity subject to federal authority is public or private is of no moment so long as the inquiry requires examination of the federal regulatory scheme.").

## B. Plaintiffs' state-law claims arise from alleged violations of duties created under section 10(b) of the Exchange Act.

Federal courts not only have exclusive jurisdiction over claims alleging "violations" of the Exchange Act, but also exclusive jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty" created by the Exchange Act.  *See* 15 U.S.C. § 78aa.  Here, Plaintiffs' state-law claims seek to enforce duties imposed by Regulation SHO, NASD Rules 3310, 3370, and 11830, and other federal rules and regulations, including the duties to locate, borrow, and

deliver shares to CNS.  The state court therefore does not have jurisdiction over those claims.  *See Shimoda-Atlantic, Inc. v. FINRA*, 2008 U.S. Dist. LEXIS 37900, at *9 (W.D. Ark. 5/8/08) ("The gravamen of Plaintiff's Complaint [alleging, *inter alia*, deceptive trade practices and false advertising] is that Defendants improperly issued securities registrations to certain undercover agents.  Issuing registrations is a duty created by the Exchange Act.  Accordingly, Plaintiff's claims fall within the exclusive jurisdiction of the federal courts."); *Whitehall Wellington Invs., Inc. v. NASD*, 2000 U.S. Dist. LEXIS 18607, at *12–14 (S.D. Fla. 12/7/00) (denying remand where "Plaintiff's claim that Defendants violated [NASD Rule 3010] . . . amounts to a claim that Defendants breached a 'liability' or 'duty' under the [Exchange Act]"); *Lowe v. NASDR*, 1999 U.S. Dist. LEXIS 19489, at *9 (D.D.C. 12/14/99) ("Although the Plaintiffs [sic] complaint is careful to allege only state law claims . . . [w]ithout explicitly pleading so, the Plaintiffs are seeking to enforce . . . a duty imposed by the Exchange Act.").  The fact that Plaintiffs have chosen to pursue a state-law remedy is irrelevant where the underlying duties are created by the federal securities laws.

In fact, federal courts regularly refuse to remand state-law claims that rely on duties created by the federal securities laws.  In *Hawkins v. NASD*, for example, the Fifth Circuit affirmed the remand denial of a state-law breach of fiduciary duty claim because "[the plaintiff's] claims against the [defendant], though carefully articulated

in terms of state law, are actions at law seeking to enforce liabilities or duties created by federal securities laws which are governed exclusively by federal courts pursuant to 15 U.S.C. § 78aa." 149 F.3d 330, 331–32 (5th Cir. 1998). The same logic applies with equal force here. To the extent Defendants had duties to locate, borrow, or deliver TASER shares to CNS, those duties necessarily arose from the rules and regulations promulgated under the Exchange Act. In fact, Plaintiffs expressly allege both the existence of those duties and Defendants' intentional violation of them. (*See, e.g.*, Compl. ¶ 72 ("When a 'fail' occurs in the DTCC system, the short seller remains obligated to settle it by delivering the shares to the DTCC. But in many cases, the defendants simply leave the 'fail' open indefinitely . . . ."); ¶ 76 ("[D]efendant's naked short selling activities described herein violated those rules and Regulation SHO.").) Thus, remand would be similarly inappropriate.[6]

## CONCLUSION

For all of the foregoing reasons, Merrill Pro respectfully requests that the Court deny Plaintiffs' Motion for Remand, Fees and Costs.

---

[6] Merrill Pro is aware of only one decision in which a federal court concluded that 15 U.S.C. § 78aa did not give it exclusive jurisdiction over a state-law RICO claim predicated on an alleged Exchange Act violation. *See Fairfax Fin. Holdings, Ltd. v. S.A.C. Capital Mgmt., LLC*, 2007 U.S. Dist. LEXIS 39214 (D.N.J. 5/15/07). *Fairfax* was wrongly decided, however, because the court failed to recognize the breadth of 15 U.S.C. § 78aa, which confers exclusive jurisdiction over any alleged "violation" of the Exchange Act, no matter plaintiff's state-law label on it. It also goes against the great weight of authority cited above.

