# EXHIBIT A



**Thursday,
November 6, 2003**

**Part V**

# Securities and Exchange Commission

**17 CFR Parts 240 and 242
Short Sales; Proposed Rule**

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Parts 240 and 242**

**[Release No. 34–48709; File No. S7–23–03]**

**RIN 3235–AJ00**

### Short Sales

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Proposed rule.

**SUMMARY:** The Securities and Exchange Commission (Commission) is publishing for public comment new Regulation SHO, under the Securities Exchange Act of 1934 (Exchange Act), which would replace Rules 3b–3, 10a–1, and 10a–2. The Commission is also proposing amendments to Rule 105 of Regulation M. Proposed Regulation SHO would, among other things, require short sellers in all equity securities to locate securities to borrow before selling, and would also impose strict delivery requirements on securities where many sellers have failed to deliver the securities. In part, this action is designed to address the problem of ''naked'' short selling. Proposed Regulation SHO would also institute a new uniform bid test allowing short sales to be effected at a price one cent above the consolidated best bid. This test would apply to all exchange-listed securities and Nasdaq National Market System Securities (NMS Securities), wherever traded.

We are also seeking comment on a temporary rule that would suspend the operation of the proposed bid test for specified liquid securities during a two-year pilot period. The temporary suspension would allow the Commission to study the effects of relatively unrestricted short selling on market volatility, price efficiency, and liquidity.

**DATES:** Comments must be received on or before January 5, 2004.

**ADDRESSES:** To help us process and review your comments more efficiently, comments should be sent by hard copy or e-mail, but not by both methods. Comments sent by hard copy should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609. Comments also may be submitted electronically at the following E-mail address: *rule-comments@sec.gov.* All comment letters should refer to File No. S7–23–03. Comments submitted by E-mail should include this file number in the subject line. Comment letters received will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, NW., Washington, DC 20549. Electronically submitted comment letters will be posted on the Commission's Internet Web site (*http://www.sec.gov*).[1]

**FOR FURTHER INFORMATION CONTACT:** Any of the following attorneys in the Office of Trading Practices, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–1001, at (202) 942–0772: James Brigagliano, Assistant Director, or Gregory Dumark, Kevin Campion, Lillian Hagen, Elizabeth Sandoe and Marla Chidsey, Special Counsels.

**SUPPLEMENTARY INFORMATION:** The Commission is publishing for comment proposed Regulation SHO and a proposed temporary rule, Rule 202 [2], and proposed amendments to Regulation M, Rule 105 [3] under the Exchange Act.

### Table of Contents

I. Introduction
   A. Background and Current Short Sale Regulation
   B. Market Effects of Short Selling
   C. Market Developments
II. Naked Short Selling
   A. Background
   B. Current Regulatory Requirements
   C. Proposed Amendments
   1. Short Sales
   2. Long Sales
III. Current Market Structure and the Tick Test
IV. Proposed Bid Test
   A. Operation of the Uniform Bid Test
   B. Scope of the Uniform Bid Test
   1. Securities Subject to the Price Test
   2. Securities Not Subject to the Price Test
   C. Bid Test Flexibility in a Decimals Environment
   D. Bid Test Flexibility for Passive Pricing Systems
V. Pilot Program
VI. Rule 10a–1 Exceptions
   A. Exceptions Proposed to be Retained
   1. Long Seller's Delay in Delivery
   2. Error in Marking a Short Sale
   3. Odd Lot Transactions
   4. Domestic Arbitrage
   5. International Arbitrage
   6. Distribution Over-Allotment
   7. Equalizing Short Sales and Trade-Throughs
   B. Exception Proposed to Be Eliminated
VII. Prior Exemption Letters under Rule 10a–1
   A. Exchange Traded Funds
   B. Short Sales Executed at the Closing Price
VIII. Market Maker Exception from Proposed Uniform Bid Test
IX. Proposed Changes to the Order Marking Requirement
   A. Marking Orders
   B. Marking Requirements for Riskless Principal Transactions
X. Rule 3b–3
   A. Unconditional Contracts to Purchase Securities
   B. Ownership of Securities Underlying Securities Futures Products
   C. Aggregation Units
   D. Block-Positioner Exception
   E. Liquidation of Index Arbitrage Positions
XI. Hedging Transactions
XII. Elimination of Current Subparagraphs 10a–1(a)(2) and (a)(3)
XIII. Exclusion of Bonds
XIV. After Hours Trading/Foreign Markets Issues
   A. After-Hours Trading
   B. Off-Shore Trading
XV. Limitations on Short Selling During Significant Market Declines
XVI. Rule 105 of Regulation M—Short Sales in Connection with a Public Offering
   A. Scope of Rule 105 of Regulation M
   B. Shelf Offerings
   C. Sham Transactions Designed to Give the Appearance of Covering with Open Market Securities
XVII. General Request for Comment
XVIII. Paperwork Reduction Act
XIX. Consideration of Proposed Regulation SHO's Costs and Benefits
XX. Consideration on Burden and Promotion of Efficiency, Competition, and Capital Formation
XXI. Consideration of Impact on the Economy
XXII. Initial Regulatory Flexibility Analysis
XXIII. Statutory Authority Text of Proposed Regulation SHO, Amendments and Temporary Rule

