# EXHIBIT B



S. REP. 94-75            Page 1

S. REP. 94-75, S. Rep. No. 75, 94TH Cong., 1ST Sess. 1975, 1975 U.S.C.C.A.N. 179, 1975 WL 12347 (Leg.Hist.)

**\*179** P.L. 94-29, SECURITIES ACTS AMENDMENTS OF 1975
Senate Report (Banking, Housing and Urban Affairs Committee) No. 94-75,
Apr. 14, 1975 (To accompany S. 249)
House Report (Interstate and Foreign Commerce Committee) No. 94-123,
Apr. 7, 1975 (To accompany H.R. 4111)
House Conference Report No. 94-229,
May 19, 1975 (To accompany S. 249)
Cong. Record Vol. 121 (1975)
DATES OF CONSIDERATION AND PASSAGE
Senate April 17, May 20, 1975
House April 24, May 22, 1975
The Senate bill was passed in lieu of the House bill. The Senate Report and the House Conference Report are set out.

SENATE REPORT NO. 94-75
Apr. 14, 1975

\* \* \*

IV. REGULATION OF CLEARING AGENCIES AND TRANSFER AGENTS

    In the Securities Investor Protection Act of 1970, the Congress undertook a long term commitment to oversee and reform the operational aspects of the securities business and directed the Commission to compile a list of unsafe and unsound practices employed by brokers and dealers in conducting their business. Pursuant to that directive the **\*232** Commission, in December, 1971, made a report to the Congress on the steps being taken under existing law to correct these practices and submitted recommendations on additional legislation which might be needed to eliminate these unsafe and unsound practices. Among the Commission's conclusions was the following:
  . . . the serious operational problems experienced by the securities industry during the period under study, especially the industry's inability to accurately and promptly process customer transactions, evidenced a need for greater scrutiny and control by the Federal Government.
    The Congress chose not to rely entirely on the examination of the industry's operational problems undertaken by the Commission in its Unsafe and Unsound Practices Study. Pursuant to Senate Resolutions 109 and 244 during the 92d Congress, the Subcommittee on Securities devoted a substantial portion of its in-depth study of the securities industry to analyzing these problems and recommending specific regulation and legislative measures designed to prevent future paper-handling breakdowns.
    The Subcommittee's February 1972 Report of its Securities Industry Study identified two primary causes of the paperwork crisis. First, the industry had failed to develop a nationwide system for the clearance and settlement of securities transactions. Second, there existed a lack of uniformity and coordination among the various methods and systems of clearing and settlement. The Subcommittee found an alarming lack of supervision, coordination, and central decision making which was delaying implementation of many of the technological innovations available to help solve processing problems. Accordingly, in its February 1972 Report, the Subcommittee recommended that:
    1. The Exchange Act be amended to make it clear that the Commission has ample power and the responsibility to direct the evolution of clearance and settlement methods in order to develop a national system open to all broker-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

dealers and all securities;

   2. Legislation be enacted requiring clearing agencies and securities depositories to register with and report to the SEC and empowering the Commission to review and amend the rules of such entities;

   3. The Commission be directed to proceed with dispatch toward elimination by December 31, 1976, of the stock certificate as a means of settlement in transactions between broker-dealers, and to report to the Congress annually through 1976 the steps it had taken and progress it had made pursuant to this direction as well as its recommendations, if any, for further legislation to eliminate the stock certificate;

   4. Legislation be enacted prohibiting the imposition of state and local taxes in such a way as to inhibit unreasonably the development of an efficient national clearing and depository system; and

   5. The Commission be directed to consider the practice of registering securities in 'street name' to determine whether such registration is consistent with the policies of the Exchange Act and whether steps can be taken to facilitate communications between corporations and their shareholders while at the same time retaining the benefits of 'street name' registration.

   S. 249 embodies the five basic recommendations in the Subcommittee on Securities' February 1972 Report. The Committee continues to believe **\*233** that these recommendations represent the core of a practical and effective approach to the development and regulation of a system for the prompt and accurate-- and economical-- processing and settlement of securities transactions.

   S. 249 establishes a system of effective regulation and centralized decision making extending to every facet of the securities handling process. The 'paperwork crisis' which occurred during 1968 through 1970, and the current jurisdictional battling that continues among the various self-regulatory agencies and securities handling facilities for control of the various aspects of the processing system are clear manifestations of the absence of an effective decision making force in the securities industry for operational matters. S. 249 is intended to make the Securities and Exchange Commission that force. The Committee expects the Commission to use the broad powers provided in the bill in a bold and effective manner to facilitate the rapid development of a nationwide system for processing securities transactions and to achieve the standardization and rationalization of the forms and procedures associated with securities processing. Without the existence of strong, centralized decision making and a clear regulatory framework for the development of an integrated national system for clearance and settlement, the securities industry faces continued uncertainty, confusion, and spiraling costs.

