# EXHIBIT E



U.S. Securities and Exchange Commission

## Division of Market Regulation: Responses to Frequently Asked Questions Concerning Regulation SHO

Responses to these frequently asked questions were prepared by and represent the views of the staff of the Division of Market Regulation ("Staff"). They are not rules, regulations, or statements of the Securities and Exchange Commission ("Commission"). Further, the Commission has neither approved nor disapproved these interpretive answers.

**For Further Information Contact:** Any of the following attorneys in the Office of Trading Practices, Division of Market Regulation, Securities and Exchange Commission, 100 F Street, N. E., Washington, D.C. 20549-1001, at (202) 551-5720: James Brigagliano, Assistant Director, Josephine Tao, Branch Chief, Joan Collopy, Lillian Hagen, Elizabeth Sandoe, and Victoria Crane, Special Counsels.

### I. Introduction

A short sale is the sale of a security that the seller does not own and any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, the short seller will borrow the security, typically from a broker-dealer or an institutional investor. The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the borrowed security to the lender. In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

Regulation SHO became effective on September 7, 2004. (Securities Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004) ("Adopting Release")). The commencement date to comply with the provisions of Regulation SHO is January 3, 2005. Pursuant to the terms of Regulation SHO, the Commission approved an order establishing a one-year pilot program ("Pilot") suspending the provisions of Rule 10a-1(a) under the Securities Exchange Act of 1934 ("Exchange Act") and any short sale price test of any exchange or national securities association ("SRO") for short sales of certain securities for certain time periods. (*See* Securities Exchange Act Release No. 50104 (July 28, 2004), 69 FR 48032 (August 6, 2004) ("Pilot Order")). The Adopting Release and the Pilot Order may also be found on the Commission's Internet web site (http://www.sec.gov/spotlight/shortsales.htm). (*See also* http://www.sec.gov/rules/final/34-50103.htm for the Adopting Release, and http://www.sec.gov/rules/other/34-50104.htm for the Pilot Order). On November 29, 2004, the Commission approved an order resetting the Pilot to commence on May 2, 2005 and end on April 28, 2006. (*See* Securities

*on a threshold list?*

**Answer:** The close-out and pre-borrow requirements of Regulation SHO are based on settlement days, not trade days. Under Regulation SHO, it is irrelevant whether a security is a threshold security on the date that it is sold short. The close-out and pre-borrow requirements apply if a security is a threshold security for 13 consecutive settlement days and a participant in a registered clearing agency has open delivery failures in that security on each of those days.

For example, if a participant sells short a security that is not a threshold security on the date of sale, the close-out and pre-borrow requirements would not apply to a fail to deliver position on the participant's net short settlement obligation unless the security later becomes a threshold security and it maintains that status for 13 consecutive settlement days and the participant has delivery failures for all of those days. On the other hand, a participant must close out a fail to deliver position in a threshold security that has persisted for 13 consecutive settlement days irrespective of the dates of the participant's trades in that security. If the security ceases to be a threshold security prior to the 13th consecutive settlement day that a participant has a fail position in the security, there would be no obligation under Regulation SHO to close out the fail position.

**Question 5.3: Does the close-out requirement apply to delivery failures that do not occur at a registered clearing agency?**

**Answer:** We interpret the close-out requirement to apply only to fail to deliver positions at a registered clearing agency. Our interpretation is based on our understanding that transactions conducted outside the Continuous Net Settlement System ("CNS") operated by the National Securities Clearing Corporation ("NSCC") are rare. If this historical pattern changes and a significant level of fails are not included in CNS, we will reconsider this position.

**Question 5.4: When entering into an arrangement to pre-borrow a threshold security, must a firm clean up the entire amount of the fail before accepting additional orders to sell short such threshold security? Or, may the firm effect short sale orders up to the amount of shares of the threshold security that is pre-borrowed?**

**Answer:** Under Rule 203(b)(3), when a participant of a registered clearing agency has a net settlement failure in a threshold security for 13 consecutive settlement days, two consequences follow: (1) the participant must immediately take steps to close out the fail to deliver position; and (2) until the fail to deliver position is closed out, the participant and any broker or dealer for which it clears transactions must borrow the security that is the subject of the fail, or enter into a bona-fide arrangement to borrow such security before the participant or such broker or dealer may effect any subsequent short sales in such security. This pre-borrow requirement remains in place until the participant closes out the entire fail to deliver position. Therefore, a participant that has a close-out obligation for a threshold security may effect short sale orders for such threshold security up to the amount pre-borrowed.

Rule 203(b)(3)(iv) permits the participant to reasonably allocate a portion

*Answer:* Any equity security of an issuer that is registered under Section 12 or that is required to file reports pursuant to Section 15(d) of the Exchange Act could qualify as a threshold security. Therefore, threshold securities may include those equity securities that trade on the OTCBB or on the pink sheets, as well as those that trade on the exchanges or Nasdaq.

