# EXHIBIT F



**Tuesday,**

**December 7, 2004**

**Part IV**

# Securities and Exchange Commission

**17 CFR Part 240**

**Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries; Final Rule**

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 240**

[Release No. 34–50758; File No. S7–24–04]

RIN 3235–AJ26

**Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission (''Commission'') is adopting a new rule under the Securities Exchange Act of 1934 (''Exchange Act'') that prohibits registered transfer agents from effecting any transfer of any equity security registered under Section 12 or any equity security that subjects an issuer to reporting under Section 15(d) of the Exchange Act if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary, such as clearing agencies, banks, or broker-dealers. The primary purpose of the rule is to promote the integrity and efficiency of the U.S. clearance and settlement system.

**DATES:** Effective Date: March 7, 2005.

**FOR FURTHER INFORMATION CONTACT:** Jerry Carpenter, Assistant Director, or Susan M. Petersen, Special Counsel, Office of Risk Management, 202/942–4187, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC, 20549–1001.

**SUPPLEMENTARY INFORMATION:**

## I. Introduction

Recently, a number of issuers of equity securities trading in the public markets have imposed restrictions on their securities to limit or to prohibit ownership of the securities by securities intermediaries such as depositories, broker-dealers, and banks. Such restrictions require these securities to be certificated and transactions in these securities to be manually cleared, settled, and transferred on a transaction-by-transaction basis.

To facilitate the clearance and settlement of securities transactions, securities held by a securities intermediary on behalf of its customers or another securities intermediary are commonly registered in the name of the securities intermediary or in its nominee name, which makes the securities intermediary the registered owner.[1] This is often referred to as holding a security in ''street name.''[2] Holding securities in street name at a securities depository facilitates the transfer of negotiable certificates and obviates manually processed paperwork and physical delivery of certificates. Registered clearing agencies acting as securities depositories help to centralize and automate the settlement of securities, in part by reducing the physical movement of securities traded in the U.S. markets using book-entry movements. On occasion, other types of securities intermediaries, such as broker-dealers or banks, may perform similar functions by holding a certificate registered in its name but held on behalf of its customers.

The use of securities depositories in order to minimize the physical movement in connection with the settlement for securities traded in the public market is essential to the prompt and accurate clearance and settlement of securities transactions.[3] The effort by some issuers to restrict ownership of publicly traded securities by securities intermediaries can result in many of the inefficiencies and risks Congress sought to avoid when promulgating Section 17A of the Exchange Act.[4] Restrictions on intermediary ownership deny investors the ability to use a securities intermediary to hold their securities and to efficiently and safely clear and settle their securities transactions by book-entry movements.

On June 4, 2004, the Commission proposed Rule 17Ad–20 that would prohibit registered transfer agents from effecting any transfer of any equity security registered under Section 12 or any equity security that subjects an issuer to reporting under 15(d) of the Exchange Act[5] if such security is

subject to any restriction or prohibition on transfer to or from a securities intermediary.[6] Under the proposed rule, the term ''securities intermediary'' would be defined as a clearing agency registered under Section 17A of the Exchange Act or a person, including a bank, broker, or dealer, that in the ordinary course of its business maintains securities accounts for others. As proposed, the rule would exclude any equity security issued by a partnership, as defined in Item 901 of Regulation S–K. For tax or other reasons, partnerships may have an appropriate need to restrict ownership and issue a securities certificate.

The Commission solicited comments on the proposed rule and received fourteen comment letters from eleven commenters.[7] The responses varied widely, with three commenters supporting the rule as proposed, five commenters opposing the proposal or expressing reservations about the proposal until certain preconditions have been met, and three commenters not expressing support or opposition but instead raising interpretive, operational, or timing concerns with adoption of the rule. After carefully considering the comments received, we have decided to adopt Rule 17Ad–20 with a minor modification to address certain commenter concerns raised relating to private placements and certain types of private agreements.

---

[1] The registered owner is the name of the individual shareholder recorded on the official records of the issuer (sometimes referred to as the record owner or legal owner of the securities).

[2] In the case of securities held in street name, generally the securities are held by a securities depository (*e.g.*, The Depository Trust Company) who as the registered owner holds the securities on behalf of another securities intermediary (*e.g.*, a broker-dealer or bank) who in turn holds the securities for its customers, the beneficial owners. All the rights and obligations of the securities are passed through the registered owner to the beneficial owners. For more information on the relationship between securities intermediaries and beneficial owners, *see infra* note 21.

[3] Section 17A(e) of the Exchange Act directs the Commission to use its authority to end the physical movement of securities certificates in connection with the settlement among brokers and dealers of transactions in securities. 15 U.S.C. 78q–1(e).

[4] 15 U.S.C. 78q–1.

[5] Pursuant to Section 12(g) of the Exchange Act and the rules thereunder, a company must generally register a class of equity securities if on the last day of its fiscal year it has total assets of more than $10

million and the class is held of record by more than 500 persons. 15 U.S.C. 78*l*(g). Under Section 12(b), all securities registered on a securities exchange must also be registered with the Commission. 15 U.S.C. 78*l*(b). Section 15(d) of the Exchange Act generally requires a company with an effective Securities Act registration statement to file the same periodic reports as a company that has a Section 12 registered class of securities. 15 U.S.C. 78o(d).

