# EXHIBIT G



**Friday,
August 6, 2004**

Part III

# Securities and Exchange Commission

17 CFR Parts 240, 241, and 242
Short Sales; Final Rule and Notice

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Parts 240, 241 and 242**

[Release No. 34–50103; File No. S7–23–03]

**RIN 3235–AJ00**

### Short Sales

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule; interpretation.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is adopting new Regulation SHO, under the Securities Exchange Act of 1934 ("Exchange Act"). Regulation SHO defines ownership of securities, specifies aggregation of long and short positions, and requires broker-dealers to mark sales in all equity securities "long," "short," or "short exempt." Regulation SHO also includes a temporary rule that establishes procedures for the Commission to suspend temporarily the operation of the current "tick" test and any short sale price test of any exchange or national securities association, for specified securities. Regulation SHO also requires short sellers in all equity securities to locate securities to borrow before selling, and also imposes additional delivery requirements on broker-dealers for securities in which a substantial number of failures to deliver have occurred. The Commission is also adopting amendments that remove the shelf offering exception, and issuing interpretive guidance addressing sham transactions designed to evade Regulation M.

The Commission is deferring consideration of the proposal to replace the current "tick" test with a new uniform bid test restricting short sales to a price above the consolidated best bid, and also deferring consideration of the proposed exceptions to the uniform bid test. The Commission will reconsider any further action on these proposals after the completion of the pilot established by Regulation SHO.

**DATES:** *Effective Date:* September 7, 2004 except part 241 will be effective August 6, 2004 and § 242.202T will be effective from September 7, 2004 to August 6, 2007.

*Compliance Date:* The compliance date for §§ 242.200 and 203 is January 3, 2005. The compliance date for § 242.202T is the same as its effective date, September 7, 2004.

**FOR FURTHER INFORMATION CONTACT:** Any of the following attorneys in the Office of Trading Practices, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–1001, at (202) 942–0772: James Brigagliano, Assistant Director, Lillian Hagen, Alexandra Albright, and Elizabeth Sandoe, Special Counsels, or Peter Chepucavage, Attorney Fellow.

**SUPPLEMENTARY INFORMATION:** The Commission is adopting Rules 200, 202T, and 203 of Regulation SHO[1] and amending Rule 105 of Regulation M,[2] and Rule 10a–1[3] under the Exchange Act.

### Table of Contents

I. Introduction
II. Price Test—Proposed Rule 201
III. Rule 200—Definitions and Marking Requirements
IV. Rule 202T—Pilot Program
V. Rule 203—Locate and Delivery Requirements for Short Sales
VI. Rule 203(a)—Long Sales
VII. Rule 105 of Regulation M—Short Sales in Connection with a Public Offering
VIII. Paperwork Reduction Act
IX. Cost-Benefit Analysis
X. Consideration of Promotion of Efficiency, Competition, and Capital Formation
XI. Final Regulatory Flexibility Analysis
XII. Statutory Basis and Text of Adopted Amendments

### I. Introduction

A short sale is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, the short seller will borrow the security, typically from a broker-dealer or an institutional investor. The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender. In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

On October 28, 2003, the Commission proposed Regulation SHO, which would replace Rules 3b–3, 10a–1, and 10a–2 under the Exchange Act.[4] As proposed, Regulation SHO contained the following rules:

• Rule 200, which would replace Rule 3b–3 and: (1) Define the term "short sale" to allow multi-service broker-dealers to aggregate their positions by separate trading units; and (2) define ownership of a security to address security futures products and unconditional contracts to purchase securities;

• Rule 201, which would replace Rule 10a–1 and apply a uniform price test for exchange-listed and Nasdaq NMS securities based upon the consolidated best bid instead of the current tick test based upon the last reported sale;

• Rule 202T, which would establish a procedure for the Commission to suspend on a temporary basis the operation of Rule 10a–1 and any short sale price test of any exchange or national securities association for specified securities; and

• Rule 203, which would replace current Rule 10a–2, incorporate provisions of the existing self-regulatory organization ("SRO") "locate" rules into a uniform Commission rule applicable to all equity securities, wherever they are traded, and impose additional delivery requirements on broker-dealers for securities in which a substantial amount of failures to deliver have occurred.

We also proposed revisions to Rule 105 of Regulation M (short selling in connection with a public offering) to eliminate the current shelf offering exception, and provide interpretive guidance addressing sham transactions designed to evade the rule.

We received letters from 462 commenters in response to proposed Regulation SHO.[5] The responses varied widely, with some commenters arguing for more stringent short sale regulation and others advocating the elimination of many or all short sale restrictions.

After considering the comments received, and upon further examination of current market practices and the purposes underlying short sale

---

[1] 17 CFR 242.200 through 242.203.
[2] 17 CFR 242.105.
[3] 17 CFR 240.10a–1.
[4] Securities Exchange Act Release No. 48709 (October 28, 2003), 68 FR 62972 (November 6, 2003) ("Proposing Release").

[5] The comment letters and a comprehensive summary of the comments are available for inspection in the Commission's Public Reference Room in File No. S7–23–03, or may be viewed at *http://www.sec.gov/rules/proposed/s72303.shtml.* The 438 different letters from 462 commenters reflect the number of different letters received; thus form letters, referred to as "letter types" on the Commission's Web site (*www.sec.gov*), counted as one letter. For example, 18 individuals sent Letter Type A, 21 individuals sent Letter Type B, 18 individuals sent Letter Type C, 19 individuals sent Letter Type D, two individuals sent Letter Type E, two individuals sent Letter Type F, 15 individuals sent Letter Type G, two individuals sent Letter Type H, 15 individuals sent Letter Type I, and four individuals sent Letter Type J. In addition, although submitted under Regulation SHO, Letter Types H, I, and J substantively refer to amendments to NASD Rule 3370. *See* Securities Exchange Act Release No. 49285 (February 19, 2004), 69 FR 8717 (February 25, 2004). They are included in the total here because commenters indicated that they were submitted in response to proposed Regulation SHO.

regulation,[6] we have decided to adopt certain provisions of proposed Regulation SHO and to defer consideration of other provisions. We are adopting proposed Rule 200, with some minor modifications. Rule 200, which incorporates Rule 3b–3, defines ownership for short sale purposes, and clarifies the requirement to determine a seller's net aggregate position. We have also decided to incorporate into Rule 200 the proposed requirements to mark sales in all equity securities ''long,'' ''short,'' or ''short exempt.''[7] We believe that the ownership, aggregation, and marking requirements are important for all short sale regulations.

We are also adopting Rule 202T, which creates a procedure for the Commission to establish, through a separate order, a pilot program pursuant to which the Commission may exclude designated securities from the operation of the tick test of Rule 10a–1 and any short sale price test rule of any exchange or national securities association (''pilot''). Concurrently with this release, we are issuing an order establishing a pilot program employing the procedures of Rule 202T.[8] We have determined not to proceed with the uniform bid test of proposed Rule 201 until we have obtained the results of the pilot. Rule 10a–1, as well as all SRO price tests, will be maintained in present form for securities not included in the pilot.

We believe that conducting a pilot pursuant to Rule 202T is an important component of evaluating the overall effectiveness of price test restrictions on short sales. The pilot will allow us to obtain data on the impact of short selling in the absence of a price test to assist in determining, among other things, the extent to which a price test is necessary to further the objectives of short sale regulation, to study the effects of relatively unrestricted short selling on market volatility, price efficiency, and liquidity, and to obtain empirical data to help assess whether a short sale price test should be removed, in part or in whole, for some or all securities, or if retained, should be applied to additional securities.

