# EXHIBIT I

*CAPT Luncheon*  *Chairman Harvey Pitt*  *Page 1 of 15*
*November 16, 2007*
*Mayflower Hotel, Washington D.C.*

*Male:* Well, on behalf of the Coalition Against Phantom Training, I want to welcome everyone to our luncheon today. The problem of naked short selling, also known as phantom trading, is one that has a very widespread impact on our nation's economy. It affects the financial security of our families, investors, and it threatens the integrity of our markets.

Were very proud to have with us today former SEC Chair, Mr. Pitt. We are thankful for his time and interest. The purpose of our coalition is to stop the harmful illegal practice of naked short selling. If you do have questions about the coalition, we encourage you to go to *www.stopphantomshortselling.org*, or you can contact me after the luncheon.

Harvey Pitt is the chief executive officer of the global business-consulting firm, Kalorama Partners. Prior to founding Kalorama Partners, Mr. Pitt was appointed by President George W. Bush to serve as the 26th chairman of the United States Security Exchange Commission. In that role from 2001 until 2003, Mr. Pitt was responsible, among other things, for overseeing the SEC's response to market disruptions resulting from the attacks of 9/11, for creating SEC's real-time enforcement program for leading the commission's adoptions of dozens of rules in response to the corporation and accounting crises generated by the excesses of the 1990s.

For nearly a quarter century, before becoming the commission's chairman, Mr. Pitt was a senior corporate partner on the internal law firm of Fried, Frank, Harris, Shriver & Jacobson. Mr. Pitt served as adjunct professor of law at Georgetown University Law Center, George Washington University Law School, and the University of Pennsylvania School of Law. Former Chairman Pitt received a JD from St. John's University School of Law, and his BA from the City University of New York.

He was awarded an honorary LLD from St. John's University School of Law in June 2002, and was given the Broken College President's Medal of Distinction in 2003. We're very fortunate to him here with us today. The Honorable Harvey Pitt.

*[Applause]*

*Harvey Pitt:* Well, thank you, and a gracious good afternoon. I think you've just seen empirical evidence of why I much prefer to be introduced by friends, rather than members of Congress.

*[Laughter]*

*Harvey Pitt:* Let me start by observing that it's a double pleasure to be here with you at the Mayflower. First, and probably foremost, because it's an easy walk from Kalorama's offices across the street. And second, because the Mayflower has a long and storied history. Some of you may know that FDR wrote his inaugural speech here. Harry Truman lived here for the first 90 days of his presidency. And Charles Lindbergh celebrated his flight around the world in this hotel.

In any event, the hotel's grand ballroom was the site of inaugural balls celebrating the elections of nearly every president since Calvin Coolidge. Of course, I'm a devotee of full disclosure, and as such, I think it's also important to note that some very strange occurrences have been reported here, seemingly linked to Coolidge's inauguration ball.

Coolidge, as you may know, didn't attend his own inaugural ball in 1925. He was mourning the tragic death of his 16-year-old son. And yet since 1937, when inauguration day was moved to January 20th, Mayflower staff report that on that day, January 20th, the grand ballroom's lights flicker and dim at approximately 10:00 p.m. when the first guests were announced for Coolidge's ball. In addition, hotel staff report that on that night, one elevator won't move from the eighth floor to the lobby until 10:15 p.m., which was approximately the time Coolidge was supposed to have arrived at the ball from his holding room.

Now I wasn't asked to speak about the ghosts of former or even current presidents. Rather, I've been asked to address a phenomenon that haunts our securities markets, phantom trading, also sometimes referred lasciviously as "naked shorting." It's an important topic in which I have great interest. In a sense, my first foray into this world as a regulator came after the market disruptions causes by the 9/11 terrorists attacks.

One of the things I thought it appropriate to do was solicit views from the public on how the SEC might ensure liquidity when the markets reopen. Public companies in unbelievable numbers advocated a ban on all short selling, period. And I, of course, had to tell people who made that proposal that I wasn't nearly as stupid as I looked.

