# EXHIBIT N

IN THE CIRCUIT COURT OF
PULASKI COUNTY, ARKANSAS
SIXTH DIVISION

PET QUARTERS, INC., AN ARKANSAS CORPORATION;
CLYDE A. JESTER, AN INDIVIDUAL; MICHAEL PARNELL,
AN INDIVIDUAL, WALTER D. O'HEARN, JR., AN INDIVIDUAL,
DEMETRI BETZIOS, AN INDIVIDUAL                                       **PLAINTIFFS**

VS.                          CASE NO. 04-11654

THE DEPOSITORY TRUST AND CLEARING CORPORATION;
THE DEPOSITORY TRUST COMPANY; AND THE
NATIONAL SECURITIES CLEARING CORPORATION              **DEFENDANTS**

## COMPLAINT

Plaintiff Pet Quarters, Inc. ("Pet Quarters"), Plaintiff Clyde A. Jester ("Jester")
Plaintiff Michael Parnell ("Parnell"), Plaintiff Walter C. O'Hearn ("O'Hearn"), and
Plaintiff Demetri Betzios ("Betzios ") (collectively, the "Plaintiffs") for their complaint
against Defendant Depository Trust and Clearing Corporation ("DTCC") and its
subsidiaries, Defendant Depository Trust Company ("Depository Trust"), and Defendant
National Securities Clearing Corporation ("NSCC") (collectively, the "Defendants"),
allege and set forth as follows:

### I. SUMMARY

1.      The Stock Borrow Program (as described below, commencing at
paragraph 107) was purportedly created to address SHORT TERM delivery failures by
sellers of securities in the stock market. However, the end result of the program has been
to create tens of millions of unissued and unregistered shares to be traded in the public
market. Further, in some instances, the Stock Borrow Program has resulted in two or
more shareholders who purchase shares in separate transactions owning the same shares.

2.      In the securities marketplace, sellers advertise asking prices and buyers
advertise offering prices. When the two prices match, a trade occurs. Clearance is the
process of verifying and confirming the terms of the trade, such as the number of shares,

price, buyer and seller. After a trade clears, it settles on the date prescribed by regulation, which means that the seller delivers the shares and the buyer delivers payment. Sometimes the seller is unable to deliver the shares at settlement. When shares are not delivered on settlement day (the "Settlement Day"), the seller is said to have "failed to deliver" the shares. This event is referred to in the securities industry as a "fail to deliver".

3.      Prior to 1981, when a fail to deliver occurred, the buyer held back his payment and waited for the seller to deliver the shares. If the buyer got tired of waiting for the seller to deliver the shares, the buyer went into the market and bought the shares from another seller. This process of going back to the market to buy shares to replace the ones that were not delivered is called "buying in" or a "buy-in." If the price of the shares increased between the time that the buyer originally bought the shares and the time the buyer went into the market to replace them, the buyer charged the additional cost to the seller who failed to deliver. Until 1981, there were only two alternatives available to a buyer whose seller failed to deliver: either wait for the shares to be delivered or go back into the market and buy in the shares.

4.      In an effort to streamline the back office operations of the securities industry, the clearance and settlement functions for virtually all securities trades in the United States were consolidated in the Depository Trust and the NSCC. In 1981, the NSCC created the Stock Borrow Program, purportedly to improve the efficiency of the clearance and settlement function by addressing temporary fail to deliver situations. Under the Stock Borrow Program, if a seller fails to deliver the shares on time, the NSCC borrows the shares from willing lenders[1] and delivers the shares to the buyer in settlement of the trade. The Stock Borrow Program operates through a computer process and now represents the only way that a buyer can cure a fail to deliver by a seller. However, in reality, the Stock Borrow Program does not cure the fail to deliver. The seller still owes

---

[1] Willing lenders are brokers and clearing firms who lend their customers' shares to the NSCC. These shares are ultimately held at the Depository Trust through a chain of custody that begins with the customers delivering share certificates to brokers who then deliver the certificates to the Depository Trust.

the shares. The only change is that the party waiting for delivery of the shares is no longer the buyer. Now, it is the NSCC.

5.     Since the NSCC instituted the Stock Borrow Program, there is little incentive for the NSCC to require sellers to cure fail to deliver positions once the loan has been made. The Stock Borrow Program has become a reliable source of income for the Depository Trust, the NSCC and willing lenders who have shares on deposit at the Depository Trust. For the year ended December 31, 2003, the Depository Trust reported revenues from services of $425,416,000 and the NSCC reported revenues from services of $293,133,000.

6.     "The failure of participants to deliver securities to NSCC on settlement date, and the corresponding failure of NSCC to redeliver the securities, results in open positions. ... At the close of business on December 31, 2003, open positions due to NSCC approximated $3,025,467,000 ..., and open positions due by NSCC to participants approximated $2,303,717,000 ... for unsettled positions and $721,750,000 ... for securities borrowed through the NSCC's Stock Borrow Program."[2] Because these open positions represent shares borrowed by the NSCC and delivered to buyers, the NSCC has subjected itself to the risk of significant financial loss if the sellers who failed to deliver are unable to honor their obligation to deliver the shares. In an attempt to reduce this exposure, the Defendants have permitted sellers to maintain open fail to deliver positions of tens of millions of shares for periods of a year and even longer and participated in a scheme to manipulate downward the price of the affected securities, thereby reducing the market value of the open fail to deliver positions with respect to these affected securities.

7.     This course of conduct by the Defendants has had the effect of creating millions of unregistered, illegal, free trading shares of the issuer, (1) artificially increasing the supply of an issuer's shares in the marketplace; (2) driving down the price of the stock of the issuer; (3) decreasing the value of the shareholders' holdings in an issuer's stock; and (4) causing multiple owners who purchased shares in separate transactions to own the same shares. Neither the Depository Trust nor the NSCC has authority to issue or create shares. Only the issuer, in the instant case Plaintiff Pet

---

[2]  National Securities Clearing Corporation Annual Financial Statements (2003).

Quarters, has authority to do so. Consequently, fails to deliver, particularly in trades of small capitalization companies such as Plaintiff Pet Quarters, are no longer temporary, and frequently remain uncured for months and even years.

      8.    The abuses of the Stock Borrow Program have been recognized by the National Association of Securities Dealers ("NASD") and measures have been proposed to address them. "Concerns have been raised by members, issuers, investors and other interested parties about potentially abusive short selling activities occurring in the marketplace. In particular, naked short selling, or selling short without borrowing securities to make delivery, <u>can result in long term failures to deliver, including aggregate failures to deliver that exceed the total float of a security. NASD believes such extended failures to deliver can have a negative effect on the market. Among other things, by not having to deliver securities, naked short sellers can take on larger short positions than would otherwise be permissible, which can facilitate manipulative activity.</u>"[3]

## II.   Parties, Jurisdiction, and Venue

   9.  Plaintiff Pet Quarters is an Arkansas corporation, with its principal place of business in Pulaski County, Arkansas.

   10.  Plaintiff Jester is an individual shareholder of Pet Quarters who resides in Pulaski County, Arkansas.

   11.  Plaintiff Parnell is an individual shareholder of Pet Quarters who resides in Pulaski County, Arkansas.

   12.  Plaintiff O'Hearn is an individual shareholder of Pet Quarters who resides in New York.

   13.  Plaintiff Betzios is an individual shareholder of Pet Quarters who resides in New York.

   14.  Defendant DTCC is a New York corporation and may be served at its principal place of business at 55 Water Street, New York, New York 10041-0099, Attention:

---

[3] NASD Proposed Amendments Relating to Short Sale Delivery Requirements (SR-NASD-2004-044) (emphasis added).

General Counsel. Defendant DTCC transacted business in Arkansas, directly or through its subsidiaries and had systematic and continuous contacts with Arkansas including:

a) clearance and settlement of securities traded on the New York Stock Exchange, American Stock Exchange, [the NASDAQ Stock Market] and the Over the Counter securities market (e.g. Over the Counter Bulletin Board and/or Pink Sheets), including purchases and sales of securities by Arkansas residents;

b) clearance and settlement of securities of companies based in, and/or with offices located in Arkansas, whose shares are traded on the New York Stock Exchange, American Stock Exchange, [the NASDAQ Stock Market] and the Over the Counter securities market (e.g. Over the Counter Bulletin Board and/or Pink Sheets);

c) maintaining custody of securities traded on the New York Stock Exchange, American Stock Exchange, [the NASDAQ Stock Market] and the Over the Counter securities market (e.g. Over the Counter Bulletin Board and/or Pink Sheets), including securities owned by Arkansas residents;

d) maintaining custody and deposit of securities of companies based in, and/or located in Arkansas whose shares are traded on the New York Stock Exchange, American Stock Exchange, the NASDAQ Stock Market, and the Over the Counter securities market (e.g. Over the Counter Bulletin Board and/or Pink Sheets);

e) operation of an interactive website on the World Wide Web located at www.dtcc.com on which DTCC actively advertises and promotes its services to U.S. residents (including residents of the State of Arkansas), and asks them to request information about DTCC's various services, including but not limited to, clearing services, settlement services, inventory management services, custody services and deposits services;

f)     frequent communications via telephone, email, facsimile and mail with numerous NSCC and/or numerous DTC members who are broker dealers located, registered and/or based in Arkansas, including, but not limited to, providing trading activity reports to each broker dealer (e.g. CNS Accounting Summary, position reports, reconciliation reports and stock borrow activity reports);

g)     as holder of virtually all publicly traded shares, receiving payments for dividends from Arkansas corporations directly and through Arkansas banks and trust companies, and disbursing such dividends to Arkansas broker dealers who are members of the DTCC, who then distribute these dividends to Arkansas residents who are holders of shares of publicly traded companies;

h)     as trades are settled, deliver registered certificates of share ownership to some Arkansas residents from DTCC's New York offices through the Direct Mail Program;

i)     accepting Exchange Offers from Arkansas corporations, interacting and providing related advice to Arkansas corporations with respect to the Exchange Offers;

j)     Arkansas corporate, municipal and state government issuers of securities are in regular contact with the DTC's Underwriting Department regarding each issuance of new securities;

k)     interaction with numerous NSCC and DTC numerous members who maintain numerous offices in Arkansas and entering into membership contracts with these NSCC and/or DTC members, which interaction includes submitting membership applications and fees in order to become a DTCC, NSCC and/or DTC member, providing exclusive membership benefits to Arkansas DTCC, NSCC and/or DTC members by the provision of net settlement for securities trading, securities immobilization, dividend collection and disbursement services, receipt

of dividend payments, access to the national clearing and settlement system, book-entry access to securities positions and simplified processing of securities positions in corporate changes such as reorganizations;

l)    annual visits by Defendants' Participant Services Staff to provide guidance on DTCC's policies and procedures and training on use of DTCC's computer systems, including how to use the Stock Borrow Program; and

m)   interaction with the Arkansas Secretary of State's offices for purpose of tracking Arkansas corporations with DTC-eligible securities through articles of incorporations filed with the Arkansas Secretary of State.

15.  Defendant NSCC is a New York Corporation and may be served at its principal place of business at 55 Water Street, New York, New York 10041-0099, Attention: General Counsel. Defendant NSCC transacted business in Arkansas, directly or through its subsidiaries, and had systematic and continuous contacts with Arkansas including:

a)    clearing, settling, borrowing and/or distributing securities traded on the New York Stock Exchange, American Stock Exchange, the NASDAQ Stock Market and the Over the Counter securities market (e.g. Over the Counter Bulletin Board and/or Pink Sheets), including purchases and sales of securities by Arkansas residents;

b)    clearing, settling, borrowing and/or distributing securities of companies based in, and/or with offices located in Arkansas, whose shares are traded on the New York Stock Exchange, American Stock Exchange, the NASDAQ Stock Market and the Over the Counter securities market (e.g. Over the Counter Bulletin Board and/or Pink Sheets);

c)    filing numerous actions in Arkansas;

d)    operation of an interactive website on the World Wide Web located at www.nscc.com on which NSCC actively advertises and promotes its services to U.S. residents (including citizens of the State of Arkansas),

and asks them to request information about NSCC's clearing services, settlement services, and distribution services;

e)   frequent communications via telephone, email, facsimile and mail with numerous NSCC members who are broker dealers located, registered and/or based in Arkansas, including, but not limited to, providing daily trading activity reports of each broker dealer (e.g. CNS Accounting Summary, position reports, reconciliation reports and stock borrow activity reports);

f)   interaction with numerous NSCC members who maintain numerous offices in Arkansas and entering into membership contracts with these NSCC members, which interaction includes submitting membership applications and fees in order to become a NSCC member, providing exclusive membership benefits to Arkansas NSCC members by the provision of net settlement for securities trading, securities immobilization, dividend collection and disbursement services, receipt of dividend payments, access to the national clearing and settlement system, book-entry access to securities positions and simplified processing of securities positions in corporate changes such as reorganizations; and

g)   annual visits by Defendants' Participant Services Staff to provide guidance on NSCC's policies and procedures and training on use of NSCC's computer systems, including how to use the Stock Borrow Program.

