# EXHIBIT T

SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| NANOPIERCE TECHNOLOGIES, INC., a Nevada Corporation; STEPHEN SEITZ, an individual; JANE SEITZ, an individual; KATHY KNIGHT-MCCONNELL, an individual; JAMES STOCK, an individual; MAUREEN O'SULLIVAN, an individual; and HELEN KOLADA, an individual, | SUPREME COURT CASE NO. 45364 <br><br> DISTRICT COURT CASE NO. CV04-01079 |
| Appellants, | |
| vs. | |
| THE DEPOSITORY TRUST AND CLEARING CORPORATION; THE DEPOSITORY TRUST COMPANY; AND THE NATIONAL SECURITIES CLEARING CORPORATION, | |
| Respondents. | |

**BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, <u>AMICUS CURIAE</u>, ON THE ISSUE ADDRESSED**

JACOB H. STILLMAN
Solicitor

MARK PENNINGTON
Assistant General Counsel

MICHAEL L. POST
Senior Counsel

(Pursuant to Nev. S. Ct. R. 43)

Securities and Exchange Commission
100 F St. NE
Washington, DC 20549-8010
(202) 551-5194 (Post)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................. iii

INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION ...... 1

ISSUE ADDRESSED BY THE COMMISSION ........................ 2

BACKGROUND ............................................................... 3

  A. Section 17A of the Exchange Act charges the Commission with overseeing the national clearance and settlement system in accordance with the public interest and the protection of investors. .................................... 3

  B. The Stock Borrow Program is designed to improve the efficiency of the continuous net settlement system by increasing the likelihood that purchasers will receive their securities on settlement date. ........................... 7

    1. The Continuous Net Settlement system .................. 8

    2. Buy-ins to satisfy delivery obligations when members fail to deliver securities ..................... 10

    3. The Stock Borrow Program ......................... 12

    4. Plaintiffs' incorrect descriptions of important aspects of the Continuous Net Settlement system and the Stock Borrow Program ....................... 13

  C. The Commission has approved the Stock Borrow Program as being in compliance with the Requirements of the Exchange Act. .................................................. 17

**TABLE OF CONTENTS (CONTINUED)**

**Page**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.    State laws that conflict with federal regulatory regimes are preempted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    Permitting state law liability for the conduct alleged in the complaint would conflict with the Exchange Act regulatory regime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.    Plaintiffs' direct challenges to the Stock Borrow Program are preempted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        2.    Plaintiffs' so-called "misrepresentation" claims are also preempted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C.    There are remedies for manipulations perpetrated by naked short sellers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

returned.  Id.  Borrowed stock is returned to the lender through normal allocation in the continuous net settlement system as securities become available.  Id. Alternatively, the lender, as any other member with a long position, may initiate buy-in procedures by submitting a Notice of Intention to Buy-in.  Until the securities are returned, the lending member no longer has ownership rights in them, and therefore cannot sell or re-lend them.

### 4. Plaintiffs' incorrect descriptions of important aspects of the Continuous Net Settlement system and the Stock Borrow Program

This summary of the applicable NSCC rules makes clear that plaintiffs' descriptions of the continuous net settlement system and the stock borrow program are flawed in important respects.  Among their erroneous allegations are that (1) the stock borrow program is the only way that fails to deliver can be cured, (2) NSCC is at fault for not requiring buy-ins, and (3) the stock borrow program results in the creation of phantom securities.

*First*, a receiving member that has failed to receive securities can obtain those securities through a buy-in that does not involve the stock borrow program at all.

*Second*, NSCC does not have the authority to require buy-ins.  As noted, its role in the stock borrow program is automated and non-discretionary -- the only

entity authorized by the rules to require a buy-in is the receiving member.  If a long position remains open for an extended period of time, that is because the receiving member has not initiated a buy-in, presumably because that member is willing to rely on the fact that it will eventually be allocated securities pursuant to NSCC's procedures.  These statements are true whether the entity that is owed securities is the original purchaser who did not receive delivery, or a firm that has loaned securities to the stock borrow program.

Furthermore, NSCC has no mechanism for determining whether particular fails to deliver have occurred because of illegal naked short selling or for some legitimate reason.  Nor are there any standards or rules that would guide its discretion in deciding whether to make a buy-in, if it were to undertake do so.  In short, the assertion that NSCC is in some way culpable for failing to initiate buy-ins is contrary to the clear terms of the Rules.

*Third* and finally, neither the continuous net settlement system nor the stock borrow program creates artificial securities.  The number of securities issued and outstanding is determined by the security issuer and is reflected in the issuer's records of registered ownership; nothing that happens in the course of clearing and settling trades, including any action taken by NSCC, can change that number.

1    As explained above, the continuous net settlement system is essentially an

2    accounting system that records delivery and receive obligations among NSCC

3    members.  These obligations do not reflect *ownership positions*.  Ownership

4    positions, as opposed to the deliver and receive obligations recorded by NSCC, are

5    reflected on the records of DTC.

6    The security's issuer maintains its own record of all of the registered

7    ownership positions of its securities.  All shares deposited at DTC are recorded on

8    the issuer's records in the name of DTC's nominee, Cede & Co., and constitute

9    some or all of the issuer's securities issued and outstanding.  The fact that

10   securities settle through the continuous net settlement system, or that they are

11   deposited at DTC, does not increase the number of the issuer's shares.

12   As to the stock borrow program, as noted above and as further explained by

13   the Commission's staff in guidance on the Commission's website, the securities

14   loaned by NSCC members for use in the program must be on deposit at DTC, and

15   are debited from members' accounts when the securities are used to make delivery.

16   See Responses to Frequently Asked Questions Regarding SHO (Jan. 3, 2005),

17   http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.  Once a member's

18   securities are used for delivery to another member, the lending member no longer

1   has ownership rights in those securities, which means that it cannot sell or re-lend

2   them until such time as the securities are returned to its DTC account.

3   When securities are not available to be loaned through the the stock borrow

4   program, the buyer is required to either wait for delivery or initiate a buy-in.

5   Neither waiting nor buying-in increases the number of issued and outstanding

6   securities.  All that the stock borrow program does is shift the *consequences* of the

7   failure to deliver from a buyer that has not affirmatively indicated a willingness to

8   wait for delivery of its securities to a lender that *has* indicated that it is willing to

9   wait.  This shift cannot possibly increase the number of securities issued, any more

10  than the buyer's decision to either wait or initiate a buy-in can do so.  Therefore,

11  plaintiffs' assertion that the stock borrow program creates securities is incorrect. [6]

12

---

[6]  While the number of securities outstanding does not change because of the clearance and settlement system, the aggregate number of positions reflected in customer accounts at broker-dealers may in fact be greater than the number of securities issued and outstanding.  This is due in part to the fact that, as noted above, broker-dealers may credit customer accounts with securities entitlements in anticipation of delivery of the security to the broker-dealer.