# EXHIBIT U

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

No. 06-16088

WHISTLER INVESTMENTS, INC., et al.,

Plaintiffs-Appellants,

v.

THE DEPOSITORY TRUST AND CLEARING CORPORATION, et al.,

Defendants-Appellees.

On Appeal From the United States District Court
for the District of Nevada

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION
AMICUS CURIAE, ON THE ISSUE ADDRESSED

FILED
MAR - 2 2007
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

A TRUE COPY
ATTEST
CATHY A. CATTERSON
Clerk of Court      4-5-07
by:
      Deputy Clerk

BRIAN G. CARTWRIGHT
General Counsel

ANDREW N. VOLLMER
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

MARK PENNINGTON
Assistant General Counsel

MICHAEL L. POST
Senior Counsel

Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-8010
(202) 551-5194 (Post)

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| TABLE OF AUTHORITIES | | iii |
| INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION | | 1 |
| ISSUE ADDRESSED BY THE COMMISSION | | 3 |
| BACKGROUND | | 4 |
| A. | Section 17A of the Securities Exchange Act of 1934 charges the Commission with overseeing the national clearance and settlement system in accordance with the public interest and the protection of investors. | 5 |
| B. | The Stock Borrow Program is designed to improve the efficiency of the Continuous Net Settlement system by increasing the likelihood that purchasers will receive their securities on settlement date. | 10 |
| | 1. The Continuous Net Settlement system | 10 |
| | 2. Buy-ins to satisfy delivery obligations when members fail to deliver securities | 13 |
| | 3. The Stock Borrow Program | 15 |
| C. | The Commission has approved NSCC's rules, including those governing the Stock Borrow Program and Continuous Net Settlement system, as meeting the Requirements of the Exchange Act. | 18 |
| ARGUMENT | | 20 |
| A. | State laws that conflict with federal regulatory regimes are preempted. | 21 |

# TABLE OF CONTENTS (Continued)

|   |   | Page |
|---|---|---|
| B. | Plaintiffs' direct challenge to the Stock Borrow Program is preempted based on conflict with the Exchange Act regulatory regime. | 22 |
| C. | There are remedies for manipulations perpetrated by naked short sellers. | 26 |

CONCLUSION ........................................................... 29

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

and continues to have the obligation to deliver, until actual delivery to NSCC is made. Simiarly, a member that has failed to receive is not obligated to pay until delivery to it is made by NSCC.

The fact that a broker-dealer that is an NSCC member fails to receive securities that it purchased on behalf of a retail customer does not mean that the customer's purchase is not completed until the member's failure to receive is cured. Under Article 8 of the Uniform Commercial Code (adopted in California and all other states), a securities broker-dealer may credit a customer's account with a security even though that security has not yet been delivered to the broker-dealer's account by NSCC. In that event, the customer receives what is defined under the Uniform Commercial Code as a "securities entitlement," which requires the broker-dealer to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the security. See UCC Sections 8-104, 8-501.

### 3. The Stock Borrow Program

The stock borrow program improves the efficiency of the clearance and settlement system by increasing the likelihood that purchasers will receive delivery of their securities on settlement date even though insufficient securities have been delivered to NSCC. NSCC Rules, Addendum C. Under the applicable

14

Rules, the program is automated and operates without the exercise of discretion by NSCC.

Members wishing to participate in the program as lenders notify NSCC each day of securities that they have on deposit with DTC that are available to be borrowed by NSCC for delivery to receiving members. Id. If NSCC has unsatisfied delivery obligations on a particular settlement date, it will borrow available securities according to a formula that allocates the borrowing among members who are willing to lend. Id. The lending members' accounts are debited the borrowed securities and credited the market value of those securities, and the long position in the lending member's account will reflect the borrowing of the shares until those shares are returned. Id. Borrowed securities are then used to satisfy delivery obligations to members with long positions who would otherwise fail to receive. Borrowed securities are returned to the lender through normal allocation in the continuous net settlement system as securities become available. Id. Alternatively, the lender, as any other member with a long position, may initiate buy-in procedures by submitting a Notice of Intention to Buy-in. Until the securities are returned, the lending member no longer has ownership rights in them, and therefore cannot sell or re-lend them. See infra n.6.

The foregoing description of the continuous net settlement system demonstrates that plaintiffs err when they claim that the stock borrow program is

15

"the only mechanism for dealing with a fail to deliver." (Br. 9.) Rather, a member that is owed delivery retains the option to initiate a buy-in. If the member does not do so, that is presumably because it is satisfied to rely on the fact that it will eventually be allocated securities pursuant to NSCC's procedures (described above).

Plaintiffs also err when they claim that the stock borrow program creates "phantom securities." (Br. 10.) The stock borrow program simply shifts the *consequences* of the failure to deliver from a buyer to a lender that has indicated that it is willing to wait. The party failing to deliver continues to have an obligation to deliver the shares. This shift of consequences does not (and cannot) increase the number of securities issued, any more than a buyer's decision to either wait or initiate a buy-in can do so.[6]

---

[6] See SEC amicus brief in Nanopierce Technologies, Inc. v. The Depository Trust and Clearing Corporation, No. 45364 (Nev.), under submission, at 14-16 (SEC Nanopierce Br.) (placed in the record in the district court in this case); Responses to Frequently Asked Questions Regarding SHO (Jan. 3, 2005), http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

The number of securities outstanding does not change because of the clearance and settlement system. We note, however, that the aggregate number of positions reflected in customer accounts at broker-dealers may be greater than the number of securities issued and outstanding. This is due in part to the fact that, as noted above, broker-dealers are permitted by the UCC to credit customer accounts with securities entitlements in anticipation of delivery of the security

16

Finally, contrary to plaintiffs' suggestion, NSCC is not somehow at fault for not requiring buy-ins. (Br. 10-11.) NSCC does not have the authority to require buy-ins. As noted, its role in the stock borrow program is automated and non-discretionary—the only entity authorized by the rules to require a buy-in is the receiving member. If a long position remains open for an extended period of time, that is because the receiving member has not initiated a buy-in, presumably because that member is willing to rely on the fact that it will eventually be allocated securities pursuant to NSCC's procedures. Furthermore, NSCC has no mechanism for determining whether particular fails to deliver have occurred because of illegal naked short selling or for some legitimate reason. Nor are there any standards or rules that would guide its discretion in deciding whether to initiate a buy-in, if it were to undertake do so. In short, any assertion that NSCC is in some way culpable for failing to require buy-ins is contrary to the clear terms of the rules.

C. **The Commission has approved NSCC's rules, including those governing the Stock Borrow Program and Continuous Net Settlement system, as meeting the Requirements of the Exchange Act.**

Defendants NSCC and DTC, and a number of other clearing agencies filed applications for registration with the Commission in 1976. Final Approval Order,

---

to the broker-dealer.

17