# EXHIBIT V

No. 08-2114

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

PET QUARTERS, INC., et al.,

Plaintiffs-Appellants,

v.

DEPOSITORY TRUST AND CLEARING CORP., et al.

Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of Arkansas (Western Division)

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
*AMICUS CURIAE,* IN SUPPORT OF APPELLEE, URGING AFFIRMANCE
ON ISSUE ADDRESSED

BRIAN G. CARTWRIGHT
General Counsel

ANDREW N. VOLLMER
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

MARK PENNINGTON
Assistant General Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9010
(202) 551-5189 (Pennington)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF THE SECURITIES AND EXCHANGE
  COMMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLAINTIFFS' ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Section 17A of the Exchange Act directs the Commission to
            oversee the national clearance and settlement system in
            accordance with the public interest and the protection of
            investors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    The Commission has approved the stock borrow program
            as being in compliance with the requirements of the
            Exchange Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ISSUE ADDRESSED BY THE COMMISSION . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    Plaintiffs' case rests on an erroneous description of the legal regime
    governing how securities are held, settled and cleared. . . . . . . . . . . . . . . 9

      A.    The U.C.C. prescribes the terms under which the securities
            involved in this case are held . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    Clearance and settlement of the securities involved in this
            case are governed by NSCC's Commission-approved rules,
            including the stock borrow program. . . . . . . . . . . . . . . . . . . . . . . . . 12

**TABLE OF CONTENTS (CONTINUED)**

Page

1.    The Continuous Net Settlement system reflects daily
      securities transactions by making net transfers among
      the broker-dealers' securities accounts at DTC. . . . . . . . . . . 12

2.    At the option of the buyer, a buy-in may by used to
      satisfy delivery obligations when a seller fails to
      deliver securities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

3.    When shares that have not been delivered are
      available to be borrowed, the stock borrow program
      provides that the shares are automatically borrowed by
      NSCC and delivered to buyers. . . . . . . . . . . . . . . . . . . . . . . 16

C.    Plaintiffs incorrectly describe the operation of the U.C.C.
      and NSCC Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.   Plaintiffs' state law challenges to the stock borrow program are
      preempted by the Exchange Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.    State laws that conflict with federal regulatory regimes are
      preempted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.    Permitting state law liability for the conduct alleged in the
      complaint would conflict with the Exchange Act regulatory
      regime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1.    Plaintiffs' direct challenges are preempted. . . . . . . . . . . . . . 22

2.    Plaintiffs' so-called "misrepresentation" claims are also
      preempted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

a.    Apparently abandoned claims. . . . . . . . . . . . . . . . . . 24

b.    The inefficiency claim. . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF CONTENTS (CONTINUED)**

<u>**Page**</u>

c.      The mis-accounting for lender shares claim. . . . . . . . . 27

III.    The Commission is vigorously exercising its regulatory responsibility
to prevent abusive short selling, but it has not suggested that
defendants or the clearing and settlement system are responsible for
any such abuses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ANTI-VIRUS CERTIFICATE

## ARGUMENT

The complaint in this case is virtually identical to the complaints filed in several other cases.  All of the earlier cases have by now been dismissed, and every court that has considered the complaint, including the Nevada supreme court and the Ninth Circuit Court of Appeals, has concluded that it is preempted because it conflicts with the Exchange Act.  See Nanopierce Technologies, Inc. v. Depository Trust and Clearing Corp., 168 P.3d 73, 82-85 (Nev. 2007); Whistler Investments, Inc. v. Depository Trust and Clearing Corp., 2008 WL 3876577 (9th Cir. Aug. 22, 2008).  We urge this Court to reach the same result.  Before turning to the preemption argument, however, we explain that the complaint misdescribes the operation of the Uniform Commercial Code (U.C.C.) and the NSCC Rules of Operation.

## I.   Plaintiffs' case rests on an erroneous description of the legal regime governing how securities are held, settled and cleared.

Plaintiffs seek to shield their erroneous description of the settlement and clearance system from scrutiny by asserting that the Court is bound by the allegations of their complaint (Br. 51-56), but they do not allege that defendants are acting inconsistently with either the U.C.C. or NSCC's Rules.  The content of the U.C.C. and NSCC's Rules are matters of public record that may be ascertained

by judicial notice both at the district court and in this Court, and that may be

considered on a motion to dismiss, see Levy v. Ohl, 477 F.3d 988, 991-92 (8th Cir.

