# EXHIBIT A

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

TASER INTERNATIONAL, INC.,  :
*et al.*,                   :
                            :
    Plaintiffs,            :         CIVIL ACTION
                            :         FILE NO.: 2008-EV-004739-B
v.                          :
                            :
MORGAN STANLEY & CO., INC., :         JURY TRIAL DEMANDED
*et al.*,                   :
                            :
    Defendants.            :

## PLAINTIFFS' AMENDED RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES AND THIRD REQUEST FOR PRODUCTION OF DOCUMENTS TO ALL PLAINTIFFS

      TASER and the Individual Plaintiffs (i.e., all Plaintiffs excluding TASER)

(TASER and the Individual Plaintiffs are collectively referred to herein as

"Plaintiffs") hereby submit their Amended Objections and Responses to

Defendants' Second Set of Interrogatories and Third Request for Production of

Documents to All Plaintiffs as follows. Plaintiffs reserve the right to enter

additional objections and responses, and to supplement their responses as

necessary. The failure to object to any of the Interrogatories or Requests for

Production does not waive any general or specific objection or privilege.

## OBJECTIONS TO THE GENERAL INSTRUCTIONS

     1.    Plaintiffs object to the General Instructions to the extent that they are

unduly burdensome or seek to impose greater obligations on them than those

imposed by the Georgia Civil Procedure Act or any applicable Order from the Court. Plaintiffs will only provide responses and information (including supplementation) in accordance with obligations set forth in the Georgia Civil Practice Act or as ordered by the Court in this action.

2.      Plaintiffs object to the General Instructions to the extent that they seek information outside of Plaintiffs' own knowledge. Plaintiffs will not provide information that is privileged and/or within the knowledge of their attorneys, consultants or investigators.

## OBJECTIONS TO THE DEFINITIONS

1.      Plaintiffs object to the definitions of "TASER" and "you" and "your" on the ground that they are overly broad and vague. For example, the definition provided defines TASER, you and your as including agents, representatives and other third parties unrelated to this case. Plaintiffs further object to these definitions on the ground that they include "attorneys," thereby making the definitions seek information protected by the attorney-client and work-product privileges. Plaintiffs further object to the definitions to the extent they seek information outside of Plaintiffs' possession, custody or control. To the extent that Plaintiffs provide any information or documents in response to the Interrogatories or the Requests for Production, Plaintiffs will assume that the definition of

"TASER," "you" or "your" does not include its attorneys or other third parties that it does not control.

    2.      Plaintiffs object to the definition of "identify" as overly broad, unduly burdensome and seeking to require Plaintiffs to provide more information than required by the Georgia Civil Practice Act and applicable law.  Plaintiffs will only provide that information that is required pursuant to the Georgia Civil Practice Act.

    3.      Plaintiffs object to the Interrogatories to the extent they ask for personal contact information for individuals identified in response to the Interrogatories, which information is not relevant.

    4.      Plaintiffs further object to the definitions to the extent they seek to impose obligations upon Plaintiffs in excess of the Georgia Civil Practice Act.

## GENERAL OBJECTIONS

The following objections apply to each and every Interrogatory or Request for Production and shall have the same force and effect as if set forth in full in response to each.  The absence of a reference to a general objection shall not be construed as a waiver of any general objection to a specific Interrogatory or Request for Production.

    1.      Plaintiffs object to the Interrogatories and Requests for Production to the extent that they are unreasonably cumulative or duplicative, or seek information that is already in Defendants' possession or that is obtainable from

another source that is more convenient, less burdensome, or less expensive.  In particular, Plaintiffs note that most, if not all, of the information sought is within the Defendants' own possession and: (a) has not yet been produced; (b) all of the keys, legends, dictionaries or other information necessary to read, analyze and/or understand the information has not been provided; and/or (c) Plaintiffs have not yet been afforded sufficient time to review and analyze all of the information.

    2.    Plaintiffs object to each Interrogatory and Request for Production on the grounds that it seeks information the Plaintiffs previously produced to the Defendants.  Plaintiffs also object to the Interrogatories and Requests for Production because they seek to contravene the key word searches that TASER and Defendants previously agreed to and seek the production of documents or information broader than the agreed upon searches.

    3.    Plaintiffs object to the Interrogatories and Requests for Production to the extent they seek information neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

    4.    Plaintiffs object to the Interrogatories and Requests for Production to the extent that they seek to impose greater obligations on Plaintiffs than those imposed by the Georgia Civil Procedure Act or any applicable Order from the Court.

5.      Plaintiffs object to the Interrogatories and Requests for Production to the extent they seek information that is protected by applicable privileges or immunities from disclosure, including, without limitation, the attorney-client privilege, accountant-client privilege and the work-product doctrine.  Inadvertent disclosure, if any, of information subject to any privilege, including without limitation the attorney-client privilege or work-product doctrine, is not intended to, and shall not, waive any such privilege or doctrine.

6.      Plaintiffs object to the Interrogatories and Requests for Production to the extent they seek expert and/or damages information in advance of the time agreed on by the parties as memorialized in the Scheduling Order or any Order from the Court in this case.  Expert and/or damages information will only be provided in accordance with the Scheduling Order or any other Order in this case.

7.      Plaintiffs object to the Interrogatories and Requests for Production because Plaintiffs have not received all documents from Defendants upon which their responses to the Interrogatories and Requests for Production may be based. As noted in the Parties' December 13, 2009 Stipulation, Plaintiffs are not required to provide responses where the information from which their response would be derived has not yet been produced.  Moreover, Plaintiffs note that Defendants have produced tens of millions of pages since November of 2009 until today's date, and a substantial portion of those pages were produced on or around December 31,

2009 (*i.e.*, they were not produced in a rolling fashion as originally contemplated by the Parties).

8.    Plaintiffs further object to the Interrogatories and Requests for Production on the grounds that Defendants have marked significant portions of their document productions as "confidential" or "highly confidential" such that the Individual Plaintiffs and some TASER executives, managers and employees are not permitted to review the documents at issue and cannot be involved in providing any response.

9.    Plaintiffs object to providing any response at this time because, as Defendants DBSI, Merrill and BAS have noted, any response Plaintiffs provide to other Defendants' discovery prior to the time all Defendants complete their document productions may be incomplete because Plaintiffs had not received or had adequate time to review documents/data from them which may bear on the liability or damages of other Defendants.

### RESPONSES TO SECOND SET OF INTERROGATORIES

**INTERROGATORY No. 1.    For each Plaintiff, please identify:  (a) each transaction in TASER stock engaged in during the Relevant Time Period in which that Plaintiff alleges it suffered losses as a result of any Defendant's "illegal short selling," as that term is used in Paragraph 2 of the Complaint, specifically identifying for each such transaction the number of shares sold, the price at which they were sold, the price paid for, or cost basis of such shares, and the loss incurred in connection with each such transaction; (b) the amount of monetary loss that each Plaintiff claims to have incurred in connection with its holdings of TASER stock as a result of such "illegal short**

selling," and (c) the amount of damages that each Plaintiff believes it suffered as a result of such "illegal short selling," regardless of whether that Plaintiff believes it suffered an actual monetary loss.

## RESPONSE NO. 1

Plaintiffs object to this Interrogatory on the grounds that it is vague and ambiguous because it is unclear whether the phrase "each transaction in TASER stock engaged in" refers to each of the Plaintiffs' transactions in TASER stock or any of Defendants' transactions in TASER stock which caused the Plaintiffs harm (or both).  For purposes of this Interrogatory, Plaintiffs have construed this phrase as seeking information concerning the Plaintiffs' own transactions in TASER stock and not relating to Defendants' transactions in TASER stock.  Accordingly, Plaintiffs will not provide any information regarding Defendants' transactions in TASER securities which harmed the Plaintiffs pursuant to this Interrogatory which, in any event, is already in the Defendants' possession.

Plaintiffs object to this Interrogatory on the grounds that it is more than one Interrogatory pursuant to O.C.G.A. § 9-11-33.

Plaintiffs object to the extent this Interrogatory seeks information that is privileged or attorney work product.

Plaintiffs object to this Interrogatory on the grounds that the amount of damages and monetary loss suffered by each Plaintiff is a topic for expert discovery and, pursuant to the Court's Scheduling Order, expert discovery has not

yet commenced.  Plaintiffs' responses to this Interrogatory will be supplemented by and through expert discovery.

Plaintiffs object this Interrogatory on the grounds that a response can only be provided after reviewing the materials produced by the Defendants, many of which have not been entirely produced or which bear confidentiality designations on them such that the Plaintiffs cannot individually review the requisite documents in order to provide a response as to what his, her or its "amount of damages" or "amount of monetary loss" is.

Plaintiffs object to this Interrogatory on the grounds that Plaintiffs do not have all of the necessary information in order to provide a full and complete response and that the Interrogatory is therefore premature.  *See* December 15, 2009 Stipulation and Order at ¶ 13 (all Defendants except UBS).  *See also* December 21, 2009 Stipulation and Order at ¶ 12 (same regarding Defendant UBS).  In particular, Defendants have not produced all of the responsive documents and data, and they have not provided all of the information necessary to fully read, understand and analyze the documents and data.

Further, as noted and stipulated by Defendants Credit Suisse, Bear Stearns and Goldman Sachs, "any response Plaintiffs provide to other Defendants' discovery prior to September 1, 2010 may be incomplete because Plaintiffs had not received or had adequate time to review documents/data from DBSI which may

bear on the liability or damages of other Defendants." Stipulation and Order (5/12/10) at ¶ 1(d). Moreover, Plaintiffs are not able to provide a full response even as to information that may have already been produced by the Defendants. Plaintiffs note that tens of millions of pages have been produced by the Defendants and most of that production occurred in June 2010 (in contravention of the parties' agreement and the Court's Order that the Defendants produce documents on a rolling basis). Given the volume of documents and other information provided, Plaintiffs have not had sufficient time to review and analyze all of the information produced to date and it is unreasonable to expect that they have yet done so.

Further, even if information had previously been provided, Plaintiffs may not be able to currently understand or appreciate the significance of that information where a Defendant has not provided all of the data responsive to Plaintiffs' document requests. For example, raw data is meaningless without communications that occurred at the same time. Conversely, without certain raw data, communications may appear to be irrelevant when they are in fact highly relevant and responsive to this Interrogatory. As stated by the SEC: "Proof of a manipulation almost always depends on inferences drawn from a mass of factual data. Findings must be gleaned from patterns of behavior, from apparent irregularities, and from trading data. When all of these are considered together, they can emerge as ingredients in a manipulative scheme designed to tamper with

free market forces." SEC Initial Decision Release No. 82 Administrative

Proceeding File No. 3-8511: In the Matter of Sharon M. Graham, Stephen C. Voss,

and James J. Pasztor, December 28, 1995, citing Pagel, Inc., 48 S.E.C. 223, 226

(1985).

Subject to and without waiving the foregoing objections, Plaintiffs respond

to this Interrogatory as follows:

By engaging in illegal and manipulative conduct, including abusive naked

short sales, Defendants created artificial and/or counterfeit security entitlements,

which are effectively treated the same as actual, authorized and issued TASER

securities. For example, the artificial and/or counterfeit security entitlements can

be bought, sold, borrowed and loaned. The creation of artificial and/or counterfeit

security entitlements dilutes the value, rights and benefits of actual, authorized and

issued TASER securities by, *inter alia*, creating excess supply. In addition,

Defendants' illegal and manipulative conduct artificially limits the demand for

TASER securities because, *inter alia*, it caused TASER to become described

and/or known as a security that is subject to manipulation, which dissuades and

deters potential investors.[1]

---

[1] The SEC has recognized that "unwarranted reputational damage" from naked
short selling can harm a security. *See, e.g., SEC Release No. 34-58774, 73 Fed.
Reg. 61666, 61669-70 (Oct. 17, 2008).*

809005.1
Highly Confidential Pursuant to Protective Order

By both artificially increasing the supply of and decreasing the demand for TASER securities, the Defendants have caused the price of TASER stock to be lower during the relevant time period than it otherwise would have been in the absence of Defendants' pattern of illegal and manipulative conduct. Indeed, "the [Securities & Exchange] Commission has repeatedly recognized that naked short selling can depress stock prices." *See Office of Inspector General, Practices Related to Naked Short Selling Complaints and Referrals, Report No. 450, March 18, 2009.*

As a result, based upon current information and belief and subject to amendment upon completion of lay and expert analyses of Defendants' data and documents, **Plaintiffs were harmed by Defendants' conduct in each instance in which any Plaintiff sold TASER securities since no later than 2004** (additional lay and/or expert analyses of Defendants' documents and data is necessary before Plaintiffs can identify a more specific time period when the harm occurred). In addition, one or more Plaintiffs may have sold additional TASER stock with greater frequency and/or in greater share amounts if they could have done so at a non-manipulated and thus higher price. Accordingly, Defendants' conduct may have caused one or more Plaintiffs to lose the availability of funds derived from TASER securities sales at a non-manipulated price (including, but not limited to the time value of money) and caused them to lose the rights and benefits associated

with selling TASER securities at a time of their choosing at a non-manipulated price.

Pursuant to O.C.G.A. § 9-11-33(c), Plaintiffs direct Defendants to Plaintiffs' productions of documents wherein they have provided all of their information regarding each of their transactions in TASER stock, including the number of shares sold, the price at which they were sold, the price paid for, or cost basis of such shares. Those documents can be located at Bates numbers: TSR-ALMEROTH-00000001 – TSR-ALMEROTH-00000072; TSR-BAKERJ-00000001 – TSR-BAKERJ-00000396; TSR-BAKERR-00000001 – TSR-BAKERR-00000531; TSR-BATCHELORD-00000001 – TSR-BATCHELORD-00000036; TSR-BATCHELORN-00000001 – TSR-BATCHELORN-00000034; TSR-BOYER-00000001 – TSR-BOYER-00000486; TSR-BURNSIDE-00000001 – TSR-BURNSIDE-00000769; TSR-COLLENTINE-00000001 – TSR-COLLENTINE-00000187; TSR-CONNELLY-00000001 – TSR-CONNELLY-00000787; TSR-CULVER-00000001 – TSR-CULVER-00000435; TSR-DUNAGIN-00000001 – TSR-DUNAGIN-00000243; TSR-FAIRES-00000001 – TSR-FAIRES-00000374; TSR-HASKELLD-00000001 – TSR-HASKELLD-00000158; TSR-HASKELLR-00000001 – TSR-HASKELLR-00000252; TSR-HASKELLS-00000001 – TSR-HASKELLS-00000203; TSR-KELLEYK-00000001 – TSR-KELLEYK-00000074; TSR-KELLEYM-00000001 – TSR-

KELLEYM00000049; TSR-LEWIS-00000001 – TSR-LEWIS-00000064; TSR-LISENBY-00000001 – TSR-LISENBY-00000255; TSR-MAJ-00000001 – TSR-MAJ-00000257; TSR-MILLER-00000001 – TSR-MILLER-00001368; TSR-RICHARDSON-00000001 – TSR-RICHARDSON-00000168; TSR-ROCHE-00000001 – TSR-ROCHE-00000039; TSR-SCOTTC-00000001 – TSR-SCOTTC-00000042; TSR-SCOTTJ-00000001 – TSR-SCOTTJ-00000140; TSR-SCOTTPA-00000001 – TSR-SCOTTPA-00000040; TSR-SCOTTPE-00000001 – TSR-SCOTTPE-00000055; TSR-SMITHP-00000001 – TSR-SMITHP-00000249; TSR-SMITHR-00000001 – TSR-SMITHR-00000149; TSR-SMITHT-00000001 – TSR-SMITHT-00000152; TSR-STUCKER-00000001 – TSR-STUCKER-00000208; TSR-ZELTEN-00000001 – TSR-ZELTEN-00001108; TASER00000991-TASER00000994; TASER00007732-TASER000007763; TSR-ALMEROTH-00000073 – TSR-ALMEROTH-00000083; TSR-BAKERJ-00000399- TSR – BAKERJ-00000415; TSR-BATCHELORN-00000035 – TSR-BATCHELORN-00000039; TSR-BATCHELORD-00000037 – TSR-BATCHELORD-00000041; TSR-BOYER-00000487 – TSR-BOYER-00000537; TSR-BURNSIDE-00000770 – TSR-BURNSIDE-00000880; TSR-COLLENTINE-00000188 – TSR-COLLENTINE-00000194; TSR-CONNELLY-00000788 – TSR-CONNELLY-00000891; TSR-DUNAGIN-00000244 – TSR-DUNAGIN-00000273; TSR-FAIRES-00000431 – TSR-FAIRES-00000510; TSR-HASKELLD-00001248 –

TSR-HASKELLD-00001260; TSR-HASKELLR-00001664 – TSR-HASKELLR-00001705; TSR-HASKELLS-00000204 – TSR-HASKELLS-00000214; TSR-KELLEYK-00000135 – TSR-KELLEYK-00000136; TSR-KELLEYM-00000050 – TSR-KELLEYM-00000051; TSR-LISENBY-00000256 – TSR-LISENBY-00000262; TSR-MAJ-00000292 – TSR-MAJ-00000342; TSR-RICHARDSON-00000169 – TSR-RICHARDSON-00000172; TSR-ROCHE-00000040 – TSR-ROCHE-00000044; TSR-SCOTTPA-00000041 – TSR-SCOTTPA-00000046; TSR-SCOTTPE-00000056 – TSR-SCOTTPE-00000060; TSR-SMITHP-00000250 – TSR-SMITHP-00000269; TSR-SMITHR-00000151– TSR-SMITHR-00000166; TSR-SMITHT-00000153 – TSR-SMITHT-00000170; TSR-STUCKER-00000211 – TSR-STUCKER-00000233; TSR-HASKELLR-00001329 - TSR-HASKELLR-00001332; TSR-CULVER-00000436 – TSR-CULVER-00000462; TSR-ROCHE-00000040 – TSRROCHE-00000044; TSR-SCOTTJ-00000141 - TSR-SCOTTJ-00000153; TSR-SCOTTPA-00000041 – TSR-SCOTTPA-00000046; TSR-SCOTTPE-00000056 – TSR-SCOTTPE-00000060; and TSR-ZELTEN-00001110 – TSR-ZELTEN-00001153.

With regard to Plaintiff TASER and any Individual Plaintiff who is also an officer or director of TASER, the information requested may also be located within their reports and filings (including annual reports and Forms 4) with the Securities and Exchange Commission ("SEC"), which have been previously produced for the

entire Time Period, even though they are a matter of public record, and can be readily accessed by the Defendants.

In addition, a purchase or sale in TASER stock did not have to occur for Defendants' conduct to have caused damage to any Plaintiff, and particularly with respect to Plaintiff TASER. For example, as stated above, the Defendants' conduct resulted in the creation of artificial and/or counterfeit security entitlements, which are treated the same as TASER securities. As a result, the Defendants effectively issued new TASER securities that TASER did not authorize and for which TASER never received payment (yet, TASER suffered the harm of dilution). Consequently, TASER securities have traded and continue to trade as though more shares were issued that TASER actually authorized. TASER has suffered all of the harms associated with the issuance of additional outstanding shares by an unauthorized third party, including, but not limited to, dilution, reputation damage, failure to receive payment for the new "shares" and failure to maintain all rights, benefits, control and value over its tangible and intangible property. Moreover, TASER has suffered harm in that, if it endeavored to try and buy the artificially created securities entitlements out of the market, it would have to assume the cost of those purchases. Each of the harms described above during the relevant time period.

Plaintiffs further respond that based upon a preliminary analysis of the partial information that has been produced to date, and subject to amendment and/or addition during expert discovery, Defendants' conduct potentially caused Plaintiffs harm in at least the additional following ways:

(1)     The creation of artificial and/or counterfeit securities entitlements diluted Plaintiffs' voting rights and the control and authority of TASER's Board;

(2)     By engaging in abusive naked short sales, particularly at or around times when TASER announced positive news, Defendants created artificial impediments to TASER's stock price appreciation;

(3)     The manipulation may have discouraged analysts or others to follow TASER stock, which may have affected demand;

(4)     Plaintiffs lost some of the rights, benefits, value and/or control over the tangible and intangible rights associated with TASER securities and/or treasury stock;

(5)     Plaintiffs lost the potential full value associated with lending TASER securities and obtaining interest associated therewith;

(6)     By creating artificial or counterfeit security entitlements, Defendants misappropriated and/or engaged in theft of TASER's name, likeness, goodwill and property (both tangible and intangible);

809005.1
Highly Confidential Pursuant to Protective Order

(7)     By creating the false impression of sales, Defendants created further downward pressure on TASER's stock price by, *inter alia*, the sales themselves and providing a perceived credibility to negative market rumors;

(8)     Abusive naked short selling creates an incentive to disseminate false news or information about TASER securities, which can detrimentally affect the company's stock price;

(9)     Because a Defendant's cost to deliver failed shares is marked to market each day, each Defendant has an incentive to lower TASER's stock price as much as possible to reduce its obligation and collateral requirements;

(10)    To the extent a Defendant was short TASER in its proprietary accounts, it had an incentive to lower TASER's stock price as much as possible;

(11)    By driving down the price of TASER stock, Defendants reduced the value of stock issuances, stock grants and stock options;

(12)    But for Defendants' illegal conduct which drove down the price of TASER stock, Defendants' conduct may have affected Plaintiffs' ability to sell their shares for their true value, resulting in the delay of sales (including but not limited to losses resulting from the time value of money) or selling shares for sums less than they were worth;

(13)   Defendants' naked short selling resulted in market manipulation;[2] and

(14)   Defendants' naked short selling infringed on the rights of actual

shareholders of TASER stock.[3]

The type and amount of damages each Plaintiff suffered as a result of

Defendants' conduct is the subject of expert testimony and will be addressed

during expert discovery.  Accordingly, Plaintiffs reserve their right to supplement

their response to this Interrogatory as discovery continues and through expert

discovery.  Rather than restate Plaintiffs' experts' position in this Interrogatory,

Plaintiffs' expert discovery is hereby incorporated into this response.

---

[2] *See, e.g.*, GSE_T 01146058.
[3] *Id.*

809005.1
Highly Confidential Pursuant to Protective Order

**Interrogatory No. 2.** **For each Defendant, please identify (a) each trading day during the Relevant Time Period where You believe that Defendant participated in "illegal short selling," as that term is used in Paragraph 2 of the Complaint, with respect to TASER stock; and (b) each transaction during the Relevant Time Period where You believe that Defendant participated in "illegal short selling," as that term is used in Paragraph 2 of the Complaint, with respect to TASER stock.**

**RESPONSE NO. 2**

Plaintiffs object to this Interrogatory on the grounds that it is more than one Interrogatory pursuant to O.C.G.A. § 9-11-33.

Plaintiffs object this Interrogatory on the grounds that a response can only be provided after reviewing the materials produced by the Defendants, many of which have not been entirely produced or which bear confidentiality designations on them such that the Plaintiffs cannot individually review the requisite documents in order to provide a response. Among other things, the Defendants have not properly responded to Interrogatory No. 5 contained in Plaintiffs' Second Interrogatories such that Plaintiffs are not able to supply all of the information requested in this Interrogatory.

Plaintiffs object to this Interrogatory on the grounds that Plaintiffs do not have all of the necessary information in order to provide a full and complete response and that the Interrogatory is therefore premature. *See* December 15, 2009 Stipulation and Order at ¶ 13 (all Defendants except UBS). *See also* December 21, 2009 Stipulation and Order at ¶ 12 (same regarding Defendant UBS). In particular,

Defendants have not produced all of the responsive documents and data, and they have not provided all of the information necessary to fully read, understand and analyze the documents and data.

Further, as noted and stipulated by Defendants Credit Suisse, Bear Stearns and Goldman Sachs, "any response Plaintiffs provide to other Defendants' discovery prior to September 1, 2010 may be incomplete because Plaintiffs had not received or had adequate time to review documents/data from DBSI which may bear on the liability or damages of other Defendants." Stipulation and Order (5/12/10) at ¶ 1(d). Moreover, Plaintiffs are not able to provide a full response even as to information that may have already been produced by the Defendants. Plaintiffs note that tens of millions of pages have been produced by the Defendants and most of that production occurred in June 2010 (in contravention of the parties' agreement and the Court's Order that the Defendants produce documents on a rolling basis). Given the volume of documents and other information provided, Plaintiffs have not had sufficient time to review and analyze all of the information produced to date and it is unreasonable to expect that they have yet done so.

Further, even if information had previously been provided, Plaintiffs may not be able to currently understand or appreciate the significance of that information where a Defendant has not provided all of the data responsive to Plaintiffs' document requests. For example, raw data is meaningless without

communications that occurred at the same time. Conversely, without certain raw data, communications may appear to be irrelevant when they are in fact highly relevant and responsive to this Interrogatory. As stated by the SEC: "Proof of a manipulation almost always depends on inferences drawn from a mass of factual data. Findings must be gleaned from patterns of behavior, from apparent irregularities, and from trading data. When all of these are considered together, they can emerge as ingredients in a manipulative scheme designed to tamper with free market forces." SEC Initial Decision Release No. 82 Administrative Proceeding File No. 3-8511: In the Matter of Sharon M. Graham, Stephen C. Voss, and James J. Pasztor, December 28, 1995, citing Pagel, Inc., 48 S.E.C. 223, 226 (1985).

In addition, Plaintiffs cannot fully respond to this interrogatory at this time because Defendant UBS has admitted that the blue sheets it produced to Plaintiffs in this case are incomplete and inaccurate. Moreover, when Plaintiffs sought to obtain accurate information by asking UBS to produce trade blotters and/or trade runs, UBS refused on the grounds that the information in the trade blotters and/or trade runs was identical to the information in the blue sheets. However, when UBS was required to certify that fact under a Court Order, it changed its position and stated that it cannot represent that the trade blotters and trade runs are identical to the blue sheets. It then offered for the first time in late May to produce that

information, and it was only produced recently.  Moreover, the trade blotters UBS

produced appear to be missing categories of data that Plaintiffs understand are

generally maintained in the ordinary course of business, including short sale

indicator, capacity, exchange, average price indicator and contra broker.  Thus,

UBS's data appears to be incomplete.  Additionally, Plaintiffs have not had

sufficient time to review and analyze the data UBS did provide in its trade blotters,

and thus Plaintiffs cannot fully respond as to UBS.

Plaintiffs also object to Interrogatory No. 2 to the extent it seeks a legal

conclusion or attorney work product, and on the ground that it is overly broad and

unduly burdensome.  Indeed, Plaintiffs cannot be expected to, and are not required

to, write down each fact (including date, person and place) showing Defendants'

liability, particularly when such evidence is contained within the millions of

documents and items of data Defendants have produced.  Consequently, Plaintiffs'

response will be a general summary as opposed to a list of every item of evidence.

Finally, in some cases, information produced by Defendants does not appear to be

accurate or complete such that Plaintiffs are not able to provide a response at this

time.  For example, according to Credit Suisse's blue sheets (CSS-TASER14339-

85601), on December 21, 2007, Credit Suisse's total short sale volume was 23,455

shares.  But, according to Equity Trade Journals produced by NASDAQ, Credit

Suisse sold short 55,204 shares that day.  Credit Suisse and other Defendants have

been sanctioned by regulators for "submitting inaccurate trading information on electronic blue sheets." *See* NYSE January 31, 2006, press release: "NYSE Regulation Announces Settlements with 20 Firms for Systemic Operational Failures and Supervisory Violations."

Bear Stearns also appears to have inaccurate blue sheets. As one example, on March 28, 2005, the Equity Trade Journal shows Bear Stearns selling short 116,406 shares worth $1.5 million to ▓▓▓▓▓▓▓▓▓ but Bear Stearns' blue sheets show the sale of the shares as a long sale from ▓▓▓ to ▓▓▓. Moreover, although Bear Stearns has provided blue sheets to NASD in response to regulatory requests which include account names and addresses,[4] in their blue sheet production to Plaintiffs, many trades list the account name and address as "Information Unavailable."[5] Plaintiffs have requested information linking account numbers to account names from Bear Stearns, but Bear Stearns has not agreed to produce this information.

