# Exhibit B



73 FR 61666-01, 2008 WL 4600724 (F.R.)                                                                      Page 1

RULES and REGULATIONS

SECURITIES AND EXCHANGE COMMISSION

17 CFR Part 240

[Release No. 34-58774; File No. S7-08-08]

RIN 3235-AK06

"Naked" Short Selling Antifraud Rule

Friday, October 17, 2008

AGENCY: Securities and Exchange Commission.

**\*61666** ACTION: Final rule.

SUMMARY: The Securities and Exchange Commission ("Commission") is adopting an antifraud rule under the Securities Exchange Act of 1934 ("Exchange Act") to address fails to deliver securities that have been associated with "naked" short selling. The rule will further evidence the liability of short sellers, including broker-dealers acting for their own **\*61667** accounts, who deceive specified persons about their intention or ability to deliver securities in time for settlement (including persons that deceive their broker-dealer about their locate source or ownership of shares) and that fail to deliver securities by settlement date.

DATES: Effective Date: October 17, 2008.

FOR FURTHER INFORMATION CONTACT: James A. Brigagliano, Associate Director, Josephine J. Tao, Assistant Director, Victoria L. Crane, Branch Chief, Joan M. Collopy, Special Counsel, Christina M. Adams and Matthew Sparkes, Staff Attorneys, Office of Trading Practices and Processing, Division of Trading and Markets, at (202) 551-5720, at the Securities and Exchange Commission, 100 F Street, NE., Washington, DC 20549-6628.

SUPPLEMENTARY INFORMATION: We are adding Rule 10b-21 [17 CFR 242.10b-21] under the Exchange Act.

I. Introduction

We are adopting an antifraud rule, Rule 10b-21, aimed at short sellers, including broker-dealers acting for their own accounts, who deceive specified persons, such as a broker or dealer, about their intention or ability to deliver securities in time for settlement and that fail to deliver securities by settlement date. Among other things, Rule 10b-21 will target short sellers who deceive their broker-dealers about their source of borrowable shares for purposes of complying with Regulation SHO's "locate" requirement.[FN1] Rule 10b-21 will also apply to sellers who misrepresent to their broker-dealers that they own the shares being sold.

FN1 See 17 CFR 242.203(b)(1).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)                                                                Page 2

A seller misrepresenting its short sale locate source or ownership of shares may intend to fail to deliver securities in time for settlement and, therefore, engage in abusive "naked" short selling. Although abusive "naked" short selling is not defined in the federal securities laws, it refers generally to selling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement cycle.[FN2]

> FN2 See Exchange Act Release No. 56212 (Aug. 7, 2007), 72 FR 45544 (Aug. 14, 2007) ("2007 Regulation SHO Final Amendments"); Exchange Act Release No. 54154 (July 14, 2006), 71 FR 41710 (July 21, 2006) ("2006 Regulation SHO Proposed Amendments").

Although abusive "naked" short selling as part of a manipulative scheme is always illegal under the general antifraud provisions of the federal securities laws, including Rule 10b-5 of the Exchange Act,[FN3] Rule 10b-21 will further evidence the liability of persons that deceive others about their intention or ability to deliver securities in time for settlement, including persons that deceive their broker-dealer about their locate source or ownership of shares.[FN4] We believe that a rule further evidencing the illegality of these activities will focus the attention of market participants on such activities. Rule 10b-21 will also further evidence that the Commission believes such deceptive activities are detrimental to the markets and will provide a measure of predictability for market participants.

> FN3 17 CFR 240.10b-5.

> FN4 This conduct is also in violation of other provisions of the federal securities laws, including the antifraud provisions.

All sellers of securities should promptly deliver, or arrange for delivery of, securities to the respective buyer and all buyers of securities have the right to expect prompt delivery of securities purchased. Thus, Rule 10b-21 takes direct aim at an activity that may create fails to deliver. Those fails can have a negative effect on shareholders, potentially depriving them of the benefits of ownership, such as voting and lending. They also may create a misleading impression of the market for an issuer's securities. Rule 10b-21 will also aid broker-dealers in complying with the locate requirement of Regulation SHO and, thereby, potentially reduce fails to deliver. In addition, Rule 10b-21 could help reduce manipulative schemes involving "naked" short selling.

II. Background

*A. Regulation SHO*

Short selling involves a sale of a security that the seller does not own or that is consummated by the delivery of a security borrowed by or on behalf of the seller.[FN5] In a "naked" short sale, a seller does not borrow or arrange to borrow securities in time to make delivery to the buyer within the standard three-day settlement period.[FN6] As a result, the seller fails to deliver securities to the buyer when delivery is due (known as a "fail" or "fail to deliver").[FN7] Sellers sometimes intentionally fail to deliver securities as part of a scheme to manipulate the price of a security,[FN8] or possibly to avoid borrowing costs associated with short sales.

> FN5 17 CFR 242.200(a).

> FN6 See Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (Aug. 6,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2004) ("2004 Regulation SHO Adopting Release") (stating that "naked" short selling generally refers to selling short without having borrowed the securities to make delivery).

FN7 Generally, investors complete or settle their security transactions within three business days. This settlement cycle is known as T+3 (or "trade date plus three days"). T+3 means that when the investor purchases a security, the purchaser's payment generally is received by its brokerage firm no later than three business days after the trade is executed. When the investor sells a security, the seller generally delivers its securities, in certificated or electronic form, to its brokerage firm no later than three business days after the sale. The three-day settlement period applies to most security transactions, including stocks, bonds, municipal securities, mutual funds traded through a brokerage firm, and limited partnerships that trade on an exchange. Government securities and stock options settle on the next business day following the trade. In addition, Rule 15c6-1 prohibits broker-dealers from effecting or entering into a contract for the purchase or sale of a security that provides for payment of funds and delivery of securities later than the third business day after the date of the contract unless otherwise expressly agreed to by the parties at the time of the transaction. 17 CFR 240.15c6-1; Exchange Act Release No. 33023 (Oct. 7, 1993), 58 FR 52891 (Oct. 13, 1993). However, failure to deliver securities on T+3 does not violate Rule 15c6-1.

FN8 In 2003, the Commission settled a case against certain parties relating to allegations of manipulative short selling in the stock of a corporation. The Commission alleged that the defendants profited from engaging in massive "naked" short selling that flooded the market with the stock, and depressed its price. See Rhino Advisors, Inc. and Thomas Badian, Lit. Rel. No. 18003 (Feb. 27, 2003); see also SEC v. Rhino Advisors, Inc. and Thomas Badian, Civ. Action No. 03-civ-1310 (RO) (S.D.N.Y) (Feb. 26, 2003); see also Securities Exchange Act Release No. 48709 (Oct. 28, 2003), 68 FR 62972, 62975 (Nov. 6, 2003) ("2003 Regulation SHO Proposing Release") (describing the alleged activity in the settled case involving stock of Sedona Corporation); 2004 Regulation SHO Adopting Release, 69 FR at 48016, n.76.

Although the majority of trades settle within the standard three-day settlement period,[FN9] we adopted Regulation SHO [FN10] in part to address problems associated with persistent fails to deliver securities and potentially abusive "naked" short selling.[FN11] Rule *61668 203 of Regulation SHO, in particular, contains a "locate" requirement that provides that, "[a] broker or dealer may not accept a short sale order in an equity security from another person, or effect a short sale in an equity security for its own account, unless the broker or dealer has: (i) Borrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) Reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) Documented compliance with this paragraph (b)(1)." [FN12] In the 2004 Regulation SHO Adopting Release, the Commission explicitly permitted broker-dealers to rely on customer assurances that the customer has identified its own source of borrowable securities, provided it is reasonable for the broker-dealer to do so.[FN13] We are concerned, however, that some short sellers may have been deliberately misrepresenting to broker-dealers that they have obtained a legitimate locate source.[FN14]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

FN9 According to the National Securities Clearing Corporation ("NSCC"), 99% (by dollar value) of all trades settle on time. Thus, on an average day, approximately 1% (by dollar value) of all trades, including equity, debt, and municipal securities fail to settle. The vast majority of these fails are closed out within five days after T+3. In addition, fails to deliver may arise from either short or long sales of securities. There may be legitimate reasons for a fail to deliver. For example, human or mechanical errors or processing delays can result from transferring securities in custodial or other form rather than book-entry form, thereby causing a fail to deliver on a long sale within the normal three-day settlement period. In addition, broker-dealers that make markets in a security ("market makers") and who sell short thinly-traded, illiquid stock in response to customer demand may encounter difficulty in obtaining securities when the time for delivery arrives. The Commission's Office of Economic Analysis ("OEA") estimates that, on an average day between May 1, 2007 and July 31, 2008 (i.e., the time period that includes all full months after the Commission started receiving price data from NSCC), trades in "threshold securities," as defined in Rule 203(b)(c)(6) of Regulation SHO, that fail to settle within T+3 account for approximately 0.3% of dollar value of trading in all equity securities.

FN10 17 CFR 242.200. Regulation SHO became effective on January 3, 2005.

FN11 See 2007 Regulation SHO Final Amendments, 72 FR at 45544 (stating that "[a]mong other things, Regulation SHO imposes a close-out requirement to address persistent failures to deliver stock on trade settlement date and to target potentially abusive "naked" short selling in certain equity securities.").

FN12 17 CFR 242.203(b). Market makers engaged in bona fide market making in the security at the time they effect the short sale are excepted from this requirement.

FN13 See 2004 Regulation SHO Adopting Release, 69 FR at 48014.

