# Exhibit C

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 60441 / August 5, 2009

ADMINISTRATIVE PROCEEDING
File No. 3-13570

| | | |
|---|---|---|
| | : | ORDER INSTITUTING |
| In the Matter of | : | ADMINISTRATIVE AND CEASE-AND- |
| | : | DESIST PROCEEDINGS PURSUANT |
| Hazan Capital Management, LLC | : | TO SECTIONS 15(b) AND 21C OF THE |
| and Steven M. Hazan, | : | SECURITIES EXCHANGE ACT OF |
| | : | 1934, MAKING FINDINGS, AND |
| Respondents. | : | IMPOSING REMEDIAL SANCTIONS |
| | : | AND A CEASE-AND-DESIST ORDER |
| | : | |
| | : | |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act against Respondent Hazan Capital Management, LLC ("HCM") and Respondent Steven M. Hazan ("Hazan") (collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' Offer, the Commission finds[1] that:

### Summary

1.      These proceedings arise out of Respondent HCM's violations of Regulation SHO ("Reg SHO").  Subject to certain exceptions, Reg SHO requires market participants seeking to effect a short sale to borrow, arrange to borrow, or have reasonable grounds to believe that a security can be borrowed prior to effecting the short sale.  This is known as the "locate requirement."  Market makers, who ensure liquidity in the market, are excepted from the locate requirement if they are engaged in bona fide market making activities.  At the time, Reg SHO also required fail-to-deliver positions[2] in certain securities that persisted for thirteen consecutive settlement days to be immediately closed out.[3]  In contrast to the locate requirement, market makers are not excepted from Reg SHO's close-out requirement.

2.      In this case, HCM improperly relied on the market marker exception from Reg SHO's locate requirement and engaged in certain transactions that violated the locate and close out requirements.  The first type of transaction – known in the industry as a "reverse conversion" or "reversal" – involves selling a put option and buying a call option – a combination that creates what is known as a "synthetic" long position – while selling short the underlying stock.  The counterparty on the components of the reverse conversion – which is engaging in a "conversion" – benefits from the transaction because it is able to acquire a long stock position that is perfectly hedged by the synthetic short options position.  That party can then loan out the shares of stock and receive fees from the borrowers.  Those fees can be quite significant when the stock is a

---

[1]     The findings herein are made pursuant to Respondents' Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2]     Fails to deliver occur when a seller fails to deliver securities to the buyer when delivery is due.  Generally, investors complete or settle their security transactions within three settlement days.  This settlement cycle is known as T+3 (or "trade date plus three days").  T+3 means that when a trade occurs, the participants to the trade deliver and pay for the security at a clearing agency three days after the trade is executed so the brokerage firm can exchange those funds for the securities on that third settlement day.  The three-day settlement period applies to most securities transactions, including stocks, bonds, municipal securities, mutual funds traded through a brokerage firm, and limited partnerships that trade on an exchange.  Government securities and stock options settle on the next settlement day following the trade (or T+1).

[3]     A "close out" of a fail position involves the purchase of shares of like kind and quantity in the amount of the fail-to-deliver position.

threshold security, because threshold securities are hard to borrow and therefore command large fees in the stock loan market.  Consequently, prime brokers created the demand for the reverse conversion to create inventory for stock loans on hard to borrow securities, and options market makers like HCM fed this demand.

3.       The second type of transaction – referred to herein as a "reset" -- is a transaction in which a market participant who has a "fail-to-deliver" position in a threshold security buys shares of that security while simultaneously selling short-term, deep in-the-money[4] call options to – or buying short-term, deep in-the-money put options from – the counterparty to the share purchase.  The purchase of shares creates the illusion that the market participant has satisfied the close out obligation of Reg SHO.  However, the shares that are apparently purchased in the reset transactions are never actually delivered to the purchaser because on the day after executing the reset, the option is either exercised (if a call) or assigned (if a put), transferring the shares back to the party that apparently sold them the previous day.  This paired transaction allows the market participant with the fail-to-deliver position to effectively borrow the stock for a day, in order to appear to have satisfied the close out requirement of Rule 203(b)(3).

4.       By avoiding the cost of borrowing shares and engaging in these reverse conversion and reset transactions, HCM was able to earn a profit while subject to minimal risk.  Because HCM improperly failed to borrow or arrange to borrow securities to make delivery when delivery was due, the short sales were "naked" short sales[5] that violated Reg SHO.

5.       Specifically, from January 2005 through October 2007, Respondent HCM – a putative options market maker – willfully violated Rule 203(b)(1) of Reg SHO by improperly claiming the market maker exception to avoid locating shares before effecting short sale transactions in Reg SHO threshold securities.  HCM also willfully violated Rule 203(b)(3) of Reg SHO by engaging in a series of sham reset transactions that employed short-term, paired stock and option positions, which enabled HCM to circumvent its close out obligations in Reg SHO threshold securities.[6]  HCM also assisted other options market makers who were executing their own sham

---

[4]       An "in-the-money" option is an option that entitles its holder to either buy securities below the current market price for that security (in the case of a call option), or to sell securities above the market price (in the case of a put option).  An option that is "deep in-the-money" has a strike price that is far below (in the case of a call option) or far above (in the case of a put) the market price for the given security.

[5]       In a "naked" short sale, the seller does not borrow or arrange to borrow the securities in time to make delivery to the buyer within the standard three-day settlement period.  As a result, the seller fails to deliver the securities to the buyer when delivery is due.

[6]       A "threshold security" is a security for which there is an aggregate fail-to-deliver position exceeding the size criteria set forth in Rule 203(c)(6) of Regulation SHO for a period of five consecutive settlement days.

reset transactions by acting as a counterparty to the sham transactions and in doing so violated the locate requirement. Respondent Hazan, the principal trader at HCM and its majority owner, willfully aided and abetted and caused HCM's violations of Rules 203(b)(1) and 203(b)(3) of Reg SHO.

## Respondents

6.  **Hazan Capital Management, LLC**, a New York limited liability company, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act. HCM was a Regular Member Organization of the AMEX[7] until terminating its membership effective December 24, 2007. From June 2006 until on or about October 20, 2007, HCM was an Options Trading Permit Holder and market maker on the ARCA.

