Exhibit E



U.S. Securities and Exchange Commission

# Office of Inspector General

Office of Audits

# Practices Related to Naked Short Selling Complaints and Referrals



**March 18, 2009**
**Report No. 450**



OFF CE OF
INSPECTOR GENERAL

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549**

# MEMORANDUM

March 18, 2009

**To:** George Curtis, Deputy Director, Division of Enforcement
Scott Friestad, Deputy Director, Division of Enforcement

**From:** H. David Kotz, Inspector General, Office of Inspector General

**Subject:** *Practices Related to Naked Short Selling Complaints and Referrals,*
Report No. 450

This memorandum transmits the U.S. Securities and Exchange Commission
Office of Inspector General's (OIG) final report detailing the results of our audit
on the Division of Enforcement's policies, procedures and practices for
processing complaints about naked short selling. The audit was conducted by
the OIG as part of our continuous effort to assess the management of the
Commission's programs and operations and was based on our audit plan.

The final report contains 11 recommendations which if implemented, will
strengthen controls over naked short selling complaints. The Division of
Enforcement concurred with one recommendation and did not concur with the
remaining 10 recommendations the OIG identified in our report.

Should you have any questions regarding this report, please do not hesitate to
contact me. We appreciate the courtesy and cooperation that you and your staff
extended to our auditor during this audit.

Attachment

cc:    Kayla J. Gillan, Deputy Chief of Staff, Office of the Chairman
Diego Ruiz, Executive Director, Office of the Executive Director
Joan McKown, Chief Counsel, Division of Enforcement
Darlene L. Pryor, Management Analyst, Office of the Executive Director

Richard J. Hillman, Managing Director, Financial Markets and Community
Investment, Government Accountability Office

# Practices Related to Naked Short Selling Complaints and Referrals

## Executive Summary

### Background

The Securities and Exchange Commission's (SEC or Commission) Division of Enforcement (Enforcement) has received a great deal of complaints and related information during the past several years from issuers and investors about a type of trading called "naked" short selling, which has become an issue of increasing concern to both issuers of securities and investors.[1]  Some of the complaints received by Enforcement concerned the general impact of naked short selling on the market.  Many complaints requested that Enforcement investigate specific instances of naked short selling.  Other complaints concerned the perceived failure on the part of the Commission and others, including Enforcement, to address the harmful effects of naked short selling.

The SEC's Office of Inspector General (OIG) has also received numerous complaints, particularly since December 2007, alleging that Enforcement has failed to take sufficient action regarding naked short selling.  Many of these complaints asserted that investors and companies lost billions of dollars because Enforcement has not taken sufficient action against naked short selling practices.  These complaints further indicated a lack of confidence on the part of some members of the public in Enforcement's ability to protect investors.

Naked short selling has been a controversial practice for several years and, while not illegal per se, abusive or manipulative naked short selling (e.g., intentionally failing to borrow and deliver shares sold short in order to drive down the stock price) violates the federal securities laws.  The Commission initially responded to concerns about abusive naked short selling in 2004 by adopting a short sale regulation, Regulation SHO, that included provisions specifically designed to address naked short selling.[2]  The recent financial crisis, including claims that aggressive short selling played a role in the failure of Lehman Brothers in September 2008, renewed the public's concerns about naked short selling.  From July through October 2008, the Commission undertook a number of measures, including emergency orders temporarily restricting short selling in the stock of certain financial companies and adopting amendments to Regulation SHO, that

---

[1]  Naked short selling involves a practice whereby short sellers of securities do not borrow securities in time to make delivery to the buyer within the standard three-day settlement period.  See infra pp. 6-7 for additional explanation.

[2]  See infra pp. 9-11 for additional discussion of Regulation SHO.

were designed to prevent abusive naked short selling and restore investor confidence in the markets.[3]

Because Enforcement does not have separate procedures and processes for handling complaints about naked short selling, our audit examined Enforcement's general complaint receipt and processing procedures as they applied to the receipt and referral of naked short selling complaints.

## Objectives

The OIG received numerous complaints alleging that Enforcement failed to take sufficient action regarding naked short selling. Many of these complaints asserted that investors and companies lost billions of dollars because Enforcement has not taken sufficient action against naked short selling practices.

In light of these complaints and based on our audit plan, we conducted an audit to assess whether Enforcement:

1. Established policies and guidelines that enabled Enforcement to respond appropriately to complaints and referrals, including those involving naked short selling; and

2. Followed existing policies and procedures for responding to complaints and referrals, including those pertaining to naked short selling.

We also followed up on the status of pertinent findings and recommendations contained in a prior OIG report, and we reviewed a Government Accountability Office (GAO) report related to Enforcement's policies and procedures for complaints and referrals.[4] Additionally, we coordinated our audit efforts with the GAO, which has an ongoing review of the implementation of the Commission's short sale regulation, Regulation SHO. Specifically, the GAO is studying the:

1. Extent to which Regulation SHO has reduced the number of failures to deliver of stocks that might impact the market for these securities;

2. SEC's oversight of the clearing and settlement processes for securities trades, particularly for identifying and addressing failures to deliver; and

---

[3]  See infra pp. 11-14 for additional discussion of these emergency orders and amendments.
[4]  These reports are SEC OIG Audit No. 352, Enforcement Internet Program, January 13, 2003, and GAO-08-33, Securities and Exchange Commission: Opportunities Exist to Improve Oversight of Self-Regulatory Organizations, November 15, 2007. During the previous OIG audit, we were informed that Enforcement's Office of Internet Enforcement was about to implement a database to track referrals of complaints for further investigation. During the current audit, however, we found that Enforcement is no longer using this database. See infra Finding 6. The prior GAO audit found that Enforcement's system for receiving and tracking referrals from the Self-Regulatory Organizations (SRO) needed improvements and recommended enhancements that would facilitate the monitoring and analysis of trend information and case activities. Enforcement's Office of Market Surveillance informed us that it has requested enhancements for the SRO referral tracking system that are pending. We found no prior GAO or OIG reports specifically related to processing naked short selling complaints.

3. Efforts made by the SEC and Self-Regulatory Organizations (SROs) to enforce compliance with Regulation SHO in connection with abusive short selling.

## Results

Our audit disclosed that despite the tremendous amount of attention the practice of naked short selling has generated in recent years, Enforcement has brought very few enforcement actions based on conduct involving abusive or manipulative naked short selling.  We also found that Enforcement generally received complaints, including naked short selling complaints, by one of three methods:

1. E-mail complaints received by the Enforcement Complaint Center (ECC) within the Office of Internet Enforcement (OIE);

2. Complaints, Tips and Referrals (CTR) that are received by Headquarters or Regional Office Enforcement staff outside of normal complaints channels (i.e., the ECC); and

3. Referral of complaints to Enforcement's Office of Market Surveillance (OMS) by SROs, such as the Financial Industry Regulatory Authority (FINRA).[5]

However, during the period of our review we found that few naked short selling complaints were forwarded to Headquarters or Regional Office Enforcement staff for further investigation.  Of approximately 5,000 naked short selling complaints received in the ECC between January 1, 2007 and June 1, 2008, only 123 (approximately 2.5 percent) were forwarded for further investigation.  Moreover, we found that these complaints were forwarded only because the complaint subjects were involved in ongoing Enforcement investigations.  None of the forwarded complaints resulted in enforcement actions, though one of the complaints referenced a pending enforcement action involving naked short selling.  Furthermore, only six of the approximately 1,900 complaints entered into Enforcement's CTR database during the period we examined, alleged naked short selling.  Based on the data available to us, these complaints led to no enforcement actions.[6]  Also, we were informed that none of the approximately 900 SRO referrals received by OMS between January 1, 2007 and June 1, 2008 involved naked short selling.

Our audit determined that Enforcement's existing complaint receipt and processing procedures hinder Enforcement's ability to respond effectively to naked short selling complaints and referrals.  We found that the ECC's written

---

[5]  FINRA was formed in July 2007 as a result of the merger of regulatory arms of the National Association of Securities Dealers and the New York Stock Exchange (NYSE).  See infra n.10 for an explanation of the SROs.

[6]  During the audit, we learned that Regional Offices have inconsistent approaches for entering data into the CTR database.  See infra Finding 3.

policies and procedures do not include specific triage[7] steps for naked short selling complaints, while they do include procedures for the in-depth analysis of several other categories of complaints, e.g., spam driven manipulations, unregistered online offerings  and insider trading.  These procedures, we believe, have the effect of naked short selling complaints being treated differently than other types of complaints.

Moreover, the ECC's policies and procedures expressly instruct staff, as a general matter, not to forward for further investigation complaints based on data obtained from "Level II" trading terminals.[8]  Because many investor complaints of naked short selling are based on information obtained from Level II trading screens, no triage is performed on these complaints and they are automatically not forwarded to Enforcement staff, unless they pertain to an existing Enforcement matter.  Our audit also disclosed a risk that naked short selling complaints with potential merit may be eliminated from further consideration during the initial complaint screening process because no supervisory review is performed of the initial screening.

Enforcement maintains that naked short selling complaints are not being treated differently than other types of complaints and that the naked short selling complaints it receives generally do not provide sufficient information to warrant pursuit of the complaint.  Enforcement, therefore, states that it is reluctant to expend additional resources to investigate such complaints and indicated that the high volume of incoming complaints precludes supervisory review of the initial screening of all e-mail complaints.  (Enforcement has indicated, however, that it is willing to perform supervisory sampling and review of complaints that are eliminated at the initial screening stage.)  Given the heightened public and Commission focus on naked short selling and guidance provided to the public leading them to believe these complaints will be taken seriously and appropriately evaluated, we believe the ECC's current policies and procedures should be improved to ensure that naked short selling complaints are addressed appropriately.

Our audit also disclosed that improvements are needed to the CTR process both at Headquarters and the Regional Offices to ensure the appropriate handling of incoming complaints, including those involving naked short selling.  We found that there is currently no uniform set of procedures for the receipt and processing of CTRs and no division-level oversight of the CTR program.  Presently, there are two separate sets of procedures for processing CTRs, one for Headquarters and one for the Regional Offices.  In addition, some Regional Offices also have their own written CTR procedures, while others have informal, unwritten CTR

---

[7]  "Triage" is the process of research and analysis used by OIE staff to determine which investor complaints are likely to be of sufficient interest to Enforcement staff to warrant the opening of an informal inquiry or formal investigation.  See infra pp. 3-4 for additional explanation.

[8]  Level II data shows the best bid (buy) and ask (sell) prices and the number of shares available for every market maker and electronic communications network (ECN).  GAO/GGD-00-61, Securities Operations:  Day Trading Requires Continued Oversight, February 24, 2000.

practices.  We also found that Regional Office procedures are inconsistent as to when and whether complaints are entered into the CTR database.  The lack of uniform procedures and Division-level oversight can lead to the inconsistent treatment of complaints, including those involving naked short selling, depending on where within the Commission the complaint is received.

Moreover, our audit found that neither the Headquarters nor the Regional Offices are complying with the existing written CTR policies and procedures.  We reviewed 82 Headquarters CTR packages for the period from January 1, 2007 to June 1, 2008, to test for compliance with the Headquarters CTR policies and procedures.  According to those procedures, a complaint package should include the original complaint, a copy of the response sent to the complainant and a completed CTR data form.  The majority of the CTR packages we reviewed were incomplete:  Sixty-seven percent (55 of 82) were missing the response to the complainant; forty percent (33 of 82) were missing the CTR data form; and ten percent (8 of 82) were missing the original complaint itself.  We also found that one of these CTRs was not entered into the CTR database, and another CTR was only partially entered.  We learned during our audit that OIE does not follow up with Enforcement staff to ensure the CTR package is complete, resulting in OIE oftentimes lacking adequate documentation of a complaint.

In order to determine compliance with Regional Office CTR procedures, we sent a questionnaire to all 11 Commission Regional Offices.  Existing CTR policies and procedures applicable to the Regional Offices require the performance of monthly reviews of a Regional Office's CTRs by supervisors at the Senior Officer (SES-equivalent) level.  The responses to our questionnaire revealed that, of the 11 Regional Offices, only five Regional Offices performed the required monthly CTR reviews.  Two Regional Offices performed the reviews on a less frequent basis.  Three Regional Offices did not perform the monthly reviews because senior officials were involved with the CTRs throughout the process, or lower level officials were considered to be responsible for CTR judgments.  One Regional Office (which was previously a District Office) forwarded its CTRs to another Regional Office for review.

Our audit also found that Enforcement's current automated complaint tracking systems, primarily the ECC complaint mailbox and the CTR database, require improvements to ensure the appropriate processing and tracking of complaints.  In addition, we learned during our audit that a database previously developed by OIE to track the results of complaint referrals was no longer in use due to technical difficulties encountered with the system.  As a consequence, OIE has no current ability to track electronically which types of complaints referred to Enforcement staff result in the opening of an informal inquiry or a formal investigation.

## Summary of Recommendations

Our audit determined that several improvements are needed to Enforcement's procedures for the receipt and processing of complaints, including those pertaining to naked short selling.

Specifically, our audit determined that the ECC should revise its current written policies and procedures to:

1. Include in-depth triage analysis for naked short selling complaints, similar to the detailed triage steps currently specified for other types of complaints, such as those about spam-driven manipulations and insider trading; and

2. Ensure that investor naked short selling complaints based on information obtained from certain types of less sophisticated computer terminals are given a proper level of scrutiny and referred for further investigation where appropriate.

The audit also found that the ECC should include naked short selling in the categories of complaints listed on the Complaint Center page of the SEC's public website.  In addition, we recommend that the ECC enhance its supervision of the initial screening of complaints to ensure the appropriateness of these important initial decisions about complaints.