Respectfully submitted, this 25th day of October, 2010.

/s/ Richard H. Sinkfield

RICHARD H. SINKFIELD
Georgia Bar No. 649100
E-mail: rsinkfield@rh-law.com

DAN F. LANEY III
Georgia Bar No. 435290
E-mail: dlaney@rh-law.com

ROGERS & HARDIN LLP
229 Peachtree Street, N.E.
2700 International Tower
Atlanta, Georgia  30303
Tel.:   404-522-4700
Fax:   404-525-2224

ANDREW J. FRACKMAN*
ABBY F. RUDZIN*
BRAD M. ELIAS*
*Motion for *Pro Hac Vice* Admission
Pending

O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
Tel.:  212-326-2000
Fax:  212-326-2061

*Attorneys for Defendant Merrill Lynch
Professional Clearing Corp.*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1(B)</u>

Pursuant to Local Rule 7.1, the undersigned counsel hereby certifies that the

foregoing **DEFENDANT MERRILL LYNCH PROFESSIONAL CLEARING**

**CORP.'S OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND** has been

prepared in accordance with Local Rule 5.1(b) with 14-point Times New Roman font.

/s/ Richard H. Sinkfield
RICHARD H. SINKFIELD
Georgia Bar No. 649100
E-mail: rsinkfield@rh-law.com

ROGERS & HARDIN LLP
229 Peachtree Street, N.E.
2700 International Tower
Atlanta, Georgia  30303
Tel.:  404-522-4700
Fax:  404-525-2224

*Attorneys for Defendant Merrill Lynch*
*Professional Clearing Corp.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

TASER INTERNATIONAL, INC.,
*et al.*

     Plaintiffs,

v.

MORGAN STANLEY & CO., INC.,
*et al.*

     Defendants.

CIVIL ACTION NUMBER:
1:10-CV-03108-JOF

## CERTIFICATE OF SERVICE

This is to certify that I have this day caused a copy of the foregoing

***DEFENDANT MERRILL LYNCH PROFESSIONAL CLEARING CORP.'S***

***OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND*** to be filed with the

Clerk of Court using the CM/ECF system, which will automatically send e-mail

notification of such filing to the following attorneys of record:

John E. Floyd, Esq.
floyd@bmelaw.com

Steven J. Rosenwasser, Esq.
rosenwasser@bmelaw.com

Nicole G. Iannarone, Esq.
iannarone@bmelaw.com

Elizabeth G. Eager, Esq.
eager@bmelaw.com

Robert L. Ashe, III, Esq.
ashe@bmelaw.com

Michael A. Caplan, Esq.
caplan@bmelaw.com

and that I have caused a copy of the foregoing to be served on the following

attorneys of record by U.S. Mail:

James W. Christian, Esq.
CHRISTIAN, SMITH & JEWELL LLP
2302 Fannin, Suite 500
Houston, TX  77002

Robert F. Wise, Jr., Esq.
William J. Fenrich, Esq.
Melissa Aoyagi, Esq.
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY  10017

Richard H. Klapper, Esq.
Richard C. Pepperman, II, Esq.
Tracy Richelle High, Esq.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004-2498

Stephen L. Ratner, Esq.
Brian L. Friedman, Esq.
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036

Gregory A. Markel, Esq.
Martin L. Seidel, Esq.
Peter J. Isajiw, Esq.
Heather L. Fesnak, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281

Fraser L. Hunter, Jr., Esq.
WILMER CUTLER PICKERING HALE AND
DORR LLP
399 Park Avenue
New York, NY  10022

Andrew J. Frackman, Esq.
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY  10036

Andrew B. Clubok, Esq.
Jeffrey G. Landis, Esq.
Jeffrey M. Gould, Esq.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC  20005

Dated:  October 25, 2010

                                        /s/ James W. Cobb
                                        _____
                                        James W. Cobb
                                        ROGERS & HARDIN LLP
                                        Georgia Bar No. 420133
                                        E-mail: jcobb@rh-law.com

                                        Attorneys for Defendants