### I. Introduction

Congress, in 1934, directed the Commission to ''purge the market'' of short selling abuses, and in response, the Commission adopted restrictions that have remained essentially unchanged for over 60 years. Originally adopted in 1938, the Commission's short sale rule, Rule 10a–1, is designed to restrict short sellers from effecting short sales in an exchange-traded security when the price of that security is declining.[4]

Since its adoption, the Commission has engaged in studies, investigations, and reviews of the efficacy of the Rule.[5]

---

[1] Personal identifying information, such as names or e-mail addresses, will not be edited from electronic submission. Submit only information that you wish to make publicly available.

[2] 17 CFR 242.202.

[3] 17 CFR 242.105.

[4] 17 CFR 240.10a–1.

[5] *See* 2 Securities and Exchange Commission, Report of Special Study of Securities Markets, H.R. Doc. No. 95, 88th Cong., 1st Sess. 247 (1963) (study to determine the relationships between changes in short positions and subsequent price trends); *see also* Short-Selling Activity in the Stock Market: Market Effects and the Need for Regulation (Part I)(House Report), H.R. Rep. No. 102–414 (1991), reprinted in CCH Federal Securities Law Reports Number 1483 Part II (1992).

Most recently, in 1999, the Commission issued a release requesting public comment on the regulation of short sales of securities (Concept Release).[6] The Concept Release examined ways to modernize our approach to short sale regulation. We received 2778 comment letters in response to the Release.[7]

Since the Concept Release was published, we have reviewed the comment letters and reexamined the structure and operation of Rule 10a–1, and related Rules 10a–2 [8] and 3b–3.[9] We also considered the status of short sale regulation in the context of requests for relief from Rule 10a–1 submitted to the Commission for a wide range of short selling activities. Finally, we considered recent market changes, including increased instances of ''naked'' short selling, *i.e.*, selling short without borrowing the necessary securities to make delivery; decimalization; the advent of security futures trading; and an increasing amount of Nasdaq securities being traded away from the Nasdaq market, and thus not subject to any short sale price test. As a result of this assessment, we are seeking comment on proposed Regulation SHO, which would replace Rules 3b–3, 10a–1, and 10a–2, and that would temporarily suspend the short sale price test for specified liquid stocks. We also propose to amend Rule 105 of Regulation M to eliminate the shelf offering exception. The comments we receive will assist us in determining whether to adopt the proposed changes to these rules and the nature and scope of such changes.