A. CENTRALIZED DECISION MAKING IN OPERATIONAL MATTERS

   S. 249 would facilitate the creation of a system of centralized regulation and decision making which extends to every facet of the securities handling process involving securities transactions within the United States-- clearing agencies, depositories, corporate issuers, and transfer agents. Only by the creation of a central authority in operational matters can paper-handling problems be squarely addressed; only the creation of such authority can assure the prompt development of a national clearing system and the fair resolution of the jurisdictional feuding which presently characterizes the various private and self-regulatory organizations involved in the processing of securities transactions.

   The bill vests this centralized authority in the Commission. In some areas the authority conferred upon the Commission by the bill is exclusive. In other areas, the Commission shares responsibility with the appropriate bank regulatory agency. In all situations, however, it is the Commission which has the authority and responsibility to regulate, coordinate, and direct the operations of all persons involved in processing securities transactions toward the goal of a national system for the prompt and accurate clearance and settlement of securities transactions.

1. Clearing Agencies

   By amendment of the Exchange Act, the bill would require 'clearing agencies' to register with and report to the Commission (Sections 17(a)(1) and 17A(b)) and would empower the Commission to review the rules of such clearing agencies (Section 19(b)) and to adopt all necessary or appropriate rules for their regulation. (Section 17A(d)(1)). The Subcommittee on Securities heard testimony **\*234** during the 92d and 93d Congress from witnesses who felt that securities depositories should be separated from securities clearing agencies for purposes of regulation. Al-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

though the Committee recognized that there may be certain theoretical differences between clearing agencies and depositories, it appears that clearing agencies and depositories currently are sufficiently similar in their operations to warrant placing them under the same regulatory umbrella. Therefore, the bill defines the term 'clearing agencies' to include securities depositories. (Section 3(a)(23)).

A principal question raised at the hearings on similar legislation in the last Congress was whether securities depositories which are organized as state or national banks should be regulated by the Commission or by the federal bank regulatory agencies. Some testimony was received that the active participation of banks in a national clearing and depository system may depend to a degree upon the establishment of depositories which conduct their affairs as banks and are regulated as banks. However, against this consideration, the Committee had to balance the obvious need to speed the development of a more centralized decision making procedure in securities handling matters. It was therefore determined that the Commission should have over-all policy responsibility for the development and coordination of all facets of the securities processing system. With respect to clearing agencies which are registered as banks, however, the Committee felt it was appropriate to delegate primary enforcement and inspection responsibilities to the bank regulatory agencies. (Sections 3(a)(34)(B), 17(a)(2), and 17A(d)(2)). In addition, the Committee concluded that the bill should expressly recognize the responsibility of the banking agencies to assure the safeguarding of funds and securities held by banks. Accordingly, the bill provides that a bank may not be registered as a clearing agency if the appropriate banking agency finds that the bank cannot assure adequate safeguarding of funds and securities within its custody or control or for which it is responsible. (Section 19(a)(2)). Similarly, a bank clearing agency cannot change its rules in a way the appropriate bank regulatory agency finds to be contrary to appropriate standards of safeguarding (Section 19(b)(4)), nor may such a bank operate in contravention of rules the banking agency finds necessary or appropriate for the adequate safeguarding of funds and securities. (Section 17A(d)(1)(B)).

The bill's recognition of the important role of the bank regulatory agencies in overseeing the standards and procedures employed by banks for safeguarding of funds and securities is in no way intended to dilute the Commission's overall rulemaking authority. Indeed the Commission is given extensive authority to adopt rules necessary to carry out the purposes of the bill including rules regarding the safeguarding of funds and securities. Furthermore, general policy responsibility for the development and regulation of a national system for the prompt and accurate processing of securities transactions is vested in the Commission. The banking agencies' authority over the safeguarding of funds and securities by banks is an existing and appropriate authority. By acknowledging this authority in the bill, the Committee is not recommending an expansion of the authority of these agencies beyond traditional banking concern, or a grant of general rulemaking power with respect to the securities processing activities **\*235** of bank clearing agencies, or the power to veto legitimate Commission determinations. The manner in which banks assure the safeguarding of funds and securities, as that phrase is commonly understood, has always been subject to regulation by the bank regulatory agencies. The bill merely makes clear that such regulation is not ousted by virtue of a bank registering as a clearing agency.