At the conclusion of each settlement day, NSCC will provide the SROs with data on securities that have aggregate fails to deliver at NSCC of 10,000 shares or more. For the securities for which it is the primary market, each SRO will use this data to calculate whether the level of fails is equal to at least 0.5% of the issuer's total shares outstanding of the security. If, for five consecutive settlement days, such security satisfies these criteria, then such security will be a threshold security. Each SRO should include such security on its daily threshold list until the security no longer qualifies as a threshold security.

**(NEW! 05/06/05)**

**7. Clearance and Settlement**

*Question 7.1: Do naked short sale transactions create "counterfeit shares?"*

*Answer:* Some believe that naked short sale transactions cause the number of shares trading to exceed the number of shares outstanding, which in turn allows broker-dealers to trade shares that don't exist. Others believe that the U.S. clearance and settlement system, and specifically the National Securities Clearing Corporation's ("NSCC") Continuous Net Settlement System ("CNS"), produces "phantom" or "counterfeit" securities by accounting for fails to deliver.

Naked short selling has no effect on an issuer's total shares outstanding. There is significant confusion relating to the fact that the aggregate number of positions reflected in customer accounts at broker-dealers may in fact be greater than the number of securities issued and outstanding. This is due in part to the fact that securities intermediaries, such as broker-dealers and banks, credit customer accounts prior to delivery of the securities. For most securities trading in the U.S. market, delivery subsequently occurs as expected. However, fails to deliver can occur for a variety of legitimate reasons, and flexibility is necessary in order to ensure an orderly market and to facilitate liquidity. Regulation SHO is intended to address the limited situations where fails are a potential problem (for example, fails in securities on a threshold list).

Similarly, CNS has no effect on an issuer's total shares outstanding. With regards to the contention that the U.S. clearance and settlement system, and specifically NSCC's CNS system, creates counterfeit shares, this is not the case. CNS is essentially an accounting system that indicates delivery and receive obligations among its members (i.e., broker-dealers and banks). These obligations do not reflect ownership positions until such time as delivery of shares are actually made. Ownership positions are reflected on the records of The Depository Trust Company ("DTC").

*Question 7.2: Does NSCC's stock borrow program ("SBP") create "counterfeit shares"?*

*Answer:* The SBP was implemented in the late 1970s to allow NSCC to satisfy its members' priority needs for stocks that they do not receive because of fails. It is governed by NSCC rules approved by the Commission. Under the SBP, NSCC uses shares voluntarily made available to the SBP by some of its members to complete deliveries to members that did not receive their securities on settlement day. The SBP moves securities that are actually on deposit at DTC from the lending member to the NSCC member who did not receive securities. NSCC then records the lender's right to receive the same amount of shares that it loaned just as if the lender had purchased securities but not received them (i.e., the member lending the securities replaces the member receiving the loaned securities in the CNS system). The lending and delivery of shares through the SBP, however, does not relieve the member that has failed to deliver from its obligation to deliver securities.

The shares loaned by NSCC members for use in the SBP must be on deposit at DTC and are debited from members' accounts when the securities are used to make delivery. Once a member's shares are used for delivery to another member, the lending member no longer has the right to sell or relend those shares until such time as the shares are returned to its DTC account. Accordingly, NSCC's SBP does not create "counterfeit shares." In fact, the program facilitates the delivery of securities to buyers while maintaining the obligation of the sellers to deliver securities to NSCC. This outcome is consistent with the NSCC's obligation to facilitate the prompt and accurate clearance and settlement of securities transactions and in general to protect investors and the public interest.

### Question 7.3: Should NSCC buy-in all fails to deliver in CNS?

*Answer:* A "fail to deliver" in NSCC's CNS occurs when an NSCC member (e.g., a broker-dealer or a bank) fails to deliver securities on settlement date. There are many reasons why NSCC members do not or cannot deliver securities to NSCC on the settlement date. Many times the member will experience a problem that is either unanticipated or is out of its control, such as (1) delays in customer delivery of shares to the broker-dealer; (2) an inability to borrow shares in time for settlement; (3) delays in obtaining transfer of title; (4) an inability to obtain transfer of title; and (5) deliberate failure to produce stock at settlement which may result in a broker-dealer not receiving shares it had purchased to fulfill its deliver obligations. In addition, market makers may maintain temporary short positions in CNS until such time as there is sufficient trading to flatten out their position.

NSCC does not have the authority to execute buy-ins on behalf of its members. Moreover, forcing close-outs of all fails can increase risk in clearing and settling transactions as well as potentially interfering with the trading and pricing of securities.

*http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm*

Home | Previous Page                                    Modified: 08/28/2009