[6] Securities Exchange Act Release No. 49809 (June 4, 2004), 69 FR 32784 (June 10, 2004), [File No. S7–24–04].

[7] Letters from David Patch (May 29, 2004, June 7, 2004, and August 3, 2004); Glenda King (June 5, 2004); Frederick D. Lipman, Esq. (June 10, 2004); Larry E. Thompson, Managing Director and Senior Deputy General Counsel, The Depository Trust & Clearing Corporation (July 8, 2004, and August 19, 2004); Robert L. Stevens, Chairman, X–Clearing Corporation (July 9, 2004); Marc Castonguay, Vice President and CEO, Pacific Corporate Trust Company (July 12, 2004); H. Glenn Bagwell, Jr., Esq. (July 12, 2004); Thomas L. Montrone, President and Chief Executive Officer, Registrar and Transfer Company (July 16, 2004); Cleary, Gottlieb, Steen & Hamilton (July 19, 2004); Ernest A. Pittarelli, Chairman, Securities Industry Association (''SIA'') (July 28, 2004), and D. Stuart Bowers, Senior Vice President, Legg Mason Wood Walker, Incorporated (July 30, 2004) (''Legg Mason'').

## II. Background

### A. The National System for Clearance and Settlement of Securities Transactions

In Section 17A(a) of the Exchange Act, Congress made findings that (1) the prompt and accurate clearance and settlement of securities transactions, including the transfer of registered ownership and safeguarding of securities and funds related to clearance and settlement activities, are necessary for the protection of investors and those acting on behalf of investors,[8] and (2) inefficient clearance and settlement procedures impose unnecessary costs on investors and those acting on their behalf.[9] To address these concerns, Congress gave the Commission the authority and responsibility to regulate, coordinate, and direct the processing of securities transactions in order to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities.[10] The basic purpose of Section 17A is to promote the development of a modern, nationwide system for the safe and efficient processing of securities transactions that serves the interests of the financial community and the investing public.[11] Congress expressly provided the Commission with jurisdiction over clearing agencies[12] and transfer

agents,[13] as well as other participants[14] in the national system for clearance and settlement.[15] Furthermore, specifically recognizing that the use of securities certificates to transfer registered ownership decreases efficiency and safety in the capital markets, Congress also directed the Commission to end the physical movement of securities certificates in connection with the settlement among brokers and dealers.[16]

### B. The Role of Securities Intermediaries

The process for delivering and transferring certificated securities is almost entirely manual and as such, is labor-intensive, expensive, and time-consuming.[17] The use of securities certificates can result in significant delays and expense in processing securities transactions.[18] Moreover, as

negotiable instruments, certificates also can be lost, stolen, or forged.[19] All this adversely affects the national system for clearance and settlement. The concern associated with lost certificates was dramatically demonstrated after September 11, 2001, when thousands of certificates at broker-dealers or banks (either being held in custody in vaults or being processed for transfer) either were destroyed or were unavailable for transfer. Certificates have also been identified by the financial services industry as an obstacle to achieving streamlined processing (*i.e.*, straight-through-processing) and shorter settlement cycles.[20]

Securities intermediaries hold securities on behalf of others in order to facilitate more efficient clearance and settlement of securities transactions by reducing the need to transfer certificates. Investors' securities generally are held in the name of a securities intermediary, such as a securities depository, broker-dealer, or bank, or its nominee, for the benefit of the security intermediary's customers. The securities intermediary or its nominee is generally the registered owner of the securities while the securities intermediary's customer typically is the beneficial owner.[21]

---

[8] 15 U.S.C. 78q–1(a)(1)(A).

[9] 15 U.S.C. 78q–1(a)(1)(B).

[10] 15 U.S.C. 78q–1(a)(2)(A)(i). Congress envisioned the Commission's authority to extend to every facet of the securities handling process involving securities transactions within the United States, including activities by clearing agencies, depositories, corporate issuers, and transfer agents. *See* S. Rep. No. 75, 94th Cong., 1st Sess. at 55 (1975).

[11] *See* S. Rep. No. 75, 94th Cong., 1st Sess. at 122 (1975).

[12] The Exchange Act defines the term clearing agency as any person who acts as an intermediary in making payment or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities. Such term also means a person, such as a securities depository, who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates, or (ii) otherwise permits or facilitates the settlement of securities transactions or they hypothecation or lending of securities without the physical delivery of securities certificates. 15 U.S.C. 78c(a)(23).

[13] The Exchange Act defines the term transfer agent generally as any person who engages on behalf of an issuer of securities or on behalf of itself as an issuer of securities in (A) countersigning such securities upon issuance; (B) monitoring the issuance of such securities with a view to preventing unauthorized issuance, a function commonly performed by a person called a registrar; (C) registering the transfer of securities; (D) exchanging or converting such securities; or (E) transferring record ownership of securities by book-keeping entry without physical issuance of securities certificates. 15 U.S.C. 78c(a)(25).