The Commission's Office of Economic Analysis (''OEA'') will gather and analyze data during the pilot period to assess trading behavior in the absence of short sale price restrictions. Additionally, researchers are encouraged to provide the Commission with their own empirical analyses of the pilot.[9]

We are adopting additional proposals in Regulation SHO, which we believe are necessary and appropriate regardless of whether short sales are subject to a price test, to clarify provisions and to address commenters' concerns. As adopted, Rule 203 creates a uniform Commission rule requiring broker-dealers, prior to effecting short sales in all equity securities, to ''locate'' securities available for borrowing, and imposes additional delivery requirements on broker-dealers for securities in which a substantial amount of failures to deliver have occurred (''threshold securities''). We believe that strong and uniform requirements in this area will reduce short selling abuses. The locate and delivery requirements will act as a restriction on so-called ''naked'' short selling.[10]

We are also adopting amendments to Rule 105 of Regulation M in order to eliminate the shelf exception. In the Proposing Release we sought comment on how to address ''sham'' transactions that are structured to give the false appearance that short sales are being covered with open market shares, when in fact, the short seller has arranged to cover the short sale with offering shares, thereby violating Rule 105. We are issuing interpretive guidance relating to ''sham'' transactions that violate Rule 105.

**II. Price Test—Proposed Rule 201**

We proposed Rule 201 of Regulation SHO to replace Rule 10a–1's tick test with a price test using the consolidated best bid as the reference point for permissible short sales. Specifically, subparagraph (b) of proposed Rule 201 would have required that all short sales in covered securities be effected at a price at least one cent above the consolidated best bid at the time of execution.[11]

The comments we received on the proposed price test varied widely. Some commenters (including the Investment Company Institute (''ICI''), North American Securities Administrators Association (''NASAA''), and many smaller investors) advocated more stringent short sale regulation. These commenters, favored extending the proposed bid test to smaller issuers and urged imposition of stricter locate and delivery requirements. Other commenters, despite supporting many of the initiatives, argued for maintaining the current ''tick'' test. The New York Stock Exchange (''NYSE''), a proponent of retaining the tick test, also contended that the NYSE should be allowed to maintain a tick test for short sales on the exchange even if the Commission determines to eliminate price restrictions on short sales.[12] Additionally, the NYSE letter stated that it was representing the views of its issuers. None of these issuers submitted comments separately.[13]

A number of commenters, including some of the largest broker-dealers (*e.g.*, J.P. Morgan, UBS Securities, Lehman Brothers), the Securities Industry Association (''SIA''), and one regional exchange, Chicago Stock Exchange (''CHX''), advocated that the Commission consider further the necessity of any price test (either the current tick test or the proposed bid test). Generally, these commenters supported the pilot as a good first step, but argued that the pilot should be shortened from the proposed two-year duration to one year to expedite this process. These commenters, and other broker-dealers (*e.g.*, Goldman Sachs, Citigroup, Merrill Lynch, and Morgan Stanley), raised various concerns about the proposed price test, and opposed the Commission requiring market

---

[6] In adopting the tick test, the Commission sought to achieve three objectives: (i) allowing relatively unrestricted short selling in an advancing market; (ii) preventing short selling at successively lower prices, thus eliminating short selling as a tool for driving the market down; and (iii) preventing short sellers from accelerating a declining market by exhausting all remaining bids at one price level, causing successively lower prices to be established by long sellers. *See* Securities Exchange Act Release No. 13091 (December 21, 1976), 41 FR 56530 (December 28, 1976). As we stated in the Proposing Release, short selling provides the market with at least two important benefits: market liquidity and pricing efficiency. Proposing Release, 68 FR at 62974.

[7] This marking requirement had been proposed in Rule 201(c). The marking requirements as adopted in Rule 200 apply to short sales in all equity securities, in contrast to paragraphs (c) and (d) of current Rule 10a–1, which only apply to exchange-listed securities.

[8] Securities Exchange Act Release No. 50104 (July 28, 2004).

[9] The Commission expects to make information obtained during the pilot publicly available.

[10] ''Naked'' short selling, while not defined in the federal securities laws or SRO rules, generally refers to selling short without having borrowed the securities to make delivery.

[11] Additionally, the Commission sought comment on an alternative price test that would allow short selling at a price equal to or above the consolidated best bid if the current best bid is above the previous bid (*i.e.*, an upbid). Under this alternative, short selling would be restricted to a price at least one cent above the consolidated best bid if the current best bid is below the previous bid (*i.e.*, a downbid).

[12] The Specialist Association also argued for maintaining the current tick test on exchange-listed securities, and also opposed the proposed pilot program, arguing that it is likely to have unwarranted and unintended adverse effects on the securities included in the pilot, and could disadvantage these issuers compared to peer issuers that remain subject to the tick test.

[13] The letter from the American Society of Corporate Secretaries (''ASCS''), an organization of corporate issuers, did not opine on the pilot or the proposed bid test, but rather focused exclusively on the effects of short selling on proxy voting. The Commission expects to determine at a future date whether to take action with regard to that issue.

necessary or appropriate, in the public interest and consistent with the protection of investors after giving due consideration to the securities' liquidity, volatility, market depth and trading market. Any such pilot would commence by separate order of the Commission, which would allow the Commission to act quickly should adverse findings result from any pilot. As part of that process, we would consider the concerns expressed by some commenters that any pilot last only as long as absolutely necessary to allow the Commission to gather sufficient data. The order establishing any such pilot would identify the pilot stocks and set forth the methodology we would use in selecting pilot and control group stocks. Any such order would also indicate the factors we plan to analyze in the pilot, such as the impact on market quality, price changes caused by short selling, costs imposed by the tick test, and the use of alternative means to establish short positions.

By separate order, the Commission is establishing a pilot that includes a subset of securities from a broad-based index. The order identifies the pilot stocks and sets forth the methodology we used in selecting pilot and control group stocks.[42] We believe that a pilot established under Rule 202T using a subset of securities from a broad-based index will provide a balanced and targeted approach to assessing the efficacy of a price test for short sales. There is the potential that prices and trading activity may vary between securities included in a pilot and similar securities subject to the price test.[43] However, to the extent there are price and trading activity variations, this is precisely the empirical data that the Commission seeks to obtain and analyze as part of our assessment as to whether the price test should be removed or modified, in part or whole, for actively-traded securities or other securities.[44]

We appreciate the concerns expressed by some commenters that issuers subject to a pilot could be unfairly disadvantaged because of potentially abusive or manipulative behavior. We note, however, that most of the more liquid securities that will be appropriate for a pilot are traded on exchanges or other organized markets with high levels of transparency and surveillance. This would enhance the ability of the Commission and SROs to monitor trading behavior during the operation of any pilot and to surveil for manipulative short selling. Moreover, the general anti-fraud and anti-manipulation provisions of the federal securities laws will continue to apply to trading activity in these securities, thus prohibiting trading activity designed to improperly influence the price of a security.[45] In addition, a pilot would suspend only the operation of the price test, while the other requirements of Regulation SHO, including the order-marking, locate and delivery requirements, would remain in effect.[46]

Further, as adopted, Rule 202T makes explicit that no SRO "shall have a rule that is not in conformity with or conflicts with" the suspension of a price test for the securities selected for the pilot. Although a few commenters asserted that SRO price tests should remain in effect even if the Commission determined to eliminate price restrictions on short sales,[47] as we noted in the Proposing Release, we believe it would be inconsistent with, and detrimental to the goals of, Rule 202T and any pilot to allow SRO price tests to continue to apply to securities subject to the pilot. A pilot would be intended to allow the Commission to, among other things, study the effects of relatively unrestricted short selling on trading behavior for a select group of stocks. If pilot stocks remained subject to SRO price tests, the empirical data would be compromised and the value of the study undermined. As a result, Rule 202T, as adopted, prohibits the SROs from applying a price test for short sales in securities selected for a pilot during the operation of any pilot.