Economists have long demonstrated that appropriate short selling adds liquidity to our capital markets. Of course, appropriate short

selling does not include naked short selling. So in our time together, I'd like to discuss current short selling regulations and offer some views about what I think remains to be done. But for those of you who sometimes read novels by turning to the last page, I'll tell you that my conclusion is very straightforward. Problems with naked short selling continue and need to be addressed.

Some of you may beware that short selling's origins trace back to the late 1500s when investors in the Dutch stock market began shorting securities they could also buy long. But in the 17th Century, short selling was blamed for a violent downturn in the Dutch markets, and the practice was banned. As with many unpopular regulations, the ban was in ignored and in time, repealed.

The next century, England banned short selling and voided all contracts to sell public securities short if sellers didn't have actual possession or legal and beneficial ownership of the securities being sold. Short sales were again legalized, but that only lasted briefly. In 1983, short sales were reauthorized again. In France, short selling was outlawed following the French stock market's collapse in the 1720s. Napoleon thought that short selling was treasonous, and in 1802, actual delivery of securities was required and short selling was criminalized. Again, those laws weren't strictly enforced, and the ban was lifted in 1885.

This pattern in Europe is mirrored here, too. In 1812, New York's legislature banned short selling, although short selling volume on the NYSE then was insignificant. The ban lifted four decades later. In 1864, Congress prohibited short sales of gold. But a few weeks later, the law was repealed when the price of gold shot up from approximately $200.00 to $300.00. In 1929, when our stock markets crashed, short sellers were blamed.

The senate banking committee studied the extent to which bare raters were preventing recovery, but was unable to determine whether short selling was a virtue or a vice, and noted that few subjects had generated greater differences of opinion. Instead of prohibiting short selling, Congress punted and handed the problem to SEC, authorizing it to regulate short sales.

Now following a "sharp market correction," as they're referred to, in 1937, the commission adopted its uptick rule to limit short sales in declining markets. And the commission's restrictions on short selling were essentially unchanged for 65 years. Eventually

developments in the markets, including complaints about naked short selling, increasing numbers of NASDAQ securities trading away from the NASDAQ market and, thus, not subject to the Tick test, advent of securities futures trading and decimalization caused the SEC to review its short sales rules. The first iteration of Reg SHO was intended to address chronic fails to deliver and abusive naked short selling. That's probably a redundant term.

This brings us up to the most recent amendments to Reg SHO. And before turning to those, I think it's instructive to examine the historical pattern I've alluded to, and consider whether things may be different this time around. Short sellers historically have been regarded with suspicious and worse because they seem to profit from the misfortune of others. In this vein, one author has written, "Known short sellers suffer the same reputation as the detested bat. They are reviled as odious pests, smudges on Wall Street, pecuniary vampires." That's a quote.

When markets get rough, short sellers are the people folks love to hate. Consequently, short sellers and short selling frequently have been blamed when bad things happen in our capital markets, and often following blame comes severe limitations or outright bans on short selling, which have generally failed in eliminating the practice, after which, the legislative regulatory pendulum swings back. We are, I think, still on an arc of the pendulum swinging toward more regulation.

Given the recent history of incremental changes in Reg SHO, the fact that data on the operation of the market and the effective short selling are available today in a way never before possible and the SEC's apparent willingness to entertain more changes, I believe appropriate additional regulations aimed at halting naked short selling are appropriate.

Now as originally adopted, Reg SHO created two principle exceptions to its general rule that fails to deliver must be closed out within 13 trading days. The so-called grandfather rule, which accepted fails to deliver occurring before a stock actually became a threshold or a hard-to-borrow security, and an option market maker exception for fails resulting from short sales by registered options market makers to establish or maintain hedges on option positions created before the underlying security became a threshold security.

The grandfather provision was intended to address the concern that without it there would be significant volatility in stocks marked by large, pre-existing fails to deliver. The options market maker

exception was intended to address concerns about liquidity and options pricing. In something of a departure from history after a *re*latively brief test drive, the SEC concluded that only tinkering was in order to close loopholes, and adopted amendments effective last month reflecting its stated aim of preserving short selling while eliminating abusive naked shorting.