16.   Defendant Depository Trust is a limited purpose trust company formed under the Banking laws of New York and may be served at 55 Water Street, New York, New York 10041-0099, Attention: General Counsel. Defendant DTCC transacted business in Arkansas, directly or through its subsidiaries, and had systematic and continuous contacts with Arkansas including:

a) maintaining custody of securities traded on the New York Stock Exchange, American Stock Exchange, the NASDAQ Stock Market, and the Over the Counter securities market (e.g. Over the Counter Bulletin Board and/or Pink Sheets), including securities owned by Arkansas residents;

b) maintaining custody and deposit of securities of companies based in, and/or with offices located in Arkansas, whose shares are traded on the New York Stock Exchange, American Stock Exchange, the NASDAQ Stock Market, and the Over the Counter securities market (e.g. Over the Counter Bulletin Board and/or Pink Sheets);

c) filing numerous actions in Arkansas;

d) operation of an interactive website on the World Wide Web located at www.dtc.org on which DTC actively advertises and promotes its services to U.S. residents (including residents of the State of Arkansas), and asks them to request information about DTC's various services, including but not limited to, clearing services, settlement services, inventory management services, custody services and deposits services, proxy solicitation services;

e) frequent communications via telephone, email, facsimile and mail with numerous DTC members who are broker dealers and issuers located, registered and/or based in Arkansas, including, but not limited to, reports regarding deposit and settlement activities of each broker dealer; security position report to broker dealers and issuers; and proxy solicitation related communications to broker dealers and issuers;

f) as holder of virtually all publicly traded shares, DTC receive payments for dividends from Arkansas corporations directly and through Arkansas banks and trust companies, DTC disburses these dividends to Arkansas broker dealers who are members of the DTC, and DTC

members then distribute these dividends to Arkansas residents who are holders of shares of publicly traded companies;

g)   as trades are settled, registered certificates of share ownership are delivered to some Arkansas residents from DTC's New York offices through the Direct Mail Program;

h)   accept Exchange Offers from Arkansas corporations, interact and provide related advice to Arkansas corporations with respect to the Exchange Offers;

i)   Arkansas corporate, municipal and state government issuers of securities' contacts with DTC's Underwriting Department regarding the issuance of new securities;

j)   interaction with numerous DTC members who maintain numerous offices in Arkansas and entering into membership contracts with these DTC members, which interaction includes submitting membership applications and fees in order to become a or DTC member, providing exclusive membership benefits to Arkansas DTC members by the provision of net settlement for securities trading, securities immobilization, dividend collection and disbursement services, receipt of dividend payments, access to the national clearing and settlement system, book-entry access to securities positions and simplified processing of securities positions in corporate changes such as reorganizations;

k)   annual visits by Defendants' Participant Services Staff to provide guidance on DTCC's policies and procedures and training on use of DTCC's computer systems, including the Stock Borrow Program; and

l)   interaction with the Arkansas Secretary of State's offices for purpose of tracking of Arkansas corporations with DTC-eligible securities through articles of incorporations filed with the Arkansas Secretary of State.

17.  The Defendants transact business on a daily basis in Arkansas through broker dealers or their agents who are based in and/or have offices located in Arkansas.  At the very least, each Defendant transacts business in Arkansas and/or has committed tortious acts both, within and outside of Arkansas, which have resulted in injury to Arkansas residents, subjecting themselves to personal jurisdiction in Arkansas.

18.  Venue is proper in this Court pursuant to Ark. Code Ann § 16-60-113.  A substantial part of the events or omissions, which gave rise to, the claims alleged herein occurred in, or was directed towards Arkansas.

### III.  GENERAL ALLEGATIONS

### A.  PLAINTIFF PET QUARTERS

19.  Shares of Pet Quarters are traded on the Over the Counter Bulletin Board ("OTCBB") and the Pink Sheets ("Pink Sheets") under the symbol "PDEN". These shares are eligible to be held in book-entry form at the Depository Trust. According to its Articles of Incorporation and amendments thereto filed with the Arkansas Secretary of State, Pet Quarters is authorized to issue 40 million shares of common stock and 10 million shares of preferred stock.

20.  Pet Quarters was incorporated in May 1997 as an internet pet supply company, selling pet food and other pet supplies and products from its website. In time, the business plan for the company expanded to include sales through mail-order catalogues. Its target clientele was consumers and pet professionals. Its goal was to provide its customers with pet products at attractive prices, together with access to a range of authoritative sources of pet-related information and advice through links on its website.

21.  Pet Quarters quickly developed an excellent reputation in the pet supply industry. Pet Quarters' sales and revenues increased from $40,000 in fiscal year 1998, to nearly $14 million in fiscal year 2000. By 2000, Pet Quarters had become an established business with a profitable business plan, and would have remained a leader in its niche market but for the actions of Defendants complained herein.

22.  In mid 1999, Pet Quarters was contacted by the owners of Humboldt Industries ("Humboldt"), a Pennsylvania pet product mail order catalogue business, concerning a possible acquisition by Pet Quarters.

23.  Realizing that Humboldt's substantial existing business would advance its plan to market products through mail-order catalogues, Pet Quarters decided to acquire Humboldt. This acquisition was one part of a carefully conceived short-term plan by which Pet Quarters intended to position itself as a leader in its market through the orderly acquisition of additional businesses and business components.

24.  On or about August 1, 1999, Pet Quarters acquired all of Humboldt's stock for a purchase price of $9.2 million; $4.6 million was to be paid in cash and $4.6 million was to be paid in Pet Quarters common stock.

25.  The agreement between the Humboldt shareholders and Pet Quarters provided that the number of shares of Pet Quarters to be transferred was based on the closing price of Pet Quarters' common stock on May 6, 1999, which was $2.25 per share. However, that number was subject to adjustment based on the closing price of such stock on the actual date of the closing of the transaction, August 1, 1999. Thus, the actual number of Pet Quarters' shares transferred to the owners of Humboldt was based on the August 1, 1999 closing price, which was $4.0125 per share.

26.  Upon information and belief, Pet Quarters' stock was actively traded during the two-year period between May 1997 to August 1999 and these trades were cleared and settled by the Defendants.

27.  Upon information and belief, the price of Pet Quarters stock fell because the operation of the Stock Borrow Program by Defendants allowed the manipulation of Pet Quarters' stock by various sellers who failed to deliver Pet Quarters' shares.

28.  In order to finance the cash portion of the Humboldt acquisition, Pet Quarters borrowed 4.6 million from an entity known as Sun Valley Trust (the "Trust"). Pet Quarters issued 153,334 shares of common stock to the Trust as an origination fee. The loan from the Trust to Pet Quarters was a bridge loan for a period of sixty days, with repayment due on October 2, 1999.

29.  Pet Quarters needed to raise capital to fund the payment due to the Trust. Pet Quarters met with Michael Vasinkevich ("Vasinkevich"), the managing director of Ladenburg Thalmann & Co., Inc.'s Structured Finance Group. Vasinkevich assured Pet Quarters that he could locate entities that would be willing to provide financing for Pet Quarters. Vasinkevich introduced Pet Quarters to Thomas Badian ("Badian"), the President of Curzon Capital Corporation, now known as Rhino Advisors, Inc., which represented that it was prepared to provide Pet Quarters the financing that it needed. Vasinkevich and Badian then introduced Pet Quarters to Amro International ("Amro") and Markham Holdings Limited ("Markham"), two companies that were interested in investing in Pet Quarters.

30.  On or about February 23, 2000, Pet Quarters entered into a Common Stock and Warrants Purchase Agreement (the "Purchase Agreement") with Amro and Markham pursuant to which Pet Quarters sold Amro 619,047 shares of its common stock, and sold Markham 95,238 shares of its common stock, each at a price of $2.10 per share, for a total of approximately $1.5 million. The Purchase Agreement contained re-pricing provisions pursuant to which Amro and Markham could demand additional shares of Pet Quarters' common stock in the event that the share price did not maintain specified levels over a period of time.

31.  Upon information and belief, during February 2000, Pet Quarters' stock was actively traded, and these trades were cleared and settled by the Defendants.

32.  Upon information and belief, the price of Pet Quarters stock fell because the operation of the Stock Borrow Program by Defendants permitted the manipulation of Pet Quarters stock by various sellers including but not limited to, Amro and Markham, who failed to deliver Pet Quarters shares.

33.  Upon information and belief, beginning in February 2000, the price of Pet Quarters stock fell because of manipulation of the market in shares of Pet Quarters stock as a result of the direct actions of Defendants in the Stock Borrow Program or through the actions of others, which were facilitated or permitted by the Defendants.

34.   In addition to introducing Pet Quarters to Amro and Markham, Badian represented himself as a "financier" for Pet Quarters. As its financier, Badian and Vasinkevich promised Pet Quarters an equity line of credit of not less than $10 million, and up to a maximum aggregate of $25 million.

35.   As a result, on March 15, 2000, Pet Quarters entered into an Equity Line of Credit Agreement (the "Equity Agreement") with Splendid Rock Holdings, Inc. ("SRH"), pursuant to which Pet Quarters was entitled to sell, or "put" to SRH shares of Pet Quarters common stock periodically (but not more often than every twenty trading days) for a period of thirty months. The Equity Agreement would become effective only upon the filing of a registration statement by Pet Quarters, so that all of the shares "put" to Splendid Rock would be immediately available for resale in the market.

36.   Pursuant to the Equity Agreement, on September 1, 2000, Pet Quarters sold 750,000 shares to SRH at $0.80 per share, totaling $562,500. On November 29, 2000, Pet Quarters sold 850,000 shares to SRH at $0.43 per share, totaling $365,500. On January 26, 2001, Pet Quarters sold 850,000 shares to SRH at $0.2345 per share, totaling $150,000. On April 12, 2001, Pet Quarters sold 300,000 shares to SRH at $0.0516 per share, totaling $15,480.

37.   Upon information and belief, between March 15, 2000 and April 12, 2001, Pet Quarters' stock was actively traded and these trades were cleared and settled by the Defendants.

38.   Upon information and belief, the price of Pet Quarters stock fell because the operation of the Stock Borrow Program by Defendants permitted the manipulation of Pet Quarters stock by various sellers, including but not limited to, SRH who failed to deliver Pet Quarters shares.

39.   On May 2, 2000, Pet Quarters entered into a loan agreement with Amro (the "Amro Loan") pursuant to which Amro agreed to make a short-term loan to Pet Quarters of up to $1 million. The actual amount of the loan was not to exceed the difference between $1 million and any funds that Pet Quarters had drawn under the Equity

Case 1:04-cv-08168-JFK Document 56-14 Filed 12/03/10 Page 32 of 60
Case 1:04-cv-01588-WRW Document 1-4 Filed 12/04/10 Page 16 of 60
NOV-08-2004 10:33    DW&C GENERAL COUNSEL    212 855 3222    P.17

Agreement with SRH as of May 4, 2000. The proceeds of the Amro Loan were used to pay $1 million of the remaining $3.8 million remaining due to the Trust.

40. The Amro Loan was subject to the terms and provisions of a May 5, 2000 Convertible Debenture (the "Amro Debenture") issued to Amro by Pet Quarters in the amount of $1 million, with a maturity date of November 5, 2000 and an interest rate of six percent per annum. Under the Amro Debenture, Amro was entitled to convert the shares due under the loan into 723,798 shares of Pet Quarters' common stock at any time.

41. The Amro Debenture was amended on June 1, 2000 to change the conversion price to either (i) $1.50 per share, or (ii) at Amro's election and under certain conditions, 85% of the average of the lowest three closing bid prices for Pet Quarters' common stock during the 22 business days prior to the day on which a notice of conversion was transmitted to Pet Quarters. Amro also received a warrant to purchase 75,000 shares of Pet Quarters' common stock at $2.07 per share. The warrant expired on June 1, 2003.