2007); Fed. R. Evid. 201.  The interpretation of these provisions raises issues of

law to be determined by a court, not questions of fact to be resolved by a factfinder

in a trial.  In other words, the Court may assume the truth of the well-pleaded facts

alleged in the complaint for purposes of this appeal, but it should not also assume

that plaintiffs' misdescriptions of the applicable law are true.  We therefore

describe the relevant aspects of the Code and the Rules.

### A.     The U.C.C. prescribes the terms under which the securities involved in this case are held.

Article 8 of the U.C.C., "Investment Securities," (U.C.C. 8-101) provides

that securities may be held either (1) directly  through possession of a certificate or

entry on the issuer's stock registry, or (2)  indirectly, by acquisition of a "security

entitlement," which is a form of property interest created by the Code to reflect the

fact that securities were increasingly being held through intermediaries such as

broker-dealers.  See generally Prefatory Note to Revised Article 8 (1994).[3]   In

essence, a security entitlement is a contractual undertaking in which a securities

---

[3]     The Official Comments to each section of the U.C.C. cited
*infra* provide further explanation of the meaning of the relevant
provisions.

intermediary such as a clearing corporation, bank or broker-dealer agrees to treat the entitlement holder as being entitled to exercise the rights that comprise the security.  See generally, U.C.C. 8-501, Comment 1. [4]  Thus, instead of a certificate or an entry in the issuer's stock registry, the holder of a security entitlement has contractual rights against an intermediary -- against DTC in the case of a broker-dealer, and against the broker-dealer in the case of broker-dealer's customers. Transfers of security entitlements are made on the books of the intermediary (the books of DTC for broker-dealers, the books of broker-dealers for their customers) rather than through delivery of a certificate or an entry on the issuer's registry. This arrangement facilitates efficient and safe transfers of large numbers of shares.

The intermediary may credit an account with a security entitlement even though the intermediary does not itself hold the security.  Section 8-501(c).  For

---

[4]    "Security entitlement" is defined as "the rights and property interest of an entitlement holder" with respect to a security (and other types of financial assets) as specified in Part 5 of Article 8 ("Security Entitlements").  U.C.C. 8-102(a)(17) (definition of security entitlement), 8-102(a)(9)(i)(definition of financial asset as including a security).  A security entitlement is created when an intermediary credits a security into the entitlement holder's "securities account," which is an account in which a security may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the entitlement holder as entitled to exercise the rights that comprise the security.  U.C.C. 8-501(a); see also U.C.C. 8-102(a)(14)(definition of "securities intermediary").

example, the U.C.C. commentary explains that it may do so when the seller of

securities has failed to deliver them:

> It is . . . entirely possible that a securities intermediary might make entries in a customer's account reflecting that customer's acquisition of a certain security at a time when the securities intermediary did not itself happen to hold any units of that security. *The person from whom the securities intermediary bought the security might have failed to deliver and it might have taken some time to clear up the problem . . .* U.C.C. 8-501, Official Comment 3 (Emphasis added)

If an intermediary credits entitlements to customer accounts even though the

intermediary does not hold the security, the result may be that the total number of

securities entitlements credited to all customer accounts exceeds the number of

shares issued by the issuer. *See* Responses to Frequently Asked Questions

Regarding SHO, Question 7.1 (Jan. 3, 2005). [5]

**B.    Clearance and settlement of the securities involved in this case are governed by NSCC's Commission-approved Rules, including the stock borrow program.**

**1.    The Continuous Net Settlement system reflects daily securities transactions by making net transfers among the broker-dealers' securities accounts at DTC.**

The securities that are the subject of the complaint were deposited at DTC,

either by DTC's participants (broker-dealers and banks) or by the issuers of the

---

[5]    www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

-12-

securities.  These securities are registered on the books of the issuer in the name of DTC's nominee, Cede & Co.  Thus, Cede & Co. is the only entity that holds these securities directly, while the DTC participants hold only securities entitlements created when DTC credits the securities deposited with it to participants' securities accounts.  DTC reflects transactions among its participants by computerized book-entry changes in those accounts in the following manner.

Trades in these securities clear through NSCC's continuous net settlement system.  See generally NSCC Rule 11, Sec. 1(a); Final Approval Order, 48 Fed. Reg. at 45170 n.32; Bradford, 590 F.2d at 1091 n.2.  Under that system, NSCC becomes the contra-party to each purchase or sale of securities.  NSCC assumes the obligation of each member that is receiving securities to receive and pay for those securities, and it assumes the obligation of each member that is delivering securities to make the delivery.  Rule 11, Secs. 1(b), (c), (e); Procedure VII(A). NSCC is also assigned the receiving party's right to receive securities and the delivering party's right to receive payment.  Id.