Similarly, UBS has informed Plaintiffs that its blue sheets may contain inaccurate information from January 1, 2003 through the end of June 2006, but UBS cannot identify which blue sheets are inaccurate (or if any are accurate).

**REDACTED**

---

[4] *See* Bear-T00027826.
[5] Bear-T00027746-27747.

809005.1
Highly Confidential Pursuant to Protective Order

In addition, DBSI has provided documents and data that is inconsistent with the Equity Trade Journals and has not provided Plaintiffs with a complete explanation as to why their blue sheets do not show an opposing broker for 94% of the trades.

Trading information inaccuracies and incomplete productions for Credit Suisse, Bear Stearns, UBS, DBSI and other Defendants may make it difficult, if not impossible, to completely analyze all of the data.  Moreover, the inaccuracies and incomplete information provided, as well as the open questions relating to data and documents Defendants produced and for which Plaintiffs have not yet received answers, may result in an incomplete response to this Interrogatory.  Accordingly, Plaintiffs expressly reserve the right to amend and supplement when and if correct and complete information becomes available.

Subject to and without waiving the foregoing objections, Plaintiffs respond to this Interrogatory as follows:

Defendants have engaged in a pattern of unlawful and manipulative activity, including abusive naked short selling, with respect to TASER and other securities. As Plaintiffs have explained to Defendants, abusive naked short selling involves numerous components and types of improper behavior, as well as acts of concealment.   Plaintiffs have generally identified the types of conduct that can constitute or be a component or abusive naked short selling in the attachment to

809005.1
Highly Confidential Pursuant to Protective Order

their April 15, 2010 email entitled "Yesterday's Agreement." That attachment is hereby incorporated by reference.

Based upon the current review of the data, and subject to amendment upon review of Defendants' data and documents and expert analyses, Defendants' pattern of improper conduct and/or the harm it caused became persistent in 2004/2005 (additional lay and/or expert analyses of Defendants' documents and data is necessary before Plaintiffs can identify a more specific time period when the conduct and/or its harm became persistent). Defendants' pattern of unlawful and manipulative activity and/or its associated harm continued until at least the filing of this lawsuit in April of 2008.

More specifically, and by way of example, Defendants' failures to deliver TASER securities is evident in 2004, with the total number of failures in the CNS system climbing above 8 million shares in December 2004. The CNS fails do not account for all of the failures to deliver TASER securities, as there were additional failures outside of the NSCC system.

In January 2005, the U.S. Securities and Exchange Commission implemented Regulation SHO ("SHO") to curb illegal abusive naked short selling. The new rules under Regulation SHO created threshold securities lists, which mandated exchanges in conjunction with the National Securities Clearing Corporation ("NSCC") to publish lists of securities in the national clearing and

settlement system that had significant failures to deliver stock for proper

settlements to purchasers.  Excessive fails to deliver of TASER stock for

settlement in the NSCC system caused TASER to be placed on the publicly

disseminated NASDAQ Regulation SHO threshold security list.  TASER had

persistent fails to deliver and was on the threshold security list for 379 consecutive

trading days beginning when the original list was published in January 2005.  The

pattern of failing to deliver TASER's shares for proper settlement continued within

the NSCC system on virtually a daily basis through July 2008.

Throughout the five plus years that TASER was failing to be delivered at the

NSCC, there was a lack of excess shares to be traded, borrowed or loaned for short

selling in the public marketplace, and the Defendants were aware of this fact.  *See,*

*e.g.,* MS_TASR00037089R-37094R (rating lack of supply of TASER "Hot" and

"Super Hot" from November 26, 2004 through the end of their available record of

May, 29, 2009); UBS_TASER0021290 – 21367 (TASER "Impossible to Borrow"

from June 6, 2005 to September 21, 2005); UBS_TASER0016146 – 21289 (UBS's

easy to borrow list contained TASER on only 18 days out of 1,614 days during the

Time Period); UBS_TASER0000003 (UBS' compliance manual for Supervisory

Procedures Applicable to Regulation SHO states that, "Securities Lending will

ensure that T+ 13 securities (and Threshold securities) will not be added to the

Easy to Borrow List."); Bear-T00030684; Bear-T00031036 (listing TASER as

hard to borrow for almost all times during the Relevant Time Period); BAS

TASER 1663 – 1666 (TASER listed on "Good to Borrow" list on only two dates

for the Relevant Time Period); UBS_TASER0016146–21289 (TASER on easy to

borrow list for only 18 days during Relevant Time Period); DBSI-TASER 003213

– 003219 (TASER listed as "Special," "Hard to Borrow" and "Not Good

Collateral" from October 13, 2006 through May 29, 2009); GS_TASER000251

(compliance manual stating that a Regulation SHO security should always be

considered a hard to borrow stock); Bear-T00030684 and Bear-T00031036 (listing

TASER as "Hard to Borrow" nearly every day from January 2, 2003 through

May 29, 2009).

Despite the repeated failures to deliver and/or receive TASER securities and

TASER securities' continued unavailability for stock loans, Defendants engaged in

a pattern of permitting, facilitating or engaging in unlawful and manipulative

abusive naked short sales of TASER securities (which included not only unlawful

short sales, but facilitating and aiding and abetting those sales through, among

other things, failing to locate or have reasonable grounds to believe that it could

borrow or obtain securities for delivery by the settlement date, false or sham

locates, mismarked tickets, failure to conduct buy ins, etc.).[6] The Defendants also took unlawful steps to conceal their illegal conduct.

The Defendants' conspiracy and/or its harmful effects occurred during the relevant Time Period (though, as stated above, it became more persistent in 2004/2005). As a result, Defendants' conduct is not appropriately tied to a single trading day or transaction. Some illustrative examples of the Defendants' conspiracy and unlawful conduct during the relevant time period, and/or evidence of their aiding and abetting that unlawful conduct, are as follows:[7]

- Defendants repeatedly failed to deliver and/or receive TASER and other securities as required by SEC and other agency rules, SROs, federal and/or state securities laws and/or their own compliance manuals, policies and procedures. *See, e.g.,* GS_TASER2945; MS_TASR_8492; MS_TASR9083; MS_TASR9673; MS_TASR9726; MS_TASR37429; CSS-TASER-E168134; MS_TASR_2633657. For example, with respect to CNS fails:

    o From 2004 to 2008, out of approximately 252 trading days per year, Goldman Sachs failed to deliver/receive TASER securities as follows:

---

[6] *See* GSE_T 01146053-77.

[7] The bullet points below are examples and do not constitute an exhaustive list. Further, in many instances, Plaintiffs are providing a few cites in an effort to demonstrate the conduct. These citations are not meant to, and do not in any way contain, an exhaustive list of the documents and data supporting Plaintiffs' claims. Rather, they are for illustrative purposes only.

809005.1
Highly Confidential Pursuant to Protective Order

- 2004 – approximately 250 days

- 2005 – approximately 245 days

- 2006 – approximately 188 days

- 2007 – approximately 145 days

- 2008 – approximately 108 days

o   In fact, from late 2004 until early 2005, ***Goldman Sachs failed to deliver over 5 million TASER shares***.

o   From 2004 to 2008, out of approximately 252 trading days per year, Credit Suisse failed to deliver/receive TASER securities as follows:

- 2004 – approximately 177 days

- 2005 – approximately 171 days

- 2006 – approximately 122 days

- 2007 – approximately 86 days

- 2008 – approximately 64 days[8]

---

[8] *See* Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Second Requests for Admission to Each Defendant at Request No. 39 ("Admitted that Credit Suisse Securities was in a net failure to *deliver* position to CNS in TASER as follows: 2004- on approximately 26 days[;] 2005 – on approximately 28 days[;] 2006 – on approximately 9 days[;] 2007 – on approximately 20 days[;] 2008 – on approximately 22 days[.]  Admitted that Credit Suisse was in a net fail to *receive* position from CNS in TASER as follows: 2004- on approximately 151 days[;] 2005- on approximately 143 days[;] 2006 – on approximately 113 days[;] 2007 – on approximately 66 days[;] 2008 – on approximately 42 days").

809005.1
Highly Confidential Pursuant to Protective Order

- o From 2004 to 2007, out of approximately 252 trading days per year, Morgan Stanley failed to deliver/receive TASER securities as follows:[9]

    - 2004 – approximately 228 days

    - 2005 – approximately 195 days

    - 2006 – approximately 135 days

    - 2007 – approximately 134 days

- o From 2004 to 2007, out of approximately 252 trading days per year, Merrill Lynch failed to deliver/receive TASER securities as follows:

    - 2004 – approximately 244 days

    - 2005 – approximately 250 days

    - 2006 – approximately 244 days

    - 2007 – approximately 154 days

- o As shown above, from 2004 to 2006, Merrill Lynch failed to deliver/receive TASER securities almost every trading day each year, with some failures exceeding 750,000 shares

- o From 2004 to 2007, out of approximately 252 trading days per year, Deutsche Bank failed to deliver/receive TASER securities as follows:

---

[9] In many cases, the failures involved transactions between and among different Defendants. *See, e.g.,* MS_TASR_37429 (showing a failure of 227,400 shares with a Goldman affiliate and a failure of 19,200 shares with Merrill Lynch).

809005.1
Highly Confidential Pursuant to Protective Order

- 2004 – approximately 186 days

- 2005 – approximately 182 days

- 2006 – approximately 130 days

- 2007 – approximately 103 days

o From 2004 to 2008, out of approximately 252 trading days per year, UBS failed to deliver/receive TASER securities as follows:

- 2004 – approximately 187 days

- 2005 – approximately 181 days

- 2006 – approximately 149 days

- 2007 – approximately 101 days

- 2008 – approximately 81 days

o From 2004 to 2005, out of approximately 252 trading days per year, Banc of America failed to deliver/receive TASER securities as follows:

- 2004 – approximately 127 days

- 2005 – approximately 73 days

o From 2004 to 2005, out of approximately 252 trading days per year, Bear Stearns  has admitted that it failed to deliver/receive TASER securities as follows:

- 2004 – approximately 115 days

809005.1
Highly Confidential Pursuant to Protective Order

- 2005 – approximately 86 days[10]

o In many instances, one or more Defendants had consistent failures to receive, indicating that the Defendant knew that TASER securities were not settling and thus the Defendant should have, *inter alia*, required a buy-in.  The failure to request a buy-in further demonstrates Defendants' agreement and conspiracy to permit and/or facilitate naked short selling and other improper and/or manipulative activity.  At a minimum, it demonstrates that the Defendant aided and abetted the conspiracy.

o In 2009, after this lawsuit was filed, every Defendant failed to deliver/receive on less than 5 trading days our of approximately 252 trading days per year, proving that their prior conduct was not inadvertent and that the failures to deliver/receive could have been prevented.[11]

---

[10] Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request No. 45.

[11] Each of the Defendants admitted the following Request for Admission on their own behalf : "In 2009, none of the Defendants had a net fail to deliver or net to receive position in TASER commons stock for more than five trading days."  UBS Securities, LLC's Objections and Responses to Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request No. 46 ("Admitted as to

- According to SEC Fails-to-Deliver Archive data -
  www.sec.gov/foia/docs/failsdata-archive.htm - on December 6, 2004, there
  were 8,102,052 CNS fails to deliver in TASER Securities, equating to
  13.66% of the shares outstanding at that time.

---

UBS during the relevant period in 2009 (i.e. January 1, 2009 – May 31, 2009).
Specifically, UBS did not have a net fail to deliver or net failure to receive position
in TASER common stock for more than five trading days between January 1, 2009
and May 31, 2009."); Defendant Banc of America Securities LLC's Responses and
Objections to Plaintiffs' Amended Second Requests for Admission at Request No.
46 ("Admitted as to BAS for the relevant period in 2009 (i.e., January 1, 2009-
May 31, 2009)."); Defendant Morgan Stanley & Co. Incorporated's Objections and
Responses to Plaintiffs' Amended Second Requests for Admission to Defendants
at No.46 (same regarding Morgan Stanley); Defendant Merrill Lynch, Pierce,
Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Amended
Second Requests for Admission at Request No. 46 (same regarding Merrill
Lynch); Defendant Deutsche Bank Securities Inc.'s Objections and Responses to
Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request
No. 46 (same regarding Deutsche Bank); Defendant Credit Suisse Securities
(USA) LLC's Objections and Responses to Plaintiffs' Second Requests for
Admission to Each Defendant at Request No. 46 (same regarding Credit Suisse);
Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman
Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for
Admission to Defendants at Request No. 46 (same regarding Goldman Sachs
defendants); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities
Corp.'s Objections and Responses to Plaintiffs' Second Amended Requests for
Admission to Each Defendant at Request No. 46 (same regarding Bear Stearns).

- Defendants' failure to deliver and/or receive TASER securities was not an isolated incident, but rather was part of a larger intentional and ongoing pattern and practice involving other securities. *See, e.g.,* UBS_TASER1077; UBS_TSR33893. For example, according to UBS's Fail on Sale Reports, failures to deliver to/from UBS sometimes exceeded one billion dollars worth of securities. *See, e.g.,* UBS_TSR47527. Those failures included transactions involving Goldman Sachs & Co., Morgan Stanley, Credit Suisse, Deutsche Bank, Bear Stearns, Banc of America and Merrill Lynch. *Id.*

- As Plaintiffs have indicated, the identification of improper transactions involving or relating to naked short selling requires expert analyses and information, which is not required at this time under the Scheduling Order and given, among other things, Defendants' failure to produce documents and data in a timely manner and their failure to provide it in a complete, useable and readable form. Nonetheless, Plaintiffs provide below examples of what they currently believe to be improper transactions, which are based on current knowledge and subject to further analysis. Plaintiffs will identify additional transactions during expert discovery and reserve the right to amend the following list as well as the other transactions identified in response to this Interrogatory:

(a)     June 25, 2004: Defendant Goldman Sachs Execution (0690) as

clearing broker, permitted, facilitated or engaged in two transactions

where           sold 232,000 shares short and failed to deliver. [12]

These trades were marketed as long and sold through the NASDAQ

even though they were actually short sales.  These short sales were not

covered, and were a substantial portion of Goldman Sachs

Execution's increase of its fail position by 315,023 shares of TASER

on June 25, 2004.[13]

(b)     On July 20, 2004: Defendant Goldman Sachs Execution as clearing

broker, permitted, facilitated or engaged in a transaction where

        sold 800,000 shares short that failed in delivery.[14]  These

trades were marketed as long and sold through the NASDAQ even

though they were actually short sales.  These short sales were not

covered, and they were a substantial portion of Goldman Sachs

Execution's increase of its fail position by 873,899 shares of TASER

on July 20, 2004.[15]  This suspect transaction also included a sham

**REDACTED**

---

[12] GSEC_TASER 000005.
[13] DTCC00000019.
[14] GSEC_TASER 000005.
[15] DTCC00000020.

809005.1
Highly Confidential Pursuant to Protective Order

options contract which consisted of an improper married put and call

for 8,000 contracts (representing 800,000 shares of TASER)[16];

(c)     On December 23, 2004, Defendant Goldman Sachs Execution as

clearing broker, permitted, facilitated or engaged in a transaction

where _____ sold 1,000,000 shares short in two transactions.[17]

These trades were marketed as long and sold through the NASDAQ

even though they were actually short sales.  These shorts were not

covered, and they were a substantial portion of Goldman Sachs

Execution's increase of its fail position by 987,418 shares of TASER

on December 23, 2004[18];

(d)     Defendant Goldman Sachs Execution facilitated, engaged in and/or

permitted its client _____ to engage in sales of TASER stock

from March 18, 2004 through May 13, 2005.  Throughout this time

period, _____ maintained a continuous short position in

TASER securities at Goldman Sachs Execution.[19]  Thus,

_____ sales of TASER stock between March 18, 2004 and May

13, 2005 involved abusive naked short selling;

**REDACTED**

---

[16] GSEC_TASER00015.
[17] GSEC_TASER 000005.
[18] DTCC00000024.
[19] GSEC_TASER 000042.

(e)     Between March 18, 2004 and May 13, 2005, Defendant Goldman

Sachs Execution facilitated, engaged in and/or permitted its client

_____ to engage in 184 transactions involving TASER

securities (*e.g.* each of _____'s transactions in TASER in that

time period) that contributed to _____'s continuous short

position[20];

(f)     In total, Goldman Sachs Execution facilitated, permitted and profited

from allowing _____ to sell 7.9 million more shares of TASER

common stock than _____ purchased;

(g)     On October 27, 2005, Defendant Merrill Lynch, permitted, facilitated

and/or engaged in a transaction where _____

sold 215,000 shares short.  These trades were marketed as long and

sold through the NASDAQ even though they were actually short

sales.  Also on this date, Defendant Merrill Lynch, permitted,

facilitated and/or engaged in a transaction where _____ sold

150,000 shares short.  These trades were also marked as long even

though they were actually short sales that failed to be delivered.[21]

These two short sale transactions were not covered and they were a

**REDACTED**

---

[20] GSEC_TASER 000005.
[21] ML-TSINTL0069216 – 69227.

809005.1
Highly Confidential Pursuant to Protective Order

substantial portion of Merrill Lynch's increase of its fail position by 358,300 shares of TASER on October 27, 2005; [22]

(h)     On July 29, 2005:  Defendant Merrill Lynch, permitted, facilitated and/or engaged in a transaction where

sold 295,023 shares short that failed to be delivered.[23]  These trades were marketed as long and sold through the NASDAQ even though they were actually short sales.  These short sales were not covered and they were a substantial portion of Merrill Lynch's increase of its fail position by 293,723 shares of TASER on July 29, 2005;[24]

(i)     On August 24, 2005: Defendant Merrill Lynch, permitted, facilitated and/or engaged in a transaction where

sold 295,100 shares short that failed to be delivered.[25]  These trades were marketed as long and sold through the NASDAQ even though they were actually short sales.   These short sales were not covered and they were a substantial portion of Merrill Lynch's increase of its fail position by 297,800 shares of TASER on August 24, 2005.[26]  This transaction also included a sham options contract which consisted of

_____

[22] DTCC00000035.                    **REDACTED**
[23] ML-TSINTL0069216 – 69227.
[24] DTCC00000033.
[25] ML-TSINTL0069216 – 69227.
[26] DTCC00000033.

809005.1
Highly Confidential Pursuant to Protective Order

an improper married call for 2,951 contracts (representing 295,100

shares of TASER);[27]

(j)     For the foregoing trades involving                                    and

                    , Defendant Merrill Lynch acted as executing broker,

prime broker and clearing firm for both the equity and options

transactions of                        and                    . As

such, it permitted, facilitated, engaged in and/or profited from these

transactions;

(k)     After Regulation SHO was implemented on January 3, 2005, Merrill

Lynch Pax had a fail position in TASER at the NSCC from January

19, 2005 through June 20, 2006, a total of 356 trading days.  This fail

position peaked at approximately 1.7 million shares on January 19,

2006.[28]  TASER was a Regulation SHO Threshold Security during

this entire period of time.  On January 19, 2006, Merrill Lynch Pax

had a fail position of 1,687,892 TASER shares at the NSCC.[29]  Merrill

Lynch's records show that the short positions of only three of its

clients,

                    , accounted for 87% of Merrill Lynch's fail

---

[27] ML-TSINTL0087536 – 87556.
[28] DTCC 00000001 – 83.                    **REDACTED**
[29] DTCC00000037.

809005.1
Highly Confidential Pursuant to Protective Order

position on this date.[30] TASER's total fails to deliver at the NSCC on

January 19, 2006 were 2,021,126 shares for all market participants.[31]

The growing fail positions at Merrill Lynch Pax from these three short

sellers, after the implementation of Regulation SHO, were deliberate

failures to deliver;

(l)     Defendant Merrill Lynch also engaged in abusive naked short selling

with regard to transactions undertaken outside the NSCC.  For

example, Merrill Lynch undertook activity which, if reported to the

NSCC, would have resulted in TASER continuing to be listed as a

Regulation SHO Threshold Security.  From July 20, 2007 through

January 2, 2008, Merrill Lynch facilitated, engaged in or permitted its

client                    to hide is failed short position in TASER

securities.  During this time period,                    established new fail

to deliver positions on 61 days, with some of those positions lasting

over one hundred days.[32]  Merrill Lynch's records show that

                    fail position grew to 900,000 shares of TASER by

December 31, 2007.  ML-TSINTL0069213.  However, TASER's <u>total</u>

---

[30] ML-TSINTL0067501.
[31] DTCC00000037.
[32] Some of these fail positions may have been pending longer than one hundred days.  Due to the in complete nature of the records at issue, the entire length of some of these fail positions cannot currently be calculated.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

fail position at the NSCC on December 31, 2007 was only 203,301 shares. DTCC00000060. Rather than report the 900,000 fails, Merrill Lynch internalized them such that they were hidden from the NSCC and regulators.

(m)     Defendant Merrill Lynch facilitated, engaged in or permitted its clients to participate in willful violations of Regulation SHO. On August 5, 2009, the SEC reported the results of its investigation of Merrill Lynch client Hazan Capital Management, finding that Hazan Capital Management had conspired with others to participate in sham transactions specifically targeting Regulation SHO Threshold Securities. TASER was such a security. As held by the SEC, Hazan Capital Management

> willfully violated Rule 203(b)(3) of Reg SHO by engaging in a series of sham reset transactions that employed short-term, paired stock and option positions, which enabled [Hazan] to circumvent its closeout obligations in Reg SHO threshold securities. HCM *also assisted other options market makers who were executing their own sham reset transactions by acting as a counterparty to the sham transactions* and in doing so violated the locate requirement.

*See* SEC Administrative Proceeding File No. 3-13570 (Aug. 5, 2009) (emphasis added).

(n)   Merrill Lynch's records show that Merrill Lynch permitted, facilitated and/or engaged in the same activity condemned by the SEC.  As one example, Merrill Lynch's Threshold Fail Tracking System Data shows that                    had a fail to deliver position of 107,409 TASER shares on November 9, 2005.  Merrill Lynch clients

                         (paired fails) had identical fail to deliver positions on this date.  For the next two trading days, November 10th and 14th, these six participants each maintained a fail position of 107,049 TASER shares.  Similar activity can be found in Merrill Lynch's records on June 16, 2005 through June 24, 2005, October 21, 2005 through October 25, 2005 and November 10, 2005 through November 15, 2005.[33]

(o)   Credit Suisse admits that, outside of CNS, there has been at least one instance where it failed to deliver TASER common stock, and that failure persisted for more than 13 consecutive settlement days.  *See* Amended Responses and Objections of Defendant Credit Suisse Securities (USA) LLC to Plaintiffs' Amended Second Interrogatories to Each Defendant, Response to Interrogatory 5(h).

**REDACTED**

---

[33] ML-TASR0052925.

809005.1
Highly Confidential Pursuant to Protective Order

(p)     Credit Suisse admits that on July 27, 2005 it engaged in a short sale of

TASER securities in its proprietary account          "without first

conducting a locate as required under the federal securities laws."  See

Amended Responses and Objections of Defendant Credit Suisse

Securities (USA) LLC to Plaintiffs' Amended Second Interrogatories

to Each Defendant, Response to Interrogatory 5(c).

(q)     Credit Suisse's blue sheets show long-term short positions.  For

example, Credit Suisse client          sold short 512,500

TASER shares from March 1, 2005 through March 29, 2005, covered

42,700 shares on April 25, 2005 and didn't cover any other TASER

shares through Credit Suisse until August 18, 2008 through September

23, 2008, three and a half years after the short sales took place.  CSS-

TASER0014339-0085601.  Similar to other Defendants' treatment of

large short positions,              's short position is not showing

in the Credit Suisse stock record provided to the Plaintiffs.

- The Defendants' persistent and ongoing pattern and practice of improper

activity concerning and relating to naked short sales and other violations of

the law or regulations are also evidenced in each Defendants' response to

Plaintiffs' Third Interrogatories to all Defendants Except UBS; Plaintiffs'

Third Interrogatories to UBS; and Plaintiffs' Fourth Interrogatories to UBS,

as well as the documents cited therein or produced contemporaneously therewith.  Those responses and documents are incorporated herein by reference as if fully stated herein.

- Defendants' own documents and reports list instances in which transactions in TASER securities were not performed, facilitated or completed in accordance with Defendants' internal rules and regulations and/or securities laws, rules and regulations.  It is equally, if not less, burdensome for Defendants to locate those instances in their own reports than it is for Plaintiffs to search the productions and identify them.   Thus, Plaintiffs will not list each instance in which Defendants' own reports list an improper/illegal TASER transaction.  However, as some examples:

    (1)    According to Morgan Stanley's SAFE/SGUD reports:

         (a)    Morgan Stanley's fail report for February 23, 2005 shows a fail between Morgan Stanley and

                      of 227,400 shares of TASER established on January 28, 2005, that remained failed for 21 days and was recorded as a "MS Short" in Morgan Stanley's reports. [34] Morgan Stanley did not deliver these shares to

---

[34] US Equity Broker and Customer SAFE/SGUD Fails VB.

This was a fail to deliver from Morgan Stanley when the Defendants' daily borrow lists and the Regulation SHO NASDAQ threshold security list indicated that TASER was virtually impossible to borrow to settle short sales.  Regulation SHO was in effect to protect TASER security transactions in the U.S. marketplace from fails due to abusive short sales such as these.

(b)   On or around December 3, 2004,

failed to deliver 19,200 shares of TASER to Morgan Stanley within 13 days, and the fail was outstanding for at least 138 days;

(c)   On or about May 26, 2005

failed to deliver 103,400 shares of TASER to Morgan Stanley within 13 days because it was "short" and had an "insufficient position";

(d)   On or about March 26, 2005, there was a failure to receive 100,000 TASER shares from                    that was 14 days old because "BROKER WAS SHORT"; and

**REDACTED**

(e) On or about May 26, 2005,

failed to deliver 63,300 shares of TASER to Morgan Stanley for

more than 13 days because "client short".

(2) According to Goldman internal reports:

(a) On or about March 2, 2005, Goldman provided improper

locates for TASER;

(b) On or about February 15, 2005, Goldman provided improper

locates for TASER;

(c) On or about April 4, 2005, Goldman provided improper locates

for TASER;

(d) On or about April 6, 2005, Goldman provided improper locates

for TASER;

(e) On or about May 16, 2005, Goldman provided improper locates

for TASER;

(f) On October 24 and 25, Goldman facilitated a short sale of

TASER from          where the ticket was mismarked;

(g) On June 20, 2008, Goldman facilitated a short sale of TASER

from              where the tickets were mismarked;

REDACTED

(h)    On or about July 15, 2004, Goldman facilitated a short sale of

10,000 TASER securities for          when only 500 shares of

TASER were located;

(i)    On or about August 2, 2005, Goldman facilitated a short sale of

2,317 TASER securities for          when only 350 shares of

TASER were located;

(j)    On or about April 15, 2005, Goldman facilitated a short sale of

9,000 TASER securities for          when only 5,000 shares of

TASER were located; and

(k)    On or about May 12, 2005, Goldman facilitated a short sale of

200,000 TASER securities for          when only 20,000

shares were located.