FN14 See, e.g., Sandell Asset Management Corp., Lars Eric Thomas Sandell, Patrick T. Burke and Richard F. Ecklord, Securities Act Release No. 8857 (Oct. 10, 2007) (settled order).

In addition, we are concerned that some short sellers may have made misrepresentations to their broker-dealers about their ownership of shares as an end run around Regulation SHO's locate requirement.[FN15] Some sellers have also misrepresented that their sales are long sales in order to circumvent Rule 105 of Regulation M,[FN16] which prohibits certain short sellers from purchasing securities in a secondary or follow-on offering.[FN17] Under Rule 200(g)(1) of Regulation SHO, "[a]n order to sell shall be marked 'long' only if the seller is deemed to own the security being sold pursuant to paragraphs (a) through (f) of this section [FN18] and either: (i) The security to be delivered is in the physical possession or control of the broker or dealer; or (ii) it is reasonably expected that the security will be in the physical possession or control of the broker or dealer no later than the settlement of the transaction."[FN19]

FN15 See id.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN16 17 CFR 242.105.

FN17 See Goldman Sachs Execution and Clearing L.P., Exchange Act Release No. 55465 (Mar. 14, 2007) (settled order); Weitz and Altman, Lit. Release No. 18121 (April 30, 2003) (settled civil action).

FN18 Rule 200(b) of Regulation SHO provides that a seller is deemed to own a security if, "(1) The person or his agent has title to it; or (2) The person has purchased, or has entered into an unconditional contract, binding on both parties thereto, to purchase it, but has not yet received it; or (3) The person owns a security convertible into or exchangeable for it and has tendered such security for conversion or exchange; or (4) The person has an option to purchase or acquire it and has exercised such option; or (5) The person has rights or warrants to subscribe to it and has exercised such rights or warrants; or (6) The person holds a security futures contract to purchase it and has received notice that the position will be physically settled and is irrevocably bound to receive the underlying security."

FN19 17 CFR 242.200(g)(1).

Under Regulation SHO, the executing or introducing broker-dealer is responsible for determining whether there are reasonable grounds to believe that a security can be borrowed so that it can be delivered on the date delivery is due on a short sale, and whether a seller owns the security being sold and can reasonably expect that the security will be in the physical possession or control of the broker-dealer no later than settlement date for a long sale. However, a broker-dealer relying on a customer that makes misrepresentations about its locate source or ownership of shares may not receive shares when delivery is due. For example, sellers may be making misrepresentations to their broker-dealers about their locate sources or ownership of shares for securities that are very difficult or expensive to borrow. Such sellers may know that they cannot deliver securities by settlement date due to, for example, a limited number of shares being available to borrow or purchase, or they may not intend to obtain shares for timely delivery because the cost of borrowing or purchasing may be high. That result undermines the Commission's goal of addressing concerns related to "naked" short selling and extended fails to deliver.

*B. Concerns About "Naked" Short Selling*

We have been concerned about "naked" short selling and, in particular, abusive "naked" short selling, for some time. As discussed above, our concerns about potentially abusive "naked" short selling were an important reason for our adoption of Regulation SHO in 2004. In addition, due to our concerns about the potentially negative market impact of large and persistent fails to deliver, and the fact that we continued to observe a small number of threshold securities [FN20] with fail to deliver positions that were not being closed out under existing delivery and settlement requirements, in 2007 we eliminated the "grandfather" exception to Regulation SHO's close-out requirement [FN21] and today we adopted amendments to eliminate the options market maker exception to the close-out requirement.[FN22]

FN20 A "threshold security" is defined in Rule 203(c)(6) as any equity security of an issuer that is registered pursuant to section 12 of the Exchange Act (15 U.S.C. 78l) or for which the issuer is required to file reports pursuant to section 15(d) of the Exchange Act (15 U.S.C. 78o(d)): (i) For which there is an aggregate fail to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

deliver position for five consecutive settlement days at a registered clearing agency of 10,000 shares or more, and that is equal to at least 0.5% of the issue's total shares outstanding; and (ii) that is included on a list disseminated to its members by a self-regulatory organization. 17 CFR 242.203(c)(6).

FN21 See 2007 Regulation SHO Final Amendments, 72 FR 45544. The "grandfather" exception had provided that fails to deliver established prior to a security becoming a threshold security did not have to be closed out in accordance with Regulation SHO's close-out requirement. This amendment also contained a one-time phase-in period that provided that previously-grandfathered fails to deliver in a security that was a threshold security on the effective date of the amendment must be closed out within 35 consecutive settlement days from the effective date of the amendment. The phase-in period ended December 5, 2007.

FN22 See Exchange Act Release No. 34-58775 (Oct. 14, 2008) ("2008 Regulation SHO Final Amendments"). The options market maker exception had excepted from the close-out requirement any fail to deliver position in a threshold security resulting from short sales effected by a registered options market maker to establish or maintain a hedge on options positions that were created before the underlying security became a threshold security.

In addition to the actions we have taken aimed at reducing fails to deliver and addressing potentially abusive "naked" short selling in threshold securities, recently we took emergency action targeting "naked" short selling in some non-threshold securities. Specifically, on July 15, 2008, we published an emergency order under Section 12(k) of the Exchange Act (the "July Emergency Order") [FN23] that temporarily imposed enhanced requirements on short sales in the publicly traded securities of certain substantial financial firms.[FN24]

FN23 See Exchange Act Release No. 58166 (July 15, 2008).

FN24 See id. The Emergency Order required that, in connection with transactions in the publicly traded securities of the substantial financial firms identified on Appendix A to the Emergency Order ("Appendix A Securities"), no person could effect a short sale in the Appendix A Securities using the means or instrumentalities of interstate commerce unless such person or its agent had borrowed or arranged to borrow the security or otherwise had the security available to borrow in its inventory prior to effecting such short sale and delivered the security on settlement date.

We issued the July Emergency Order because we were concerned that false rumors spread by short sellers regarding financial institutions of significance in the U.S. could continue to threaten significant market disruption. As we *61669 noted in the July Emergency Order, false rumors can lead to a loss of confidence in our markets. Such loss of confidence can lead to panic selling, which may be further exacerbated by "naked" short selling. As a result, the prices of securities may artificially and unnecessarily decline well below the price level that would have resulted from the normal price discovery process. If significant financial institutions are involved, this chain of events can threaten disruption of our markets.[FN25]

FN25 We delayed the effective date of the Emergency Order to July 21, 2008 to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

create the opportunity to address, and to allow sufficient time for market participants to make, adjustments to their operations to implement the enhanced requirements. Moreover, in addressing anticipated operational accommodations necessary for implementation of the Emergency Order, we issued an amendment to the Emergency Order on July 18, 2008. See Exchange Act Release No. 58190 (July 18, 2008) (excepting from the Emergency Order bona fide market makers, short sales in Appendix A Securities sold pursuant to Rule 144 of the Securities Act of 1933, and certain short sales by underwriters, or members of a syndicate or group participating in distributions of Appendix A Securities).

On July 29, 2008, we extended the July Emergency Order after carefully reevaluating the current state of the markets in consultation with officials of the Board of Governors of the Federal Reserve System, the Department of the Treasury, and the Federal Reserve Bank of New York. Due to our continued concerns about the ongoing threat of market disruption and effects on investor confidence, we determined that the standards of extension had been met.[FN26] Pursuant to the extension, the July Emergency Order terminated at 11:59 p.m. EDT on August 12, 2008.[FN27]

FN26 See Exchange Act Release No. 58248 (July 29, 2008).

FN27 In addition, on September 17, 2008, the Commission further addressed abusive "naked" short selling by issuing an Emergency Order that temporarily adopted amendments to Regulation SHO's close-out requirement, amendments to eliminate Regulation SHO's options market maker exception to the close-out requirement, and Rule 10b-21. See Exchange Act Release No. 58572 (Sept. 17, 2008). The Commission also issued emergency orders to require disclosure of short sales, Exchange Act Release 58591 (Sept. 18, 2008) and 58591A (Sept. 21, 2008), and temporarily halt short selling in financial stocks, Exchange Act Release 58592 (Sept. 18, 2008) and Exchange Act Release 58611 (Sept. 21, 2008).

In addition to our adopting Rule 10b-21, as noted above, today we also adopted amendments to eliminate the options market maker exception to Regulation SHO's delivery requirement.[FN28] We also adopted today an interim final temporary rule that enhances the delivery requirements for sales of all equity securities ("2008 Interim Rule").[FN29]

FN28 See supra note 22.

FN29 See Exchange Act Release No. 58773 (Oct. 14, 2008).

The amendments to the options market maker exception and the 2008 Interim Rule that we adopted today both focus on the timely delivery of securities and are not aimed at pre-trade activity, such as compliance with Regulation SHO's locate requirement. Because we continue to be concerned about fails to deliver and potentially abusive "naked" short selling, in addition to our initiatives to strengthen Regulation SHO's delivery requirements, we are adopting Rule 10b-21 to also target sellers who deceive their broker-dealers or certain other persons about their source of borrowable shares and their share ownership.

As we stated in the Proposing Release,[FN30] we are concerned about persons that sell short securities and deceive specified persons about their intention or ability to deliver the securities in time for settlement, or deceive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)                                                                    Page 8

their broker-dealer about their locate source or ownership of shares. Commission enforcement actions have contributed to our concerns about the extent of misrepresentations by short sellers about their locate sources and ownership of shares, regardless of whether they result in fails to deliver. For example, the Commission recently announced a settled enforcement action against hedge fund adviser Sandell Asset Management Corp. ("SAM"), its chief executive officer, and two employees in connection with allegedly (i) improperly marking some short sale orders "long" and (ii) misrepresenting to executing brokers that SAM personnel had located sufficient stock to borrow for short sale orders.[FN31]

> FN30 Exchange Act Release No. 57511 (Mar. 17, 2008), 73 FR 15376, 15377 (Mar. 21, 2008) ("Proposing Release").