7.  **Steven Moses Hazan**, age 31, is a resident of New York, New York. At all relevant times, Hazan was the majority owner and managing member of HCM and controlled its trading activity. During the relevant period, Hazan was registered as Regular Member and a registered options trader on the AMEX, and was also an Options Trading Permit Holder and market maker with the ARCA. Hazan's membership on the AMEX was terminated effective August 3, 2006; his membership on the ARCA was terminated on or about October 20, 2007.

## Facts

### HCM Failed to Locate Shares Prior to Effecting Short Sales

8.  From January 2005 through October 2007,[8] HCM engaged in reverse conversions with purchasers of Reg SHO threshold securities.

9.  In these reverse conversions, Hazan, on behalf of HCM, sold short shares of Reg SHO threshold securities while simultaneously creating a synthetic long position in those same securities by purchasing call options from, and selling put options to, the same counterparty to whom HCM was selling short the shares of the threshold securities. These call and put options had the same strike price and expiration date, and were options to buy (or sell) the same threshold securities that HCM sold short in the reverse conversion transactions. HCM purchased enough call options and put options so that the number of shares underlying the options equaled

---

[7]     On October 1, 2008, the AMEX was acquired by NYSE Euronext and renamed NYSE Alternext US, LLC.  On March 6, 2009, NYSE Alternext US, LLC was renamed NYSE Amex, LLC.

[8]     The trading at issue took place on the AMEX during the period January 3, 2005 through July 31, 2006, and on the ARCA during the period June 2006 through October 20, 2007.

the number of shares it sold short.  Through this set of transactions, HCM eliminated its market risk because the short position was used to hedge the synthetic long position that had been created by purchasing call options and selling put options.

10.     The reverse conversion transactions in Reg SHO securities were profitable for HCM because the prices of the three separate components of the transactions -- the short sale, the sale of the put options, and the purchase of the call options -- were interdependent, and were set at levels that created an agreed-upon net profit per share for HCM.  That per-share net profit was the effective price of the conversion, a price that HCM's counterparties were willing to pay in order to obtain shares of hard-to-borrow Reg SHO threshold securities for the length of time between the original execution of the conversion and the expiration of the option components of the conversion.

11.     In executing these reverse conversions, HCM claimed the market maker exception in Rule 203(b)(1) of Reg SHO and did not locate, arrange to borrow, or borrow shares of the security in question prior to effecting the short sale.  This failure to locate, arrange to borrow, or borrow shares was improper, however, because HCM was not engaged in bona fide market making activity in connection with effecting the short sale transactions.

## HCM Failed to Close Out Fail-to-Deliver Positions in Reg SHO Threshold Securities

12.     HCM's short sales resulted in a fail-to-deliver position in the threshold security on the books and records of its clearing firm – i.e. HCM had not delivered the shares it sold short to its clearing firm so that the clearing firm could settle the trade.

13.     During the relevant time, Rule 203(b)(3) of Reg SHO required clearing firms immediately to close out any fail-to-deliver position in a threshold security that persists for thirteen consecutive settlement days by purchasing securities of a like kind and quantity. Specifically, at the relevant time, Rule 203(b)(3) required a participant of a clearing agency registered with the Commission to take immediate action to close out a fail-to-deliver position in a threshold security in the Continuous Net Settlement system that has persisted for thirteen consecutive settlement days.  However, pursuant to Rule 203(b)(3)(vi) of Reg SHO, a clearing firm is permitted reasonably to allocate a fail-to-deliver position to a broker or dealer whose short sale resulted in the position.  Once the clearing firm has allocated the fail-to-deliver position to another broker or dealer, the obligation for complying with the close out requirement shifts to that broker or dealer.

14.     On numerous occasions from January 2005 through October 2007, HCM's clearing firm notified HCM that the clearing firm had allocated to HCM the obligation to close out fail-to-deliver positions in threshold securities.  These notifications informed HCM that if it did not purchase shares sufficient to satisfy its fail-to-deliver position, the clearing firm would purchase (or "buy-in") those shares for HCM's account.

15.     HCM did not want its fail-to-deliver position – which resulted from the short sale portion of the reverse conversion – to be closed out by the clearing firm because this would result in the clearing firm making large purchases of Reg SHO threshold securities, at HCM's expense, at a price determined by the market.  Additionally, the close out would have exposed Respondent HCM to market risk on its reverse conversion transaction because it would have eliminated the short position that had been used to hedge HCM's synthetic long position created by the options component of the reverse conversion.

16.     To avoid a forced close out, Hazan, on behalf of HCM, entered into a series of sham reset transactions that circumvented HCM's obligation under Reg SHO to close out its fail-to-deliver position.  These complex sham transactions gave the appearance that HCM was closing out its fail-to-deliver position by purchasing securities of like kind and quantity.

17.     Specifically, on numerous occasions, Hazan, on behalf of HCM, effected short-term in-the-money option transactions in conjunction with stock purchases to circumvent the Reg SHO close out requirements.  HCM "purchased" stock in the Reg SHO threshold security from another market maker and simultaneously sold a short-term call option to (or purchased a short-term put option from) the same market maker.  These combined stock and option transactions were either "married puts" (the purchase of stock in conjunction with the purchase of a put option on the same security) or "buy-writes" (the purchase of stock in conjunction with the sale (or "writing") of call options on the same security).

18.     Although married puts and buy-writes can be created using standard options, the option component of HCM's reset transactions were usually established using "FLEX" options.  FLEX options are exchange traded options for which the parties can customize certain terms of the options, including the strike price, expiration date, and exercise type (*i.e.*, American or European).  HCM used these FLEX options because it did not intend to actually purchase the shares required to satisfy its close out obligation.  Rather, it simply wanted to appear to have satisfied that obligation through a purported purchase of shares.  Thus, HCM structured the reset transactions so that the options component of the transaction would expire very soon after the purported "purchase" of shares had been reflected in HCM's account at its clearing firm.  Indeed, most of the FLEX options were customized to expire one day after they were purchased.[9]

19.     By entering into these reset transactions, HCM created the false impression that it had satisfied its Reg SHO close out obligation.  HCM, however, knew that the following day, or shortly thereafter, the option would expire in-the-money, causing the market maker that had purchased that call option to assign an exercise notice to HCM for HCM to sell the stock.  (In the

---

[9]     The options exchanges prohibited the trading of FLEX options on certain days right before and right after the standard expiration date of any given month (*i.e.*, the third Saturday after the first Friday of the month).  Thus, for reset transactions executed on those days, HCM used standard options to create the married puts and buy-writes.

case of a put option, HCM itself would exercise the right to sell the stock back to its counterparty.)