Our audit further found that a number of improvements are needed to the Enforcement's CTR program, both at Headquarters and in the Regional Offices. Specifically, the Division should develop uniform written policies and procedures for the CTR program at Headquarters and the Regional Offices and should designate an office or individual at Headquarters to oversee the program on a nationwide basis.  In addition, Enforcement should ensure that CTRs forwarded to OIE contain complete complaint documentation and that Regional Office senior officials perform monthly CTR reviews, as required by existing policies and procedures.

Finally, our audit found that Enforcement should make improvements to its existing information technology systems for the receipt and processing of complaints, primarily the ECC complaint mailbox and the CTR database, to increase their functionality and analytical capabilities.  We are also recommending that OIE update and resume its previously-developed complaint referral tracking system, or develop a new system to track information concerning the results of complaint referrals.

See the Findings and Recommendations section for a detailed discussion of the audit's findings and recommendations.  A detailed list of our recommendations is located in Appendix IV.

# TABLE OF CONTENTS

Executive Summary ................................................................................................... i

Table of Contents ................................................................................................... vii

Background ............................................................................................................... 1

    Overview of the Division of Enforcement ............................................................ 1
    Enforcement's Complaint Process ..................................................................... 2
    The Enforcement Complaint Center ................................................................. 2
    Complaints, Tips and Referrals System ............................................................ 4
    Referrals from the Self-Regulatory Organizations ............................................ 6
    Concerns about Naked Short Selling and the Commission's Response .......... 6
    Short Selling in General .................................................................................... 6
    The Practice of Naked Short Selling ................................................................. 7
    Outside Concerns about the Abusive Effects of Naked Short Selling ............... 8
    The Commission's Views on Naked Short Selling ............................................ 9
    Regulation SHO ............................................................................................... 9
    Recent Emergency Orders and Amendments to Regulation SHO ................. 11
    Enforcement Actions Against Manipulative Naked Short Selling .................... 14
    Receipt and Processing of Complaints about Naked Short Selling ................ 15

Objectives ............................................................................................................. 16

Findings and Recommendations ........................................................................... 18

    Finding 1:  The Enforcement Complaint Center's Policies and Procedures
    Do Not Provide Specific Triage Steps for Naked Short Selling Complaints
    and Appear to Result in These Types of Complaints Not Being Forwarded
    for Further Investigation ................................................................................. 18
        Recommendation 1 ................................................................. 22
        Recommendation 2 ................................................................. 22
        Recommendation 3 ................................................................. 23

    Finding 2: The Enforcement Complaint Center Does Not Perform
    Supervisory Review of Its Initial Screening of Complaints ............................. 23
        Recommendation 4 ................................................................. 24

Finding 3: Enforcement's Procedures for Processing Complaints, Tips and
Referrals Differ and There is Insufficient Division-Level Oversight of the
CTR Program ..................................................................................................25
        Recommendation 5.................................................................................26
        Recommendation 6.................................................................................27

Finding 4: Headquarters and the Regional Offices Do Not Consistently
Follow Existing Complaint, Tips and Referrals Processing Procedures ..........27
Testing of Headquarters CTR Procedures ......................................................27
Questionnaires about Regional Office CTR Policies and Procedures ..............28
        Recommendation 7.................................................................................28
        Recommendation 8.................................................................................28

Finding 5:  Enforcement's Complaint Tracking Systems Need
Improvement ...................................................................................................29
The ECC's Mailbox Functions .........................................................................29
CTR Database Capabilities ..............................................................................30
        Recommendation 9.................................................................................30
        Recommendation 10...............................................................................31

Finding 6:  The Office of Internet Enforcement Does Not Track the Results
of Referrals of Complaints................................................................................31
        Recommendation 11...............................................................................32

Appendices
    Appendix I:   Abbreviations and Acronyms....................................................33
    Appendix II:  Scope and Methodology...........................................................34
    Appendix III: Criteria......................................................................................36
    Appendix IV: List of Recommendations .........................................................38
    Appendix V:  Management Comments...........................................................40
    Appendix VI: OIG Response to Management Comments ...............................44

# Background and Objectives

## Background

### Overview of the Division of Enforcement

The U.S. Securities and Exchange Commission's (SEC or Commission) Division of Enforcement (Enforcement) is responsible for overseeing the Commission's enforcement activities at the SEC's Headquarters located in Washington, D.C. and 11 Regional Offices located throughout the country.  The Enforcement staff conducts investigations into possible violations of the federal securities laws, and prosecutes the Commission's civil suits in the federal courts, as well as its administrative proceedings before administrative law judges and the Commission itself.[9]

Enforcement receives information on potential securities law violations from a variety of sources, including:

- Members of the public;
- Press articles;
- Self-Regulatory Organizations (SROs)[10]; and
- Other Commission Divisions and Offices.

In addition, Enforcement's Office of Market Surveillance (OMS)[11] proactively conducts surveillance of the markets and develops leads to identify potential securities law violations.

---

[9] About the Division of Enforcement, http://www.sec.gov/divisions/enforce/about.htm.  In civil suits, the Commission seeks injunctions (orders prohibiting future violations), civil monetary penalties and the disgorgement of illegal profits.  Id.  The courts may also bar or suspend individuals from acting as corporate directors or officers.  Id.  The Commission can bring a variety of administrative proceedings seeking different types of remedies, including cease and desist orders, disgorgement and the payment of civil penalties, the revocation or suspension or registration, and bars or suspensions from employment.  Id.

[10] An SRO is a membership-based organization that creates and enforces rules for its members based on the federal securities laws, and is the frontline in regulating broker-dealers.  Division of Market Regulation:  Key Points About Regulation SHO, http://www.sec.gov/spotlight/keyregshoissues.htm, April 11, 2005, at n.11.  The SROs include, among others, the national securities exchanges and securities associations registered with the SEC, such as the Financial Industry Regulatory Authority (FINRA), which was formed in July 2007 through a merger of the regulatory arms of the NYSE and the NASD.  GAO-08-33, Securities and Exchange Commission:  Opportunities Exist to Improve Oversight of Self-Regulatory Organizations, at 1.  The SROs are responsible for conducting surveillance of the trading activity on their markets.  Id. at 8.

Enforcement staff performs preliminary research to determine if further investigation would be appropriate. This research generally includes reviewing information in Enforcement databases for prior or current enforcement activity, as well as sources such as LEXIS and SEC filings. Enforcement staff may also research related news articles and stock trading information.

Based on this research, Enforcement staff at Headquarters and the Regional Offices may open an informal inquiry, which is initially referred to as a "Matter Under Inquiry," or "MUI." Generally, MUIs are approved at the Associate Director level at Headquarters and at the Associate Regional Director level in the Regional Offices. Enforcement staff may also recommend that the Commission order a formal investigation into a matter. In addition, Enforcement refers evidence of violations of the criminal laws to the Department of Justice for prosecution.

### Enforcement's Complaint Process

**The Enforcement Complaint Center.** Enforcement receives the majority of public complaints through its Enforcement Complaint Center (ECC). The ECC is located within Enforcement's Office of Internet Enforcement (OIE).[12] The ECC is an important source of investigative leads for Enforcement, and complaints sent to the ECC have led to criminal arrests, trading suspensions, temporary restraining orders, as well as civil enforcement cases.[13] The ECC is staffed by four members of the OIE, including three attorneys and a program analyst, who screen incoming complaints and then forward them to Headquarters or Regional Office Enforcement attorneys for further investigation.

The ECC receives complaints both through online complaint forms, available on the SEC's website at www.sec.gov/complaint.shtml (which the ECC staff receive in e-mail form), and an electronic mail box accessible via the Internet e-mail address, enforcement@sec.gov.[14] The Commission's website instructs the public to report a potential violation of the securities laws directly to enforcement@sec.gov, and not to use this e-mail box for general comments or questions.[15] The website also instructs the public to forward investment-related spam e-mails to enforcement@sec.gov.[16] In addition, complaints may be

---

[11] OMS receives advisories (information on suspicious trading activity) and referrals of possible securities law violations from the SROs, which may lead to investigations and enforcement actions. Id. at 6.

[12] The OIE was created in 1998 as a specialized unit designed to combat securities fraud occurring over the Internet. SEC Press Release 98-69, SEC Creates Office of Internet Enforcement to Battle Online Securities Fraud, July 28, 1998, http://www.sec.gov/es/press/pressarchive/1998/98-69.txt.

[13] Memorandum Re: Enforcement Complaint Center/How To, September 17, 2007, at 1.

[14] Id.

[15] SEC Center for Complaints and Enforcement Tips, http://www.sec.gov/complaint.shtml.

[16] Id.

submitted to the SEC Complaint Center by fax or mail.[17]  The SEC's website also informs potential complainants: "We thoroughly review and evaluate your information so that we may refer to the appropriate SEC office."[18]  In addition, potential complainants are informed that "[a]ttorneys in the Enforcement evaluate information and tips concerning violations of the federal securities laws."[19]

According to ECC information available as of 2007, the ECC typically received between 5,000 and 7,000 e-mail complaints per day.[20]  The number of complaints received in the ECC greatly increased beginning with the Enron accounting scandal in the fall of 2001.[21]  While the number of complaints per day subsequently began to level off, the "fluctuations in complaint volume typically depend on the SEC's profile in the news."[22]  Based on information the Office of Inspector General (OIG) obtained from Enforcement, we found that the ECC received approximately 1.38 million complaints via e-mail from January 1, 2007 to June 1, 2008, which were handled by a staff of four persons.

After complaints are received in the ECC, they go through a three-step process. First, an initial coordinator review is conducted on the morning of each business day "to cull out a) extraneous e-mails not involving securities matters; and b) large-scale spam (10, 20, 50 or more) involving pending investigations of which the coordinator is aware."[23]  Also, at this initial stage, to the extent possible, certain "consumer" matters, i.e., investors' private disputes with brokers -- are sent to the Office of Investor Education and Advocacy (OIEA) for review.[24]

Second, a second-level coordinator review is conducted on the remaining complaints to determine if they:

- Relate to pending investigations;
- Describe conduct better handled by OIEA;
- Relate to situations more appropriately handled by other agencies; or
- Should be sent to state regulators.[25]

Third, complaints that remain after the first and second level reviews are forwarded to OIE staff every ten days to conduct a "triage."[26]  Triage is "the

---

[17] Id.

[18] Id.

[19] Id.

[20] Memorandum Re: Enforcement Complaint Center/How To, September 17, 2007, at 1.

[21] Id.

[22] Id. at 1 n.1.

[23] Id. at 3.

[24] OIEA is a separate office within the Commission that handles certain general questions about the securities laws, as sell as "complaints relating to financial professionals or a complainant's personal financial matters."  SEC Center for Complaints and Enforcement Tips, http://www.sec.gov/complaint.shtml, at 2.  OIEA also has an online complaint form for use by investors.  See Investor Information, http://www.sec.gov/investor.shtml.

[25] Memorandum Re: Enforcement Complaint Center/How To, September 17, 2007, at 3.

[26] Id.

process of research and analysis used to determine if an incoming investor complaint is likely to trigger sufficient staff interest to entail the opening of" a MUI or formal investigation.[27]   Essentially, "it is a series of steps designed to assess what type of wrongdoing is being alleged, what the market impact of that wrongdoing is, who may be involved in the conduct, and who the most appropriate persons are to look into that conduct."[28]

The triage process includes obtaining information pertinent to a complaint from a variety of public and internal sources.  OIE staff are provided with guidance on the basic tools of triage generally and are instructed how to perform in-depth analysis of specific types of complaints, such as spam-driven manipulations, unregistered online offerings and insider trading.[29]  If, after the triage process, the OIE staff determines that a referral is warranted, he or she prepares a referral memorandum forwarding the complaint to investigative staff located at Headquarters or a Regional Office.[30]  Under the ECC's procedures, complaints pertaining to existing Enforcement matters are always forwarded to the Enforcement attorneys working on those matters.[31]

**Complaints, Tips and Referrals System.**  In addition to complaints received through the ECC, Enforcement receives complaints that do not come through normal complaint channels, such as the ECC.  These include complaints received by Headquarters or Regional Office staff from a member of the public via letter, e-mail, telephone, walk-in, or otherwise.[32]  These complaints are referred to as complaints, tips and referrals or "CTRs."

The Commission implemented the CTR system in 2005 to improve record-keeping and follow-up for complaints.[33]   CTRs received by Enforcement Headquarters staff, as well as CTRs that Enforcement occasionally receives from another Commission Division or Office, are collected in a CTR database maintained by OIE staff.[34]  Copies of CTR reports are also maintained within OIE in certain Outlook folders that have been set aside for this purpose.[35]  In addition,

---

[27] Memorandum Re:  Review of ECC Triage Guidelines/Procedures, September 17, 2007, at 1.
[28] Id.
[29] Id. at 1-9.
[30] Memorandum Re:  Enforcement Complaint Center/How To, September 17, 2007, at 11.
[31] Id. at 7.
[32] Home Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated October 6, 2005;  Field Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated September 1, 2005.
[33] According to Enforcement, the CTR computer database remains a "temporary" system that is being used until modifications are completed on a new replacement system that Enforcement anticipates launching.  In addition, the Chairman recently announced that the Commission has enlisted a contractor to conduct a comprehensive review of internal procedures used to evaluate tips, complaints, and referrals for the entire agency.  SEC Press Release No. 2009-44, SEC Revamping Process for  Reviewing Whistleblower Complaints and Enforcement Tips, March 5, 2009, http://www.sec.gov/news/press/2009/2009-44.htm.
[34] Memorandum Re:  Enforcement Complaint Center/How To, September 17, 2007, at 12.  The Office of Information Technology developed this database for OIE in 2005.
[35] Id.

each Regional Office maintains its own complaint information on the CTR database.