*A. Background and Current Short Sale Regulation*

A short sale is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller.[10] In order to deliver the security to the purchaser, the short seller will borrow the security, typically from a broker-dealer or an institutional investor. The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender. In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

The following example illustrates a typical short sale transaction:

XYZ stock is currently selling at $50 per share. An investor anticipates that the price of XYZ stock will decline and wants to sell short 100 shares. The investor's broker borrows 100 shares for the investor and executes the short sale. The $5,000 proceeds from the sale (plus, usually, an additional 2%) are posted as collateral with the lender and the investor must also post margin equal to 50% of the purchase price with his broker.[11] At some point in the future the investor must purchase 100 shares to return to the lender. If the investor can purchase the XYZ shares at a price below $50, the investor can cover the short position at a profit. If the price of XYZ shares rises above $50, the investor may have to cover the short position at a loss.[12]

Section 10(a) of the Exchange Act gives the Commission plenary authority to regulate short sales of securities registered on a national securities exchange (listed securities), as necessary to protect investors. After conducting an inquiry into the effects of concentrated short selling during the market break of 1937, the Commission adopted Rule 10a–1 in 1938 in order to restrict short selling in a declining market.[13] The core provisions of the Rule are largely the same today as when they were adopted.

Paragraph (a) of Rule 10a–1 generally covers short sales in listed securities if trades of the security are reported pursuant to an ''effective transaction reporting plan'' and information as to such trades is made available in accordance with such plan on a real-time basis to vendors of market transaction information.[14] Paragraph (b) applies to short sales on national exchanges in securities that are not covered by paragraph (a).

Rule 10a–1(a)(1) provides that, subject to certain exceptions, a listed security may be sold short (A) at a price above the price at which the immediately preceding sale was effected (plus tick), or (B) at the last sale price if it is higher than the last different price (zero-plus tick).[15] Short sales are not permitted on minus ticks or zero-minus ticks, subject to narrow exceptions. The operation of these provisions, commonly described as the ''tick test,'' determines the minimum shortable price (MSP) [16] at which a security can be sold short. The following transactions illustrate the operation of the tick test: [17]

---

[6] Securities Exchange Act Release No. 42037 (October 20, 1999), 64 FR 57996 (October 28,1999).

[7] The comment letters and a comprehensive summary of the comments are available for inspection in the Commission's Public Reference Room in File No. S7–24–99.

[8] 17 CFR 240.10a–2.

[9] 17 CFR 240.3b–3.

[10] *See* Rule 3b–3 under the Exchange Act, 17 CFR 240.3b–3.

[11] *See, e.g.*, 12 CFR 220.12(c)(1) of Regulation T of the Board of Governors of the Federal Reserve System, which requires margin for a short sale of a nonexempted equity security of 150 percent of the current market value of the security. An investor may be required to deposit additional ''maintenance margin'' for transactions in short sales under margin requirements imposed by self regulatory organizations (SROs). *See, e.g.*, NASD Rule 2520(c) and NYSE Rule 431(c). Further, broker-dealers may institute higher short sale margin requirements than those imposed by self-regulatory organization rules. *See, e.g.*, NASD Rule 2520(d) and NYSE Rule 431(d).

[12] This simple example does not include transaction and carrying costs. For a more complete discussion of equity lending and costs of borrowing equity *see Securities Lending Transactions: Market Developments and Implications,* Technical Committee of the International Organization of Securities Commissions (IOSCO) Committee on Payment and Settlement Systems (CPSS) (July, 1999). This paper can be accessed at *www.iosco.org/pubdocs/pdf/IOSCOPD96.pdf. See also* Geczy, Musto, and Reed, 2002, *Stocks Are Special Too: An Analysis of the Equity Lending Market,* Journal of Financial Economics, 66, 241–269.

[13] Securities Exchange Act Release No. 1548 (January 24, 1938), 3 FR 213 (January 26, 1938).

[14] Rule 10a–1 uses the term ''effective transaction reporting plan'' as defined in Rule 11Aa3–1 (17 CFR 240.11Aa3–1) under the Exchange Act. *See* 17 CFR 240.10a–1(a)(1)(i).

[15] The last sale price is the price reported pursuant to an effective transaction reporting plan, *i.e.*, the Consolidated Tape Association, also generally referred to as the ''Tape.''

[16] The MSP is the lowest price that a stock can be sold short under current short sale regulation. If a stock is trading on a minus or zero-minus tick, a short sell order must be executed at a price higher than the last trade.

[17] The first execution at 47.04 is a plus tick since it is higher than the previous last trade price of 47.00. The next transaction at 47.04 is a zero-plus tick since there is no change in trade price but the last change was a plus tick. Short sales could be executed at 47.04 or above. The final two transactions at 47.00 are minus and zero-minus transactions, respectively. Short sales would have to be effected at the next higher increment above 47.00 in order to comply with Rule 10a–1.