The bill provides that inspection of clearing agencies and enforcement of the legislation and the rules promulgated thereunder are the primary responsibility of the 'appropriate regulatory agency.' The appropriate regulatory agency is the Comptroller of the Currency with respect to national banks and banks operating under the Code of Law for the District of Columbia, and their subsidiaries; the Federal Reserve Board with respect to State member banks, subsidiaries thereof, bank holding companies and bank subsidiaries thereof; the Federal Deposit Insurance Corporation with respect to banks insured by the FDIC (non-members of the Federal Reserve System), and their subsidiaries; and the Commission in the case of all other clearing agencies and for all matters of discipline and access where the subject of the action is not a bank.  (Section 3(a)(34)(B) and (C)). Under the bill, the Commission has the right to examine the operations of clearing agencies for which it is not the appropriate regulatory agency, if such review is necessary to fulfill its rulemaking and other responsibilities; the authority is carefully circumscribed to assure that any such Commission review will occur only after consultation with the appropriate bank regulatory agency and only with respect to matters which are germane to proposals or applications then before the Commission.  (Section 17(b)).

The bill contains several provisions designed to assure cooperation among and avoid duplicative regulation by the several agencies which regulate and enforce compliance by clearing agencies. The Commission and the bank regulatory agencies must furnish one another with copies of reports concerning clearing agencies for which they have mutual responsibility. (Section 17(c)). The regulatory agencies charged with regulation, inspection, and enforcement regarding clearing agencies must consult with an request the views of each other before issuing a proposed rule for public comment or adopting such a rule. (Section 17A(d)(3)(A)(i)). Nothing contained in the bill impairs the author-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ity of any state banking authority or of any other state or federal regulatory authority which has jurisdiction over a person registered as a clearing agency to make or enforce rules governing such person if such rules are not inconsistent with the bill or any rules prescribed thereunder. (Section 17A(d)(4)).

### 2. Transfer Agents

The bill also amends the Exchange Act to require registration and reporting by transfer agents. In cases where the transfer agent is a bank, it will register with the appropriate bank regulatory agency, and in the case of all other transfer agents, registration shall be with the Commission. (Sections 17A(c) and 3(a)(34)(B)). The Commission is empowered with broad rulemaking authority over all aspects of a transfer agent's activities as transfer agent. (Section 17A(d)(1)(A)). The Committee expects this to include, among other matters, minimum standards of performance, the prompt and accurate processing of securities ***236** transactions, and operational compatibility of and cooperation by transfer agents with other facilities and participants in the securities handling process. With respect to the safeguarding of securities and funds, the Committee has adopted the same rulemaking procedures as in the preceding section dealing with clearing agencies. When the transfer agent is a bank, rulemaking authority over safeguarding practice, as commonly understood, also resides with the appropriate bank regulatory agency. (Section 17A(d)(1)(B)).

Inspection and enforcement of rules and regulations applicable to transfer agents are the responsibility of the appropriate regulatory agency. (Sections 17(b) and 17A(d)(3)(A)(ii)). However, to assist the Commission in discharging its policymaking functions under the bill in an informed manner, the bill gives the SEC authority to examine the operation of bank transfer agents. The authority is carefully circumscribed to assure that any such Commission examination will occur only after consultation with the appropriate bank regulatory agency and only with respect to matters which are germane to the Commission's responsibilities under the Act. (Section 17(b)). The transfer agent section of the bill contains provisions similar to those applicable to clearing agencies designed to provide, to the maximum extent possible, cooperation and coordination among the various supervising agencies. (Sections 17(c) and 17A(d)(3)).

### 3. The Commission's Powers

The SEC's general investigative and enforcement powers under Section 21 of the Exchange Act extend to all violations of that Act, and therefore to violations of the newly added provisions concerning clearing agencies and transfer agents. It is not contemplated, however, that the Commission will use these powers to engage in day-to-day or regular supervision of clearing agencies and transfer agents which are organized as banks. Rather, it is expected that the Commission will use its powers in coordination with, and to facilitate the exercise of the enforcement powers granted to, the bank regulatory agencies. Accordingly, the bill states that the appropriate regulatory agency shall have 'primary'-- but not the exclusive-- authority to enforce these new provisions of the Exchange Act. (Section 17A(d)(3)(A)(ii)).