[14] Section 17A(f)(1) permits the Commission to adopt rules concerning the transfer of securities and the rights and obligations of purchasers, sellers, owners, lenders, borrowers, and financial intermediaries involved in or affected by such transfers, and the rights of third parties whose interests devolve from such transfers. 15 U.S.C. 78q–1(f)(1).

[15] *See, e.g.*, Section 17A(b)(1) of the Exchange Act makes it unlawful for any clearing agency, unless registered with the Commission, to perform the function of a clearing agency with respect to any security other than an exempted security. 15 U.S.C. 78q–1(b)(1). Section 17A(c)(1) of the Exchange Act, which makes it unlawful for any transfer agent, unless registered with the Commission, to directly or indirectly perform the function of a transfer agent with respect to any security registered under Section 12 of the Act or which would be required to be registered except for the exemption from registration proved by Section 12(g)(2)(B) (investment companies) or Section 12(g)(2)(G) (certain securities issued by insurance companies). 15 U.S.C. 78q–1(c)(1) and 15 U.S.C. 78*l*(a) respectively. Exchange Act Section 17A(d)(1) prohibits any registered clearing agency or registered transfer agent from engaging in any activity as a clearing agency or transfer agent in contravention of rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest, for the protection of investors or otherwise in furtherance of the purposes of the Act. 15 U.S.C. 78q–1(d)(1).

[16] 15 U.S.C. 78q–1(e).

[17] For more information on the costs and risks associated with processing certificates, *see* Exchange Act Release No. 49405 (March 11, 2004), 69 FR 12922 (March 18, 2004), [File No. S7–13–04] (securities transaction settlement concept release).

[18] If a broker-dealer is unable to have the security reregistered into the name of the buyer or the buyer's securities intermediary after trade date, the rejection of the transfer after trade date exposes the customer to the costs and risks that she may have to buy in the security and exposes the broker-dealer

to the costs and risks associated with buy-ins. Investors bear direct costs as well. Transfer agents require investors to obtain a surety bond before the transfer agent will issue a replacement certificate for lost and stolen certificates. We understand that generally most transfer agents charge investors between 2%–4% of the current market value of the securities to obtain a surety bond.

[19] In an effort to identify lost, missing, counterfeit, and stolen securities, Exchange Act Rule 17f–1 requires, among other entities, every exchange, the securities association, broker, dealer, transfer agent, registered clearing agency, and many banks to report to the Commission or delegee, which currently is the Securities Information Center (''SIC''), missing, lost, counterfeit, or stolen securities certificates. *See* 17 CFR 240.17f–1. SIC operates a centralized database that records lost and stolen securities. When a broker-dealer receives a security certificate to sell, the broker-dealer will submit information about the certificate to SIC so that SIC may search its database to see if the certificate has been reported as missing, lost, stolen, or counterfeited. (For more information about SIC, see *www.secic.com*.)

[20] See Exchange Act Release No. 49405 (March 11, 2004), 69 FR 12922 (March 18, 2004), [File No. S7–13–04] (securities transaction settlement concept release).

[21] The relationship between various levels of securities intermediaries and beneficial owners is complex. There may be many layers of beneficial owners (some of which may also be securities intermediaries) with all ultimately holding securities on behalf of a single beneficial owner, who is sometimes referred to as the ultimate beneficial owner. For example, an introducing broker-dealer may hold its customer's securities in its account at a clearing broker-dealer, that in turn holds the introducing broker-dealer's securities in an account at DTC. In this context, DTC or its nominee is the registered owner and DTC's

Continued

Securities registered in the name of the securities intermediary or its nominee allows the securities to be immobilized [22] and held in fungible bulk [23] thereby significantly reducing the number of certificates that need to be delivered and transferred. This in turn reduces the risk and cost associated with transferring the securities. Transfers in ownership of securities held in the name of a securities intermediary are accomplished by making book-entry adjustments to the accounts on the securities intermediary's records.

Consistent with Congress' directive to establish a national system for clearance and settlement and to decrease the inefficiencies and risks associated with processing securities certificates, the Commission has long encouraged the use of alternatives to holding securities in certificated form. The Commission's approval of the registration of securities depositories as clearing agencies in 1983 constituted an important step in achieving the mandates established by Congress by immobilizing securities in a registered clearing agency and settling transactions by book-entry movements.[24] The Commission also has approved the rule filings of self-regulatory organizations that require their members to use the facilities of a securities depository for the book-entry settlement of all transactions in

depository-eligible securities [25] and that require securities to be made depository eligible if possible before they can be listed for trading.[26]

Registered clearing agencies acting as securities depositories immobilize securities and centralize and automate securities settlements.[27] Holding securities positions in book-entry form at securities depositories reduces the physical movement of publicly traded securities in the U.S. markets and significantly improves efficiencies and safeguards in processing securities certificates, which in turn reduces the costs of those transactions to investors and market professionals alike.