## B. After-Hours Trading

We included in the Proposing Release our interpretation that the tick test applies to all trades in listed securities, whenever they occur, including in the after-hours market and after the consolidated transaction reporting system ceases to operate.[48] A significant number of commenters objected to this position, arguing that there is limited liquidity after regular trading hours, and that the trades do not generate price effects associated with the abusive practices that the short sale rule is designed to prevent.[49] These commenters further argued that many short sales that are executed after-hours are facilitating trades that are provisionally agreed to during regular trading hours, and accordingly provide liquidity to investors.[50]

Moreover, some commenters asserted that many after-hours trades are currently executed overseas due to the operation of Rule 10a–1.[51] Excepting short sales executed after-hours on a pilot basis may result in these trades being executed in the United States, thus allowing for increased surveillance of these trades and providing increased liquidity to potential U.S. buyers.

In response to the comments received, Rule 202T, as adopted, establishes a procedure by which we may suspend on a pilot basis the tick test of Rule 10a–1(a) and any SRO short sale price test during such time periods as the Commission finds necessary or appropriate and consistent with the protection of investors. Any such pilot would commence by order of the Commission.[52] The order described above establishes a pilot removing any price test for short sales of certain securities effected during certain after-hours periods.

## V. Rule 203—Locate and Delivery Requirements for Short Sales

### A. "Locate" Requirement

We are adopting proposed Rule 203, with some modifications, after considering the comments received.[53]

---

[42] The Commission may in the future issue other orders adopting other pilot programs.

[43] See, e.g., letter from SONECON, LLC.

[44] No individual issuers submitted comment letters opposing a pilot or expressing concern about the possible disparate trading of securities subject to a pilot or about the possible adverse impact on their securities should the price test be removed from short selling in their stock on a temporary basis. However, the NYSE submitted a letter expressing concern "on behalf of its members and its listed companies" that strongly supported continuing price restrictions and expressed concern about unscrupulous market participants forcing prices lower in stocks not subject to a price test.

[45] See, e.g., Securities Act of 1933 ("Securities Act") Section 17(a), and Exchange Act Sections 9(a), 10(b), and 15(c) and Rules 10b–5 and 15c1–2 thereunder.

[46] Also, the order permits the Commission to act quickly to modify the pilot to address any adverse results, should we determine that continued operation of an established pilot would not be necessary or appropriate in the public interest or inconsistent with the protection of investors.

[47] The NYSE asserted that it should be allowed to maintain a tick test for short sales on the NYSE even if the Commission determines to eliminate price restrictions on short sales. The Specialist Association also argued for maintaining the current tick test on exchange-listed securities.

[48] Proposing Release, Section XIV.A. After the consolidated tape ceases to operate, the tick test rule prevents any person from effecting a short sale at a price that is lower than the last sale reported to the tape.

[49] See, e.g., letters from James Angel; Charles Schwab; Davis Polk; Goldman; Citigroup; Merrill Lynch; Morgan Stanley; LEK Securities; MFA; SIA; Susquehanna International Group, LLP; Willkie Farr.

[50] See, e.g., letters from Goldman, Citigroup, Merrill Lynch, Morgan Stanley.

[51] See, e.g., letter from SIA.

[52] The order that is being issued concurrently with this release includes a pilot for short sales occurring after hours. See, n. 8, supra.

[53] Most commenters welcomed the Commission's proposal as a means to address potential manipulation through so called "naked" short selling, and additionally welcomed replacing the

Continued

As adopted, Rule 203(b) creates a uniform Commission rule requiring a broker-dealer, prior to effecting a short sale in any equity security, to "locate" securities available for borrowing. For covered securities, Rule 203 supplants current overlapping SRO rules. Specifically, the rule prohibits a broker-dealer from accepting a short sale order in any equity security from another person, or effecting a short sale order for the broker-dealer's own account unless the broker-dealer has (1) borrowed the security, or entered into an arrangement to borrow the security, or (2) has reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due.[54] The locate must be made and documented prior to effecting a short sale, regardless of whether the seller's short position may be closed out by purchasing securities the same day.[55] The rule provides for some limited exceptions, including for short sales effected in connection with bona-fide market making, as discussed in further detail below.

As proposed, Rule 203(b) would have allowed the "person for whose account the short sale is executed" to perform a locate.[56] We agree with commenters that the locate requirement should apply to a regulated entity—the broker-dealer effecting the sale—and have modified the adopted rule accordingly.[57] Therefore, the rule as adopted makes clear that the broker-dealer effecting the short sale has the responsibility to perform the locate.[58]

We requested comment in the Proposing Release on the manner in which persons could satisfy the "reasonable grounds" determination in the proposed rule. In particular, we asked whether blanket assurances that stock is available for borrowing, *i.e.*, "Easy to Borrow" or "Hard to Borrow" lists, provide an accurate assessment of the current lending market in a manner that would not impede liquidity and the ability of market participants to establish short positions, while at the same time guarding against potential problems inherent with large extended settlement failures.[59] After considering the comments received, we believe that, absent countervailing factors, "Easy to Borrow" lists may provide "reasonable grounds" for a broker-dealer to believe that the security sold short is available for borrowing without directly contacting the source of the borrowed securities.[60] In order for it to be reasonable that a broker-dealer rely on such lists, the information used to generate the "Easy to Borrow" list must be less than 24 hours old, and securities on the list must be readily available such that it would be unlikely that a failure to deliver would occur.[61] Therefore, absent adequately documented mitigating circumstances, repeated failures to deliver in securities included on an "Easy to Borrow" list would indicate that the broker-dealer's reliance on such a list did not satisfy the "reasonable grounds" standard of Rule 203.[62]

Broker-dealers create "Hard to Borrow" lists to identify securities that are in limited supply. Thus, locates for securities on "Hard to Borrow" lists are likely to be difficult. However, the fact that a particular lender placed certain securities on a "Hard to Borrow" list cannot be taken to mean that the lender represents that securities that are *not* on the "Hard to Borrow" list are easy to borrow. Commenters viewed "Hard to Borrow" lists with circumspection,[63] and we understand that such lists are not widely used by broker-dealers. Therefore, the fact that a security is not on a hard to borrow list cannot satisfy the "reasonable grounds" test of Rule 203(b)(1)(ii).

---

[54] Any broker-dealer using the United States jurisdictional means to effect short sales in securities traded in the United States would be subject to Regulation SHO, regardless of whether the broker-dealer is registered with the Commission or relying on an exemption from registration. In addition, Commission staff members have engaged in discussions with staff of The Investment Dealers Association of Canada ("IDA"), who have confirmed that the IDA intends to issue an interpretation that failure of IDA members to comply with the requirements of Regulation SHO may be considered a breach of IDA rules. This would be consistent with an interpretation that the IDA recently issued regarding an amendment to NASD Rule 3370, noting that IDA members would be required to make an affirmative determination that the member will receive delivery of the security from its customer or that the member can borrow the security on behalf of the customer by settlement date. It was stated that failure of IDA members to make such an affirmative determination may be considered a breach of IDA rules. Investment Dealers Association of Canada Member Regulation Notice MR0282 (April 13, 2004). The NASD amendment had extended the affirmative determination requirements to short sale orders that NASD members receive from non-member broker-dealers. Securities Exchange Act Release No. 48788 (November 14, 2003), 68 FR 65978 (November 24, 2003); NASD Notice to Members 04–03 (January, 2004); NASD Notice to Members 04–21.

[55] This is consistent with the current practice under NASD Rule 3370. *See, e.g., Ko Securities, Inc.* and *Terrance Y. Yoshikawa*, Securities Exchange Act Release No. 48550 (September 26, 2003) (holding that an affirmative determination, *i.e.*, a "locate," must be made before the securities are sold short regardless of whether the short seller repurchases securities on the same day).