Significantly, the grandfather rule was abolished, requiring all fails and threshold securities to be closed out within 13 days. Now you have to permit me a digression here to note that security settlements are T+3, and there's been a lot of pressure to move to T+1. However, the rule here for fails in threshold securities is T+13.

I think that that change alone acknowledges that fails to deliver remaining after Reg SHO were largely attributable to the grandfather exception. In addition, the SEC abolished its 70-year-old rule prohibiting no short sales of exchange-traded securities on town ticks. Refreshingly, it did that after a pilot test. The commission found that the tick rule reduced liquidity and really wasn't needed to prevent manipulation. But these actions begged the question whether Reg SHO will be effective against the evil of naked shorting, or whether more needs to be done. And if more needs to be done, what else is in order?

In thinking about this, I think it's important to recall that while naked shorting is a problem, regular short selling contributes to stock market efficiency. As I've noted, it provides liquidity in thinly traded stocks. It enables traders to limit the degree of risk to which their portfolios are subject, permits investors to pursue greater returns in return for increased risk, and effectively counterbalances the herd mentality that too my analysts and investors exhibit. So while it's theoretically possible to eliminate naked short selling by prohibiting all short selling, that approach I believe would be detrimental to the economically. And if history teaches us anything, it would ultimately fail.

The challenge is to define the problem to be addressed and to design and implement effective and proportionate solutions. First, while it's clear that companies and investors have been victimized by short sellers who resort to dubious tactics, even market manipulation to ensure the success of their bearish gambles, it's short selling coupled with improper use of inside information, a campaign to spread false information or other manipulative efforts, rather than short selling per se that are the real problem.

Recognizing abusive naked short selling is illegal, SEC Chairman Cox asked the staff to draft a rule that specifically would so state. Such a rule, of course, is really unnecessary since it would merely specify the illegality of activities that are already illegal. However, it would clean up the edges of short trading practices and facilitate enforcement. That rule could be useful, and if properly drafted and diligently enforced, could eliminate some of the problems caused by naked shorting.

The problem isn't short selling itself, but rather the ability of short sellers to sell stocks they haven't actually borrowed in advance of their short sale, which frequently causes fails to deliver. Naked shorts expose sellers and those linked to their short sales to the risk that when settlement day arrives, the short seller won't have the necessary shares available. Naked shorting harms the market and market participants, particularly when fails persist for substantial periods, as they clearly have.

Naked short sellers effectively gain more leverage than if they were required to borrow securities and deliver within a reasonable period of time. And this additional leverage may be used to drive down a stock's price. In addition, naked shorting effectively dilutes the pool of real securities.

Phantom shares created by naked shorting are analogous to counterfeit money. In a stock market corollary to Gresham's law, the more phantom shares of an issuer's stock that circulate the more they drive out or devalue an issuer's real shares to the detriment of investors and issuers alike. Fails associated with naked shorting harm investors in other ways, for example, by depressing stock prices to the point that shares may not be marginable, denying shareholders the ability to borrow against them.

The SEC has now acknowledged this problem and is taking steps to address it. Thus far, however, its efforts haven't gone far enough or proven entirely successful. Reg SHO requires short sellers and their brokers reasonably to believe security sold short can be, quote, borrowed and delivered at settlement, close quote. But reasonable belief is very much like beauty, it's dependent on who you ask.

Many prime brokers, for example, assert reasonable grounds by assuming that if large long positions reside somewhere in-house, they'll be able to borrow those shares without actually checking to see if the shares are available for borrowing, and without even

ascertaining if the same shares have already provided reasonable grounds for another short sale of the same securities. This, of course, leads to over shorting of securities, a phenomenon in which the number of shares shorted actually exceeds the number of shares physically available for trading.

When the number of shares shorted exceeds the number of shares available for trading, a stock's price can take a pounding that's wholly unrelated to the actual value of the stock. To combat naked shorting of heavily shorted threshold securities, Reg SHO requires brokers planning a short sale in a threshold security prior to shorting, to have a definitive arrangement to borrow those shares.