42. In October 2000, the Amro Debenture was further amended by a letter agreement between Pet Quarters and Amro. The maturity date was extended to May 5, 2001, and the conversion rate was changed to either (i) $1 per share, or (ii) at Amro's election and under certain conditions, the average of the three lowest closing bid prices for Pet Quarters' common stock during the 22 business days prior to the day on which a conversion notice was transmitted. The exercise price of Amro's warrants was also reduced to $1.00.

43. On January 26, 2001, Amro converted $117,942 into 723,793 shares of common stock at $0.1629 per share, and the principal balance on the Debenture was reduced to $882,058. On May 9, 2001, Amro converted $32,000 into 607,360 shares of common stock at $0.0527 per share.

44. The transactions with Amro, Markham, and Splendid Rock required Pet Quarters to file a registration statement of its common stock with the SEC. Accordingly, Pet Quarters subsequently filed its registration statement and the SEC approved it. Pet Quarters then filed a prospectus dated July 10, 2000 (the "Prospectus"). The Prospectus related to (i) the issuance of up to 4,242,349 shares of common stock which might be

issued to persons then holding warrants or recently-issued shares of Convertible Preferred Stock, and (ii) the resale of up to 9,541,384 shares by selling shareholders. Of the total shares thus offered, 7,152,369 of the resale shares were collectively attributable to, and offered for resale by Amro, Markham, and Splendid Rock.

45.   The price of Pet Quarters common stock continuously declined following the aforementioned transactions. On May 6, 1999, the day that Pet Quarters agreed to acquire Humboldt, its stock closed at $2.25 per share. The price declined to $1.38 per share on May 2, 2000, the date of the Amro Loan and the Amro Debenture. By July 7, 2000, the price was down to $1.140625 per share, and it declined steadily thereafter to $.03 on August 17, 2004.

46.   Upon information and belief, during the period between August 1, 1999 and May 5, 2001, Pet Quarters' stock was actively traded and these trades were cleared and settled by the Defendants.

47.   Upon information and belief, the price of Pet Quarters stock fell because the operation of the Stock Borrow Program by Defendants permitted the manipulation of Pet Quarters stock by various sellers who failed to deliver Pet Quarters shares.

48.   The Defendants permitted sellers of Pet Quarters' shares to maintain significant open fail to deliver positions of millions of shares of Pet Quarters stock for extended periods of time by implementing the Stock Borrow Program to cover these open positions.

49.   By covering open fail to deliver positions with shares borrowed through the Stock Borrow Program and delivering the borrowed shares to the buyers, the Defendants artificially created unregistered, free trading Pet Quarters shares and increased the supply of Pet Quarters shares in the marketplace without authority.

50.   The artificially increased supply of Pet Quarters shares in the marketplace created by Defendants' borrowing of Pet Quarters shares through the Stock Borrow Program has significantly deceased the value of Pet Quarters stock. As a result, Pet Quarters is damaged in an amount to be proven at trial.

## B.     PLAINTIFF CLYDE A. JESTER

51.  Plaintiff Jester is an individual shareholder of Pet Quarters.

52.  During the period between May 10, 1999 and December 29, 2000 Plaintiff Jester purchased approximately 187,100 shares of Pet Quarters stock in approximately 64 separate transactions at various prices from an approximate high of $4.16 to an approximate low of $0.21.

53.  During the period between April 17, 1999 and July 23, 2001 Plaintiff Jester sold approximately 781,100 shares of Pet Quarters common stock in approximately 561 separate transactions at various prices from an approximate high of $6.00 to an approximate low of $0.06.

54.  Upon information and belief, when Plaintiff Jester purchased and sold Pet Quarters shares, these transactions were cleared and settled by the Defendants.

55.  Upon information and belief, the Defendants borrowed Plaintiff Jester's Pet Quarters shares through the Stock Borrow Program to cover open fail to deliver positions in Pet Quarters stock created by sellers who failed to deliver by Settlement Day.

56.  Upon information and belief, the price of Pet Quarters stock fell because the Defendants' operation of the Stock Borrow Program facilitated or permitted the manipulation of Pet Quarters stock by various sellers who failed to deliver Pet Quarters shares by Settlement Day.

57.  The Defendants permitted certain sellers to maintain significant open fail to deliver positions of millions of shares of Pet Quarters stock for extended periods of time well beyond Settlement Day by implementing the Stock Borrow Program to cover these open positions.

58.  By covering open fail to deliver positions with shares borrowed through the Stock Borrow Program and delivering the borrowed shares to the buyers, the Defendants have artificially created unregistered, free trading Pet Quarters shares and increased the supply of Pet Quarters shares in the marketplace without authority.

59. The artificially increased supply of Pet Quarters shares in the marketplace created by Defendants' borrowing of Pet Quarters shares through the Stock Borrow Program has significantly decreased the value of Pet Quarters stock and Plaintiff Jester's holding in Pet Quarters stock. As a result, Plaintiff Jester is damaged in an amount to be proven at trial.

## C.   PLAINTIFF PARNELL

60. Plaintiff Parnell is an individual shareholder of Pet Quarters.

61. During the period between August 13, 1997 and February 20, 2000 Plaintiff Parnell purchased 1,093,000 shares of Pet Quarters stock in approximately twenty-nine separate transactions at various prices from an approximate high of $2.10 to an approximate low of $0.001.

62. During the period between May 2, 2000 and April 2, 2002 Plaintiff Parnell sold 1,093,000 shares of Pet Quarters common stock in twenty-nine separate transactions at various prices from an approximate high of $5.43 to an approximate low of $0.03.

63. Upon information and belief, when Plaintiff Parnell purchased and sold Pet Quarters shares, these transactions were cleared and settled by the Defendants.

64. Upon information and belief, the Defendants borrowed Plaintiff Parnell's Pet Quarters shares through the Stock Borrow Program to cover open fail to deliver positions in Pet Quarters stock created by sellers who failed to deliver by Settlement Day.

65. Upon information and belief, the price of Pet Quarters stock fell because the Defendants' operation of the Stock Borrow Program facilitated or permitted the manipulation of Pet Quarters stock by various sellers who failed to deliver Pet Quarters shares by Settlement Day.

66. The Defendants permitted certain sellers to maintain significant open fail to deliver positions of millions of shares of Pet Quarters stock for extended periods of time well beyond Settlement Day by implementing the Stock Borrow Program to cover these open positions.

67.  By covering open fail to deliver positions with shares borrowed through the Stock Borrow Program and delivering the borrowed shares to the buyers, the Defendants have artificially created unregistered, free trading Pet Quarters shares and increased the supply of Pet Quarters shares in the marketplace without authority.

68.  The artificially increased supply of Pet Quarters shares in the marketplace created by Defendants' borrowing of Pet Quarters shares through the Stock Borrow Program has significantly decreased the value of Pet Quarters stock and Plaintiff Parnell's holding in Pet Quarters stock. As a result, Plaintiff Parnell is damaged in an amount to be proven at trial.

### D.  PLAINTIFF O'HEARN

69.  Plaintiff O'Hearn is an individual shareholder of Pet Quarters.

70.  During the period between April 2, 2002 and April 22, 2002 Plaintiff O'Hearn purchased 270,500 shares of Pet Quarters common stock in approximately six separate transactions at various prices from an approximate high of $0.0900 to an approximate low of $0.0600.

71.  On December 9, 2002, Plaintiff O'Hearn sold 270,500 shares of Pet Quarters at the price of $0.0010 per share.

72.  Upon information and belief, when Plaintiff O'Hearn purchased and sold Pet Quarters shares, these transactions were cleared and settled by the Defendants.

73.  Upon information and belief, the Defendants borrowed Plaintiff O'Hearn's Pet Quarters shares through the Stock Borrow Program to cover open fail to deliver positions in Pet Quarters stock created by sellers who failed to deliver by Settlement Day.

74.  Upon information and belief, the price of Pet Quarters stock fell because the Defendants' operation of the Stock Borrow Program facilitated or permitted the manipulation of Pet Quarters stock by various sellers who failed to deliver Pet Quarters shares by Settlement Day.

75.  The Defendants permitted certain sellers to maintain significant open fail to deliver positions of millions of shares of Pet Quarters stock for extended periods of time

well beyond Settlement Day by implementing the Stock Borrow Program to cover these open positions.

76.  By covering open fail to deliver positions with shares borrowed through the Stock Borrow Program and delivering the borrowed shares to the buyers, the Defendants have artificially created unregistered, free trading Pet Quarters shares and increased the supply of Pet Quarters shares in the marketplace without authority.

77.  The artificially increased supply of Pet Quarters shares in the marketplace created by Defendants' borrowing of Pet Quarters shares through the Stock Borrow Program has significantly decreased the value of Pet Quarters stock and Plaintiff O'Hearn's holding in Pet Quarters stock. As a result, Plaintiff O'Hearn is damaged in an amount to be proven at trial.

### E.  PLAINTIFF BETZIOS

78.  Plaintiff Betzios is an individual shareholder of Pet Quarters.

79.  During the period between July 15, 1999 and May 18, 2001 Plaintiff Betzios purchased 106,395 shares of Pet Quarters stock in approximately fourteen separate transactions at various prices from an approximate high of $1.3281 to an approximate low of $0.1300.

80.  During the period between May 23, 2001 and May 23, 2002 Plaintiff Betzios sold 103,547shares of Pet Quarters common stock in thirteen separate transactions at various prices from an approximate high of $0.3550 to an approximate low of $0.070.

81.  Upon information and belief, when Plaintiff Betzios purchased and sold Pet Quarters shares, these transactions were cleared and settled by the Defendants.

82.  Upon information and belief, the Defendants borrowed Plaintiff Betzios' Pet Quarters shares through the Stock Borrow Program to cover open fail to deliver positions in Pet Quarters stock created by sellers who failed to deliver by Settlement Day.

83.  Upon information and belief, the price of Pet Quarters stock fell because the Defendants' operation of the Stock Borrow Program facilitated or permitted the

manipulation of Pet Quarters stock by various sellers who failed to deliver Pet Quarters shares by Settlement Day.

84. The Defendants permitted certain sellers to maintain significant open fail to deliver positions of millions of shares of Pet Quarters stock for extended periods of time well beyond Settlement Day by implementing the Stock Borrow Program to cover these open positions.

85. By covering open fail to deliver positions with shares borrowed through the Stock Borrow Program and delivering the borrowed shares to the buyers, the Defendants have artificially created unregistered, free trading Pet Quarters shares and increased the supply of Pet Quarters shares in the marketplace without authority.

86. The artificially increased supply of Pet Quarters shares in the marketplace created by Defendants' borrowing of Pet Quarters shares through the Stock Borrow Program has significantly decreased the value of Pet Quarters stock and Plaintiff Betzios' holding in Pet Quarters stock. As a result, Plaintiff Betzios is damaged in an amount to be proven at trial.

## F.  DTCC

87. DTCC is a holding company which consists of five subsidiaries: the Depository Trust, the NSCC, the Fixed Income Clearing Corporation, the Emerging Markets Clearing Corporation, and Global Assets Solutions, LLC.

88. DTCC, through its subsidiaries, provides clearance, settlement and information services for equities, corporate and municipal bonds, government and mortgage backed securities, over-the-counter credit derivatives and emerging market debt trades.

89. In 2003, the value of securities cleared and settled through the DTCC was stated to be $923.4 trillion. The DTCC's total revenue for 2003 was stated to be $947 million.

90. Upon information and belief, the DTCC, through its subsidiaries, provides its services to Arkansas corporations and residents.

### G. DEPOSITORY TRUST

91. Depository Trust is a subsidiary of the DTCC. It is the world's largest securities depository and a clearinghouse for settlement of securities trading activity.

92. Depository Trust was formed 30 years ago to eliminate the physical movement of securities among brokerage firms on Wall Street to satisfy delivery requirements.

93. Financial organizations deliver securities on behalf of their customers through computerized bookkeeping records (also known as book-entry deliveries) at the Depository Trust without ever physically transferring the securities. In 2003, the value of book-entry deliveries processed by the Depository Trust was stated to be $105.7 trillion.

94. Depository Trust records the transfer of securities by book-entry by debiting the transferor's Depository Trust account and crediting the transferee's Depository Trust account.