The assumption of these obligations and the assignment of these rights by NSCC place it between the delivering member and the receiving member – the delivering member is obligated to deliver securities to NSCC; the receiving member is obligated to accept and pay for securities delivered by NSCC; and

NSCC is obligated to receive and pay for securities from the delivering member, and to deliver securities to the receiving member.  <u>Id</u>.

All member purchases and sales of a given security are netted daily based on the trade date, so that each member is required to deliver to NSCC or receives from NSCC only the difference between the total amount of each security that it bought and the total amount that it sold during the trading period.  Procedure VII(C)(1).  A member that owes NSCC securities is described in NSCC Rules as having a short position, a member that is entitled to receive securities from NSCC has a long position, and a member that is neither obligated to deliver nor entitled to receive securities has a flat position.  Rule 11, Secs. 1(a), 2. [6]

For each member with a short position in a security at the close of business on settlement date, NSCC instructs DTC to deliver securities from the member's account at DTC to NSCC's account at DTC.  Rule 11, Secs. 3, 4; Procedure VII(C)(2).  NSCC then instructs DTC to deliver those securities from NSCC's

---

[6]     "Short position" in this context means only that the member has an obligation to deliver securities to NSCC.  It does not mean that the securities were sold short in the market.

account to the DTC accounts of members with long positions in the security.  Rule

11, Secs. 3, 4; Procedure VII(C)(3). [7]

> **2.     At the option of the buyer, a buy-in may by used to satisfy
> delivery obligations when a seller fails to deliver securities**.

Sometimes, members do not have sufficient securities on deposit at DTC to

meet their delivery obligation to NSCC on settlement date.  Procedure VII(C)(3).

Fails to deliver may be caused by reasons other than naked short selling.  For

example, human or mechanical errors or processing delays can result from

transferring securities, thus causing a failure to deliver on a long sale within the

normal three-day settlement period.

When a delivery failure occurs, NSCC allocates the fails to members that

are due to receive securities according to NSCC Rules (Procedure VII(E)).  This

allocation may cause the receiving member to whom the fail is allocated to have a

long position, i.e., to be entitled to receive securities from NSCC.  (The receiving

member is not obligated to pay for the securities until their delivery.)

A member that has failed to receive securities has two options:  it may

either maintain that position and wait for delivery to be made to it as securities are

delivered to NSCC, or it may file a Notice of Intention to Buy-in with NSCC.

---

[7]     Details of the procedures for establishing each member's position on
settlement date are set forth in Rule 11-5.

Rule 11, Sec. 7(a), Procedure VII(J).  In response to the filing of such a Notice,

NSCC takes a series of steps to facilitate the buy-in, including, if necessary,

executing the buy-in in the marketplace of its choice, through the agents of its

choosing.  (Typically it will instruct the buyer to make the purchase).  Procedure

X(A)(1).  When a buy-in is executed, any financial loss incurred in the purchase is

allocated in accordance with NSCC procedures to members with short positions in

the security.  Id.

> **3.     When shares of securities that have not been delivered are
> available to be borrowed, the stock borrow program
> provides that available shares are automatically borrowed
> by NSCC and delivered to buyers.**

The stock borrow program is operated by NSCC as an alternative to the

buyer either waiting for the securities to be delivered by the seller or initiating a

buy-in.  The program  is intended to improve the efficiency of the clearance and

settlement system by increasing the likelihood that purchasers will receive

delivery of their securities on settlement date even though insufficient securities

have been delivered to NSCC on that day.  See NSCC Rules, Addendum C.  Under

the applicable Rules, the program is automated and operates without the exercise

of discretion by NSCC.

Members wishing to participate in the program as lenders notify NSCC of securities that they have on deposit with DTC that are available to be borrowed for delivery to receiving members.  Id.  NSCC will borrow those shares if it has unsatisfied delivery obligations on a particular settlement date.  Id.  Borrowed securities are transferred from the lending member's account to an NSCC account at DTC, and are then used to satisfy delivery obligations to members with long positions that would otherwise fail to receive.