(3)    According to Bear Stearns' internal reports:

(a)    On or about May 24, 2004, Bear Stearns facilitated, permitted

and/or engaged in a short sales of TASER for which it could not

borrow the securities (BEAR T48514 and BEAR T48521)

(4)    Similarly, Defendants' own documents show:

(a)    From at least May 2004 to May 2007, UBS permitted and/or

facilitated short sales for          using inaccurate Easy-to-Borrow

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

lists. This occurred for over one million short sale orders which included, upon information and belief, TASER securities;

(b)     On or around March 8, 2005, BAS had a fail position in TASER that was at least 20 days old from

(c)     On or around August 17, 2007, Merrill Lynch participated, facilitated or otherwise was involved in Reg. SHO violations with respect to TASER securities;

(d)     On or around August 20, 2007, Merrill Lynch participated, facilitated or otherwise was involved in Reg. SHO violations with respect to TASER securities;

(e)     On or around August 22, 2007, Merrill Lynch participated, facilitated or otherwise was involved in Reg. SHO violations with respect to TASER securities;

(f)     Between at least March 2006 and January 2008, Deutsche Bank permitted certain accounts/clients to engage in short sales of TASER stock without first conducting a locate when it disabled its Automatic Block;

(g)     In or around January 28, 2005, Credit Suisse engaged in a short sale of TASER stock when a locate had not been secured and TASER was "impossible to borrow";

(h) Until at least June 2006, short sale orders in UBS's Pinpoint order management system may not have had appropriate locate information as required by Regulation SHO;

(h)    As found by NASD, from January 19, 2005 through May 20, 2005, Merrill Lynch had a fail to deliver position in TASR while the stock was a threshold security.  ML-TSINTL-593578-80.  Those fails included, but are not limited to, the following:

| | |
|---|---|
| 1/19/05 | 15,620 |
| 1/20/05 | 26,012 |
| 1/21/05 | 47,212 |
| 1/24/05 | 22,258 |
| 1/25/05 | 25,258 |
| 1/26/05 | 59,758 |
| 1/27/05 | 49,655 |
| 1/28/05 | 47,905 |
| 1/31/05 | 54,605 |
| 2/1/05 | 49,253 |
| 2/2/05 | 63,853 |
| 2/3/05 | 90,030 |
| 2/4/05 | 91,930 |
| 2/7/05 | 60,130 |
| 2/8/05 | 56,630 |
| 2/9/05 | 57,630 |
| 2/10/05 | 62,952 |
| 2/11/05 | 39,716 |
| 2/14/05 | 47,616 |
| 2/15/05 | 41,916 |
| 2/16/05 | 10,527 |
| 2/17/05 | 56,077 |
| 2/18/05 | 61,777 |
| 2/22/05 | 52,309 |

| | |
|---|---|
| 2/23/05 | 14,409 |
| 2/24/05 | 197,929 |
| 2/25/05 | 194,229 |
| 2/28/05 | 185,829 |
| 3/1/05 | 189,729 |
| 3/2/05 | 174,629 |
| 3/3/05 | 165,379 |
| 3/4/05 | 166,779 |
| 3/7/05 | 180,679 |
| 3/8/05 | 208,879 |
| 3/9/05 | 213,879 |
| 3/10/05 | 215,379 |
| 3/11/05 | 221,829 |
| 3/14/05 | 218,329 |
| 3/15/05 | 208,279 |
| 3/16/05 | 205,379 |
| 3/17/05 | 196,879 |
| 3/18/05 | 191,879 |

(j)     As found by NASD, as of February 4, 2005, Merrill Lynch had

a close-out obligation in TASR under Reg. SHO that it did not

meet.  ML-TSINTL-594578-80;

(k)     On November 7, 2006, Defendant UBS facilitated, permitted

and/or engaged in a short sale of 80,000 shares of TASER with

Defendant                          in which no locate was provided.  At

the time of this transaction, TASER was *not* on the easy to

borrow list;

(l)     On numerous dates, including, but not limited to, March 30,

2007, February 14, 2008, April 25, 2008, April 29, 2008, May

**REDACTED**

1, 2008, May 6, 2008 and June 27, 2008, TASER was listed on
Defendant UBS's Authorized Not Covered report, which tracks,
inter alia, instances where UBS failed to deliver a threshold
security;

(m)  Defendant UBS provided locates for TASER while, at the same
time, it failed to deliver to CNS.  This occurred, for example,
on or around June 27, 2008;.

(n)  Between July 20, 2007 and at least August 17, 2007, Defendant
Merrill Lynch facilitated, permitted and/or engaged in
Regulation SHO violations relating to TASER involving

(o)  On or about August 27, 2004, Merrill Lynch facilitated,
permitted and/or engaged in short sales of TASER in violation
of locate requirements and at a time when TASER stock was
not on the available to borrow list;

(p)  Defendant UBS's documents show that on or about January 18,
2005, Defendant UBS permitted, facilitated and/or engaged in a
short sale of TASER for account          without first making an
affirmative determination;

**REDACTED**

(q)     On or about January 11, 2005, Defendant UBS permitted,

facilitated or engaged in a short sale of 116,614 shares of

TASER with                            UBS allowed that trade

through its IQ system, which did not prevent short sales when

no affirmative determination was made (and, in this case, there

was no affirmative determination).  UBS was later sanctioned

by regulators for this precise conduct, which violates

Regulation SHO;

(r)     According to Defendant UBS's own documents, UBS engaged

in unauthorized short sales of TASER securities for

on numerous days, including, but not

limited to, August 8, 2006 (UBS_TSR1175205), August 9,

2006 (UBS_TSR1175199), January 29, 2007

(UBS_TSR301196), April 2, 2007 (UBS_TSR44351), April 9,

2007 (UBS_TSR45931), April 11, 2007 (UBS_TSR44086),

April 25, 2007 (UBS_TSR45929),  May 1, 2007

(UBS_TSR42551), May 7, 2007 (internally UBS_TSR42393),

May 19, 2007 (UBS_TASR327865),  June 6, 2007

(UBS_TSR385664), June 17,  2007 (UBS_TSR42806), June

20, 2007 (UBS_TSR376927), June 28, 2007

(UBS_TSR44829), July 27, 2007 (UBS_TSR376147), July 30, 2007 (UBS_TSR337310),August 2, 2007 (UBS_TSR398014), August 7, 2007 (UBS_TSR385507),  August 10, 2007 (UBS_TSR387460),  August 14, 2007 (UBS_TSR399683), August 15, 2007 (UBS_TSR387458), August 17, 2007 (UBS_TSR372634), August 19, 2007 (UBS_TSR372634), September 14, 2007 (UBS_TSR376199), September 26, 2007 (UBS_TSR392163), October 29, 2007 (UBS_TSR317657), November 9, 2007 (UBS_TSR389290), November 12, 2007 (UBS_TSR392140), November 18, 2007 (UBS_376129), November 26, 2007 (UBS_TSR339564), December 2, 2007 (UBS_TSR339554),  December 13, 2007 (UBS_TASR401068), December 26, 2007 (UBS_TSR349444), May 13, 2008 (UBS_TSR734190), May 14, 2008 (UBS_TSR343062), May 15, 2008 (UBS_TSR334882),May 23, 2008 (UBS_TSR734462), May 29, 2008 (UBS_TSR734466), May 30, 2008 (UBS_TSR734005), June 6, 2008 (UBS_TSR733977), September 25, 2008 (UBS_TSR734431).   UBS's internal documents describe an

809005.1
Highly Confidential Pursuant to Protective Order

unauthorized short sale as including instances where no locate
was obtained;

(s)　According to DBSI's documents, on or about August 9, 2005,
Defendant DBSI facilitated, permitted and/or engaged in an
improper short sale of TASER stock while TASER was on the
threshold list;

(t)　According to Defendant DBSI's own documents, on or about
December 4, 2008, DBSI disabled the locate block to permit its
client .　　　　　　to engage in a short sale of TASER stock
without a locate;

(u)　According to Defendant DBSI's own documents, on or about
November 17, 2007, DBSI facilitated, permitted and/or
engaged in an improper short sale of TASER stock;

(v)　According to Defendant DBSI's own documents, on April 19,
2004, DBSI had failures to receive in TASER stock that were
over 13 days old;

(w)　According to Defendant Bear Stearns' documents, on June 14,
2007, Bear Stearns had a fail position in TASER securities that
was greater than 13 days old;

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

(x)     According to Defendant Bear Stearns' own documents, on May

8, 2007, Bear Stearns had a failure to receive position in

TASER that was greater than 13 days old;

(y)     According to Defendant Credit Suisse's documents, Credit

Suisse permitted, facilitated and/or engaged in the short sale of

TASER securities without conducting a locate, and while the

stock was not easy to borrow.  That conduct occurred on at least

the following days:  May 25, 2007, April 15, 2007, February 7,

2008,  February 15, 2008,  March 14, 2008, March 20, 2008,

April 24, 2008,  April 25, 2008, May 30, 2008, June 2, 2008,

June 16, 2008, June 17, 2008, June 19, 2008, July 2, 2008, July

31, 2008,  August 5, 2008, August 15, 2007, August 19, 2008,

August 25, 2008, September 4, 2008,  September 10, 2008,

September 15, 2008, November 7, 2008, November 12, 2008,

November 13, 2008, November 14, 2008, November 17, 2008,

November 18, 2008, November 20, 2008, November 24, 2008,

November 25, 2008, December 1, 2008,  December 3, 2008,

December 4, 2008, December 11, 2008, January 15, 2009,

January 20, 2009, February 2, 2009, February 3, 2009 and

February 10, 2009;

809005.1
Highly Confidential Pursuant to Protective Order

(z)    According to Credit Suisse's documents, Defendant Credit

Suisse permitted, facilitated and or engaged in TASER short

sales without conducting a locate on at least the following

days:  June 29, 2004, November 30, 2004, December 1, 2004,

September 1, 2005, July 9, 2007, August 8, 2007, and August

15, 2007;

(aa)    Defendant Goldman Sachs' documents reveal that TASER was

listed on its REDI Locate Broker Validation Report, which

shows instances in which a short sales was permitted with an

invalid broker ID code.  TASER transactions using invalid

locate codes occurred on at least the following dates: August

12, 2005, August 15, 2005, September 14, 2005, September 27,

2005, October 26, 2005, October 27, 2009, October 28, 2005,

October 31, 2005, November 1, 2005, November 7, 2005,

November 10, 2005, November 11, 2005, November 15, 2005,

November 16, 2005, November 17, 2005,  February 3, 2006,

March 9, 2006, March 14, 2006, March 15, 2006, March 16,

2006, March 17, 2006, March 20, 2006, March 21, 2006, March

24, 2006, March 27, 2006, March 28, 2006, March 29, 2006,

March 30, 2006, March 31, 2006, April 4, 2006, April 5, 2006,

May 3, 2006, May 25, 2006.  Plaintiffs respond further by reference to these reports in Goldman's production, with the burden equal on Plaintiffs and Defendants to ascertain the remaining dates;

(bb)   According to Defendant Banc of America Securities' documents, on or about December 6, 2004, Banc of America Securities permitted, engaged in and/or facilitated a short sale of TASER securities without first locating sufficient shares to cover that short;

(cc)   According to Defendant Banc of America Securities' documents,  Banc of America Securities permitted, engaged in or facilitated unapproved short sales of TASER on at least the following days: June 26, 2007 and June 25, 2008; and

(dd)   Defendant Credit Suisse's own documents acknowledge that, on or about April 26, 2006, it was in violation of Reg SHO with respect to TASER securities.

- Defendants' failures to deliver/receive were not limited to CNS failures, but also included ex-clearing fails.

- Defendants misreported or otherwise concealed their abusive short selling activity by transferring large short positions of TASER securities off of the Defendants' main books.

  o As an example, Goldman Sachs International's stock records reflect large short positions in the accounts of                    and
    .[35]  Although Goldman Sachs & Co. executed these trades,[36] the positions were removed from Goldman Sach's stock record and "parked"[37] in Goldman Sachs International's stock record in order to mask the true short position in TASER's securities.  Goldman Sachs' records for its reporting of uncovered short positions to regulators and the marketplace reflect these improper activities.[38]

  o In particular, on January 22, 2008, Goldman Sachs International's stock record reflects that                    had a position of 5.1 million short shares of TASER which was built up over a four year

---

[35] GS_T 00000001.
[36] GSCO_TASER 000001.
[37] When parking shares, brokerage firms are attempting to cover undeclared short positions left over from transactions whose stock was not delivered by the settlement date. Rather than performing a buy-in transaction, these firms collude with one another and, by delaying the settlement process, inflate the number of shares available for trade in the secondary market. Source: Forbes Investopedia.
[38] GSCO_TASER_001616 – 1719.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

period.[39]  Although the Defendants, including Goldman Sachs, are responsible for reporting short positions to regulators (who then report those positions to the marketplace), Goldman Sachs' International division failed to meet its obligations and did not report these 5.1 million short TASER shares to regulators at that time.  When the 5.1 million short TASER shares position was later transferred from Goldman Sachs International back into Goldman Sachs & Co.'s stock record on January 23, 2008, the short position was then reported to FINRA, the regulator in charge of receiving short position reports from the Defendants and reporting those positions to the marketplace.[40]

o  As a direct result of Defendant Goldman Sachs' four year old 5.1 million short share position in TASER coming into Goldman Sachs & Co's stock record, where it was netted against all other Goldman Sachs activity, TASER's total short interest increased by 5.5 million shares between short interest reporting dates January 15, 2008 and January 31, 2008.[41]  Of the 5.5 million TASER short interest increase, 3.9 million shares were directly attributable to

---

[39] GS_T 00000001.
[40] GSCO_TASER 001680.
[41] GSCO_TASER 000016.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

Goldman Sachs' position for                              after it was netted

with Goldman Sachs clients' other short positions.  In addition,

Goldman Sachs' Short Position Info Report[42] submitted to FINRA for

reporting date January 31, 2008, disclosed a 3.9 million share short

position that                      held in TASER.

o  Goldman Sachs engaged in similar abusive naked short selling

activity with regard to short shares for                         .  On

October 24, 2007, four years after a                         short position

of 3 million TASER shares had been parked at Goldman Sachs

International,[43]  this short position of 3 million TASER shares was

moved to Goldman Sachs & Co.'s stock record.[44]  Thus, Goldman

Sachs parked another TASER short position for four years before

reporting it to FINRA as required.[45]

o  At its peak, Goldman Sachs International's undisclosed short

positions in TASER was 8.4 million shares on September 11, 2007.[46]

At the same time, the reported total TASER short positions in the

market were 13.3 million shares.  By parking shares offshore and

---

[42] GSCO_TASER 001680.
[43] GS_T 00000001.
[44] GSCO_TASER 000016.
[45] GSCO_TASER 001674.        **REDACTED**
[46] GS_T 00000001.

809005.1
Highly Confidential Pursuant to Protective Order

failing to report them, Goldman Sachs, through its International division, concealed its unlawful activity.

o In the middle of September 2007, Goldman Sachs reported to regulators that its TASER short positions were 3.1 million shares.[47] However, the Goldman Sachs & Co. and Goldman Sachs International short positions in TASER were in fact 11.4 million shares, almost 4 times the amount reported by Goldman Sachs. It is also possible that other abusive undisclosed short positions may be held in the records of Goldman Sachs Asset Management and other Goldman Sachs affiliates that have not been produced to the Plaintiffs.

o Goldman Sachs balanced out its stock records each day to conceal these improper transactions. Each day, a loan was recorded internally between                                                                                [48] More investigation is required to determine if this was in fact an actual loan of TASER shares between these Goldman Sachs divisions or if the loans were merely a book entry designed to cover up the activity.  For over four years, these book entries of loans and borrows matched the TASER short positions Goldman Sachs

---

[47] GSCO_TASER 001671.
[48] GS_TASER_001427 – 1429.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

International held.[49]  Although Defendant Goldman Sachs was aware

that it was required to report an 8.4 million short share position in

TASER to FINRA, Goldman Sachs instead moved the short positions

to another division to conceal them.[50]

o   At the time that Goldman Sachs permitted, facilitated or engaged in

　　　　　's total short position of 5.1 million shares in

TASER, a hard to borrow Regulation SHO threshold security,

---

[49] GS_TASER_001427- 1429.

[50] For similar short interest reporting violations see:  Morgan Stanley & Co., Incorporated, FINRA Monthly Disciplinary Actions, October 2009, FINRA Case #2007008266401; Goldman Sachs Execution & Clearing, L.P, March 20, 2009, AMEX Hearing Board Decision 09-AMEX-4; Goldman Sachs Execution & Clearing, L.P, March 20, 2009, NYSE Hearing Board Decision 09-NYSE-6. Goldman Sachs & Co., March 20, 2009, NYSE Hearing Board Decision 09-NYSE-5.; UBS Financial Services Inc., FINRA Monthly Disciplinary Actions, April 2008, FINRA Case #20041000031-01; Bear Stearns Securities Corporation, NASD Monthly Disciplinary Actions, April 2007, FINRA Case #20041000025-01, AMEX Case Nos. 06-293 and 06-321 (AMXC07001); Morgan Stanley DW, Inc., NASD Disciplinary Actions, November 2006, NASD Case #20050024147-01, NYSE Hearing Board Decision 06-155; Deutsche Bank Securities, Inc., NASD Disciplinary Actions, June 2004, NASD Case #CMS040065; Deutsche Bank Securities, Inc., NASD Disciplinary Actions, June 2004, NASD Case #CMS040066; Deutsche Bank Securities, Inc., December 18, 2003, NYSE Exchange Hearing Panel Decision 03-221; Goldman, Sachs & Co., Inc., NASD Disciplinary Actions, January 2003, NASD Case #CMS020229; Morgan Stanley DW, Inc., NASD Disciplinary Actions, May 2002, NASD Case #CMS020050 Merrill Lynch Professional Clearing Corp, NASD Disciplinary Actions, January 2002, NASD Case #CMS010184; Morgan Stanley & Co., NASD Press Release, December 2006, NYSE Exchange Hearing Panel Decision 00-166 and Credit Suisse First Boston Corporation, NASD Disciplinary Actions April 2000, NASD Case #CMS990030.

Goldman Sachs knew that                      was threatening to leave

Goldman Sachs.  Specifically,                      told Goldman Sachs

that it did not desire to provide a locate at the time it submitted a short

sale order and that                      did not wish to disclose any of

its locates that it allegedly obtained from sources other than Goldman

Sachs.[51]

o   Goldman Sachs engaged in, permitted or facilitated similar

transactions with its client                      .  Goldman Sachs'

records show that from February 13, 2004 through July 27, 2007,

Goldman Sachs permitted                      , through five different

accounts, to sell 3.2 million more TASER shares than they

purchased.[52]  Goldman Sachs & Co.'s stock record showed a short

position of only 500,000 shares for                  on July 27, 2007.[53]

o   Goldman Sachs Execution's Trade History Report shows that

Goldman Sachs permitted                      to be in an oversold

position of an additional 353,870 TASER shares, which they sold

from January 28, 2004 through July 27, 2007, for accounts Goldman

---

[51] GSE_T 01421280 – 1421281.
[52] GSCO_TASER 000001.
[53] GSCO_TASER 000016.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

Sachs & Co. for                    UBS PaineWebber for

and Morgan Stanley for                         [54]

o From settlement date August 3, 2004 to October 23, 2007, Goldman

Sachs International housed a large undisclosed

short position in TASER stock.[55]  Of this total short position, 83%

was obtained after the implementation of Regulation SHO.  The short

position peaked at nearly 3 million shares short on August 1, 2007 and

remained unchanged through October 23, 2007.  The following day,

October 24th, the short position was transferred to

accounts at Goldman Sachs & Co.[56] and Goldman Sachs did not

report this large short position to FINRA until it was nearly four years

old.

- Defendants facilitated, engaged in or permitted                    and

to cover the above described four year old short positions,

starting on January 2, 2008.

o Defendant UBS appears to have supplied 3.3 million TASER shares,

or 94% of the cover, for                    's 3.5 million open

---

[54] GSEC_TASR00005 — 14.
[55] GS_T 00000001.
[56] GSCO_TASER 000016

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

TASER positions maintained at Goldman Sachs. [57]  However, during this time period, January 2, 2008 through February 21, 2008, UBS only held 400,000 TASER shares in its DTCC account.

o  Defendant Goldman Sachs Execution's records show that, on January 24, 2008, Defendants Goldman Sachs and Morgan Stanley provided with 72,778 TASER shares. [58]

o  Defendant Morgan Stanley's trade runs show that 706,000 shares were used by                    to cover its TASER position between January 24, 2008 and February 20, 2008.  Defendant UBS sold 96% of the shares                    purchased through Morgan Stanley.[59]

o  Defendant UBS's blue sheets (which, as described above, are inaccurate), show                    's purchase of over 6.1 million TASER shares from January 2, 2008 through February 21, 2008. Although UBS's actual involvement in this transaction cannot be completely reconciled until Plaintiffs review UBS's recently produced trade runs, it is estimated that UBS engaged in, facilitated or permitted

---

[57] GSCO_TASER 000001.
[58] GSEC_TASR00005 – 14.          **REDACTED**
[59] MS_TASR_00003243 – 3261.

809005.1
Highly Confidential Pursuant to Protective Order

'to purchase at least 3.1 million TASER shares to cover the four year old short positions. [60]

o These extremely large purchases, which were facilitated by many Defendants, indicate that the Goldman Sachs reported short position was much larger than Goldman Sachs' records show. In particular, although Goldman Sachs' records show a 3.5 million TASER short position by                    , [61] other Defendants facilitated, engaged in or permitted                    to purchase 7.4 million shares to cover short positions.

- Other Defendants also engaged in, facilitated or permitted suspicious transactions involving both                    and                    .

  o Because Defendant UBS has admitted that its blue sheets are inaccurate, it is not possible to determine exactly how many short sales of TASER stock UBS permitted, engaged in or facilitated for                    . The record shows 925,500 shares were sold short through UBS from January 3, 2005 through July 24, 2007 by Morgan Stanley for                    , Goldman Sachs for

---

[60] UBS_TASER0000904 – 908.
[61] GSCO_TASER 000016.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

; UBS PaineWebber for

However, some of these were average price trades, accounted for twice in the record.[62] After Plaintiffs filed a motion to for UBS's violation of a Court order, UBS has finally agreed to provide its trade runs due to the inaccuracies in their blue sheets.  It can be estimated that there was a minimum of 462,000 TASER shares sold short by                at UBS. Plaintiffs cannot fully evaluate these trades until UBS provides the required data.

o  Defendant Morgan Stanley was also involved in, permitted or facilitated suspicious transactions with                . From February 25, 2004 through May 29, 2008,                and its affiliates sold short a net of 2 million TASER shares through Morgan Stanley[63], but the Morgan Stanley Summary Stock Position records do not reflect any short positions held by                accounts.[64] Morgan Stanley only showed                on its stock record on the first day of each month from January 3, 2005 through May 1, 2009.  Moreover, even though                was shown on those

---

[62] UBS_TASER0000892 – 909.
[63] MS_TASR_00003243 – 3262.
[64] MS_TASR_00003266 – 3268.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

dates, Morgan Stanley did not reflect any of                's

positions with regard to TASER.

o  From August 5, 2004 through January 2, 2008, Defendant Morgan

Stanley permitted, engaged in or facilitated                and its

affiliates selling short a net of 685,000 TASER shares[65], but Morgan's

Stanley Summary Stock Position Data shows

accounts with zero shares.[66]  Even though both

's TASER short positions are excluded from the

Morgan Stanley records, these positions do appear to be held within

Morgan Stanley's books at some location because

appears to have purchased shares to cover these positions through

Morgan Stanley.

o  Multiple Defendants also engaged in, facilitated and permitted

to allegedly cover the four year old short positions from

May 30, 2008 through October 8, 2008.  Goldman Sachs' records

show that                provided 1.2 million shares (or 28% of the

TASER short position) and                provided 2 million shares

---

65 MS_TASR_00003243 – 3262

[66] MS_TASR_00003266 – 3268.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

(or 44% of the TASER short position).[67]  During this time,

held less than 100,000 TASER shares in its DTCC account

and it appears that             's clearing firm,          , did not

supply the shares from its inventory at the DTCC because its position

held relatively stable during the covering period.[68]

o  Defendant Bear Stearns' records show that Bear Stearns permitted or

facilitated                   's acquisition of 562,500 TASER shares

through three Bear Stearns accounts:

;                                        .  Defendants

Goldman Sachs, Morgan Stanley or UBS prime brokered these

transactions.  The contra side to these short sale cover

trades was unpopulated for each of the purchases in the Bear Stearns

record.[69]

o  Defendant Morgan Stanley permitted, engaged in or facilitated

's purchase of 2.5 million of TASER shares to cover the

four year long open short position in TASER.  The source of 76% of

**REDACTED**

---

[67] GSCO_TASER 000001, from May 30, 2008 through October 8, 2008.

[68] DTC TASER Security Position Reports - May 30, 2008 through October 8, 2008.

[69] Bear-T00027746 – 27747, from July 31, 2008 through September 26, 2008.

809005.1
Highly Confidential Pursuant to Protective Order

these shares was 887,000 from              , 633,000 from         and

376,000 from                        .[70]

o  Defendant Merrill Lynch's blue sheets show that              through

   accounts at Goldman Sachs, Morgan Stanley and UBS Financial

   covered 130,000 TASER shares.  The contra party is blank for all

   purchases.[71]

o  Goldman Sachs Execution's records show that several defendants,

   including Goldman Sachs, Morgan Stanley and UBS Paine Webber

   engaged in, facilitated or permitted              to obtain

   784,000 TASER shares (43% of which were sold from Goldman

   Sachs Execution) to allegedly cover the four year short position in

   TASER.[72]

o  Because Defendant UBS's blue sheets are inaccurate and Plaintiffs

   have not had an adequate opportunity to review UBS's trade runs, it

   cannot be determined exactly how many TASER shares UBS

   permitted accounts owned by              to purchase.  The

   record shows              purchasing 3.4 million TASER shares

**REDACTED**

---

[70] MS_TASR_00003243 – 3262, from May 30, 2008 through October 8, 2008.
[71] ML-TASR0052916 – 52922, from July 1, 2008 through September 10, 2008.
[72] GSEC_TASR00005 – 14, from June 4, 2008 through August 27, 2008.

809005.1
Highly Confidential Pursuant to Protective Order

from May 30, 2008 through October 8, 2008.[73]  It is currently estimated that there was a minimum of 1.7 million shares of TASER purchased through UBS.

o  Although the Defendants' records only reflect a short position of          in the amount of 4.5 million TASER short shares, [74] it appears that there was a much larger          TASER short position which was being covered through the 10.1 million TASER share purchases through the above-listed Defendants.

o  The Defendants' actions related to          and          's purchase of TASER shares to allegedly cover the long-standing short positions raise questions as to whether these shares were actually used to cover or whether purchases of TASER shares were simply moved around but the short positions remained intact (and were not disclosed to regulators).

o  For example, Defendant UBS's records show that UBS netted out          's short positions in TASER to zero at the end of each day.  UBS's records do not show          holding any TASER short positions.  The covering transactions in UBS's records

---

[73] UBS_TASER0000904.
[74] GSCO_TASER 000016.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

for                             appear to be offsetting existing loans that are

shown in the stock record, but no accounts of          show a short

position in the UBS stock record. [75]

o   Defendant Goldman Sachs & Co.'s stock record reflects identical

activity (as discussed more fully above).  Goldman Sachs & Co.

executed                    's transactions, but for over four years,

those transactions were held outside of the Goldman Sachs & Co.'s

stock record at Goldman Sachs International.  Nevertheless, the loans

for those positions also appeared in the Goldman Sachs & Co. record.

o   Defendant Morgan Stanley's stock record reflects similar activity.

Morgan Stanley reports no positions for

Nevertheless, a              short position appears to have

existed at Morgan Stanley because, as Morgan Stanley's records

show, Morgan Stanley purchased shares to 'cover' a

short position in TASER. [76]

o   Defendants Morgan Stanley and UBS may be using the same strategy

of moving large short positions outside of their main stock record like

---

[75] UBS_TASER0000886 – 891.
[76] MS_TASR_00003266 – 3268.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

Defendant Goldman Sachs and could be "parking" the positions at an
affiliate.

o   The market during the time of this covering activity undertaken by
the Defendants for                        and                    does not
appear to reflect the short squeeze that would have taken place at this
time if the Defendants' purchasing of TASER to cover the short
positions was legitimate,[77] suggesting that these covering transactions
were in fact a process through which these Defendants parked
positions in order to conceal large abusive short positions in TASER.

•   While concealing their actual short positions (such as Goldman Sachs' four
year concealed positions described above), Defendants lobbied the U.S.
government and industry regulators for rules designed to limit restrictions on

---

[77] As one example, on February 14, 2008, TASER's total volume was 6.6 million
shares.  According to Defendants' records,                      purchased 2.3
million TASER shares on this date (34% of the total volume trading volume).
While this activity should have driven TASER's stock price up, the price declined
by 8%.