> FN31 See Sandell Asset Management Corp., Securities Act Release No. 8857; see also Goldman Sachs Execution and Clearing L.P., Exchange Act Release No. 55465; U.S. v. Naftalin, 441 U.S. 768 (1979) (discussing a market manipulation scheme in which brokers suffered substantial losses when they had to purchase securities to replace securities they had borrowed to make delivery on short sale orders received from an individual investor who had falsely represented to the brokers that he owned the securities being sold).

In addition, as we have stated on several prior occasions, we are concerned about the negative effect that fails to deliver may have on the markets and shareholders.[FN32] For example, fails to deliver may deprive shareholders of the benefits of ownership, such as voting and lending.[FN33] In addition, where a seller of securities fails to deliver securities on settlement date, in effect the seller unilaterally converts a securities contract (which is expected to settle within the standard three-day settlement period) into an undated futures-type contract, to which the buyer might not have agreed, or that might have been priced differently.[FN34]

> FN32 See supra note 22; 2007 Regulation SHO Final Amendments, 72 FR at 45544; 2006 Regulation SHO Proposed Amendments, 71 FR at 41712; 2007 Regulation SHO Proposed Amendments, 72 FR at 45558-45559; Proposing Release, 73 FR at 15378.

> FN33 See id.

> FN34 See id.

In addition, commenters (including issuers and investors) have repeatedly expressed concerns about fails to deliver in connection with manipulative "naked" short selling. For example, in response to proposed amendments to Regulation SHO in 2006 [FN35] designed to further reduce the number of persistent fails to deliver in certain equity securities by eliminating Regulation SHO's "grandfather" exception, and amending the options market maker exception, we received a number of comments that expressed concerns about "naked" short selling and extended delivery failures.[FN36] Commenters continued to express these concerns in response to proposed amendments to eliminate the options market maker exception to the close-out requirement of Regulation SHO in 2007 [FN37] and in response to the Proposing Release.[FN38]

> FN35 See 2006 Regulation SHO Proposed Amendments, 71 FR 41710.

> FN36 See, e.g., letter from Patrick M. Byrne, Chairman and Chief Executive Of-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ficer, Overstock.com, Inc., dated Sept. 11, 2006 ("Overstock"); letter from Daniel Behrendt, Chief Financial Officer, and Douglas Klint, General Counsel, TASER International, dated Sept. 18, 2006 ("TASER"); letter from John Royce, dated April 30, 2007 ("Royce"); letter from Michael Read, dated April 29, 2007 ("Read"); letter from Robert DeVivo, dated April 26, 2007 ("DeVivo"); letter from Ahmed Akhtar, dated April 26, 2007 ("Akhtar").

FN37 See, e.g., letter from Jack M. Wedam, dated Oct. 16, 2007; letter from Michael J. Ryan, Executive Director and Senior Vice President, Center for Capital Markets Competitiveness, U.S. Chamber of Commerce, dated Sept. 13, 2007 ("U.S. Chamber of Commerce"); letter from Robert W. Raybould, CEO Enteleke Capital Corp., dated Sept. 12, 2007; letter from Mary Helburn, Executive Director, National Coalition Against Naked Shorting, dated Sept. 11, 2007 ("NCANS 2007").

FN38 See, e.g., letter from Richard H. Baker, President and Chief Executive Officer, Managed Funds Association, dated May 21, 2008 ("MFA") (stating that "[m]arket manipulation, such as intentional and abusive naked short selling, undermines the integrity of the U.S. capital markets and threatens investor confidence, market liquidity and market efficiency"); letter from Kurt N. Schacht and Linda Rittenhouse, Centre for Financial Market Integrity, dated June 17, 2008 (stating that they "support efforts by the Commission to curtail naked short selling, for all the reasons noted in the [Proposing Release] relating to the detrimental effects on the marketplace. As noted [in the Proposing Release], this practice not only affects ¢ mshareowners by depriving the[m] of the basic benefits of ownership, it also may detrimentally affect the issuer's reputation and subvert the appropriate workings of the market by avoiding certain restrictions applicable to those who deliver on time. All of these issues can ultimately undermine investor confidence."); letter from Wallace E. Boston, President and Chief Executive Officer, American Public Education, Inc., dated May 20, 2008 (noting that "[a]s the CEO of a recently public company, I am acutely aware of the impact that abusive short-selling can have on issuers and investors.").

**\*61670** To the extent that fails to deliver might be part of manipulative "naked" short selling, which could be used as a tool to drive down a company's stock price,[FN39] such fails to deliver may undermine the confidence of investors.[FN40] These investors, in turn, may be reluctant to commit capital to an issuer they believe to be subject to such manipulative conduct.[FN41] In addition, issuers may believe that they have suffered unwarranted reputational damage due to investors' negative perceptions regarding fails to deliver in the issuer's security.[FN42] Unwarranted reputational damage caused by fails to deliver might have an adverse impact on the security's price.[FN43]

FN39 See, e.g., Rhino Advisors, Inc. and Thomas Badian, Lit. Rel. No. 18003 (Feb. 27, 2003); see also SEC v. Rhino Advisors, Inc. and Thomas Badian, Civ. Action No. 03 civ 1310 (RO) (S.D.N.Y) (Feb. 26, 2003) (settled case in which we alleged that the defendants profited from engaging in massive "naked" short selling that flooded the market with the company's stock, and depressed its price);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

see also S.E.C. v. Gardiner, 48 S.E.C. Docket 811, No. 91 Civ. 2091 (S.D.N.Y. 1991) (alleged manipulation by sales representative by directing or inducing customers to sell stock short in order to depress its price); U.S. v. Russo, 74 F.3d 1383, 1392 (2d Cir. 1996) (short sales were sufficiently connected to the manipulation scheme as to constitute a violation of Exchange Act Section 10(b) and Rule 10b-5).

FN40 In response to the 2007 Regulation SHO Proposed Amendments, we received comment letters discussing the impact of fails to deliver on investor confidence. See, e.g., letter from NCANS 2007. Commenters expressed similar concerns in response to the 2006 Regulation SHO Proposed Amendments. See, e.g., letter from Mary Helburn, Executive Director, National Coalition Against Naked Shorting, dated Sept. 30, 2006 ("NCANS 2006"); letter from Richard Blumenthal, Attorney General, State of Connecticut, dated Sept. 19, 2006.

FN41 In response to the 2007 Regulation SHO Proposed Amendments, we received comment letters expressing concern about the impact of potential "naked" short selling on capital formation, claiming that "naked" short selling causes a drop in an issuer's stock price and may limit the issuer's ability to access the capital markets. See, e.g., letter from Robert K. Lifton, Chairman and CEO, Medis Technologies, Inc., dated Sept. 12, 2007; letter from NCANS 2007. Commenters expressed similar concerns in response to the 2006 Regulation SHO Proposed Amendments. See, e.g., letter from Congressman Tom Feeney—Florida, U.S. House of Representatives, dated Sept. 25, 2006; see also letter from Zix Corporation, dated Sept. 19, 2006 (stating that "[m]any investors attribute the Company's frequent re-appearances on the Regulation SHO list to manipulative short selling and frequently demand that the Company "do something" about the perceived manipulative short selling. This perception that manipulative short selling of the Company's securities is continually occurring has undermined the confidence of many of the Company's investors in the integrity of the market for the Company's securities.").

FN42 Due in part to such concerns, some issuers have taken actions to attempt to make transfer of their securities "custody only," thus preventing transfer of their stock to or from securities intermediaries such as the Depository Trust Company ("DTC") or broker-dealers. See 2003 Regulation SHO Proposing Release, 68 FR at 62975. Some issuers have attempted to withdraw their issued securities on deposit at DTC, which makes the securities ineligible for book-entry transfer at a securities depository. See id. Withdrawing securities from DTC or requiring custody-only transfers would undermine the goal of a national clearance and settlement system designed to reduce the physical movement of certificates in the trading markets. See id. We note, however, that in 2003 the Commission approved a DTC rule change clarifying that its rules provide that only its participants may withdraw securities from their accounts at DTC, and establishing a procedure to process issuer withdrawal requests. See Exchange Act Release No. 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

> FN43 See also 2006 Regulation SHO Proposed Amendments, 71 FR at 41712; 2007 Regulation SHO Amendments, 72 FR at 45544; 2007 Regulation SHO Proposed Amendments, 72 FR at 45558-45559; Proposing Release, 73 FR at 15378 (providing additional discussion of the impact of fails to deliver on the market); see also 2003 Regulation SHO Proposing Release, 68 FR at 62975 (discussing the impact of "naked" short selling on the market).

Strengthening rules that address "naked" short selling will provide increased confidence in the markets. Since the issuance of the July Emergency Order, members of the public have repeatedly expressed their concerns about a loss of confidence in the markets. For example, one commenter stated that "financial confidence is critically important" for companies to do business.[FN44] Another commenter stated that "existing laws should be enforced, but further steps should be taken to prevent any further erosion of the investing publics [sic] confidence."[FN45]

> FN44 See Comment of Ron Heller (July 21, 2008) ("Heller") (commenting on the Emergency Order).

> FN45 See Comment of Ronald L. Rourk (July 21, 2008) ("Rourk") (commenting on the proposal to eliminate Regulation SHO's options market maker exception).