20.     Moreover, HCM never actually received the stock it "purchased" from the other market maker because that market maker was selling short the stock without actually having any shares to sell.[10] Accordingly, HCM never received any shares and so never in fact closed out the "fail-to-deliver" position – as required by Reg SHO – that was initially established during the reverse conversion transaction.  HCM knew, or should have known, that the combination of the purchase of shares and the sale of the FLEX option would result in maintenance of the "fail-to-deliver" position.

21.     HCM's clearing firm, however, reset HCM's Reg SHO close out obligation to day one – thus giving HCM another thirteen settlement days in which to close out the short position – based on HCM's purported "purchase" of shares and exercise of the option.

22.     After receiving subsequent close out notices from its clearing firm, HCM continued to engage in these and other types of transactions until the initial options positions (call options purchase/put options sale) expired or were assigned, thus closing out the short position and eliminating the synthetic long position that the short position had hedged.  By engaging in this course of conduct, Hazan, on behalf of HCM, impermissibly maintained fail-to-deliver positions in numerous Reg SHO threshold securities longer than thirteen settlement days. Indeed, on numerous occasions, HCM's repeated use of reset transactions allowed it to maintain a large fail-to-deliver position in a threshold security for several months.

23.     During the relevant period, HCM engaged in a large volume of reverse conversions and reset transactions in numerous threshold securities.  As a result of HCM's repeated violation of Reg SHO's locate and close out requirements, it received ill-gotten gains of at least $3 million.

24.     In addition, on numerous occasions, HCM assisted other putative market makers in evading their close out obligations by acting as the counterparty to reset transactions. Specifically, HCM sold short shares of Reg SHO threshold securities so that other market makers could "purchase" the securities to close out their own fail-to-deliver positions, and simultaneously bought deep in-the-money call options, the combination of which allowed the other market makers to circumvent their own Reg SHO close out obligations.  HCM did not borrow, arrange to borrow, or locate the shares of these threshold securities prior to entering into the short sale component of these reset transactions.

## VIOLATIONS

---

[10]     These market makers were themselves improperly relying on Reg SHO's locate exception related to bona fide market making activity because they were not engaged in bona fide market making activity in connection with these short sales.

7

**HCM Willfully Violated Rule 203(b)(1) of Reg SHO and Hazan Willfully Aided and Abetted and Caused HCM's Violation**

25.     Pursuant to the locate requirement of Rule 203(b)(1) of Reg SHO, a broker or dealer may not effect a short sale in an equity security unless it has "(i) [b]orrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) [r]easonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) [d]ocumented compliance with [these requirements]."

26.     Rule 203(b)(2)(iii) contains an exception to this locate requirement for short sales effected "by a market maker in connection with bona-fide market making activities in the security for which this exception is claimed."

27.     At the time Hazan, on behalf of HCM, placed orders to sell short certain Reg SHO threshold securities as part of the reverse conversion transactions and reset transactions described above, he failed to borrow, arrange to borrow, or locate the securities, claiming the market maker exception to the locate requirement.  The market maker exception was not available to HCM, however, because it was not engaging in bona-fide market making activities in these securities.

28.     As a result of this conduct, HCM willfully violated, and Hazan willfully aided and abetted and caused HCM's violations, of Rule 203(b)(1) of Reg SHO.

**HCM Willfully Violated Rule 203(b)(3) of Reg SHO and Hazan Willfully Aided and Abetted and Caused HCM's Violation**

29.     At the relevant time, Rule 203(b)(3) imposed an obligation on clearing firms immediately to close out any fail-to-deliver positions in a threshold security that lasts for thirteen consecutive settlement days[11] by purchasing securities of like kind and quantity. Pursuant to Rule 203(b)(3)(vi), however, a clearing firm is permitted reasonably to allocate a fail-to-deliver position to a broker or dealer whose short sale resulted in the position.  Once the clearing firm has allocated the fail-to-deliver position to another broker or dealer, the obligation to comply with the mandatory close out requirement shifts to that broker or dealer.

---

[11]     In October 2008, the Commission adopted Rule 204T (which was made permanent as Rule 204 on July 27, 2009).  Under Rule 204, clearing firms must close out fails-to-deliver on all securities (not just threshold securities) and must do so earlier than under Rule 203(b)(3).  Clearing firms must now close out fails-to-deliver by either borrowing or purchasing sufficient shares before the beginning of trading hours on the first settlement day after the settlement date.  Fails relating to long sales or bona fide market making activity have two additional settlement days before they must be closed out.

8

30.    Once the fail-to-deliver position is allocated to the broker or dealer, that broker or dealer, in order to satisfy the close out requirement of Rule 203(b)(3) of Reg SHO, must purchase securities of like kind and quantity.  Borrowing securities, or otherwise entering into an arrangement that merely creates the appearance of a purchase, does not satisfy Reg SHO's close out requirement.

31.    In addition, Rule 203 of Reg SHO specifically prohibits firms from satisfying their close out obligations through sham transactions that merely give the appearance of closing out a fail-to-deliver position.  Specifically, Rule 203(b)(3)(vii) provides that a clearing firm – or a broker or dealer to which the clearing firm allocated a fail-to-deliver position – will be deemed not to have satisfied the close out obligation if it knows, or has reasonable grounds to believe, that the close out purchase will result in a fail-to-deliver.

32.    By selling (or purchasing) deep in-the-money FLEX call (or put) options while simultaneously purporting to "purchase" stock, Respondent HCM engaged in sham transactions that gave the appearance that it was closing out its fail-to-deliver position when, in fact, Respondent HCM knew, or should have known, that these transactions would result in a fail-to-deliver position.

33.    As a result of this conduct, HCM willfully violated, and Hazan willfully aided and abetted and caused HCM's violations of, Rule 203(b)(3) of Reg SHO.