Enforcement has separate written procedures for CTRs received by Headquarters staff and those received by Regional Office staff.  Headquarters staff are instructed to perform the review, research and analysis steps deemed appropriate by their branch, and to forward the CTR to or consult with supervisory staff as appropriate.[36]  Staff are instructed to ensure that a response is sent whenever the staff are not planning to contact the complainant for further information.[37]  The procedures also advise staff that if the CTR describes potential violations of the federal securities laws remediable by enforcement action, they should complete a CTR form and forward it to OIE.[38]  The procedures further provide guidance on certain types of CTRs that should be sent expeditiously, e.g., whistleblower complaints, allegations made by the directors, officers or counsel of public companies or accounting firms, credible, documented allegations of material fraud on the securities markets, etc.[39]  Finally, the procedures specify that certain types of matters should NOT be forwarded to OIE, including consumer matters that should be forwarded to OIEA, non-securities-related matters, etc.[40]

The procedures for Regional Office CTRs state that each Regional Office has its own procedures for handling CTRs and do not recommend "that those processes be scrapped or significantly modified," recognizing that many Regional Offices have good systems already in place and experienced investor affairs specialists on staff.[41]  Hence, the Regional Office procedures do not provide for a specific method by which CTRs should be referred to OIE.[42]  Rather, they focus on supervisory review, recognizing "that an initial decision as to what type of complaint has enforcement implications often comes down to a matter of judgment on the part of the person receiving the CTRs."[43]  According to the procedures, "[t]his fact makes it imperative that there be a regular review by a more senior staff member of the judgments being made by the recipients of a CTR in terms of how it should be addressed...."[44]

---

[36] Home Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated October 6, 2005, at 1.

[37] Id.

[38] Id.

[39] Id.

[40] Id. at 2.

[41] Field Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated September 1, 2005, at 2.

[42] The Regional Office CTR procedures do point out the particular importance of CTRs from employees of issuers and various financial services firms, outside attorneys or accountants or referrals from other local and federal law enforcement and regulatory organizations.  Id. at 1.  Further, similar to the Headquarters CTR procedures, the Regional Office CTR procedures advise staff of the types of complaints that are not Enforcement-related.  Id.

[43] Id.

[44] Id.

The Regional Office CTR procedures also require that on a monthly basis, a senior member of the Regional Office's Enforcement staff review that month's CTRs for their office, "including the evaluation of the judgments made as to how the matter would be handled and how timely the disposition of the matter was implemented."[45]  The procedures further request that each Regional Office designate a supervisor at the Senior Officer level to serve as the office's contact person on the CTR initiative and to be responsible for the monthly review of the office's CTRs.[46]

Between January 1, 2007 and June 1, 2008, approximately 1,900 complaints received by Enforcement Headquarters and Regional Office staff were entered into the CTR database.

**Referrals from the Self-Regulatory Organizations.**  Enforcement also receives referrals from the SROs.  The SROs send these referrals to Enforcement through the automated SRO Market Referral System (SMRS), which is monitored by OMS.  Enforcement regards these referrals to be more reliable than complaints received directly from the public because the referrals are based on investigations conducted by SRO staff, who have access to state-of-the art market monitoring resources.  Based upon information obtained during our audit, we determined that OMS received approximately 900 referrals from the SROs between January 1, 2007 and June 1, 2008.


**Concerns about Naked Short Selling and the Commission's Response**

**Short Selling in General.**  The practice of short selling "involves a sale of a security that the seller does not own or a sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller."[47]  A short seller believes that the price of the stock will fall, or is seeking to hedge against potential price volatility in securities he or she owns.[48]  If the price of the stock falls, the short seller buys back the stock at a lower price and makes a profit.[49]  If the stock price rises, however, the short seller will incur a loss.[50]  In the typical short sale transaction, the seller borrows stock from his or her brokerage firm and delivers the borrowed shares to the buyer

---

[45] Id. at 1-2.
[46] Id. at 2.
[47] Amendments to Regulation SHO, Interim final temporary rule, Release No. 34-58773, October 14, 2008, at 5.
[48] Division of Market Regulation:  Key Points About Regulation SHO, April 11, 2005, http://www.sec.gov/spotlight/keyregshoissues.htm, at 1.
[49] Id.
[50] Id.

within the standard settlement period (currently three business days).[51]

**The Practice of Naked Short Selling.**  A "naked short sale" occurs when "the seller does not borrow securities in time to make delivery to the buyer within the standard three-day settlement period."[52]  "As a result, the seller fails to deliver securities to the buyer when delivery is due (known as a 'failure to deliver' or 'fail')."[53]  Failures to deliver may result from either short or long sales.[54]  In addition, failures to deliver may be caused by legitimate reasons, such as human or mechanical errors or processing delays.[55]  A fail may also result from naked short selling, e.g., where a market maker who sells thinly traded illiquid stock in response to customer demand encounters difficulty in obtaining securities at the time for delivery.[56]

Naked short selling is not necessarily a violation of the federal securities laws or the Commission's rules.[57]  According to guidance of the Division of Market Regulation, now the Division of Trading and Markets (Trading and Markets), on the Commission's website regarding Regulation SHO, in certain circumstances, naked short selling contributes to market liquidity.[58]  Nonetheless, Trading and Markets has recognized that abusive naked short selling can have negative effects on the market, as fraudsters may use naked short selling to engage in illegal market manipulation, e.g., by selling stock short and failing to deliver shares at the time of settlement with the purpose of driving down the stock price.[59]  According to Trading and Markets, such manipulative activity would violate various securities laws and regulations, including Rule 10b-5 promulgated under the Securities Exchange Act of 1934.[60]

---

[51] Investors must generally complete or settle their security transactions within three business days (known at T+3 or "trade date plus three days").  "T+3 means that when a trade occurs, the participants to the trade deliver and pay for the security at a clearing agency three business days after the trade is executed."  Amendments to Regulation SHO, Final rule, Release No. 34-58775, October 14, 2008, at 2 n.4.  Commission Rule 15c6-1, 17 C.F.R. § 240.15c6-1, prohibits broker-dealers from effecting or entering into contracts for the purchase or sale of securities that provides for payment of funds and delivery of securities later than three business days after the date of the contract, unless otherwise expressly agreed to by the parties at the time of the transaction.  Id.

[52] Division of Market Regulation:  Key Points About Regulation SHO, April 11, 2005, at 2 (footnote omitted).

[53] Division of Market Regulation:  Key Points About Regulation SHO, April 11, 2005, at 2 (footnote omitted).

[54] Id.

[55] Id.

[56] Id.

[57] Id.

[58] Id.

[59] Id. at 7-8.

[60] Id. at 8.  See 17 C.F.R. § 240.10b-5.  In addition, the Commission has recently adopted a naked short selling antifraud rule, Rule 10b-21, 17 C.F.R. § 240.10b-21.  See infra pp. 13-14.

---

**Outside Concerns about the Abusive Effects of Naked Short Selling.**  A large number of individuals and entities have become concerned about the abusive effects of naked short selling and the harm caused to the markets as a result of that practice.  In fact, there are a number of websites devoted to this topic.[61]  Some critics of naked short selling believes that this practice causes the number of shares trading to exceed the number of shares outstanding, allowing broker-dealers to trade shares that do not exist.[62]  "Others believe that the United States clearance and settlement system, and specifically National Securities Clearing Corporation's (NSCC) Continuous Net Settlement System (CNS), produces 'phantom' or 'counterfeit' securities by accounting for fails to deliver."[63]  Some groups believe that people who buy these phantom or counterfeit shares from naked short sellers are, in effect, involuntarily loaning the stock to the short seller, and are also deprived of voting rights they would have if they possessed the stock.[64]

Many individuals and entities have complained that the SEC has not taken sufficient action to enforce against naked short selling.[65]  For example, former SEC Chairman Harvey Pitt said the SEC has not done enough to curb naked short selling practices, but did praise the SEC for recent constructive steps.  Speaking at a "Coalition Against Market Manipulation" event, former Chairman Pitt stated:  "Naked shorting is a situation in which someone is gambling but they have no skin in the game.  They are not required to make any effort to deliver the shares."[66]  Former Chairman Pitt has also stated that the "agency must make it extremely clear that any naked short selling is illegal and it has to remove the ambiguities so the rules are very clear."[67]

---

[61] See, e.g., http://www.investigatethesec.com; http://www.deepcapture.com; http://www.stopmarketmanipulation.org.

[62] Division of Market Regulation: Responses to Frequently Asked Questions Concerning Regulation SHO, http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm, Answer to Question 7.1, at 20.

[63] Id.  NSCC, a subsidiary of Depository Trust and Clearing Corporation (DTCC), see infra n.70, provides a variety of clearing, settlement, risk management and related services for virtually all broker-to-broker trades.  http://www/dtcc.com/about/subs/nscc.php.  NSCC "generally clears and settles trades on a T+3 basis."  Id.

[64] Comments submitted by Washington Legal Foundation, Re: File No S7-08-08, Release No. 34-57511, Proposed "Naked" Short Selling Anti-Fraud Rule, May 20, 2008, at 4.

[65] See, e.g., Comments submitted by the Washington Legal Foundation, File No. S7-08-08; Release No. 34-57511, Proposed "Naked" Short Selling Anti-Fraud Rule, May 20, 2008, at 3 (claiming that "the SEC has been woefully remiss in its duties to enforce the law").

[66] SEC urged to do more to curb naked short selling, by Rachelle Younglai, December 9, 2008, Reuters, http://www.reuters.com/article/marketsNews/idUSN0926750020081209.  It should be noted that former Chairman Pitt is currently the Chief Executive Officer of Kalorama Partners, LLC, a global business consulting firm.  Mr. Pitt has also launched a website, http://www.regsho.com.  The website offers an automated Regulation SHO compliance tool for a monthly fee of $995.

[67] Obama adviser: Short selling must be disclosed, by Ronald D. Orol, Market Watch, http://www.marketwatch.com/news/story/Short-selling-must-publicly-disclosed/story.aspx?guid=%7B4269F7F7-FB08-4766-A5DD-53453B95A17A%7D.

**The Commission's Views on Naked Short Selling.**  The Commission has repeatedly recognized that naked short selling can depress stock prices and may have harmful effects on the market.  For example, in initially proposing its short sale regulation, Regulation SHO, the Commission specifically stated:

> Naked short selling can have a number of negative effects on the market, particularly when the fails to deliver persist for an extended period of time and result in a significantly large unfilled delivery obligation at the clearing agency where trades are settled.  At times, the amount of fails to deliver may be greater than the total public float.  In effect the naked short seller unilaterally converts a securities contract (which should settle in three days after the trade date) into an undated futures-type contract, which the buyer might not have agreed to or that would have been priced differently.  The seller's failure to deliver securities may also adversely affect certain rights of the buyer, such as the right to vote.  More significantly, naked short sellers enjoy greater leverage than if they were required to borrow securities and deliver within a reasonable time period, and they may use this additional leverage to engage in trading activities that deliberately depress the price of a security.[68]

According to guidance provided by Trading and Markets, however, "[n]aked short selling has no effect on an issuer's total shares outstanding.  There is significant confusion relating to the fact that the aggregate number of positions reflected in customer accounts at broker-dealers may in fact be greater than the number of securities issued and outstanding."[69]

Similarly, Trading and Markets has stated that the U.S. clearance and settlement system, and specifically NSCC's CNS system, does not create counterfeit shares. According to Trading and Markets, CNS is essentially an accounting system that indicates delivery and receives obligations among its members, but these obligations do not reflect ownership positions until the delivery of shares are actually made, as reflected in the records of The Depository Trust Company (DTC).[70]

**Regulation SHO.**  The Commission adopted regulation SHO "to update short sale regulation in light of the numerous market developments since short sale

---

[68] Short Sales, Proposed rule, Release No. 34-48709, October 29, 2003, at 6-7.
[69] Division of Market Regulation: Responses to Frequently Asked Questions Concerning Regulation SHO, Answer to Question 7.1, at 20.
[70] Id.  The DTC, another subsidiary of DTCC, was established in 1973 "to reduce costs and provide clearing and settlement efficiencies by immobilizing securities and making 'book-entry' changes to ownership of securities." http://www.dtcc.com/about/subs/dtc.php.  In 2006, The DTC settled transactions worth almost $445 trillion, and processed over 290 million book-entry deliveries. Id.  DTCC, which through its subsidiaries provides clearing, settlement and information services for various types of securities, has been criticized for its approach to naked short selling.  DTCC, however, has disagreed with the criticisms.  See DTCC Press Release, DTC Responds to the Wall Street Journal Article, "Blame the 'Stock Vault?'", http://www.dtcc.com/news/press/releases/2007/wsj_response.php.

regulation was first adopted in 1938."[71]  Regulation SHO became effective on September 7, 2004, and compliance with the regulation began on January 3, 2005.[72]  Regulation SHO established a new regulatory framework governing the short selling of securities, including naked short selling.[73]  Among other things, Regulation SHO established "uniform locate and delivery requirements in order to address problems associated with failures to deliver, including potentially abusive 'naked' short selling . . .", and created uniform marking requirements for sales of equity securities.[74]  Under Rule 203 of Regulation SHO, a broker-dealer, prior to effecting a short sale in an equity security, must locate securities available for borrowing in order to be able to deliver the securities on the transaction settlement date.[75]  Rule 203 also imposed additional requirements on broker-dealers for securities in which a substantial amount of failures to deliver occurred.[76]

Under Rule 203(b)(3) of Regulation SHO, a "threshold security" is an equity security that has an aggregate fail to deliver position for:

- Five consecutive settlement days at a registered clearing agency (e.g., the NSCC);
- Totaling 10,000 shares or more; and
- Equal to at least 0.5 percent of the issuer's total shares outstanding.[77]