In adopting the tick test, the Commission sought to achieve three objectives:

(i) allowing relatively unrestricted short selling in an advancing market;

(ii) preventing short selling at successively lower prices, thus eliminating short selling as a tool for driving the market down; and

(iii) preventing short sellers from accelerating a declining market by exhausting all remaining bids at one price level, causing successively lower prices to be established by long sellers.[18]

In 1994, the Commission granted temporary approval to the NASD to apply its own short sale rule to Nasdaq NMS securities.[19] NASD Rule 3350 prohibits short sales by NASD members in Nasdaq NMS Securities[20] at or below the current best (inside) bid when that bid is lower than the previous best (inside) bid (commonly referred to as the bid test).

The operation of the bid test in NASD Rule 3350 is illustrated as follows:

| Bid Sequence | 47 | 47.04 | 47.04 | 47 | 47 |
|---|---|---|---|---|---|
| Current Bid Compared to the previous bid. | ........ | plus bid (compared to last bid at 47). | zero-plus bid (compared to last bid at 47.04). | minus bid (compared to last bid at 47.04). | zero-minus bid (compared to last bid at 47) |
| MSP | ........ | any price | any price | 47.01 | 47.01 |

*B. Market Effects of Short Selling*

Short selling provides the market with at least two important benefits: market liquidity and pricing efficiency.[21] Market liquidity is generally provided through short selling by market professionals, such as market makers (including specialists) and block positioners, who offset temporary imbalances in the buying and selling interest for securities. Short sales effected in the market add to the selling interest of stock available to purchasers and reduce the risk that the price paid by investors is artificially high because of a temporary contraction of selling interest. Short sellers covering their sales also may add to the buying interest of stock available to sellers.

Short selling also can contribute to the pricing efficiency of the equities markets. Efficient markets require that prices fully reflect all buy and sell interest. When a short seller speculates or hedges against a downward movement in a security, his transaction is a mirror image of the person who purchases the security based upon speculation that the security's price will rise or to hedge against such an increase. Both the purchaser and the short seller hope to profit, or hedge against loss, by buying the security at one price and selling at a higher price. The strategies primarily differ in the sequence of transactions. Market participants who believe a stock is overvalued may engage in short sales in an attempt to profit from a perceived divergence of prices from true economic values. Such short sellers add to stock pricing efficiency because their transactions inform the market of their evaluation of future stock price performance. This evaluation is reflected in the resulting market price of the security.[22]

Although short selling serves useful market purposes, it also may be used to illegally manipulate stock prices.[23] One example is the "bear raid" where an equity security is sold short in an effort to drive down the price of the security by creating an imbalance of sell-side interest.[24] Further, unrestricted short selling can exacerbate a declining market in a security by increasing pressure from the sell-side, eliminating bids, and causing a further reduction in the price of a security by creating an appearance that the security price is falling for fundamental reasons.

Short selling was one of the central issues studied by Congress before enacting the Exchange Act, but Congress did not directly prohibit short selling.[25] Instead, Congress gave the Commission broad authority to regulate short sales in order to stop short selling abuses.[26]

*C. Market Developments*

Several significant developments in the securities markets, including, but not limited to, instances of abusive naked short selling, the increasing

---

[18] *See* Securities Exchange Act Release No. 13091 (December 21, 1976), 41 FR 56530 (December 28, 1976).

[19] *See* Securities Exchange Act Release No. 34277 (June 29, 1994), 59 FR 34885 (July 7, 1994).

[20] Rule 11Aa2–1 under the Act sets forth the criteria and procedures by which certain over-the-counter (OTC) securities are designated as NMS Securities. 17 CFR 240.11Aa2–1.

[21] *See* Lamont, Owen A. and Thaler, Richard H, 2003, *Can the Market Add and Subtract? Mispricing in Tech Stocks Carve-outs,* University of Chicago and NBER.

[22] Arbitrageurs also contribute to pricing efficiency by utilizing short sales to profit from price disparities between a stock and a derivative security, such as a convertible security or an option on that stock. For example, an arbitrageur may purchase a convertible security and sell the underlying stock short to profit from a current price differential between two economically similar positions.