In order to assure that the regulatory pattern established by this legislation extends to the entire securities handling process, the bill gives the Commission broad and clear power to regulate all activities of broker-dealers and national securities associations with respect to the clearance, settlement, transfer, payment, and delivery of securities. This is accomplished through clarification of existing rulemaking authority. Although the Commission has indicated that it believes it already has the powers enumerated in proposed Section 15(c)(6), the legislation is designed to eliminate any possible ambiguity and thereby avoid any delay in achieving comprehensive regulation of the processing of securities transactions.

### B. ELIMINATION OF STOCK CERTIFICATE

A second major purpose of this legislation is to initiate concrete steps toward the elimination of the negotiable stock certificate as a ***237** means of transferring ownership of securities. S. 249 directs the Commission, by the end of 1976, to use its authority under the Exchange Act to bring about the discontinuation of the physical movement of the securities certificate in connection with the settlement among brokers and dealers of transactions consummated

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

on national securities exchanges or by means of the mails or other means or instrumentalities of interstate commerce. (Section 17A(e)). This provision would in no way preclude individual shareholders from asking for and receiving certificates as proof of ownership of their shares. The bill requires the Commission to report annually to Congress on its progress in eliminating the movement of certificates in connection with settlement and its recommendations, if any, for legislation, if appropriate, actually to eliminate the certificate. (Section 23(b)(4)).

### C. 'STREET NAME' REGISTRATION OF SECURITIES

Shares which are held in 'street name' are registered in the name of a broker-dealer or other financial institution (or clearing agency) and not in the name of the customer for whose account they are held. 'Street name' registration has been a popular form of ownership largely because it facilitates the transfer of negotiable certificates obviating the need for customer signature and delivery. However, it also creates some problems which may well be intensified by the proposed development of large-scale certificate depositories.

Both state and federal law evidence a policy of encouraging communication between the corporation and its shareholders. most state corporation codes, for example, require the corporation to keep and maintain a list of shareholders and to furnish certain notices to shareholders before required meetings are held. Similarly, the Exchange Act and rules thereunder require registered corporations to periodically furnish certain information to shareholders. There is evidence that 'street name' registration may be making shareholders communications more difficult by imposing a layer of record ownership between the corporation and its beneficial owners. When shares are registered in the name of a broker-dealer, that broker-dealer's name may represent the beneficial interests of hundreds or thousands of individual shareholders. When shares are held by a depository or clearing house, a single nominee name (such as 'Cede & Co.' in the case of Depository Trust Company) on the shareholder list could represent literally tens of thousands of investors. This phenomenon makes the dissemination of proxy material, financial reports, and other communications to shareholders a more complex procedure and one subject to greater possibility of error and delay. It also makes it extremely difficult for a corporation or a stockholder of a corporation to identify the beneficial owners of the corporation's shares.

In view of the fact that 'street name' registration presents both advantages and disadvantages in the transfer and ownership of securities and of the fact that recent developments in the settlement process may aggravate problems which already exist, the bill directs the Commission to consider the practice of registering securities in 'street name' in the context of the Exchange Act to determine (a) whether such registration is consistent with the policies of the Exchange **238 Act, including Sections 12(g) and 15(d), which prescribe when a corporation must register its securities under the Act, and Section 14, which concerns proxy matters, and (b) if consistent, whether steps can be taken to facilitate communications between corporations and their shareholders while at the same time retaining the benefits of 'street name' registration. (Section 12(m)). The Commission is directed to report its preliminary findings to Congress within six months of enactment of the bill and its final results and recommendations within a year of enactment.

### D. STATE TAXES ON SECURITIES TRANSACTIONS

During its previous hearings on paperwork processing legislation, the Committee received evidence that the imposition of state transfer taxes may be impeding the development of a national system of processing securities transactions. At the time of its hearings in October of 1971, for example, it appeared that the New York Stock Transfer Tax might apply to transactions, regardless of where or between whom executed, if delivery were made by means of bookkeeping entry in New York or by the movement of securities in or out of a New York depository or clearing house. Recent amendments to the New York Stock Transfer Tax may have eliminated this particular problem, but the evidence also revealed that other state and local authorities are considering the imposition of stock transfer taxes as one means of producing badly needed revenue. The Committee expresses no opinion regarding the wisdom of such taxes provided they are not applied in such a way as to impede the development of a national system of clearing and settling securities transactions. But, prohibition of state transfer taxes which do impede such development is clearly in the public interest.

Therefore, the bill prohibits the imposition of state taxes on securities or upon the transfer of securities merely be-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

cause the facilities of a clearing agency are physically located in the taxing state. (Section 28(a)). This provision is designed to facilitate the development of a national system for handling securities transactions while at the same time preserving the state taxing powers over transactions with which the taxing state has a traditional jurisdictional basis for taxation.

\* \* \*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.