The Depository Trust Company ("DTC"), the largest securities depository in the world, provides custody and book-entry transfer services for the vast majority of securities transactions in the U.S. market involving equities, corporate and municipal debt, money market instruments, American depositary receipts, and exchange-traded funds.[28]

In accordance with its rules, DTC accepts deposits of securities from its participants (*i.e.*, broker-dealers and banks),[29] credits those securities to the depositing participants' accounts, and effects book-entry movements of those securities.[30] The securities deposited with DTC are registered in DTC's nominee name [31] and are held in fungible bulk for the benefit of its participants and their customers.[32] Each participant having an interest in securities of a given issue credited to its account has a pro rata interest in the securities of that issue held by DTC.[33]

Some securities trading in the public market are not deposited at a securities depository because either the securities are not eligible for deposit [34] or the securities intermediary chooses not to deposit the securities.[35] To clear and settle securities transactions without the use of a securities depository, broker-dealers must make independent arrangements to provide for delivery of securities (in certificated form) and payment on a trade-by-trade basis. In cases where an issuer has prohibited ownership of their securities by certain securities intermediaries, such as DTC, some broker-dealers register their customers' positions in the name of the broker-dealer so that certificates do not need to be issued for each customer and transferred on each trade. However, securities transactions between broker-dealers would still have to be manually processed. Thus, clearing and settling securities transactions outside of a depository causes greater risks and

participants (*i.e.*, broker-dealers and banks) are beneficial owners, as are the participants' customers. However, DTC, the clearing broker-dealer (the DTC participant), and the introducing broker-dealer are all securities intermediaries. These distinctions may be important under both federal and state law when determining the rights and obligations of the parties holding securities on behalf of others.

[22] Immobilization of securities occurs where a securities depository holds the underlying certificate and transfers of ownership are recorded through book-entry movements between the depository's participants' accounts. An issue is partially immobilized (as is the case with most equity securities traded on an exchange or at the NASD) when the street name positions are immobilized (*i.e.*, those held through broker-dealers that are participants of a depository), but certificates are still available to individual shareholders upon request. Dematerialization of securities occurs where there are no paper certificates available, and all transfers of ownership are made through book-entry movements. For more information about immobilization and dematerialization, *see* Exchange Act Release No. 49405 (March 11, 2004), 69 FR 12922 (March 18, 2004), [File No. S7–13–04].

[23] Fungible bulk means that no participant or customer of a participant has any claim or ownership rights to any particular certificate held by DTC. Rather, participants have a securities entitlement to obtain a certificate representing securities held in their DTC accounts.

[24] Exchange Act Release No. 20221 (September 23, 1983), 48 FR 45167 (October 3, 1983), [File Nos. SR–600–5 and 600–19] (order approving the clearing agency registration of four depositories and four clearing corporations).

[25] Exchange Act Release No. 32455 (June 11, 1993), 58 FR 33679 (June 18, 1993), [File Nos. SR–Amex–93–07; SR–BSE–93–08; SR–MSE–93–03; SR–NASD–93–11; SR–NYSE–93–13; SR–PSE–93–04; and SR–Phix–93–09)] (order approving rules requiring members, member organizations, and affiliated members of the New York Stock Exchange, National Association of Securities Dealers, American Stock Exchange, Midwest Stock Exchange, Boston Stock Exchange, Pacific Stock Exchange, and Philadelphia Stock Exchange to use the facilities of a securities depository for the book-entry settlement of all transactions in depository-eligible securities with another financial intermediary). In rare circumstances, DTC will be unable to accept a deposit of a security because it is unable to process it. In those cases, the rules of the self-regulatory organizations do not require the security to be depository eligible.

[26] Exchange Act Release No. 35798 (June 1, 1995), 60 FR 30909 (June 12, 1995), [File Nos. SR–Amex–95–17; SR–BSE–95–09; SR–CHX–95–12; SR–NASD–95–24; SR–NYSE–95–19; SR–PSE–95–14; SR–PHLX–95–34] (order approving rules setting forth depository eligibility requirements for issuers seeking to have their shares listed on the American Stock Exchange, Boston Stock Exchange, Chicago Stock Exchange, National Association of Securities Dealers, New York Stock Exchange, Pacific Stock Exchange, and the Philadelphia Stock Exchange).

[27] Securities depositories work in conjunction with securities clearing corporations. Both types of entities must be registered as clearing agencies under Section 17A of the Exchange Act. Clearing corporations, such as the National Securities Clearing Corporation, serve to compare trades submitted to it by its participants and net those trades to a single position at the end of the day. The trade position data is then submitted to the depository in order to effectuate settlement by debiting or crediting the participants' book-entry securities position at DTC and facilitating the payments to or from the participants.

[28] Of the four depositories registered as clearing agencies in 1983, DTC is the only one still operating. DTC estimates that as of December 31, 2002, approximately 84% of the shares issued by domestic companies listed on the NYSE and 88% of the domestic companies listed on the Nasdaq are deposited at DTC. (These statistics do not include

ADRs.) E-mail from Joseph Trezza, Senior Product Manager, DTCC, to the Commission staff (November 14, 2003).

[29] In the case of "book-entry-only" securities (*e.g.*, no securities certificates are available), the issuer will authorize DTC to credit the account or accounts of participants with all of the issuer's outstanding shares.

[30] *See, e.g.*, Rules 5 and 6 of DTC's Rules.

[31] DTC registers securities in the name of its nominee, Cede & Co., which makes it the registered owner of the securities.