[56] Several commenters addressed this issue. *See, e.g.*, letters from NYSE; SIA.

current disparate SRO requirements with a uniform Commission rule. *See, e.g.*, letters from NYSE; Nasdaq; SIA.

[57] *See, e.g.*, letter from NYSE.

[58] A broker-dealer may obtain an assurance from a customer that such party can obtain securities from another identified source in time to settle the trade. This may provide the "reasonable grounds" required by Rule 203(b)(1)(ii). However, where a broker-dealer knows or has reason to know that a customer's prior assurances resulted in failures to deliver, assurances from such customer would not provide the "reasonable grounds" required by 203(b)(1)(ii). The documentation required by Rule 203(b)(1)(iii) should include the source of securities cited by the customer. The broker-dealer also should be able to demonstrate that there are "reasonable grounds" to rely on the customer's assurances, *e.g.*, through documentation showing that previous borrowings arranged by the customer resulted in timely deliveries in settlement of the customer's transactions.

[59] According to the current NASD "affirmative determination" rule, the manner by which a member or person associated with a member annotates compliance with the affirmative determination requirement is to be decided by each member. Members may rely on "blanket" or standing assurances (*i.e.*, "Easy to Borrow" lists) that securities will be available for borrowing on settlement date. For short sales executed in Nasdaq National Market ("NNM") or exchange-listed securities, members also may rely on "Hard to Borrow" lists identifying NNM or listed securities that are difficult to borrow or unavailable for borrowing on settlement date provided that: (i) Any securities restricted pursuant to NASD Rule 11830 must be included on such a list; and (ii) the creator of the list attests in writing (on the document or otherwise) that any NNM or listed securities not included on the list are easy to borrow or are available for borrowing. Members are permitted to use Easy to Borrow or Hard to Borrow lists provided that: (i) The information used to generate the list, is no more than 24 hours old; and (ii) the member delivers the security on settlement date. Should a member relying on an Easy to Borrow or Hard to Borrow list fail to deliver the security on settlement date, the NASD deems such conduct inconsistent with the terms of Rule 3370, absent mitigating circumstances adequately documented by the member. See NASD Rule 3370(b)(4)(C).

[60] In its comment letter, the SIA noted that in developing "Easy to Borrow" lists, broker-dealer stock loan desks use information from a number of sources, including institutional lenders that have sophisticated systems for estimating borrow supply. Broker-dealer stock loan desks also consider the availability of inventory at their own firms and potential availability from other broker-dealers that act as conduit lenders. Much of this information is available through electronic feeds and is updated frequently. *See* letter from SIA.

[61] A broker-dealer could look to a lender's statement to the broker-dealer regarding the amount of securities available to lend on an "Easy to Borrow" list.

[62] Of course, securities that are "threshold securities" pursuant to Rule 203(c) should generally not be included on "Easy to Borrow" lists.

[63] *See, e.g.*, letter from NYSE. In particular, the NYSE stated that, "We believe that the use of 'easy to borrow' lists, together with an industry-wide list of securities where there is evidence of significant settlement failures (*i.e.*, those for which there are fails to deliver at a clearing agency of 10,000 shares or more and that is equal to at least one-half of one percent of the issue's total shares outstanding) prepared daily by the National Securities Clearing Corporation ('NSCC') as proposed, would be a more appropriate means of determining whether a security sold short could be borrowed. Consequently, the Exchange believes that broker-dealers should be required to make an affirmative determination for those securities that are not on the 'easy to borrow' list."

1. Exceptions From the Locate Requirement

a. Broker-Dealer Accepting Short Sale Order From Another Broker-Dealer—Rule 203(b)(2)(i)

Rule 203(b)(2)(i) provides a new exception from the uniform locate requirement of Rule 203(b)(1) for a registered broker or dealer that receives a short sale order from another registered broker or dealer that is required to comply with 203(b)(1). For example, where an introducing broker-dealer submits a short sale order for execution, either on a principal or agency basis, to another broker-dealer,[64] the introducing broker-dealer has the responsibility of complying with the locate requirement. The broker-dealer that received the order from the introducing broker-dealer would not be required to perform the locate. However, a broker or dealer would be required to perform a locate where it contractually undertook to do so or the short sale order came from a person that is not a registered broker-dealer.[65]

b. Bona-Fide Market Making

We are adopting the proposed exception from the uniform "locate" requirement, as Rule 203(b)(2)(iii), for short sales executed by market makers, as defined in Section 3(a)(38) of the Exchange Act,[66] including specialists and options market makers, but only in connection with bona-fide market making activities.[67] Bona-fide market making does not include activity that is related to speculative selling strategies or investment purposes of the broker-dealer and is disproportionate to the usual market making patterns or practices of the broker-dealer in that security. In addition, where a market maker posts continually at or near the best offer, but does not also post at or near the best bid, the market maker's activities would not generally qualify as bona-fide market making for purposes of the exception.[68] Further, bona-fide market making does not include transactions whereby a market maker enters into an arrangement with another broker-dealer or customer in an attempt to use the market maker's exception for the purpose of avoiding compliance with Rule 203(b)(1) by the other broker-dealer or customer.[69]

c. Additional Exception From the Locate Requirement—Rule 203(b)(2)(ii)

Pursuant to the suggestions of other commenters, we are including an additional exception from the uniform locate requirement of Rule 203(b)(1) for situations where a broker-dealer effects a sale on behalf of a customer that is deemed to own the security pursuant to Rule 200, although, through no fault of the customer or the broker-dealer, it is not reasonably expected that the security will be in the physical possession or control of the broker-dealer by settlement date, and is thus a "short" sale under the marking requirements of Rule 200(g) as adopted.[70] Such circumstances could include the situation where a convertible security, option, or warrant has been tendered for conversion or exchange, but the underlying security is not reasonably expected to be received by settlement date.[71] Rule 203(b)(2)(ii) as adopted provides that in all situations, delivery should be made on the sale as soon as all restrictions on delivery have been removed, and in any event no later than 35 days after trade date, at which time the broker-dealer that sold on behalf of the person must either borrow securities or close out the open position by purchasing securities of like kind and quantity.[72]

Two commenters advocated maintaining the current exception from the "affirmative determination" requirements of NASD Rule 3370 for short sales that result in fully hedged or arbitraged positions.[73] One comment letter requested an exception from the proposed locate and delivery requirements of Rule 203 in a situation where a market participant has a long position in warrants or rights which are exercisable within 90 days and are subject to a fixed price per share conversion ratio.[74] The other comment letter requested an exception from the proposed locate and delivery requirements in the situation where a market participant is long in-the-money call options.[75] The commenter argued

---

[64] This could include an electronic communications network (ECN).

[65] Of course, an executing broker-dealer who executes a short sale pursuant to an order from an introducing broker as part of a scheme to manipulate the security, or where, for example, it knows that the introducing broker did not perform the locate, could be liable under the securities laws, for, among other violations, committing or aiding and abetting a violation of Rule 203(b)(1). *See, e.g.*, Sections 15(b)(4)(e) and 20(e) of the Exchange Act. 15 U.S.C. 78t.

[66] Section 3(a)(38) states: "The term 'market maker' means any specialist permitted to act as a dealer, any dealer acting in the capacity of a block positioner, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer quotation system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. 78c(a)(38).

[67] As noted in the Proposing Release, we believe that a narrow exception for market makers engaged in bona-fide market making activities is necessary because they may need to facilitate customer orders in a fast moving market without possible delays associated with complying with the "locate" requirement.

[68] Moreover, a market maker that continually executed short sales away from its posted quotes would generally be unable to rely on the bona-fide market making exception.