While this helps, it doesn't solve the entire problem. It doesn't even address situations where stocks not on the threshold list are subject to naked shorting. In addition, in another step in the right direction, last year the self-regulatory organizations adopted SEC guidance that shares brought in by brokers to satisfy undelivered shortage shares must be applied to the earliest undelivered shorts. This essentially requires brokers to buy in all shares they failed to deliver once any shares are bought in. But still, this isn't enough.

In January 2005, when Reg SHO became effective, there were 520 threshold securities. As of two days ago, even with all of the SEC's efforts, there are still 451, many of which have been on the list for months, and some of which have been on the list for years. The SEC is concerned, as it should be, the number is still way too high. So what's to be done?

One answer is that the SEC and exchanges should actually enforce existing rules. This is to some extent occurring. But in the two years since Reg SHO's adoption, the New York Stock Exchange has brought seven enforcement actions, but imposed total fines of $1.9 million. While these enforcement actions are positive, fines of that aggregate magnitude won't provide much deterrence.

In contrast, by the way, this summer the AMEX brought disciplinary actions for Reg SHO violations against two firms resulting in aggregate penalties and fines of $8 million, including $2.6 of disgorgement. And last month, the SEC settled an enforcement action against a hedge fund advisor, its CEO, and two employees for improper short sales resulting in total fines of over $8 million, including $6.7 million in disgorgement. Now penalties of this latter magnitude are more likely to inhibit impermissible short selling, particularly if the more cases are brought.

Another approach that I personally oppose has been state efforts to impose regulations and institute enforcement actions. In 2006, Utah passed a bill cracking down on naked shorts, with fines starting at $10,000.00 a day, and increasing to the total of all unsettled trades. Under pressure from the SEC and SIFMA, Utah repealed the bill last March. Missouri held hearings on a similar measure last month. And efforts are under way in South Dakota to put a bill banning all short selling on next November's ballot.

Arizona, Oklahoma, and even nearby Virginia considered, yet rejected, short selling legislation this year. But that's no guarantee these measures won't be revived or proposed and adopted elsewhere.

Continued state interest in legislation reflects public discontent, and appropriately so, with naked short selling. But if adopted, we've have to deal with a patchwork quit of state regulations to govern an important facet of what are uniquely national and global markets. There's a problem with naked shorting, but individual state legislation isn't the solution.

Other solutions come to mind. Now those who've heard me speak before know that I am fond of stating that I have a list of ten suggestions to solve the specific problem. I do this all the time. But I have to offer a disclaimer, which I always do. Although I say I have ten, I never have ten. But if I told you that I had 12 or 13, you'd tune out, and who could blame you. Now this did get me in trouble when I was chairman of the SEC.

In August of 2002, I gave a speech to the American Bar Association's Business Law Committee, and I decided as a service to my audience to share with them the top ten lessons I had learned from public service. I gave the exact same disclaimer, and I would up with 12 lessons learned. The next day, the front page of the business section of *The New York Times* said, "No wonder we have all these accounting problems, this joker at the SEC can't add." In any event, here are my so-called ten.

First, SROs and the SEC need actively to pursue ongoing chronic and serial short selling in fractions. Next. Meaningful penalties have to be imposed for violations of existing Reg SHO requirements. Third, the SEC should define and punish as fraud, abusive naked short selling practices. Next. The SEC should act quickly and forcefully, otherwise, state regulation is more likely. And as I've already said, I don't think that's the best way to go.

Our capital markets work because they're governed by uniform rules from Portland, Maine to Portland, Oregon. State regulation means fragmented requirements, practices, and procedures, and could cause loss of our competitive edge.

Next. The SEC should eliminate the option market maker exception. It isn't demonstrably of any value, and it risks facilitating illegal activity. Next. Reg SHO should impose firm locate requirements as a condition precedent to all short sales. Next. Reg SHO should cover securities that are also traded in the pink sheets. Naked shorts occur in the shares of small, thinly traded issuers, and those are likely to trade in the pink sheets.