95. Depository Trust also retains physical custody of stock certificates on behalf of its members. Stock certificates for registered securities deposited with the Depository Trust are held in the name of Cede & Co., Depository Trust's nominee name. As of December 31, 2003, the value of securities on deposit at the Depository Trust was stated to be $24.6 trillion and the number of depository-eligible securities was stated to be 2,227,000.

96. Upon information and belief, the Depository Trust provides its services to Arkansas corporations and residents.

### H. NSCC

97. NSCC, in conjunction with the Depository Trust, provides centralized clearance, settlement and information services for virtually all broker-to-broker equity, corporate bond and municipal bond, exchange-traded funds and unit investment trust trades that occur in the United States.

98. NSCC was created in 1976 as a result of the merger of three major clearing corporations (NYSE, AMEX, and NASD). In 2003, the total number of transactions processed by the NSCC was stated to be 4.7 billion with a value of $81.2 trillion.

99.  Upon information and belief, the NSCC provides its services to Arkansas corporations and residents.

## I.    CONTINUOUS NET SETTLEMENT SYSTEM

100.  Transactions processed by the NSCC clear and settle through the Continuous Net Settlement System ("CNS System"). Sellers and buyers who clear and settle through the CNS System are required to be members of the NSCC and the Depository Trust ("Members").

101.  NSCC guarantees completion of the transactions it processes through the CNS System by assuming (i) the obligation of the buyers to make payment to the sellers upon delivery of the shares, and (ii) the obligation of the sellers to deliver shares to the buyers.

102.  Each day during the daytime allocation cycle, the CNS System continually nets all trades of its Members by security to net long (purchase) and net short (sale) positions that are then further netted with closing positions carried forward from the previous trading day. The resulting net positions represent the quantity of each security due for settlement by the Members. A long position represents the quantity owed to the Members by the NSCC and a short position represents the quantity owed to the NSCC by the Members. After determination of a Member's long and short positions at the end of the daytime allocation cycle, the positions are passed to the Depository Trust for processing over the evening allocation cycle.

103.  The short positions are compared to the Member's Depository Trust account to determine if the number of shares on deposit is sufficient to settle the short positions. If so, the shares are transferred from the Member's Depository Trust account to the NSCC's Depository Trust account. Shares received from Members in settlement of short positions are placed in the NSCC's Depository Trust account awaiting instructions from the NSCC for delivery to the Depository Trust accounts of Members in long positions.

104.  Based on instructions from the NSCC, as shares are received by the NSCC from Members with short positions, they are automatically allocated from the NSCC's Depository Trust accounts to the Depository Trust accounts of Members with long positions.

105.  Early morning on the next business day, after regular evening allocation processing, the NSCC determines which open short positions are high-priority obligations. The NSCC then attempts to borrow shares through the Stock Borrow Program to satisfy these open positions.

### J.    STOCK BORROW PROGRAM

106.  The Stock Borrow Program allows the NSCC to borrow available stocks from participating Members to cover short positions that remain open after a day's trade. These short positions are created by priority requests for allocation, buy-ins submitted by Members, the need to deliver against omnibus positions with other clearing corporations and by sellers' fails to deliver.

107.  As provided in Addendum C-1 of the Rules and Procedures of the National Securities Clearing Corporation, the process of the Stock Borrow Program is as follows:

(a)    On a daily basis, Members who wish to participate in the Stock Borrow Program inform NSCC of the number of shares of each security that are available to be borrowed in their general unpledged account at the Depository Trust.

(b)    Each morning, after the evening allocation cycle, the NSCC determines which short positions still remain open.

(c)    If a short position remains open, the NSCC attempts to borrow securities from its Members to satisfy these open positions.

(d)    The NSCC uses a formula to determine the order in which it will borrow securities from its Members and utilizes the full amount of shares available from one Member before borrowing from the next Member in sequence.

(e)    When the shares are borrowed, the lending Member's Depository Trust account is debited by the number of borrowed shares. The borrowed shares are then credited to the NSCC's Depository Trust account and transferred to the buyer's Depository Trust account. The buyer acquires all

right, title and interest in the borrowed shares, including the right to vote, receive dividends and resell the shares, without encumbrance or any reservation of rights.[4]

(f)   The NSCC records the borrowing of the shares as a long position in a special CNS sub-account set up specifically for the lending Member's stock borrow activity.

(g)   The NSCC credits the lending Member's regular CNS account with funds equivalent to the total current market value of the borrowed shares that the lending Member may invest to earn interest overnight.

(h)   The NSCC also receives a fee from the Member who created the short position requiring the NSCC to borrow the shares through the Stock Borrow Program.

108.   Shares borrowed by the NSCC are only returned when regular short deliveries from sellers for that day exceed priority needs in a particular security.

109.   Through normal allocation to the CNS sub-account of the lending Members, borrowed shares that are returned are allocated to the lending Members' accounts at current market prices and the returned shares are transferred from the NSCC's Depository Trust account to the lending Member's Depository Trust account. The NSCC distributes reports to the lending Members each morning, reflecting stock borrow activity.

110.   Membership in both the NSCC and Depository Trust is required in order to be a lender in the Stock Borrow Program. Lenders are selected based on a certain formula. Each day the lending Members are assigned a random allocation number for each security made available. A factor is developed for each lending Member by dividing the percentage of each lending Member's average loans as they relate to total NSCC borrowings by the percentage of each lending Member's average fees paid for trade comparison, trade recording and clearance as they relate to the total fees for all Members. Each random allocation number is then multiplied by the factor to produce an adjusted

---

[4]   As noted in NASD Proposed Amendments Relating to Short Sale Delivery Requirements (SR-NASD-2004-044), "significant failures to deliver can impact certain rights of buyers, such as the right to vote shares or the treatment of dividends".

random number per position for each lending Member. The lending Member with the lowest number will receive the first priority for borrowing.

### K.    THE DILUTIVE EFFECTS OF THE STOCK BORROW PROGRAM

111.  One of the effects of the Stock Borrow Program is to allow sellers to continue to fail to deliver because the NSCC can borrow shares from the Stock Borrow Program to cover the fail to deliver positions.

112.  If the seller fails to deliver the sold shares on Settlement Day, a short position for that seller is created in the CNS System which is ultimately covered by the Stock Borrow Program either directly through the NSCC's daily allocation cycle or indirectly through a buy-in executed with shares borrowed through the Stock Borrow Program.

113.  In the case of a buy-in, as set forth in the Rules and Procedures of the National Securities Clearing Corporation, when a seller fails to deliver, the buyer notifies the NSCC that it intends to buy-in the seller's fail to deliver position. However, instead of executing the buy-in by going into the market, the NSCC executes the buy-in by borrowing shares from lending Members of the Stock Borrow Program.

114.  As a result, the Stock Borrow Program allows sellers to continue to fail to deliver because the Stock Borrow Program has effectively obviated the sellers' obligation to deliver and the buyers' right to buy-in through the market.

115.  By borrowing shares through the Stock Borrow Program to cover fails to deliver, the Defendants have created tens of millions of unregistered illegal free trading shares of issuers, artificially (1) increasing the supply of an issuer's shares in the marketplace; (2) driving down the price of the stock of the issuer; (3) devaluing the shareholders' holdings in an issuer's stock; and (4) causing multiple owners who purchase shares in separate transactions to own the same shares.

116.  For example, assume that on April 1, an issuer ("Issuer") has 100,000 issued and outstanding shares. On April 1, Seller S sells 1,000 shares of Issuer's stock to Buyer B. Seller S fails to deliver the 1,000 shares for settlement by April 4, which is Settlement Day. The NSCC then borrows 1,000 shares from Lender L through the Stock Borrow

Program and delivers the 1,000 shares to Buyer B's Depository Trust account on April 4. Buyer B's Depository Trust account now reflects that Buyer B owns 1,000 shares. At the same time, since Lender L's loan of 1000 shares to the NSCC is not reported or visible to the marketplace, Lender L's NSCC account still reports that it owns the 1,000 shares that it lent to the NSCC. As a result, the marketplace now indicates that Issuer has 101,000 issued and outstanding shares, when in fact Issuer has NOT issued or authorized the additional 1,000 shares. These shares were artificially created by the NSCC when it borrowed 1,000 shares through the Stock Borrow Program and delivered them to Buyer B. Furthermore, two people now own the same 1,000 shares – Lender L and Buyer B.

117.   Since the 1,000 shares received by Buyer B in the paragraph 117 illustration is now held in Buyer B's Depository Trust account, Buyer B can now lend the 1,000 shares to the NSCC through the Stock Borrow Program, thus, repeating the process and resulting in multiple shareholders owning the same shares. For example, assume that in a subsequent transaction on April 5, Seller S sells 750 shares of Issuer's stock to Buyer C. Seller S fails to deliver the 750 shares on April 8, Settlement Day. Therefore, the NSCC borrows 750 shares from Buyer B through the Stock Borrow Program and delivers the shares to Buyer C's Depository Trust account on April 8, which account now reflects that Buyer C owns 750 shares. In addition, since Buyer B's loan of 750 shares to the NSCC is not reported or visible to the marketplace, Buyer B's NSCC account still indicates that Buyer B owns the 750 shares that the NSCC borrowed for delivery to Buyer C. In sum, the marketplace now indicates that Issuer has 101,750 issued and outstanding shares, when in fact Issuer has NOT issued or authorized the additional 1,750 shares. These shares were artificially created by the NSCC when it borrowed 1,000 shares through the Stock Borrow Program for delivery to Buyer B and then borrowed 750 shares from Buyer B for delivery to Buyer C. Furthermore and most remarkably, three people now own the same 750 shares– Lender L, Buyer B and Buyer C.

118.   This process of recycling borrowed shares amounts to stock-kiting in that the same borrowed shares can continuously be transferred from a buyer and loaned to the NSCC for delivery to the next buyer who then loans the same shares to the NSCC and so

forth. Thus, the same shares can be recycled repeatedly through the Stock Borrow Program to satisfy multiple delivery requirements.

119.   The Stock Borrow Program allows the borrowed shares to be recycled repeatedly, resulting in the number of borrowed shares exceeding the number of shares issued and authorized by the issuer. In addition, upon information and belief, the number of borrowed shares exceeds the total number of issuer's shares actually on deposit at the Depository Trust.[5] Thus, upon information and belief, the Depository Trust owns and holds a significantly fewer number of lendable shares than the NSCC has borrowed through the Stock Borrow Program.

120.   This recycling of borrowed shares through the Stock Borrow Program could potentially result in a "run-on-the-bank" situation. If every shareholder (including shareholders who received borrowed shares) were to demand delivery of stock certificates by the Depository Trust, the custodian of the physical shares, there would be insufficient shares available for delivery because the Stock Borrow Program has artificially generated more shares than are held by the Depository Trust.

121.   There is little incentive for the Defendants to force sellers to cure fail to deliver positions once the loan has been made because the Stock Borrow Program has become such a reliable source of income for the Defendants. For the year ended December 31, 2003, the Depository Trust reported revenues from services of $425,416,000 and the NSCC reported revenues from services of $293,133,000. In addition, open fail to deliver positions present a potential risk of loss to the Defendants because the NSCC covers these positions by borrowing shares through the Stock Borrow Program. At the close of business on December 31, 2003, the value of securities borrowed through the Stock Borrow Program was stated to be approximately $721,750,000. As a result, the NSCC, as borrower, has subjected itself to the possibility of significant financial losses if the seller is ultimately unable to honor its delivery obligations to the NSCC.

---

[5]   As set forth in the letter from Ralph A. Lambiase, President, North American Securities Administrators Association, Inc., to Jonathan Katz, Secretary, Securities and Exchange Commission (January 5, 2004), the Securities and Exchange "Commission should explicitly prohibit the [Depository Trust] from lending more shares of a security than it actually holds."

122. Through the Stock Borrow Program, the Defendants have permitted sellers to maintain fail to deliver positions of millions of shares for periods of a year and even longer. This course of conduct by the Defendants has had the effect of creating tens of millions of unregistered illegal free trading shares of the issuer, artificially increasing the supply of shares in the marketplace and driving down and manipulating the price of the stock of numerous issuers, including Plaintiff Pet Quarters.