The lending member is credited with the market value of the securities borrowed, and the long position in the member's account will reflect the borrowing of the shares until those shares are returned, i.e., the account will reflect that the member is owed shares.  Id.  Borrowed stock is returned to the lender through normal allocation in the continuous net settlement system as securities become available.  Id.  Alternatively, the lender, like any other member with a long position, may initiate buy-in procedures by submitting a Notice of Intention to Buy-in.  Until the securities are returned to it, the lending member cannot sell or re-lend them.  See Responses to Frequently Asked Questions Regarding SHO (Jan. 3, 2005). [8]

---

[8]        www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

**C.    Plaintiffs incorrectly describe the operation of the U.C.C. and NSCC Rules.**

The foregoing summary of the applicable U.C.C. provisions and NSCC Rules makes clear that plaintiffs' description of the continuous net settlement system and the stock borrow program that are created by NSCC's Rules is flawed in essential respects.  Among their erroneous allegations are that (1) the stock borrow program is the only way that fails to deliver can be cured, (2) NSCC is at fault for "permitting" fails to deliver to remain open, and (3) the continuous net settlement system or the stock borrow program results in the creation of "phantom shares."

(1) A member that has failed to receive securities can obtain those securities through a buy-in, which will not involve the stock borrow program at all.  Conversely, a member that receives securities from the stock borrow program will not have to initiate a buy-in, and will not be aware that the securities it receives are borrowed; rather, it will receive the borrowed shares from NSCC along with delivered shares..

(2) NSCC's job is to account for securities that are delivered into the system and to instruct DTC to make transfers among participants' accounts to reflect those deliveries.  It does not have the authority to require either delivery by

-18-

sellers that fail to deliver or buy-ins by buyers that have not received securities. Moreover, it has no mechanism for determining whether particular fails to deliver have occurred because of illegal naked short selling or for some legitimate reason, and it does not have any standards that would guide it in deciding whether a buy-in should be made.

(3) While the operation of the U.C.C. may result in more shares being credited to customer accounts in the form of security entitlements than have been issued, that fact is a recognized feature of the statutory scheme, arising from the fact that broker-dealers are permitted to credit accounts with security entitlements even though the firm is not holding an equivalent number of shares.  In contrast, as operated under NSCC Rules, the continuous net settlement system and the stock borrow program do not result in more shares being credited to DTC participants' accounts than have been issued by the issuer and are being held by DTC.

First of all, DTC (through its nominee) is shown on the issuer's books as the record holder of the shares deposited with it, so DTC cannot hold more shares than the issuer has issued.  DTC, in turn, credits its participants' accounts with securities entitlements only up to the number of shares it has on deposit, so the total number of entitlements in those accounts also will not exceed the number of issued shares.

-19-

Next, as noted, the continuous net settlement system operated by NSCC is essentially an accounting system that records delivery and receive obligations among NSCC members.  Under NSCC Rules, NSCC will not direct DTC to transfer more shares out of a selling member's account than the member has in that account.  Instead, NSCC will show the seller as owing delivery (i.e., having a short position) to the extent that the account has an insufficient number of shares to cover all deliveries required that day, and it will allocate the resulting fails to deliver to purchasing members, who will be shown as being owed delivery (i.e., having long positions).  As a result, there will not be more shares in NSCC members' accounts at DTC than are issued.

Finally, when shares are borrowed through the stock borrow program, NSCC will instruct DTC to transfer shares that are in a lender's account to NSCC's account, from where they will be transferred to buyers – a lender's DTC account will be debited the lent shares, and the buyer's DTC account will ultimately be credited with those shares.  The seller will continue to have the same short position.  All that the stock borrow program does is shift the *consequences* of the failure to deliver from a buyer that would otherwise be allocated a fail to receive  to a lender that has indicated that it is willing to lend its shares and await delivery of replacement shares.  This shift cannot possibly increase the number of

-20-

securities issued, any more than the buyer's decision to either wait or initiate a buy-in can do so.

## II.   Plaintiffs' state law challenges to the stock borrow program are preempted by the Exchange Act.

### A.   State laws that conflict with federal regulatory regimes are preempted.

State laws are "naturally preempted to the extent of any conflict with a federal statute." Crosby v. National Foreign Trade Council, 530 U.S. 363, 372 (2000).  A court will find conflict preemption "where it is impossible for a private party to comply with both state and federal law, and where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (internal citations, quotation marks, and brackets omitted).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Id. at 373.  In Crosby (530 U.S. at 373), the Court quoted Savage v. Jones, 225 U.S. 501, 533 (1912):

> For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed.  If the purpose of the act cannot otherwise be accomplished – if its operation within its chosen field else must be