On the following day, February 15, 2008, TASER's total volume was 2.6 million
shares.                      purchased approximately 1.3 million TASER shares or
an astounding 50% of the total trade volume. The price of TASER increased this
day by 17 cents for just over a 1% gain for the day.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

short selling.[78]  Naked short selling without loaning and borrowing legal

shares instead adds phantom shares that are fraudulent and manipulative.

For example, the four year TASER short positions that Goldman Sachs

permitted, facilitated or engaged in for                              and

                    were so long term that they had dilutive and disruptive effects on

TASER's stock price.  In fact, they were strategically placed abusive short

positions that disrupted the marketplace while Defendants purposely hid them

from regulators to circumvent short sale rules and regulations.


- The Defendants also used other methods and means to move short sale

   positions in TASER off of the stock record.  For example, Defendant

   Goldman Sachs was aware that its client                   intended to artificially

   reduce his short positions at Goldman Sachs by moving the short positions to

   another location and Goldman Sachs facilitated, engaged in or participated in

   such conduct.[79]  Then, on or about December 29, 2004,

                    affiliate hedge fund,                           , entered into a

   derivative swap contract  in the amount of $34,490,000  (contract number

---

[78] Letter from Morgan Stanley & Co., Goldman Sachs & Co., Merrill Lynch,
Pierce, Fenner & Smith and Citigroup Global Markets, to Jonathan Katz, U.S.
Securities and Exchange Commission, Re: Short Sales, dated February 27, 2004.
http://www.sec.gov/rules/proposed/s72303/4firms02272004.htm.
[79] GSE_T 00803762.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

) for shares that were short within days prior to the

implementation of Regulation SHO.[80] The contra party to this transaction was

. This contract was in effect from

December 29, 2004 through January 18, 2006.  This contract caused

short position to appear technically long (*i.e.*, to appear as if

TASER had issued the shares for sale).          position for

in the Stock Record Reports decreased from 1.6 million

shares short to 700,000 shares short.[81]  This contract appears to be related to a

2 million share decrease in fails to deliver by Goldman Sachs at the NSCC.

This allowed the short position to appear long, in effect, disguising the short

position and fails from regulators.  This synthetic position reduced the

number of shares shorted by        in the Goldman Sachs & Co. record

because Goldman Sachs transferred the short position to the

account at Goldman Sachs International.  On the date that Goldman  Sachs

executed the swap contract for the synthetic long position and moved the

short position to Goldman Sachs International, Goldman Sachs entities were

in a large fail to deliver position with regard to TASER.[82]  Goldman Sachs'

activities regarding abusive short selling for          might not have been

---

[80] GS_TASER 002869.
[81] GSCO_TASER 000013 – 14.
[82] DTCC00000026.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

limited to TASER securities, but may also have included the following long-term Regulation SHO threshold stocks:  OmniVision Technologies, Inc., Overstock.com, Inc., Krispy Kreme Doughnutes, Inc. and NovaStar Financial, Inc.[83]


- Moreover, Goldman Sachs permitted, facilitated or engaged in other methods to conceal          true short position in TASER.  As one example, a Term Transaction Confirmation between Goldman Sachs and          executed on August 15, 2005 showed a contract that remained in effect until September 15, 2005 for almost 2 million shares of TASER.  This transaction allowed          "to maintain open any short positions you may have in such security in your account at Goldman Sachs".[84]  Prior to this contract, Goldman Sachs' stock record shows that          accounts were short 2.3 million shares of TASER and the          account discussed above was short 1.1 million TASER shares in Goldman Sachs International's stock record. [85]

---

[83] GSE_T 00803762.
[84] GSE_T 00950832 – 950833.          **REDACTED**
[85] GS_T 00000001.

809005.1
Highly Confidential Pursuant to Protective Order

- Defendants permitted clients with a history of failing to deliver (or otherwise acting unlawfully) to engage in short sales of TASER and other securities without reasonable grounds to believe the client could deliver the security.[86]

- Defendants violated NASD rules requiring the prompt receipt and delivery of securities, including, but not limited to, UBS failing to abide by the affirmative determination rule.

- Defendants violated NASD Rule 282, 3010, 3310 and 3370.

- Defendants violated NASD Rule 11830.

- Defendants violated 17 CFR 240.15c3-3.

- Goldman Sachs' Trade History Reports in 2004 and 2005 reflect shorting TASER securities while, at the same time, Goldman Sachs' Stock Record Reports and CNS Accounting Summaries show

---

[86] GSE_T 01146068 ("In order to be deemed to have met such close-out requirements [for threshold securities], the participant must not know or have reason to know that the counterparty from whom the participant purchases securities will not deliver the securities.").

failing to deliver millions of shares of TASER. *See, e.g.,* GSEC_TASER
000005, GSEC_TASER 000042, GSEC_TASER 000044 – 45,
GSCO_TASER 000013 – 14, CNS Accounting Summary for 0005;
GSCO_TASER 000479 – 529, 0501; GSEC_TASER 004132 – 4171 and
GSEC_T 000023-32, 0690: GSEC_TASER 002605 – 2655. Goldman knew
about          trading activity, and nonetheless continued to permit, facilitate
and profit from it.[87]

- Defendants facilitated illegal transactions on behalf of their clients. *See*
  GSEC_TASER_000042, GSEC_TASR00015, GSEC_TASR00005,
  GSCO_TASER_000017-001603, GSEC_TASER 002181-005231 (detailing
  illegal activity Goldman Sachs conducted on behalf of                ).

- Defendants relied upon "locates" from other Defendants and banks that they
  knew would not likely deliver the located shares if requested. *See, e.g.,*
  GS_TASER 001419 – 1425.

---

[87] *See* GSE_T01146065 (reasonable grounds for reliance upon a customer's
assurance that a locate was received only if the source of reliance is documented
and "prior assurances from such customer did not result in fails to deliver.").

- Defendants moved fails out of the NSCC but did not deliver shares for settlement. *See, e.g.*, GSCO_TASER 000479 – 529, 0501: GSEC_TASER 004132 – 4171; GSEC_T 000023-32, 0690; GSEC_TASER 002605 – 2655; GSCO_TASER 00050; GSEC_TASER 002629; GSEC_TASER 004145; GSEC_TASER 000042; GSEC_TASER 000044; GSCO_TASER 000013.

- Defendants charged clients, customers, banks or others fees, commissions and/or interest for "loaning" TASER or other securities that Defendants never loaned (and in some cases did not even possess).

- Defendants violated Information Circulars 90-25 and 98-1135.

- Defendants charged clients, customers, banks or others fees, commissions and/or interest for opening or maintaining a short position and/or borrowing securities to effectuate a short transaction in instances where the broker failed to borrow the stock for the short transaction and/or open short position.[88] This includes, but is not limited to:

---

[88] With respect to any claim that customers do not borrow stock, please see MS_TASR13356 which belies that claim.

809005.1
Highly Confidential Pursuant to Protective Order

- o Charging for carrying a short position when the broker never borrows shares to cover the short or fails to timely deliver the shares to the buyer (including, but not limited to, charging a negative rate);

- o Charging for carrying a short position, even though the firm does not have that position covered on their LoanNet or equivalent reports;

- o Charging for open short positions when the broker did not borrow shares, and its excess securities available for loan is less than the amounts shorted.

- o Charging a borrow fee,[89] loan fee[90] or other fee to open or maintain an open short position or to effectuate a short sale when: (a) the broker does not borrow outside of the firm and the firm has a net fail position; (b) the broker does not borrow shares and its excess securities available for loan is less than the amount shorted; or (c) the sum of the shares borrowed by the broker and its excess securities available for loan are less than the amount shorted.

- Defendants may have attempted to make short sales appear as long sales through offshore trading.

---

[89] *See, e.g,* MS_TASR13755.

[90] *See, e.g,.* MS_TASR2425.

809005.1
Highly Confidential Pursuant to Protective Order

o   For example, Goldman Sachs' Trade History Report on July 20, 2004

reflects that                                      short sold 50,384 shares at

$30.65 to                           and then purchased 50,384 shares at

the same price from                                .

short sold 49,616 shares at $30.65 to

and then purchased 49,616 shares at the same

price from                           . These two           accounts totaled

a short sale of 100,000 shares and purchase of 100,000 shares.  Then,

, from their Goldman Sachs & Company

Account, sold 100,000 shares long at $30.65 to

and purchased 100,000 shares long at $30.65 from

[91]  This example of share movements for hedge

funds implies that this may be a way to make short shares appear to be

long shares as if TASER issued them and they were registered for sale

by the SEC.  The           trades in the Goldman Sachs Trade History

Report do not match to the Stock Record.  *See*

GSCO_TASER0000013.

o   Merrill Lynch similarly engaged in suspect transactions involving

.  For example, on April 23, 2007, Merrill Lynch Professional

---

[91] GSCO_TASR000001.

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

records show the following transactions undertaken for
and hedge fund                accounts to make short sales appear as
long:[92]

- (for the account of

  ), *short sold* 97,500 shares at an
  average of $8.30 in just over 300 transactions to        and
  broker     , which is not a recognized NSCC broker number.
  (for the account of

  *purchased* 97,500 shares at $8.30 in 306
  transactions from

- for the account                *purchased* 2,500
  shares at $8.30 in one transaction from

              .or account            then
  *sold long* 2,500 shares at $8.30 in 13 transactions to

- for the account of

  *short sold* 100,000 shares at $8.30, in just over
  300 transactions to

- for the account of

  *purchased* 100,000 shares at an average price of

---

[92] ML-TSINTL0069214 – 69215.

$8.30, with Merrill Lynch Professional 0551 as the executing and contra broker to the transaction.  Although these shares were reported in Merrill Lynch Professional's blue sheets to be transacted on the NASDAQ market, they are not listed in the Equity Trade Journal.

-        ,  the founder of        , *sold long* 100,000 shares at $8.30 with Merrill Lynch Professional 0551 as the executing and contra broker to the transaction.  Although this trade was reported by Merrill Lynch Professional to be transacted on the NASDAQ market, it is not listed in the Equity Trade Journal.       account at Merrill Lynch addresses to its prime broker Goldman Sachs.

- Goldman Sachs Trade History Report for April 23, 2007[93] shows                               , *short sold* 59,774 shares and       *short sold* 40,226 shares, a total of 100,000 shares at $8.30 to       .  This trade is not reported in the records produced by Morgan Stanley in this case.

---

[93] GSCO_TASER 000001.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

- Defendants improperly provided locates for TASER securities on the same dates for which they were failing to deliver TASER securities (*i.e.*, Defendants were saying they could provide TASER securities to support short sales at the same time they did not even have sufficient TASER securities to cover past sales). Defendants engaged in this conduct with respect to other securities as well.

- Defendants engaged in short sales of TASER and other securities when they had existing net failures to deliver[94]:

   o Banc of America, Morgan Stanley, Merrill Lynch, Credit Suisse, Goldman Sachs and Bear Stearns admit that, during the Time Period of January 1, 2003 through May 31, 2009, "as an executing broker, [they] engaged in short sales of TASER common stock for or on behalf of [their] clients/customers at a time when [they] had existing fails to deliver TASER common stock."[95]

---

[94] Having admitted engaging in the following conduct, Defendants should be well aware when it occurred and the specific trades to which it relates.

[95] Defendant Banc of America Securities LLC's Responses and Objections to Plaintiff's Third Requests for Admission at Request No. 18; Defendant Morgan Stanley & Co. Incorporated's Objections and Responses to Plaintiffs Third

o Banc of America, Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs and Bear Stearns admit that, during the Time Period of January 1, 2003 through May 31, 2009, "as a clearing broker, [they] engaged in short sales of TASER common stock for or on behalf of [their] clients/customers at a time when [they] had existing fails to deliver TASER common stock."[96]

---

Requests for Admission to Defendants at Request No. 18; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 18; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 18; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 18; Defendant Bear, Stearns & Co., Inc.'s And Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 18.

[96] Defendant Banc of America Securities LLC's Responses and Objections to Plaintiff's Third Requests for Admission at Request No. 19; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 19; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 19; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 19; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 19; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 19.

809005.1
Highly Confidential Pursuant to Protective Order

- o  Merrill Lynch, Credit Suisse, Goldman Sachs and Bear Stearns admit that, between January 1, 2003 and May 31, 2009, "as an executing broker, [they] engaged in short sales of TASER common stock for on behalf of [their] clients/customers at a time when [they] had existing net fails to deliver TASER common stock that persisted for more than 13 consecutive settlement days."[97]

- o  Merrill Lynch, Deutsche Bank, Credit Suisse and Bear Stearns have admitted that, between January 1, 2003 and May 31, 2009, "as an clearing broker, [they] engaged in short sales of TASER common stock for on behalf of [their] clients/customers at a time when [they]

---

[97] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 20; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 20 ("Admitted that, during the single instance where there was a fail to deliver TASER common stock that persisted for more than 13 consecutive settlement days, which occurred outside of CNS, Credit Suisse Securities engaged in short sales of TASER common stock on behalf of clients"); Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 20; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 20.

had existing net fails to deliver TASER common stock that persisted for more than 13 consecutive settlement days."[98]

o   Merrill Lynch, Credit Suisse, Goldman Sachs and Bear Stearns have admitted that between January 1, 2003 and May 31, 2009, as clearing and executing brokers, they "engaged in short sales … the next business day after a time perioud during which [they] had a net fail to deliver in TASER common stock for at least 13 consecutive days."[99]

o   Merrill Lynch, Credit Suisse and Goldman Sachs have admitted that, "[d]uring the Time Period, and as an executing broker, [they] engaged

---

[98] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 21; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 21; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 21; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 21.

[99] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 41-42; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 41-42; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 41-42; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 41-42.

in short sales of TASER common stock for or on behalf of [their] clients/customers at a time when [they] had net existing fails to deliver in that stock for at least 13 consecutive settlement days."[100] The same Defendants, along with Deutsche Bank and Bear Stearns, engaged in the same conduct as clearing brokers.[101]

- Defendants provided locates for TASER and other securities at times when the stock was on their NG, do not locate or equivalent list. *See, e.g.,*

---

[100] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 47; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 47; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 47.

[101] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 48; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 48; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 48; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 48; Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 48.

809005.1
Highly Confidential Pursuant to Protective Order

GSE_T199294; Bear-T00027788-27794 (Bear Stearns providing locates for 50,000 shares on each day from August 8, 2005 through December 15, 2005 when TASER was listed on Bear Stearns' hard to borrow list); *id.* (Bear Stearns providing locates for 100,000 to 300,000 shares to            nearly every day from August 8, 2005 through December 28, 2005 when TASER was listed on Bear Stearns' hard to borrow list).

- Defendants' improper actions occurred in, among other places, Atlanta, Georgia.  For example, Bear Stearns filled TASER locate requests for its          office on a regular basis from January 26, 2006 through February 14, 2007, the same time that TASER was on Bear Stearns' hard to borrow list. These locates were requested and filled for 30,000 and 50,000 share blocks of TASER stock.  Bear Stearns employees Christopher Niglio, Madelyn Lando and MVELASCO approved these locates.
  - o  The transactions undertaken by Bear Stearns within this date range also indicate improper standing locates in violation of Bear Stearns' compliance manuals.  For example, Bear Stearns' locate logs show that one of its                 employees,          requested approval for locates of 50,000 TASER shares almost every day from December 4, 2006 through February 14, 2007.  Each of these locate requests were

filled and approved by Bear Stearns' Christopher Niglio.  *See* Bear-T

00027788-27794.  Many of these locates appear to be made as standing

automated locates for a 5 to 8 day duration.  For example, on

December 4, 2006, a request to locate 50,000 shares was filled at 8:13

a.m.  This locate remained in effect for 6 days and was filled for the

next five days for 50,000 shares at 4:30 a.m., suggesting that a

standing, automatic locate was provided.  This pattern indicates that

Bear Stearns maintained a prearranged locate for short selling large

blocks of TASER through Bear Stearns' trading desk in           .  These

standing automated locates appear in the first half of 2006, at a time

period when TASER was a Regulation SHO threshold security such

that these locates could not be automatically approved by Bear

Stearns.[102]  In total,                          received locates for

7,360,000 shares of TASER stock from January 26, 2006 through

February 14, 2007.  At this time, however, these apparently improper

patterns cannot be fully investigated because the         trading

activity does not appear to be included in the blue sheets produced to

Plaintiffs by Bear Stearns.

---

[102] *See* Bear-T00000077 ("Daily, Stock Loan ITG ensures that the Threshold
securities and Penalty items are blocked from the Department's automatic approval
system.").

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

o   Bear Stearns' Atlanta office's actions in trying to short sell hard to

borrow stocks was not limited to short sales in TASER.  *See, i.e.*, Bear-

T00217944-217947 (requesting "hard ones" and "tough ones.").

- Throughout 2004, TASER was a restricted stock on NASDAQ.  Defendants

violated rules and regulations associated with and applicable to restricted

stocks, including UPC 71.

- Defendants claimed to receive locates from other Defendants (or non-party

banks) on dates when those other Defendants (or non parties) did not possess

sufficient TASER securities to cover the alleged locate.  *See, e.g.*, GS_TASER

$001419 - 1425$.  For example:

o   In 2007,                         provided locates for approximately 7

million TASER shares when it had no real shares of TASER on deposit

at the DTCC and they did not appear to be lending/borrowing shares

from

o   In Goldman Sachs' Securities Lending Locate Logs,[103] on eight

consecutive trading days in March 2009,

were the exclusive providers of locates

---

[103] GS_TASER $001419 - 1425$.

809005.1

Highly Confidential Pursuant to Protective Order

**REDACTED**

for 13-14 million TASER securities to Goldman Sachs and a small group of hedge funds.[104] Yet, during these eight days, the average amount of actual TASER shares on deposit at the DTCC for was 534,000, the average for was 996,000, and the average for was 2.4 million. Similar findings exist with respect to other Defendants. *See, e.g.,* CSS-TASER0292381 (showing that on March 25, 2009 and March 26, 2009, Credit Suisse relied on locates in the amount of 5.5 million TASER shares from when had less than 2.3 million real TASER shares on deposit at the DTCC); *id.* (showing that on March 18, 2009, Credit Suisse relied on locates from in the amount of 4.3 million TASER shares, far in excess of DTCC position of 1 million TASER shares); *id.* (showing that on April 14, 2009, Credit Suisse relied on locates from in the amount of 4.8 million TASER shares when only had 1.1 million TASER shares on deposit at the DTCC).

---

[104] On March 13. 2009. locates for 14.1 million shares, worth $59.8 million were filled solely by . The following trade day. March 16, 2009, locates for 13.9 million shares were filled exclusively by . From March 17 – 19, 2009, locates for approximately 12.5, 13 and 12.6 million shares, respectively, were filled only by . Then, on March 20, 2009, March 23, 2009 and March 24, 2009, locates for 12.5, 12.7 and 12.8 million shares, respectively, were filled solely by

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

o   Similarly, on 23 consecutive trading days from December 4, 2008

through January 12, 2009, Goldman Sachs relied on

to fill locates in Goldman Sachs' records, averaging 12.9

million TASER shares each day.[105]  During this same 23 day period,

Credit Suisse relied on locates from                              's parent,

, to fill locates in Credit Suisse's records, averaging 3

million TASER shares each day.[106]  While these affiliated entities were

providing locates to Credit Suisse and Goldman Sachs for a total of

nearly 16 million TASER shares every day (worth $80 million), their

real shares of TASER on deposit at the DTCC only averaged 1.3

million TASER shares.

o   The Defendants could not have reasonably considered these locates to

be bona fide given their size and claimed ready availability each day.

In Credit Suisse's Loanet reports, there were no Credit Suisse borrows

or loans with                    or                          during either

December 2008 or January 2009.[107]  In Goldman Sachs Borrow &

**REDACTED**

---

[105] GS_TASER 001427 – 1429.
[106] CSS-TASER 0292381.
[107] CSS-TASER0288831 – 288838.

809005.1
Highly Confidential Pursuant to Protective Order

Loan Contract records, there were no borrows or loans with

or ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ during the same months.[108]


- Defendants were aware of and permitted, facilitated or engaged in locate

  requests that could not be legitimate.  For example, Merrill Lynch's

  documents show that ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ was requesting 1 billion TASER

  shares every trading day from July 6, 2006 through May 29, 2009, the end of

  the available record.[109]  These requests for locates totaled 736 billion shares

  of TASER.  Considering TASER only had approximately 62 million shares

  outstanding, these locate requests are suspicious at best.


- The Defendants have been sanctioned by regulators dozens of times for

  conduct relating to and constituting their illegal naked short selling activity,

  including sanctions of several million dollars.  In some cases, the sanctions

  have included conduct nearly identical, if not identical, to that alleged here.

  As just a few examples:

  - On February 27, 2009, after this lawsuit was filed, Goldman Sachs

    Execution & Clearing received an Amended Examination Report from

---

[108] GS_TASER 001427 – 1429.

[109] ML-TASR0058514 – 58515.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

FINRA finding the following exceptions regarding Goldman Sach's short sale activities.  *See* GSE_T01145642-48.  In particular:

- "The firm did not have adequate controls in place to monitor and supervise National Securities Clearing Corporation-Continuous Net Settlement (hereinafter CNS) Fails to Deliver for purposes of complying with SEA Rule 204T.  The firm utilized two reports to monitor CNS Fails to Deliver that relate to Rule 204T: (1) 204T long sale report and (2) 204T short sale report.  ***These reports for the time period of September 17 through October 3, 2008 contained information that was deemed to be incomplete and insufficient.***  For the majority of securities under review, the firm's 204T short sale and long sale reports did not identify the amount of shares that were long or short.  Additionally, the reports failed to identify which customer the Fail to Deliver was related to."[110]

- "The review of 12 CNS Fail to Deliver securities for the period of September 22 through November 29, 2008 disclosed that the

---

[110] *Id.* at GSE_T01145645 (emphasis added).

809005.1
Highly Confidential Pursuant to Protective Order

firm failed to close-out the CNS Fail to Deliver on a timely basis" for several securities.[111]

- "The firm failed to properly monitor DVP/RVP customers for patterns of long sales that fail for the purpose of determining whether its reliance on those customers' representations that they are 'long' is reasonable…the firm may not have had a reasonable basis for marking such customer sell orders 'long.'"[112]

- Goldman Sachs was not in compliance with SEA Rule 204T (Emergency Order) because it "executed sales short sales of 4,643 shares of Banc of America Securities (BAC)"[113]

o On July 24, 2006, the NYSE censured and fined Credit Suisse for "accepting short sale orders and effecting those orders without having borrowed securities or entered into bona-fide arrangements to borrow them or without having reasonable grounds to believe that the securities could be borrowed so that they could be delivered on dates

---

[111] *Id.*

[112] *Id.* at GSE_T 01145646.

[113] *Id.*

delivery was due." *See* NYSE Hearing Decision 06-112, July 24, 2006.

o "Between January 2005 through approximately October 2006 (the "Relevant Period"), DBSI, with respect to at least five of its 19 proprietary trading desks (the "Five Desks") failed to comply with certain NYSE Arca Equities Rules and Regulations and Regulation SHO ("Reg SHO") requirements with respect to its execution and supervision of short sale orders....Specifically, the Firm effected an unquantified but significant number of short sales on at least the Five Desks in securities that were not on the Firm's Easy-to-Borrow List without having borrowed the securities or entered into bona-fide arrangements to borrow the securities, or having reasonable grounds to believe that such securities could be borrowed for delivery when due." *See* NYSE Arca Equities, Inc., Enforcement Decision No. 08-AE-02.

o DBSI was also sanctioned for violating regulations requiring them to keep accurate books and records.[114]  As held by the NYSE in a December 18, 2003 decision:

---

[114] June 2004: NASD Case #CMS040065 and NASD Case #CMS040066, October 2004: NASD Sanctions 18 Firms for Order Audit Trail (OATS) Reporting and Supervision Violations, FINRA Newsroom, October 4, 2004, April 2006: NASD Case #20050004905-01, February 2007: NASD Case #20050014655-01,

809005.1
Highly Confidential Pursuant to Protective Order

> [DBSI] violated Exchange Rule 421 in that the Firm
> submitted inaccurate reports of short positions… violated
> SEC Rule 17a-3 and Exchange Rule 440 in that it did not
> make and keep current required books and records
> relating to the reconciliation of ledgers and the
> identification and creation of suspense accounts…
> violated Exchange Rule 440.20 in that it did not identify
> unreconciled ledger differences on its books and
> records… and violated Exchange Rule 342 in that the
> Firm failed to reasonably supervise and control the
> actions of its employees, and failed to establish a separate
> system of follow-up and review, to ensure compliance
> with Exchange Rules.[115]

o  Bear Stearns "failed to report to the NASDAQ Market Center the

correct symbol indicating whether it executed transactions in eligible

securities in a principal, riskless principal or agency capacity. The

findings stated that the firm failed to report to the NASDAQ Market

Center the correct symbol indicating whether the transaction was a

"buy," "sell," "sell short," "sell short exempt" or "cross" for a

transaction in eligible securities, and failed to report the contra side

executing broker in transactions in eligible securities."[116]

---

August 2007: NASD Case #20060054835-01, November 2007: FINRA Case
#20060047177-01 and FINRA Case #20060060150-01, and April 2009: FINRA
Case #2006005064401.

[115] NYSE Exchange Hearing Panel Decision 03-221, DBSI Securities Inc.,
December 18, 2003.

[116] NASD NTM Disciplinary Actions September 2006, (NASD Case
#20042000210-01).

809005.1

Highly Confidential Pursuant to Protective Order

o   Banc of America agreed to sanctions being entered into against it by

regulators for inaccurate and incorrect reporting:

> Without admitting or denying the findings, the firm
> consented to the described sanctions and to the entry of
> findings that it accepted customer short sale orders in
> securities and, for each order, failed to make/annotate an
> affirmative determination that the firm would receive
> delivery of the security on the customer's behalf, or that
> the firm could borrow the security on the customer's
> behalf for delivery by settlement date. The findings stated
> that the firm failed to report to the Trade Reporting and
> Compliance Engine (TRACE) the correct contra-party's
> identifier for transactions in TRACE-eligible securities.
> (FINRA Case #20041000170-01).[117]

o   DBSI consented to the entry of a censure and fine of $37,500 for

having a fail-to-deliver position in a threshold security at a registered

clearing agency for thirteen consecutive settlement days and failing

immediately thereafter to close out the fail-to-deliver position by

purchasing securities of like kind and quantity and continuing to have a

fail-to-deliver position which it failed to close out as required for ten

consecutive days thereafter.  *See* FINRA Case #20050018280-01.

o   DBSI has been found in violation of securities regulations requiring an

affirmative determination for short sales.  In November 2005, NASD

---

[117] NASD DISCIPLINARY ACTIONS, February 2008
http://www.finra.org/web/groups/rules_regs/documents/notice_to_members/p0380
11.pdf.

809005.1
Highly Confidential Pursuant to Protective Order

found that DBSI "failed to make an affirmative determination that the firm could borrow the securities or otherwise provide for their delivery by the settlement date."[118]

o   In May 2007, NASD fined DBSI again, finding that DBSI "failed to make/annotate an affirmative determination that the firm would receive delivery of the security on the customer's behalf, or that the firm could borrow the security on the customer's behalf for delivery by settlement date."[119]

o   On September 10, 2008, NYSE Arca sanctioned and fined DBSI for similar violations, finding that DBSI:

> violated Rule 203(b)(1) of Reg SHO by effecting an unquantified but significant number of short sales on at least five of its 19 proprietary trading desks in securities that were not on the Firm's Easy-To-Borrow List *without having* borrowed the securities or entered into bona fide arrangements to borrow the securities, or having reasonable grounds to believe that the securities could be borrowed for delivery when due; ... violated Rule 200(g) of Reg SHO in that at least two of the five proprietary trading desks incorrectly marked an unquantified but significant number of proprietary short sale orders as long; ... violated NYSE Arca Equities Rules 6.18(a) and (c) by failing to adequately supervise certain traders on at least five proprietary trading desks and failing to

---

[118] NASD NTM Disciplinary Actions November 2005, DBSI Securities Inc. NASD Case #20050002625-01.