We are concerned about the ability of short sellers to use "naked" short selling as a tool to manipulate the prices of securities.[FN46] Thus, in conjunction with our other short selling initiatives aimed at further reducing fails to deliver and addressing abusive "naked" short selling, we have adopted Rule 10b-21 substantially as proposed.

> FN46 See, e.g., Commission press release, dated July 13, 2008, announcing that the Commission's Office of Compliance Inspections and Examinations, as well as FINRA and New York Stock Exchange Regulation, Inc., will immediately conduct examinations aimed at the prevention of the intentional spreading of false information intended to manipulate securities prices. See http:// www.sec.gov/news/press/2008/2008-140.htm. In addition, in April of this year, the Commission charged Paul S. Berliner, a trader, with securities fraud and market manipulation for intentionally disseminating a false rumor concerning The Blackstone Group's acquisition of Alliance Data Systems Corp ("ADS"). The Commission alleged that this false rumor caused the price of ADS stock to plummet, and that Berliner profited by short selling ADS stock and covering those sales as the false rumor caused the price of ADS stock to fall. See http://www.sec.gov/litigation/litreleases/2008/lr20537.htm.

Proposed Rule 10b-21 was narrowly tailored to specify that it is unlawful for any person to submit an order to sell a security if such person deceives a broker-dealer, participant of a registered clearing agency,[FN47] or purchaser regarding its intention or ability to deliver the security on the date delivery is due, and such person fails to deliver the security on or before the date delivery is due.[FN48] We received over 700 comment letters in response to the Proposing Release.

> FN47 The term "participant" has the same meaning as in section 3(a)(24) of the Exchange Act. See 15 U.S.C. 78c(a)(24). The term "registered clearing agency" means a clearing agency, as defined in section 3(a)(23) of the Exchange Act, that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)                                                           Page 12

is registered as such pursuant to section 17A of the Exchange Act. See 15 U.S.C. 78c(a)(23)(A), 78q-1 and 15 U.S.C. 78q-1(b), respectively.

FN48 See Proposed Rule 10b-21.

The comment letters were from numerous entities, including issuers, retail investors, broker-dealers, SROs, associations, members of Congress, and other elected officials.[FN49] Many commenters supported our goals of further addressing potentially abusive "naked" short selling and fails to deliver, while not necessarily agreeing with the Commission's approach. For example, some commenters argued for more stringent short sale regulation.[FN50] Others urged us to take stronger enforcement action against abusive "naked" short sellers under the current federal securities laws rather than, or in addition to, adopting Rule 10b-21.[FN51] *61671 Some commenters asked that if we adopt Rule 10b-21 as proposed, we provide certain clarifications regarding the application of the rule.[FN52] We highlight in the discussion below some of the main issues, concerns, and suggestions raised in the comment letters.

FN49 The comment letters are available on the Commission's Internet Web Site at http://www.sec.gov/comments/s7-08-08/s70808.shtml.

FN50 See, e.g., letter from Arik B. Fetscher, Esq., dated April 2, 2008; letter from Fred Adams, Jr., Chairman and Chief Executive Officer, Cal-Maine Foods, Inc., dated May 19, 2008; letter from David T. Hirschman, President and Chief Executive Officer, Center for Capital Markets Competitiveness, United States Chamber of Commerce, dated May 20, 2008 ("Chamber of Commerce"); letter from Wallace E. Boston, Jr., President and Chief Executive Officer, American Public Education, Inc., dated May 20, 2008; letter from Kurt N. Schacht, Executive Director, and Linda L. Rittenhouse, Senior Policy Analyst, CFA Institute Centre for Financial Market Integrity, dated June 17, 2008; letter from Guillaume Cloutier, dated July 25, 2008; letter from Shunliang Wang, dated July 27, 2008; letter from Scott Bridgford, dated July 29, 2008; letter from Keith Kottwitz, dated Aug. 1, 2008.

FN51 See, e.g., letter from Tony J. Akin, Jr., Financial Advisor, dated March 31, 2008; letter from Gary D. Owens, CEO, OYO Geospace, dated April 22, 2008; letter from Daniel J. Popeo, Chairman & General Counsel, and Paul D. Kamenar, Senior Executive Counsel, Washington Legal Foundation, dated May ¢ m20, 2008; letter from David Hughes, dated July 17, 2008; letter from Dave Morgan, dated July 25, 2008; letter from Seth Bradley, dated July 30, 2008; letter from Michael Kianka, dated Aug. 1, 2008.

FN52 See, e.g., letter from James J. Angel, Associate Professor of Finance, Georgetown University, dated May 17, 2008 ("Angel"); letter from Heather Traeger, Assistant Counsel, Investment Company Institute, dated May 20, 2008; letter from Dr. Robert J. Shapiro, Chairman, Sonecon, LLC, and former U.S. Under Secretary of Commerce, dated May 20, 2008 ("Shapiro"); letter from Ira D. Hammerman, Managing Director and General Counsel, Securities Industry and Financial Markets Association, dated May 22, 2008 ("SIFMA"); letter from Michael R. Trocchio, Bingham McCutchen LLP, dated July 14, 2008 ("Bingham"); letter

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

from MFA.

## III. Discussion of Rule 10b-21

### A. Rule 10b-21

After careful consideration of the comments, we are adopting Rule 10b-21 substantially as proposed. Rule 10b-21 specifies that it is unlawful for any person to submit an order to sell an equity security if such person deceives a broker-dealer, participant of a registered clearing agency,[FN53] or purchaser regarding its intention or ability to deliver the security on the date delivery is due, and such person fails to deliver the security on or before the date delivery is due.[FN54] Scienter is a necessary element for a violation of the rule.[FN55] Some commenters questioned whether, similar to Regulation SHO, proposed Rule 10b-21 would apply only to equity securities.[FN56] In response to these comments, we clarify that as proposed and adopted, Rule 10b-21 applies only to equity securities.[FN57]

> FN53 See supra note 47 (defining the terms "participant" and "registered clearing agency" for purposes of the rule).

> FN54 See Rule 10b-21.

> FN55 Ernst & Ernst v. Hochfelder, et al., 425 U.S. 185 (1976). Scienter has been defined as "a mental state embracing the intent to deceive, manipulate or defraud." Id. at 193, n.12. While the Supreme Court has not decided the issue (see Aaron v. SEC, 446 U.S. 686 (1980); Ernst & Ernst, 425 at 193 n.12), federal appellate courts have concluded that scienter may be established by a showing of either knowing conduct or by "an 'extreme departure from the standards of ordinary care * * * which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Dolphin & Bradbury v. SEC, 512 F.3d 634 (D.C. Cir. Jan. 11, 2008) (quoting Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)). Some commenters stated they believe that Rule 10b-21 should require a finding of "intentional deception" to best achieve our goals without deterring legitimate short selling. See, e.g., letter from MFA; another commenter, however, requested that we confirm that the concept of scienter, for purposes of Rule 10b-21, is identical to established precedent under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. See letter from SIFMA. We intend the scienter requirement of Rule 10b-21 to be the same as that required under Rule 10b-5.

> FN56 See, e.g., letter from MFA.

> FN57 See, e.g., Proposing Release, 73 FR at 15380; see also Rule 10b-21.

Rule 10b-21 will cover those situations where a seller deceives a broker-dealer, participant of a registered clearing agency, or a purchaser about its intention or ability to deliver securities by settlement date, its locate source, or its share ownership, and the seller fails to deliver securities by settlement date.[FN58] Rule 10b-21 will prohibit the deception of persons participating in the transaction—broker-dealers, participants of registered clearing agencies, or purchasers. Further, because one of the principal goals of Rule 10b-21 is to reduce fails to deliver, viola-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

tion of the rule will occur only if a fail to deliver results from the relevant transaction.

> FN58 As proposed, the rule referenced "the date delivery is due." To provide spe-
> cificity as to when delivery is due for purposes of the rule, we are modifying this
> language to "settlement date" and defining "settlement date" as "the business day
> on which delivery of a security and payment of money is to be made through the
> facilities of a registered clearing agency in connection with the sale of a secur-
> ity."See Rule 10b-21(b).

For purposes of Rule 10b-21, broker-dealers (including market makers) acting for their own accounts will be
considered sellers. For example, a broker-dealer effecting short sales for its own account will be liable under the
rule if it does not obtain a valid locate source and fails to deliver securities to the purchaser. Such broker-dealers
defraud purchasers that may not receive delivery on time, in effect unilaterally forcing the purchaser into accept-
ing an undated futures-type contract.[FN59]

> FN59 See supra note 22; 2007 Regulation SHO Final Amendments, 72 FR at
> 45544; 2006 Regulation SHO Proposed Amendments, 71 FR at 41712; 2007 Reg-
> ulation SHO Proposed Amendments, 72 FR at 45558-45559.

As noted above, under Regulation SHO, the executing or introducing broker-dealer is responsible for determin-
ing whether there are reasonable grounds to believe that a security can be borrowed so that it can be delivered on
the date delivery is due on a short sale.[FN60] In the 2004 Regulation SHO Adopting Release, the Commission
explicitly permitted broker-dealers to rely on customer assurances that the customer has identified its own locate
source, provided it is reasonable for the broker-dealer to do so.[FN61] If a seller elects to provide its own locate
source to a broker-dealer, the seller is representing that it has contacted that source and reasonably believes that
the source can or intends to deliver the full amount of the securities to be sold short by settlement date. In addi-
tion, if a seller enters a short sale order into a broker-dealer's direct market access or sponsored access system
("DMA") with any information purporting to identify a locate source obtained by the seller, the seller makes a
representation to a broker-dealer for purposes of Rule 10b-21.[FN62]

> FN60 See 17 CFR 242.203(b)(3)(1).