## Undertakings

34.    Respondent Hazan and Respondent HCM have undertaken to pay, jointly and severally, a fine in the amount of $500,000 to NYSE Amex, LLC pursuant to the terms of the decision by the NYSE Amex, LLC Hearing Board accepting the Stipulation of Facts and Consent to Penalty entered into by Respondents and NYSE Amex, LLC on February 19, 2009.

35.    Respondent Hazan and Respondent HCM have undertaken to pay, jointly and severally, a fine in the amount of $500,000 to NYSE Arca, Inc. pursuant to the terms of the decision by the NYSE Arca, Inc. Hearing Board accepting the Stipulation of Facts and Consent to Penalty entered into by Respondents and NYSE Arca, Inc. on February 19, 2009.

In determining whether to accept Respondents' Offer, the Commission has considered these undertakings.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offer.

Accordingly, pursuant to Section 15(b) and 21C of the Exchange Act, it is hereby ORDERED that:

1.    Respondent HCM shall cease and desist from committing or causing, and Respondent Hazan shall cease and desist from causing, any violations and any future violations of Exchange Act Rules 203(b)(1) and 203(b)(3);

2.    Respondent Hazan be, and hereby is barred from association with any broker, or dealer, with the right to reapply for association after five (5) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

3.    Any reapplication for association by Respondent Hazan will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following:  (a) any disgorgement ordered against Respondent Hazan, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order;

4.    Respondent HCM is censured;

5.    Respondent Hazan and Respondent HCM shall pay, jointly and severally, disgorgement in the amount of $3,000,000.  This order to pay disgorgement shall be deemed satisfied by the orders of NYSE Amex, LLC directing Respondent Hazan and Respondent HCM to pay disgorgement in the amount of $1,500,000, and NYSE Arca, Inc. directing Respondent Hazan and Respondent HCM to pay disgorgement in the amount of $1,500,000, in related actions brought by those self-regulatory organizations, NYSE Amex Disciplinary Proceedings against Steven M. Hazan and Hazan Capital Management, LLC and NYSE Arca Disciplinary Proceedings against Steven M. Hazan and Hazan Capital Management, LLC.

By the Commission.

Elizabeth M. Murphy
Secretary

**Disciplinary Panel**
**American Stock Exchange LLC**

|  |  |
|---|---|
| IN THE MATTER<br>OF<br>SCOTT H. ARENSTEIN<br>AND<br>SBA TRADING, LLC | Case No. 07-71<br>[AMXC07013]<br><br>Hearing Officer – DMF<br><br>**DECISION**<br><br>July 20, 2007 |

> **In accordance with a Stipulation of Facts and Consent to Penalty, the Disciplinary Panel Chair determined that Respondents violated SEC Rules 203(b)(1) and (3), Article V, Sections 4(h) and (i) of the Exchange Constitution, and Exchange Rule 958—ANTE, as stipulated, and as a penalty imposed: (1) a censure against both Respondents; (2) disgorgement of trading profits of $1,400,000 against both Respondents, jointly and severally; (3) a fine in the amount of $3,600,000 against Respondents, jointly and severally; and (4) a five-year suspension from Exchange membership in any capacity and from employment or association in any capacity with an Exchange Member or Member Organization against Respondent Arenstein.**

## I.   Introduction

The American Stock Exchange, LLC (Exchange) instituted a formal disciplinary proceeding against Scott H. Arenstein, a former Member of the Exchange, and SBA Trading, LLC, a former Regular Member Organization of the Exchange. The Disciplinary Panel Chair, presiding without convening a full Disciplinary Panel, pursuant to Article V, Section 1(b) of the Exchange Constitution, held a hearing on July 9, 2007, pursuant to Article V, Section 2 of the Exchange Constitution, to review a Stipulation of Facts and Consent to Penalty (Stipulation), which is attached as Exhibit A. The

Exchange, Arenstein and SBA Trading entered into the Stipulation for the purposes of settling this proceeding and concluding all disciplinary actions by the Exchange against Arenstein and SBA Trading based upon or arising out of the facts set forth in the Stipulation.

## II.     Facts

Arenstein and SBA Trading, without admitting or denying liability, stipulated to the facts set forth in the attached Stipulation. The Chair has determined to accept the facts for purposes of this Decision, and they are incorporated herein.

## III.    Violations

Based on the stipulated facts, the Chair concludes that Respondents Arenstein and SBA Trading violated:

(1) SEC Rule 203(b)(1) and Article V, Sections 4(h) and (i) of the Exchange Constitution in that Respondents, who were not acting as bona fide options market makers, improperly utilized the Reg SHO market maker locate exemption to avoid locating shares prior to effecting short sale transactions in Reg SHO threshold securities, as set forth in paragraphs 3 through 9 and 21 through 24 of the Stipulation;

(2) SEC Rule 203(b)(3) and Article V, Sections 4(h) and (i) of the Exchange Constitution in that Respondents engaged in a series of transactions that circumvented Respondents' delivery obligations in Reg SHO threshold securities that had been allocated to Respondents by their clearing firm, as set forth in paragraphs 10 through 19 and 25 through 29 of the Stipulation; and

(3) Exchange Rule 958—ANTE in that Respondents failed to meet their in-person, on-floor, assigned class and quoting obligations, as set forth in paragraph 9 of the Stipulation.

**IV.   Penalties and Publicity**

The Stipulation proposes that the Chair impose the following penalties on Respondents:  (1) a censure against Arenstein and SBA Trading; (2) disgorgement of $1,400,000 in trading profits resulting from the circumvention of Reg SHO locate and delivery obligations during the period August 2005 through December 2005 against Arenstein and SBA Trading, jointly and severally; (3) a fine in the amount of $3,600,000 against Arenstein and SBA Trading, jointly and severally; and (4) a five-year suspension from Exchange membership in any capacity and from employment or association in any capacity with any Exchange Member or Member Organization against Arenstein.

The Chair carefully reviewed the stipulated facts and considered the statements and representations of the parties during the hearing.  There do not appear to be any directly applicable Exchange Sanction Guidelines, or any closely analogous decisions issued by the Exchange or any other Self Regulatory Organization.  The Chair finds, however, that the proposed penalties are consistent with the General Principles Applicable to All Sanction Determinations and the Principle Considerations in Determining Sanctions set forth in the Exchange's Sanction Guidelines.  In particular, the stipulated facts indicate that Respondents' conduct involved a complex scheme that took place over a period of several months and resulted in very substantial financial gains for Respondents.  The proposed penalties include disgorgement of Respondents' gains, as well as a substantial fine and a lengthy suspension against Respondent Arenstein, which the Chair finds appropriately remedial under the stipulated facts of this case.