Regulation SHO requires that each SRO provide a threshold securities list for those securities for which the SRO is the primary market.[78]  In addition, Regulation SHO requires that broker-dealers close out all failures to deliver that exist in threshold securities for 13 consecutive settlement days by purchasing securities of like kind and quantity.[79]  Until the position is closed out, the broker-dealer, and any broker-dealer for which it clears transactions, may not effect further short sales in that threshold security without borrowing or entering into a bona fide agreement to

---

[71] Division of Market Regulation:  Key Points About Regulation SHO, April 11, 2005, at 2.  See Short Sales, Final rule; Interpretation, Release No. 34-50103, July 28, 2004.
[72] Division of Market Regulation:  Responses to Frequently Asked Questions Concerning Regulation SHO, at 1.
[73] Id. at 2.
[74] Id.
[75] Id.; see 17 C.F.R. § 242.203.
[76] Division of Market Regulation:  Responses to Frequently Asked Questions Concerning Regulation SHO, http, at 2.
[77] Division of Market Regulation:  Key Points About Regulation SHO, April 11, 2005, at 3.
[78] Id. at 4.
[79] Id. at 5.

borrow the security.[80]

Under Regulation SHO, threshold securities only include issuers that are registered or are required to file reports with the Commission.[81]   However, non-reporting securities are covered by SRO rules. According to Enforcement, NASD (now FINRA) Rule 3210 provides that non-reporting threshold securities shall be closed out in the same manner as reporting securities would be closed out under Regulation SHO.[82]   Under this Rule, non-reporting threshold securities are defined as securities with aggregate fails for five consecutive settlement days of 10,000 or more shares that are valued at $50,000 or more.[83]

In adopting Regulation SHO, the Commission stated its belief that the threshold level "characterizes situations where the ratio of unfulfilled delivery obligations at the clearing agency at which trades are settled represents a significant number of shares relative to the company's total shares outstanding."[84]   According to the Commission, "such circumstances warrant action designed to address potential negative effects," and "Rule 203(b)(3) is intended to address potential abuses that may occur with large, extended fails to deliver."[85]

According to Trading and Markets, "[a] security's appearance on a threshold list does not necessarily mean that any improper activity has occurred or is occurring".[86]   At the same time, "[w]hether or not a security is a threshold security does not affect the Commission's ability to prosecute manipulative or fraudulent activity that may have occurred before or after adoption of Regulation SHO."[87]

**Recent Emergency Orders and Amendments to Regulation SHO.**  In response to the financial crisis that began with the collapse of The Bear Stearns

---

[80] Id. As originally enacted, Regulation SHO contained two exceptions to its mandatory close-out requirement:  a grandfather provision and an options market maker exception.  The grandfather provision, which exempted positions that were established before a security became a threshold security from the requirement to close-out fail to deliver positions that remained for 13 consecutive settlement days, was eliminated by a rule amendment that was adopted effective October 15, 2007.  Amendments to Regulation SHO, Release No. 34-56212, August 7, 2007. The options market maker exception, "which excepted any fail to deliver in a threshold security resulting from short sales effected by a registered options market maker to establish or maintain a hedge on options positions that were created before the underlying security became a threshold security," was eliminated temporarily effective September 17, 2008, and then permanently effective October 17, 2008.  See infra p. 13.

[81] Division of Market Regulation:  Key Points About Regulation SHO, April 11, 2005, at 3.

[82] SROs; FINRA; Notice of Filing and Immediate Effectiveness of Proposed Rule Change Relating to Amendments to NASD Rule 3210 in Light of Amendments to the SEC Regulation SHO Delivery Requirements, Release No. 34-56682, October 22, 2007.

[83] SROs; FINRA. Notice of Filing of Proposed Rule Change and Amendments Nos. 1 and 2 thereto Relating to Short Sale Delivery Requirements, Release No. 34-52752, November 8, 2005.

[84] Short Sales, Final Rule; Interpretation, Release No. 34-50103, July 28, 2004, at 15.

[85] Id.

[86] Division of Market Regulation:  Key Points About Regulation SHO, April 11, 2005, at 5.

[87] Id.

Companies Inc. in March 2008, the Commission instituted a number of emergency orders and amendments to Regulation SHO. Initially, on July 15, 2008, the Commission issued a temporary emergency order providing that no short sales could be effected in the securities of certain financial firms unless the seller or its agent has borrowed or arranged to borrow the security or otherwise has the security available to borrow in its inventory prior to effecting the short sale and delivers the security on settlement date.[88] In imposing the initial emergency order, the Commission recognized that false rumors can lead to a loss of confidence in the markets, which in turn can lead to panic selling and may be further exacerbated by naked short selling.[89]

Subsequent to the initial emergency order in July 2008, the Commission continued to be "concerned about the possible unnecessary or artificial price movements based on unfounded rumors regarding the stability of financial institutions and other issuers exacerbated by 'naked' short selling."[90] The Commission's concerns, however, were no longer limited to the financial institutions that were the subject of the July Emergency Order.[91] In addition, the Commission became "concerned that some persons may take advantage of issuers that have become temporarily weakened by current market conditions to engage in inappropriate short selling in the securities of such issuers."[92]

As a consequence, on September 17, 2008, the Commission took a number of coordinated actions designed to strengthen investor protections against "naked" short selling."[93] According to former SEC Chairman Christopher Cox, "[t]hese several actions today make it crystal clear that the SEC has zero tolerance for abusive naked short selling. The Enforcement Division, the Office of Compliance Inspections and Examinations and the Division of Trading and Markets will now have [additional] weapons in their arsenal in their continuing battle to stop unlawful manipulation."[94] As part of the emergency measures taken on September 17, 2008, the Commission imposed "enhanced delivery requirements on sales of all equity securities, by adding and making immediately effective a temporary rule to Regulation SHO, Rule 204T."[95] The temporary rule imposed "a penalty on any participant of a registered clearing agency, and any broker-dealer

---

[88] Securities Exchange Act Release No. 58166, July 15, 2008. The initial emergency order became effective on July 21, 2008, and was subsequently extended until August 12, 2008. See Securities Exchange Act Release No. 58248, July 29, 2008.
[89] Securities Exchange Act Release No. 58166, July 15, 2008, at 1.
[90] Securities Exchange Act Release No. 58572, September 17, 2008, at 1.
[91] Id.
[92] Id.
[93] SEC Issues New Rules to Protect Investors Against Naked Short Selling Abuses, Press Release 2008-404, September 17, 2008, www.sec.gov/news/press/2008/2008-204.htm, at 1.
[94] Id.
[95] Securities Exchange Act Release No. 58572, September 17, 2008, at 2. See 17 C.F.R. § 242.204T.

from which it receives trades for clearance and settlement, for having a fail to deliver position at a registered clearing agency in any equity security."[96]

In addition, in its September 17, 2008 Emergency Order, the Commission concluded that it was necessary to make immediately effective amendments to "eliminate the options market maker exception from Regulation SHO's close-out requirement."[97]  The Commission made immediately effective a naked short selling antifraud rule, Rule 10b-21.[98]  In another emergency order entered on September 18, 2008, the Commission temporarily prohibited any short selling in the publicly traded shares of certain financial firms.[99]

Subsequently, on October 14, 2008, the Commission adopted final rule amendments that eliminated the options market maker exception to the close-out requirement of Regulation SHO.[100]  As a result of these amendments, "fails to deliver in threshold securities that result from hedging activities by options market makers will no longer be excepted from Regulation SHO's close-out requirement."[101]  In adopting the rule amendments, the Commission observed: "[A]s we have stated on several prior occasions, we are concerned about the negative effect that fails to deliver may have on the markets and shareholders."[102]  In addition, the Commission pointed to the concerns repeatedly expressed by issuers and investors "about fails to deliver in connection with manipulative 'naked' selling."[103]  The Commission then recognized that "[t]o the extent that fails to deliver might be part of manipulative 'naked' short selling, which could be used as a tool to drive down a company's stock price, such fails to deliver may undermine the confidence of investors."[104]

Also on October 14, 2008, the Commission adopted a final "antifraud rule, Rule 10b-21, aimed at short sellers, including broker-dealers acting for their own accounts, who deceive specified persons, such as a broker or dealer, about their intention or ability to deliver securities in time for settlement and that fail to deliver the securities by settlement date."[105]  The Commission recognized that although

---

[96] Securities Exchange Act Release No. 58572, September 17, 2008, at 2 (footnotes omitted). According to Enforcement, Rule 204T covers all equity securities regardless of whether they are reporting or non-reporting (as the threshold securities concept no longer applies under Rule 204T); hence, SRO rules are not used in conjunction with Rule 204T.

[97] Id. at 2-3.

[98] Id. at 3.  See 17 C.F.R. § 240.10b-21.

[99] Securities Exchange Act Release No. 34-58592, September 18, 2008.  Yet another emergency order issued on September 18, 2008 temporarily imposed certain reporting requirements concerning daily short sale of securities by institutional investment managers.  See Securities Exchange Act Release No. 34-58591, September 18, 2008.

[100] Amendments to Regulation SHO, Final rule, Release No. 34-58775, October 14, 2008.

[101] Id. at 1.

[102] Id. at 4.  Specifically, for example,  the Commission recognized that "fails to deliver may deprive shareholders of the benefits of ownership, such as voting and lending."  Id.

[103] Id.

[104] Id. at 5.

[105] "Naked" Short Selling Antifraud Rule, Final rule, Release No. 34-58774, October 14, 2008, at 2.

---

abusive naked short selling as part of a manipulative scheme is always illegal under the general antifraud provisions of the federal securities laws, Rule 10b-21 will further evidence the liability of persons who deceive others about their intention or ability to deliver securities in time for settlement.[106]   Also, on October 14, 2008, the Commission adopted an interim final temporary rule enhancing the delivery requirements for sales of all equity securities.[107]   The Commission solicited comments on all aspects of Rule 204T, which is effective until July 31, 2009.[108]

**Enforcement Actions Against Manipulative Naked Short Selling.**
Historically, Enforcement has brought few enforcement actions based on manipulative or abusive naked short selling.  In one settled civil action brought in 2003, the Commission alleged that a money management firm and its president engaged in a manipulative short selling scheme in the stock of Sedona Corporation.[109]   The Commission alleged that the defendants profited from engaging in a massive naked short selling scheme that flooded the market with Sedona stock and depressed its price.[110]  The defendants in that action consented to the entry of an injunction for violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder.[111]  The defendants also agreed to pay a civil penalty of $1 million.[112]

The Commission also settled charges against a hedge fund adviser, its chief executive officer and two firm employees for engaging in improper short sales transactions, including representing to broker-dealers executing trades on their behalf that they had located stock to borrow, when they had not in fact done so.[113]  In an administrative proceeding, the Commission censured the respondents, ordered that the firm cease and desist from future violations of Section 17(a)(2) of the Securities Act of 1933, imposed civil penalties of

---

[106] Id.
[107] Amendments to Regulation SHO; Interim final temporary rule; request for comments, Release No. 34-58773,  October 14, 2008.
[108] Id. at 1, 3.
[109] See Litigation Release No. 18003, February 27, 2003, SEC v. Rhino Advisors, Inc., and Thomas Badian, Civ. Action No. 03 civ 1310 (RO)(Southern District of New York).
[110] Short Sales, Proposed Rule, Release No. 34-48709, October 28, 2003, at n.31.
[111] Ligation Release No. 18003, February 27, 2003, at 1.  Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, prohibits the use of interstate commerce for the purpose of fraud or deceit in the offer or sale of any security or any security-based swap agreement.  Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful to use interstate commerce to use or employ a manipulative or deceptive device or contrivance in contravention of the Commission's rules in connection with the purchase or sale of a security.
[112] Id.  The SEC has a pending related action pending in the United States District Court for the Southern District of New York as a result of the defendants' failure to abide by the Court's previous judgment.  See SEC v. Andreas Badian, et al., Civil Action No. 06 CV 2621 (S.D.N.Y, filed April 4, 2006).
[113] SEC Charges New York Hedge Fund Adviser with Short Sale Violations in Connection with Hibernia-Capital One Merger, Press Release 2007-116, October 10, 2007, http://www.sec.gov/news/press/2007/2007-216.htm.

$840,000, and ordered disgorgement of approximately $6.7 million, plus over $730,000 in prejudgment interest.[114]  In another matter, the Commission brought and settled charges against a unit of Goldman Sachs for allowing customers to engage in an illegal short selling scheme that allegedly included naked short selling.[115]

In a few other matters, the Commission has brought and settled cases in which naked short sale activity was part of the conduct charged in connection with illegal trading schemes designed to evade the registration requirements of the Federal securities laws in connection with securities offerings involving Private Investments in Pubic Equity (PIPE).[116]

The Commission has recently "announced a sweeping expansion of its ongoing investigation into possible market manipulation in the securities of certain financial institutions." [117]  The Commission has also approved a formal order of investigation that will allow SEC Enforcement staff to obtain additional documents and testimony by subpoena and is working jointly with NYSE Regulation and FINRA.[118]  According to the Enforcement Director: "Abusive short selling, market manipulation and false rumor mongering for profit by any entity cuts to the heart of investor confidence in our markets.  Such behavior will not be tolerated.  We will root it out, expose it, and subject the guilty parties to the full force of the law."[119]

### Receipt and Processing of Complaints about Naked Short Selling

Of the approximately 1.38 million email complaints the ECC received between January 1, 2007 and June 1, 2008, approximately 5,000 of these complaints

---

[114] In the Matter of Sandell Asset Management Corp., et al., Securities Act Release No. 8857, October 10, 2007.