[23] *See, e.g., S.E.C.* v. *Gardiner,* 48 S.E.C. Docket 811, No. 91 Civ. 2091 (S.D.N.Y. March 27, 1991) (alleged manipulation by sales representative by directing or inducing customers to sell stock short in order to depress its price); *U.S.* v. *Russo,* 74 F.3d 1383, 1392 (2nd Cir. 1996) (short sales were sufficiently connected to the manipulation scheme as to constitute a violation of Exchange Act Section 10(b) and Rule 10b–5).

[24] Many people blamed "bear raids" for the 1929 stock market crash and the market's prolonged inability to recover from the crash. *See* 7 Louis Loss and Joel Seligman, *Securities Regulation* 3203–04, note 213 (3d ed. 1989).

[25] *See* 2 Securities and Exchange Commission, Report of Special Study of Securities Markets, H.R. Doc. No. 95, 88th Cong., 1st Sess. 247 (1963) (Special Study).

[26] *Id.*

number of Nasdaq securities trading away from the Nasdaq market (and thus not subject to any price test), the advent of security futures trading, and decimalization have caused the Commission to reexamine short sale regulation. At a minimum, the Commission believes that adjustments to short sale regulation are required to keep pace with these market developments.

## II. Naked Short Selling

### A. Background

Many issuers and investors have complained about alleged ''naked short selling,'' especially in thinly-capitalized securities trading over-the-counter.[27] Naked short selling is selling short without borrowing the necessary securities to make delivery, thus potentially resulting in a ''fail to deliver'' securities to the buyer.

Naked short selling can have a number of negative effects on the market, particularly when the fails to deliver persist for an extended period of time and result in a significantly large unfulfilled delivery obligation at the clearing agency where trades are settled.[28] At times, the amount of fails to deliver may be greater than the total public float. In effect the naked short seller unilaterally converts a securities contract (which should settle in three days after the trade date) into an undated futures-type contract, which the buyer might not have agreed to or that would have been priced differently. The seller's failure to deliver securities may also adversely affect certain rights of the buyer, such as the right to vote. More significantly, naked short sellers enjoy greater leverage than if they were required to borrow securities and deliver within a reasonable time period, and they may use this additional leverage to engage in trading activities that deliberately depress the price of a security.[29]

The Commission recently brought an enforcement action against certain parties, alleging manipulative naked short selling, in a scheme sometimes termed as a ''death spiral.'' These schemes generally involve parties arranging financings in public companies that are unable to obtain more conventional financing in the capital markets due to their precarious financial condition. The party providing financing receives from a public company debentures that are later convertible into the stock of the issuer. The terms typically provide that the conversion ratio will be tied to a fixed value of the aggregate underlying shares (typically a discount from the market price of the security at the time of the conversion rather than a conversion price per share).[30] In some cases the parties providing financing have engaged in extensive naked short selling designed to lower the price of the issuer's stock, thus realizing profits when the debentures are converted to cover the short sales.[31]

Naked short selling has sparked defensive actions by some issuers designed to combat the potentially negative effects on shareholders, broker-dealers, and the clearance and settlement system.[32] Some issuers have taken actions to attempt to make transfer of their securities ''custody only,'' thus preventing transfer of their stock to or from securities intermediaries such as the Depository Trust Company (DTC) or broker-dealers. A number of issuers have attempted to withdraw their issued securities on deposit at DTC, which makes the securities ineligible for book-entry transfer at a securities depository.[33] Withdrawing securities from DTC or requiring custody-only transfers undermine the goal of a national clearance and settlement system, designed to reduce the physical movement of certificates in the trading markets.[34]

### B. Current Regulatory Requirements

The SROs have adopted rules generally requiring that, prior to effecting short sales, members must ''locate'' stock available for borrowing.[35] For example, NYSE Rule 440C.10 states that no NYSE member or member organization should ''fail to deliver'' against a short sale of a security on a national securities exchange until a diligent effort has been made by such member or member organization to borrow the necessary securities to make delivery.[36] An NYSE interpretation to the rule further states that member organizations effecting short sales for their own account or the accounts of customers must be in a position to complete the transaction. The interpretation states that no orders to sell short should be accepted or entered unless prior arrangements to borrow the stock have been made or other acceptable assurances that delivery can

---

[27] For example, *see* comment letters from John Henry Austin (2675), Bridget Thomas (2297), James McCaffery (492), Richard Ballard (507), and Ken Klaser (596).