[32] Securities deposited at DTC by its participants or the issuers in the case of book-entry-only securities are legally or beneficially owned by the participants or their customers at the time of the deposit and are subsequently transferred into DTC's nominee name.

[33] While DTC is the registered owner, the participants and their customers are the beneficial owners. *See supra* note 21.

[34] A securities depository determines whether a security is eligible for deposit. Certain securities may not be eligible for a variety of reasons such as the security cannot conform to the depository's processing systems or ownership of the security is restricted in such a manner that it cannot be freely transferred. *See* Rule 5 of DTC's Rules.

[35] For example, DTC participants may choose not to deposit the securities in the depository if the security is not widely traded, and instead hold certificated securities registered in the name of either the participant's nominee or its customer.

inefficiencies, including credit risk issues and risk of defaults, than clearing and settling securities transactions within a depository.

*C. Need for the Rule*

A small but growing number of issuers whose securities are registered under Section 12 or are reporting under Section 15(d) of the Exchange Act [36] recently have restricted, or indicated their intention to restrict, ownership of their securities by prohibiting their transfer agents from acknowledging ownership of shares registered in the name of DTC or by prohibiting transfer of their securities to DTC or in some cases to any securities intermediary.[37] Most, if not all, of the issuers restricting ownership of their securities have also required that the shares be represented in certificated form.[38] In several cases, the issuer has required the broker-dealer to disclose the name of the ultimate beneficial owner before reregistering any securities held by the broker-dealer either in the name of the broker-dealer or in the name of DTC. [39] Some brokers refused because they believed disclosure of the customer's name would violate federal securities laws [40] or contractual obligations to the customer. Other broker-dealers could not disclose the name of the ultimate beneficial owner because they knew only the identity of their customer and not necessarily for whom their customer was holding the securities.

Issuers imposing these restrictions, sometimes referred to as ''custody-only trading,'' frequently state that they are imposing ownership or transfer restrictions on their securities to protect their shareholders and their share price from ''naked'' short selling.[41] These

issuers believe that requiring all securities to be in certificated form and precluding ownership by certain securities intermediaries forces broker-dealers to deliver certificates on each transaction and eliminates the ability of naked short sellers to maintain a naked short sale position.[42]

A number of these issuers indicated that they had adopted or would adopt restrictions, assertedly pursuant to state corporation laws, to prohibit ownership of their securities by a depository, securities intermediaries, or both.[43] Issuers' actions to implement the restrictions caused numerous clearance and settlement problems. Some of these issuers refused to recognize positions that had been registered in the name of DTC's nominee or in the name of broker-dealers before the adoption of the restriction and refused to transfer (or allow their transfer agent to transfer) stock to the name of any entity or person that the issuer believed was not the ultimate beneficial owner. Where issuers refused to recognize ownership positions registered in the name of securities intermediaries, the broker-dealers and banks were forced individually to negotiate a solution directly with the issuer.

If securities intermediaries are precluded from having securities registered in their names, the securities intermediaries' ability to hold and move securities is severely limited. As a result, trading and clearance and settlement efficiency suffers, and costs and risks increase. This consequence of issuer restrictions is not compatible with the Congressional objective that trades in the securities of publicly traded companies should be settled

through the national system for clearance and settlement and benefit from its efficiencies and risk reductions and is a significant step backwards in our progress to develop the national system. Furthermore, forced certification of securities is inconsistent with the industry's goals of streamlining processing of securities transactions.[44]

These types of restrictions have also caused investors increased costs and delays. By forcing securities intermediaries to submit securities as part of an issuer's recapitalization, the transfer agent must transfer the securities by canceling the certificate registered in the name of the securities intermediary and re-register a new certificate in the name of the beneficial owner. Transfer agent registration fees, which may range from $10.00 to $75.00 per transfer, and costs for secure delivery of securities certificates, can be more than the market value of the securities being processed.[45] In some cases, the broker-dealers assume these costs but in many cases the cost is passed along to investors. Broker-dealers that did reregister securities received numerous complaints from investors about the fees, particularly where the investors had not issued instructions to reregister the securities. Where broker-dealers must deliver the securities certificates to an issuer's transfer agent and the transfer agent similarly must deliver the newly registered certificates, there are significant costs and delays in obtaining certificates, which could ultimately impede the customers' ability to sell or otherwise negotiate the security in the marketplace.

**III. The Proposed Rule**

On June 4, 2004, the Commission proposed Rule 17Ad–20[46] that would prohibit registered transfer agents [47] from effecting any transfer of any equity security registered under Section 12 or any equity security that subjects an issuer to reporting under 15(d) of the Exchange Act [48] if such security is subject to any restriction or prohibition

---

[36] *Supra* note 5.

[37] *See, e.g., www.jagnotes.com; www.nutk.com.* Also *see* ''Intergold Corporation Announces Custody Only CommonShare Transfer System,'' PRNewswire-First Call (January 30, 2003).

[38] *Id.* The certification requirement does not in and of itself preclude securities from being deposited at DTC. In fact, DTC's nominee owns many of the securities deposited at DTC in certificated form, generally by a global or balance certificate.