[69] *See also* NASD IM–3350(c)(2) ("A market maker would be deemed in violation of the Rule if it entered into an arrangement with a member or a customer whereby it used its exemption from the rule to sell short at the bid at successively lower prices, accumulating a short position, and subsequently offsetting those sales through a transaction at a prearranged price, for the purpose of avoiding compliance with the Rule, and with the understanding that the market maker would be guaranteed by the member or customer against losses on the trades."). Although the IM–3350 interpretation applies expressly to the bid test in NASD Rule 3350, the NASD previously found that the standards set forth are equally applicable to the market maker exemption in NASD Rule 3370. *See* NASD Hearing Panel Decision as to Respondents John Fiero and Fiero Brothers, Inc. (December 6, 2000); *See also* Section 20(b) of the Exchange Act, 15 U.S.C. 78t.

[70] Pursuant to Rule 200(g), a broker or dealer shall mark an order to sell a security "long" only if the seller is deemed to own the security being sold pursuant to 17 CFR 242.200 and either: (i) The security to be delivered is in the physical possession or control of the broker or dealer; or (ii) it is reasonably expected that the security will be in the physical possession or control of the broker or dealer no later than the settlement of the transaction. *See, supra* Part III.B. for a further discussion of the order marking requirements.

[71] Another situation could be where a customer owns stock that was formerly restricted, but pursuant to Rule 144 under the Securities Act of 1933, the securities may be sold without restriction. In connection with a sale of such security, the security may not be capable of being delivered on settlement date, due to processing to remove the restricted legend. *See, e.g.*, letter from Feldman Weinstein, LLP ("Feldman").

[72] We believe that 35 days is a reasonable outer limit to allow for restrictions on a security to be removed if ownership is certain. We note that Section 220.8(b)(2) of Regulation T of the Federal Reserve Board allows 35 days to pay for securities delivered against payment if the delivery delay is due to the mechanics of the transaction. 12 CFR 220.8(b)(2).

[73] *See* NASD Rule 3370(b)(2)(B), which states in pertinent part that, "[n]o member shall effect a 'short' sale for its own account in any security unless the member or person associated with a member makes an affirmative determination that the member can borrow the securities or otherwise provide for delivery of the securities by settlement date. This requirement will not apply to * * * transactions that result in fully hedged or arbitraged positions." Rule 3370(b) provides guidelines in determining the availability of the exception.

[74] *See* first and fourth letters from Saul Ewing, LLP., on behalf of Greenwood Partners. The commenter noted the situation where a market participant views the issuer's warrants as being overly rich in comparison to the pricing of the warrants, and will thus sell the underlying stock short and purchase the warrants. It also stated that, because the stock borrow programs for many smaller issuers are virtually non-existent, the market participant engaging in this activity may be required to sell short naked. In order to guard against potential "death spiral" activity, it was requested that the exception be limited to warrants with a fixed price per share conversion ratio.

[75] *See* third letter from Saul Ewing, LLP. Specifically, the commenter, writing on behalf of an unnamed private equity fund, argued that the fund

Continued

that excepting short sales in such situations promotes the ability of smaller issuers to acquire financing.

We have decided not to incorporate an exception from the locate and delivery requirements of Rule 203 for short sales that result in bona-fide fully hedged or arbitraged positions. Because ''bona-fide'' hedging and arbitrage can be difficult to ascertain, we are concerned about including a blanket exception for some activity that may have the potential to harm issuers and shareholders.[76] During the period of the pilot, we prefer instead to address the situations noted by the commenters, and other similarly situated entities, through the exemptive process, to the extent warranted.[77] This will allow us to consider the particular facts and circumstances relevant to each request, as well as any potentially negative ramifications, and, should we gain comfort with the described transaction(s), fashion appropriate relief.

Additionally, we have declined at this time to include an express exception from the locate requirements of Rule 203(b)(1) for transactions in exchange traded funds (''ETFs'').[78] We have observed high levels of fails in some ETFs. Rather than providing a blanket exception from the requirements of Rule 203, we would prefer instead to address the treatment of ETFs through the exemptive process, which would be consistent with the prior treatment of ETFs.[79] In considering any exemptive request, the Commission would evaluate the causes of large fails in certain ETFs, as well as potential remedies to resolve such fails, if necessary.

### B. Short Sales in Threshold Securities— Rule 203(b)(3)

1. Threshold Securities

The Commission has decided to adopt, with certain modifications from what was proposed, additional requirements targeted at stocks that have a substantial amount of failures to deliver. As adopted, Rule 203(b)(3) requires any participant of a registered clearing agency (''participant'')[80] to take action on all failures to deliver that exist in such securities ten days after the normal settlement date, *i.e.*, 13 consecutive settlement days.[81] Specifically, the participant is required to close out the fail to deliver position by purchasing securities of like kind and quantity.

With slight modification from the proposal, a ''threshold security'' is defined in Rule 203(c)(6) as any equity security of an issuer that is registered under Section 12, or that is required to file reports pursuant to Section 15(d) of the Exchange Act[82] where, for five consecutive settlement days: there are aggregate fails to deliver at a registered clearing agency of 10,000 shares or more per security; that the level of fails is equal to at least one-half of one percent of the issuer's total shares outstanding; and the security is included on a list published by an SRO.[83] We believe this threshold characterizes situations where the ratio of unfulfilled delivery obligations at the clearing agency at which trades are settled represents a significant number of shares relative to the company's total shares outstanding. We believe that such circumstances warrant action designed to address potential negative effects.[84] This narrowly targeted threshold will not burden the vast majority of securities where there are not similar concerns regarding settlement.[85] Our OEA analyzed recent data from NSCC on fails to deliver and calculated that approximately 3.9% of all exchange-listed and Nasdaq securities, and 4.0%

---

provides financing to smaller issuers, with a typical transaction generally involving a private placement of restricted stock in a company at a fixed price in exchange for an agreement to provide cash for such shares upon the closing of the transaction. In order to hedge the risk of market price changes in the restricted shares, the fund would buy over-the-counter put options from a counterparty. It was argued, however, that the counterparty would want to hedge its risk by purchasing an in-the-money call option, and shorting the underlying stock. It was similarly argued that due to the dearth of borrowable shares in some smaller issuers, the sales could be naked short sales.

[76] In a recent matter, the Commission accepted offers of settlement from Rhino Advisors and Thomas Badian, Rhino's president, in connection with trading in the common stock of Sedona Corporation by Rhino on behalf of certain foreign entities. The Commission alleged that Rhino and Badian, acting in their capacities as investment advisors, manipulated Sedona's stock price downward by engaging in naked short selling of Sedona's stock in accounts maintained in the names of others. In the complaint filed in the action, the Commission alleged that Rhino manipulated Sedona's stock price to enhance an offshore entity's economic interests in a $3 million convertible debenture issued by Sedona and that, by depressing Sedona's stock price, Rhino increased the number of shares that the offshore entity received when it exercised its conversion rights under the debenture. *See Rhino Advisors, Inc. and Thomas Badian*, Litigation Release No. 18003 (February 27, 2003); *see also SEC* v. *Rhino Advisors, Inc. and Thomas Badian*, Civ. Action No. 03 Civ 1310 (SDNY March 5, 2003).

[77] *See* Section 203(d) of Regulation SHO, 17 CFR 242.203(d), and Section 36 of the Exchange Act. 15 U.S.C. 78mm.

[78] Two commenters requested an exception to the locate and delivery requirements for ETFs. The commenters maintain that ETFs should not be subject to the requirements of Rule 203 because ETFs have the ability to continuously create and redeem shares. *See* letters from Amex; Nasdaq.

[79] Prior exemptions from Rule 10a–1 have been granted for transactions in certain ETFs. *See, e.g.*, Letter re: SPDRs (January 27, 1993); Letter re: MidCap SPDRs (April 21, 1995); Letter re: Select Sector SPDRs (December 14, 1998); Letter re: Units of the Nasdaq-100 Trust (March 3, 1999); Letter re: ETFs (August 17, 2001) (class letter).