Next. Chronic and unjustified violations of T+3 settlement rules should be punished. Next. Before brokers are allowed to borrow margin shares, they should make clear disclosure and give investors the opportunity to opt out. Next. Securities lending should occur openly and transparently at arms-length prices, enhancing returns, increasing efficiency, promotion valid short selling, and curbing abuses.

Next. The NSCC should allow members to settle borrowing and lending activity through these facilities that I've just mentioned so accurate accounting and data is available to market participants and regulators. Next. Shady activities thrive in shadowy market corners. Exchanges in other markets should be required to report the securities on daily threshold lists and aggregate daily volume of fails for each such security. And, finally, Form 13F, institutional investor's reports, should disclose both short and long positions. That would provide issuers and investors with a better understanding of trading activity.

Now in closing, I'm reminded of Daniel Drew, an 19th Century speculator and robber barron, who was fond of cornering markets and enjoyed forcing short sellers to cover their shorts when there weren't enough securities available. He allegedly authored the following refrain, "He that sells what isn't his'n, must buy it back or go to prison." Ironically, Drew later lost $500,000.00 to his arch nemesis Cornelius Vanderbilt, shorting shares in the New York and Harlem Railroad.

Short selling isn't illegal, per se, and shouldn't be. But naked shorting violates established laws and shifts economic burden from naked short sellers to others, including issuers and investors. The SEC accepts this distinction and is working to implement it. It's time to exercise our ghosts. It remains to be seen how long this

|  |  |
|---|---|
|  | will take and if regulation finds an appropriate equipoise.  Thank you. |

*[Applause]*

*Harvey Pitt:* I believe it hasn't done enough to promote an effective system of clearance and settlement that also provides everyone in the marketplace with current, accurate data.  And until we get there, we will continue to have problems, and it will enable people to continue to, in my view, manipulate the market and take advantage of the unsuspecting public.  So to me, it's a very clear need, and that's part of why I thought there needs to be transparency in this market.  It is unthinkable to me that we have the paradigm in long-equity trading for transparency.  And when it comes to short equity trading, we have very, very little transparency.  There's no rationale for that distinction.

*Audience:* You talked a bit about the dichotomy between regulation enforcement at the SEC.  Why do you think there have been so few enforcement actions with Reg SHO?

*Harvey Pitt:* Well, it's always hard to say.  But in part, if you look at the nature of the rule, you'd understand why people who have only finite resources to throw at our capital markets would shy away.  What is the standard or what does the standard that you reasonably believe you can acquire the securities to settle on time?  What does that mean?  How do you bring an enforcement auction against someone when they say, "I had a reasonable belief"?  I don't, by the way, think that that justifies the lack of enforcement action, but I think it explains it.

I think if you had a firm locate requirement for everything, you eliminate any question about enforcement because then the question will be, "Do you have, in hand, a contractual obligation that enables you to claim you will, in fact, be able to deliver the securities that you sold short for one of your customers?"  Until we get there, I'm concerned about the enforcement area.

I could offer other explanations such as the fact that short selling isn't very sexy compared with corporate accounting fraud, insider trading, and other things.  And one other thing.  I think that there is a real concern, particularly on the part of the SEC's enforcement division, that short sellers are often able to ferret out negative information about companies, and there's a fear about chilling those efforts.  And as a result, I believe the people are reluctant in some cases to bring actions even though they'd be validated.