### As And For a First Claim For Relief For Violation Of Arkansas Securities Act Section 23-42-507 Misrepresentations And Fraudulent Conduct In The Stock Borrow Program

123. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

124. Defendants have each misrepresented to the Plaintiffs that the NSCC is borrowing shares from lending Members of the Stock Borrow Program to cover fail to deliver positions in the clearing and settlement process, when, in fact, the transfer of shares from lending Members to the NSCC to cover such fail to deliver positions is actually a "sale" of securities. This transaction is actually a sale because the NSCC delivers the borrowed shares to the buyer who acquires all right, title and interest in the shares, including the right to vote, receive dividends and resell the shares, without encumbrance or any reservation of rights.[6]

125. The misrepresentations and omissions by the Defendants alleged above were false and misleading when made.

126. The misrepresentations and omissions by the Defendants as alleged above were material.

127. In making these misrepresentations and omissions, the Defendants acted with scienter. The Defendants had a major financial motivation to make the misrepresentations and omissions alleged herein. Defendants have a significant economic incentive to keep

---

[6] As noted in NASD Proposed Amendments Relating to Short Sale Delivery Requirements (SR-NASD-2004-044), "significant failures to deliver can impact certain rights of buyers, such as the right to vote shares or the treatment of dividends".

knowledge of the fail to deliver problem away from the investing public since questions or doubts as to the efficiency of the DTCC, the NSCC, the Depository Trust and their systems would jeopardize the $947 million fee-based revenues generated by the DTCC.

128. The misrepresentations and omissions by the Defendants were made in their Annual Statements, on their websites and various press releases issued to the investing public, which include the Plaintiffs.

129. In reliance upon these misrepresentations and omissions by Defendants, Plaintiffs traded Pet Quarters shares without knowledge of Defendants' violation of Arkansas securities laws. These trades were cleared and settled by and through the Defendants.

130. Alternatively, Plaintiffs relied on the Defendants' material and public misrepresentations and omissions and traded Pet Quarters shares in the stock market without knowledge of Defendants' fraud-on-the-market through the clearing and settlement services they provided.

131. During the relevant period, the Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the period, did (i) deceive Plaintiffs; and (ii) cause Plaintiffs to purchase and/or sell Pet Quarters shares at artificially depressed prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein, which are in violation of Arkansas Securities Act Section 23-42-507.

132. The misrepresentations, omissions and fraudulent conduct by the Defendants detailed above have damaged and injured Plaintiffs, which relied on those misrepresentations and omissions in connection with the purchase and/or sale of Pet Quarters shares.

133. As a result of the Defendants' violations of Arkansas Securities Act Section 23-42-507 and the wrongs herein alleged, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

### As and For a Second Claim for Relief for Violation
### of Arkansas Securities Act Section 23-42-507
### Misrepresentations and Fraudulent Conduct in the clearance and
### settlement of trades

134.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

135.  The Defendants have each represented to Plaintiffs that they efficiently clear and settle trades. In fact, the DTCC, the NSCC and the Depository Trust are not clearing and settling trades that result in open fail to deliver positions, because these trades are processed through the Stock Borrow Program and therefore remain unsettled for extended periods of time.

136.  In connection with its services to the marketplace, the DTCC, itself and by and through the NSCC and the Depository Trust, made the following representations to Plaintiffs on its Annual Statement, its websites and various press releases:

    (i)   that through the CNS System, it maintains an orderly flow of security and money balances;

    (ii)  that through the Stock Borrow Program, Members lend NSCC stock from their accounts at the Depository Trust to cover temporary shortfalls in the CNS System; and

    (iii)  that securities loaned to the NSCC through the Stock Borrow Program enable the NSCC to satisfy CNS delivery obligations not filled through normal deliveries.

137.  Notwithstanding these representations, upon information and belief, the Defendants are each aware that sellers routinely fail to deliver securities and that unfulfilled obligations to deliver securities can have negative effects on the market when fails to deliver persist for extended periods of time.

138.  Further, the Defendants are each aware that open fail to deliver positions covered by shares borrowed through the Stock Borrow Program actually increase the

supply of shares in the marketplace by the number of shares borrowed, resulting in the artificial inflation of the issued and outstanding shares of issuers.

139.  By utilizing the Stock Borrow Program to cover open fail to deliver positions in Pet Quarters stock, and consequently creating artificial Pet Quarters shares, the Defendants have misrepresented to Plaintiffs that these artificial shares are issued and outstanding shares of Pet Quarters, when in fact these shares have not been issued or authorized by Pet Quarters. This misrepresentation by the Defendants has adversely affected the sale of Pet Quarters stock and was relied upon by Plaintiffs when deciding to purchase and/or sell Pet Quarters shares.

140.  The representations and omissions by the Defendants alleged above were false and misleading when made.

141.  In making the misrepresentations and omissions, the Defendants acted with scienter. The Defendants have a major financial motivation to make the misrepresentations and omissions alleged herein. Defendants have a significant economic incentive to keep knowledge of the fail to deliver problem away from the investing public since questions or doubts as to the efficiency of the DTCC, the NSCC, the Depository Trust and their systems would jeopardize the $947 million fee-based revenues generated by the DTCC.

142.  During the relevant period, the Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the period, did (i) deceive Plaintiffs; and (ii) cause Plaintiffs to purchase and/or sell Pet Quarters shares at artificially depressed prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein, which are in violation of Arkansas Securities Act Section 23-42-507.

143.  Defendants' misrepresentations and omissions, as alleged above were material.

144.  In reliance upon these misrepresentations and omissions by Defendants, Plaintiffs traded Pet Quarters shares without knowledge of Defendants' violation of Arkansas securities laws. These trades were cleared and settled by and through the Defendants.

145.  Alternatively, Plaintiffs relied on Defendants' material and public misrepresentations and omissions and traded Pet Quarters shares in the stock market without knowledge of Defendants' fraud-on-the-market through statements they made about the clearing and settlement services they provided.

146.  The Plaintiffs have suffered substantial damages due to the Defendants' misrepresentation that they use the Stock Borrow Program to efficiently clear and settle trades, when in fact they are not using the Stock Borrow Program to clear and settle trades efficiently but rather to mask inefficiencies in their clearance and settlement process by covering open fail to deliver positions with borrowed shares for extended periods of time. As a result, the Defendants have created unregistered and unauthorized Pet Quarters shares and have artificially increased the supply of Pet Quarters shares in the marketplace and have decreased the stock's value.

147.  The misrepresentations, omissions and fraudulent conduct by the Defendants detailed above are in violation of Arkansas Securities Act Section 23-42-507 and have damaged and injured Plaintiffs, which relied on those misrepresentations and omissions in connection with the purchase and/or sale of Pet Quarters shares.

148.  As a result of the Defendants' violations of Arkansas Securities Act Section 23-42-507 and the wrongs herein alleged, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

## AS AND FOR A THIRD CLAIM FOR RELIEF FOR VIOLATION OF ARKANSAS SECURITIES ACT SECTION 23-42-507 MISREPRESENTATIONS AS TO THE NUMBER OF SHARES HELD IN LENDING MEMBERS' NSCC AND DEPOSITORY TRUST ACCOUNTS

149.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

150.  The Defendants have misrepresented to Plaintiffs the number of Pet Quarters shares actually held by the lending Members at the Depository Trust by providing misleading information in the lending Members' Depository Trust and NSCC account statements.

151.  When shares are borrowed by the NSCC from a lending Member, the lending Member's Depository Trust account reflects a debit of the number and value of the shares borrowed and a balance which is minus the borrowed shares. The borrowed shares are credited to a separate account that reflects all the shares loaned by the lending Member. However, because the Depository Trust records the borrowing by balancing the aforementioned two accounts, the lending Member's total Depository Trust account is not reduced to exclude the number and value of the loaned shares. Therefore, when shares are borrowed, the lending Member's Depository Trust account misleadingly reflects an amount and value of shares that are not actually held by the lending Member at the Depository Trust.

152.  Further, the NSCC records the borrowing of the shares by balancing the lending Member's CNS sub-accounts,[7] so that the net change in holdings of the lending Member is not reduced to exclude the number and value of the loaned shares. Therefore, when shares are borrowed, the lending Member's NSCC account statement misleadingly reflects an amount and value of shares that are not actually held by the lending Member at the Depository Trust.

153.  But for Defendants' inaccurate and misleading accounting of the borrowed shares, the number of shares borrowed would not exceed the number of lendable shares on deposit with the Depository Trust.

154.  The representations and omissions by the Defendants alleged above were false and misleading when made.

155.  In making the misrepresentations and omissions, the Defendants acted with scienter. The Defendants have a major financial motivation to make the misrepresentations and omissions alleged herein. Defendants have a significant economic

---

[7]  The NSCC records the borrowing of the shares by creating a miscellaneous activity entry in the lending Member's CNS sub-accounts. The number of shares borrowed is journaled in the lending Member's CNS sub-account as a short position to show the delivery obligation of the lending Member to the NSCC for the number and value of the borrowed shares. This short position is automatically covered by taking the shares on deposit in the lending Member's Depository Trust account. A separate journal entry is made in another sub-account of the lending Member as a long position to show the number and value of the shares due to be returned by the NSCC to the lending Member. The long position is adjusted daily to reflect the market value of the borrowed shares.

incentive to keep knowledge of the fail to deliver problem away from the investing public since questions or doubts as to the efficiency of the DTCC, the NSCC, the Depository Trust and their systems would jeopardize the $947 million fee-based revenues generated by the DTCC.

156.  The misrepresentations and omissions of the Defendants, as alleged above, were material.

157.  In reliance upon these misrepresentations and omissions by Defendants, Plaintiffs traded Pet Quarters shares, which trades were cleared and settled by and through the Defendants and without knowledge of Defendants' violation of Arkansas securities laws.

158.  Alternatively, Plaintiffs relied on Defendants' material and public misrepresentations and omissions and traded Pet Quarters shares in the stock market without knowledge of Defendants' fraud-on-the-market through the clearing and settlement services they provided.

159.  DTCC, through its subsidiaries, the NSCC and the Depository Trust, offers to sell and actually sells securities by means of communications which contain material misrepresentations and omissions, in violation of Arkansas Securities Act Section 23-42-507.

160.  The misrepresentations, omissions and fraudulent conduct by the Defendants detailed above are in violation of Arkansas Securities Act Section 23-42-507 and have damaged and injured Plaintiffs, which relied on those misrepresentations and omissions in connection with the purchase and/or sale of Pet Quarters shares.

161.  As a result of the Defendants' violation of Arkansas Securities Act Section 23-42-507 and the wrongs herein alleged, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

### AS AND FOR A FOURTH CLAIM FOR RELIEF FOR VIOLATION
### OF ARKANSAS SECURITIES ACT SECTION 23-42-507
### MISREPRESENTATIONS AS TO THE OPERATION OF THE STOCK BORROW PROGRAM

162.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

163.  The Defendants have represented to Plaintiffs that open fail to deliver positions will be cured by buying in the open positions with shares purchased from the marketplace, when in fact, these open positions are actually cured with shares borrowed from lending Members through the Stock Borrow Program.

164.  As set forth in the Rules and Procedures of the National Securities Clearing Corporation, when a seller fails to deliver, the buyer notifies the NSCC that it intends to buy-in the seller's fail to deliver position. Instead of executing the buy-in by going into the market, the NSCC executes the buy-in by borrowing shares from lending Members of the Stock Borrow Program to satisfy the buyer's buy-in request and to cover the seller's fail to deliver position.

165.  The representations and omissions by the Defendants alleged above were false and misleading when made.

166.  In making the misrepresentations and omissions, the Defendants acted with scienter. The Defendants have a major financial motivation to make the misrepresentations and omissions alleged herein. Defendants have a significant economic incentive to keep knowledge of the fail to deliver problem away from the investing public since questions or doubts as to the efficiency of the DTCC, the NSCC, the Depository Trust and their systems would jeopardize the $947 million fee-based revenues generated by the DTCC.

167.  During the relevant period, the Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the period, did (i) deceive Plaintiffs; and (ii) cause Plaintiffs to purchase and/or sell Pet Quarters shares at artificially depressed prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein, which are in violation of Arkansas Securities Act Section 23-42-507.

168.  The misrepresentations and omissions of the Defendants, as alleged above, were material.

169.  In reliance upon these misrepresentations and omissions by Defendants, Plaintiffs traded Pet Quarters shares, which trades were cleared and settled through Defendants without knowledge of Defendants' violation of Arkansas securities laws.

170.  Alternatively, Plaintiffs relied on Defendants' material and public misrepresentations and omissions and traded Pet Quarters shares in the stock market without knowledge of Defendants' fraud-on-the-market through the clearing and settlement services they provided.