[119] NASD NTM Disciplinary Actions May 2007, DBSI Securities Inc. NASD Case #20041000088-01.

809005.1
Highly Confidential Pursuant to Protective Order

maintain and enforce written supervisory procedures concerning proprietary short sales *in a manner reasonably designed to achieve compliance with relevant regulations*.[120]

o DBSI was also sanctioned for conduct relating to the issuance of proxy materials during the time period of March 1998 through November 2003, conduct which may indicate illegal naked short selling in this case. *See In the Matter of Deutsche Bank Securities Inc.*, Decision 05-45 (Feb. 2, 2006) (New York Stock Exchange, Inc.). In particular, DBSI:

(a) failed to timely reconcile stock records on beneficial ownership in connection with proxy voting; (b) issued duplicate requests for proxy voting instructions for securities held in certain omnibus accounts, which resulted in duplicate votes in some instances; (c) failed to transmit accurate information to its proxy services provider on numerous occasions; (d) voted more shares than it was entitled to vote ("over-voting") in proxy matters in numerous instances; and (e) did not adequately retain certain proxy solicitation records. [DBSI] also failed to reasonably supervise and control its business activity, and failed to establish a separate system of follow-up and review, to comply with the Exchange Rules and the federal securities laws, in that Respondent: (a) failed to reasonably supervise its proxy operations to prevent over-voting; (b) failed to provide for and implement written operations and supervisory procedures for its Proxy Department; and (c) failed to provide for

---

[120] NYSE ARCA Equities Disciplinary Action Hearing Board Decision: 08-AE-02, September 10, 2008.

809005.1
Highly Confidential Pursuant to Protective Order

and implement written procedures for the oversight of its proxy service provider.

o Since the filing of this lawsuit, Defendants continue to be investigated for their conduct related to short selling in TASER.  For example, in March of 2009, the SEC continued its five year investigation into TASER's trading, requesting additional records from Merrill Lynch and Goldman Sachs spanning years 2004 to 2008.[121]

o NASD investigators conducted a serious and continuously growing examination into Goldman Sachs' TASER trades from at least October 22, 2004 to February 6, 2006.[122]  On February 6, 2006, NASD sent a non-reportable letter of caution to Goldman Sachs regarding possible rule and law violations.[123]  Although this cautionary letter was later withdrawn by Cameron Funkhouser, the Senior Vice President of Market Regulation at the NASD nevertheless cautioned Goldman Sachs that "should Goldman Sachs fail to comply with the short sale rules in the future, the firm may be subject to disciplinary action."[124]

---

[121] GS_TASER 002822 – 2863 and ML-TASR0058091 – 58109.
[122] GS_TASER 002887.
[123] GS_TASER 003008.
[124] GS_TASER 003013.

809005.1
Highly Confidential Pursuant to Protective Order

o Bear Stearns "accepted customer short sale orders and failed to make an affirmative determination that the firm would receive delivery of the securities on the customers' behalf or that the firm could borrow the securities on the customers' behalf for delivery by the settlement date. The findings stated that the firm effected short sales in securities for its proprietary accounts and failed to make an affirmative determination that the firm could borrow the securities or otherwise provide for delivery of the securities by settlement date."[125]

o Credit Suisse was fined £1.75m by the United Kingdom's Financial Services Authority for failing to accurately report 40 million trades between November 2007 and November 2008. Credit Suisses' reporting failures included the failure to report all 30 million of its transactions on the London Stock Exchange.

o UBS has been fined by regulatory agencies for numerous reporting deficiencies and for the naked short selling activities alleged in this case. For example, UBS was fined by NASD for reporting violations in March 2007, in particular for "submitt[ing] reports to OATS (Order Audit Trail System), that contained inaccurate, incomplete or improperly formatted data, and erroneously submitt[ing] Execution

---

[125] NASD Disciplinary Actions November 2007 (FINRA Case #20041000121-01).

809005.1
Highly Confidential Pursuant to Protective Order

Reports it routed away for handling and/or execution to OATS."[126]

UBS was also fined in May 2007 in a different NASD action for similar violations.[127] In August 2008, FINRA (f/k/a NASD) again found that UBS reported inaccurate information to OATS and the ACT (Automated Confirmation Transaction Service).[128] The August 2008 FINRA finding stated:

> Without admitting or denying the findings, [UBS] consented to the described sanctions and to the entry of findings that *it accepted customer short sale orders in securities and, for each order, failed to make an affirmative determination that the firm would receive delivery of the security on the customer's behalf or that the firm could borrow the security on the customer's behalf for delivery by settlement date.* The findings stated that *the firm effected short sales in securities for its proprietary account and failed to make an affirmative determination or to annotate an affirmative determination that the firm could borrow the securities or otherwise provide for delivery by settlement date.* The findings also stated that *the firm executed short sale orders and failed to properly mark the order tickets as short*; in addition, the firm executed short sale transactions and failed to report them to the NMC with a short sale modifier.[129]

---

[126] NASD NTM Disciplinary Actions March 2007, NASD Case #2004200014401.
[127] NASD NTM Disciplinary Actions May 2007, NASD Case #20050002993-01.
[128] FINRA Disciplinary Actions August 2008, FINRA Case #20041000004-01.
[129] *Id.*

809005.1
Highly Confidential Pursuant to Protective Order

- In addition to its improper activities relating to naked short selling, UBS has also engaged in a wide variety of actions in violation of the law and is under active investigation by various governmental agencies.[130]  Investigations against UBS have been ongoing throughout the last decade, alleging illegal reporting to regulators, U.S. stock exchanges, and the I.R.S. by arranging illicit reporting through offshore accounts to avoid paying U.S. taxes[131], hiding the identity of account holders, money laundering and systematic efforts to violate US laws.  For example, a former UBS banker admitted to law enforcement officials that he secretly visited U.S. clients to manage accounts hidden from the IRS, used encrypted computers to conceal client data, received counter-surveillance training to deflect U.S. inquiries, and opened accounts in the names of offshore corporations to conceal their true owners.[132]  Internal UBS documents, produced to the United States Senate, show that UBS took actions, according to U.S. Senator Carl Levin, "to help U.S. clients hide assets and income from Uncle Sam and preserve the secrecy

---

[130] UBS 20-FA 2008 Annual Report filed with the SEC, May 21, 2009.
[131] As announced on 18 February 2009, UBS settled the U.S. cross-border case with the U.S. DOJ and the SEC by entering into a Deferred Prosecution Agreement with the DOJ and a Consent Order with the SEC. United States Securities and Exchange Commission Form 20-F/A Amendment No. 1 Filed by UBS, May 2009.
[132] Keynote Address by Senator Carl Levin at the Conference on Increasing Transparency in Global Finance: A Development Imperative, September 16, 2009.

809005.1
Highly Confidential Pursuant to Protective Order

needed to thwart U.S. tax enforcement."[133]  Other examples of investigations

into UBS for illegal activities include:

- o  UBS is currently under criminal investigation relating to tax shelters

   and tax-oriented transactions in which it engaged and promoted

   between 1996 and 2000.

- o  UBS has received subpoenas from the U.S. Department of Justice,

   Antitrust Division and SEC seeking information relating to derivative

   transactions entered into with municipal bond issuers and to the

   investment of proceeds of municipal bond issuances.

- o  UBS has been advised that the SEC is considering bringing a civil

   action against UBS regarding the bidding of various financial

   instruments associated with municipal securities.

- o  UBS was sued by three state regulatory authorities and was the subject

   of investigations by the SEC and other regulators, relating to UBS's

   role in the marketing and sale of Auction Rate Securities to clients.

- o  UBS entered into settlements in principle with the SEC, the New York

   Attorney General (NYAG) and other state agencies represented by the

---

[133] Opening Statement of Senator Carl Levin at Permanent Subcommittee on
Investigations Hearing on Tax Haven Banks and U.S. Tax Compliance: Obtaining
the Names of U.S. Clients with Swiss Accounts, March 4, 2009.

809005.1
Highly Confidential Pursuant to Protective Order

North American Securities Administrators Association (NASAA), including the Massachusetts Securities Division (MSD), wherein, among other things, UBS agreed to pay penalties of $150 million relating to its role in Auction Rate Securities.

o UBS has been responding to a number of governmental inquiries and investigations relating to its cross border private banking services to U.S. private clients during the years 2000 – 2008. In particular, the Department of Justice has been examining whether certain UBS clients received advice from UBS on how to evade their tax obligations by avoiding restrictions on their securities investments.

o On February 18, 2009, UBS entered into a Deferred Prosecution Agreement with the Department of Justice and a Consent Order with the SEC whereby UBS will pay a total of $780 million, representing disgorgement of UBS's profits from maintaining a U.S. cross border business; U.S. federal backup withholding tax, interest, penalties; and restitution for unpaid taxes associated with certain account relationships involving fraudulent sham and nominee offshore structures.

o UBS has received summons from the IRS regarding accounts maintained by U.S. citizens at UBS in Switzerland.  The IRS

commenced a civil summons enforcement action against UBS

regarding these summons.

- o UBS is currently responding to a number of governmental inquiries

  and investigations, and is involved in a number of litigations,

  arbitrations and disputes, related to the subprime crisis, sub-prime

  securities, and structured transactions involving sub-prime securities.

- o In relation to the Madoff investment fraud, UBS, UBS (Luxembourg)

  SA and certain other UBS subsidiaries are responding to inquiries by a

  number of regulators, including FINMA (Swiss Financial Market

  Supervisory Authority) and the Luxembourg Commission de

  surveillance du secteur financier (CSSF).

- In 2005 over 80 million votes were received for TASER's annual

  shareholders meeting, even though only approximately 60 million shares

  were outstanding.

- Defendants also engaged in improper activities regarding the voting of

  TASER securities:

  - o For example, Defendant Deutsche Bank admits that "[d]uring the

    Time Period, [it] voted more shares for [itself] and/or [its]

clients'/customers' accounts th[a]n [it] had on deposit at the DTCC on the record date."[134]

o   Defendant Goldman Sachs Execution & Clearing admits that it "submitted 2,901 shares more votes to the Tabulator for TASER with respect to the May 1, 2003 annual TASER Shareholders' meeting than GSEC had on deposit at the DTCC."[135]

o   Defendants Deutsche Bank and Goldman Sachs Execution & Clearing also have admitted that they "voted more TASER shares for [themselves] and [their] clients collectively th[a]n [they] held in deposit at the DTCC on the record date."[136]

o   Defendant Credit Suisse also engaged in improper voting activity. First, Credit Suites admits that "as of the record date in 2006, it had two client accounts with a long position in TASER.  According to the

---

[134] Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 32.

[135] Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 32.

[136] Requests for Admission to Defendants at Request No. 40; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 40.

809005.1
Highly Confidential Pursuant to Protective Order

data provided by Broadridge, the number of shares hold in those
accounts, which exceeded the number of shares held on deposit at
DTCC as of the record date, were voted in TASER's 2006
shareholders' vote."[137]  Moreover, Credit Suisse has admitted that
"based upon records produced by plaintiffs, it is possible that in 2005
more TASER shares were voted by Credit Suisse Securities than were
held on deposit at DTCC as of the record date."[138]

- Defendants manipulated the supply of TASER shares on the market by
  borrowing more shares than they lent, without any legal purpose for doing so.
  *See, e.g.*, GSCO_TASER 000016.

- Defendants claimed to own more shares of TASER than they held at the
  DTCC.
  - For example, on May 22, 2007, Defendant Morgan Stanley's DTCC
    position was 1,792,404 shares of TASER,[139] but Morgan Stanley
    claimed 10,803,207 beneficially owned shares even though Morgan

---

[137] Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to
Plaintiffs' Third Requests for Admission to Defendants at Request No. 40.

[138] *Id.*

[139] MS_TASR_00003267.

809005.1
Highly Confidential Pursuant to Protective Order

Stanley's Summary Stock Position Data does not show positions equaling the 10.8 million shares claimed.[140]

o Similarly, on six dates between October 13, 2006 through January 14, 2007, Morgan Stanley claimed millions more beneficially owned shares of TASER than they had on deposit at the DTCC. [141]

- Defendants mismarked short sales as long sales.[142]

o For example, Merrill Lynch Professional blue sheets contain several transactions marked as short sales that were reported to the marketplace as long sales of TASER securities.  On September 23, 2004, an account of                    , at Merrill Lynch Professional, *short sold* 12,500 TASER shares to                    .  In the Equity Trade Journal, the transaction is listed as a *long* cross trade for

---

[140] MS_TASR_00003266 – 3268.

[141] For these examples, see the DTCC position in Morgan Stanley's stock record (MS_TASR_00003266 – 3268) and the NOBO/OBO reports for the following dates: October 13, 2006, October 24, 2007, December 31, 2007, January 11, 2008 and January 14, 2008.

[142] *See* NYSE January 31, 2006 press release: "NYSE Regulation Announces Settlements with 20 Firms for Systemic Operational Failures and Supervisory Violations" ("The inaccurate blue sheets [from several Defendants] were submitted over a significant period of time and resulted from deficiencies that were systemic in nature.  Inaccuracies included the reporting of *short equity sales as long sales*.").  *See also* NYSE Exchange Hearing Panel Decision 05-159.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

12,500 shares from                to    $i$              . On May 16, 2005,

an account of                    at Merrill Lynch Professional *short sold*

15,000 shares to                           which is marked in the

Equity Trade Journal as a *long* cross transaction from            to

- o UBS has, on at least three instances, marked a short sale of TASER common stock as a long sale.[143]

    - ▪ UBS has stated, under oath, that "execution-level short sale trades in the firm's [UBS's] 'Average Price Account' were coded as long sales on the firm's blue sheets. ... UBS believes that this issue may have affected UBS's blue sheets from July 2006 to April 20, 2009."[144]

    - ▪ In addition, UBS has stated that "short sale transactions related to an arbitrage strategy designated          were being reported

---

[143] UBS Securities, LLC's Objections and Responses to Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request No. 59 ("UBS states, however, that, to date, it has identified three instances in which an unintended coding error resulted in a short sale of TASER common stock inadvertently being marked as a long sale.").

[144] UBS Securities, LLC's Amended Objections and Responses to Plaintiffs' Third Interrogatories (As Amended by the Parties) to Defendant UBS Securities, LLC at 6.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

on the [UBS] blue sheets as long sell transaction. … UBS
believes that this issue may have affected UBS's blue sheets
from the 3rd Quarter of 2007 to May 18, 2009."[145]

o   There are also discrepancies between the NASDAQ Equity Trade
Journal and the blue sheet production from Banc of America which
suggest improper transactions and/or concealment.

    ▪   For example, on January 4, 2005, the Equity Trade Journal
shows                     *sold short* 22,300 shares to a
                    at 6:07 PM, after the market close.  In Banc of
America's blue sheets, this trade is *sold long* for the account of
            to a                              .

    ▪   On January 13, 2005 the Equity Trade Journal shows
            *sold short* 13,937 shares to a                         at 5:04
PM.  In Banc of America's blue sheets, this trade is *sold long*
for the account of                               to a

---

[145] UBS Securities, LLC's Amended Objections and Responses to Plaintiffs' Third
Interrogatories (As Amended by the Parties) to Defendant UBS Securities, LLC at
7.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

- According to the Equity Trade Journal on November 4, 2005,
        *sold short* 62,600 shares to a blank contra
  party. In         's blue sheets, this trade is *sold long*
  for the account of         to a        .

- On June 30, 2006, there are five trades totaling 37,300 shares
  *sold short* in the Equity Trade Journal, but in Banc of
  America's blue sheets there are only four trades marked short,
  totaling 2,758 shares, none of which are listed as traded on the
  NASDAQ market.

- Defendants submitted inaccurate blue sheets, short interest reports or other
  documents to regulators. *See, e.g.,* NYSE Hearing Board Decision 09-
  NYSE-5, 6.

- Defendants' blue sheets appear to be inaccurate and may have been a means
  by which Defendants attempted to conceal illegal activity. Each of the
  improperly recorded transactions in TASER is suspect.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

o For example, UBS admits that its blue sheets for certain time periods are inaccurate.[146]  UBS's counsel has admitted that from January 1, 2003 through the end of June 2006, UBS cannot identify which of its blue sheets are accurate or inaccurate.  *See* November 13, 2009 Letter from D. Gomez to S. Rosenwasser.  It also appears that several additional UBS blue sheets after June of 2006 are inaccurate.  UBS has admitted "that some of the information that comprises blue sheets may have reflected incorrect information during the relevant time period."[147]

o Banc of America's blue sheets likewise contain inaccuracies.  For example, on August 20, 2004, Banc of America's blue sheets show price discrepancies.  On that date, TASER's trading high was $27.75.

---

[146] *See Defendants' June 16 Positions Concerning Plaintiffs' Requests For Production Of Documents Nos. 1-16* at n.2 ("there may be certain data issues that could affect some of the blue sheets which UBS Securities, LLC ('UBS') has agreed to produce in this litigation stemming from historical errors (that have since been corrected) in the blue sheet systems used by UBS. For more information about such issues, UBS refers plaintiffs to Exchange Hearing Panel Decision 05-159 (Jan. 3, 2006). UBS believes that the other documents it has agreed to produce, including the stock records and the data from its order management systems, will provide accurate information that responds to this request, that may not have been correct on the blue sheets.").

[147] UBS Securities, LLC's Objections and Responses to Plaintiffs' Second Amended Requests for Admission to Each Defendant at Request No. 63.

809005.1
Highly Confidential Pursuant to Protective Order

However Banc of America's blue sheets show eleven transactions totaling 210,800 TASER shares trading as high as $50.

o Defendant Merrill Lynch also appears to have inaccurate blue sheets. For example, on May 10, 2004, an account of                    at Merrill Lynch Professional short sold 15,000 shares to                    on the NASDAQ market.[148]  In the NASDAQ Equity Trade Journal, however,                    was a party to only five transactions totaling 5,300 TASER shares.

o DBSI also appears to have inaccurate and incomplete blue sheets. First, DBSI's equity blue sheet production does not indicate the opposing broker in the majority of the trades produced.  The opposing broker column is blank for 94% of the TASER transactional volume in the blue sheets produced by DBSI.  In addition, DBSI's equity blue sheet production shows only two trades transacted on the NASDAQ market for 112,200 shares of TASER during the over six year record produced by DBSI, neither of which are reported on NASDAQ's Equity Trade Journal.[149]  However, the Equity Trade Journal shows

---

[148] ML-TSINTL0069214 – 69215.
[149] DBSI-TASER 003209 (*See* April 5, 2005 transactions, showing (1) 101,387 shares sold sort at $9.98; and (2) 10,813 shares sold short at $9.98, which are not shown in the Equity Trade Journal).

DBSI participating in 124,289 transactions on the NASDAQ market during the period, totaling 31.5 million TASER shares. There are numerous other inaccuracies between DBSI's blue sheets and the NASDAQ Equity Trade Journal. Although DBSI's blue sheets show little volume of TASER short sales executed on NASDAQ, there is a substantial volume of TASER short sales executed by DBSI on NASDAQ that were not, but should have been, reported on DBSI's blue sheets. For example:

- On September 16, 2005, DBSI's blue sheets show 3 transactions totaling 7,900 TASER shares executed on the National Stock Exchange. However, the Equity Trade Journal shows that DBSI executed 8 transactions totaling 122,100 TASER shares that are not included on DBSI's blue sheets.

- On June 20, 2008, DBSI's blue sheets only show 28,412 TASER shares transacted while the Equity Trade Journal shows that DBSI actually transacted 128,752 shares of TASER.

- On June 27, 2008, DBSI's blue sheets list no short sales in TASER stock but the Equity Trade Journal shows that DBSI sold short 18,026 TASER shares to NASDAQ Execution Services.

- On February 11, 2009, DBSI's blue sheets show that DBSI executed TASER short sales for 15,910 shares on the National Stock Exchange, but the Equity Trade Journal shows that DBSI actually sold 45,900 TASER shares short to a blank contra party.

- Similarly, prices reported in Merrill Lynch Pax blue sheets do not match the market prices on several occurrences.  For example, from November 18, 2005 through December 1, 2005 there are 52 blue sheet reported trades above the highest market price, which was $7.50.  These trades were transacted as high as $46.37.  Just on these nine trading days, 473,740 shares, or over $6.1 million in transactional value, were reported in Merrill Lynch Pax blue sheets as transacted above the highest price reported for the day.[150]  These trades were not reported to the market because the highest price of TASER for these nine days was $7.50, not as high as $46.37.

- The NYSE fined member firms, including Defendants UBS, Goldman Sachs, Merrill Lynch and Credit Suisse, for violating NYSE Rule 410A, NYSE Rule

---

[150] ML-TSINTL0069216 - 69217.

809005.1
Highly Confidential Pursuant to Protective Order

342 and NYSE Rule 401 by "submitting inaccurate trading information on electronic blue sheets."[151]  As held by the NYSE:

> Blue sheets are documents that are generated by firms at the request of regulators in connection with investigations of questionable trading.  The blue sheets provide information such as the identity of an account holder for whom specific trades were executed and whether a transaction was a buy or a sell and long or short.   Since 1989, firms have submitted blue sheets in an electronic format to all regulators including the NYSE.

> Blue sheets are an ***essential component of NYSE investigations*** into insider trading, ***market manipulation*** and other potential violations.  Firms must get their operations in order, then periodically test their internal systems to be sure this ***vital information*** is accurate," said Susan L. Merrill, chief of enforcement, NYSE Regulation.  "We cannot allow the failure of firms to respond accurately and completely to regulatory requests for information to ***impede our investigations***.

> The inaccurate blue sheets were submitted over a significant period of time and resulted from deficiencies that were systemic in nature.  Inaccuracies included the reporting of ***short equity sales as long sales***.  Additionally, some Firms continued to have ongoing deficiencies in blue sheet reporting even though NYSE Regulation alerted them to these problems.[152]

- Merrill Lynch was also fined by the AMEX on January 17, 2006 for submitting "erroneous blue sheet trade information to the Exchange in

---

[151] NYSE January 31, 2006 press release: "NYSE Regulation Announces Settlements with 20 Firms for Systemic Operational Failures and Supervisory Violations."  *See also* NYSE Exchange Hearing Panel Decision 05-159.
[152] *Id.*

809005.1
Highly Confidential Pursuant to Protective Order

response to requests made in the context of ongoing Exchange investigations."[153]

- A significant number of UBS's blue sheets contain inaccuracies, incorrect and/or incomplete information.  For example:

  o Although UBS has only produced blue sheets dating back to August 8, 2003, the NASDAQ Equity Trade Journal shows UBS trading activity as early as January 3, 2003.

  o UBS's blue sheets[154] and data contained in the Equity Trade Journal do not match for numerous dates, including December 1, 2004, January 6, 2005 and January 24, 2005.  On each of these dates, the UBS blue sheets underreport the number of trades and volume of TASER shares UBS transacted as reflected in the Equity Trade Journal.  For example, on December 1, 2004, the UBS blue sheets reported 131 trades for a volume of 222,186 shares, while the Equity Trade Journal shows UBS as a party to 12,036 trades for a total volume of 4,614,701 TASER shares.

---

[153] American Stock Exchange LLC Disciplinary Panel Decision, Case No. 05-95, In the Matter of Merrill Lynch, Pierce Fenner & Smith, Incorporated, January 17, 2006.
[154] UBS_TASER0000893 - 894.

809005.1
Highly Confidential Pursuant to Protective Order

o   Although UBS claims that its blue sheets are correct after June of
2006, blue sheets for June 4, 2008, July 15, 2008 and September 18,
2008[155] do not match UBS's transactions as listed in the Equity Trade
Journal.  For example, on June 4, 2008, UBS blue sheets show three
trades marked short for a total of 255 shares.  The Equity Trade
Journal shows UBS short sold 69 trades totaling almost 14,000 shares
of TASER.  On July 15, 2008, the Equity Trade Journal shows UBS
*short selling* 36,836 TASER shares in four transactions to
                        UBS's blue sheets show that these four trades for
36,836 shares are *sold long* by UBS to
On September 18, 2008, UBS blue sheets show one short sale for
4,700 TASER shares.  The Equity Trade Journal for that date shows
UBS short sold 48 trades totaling 25,000 TASER shares.  One of the
*short sales* in the Equity Trade Journal, for 20,000 shares, is listed as a
*long sale* to                                    ' in the blue sheets produced
by UBS.

o   UBS blue sheets indicate that UBS has engaged in significant trading
of TASER securities on markets other than the NASDAQ.  For
example, UBS blue sheets reflect that, on December 1, 2004, UBS

---

[155] UBS_TASER0000904 - 908.                **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

traded 131 trades for 222,000 TASER shares.  Of these 131 trades, 55 trades were reported to be transacted on the New York Stock Exchange, NYSE Arca or the Chicago Stock Exchange.  These trades constituted 40% of UBS's TASER trades on that date.  Since UBS's blue sheets reported 131 trades for a volume of 222,186 shares, while the Equity Trade Journal shows UBS as a party to 12,036 trades for a total volume of 4,614,701 TASER shares, it appears that UBS traded large volumes of shares off the NASDAQ market.

- DBSI's blue sheets likewise do not match the NASDAQ Equity Trade Journal on numerous occasions:

  o On September 16, 2005, DBSI's blue sheets show 3 transactions totaling 7,900 TASER shares, executed on the National Stock Exchange.  The Equity Trade Journal shows DBSI traded 8 transactions totaling 122,100 shares of TASER executed by DBSI that are not reported in DBSI's blue sheets.

  o On June 20, 2008, the Equity Trade Journal shows DBSI transacted 128,752 TASER shares, but DBSI's blue sheets show only 28,412 TASER shares transacted.

- o On June 27, 2008, the Equity Trade Journal shows DBSI sold short
  18,026 shares to                                    , but DBSI's blue sheets
  list no short sales.

- o On February 11, 2009, the Equity Trade Journal shows DBSI sold
  short 45,900 shares to                      but DBSI's blue sheets
  show total short sale volume was only 15,910 shares, all of which
  were executed on the National Stock Exchange.

- o DBSI's illegal conduct with regard to naked short selling includes
  DBSI, on its blue sheets, significantly underreporting short sales that
  DBSI executed on NASDAQ, which also may be indicative of
  underreporting of transactions in other markets.


- As another example of inaccurate blue sheets, on several dates, Bear Stearns'
  blue sheets[156] do not match the NASDAQ Equity Trade Journal.[157]

  - o On March 28, 2005, the Equity Trade Journal shows that
                                , short sold 116,406 shares worth $1.5 million to
                                .  The blue sheets for the same date show the sale of
    the 116,406 shares as a long sale from                    to                    .

---

[156] Bear-T00027746-48 (Bear Stearns' blue sheets).
[157] NASDAQ00000081-89 (Equity Trade Journals for the entire Time Period).

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

o   On April 12, 2006, the Equity Trade Journal shows that

sold 75,000 shares short to a                          .  The Bear Stearns

blue sheets for this date show the 75,000 shares as being sold long

from                        to                        (and then the trade is cancelled).


o   On February 27, 2007, the Equity Trade Journal shows that

sold 133,000 shares short as principal to a

The Bear Stearns blue sheets for this date show the 133,000 shares as

purchased long in a transaction between


- Defendants' options blue sheets contain inaccuracies and omissions,

  illustrating Defendants' misconduct and showing the incomplete and

  misleading nature of the Defendants' data.  For example, the March 30, 2004

  Options Clearing Corporation record does not show a

  trade for 13 contracts in TASER, but that trade is reported in Bear

  Stearns' blue sheets.[158]  Similarly, some of Bear Stearns' trades with

  and                         are not reported in the Bear Stearns options blue

---

[158] Bear-T00027748.                          **REDACTED**

sheets produced to Plaintiffs, but are included in the Options Clearing
Corporation record.  Moreover, UBS's options blue sheets also appear
inaccurate.  *See also* November 13, 2009 Letter from D. Gomez to S.
Rosenwasser (noting that UBS's options blue sheets contained "duplicate
trades that are the result of the query system that UBS used to pull the options
blue sheets.").