> FN61 See 2004 Regulation SHO Adopting Release, 69 FR at 48014.

> FN62 Broker-dealers offer DMA to some customers by providing them with elec-
> tronic access to a market's execution system using the broker-dealer's market par-
> ticipant identifier. The broker-dealer, however, retains the ultimate responsibility
> for the trading activity of its customer.

If a seller deceives a broker-dealer about the validity of its locate source, the seller will be liable under Rule
10b-21 if the seller also fails to deliver securities by the date delivery is due. For example, a seller will be liable
for a violation of Rule 10b-21 if it represented that it had identified a source of borrowable securities, but the
seller never contacted the purported source to determine whether shares were available and could be delivered in
time for settlement and the seller fails to deliver securities by settlement date. A seller will also be liable if it
contacted the source and learned that the source did not have sufficient shares for timely delivery, but the seller
misrepresented that the source had sufficient shares that it could deliver in time for settlement and the seller fails
to deliver securities by settlement date; or, if the seller contacted the source and the source had sufficient shares

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

that it could deliver in time for settlement, but the seller never instructed the source to deliver the shares in time for settlement and the seller otherwise refused to deliver shares on settlement date such that the sale results in a fail to deliver.

One commenter recommended that the rule focus on whether there is a fail to deliver in the Continuous Net Settlement ("CNS") system, rather than on a seller's failure to deliver the securities sold.[FN63] The majority of equity trades in the United States are cleared and settled through systems administered by clearing agencies registered with the Commission. The NSCC clears and settles the majority of equity securities trades conducted on the exchanges and in the over the counter market. NSCC clears and settles trades through the CNS system, which nets the securities delivery and payment obligations of all of its members. The majority of NSCC's members are broker-*61672 dealers.[FN64] NSCC notifies its members of their securities delivery and payment obligations daily. In addition, NSCC guarantees the completion of all transactions and interposes itself as the contraparty to both sides of the transaction. This commenter noted that a seller's clearing broker generally bears the responsibility to meet the firm's CNS delivery requirement and that it is difficult for a broker-dealer to determine which customer transactions or accounts give rise to a fail to deliver in the CNS system. We note, however, that Rule 10b-21 as proposed was not based on whether a fail to deliver occurred in CNS. Rather, the rule as proposed was concerned with whether an individual seller delivered securities that it sold. Along those lines, another commenter stated that the proposed rule should require a failure to deliver by the seller.[FN65]

> FN63 See letter from SIFMA.

> FN64 As of July 31, 2008 approximately 91% of members of the NSCC were registered as broker-dealers.

> FN65 See letter from Bingham.

We have determined to adopt the rule as proposed. The rule targets the misconduct of sellers. As discussed above, sellers should promptly deliver the securities they have sold and purchasers have the right to the timely receipt of securities that they have purchased. Thus, Rule 10b-21's focus is on whether or not there is a fail to deliver by the seller, rather than on whether or not there is a fail to deliver in the CNS system. Because fails to deliver in the CNS system are netted with pending deliveries, some sellers may be able to postpone delivery if another customer's purchase is received the same day. Thus, a person engaging in abusive "naked" short selling may be able to avoid detection for a period of time. This would undermine our goal of addressing abusive "naked" short selling.

*B. Seller's Reliance on a Broker-Dealer or "Easy to Borrow" Lists*

Rule 10b-21 provides that it shall be unlawful for any person to submit an order to sell an equity security if such person deceives a broker-dealer, participant of a registered clearing agency, or purchaser regarding its intention or ability to deliver the security on the date delivery is due.[FN66] Thus, as we discussed in the Proposing Release,[FN67] if a seller is relying on a broker-dealer to comply with Regulation SHO's locate obligation and to make delivery on a sale, the seller would not be representing at the time it submits an order to sell a security that it can or intends to deliver securities on the date delivery is due. For example, a seller might be relying on its broker-dealer to borrow or arrange to borrow the security to make delivery by settlement date. Alternatively, a seller might be relying on a broker-dealer's "Easy to Borrow" list. If a seller in good faith relies on a broker-dealer's "Easy to Borrow" list to satisfy the locate requirement, the seller would not be deceiving the broker-dealer at the time it submits an order to sell a security that it can or intends to deliver securities on the date delivery is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

due. In discussing the locate requirement of Regulation SHO, in the 2004 Regulation SHO Adopting Release, the Commission stated that "absent countervailing factors, 'Easy to Borrow' lists may provide 'reasonable grounds' for a broker-dealer to believe that the security sold short is available for borrowing without directly contacting the source of the borrowed securities."[FN68]

> FN66 See Rule 10b-21.

> FN67 See Proposing Release, 73 FR at 15379.

> FN68 2004 Regulation SHO Adopting Release, 69 FR at 48014.

*C. Bona Fide Market Makers*

As we discussed in the Proposing Release,[FN69] a market maker engaged in bona fide market making activity would not be making a representation at the time it submits an order to sell short that it can or intends to deliver securities on the date delivery is due, because such market makers are excepted from the locate requirement of Regulation SHO. Regulation SHO excepts from the locate requirement market makers engaged in bona-fide market making activities because market makers need to facilitate customer orders in a fast moving market without possible delays associated with complying with the locate requirement.[FN70] Thus, at the time of submitting an order to sell short, market makers that have an exception from the locate requirement of Regulation SHO may know that they may not be able to deliver securities on the date delivery is due.

> FN69 See Proposing Release, 73 FR at 15379.

> FN70 See 2004 Regulation SHO Adopting Release, 69 FR at 48015, n. 67; see also 2008 Regulation SHO Final Amendments, supra note 22 (providing interpretive guidance regarding bona fide market making activities for purposes of Regulation SHO).

*D. "Long" Sales*

Under Rule 10b-21, a seller will be liable if it deceives a broker-dealer, participant of a registered clearing agency, or purchaser about its ownership of shares or the deliverable condition of owned shares and fails to deliver securities by settlement date.[FN71] As we discussed in the Proposing Release,[FN72] a seller will be liable for a violation of Rule 10b-21 for causing a broker-dealer to mark an order to sell a security "long" if the seller knows or recklessly disregards that it is not "deemed to own" the security being sold, as defined in Rules 200(a) through (f) of Regulation SHO [FN73] or if the seller knows or recklessly disregards that the security being sold is not, or cannot reasonably be expected to be, in the broker-dealer's physical possession or control by the date delivery is due, and the seller fails to deliver the security by settlement date.

> FN71 See Rule 10b-21.

> FN72 See Proposing Release, 73 FR at 15379.

> FN73 17 CFR 242.200(a)-(f).

Broker-dealers acting for their own accounts will also be liable under Rule 10b-21 for marking an order "long" if the broker-dealer knows or recklessly disregards that it is not "deemed to own" the security being sold or that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

the security being sold is not, or cannot reasonably be expected to be, in the broker-dealer's physical possession or control by the date delivery is due, and the broker-dealer fails to deliver the security by settlement date.[FN74]

> FN74 Such broker-dealers will also be liable under Regulation SHO Rule 203(a).

However, a seller would not be making a representation at the time it submits an order to sell a security that it can or intends to deliver securities on the date delivery is due if the seller submits an order to sell securities that are held in a margin account but the broker-dealer has loaned out the shares pursuant to the margin agreement. Under such circumstances, it would be reasonable for the seller to expect that the securities will be in the broker-dealer's physical possession or control by settlement date.

*E. Rule 10b-21 and Other Antifraud Provisions of the Federal Securities Laws*

One commenter stated that it believes proposed Rule 10b-21 is unnecessary "because the Commission already has ample existing authority, under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, to prosecute manipulative and/or fraudulent activity, including the type of activity that proposed Rule 10b-21 seeks to address."[FN75] Other commenters urged us to use less formal means than rulemaking to address our concerns regarding misrepresentations in the order entry process.[FN76] For **\*61673** instance, these commenters suggested that the Commission or its staff could convey this message through FAQs, staff bulletins, and speeches.[FN77] We have determined, however, that the negative effects of abusive "naked" short selling on market confidence warrant further Commission action.

> FN75 See letter from SIFMA; see also letter from Bingham (stating that "[t]he Firms agree that the illicit conduct the Commission seeks to address through [proposed Rule 10b-21] is already illegal"); letter from MFA.
>
> FN76 See, e.g., letter from Bingham; letter from MFA; but, c.f., letter from Chamber of Commerce (noting that although the activity covered by proposed Rule 10b-21 is already a violation of the antifraud provisions of the federal securities laws, "[e]mphasizing that such deceit violates these laws may deter some of this activity in the future").
>
> FN77 See, e.g., letter from Bingham.

While "naked" short selling as part of a manipulative scheme is already illegal under the general antifraud provisions of the federal securities laws, we believe that a rule further evidencing the illegality of these activities will focus the attention of market participants on such activities. Rule 10b-21 will also further evidence that the Commission believes such deceptive activities are detrimental to the markets and will provide a measure of predictability for market participants.

Some commenters sought clarification as to how this rule was different from Rule 10b-5.[FN78] We note that the set of factors that will serve as the basis for a violation of Rule 10b-21 as adopted are not determinative of a person's obligations under the general antifraud provisions of the federal securities laws. Accordingly, and in order to clarify the continued applicability of the general antifraud provisions outside of the strict context of Rule 10b-21, we have added a preliminary note to the rule as adopted, which states: "This rule is not intended to limit, or restrict, the applicability of the general antifraud provisions of the federal securities laws, such as section

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

10(b) of the Act and rule 10b-5 thereunder."We added this preliminary note because we believe it is important to underscore that Rule 10b-21 is not meant, in any way, to limit the general antifraud provisions of the federal securities laws. Additionally, this preliminary note provides much needed public clarity in answer to the confusion voiced by many commenters.