Accordingly, the Chair finds that the proposed penalties are appropriate under the facts and circumstances of this case, and therefore they will be imposed.  The Chair

further finds that the results of this disciplinary proceeding should be publicly disclosed, as provided in Rule 12 of the Exchange Rules on Disciplinary Proceedings.[1]

## V.   Conclusion

The Chair accepts the Stipulation of Facts and Consent to Penalty and hereby imposes the following penalties:  (1) a censure against both Respondents; (2) disgorgement of $1,400,000 in trading profits against Respondents, jointly and severally; (3) a fine in the amount of $3,600,000 against Respondents, jointly and severally; and (4) a five-year suspension from Exchange membership in any capacity and from employment or association in any capacity with any Exchange Member or Member Organization against Respondent Arenstein.

**FOR THE DISCIPLINARY PANEL**

David M. FitzGerald
Panel Chair

Copies to:     Scott H. Arenstein (*via overnight and first class mail*)
              SBA Trading, LLC (*via overnight and first class mail*)
              Ted S. Helwig, Esq. (*via facsimile and first class mail*)
              Thomas McCabe, Esq. (*via facsimile and first class mail*)
              Sebastian Krawczyk, Esq. (*electronically and via first class mail*)
              Arlene Collins-Day (*electronically and via first class mail*)

---

[1] Rule 12 exempts from publicity those cases in which the Panel finds that the offense "related solely to minor administrative requirements of the Exchange and does not materially affect the public interest or the interest of investors."  That exemption does not apply to the facts of this case.

Exhibit A

DISCIPLINARY PANEL
AMERICAN STOCK EXCHANGE LLC

RECEIVED

JUN 2 0 2007

OFFICE OF HEARING OFFICERS

IN THE MATTER
OF
SCOTT H. ARENSTEIN and
SBA TRADING, LLC

STIPULATION OF FACTS AND
CONSENT TO PENALTY
Amex Case No. 07-71

This proceeding was instituted by the American Stock Exchange LLC ("Amex" or the

"Exchange") against SCOTT H. ARENSTEIN ("Arenstein") (CRD No. 2372520), a

former Member of the Exchange and SBA TRADING, LLC ("SBA Trading" or the

"Firm") (CRD No. 44717), a former Regular Member Organization of the Exchange

(collectively "Respondents"). This Stipulation of Facts and Consent to Penalty

("Stipulation") is entered into with Respondents pursuant to Article V, Section 2 of the

Exchange Constitution in order to settle and conclude all disciplinary actions by the

Exchange against Respondents based upon or arising out of the facts hereinafter

stipulated. Respondents, without admitting or denying the facts, allegations and

conclusions contained in this Stipulation, hereby consent to the entry of findings of

violations of the federal securities laws and rules and regulations thereunder, the

Exchange Constitution and Rules, and the imposition of the penalties hereinafter

provided. Respondents understand that this settlement is subject to approval by an

Exchange Disciplinary Panel and can be the subject of review by the Amex Adjudicatory

Council and that, if so approved, shall constitute a final decision, which may not be

appealed by the parties. Respondents understand and acknowledge that the Disciplinary

Panel's decision in this matter will become part of their disciplinary records and may be considered in any future proceeding brought by the Exchange.

## STIPULATED FACTS:

### Background and Jurisdiction

1. During all relevant periods herein, SBA Trading, a New York limited liability company, was a duly registered broker-dealer with the Securities and Exchange Commission ("SEC") and a Regular Member Organization of the Exchange. SBA Trading subsequently filed a Form BDW requesting withdrawal of the firm's broker-dealer registration and terminated its Exchange membership effective July 31, 2006. Jurisdiction was retained over SBA Trading in accordance with Article V, Section 6 of the Exchange Constitution, by a letter delivered via certified mail/return receipt requested dated July 31, 2006.

2. During all relevant periods herein, Arenstein was a Regular Member of the Exchange and a Managing Member of SBA Trading. Arenstein subsequently terminated his Exchange membership effective July 31, 2006. Jurisdiction was retained over Arenstein in accordance with Article V, Section 6 of the Exchange Constitution, by a letter delivered via certified mail/return receipt request dated July 31, 2006.

### Respondents Failure to Locate Shares Prior to Effecting Short Sale Transactions

3. During all relevant periods herein, Regulation SHO[1] ("Reg SHO") required market participants to locate shares to borrow[2] prior to effecting a short sale transaction. However, pursuant to an exemption in Reg SHO, market makers engaged in bona-fide market making activities[3] in a particular security are exempt from the locate requirements applicable to other market participants. Options market markers in equity options are exempt from the locate requirements of Reg SHO when selling the underlying equity short, provided that such short sales hedge options positions established during the course of bona fide options market making activity.[4]

---

[1] Securities Exchange Act Release No. 34-50103 (July 28, 2004) 69 FR 48008 (August 6, 2004) ("Reg SHO Adopting Release"). Reg SHO was adopted to update short sale regulation in light of numerous market developments since short sale regulation was first adopted in 1938. One of the goals of Reg SHO was to address problems associated with failures to deliver, including potentially abusive "naked" short selling, by establishing uniform "locate" and "close-out" requirements. Division of Market Regulation: Key Points About Regulation SHO (April 11, 2005).

[2] "Locating shares" requires a market participant to, prior to effecting a short sale in any equity security, borrow the security, enter into an arrangement to borrow the security, or have reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due.

[3] In the Reg SHO Adopting Release, the SEC provided guidance on bona-fide market making activities. Specifically, the SEC stated, "...bona-fide market making does not include transactions whereby a market maker enters into an arrangement with another broker-dealer or customer in an attempt to use the market maker's exception for the purpose of avoiding compliance with Rule 203(b)(1) by the other broker-dealer or customer" [footnote omitted]. 69 FR 48008, 48015 (August 6, 2004).

[4] See Section 3(a)(38) of the Securities Exchange Act of 1934 ("Exchange Act"), Rules 203(b)(2)(iii) and 11a1-3(T) thereunder, and the Reg SHO Adopting Release.