[115] SEC and NYSE Settle Enforcement Actions Against Goldman Sachs Unit for Role in Customers' Illegal Trading Scheme, Press Release 2007-41, March 14, 2007, www.sec.gov/news/press/2007/2007-41.htm.; In the Matter of Goldman Sachs Execution & Clearing, L.P., Securities Exchange Act Release No. 55465, March 14, 2007.

[116] See, e.g., Litigation Release No. 19956, January 4, 2007, SEC v. Joseph Spiegel, Civil Action No. 1:07CV00008 (RCL)(D.D.C.);  In the Matter of Spinner Asset Management, LLC, et al., Securities Act Release No. 8763, December 20, 2006; Litigation Release No. 19607, March 14, 2006, SEC v. Langley Partners, L.P., et al., Civil Action No. 1:06CV00467 (JDB)(D.D.C.)  See also Litigation Release No. 19942, December 12, 2006, SEC v. Edwin Buchanan Lyon, et al., Civil Action No. 06 CV 14338 (S.D.N.Y.) for a pending case involving a PIPES trading scheme that included alleged naked short selling.  A "PIPE" involves the selling of publicly traded common shares, or some form of preferred stock or convertible security, to private investors.  The PIPE offering may consist of shares registered with the SEC or may be completed as an unregistered private placement capital.  See PIPE Offerings, http://www.sec.gov/answers/pipeofferings.htm.

[117] SEC Press Release No. 2008-214, SEC Expands Sweeping Investigations of Market Manipulation, September 19, 2008, http://www.sec.gov/news/press/2008/2008-214.htm.

[118] Id.

[119] Id.

---

pertained to naked short selling.  Based on our review, the naked short selling complaints received by Enforcement generally fell into three categories:  (1) general statements about the impact of naked short selling on companies and the markets; (2) complaints about the perceived lack of action by the Commission, and in particular Enforcement, to combat naked short selling; and (3) specific complaints about naked short selling in the shares of specific companies.[120]  The complaints about naked shorting of the shares of specific companies often included information about the securities' decline in price after high trading volume, as well as the securities' appearance on the threshold list.

Enforcement does not have any separate procedures that are specifically tailored to complaints involving naked short selling, but processes these complaints through the procedures generally applicable to complaints received in the ECC or to CTRs.  Of the approximately 5,000 naked short selling complaints received in the ECC during the period reviewed, only 123 were forwarded to Enforcement staff for further investigation.  We found that no Enforcement actions were brought based on these naked short selling complaints, although one of the referred complaints referenced a pending Enforcement action involving naked short selling.[121]

In addition, we found that of the approximately 1,900 complaints that were entered into the CTR database during the period from January 1, 2007 through June 1, 2008, only six of these complaints alleged naked short selling.  We also found that no Enforcement actions were brought based on these complaints.

Based on information provided by the OMS, none of the approximately 900 referrals received from the SROs during the period from January 1, 2007 to June 1, 2008 involved naked short selling.

# Objectives

**Objectives**.  The OIG has received numerous complaints alleging that Enforcement has failed to take sufficient action regarding naked short selling.  Many of these complaints asserted that investors and companies lost billions of dollars because Enforcement has not taken sufficient action against naked short selling practices.

In light of these complaints and based on our audit plan, we conducted an audit to assess whether Enforcement:

---

[120] The 5,000 complaints included multiple complaints sent by the same individuals about the same securities.
[121] This complaint expressed concerns about the lack of oversight in the daily trading of the stock of Sedona Corporation and referenced the two actions that had been brought in the United States District Court for the Southern District of New York alleging a massive naked short selling scheme involving Sedona stock.  See supra p. 14 and n.112.

- Established policies and guidelines that enabled Enforcement to respond appropriately to complaints and referrals, including those involving naked short selling; and

- Followed existing policies and procedures for responding to complaints and referrals, including those pertaining to naked short selling.

We also conducted follow-up on the status of pertinent findings and recommendations contained in a prior OIG report. We further reviewed a Government Accountability Office (GAO) report related to Enforcement's policies and procedures for complaints and referrals.[122]  Additionally, we coordinated our audit efforts with GAO, which has an ongoing review of the implementation of the Commission's short sale regulation, Regulation SHO. Specifically, GAO is studying the:

1. Extent to which Regulation SHO has reduced the number of failures to deliver of stocks that might impact the market for these securities;

2. SEC's oversight of the clearing and settlement processes for securities trades, particularly for identifying and addressing failures to deliver; and

3. Efforts made by the SEC and Self-Regulatory Organizations to enforce compliance with Regulation SHO in connection with abusive short selling.

---

[122] These reports are SEC OIG Audit No. 352, Enforcement Internet Program, January 13, 2003, and GAO-08-33, Securities and Exchange Commission: Opportunities Exist to Improve Oversight of Self-Regulatory Organizations, November 15, 2007. During the previous OIG audit, we were informed that the Office of Internet Enforcement was about to implement a database to track referrals of complaints for further investigations. During the current audit, however, we found that Enforcement is no longer using this database. See infra Finding 6. The prior GAO audit found that Enforcement's system for receiving and tracking referrals from the Self-Regulatory Organizations needed improvements and recommended enhancements that would facilitate the monitoring and analysis of trend information and case activities. Enforcement's Office of Market Surveillance informed us that it has requested enhancements for the SRO referral tracking system that are pending. We found no prior GAO or OIG reports specifically related to processing naked short selling complaints.

# Findings and Recommendations

## Finding 1:  The Enforcement Complaint Center's Policies and Procedures Do Not Provide Specific Triage Steps for Naked Short Selling Complaints and Appear to Result in These Types of Complaints Not Being Forwarded for Further Investigation.

> The ECC's written policies and procedures do not include specific triage steps for naked short selling complaints.  Moreover, many naked short selling complaints fall into a category of complaints that the ECC's written procedures describe as "problematic."  The written procedures, therefore, advise that these complaints should generally not be referred for investigation.  In addition, the ECC does not have an online complaint form that is specifically designed for naked short selling complaints.

Our review of the ECC's written complaint processing procedures indicated that they do not provide specific triage steps for the in-depth analysis of naked short selling complaints.  In contrast, however, the ECC's triage guidelines provide steps for in-depth analysis of other specific types of complaints, such as spam-driven manipulations, unregistered online offering, insider trading, whistleblowers/ accounting or other fraud, and advance free frauds and offshore boiler rooms.[123]

In fact, cautionary language in the ECC's complaint handling procedures appears to result in naked short selling complaints not being forwarded to Enforcement staff for further investigation.  Those procedures state, in part, as follows:

> Each day, we get a significant number of complaints from individuals who claim they, from observing price/volume information found on "Level II" trading terminals,[124] have found evidence of market manipulation or other suspect behavior by broker-dealers, market makers or other market participants.  These complaints are

---

[123] Memorandum Re: Review of ECC Triage Guidelines/Procedures, September 17, 2007, at 6-9.
[124] According to information OIE obtained from OMS, "[c]asual observers of the market using Level II terminals typically obtain only a snapshot of a particular segment of market activity and lack the breadth of vision to really make substantive evaluations of market conduct."  E-mail dated October 17, 2003, Subject: Important Guidelines Re: Investor "Level II" Complaints.

problematic. While malfeasance by market participants is a serious matter, we have conferred extensively with [OMS] to determine how these should be handled. In general, OMS feels that the average Level II user lacks a sufficiently broad view of the market to make the kinds of general allegations regarding manipulation more appropriate to FINRA, the regulatory body with primary responsibility for market surveillance. [125]

The procedures advise that complaints based on Level II data should not be referred for further investigation, although they do provide that complaints that describe "certain very specific market practices" should be sent to OMS supervisory staff. [126] Otherwise, specific allegations against specific market makers should be passed on to certain mailboxes within the Office of Compliance Inspections and Examinations, "which factors these complaints into its consideration of broker-dealer examinations." [127]

During our audit, ECC staff informed us that the typical naked short selling investor complaint is based on data obtained from a Level II trading terminal. The ECC staff further explained that they were troubled by these complaints and consulted with OMS to make sure they were handling them properly. According to ECC staff, OMS advised the ECC that while complaints alleging naked short selling, as well as all manners of short-selling conspiracies, should be taken seriously, such activity generally cannot be observed from a Level II computer screen, which does not provide information about delivery of shares or the covering of short positions. [128] As a consequence, OMS advised the ECC that naked short selling complaints based upon data from Level II terminals typically lacked a specific, substantial factual foundation and were unlikely to lead to a successful investigation. [129]

However, the delivery and settlement information that Enforcement claims is missing from many investor naked short selling complaints is frequently proprietary information that is not available to an individual complainant or the general public. Oftentimes, a member of the public can only point to the fact that shares are on a threshold list, which in itself is not probative of naked short selling. We observed that the Commission's public webpage for soliciting complaints from the public does not currently specifically list naked short selling under the categories of conduct that best describe a complaint. [130] By adding a

---

[125] Memorandum Re: Enforcement Complaint Center/How To, September 17, 2007, at 6. See also Memorandum Re: Review of ECC Triage Guidelines/Procedures, September 17, 2007, at 14.

[126] Memorandum Re: Enforcement Complaint Center/How To, September 17, 2007, at 6. These specific market practices do not include naked short selling. See E-mail dated October 17, 2003, Subject: Important Guidelines Re: Investor "Level II" Complaints.

[127] Memorandum Re: Enforcement Complaint Center/How To, September 17, 2007, at 6-7.

[128] E-mail dated October 17, 2003, Subject: Important Guidelines Re: Investor "Level II" Complaints.

[129] Id.

[130] See Tell Us About Your Complaint, http://www.sec.gov/complaint/selectconduct.shtml.

specific category for naked short selling complaints and linking this category to a form specifically designed to elicit information pertinent to such complaints, the Commission may be able to improve the quality of the naked short selling complaints it receives.

Moreover, the ECC's policies that result in no triage steps being performed on naked short selling complaints appear to be inconsistent with the SEC's guidance to the public for submitting complaints, which states that "[a]ttorneys in Enforcement evaluate information and tips concerning violations of the federal securities laws."[131]  In addition, Trading and Market's guidance regarding Regulation SHO, under the heading, "Reporting Alleged Abusive Naked Short Selling Activity," states that "[t]he SEC takes information alleging violations of the federal securities laws very seriously," and advises the public to send "specific enforcement-related information" in an e-mail to enforcement@sec.gov.[132]  The information available on the Commission's website suggests to the public that Enforcement will develop the facts necessary to evaluate appropriately all types of complaints alleging violations of the securities laws, including naked short selling complaints.

Based on our audit work, we determined that the ECC's current policies and procedures appear to be significantly limiting the referral of naked short selling complaints.  Between January 1, 2007 and June 1, 2008, fails to deliver averaged approximately 20.3 billion shares per month, according to data maintained on the Commission's website.[133]  During this same period, however, we found that of the approximately 5,000 e-mail complaints about naked short selling received by the ECC, only 123 (2.5 percent) were forwarded for further review by Enforcement staff.  Moreover, ECC staff informed us that these complaints were not referred because they involved potentially illegal naked short selling, but rather because the subjects of the complaints were already involved in ongoing Enforcement matters.  In addition, we found that Enforcement attorneys who received these referrals involving naked short selling complaints did not always review the naked short selling allegations during their existing inquiries or investigations.

Our audit also found that the ECC's written policies and procedures result in naked short selling complaints being treated differently from other types of complaints of securities law violations, such as insider trading complaints.  Under the ECC's written policies and procedures, in-depth triage steps are performed for many types of complaints, even if these complaints do not initially include all of the information needed to decide whether to refer them.[134]  In comparison to the low percentage of referrals of naked short selling complaints between

---

[131] SEC Center for Complaints and Enforcement Tips, http://.sec.gov/complaint.shtml.
[132] Division of Market Regulation:  Key Points About Regulation SHO, April 11, 2005, at 12.
[133] Frequently Requested FOIA Document:  Fails-to-Deliver Data – Archive Data, http://www.sec.gov/foia/docs/failsdata-archive.htm.
[134] Memorandum Re: Review of ECC Triage Guidelines/Procedures, September 17, 2007, at 6-9.

January 1, 2007 and June 1, 2008, the ECC referred 169 (approximately 12.5 percent) of the 1,346 insider trading complaints it received during this period.

ECC and OMS staff indicated that naked short selling complaints were not being treated differently. Rather, they claimed that the naked short selling complaints typically received do not include useful information on individual trades, such as proof of fails to deliver or the absence of locate documentation. According to Enforcement, the presence of a security on the threshold list does not necessarily mean naked short selling has occurred, as there are other explanations for a failure to deliver. Enforcement staff further opined that violations of Regulation SHO are considered to be technical rule violations that are better addressed by inspections and examinations, or the rulemaking process. As a consequence, Enforcement stated that it was not inclined to invest the substantial resources that would be required to investigate the naked short selling complaints it receives by examining broker-dealer records for individual trades, pointing out that, even after such an expenditure of resources, there might be no illegal naked short selling.

Enforcement acknowledged that in recent months a small but vocal cadre of advocates has emerged decrying the practice of naked short selling and suggesting that it has damaging market effects. However, Enforcement maintained that there is hardly unanimity in the investment community or the financial media on either the prevalence, or the dangers, of naked short selling and noted that some view the threat posed by naked short selling as wildly exaggerated.

Enforcement also pointed out that as the Commission has observed in its releases, NSCC reports that 99 percent of all trades settle on time, or within the standard T+3 settlement cycle, and noted that a fail to deliver occurs even where a security settles one day late. Further, Enforcement stated that more than half of all fails to deliver and 70 percent of all fails to deliver positions are closed out within two settlement days after T+3 (two days late), and the vast majority of fails to deliver are closed out within five days after T+3. According to Enforcement, therefore, the Commission's recent rulemaking in the area of naked short selling recognizes that trades do fail, but that the fails should not persist.