[28] ''Clearing agency'' is defined in Section 3(a)(23)(A) of the Exchange Act, 15 U.S.C. 78c(a)(23)(a).

[29] The Commission issued a prior statement cautioning broker-dealers that where the broker-dealer has sold short, but did not, for a substantial period of time, effect the offsetting purchase transactions for purpose of delivery, this could generally involve violations of the anti-fraud provisions of the Federal securities laws. *See* Securities Exchange Act Release No. 6778 (April 16, 1962).

[30] For more information, *see* ''Convertible Securities'' on the Commission's Web site at *www.sec.gov/answers/convertibles.htm*

[31] The Commission recently settled a case against parties relating to allegations of manipulative short selling in the stock of Sedona Corporation, a Nasdaq Small Cap company. The action alleged that the defendants engaged in massive naked short selling that flooded the market with Sedona stock, and thus depressed its price. The defendants thereby profited by subsequently exercising the conversion rights under the debenture. *See* Rhino Advisors, Inc. and Thomas Badian, Lit. Rel. No. 18003 (February 27, 2003); *see also SEC* v. *Rhino Advisors, Inc. and Thomas Badian*, Civ. Action No. 03 civ 1310 (RO) (Southern District of New York).

[32] There have been press reports concerning the actions of some issuers, and questioning whether the cause of declines in their stock prices can be attributed to naked short selling, or to fundamental problems with the company. *See, e.g.*, Carol S. Remond, *Universal Blames Shorts, But What of Dilution?, Dow Jones Newswires* (October 6, 2003); Rob Wherry, *Wall Street's Next Nightmare?*, Forbes.com (October 6, 2003); *see also* Gretchen Morgenson, *If Short Sellers Take Heat, Maybe It's Time to Bail Out*, NY Times (January 26, 2003) (citing a study by Professor Owen A. Lamont that analyzed returns at companies that waged public battles with short sellers, and found that their stocks lagged the market by 2.34 percent in each of the twelve months after the battles began). As a matter of practice, the Commission does not opine on the content or accuracy of such reports.

[33] The Commission recently approved a DTC rule change clarifying that its rules provide that only its participants may withdraw securities from their accounts at DTC, and establishing a procedure to process issuer withdrawal requests. *See* Securities Exchange Act Release No. 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003) (File No. SR–DTC–2003–02).

[34] *See* Section 17A(e) of the Exchange Act. 15 U.S.C. 78q–1(e). The Commission noted in the order approving the DTC rule change that the use of certificates can result in significant delays and expenses in processing securities transactions and can raise safety concerns associated with lost, stolen, and forged certificates. *See, supra* n. 33.

[35] In 1976 the Commission proposed the adoption of Rule 10b–11. Rule 10b–11 would have prohibited any person from effecting a short sale in any equity security (*i.e.*, not just exchange-traded securities) for his own account or the account of any other person unless he, or the person for whose account the short sale is effected (i) borrowed the security, or entered into an arrangement for the borrowing of the security, or (ii) had reasonable grounds to believe that he could borrow the security so that, in either event, he would be capable of delivering the securities on the date delivery is due. Securities Exchange Act Release No. 13091 (December 21, 1976), 41 FR 56530 (December 28, 1976). In 1988, the Commission withdrew proposed Rule 10b–11, noting that since the time the rule was proposed, the NYSE and the NASD had adopted interpretations specifying that members should not accept or enter a short sale order unless prior arrangements to borrow the stock have been made, or other acceptable assurances that delivery can be made on settlement date have been obtained. The Commission also stated that it believed the general antifraud provisions of the federal securities laws were applicable to activity addressed by proposed Rule 10b–11. Securities Exchange Act Release No. 26182 (October 14, 1988), 53 FR 41206.

[36] *See* NYSE Rule 440C.10.