[39] *Id.* Registration of a transfer is necessary to change registered ownership of a security.

[40] For example, some broker-dealers have expressed concern that such disclosure may cause them to violate Exchange Act Rule 14b–1 that requires a broker to provide a requesting issuer only with the identities of beneficial owners who have not objected to disclosures of this information to issuers. 17 CFR 240.14b–1.

[41] *See* Exchange Act Release No. 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003), [File No. SR–DTC–2003–02] (order approving proposed rule change concerning requests for withdrawal of certificates by issuers). A short sale is a sale of a security that the seller does not own or is effectuated by the delivery of borrowed securities. Although ''naked short sale'' is not a defined term

under federal securities laws, it generally refers to situations where a seller sells a security without owning or borrowing the security and does not deliver when delivery is due. Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7–23–03] (adoption of Regulation SHO).

[42] *Id.*

[43] *See, e.g., www.jagnotes.com; www.nutk.com.* Also *see* ''Intergold Corporation Announces Custody Only CommonShare Transfer System,'' PRNewswire-First Call (January 30, 2003). Previously, some issuers sought to withdraw from DTC all securities issued by them and indicated that they would not allow their securities to be reregistered in the name of DTC. In June 2003, the Commission approved a DTC rule change clarifying that DTC's rules and procedures provide only for participants (*i.e.*, broker-dealers and banks) to submit withdrawal instructions for securities deposited at DTC and do not require DTC to comply with withdrawal requests from issuers. Exchange Act Release Nos. 47365 (February 13, 2003), 68 FR 8535 (February 21, 2003), [File No. SR–DTC–2003–02] (notice of proposed rule change); 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003), [File No. SR–DTC–2003–02] (order approving proposed rule change concerning requests for withdrawal of certificates by issuers).

[44] See Exchange Act Release No. 49405 (March 11, 2004), 69 FR 12922 (March 18, 2004), [File No. S7–13–04]. *See also* ''SIA T+1 Business Case Final Report,'' at 18–21 (August 2000)(''SIA Business Case Report''). The report is available online at *http://www.sia.com/t_plus_one_issue/pdf/BusinessCaseFinal.pdf.*

[45] Only issuers whose securities are trading on the NYSE are prohibited from charging transfer or certification fees.

[46] Securities Exchange Act Release No. 49809 (June 4, 2004), 69 FR 32784 (June 10, 2004), [File No. S7–24–04].

[47] *Supra note 13.* Issuers acting as their own transfer agent would be subject to Rule 17Ad–20.

[48] *Supra note 5.*

on transfer to or from a securities intermediary.[49] Under the proposed rule, the term ''securities intermediary'' would be defined as a clearing agency registered under Section 17A of the Exchange Act or a person, including a bank, broker, or dealer, that in the ordinary course of its business maintains securities accounts for others. As proposed, the rule would exclude any equity security issued by a partnership, as defined in Item 901 of Regulation S–K.[50]

## IV. Comment Letters

As noted above, the Commission received fourteen comment letters from eleven commenters in response to the proposed rule.[51] Three commenters submitting four letters supported the proposal in its current form.[52] The SIA stated that precluding securities intermediaries from having securities registered in their own name will increase the use of securities certificates and thereby will increase the costs and risks associated with processing these certificates. Legg Mason stated in its comment letter that it concurred with the SIA's comment. They noted that the use of certificates adversely affects the clearance and settlement system and undermines the industry's long-term efforts to streamline securities processing and achieving straight-through processing in the U.S.

DTC noted in its support for Rule 17Ad–20 that some issuers have refused to process or return shares presented by DTC for transfer or have significantly delayed transfer.[53] In many cases, DTC asserts, issuers' actions have resulted in the suspension of clearance and settlement services, and thereby have delayed or prevented the settlement of trades and ultimately disrupted the national system for clearance and settlement. While some issuers have claimed they have the right to control the disposition of securities trading in

the public market and have directed that shares owned by and registered in the name of DTC's nominee be surrendered, DTC contends that issuers do not have continuing ownership rights in securities they have sold into the marketplace and that attempts to exercise control is improper and may constitute conversion. As such, DTC believes Rule 17Ad–20 will prevent transfer agents from aiding and abetting wrongful conduct by certain issuers that interferes with the exercise by DTC and by its participants of their duties to securityholders with respect to securities deposited at DTC.

DTC submitted a second comment letter [54] to address one commenter who opposed the adoption of Rule 17Ad–20 and who criticized the National Securities Clearing Corporation's (''NSCC'') [55] stock borrow program because he believed that the stock borrow program facilitated naked short selling by allowing broker-dealers to trade more shares than have been issued.[56] DTC stated that the program was implemented in order to satisfy its members' priority needs for stock that the members do not receive because of fails, and therefore the program facilitates the settlement of securities transactions.[57] DTC further stated that shares must be on deposit at DTC and that the lender cannot loan shares multiple times.