[80] ''Participant'' is defined in Section 3(a)(24) of the Exchange Act. 15 U.S.C. 78c(a)(24). A ''registered clearing agency'' is a clearing agency, as defined in Section 3(a)(23)(A) of the Exchange Act, (15 U.S.C. 78c(a)(23)(A)), that is registered with the Commission pursuant to Section 17A of the Exchange Act, 15 U.S.C. 78q–1.

[81] Rule 203(c)(5) defines ''settlement day'' to mean any business day on which deliveries of securities and payments of money may be made through the facilities of a registered clearing agency.

[82] As proposed, the restrictions of Rule 203 would have covered equity securities registered under Section 12 of the Exchange Act. We are also extending the delivery restrictions to equity securities of issuers subject to Exchange Act reporting pursuant to Section 15(d). This would thus mandate coverage of those companies that are required to provide ongoing public disclosure about the company, its actions, and its performance. As the calculation of the threshold that would trigger the delivery requirements of Rule 203 depends on identifying the aggregate fails to deliver as a percentage of the issuer's total shares outstanding, it is necessary to limit the requirement to companies that are subject to the reporting requirements of the Exchange Act.

[83] For example, if an issuer had 1,000,000 shares outstanding, one-half of one percent (.005) would be 5,000 shares. An aggregate fail to deliver position at a clearing agency of 10,000 shares or more would thus exceed the specified level of fails. If an issuer had 10,000,000 shares outstanding, one-half of one percent would be 50,000 shares. An aggregate fail to deliver position at a clearing agency of 50,000 shares or greater would exceed the specified level of fails.

[84] We are incorporating the same threshold that is currently used in NASD Rule 11830. Because of this, it is our belief that implementation will not impose excessive programming costs on the industry, although we note that some programming modifications will be necessary to extend the current calculation beyond the current universe of Nasdaq securities.

[85] As noted by some commenters, there may be many different causes of fails to deliver that could be unrelated to a market participant engaging in naked short selling. Thus, imposing a lower threshold or, as suggested by some commenters, prohibiting all fails, might be impracticable or an overly-broad method of addressing any potential abuses, and could also disrupt the efficient functioning of the Continuous Net Settlement system (''CNS'') operated by the National Securities Clearing Corporation (''NSCC''). For example, one commenter noted that some fails are caused by custodian banks failing to deliver on behalf of their customers for a number of reasons, such as where a foreign domiciled customer engages in arbitrage involving American Depositary Receipts (''ADRs'') and operates under the international arbitrage exemption provided in Rule 10a–1(e)(8). *See* letter from LEK Securities.

Additionally, some commenters addressed NSCC's securities lending program. *See, e.g.*, letter from NASAA at 3. In responding to comments on the stock borrow program, NSCC noted that the program can reduce fails and give purchasers an increased chance of receiving those securities on settlement date. *See* letter from NSCC at 6–7. The Commission notes that NSCC's stock borrow program, as approved by the Commission, permits NSCC to borrow securities for the purpose of completing settlements only if participants have made those securities available to NSCC for this purpose and those securities are on deposit in the participant's account at The Depository Trust Company (''DTC''). *See* Securities Exchange Act Release No. 17422 (December 29, 1980), 46 FR 3104 (January 13, 1981).

of all securities, would meet this threshold.[86]

In order to be deemed a threshold security, and thus subject to the restrictions of Rule 203(b)(3), a security must exceed the specified fail level for a period of five consecutive settlement days. Similarly, in order to be removed from the list of threshold securities, a security must not exceed the specified level of fails for a period of five consecutive settlement days.[87] This five-day requirement will address the potential situation where a security exceeds the fails level on one day, based on an aberrant fail to deliver that may not be indicative of the usual pattern of that particular security, and thus would prevent potential ''flickering'' of securities in and out of the list of threshold securities.[88] Rule 203(b)(3) is intended to address potential abuses that may occur with large, extended fails to deliver.[89] We believe that the five-day requirement will facilitate the identification of securities with extended fails.

As is currently the practice for Nasdaq securities that exceed the threshold designated in NASD Rule 11830, the pertinent SRO will be responsible for publishing a daily list of the threshold securities that are listed on their markets, or for which the SRO bears the primary surveillance responsibility.[90]

The SROs derive the information necessary to calculate the list of threshold securities from data on fails to deliver currently received from NSCC.[91]

2. Close-out Requirement

As proposed, the rule would have specified that, for short sales of any security meeting this threshold, the selling broker-dealer must deliver the security no later than two days after the settlement date. If for any reason such security were not delivered within two days after the settlement date, the rule would have restricted the broker-dealer, including market makers, from executing additional short sales for the next 90 days in such security for the person for whose account the failure to deliver occurred, unless the broker-dealer or the person for whose account the short sale is executed, borrowed the security or entered into a bona-fide arrangement to borrow the security, prior to executing the short sale. In addition, the rule would have required the registered clearing agency that processed the transaction to refer the party failing to deliver to the NASD and the designated examining authority for such broker-dealer for appropriate action; and to withhold a benefit of any mark-to-market amounts or payments that otherwise would be made to the party failing to deliver.

Some commenters argued that under the confines of current settlement practices and procedures, it is not practical to assign delivery failures to a particular clearing firm customer account. It was noted that because NSCC's continuous net settlement (''CNS'') system nets all buys and sells in each security for each NSCC participant, broker-dealers cannot determine which customer's transaction or account gave rise to a failure to deliver.[92] We note that while this may be the current situation in the industry, if the Commission believes that the rules as adopted are not having the intended effects of reducing potentially manipulative behavior, we may consider additional rulemaking that could require broker-dealers to identify individual accounts that are causing fails to deliver.

We have considered the comments received, and have adopted a rule that differs in the mechanics from the proposed rule, but continues to preserve the goal of limiting failures to deliver in threshold securities. As adopted, Rule 203(b)(3) requires action if a fail in a threshold security remains open ten days after the settlement date, i.e., for thirteen consecutive settlement days.[93] Specifically, Rule 203(b)(3) requires a participant of a clearing agency registered with the Commission[94] to take action to close out the fail to deliver that has remained for thirteen consecutive settlement days by purchasing securities of like kind and quantity.[95] In addition, Rule

---

[86] Some stocks that are quoted in the Pink Sheets are not reporting issuers, and thus there is not a readily available means to determine the total shares outstanding in such securities. If, however, we incorporate non-reporting issuers that have aggregate fails in excess of 10,000 shares, only an additional 1% of all securities would be added. These securities will not be subject to the additional requirements imposed upon threshold securities, although broker-dealers effecting short sales in these securities are subject to the locate requirements of Rule 203(b)(1).

[87] For example, an issuer that had 10,000,000 shares outstanding and an aggregate fail to deliver position greater than 50,000 shares for at least five consecutive settlement days, would be a threshold security, and would no longer be a threshold security after the aggregate fail to deliver position was less than 50,000 shares for at least five consecutive settlement days.

[88] For example, we note the situation involving ADR arbitrage as described in n. 85, *supra*.

[89] A person that sells a security and fails to deliver, with the intent of triggering the close-out requirement of Rule 203(b)(3) and creating a short squeeze that could benefit a person's long position, could be deemed to be engaging in manipulative behavior.

[90] It is expected that the NYSE will calculate and disseminate a list of NYSE-listed securities that exceed the specified fails level for at least five consecutive settlement days. Amex will calculate and disseminate a list of Amex-listed securities that exceed the specified fails level for at least five consecutive settlement days, in addition, the NASD will calculate and disseminate a list of all over-the-counter securities, including Nasdaq, OTCBB, and Pink Sheet securities that exceed the specified fails level for at least five consecutive settlement days. It is expected that the lists of threshold securities will be disseminated prior to the commencement of each trading day.