|  |  |
|---|---|
|  | But as I say, I think the main cure for that is come up with a firm locate requirement and you avoid any question of whether the belief was reasonable or unreasonable. |
| *Audience:* | Following up on the locate requirement, the commission staff has taken a lot of heat for not being more aggressive, not defining better, etcetera. But one group that hasn't taken any heat is the Congress of the United States. There's an easy fix to change the law to make it a firm locate. Why not? And why wasn't it in your top ten suggestions? |
| *Harvey Pitt:* | It was. It was in my top ten, but not legislation. Let me tell you one of the three worst curses that can apply to mankind. If you're a curse aficionado as I am, is be careful what you ask for, okay? In my view, Congress, in 1934, made a judgment that it couldn't resolve how to do this.<br><br>So as I said in my talk, it punted. The SEC has unquestionable authority to require a firm locate. There is no one that I've heard of who doubts – or at least in any serious way – that the SEC could do this. So we don't need legislation. The legislative process takes time, it's subject to vagaries. And unless I missed my bet, after a few months of 2008, everybody's gonna be focused on November of 2008, and less on this issue.<br><br>And another concern is where's the impetus? Why should people care? I mean I think that Congress is responsive when people make the case. I know that there are people trying to make the case. I think it has to be made even more forcefully than it's being made, but not so much to get Congress to adopt new legislation as much as to require Congress to sort of sit on the SEC's back and say, "Come on, guys. Let's go with it." There is no understandable reason in my view why the commission should not now require a firm locate. I have not heard it. Pardon? |
| *Audience:* | – the reason why? |
| *Harvey Pitt:* | No. |
| *Audience:* | SIFMA will not allow it. |
| *Harvey Pitt:* | The last time I looked, SIFMA was, A) not a governmental agency; and, B) was comprised of members who were regulated by the SEC. As I say, I am not aware of any reason why the SEC |

Case 1:10-cv-03108-JEC   Document 56-9   Filed 10/25/10   Page 13 of 16

| | | |
|---|---|---|
| CAPT Luncheon<br>November 16, 2007<br>Mayflower Hotel, Washington D.C. | *Chairman Harvey Pitt* | *Page 12 of 15* |

|  |  |
|---|---|
|  | does not and should not require a firm locate. Uh oh. Now I'm in trouble. |
| *Audience:* | Not at all. On disclosure, do you see any harm in providing the aggregate amount of fails in companies on a daily basis or a very periodic basis? |
| *Harvey Pitt:* | I see a harm in not providing it. Everyone knows that the most critical factors in the success of capital markets is transparency in disclosure. Investor and corporations, brokers, and others all have a need and, in my view, the right to know aggregate data on a daily basis. It is an easy solution. It doesn't require more regulation. It simply requires disclosure of data that already has to be collected and analyzed. So in my view, no, I don't see any harm, and I see a lot of harm in not doing it. |
| *Audience:* | There's a lot of debate about the role of the Depository Trust Company and its subsidiaries in this process. And I wonder what your thoughts are on DTC and its members, and whether it can play a positive role in facilitating disclosure and better enforcement. |
| *Harvey Pitt:* | Yeah. Every time I get an invitation by anyone to speak about anything relating to short selling, I either get a visit or a letter from DTCC, and I think that's very smart on their part, but it means that we stay in touch because this is a subject I care about and so I do speak about it. I believe that DTCC can play a very positive role. And the real difficulty which exists with respect to any issue in any field is somebody has to take ownership of the issue, okay. And so DTCC will say, "It's not our data. It belongs to the exchanges." The SEC will say, "Gee, this is proprietary data. We haven't required it to be disclosed and so on." |
|  | The short answer, and we did this effectively when I was at the commission on market-related issues like this is, is you get everybody in a room and you say, "Here's what our goal is. Our goal is transparency. Our goal is to provide the marketplace on a continuing daily basis with accurate, current information about the status of fails and the like. Now who is gonna do what to get us to that position?" |
|  | And if nobody volunteers, then the regulator can say, "Well, here's now we ought to try and get it done." That's effective leadership. Somebody has to start by assuming ownership of the problem. And unfortunately, what you hear a lot of, depending on who you talk to is, "Well, they aren't letting me do what I would otherwise |