171.  The misrepresentations and omissions by the Defendants detailed above are in violation of Arkansas Securities Act Section 23-42-507 and have damaged and injured Plaintiffs, which relied on those misrepresentations and omissions in connection with the purchase and/or sale of Pet Quarters shares.

172.  As a result of the Defendants' violation of Arkansas Securities Act Section 23-42-507 and the wrongs herein alleged, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

### AS AND FOR A FIFTH CLAIM FOR RELIEF FOR FRAUDULENT MISREPRESENTATIONS AS TO THE NATURE OF THE STOCK BORROW PROGRAM

173.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

174.  Defendants have fraudulently represented to Plaintiffs that the NSCC is borrowing shares from lending Members of the Stock Borrow Program to cover fail to deliver positions in the clearing and settlement process, when, in fact, the transfer of shares from lending Members to the NSCC to cover such fail to deliver positions is actually a "sale" of securities. This transaction is a sale because the NSCC delivers the borrowed shares to the buyer who acquires all right, title and interest in the shares,

Case 1:04-cv-08168-JFK Document 56-14 Filed 12/25/10 Page 39 of 60
Case 1:04-cv-01528-WRW Document 1-4 Filed 12/04/10 Page 58 of 76

NOV-08-2004  10:39        DTCC GENERAL COUNSEL                    212 855 3222      P.40

including the right to vote, receive dividends and resell the shares, without further encumbrance or any reservation of rights.[8]

175.  The representations and omissions by Defendants alleged above were false and misleading when made.

176.  The misrepresentations and omissions by Defendants were made in their Annual Statements, on their websites and in various press releases issued to the investing public, which include the Plaintiffs.

177.  Defendants have a major financial motivation to make the misrepresentations and omissions. Defendants have a significant economic incentive to keep knowledge of the fail to deliver problem away from the investing public because questions or doubts as to the efficiency of the DTCC, the NSCC, the Depository Trust and their systems would jeopardize the $947 million fee-based revenues generated by the DTCC.

178.  The fraudulent misrepresentations and omissions by Defendants detailed above have damaged and injured Plaintiffs, which relied on those misrepresentations and omissions in connection with the purchase and/or sale of Pet Quarters shares.

179.  Plaintiffs have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proven at trial.

### AS AND FOR A SIXTH CLAIM FOR RELIEF
### FOR FRAUDULENT MISREPRESENTATIONS REGARDING
### THE CLEARING AND SETTLEMENT OF TRADES

180.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

181.  Defendants have fraudulently misrepresented to Plaintiffs that they efficiently clear and settle trades. In fact, Defendants are not clearing and settling those trades which result in open "fail to deliver," positions because those trades are processed through the Stock Borrow Program and therefore remain unsettled for extended periods of time.

---

[8]  As noted in NASD Proposed Amendments Relating to Short Sale Delivery Requirements (SR-NASD-2004-044), "significant failures to deliver can impact certain rights of buyers, such as the right to vote shares or the treatment of dividends".

182.   In connection with its services to the marketplace, the Defendants have further made to Plaintiffs the following false representations on its Annual Statements, its websites and various press releases:

    (i)   that through the CNS System, it maintains an orderly flow of security and money balances;

    (ii)   that through the Stock Borrow Program, Members lend NSCC stock from their accounts at the Depository Trust to cover temporary shortfalls in the CNS System; and

    (iii)   that securities loaned to the NSCC through the Stock Borrow Program, enable the NSCC to satisfy CNS delivery obligations not filled through normal deliveries.

183.   Notwithstanding these representations, upon information and belief, the Defendants are aware that sellers routinely fail to deliver securities on required Settlement Days and that unfulfilled obligations to deliver securities can have negative effects on the market when fails to deliver persist for an extended period of time.

184.   Further, the Defendants are aware that open fail to deliver positions covered by shares borrowed through the Stock Borrow Program actually increase the supply of shares in the marketplace by the number of shares borrowed, resulting in the artificial inflation of the issued and outstanding shares of the issuer.

185.   By utilizing the Stock Borrow Program to cover open fail to deliver positions in Pet Quarters stock and consequently creating artificial Pet Quarters shares, the Defendants have misrepresented to the Plaintiffs that these artificial shares are issued and outstanding shares of Pet Quarters, when in fact these shares have not been issued or authorized by Pet Quarters. This misrepresentation by the Defendants adversely affected the sale of Pet Quarters stock and was relied upon by Plaintiffs when making decisions to purchase and/or sell Pet Quarters shares.

186.   The representations and omissions by Defendants alleged above were false and misleading when made.

187. Defendants have a major financial motivation to make the misrepresentations and omissions. Defendants have a significant economic incentive to keep knowledge of the fail to deliver problem away from the investing public because questions or doubts as to the efficiency of the DTCC, NSCC, Depository Trust and their systems would jeopardize the $947 million fee-based revenues generated by the DTCC.

188. The Plaintiffs have suffered substantial damages as a result of the Defendants' misrepresentation that they use the Stock Borrow Program to efficiently settle and clear trades, when in fact they are not using the Stock Borrow Program to clear and settle trades efficiently but rather to mask inefficiencies in their clearance and settlement process by covering open fail to deliver positions with borrowed shares for millions of shares and extended periods of time. As a result, the Defendants have created additional unregistered and unauthorized Pet Quarters shares and have artificially increased the supply of Pet Quarters stock in the marketplace and decreased the value of the stock.

189. The fraudulent misrepresentations and omissions by Defendants detailed above have damaged and injured Plaintiffs, which relied on those misrepresentations and omissions in connection with the purchase and/or sale of Pet Quarters shares.

190. Plaintiffs have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proven at trial.

### AS AND FOR A SEVENTH CLAIM FOR RELIEF
#### FOR FRAUDULENT MISREPRESENTATIONS AS TO THE NUMBER OF SHARES HELD IN LENDING MEMBERS' NSCC AND DEPOSITORY TRUST ACCOUNTS

191. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

192. Defendants have fraudulently represented to Plaintiffs the number of Pet Quarters shares actually held by the lending Members at the Depository Trust by providing misleading information in the lending Members' Depository Trust and NSCC account statements.

193. When shares are borrowed by the NSCC from a lending Member, the lending Member's Depository Trust account reflects a debit of the number and value of the shares

borrowed and a balance which is minus the borrowed shares. The borrowed shares are credited to a separate account that reflects all the shares loaned by the lending Member. However, because the Depository Trust records the borrowing by balancing the aforementioned two accounts, the lending Member's total Depository Trust account is not reduced to exclude the number and value of the loaned shares. Therefore, when shares are borrowed, the lending Member's Depository Trust account misleadingly reflects an amount and value of shares that are not actually held by the lending Member at the Depository Trust.

194.    Further, the NSCC records the borrowing of the shares by balancing the lending Member's CNS sub-accounts,[9] so that the net change in holdings of the lending Member is not reduced to exclude the number and value of the loaned shares. Therefore, when shares are borrowed, the lending Member's NSCC account statement misleadingly reflects an amount and value of shares that are not actually held by the lending Member at the Depository Trust.

195.    But for Defendants' false and misleading accounting of the borrowed shares, the number of shares borrowed would not exceed the number of lendable shares on deposit with the Depository Trust.

196.    The representations and omissions by Defendants alleged above were false and misleading when made. .

197.    Defendants have a major financial motivation to make the misrepresentations and omissions. Defendants have a significant economic incentive to keep knowledge of the fail to deliver problem away from the investing public because questions or doubts as to the efficiency of the DTCC, NSCC, Depository Trust and their systems would jeopardize the $947 million fee-based revenues generated by the DTCC.

---

[9]    The NSCC records the borrowing of the shares by creating a miscellaneous activity entry in the lending Member's CNS sub-accounts. The number of shares borrowed is journaled in the lending Member's CNS sub-account as a short position to show the delivery obligation of the lending Member to the NSCC for the number and value of the borrowed shares. This short position is automatically covered by taking the shares on deposit in the lending Member's Depository Trust account. A separate journal entry is made in another sub-account of the lending Member as a long position to show the number and value of the shares due to be returned by the NSCC to the lending Member. The long position is adjusted daily to reflect the market value of the borrowed shares.

198.  The fraudulent misrepresentations and omissions by the Defendants detailed above have damaged and injured Plaintiffs which relied on those misrepresentations and omissions in connection with the purchase and/or sale of Pet Quarters shares.

199.  Plaintiffs have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proven at trial.

### As and For an Eighth Claim for Relief
### for Fraudulent Misrepresentations as to the Operation
### of the Stock Borrow Program

200.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

201.  Defendants have fraudulently represented to Plaintiffs that open fail to deliver positions will be cured by buying in the open positions with shares purchased from the marketplace, when in fact, these open positions are actually cured with shares borrowed from lending Members through the Stock Borrow Program.

202.  As set forth in the Rules and Procedures of the National Securities Clearing Corporation, when a seller fails to deliver, the buyer notifies the NSCC that it intends to buy-in the seller's fail to deliver position. Instead of executing the buy-in by going into the market, the NSCC executes the buy-in by borrowing shares from lending Members of the Stock Borrow Program to satisfy the buyer's buy-in request and to cover the seller's open fail to deliver position.

203.  The representations and omissions by Defendants alleged above were false and misleading when made.

204.  Defendants have a major financial motive to allow the misrepresentations and omissions to be made. Defendants have a major economic incentive to keep knowledge of the fail to deliver problem out of the awareness of the investing public because questions or doubts as to the efficiency of the DTCC, NSCC, Depository Trust and their systems would jeopardize the $947 million fee-based revenues generated by the DTCC.

205. The fraudulent misrepresentations and omissions by Defendants detailed above have damaged and injured Plaintiffs, which relied on those misrepresentations and omissions in connection with the purchase and/or sale of Pet Quarters shares.

206. Plaintiffs have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proven at trial.

### AS AND FOR A NINTH CLAIM FOR RELIEF FOR VIOLATION OF ARKANSAS SECURITIES ACT SECTION 23-42-508 MARKET MANIPULATION

207. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

208. Prior to the establishment of the Stock Borrow Program, the Defendants executed buy-ins by purchasing shares from the open market to cover open fail to deliver positions. These transactions involved a change in beneficial ownership of the affected shares and constituted a purchase and sale of securities which was reported and visible to the marketplace.

209. Since the institution of the Stock Borrow Program and as set forth in Addendum C-1, Rules and Procedures of the National Securities Clearing Corporation, instead of executing buy-ins by purchasing shares from the open market, the NSCC now executes buy-ins by borrowing shares through the Stock Borrow Program. As alleged in [paragraph 108] the borrowing of Shares through the NSCC Stock Borrow Program is actually a sale of securities which is visible to the marketplace. Alternatively, when NSCC executes a buy in using shares borrowed through the Stock Borrow Program, shares borrowed are not visible to the marketplace because NSCC characterized it as a loan. As a result, a buy-in executed by borrowing shares through the Stock Borrow Program does not involve a change in beneficial ownership since borrowed shares are not deducted from a lending Member's total Depository Trust and NSCC account holdings. This is in violation of Arkansas Securities Act Section 23-42-508.

Case 1:04-cv-01938-JFK Document 56-14 Filed 12/25/10 Page 45 of 60
Case 4:04-cv-01938-WRW Document 56-14 Filed 12/04/10 Page 64 of 76
NOV-08-2004 10:41    DTC GENERAL COUNSEL                    212 855 3222    P.46

210.   The purpose of Defendants in executing buy-ins by borrowing shares through the Stock Borrow Program instead of purchasing shares from the open market is to create a false and misleading appearance with respect to the market for Pet Quarters stock.

. 211.   By lending shares to sellers who have failed to deliver, the Defendants have manipulated the market by effecting a transaction in Pet Quarters securities which involves no change in the beneficial ownership of the security for the purpose of creating a false or misleading appearance with respect to the market for Pet Quarters stock.

212.   The Defendants' execution of buy-ins with shares borrowed through the Stock Borrow Program is in violation of Arkansas Securities Act Section 23-42-508 and has damaged and injured the Plaintiffs.