- Defendants also produced inaccurate and incomplete reports.  For example,
  Loanet reports reflect only borrows by                    and not
  loans for the month.  In December of 2004,                   had at
  least 1.8 million TASER shares on loan, but               Loanet reports
  only reflect TASER borrows and do not show any of these loans.

- Defendants used option contracts or other derivatives to mask naked short
  selling or fails to deliver.  *See, e.g.,* GS_TASER 002869; GSCO_TASER
  000013 – 14; GS_TASER 0001409.

- Defendants failed to request or require buy-ins for TASER and other
  securities that a Defendant failed to deliver, including each Defendant
  permitting the other to fail to deliver beyond the permitted time frame or

otherwise improperly account for an illegal short sale. *See, e.g.,*
MS_TASR37477.

- Defendants sought to create artificial and/or counterfeit TASER security
  entitlements because, *inter alia*, TASER stock was hard to borrow and thus
  commanded a high interest rate when loaned (*i.e.*, the Defendants could use
  the artificial security entitlements they created to earn high interest rates).

- Defendants failed to deliver shares because they were instead using them for
  stock loans. *See, e.g.,* ML-TSINTL-ESI371963.

- Defendants permitted, facilitated and/or participated in short sales without
  knowing whether shares would be borrowed and delivered for legal
  settlement. *See, e.g.*, GSE_T68193; GSE_T176910; CSS-TSRGA-E98519.

- Defendants failed to deliver TASER while it was a threshold security. *See,
  e.g.,* GS_TASER2945.

- Defendants permitted, facilitated and/or participated in short sales for or with
  clients they knew or should have known were engaged in improper trading or

acts relating to improper trading.  *See, e.g.,*  GSE_T69192-93; *AMEX v. Scott H. Arenstein and SBA Trading, LLC*, Case No. 07-71 [AMXC07013] (July 20, 2007); *In the Matter of SBA Trading LLC and Scott Arenstein*, File No. 09-0008 (September 24, 2009) (Business Conduct Committee of the Chicago Board Options Exchange, Inc.); American Stock Exchange Announces Two Disciplinary Actions For Violations Of Regulation SHO Short Sale Rules, July 31, 2007;  GS_TASER 002822 – 002863; GS_TASER 002895 – 002897; GS_TASER 002891.

- o  Merrill Lynch permitted its clients to engage in short sales of TASER stock with full knowledge that those clients had previously failed to deliver.  For example, from July 20, 2007 through January 2, 2008, while TASER was a Regulations SHO threshold security, Merrill Lynch Professional permitted its client

  to open 61 new TASER short positions that failed in delivery. On each of the days Merrill Lynch allowed                    to establish a new short position,                    had already failed to deliver on a prior position.  On or about the thirteenth day, when a mandatory close out of                    fail positions were required by Regulation SHO, Merrill Lynch instead booked an options trade for                    . Merrill Lynch's conduct in permitting clients who consistently failed

to deliver to continue to enter into short transactions based upon the

customer's representation that the customer has obtained a locate

violates Regulation SHO:

> The executing broker may rely on a customer's representation that an order to sell short a security is supported by a locate obtained by the customer from the stock loan department of the executing broker, or any other identified entity that is authorized to loan stock, as long as reliance on such representation is reasonable. However, where a broker-dealer knows or has reason to know that a *customer's prior assurances resulted in failures to deliver*, assurances from such customer *would not provide the reasonable grounds required* for a locate.[159]

o And, because the          short positions that failed were

established during the time that TASER was a threshold

security,[160] even if the market maker exception applied (which

---

[159] The SEC Division of Market Regulation: Responses to Frequently Asked Questions Concerning Regulation SHO. Question 4.3 (emphasis added).

[160] The short sale trades by          that failed do not appear to be executed in the available records of Merrill Lynch. For example, the original short equity transaction for          fail position of 48,170 shares starting March 3, 2006, is not executed in any of the blue sheet production from Merrill Lynch, nor does it appear to be executed on the NASDAQ exchange. The option trade that exempted fail positions of          starting on July 20, 2007 cannot be fully examined at this time because Plaintiffs have yet to receive Options Clearing Corporation data for this time period and Merrill Lynch Pax and Merrill Lynch Pro have not yet produced their options data to Plaintiffs at this time. Moreover, it appears that there are several documents related to the          transactions that have not been produced by Merrill Lynch.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

it does not), Merrill Lynch's conduct nevertheless violates

Regulation SHO because the position in TASER was not

created before TASER became a threshold security.[161]

o   Merrill Lynch also facilitated trades between

                    and                    identical to trades that NYSE

Arca and NYSE Amex found were sham transactions.

o   Merrill Lynch facilitated trades for SBA Trading and its owner, Scott

Arenstein, both of whom have been fined and sanctioned for illegal

activity by the American Stock Exchange and the Chicago Board of

Options regulatory divisions and were barred from the securities

industry for 5 years.  The AMEX concluded that SBA Trading a) was

targeting Regulation SHO securities; b) was not acting as a bona fide

market maker; c) did not have a market maker exemption for their

illegal trading; and d) illegally failed to deliver shares of threshold

securities for settlement.  *See* AMEX v Scott H. Arenstein and SBA

Trading, LLC, Case No. 07-71 [AMXC07013] Decision, July 20,

2007 ("Based on the stipulated facts, the Chair concludes that

---

[161] Federal Register, Vol. 69, No. 151, August 6, 2004, Rules and Regulations,
page 48019 ("Any fails to deliver from short sales that are not effected to hedge
pre-existing options positions, and that remain for thirteen consecutive settlement
days, *are subject to the mandatory close out requirement*.") (emphasis added).

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

Respondents Arenstein and SBA Trading violated: … SEC Rule 203(b)(3) and Article V, Sections 4(h) and (i) of the Exchange Constitution in that Respondents *engaged in a series of transactions that circumvented Respondents' delivery obligations in Reg SHO threshold securities* that had been allocated to Respondents by their clearing firm.").

- The Defendants permitted their clients to engage in transactions identical to transactions for which those clients were sanctioned by regulators.

    o Merrill Lynch client Hazan Capital Management and its owner, Steven Moses Hazan, were fined and barred by NYSE Amex and NYSE Arca on August 5, 2009 for illegal transactions designed to disguise failure to deliver positions in Regulation SHO Threshold Securities.  Hazan Capital and Steven Hazan used various complex transactions to avoid closing out their threshold security short positions:

        In order to avoid being bought-in, Respondents entered into a series of transactions that circumvented Respondents' obligation to actually deliver securities to close out their short position pursuant to Regulation SHO. Specifically, Respondents, utilizing the services of an options floor broker, executed a series of complex transactions that appeared to close out their fail to deliver position by purchasing securities of like kind and quantity…

Respondents repeatedly engaged in these or other types of transactions after receiving a Regulation SHO Buy-In Notification from their clearing firm and these transactions caused the buy-in date to be reset.

…

These transactions were executed approximately every 13 settlement days until the options positions either expired or were closed out. These transactions enabled Respondents to maintain impermissible short positions in a number of Regulation SHO threshold securities for extended periods of time. [162]

o  Merrill Lynch's blue sheet records show a pattern of identical transactions by                in TASER stock which Merrill Lynch should not have permitted and should have taken action to stop.[163] For example, on March 16, 2006,                sold 362,700 shares to                ,[164] restarting the settlement date for the original fail position for the same amount of TASER shares.[165]  Similar transactions between                and                also occurred on February 28, 2006, April 10, 2006 and May 24, 2006.  Merrill

---

[162] NYSE AMEX LLC and NYSE ARCA, Inc., Hearing Board Decision 09-AMEX-21, Hearing Board Decision 09-AMEX-22, Hearing Board Decision 09-ARCA-5, Hearing Board Decision 09-ARCA-6, for Steven M. Hazan and Hazan Capital Management, L.L.C., August 4, 2009.
[163] ML-TSINTL0069213.
[164] ML-TSINTL0069216 – 69227.
[165] ML-TSINTL0069213.

Lynch Pax division's records from August 2005 through May 2006 contain these transactions.  Hazan and SBA Trading were the parties to the sham transactions investigated by regulators as described above.

o   Merrill Lynch also assisted          in undertaking sham transactions identical to those undertaken by Hazan which the SEC found violated Regulation SHO:

> HCM [Hazan Capital Management] also willfully violated Rule 203(b)(3) of Reg SHO by engaging in a series of sham reset transactions that employed short-term, paired stock and option positions, which enabled HCM to circumvent its close out obligations in Reg SHO threshold securities. HCM *also assisted other options market makers who were executing their own sham reset transactions by acting as a counterparty to the sham transactions* and in doing so violated the locate requirement.[166]

o   Merrill Lynch's records reflect similar illegal activity by          .  For example,          had a fail to deliver in the record of 107,049 shares on November 9, 2005 as did And also had a fail position of 107,049 shares.  For the next two trading days, November 10th and 14th, 2005, these six participants each

---

[166] SEC Administrative Proceeding File No. 3-13570 In the Matter of: Hazan Capital Management, LLC and Steven M. Hazan, Respondents, Release No. 60441 (August 5, 2009) (emphasis added).

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

maintained a fail position of 107,049 TASER shares.  This pattern is seen throughout Merrill Lynch's fail record.[167]  While other records are required to fully understand these identical fail to deliver positions, this activity appears to mirror the findings of the SEC that suggest that paired positions were being employed by Merrill Lynch and their clients to assist "other options market makers who were executing their own sham reset transactions by acting as a counterparty to the sham transactions."

o  Merrill Lynch also allowed its client        to engage in rolling locates.  For example, from November 2006 through March 2009, Merrill Lynch client        requested and received large rolling locates from Merrill Lynch. Merrill Lynch's locate records show on five consecutive trading dates from November 21, 2007 through November 28, 2007 that        requested three blocks of shares amounting to 1.2 million TASER shares on each day.        requested such large locates for shares to sell short on consecutive trading days from June 2006 through March 2009.

o  Merrill Lynch client Third Millennium was also fined by the Chicago Board Options Exchange for "effect[ing] 47 short-term FLEX

---

[167] ML-TASR0052925.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

transactions in conjunction with stock purchases to circumvent

Regulation SHO closeout obligations.[168]


- Defendants, for themselves or their clients/customers, shorted more TASER

  securities than were located.


- Defendants created false and misleading information to be distributed to

  regulators and the investing public.  For example, by December 31, 2007,

  Merrill Lynch's books show that its client                had fail positions

  exceeding 900,000 TASER shares. TASER's fail position at the NSCC was

  only 203,301 at the same time,[169] indicating that Merrill Lynch internalized

  the fails and utilized ex-clearing to hide the fails from the NSCC and the

  DTCC.  Between July 20, 2007 through January 2, 2008 (the time period

  during which            increased its fail position to over 900,000 TASER

  shares),            established new fail to deliver positions on 61 days,

  with some open TASER positions lasting over 100 days. [170]  These fail

  positions appear to have been open longer than 100 days, but the record is not

---

[168] Business Conduct Committee Of The Chicago Board Options Exchange,
Incorporated, In the Matter of Third Millennium Trading, LLC, July 6, 2009.

[169] DTCC00000060.

[170] ML-TSINTL0069213.             **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

currently complete for these TASER transactions. These fails to deliver, which Merrill Lynch was required to have been reported, were not contained in any of the stock records of the three Merrill Lynch divisions who have produced records to date and may have deprived TASER and its shareholders of their rights and protection of Regulation SHO by facilitating the removal of TASER from the Regulation SHO Threshold Security List on January 2, 2008. These and similar omissions and misstatements permitted the creation and release of false and misleading information to the securities market.

- Defendants claimed beneficial ownership of TASER securities far greater than their actual DTCC ownership of TASER securities. For example, in May of 2007, Morgan Stanley claimed to own 11,767,234 TASER shares when the DTCC reflected that its actual ownership was only 2,646,970. Similarly, in May of 2007, Merrill Lynch claimed to own 2,809,889 TASER shares when the DTCC reflected that its actual ownership was only 1,443,995.

- Defendants used intra company loans in order to facilitate and mask illegal naked short sales. *See, e.g.*, MS_TASR00037089R-37094R;

MS_TASR_00006709 – 6715; MS_TASR_00006809 – 6811;

MS_TASR_00098391 – 00098838; MS_TASR_00098830.

- o Defendant Morgan Stanley's stock record shows that Morgan Stanley appears to have engaged in a significant number of rolling TASER loans to

  in order to conceal improper TASER short sale activity.

  - ▪ For example, on settlement date May 21, 2007, the
    loan amounted to 4.5 million TASER shares, but on May 22,
    2007, that loan was reduced to 901,380 TASER shares. But
    Morgan Stanley's record does not reflect a decrease of 3.6
    million TASER shares. By May 23, 2007, the TASER loan
    was 754,503, and then it increased to 4.8 million TASER shares
    on May 24, 2007.

  - ▪ These apparent rolling loans between
    should be reflected in the stock record, with real
    TASER shares moving into and out of Morgan Stanley's stock
    records. However, Morgan Stanley's stock record does not
    reflect these changes.

  - ▪ On settlement date May 21, 2007, when
    almost 4.5 million shares,            had

TASER shares on deposit at the DTCC and had only borrowed 2,860,002 TASER shares from other dealers.[171]

o          \ 's Loanet Reports also show loaning millions of shares to                    These intra company loans also appear to be rolling loans.  They are short term loans (days) are renewed when they expire with a new loan contract for a similar number of shares.  One example of this can be found in September/October of 2007.[172]

- On September 21, 2007,                   loans approximately 5 million TASER shares, worth $78.2 million (amount of shares per contract change slightly) to

  On September 28, 2007 this loan contract was closed and a new loan contract was written for 5 million shares that closed on October 1, 2007.  When the loan closed on October 1, 2007, a new loan contract was written for 5 million shares that closed on October 12, 2007.  On October 12, 2007 a new loan contract was issued for 5 million shares that closed on October 15, 2007.  This pattern continues and                    's record reflects

---

171 · .     _    ·              ..                · .

172 ;                        ·            ) and )

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED** ·

other loan contracts that appear to be similarly rolled for long periods of time.[173]

■ These loans are causing no movement of real TASER shares on deposit at the DTCC between the two accounts.                    TASER position at the DTCC during the time period examined, September/October 2007, only ranged between zero and 125,000 shares.

■ Rolling TASER loans like this could be for several illicit purposes by                    , including: (a) disguising fails internally to prevent detection by regulators; (b) supplying additional shares in the marketplace to manipulate TASER securities; and (c) avoiding a required buy-in of shares in the open market by                    , which would put enormous pressure on the upward pricing of TASER, costing                    and other firms that are short TASER a substantial amount of money.

---

[173] For additional documentation regarding loans between Inc. and _____ , see

- Credit Suisse engaged in substantial purchases and sales with          (*i.e.*, cross

  trades).  For example, from 2004 through 2009, Credit Suisse transacted with

  itself 6,157 times, for a total of approximately 17.2 million TASER shares.

  Credit Suisse also engaged in numerous trades with                         (*e.g.*,

  in 2006, there were approximately 2.2 million shares involved in such trades).

  The implications of these trades are being examined.


- Defendants may have improperly used options and/or derivatives involving

  TASER.


- Defendants improperly failed to deliver and receive TASER stock on the

  CNS, NSCC and/or in ex-clearing.

  - Between January 1, 2003 and May 31, 2009, Merrill Lynch, Deutsche

    Bank and Goldman Sachs each admit that "there have been at least

    two instances in which [they] had a net failure to deliver TASER

    common stock for 13 consecutive settlement days."[174]

---

[174] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections
and Responses to Plaintiffs' Third Requests for Admission at Request No. 1;
Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs'
Third Requests for Admission to Defendants at Request No. 1; Responses and
Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution &

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

- o Between January 1, 2003 and May 31, 2009, Defendants UBS, Banc of America, Morgan Stanley, Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs, and Bear Stearns admit that "there have been at least two instances in which [they] had a net failure to receive in TASER common stock for 13 consecutive settlement days."[175]

- o Banc of America, Merrill Lynch and Credit Suisse have admitted that "[o]n at least two occasions, [they] agreed to loan TASER common

---

Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 1.

[175] UBS Securities, LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Each Defendant at Request No. 3; Defendant Banc of America Securities LLC's Responses and Objections to Plaintiff's Third Requests for Admission at Request No. 3; Defendant Morgan Stanley & Co. Incorporated's Objections and Responses to Plaintiffs Third Requests for admission to Defendants at Request No. 3; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 3; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 3; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 3; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 3; Defendant Bear, Stearns & Co., Inc.'s And Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 3.

809005.1
Highly Confidential Pursuant to Protective Order

stock while, at the same time [they] agreed to make the loan, [they] ha[d] a net failure to deliver TASER common stock."[176]

o   Goldman Sachs has admitted that, "[o]n at least two occasions, [Goldman Sachs] ha[s] had a net CNS fail to deliver position in TASER common stock of 100,000 shares or greater for more than 13 consecutive settlement days."[177]

- Defendants engaged in short sales of TASER securities – including while it was on the threshold list – without having reasonable grounds to believe it could obtain and deliver those securities by the settlement date.

- Some Defendants engaged in short sales of TASER securities in their own proprietary accounts, and thus sought to profit from any artificial drop in TASER's price.

---

[176] Defendant Banc of America Securities LLC's Responses and Objections to Plaintiffs' Amended Second Requests for Admission at Request No. 70; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Amended Second Requests for Admission at Request No. 70; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Second Requests for Admission to Each Defendant at Request No. 70.

[177] Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 62.

o  For example, Credit Suisse admits that it has "engaged in a short sale of TASER common stock in a proprietary account without first obtaining a locate."[178]

o  Morgan Stanley, Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs and Bear Stearns all admit that, between January 1, 2003 and May 31, 2009, "as an executing broker, [they] engaged in short sales of TASER common stock for or in [their] proprietary account at a time when [they] had existing net fails to deliver TASER common stock."[179]

---

[178] Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 9; *id.* at 10.

[179] Defendant Morgan Stanley & Co. Incorporated's Objections and Responses to Plaintiffs Third Requests for admission to Defendants at Request No. 14; Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 14; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 14; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 14; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 14 ("GS&Co.: Admitted."); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 14.

- o Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs and Bear Stearns all admit that, between January 1, 2003 and May 31, 2009, "as a clearing broker, [they] engaged in short sales of TASER common stock for or in [their] proprietary account at a time when [they] had existing net fails to deliver TASER common stock."[180]

- o Merrill Lynch, Deutsche Bank, Credit Suisse and Goldman Sachs have admitted that between January 1, 2003 and December 31, 2009, as an executing and clearing broker, "[they] engaged in short sales of TASER common stock for or in [their] proprietary account at a time when [they] had existing net fails to deliver TASER common stock that persisted for more than 13 consecutive settlement days.[181]

---

[180] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 15; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 15; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 15; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at Request No. 15 ("GS&Co.: Admitted."); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 15.

[181] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaitniffs' Third Requests for Admission at Request No. 16 -17; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs'

809005.1
Highly Confidential Pursuant to Protective Order

- o Merrill Lynch, Deutsche Bank, Credit Suisse, Goldman Sachs and

  Bear Stearns admit that , "as a clearing broker, [they] engaged in short

  sales of TASER common stock for or in [their] proprietary account at

  a time when [they] had net existing fails to deliver in that stock."[182]

  These same Defendants, along with Morgan Stanley, engaged in the

  same conduct as an executing broker.[183]

---

Third Requests for Admission to Defendants at Request No. 16-17; Defendant
Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs'
Third Requests for Admission to Defendants at Request No. 16-17; Responses and
Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution &
Clearing, L.P. to Plaintiffs' Third Requests for Admission to Defendants at
Request No. 16-17 ("GS&CO.: Admitted.")

[182] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections
and Responses to Plaintiffs' Third Requests for Admission at Request No. 43;
Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs'
Third Requests for Admission to Defendants at Request No. 43; Defendant Credit
Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third
Requests for Admission to Defendants at Request No. 43; Responses and
Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution &
Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to
Defendants at Request No. 43 ("GS&Co.: Admitted."); Defendant Bear, Stearns &
Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to
Plaintiffs' Third Requests for Admission to Defendants at Request No. 43.

[183] Defendant Morgan Stanley & Co. Incorporated's Objections and Responses to
Plaintiffs Third Requests for Admission to Defendants at Request No. 44;
Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and
Responses to Plaintiffs' Third Requests for Admission at Request No. 44;
Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs'
Third Requests for Admission to Defendants at Request No. 44; Defendant Credit

- o Merrill Lynch, Deutsche Bank, Credit Suisse and Goldman Sachs have admitted that, as an executing and clearing broker, "[they] engaged in short sales of TASER common stock for or in [their] proprietary account at a time when [they] had net existing fails to deliver in that stock for at least 13 consecutive settlement days."[184]

- Defendants improperly purported to rely upon market maker exemptions and locates to effectuate speculative or investment short selling decisions between TASER market makers in violation of NASD Notice to Members 94-68. *See* GS_TASER001419-1425 ([          filled locate requests for 12.1 million

Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 44; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 44 ("GS&Co.: Admitted."); Defendant Bear, Stearns & Co., Inc.'s and Bear, Stearns Securities Corp.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 44.

[184] Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Objections and Responses to Plaintiffs' Third Requests for Admission at Request No. 45-46; Defendant Deutsche Bank Securities Inc.'s Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 45-46; Defendant Credit Suisse Securities (USA) LLC's Objections and Responses to Plaintiffs' Third Requests for Admission to Defendants at Request No. 45-46; Responses and Objections of Defendants Goldman, Sachs & Co. and Goldman Sachs Execution & Clearing, L.P. to Plaintiffs' Amended Second Requests for Admission to Defendants at Request No. 45-46 ("GS&Co.: Admitted").

shares of TASER on July 16, 2008 to Goldman Sachs despite having on deposit with the DTCC only 55 shares on July 15 and 2,224 shares on July 16).

- Defendants misrepresented to clients, customers, borrowers and/or lenders that, when conducting short sales or engaging in stock loans or borrows, that the Defendants would abide by all applicable rules and regulations, including short selling, borrowing, delivery and settlement rules and regulations. Defendants' misrepresentations regarding this subject may be found in, *inter alia*, their respective securities lending agreements, stock loan agreements, prime brokerage agreements and margin account agreements.

- Defendants received payments from clients and others for tasks they agreed to, but did not, actually undertake.

- Defendants violated their duties, responsibilities and obligations to know their customer and to report suspicious transactions.

- Defendants allowed clients and customers who had a history of failing to deliver securities to sell short.

809005.1
Highly Confidential Pursuant to Protective Order

- Defendants misrepresented to clients, customers and others that they would borrow stock for purposes of effectuating a short sale, when in fact they did not borrow stock or did not borrow a sufficient amount of stock. In many instances, those misrepresentations were made in an effort to obtain money.

Moreover, as stated above, Defendants' failure to deliver and related conduct is not limited to TASER securities, but rather is part of a pattern of unlawful and improper conduct of illegal naked short selling which includes improper transactions of the nature described above in the securities of other companies. *See, e.g.*, *SEC v. Goldman Sachs Execution & Clearing, L.P.*, File No. 3-12590 (2007); *Goldman Sachs Execution & Clearing, L.P. f/k/a Spear, Leeds & Kellogg, L.P.*, NYSE Hearing Board Decision: 07-033, March 14, 2007; NASD Fines Morgan Stanley Firms $2.9 Million for Widespread Violations of NASD Rules Number and Scope of Violations Indicate Extensive Reporting Problems at Both Firms, NASD NTM Disciplinary Actions October 2006; *In The Matter of Morgan Stanley & Co., Inc.*, Case No. 05-185 (AMEX March 13, 2007).

Defendants also acted improperly, unlawfully and illegally to the extent they acted as purported market makers in TASER securities. Defendants, as market makers and otherwise, have a duty to protect investors and issuers of stock from

809005.1
Highly Confidential Pursuant to Protective Order

fraud and to protect the integrity of the self-regulated marketplace. Because of their positions as gatekeepers to the public markets, Defendants have a responsibility to ascertain that they are not selling unregistered securities.[185] Defendants also had a duty to inquire about, report and, where appropriate, prevent suspicious activity in the trading of TASER. At a minimum, Defendants were not permitted to allow, facilitate and/or engage in trading that they knew was improper. *See, e.g.,* SEC Press Release August 5, 1999 ("The Commission's Order finds that Bear Stearns took actions that directly facilitated Baron's widespread fraudulent activity. ***A firm's status as a clearing broker does not immunize it from the consequences of participating in a fraud.*** To the contrary, a clearing firm, or any other market participant, that engages in conduct enabling a boiler room like Baron to defraud investors or millions of dollars is fully responsible for its actions.").

Defendants violated these and other duties by failing to comply with industry standards and codes of conduct, and by permitting, facilitating, engaging in and/or aiding and abetting improper TASER transactions, including naked short selling.

---

[185] SEC v. Joseph W. Pellechia, File No. 3-9718 (1999), available at http://www.sec.gov/litigation/admin/34-41035.txt.

809005.1
Highly Confidential Pursuant to Protective Order

For example, Defendants were put on notice of irregular trading in TASER by Regulation SHO daily threshold lists and their own daily stock loan lists describing TASER as a hard or impossible stock to borrow to complete settlement of short sale trades.  Once Defendants received notice that TASER securities were not settling on time and could not be readily borrowed, they had a duty to carefully make every effort to ensure that short sales could and would be delivered for settlement and that stock market manipulation was not occurring.  They did not do so.  Instead, Defendants continued to permit, facilitate and/or engage in improper and unlawful transactions, including naked short selling.

Defendants' improper conduct also includes the failure to properly provide or obtain a locate for TASER securities that either the Defendants or their customers sought to sell short.  A locate is the affirmative determination that shares can, in fact, be borrowed and delivered for legal settlement of short sale transactions.  Locates are required by Regulation SHO and were also required by other rules before the implementation of Regulation SHO, such as NASD Rule 3370 and NYSE Rule 440B.  *See, e.g., Ko Securities, Inc. and Terrance Y. Yoshikawa*, Securities Exchange Act Release No. 48550 (September 26, 2003) (holding that an affirmative determination, *i.e.*, a "locate," must be made before the

securities are sold short regardless of whether the short seller repurchases securities on the same day)."[186]

Circumventing the borrowing of securities to complete legal settlement by simply obtaining a locate for securities to be borrowed, but not actually borrowing the securities and delivering the securities is a violation of Regulation SHO and prior securities regulations. Regulation SHO specifically states that the rule prohibits a broker dealer from effecting a short sale for a customer or for their own account, unless the security has been borrowed, or there is a firm arrangement to borrow the security to complete settlement. Regulation SHO contains language that the dealer must have reasonable grounds to believe that the locate is backed by securities that can be borrowed and delivered on the settlement date of the short sale.

Securities reported on hard to borrow lists, as TASER was throughout the Time Period (as discussed above), are difficult to borrow. Therefore, the availability of very large quantities of shares to borrow of a threshold security on the broker dealers hard to borrow lists, like TASER, should have been extremely suspect at the time the locates were provided. Nevertheless, Defendants continued to provide and rely upon locates for TASER. Each time a Defendant knew or had

---

[186] Securities and Exchange Commission, 17 CFR Parts 240, 241 and 242, Release No. 34-50103; File No. S7-23-03, Final rule; Interpretation of Regulation SHO, Federal Register, Vol. 69, No. 151, Friday, August 6, 2004 page 48014.

809005.1
Highly Confidential Pursuant to Protective Order

reason to know that TASER shares would not or could not be delivered for settlement, that Defendant engaged in activity constituting, among other violations, illegal naked short selling.

Taking into account TASER's market conditions (*i.e.*, its threshold security status, restricted NASDAQ security status in 2004, large numbers of fails to deliver just within the NSCC system, very large amounts of short sales, excessive trading volumes and a virtual industry-wide hard to borrow designation) each Defendant should have been or was on notice of suspicious activity regarding short selling in TASER that was present in their own books and records.  According, by permitting, failing to recognize or failing to stop this activity in accordance with the law, Defendants actively participated in manipulation of the market in TASER securities or aided or abetted market manipulation.