> FN78 See, e.g., letter from MFA; see also letter from SIFMA (seeking clarification as to whether the level of scienter in the proposed rule differs from that of Rule 10b-5).

Similarly, we are modifying the proposed rule text slightly to add the word "also," as follows: "It shall also constitute a 'manipulative or deceptive device or contrivance' as used in section 10(b) of this Act for any person to submit an order to sell an equity security if such person deceives a broker or dealer, a participant of a registered clearing agency, or a purchaser about its intention or ability to deliver the security on or before the settlement date, and such person fails to deliver the security on or before the settlement date."

We believe the adding the word "also" in the rule text further clarifies that Rule 10b-21 does not affect the operation of Rule 10b-5 or other antifraud rules, but is instead intended to supplement the existing antifraud rules.

Commenters also raised questions whether there would be a private right of action for a violation of proposed Rule 10b-21.[FN79] We note that the courts have held that a private right of action exists with respect to Rule 10b-5 provided the essential elements constituting a violation of the rule are met.[FN80] Thus, a private plaintiff able to prove all those elements in a situation covered by Rule 10b-21 would be able to assert a claim under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

> FN79 See, e.g., letter from SIFMA. Another commenter stated that "[t]he Commission should make explicitly clear that the adoption of Proposed Rule 10b-21 does not create a private right of action for violations of the rule. * * *"See letter from Bingham.

> FN80 See, e.g., Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 13, n. 9 (1971); Ernst & Ernst, 425 at 196 (citing prior cases).

*F. Aiding and Abetting Liability*

In the Proposing Release, we stated that "[a]lthough the proposed rule is primarily aimed at sellers that deceive specified persons about their intention or ability to deliver shares or about their locate source and ownership of shares, as with any rule, broker-dealers could be liable for aiding and abetting a customer's fraud under the proposed rule."[FN81] One commenter stated that broker-dealers should not be held responsible for policing their customer's compliance with their own legal requirements.[FN82] Another commenter urged us to specifically state that reliance by a broker-dealer on a customer representation regarding long/short status or receipt of a locate does not rise to the level of scienter required for aiding and abetting liability.[FN83] This commenter also asked us to make clear that broker-dealers who merely offer DMA or sponsored access to a customer who violates the new rule would not be liable for aiding and abetting such violation.[FN84]

> FN81 See Proposing Release, 72 FR at 15379.

> FN82 See letter from SIFMA.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

> FN83 See letter from Bingham.

> FN84 See id.

Rule 10b-21 as adopted does not impose any additional liability or requirements on any person, including broker-dealers, beyond those of any existing Exchange Act rule. As we stated in the Proposing Release, broker-dealers would remain subject to liability under Regulation SHO and the general antifraud provisions of the federal securities laws.[FN85]

> FN85 See Proposing Release, 72 FR at 15380.

*G. Administrative Law Matters*

The Administrative Procedure Act also generally requires that an agency publish an adopted rule in the Federal Register 30 days before it becomes effective.[FN86] This requirement, however, does not apply if the agency finds good cause for making the rule effective sooner.[FN87] The Commission has determined that the rule should be effective in fewer than 30 days because it addresses illegal conduct that can cause market disruption. In addition, because the rule further evidences conduct that is manipulative and deceptive under existing general antifraud rules, market participants should not need time to adjust systems or procedures to comply with the rule. Therefore, the Commission finds good cause to make the rule effective on October 17, 2008.

> FN86 See 5 U.S.C. § 553(d).

> FN87 Id.

IV. Paperwork Reduction Act

Rule 10b-21 does not contain a "collection of information" requirement within the meaning of the Paperwork Reduction Act of 1995.[FN88]

> FN88 44 U.S.C. 3501 et seq.

V. Cost-Benefit Analysis

We are sensitive to the costs and benefits of our rules and we have considered the costs and benefits of Rule 10b-21. In order to assist us in evaluating the costs and benefits, in the Proposing Release, we encouraged commenters to discuss any costs or benefits that the rule would impose. In particular, we requested comment on the potential costs for any modification to both computer systems and surveillance mechanisms and for information gathering, management, and recordkeeping systems or procedures, as well as any potential benefits resulting from the rule for issuers, investors, brokers or dealers, other securities industry professionals, regulators, and other market participants. Commenters were encouraged to provide analysis and data to support their views on the costs and benefits associated with the rule.

*A. Benefits*

Rule 10b-21 is intended to address abusive "naked" short selling and fails *61674 to deliver. The rule is aimed at short sellers, including broker-dealers acting for their own accounts, who deceive broker-dealers, participants of a registered clearing agency, or purchasers about their intention or ability to deliver securities in time for set-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

tlement and that fail to deliver securities by settlement date. Among other things, Rule 10b-21 targets short sellers who deceive their broker-dealers about their source of borrowable shares for purposes of complying with Regulation SHO's "locate" requirement.[FN89] The rule also applies to sellers who misrepresent to their broker-dealers that they own the shares being sold.[FN90]

> FN89 See 17 CFR 242.203(b)(1).

> FN90 See Rule 10b-21.

A seller misrepresenting its short sale locate source or ownership of shares may intend to fail to deliver securities in time for settlement and, therefore, engage in abusive "naked" short selling. As noted above, although abusive "naked" short selling is not defined in the federal securities laws, it refers generally to selling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement cycle.[FN91] Such short selling may or may not be part of a scheme to manipulate the price of a security. Although "naked" short selling as part of a manipulative scheme is always illegal under the general antifraud provisions of the federal securities laws, including Rule 10b-5 under the Exchange Act,[FN92] Rule 10b-21 will further evidence the specific liability of persons that deceive specified persons about their intention or ability to deliver securities in time for settlement, including persons that deceive their broker-dealer about their locate source or ownership of shares and that fail to deliver securities by settlement date. We believe that a rule specifying the illegality of these activities will focus the attention of market participants on such activities. The rule will also further evidence that the Commission believes such deceptive activities are detrimental to the markets and will provide a measure of predictability for market participants.

> FN91 See supra note 2.

> FN92 17 CFR 240.10b-5.

All sellers of securities should promptly deliver, or arrange for delivery of, securities to the respective buyer and all buyers of securities have a right to expect prompt delivery of securities purchased. Thus, the rule takes direct aim at an activity that may create fails to deliver. Those fails can have a negative effect on shareholders, potentially depriving them of the benefits of ownership, such as voting and lending. They also may create a misleading impression of the market for an issuer's securities. As noted above, issuers and investors have expressed concerns about fails to deliver in connection with "naked" short selling. For example, in response to the 2006 Regulation SHO Proposed Amendments, we received a number of comments that expressed concerns about "naked" short selling and extended delivery failures.[FN93] Commenters continued to express these concerns in response to the 2007 Regulation SHO Proposed Amendments,[FN94] and in response to the Proposing Release.[FN95]

> FN93 See supra note 36.

> FN94 See supra note 37.

> FN95 See supra note 38.

To the extent that fails to deliver might be indicative of manipulative "naked" short selling, which could be used as a tool to drive down a company's stock price,[FN96] such fails to deliver may undermine the confidence of investors.[FN97] These investors, in turn, may be reluctant to commit capital to an issuer they believe to be subject to such manipulative conduct.[FN98] In addition, issuers may believe that they have suffered unwarranted

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

reputational damage due to investors' negative perceptions regarding fails to deliver in the issuer's security.[FN99] Any unwarranted reputational damage caused by fails to deliver might have an adverse impact on the security's price.[FN100]

 FN96 See supra note 39.

 FN97 See supra note 40.

 FN98 See supra note 41.

 FN99 See supra note 42 (discussing the fact that due to such concerns some issuers have taken actions to attempt to make transfer of their securities "custody only," thus preventing transfer of their stock to or from securities intermediaries such as the DTC or broker-dealers).

 FN100 See supra note 43.

Thus, to the extent that fails to deliver might create a misleading impression of the market for an issuer's securities, the rule will benefit investors and issuers by taking direct aim at an activity that may create fails to deliver. In addition, to the extent that "naked" short selling and fails to deliver result in an unwarranted decline in investor confidence about a security, the rule will improve investor confidence about the security. In addition, the rule will lead to greater certainty in the settlement of securities which should strengthen investor confidence in that process.

We believe the rule will result in broker-dealers having greater confidence that their customers have obtained a valid locate source and, therefore, that shares are available for delivery on settlement date. Thus, the rule will aid broker-dealers in complying with the locate requirement of Regulation SHO and, thereby, potentially reduce fails to deliver. In addition, to the extent that the rule results in fewer sales of threshold securities resulting in fails to deliver, the rule will reduce costs to broker-dealers because such broker-dealers will have to close-out a lesser amount of fails to deliver under Regulation SHO's close-out requirement.[FN101] The rule should also help reduce manipulative schemes involving "naked" short selling.

 FN101 Rule 203(b)(3)(iii) of Regulation SHO contains a close-out requirement that applies only to broker-dealers for securities in which a substantial amount of fails to deliver have occurred, also known as "threshold securities." Specifically, Rule 203(b)(3)'s close-out requirement requires a participant of a clearing agency registered with the Commission to take immediate action to close out a fail to deliver position in a threshold security that has persisted for 13 consecutive settlement days by purchasing securities of like kind and quantity; see also 2008 Interim Rule, supra note 29 (temporarily enhancing Regulation SHO's delivery requirements for sales of all equity securities).