2

4. During   the period August 2005 through December 2005, Respondents engaged in transactions known as "reverse conversions" [5] with purchasers of Reg SHO threshold securities.[6]

5.   In a typical reverse conversion transaction during the relevant period, a floor broker acting as agent for a purchaser of stock in a Reg SHO threshold security (the "converter") solicited Respondents to take the other side ("contra side") to a reverse conversion transaction (the "reverser").

6.   The converter, or buyer of the Reg SHO security, also sold call options and bought put options.

7.   Respondents participated in the reverse conversion transactions by taking the contra side of the reverse conversion transaction (i.e., reversing against the conversion). Respondents sold short shares of a Reg SHO threshold security, bought call options and sold put options on the security at a specific hedge ratio[7] equaling the number of shares sold short by the Respondents. Effecting the options component of this transaction eliminated directional risk of the market for the Respondents.[8]

8.   Respondents did not locate or borrow shares of the security in question prior to entering an order to effect the short sale portion of the reverse conversion transaction as required by Reg SHO.

9.   In certain cases, Respondents were not entitled to the Reg SHO market maker exemption from the locate requirements since the short sales were not effected in connection with bona-fide options market making activities.  During the relevant period, Respondent Arenstein was rarely physically present on the floor of the Exchange, and Respondents' options trades were effected from off the Floor of the Exchange, without complying with the applicable Exchange options market maker obligations with respect to the in-person, on-floor, assigned class, and quoting requirements.  Further, Respondents did not maintain regular and continuous two-sided quotations or otherwise hold themselves out as willing to buy and sell securities on a regular or continuous basis in the options overlying the equity securities that were sold short as part of the reverse conversion transactions.  As a result,

---

[5] A reversal or a reverse conversion is a short stock transaction that is tied to a long options combination. The options position creates a "synthetic long position", which carries the essential risk/reward characteristics comparable to the instrument it replicates (i.e., long stock).  A synthetic long position is created by buying a call option and selling a put option with the same strike price and expiration.  The contra side of reversal transaction is called a conversion.  A conversion is a long stock transaction that is tied to a short option combination.  The options position creates a "synthetic short position", which carries the essential risk/reward characteristics comparable to the instrument it replicates (i.e., the short sale of stock).  The synthetic short position is created by selling a call option and buying a put option with the same strike price and expiration.

[6] A "threshold security" is an equity security for which there is an aggregate "fail to deliver" position exceeding the size criteria as set forth in Reg SHO for a period of five consecutive settlement days.

[7] A "hedge ratio", also known by the Greek symbol "delta", is typically defined as the change in price of a call/put option for every one-point move in the price of the underlying security.

[8] Because put sellers hedge their transactions with stock sales and Reg SHO threshold securities are hard-to-borrow, the difficulty in delivering the stock causes the puts to trade at a higher price than the corresponding call options.

Respondents failed to meet the requirements to be classified as a market maker under Sections 3(a)(38) and 11(a) of the Exchange Act, Rule 11a-1 under the Exchange Act and Exchange Rule 958-ANTE. Thus, Respondents' short selling activities in the reverse conversion transactions and certain buy-writes[9] where Respondents were using their locate exemption to provide long stock to another broker-dealer were not related to bona-fide options market making activities and, therefore, Respondents were not entitled to the market maker exemption to the locate rule when selling the stock short.

## Respondents Failure to Close Out Fail to Deliver Positions in Reg SHO Threshold Securities

10. The short sale portion of the reverse conversion transaction resulted in a "fail to deliver position"[10] in the security on the books and records of Respondents' clearing firm.

11. Pursuant to SEC Rule 203(b)(3), Respondents' clearing firm was obligated to immediately close out[11] any fail to deliver positions in a threshold security that lasted for 13 consecutive settlement days by purchasing securities of like kind and quantity ("Reg SHO buy-in"). However, pursuant to SEC Rule 203(b)(3)(iv), a clearing firm is permitted to allocate a portion of the fail to deliver position in the subject threshold security to a broker or dealer based on such broker or dealer's short position and thereby shift the obligation for complying with the mandatory close-out to such broker or dealer that was allocated the fail to deliver position.

12. Respondents' clearing firm routinely notified Respondents of a potential Reg SHO buy-in by sending Respondents a Reg SHO Buy-In Notification via email beginning on or about the 10th day of a fail to deliver position.

13. Respondents did not want their fail to deliver position from the reverse conversion transaction to be bought-in since Respondents or their clearing firm would be forced to make large open market purchases of a Reg SHO threshold security with little or no control as to execution price. Additionally, a buy-in would result in an unhedged synthetic long stock position (long calls and short puts) from the original reversal transaction. This would expose Respondents to directional market risk, which could negatively impact the profit from the reverse conversion transaction.

---

[9] A buy-write is a combination transaction in which stock is purchased and an equivalent number of calls are sold (written) and executed simultaneously.
[10] A "fail to deliver" position exists when there has been no delivery of the borrowed shares.
[11] A "close out" of a short position involves the purchase of an equivalent number of shares to reduce the short position to zero.

14. In order to avoid being bought-in Respondents entered into a series of transactions that circumvented Respondents' obligation to actually deliver securities to close out their short position pursuant to Reg SHO. Specifically, Respondents, utilizing the services of a floor broker, executed a series of complex transactions that appeared to close out their fail to deliver position by purchasing securities of like kind and quantity.

15. In an example of one type of such a transaction[12], Respondents executed a buy-write using a one-day FLEX option[13] that had the effect of temporarily resetting the buy-in date. In the transaction, Respondents bought stock from another Exchange "market maker" ("buy-write contra party")[14] and simultaneously sold (wrote) one-day, deep in-the-money FLEX call options[15] for a corresponding number of shares to the same "market maker."[16] Respondents' clearing firm reflected the transaction in Respondents' account on the clearing firm's books and records.

16. The following day, the one-day FLEX call options[17] expired in-the-money and Respondents, who wrote the FLEX call options, were assigned an exercise notice to deliver the stock. Respondents then used the purported "long" stock[18] they had purchased in the buy-write the previous day, to satisfy this exercise notice. Respondents, however, had not received delivery of long stock from the buy-write contra party. Accordingly, shares were not delivered to close out the short position that was established during the initial reversal transaction. Based on the execution of the FLEX call option transactions, Respondents' clearing firm reset Respondents' Reg SHO close-out obligation to Day 1.