Accordingly, Enforcement stated that given that it is called upon to police the massive U.S. securities markets with decidedly limited resources, it prioritizes the complaints that it passes on for further investigation. It therefore focuses on complaints with a high likelihood of accuracy and credibility (like those of purported insiders or scam victims), those containing information that can be readily vetted (i.e., visible price swings in a possible manipulation or insider trading allegation), or those involving demonstrated, immediate investor hazard in the current market environment (e.g., Ponzi schemes, improper sales of auction-rate securities).

The Commission, however, has considered naked short selling to be an issue that warranted its attention. In adopting the naked short selling antifraud rule,

Rule 10b-21, in October 2008, the Commission stated, "We have been concerned about 'naked' short selling and, in particular, abusive 'naked' short selling, for some time."[135]  And in amending Regulation SHO to eliminate the options market maker exemption from Regulation SHO's close-out requirement, the Commission recognized as follows:

> Although high fail levels exist only for a small percentage of issuers, we believe that all sellers of securities should promptly deliver, or arrange for delivery of, securities to the respective buyer, and that all buyers of securities have a right to expect prompt delivery of securities purchased. . . . [A]s we have stated on several prior occasions, we are concerned about the negative effect that fails to deliver may have on the markets and shareholders. . . .  In addition, issuers and investors have repeatedly expressed concerns about fails to deliver in connection with manipulative 'naked' short selling. . . . To the extent that fails to deliver might be part of manipulative 'naked' short selling, which could be used as a tool to drive down a company's stock price, such fails to deliver may undermine the confidence of investors. . . .  Unwarranted reputational damage caused by fails to deliver might have an adverse impact on the security's price.[136]

Hence, we conclude that in light of the serious concerns expressed by many individual entities and the Commission itself about abusive naked short selling and its harmful effects on the markets, the ECC should modify its current policies and procedures to inquire into naked short selling complaints more thoroughly and to increase the number of referrals of these types of complaints.

## Recommendation 1

The Division of Enforcement should develop written in-depth triage analysis steps for naked short selling complaints, as it has for complaints involving other types of securities law violations, such as spam-driven manipulations and insider trading.

## Recommendation 2

The Division of Enforcement should revise its written guidance to the Enforcement Complaint Center staff to ensure that naked short selling complaints based on information obtained from "Level II" computer screens are given a proper level of scrutiny and referred for further investigation where appropriate.

---

[135] "Naked" Short Selling Antifraud Rule, Final rule, Release No. 34-58774, October 14, 2008, at 7.

[136] Amendments to Regulation SHO, Final rule, Release No. 34-58775, October 14, 2008, at 3-6.

**Recommendation 3**

The Division of Enforcement should add naked short selling to the list of categories of complaints on the Commission's public webpage that solicits complaints from the public and should develop an online complaint form specifically tailored to naked short selling complaints.

# Finding 2:  The Enforcement Complaint Center Does Not Perform Supervisory Review of Its Initial Screening of Complaints.

The ECC does not forward for further investigation the majority of the e-mails reviewed during the initial screening process.  While many of these e-mails are spam and many of them do not involve violations of the securities laws, no supervisory review is performed of the initial screening results.  Supervisory review would provide an important internal control over the initial decision not to forward e-mails received by the ECC.

Based on data provided by the ECC, on average the ECC received approximately 2,700 e-mails per day, on a calendar day basis, during the period we reviewed (from January 1, 2007 to June 1, 2008).  Based on our review, the e-mails received in a typical day include:  various advertisements and "junk" e-mails, investor complaints, and allegations of possible violations of the federal securities laws.

During our audit, we observed an OIE initial coordinator conduct a review of the emails the ECC had received on a given day.  On that occasion, the initial coordinator reviewed approximately 3,600 incoming e-mails.  At the end of the initial screening process, approximately two percent of these emails (77 of 3,600) were forwarded for review by the second-level coordinator.  No supervisory review was performed on the approximately 3,500 emails that were not forwarded for further review, and the ECC's current policies and procedures do not require such a supervisory review.

Supervisory review is an important internal control that provides ongoing monitoring of activities to ensure that applicable policies and procedures are followed.[137]  In fact, Enforcement's Regional Office CTR procedures (see description of CTR process on pages 4-6) recognize the importance of supervisory review of the handling of complaints received by Enforcement.  According to these procedures, because "an initial decision as to what type of

---

[137] Internal Control – Integrated Framework, Committee of Sponsoring Organizations of the Treadway Commission, July 1994, at 69-70.

complaint has enforcement implications often comes down to a matter of judgment on the part of the person receiving" the complaint, it is "imperative that there be a regular review by a more senior staff member of the judgments being made . . .."[138]  The reasons warranting supervisory review of initial decisions made on CTRs by Regional Office staff would equally seem to apply to the initial screening decision on e-mail complaints received by the ECC.

An ECC supervisor informed us that he did not perform supervisory reviews of the initial coordinator analysis of incoming e-mail complaints primarily because he had previously performed the initial coordinator screening himself and was aware of the kinds of e-mails that were typically received.  The supervisor also indicated that the sheer volume of e-mails received on a daily basis precluded supervisory review of the e-mails that were not forwarded for further review.

Notwithstanding the fact that a significant percentage of the e-mails received by the ECC were spam or did not relate to the securities laws, the initial screening process serves to eliminate complaints from any further consideration by Enforcement, and the initial coordinator thus exercises a significant amount of authority.  We believe, therefore, that it is important that supervisory review of e-mails eliminated during the initial coordinator review be conducted, at least on a test basis.  Enforcement has indicated that it will draft and implement policies and procedures for supervisory sampling and review of complaints that do not survive the initial review.

## Recommendation 4

The Division of Enforcement's Enforcement Complaint Center should develop and implement policies and procedures providing for supervisory review of a sample of e-mails that are not forwarded for further review as a result of the initial screening process.

---

[138] Field Office Procedures for Handling Complaints/Tips/Referral (CTR's), updated October 6, 2005.

# Finding 3: Enforcement's Procedures for Processing Complaints, Tips and Referrals Differ and There is Insufficient Division-Level Oversight of the CTR Program.

> Enforcement's written procedures for processing CTRs at Headquarters and the Regional Offices are different. In addition, there appears to be little, if any, overall Division-level oversight of the CTR program.

Currently, there are two separate sets of written procedures that were developed by Enforcement for processing CTRs that are received directly by Enforcement attorneys and do not come through the ECC. One set of procedures applies to Headquarters,[139] while another set of procedures applies to the Regional Offices.[140]

The Headquarters CTR procedures focus on the processing of CTRs by Enforcement staff. These procedures instruct staff to:

- Review, research and analyze complaints as deemed appropriate by their branch;

- Consult with their supervisor about the CTR;

- Send a response to the complaint if no further contact with the complainant is planned; and

- If the CTRs describe a potential violation of the Federal securities laws, send a completed CTR form, the original CTR and the response to OIE.[141]

In contrast, the Regional Office CTR procedures do not include specific procedures for processing CTRs, as they recognize that many Regional Offices have good systems in place for handling CTRs.[142] Instead, the Regional Office CTR procedures focus on supervisory review of the staff's initial judgment as to whether a CTR should be forwarded to an Enforcement attorney or accountant for further consideration.[143] To ensure the appropriate level of supervisory

---

[139] Home Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated October 6, 2005.

[140] Field Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated September 1, 2005.

[141] Home Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated October 6, 2005.

[142] Field Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated September 1, 2005.

[143] Id.

oversight, the procedures require regular review of the judgments made on CTRs by a more senior staff member.[144]  The procedures further require monthly reviews of an office's CTRs by a supervisor at the Senior Officer level that should evaluate the judgment made on how the matter should be handled, as well as the timeliness of the initial decision.[145]

Our audit also found that in addition to the two sets of written CTR procedures described above, three Regional Offices have developed their own written CTR policies and procedures.  These individual Regional Office written procedures generally appear to supplement the CTR procedures applicable to all Regional Offices.  Other Regional Offices informed us that while they follow Enforcement's written Regional Office CTR procedures, they also have their own informal, unwritten procedures for handling CTRs.

As a result, Regional Offices handled their CTRs differently.  For example, we found that two Regional Offices input CTRs after a decision has been made whether to pursue or close the complaint.  These Offices do not log the complaint into the CTR system while it is undergoing an initial research or inquiry.  Other Regional Offices input CTRs upon receipt.  Another Regional Office informed us that it commonly does not input complaints into the CTR database if a MUI is immediately opened on the complaint.

The absence of uniform set of policies and procedures for processing CTRs leads to inconsistencies regarding the entering of complaints into the CTR data base.  In fact, we found that differences in Regional Offices practices result in complaints being entered into the CTR database at various stages in the process, e.g., upon receipt, after initial inquiry, or not being entered at all.

Moreover, the likelihood of inconsistent treatment of complaints is increased by the absence of any Division-level oversight of the CTR program.  OIE staff informed us that they were not responsible for overseeing the CTR program at Headquarters, and that the Regional Offices implemented their own CTR programs as they deemed appropriate for their offices.


## Recommendation 5

The Division of Enforcement should develop uniform written policies and procedures for the Complaints, Tips and Referrals (CTR) Program at Headquarters and the Regional Offices.  These policies and procedures should include a requirement for when complaints should be entered into the CTR database, e.g., upon receipt, and should provide for consistent, periodic supervisory reviews of CTRs.

---

[144] Id. at 1.
[145] Id. at 1-2.

## Recommendation 6

The Division of Enforcement should designate an office or individual at Headquarters to provide nationwide oversight for the Complaints, Tips and Referrals program.

# Finding 4:  Headquarters and the Regional Offices Do Not Consistently Follow Existing Complaint, Tips and Referrals Processing Procedures.

> Enforcement's   CTR   procedures   applicable   to Headquarters and the Regional Offices are not being followed on a consistent basis.

During our audit, we performed testing of CTRs processed by Enforcement staff at Headquarters during the period of our examination and reviewed the results of questionnaires we submitted to the Regional Offices.  Based on the results of this testing and questionnaires, we found that the CTR procedures for Headquarters and the Regional Offices were not consistently being followed.

**Testing of Headquarters CTR Procedures.**  We requested documentation related to the CTRs that were received by Headquarters Enforcement staff between January 1, 2007 and June 1, 2008.  We received and reviewed documentation related to 82 CTRs to determine whether they complied with the Headquarters CTR procedures.  According to the Headquarters CTR procedures, the CTR materials that are sent to OIE should include the original complaint, the response and a CTR form.[146]

Of the 82 CTR packages we reviewed, 90 percent (74 of 82) included a complaint, 60 percent (49 of 82) included the CTR data form, and only 33 percent (27 of 82) included a response that was sent to the complainant.[147]  Our review also disclosed that OIE does not follow up with Enforcement staff to ensure that the CTR package is complete and, as a consequence, oftentimes lacked complete documentation of a complaint.  In addition, we found one complaint that was not entered into the CTR database and, for another complaint, only one of the five entities named in the complaint appeared in the CTR database.  OIE management indicated that it was just a repository for the CTR data and was not responsible for overseeing the CTR program at Headquarters.

---

[146] Home Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated October 6, 2005, at 1.

[147] We noted two instances where OIEA had informed Enforcement that no response to the complaint was necessary because OIEA had already responded.  However, OIEA's response was not included in the CTR package.

**Questionnaires about Regional Office CTR Policies and Procedures.** We issued an e-mail questionnaire to all 11 Commission Regional Offices to obtain information about their CTR policies and procedures and to determine whether and how its monthly CTR reviews were conducted. Based upon the responses we received to the questionnaire, we determined that:

- Five Regional Offices performed monthly CTR reviews;

- One Regional Office sometimes performed its reviews every six weeks, rather than monthly;

- One Regional Office reviewed its CTRs on a quarterly basis;

- Two Regional Offices did not perform the monthly reviews of CTRs because senior officers were involved with CTRs throughout the process;

- One Regional Office did not perform monthly reviews because the Branch Chiefs and their staff were viewed as responsible for their judgments on CTRs; and

- One Regional Office (which was previously a District Office and reported to a Regional Office) did not perform its own CTR reviews, but rather forwarded its complaints to another Regional Office for review.

Thus, the responses to our questionnaires disclosed that only five of eleven Regional Offices were regularly performing monthly CTR reviews, as required by the Regional Office CTR procedures, despite the emphasis that these procedures place on supervisory review.[148]

## Recommendation 7

The Division of Enforcement should require that the Office of Internet Enforcement (OIE) performs the necessary follow-up to ensure that all Complaints, Tips and Referrals (CTR) packages forwarded to OIE contain complete documentation concerning a complaint, and that all CTRs are entered into the CTR database.

## Recommendation 8

The Division of Enforcement should require that Regional Office senior officials perform monthly reviews of Complaints, Tips and Referrals (CTR), as is required by the Regional Office CTR procedures.

---

[148] See Field Office Procedures for Handling Complaints/Tips/Referrals (CTR's), updated October 6, 2005.

# Finding 5:  Enforcement's Complaint Tracking Systems Need Improvement.

> Enforcement's complaint tracking systems do not provide the capabilities that Enforcement needs to manage effectively the large volume of complaints that it receives.

Enforcement uses several automated systems to track complaints.  The ECC uses dedicated folders in the Commission's e-mail system to receive and maintain complaints sent to the Enforcement's complaint mailbox, enforcement@sec.gov.  Enforcement also uses the CTR database to track complaints that Enforcement Headquarters and Regional Office staff receive by a variety of methods, including telephone, letter, fax and e-mail.[149]

Data tracking systems should identify, capture and communicate information to enable the users of the systems to carry out their responsibilities efficiently and effectively.[150]  As the information generated by these systems assists management in making crucial decisions regarding its operations, data systems should include adequate controls to ensure, among other things, the completeness of data.[151]  As discussed below, our audit found that the ECC and CTR systems currently in use by Enforcement to track complaints are insufficient in several important respects.