Five commenters submitting seven comment letters were either against adoption of the proposal or expressed reservations about adopting such a rule until certain preconditions were met.[58] One of the five commenters opposed the adoption of the proposed rule for a variety of reasons, including that adoption of the rule would remove the ''self help'' measure issuers were using to protect themselves against the negative effects of naked short selling.[59] Another commenter opposed to adoption of Rule 17Ad–20 expressed her belief that it was important to be able to register shares in her own name and to obtain certificates.[60]

One of these commenters opposed to adoption of Rule 17Ad–20 believed that adoption of the rule raises state law concerns.[61] This commenter stated that restrictions on transfer, as well as the rights of a corporation and its securityholders, are a matter of state law and that by prohibiting transfer agents from effecting certain transfers, the rule circumvents the rights of issuers to ''control its own destiny and protect its shareholders.'' [62]

Three of these commenters believe that certain preconditions should be met before Rule 17Ad–20 is adopted.[63] Two of these commenters believe the Commission should develop an effective program to prevent naked short selling before limiting the efforts of small companies to prevent naked short selling and to reasonably guarantee the ''integrity'' of the U.S. clearance and settlement system, including the alleged problems relating to ''DTC's stock borrow program,'' which they believe facilitates naked short selling.[64] One commenter also recommended, without addressing legal and regulatory concerns, that issuers should be able to require that their securities be cleared and settled through the issuer or other alternative means and that the proposed rule be amended to provide an exception to allow the issuer to do so if it can demonstrate the capability to settle transactions in electronic book-entry form.[65]

Three commenters did not express their support for or opposition to the adoption of Rule 17Ad–20 but instead raised interpretive, operational, or timing issues with the proposal.[66] Two of these commenters suggested the proposed the rule should not be adopted

---

[49] *Supra note 15.*

[50] Item 901(b)(1) defines the term partnership to mean any: (i) Finite-life limited partnership or (ii) other finite-life entity. 17 CFR 229.901(b)(1). The Commission has the authority under Section 36 of the Exchange Act to conditionally or unconditionally exempt any security or class of securities from the provisions of the Exchange Act to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors. 15 U.S.C. 78mm(a)(1).

For tax or other reasons, partnerships may have an appropriate need to restrict ownership and issue a securities certificate. A ''publicly traded partnership'' as defined in Section 7704 of the Internal Revenue Code is subject to treatment as a corporation rather than a partnership for tax purposes. 26 CFR 1.7704–1.

[51] *Supra note 7.*

[52] Letters from the SIA, Legg Mason, and DTC.

[53] Letter from DTC (July 8, 2004).

[54] Letter from DTC (August 19, 2004).

[55] NSCC is an affiliate of DTC and is a registered clearing agency that maintains a book-entry accounting system that centralizes the settlement of compared security transactions and maintains an orderly flow of security and money balances.

[56] Letter from H. Glenn Bagwell.

[57] NSCC's Stock Borrow Program was approved by the Commission. Securities Exchange Act Release No. 17422 (December 29, 1980), 46 FR 3104 (January 13, 1981).

[58] Letters from David Patch, Glenda King, Frederick D. Lipman, X–Clearing Corporation, and H. Glenn Bagwell.

[59] Letter from David Patch.

[60] Letter from Glenda King.

[61] Letter from X–Clearing Corporation.

[62] *Id.*

[63] Letters from David Patch, H. Glenn Bagwell, and Frederick D. Lipman.

[64] Letters from H. Glenn Bagwell, and Frederick D. Lipman. One of these commenters maintained that state corporation laws generally permit corporations to establish the number of authorized shares in their certificates or articles or incorporation and authorize the board of directors to issue those shares. Naked short selling, this commenter contends, can increase the supply of shares beyond those authorized, thereby undermining the board's authority under state law to control the number of outstanding shares. Another commenter alluded to this issue when he noted that Regulation SHO indicated that in some cases settlement failure exceed the public float. Letter from David Patch (August 16, 2004). The Commission recently adopted Regulation SHO that addresses certain concerns relating to naked short selling. Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7–23–03]. See Section IV for further discussion on Regulation SHO.

[65] Letter from X–Clearing Corporation.

[66] Letters from Pacific Corporate Trust Company, Registrar and Transfer Company, and Cleary, Gottlieb, Steen & Hamilton.

until after Regulation SHO has become effective to ensure that the rules have effectively dealt with the naked short selling problem and therefore have eliminated the issuers' need to impose restrictions on ownership by or transfer to securities intermediaries.[67] Another commenter expressed concern that adoption of Rule 17Ad–20 may lead to unintended consequences. [68] This commenter argued that by prohibiting transfer agents from following the directions of issuers, the rule could force issuers to terminate their current transfer agent and assume the processing responsibilities as "self agents," which may lead to a deterioration of recordkeeping and shareholder services.

One of these three commenters expressed concerns that adoption of Rule 17Ad–20 as proposed may unintentionally result in prohibiting certain restrictions on transfers that were never intended to be covered by the rule.[69] The commenter contended that, as currently worded, the rule would not only cover "custody-only" trading restrictions on equity securities but would also prohibit issuers from issuing equity securities of the same class that are "subject to" transfer restrictions that may be imposed for a variety of commercial reasons, such as escrow arrangements, collateral security arrangements, and the issuance of equity securities in private placements. This commenter suggested that any restriction or prohibition on transfer be exempt from the rule when the same class of securities is eligible for clearance through a securities intermediary.