[91] As NSCC noted in its comment letter, it is providing the Commission, the NYSE, the NASD, and Amex with a daily report listing information on all participant short obligations for all equity securities with aggregate clearing short positions greater than 10,000 shares. The SROs will calculate whether the aggregate fails at NSCC exceed 0.5% of the issuer's total shares outstanding.

[92] *See, e.g.*, letter from SIA. The SIA, as well as several other commenters, stated the belief that buy-ins were more practical since it is possible to allocate the costs of a buy-in among multiple short sellers, whereas application of the proposed account trading restriction is not feasible. Other commenters stated that the fear of a mandatory buy-in and threat of a market loss would be a greater deterrent than the proposed restriction and withholding of the mark. *See, e.g.*, letter from H. Glenn Bagwell, Jr.

[93] We note that some commenters believed that imposing the delivery requirements two days after settlement, *i.e.*, after five settlement days, would capture many instances of ordinary course settlement delays, rather than address potentially abusive activity. *See, e.g.*, letters from CBOE; SIA; Willkie Farr. OEA took a snapshot of fails data received from NSCC from April 19 through April 30, 2004, which confirmed a rate of decline over a course of settlement days. Similar rates of decline were found using data obtained from NSCC for other periods during the past six months. In addition, because Rule 203(b)(3) would require a participant to close out all fails to deliver in threshold securities, whether resulting from short sales or long sales, extending the time period to ten days after settlement would make the close-out requirement consistent with 17 CFR 240.15c–3–3(m). Ten days after settlement is also the timeframe currently identified in NASD Rule 11830.

[94] A participant of a registered clearing agency includes registered broker-dealers, and entities that may not be registered broker-dealers, but are responsible for the settlement of transactions at a registered clearing agency, such as the Canadian Depository for Securities (''CDS'').

[95] The following examples illustrate potential scenarios involving threshold security XYZ: (i) If a participant has a 100 share fail to deliver position in XYZ for 13 consecutive settlement days, the participant is required to purchase 100 shares; (ii) If a participant has a 100 share fail to deliver position in XYZ, and the fail to deliver position increases by 100 shares each day for 13 consecutive settlement days, yielding a 1300 share fail to deliver position, then the participant is required to purchase 100 shares at the end of the 13th day, 100 shares the next day, etc., until the entire fail to deliver position is closed out; (iii) If a participant has a 100 share fail to deliver position in XYZ, which is then reduced to a 50 share fail to deliver position during the following 13 consecutive settlement days, then the participant is required to close out 50 shares; or (iv) If a participant has a 100 share fail to deliver position in XYZ, which is netted to zero five settlement days later, and then a new 100 share position is established the following day, the participant would not be required to close out the initial 100 shares, but would be required to close out the subsequent 100 share fail to deliver position if it remained for 13 consecutive settlement days.

203(b)(3)(iii) states that the participant, and any broker-dealer for which it clears transactions, including any market maker that would otherwise be entitled to rely on the bona-fide market making exception, is prohibited from effecting further short sales in the particular threshold security without borrowing, or entering into a bona-fide arrangement to borrow, the security until the fail to deliver position is closed out. To the extent that the participant can identify the broker-dealer(s) or account(s) that have contributed to the fail to deliver position, the requirement to borrow or arrange to borrow prior to effecting further short sales should apply to only those particular broker-dealer(s) or account(s). Rule 203(b)(3)(v) states that where a participant enters into an arrangement with a counterparty to purchase securities as required by Rule 203(b)(3), and the broker or dealer knows or has reason to know that the counterparty will not deliver the securities, the broker or dealer will not have fulfilled the requirements of the rule.[96]

The requirement to close out fail to deliver positions in threshold securities that remain for thirteen consecutive settlement days does not apply to any positions that were established prior to the security becoming a threshold security.[97] However, if a participant's fail to deliver position is subsequently reduced below the pre-existing position, then the fail to deliver position excepted by this subparagraph shall be the lesser amount.[98] Rule 203(b)(3)(iv) also provides that a participant may reasonably allocate its responsibility to close out open fail positions in threshold securities to another broker-dealer for which the participant is responsible for settlement. Thus, participants that are able to identify the accounts of broker-dealers for which they clear may allocate the responsibility to close out open fail to deliver positions to the particular account(s) whose trading activities have caused the fail to deliver position. Absent such identification, however, the participant would remain subject to the close out requirement.

3. Other Proposed Requirements

We are not adopting the additional requirements of proposed Rule 203(b)(3)(ii), which would have required a registered clearing agency that processed the transaction to refer the party failing to deliver to the NASD and the designated examining authority for such broker-dealer for appropriate action; and withhold a benefit of any mark-to-market amounts or payments that otherwise would be made to the party failing to deliver. Since the Proposing Release was issued, Commission staff and the SROs have developed new procedures to identify and inquire regarding failures to deliver that achieve the goals of the proposed notification requirement. This includes the daily dissemination by NSCC to the Commission and the SROs of a report listing information on all participant short obligations for all equity securities with aggregate clearing short positions greater than 10,000 shares, which is being used by the SROs to initiate inquiries with members concerning the cause of the fails and whether there was compliance with regulatory requirements.

In addition, NSCC and other commenters noted that, due to the manner in which the CNS system currently calculates each participant net position in a security, it is not possible to distinguish between obligations to deliver that are the result of short sales as opposed to long sales.[99] As such, it is not possible to determine whether a mark paid to a participant is a ''benefit'' received in connection with a fail to deliver position resulting from a short sale.

We are not adopting at this time the proposal that would require NSCC to withhold mark-to-market amounts paid to individuals. However, the Commission intends to pay close attention to the operation and efficacy of the provisions we are adopting in Rule 203, and will consider whether any further action is warranted.

4. Market Makers

We received a number of comments from market makers, including options market makers, on the proposal not to provide an exception for market makers from the special delivery requirements applicable to securities that meet the designated threshold.[100] Some of these commenters stated that the effect of not including such an exception would be to cease altogether options trading in securities that are difficult to borrow, as it was argued that no options market maker would make markets without the ability to hedge by selling short the underlying security.[101] In addition, another commenter stated that the heightened delivery requirements for threshold securities could drain liquidity in other securities where there is no current indication of significant settlement failures.[102] The commenter believed that, while a blanket exception from the heightened delivery requirements would be preferable, at a minimum the implementation of any such provision should not apply to market maker positions acquired prior to the effective date of the rule, and likewise should not apply to any short position acquired prior to the time that the subject security meets the designated threshold.

We note that the close out requirements of Rule 203(b)(3) will only apply to fail to deliver positions in threshold securities, and will not apply to any fail to deliver positions established prior to the security meeting the threshold.[103] As such, we believe that this addresses in part the commenters' concerns that market makers would need to assess the probability of a security meeting the threshold at some point in the future. Moreover, we expect that a small percentage of securities for which there are associated options will exceed the threshold.[104] In light of this, we believe that the effects of not including a market

---

[96] This includes the situation where a broker-dealer that was required to close out a fail to deliver in a security exceeding the threshold entered into an arrangement to buy from a counterparty, and thus net out the broker-dealer's position at CNS, but the broker-dealer knew or had reason to know that the counterparty did not intend to deliver the security, which thus created another fail in the CNS system.

[97] Rule 203(b)(3)(i). This is consistent with the current operation of NASD Rule 11830.