|  |  |
|---|---|
|  | be happy to do.  But I'm not allowed to do that and it's not my say so."  And the answer is, "Everybody can make it their say so."  It's very easy to pass the baton to somebody else and just hope it never winds up in your lap. |
| *Audience:* | You mentioned a time or two in your points about advancing the SEC's enforcement.  It seems to me that there'd have to be circumstances in place to facilitate that, such as modules that the Office of the Compliance and Inspection create to generate those cases and other things.  What are some of the other things that the SEC could do to incentivize SEC enforcement?  We've seen some Exchange enforcement and a little SEC enforcement.  But what's part of that program? |
| *Harvey Pitt:* | Yeah.  Well as I said, actually, in response to an earlier question, and also in my remarks, I think the first thing the SEC has to do is make it very easy to figure out what a violation is and who's violating.  It's hard to enforce the law if the people who are charged with enforcing it are worried that somebody will persuade a judge or someone else that they had a, quote, reasonable ground to believe.  So in my view, that's why I said even though I don't think it's necessary to define already illegal acts as illegal, I favor that 'cause it will make life easier.  But it's also why I favor a firm locate requirement so we get rid of this reasonable ground.

But the next step really has to come from the commission itself.  Left to its own devices, the enforcement staff is very hard-working, they are a terrific group of people, and they take whatever cases fall in their lap.  Chairmen and commissioners can influence the docket by emphasizing things that really matter.  For example, several decades ago, Ralph Nader criticized the SEC because it didn't go after delinquent filing of corporate reports.

The SEC was embarrassed and there was directive internally.  And they went after those cases and they started bringing them, large numbers of them.  So another thing that I think is required is that the people who set the policy for the agency have to believe – they have to be convinced and then they have to believe that this is really important.  Unless they believe that, SEC staffers aren't gonna go looking for these cases.  To increase the numbers, people have to go looking.  So those are some of the things that I think people have to do in order to bulk up.  I, of course, do not recommend that the enforcement division take steroids.  I'm off that.  Uh oh. |

*Audience:* In October, *CFO Magazine* had an article entitled *Who Owns Your Stock?* And in that, *CEO/CFO's* IR people talk about how it's impossible to get transparency into individual shareholders as well as institutions. And then there were those that say naked short selling represents circa $6 billion dollars a day in the free enterprise market.

If there was a way to give a publicly traded company transparency in to their individual shareholders as well as their institutions, is it the responsibility of the SEC to enforce that? Is it the responsibility of the exchange on which they're traded? Or is it the responsibility of the corporate governance of the publicly traded company?

*Harvey Pitt:* Well, you've hit on a major conundrum in the markets. I believe that there is a serious problem in that people who actually own corporations are not known to the managers of their company, so that it becomes hard to communicate, and this is a serious, serious issue.

The other side of it, which I completely also understand, is the fact that Congress was very much worried about individual privacy. And in a computerized age that we live in, the ability for somebody, if all this data were easily public – and I haven't answer your question yet, but this is the conflict, if you will – if somebody can get filings, they can figure out what your net worth is – you. I mean you, personally. And I mean all of us. But not anybody special, not that you're not special. But not anyone that the law would focus on, but just everyone. And so there's a personal privacy concern that also dovetails.

The problem that I believe you have is that the rules that we have, as in so many areas, are antiquated. There is a way to balance the privacy concern with the benefits of allowing companies to be able to communicate with their shareholders. But nobody is focusing on it at the moment. Everybody starts with the assumption that until somebody exceeds 5 percent, there doesn't have to be disclosure.

Now if you wait until I own 5 percent of Google, the fact of the matter is you've waited too long. These companies and a soaring stock market make the current levels wholly inappropriate. Nobody's gone back and revisited them and rethought the process. There has to be a better way of communicating. The SEC does have the initiative, but it is also circumscribed by what the legislation that it enforces is. The exchanges can do more, and

they are doing more.  I mean one of the big issues which New York has now addressed was that brokers could vote shares for which they got no proxy guidance from the true owners of the securities.  Now that doesn't work anymore.  Query who that helps and who that hurts.

I mean it may turn around to hurt the companies as well.  But the exchanges can do more.  I think the SEC can do more.  But unlike the area of short selling where I gave a different answer, this is an area where Congress, in my view, has to rejigger the presumptions that underlie the current disclosure approaches so that yes, you preserve individual privacy within reason, but you also take the position that when you pass a threshold –

*[End of Audio]*