213.   As a result of the Defendants' violation of Arkansas Securities Act Section 23-42-508 and the wrongs herein alleged, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

### AS AND FOR A TENTH CLAIM FOR RELIEF
### FOR AN ILLEGAL TYING ARRANGEMENT IN VIOLATION
### OF ARKANSAS CODE ANNOTATED SECTIONS § 4-75-301, § 4-75-302,
### AND ARTICLE 2, SECTION 19 OF THE ARKANSAS CONSTITUTION

214.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

215.   DTCC, through its subsidiaries, the NSCC and the Depository Trust, provides clearance and settlement services for its Members.

216.   Defendants claim that the Stock Borrow Program improves the efficiency of the clearance and settlement function by addressing temporary fail to deliver situations. Under the Stock Borrow Program, if a seller fails to deliver shares on Settlement Day, the NSCC borrows the shares from willing lenders and gives the shares to the buyer in settlement of the trade. Membership in both the NSCC and Depository Trust is required in order to be a lender in the Stock Borrow Program.

217. The clearance and settlement services provided by the Defendants are completely separate and distinct from the functions of the Stock Borrow Program, and there is a separate market and demand for each of them.

218. The Defendants have illegally tied the Stock Borrow Program to the separate and distinct functions of clearing and settling stock trades by requiring that open fail to deliver positions be covered with shares borrowed through the Stock Borrow Program, either directly through the NSCC's daily allocation cycle or indirectly through a buy-in executed with shares borrowed through the Stock Borrow Program.

219. The purpose and effect of this tying arrangement is to prevent buyers from entering the stock market to purchase shares to buy in open fail to deliver positions at competitive market prices, and instead requiring buyers to execute buy-ins through the Stock Borrow Program.

220. The conduct of the Defendants is anticompetitive since they have prevented buyers from entering the stock market to purchase shares to cover open fail to deliver positions, thereby unreasonably restraining competition in the market and violating the Arkansas Code Annotated Sections 4-75-301, 4-75-302, and Article 2, Section 19 of the Arkansas Constitution.

221. The tying arrangement is anticompetitive because it diverts to the Defendants the buyers' demand for shares to cover open fail to deliver positions by requiring that buy-ins for open fail to deliver positions be filled with shares borrowed through the Stock Borrow Program, instead of allowing the demand to be filled by all market participants through buying in from the stock market at large.

222. The value of Pet Quarters shares on the open market has been reduced by the Defendants' anticompetitive behavior because the supply of shares from buy-ins executed through the Stock Borrow Program is limited to lending Members rather than the open market of securities sellers as a whole. Whereas, a buy-in executed by entering the stock market promotes competition because it includes all market participants and is based on the natural supply and demand for the borrowed security.

223.   If the clearance and settlement functions of the Defendants were not tied to the Stock Borrow Program, buyers would be able to buy-in open fail to deliver positions by going into the stock market instead of having to execute their buy-in request through the Stock Borrow Program.

224.   In addition, the transaction which underlies the Stock Borrow Program is actually a "sale" of securities by a member to the NSCC. This transaction is a sale because the NSCC delivers the borrowed shares to the buyer who acquires all right, title and interest in the shares, including the right to vote, receive dividends and resell the shares, without further encumbrance or any reservation of rights.[10] The Defendants have intentionally mischaracterized this transaction as a "loan" in order to disguise the anticompetitive nature of the transaction.

225.   As a result of the Defendants' anticompetitive conduct in tying the Stock Borrow Program to the separate and distinct functions of clearing and settling stock trades, upon information and belief, buyers of Pet Quarters shares in trades which resulted in open fail to deliver positions were prevented from entering the stock market to buy-in shares to cover these positions. Instead, these fail to deliver positions were required to be covered by shares borrowed through the Stock Borrow Program.

226. By requiring that buyers buy-in open fail to deliver positions with shares borrowed through the Stock Borrow Program and accepting delivery of the borrowed shares, the Defendants have artificially created unregistered, free trading Pet Quarters shares and have increased the supply of Pet Quarters shares in the marketplace without authority.

227. The artificially increased supply of Pet Quarters shares in the marketplace created by the Defendants' anticompetitive conduct in tying the Stock Borrow Program to the separate and distinct functions of clearing and settling stock trades has significantly decreased the value of Pet Quarters stock and Plaintiffs' holdings in Pet Quarters stock.

---

[10]  As noted in NASD Proposed Amendments Relating to Short Sale Delivery Requirements (SR-NASD-2004-044), "significant failures to deliver can impact certain rights of buyers, such as the right to vote shares or the treatment of dividends".

228. The foregoing acts and practices, and the continuing course of the Defendants' anticompetitive conduct, have harmed the Plaintiffs.

229. The Defendants' conduct is anticompetitive. There are no procompetitive effects of this tying arrangement that might outweigh the harm to competition in the stock market.

230. As a direct result of the Defendants' illegal conduct, competition in the stock market has been restrained and suppressed.

231. Defendants' anticompetitive and exclusionary conduct has directly and proximately caused injury to Plaintiff Pet Quarter's businesses and property and Plaintiff Jester's, Plaintiff Parnell's, Plaintiff O'Hearn's and Plaintiff Betzios' property as set forth above. Plaintiffs' injuries are the type the Arkansas Code Annotated Sections 4-75-301, 4-75-302, and Article 2, Section 19 of the Arkansas Constitution is intended to prevent and thus constitute unfair trade practice injuries.

232. As a result of the Defendants' violation of the Arkansas Code Annotated Sections 4-75-301, 4-75-302, and Article 2, Section 19 of the Arkansas Constitution and the wrongs herein alleged, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

### AS AND FOR AN ELEVENTH CLAIM FOR RELIEF FOR A MONOPOLY IN VIOLATION OF ARKANSAS CODE ANNOTATED SECTIONS 4-75-301, 4-75-302, AND ARTICLE 2, SECTION 19 OF THE ARKANSAS CONSTITUTION

233. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the complaint as if fully set forth herein.

234. Prior to the establishment of the Stock Borrow Program, the Defendants executed buy-ins by purchasing shares in the stock market to cover open fail to deliver positions.

235. Since the institution of the Stock Borrow Program, and as set forth in Addendum C-1, Rules and Procedures of the National Securities Clearing Corporation, instead of

executing buy-ins by purchasing shares in the market, the NSCC now executes buy-ins by purchasing shares through the Stock Borrow Program.

236. Under the Stock Borrow Program, if a seller fails to deliver shares on Settlement Day, the NSCC borrows the shares from willing lenders and gives the shares to the buyer in settlement of the trade. In addition, if a buy-in is requested, the NSCC borrows shares from willing lenders to fulfill the buy-in request. Membership in both the NSCC and Depository Trust is required in order to be a lender in the Stock Borrow Program.

237. By covering fail to delivers and buy-ins with shares through the Stock Borrow Program, Defendants have effectively created a monopoly in supplying shares to cover open fail to delivers and buy-in requests, because open fail to deliver positions are filled almost exclusively through shares borrowed from the Stock Borrow Program.

238. The purpose and effect of this monopoly is to prevent stockholders in the market at large from supplying the NSCC with shares to satisfy open fail to delivers, by making Members of the Stock Borrow Program the exclusive lenders. Further, the purpose and effect of this monopoly is to prevent buyers from entering the stock market at large to buy in open fail to deliver positions at competitive market prices, and instead, requiring buyers to execute buy-ins through the Stock Borrow Program.

239. The conduct of the Defendants is anticompetitive because they have prevented: (i) stockholders in the market at large to lend shares; and (ii) buyers from entering the stock market at large to buy-in open fail to deliver positions, thereby unreasonably restraining competition in the market and violating the Arkansas Code Annotated Sections 4-75-301, 4-75-302, and Article 2, Section 19 of the Arkansas Constitution.

240. The acts of Defendants in operating the Stock Borrow Program are anticompetitive because it diverts to the Defendants the demand for shares to cover open fail to deliver positions by requiring that these positions and requests to buy-in be filled with shares borrowed through the Stock Borrow Program, instead of allowing the demand to be filled by all market participants in the stock market at large.

241. The value of Pet Quarters shares in the open market has been reduced as a result of the Defendants' anticompetitive activities, because the supply of shares for covering

open fails to deliver and buy-in requests is provided exclusively by the Stock Borrow Program, rather than the stock market at large. Covering open fails to delivers and buy-in requests through the stock market at large would promote competition because it would open the markets to all market participants and would be based on the natural supply and demand for borrowed securities.

242. If the Defendants did not monopolize the market to supply shares to cover open fail to deliver positions and buy-in requests through the Stock Borrow Program, this supply would be fulfilled by the stock market at large rather than exclusive membership of the Stock Borrow Program.

243. Further, the transaction which underlies the Stock Borrow Program is actually a "sale" of securities by a member to the NSCC. This transaction is a sale because the NSCC delivers the borrowed shares to the buyer, who acquires all right, title and interest in the shares, including the right to vote, receive dividends and resell the shares, without further encumbrance or any reservation of rights.[11] The Defendants have intentionally mischaracterized this transaction as a "loan" in order to disguise the anticompetitive nature of the transaction.

244. As a result of the Defendants' anticompetitive conduct in creating a monopoly of the market for shares to cover open fails to deliver and buy-in requests, through the Stock Borrow Program the Defendants have artificially created unregistered, free trading Pet Quarters shares and have increased the supply of Pet Quarters shares in the marketplace without authority.

245. The artificially increased supply of Pet Quarters shares in the marketplace created by the Defendants' anticompetitive conduct has significantly decreased the value of Pet Quarters stock and Plaintiffs' holdings in Pet Quarters stock.

246. The foregoing acts and practices, and the continuing course of the Defendants' anticompetitive conduct, have harmed the Plaintiffs.

---

[11]  As noted in NASD Proposed Amendments Relating to Short Sale Delivery Requirements (SR-NASD-2004-044), "significant failures to deliver can impact certain rights of buyers, such as the right to vote shares or the treatment of dividends".

247. The Defendants' conduct is anticompetitive. There are no procompetitive effects of this monopoly that might outweigh the harm to competition in the stock market.

248. As a direct result of the Defendants' illegal conduct, competition in the stock market has been restrained and suppressed.

249. Defendants' anticompetitive and exclusionary conduct has directly and proximately caused injury to Plaintiff Pet Quarters' business and property and Plaintiff Jester's, Plaintiff Parnell's, Plaintiff O'Hearn's, and Plaintiff Betzios' property as set forth above. Plaintiffs' injuries are the type the Arkansas Code Annotated Sections 4-75-301, 4-75-302, and Article 2, Section 19 of the Arkansas Constitution is intended to prevent and thus constitute unfair trade practice injuries.

250. As a result of the Defendants' violation of the Arkansas Code Annotated Sections 4-75-301, 4-75-302, and Article 2, Section 19 of the Arkansas Constitution and the wrongs herein alleged, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

### AS AND FOR AN TWELFTH CLAIM FOR RELIEF FOR
### VIOLATION OF ARKANSAS CODE ANNOTATED SECTIONS 4-75-202 AND 4-75-206

251. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

252. Under the Stock Borrow Program, if a seller fails to deliver shares on Settlement Day, the NSCC borrows the shares from willing lenders and gives the shares to the buyer in settlement of the trade. Membership in both the NSCC and Depository Trust is required in order to be a lender in the Stock Borrow Program.

253. This relationship of borrowing and lending creates an implied contract between NSCC and its Members.

254. The Stock Borrow Program, by its mere existence, hinders competition. The Stock Borrow Program is anticompetitive because it diverts to the Defendants the buyers' demand for shares to cover open fail to deliver positions by requiring that buy-ins for open fail to deliver positions be filled with shares borrowed through the Stock Borrow

Case 4:04-cv-03168-JFM Document 56-14 Filed 12/25/10 Page 52 of 60
Case 4:04-cv-01888-WRW Document 1-4 Filed 12/04/10 Page 68 of 76

NOV-08-2004  10:43          DTCC GENERAL COUNSEL                 212 855 3222          P.53

Program, instead of allowing the demand to be filled by all market participants through buying in from the stock market.

255. In addition, the transaction which underlies the Stock Borrow Program is actually a "sale" of securities by a member to the NSCC. This transaction is a sale because the NSCC delivers the borrowed shares to the buyer who acquires all right, title and interest in the shares, including the right to vote, receive dividends and resell the shares, without further encumbrance or any reservation of rights.[12] The Defendants have intentionally mischaracterized this transaction as a "loan" in order to disguise the anticompetitive nature of the transaction.