For example, DBSI's locate records reflect unusual and suspect locate activity.[187]  Beginning at the time Regulation SHO went into effect, January 3, 2005,                                    was requesting locates for 1,305,600 shares of TASER securities from DBSI.  By January 5, 2005,                              was requesting 1,627,300 shares.                              requested 1,751,700 shares on January 10th, 3,130,800 shares on January 12th, and 5,232,300 shares on January 13th.                              'locate requests peaked on January 21, 2005 at

---

[187] DBSI-TASER 003213 – 3219.          **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

5,439,000 shares.  DBSI was not filling these large requests from

during this period.  During January 2005,

requested locates for a total of 69.5 million shares, more than all of the shares

TASER had outstanding for trading.

Because TASER was a threshold security at this time, DBSI knew or should

have known from its own books and records, that: a) it could not supply shares of

TASER for the locates, b) millions of shares were virtually impossible to obtain of

TASER, and c) that Regulation SHO may have been violated by a client possibly

short selling millions of shares without a locate, then trying to acquire shares it

sold without a proper borrow and delivery of the security.

The                                    locate requests remained in the high hundreds

of thousands of shares to over 1 million shares until May 16, 2005, all during a

period when TASER's shares were virtually impossible to obtain.  On May 16,

2005,                             's locate request increased from 943,600 shares to

5,031,200 shares, peaking on May 19, 2005 at 6,758,800 shares.

continued to request locates on millions of shares of TASER until

June 30, 2005.  On July 1, 2005                        sought 557,400 TASER

shares.  DBSI's stock record shows that                       continued to

request large locates of TASER throughout the remaining Time Period.  In sum,

during the Time Period,                            requested locates for 1 billion

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

shares of TASER, which is significantly out of proportion to the 60 million shares

TASER had outstanding.

DBSI's stock record also shows suspect transactions by its client

⸻. From April 2005 through May 29, 2009,

requested 400,000 shares nearly every day from DBSI, whether or not they

received fills.  For example, from September 26 through September 28, 2005,

⸻ received fills for the 400,000 share request, totaling 1.2

million shares, but continued to request the same amount of shares for almost two

years.

Moreover, ⸻ requested locates for

3,794,001 TASER shares nearly every day from August 3, 2007 through October

2, 2007.  These requests were only partially filled by 25,000 shares each day from

August 3 through September 7.   DBSI's records show

⸻ requested 1,453,841 TASER shares every day from May 20, 2008

through July 18, 2008.            ⸻' request for these shares was filled in part

on only one occasion, for 25,000 shares.  These large locate requests were a pattern

for ⸻

From September 18, 2008 through November 7, 2008, ⸻

⸻ requested from 1.3 to 2.4 million shares each day from DBSI, but did

not receive fills for any of its requests.

From July 1, 2008 through May 29, 2009 (230 trading days),

requested 300,000 TASER shares on 229 trading days.  These requests were filled

in full on 157 trading days and were partially filled on another 58 trading days,

totaling 49.6 million shares of TASER.  Thus, there were only 14 days in this

period where          did not receive a locate for any of the 300,000 shares

requested, but          continued to request the locates for the 300,000 shares

even though they were fully filled on 68% of the trading days.   From November

11, 2008 through May 29, 2009,          received fills for 300,000 TASER

shares each day, but DBSI's loan data shows the highest loan during that period

was for only 16,000 shares.[188]  DBSI's DTCC position peaked during the period at

164,180 shares of TASER.  In December 2008, the records of DBSI show filled

locates totaling 1 to 2.5 million shares each day, while the DTCC shows DBSI had

less than 61,000 shares on deposit during this entire month.  DBSI redacted the

lender information in its locate records, making it impossible to fully evaluate

these suspect locates.

Defendants were also put on notice of irregular TASER trading activity

through the stock's abnormal trading volume.  For example, in December 2004,

failures to deliver TASER shares just within the NSCC system alone peaked at 8.1

million shares, with those failures attributable to Defendants such as Goldman

---

[188] DBSI-TASER 003213 – 3219.                **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

Sachs.  The short interest in TASER, which, in a market free of illegal and manipulative conduct, is assumed to be the *legally* shorted shares in the marketplace, was reported at 30 million shares or more than half of the 59 million shares TASER had outstanding in December 2004.  Historically, a security's short interest averages between 2 and 3.5% of shares outstanding for stocks trading on the NYSE and NASDAQ.  The consistently large number of fails and short interest in TASER during this time shows that TASER shares were in a constricted state of available supply.

Although Defendants knew that TASER securities were in a constricted state of supply, they continued to permit, facilitate and/or engage in extensive short selling of TASER securities for themselves and/or their clients.  As a result, in December 2004 – when short interest was at approximately 30 million shares and the fails to deliver at the NSCC alone averaged approximately 5.4 million shares - 184 million shares of TASER securities (three times the number of shares outstanding in December 2004) were traded.  This could not have occurred without Defendants' participation and unlawful conduct.

This pattern is seen again in January of 2005.  In that month, there were approximately 107 million shares of TASER (twice the amount that were issued) sold short.  Defendants, as market makers, took steps designed to conceal this fact.  Although the fails to deliver in TASER appeared to decline at the NSCC by 60%

from December 2004 to January 2005, and the reported short interest declined 30% during the same time period, this apparent change was caused by Defendants' actions. For example, Defendant Goldman Sachs appears to have removed large fails to deliver from the NSCC system, accounting for the majority of the decline in the average daily fails of TASER within the NSCC.

Moreover, the extraordinary trade volumes in TASER illustrate the Defendants' illegal conduct. For example, on January 13, 2005, there were over 214,000 trades for 70 million shares of TASER stock, which constitutes 10.6 million more shares than were actually issued by TASER and, on average, over 9 trades of TASER stock executed every second during regular market hours. On this one day, 33% of all legally issued TASER shares were sold short in 59,000 transactions representing a value of $415,000,000. Between January 7, 2005 and January 13, 2005, TASER's trade volume was 249 million shares, a transactional value of over $4,500,000,000. In these five days, TASER's outstanding, validly issued 59.3 million shares turned over four times, which would result in an annual turnover rate of 211 times the TASER shares outstanding. This magnitude of trading is far greater than the average NYSE traded company's annual turnover, 1.03 times, and the NASDAQ average turnover, 2.6 times per year during the same time frame. Moreover, during this same time, Defendants' illegal actions

contributed to over 65 million newly traded short sales in TASER through 213,000 reported trades worth approximately $1,200,000,000.

In the month prior to a forward split effected on April 29, 2004, UBS[189] traded 91 million TASER shares or 42% of the total TASER trade volume on the NASDAQ market, when TASER had only 28.5 million shares outstanding. The 91 million TASER shares transacted represented 3.2 times the total TASER shares outstanding. During December 2004, UBS traded 48 million TASER shares or 25% of the total volume traded on the NASDAQ, with 24% of the volume as transactions involving a short sale. In January 2005, UBS traded 94.4 million shares or 21% of the total TASER volume traded on the NASDAQ and over 1.5 times TASER's shares outstanding. Of the total volume traded by UBS, 25% or 23.6 million shares were transacted short, which was 40% of TASER's shares outstanding. In 2007, UBS traded 18% of the NASDAQ volume or 156 million shares, amounting to $2 billion worth of TASER shares. From January 3, 2006 through July 31, 2009, the NASDAQ market alone shows UBS trading 17.3% of the share volume for TASER.

Merrill Lynch also engaged in significant volumes of TASER trades on behalf of its clients, and, in particular, on behalf of its largest trading client

---

[189] UBS also includes Schwab Capital Markets which was acquired by UBS. *See* UBS Press Release, August 31, 2004, UBS to Acquire Charles Schwab's Capital Markets Division.

According to the Equity Trade Journal, from January through June 2003, the "base" period prior to the manipulation period,                traded 1.8 million TASER shares or less than 1% of the total volume traded on the NASDAQ during the first six months of 2003. From July through December 2003, while TASER had a very stable supply of only 3 million shares outstanding,            traded 16.8 million shares.

From January 1, 2004 through February 10, 2004,          traded 7.5 million shares or 29% of the total TASER volume traded on the NASDAQ, while TASER had only approximately 4.2 million shares outstanding. This is a significant 29 day trading period because, of the 4.2 million shares outstanding, approximately 900,000 shares were owned by insiders, institutions owned 1.2 million shares and 1.15 million shares were reportedly delivered to cover short sales, leaving a very small number of shares available for free trading.

TASER's stock split 3 for 1 on February 11, 2004. During the period from February 11, 2004 through April 28, 2004, when TASER had between 12 and 14 million shares outstanding,         traded 81 million TASER shares during this 54 trading day period.

TASER's stock split 2 for 1 on April 29, 2004. From April 29, 2004 through November 26, 2004,         transacted 240 million shares or 21% of the total TASER volume traded on the NASDAQ market. Throughout these seven

months, TASER had only 29 million shares outstanding.  During the period

sold 28.6 million shares short to                      , a heavily advertised large retail

brokerage that caters to individual investors.

TASER's stock split again 2 for 1 on November 29, 2004.  From November

29, 2004 through December 31, 2004,          traded 46.6 million TASER shares or

20% of the total volume traded on the NASDAQ, while TASER had 59.3 million

shares outstanding.          largest contra party remained                and

sold 6.3 million shares of TASER short to                      .  This trading

executed by          totaling 46.6 million TASER shares is only from the

NASDAQ, and additional activity may have taken place on other exchanges that

have not yet produced information in this case.

During the entire year of 2004,          traded 375 million TASER shares,

acting in a capacity as principal for 68% of the trades.  In 2005,          continued

to trade high volumes of TASER shares.  For the year 2005,          traded 322

million shares or 21% of the total TASER volume traded on the NASDAQ market.

The volume of trades by          in a threshold security should have indicated a

potential problem to Merrill Lynch.

The heavy trading discussed above is not expected to occur in a normal

supply and demand market that is free from the influence of illegal and

manipulative conduct (such as the market resulting from Defendants' illegal

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

actions here).  Indeed, absent the abundance of "supply" provided and created by Defendants' conduct in illegal short selling and fails to deliver of TASER stock, the trading in the market of TASER should have slowed down dramatically in January 2005 until the supply of shares issued by TASER and registered for sale by the SEC were brought into balance for settlement with the requirements of Regulation SHO.  TASER securities, however, were not quickly brought into balance because of Defendants' decision to continue to permit, facilitate and engage in unlawful short sales after being put on notice of irregular TASER trading.

Defendant market makers' willingness to conceal the large amount of short interest and to transact such heavy volumes exists at other points during the Time Period and illustrates the existence of illegal conduct.  Further, by permitting, facilitating and/or engaging in the direct participation in or facilitation of manipulation of TASER shares through this activity, Defendants were not bona fide market makers.  Accordingly, their actions in failing to possess shares for sale and failing to properly locate, borrow and deliver stock for settlement of short sale transactions results in violations of the law that harmed Plaintiffs.[190]

---

[190] *See* GSE_T01146066 ("Examples that would not constitute a 'bona-fide' market making" include "Activity that is related to speculative selling strategies of the broker-dealer and is disproportionate to the broker-dealer's usual market making patterns or practices" and "Transactions whereby the market maker enters

809005.1
Highly Confidential Pursuant to Protective Order

Plaintiffs note that the preceding response is based on a preliminary review of the limited data produced by Defendants to date and that additional data is necessary to understand the full extent of the improper trading. For example, with respect to those Defendants for whom a response is being provided, there is important transactional activity that is missing, such as transactional activity from Goldman Sachs International and Goldman Sachs Funds Management. That information is potentially important because                    ¦ and

entered into a loan and borrow contract for shares of TASER on January 20, 2004 that appears to remain in effect today. This contract has resulted in intra-company loans, at times exceeding 8 million shares borrowed/loaned between these accounts.[191]

In addition, information from other Defendants is necessary to understand the full conspiracy with regard to all of the Defendants. For example, several transactions DBSI undertook in TASER stock are suspect and may evidence DBSI and the other Defendants' participation in illegal naked short selling activity:

- On October 22, 2004, Credit Suisse' blue sheets show an account of

sold long 50,000 shares at

---

into an arrangement with another broker-dealer or customer to use the market maker's exception to avoid compliance with the locate requirement").

[191] GS_TASER 001427-1429.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

161

$40.36 to opposing broker          .  Credit Suisse' blue sheets show

purchased 50,000 shares at $40.36, worth over $2 million, from a

.  Both of these transactions were marked as a

"client request" in the Execution Trade Type column and both were

prime brokered by Credit Suisse.[192]

- On October 22, 2004, DBSI's blue sheets show an account

  with Credit Suisse as the prime broker sold

  long 50,000 shares at $40.36 to an                    .  DBSI's

  record also shows an account of Morgan Stanley as prime broker for

  the account of                                        which

  purchased 50,000 shares at $40.36 from an opposing broker of

  Both of these trades were executed Over-the-Counter.[193]

- In Morgan Stanley's Trade Runs, account

  purchased 50,000 shares at $40.36 from contra broker          from an

  account that was listed as a                            account.

  This trade was marked as an ex-clearing transaction.  Also, Morgan

  Stanley's records show account

REDACTED

---

[192] CSS-TASER 0014682.
[193] DBSI-TASER 003209.

809005.1
Highly Confidential Pursuant to Protective Order

purchased 50,000 shares at $40.36 from a

which was marked as an average price trade.[194]

- Activity in Credit Suisse' stock record for this settlement date show

in a new "short settlement position" of

50,000 shares and show an account for

short 50,000 shares.[195]

- DBSI's stock record for the settlement date shows 50,000 TASER

shares received from Credit Suisse into                account

and then                transferred the 50,000 shares to an account

of                                                  The

record shows a delivery of the 50,000 shares to Morgan Stanley.[196]

- The 50,000 shares that were supposedly delivered to

in the DBSI record do not show up in the Morgan Stanley Summary

Stock Position Data.  The        accounts at Morgan Stanley that each

purchased 50,000 shares do not appear in Morgan Stanley's Summary

Stock Position Data.  The purchases do not appear to be held in any

other account.[197]

---

[194] MS_TASR_00003243 − 3261.
[195] CSS-TASER 0003191.
[196] DBSI-TASER 006506.                    **REDACTED**
[197] MS_TASR_00003266.

- In the NASDAQ Equity Trade Journal, the only transaction posted from the above series of trades was a cross transaction by ⎧where sold short 50,000 shares at $40.36. This trade was executed after the market closed, at 4:41 PM. DBSI acted as agent for both sides of the transaction and it was marked "not for clearing submission."[198]

- In the above transactions, the Defendants' blue sheets and trade runs indicate the transactions were long shares of TASER, when the trades reported on the NASDAQ were listed as a short sale. These transactions appear to be designed for the sole purpose of disguising the nature and value of the shares being sold. Further information is required to fully evaluate these transactions.

Information and data may also not have been produced by UBS. For example, Plaintiffs have inquired as to whether UBS has produced all of the TASER data relating to trades or transactions involving SCHB (a wholly-owned market marker). Plaintiffs informed UBS that according to NASDAQ's equity trade journals, from November 2004 through January 2005, there were over

---

[198] For additional examples of these types of transactions for accounts of HBK Investments, *see* DBSI's blue sheet records on September 23, 2004 and October 4, 2004. The transactions on September 23, 2004 are with prime brokers Goldman Sachs and Morgan Stanley for 25,000 shares. The transactions on October 4, 2004 are with prime brokers Citigroup and Morgan Stanley for 10,000 shares.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

130,000 TASER transactions involving SCHB.  UBS has not yet responded to Plaintiffs' requests that it confirm that it has produced all SCHB TASER trading and transaction data.

Additionally, while UBS has produced some trading data from its affiliate UBS Financial Services, the information appears to be incomplete and is missing important fields of information, which Plaintiffs understand are generally maintained in the ordinary course of business.  The data produced by UBS does not appear to include the short sale indicator, capacity, average price indicator, contra broker, account address information, clearing broker, or registered representative. Plaintiffs requested complete data from UBS but have not yet received it.

UBS also engaged in suspicious settlements within the NSCC's CNS System for which additional documentation is needed.  On December 30, 2004, UBS transacted 5.1 million shares of TASER in the Equity Trade Journal, with 1.3 million shares transacted short.  However, on settlement date in the CNS Accounting Summary, the UBS accounts were flat, *i.e.* they owed no shares and no one owed them shares.[199]  Four trading days later, the same unusual market/settlement phenomenon occurs.  On January 6, 2005, UBS traded 1.6 million shares of TASER in the Equity Trade Journal, with 466,000 shares transacted short.  However, the CNS Accounting Summary shows the UBS

---

[199] DTCC 00000026.

809005.1
Highly Confidential Pursuant to Protective Order

accounts were flat on settlement date.[200]  These activities are suspicious due to the lack of supply of TASER shares available during the Time Period.  Due to the low supply of TASER shares and UBS's heavy trading of TASER, it is extremely unlikely and unusual that UBS would be flat at the end of any day.  The full record of UBS' trading is required in order to understand this trading activity and the flat accounts.

Further information and discovery is also required as to UBS's relationship with and large volume of short sales to certain retail brokerage houses.  The Equity Trade Journal shows that UBS consistently engaged in heavy volumes of TASER trading throughout the Time Period.  For example, in December 2004, UBS traded 26.3 million TASER shares (55% of UBS's total TASER volume that month) with large retail brokerage houses that are heavily advertised to small individual investors.  UBS purchased 13.6 million shares long and less than 10,000 shares short from , but UBS sold the two retail brokerages 8 million shares short.  It appears to be quite unusual that UBS would be such a heavy short seller to investors at these retail brokerage houses, which are mostly comprised of average American investors.  Further documentation is required to understand the nature of

**REDACTED**

---

[200] DTCC 00000026.

809005.1
Highly Confidential Pursuant to Protective Order

these agreements and why there is such an imbalance of short TASER shares being sold by UBS to these discount retail firms.

UBS and _____ together are the largest traders of TASER in 2004 and 2005 and are both large trading partners to _____ . Remarkably, in just January 2005, after the implementation of Regulation SHO, which was designed to curb abusive short selling, UBS and _____ bought 543,000 shares, which were sold short from _____ but sold over 15 million shares short to in these 20 trading days.

In the NASDAQ Equity Trade Journal in January 2005, _____ executed 93,652 transactions with _____ but in Merrill Lynch's blue sheets for January 2005, Knight is listed as executing only 233 transactions with _____ . In the Equity Trade Journal, _____ traded 45 million shares of TASER with _____ but in Merrill Lynch's blue sheets, _____ traded only 29.3 million TASER shares with _____ .

Of the 233 total trades in Merrill Lynch's blue sheets between _____ there were 48 block trades comprising 29.1 million shares of the reported 29.3 million shares in Merrill Lynch's blue sheets. Shorted shares by _____ in the Equity Trade Journal totaled 9.1 million shares, but Merrill Lynch's blue sheets show only a total of 31,679 shorted shares. Merrill Lynch's blue sheets, which were transmitted to regulators, do not reflect the reality

of trades undertaken by Merrill Lynch and its clients and created misleading and incorrect information that was disseminated to others.

In addition, further information is necessary from Goldman Sachs. Plaintiffs have requested data from GSFM and additional data related to account(s). Between 2003 and 2007, GSFM filled affirmative determinations for more than 8.8 million TASER shares. GFSM provided locates for hedge funds expressly identified in Plaintiffs' these interrogatory responses, including                                        . It also provided them to                              in 2007. Moreover, Goldman's trade history report for options shows that              traded over 1 million TASER shares. But, Goldman has not producing any trading data from GSFM. Additionally, there are over 814 transactions in Goldman's TASER trade history report where the account                          was on the opposite side of the account in transactions. Plaintiffs have requested additional information on these trades, but Goldman has not yet provided it.


Banc of America's blue sheet production likewise appears to be incomplete or does not contain certain information. For example, Banc of America's blue sheets show transactions for 128 million TASER shares from January 2, 2003

**REDACTED**

through March 16, 2009.[201]  This volume of shares was not transacted through

Banc of America as trades in the marketplace.  The NASDAQ Equity Trade

Journal, the only market that Plaintiffs have received trade-by-trade information

from to date, shows Banc of America trading only 12.3 million shares in the same

time period.  It appears that the majority of the trading by Banc of America was

executed at trading venues other than the NASDAQ, the primary market where

TASER trades.  Moreover, Banc of America's blue sheets show transactions of 9

million TASER shares with a name                    in the column for the account.[202]

The blue sheet column indicating the exchange where these transactions were

executed is 90% empty.

These instances show why complete records from each of the Defendants

must be provided before Plaintiffs are able to provide a full and complete response

to this Interrogatory with regard to any single Defendant.

Other than the missing affiliate records, certain records appear to be missing

data fields that are required to properly account for transactions.  These missing

data fields are collected by other dealers in their normal course of business.  For

example,                    options trades are found in the Goldman Sachs Execution

**REDACTED**

---

[201] BAS-TASER_0001644 – 1649.
[202] BAS-TASER_0001644 – 1649.

& Clearing Legacy FOC Trade History Report for options.[203]  From March 30,
2004 through August 4, 2005,                    traded 351 options trades for 305,515
contracts, representing 30,551,500 shares of TASER.  93% of the contracts were
traded between June 21, 2004 and January 24, 2005.  These reports appear
incomplete because they do not contain normal options fields that are collected by
other dealers in their normal course of business.  Cancelled transactions have not
been removed from these numbers because there is no column indicating cancelled
trades.  Columns M through V appear to be missing in these databases.  Examples
of the missing columns can be found in Goldman Sachs Execution & Clearing
Legacy SLK Trade History Report for options: GSEC_TASR 000017.  The
examination of the Goldman Sachs options activity remains incomplete without
this information.

Bear Stearns has also produced incomplete information even though it
appears that the information is available.  For example, the Bear Stearns blue
sheets produced to Plaintiffs list many trades where the account name and address
fields state "Information Unavailable."  However, the fields listed in Bear Stearns'
production to Plaintiffs as "Information Unavailable" have been provided to
NASD in response to regulatory requests.  *See* Bear-T00027826.

---

[203] Part 1, dates 3/22/2004 – 5/30/2007: GSEC_TASR000015; Part 2, dates
6/1/2007 – 5/20/2009: GSEC_TASR000016.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

Bear Stearns has also engaged in suspicious trading activity which cannot be entirely examined on the basis of the current record.  For example, Bear Stearns' traded over 80 million TASER shares from April 7, 2004 through May 27, 2008, representing purchases of 40.1 million shares and sales of 40.1 million shares of TASER.  The cessation of trading is significant as it is the very day this lawsuit was filed.  Of these transactions, 22.1 million TASER shares were sold short, worth $321.4 million.  As Bear Stearns' Daily Stock Records do not reflect an imbalance of 17.9 million shares waiting to be delivered, it is unclear, based upon the current record, why this short position was necessary.

Moreover, Bear Stearns' metrics with regard to TASER trading appear to be out of balance such that further inquiry and documents are necessary to fully evaluate them.  According to trading information provided by NASDAQ, Bear Stearns engaged in 13,000 transactions in TASER stock with for 11.9 million shares, worth $231.9 million,  Bear Stearns sold short 3.4 million TASER shares to                .  These trades were undertaken in Bear Stearns' capacity as                         [204]

---

[204] Merrill Lynch likewise engaged in suspect             transactions for which additional information is required.  According to the NASDAQ Equity Trade Journal, Merrill Lynch traded 22.1 million shares with a In total, Merrill Lynch purchased 10.9 million long shares from a

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

Bear Stearns also traded with          as buyer and seller in 2,305 transactions of TASER stock, totaling 1.8 million shares, with 83% of the volume transacted as short sales.   The vast majority, nearly 99% of these trades, involved Bear Stearns trading with

In total, Bear Stearns purchased 15.7 million TASER shares from and sold 14.8 million TASER shares to its four biggest trading partners (

                                        ). Only 11% of these shares purchased were short sales, but Bear Stearns sold short 9.8 million TASER shares (66% of the 14.8 million shares sold to its largest trading partners).

As another example, Morgan Stanley's Trade Runs show unusual transactions for hedge funds, including for                              , a large hedge fund and client of both Morgan Stanley and Goldman Sachs.  On August 28, 2007,

                                        short sold a total of 175,466 shares at $13.72 to a                     Then,

          short sold 175,466 shares at $13.72 to          This trade is

with zero short shares purchased, but Merrill Lynch sold 7 million short shares to a                   Banc of America also has a number of transactions involving               every 1 out of 5 shares Banc of America listed in the Equity Trade Journal.  As with other Defendants who traded with          , these transactions appear to be out of balance on the short side of the trades and require further inquiry.

marked as an ex-clearing transaction.[205]  No affiliated accounts were

posted with positions in Morgan Stanley's stock record for these trades.[206]  Only

the NASDAQ has produced exchange trade by trade data, which does not show

these trades, therefore the full audit trail for these transactions is not available and

conclusions about these transactions are pending further discovery.

As another example, on April 25, 2007, short sold 103,252 shares at $8.09 to

short sold 5,146 shares at $8.08 to a and

short sold 103,252 shares at $8.09 and 5,146 shares at

$8.08 to a total of 108,398 shares.  These trades were

marked as ex-clearing transactions.  Then short sold 108,398 shares at $8.09 to

purchased 108,398 long shares at $8.09

from [207]

Morgan Stanley's Trade Runs show other illustrations of unusual trading by

hedge funds.  For example, on July 12, 2007, sold long 300,000

shares at $15.72 to This trade is marked as an ex-clearing

---

[205] MS_TASR_00003243 – 00003261.
[206] Summary Stock Position Data, MS_TASR_00003266 – 3268.
[207] MS_TASR_00003243 – 3261.

809005.1
Highly Confidential Pursuant to Protective Order

173                          **REDACTED**

transaction. On the same day.



sold a total of 300,000 shares long at $15.72 to a [REDACTED].[208] None of the [REDACTED] affiliated accounts were accounted for in Morgan Stanley's stock record for these trades.[209]

On January 2, 2008, [REDACTED] sold 80,000 long shares at $14.19 to [REDACTED]. This trade is marked as an ex-clearing transaction. On the same day, [REDACTED] sold a total of 80,000 shares long at $14.19 to a [REDACTED].[210] None of the [REDACTED] affiliated accounts were accounted for in Morgan Stanley's stock record for these trades.[211]

Similarly, there is movement in Morgan Stanley's Daily Stock Activity Report that is not reported in their Trade Runs[212] or their stock record.[213] For example, this movement involves five account numbers beginning with ' [REDACTED] .[214] On twenty nine trading days ranging from April 9, 2007 through August 22, 2007,

---

[208] MS_TASR_00003243 – 3261.
[209] MS_TASR_00003266 – 3268.
[210] MS_TASR_00003243 – 3261.
[211] MS_TASR_00003266 – 3268.
[212] MS_TASR_00003243 – 3261.
[213] MS_TASR_00003266 – 3268.
[214] MS_TASR_00003263.

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

the record shows Morgan Stanley debiting TASER shares from these accounts and

crediting TASER shares to these accounts totaling 1.6 million shares on a rolling

basis with each account either being debited or credited the same quantity of shares

for each activity date.

On May 22, 2007, accounts prefaced "          ?" were being offset by account

          , which is the account for

These appear to be offsetting journal entries that are accounting for TASER stock

transactions that do not show up in the Morgan Stanley stock positions record.

Considering just the          account data on May 22, 2007, almost 4 million

TASER shares are included by Morgan Stanley that are not accounted for in

Morgan Stanley's Summary Stock Position Data.

Considering this record, it appears that there are TASER transactions not

connected to Morgan Stanley's stock record, indicating that the full record has not

been produced, and Plaintiffs thus cannot fully respond to this Interrogatory at this

time. Similarly, there are transactions between Morgan Stanley and

          that may reflect illegal short sales, but documents from

          have not yet been produced.

This hedge fund activity at Morgan Stanley does not appear to reconcile

with their stock record.  It is yet to be explained where or how Morgan Stanley is

accounting for these types of trades.  Morgan Stanley has been asked about the

trading with blank contra parties, but has not responded to date.  Morgan Stanley is

not the only Defendant with a pattern of trading for certain clients with an

unknown/blank contra party to the trades.