In the Proposing Release, we solicited comment on any additional benefits that could be realized with the proposed rule, including both short-term and long-term benefits. We also solicited comment regarding benefits to market efficiency, pricing efficiency, market stability, market integrity and investor protection. In response, one commenter stated that the "rule will have a positive impact on liquidity and market quality in securities traded."[FN102] Another commenter stated that "the liquidity of the market and the market quality of securities

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

traded can be threatened or damaged if investors perceive that naked short sales may artificially distort the price of securities, in ways and instances unknown to honest investors, * * * in this regard, the strict application of the rule * * * should enhance liquidity and the market quality of securities traded."[FN103] This commenter also noted that, "[b]y increasing the liability of naked short sellers, the proposed rule should reduce the incidence of naked short sales and thereby reduce the likelihood of short squeezes."[FN104]

> FN102 See letter from Susanne Trimbath, PhD., CEO and Chief Economist, STP Advisory Services, LLC, dated May 30, 2008 ("Trimbath") (noting also a tax benefit to investors from enforcing delivery on settlement date).
>
> FN103 See letter from Shapiro.
>
> FN104 See id.

*B. Costs*

Rule 10b-21 is intended to address abusive "naked" short selling by further evidencing the liability of persons that deceive specified persons about their intention or ability to deliver securities *61675 in time for settlement, including persons that deceive their broker-dealer about their locate source or ownership of shares and that fail to deliver securities by settlement date. In the Proposing Release, we sought data supporting any potential costs associated with the rule, and specific comment on any systems changes to computer hardware and software, or surveillance costs that might be necessary to implement the rule. One commenter stated that "the rule will have a positive impact on liquidity and market quality in securities traded * * * [w]ithout strict rules against settlement failures, a systemic crisis could occur where investors are reluctant to engage in trades in U.S. markets because settlement finality is in question. The markets and investors need the assurance of Rule 10b-21 that securities transactions will be settled."[FN105] Another commenter stated that "the liquidity of the market and the market quality of securities traded can be threatened or damaged if investors perceive that naked short sales may artificially distort the price of securities, in ways and instances unknown to honest investors, * * * in this regard, the strict application of the rule * * * should enhance liquidity and the market quality of securities traded."[FN106] This commenter also noted that, "[b]y increasing the liability of naked short sellers, the proposed rule should reduce the incidence of naked short sales and thereby reduce the likelihood of short squeezes. The prospect of short squeezes is increased by the moral hazard that occurs when short sellers believe there is little or no cost to carrying out abusive naked short sales, and therefore rules that impose such costs reduce this prospect."[FN107] The commenter also noted that any costs associated with purchasing or borrowing securities to deliver on a sale instead of allowing the fail to deliver position to remain open "would not represent an additional cost, since a legitimate short sale involves borrowing the security for delivery at the cost of such borrowing. Therefore, it would reflect only the cost of complying with the rules and laws that apply to all investors."[FN108] This commenter also noted that "[s]trict liability for failing to deliver securities in short sales is needed to offset the implicit savings of violating the law and rules, and getting away with it."[FN109]

> FN105 See letter from Trimbath.
>
> FN106 See letter from Shapiro.
>
> FN107 See id.
>
> FN108 See id.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN109 See id.

We recognize, however, that Rule 10b-21 may result in increased costs to broker-dealers to the extent that the rule encourages or results in broker-dealers limiting the extent to which they rely on customer assurances in complying with the locate requirement of Regulation SHO. In addition, the rule may result in increased costs to sellers who inadvertently fail to deliver securities because such sellers, in an attempt to avoid liability under the rule, might purchase or borrow securities to deliver on a sale at a time when, but for the rule, the seller would have allowed the fail to deliver position to remain open.

One commenter stated that, "unless Proposed Rule 10b-21 were modified to eliminate aiding and abetting liability and allow reliance upon customer assurances, the price discovery and liquidity provided through short sales may be constrained."[FN110] Although broker-dealer concerns regarding aiding and abetting liability under Rule 10b-21 may potentially impact liquidity and efficiency in the markets, we believe that such an impact, if any, will be minimal. Rule 10b-21 as adopted does not impose any additional liability or requirements on any person, including broker-dealers, beyond those of any existing Exchange Act rule. Aiding and abetting liability is a question of fact, determined on a case-by-case basis. In addition, as we stated in the Proposing Release, broker-dealers would remain subject to liability under Regulation SHO and the general antifraud provisions of the federal securities laws.[FN111]

FN110 See letter from Bingham.

FN111 See Proposing Release, 72 FR at 15377.

VI. Consideration of Burden on Competition and Promotion of Efficiency, Competition, and Capital Formation

Section 3(f) of the Exchange Act requires the Commission, whenever it engages in rulemaking and whenever it is required to consider or determine if an action is necessary or appropriate in the public interest, to consider whether the action would promote efficiency, competition, and capital formation.[FN112] In addition, Section 23(a)(2) of the Exchange Act requires the Commission, when adopting rules under the Exchange Act, to consider the impact such rules would have on competition.[FN113] Exchange Act Section 23(a)(2) prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

FN112 15 U.S.C. 78c(f).

FN113 15 U.S.C. 78w(a)(2).

Rule 10b-21 is intended to address abusive "naked" short selling and fails to deliver. The rule is aimed at short sellers, including broker-dealers acting for their own accounts, who deceive specified persons, such as a broker-dealer, about their intention or ability to deliver securities in time for settlement and fail to deliver securities by settlement date. Among other things, Rule 10b-21 targets short sellers who deceive their broker-dealers about their source of borrowable shares for purposes of complying with Regulation SHO's "locate" requirement.[FN114] The rule also applies to sellers who misrepresent to their broker-dealers that they own the shares being sold.[FN115]

FN114 See 17 CFR 242.203(b)(1).

FN115 See Rule 10b-21.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)                                                    Page 24

Although "naked" short selling as part of a manipulative scheme is always illegal under the general antifraud provisions of the federal securities laws, including Rule 10b-5 under the Exchange Act,[FN116] Rule 10b-21 will further evidence the liability of persons that deceive specified persons about their intention or ability to deliver securities in time for settlement, including persons that deceive their broker-dealer about their locate source or ownership of shares and that fail to deliver securities by settlement date. We believe that a rule further evidencing the illegality of these activities will focus the attention of market participants on such activities. The rule will also provide a measure of predictability for market participants. We believe Rule 10b-21 will have minimal impact on the promotion of price efficiency.

      FN116 17 CFR 240.10b-5.

In the Proposing Release, we sought comment regarding whether Rule 10b-21 will adversely impact liquidity, disrupt markets, or unnecessarily increase risks or costs to customers. In response, one commenter noted that, "the liquidity of the market and the market quality of securities traded can be threatened or damaged if investors perceive that naked short sales may artificially distort the price of securities, in ways and instances unknown to honest investors, * * * in this regard, the strict application of the rule * * * should enhance liquidity and the market quality of securities traded."[FN117] This commenter also noted that, "[b]y increasing the liability of naked short sellers, the proposed rule should reduce the incidence of naked short sales and **\*61676** thereby reduce the likelihood of short squeezes. * * *"[FN118]

      FN117 See letter from Shapiro.

      FN118 See id.

Another commenter stated that, "unless Proposed Rule 10b-21 were modified to eliminate aiding and abetting liability and allow reliance upon customer assurances, the price discovery and liquidity provided through short sales may be constrained."[FN119] Although broker-dealer concerns regarding aiding and abetting liability under Rule 10b-21 may potentially impact liquidity and efficiency in the markets, we believe that such an impact, if any, will be minimal. Rule 10b-21 as adopted does not impose any additional liability or requirements on any person, including broker-dealers, beyond those of any existing Exchange Act rule. Aiding and abetting liability is a question of fact, determined on a case-by-case basis. In addition, as we stated in the Proposing Release, broker-dealers would remain subject to liability under Regulation SHO and the general antifraud provisions of the federal securities laws.[FN120]

      FN119 See letter from Bingham.

      FN120 See Proposing Release, 72 FR at 15377.

In addition, we believe that the rule will have minimal impact on the promotion of capital formation. The perception that abusive "naked" short selling is occurring in certain securities can undermine the confidence of investors. These investors, in turn, may be reluctant to commit capital to an issuer they believe to be subject to such manipulative conduct. For example, in response to the Proposing Release, one commenter noted that, "[c]onfidence in the securities markets is diminished when investors and others cannot rely on the receipt of securities in trades."[FN121] Thus, we believe that strengthening our rules against "naked" short selling by targeting sellers who deceive their broker-dealers about their source of borrowable shares and their share ownership will provide increased confidence in the markets.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN121 See letter from Trimbath.

In addition, we note that we have previously sought comment regarding the impact on capital formation of other proposed amendments aimed at reducing fails to deliver and addressing potentially abusive "naked" short selling, including whether the proposed increased short sale restrictions would affect investors' decisions to invest in certain equity securities.[FN122] In response, commenters expressed concern about the potential impact of "naked" short selling on capital formation claiming that "naked" short selling causes a drop in an issuer's stock price that may limit the issuer's ability to access the capital markets.[FN123] Thus, to the extent that "naked" short selling and fails to deliver result in an unwarranted decline in investor confidence about a security, the rule is expected to improve investor confidence about the security. We note, however, that persistent fails to deliver exist in only a small number of securities and may be a signal of overvaluation rather than undervaluation of a security's price.[FN124] In addition, we believe that the rule will lead to greater certainty in the settlement of securities, which is expected to strengthen investor confidence in the settlement process.

FN122 See 2006 Regulation SHO Proposed Amendments, 71 FR 41710; 2007 Regulation SHO Proposed Amendments, 72 FR 45558.