17. Respondents repeatedly engaged in these or other types of transactions after receiving a Reg SHO Buy-In Notification from their clearing firm and these transactions caused the buy-in date to be reset. These transactions were executed approximately every 13 settlement days until the options positions either expired or were closed out. This course of conduct enabled Respondents to maintain impermissible short positions in a number of Reg SHO threshold securities for extended periods of time.

---

[12] Respondents utilized a variety of different types of transactions to circumvent their delivery obligations under Reg SHO. Examples of other types of transactions utilized by Respondents include, without limitation, married puts and two-day FLEX options.

[13] A FLEX option is an exchange traded equity or index option, that enables an investor to specify within certain limits, the terms of the options, such as exercise price, expiration date, exercise type, and settlement calculation.

[14] Respondents generally bought stock from other market makers that were also selling short hard to borrow Reg SHO threshold securities and utilizing the market maker exemption from the Reg SHO locate requirements.

[15] A "deep-in-the-money call option" is where the market price of a security is well above the strike price of the option.

[16] Because the payment received by the other "market maker" is generally less than the interest payment that such "market maker" could have received by lending the same number of shares, Respondents should have been reasonably able to infer that such "market maker" selling stock within the buy-write transaction was also short stock.

[17] By setting the FLEX option to be a "one day" option, it meant the option would expire the next day.

[18] While Respondents appeared to have purchased stock on the books and records of Respondents' clearing firm, the counterparty to the buy-write did not deliver stock to Respondents.

18. Respondents' buy-write transactions described above, which circumvented the delivery requirements of Reg SHO, were in violation of Rule 203(b)(3) of Reg SHO.[19]

19. In addition to buying stock in the buy-write transactions that circumvented Respondents' Reg SHO delivery obligations, Respondents also acted as counterparties to buy-write transactions for other Exchange "market makers." Specifically, Respondents would sell short shares of threshold securities and buy one-day, deep-in-the-money FLEX call options which allowed such "market makers" to circumvent their Reg SHO delivery obligations in threshold securities for extended periods of time. Respondents' conduct in acting as a counterparty to buy-write transactions for other Exchange "market makers" was in violation of Rule 203(b)(3) of Reg SHO.

**Example of Respondents' Trading Activity**

20. Although the manner of effecting the reverse conversion transaction, as well as the close-out transactions varied depending on the particular transaction, the following example is representative of Respondents' actions that circumvented the Reg SHO locate and delivery obligations.

21. On Trade Date, Floor Broker A, acting as agent for Entity B purchasing shares of ABCD, a Reg SHO threshold security, solicited Respondents to be the contra party to a reverse conversion transaction. In the transaction, Respondents bought ABCD calls, sold ABCD puts and sold short ABCD shares without first locating ABCD stock as required by Reg SHO. Entity B appeared to have received purported "long" stock by executing the conversion side of the transaction. Specifically, Entity B sold ABCD calls, bought ABCD puts and bought ABCD shares. The transaction is summarized below:

| | Respondents – Reversal Transaction | Entity B – Conversion Transaction |
|---|---|---|
| Trade Date | SBA buys 950 ABCD Dec 45 calls @ 3.70. | Entity B sells 950 ABCD Dec 45 calls @ 3.70. |
| Trade Date | SBA sells 950 ABCD Dec 45 puts @ 6.40. | Entity B buys 950 ABCD Dec 45 puts @ 6.40. |
| Trade Date | SBA sells short 95,000 shares of ABCD @ 43.70. | Entity B buys 95,000 shares of ABCD @ 43.70. |

22. The sale of the December 45 puts and the purchase of the December 45 calls by the Respondents created a synthetic long position. The sale of ABCD shares by Respondents created a short position. The overall reversal transaction was delta neutral[20] for the Respondents because the synthetic long options position was hedged against the short stock position, effectively eliminating market risk for the Respondents.

---

[19] Reg SHO prohibits a broker-dealer from "entering into an arrangement with a counterparty to purchase securities for purposes of closing out a failure to deliver position and the broker-dealer knows or has reason to know that the counterparty will not deliver the securities, and which thus creates another failure to deliver position" [footnote omitted]. Securities Exchange Act Release No.34-54154 (July 14, 2006) 71 FR 41709, 41711 n.13 (July 21, 2006).

[20] Since delta measures the exposure of a derivative to changes in the value of the underlying, a portfolio that is delta neutral is effectively hedged. That is, its overall value will not change for small changes in the price of its underlying instrument.

23. In the reversal transaction described above, Respondents received $2.70 on the execution of the options combination.[21] Respondents paid $1.30 on the execution of the short stock related to the $45 strike price of the options combination.[22] In sum, Respondents received $1.40 per contract on this reverse conversion transaction.[23]

24. Since Respondents did not locate or borrow shares of ABCD prior to effecting the short sale, Respondents created a fail to deliver position in the Respondents' account on the books and records of Respondents' clearing firm.

25. Ten settlement days after the initial reverse conversion transaction, Respondents received a Regulation SHO Buy-In Notification from their clearing firm for 98,500 shares of ABCD, which Respondents had failed to deliver for 10 days. Respondents thereafter contacted Floor Broker A to solicit a contra party ("Contra party C") to engage in a buy-write transaction in order to satisfy Respondents' Reg SHO close-out obligation. Floor Broker A brokered a transaction in which Respondents bought 98,500 shares of ABCD from Contra party C, an Exchange market maker who sold short such stock, and simultaneously sold (wrote) 985 one-day, 1 strike ABCD FLEX call options to Contra party C.

26. Shortly thereafter, Respondents' clearing firm reflected this transaction in the Respondents' account and reduced Respondents' short position by the amount of the purchase on the clearing firm's books and records.