**The ECC's Mailbox Functions.**  The ECC's complaint mailbox serves more as a repository for e-mails than as a complaint management information system.  The e-mail folders the ECC uses to organize the e-mails it receives have basic sort capabilities.  However, the ECC's e-mail system has several limitations:  (1) it lacks the ability to translate e-mails submitted in foreign languages; (2) it has limited report generation capability; (3) complaints cannot be tracked through the different levels of review; and (4) there is no ability to link complaints received with subsequent related investigations or enforcement actions.

Our audit disclosed that the limitations of the ECC's e-mail system hamper OIE's ability to manage the e-mail complaints it receives effectively.  For example, due to the high volume of e-mails maintained in the ECC's system, basic analysis of the e-mails has to be conducted through a sort, and is very difficult and time-consuming to perform.  In addition, because the ECC cannot translate e-mails that are submitted in foreign languages, the ECC initial review coordinators

---

[149] In addition, OMS receives referrals of complaints from the SROs through its SMRS interface. During our audit, we learned that OMS has requested enhancements of the SMRS system that are pending.

[150] Internal Control – Integrated Framework, Committee of Sponsoring Organizations of the Treadway Commission, July 1994, at 59.

[151] Id.

automatically discard these emails, unless they include a section in English that contains information in which Enforcement is interested.

**CTR Database Capabilities.**  Overall, the CTR database has greater capabilities than the ECC e-mail system has.  For example, the CTR database has basic sorting and searching functions, as well as an add-on program that is available for generating reports.  The CTR database also appears to generate sequential numbers for each record.  We further found that the CTR system includes useful information about the nature of the complaint, its source, its disposition, and the name of the staff who performed the initial review of the complaint.

Nonetheless, we found that improvements could be made to enhance the effectiveness of the CTR system. The CTR system does not record the name of the supervisor or senior staff member who reviewed the complaint.  This information would be useful to document the supervisory and senior staff reviews required by the Regional Office CTR procedures.  In addition, staff in two Regional Offices who used the CTR database stated that improved data search and report generating capabilities would be helpful.[152]  We also learned that three Regional Offices developed their complaint tracking systems to obtain some of the capabilities lacking in the Headquarters' CTR database.  Finally, we found that the reliability of the CTR system could be questioned because duplicate records exist and there appear to be gaps in the sequential numbering of complaints.

In addition, it recently came to our attention that three Regional Offices have experienced difficulties accessing the CTR system to input information into the database for the past few months.

During our audit, we learned that OIEA uses a complaint tracking system that captures correspondence, analysis and disposition information used for tracking public and investor complaints and inquiries.  This system provides many of the capabilities that Enforcement's CTR system lacks (e.g., better searching and report generation capabilities).  Enforcement may wish to use OIEA's system as a model for improving the CTR system.

**Recommendation 9**

The Division of Enforcement should improve the analytical capabilities of the Enforcement Complaint Center's e-mail complaint system, including its search and report generation capabilities, as well as its ability to translate foreign-language e-mails.

---

[152] We were informed during the audit that reports were previously generated from the CTR system for Headquarters management review, but that this process was discontinued due to a lack of interest in the information.

**Recommendation 10**

The Division of Enforcement should improve the Complaints, Tips and Referrals database to include additional information about, and to better track, complaints, e.g., by adding data fields to document supervisory and senior staff review, and improving its searching and report generating capabilities, and should resolve problems with Regional Office access to the database.

# Finding 6:  The Office of Internet Enforcement Does Not Track the Results of Referrals of Complaints.

> OIE had developed a database to track the results of its referrals of complaints to Enforcement staff for further investigation.   However, OIE discontinued use of this database in 2007 due to problems encountered with the system.  As a consequence, OIE does not currently track the results of complaint referrals.

During an audit the OIG conducted in 2003 of Enforcement's Internet program,[153] we learned that OIE was developing a new database to track the results of complaints that OIE referred for further investigation.  This database was intended to enhance OIE's complaint tracking abilities by reflecting whether a MUI or investigation was opened based upon a complaint referral from OIE. While conducting our current audit, we inquired about the status of this database and were informed that it was discontinued in 2007, as a result of technical difficulties encountered with the system, such as communicating with other systems.

Information systems are an integral part of operational activities, and should provide management with reports on performance relative to established objectives.[154]  Because OIE discontinued use of its previous referral tracking system, OIE currently has no system that tracks information on the results of its referrals of complaints.  As a consequence, OIE is not collecting in any formalized manner information showing whether complaint referrals led to the opening of a MUI or investigation.  Such information would assist OIE staff in understanding what types of complaints Enforcement staff have found warranted the opening of a MUI or investigation, and determining what types of complaints should be referred in the future.  A complaint referral database would also be

---

[153] Internet Enforcement Program, OIG Report No. 352, January 13, 2003.
[154] Internal Control – Integrated Framework, Committee of Sponsoring Organizations of the Treadway Commission, July 1994, at 59.

useful to generate statistical information concerning the results of complaint referrals and could serve as a useful management tool.

## Recommendation 11

The Division of Enforcement should ensure that the Office of Internet Enforcement updates and resumes using its previous complaint referral tracking system, or develops a new system for tracking information on the results of complaint referrals.

# Abbreviations and Acronyms

| | |
|---|---|
| CNS | Continuous Net Settlement |
| CTR | Complaint, Tip, and Referral |
| DTC | Depository Trust Company |
| DTCC | Depository Trust & Clearing Corporation |
| ECC | Enforcement Complaint Center |
| Enforcement | Division of Enforcement |
| FINRA | Financial Industry Regulatory Authority |
| GAO | Government Accountability Office |
| MUI | Matter Under Inquiry |
| NYSE | New York Stock Exchange |
| NSCC | National Securities Clearing Corporation |
| OCIE | Office of Compliance Inspections and Examinations |
| OIE | Office of Internet Enforcement |
| OIEA | Office of Investor Education and Advocacy |
| OIG | Office of Inspector General |
| PIPE | Private Investment in Public Equity |
| OMS | Office of Market Surveillance |
| SEC/Commission | U.S. Securities and Exchange Commission |
| SMRS | SRO Market Referral System |
| SRO | Self-Regulatory Organization |
| Trading and Markets | Division of Trading and Markets (formerly the Division of Market Regulation) |

# Scope and Methodology

We conducted this performance audit in accordance with generally accepted government auditing standards.  These standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**Scope.**  We obtained data from  Enforcement's ECC e-mail system, CTR system, and SRO Market Referral System for the period from January 1, 2007 to June 1, 2008.  We conducted our fieldwork from May 2008 to January 2009.

**Methodology.**  We interviewed staff and managers in Enforcement, Trading and Markets, OIEA, OCIE, and several Regional Offices to obtain an understanding of the issues pertinent to naked short selling, as well as complaint receipt and processing procedures.  We requested and obtained copies of the naked short selling complaint e-mails received by the ECC, the CTRs received by Enforcement's OIE, and a list of the SRO referrals received by OMS for the period from January 1, 2007 through June 1, 2008.  We used this information to estimate total naked short selling complaints received and to test compliance with applicable policies and procedures.

In addition, we submitted a questionnaire, in June 2008, to the Commission's 11 Regional Offices to obtain information about their complaint processing procedures.  We received responses from all 11 Regional Offices and followed up on the responses received as appropriate.  We also reviewed selected information concerning naked short selling that was generated by the Commission or outside parties, including numerous complaints about naked short selling that the OIG received.

**Internal/Management Controls.**  We reviewed internal controls that were considered significant within the context of the audit objectives.  We interviewed Enforcement management and staff, identified and reviewed applicable policies and procedures, obtained and reviewed complaints and complaint tracking data, and tested the data for compliance with selected policies and procedures.  We identified areas for improvement, as listed in Appendix IV.

**Use of Computer-Processed Data.**  We used computer-processed data such as e-mails, Excel spreadsheets, and Commission database information.  To the extent practical, we compared the data we received with the source documents, such as complaints or data input forms.  We did not perform extensive tests of

system general or application controls.  While we found some discrepancies in the CTR database, including duplicate records, gaps in the sequential record numbering, and inconsistent procedures for data input, these errors did not preclude our use of the computer-processed data to meet our audit objectives or change our conclusions.  Also, we are making recommendations to address the issue of inconsistent procedures for CTR data input.

**Judgmental Sampling.**  Due to the relatively small universe of Headquarters CTRs submitted to OIE between January 1, 2007 and June 1, 2008, rather than selecting a judgmental sample, we reviewed the entire universe in order to test for compliance with Enforcement's established policies and procedures for Headquarters CTR complaint processing.  Specifically, we requested and tested documentation related to 82 CTR packages that were submitted to OIE between January 1, 2007 and June 1, 2008 (which should consist of a complaint, response and CTR form).

**High-Risk Areas.**  GAO has not specifically identified naked short selling complaint processing as a high-risk area at the agency.  However, this issue has generated a great deal of attention from Congress, GAO, and the public, and the GAO is currently conducting a review of the implementation of Regulation SHO. Additionally, in the wake of the recent financial crisis and increased concerns about abusive naked short selling, the Commission entered an initial temporary emergency order that required all persons to borrow or arrange to borrow securities of certain financial institutions prior to affecting an order for a short sale of those securities.  See Securities Exchange Act Release No. 34-58166, July 15, 2008.  The Commission subsequently entered additional temporary emergency orders that, among other things, prohibited short selling in the publicly traded shares of certain financial firms, imposed enhanced delivery requirements on the sales of all equity securities by amending the Commission's short selling regulation, Regulation SHO, the options market maker exception from Regulation SHO's close-out requirement, and implementing a naked short selling antifraud rule.  See Securities Exchange Act Release No. 34-58572, September 17, 2008; Securities Exchange Act Release No. 34-58592, September 18, 2008.

**Prior Audit Coverage.**  We found no prior audit coverage of the issue of naked short selling complaint processing.  However, we noted that a recent GAO report addressed needed improvements in Enforcement's electronic system for the receipt of referrals of potential securities law violations from the SROs.  See GAO-08-33, Securities and Exchange Commission:  Opportunities Exist to Improve Oversight of Self-Regulatory Organizations, November 15, 2007. We also followed-up on the status of findings and recommendations contained in SEC OIG Enforcement Internet Program, Report No. 352, issued January 13, 2003, regarding OIE, which is responsible for the ECC.  We determined that all the recommendations were properly closed.

# Criteria

---

**Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q.** Prohibits the use of interstate commerce for the purpose of fraud or deceit in the offer or sale of any security or any security-based swap agreement.

**Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j.** Prohibits the use of interstate commerce to use or employ a manipulative or deceptive device or contrivance in contravention of the Securities and Exchange Commission's rules in connection with the purchase of sale of a security.

**SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.** Prohibits the employment of manipulative and deceptive devices by using interstate commerce, or the mails or facilities of any national securities exchange in connection with the purchase of sale of any security.

**SEC Rule 10b-21, 17 C.F.R. § 240.10b-21, SEC Release 34-58774 (Oct. 14, 2008).** Recently adopted anti-fraud rule specifically aimed at fails to deliver securities associated with naked short selling.

**SEC Rule 15c6-1, 17 C.F.R. § 240.15c6-1.** Prohibits broker-dealers from effecting or entering into contracts for the purchase or sale of securities that provide for payment of funds and delivery of securities later than three business days after the date of the contract, unless otherwise expressly agreed to by the parties at the time of the transaction.

**SEC Rule 203, 17 C.F.R. § 242.203.** Initially adopted in 2004 as part of Regulation SHO, the Securities and Exchange Commission's short sale regulation. Requires broker-dealers, prior to effecting short sales in all equity securities, to locate securities available for borrowing in order to deliver securities on the settlement date of the transaction. It also imposes additional requirements on broker-dealers for securities in which a substantial amount of fails to deliver have occurred.

**SEC Rule 204T, 17 C.F.R. § 242.204T, SEC Release 34-58773 (Oct. 14, 2008).** Recently adopted interim final temporary rule amendment to Regulation SHO. Requires that securities be purchased or borrowed to close out any fail to deliver position in an equity security by the beginning of regular trading hours on the settlement day following the date on which the fail to deliver position occurred. This temporary rule is effective through July 31, 2009.

**July 15, 2008 SEC Emergency Order, Securities Exchange Act Release No. 58166.** Temporary emergency order providing that no short sale could be

---

effected in the securities of certain financial firms unless the seller or its agent borrowed or arranged to borrow the security or otherwise had the security available to borrow prior to effecting the short sale and delivers the security on the settlement date. The order took effect on July 21, 2008, and was subsequently extended until August 12, 2008.

**September 17, 2008 SEC Emergency Order, Securities Exchange Act Release No. 34-58572.** Imposed a number of additional emergency measures, that included adding a temporary rule to Regulation SHO, Rule 204T; temporarily eliminating the options market maker exception from Regulation SHO's close-out requirement, and making immediately effective Rule 10b-21, a naked short selling antifraud rule. The order was effective from September 18, 2008 until October 1, 2008.

**September 18, 2008 SEC Emergency Order, Securities Exchange Act Release No. 34-58592.** Temporarily prohibited any short selling in the publicly traded shares of certain financial firms. The order was effective until October 2, 2008.

**Enforcement Complaint Center Policies and Procedures.** Prescribe policies and procedures for the receipt and processing of incoming complaints by Enforcement's ECC. Include Memorandum Re: Enforcement Complaint Center/How To, September 17, 2007; Memorandum Re: Review of ECC Triage Guidelines/Procedures, September 17, 2007; and E-mail dated October 17, 2003, Subject: Important Guidelines RE: Investor "Level II" Complaints.