## V. Discussion

### A. Adoption of the Rule

After considering the comments received, the Commission is adopting proposed Rule 17Ad–20, with one minor modification. In response to the concern raised by one commenter that Rule 17Ad–20 might unintentionally result in prohibiting transfers that were not intended to be covered by the rule (*e.g.,* restrictions imposed by private placements or restrictions resulting from private agreements between shareholders), the Commission is modifying Rule 17Ad–20(a) to prohibit

transfer agents [70] from transferring [71] any equity security registered under Section 12 or any equity security that subjects an issuer to reporting under Section 15(d) of the Act [72] if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary "in its capacity as such." Restrictions imposed by private placements or in private agreements generally do not permit transfers to anyone but those permitted to purchase or own the securities, as specified under federal law or by private agreements. By modifying Rule 17Ad–20(a), the Commission is making clear that the rule applies only to restrictions or prohibitions imposed by issuers on transfers of their publicly traded securities to or from those securityholders that are securities intermediaries and are not the ultimate beneficial owners.[73] As a result, the rule does not apply to situations such as restrictions imposed by issuers in order to prevent an unregistered distribution or other violation of federal securities laws, or to effectuate private agreements.

Restrictions on transfer or ownership imposed by issuers subsequent to the purchase of securities by investors in the public market raise a number of legal and regulatory concerns. A number of issuers have received but refused to allow transfer and return of securities registered in DTC's nominee name, which in some cases has constituted DTC's entire position.[74] DTC and its participants have expended significant

[70] *Supra* notes 13 and 15. All transfer agents that are required to register as such pursuant to Section 17A(c) of the Exchange Act, whether they are in fact registered or not, must comply with Rule 17Ad–20 and all other applicable transfer agent rules.

[71] The term "transfer" means (1) delivery of the security (*i.e.,* the certificate, or in the case of book-entry, an instruction) (2) a volitional act by the transferor which manifests an intent to change ownership or convey a security interest and, (3) reregistration of ownership. Egon Guttman, *Modern Securities Transfers* section 6:2, at 6–4 (3d ed. 2002).

[72] 15 U.S.C. 78*l* and 15 U.C.C. 78o(d) respectively.

[73] The rule will apply even if a restriction or prohibition does not expressly state that transfer to or ownership by securities intermediaries is restricted or prohibited. For example, the rule would apply to securities where the issuer permits transfer to or ownership by only the "ultimate beneficial owner."

[74] When a broker-dealer participant or its customer requests a certificate for a position maintained at DTC, the broker-dealer participant submits a "Withdrawal by Transfer" instruction to DTC, which in turn sends the appropriate transfer agent a certificate representing all or a portion of DTC's position. The transfer agent registers the number of shares in the customer's name as instructed by DTC and then reregisters the remainder of the shares in DTC's nominee name. The transfer agent sends the broker-dealer or the customer his or her shares and sends DTC the balance of its shares.

resources in attempting to negotiate resolutions with these issuers and their transfer agents. In many cases, the issuers' refusal to return the shares has resulted in the suspension of clearance and settlement services for the issuers' securities, which in some cases has resulted in problems in clearing and settling trades. The difficulty in obtaining access to securities deposited at DTC but withheld by an issuer or its transfer agent and the difficulty in obtaining timely transfers through the transfer agent have caused some broker-dealers to discontinue buying or selling these issuers' securities on behalf of their customers.

We believe that restrictions on transfer of publicly traded securities to securities intermediaries are inconsistent with Section 17A of the Exchange Act. Transactions settled outside of a registered clearing agency have to be certificated and then processed manually on a transaction-by-transaction basis, which creates inefficiencies, risks, and added costs in clearing and settling securities transactions and in transferring securities ownership. Furthermore, restrictions that force investors to clear and settle their securities outside the national system for clearance and settlement require shareholders to assume these increased costs and risks. Investors and market participants should be permitted to hold securities in street name and avail themselves of the benefits of the national system for clearance and settlement if they so choose.

The use of the national system for clearance and settlement, and more specifically, the use of clearing agencies, does not hamper an investors' ability to register securities in their own name or obtain certificates, provided that the issuer allows for certificated positions.[75] Generally, an investor who wants an individually registered position in certificate form can instruct her broker-dealer to register the securities in her name and issue a certificate.

While we understand that restrictions on transfer to intermediaries reflect issuer attempts to address what they believe to be illegal naked short selling, the Commission does not believe that naked short selling concerns should be addressed by restrictions on transferability of securities that trade in the public markets. Restrictions on transferability to securities intermediaries results in the stock being

[67] Letters from Pacific Corporate Trust Company and Registrar and Transfer Company. The compliance date for the relevant provisions of Regulation SHO designed to address naked short selling problems is scheduled for January 3, 2005. Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7–23–03].

[68] Letter from Registrar and Transfer Company.

[69] Letter from Cleary, Gottlieb, Steen & Hamilton.

[75] State law determines if an issuer is required to issue certificates and the conditions to such issuance. Some states, such as New York, permit issuers to issue securities in book-entry form only (*i.e.,* in dematerialized form).