[98] For example, if a participant had a 100 share fail to deliver position in XYZ security prior to XYZ becoming a threshold security, and if XYZ subsequently became a threshold security, the participant would not be required to close out the 100 share fail, even if it remained for 13 consecutive settlement days. Therefore, if after becoming a threshold security the fail to deliver position in XYZ increased to 200 shares, and remained for 13 consecutive settlement days, the participant would be required to close out 100 shares. If, after becoming a threshold security, the participant's total fail to deliver position in XYZ fell to 50 shares, and then rose to 150 shares and remained for 13 consecutive settlement days, the participant would be required to close out 100 shares, rather than only 50 shares.

[99] *See* letter from NSCC at p. 5 for further discussion regarding the operation of the CNS system.

[100] *See, e.g.*, letters from Knight; Susquehanna; Pacific Exchange (''PCX''); Amex; and joint letter from Amex, CBOE, International Securities Exchange (''ISE''); The Options Clearing Corporation (''OCC''), PCX, Philadelphia Stock Exchange (''PHLX'') (''Joint Options Letter'').

[101] *See* Joint Options Letter.

[102] *See* letter from Susquehanna. In particular, this commenter believed that market makers would need to assess for each assigned security the probability that it would become a threshold security at some point in the future, and in circumstances in which this is thought to be a realistic possibility, the market maker would need to decide whether to incorporate the added risks into pricing or relinquish market maker status in the particular security.

[103] *See* Rule 203(b)(3)(i).

[104] OEA has estimated that approximately 4.1% of all securities that have options traded on them would meet the threshold.

maker exception from the heightened delivery requirement will not be as severe as some of the commenters have described. Moreover, while some of these commenters have opined that options market makers are not responsible for significant failures to deliver,[105] other commenters and academics have questioned this assertion.[106]

Therefore, while market makers (including options market makers) engaged in bona-fide market making will continue to be excepted from the locate requirement of Rule 203(b)(1), even when effecting short sales in threshold securities, we have decided at this time not to extend an exception to market makers from the requirements to close out fails to deliver in such securities that remain for thirteen consecutive settlement days. Moreover, as discussed previously, Rule 203(b)(3)(iii) provides that until the market maker, or the participant that clears for the market maker, takes action to close out any such fails to deliver that remain ten days after the normal settlement date, the market maker shall be unable to rely on the exception in Rule 203(b)(2)(iii) from the requirement to ''borrow or arrange to borrow'' for further short sales in such security.

We have, however, included a limited exception from the close out requirement to allow registered options market makers to sell short threshold securities in order to hedge options positions, or to adjust such hedges, if the options positions were created prior to the time that the underlying security became a threshold security. Any fails to deliver from short sales that are not effected to hedge pre-existing options positions, and that remain for thirteen consecutive settlement days, are subject to the mandatory close out requirement. We will, however, take into consideration information that shows that this provision operates significantly differently from our expectations.

## VI. Rule 203(a)—Long Sales

We are adopting subparagraph (a) of Rule 203, which covers delivery requirements applicable to long sales of securities, largely as proposed. Rule 203(a) incorporates current Rule 10a–2.

As proposed, Rule 203(a) would have provided that if a broker-dealer knows or should know that a sale was marked long, the broker-dealer must make delivery when due and cannot use borrowed securities to do so. The proposed rule would have provided that the delivery requirements would not apply in three situations: to the loan of a security through the medium of a loan to another broker or dealer; where the broker or dealer knows or has been reasonably informed by the seller that the seller owns the security and will deliver it to the broker or dealer prior to the scheduled settlement of the transaction; or where an exchange or securities association finds, prior to the loan or fail, that the sale resulted from a good-faith mistake, the broker-dealer exercised due diligence, and either that requiring a buy-in would result in undue hardship or that the sale had been effected at a permissible price. The proposed requirements would have extended to all securities, not just to those registered on an exchange.

Three commenters supported the proposed changes, believing that they would ensure greater consistency across markets and securities.[107] One commenter requested that the rule except long sales that fail, through no fault of the seller, because of processing delays.[108] In addition, two commenters suggested that the proposed Rule did not adequately address long sale delivery fails.[109]

After considering comments received, we are adopting the changes proposed, with one modification. Pursuant to proposed Rule 203(a), one of the circumstances in which a fail or delivery of borrowed shares would have been permitted was where, prior to the sale, the broker or dealer knew that the seller owned the securities and the seller had represented that he or she would deliver them to the broker in time for settlement. Although we believe it was implicit in the proposed rule text (and in current Rule 10a–2), we are including in the rule text the predicate that the seller fails to make such delivery after advising the broker-dealer that he or she would deliver the securities in time for settlement.[110]

As adopted, Rule 203(a) requires that if a broker-dealer knows or should know that a sale of an equity security is marked long, the broker-dealer must make delivery when due and cannot use borrowed securities to do so. This delivery obligation does not apply in three circumstances: (1) The loan of a security through the medium of a loan to another broker or dealer; (2) where the broker or dealer knows or has been reasonably informed by the seller that the seller owns the security and will deliver it to the broker or dealer prior to the scheduled settlement of the transaction and the seller fails to make such delivery;[111] or (3) where an exchange or securities association finds, prior to the loan or arrangement to loan any security for delivery, or failure to deliver, that the sale resulted from a good-faith mistake, the broker-dealer exercised due diligence, and either that requiring a buy-in would result in undue hardship or that the sale had been effected at a permissible price.[112]

The new rule is consistent with the Commission's view that delivery requirements are important for all securities, particularly those with a lower market capitalization that may be more susceptible to abuse. Moreover, Rule 203(a) provides that on a long sale, a broker-dealer cannot fail or loan shares unless, in advance of the sale, it ascertained that the customer owned the shares, and had been reasonably informed that the seller would deliver the security prior to settlement of the transaction. This requirement is consistent with changes being made to the order marking requirements, which require that for an order to be marked

---

[105] See Joint Options Letter.

[106] See letter from SIA (which noted in pertinent part, ''[t]he SEC and SROs may also want to consider whether to utilize their existing authority to determine to what extent non-bona-fide market making trading activities by market makers does or does not contribute to extended fails.''); see also Evans, Geczy, Musto & Reed, *Failure Is an Option: Impediments to Short Selling and Options Prices*, Working Paper, The Wharton School at the University of Pennsylvania and the University of North Carolina (March 1, 2003) (finding that the options market maker exemption from the requirement to locate stock to borrow on short sales may create significant profits for the market makers).

[107] See letters from H. Glenn Bagwell, Jr.; Feldman; LEK Securities.

[108] See letter from Feldman. We have addressed this situation by providing an exception in Rule 203(b)(2)(ii) for situations where a broker effects a sale on behalf of a customer that is deemed to own the security pursuant to Rule 200, although, through no fault of the customer or the broker-dealer, it is not reasonably expected that the security will be in the physical possession or control of the broker-dealer by settlement date, and is thus a ''short'' sale under the marking requirements of Rule 200(g) as adopted.

[109] See Letter Type A; SIA. The Commission disagrees with these comments. We believe that the provisions of Rule 203(a) are appropriate to guard against fails to deliver on long sales, in that a broker may fail to deliver borrowed shares on long sale fails only in the limited circumstances set forth in the rule. In addition, Rule 203(b)(3) requires a participant to close out all fails to deliver that remain in threshold securities for 13 consecutive settlement days. 17 CFR 240.15c–3–3(m) also addresses fails to deliver on long sales.

[110] See Rule 203(a)(2)(ii).

[111] It may be unreasonable for a broker-dealer to treat a sale as long where orders marked ''long'' from the same customer repeatedly require borrowed shares for delivery or result in ''fails to deliver.'' A broker-dealer also may not treat a sale as long if the broker-dealer knows or has reason to know that the customer borrowed the shares being sold.

[112] As with other provisions of Regulation SHO, this provision requires good faith conduct by the broker-dealer. Therefore, where the broker-dealer did not in good faith believe that the customer would deliver the securities in time for settlement, the broker-dealer cannot borrow or lend securities to deliver when the customer fails.