256. Upon information and belief, buyers of Pet Quarters shares in trades which resulted in open fail to deliver positions were prevented from entering the stock market to buy-in shares to cover these positions. Instead, these fail to deliver positions were required to be covered by shares borrowed through the Stock Borrow Program.

257. By requiring that buyers buy-in open fail to deliver positions with shares borrowed through the Stock Borrow Program and accepting delivery of the borrowed shares, the Defendants have artificially created unregistered, free trading Pet Quarters shares and have increased the supply of Pet Quarters shares in the marketplace without authority.

258. The artificially increased supply of Pet Quarters shares in the marketplace created by this implied contract between the NSCC and its Members has significantly decreased the value of Pet Quarters stock and Plaintiffs' holdings in Pet Quarters stock.

259. This implied contract is in direct violation of Arkansas' Unfair Practices Act Section 4-75-206.

260. The implementation of the Stock Borrow Program frustrates the purpose of Arkansas' Unfair Practices Act as set forth in Section 4-75-202, in that it discourages competition and prevents honest competition because Members are not allowed to enter the market to buy-in open fail to deliver positions at current market prices.

---

[12] As noted in NASD Proposed Amendments Relating to Short Sale Delivery Requirements (SR-NASD-2004-044), "significant failures to deliver can impact certain rights of buyers, such as the right to vote shares or the treatment of dividends".

261. The foregoing acts and practices, and the continuing course of the Defendants' anticompetitive conduct, have harmed the Plaintiffs.

262. As a direct result of the Defendants' illegal conduct, competition in the stock market has been restrained and suppressed.

263. Defendants' anticompetitive and exclusionary conduct has directly and proximately caused injury to Plaintiff Pet Quarter's businesses and property and Plaintiff Jester's, Plaintiff Parnell's, Plaintiff O'Hearn's, and Plaintiff Betzios' property as set forth above. Plaintiffs' injuries are the type the Arkansas Code Annotated Sections 4-75-202 and 4-75-206 are intended to prevent and thus constitute unfair trade practice injuries.

264. As a result of the Defendants' violation of the Arkansas Code Annotated Sections 4-75-202 and 4-75-206 and the wrongs herein alleged, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

### AS AND FOR A THIRTEENTH CLAIM FOR RELIEF FOR CONVERSION

265. Plaintiff Jester, Plaintiff Parnell, Plaintiff O'Hearn, and Plaintiff Betzios repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

266. Upon information and belief, the Defendants, through the Stock Borrow Program, borrowed shares of Pet Quarters stock from lending Members in order to cover open fail to deliver positions. The NSCC then delivered these Pet Quarters shares to buyers. Upon delivery, the buyer acquired all right, title and interest in the Pet Quarters shares, including the right to vote, receive dividends and resell the shares, without encumbrance or any reservation of rights.[13] This transaction was actually a sale of Pet Quarters shares and not a loan. As a result, the Defendants exercised a wrongful and unauthorized dominion and control over the aforesaid borrowed Pet Quarters shares, since the Defendants do not own the shares and have no right to transfer them.

---

[13] As noted in NASD Proposed Amendments Relating to Short Sale Delivery Requirements (SR-NASD-2004-044), "significant failures to deliver can impact certain rights of buyers, such as the right to vote shares or the treatment of dividends".

267. Further, the Defendants have not obtained consent of the beneficial owners of the shares borrowed and transferred through the Stock Borrow Program.

268. Upon information and belief, Plaintiff Jester's, Plaintiff Parnell's, Plaintiff O'Hearn's and Plaintiff Betzios' shares were borrowed and transferred by the DTCC, the NSCC and the Depository Trust through the Stock Borrow Program without their consent. By borrowing shares without Plaintiff Jester's, Plaintiff Parnell's, Plaintiff O'Hearn's, and Plaintiff Betzios' consent, the Defendants have exerted a wrongful dominion and control over the borrowed shares which is inconsistent with the rights of Plaintiff Jester, Plaintiff Parnell, Plaintiff O'Hearn, and Plaintiff Betzios and therefore constitutes a conversion of the borrowed shares.

269. The Defendants, through the implementation of the Stock Borrow Program, allowed an unlimited number of shares to be borrowed for an unlimited period of time. Because of this, the Stock Borrow Program actually increased the supply of shares of Pet Quarters stock in the marketplace by the number of shares borrowed.

270. As a result, the Defendants have created additional unregistered and unauthorized Pet Quarters shares and artificially increased the supply of Pet Quarters shares in the marketplace and decreased the value of the stock.

271. The Defendants' conversion of Plaintiff Jester's, Plaintiff Parnell's, Plaintiff O'Hearn's, and Plaintiff Betzios' shares through borrowing in the Stock Borrow Program decreased the value of Pet Quarters stock and thus damaged the value of Pet Quarters shares held by Plaintiff Jester, Plaintiff Parnell, Plaintiff O'Hearn, and Plaintiff Betzios.

272. As a result of the wrong alleged herein, Plaintiff Jester, Plaintiff Parnell, Plaintiff O'Hearn, and Plaintiff Betzios have suffered damages in an amount representing the value of the stock prior to the conversion minus the value of the stock after the conversion.

### AS AND FOR A FOURTEENTH CLAIM FOR RELIEF
### FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### BETWEEN PET QUARTERS AND ITS SHAREHOLDERS

273. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

274. The operation of the Stock Borrow Program by the Defendants is an intentional interference with Pet Quarter's contractual relationships with its shareholders, including but not limited to Plaintiff Jester, Plaintiff Parnell, Plaintiff O'Hearn, and Plaintiff Betzios.

275. The Articles of Incorporation of Pet Quarters constitute a contract between Pet Quarters and its shareholders which sets forth the number of shares Pet Quarters is authorized to issue.

276. The Defendants are aware of the existence and terms of this contract, since the Articles of Incorporation of Pet Quarters are public records on file with the Arkansas Secretary of State.

277. The operation of the Stock Borrow Program by Defendants is an intentional interference with the contractual relationship between Pet Quarters and its shareholders.

278. The operation of the Stock Borrow Program by the Defendants has interfered with and contravened the terms of Pet Quarter's Articles of Incorporation because by covering open fail to deliver positions with shares borrowed through the Stock Borrow Program and delivering the borrowed shares to buyers, the NSCC has artificially created unauthorized, unregistered, free trading Pet Quarters shares. This constitutes a clear contravention of Pet Quarter's Articles of Incorporation and contractual relationship with its shareholders, including but not limited to Plaintiff Jester, Plaintiff Parnell, Plaintiff O'Hearn, and Plaintiff Betzios.

279. By covering open fail to deliver positions with shares borrowed through the Stock Borrow Program, the NSCC, as borrower, has subjected itself to the possibility of significant financial losses if the sellers are ultimately unable to honor their delivery obligations. Therefore, the Defendants have motive to continue to operate the Stock

Borrow Program in order to manipulate downward the price of Pet Quarter's stock and reduce the market value of the open fail to deliver positions created by sellers.

280. The interference with Pet Quarter's Articles of Incorporation by Defendants' creation of artificial additional Pet Quarters shares through the Stock Borrow Program has damaged Pet Quarters and its shareholders. The creation of unauthorized Pet Quarters shares has caused an increase in the supply of such Pet Quarters shares in the marketplace, which has significantly decreased the value of Pet Quarters shares held by its shareholders, including but not limited to Plaintiff Jester, Plaintiff Parnell, Plaintiff O'Hearn, and Plaintiff Betzios.

281. As a result, Pet Quarters and its shareholders, including but not limited to Plaintiff Jester, Plaintiff Parnell, Plaintiff O'Hearn, and Plaintiff Betzios have suffered substantial damages in an amount to be proven at trial.

### AS AND FOR A FIFTEENTH CLAIM FOR RELIEF
### FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

282. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

283. Pet Quarters stock certificates constitute a contract between Pet Quarters and the shareholder named on the stock certificate.

284. The Depository Trust is a shareholder of Pet Quarters.

285. As a trustee and shareholder of Pet Quarters shares, the Depository Trust is required to lawfully hold Pet Quarter's shares.

286. Pet Quarters relied on the Depository Trust, as shareholder and trustee of its shares, to act in good faith when holding its shares.

287. By permitting shares of Pet Quarters to be diluted through the operation of the Stock Borrow Program, the Depository Trust has breached the implied covenant of good faith and fair dealing.

288. As a result, Pet Quarters has suffered substantial damages in an amount to be proven at trial.

### AS AND FOR A SIXTEENTH CLAIM FOR RELIEF FOR CONSPIRACY

289. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of the Complaint as if fully set forth herein.

290. The DTCC, the NSCC and the Depository Trust acted in concert to operate the Stock Borrow Program for the purpose of manipulating the price of Pet Quarters stock.

291. By permitting shares of Pet Quarters to be borrowed through the Stock Borrow Program, the DTCC, the NSCC and the Depository Trust have conspired to drive down the price of Pet Quarters stock.

292. Upon information and belief, the price of Pet Quarters stock fell because the operation of the Stock Borrow Program by the Defendants allowed the manipulation of Pet Quarters stock by various sellers who failed to deliver Pet Quarters shares.

293. The Defendants conspired to maintain significant open fail to deliver positions of millions of shares of Pet Quarters stock for extended periods of time by implementing the Stock Borrow Program to cover these open and unsettled positions.

294. By covering open fail to deliver positions with shares borrowed through the Stock Borrow Program and delivering the borrowed shares to the buyers, the Defendants artificially created unregistered, free trading Pet Quarters shares and increased the supply of Pet Quarters shares in the marketplace without authority.

295. The artificially increased supply of Pet Quarters shares in the marketplace created by the NSCC's and Depository Trust's borrowing of Pet Quarters shares through the Stock Borrow Program to cover open fail to deliver positions caused a dramatic devaluation of Pet Quarters stock that would not have occurred absent the actions of Defendants as described herein.

296. As a result, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

297. Plaintiffs demand a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in its favor and against the Defendants as follows:

a.     Damages in an amount in excess of $400,000,000 in favor of each Plaintiff and against each Defendant; jointly and severally;

b.     An accounting of all profits which inured to Defendants as a result of their scheme and disgorgement of those profits to Plaintiffs;

c.     Attorneys' fees, expert witness fees, and costs, as allowed by law;

d.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

e.     Exemplary, special and punitive damages from all Defendants;

f.     Such other and further relief, at law or in equity, the Court deems just and proper.

Dated: OCTOBER 29, 2004

Respectfully submitted,


By:   Richard L. Ramsay (77108)

EICHENBAUM, LILES & HEISTER, PA
124 West Capitol, Suite 1400
Little Rock, Arkansas 72201

Attorneys for:

Pet Quarters, Inc.
Clyde A. Jester
Michael Parnell
Walter D. O'Hearn, Jr.
Demetri Betzios

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in its favor and against the Defendants as follows:

a. Damages in an amount in excess of $400,000,000 in favor of each Plaintiff and against each Defendant; jointly and severally;

b. An accounting of all profits which inured to Defendants as a result of their scheme and disgorgement of those profits to Plaintiffs;

c. Attorneys' fees, expert witness fees, and costs, as allowed by law;

d. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

e. Exemplary, special and punitive damages from all Defendants;

f. Such other and further relief; at law or in equity, the Court deems just and proper.

Dated: OCTOBER 29, 2004

Respectfully submitted,

By: Richard L. Ramsay (77108)

EICHENBAUM, LILES & HEISTER, PA
124 West Capitol, Suite 1400
Little Rock, Arkansas 72201
(501) 376-4531
(501) 376-8433 – Fax
email: rramsay@elhlaw.com

Local Counsel for Plaintiffs:
Pet Quarters, Inc.,
Clyde A. Jester,
Michael Parnell,
Walter D. O'Hearn, Jr.,
Demetri Betzios

Plaintiffs also represented by:

John M. O'Quinn
TX State Bar No. 15296000
O'Quinn, Laminack & Pirtle
2300 Lyric Centre Building
Houston, Texas 77002
(713) 223-1000
(713) 222-6903 - Fax

Denman Heard
TX State Bar No.00784235
Adam Q. Voyles
TX State Bar No. 24003121
email: avoyles@heardrobins.com
Heard, Robins, Cloud, Lubel & Greenwood, LLP
500 Dallas, Suite 3100
Houston, Texas 77002
(713) 650-1200
(713) 650-1400 - Fax

James W. Christian
TX State Bar No. 04228700
Christian, Smith & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas 77002
(713) 659-7617
(713) 659-7641 - Fax