Banc of America likewise participated in suspect transactions on behalf of

its hedge fund clients.  For example, on February 12, 2004,

*sold short* 81,900 shares at $58.43 to

' then *sold long* the 81,900 shares at $58.16 back to

On June 25, 2004, a different account of

transacted the same type of trade.                        *short sold* 31,900

shares at $40.31 to

Then, the                                                                        *sold long*

the 31,900 shares back to                        at $41.69.

On November 26, 2004, hedge fund                          *sold short*

15,000 TASER shares at $46.94 with                  as the contra broker.

purchased and sold the 15,000 shares *long* at $46.94, with

Banc of America account                          purchased the

15,000 shares *long* at $46.94.  For additional examples of these types of

REDACTED

transactions of                     see Banc of America's records for January 7th,

10th, 11th and 13th, 2005.

On January 13, 2005,                          *sold short* 25,300

shares at $21.51 to                          Then,

Group *sold long* the 25,300 shares at $21.19 to                     . For

additional examples of these transactions between

see November 17, 2004, December 7, 2004, January 10, 2005 and

January 12, 2005.

On March 28, 2005,                     *sold short* 12,800 shares at $13.23 to

for the account of



Then,

*sold long* 12,800 shares at $13.23.

On March 17, 2006,                     *sold short* 140,300 shares at

$10.12, with                     as its own contra broker.  These shares were

transacted *long* through three other accounts within the books and records of

before being sold to                     a)

purchased and *sold long* 140,300 shares at $10.12, with Banc

of America as the contra broker for both the purchase and sale transactions; b)

purchased and *sold long* the 140,300 shares at $10.12; and c)

purchased 140,300 shares at $10.12 and then *sold long* the 140,300 shares at $10.18 with Bear Stearns as the contra broker.  In Bear Stearns blue sheets there is a *long sale* for 140,300 shares at $10.18 for

.  Bear Stearns is listed as both the executing broker and the contra broker, but Banc of America is listed as the prime broker for the transaction.[215]  This series of transactions appears to show Banc of America creating short shares that were sold long after the shares were washed through accounts.

Merrill Lynch also engaged in suspicious trades involving mutual funds. Prior to July 24, 2003, institutional money manager          bought and sold a small amount of TASER's stock in three trades through Merrill Lynch.  On July 24, 2003, on behalf of

began a buy and hold strategy in TASER.  In Merrill Lynch blue sheets,          sold 70,000 shares at $15.68 for $1,097,502 to

[216]  The NASDAQ Equity Trade Journal shows the sale was then split by Merrill Lynch's largest trader,          into four blocks.          sold the 70,000

---

[215] Bear-T00027747.
[216] ML-TASR0052916 – 52922.

REDACTED

809005.1
Highly Confidential Pursuant to Protective Order

shares long to a                            at an average share price of $15.68.  The

following day, July 25, 2003, Merrill Lynch sold 12,400 shares to                    at

$16.00 for $198,400.  The trade had the same characteristics as the 70,000 share

block.                          sold to a                          12,400 shares at $16.00.  In this

case, the                            to                    is known to be                      .

According to the Equity Trade Journal and Merrill Lynch's blue sheet records,

             purchased 70,000 long shares.  However, Merrill Lynch failed to

deliver these shares to                      as is evidenced by the fail account[217] in Merrill

Lynch's Position Stock Record.[218]  These particular trades failed to deliver,

resulting in the sale of stock not owned as if TASER had issued the securities when

it in fact had not.

There are similar trades in the Merrill Lynch record between mutual funds

and institutions that are executed with blank contra parties.

Bear Stearns likewise engaged in unusual options trades for hedge fund

clients.  On March 30, 2004,                          , through Bear Stearns as the

executing broker, and a                          conducted the following series of

options trades in a                              :  a) purchased 10 contracts

and 3 contracts (both of which were cancelled); and b) sold 10 contracts and 3

---

[217] Merrill Lynch's failures to deliver or receive TASER common stock within the CNS system is Account #

[218] ML-TASR0002020-2069                    **REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

contracts (both of which were cancelled).                      through Bear Stearns as

executing broker and contra party then executed the following options trades: a)

purchased 13 contracts (uncancelled); and b) sold 13 contracts (uncancelled).

then sold 1,300 TASER shares long to                      as if the shares

were owned by            , issued by TASER and registered for sale by the SEC,

although these shares do not appear to have been registered or issued.  Bear

Stearns' stock record also reflects that            had a short position of 1,300

shares on the trade settlement date.  Bear Stearns executed the above transactions

knowing that the shares it purported to purchase were not long.

Banc of America likewise engaged in options trades designed to unlawfully

mask short sales.                  was the largest options trader in Banc of

America's options blue sheet record.[219]  On at least two occasions, options trades

for                      were hedged with an equity transaction that was illegally

sold long in Banc of America's equity blue sheets.

On May 31, 2006,                      entered into a call option contract

representing 555,000 shares and entered into a put option contract representing

555,000 shares, both on the NYSE Amex.[220]

, was the contra broker to Banc of America for both transactions.  The Banc of

---

[219] BAS-TASER_0001644 – 1649.

[220] Banc of America's options blue sheet record: BAS-TASER_0001644 – 1649.

809005.1
Highly Confidential Pursuant to Protective Order

REDACTED

America blue sheets also show an equity trade *sold long* by                    for 555,000 TASER shares, worth $5.1 million, on the NYSE.  Shares sold as a hedge against an option contract are shares not owned by the seller.  Therefore, they are short shares that cannot be sold long.  This constitutes violations of Regulation SHO Rule 200.

The OCC record does not show the above transactions, which indicates that the option trades were cancelled.[221]  However, it does show six transactions comprising the same 555,000 shares at the same price for both put and call options between Banc of America and Merrill Lynch.  Although Banc of America's options blue sheets should show these options trades, they do not.  The OCC shows a "Clearing Member Trade Agreement" between Merrill Lynch and

for these trades.

The OCC data shows these same trades executed again by Merrill Lynch and

The options data of Merrill Lynch (which has not been fully produced) should reflect these transactions.  These Merrill Lynch offsetting transactions were market neutral such that there was no risk associated with the trading.  Without market risk there should be no hedge to the option position and the 555,000 shares should not have been sold because the option trades could not be legally hedged.

---

[221] Transactional History Data: OCC00000001 – 136.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

Next, a purported hedge was created for the 550,000 shares and purchased long 550,000 shares from                                        ,                                        . Banc of America's blue sheets do not show the                555,000 share transaction, but do show an equity trade *sold long* by a                          account for                of 555,000 TASER shares, worth $5.1 million to broker

At this time, it appears that through this series of complex sham options transactions, Banc of America created 1,110,000 shares of TASER through the use of non bona fide transactions and sold these shares long, as if TASER issued and the SEC had registered the shares for sale.

Another example of shares hedged with options transactions is on January 16, 2008.  Banc of America records show                           entered into a call option representing 543,900 shares and entered into a put option representing 543,900 shares.                           was the contra broker to both of these options trades.                           *sold long* 543,900 TASER shares, worth $6 million, to Banc of America account                           who sold the shares long to                           in the equity blue sheets.  Additional documents are needed to fully evaluate this trade, but it appears that the shares that should have been sold short were instead sold long and that the 543,900 illegal long shares were sold twice through                                        **REDACTED**

DBSI similarly appears to have engaged in apparent sham option transactions involving TASER securities through                , which conduct constitutes illegal naked short selling activities.  DBSI's option blue sheet production[222] reflects several accounts associated with the                , each of which were involved in the following suspicious options transactions with DBSI's assistance.  The execution of these transactions was not reported in the Options Clearing Corporation data.[223]  On at least two particular occasions, DBSI facilitated apparent improper options transactions involving            funds.

First, on November 3, 2006, accounts affiliated with            purchased the following series of options transactions from                [224]  The record produced to the plaintiffs by                         does not show these options transactions.[225]                                   sold the same options contracts to                .  The price of these options contracts were between $0.14 and $0.15.  All of the options transactions had a strike price of $55.00 and expired on February 16, 2008, 16 months after the option trade date.  TASER's trading price was below $9.00 on this trade date.  This option

---

[222] DBSI-TASER 003211.

[223] OCC00000124.

[224] Notably, Goldman Sachs Execution's documents, GSEC_TASR00015 – 17, do not show these options transactions.

[225] Goldman Sachs Execution's Trade History Reports for options: GSEC_TASR00015 – 17.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

was significantly, in industry terms, 'out of the money.'  In total,



collectively *purchased* options totaling 4,000 contracts (representing

400,000 shares) of TASER from

collectively *purchased*

options totaling 4,000 contracts of TASER from

*sold* options totaling another 4,000

contracts of TASER to

Second, on February 13, 2008,            related accounts executed similar

options as the above described transactions.  DBSI executed these transactions for

just two days before the option expired.  DBSI's blue sheets[226] show that

collectively *purchased*

options totaling 461 contracts of TASER from

---

[226] DBSI-TASER 003211.

**REDACTED**

809005.1
Highly Confidential Pursuant to Protective Order

collectively *purchased* options totaling 461 contracts of TASER from

                                                          *sold* options totaling

461 contracts of TASER to                              In

                                          *purchased* 461

options contracts in one transaction from

          also *purchased* 13 option transactions totaling 461 option contracts

from a                            .[227]  The price of these options contracts was $0.60.  All

of the options transactions had a strike price of $12.50 and expired 3 days after the

transactions on February 16, 2008.  TASER's average price on this trade date was

$12.37.

　　　DBSI also appears to have engaged in improper conduct by netting short

sale transactions.  As one example, from January 8, 2008 to February 7, 2008,

                          sold short 448,542 shares of TASER, worth over $5

million.  On the settlement date at the beginning of these transactions,

      position in DBSI's stock records was zero,[228] and for 16 of these 21 days,

DBSI's records reflected a position of zero, despite of the fact that almost 450,000

---

[227] GSEC_TASR00017.

[228] DBSI-TASER 001791 – 1794.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

shares had been sold short.[229]  On the five days the position was shown in DBSI's stock record, DBSI journaled it out the next day to bring the position back down to zero.  These transactions were booked in a DBSI short sale account and netted to another account in order to produce the zero balance.  More information is required from DBSI in order to determine what happened with these transactions after they were netted in DBSI's records.  This does not appear to be the only account that DBSI is netting positions on behalf of in their stock record.

Additional red flags at DBSI are found in another type of interaction between            within the records of DBSI.  In DBSI's equity blue sheet records,          constantly balances its purchases and sales with        .  These balancing transactions exhibit the same characteristics each time.

For example, on September 29, 2004,    *purchased* 54,700 TASER shares in 113 transactions at an average price of $35.38, worth $1.9 million.  These trades were executed on the NYSE Arca.

             *sold* 54,700 TASER shares at $35.38 in one transaction. This transaction was executed Over-the-Counter.

*purchased* 54,700 TASER shares at $35.38 in one transaction.  This transaction

---

**REDACTED**

[229] DBSI-TASER 001870 – 1872.

was executed Over-the-Counter.  None of these transactions had an opposing broker reported.

As another example, on February 13, 2006,                                          sold short 62,300 TASER shares at $9.91 in one transaction.  This transaction was executed Over-the-Counter.                              *purchased* 62,300 TASER shares at $9.91 in one transaction.  This transaction was executed Over-the-Counter.                              *sold short* 62,300 TASER shares at an average price of $9.91 in 82 transactions.  These trades were executed on the NYSE Arca.  None of these transactions had an opposing broker reported.

Similar transactions involving this apparent improper activity with                              continue nearly every day in DBSI's records from September 27, 2004 through July 11, 2007, a total of 360 trading days.  Moreover, DBSI's stock record does not reflect delivery or receipt of shares for any of these trades.  They appear to be journal entries that net to a zero balance position each day.  The transactional value through the        account exceeds $100 million.  Because DBSI did not produce the requested 'chart of accounts' for its stock record, further information is required to fully evaluate each of these suspect transactions.

This conduct of the Defendants results in violations of Section 5 of the Securities Act, Regulation SHO Rule 200(g) and Section 10(a) of the Exchange

Act and Rule 10a-1(a) thereunder.  The above-described transactions also appear to be an improper attempt to marry an equity sale of stock to an option trade.  Illegal married options have been executed for many different trades in TASER, with the end result of a creation of TASER shares which did not exist prior to the option transaction.  As the SEC held:

> We find the use of married put transactions as a part of these strategies <u>particularly troubling</u> because they represent an attempt to facilitate the <u>very kind of abuse that Rules 10a-1 and 105 are designed to prevent</u>…

> We are issuing this guidance to address married puts that are used as part of an attempt to create a "long" position for the purpose of circumventing Rules 10a-1 and 105.  Such transactions usually have some or all of the following characteristics (or a variation of them):
>
> - the purchase of an at- or in-the-money non-standardized put option with a brief (1 to 5 day) expiration period,
>
> - the <u>contemporaneous purchase</u> of an equivalent number of shares of the same security,
>
> - the <u>contemporaneous sale</u> of the stock acquired with a married put, in essence <u>divorcing the stock position from the put option,</u>
>
> - the <u>repeated</u> use of a "facilitator" that <u>sells both the puts and the "long" position</u> (often by ***selling the stock short to the counterparty***),
>
> - the "netting out" of the transaction between the facilitator and the counterparty, <u>often at the end of the day the married put was purchased,</u> and
>
> - the payment of a standardized fee, not calculated in accordance with a standard options pricing model, <u>to the facilitator for the transaction.</u>

The net result of these transactions is that there is minimal or <u>no economic risk to the married put purchaser or the party facilitating the married put.</u>  These married puts are distinguishable from other paired positions of stock and options where each component is <u>intended to offset the risk of the other</u>. In those cases, both sides of the position are held for a period of time, and the stock and options are priced at market levels.

Married puts with the characteristics described above are <u>sham transactions</u> that do not give rise to security ownership under Rule 3b-3.  Therefore, sellers who use these types of married puts may violate Rule 10a-1 and Rule 105.  Moreover, if sham married puts are used as part of a fraudulent or manipulative scheme, the conduct may also violate the Commission's anti-fraud and anti-manipulation provisions, including, but not limited to, Sections 9(a) and 10(b) of the Exchange Act."[230]

Moreover, Bear Stearns' blue sheets show that

⎮, on behalf of                    and other clients, engaged in 7,479 option

transactions in TASER through Bear Stearns from March 29, 2004 through April

24, 2008.  These contracts, representing 17 million TASER shares and valued at

$34 million, were all later cancelled.  Although the options transactions are listed

in Bear Stearns' records as executed on a national exchange, they were cancelled

on Bear Stearns books with a code for "Other" exchange.

Defendants have also engaged in transactions in their own internal accounts

that do not appear to be legitimate.  For example, Bear Stearns' blue sheets show

---

[230] SEC Interpretive Release, Commission Guidance on Rule 3b-3 and Married Put Transactions 17 CFR Part 241 Release No. 34-48795, available at <u>http://sec.gov/rules/interp/34-48795.htm</u>.

809005.1
Highly Confidential Pursuant to Protective Order

**REDACTED**

that an account titled                                            engaged in 118

distinct TASER options trades from April 12, 2004 through April 22, 2005,

representing almost $12 million in options contracts, each of which was

cancelled.[231]   Although these transactions were executed on the NYSE, AMEX or

PHLX markets, they were all cancelled on "Other" exchanges.  Each cancelled

option contract was executed by Bear Stearns and              also acted as the

contra party.

Moreover, inaccuracies in data provided by the Defendants cannot currently

be fully investigated without the provision of underlying data.  As one example,

Bear Stearns' blue sheets report prices for stock far different than the market price

on the same date.  On December 27, 2004 and December 29, 2004, Bear Stearns'

blue sheets contain twenty five trades below the lowest market price, which was

$27.55.  These trades, totaling 868,500 shares of TASER, transacted as low as $5,

and appear to be in error.[232]   Absent the production of Bear Stearns' trade runs,

these apparent inaccuracies cannot be confirmed or resolved.  Alternatively, if

these are actual transactions and not blue sheet reporting errors, they must be

internalized transactions that were not reported to the marketplace.[233]

---

**REDACTED**

[231] Bear-T00027748.

[232] Bear-T00027746-27747.

[233] *See, e.g.,* SEC v. Sharon M. Graham, Stephen C. Voss and James J. Pasztor
(December 28, 1995) ("Purchasers in over-the-counter as well as the Exchange

809005.1
Highly Confidential Pursuant to Protective Order

In further response to this Interrogatory, Plaintiffs state that the information requested may be obtained by Defendants and is within Defendants' possession or may be located in the documents identified above, and, pursuant to O.C.G.A. § 9-11-33(c), the burden of deriving or ascertaining the answer is substantially the same for Defendants and the Plaintiffs.

Plaintiffs expressly reserve the right to supplement their response to this Interrogatory as discovery continues and when expert discovery commences. Rather than restate Plaintiffs' experts' position in this Interrogatory, Plaintiffs' expert discovery is hereby incorporated into this response.

**Interrogatory No. 3.**     **Please identify each public relations firm used by plaintiff TASER during the Relevant Time Period, and the dates during which TASER was a client for each of those firms.**

## RESPONSE NO. 3

Plaintiffs object to this Interrogatory as overly broad and not reasonably tailored to lead to the discovery of admissible information in that it is not limited to the factual matters at issue in this case and is, in fact, not limited to any topic for which a public relations firm may have been hired at all.  Plaintiffs further object to this Interrogatory on the grounds that the definition "public relations firm" is

---

market are entitled to believe that the Exchange market price which governed the price charged them represents a price established in an independent market free of artificial devices.  This would by implication require that all transactions be reported and be subject to, as well as effect, the competitive market.") (internal citations and quotations omitted).

overly broad in that it may be read to include attorneys and others who advocate on behalf of their clients. No attorneys or law firms will be identified in response to this Interrogatory. Plaintiffs also object to this Interrogatory on the grounds that the information sought is already in the possession of Defendants to the extent that non-privileged communications between TASER and its public relations firm(s) was previously produced, Defendants can obtain the identification of any such firm from documents already in their possession pursuant to O.C.G.A. § 9-11-33(c).

The Individual Plaintiffs object to this Interrogatory and state that they will not provide any answer other than their objections because the Interrogatory does not appear to be directed towards them and they do not have the information necessary to respond to this Interrogatory.

Subject to its objections as stated above, TASER responds to this Interrogatory as follows: TASER has worked with the following public relations firms during the applicable time period:

- Public Strategies, Inc., P.O. Box 846, San Antonio, TX 78293 (November 2001 – October 2005);

- Dittus Communications, 1150 17th Street, NW, Suite 701, Washington, DC 20036 (March 2005 – July 2008);

- Ashton Partners, LLC, 33 N. LaSalle, Suite 1800, Chicago, IL 60602 (December 2007 – present);

- Moses Anshell, 20 W. Jackson St., Phoenix, AZ 85003 (June 2007 – present);

- Kragie Newell Advertising LLC, 2633 Fleur Drive, Des Moines, IA 50321

  (August 2008 – present).

**Interrogatory No. 4      For each Plaintiff, please describe (including date, place, and person, where applicable) each fact that You believe supports the allegation that the Plaintiff was directly injured by a predicate act allegedly committed by each Defendant under the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-15-1 *et seq.***

## RESPONSE NO. 4

Plaintiffs respond by reference to and incorporating herein all of their

objections (including General and specific) to Interrogatory Nos. 1 and 2 as if fully

restated herein.

Plaintiffs also object to Interrogatory No. 4 to the extent it seeks a legal

conclusion or attorney work product, and on the ground that it is overly broad and

unduly burdensome.  Indeed, Plaintiffs cannot be expected to, and are not required

to, write down each fact (including date, person and place) showing Defendants'

liability, particularly when such evidence is contained within the millions of

documents and items of data Defendants have produced.  Consequently, Plaintiffs'

response will be a general summary as opposed to a list of every item of evidence.

Subject to these objections, Plaintiffs respond by reference to and

incorporating their substantive responses to Interrogatory Nos. 1 and 2 as if fully

set forth herein.  Plaintiffs further respond by stating that the Defendants' predicate

acts include, but are not limited to, violations of the Georgia Securities Act, theft

by taking under O.C.G.A. § 16-8-2, theft by deception under O.C.G.A. § 16-8-3,

violations of the Georgia Computer Systems Protection Act under O.C.G.A. § 16-

9-93, acts involving theft and dealing in securities defined as racketeering activity

by O.C.G.A. § 16-14-3(9)(B) and false swearing and perjury under O.C.G.A. §§

16-10-70 and 16-10-71.

     Plaintiffs expressly reserve the right to supplement their response to this

Interrogatory as discovery continues and when expert discovery commences.

## RESPONSES TO THIRD REQUESTS FOR PRODUCTION OF DOCUMENTS

    **1.**    **All documents relating to any transaction or instance of alleged "illegal short selling" identified in response to Interrogatory Nos. 1 and 2.**

## RESPONSE NO. 1

     Plaintiffs object to this Request on the grounds that it is overly broad,

burdensome and oppressive because it is duplicative of previous Requests served

upon Plaintiffs.  Plaintiffs also object to this Request because many of the

responsive documents are already in the possession of the Defendants, either

because they are Defendants' own documents or Plaintiffs have previously

produced them to the Defendants, and Plaintiffs will not reproduce those

documents to Defendants which Defendants already have.  TASER objects to this

Request on the grounds that the Defendants agreed to search terms for TASER's electronic information and TASER has previously conducted the searches and produced the responsive, non-privileged information responsive to those searches. To the extent that this Request seeks to require TASER to undertake another search in addition to the key word searches already undertaken, TASER objects to doing so. Moreover, the Plaintiffs object to this Request because it seeks the production of documents concerning expert discovery in advance of the deadlines set by the Court. Finally, Plaintiffs object to this Request because the definition of "all documents" is overly broad and includes, for instance, privileged communications and attorney work product undertaken in the prosecution of this lawsuit. No such privileged materials will be provided. Plaintiffs are willing to confer with Defendants to the extent that Defendants believe that there are documents which would be responsive to this Request that are not privileged, expert discovery, already within the Defendants' possession or not otherwise captured by the keyword searches already undertaken.

**2.     All Communications with any public relations firm identified in response to Interrogatory No. 3 during the Relevant Time Period regarding short selling, the price of TASER common stock or the possible effect of any event, announcement or occurrence on the price of TASER common stock.**

**RESPONSE NO. 2**

The Individual Plaintiffs object to this Request on the grounds that it does not appear to be directed towards them and they accordingly need not respond. The Individual Plaintiffs also incorporate TASER's objections below as if fully stated herein.

TASER objects to this Request on the grounds that it is overly broad, burdensome and oppressive because it is duplicative of previous Requests served upon Plaintiffs.  TASER further objects to this Request because many of the responsive documents are already in the possession of the Defendants because TASER has previously produced them to the Defendants and TASER will not reproduce those documents to Defendants which Defendants already have. TASER objects to this Request on the grounds that the Defendants agreed to search terms for TASER's electronic information and TASER has previously conducted the searches and produced the responsive, non-privileged information responsive to those searches.  To the extent that this Request seeks to require TASER to undertake another search in addition to the keyword searches already undertaken, TASER objects to doing so.  Finally, TASER objects to this Request because the definition of "all Communications" is overly broad and includes, for instance, privileged communications and attorney work product undertaken in the prosecution of this lawsuit.  No such privileged materials will be provided.

TASER also objects to this Request on the grounds that it seeks the production of

documents from third parties (and not just TASER itself) and Defendants have not

undertaken to or provided any such documents from any third party in response to

Plaintiffs' requests.  TASER is willing to confer with Defendants to the extent that

Defendants believe that there are documents which would be responsive to this

Request that are not privileged, already within the Defendants' possession or not

otherwise captured by the keyword searches already undertaken.

     **3.**    **All other documents that support or relate to your response to the
above Interrogatories.**

**<u>RESPONSE NO. 3</u>**

     Plaintiffs object to this Request on the grounds that it is overly broad,

burdensome and oppressive because it is duplicative of previous Requests served

upon Plaintiffs.  Plaintiffs also object to this Request because many of the

responsive documents are already in the possession of the Defendants, either

because they are Defendants' own documents or Plaintiffs have previously

produced them to the Defendants, and Plaintiffs will not reproduce those

documents to Defendants which Defendants already have.  TASER objects to this

Request on the grounds that the Defendants agreed to search terms for TASER's

electronic information and TASER has previously conducted the searches and

produced the responsive, non-privileged information responsive to those searches.

To the extent that this Request seeks to require TASER to undertake another search

in addition to the key word searches already undertaken, TASER objects to doing so.  Moreover, Plaintiffs object to this Request because it seeks the production of documents concerning expert discovery in advance of the deadlines set by the Court.  Finally, Plaintiffs object to this Request because the definition of "all documents" is overly broad and includes, for instance, privileged communications and attorney work product undertaken in the prosecution of this lawsuit.  No such privileged materials will be provided.  TASER further objects to this Request on the grounds that it is duplicative of Request No. 2 and incorporates its response to Request No. 2 as if fully stated herein.  Plaintiffs are willing to confer with Defendants to the extent that Defendants believe that there are documents which would be responsive to this Request that are not privileged, expert discovery, already within the Defendants' possession or not otherwise captured by the keyword searches already undertaken.

Respectfully submitted this 16th day of August, 2010.

John E. Floyd
Georgia Bar No. 266413
Steven J. Rosenwasser
Georgia Bar No. 614908
Nicole G. Iannarone
Georgia Bar No. 382510
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.

Atlanta, Georgia  30309-3417
(404) 881-4100 Tel.
(404) 881-4111 Fax

James W. Christian
State Bar No. 04228700
Gary M. Jewell
State Bar No. 10664800
Scott R. Link
State Bar No. 12390900
Christian, Smith, & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas  77002
(713) 659-7617 Tel.
(713) 659-7641 Fax
(admitted pro hac vice)

***ATTORNEYS FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2010, a true and correct copy of the foregoing **PLAINTIFFS' AMENDED RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES AND THIRD REQUEST FOR PRODUCTION OF DOCUMENTS TO ALL PLAINTIFFS** was served via U.S. Mail and email to:

**Attorneys for Defendants:**
Richard H. Sinkfield, Esq.
Rogers & Hardin
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303-1601

and via U.S. mail to:

**Attorneys for Banc of America Securities, LLC:**
Andrew J. Frackman, Esq.
Benjamin D. Petrosky, Esq.
Brendan J. Dowd, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, NY  10036

**Attorneys for Morgan Stanley & Co. Incorporated:**
Robert F. Wise, Jr., Esq.
William J. Fenrich, Esq.
David B. Steinberg, Esq.
Melissa T. Aoyagi, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017
**Attorneys for Bear Stearns:**
Stephen L. Ratner, Esq.

Harry Frischer, Esq.
Brian L. Friedman, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY  10036

**Attorneys for The Goldman Sachs Group, Inc.:**
Richard C. Pepperman II, Esq.
Richard H. Klapper, Esq. .
Tracy Richelle High, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

**Attorneys for Deutsche Bank Securities Inc.:**
Heather L. Fesnak, Esq.
Peter J. Isajiw, Esq.
Gregory A. Markel, Esq.
Martin L. Seidel, Esq.
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY  10281

**Attorneys for UBS Securities, LLC:**
Andrew B. Clubok, Esq.
Emily P. Hughes, Esq.
Jeffrey G. Landis, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC  20005-5793

Maria Ginzburg, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

780300.1
Highly Confidential Pursuant to Protective Order

**Attorneys for Credit Suisse USA, Inc.:**
Fraser L. Hunter, Jr., Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY 10022

Ryan P. Phair, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

**Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc.:**
Paul M. Eckles, Esq.
Shepard Goldfein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036

Richard S. Horvath, Jr., Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center
Suite 3800
San Francisco, CA 94111-4144

This 16th day of August, 2010.

Nicole G. Iannarone
Georgia Bar No. 382510

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3417
Tel.: (404) 881-4100
Fax: (404) 881-4111

780300.1
Highly Confidential Pursuant to Protective Order