FN123 See, e.g., supra note 41 (citing to comment letters expressing concern regarding the impact of potential "naked" short selling on capital formation).

FN124 Persistent fails to deliver may be symptomatic of an inadequate supply of shares in the equity lending market. If short sellers are unable to short sell due to their inability to borrow shares, their opinions about the fundamental value of the security may not be fully reflected in a security's price, which may lead to overvaluation.

We also believe that Rule 10b-21 will not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act. By specifying that abusive "naked" short selling is a fraud, the Commission believes the rule will promote competition by providing the industry with guidance regarding the liability of sellers that deceive specified persons about their intention or ability to deliver securities in time for settlement, including persons that deceive their broker-dealer about their locate sources or share ownership and that fail to deliver securities by settlement date.

VII. Final Regulatory Flexibility Analysis

The Commission has prepared a Final Regulatory Flexibility Analysis ("FRFA"), in accordance with the provisions of the Regulatory Flexibility Act ("RFA"),[FN125] regarding Rule 10b-21 under the Exchange Act. An Initial Regulatory Flexibility Analysis ("IRFA") was prepared in accordance with the RFA and was included in the Proposing Release. We solicited comments on the IRFA.

FN125 5 U.S.C. 603.

*A. Reasons for the Rule*

Rule 10b-21 is intended to address fails to deliver associated with abusive "naked" short selling. While "naked" short selling as part of a manipulative scheme is already illegal under the general antifraud provisions of the federal securities laws, Rule 10b-21 specifies that it is unlawful for any person to submit an order to sell an equity

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)

security if such person deceives a broker-dealer, participant of a registered clearing agency, or purchaser about its intention or ability to deliver securities on the date delivery is due, and such person fails to deliver the security on or before the date delivery is due. Thus, Rule 10b-21 will further evidence the liability of persons that deceive specified persons about their intention or ability to deliver securities in time for settlement, including persons that deceive their broker-dealer about their locate source or ownership of shares.

*B. Objectives*

Rule 10b-21 is aimed at short sellers, including broker-dealers acting for their own accounts, that deceive specified persons, such as a broker or dealer, about their intention or ability to deliver securities in time for settlement and that fail to deliver securities by settlement date. We believe that a rule further evidencing the illegality of these activities will focus the attention of market participants on such activities. The rule will also underscore that the Commission believes such deceptive activities are detrimental to the markets and will provide a measure of predictability for market participants.

All sellers of securities should promptly deliver, or arrange for delivery of, securities to the respective buyer and all buyers of securities have a right to expect prompt delivery of securities purchased. Thus, Rule 10b-21 takes direct aim at an activity that may create fails to deliver. Those fails can have a negative effect on shareholders, potentially depriving them of the benefits of ownership, such as voting and lending. They also may create a misleading impression of the market for an issuer's securities. Rule 10b-21 will also aid broker-dealers in complying with the locate requirement of Regulation SHO and, thereby, potentially reduce fails to deliver. In addition, the rule is expected to help reduce manipulative schemes involving "naked" short selling.

*C. Significant Issues Raised By Public Comment*

The IRFA appeared in the Proposing Release. We requested comment on any aspect of the IRFA. In particular, we requested comment on: (i) The number of small entities that would be affected by the rule; and (ii) the existence or nature of the potential impact of the rule on small entities. We requested that the **\*61677** comments specify costs of compliance with the rule, and suggest alternatives that would accomplish the objectives of the rule. We did not receive any comments that responded specifically to this request.

*D. Small Entities Subject to the Rule*

The entities covered by Rule 10b-21 will include small broker-dealers, small businesses, and any investor who effects a short sale that qualifies as a small entity. Although it is impossible to quantify every type of small entity that may be able to effect a short sale in a security, paragraph (c)(1) of Rule 0-10 under the Exchange Act [FN126] states that the term "small business" or "small organization," when referring to a broker-dealer, means a broker or dealer that had total capital (net worth plus subordinated liabilities) of less than $500,000 on the date in the prior fiscal year as of which its audited financial statements were prepared pursuant to § 240.17a-5(d); and is not affiliated with any person (other than a natural person) that is not a small business or small organization. As of 2007, the Commission estimates that there were approximately 896 broker-dealers that qualified as small entities as defined above.[FN127]

FN126 17 CFR 240.0-10(c)(1).

FN127 These numbers are based on OEA's review of 2007 FOCUS Report filings reflecting registered broker-dealers. This number does not include broker-dealers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

that are delinquent on FOCUS Report filings.

Any business, however, regardless of industry, could be subject to the rule if it effects a short or long sale. The Commission believes that, except for the broker-dealers discussed above, an estimate of the number of small entities that fall under the rule is not feasible.

*E. Reporting, Recordkeeping, and Other Compliance Requirements*

Rule 10b-21 is intended to address abusive "naked" short selling by further evidencing the liability of persons that deceive specified persons about their intention or ability to deliver securities in time for settlement, including persons that deceive their broker-dealer about their locate source or ownership of shares and that fail to deliver securities by settlement date. The Commission believes that the rule may impose new or additional compliance costs on any affected party, including broker-dealers, that are small entities. To comply with Regulation SHO, small broker-dealers needed to modify their systems and surveillance mechanisms to comply with Regulation SHO's locate, marking and delivery requirements. Thus, any systems and surveillance mechanisms necessary for broker-dealers to comply with the rule should already be in place. We believe that any necessary additional systems and surveillance changes, in particular changes by sellers who are not broker-dealers, will be similar to the changes incurred by broker-dealers when Regulation SHO was implemented.

*F. Agency Action To Minimize Effect on Small Entities*

The RFA directs the Commission to consider significant alternatives that would accomplish the stated objective, while minimizing any significant adverse impact on small entities. Pursuant to Section 3(a) of the RFA,[FN128] the Commission must consider the following types of alternatives: (a) The establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (b) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for small entities; (c) the use of performance rather than design standards; and (d) an exemption from coverage of the rule, or any part thereof, for small entities.

FN128 5 U.S.C. 603(c).

A primary goal of Rule 10b-21 is to address abusive "naked" short selling. While "naked" short selling as part of a manipulative scheme is always illegal under the general antifraud provisions of the federal securities laws, Rule 10b-21 specifies that it is a fraud for any person to submit an order to sell an equity security if such person deceives a broker-dealer, participant of a registered clearing agency, or purchaser about its intention or ability to deliver the security on the date delivery is due and such person fails to deliver the security on or before the date delivery is due. Rule 10b-21 is aimed at short sellers, including broker-dealers acting for their own accounts, who deceive specified persons, such as a broker or dealer, about their intention or ability to deliver securities in time for settlement and who do not deliver securities by settlement date. Among other things, Rule 10b-21 targets short sellers who deceive their broker-dealers about their source of borrowable shares for purposes of complying with Regulation SHO's "locate" requirement.[FN129] The rule also applies to sellers who misrepresent to their broker-dealers that they own the shares being sold.

FN129 See 17 CFR 242.203(b)(1).

We believe that imposing different compliance requirements, and possibly a different timetable for implementing compliance requirements, for small entities would undermine the Commission's goal of addressing abusive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

"naked" short selling and fails to deliver. In addition, we have concluded similarly that it is not consistent with the primary goal of the rule to further clarify, consolidate, or simplify the rule for small entities. Finally, the rule imposes performance standards rather than design standards.

VIII. Statutory Authority

Pursuant to the Exchange Act and, particularly, Sections 2, 3(b), 6, 9(h), 10, 11A, 15, 15A, 17, 17A, 19 and 23(a) thereof, 15 U.S.C. 78b, 78c(b), 78f, 78i(h), 78j, 78k-1, 78o, 78o-3, 78q, 78q-1, 78s and 78w(a), the Commission is adopting a new antifraud rule, Rule 10b-21, to address abusive "naked" short selling.

List of Subjects in 17 CFR Part 240

Brokers, Fraud, Reporting and recordkeeping requirements, Securities.

For the reasons set out in the preamble, Title 17, Chapter II, of the Code of Federal Regulations is amended as follows.

PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 19341. The authority citation for part 240 continues to read, in part, as follows:

Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78o, 78p, 78q, 78s, 78u-5, 78w, 78x, 78-ll, 78mm, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, 80b-11, and 7201 et seq.; and 18 U.S.C. 1350, unless otherwise noted.

17 CFR § 240.10b-21

2. Add § 240.10b-21 to read as follows:

17 CFR § 240.10b-21

§ 240.10b-21 Deception in connection with a seller's ability or intent to deliver securities on the date delivery is due.

Preliminary Note to § 240.10b-21: This rule is not intended to limit, or restrict, the applicability of the general antifraud provisions of the federal securities laws, such as section 10(b) of the Act and rule 10b-5 thereunder.

(a) It shall also constitute a "manipulative or deceptive device or contrivance" as used in section 10(b) of this Act for any person to submit an order to sell an equity security if such person deceives a broker or dealer, a participant of a registered clearing agency, or a purchaser about its intention or ability to deliver the security on or before the settlement date, and such person fails to deliver the *61678 security on or before the settlement date.

(b) For purposes of this rule, the term settlement date shall mean the business day on which delivery of a security and payment of money is to be made through the facilities of a registered clearing agency in connection with the sale of a security.

By the Commission.

Dated: October 14, 2008.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 FR 61666-01, 2008 WL 4600724 (F.R.)                                              Page 29

Florence E. Harmon,

Acting Secretary.

[FR Doc. E8-24714 Filed 10-16-08; 8:45 am]

BILLING CODE 8011-01-P

73 FR 61666-01, 2008 WL 4600724 (F.R.)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.