27. The following day, the 985 one-day 1 strike ABCD FLEX call options sold by the Respondents, expired in-the-money and Respondents were assigned and required to deliver the shares they bought the previous day. As a result of the transaction, Respondents reestablished their previous short position and the fail to deliver position was reset to Day 1 on the books and records of Respondents' clearing firm. The buy-write transaction is summarized below:

### Buy – Write Transaction

| | |
|---|---|
| Trade Date + 10 | SBA receives a Regulation SHO Buy-In Notification for 98,500 shares of ABCD, which has failed to deliver for 10 days. |
| Trade Date + 13 | SBA sells 985 ABCD Oct 1 calls (next day settlement) @ 37.50. |
| Trade Date + 13 | SBA buys 98,500 shares of ABCD common stock @ 38.53. |
| Trade Date + 14 | SBA is assigned 985 ABCD Oct 1 calls, causing the appearance of delivery of 98,500 shares of ABCD. |

28. Respondents' reestablished fail to deliver position continued to age on the books and records of Respondents' clearing firm. After approximately 10 days, Respondents

---

[21] Respondents received: $6.40 (sell puts) – $3.70 (buy calls) = $2.70.
[22] Respondents paid: $45.00 (strike price) - $43.70 (short sale) = $1.30.
[23] Respondents received: $2.70 - $1.30 = $1.40 per contract. Generally, in a security that is not a Reg SHO threshold security, the Respondent would have to pay to reverse as opposed to receiving payment as is the case in hard-to-borrow securities such as in this example. The amount that Respondents' received does not take into account certain fees such as transaction costs and clearance fees.

once again received a Reg SHO Buy-In Notification from their clearing firm for 98,500 shares of ABCD. Respondents again engaged in a transaction that was identical or similar to the transaction described above in paragraphs 25 through 27. Respondents repeated this process to reset their Reg SHO obligation periodically until the options positions in the reversal transaction expired.

29. Specifically, on the options expiration date, ABCD closed at 36.76. As a result, the 950 ABCD Dec 45 calls expired worthless and the 950 ABCD Dec 45 puts expired at parity[24] with the short stock position.

30. Respondents received $1.40 per contract on 950 contracts which represent 100 shares of stock each for a total realized gross profit on this transaction of approximately $133,000. Respondents effectively locked in $1.40 per contract at the time the reversal transaction was executed and at no point were Respondents subject to market risk based on the directional movement of the underlying ABCD stock. If the price of ABCD moved down, Respondents covered the ABCD short stock when they were assigned on the ABCD puts that Respondents sold in the reversal transaction. If the price of ABCD moved up, Respondents covered the ABCD short stock position by exercising the ABCD calls that Respondents bought in the reversal transaction. In either scenario, Respondents would lose $1.30 on this portion of the transaction. This loss was offset by the $2.70 that Respondents initially received when they effected the options portion of the reversal transaction.

31. During the period August 2005 through December 2005, the Respondents engaged in a total of 22 reverse conversion transactions in ABCD for a total profit of approximately $1.4 million.


**CONCLUSION:**

By reason of the foregoing Stipulated Facts, a Disciplinary Panel may conclude that:

32. Respondents violated SEC Rule 203(b)(1) and Article V, Sections 4(h) and (i) of the Exchange Constitution in that Respondents, who were not acting as bona-fide options market makers, improperly utilized the Reg SHO market maker locate exemption to avoid locating shares prior to effecting short sale transactions in Reg SHO threshold securities, as set forth in paragraphs 3 through 9 and 21 through 24.

33. Respondents violated SEC Rule 203(b)(3) and Article V, Sections 4(h) and (i) of the Exchange Constitution in that Respondents engaged in a series of transactions that circumvented Respondents' delivery obligations in Reg SHO threshold securities that had been allocated to the Respondents by their clearing firm, as set forth in paragraphs 10 through 19 and 25 through 29.

---

[24] The intrinsic value of the put was equal to the difference between the stock price and the exercise price of the option.

8

34. Respondents violated Exchange Rule 958 – ANTE in that Respondents failed to meet their in-person, on-floor, assigned class and quoting obligations, as set forth in paragraph 9.

**DISCIPLINARY ACTION:**

By reason of the foregoing Stipulated Facts, a Disciplinary Panel may impose the following penalties:

(a)     a censure against Arenstein and SBA Trading;

(b)     a disgorgement to be paid jointly and severally by Arenstein and SBA Trading of $1,400,000 in trading profits resulting from the circumvention of Reg SHO locate and delivery obligations in connection with trading in ABCD during the period August 2005 through December 2005;

(c)     a fine in the amount of $3,600,000 to be paid jointly and severally by Arenstein and SBA Trading; and

(d)     a suspension against Arenstein from Exchange membership in any capacity and employment or association in any capacity with an Exchange Member or Member Organization for a period of five years.

Arenstein understands that if he is suspended from association with any Exchange Member or Member Organization, he becomes subject to a statutory disqualification as that term is defined in Section 3(a)(39) of the Securities Exchange Act of 1934, as amended.  Accordingly, Arenstein understands that he may not be associated with any Exchange Member or Member Organization in any capacity, including clerical or ministerial functions, during the period of the suspension.

9

Arenstein and SBA Trading hereby acknowledge that they have carefully read this Stipulation and understand all of the provisions contained herein and that Arenstein and SBA Trading have agreed to its provisions voluntarily.

Further, Arenstein and SBA Trading agree that they may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this Stipulation or create the impression that the Stipulation is without factual basis.  Nothing in this provision affects Arenstein and SBA Trading's testimonial obligations or right to take legal or factual positions in litigation or other legal proceedings in which the Exchange is not a party.

Finally, it is understood and agreed that in any written submission to or proceeding before any person or body convened to consider this Stipulation (including, but not limited to, a Hearing Officer acting alone, a Hearing Panel, or any reviewing body authorized by the Exchange Constitution and/or Rules), neither Enforcement nor Respondents shall offer any argument that is inconsistent with the stipulated facts or the agreed-upon penalty, nor shall any party ask for the imposition of any penalty other than that agreed upon in this Stipulation.

ON BEHALF OF
AMERICAN STOCK EXCHANGE LLC

By: *Claudia Crowley*

Claudia Crowley
Senior Vice President
Chief Regulatory Officer
American Stock Exchange LLC

SCOTT H. ARENSTEIN

Agreed to this _22nd_ day of _June_ , 2007

SBA TRADING, LLC

By: _____

Name: _Scott Arenstein_

Title: _Manag ments_

Agreed to this _22nd_ day of _June_ , 2007.

11