**Enforcement's Complaints, Tips and Referrals Procedures.** Prescribe policies and procedures for the processing CTRs received by Division of Enforcement staff outside normal complaint channels. Include Home Office Procedures for Handling Complaints/Tips/Referrals, updated October 6, 2005; and Field Office Procedures for Handling Complaints/Tips/Referrals, updated September 1, 2005.

# List of Recommendations

**Recommendation 1:**

The Division of Enforcement should develop written in-depth triage analysis steps for naked short selling complaints, as it has for complaints involving other types of securities law violations, such as spam-driven manipulations and insider trading.

**Recommendation 2:**

The Division of Enforcement should revise its written guidance to the Enforcement Complaint Center staff to ensure that naked short selling complaints based on information obtained from "Level II" computer screens are given a proper level of scrutiny and referred for further investigation where appropriate.

**Recommendation 3:**

The Division of Enforcement should add naked short selling to the list of categories of complaints on the Commission's public webpage that solicits complaints from the public and should develop an online complaint form specifically tailored to naked short selling complaints.

**Recommendation 4:**

The Division of Enforcement's Enforcement Complaint Center should develop and implement policies and procedures providing for supervisory review of a sample of e-mails that are not forwarded for further review as a result of the initial screening process.

**Recommendation 5:**

The Division of Enforcement should develop uniform written policies and procedures for the Complaints, Tips and Referrals (CTR) Program at Headquarters and the Regional Offices.  These policies and procedures should include a requirement for when complaints should be entered into the CTR database, e.g., upon receipt, and should provide for consistent, periodic supervisory reviews of CTRs.

**Recommendation 6:**

The Division of Enforcement should designate an office or individual at Headquarters to provide nationwide oversight for the Complaints, Tips and Referrals program.

**Recommendation 7:**

The Division of Enforcement should require that the Office of Internet Enforcement (OIE) performs the necessary follow-up to ensure that all Complaints, Tips, and Referrals (CTR) packages forwarded to OIE contain complete documentation concerning a complaint, and that all CTRs are entered into the CTR database.

**Recommendation 8:**

The Division of Enforcement should require that Regional Office senior officials perform monthly reviews of Complaints, Tips and Referrals (CTR), as is required by the Regional Office CTR procedures.

**Recommendation 9:**

The Division of Enforcement should improve the analytical capabilities of the Enforcement Complaint Center's e-mail complaint system, including its search and report generation capabilities, as well as its ability to translate foreign-language e-mails.

**Recommendation 10:**

The Division of Enforcement should improve the Complaints, Tips and Referrals database to include additional information about, and to better track, complaints, e.g., by adding data fields to document supervisory and senior staff review, and improving its searching and report generating capabilities, and should resolve problems with Regional Office access to the database.

**Recommendation 11:**

The Division of Enforcement should ensure that the Office of Internet Enforcement updates and resumes using its previous complaint referral tracking system, or develops a new system for tracking information on the results of complaint referrals.

# Management Comments

**Division of Enforcement**                                    **March 5, 2009**

Thank you for the latest draft of the report.  Our formal written comments remain the same.  As to the specific recommendations:

- Recommendations 1-3: We do not concur.
- Recommendation 4: We concur.
- Recommendations 5-11:  In light of the Chairman's efforts in this area, as shown in the Commission's release today, we wonder whether now is the appropriate time for recommendations that approach referrals in a fragmented manner. We therefore would prefer to take no position until after the Commission's comprehensive review is done.  If we do not have that option then we should be put down as not concurring.

**Enforcement's Comments:**                                    **February 17, 2009**

This letter is in response to Audit Report No. 450, regarding Practices Related to Naked Short Sale Complaints and Referrals.

Market manipulation effected by abusive "naked" short selling ("NSS") -- like manipulation in all its other forms -- is an issue that the Enforcement Division takes very seriously.  However, as the Report confirms, "naked" short sales, *i.e.*, selling short without having borrowed the securities to make delivery, can occur for legitimate reasons, without any sort of manipulative intent.  In addition, the mere fact that a stock may experience "failures to deliver" does not imply a violation of the federal securities laws.  Indeed, a fail may occur as a result of a long sale (*i.e.*, a sale of owned securities) as well as a short sale.

In recent months, a small but vocal cadre of advocates has emerged decrying the practice and suggesting that it has damaging market effects.  But there is hardly unanimity in the investment community or the financial media on either the prevalence, or the dangers, of "naked" short selling.  The Commission has repeatedly stressed the fact that the practice can provide needed market liquidity in certain circumstances.  For instance, market makers sometimes engage in legitimate "naked" short selling when there is high buying demand in a security.[155]  Still others view the threat posed by "naked" short selling as wildly exaggerated, and point to instances in which allegations of abusive "naked" short

---

[155] If a market maker fails to deliver securities by settlement date (T+3), Commission rules require that such fails to deliver be closed out promptly.

selling were used to cover up other management malfeasance, like the dumping on the market of large blocks of unregistered shares. We have recently alleged such behavior in the widely-discussed *CMKM Diamonds* litigation. Other fraud defendants have also attempted to portray depressed stock prices as the work of clandestine short sellers.

Despite its assertions regarding the potential danger of "naked" short selling and the growing interest in the subject, the Report can cite to no *bona fide* studies or empirical data regarding the practice's market impact. The Division of Trading and Markets debunks the theory that NSS creates "counterfeit" or "phantom" shares.[156] The Report cites to the emergency orders, final rules, and interim final temporary rules addressing short selling, including "naked" short selling that the Commission issued in July, September, and October of 2008. When it issued each of these rules, the Commission noted in its releases that the purpose of the emergency actions was to address the lack of market confidence and investor fears that short selling, including legitimate short selling, could exacerbate the current financial crisis by creating downward price momentum unrelated to the fundamental financials of issuers.

As the Commission has noted in its releases, NSCC reports that 99% (by dollar value) of all trades settle on time, or within the standard T+3 settlement cycle. It is important to note that a fail to deliver occurs even where a security settles one day late. As the Commission noted in its October interim final temporary rule release adopting Rule 204T, more than half of all fails to deliver and 70% of all fails to deliver positions are closed out within two settlement days after T+3 (two days late). The vast majority of fails to deliver are closed out within five days after T+3. While the Commission recently strengthened the close-out requirements because it is concerned about the impact of persistent fails on market confidence, these fails to deliver are not necessarily the result of illicit activity, such as abusive "naked" short selling. As noted above, there may be legitimate reasons for fails to deliver, including mechanical errors or processing delays. Thus, while the Commission has recognized that timely settlement of trades is important for market integrity and investor confidence, the Commission's recent rulemaking in this area recognizes that trades do fail (whether from long sales or short sales) but that fails should not persist.

The Division of Enforcement is called upon to police the massive U.S. securities markets with decidedly limited resources and, in order to fulfill our mission of investor protection, we must intelligently leverage those resources. As manager of the Enforcement Complaint Center (ECC), the Office of Internet Enforcement (OIE) is under the same mandate with respect to its limited staff.[157]

---

[156] See http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm, Question 7.1
[157] While OIE manages the ECC and is responsible for training staff that review complaints, OIE's responsibilities do not extend to tracking or stipulating investigative follow-up to complaints referred to

In order to derive the maximum value from the investor complaints it handles, OIE is charged with prioritizing and passing on for further investigation complaints that contain the most facially compelling information regarding possible violations of the federal securities laws, the material most likely to trigger Enforcement investigations leading to filed actions. This is accomplished by focusing on complaints with a high likelihood of accuracy and credibility (like those of purported insiders or scam victims), those whose information can be readily vetted (*i.e.*, visible price swings in a possible manipulation or insider trading allegation), or those involving demonstrated, immediate investor hazard in the current market environment (Ponzi schemes, improper sales of auction-rate securities).

The ECC receives all sorts of communications. Investor complaints run the gamut from the painstakingly specific and well-researched to the speculative and fanciful. So-called "Level II" complaints – that is, assertions of market manipulation or distortion from retail investors based purely on observations of private computer terminals – rely on simple trading snapshots and are really no more reliable an indicator of fraud than a dart tossed at a dartboard full of company names. Other types of complaints, like those based on direct in-person or electronic solicitation, for example, are far more likely to paint a coherent picture for investigators.

As the Report notes, a large number of the complaints received provide no support for the allegations. For instance, some complaints merely state that no one should be permitted to sell stock that they do not own. However, legitimate short selling by definition is the sale of a security that the seller does not own. Other complaints allege that a specific issuer's price has declined and the complainant believes the decline must be the result of "naked" short selling, even though the complainant cannot know if the price decline is due to "naked" short selling, legitimate short selling where the seller has borrowed and timely delivered securities, or other legitimate price discovery mechanisms. For instance, price declines may occur because owners of the security may have sold their securities in response to unfavorable financial information or unfavorable news about the issuer or the issuer's particular industry.

The best sources for information on violations relating to "naked" short selling is the SRO, which has primary responsibility for surveillance of its trading. And we receive a large number of referrals from the SROs, addressing all forms of alleged investment misconduct. It is telling that, of the 900 SRO referrals Enforcement received during the Report's 18-month survey period, none involved the practice of "naked" short selling. That is to say, the people closest to the trading, with the deepest understanding of and

---

Regional or Home Office attorneys. Similarly, OIE has not been charged with approving, or supervising compliance with, CTR procedures in the regions.

access to the data, did not see and refer any of the large-scale, damaging "naked" short sale abuse about which the Report hypothesizes.  That having been said, as the Report notes, the Commission has brought Enforcement actions for conduct including "naked" short selling, where violations have occurred.[158]

Consequently, with respect to Recommendations 1-3 contained in the Report (specific triage steps for NSS complaints, revision of OIE training materials to mandate enhanced scrutiny for Level II complaints, creation of specific NSS complaint form), the Division believes that these are not optimal uses for Commission resources and are not calculated to yield a higher quality of investigative referrals to Enforcement attorneys in the Home Office and Regions.

With regards to Recommendation 4, suggesting supervisory sampling and review of complaints that do not survive "first stage" triage review, we concur and will draft and implement suitable policies and procedures.

The remaining Recommendations relate to suggested modifications to the Division's general complaint-handling systems, both those handling (i) information that flows directly to OIE from the public (the ECC), and (ii) information received by non-OIE attorneys in the regions and Home Office, reviewed, resolved and catalogued by OIE (the CTR program).

As you know, a new Chairman has taken office, and her staff is currently engaged in an agency-wide effort to determine how tips and complaints are handled in the various Divisions and Offices.  No doubt this effort will result in important changes to the agency's approach, and will likely address the principles discussed in the Report. Considering that such an effort is underway, the Division believes that the best way forward on Recommendations 5-11 is to cooperate fully in the Commission's review, and to implement its recommendations, along with the rest of the agency, in a coordinated fashion.

---

[158] See, e.g., In re Sandell Asset Management, et al., Securities Act Rel. No. 8857 (October 10, 2007).

# OIG Response to Management Comments

We are disappointed that the Division of Enforcement (Enforcement) only concurred with one of the 11 recommendations in this audit report. We are particularly concerned that Enforcement did not concur with the report's first three recommendations that it develop written in-depth triage analysis steps for naked short selling complaints, as it has for other complaints; that it revise its written guidance to the Enforcement Complaint Center staff to ensure that naked short selling complaints are given a proper level of scrutiny and referred for further investigation; and that it add naked short selling to the list of categories of complaints on the Commission's public webpage and develop an online complaint form specifically tailored to naked short selling complaints.

As we discussed in our report, the SEC has repeatedly recognized that naked short selling can depress stock prices and have harmful effects on the market. In adopting a naked short selling antifraud rule, Rule 10b-21, in October 2008, the Commission stated, "We have been concerned about 'naked' short selling and, in particular, abusive 'naked' short selling, for some time." In this report, we determined that Enforcement's current policies and procedures appear to limit significantly the referral of naked short selling complaints, and that its written policies and procedures result in naked short selling complaints being treated differently from other types of complaints of securities law violations. Notwithstanding the Commission's previous statement and our findings, Enforcement responded to our report by stating that "there is hardly unanimity in the investment community or the financial media on either the prevalence, or the dangers, of 'naked' short selling," and references the view held by some that "the threat posed by 'naked' short selling is wildly exaggerated . . . ." Accordingly, Enforcement concludes that the report's recommendations, which are intended to allow for more thorough investigations of naked short selling complaints, are not optimal uses of Commission resources. We would hope that Enforcement reconsiders this position in light of the Commission's stated concerns about the effect of naked short selling on the market.

We are also disappointed that Enforcement does not intend to implement immediately our specific recommendations (Nos. 5-11) designed to improve its complaints, tips and referral process. We understand that the SEC's new Chairman has announced the enlisting of a contractor to conduct a comprehensive review of internal procedures used to evaluate tips, complaints, and referrals for the entire agency, and we will certainly work closely with the contractor to assist with this review. Nonetheless, we believe that implementation of our recommended improvements should begin now, in coordination with the contractor's review, to ensure that the implementation of necessary improvements to Enforcement's complaint system is not unduly delayed.

# Audit Requests and Ideas

The Office of Inspector General welcomes your input.  If you would like to request an audit in the future or have an audit idea, please contact us at:

U.S. Securities and Exchange Commission
Office of Inspector General
Attn: Assistant Inspector General, Audits (Audit Request/Ideas)
100 F Street, N.E.
Washington D.C.  20549-2736

Tel. #:  202-551-6061
Fax #:  202-772-9265
Email: oig@sec.gov

# Hotline

**To report fraud, waste, abuse, and mismanagement at SEC, contact the Office of Inspector General at:**

**Phone:  877.442.0854**

**Web-Based Hotline Complaint Form:**
**www.reportlineweb.com/sec_oig**