# Exhibit C

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 20449510
Date: Jun 30 2008 12:01PM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

TASER INTERNATIONAL, INC., DAVID
and NATALIE BATCHELOR, DR.
THOMAS and JUDITH COLLENTINE,
CHARLES and SANDRA FAIRES,
MASAJI and KELLY KELLEY, STEPHEN
and PATRICIA LISENBY, RICHARD and
CONSTANCE ALMEROTH, JAMES
BAKER, JR., ROBERT BAKER, WILLIAM
BURNSIDE, DAVID EVERETT, KELLIE
BURNSIDE, HELEN BURNSIDE, ESTATE
OF JAMES CONNELLY, DOROTHY
CONNELLY, JAMES L. DUNAGIN, JR.
TTEE SOUTHEAST EYE SURGERY
CLINIC, INC. EMPLOYEE PSP, JAMES
and EMILY DUNAGIN, RICHARD C.
HASKELL, SUSAN HASKELL, RICHARD
C. and AMY HASKELL, JR., MARY
RICHARDSON, PAMELA LEWIS, JANE
MAJ, ROZALIA MAJ, CRAIG MILLER,
MARGARET ROCHE, CHET SCOTT,
JOHN SCOTT, PAULA SCOTT, PETER
and MICHELLE SCOTT, MARY ROSE
STUCKER, DAVID and ANNE ZEBER,
and MICHAEL BOYER,

      Plaintiffs,

v.

MORGAN STANLEY & CO., INC.,
GOLDMAN SACHS GROUP, INC., BEAR
STEARNS CAPITAL MARKETS, INC.,
BEAR STEARNS & CO, INC., THE BEAR
STEARNS COMPANIES, INC., MERRILL
LYNCH, PIERCE, FENNER & SMITH,
INC., DEUTSCHE BANK SECURITIES,
INC., CREDIT SUISSE USA, INC., BANC
OF AMERICA SECURITIES, LLC, and
UBS SECURITIES, LLC,

      Defendants.

JURY TRIAL DEMANDED


Civil Case No.
2008-EV-004739-B



**THIRD
AMENDED
COMPLAINT**

# TABLE OF CONTENTS

NATURE OF THE ACTION ....................................................................................1

Parties, Jurisdiction and Venue...........................................................................20

STATEMENT OF THE RELEVANT FACTS .......................................................28

A.   Background of the Parties and Conspirators ...................................28

B.   The Mechanics of Short Sales and Naked Short Sales....................32

C.   Naked Short Selling is Harmful and Illegal ....................................36

D.   Mechanisms Through Which The Defendants Engage In
     and/or Conceal Naked Short Sales ....................................................38

     (i)     Naked Short Selling On Behalf Of Clients .........................38

     (ii)    Naked Short Selling In the Defendants' Proprietary Accounts ..........39

     (iii)   Permitting Indefinite Delivery Fails ..................................39

     (iv)    Providing Phantom Shares for Loans of TASER's Stock to Cover
             Short Sales.............................................................................40

     (v)     False Documentation .........................................................40

     (vi)    Concealment by Trading Off the Market............................41

E.   Evidence of the Defendants' Conspiracy To Engage In,
     Facilitate and Profit From Naked Short Selling ............................47

F.   The Defendants' Naked Short Selling Has Injured Plaintiffs ......54

COUNT ONE (Violation of Georgia's RICO Statute)..........................................55

COUNT TWO (Violation of the Georgia Securities Act).......................................67

COUNT THREE (Violation of the Georgia Computer Systems Protection Act)...68

COUNT FOUR (Conversion)................................................................................68

## COMPLAINT

Plaintiffs hereby file their Complaint against the above-named defendants, and respectfully show the Court as follows:

## NATURE OF THE ACTION

1.

This is an action to recover damages incurred as a result of the defendants' conspiracy to unlawfully, deceptively and fraudulently manipulate the price of the common stock of TASER International, Inc. ("TASER"), a publicly-traded company on the NASDAQ stock market. As described in detail below, the defendants have substantially injured plaintiffs, while at the same time reaping enormous profits, by knowingly and intentionally creating, loaning and selling unauthorized, counterfeit shares of TASER stock.

2.

The defendants' unlawful conduct occurs in the context of illegal short selling. In a typical legal short selling transaction, a party (known as a "short seller") speculates that the price of a stock will decline, and seeks to profit from that expected decline. To accomplish this, the short seller borrows shares of the subject company's stock, and sells those borrowed shares on the open market at the existing price. The short seller replaces the

1

shares it borrowed by purchasing the subject company's stock at a later date, and returning the borrowed shares back to the lender. If the short seller's speculation that the stock price will decline is correct, the short seller will earn as profit the difference between the higher price at which it sold the borrowed shares and the lower price at which it subsequently replaced them.

As an illustrative example, a short seller speculates that Stock X is currently overvalued at $50/share, and expects the share price to decline. The short seller (who doesn't own Stock X) borrows 100 shares of Stock X, and sells those shares on the open market at the existing $50/share price. The borrowed shares are delivered to the purchaser to complete the proper settlement of the short sale. The stock price later falls to $45/share, at which time the short seller purchases 100 shares of the stock to replace the shares the short seller borrowed. As a result, the short seller earns $5/share, minus any fees, commissions and/or interest it incurred in completing the transaction.

3.

When conducted in accordance with securities and other laws and regulations, short selling is a legal and accepted trading strategy. A critical requirement of a *lawful* short sale is that the short seller first makes an affirmative or reasonable determination that the shares are available and

2

actually borrows or otherwise obtains the stock it initially sells at the (hoped

for) higher price. Indeed, securities laws and regulations require a short

seller to borrow the stock it sold and deliver that borrowed stock within three

days of the short sale (known as the "settlement date"). The logic of these

laws and regulations is simple – if the short seller never borrows or

otherwise obtains the stock it sold short, the short seller cannot convey

authorized and issued stock to the purchaser.

4.

In those instances in which a short seller fails to borrow or otherwise

obtain the stock it sold short, the purchaser is not precluded from completing

the sale and obtaining the purchased stock. Virtually all settlements of

securities trades today are conducted electronically through a central

depository, known as the Depository Trust and Clearing Corporation

("DTCC")[1], which accounts for the buying and selling of securities through

electronic book entries (rather than transfer of physical stock certificates).

In a typical securities transaction, the DTCC reflects in its electronic trading

records that the buyer "owns" the shares, and that the seller "owes" the

purchased shares, which the seller is supposed to deliver by the three-day

---

[1] One of the primary subsidiaries the DTCC operates through is the National
Securities Clearing Corporation (NSCC). Throughout this Complaint,
"DTCC" refers to both the DTCC and the NSCC.

3

settlement date.  In a short sale, the DTCC still electronically transfers to the buyer the stock it purchased *even if the seller fails to deliver the shares it "owes" to the DTCC* (what is commonly referred to as a "fail").  If the short seller fails to deliver the stock it owes to the DTCC, the short seller has, in effect, electronically created and conveyed a new, counterfeit share of stock to the buyer.  That is, the DTCC credits the buyer with owning shares that did not previously exist.  The newly created shares are counterfeit shares because they were not authorized or issued by the company or registered for sale by the company with either the U. S. Securities  and Exchange Commission ("SEC") or the market on which the shares trade.  Rather, they were created electronically by the short seller through an illegal short sale of a stock that the short seller did not own, deliver and/or intend on possessing for the settlement of the short sale.

5.

The practice of selling a stock short without borrowing or otherwise obtaining shares of that stock is commonly referred to as "naked short selling."  Naked short selling is illegal.  Indeed, the SEC (which oversees federal securities laws substantially similar to some of the state laws at issue here) has found that naked short selling "can have a number of negative

4

effects on the market."[2]  In November of 2007, former SEC Chairman
Harvey Pitt stated: "Phantom shares created by naked shorting are analogous
to counterfeit money."[3]  Similarly, during a February 14, 2008 Senate
Banking Committee Hearing, Senator Robert Bennett noted that as a result
of naked short selling it is becoming "increasingly...easier in this electronic
world to give you counterfeit shares."[4]  In a release dated March 17, 2008,
the SEC stated that abusive naked short selling refers to "selling short
without having stock available for delivery and intentionally failing to
deliver stock within the standard three-day settlement cycle," and that such
short selling "as part of a manipulative scheme is always illegal under the
general anti-fraud provisions of the federal securities laws."[5]

6.

Naked short selling damages rightful shareholders of a company
because it floods the market with counterfeit shares, thereby diluting the
value of each legitimate share of stock, diluting the shareholder's right to a
fixed percentage ownership of the company and diluting the shareholder's
voting rights.  As Chairman Pitt noted, these phantom shares of a company's

---

[2] www.sec.gov/spotlight/keyregshoissues.htm.
[3] www.financialsense.com/fsn/2007/HarveyPitt.pdf.
[4] www.cnbc.com/id/15840232?video=652216599&play=1.
[55] SEC Release No. 34-57511, p. 3, File No. S7-08-08 (Mar. 17, 2008).

159367

stock "devalue an issuer's shares to the detriment of investors and
[legitimate] issuers alike."[6]

7.

For years, the defendants have damaged owners of TASER stock,
including the plaintiffs, by engaging in or facilitating naked short sale
transactions of TASER stock.  This conduct constitutes a knowing and
intentional violation of Georgia's Securities Act and other laws.

8.

The defendants have used several illegal methods to engage in and
conceal their naked short selling, including, but not limited to: (a) conspiring
to use the DTCC stock borrowing program as a means to conceal naked
short sales; (b) failing to make legitimate or reasonable efforts to locate
TASER shares prior to short selling them; (c) entering into fictitious option
contracts to conceal naked short sales; (d) falsely marking short sales as
"long" on order tickets to conceal naked short positions; (e) failing to
supervise compliance with the laws regarding short sale and short interest
position reporting; (f) submitting fake short interest and other reports to
regulators; (g) concealing fails through washed and matched trades; (h)
transacting illegal stock sales off the primary market to avoid NASDAQ

---

[6] www.financialsense.com/fsn/2007/HarveyPitt.pdf.

6

oversight and to maintain anonymity; (i) concealing their activity through falsely reporting nonexistent assets of TASER on brokerage statements to investors as if these assets were representative of real TASER shares; (j) concealing their activity by issuing voting material to shareholders with nonexistent assets of TASER that have no corporate rights including the right to vote TASER shares; (k) conspiring to not comply with their responsibilities and duties to investigate and report suspicious transactions to regulatory authorities and (l) falsely representing that they either possessed the borrowed securities or had located them for borrowing and delivery.

Securities regulators have sanctioned the defendants numerous times for their role in the preceding illegal conduct. The following table lists some of the sanctions assessed against the defendants:

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|--------|-----------------|---------------------|-----------------|-----------|
| Goldman Sachs Execution & Clearing, L.P | 4/17/07 | NYSE | $2,000,000 | Violated § 10(a) of Exchange Act and NYSE Rules 401 and 342 by marking shorts sales "long" and lending securities without reasonable basis for delivery; effecting short sales on minus and zero-minus ticks; and failing to supervise with respect to short sales |

7

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| Goldman Sachs Execution & Clearing, L.P. | 3/14/07 | SEC | $1,000,000 | Violated § 10(a) of Exchange Act by selling short in advance of secondary offerings in prime broker accounts and by falsely marking short sales "long" |
| Deutsche Bank Securities Inc. | 2/6/04 | NYSE | $725,000 | Violated NYSE Rule 421 by, among other things, submitting inaccurate short interest reports |
| Banc of America Specialist, Inc. | 12/21/06 | NYSE | $500,000 | Violated § 10(a) of the Exchange Act and NYSE Rule 440B by executing short sales on minus or zero minus ticks (a tick refers to a change in a stock's price; e.g., a trade from a lower price to a higher price is an "uptick") |
| Morgan Stanley & Co. | 8/4/06 | NYSE | $500,000 | Violated NYSE Rules 421 and 342(a) by submitting inaccurate short position reports and failing to supervise short interest position reporting |
| Banc of America Securities | 12/20/01 | NYSE | $290,000 | Violated SEC Rule 15c3-3(e) by recalling customer stock loans on Fridays and |

8

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| LLC | | | | reinstating them shortly thereafter, circumventing the customer reserve account requirement |
| Bear Stearns | 4/30/07 | AMEX | $250,000 | Violated AMEX Rules 30 and 320 by submitting inaccurate reports of short interest positions and failing to ensure compliance with respect to short interest reporting |
| Bear Stearns. | 2/20/07 | NASD | $250,000 | Violated NASD Rules 2110, 3010 and 3360 by submitting inaccurate short interest position data and failing to supervise compliance with law regarding short interest position reporting |
| Deutsche Bank Securities Inc. | 4/27/04 | NASD | $225,000 | Violated NASD Rules 2110, 3010 and 3360 by submitting inaccurate short interest report; incorrectly netting short interest positions against longs; and failing to correct inaccurate reporting |
| Credit Suisse Securities (USA) LLC | 11/10/06 | NASD | $110,000 | Violated SEC Rules 10B-10 and 604, and a variety of NASD Rules by, among other things, executing |

9

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| | | | | short sales at or below current inside bid that was below the preceding inside bid |
| Banc of America Securities LLC | 2/6/03 | NASD | $80,000 | Violated a variety of NASD Rules by, among other things, failing to accurately report its short positions |
| UBS Securities, LLC | 03/07 | NASD | $65,000 | Submitted reports to OATS that contained inaccurate, incomplete or improperly formatted data, and erroneously submitted Execution Reports it routed away for handling and/or execution to OATS |
| Banc of America Securities LLC | 3/12/07 | NASD | $56,500 | Violated SEC Rule 10B-10 and a variety of NASD Rules by, among other things, failing to make affirmative determination it could borrow securities and failing to properly mark tickets as short |
| Deutsche Bank Securities Inc. | 3/12/07 | NASD | $45,000 | Violated NASD Rules 2110, 3010 and 3370 by failing to make affirmative determination that firm could receive or borrow securities underlying short |

10

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| | | | | sale for delivery by settlement date |
| Deutsche Bank Securities Inc. | 6/12/07 | NASD | $30,000 | Violated SEC Rule 10B-10, Reg. SHO, and NASD Rules 4632, 6130 and 6955 by, among other things, incorrectly marking long sales as short |
| Bear Stearns | 9/28/07 | FINRA (NASD) | $25,500 | Violated SEC Rule 10B-10 and NASD Rules 2110, 2320, 3370 and 4632 by failing to make an affirmative determination that securities underlying short sale could be delivered or borrowed |
| Deutsche Bank Securities Inc. | 9/9/05 | NASD | $15,000 | Violated SEC Rule 10B-10 and NASD Rules 3370 and 6130 by failing to make affirmative determination that firm could receive or borrow securities underlying short sale for delivery by settlement date |

11

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| Merrill Lynch Professional Clearing Corp. | 6/26/07 | NASD | $12,500 | Violated SEC Rule 203(B)(3) and NASD Rules 2110 and 3010 by having a fail-to-deliver position in a threshold security for 13 consecutive settlement days and failing to timely allocate and close out its fail-to-deliver position |
| Banc of America Securities LLC | 12/31/07 | FINRA (NASD) | $12,000 | Violated NASD Rules 3370 and 6230(c)(6) by failing to make affirmative determination it would receive delivery of short sale securities |
| Deutsche Bank Securities Inc. | 4/27/04 | NASD | $10,000 | Violated NASD Rules 2110, 3010 and 3360 by submitting inaccurate short interest position report |
| UBS Securities, LLC | 10/04 | NASD | $10,000 | Submitting inaccurate and/or incomplete OATS data |
| Morgan Stanley & Co. | 3/13/07 | ASE | $10,000 | Violated ASE Rule 320 and §4(H) of ASE Constitution by failing to make affirmative determination prior to effecting short sales and failing to ensure |

12

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|--------|-----------------|---------------------|-----------------|-----------|
|  |  |  |  | compliance that delivery be made on the settlement date |

Most, if not all, of this misconduct also constitutes an improper manipulation of a security in violation of the Georgia Securities Act and other laws.

9.

Because the defendants have significant financial and other incentives to continue illegal short selling, the foregoing sanctions have failed to stop the defendants' impermissible conduct.

10.

While the SEC's and other securities regulators' sanctions are themselves strong evidence of defendants' violations of Georgia law, the defendants' own share ownership records further reveal their knowing, willfully and repeated participation in illegal naked short selling and their efforts to conceal that illegal conduct.

Because most securities trades are conducted electronically, actual paper shares are not transferred between a buyer and seller, but are rather held by DTCC. Because the DTCC's records reflect actual paper shares,

13

and not electronic debits and credits, the number of shares held by the DTCC generally reflects the number of authorized shares of a security that exists in brokerage accounts.

Beneficial share records, on the other hand, are maintained by prime brokers, like these defendants, and they reflect the number of shares the prime brokers claim to possess for themselves and their clients.

A comparison of the DTCC inventory records and the beneficially owned shareholder records reveals that the defendants claim ownership of TASER stock far in excess of the actual number of real shares they possess at the DTCC.  The following table shows various reporting dates where the defendants claimed beneficial ownership of vastly more shares of TASER than they had actual inventory at the DTCC:

| DTCC Inventory Position v Beneficial Ownership Claims | | | | |
|---|---|---|---|---|
| **Date** | **Participant Name** | **DTCC Position** | **Beneficial Ownership Claims** | **Difference in Shares Reported Held** |
| October 24, 2007 | Banc of America | 126,442 | 269,528 | 143,086 |
| January 15, 2008 | Deutsche Bank | 47,275 | 760,588 | 713,313 |
| October 24, 2007 | Goldman Sachs | 3,475,453 | 5,039,387 | 1,563,934 |
| May 22, 2007 | Merrill Lynch | 1,443,995 | 2,809,889 | 1,365,894 |
| May 22, 2007 | Morgan Stanley | 2,646,970 | 11,767,234 | 9,120,264 |
| May 22, 2007 | UBS | 1,417,489 | 2,129,815 | 712,326 |

159367

11.

An analysis of the volume of the defendants' trades in TASER stock further reveals their participation in unlawful naked short selling. In particular, the volume of the defendants' trades in TASER stock reveals that they have traded TASER stock far in excess of their actual inventory. For example, according to available DTCC data from March to May of 2004 and October to December of 2004, Defendant UBS held directly and/or beneficially a position under 1.5 million TASER shares, yet UBS traded 243 million shares of the stock from March to December 2004 (213 trading days). The available DTCC data also shows that during that time Defendant Merrill Lynch held directly and/or beneficially under 2 million TASER shares, yet one of Merrill Lynch's clients, Knight Securities, traded 219 million shares of the stock from March to December 2004. This volume of trading could not have been accomplished if the defendants had not conspired to engage in, facilitate and profit from their naked short sales.

12.

Objective shareholder voting data demonstrates that the defendants' unlawful selling of unregistered and unissued TASER shares flooded the market with counterfeit shares. For example, at the time of Taser's 2005 annual vote, TASER had approximately 61.1 million shares outstanding.

15

Yet, approximately 82 million shares voted, an additional over-vote of approximately 20 million shares.

The approximately 20 million over-voted shares is particularly compelling given that, as of the voting date, there were approximately 17.2 million TASER shorted shares. Even if all of the TASER shares that were sold short were able to vote, the total number of votes would still only be 78.3 million (61.1 million shares outstanding + 17.2 million short shares). The fact that 82 million votes were received – 3.7 million more than the outstanding shares plus all shorted shares – indicates that there were at least 3.7 million shares (82 million – 78.3 million) that were undoubtedly counterfeit.

13.

The defendants' conspiracy to engage in, facilitate and profit from naked short selling has caused and continues to cause owners of legitimate shares of TASER stock, like plaintiffs, substantial harm. For one, by flooding the market with counterfeit TASER shares, the defendants have diluted the value of each legitimate share of TASER stock, including diluting the shareholder's right to a fixed percentage ownership of the company and associated voting rights. As former SEC Chairman Harvey Pitt recently articulated in discussing naked short sales: "In a stock market

16

corollary to Gresham's law, the more phantom shares of an issuer's stock

that circulate the more they drive out or devalue an issuer's shares to the

detriment of investors and issuers alike." *See*

www.financialsense.com/fsn/2007/ HarveyPitt.pdf.

In addition, defendants' conspiracy has harmed TASER by, among

other things, electronically issuing TASER treasury shares without

authorization or compensation to TASER, limiting TASER's access to

capital, lowering its market capitalization, damaging its perception in the

market and making it more difficult for the company to expand and/or

merge.

14.

Unlike the plaintiffs, who have suffered substantial harm as a result of

the defendants' unlawful conspiracy, the defendants have and continue to

reap enormous illicit profits in at least the following three ways:

(a)    Proprietary Trades – Upon information and belief, the

defendants short sell TASER stock in their own proprietary accounts, giving

them a financial interest in lowering the stock's price.  One mechanism

through which the defendants can increase the likelihood and amount by

which TASER stock will fall (increasing the profits from their short sale) is

to dilute TASER stock through the creation, loan and sale of counterfeit

17

TASER stock, which artificially depresses its price.  The more TASER stock the defendants' counterfeit, the greater the likelihood the stock will drop and the greater the profits the defendants will reap from their own short sales.

Further, the defendants have received the proceeds of naked short sales without giving up anything of value in exchange.  Indeed, they may never be called on to "cover" their short sales because they have not borrowed shares, and so long as customers who have paid for these phantom shares receive proxy and false account statements, they may not become aware of the fact that they do not own real shares authorized and issued by TASER.

(b)    Charging Fees for "Loans" of TASER stock – Typically, when an investor sells TASER stock short, it borrows TASER stock from one of the defendants to deliver by the settlement date.  In a lawful transaction, the defendant has or arranges to borrow TASER stock, loans that stock to the short seller, and then charges the short seller a fee for the stock loan.  The defendants, however, often loan short sellers TASER stock that they neither own nor have any intention of obtaining.  The defendants simply inform the short seller that the loan was made, even though the defendants deliver no actual stock (because they have none).  The defendants then charge the short

159367

seller fees for the "loan" of this phantom stock, including transaction fees, negative rebates and interest, thereby earning illicit profits.

The defendants' ability to engage in these non-bona fide loans is the direct result of their knowing and willful decision to violate securities regulations requiring them to deliver shares by the settlement date. Indeed, if the defendants abided by the regulations, the fact that they did not actually loan stock to the short seller would be revealed on the settlement date when they are unable to deliver the loaned stock on the short seller's behalf. However, since the defendants have conspired to violate the possession and delivery requirement, the non bona fide loans are concealed.

(c)    Transaction Fees – Another object of the conspiracy is to earn profits through unlawful transaction fees. For example, if a short seller sought to make a short sale through one of the defendants, but that defendant could not obtain TASER stock, the defendant would be unable to complete the short sale (and thus would be unable to obtain and retain the fees and commissions associated with that short sale). However, by ignoring the need for the defendant to locate stock before it completes the short sale, the defendant can complete the transaction, thereby obtaining fees and a commission. Similarly, by unlawfully increasing the number of shares of TASER stock, the defendants have created opportunities for further trades in

19

159367

that stock, earning them additional fees and commissions.   At the same

time, the defendants are diluting TASER stock, injuring legitimate

shareholders.

Through the above mechanisms, and others, the defendants have

collectively reaped hundreds of millions of dollars in illicit profits.

15.

For the reasons set forth in this Complaint, the plaintiffs are entitled to

damages for the injuries they have suffered as a result of the defendants'

unlawful conduct, and hereby bring this action for: (1) violations of the

Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"),

O.C.G.A. §§ 16-14-1, *et. seq.;* (2) violations of the Georgia Securities Act;

(3) violations of the Georgia Computer Systems Protection Act; and (4)

conversion.

## Parties, Jurisdiction and Venue

16.

TASER International Inc. ("TASER") is a business corporation

organized under the laws of Delaware with its principal place of business in

Scottsdale, Arizona.

20

159367

17.

Plaintiffs David Batchelor and Natalie Batchelor are individual citizens of the State of Georgia, residing in Gwinnett County, Georgia.

18.

Plaintiffs Dr. Thomas Collentine and Judith Collentine are individual citizens of the State of Georgia, residing in Cobb County, Georgia.

19.

Plaintiffs Charles Faires and Sandra Faires are individual citizens of the State of Georgia, residing in Fulton County, Georgia.

20.

Plaintiffs Masaji and Kelly Kelley are individual citizens of the State of Georgia, residing in Cobb County, Georgia.

21.

Plaintiffs Stephen and Patricia Lisenby are individual citizens of the State of Georgia, residing in Fulton County, Georgia.

22.

Plaintiffs Constance and Richard Almeroth are individual citizens of the State of North Carolina, residing in Wilkes County, North Carolina.

23.

Plaintiff James Baker, Jr. is an individual citizen of the State of

21

Arizona, residing in Maricopa County, Arizona.

24.

Plaintiff Robert Baker is an individual citizen of the State of Florida, residing in Broward County, Florida.

25.

Plaintiffs William and Helen Burnside are individual citizens of the State of Tennessee, residing in Hamilton County, Tennessee.  Plaintiff Kellie Burnside resides in Boulder County, Colorado

26.

Plaintiff David Everett is an individual citizen of the State of Tennessee, residing in Hamilton County, Tennessee.

27.

Plaintiff James Dunagin Jr. TTEE Southeast Eye Surgery Clinic, Inc. PSP is a resident of McAlester, Oklahoma.

28.

Plaintiff Estate of James Connelly is administered in Charleston County, South Carolina.  Plaintiff Dorothy Connelly is a resident of Charleston County, South Carolina.

29.

Plaintiffs James Dunagin and Emily Dunagin are individual citizens

22

159367

of the State of Oklahoma residing in Pittsburg County, Oklahoma.

30.

Plaintiffs Richard C. Haskell and Susan Haskell are individual citizens of the State of Illinois, residing in Cook County, Illinois.

31.

Plaintiff Richard C. Haskell, Jr. and Amy Haskell are individual citizens of the State of Illinois, residing in Cook County, Illinois.

32.

Plaintiff Mary Richardson is an individual citizen of the State of Illinois, residing in Cook County, Illinois.

33.

Plaintiff Pamela Lewis is an individual citizen of the State of Ohio, residing in Cuyahoga County, Ohio.

34.

Plaintiff Jane Maj is an individual citizen of the State of Illinois, residing in Cook County, Illinois.  Plaintiff Rozalia Maj is an individual citizen of the State of Illinois, residing in Cook County, Illinois.

35.

Plaintiff Craig Miller is an individual citizen of the State of Texas, residing in Harris County, Texas.

23

36.

Plaintiff Margaret Roche is an individual citizen of the State of Ohio, residing in Montgomery County, Ohio.

37.

Plaintiff Chet Scott is an individual citizen of the State of South Carolina, residing in Lexington County, South Carolina.

38.

Plaintiff John Scott is an individual citizen of the State of New York, residing in Rensselaer County, New York.

39.

Plaintiff Paula Scott is an individual citizen of the State of Vermont, residing in Addison County, Vermont.

40.

Plaintiffs Peter and Michelle Scott are individual citizens of the State of New York, residing in Rensselaer County, New York.

41.

Plaintiff Mary Rose Stucker is an individual citizen of the State of Illinois, residing in Cook County, Illinois.

42.

Plaintiffs David Zeber and Anne Zeber are individual citizens of the

24

State of Ohio, residing in Cuyahoga County, Ohio.

43.

Plaintiff Michael Boyer is an individual citizen of the State of Oklahoma, residing in Pittsburg County, Oklahoma.

44.

Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") is a business corporation organized under the laws of Delaware with its principal place of business in New York, New York. Morgan Stanley is registered to conduct business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, CT Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.

45.

Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is a business corporation organized under the laws of Delaware with its principal place of business in New York, New York. Goldman Sachs is registered to conduct business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, CT Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.

46.

Defendants Bear Stearns Capital Markets, Inc., Bear Stearns & Co, Inc.,

25

and The Bear Stearns Companies, Inc., ("Bear Stearns") are business corporations organized under the laws of Delaware with their principal places of business in New York, New York.  Bear Stearns is registered to conduct business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, CT Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.

47.

Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a business corporation organized under the laws of Delaware with its principal place of business in New York, New York. Merrill Lynch is registered to conduct business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, CT Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.

48.

Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank") is a business corporation organized under the laws of Delaware with its principal place of business in New York, New York. Deutsche Bank is registered to conduct business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, CT Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.

2

49.

Defendant Credit Suisse (USA) Inc. ("Credit Suisse") is a business

corporation organized under the laws of Delaware with its principal place of

business in New York, New York. Credit Suisse is registered to conduct

business in Georgia, maintains an office in Fulton County, Georgia, and may

be served with process through its registered agent, Corporation Service

Company, 40 Technology Parkway South, #300, Norcross, Georgia 30092.

50.

Defendant Banc of America Securities, LLC ("Banc of America") is a

business corporation organized under the laws of Delaware with its principal

place of business in San Francisco, California. Banc of America is registered

to conduct business in Georgia, maintains an office in Fulton County,

Georgia, and may be served with process through its registered agent, CT

Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.

51.

Defendant UBS Securities, LLC ("UBS") is a business corporation

organized under the laws of Delaware with its principal place of business in

Stamford, Connecticut. UBS is registered to conduct business in Georgia,

maintains an office in Fulton County, Georgia, and may be served with

27

process through its registered agent, Corporation Service Company, 40

Technology Parkway South, #300, Norcross, Georgia 30092.

52.

Jurisdiction is proper in this Court pursuant to Ga. Const. art. VI, § 3,

¶ 1 and O.C.G.A. § 15-7-4.

53.

Venue is proper in this Court pursuant to Ga. Const. art. VI, § 2, ¶ 6.

## STATEMENT OF THE RELEVANT FACTS

### A.    Background of the Parties and Conspirators

54.

Each of the plaintiffs currently owns, or has during the relevant time

frame owned, TASER stock.

55.

The defendants are "clearing firms," "prime brokers" and "market

makers" who, among other things: (a) loan or purport to loan TASER stock

to their clients and others to complete short sales; (b) engage in and facilitate

trades of TASER stock on behalf of their clients; (c) trade TASER stock for

their own proprietary accounts; (d) purport to be bona fide market makers

for TASER stock; and (e) conduct market making transactions in options

involving TASER stock.

28

159367

56.

The Depository Trust Company ("DTCC") and its subsidiary, the National Securities Clearing Corporation ("NSCC"), are relevant non-parties.

The DTCC is an electronic system for the clearance and settlement of securities transactions. It was created in 1974 for, *inter alia*, "prompt and accurate clearance and settlement of securities transactions" as "necessary for the protection of investors."[7]

Today, the DTCC is the country's only national clearance and settlement system. Since 1999, the DTCC has controlled virtually all of the U.S. trade clearance and settlement processing of real stock issued by corporations that is held in brokerage accounts.

---

[7] Section 17(a) of the Securities Exchange Act states: "New data processing and communications techniques create the opportunity for more efficient, effective, and safe procedures for clearance and settlement. *The prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors* and persons facilitating transactions by and acting on behalf of investors. The linking of all clearance and settlement facilities and the development of uniform standards and procedures for clearance and settlement will reduce unnecessary costs and increase the protection of investors and persons facilitating transactions by and acting on behalf of investors." (emphasis added).

29

57.

In 1981, further efforts were made to increase the speed of the

settlement trade process through the advent of the DTCC stock borrow

program.  That program created a massive lending pool of shares from

brokers' client margin accounts (*i.e.*, brokerage accounts in which the broker

lends the customer cash to purchase securities, which are securitized by both

securities and cash), which facilitated securities trades as follows:  If a prime

broker is unable to deliver stock it sold within the three-day settlement date,

the prime broker could obtain shares to provide to the purchaser from the

DTCC borrowing pool, allowing the trade to clear.  When operated properly,

the prime broker who sold the stock will replace the shares it owes to the

DTCC.  But, as described in detail throughout this Complaint, the

defendants have conspired to violate the requirement that they actually

deliver shares they owe to the DTCC.

58.

The defendants, as owners of the DTCC, have significant involvement

and communication with, as well as influence over, the DTCC.  For

example, the defendants act as "DTCC member clearing firms," meaning

that they are informed by the DTCC of the clearing and settling of trades and

purportedly they assure that paperwork associated with a securities

159367

transaction is accurate.  Further, all of the defendants are part owners of the

DTCC, with the largest firms owning the greatest share of the DTCC.  The

defendants also have involvement with and influence over the DTCC's

Board of Directors.  For example, in 2006, Diane L. Schueneman of Merrill

Lynch & Co. and Randolph Cowen of Goldman Sachs were members of the

DTCC's board of directors.  Thus, the defendants directly communicate with

and have influence over the DTCC regarding securities transaction

settlements, including short sales.

59.

Collectively, the defendants control approximately 78% of the prime

brokerage market in the United States in terms of aggregate client assets.

Upon information and belief, (i) Morgan Stanley is the largest prime broker,

with 23.1% of the prime brokerage market, (ii) Bear Stearns is the second

largest prime broker, with 20.9% of the prime brokerage market, (iii)

Goldman Sachs is the third largest prime broker, with 16.5% of the prime

brokerage market, (iv) UBS is the fourth largest prime broker, with 5.9% of

the prime brokerage market, (v) Merrill Lynch is the fifth largest prime

broker, with 4.6% of the prime brokerage market, (vi) Deutsche Bank is the

eighth largest prime broker, with 2.5% of the prime brokerage market, (vii)

Credit Suisse is the ninth largest prime broker, with 2.2% of the prime

31

brokerage market and (vii) Banc of America is the tenth largest prime

broker, with 2.0% of the prime brokerage market.

**B.     The Mechanics of Short Sales and Naked Short Sales**

60.

The defendants, as prime brokers, play an integral role in short sale

securities transactions.  Among other things, the defendants are responsible

for locating shares of the shorted stock, borrowing the shorted stock, and

delivering the shares by the three-day settlement date.

61.

As discussed in the Nature of the Case section above,

in a typical short selling transaction, a short seller speculates that the price of

a stock will decline, and seeks to profit from that expected decline.  To

accomplish this, the short seller borrows shares of the subject company's

stock, and sells those borrowed shares on the open market at the existing

price.  The short seller purchases the subject company's stock at a later date,

and provides those purchased shares to the lender.  If the short seller's

speculation that the stock price will decline is correct, the short seller will

earn as profit the difference between the higher price it sold its shares and

the lower price it subsequently purchased them.

159367

62.

Typically, a client seeking to engage in a short sale will contact one of the defendants and request to short sell, for example, TASER stock. Because the short seller is required under securities regulations to obtain and deliver the TASER stock it is selling short by the settlement date, the short seller will often borrow the TASER stock from one of the defendants. In a lawful transaction, the defendant will loan the short seller TASER shares that it obtains from its own inventory or other prime brokers, and then the short seller will convey those borrowed shares through the DTCC to complete the short sale transaction. The defendants will charge the short seller a fee and interest for the loan of the TASER stock. The selling broker is required to mark the order ticket as a short sale and document the source of the securities that will be borrowed to complete settlement of the short sale transaction.

63.

Like all stock transactions, short sale transactions should be cleared and settled through the DTCC. The DTCC becomes the contractual counter party (middleman) to each side of the transactions. In other words, when a short seller sells TASER stock to a purchaser, the seller does not owe the stock to the purchaser. Rather, the seller owes the shares it sold to the

159367

DTCC, and the purchaser is owed the shares it purchased by the DTCC, the counter party.

64.

Significantly, purportedly to protect bona fide purchasers, the DTCC provides the purchaser an electronic entry for the TASER stock it purchased, with its full value and rights, ***regardless of whether the short seller delivers TASER shares to the DTCC.*** If the short seller does not deliver TASER shares, the transaction is marked by the DTCC as "open," awaiting delivery in the DTCC system from the short seller, and the short sale is a naked short sale, which is not backed by assets of TASER.

65.

When a purchaser requests delivery of shares and the DTCC cannot deliver because it has insufficient real shares of a security, then the DTCC records the shares as "fails to deliver" or "fail" in the DTCC system.

66.

This practice is evidenced in TASER stock when, for example, in mid December 2004, long-term reported short sales (*i.e.*, short interest[8]) had amassed to 30 million shares but fails to deliver were reported to be only 8.1

---

[8] NASDAQ provides the following definition of short interest: "The total number of shares of a security that have been sold short by customers and securities firms that have not been repurchased to settle short positions in the market."

34

million shares.  In other words, 22 million undelivered shares were awaiting delivery within the DTCC system and 8.1 million shares could not be delivered by the DTCC.

67.

When a "fail" occurs in the DTCC system, the short seller remains obligated to settle it by delivering the shares to the DTCC.  But, in many cases, the defendants simply leave the "fail" open indefinitely, a direct result of the defendants' conspiracy to not require each other to settle delivery failures.

68.

In those instances where a short seller fails to deliver shares to the DTCC (*i.e.*, engages in a naked short sale), it has, in effect, created and sold unauthorized, counterfeit shares.

69.

By way of illustration using TASER stock:  Short Seller X sells 100 shares of TASER stock to Purchaser Y, but never delivers those shares to the DTCC.  Because Purchaser Y receives electronic evidence of the transfer of the shares from the DTCC regardless of whether Short Seller X actually delivers them, Purchaser Y has received electronic evidence of the transfer of shares that, prior to the transaction, did not exist.  These shares have never

35

been borrowed and cannot reasonably be "bought in" from a marketplace that is overly short sold, because there are not sufficient TASER shares available to loan or purchase to complete delivery. Despite this fact, the 100 counterfeit TASER shares provided to Purchaser Y through an electronic entry in Purchaser Y's account remain tradable in the market, diluting the value of the authorized shares actually issued by TASER. Indeed, these 100 counterfeit shares can be re-loaned and counterfeited continuously by the defendant brokers through the DTCC's electronic booking system, increasing the harm to TASER investors. This is evidenced by this SEC statement: "At times, the amount of fails to deliver may be greater than the total public float."[9]

## C.   Naked Short Selling is Harmful and Illegal

70.

It is unlawful and illegal for a prime broker to engage in naked short selling. Indeed, the SEC, which regulates federal securities laws that are substantially similar to Georgia's Securities Act, has explicitly stated "selling stock short and failing to deliver shares at the time of settlement with the purpose of driving down the security's price" constitutes a

---

[9] Federal Register, Vol. 68, No. 215, Thursday, November 6, 2003, Proposed Rules Securities and Exchange Commission 17 CFR Parts 240 and 242 [Release No. 34–48709; File No. S7–23–03] RIN 3235–AJ00 Short Sales.

159367

"manipulative activity" that "in general, would violate various securities

laws." *See www.sec.gov/spotlight/keyregshoissues.htm*; *see also* SEC

Release No. 34-.57511, p. 3, File No. S7-08-08 (Mar. 17, 2008).

71.

Naked short selling is unlawful and illegal for numerous reasons, as

recently articulated by the SEC:

> ...we are concerned that large and persistent fails to deliver may have
> a negative effect on the market in these securities. For example, large
> and persistent fails to deliver may deprive shareholders of the benefits
> of ownership, such as voting and lending. In addition, where a seller
> of securities fails to deliver securities on trade settlement date, in
> effect the seller unilaterally converts a securities contract (which
> should settle within the standard 3-day settlement period) into an
> undated futures-type contract, to which the buyer may not have
> agreed, or that may have been priced differently. Moreover, sellers
> that fail to deliver securities on trade settlement date may enjoy fewer
> restrictions than if they were required to deliver the securities within a
> reasonable period of time, and such sellers may attempt to use this
> additional freedom to engage in trading activities that deliberately and
> improperly depress the price of a security.
>
> In addition, many issuers and investors continue to express
> concern about extended fails to deliver in connection with "naked"
> short selling. To the extent that large and persistent fails to deliver
> might be indicative of manipulative "naked" short selling, which
> could be used as a tool to drive down a company's stock price, fails to
> deliver may undermine the confidence of investors. These investors,
> in turn, may be reluctant to commit capital to an issuer they believe to
> be subject to such manipulative conduct. In addition, issuers may
> believe that they have suffered unwarranted reputational damage due
> to investors' negative perceptions regarding large and persistent fails
> to deliver. Any unwarranted reputational damage caused by large and
> persistent fails to deliver might have an adverse impact on the
> security's price.

37

159367

72.

One of the primary harms caused by naked short selling is the dilution

of a company's legitimate, authorized stock.  These new shares dilute the

value of authorized shares (including both the monetary value and voting

rights), depressing the stock's price.

**D.** **Mechanisms Through Which The Defendants Engage In and/or**
**Conceal Naked Short Sales**

73.

The defendants have and continue to knowingly, intentionally and

willfully violate securities and other laws and regulations in connection with

short sales of TASER stock.  The defendants' unlawful and illegal conduct

includes, but is not limited to, the following:

(i)     Naked Short Selling On Behalf Of Clients – The defendants

have knowingly and intentionally accepted and facilitated short sales of

TASER stock for their clients at times when the defendants neither

possessed nor intended to obtain through borrowing sufficient TASER stock

to loan to those clients for delivery to the DTCC by the settlement date.  The

defendants' decision to engage in and facilitate short sales of TASER stock

while knowing and intending that they would not deliver that stock by the

38

settlement date is a willful violation of, *inter alia*, securities laws and regulations.

(ii) <u>Naked Short Selling In the Defendants' Proprietary Accounts</u> – The defendants maintain their own proprietary accounts, from which they conduct stock transactions on their own behalf. Upon information and belief, the defendants have engaged in short sales of TASER stock at times during which they neither possessed nor intended to obtain sufficient TASER stock to deliver to the DTCC by the settlement date (if ever). The defendants have thus knowingly, willfully and intentionally sold short "without having stock available for delivery and intentionally failing to deliver stock within the standard three day settlement cycle," in willful violation of securities and other laws and regulations.

(iii) <u>Permitting Indefinite Delivery Fails</u> – When a short seller fails to deliver stock by the settlement date, the DTCC system indicates that a "fail" occurred. Under DTCC rules, only the purchaser (or the defendant prime broker representing it) has the ability to force the short seller to deliver the shares and clear out the "fail" position. The defendants, however, have conspired and agreed not to require each other to clear out "fails"; instead permitting "fail" transactions to remain unfulfilled indefinitely. This practice facilitates naked short sales by eliminating the

39

need for a defendant to actually locate TASER stock before loaning or selling TASER stock in conjunction with a short sale.

(iv)   <u>Providing Phantom Shares for Loans of TASER's Stock to Cover Short Sales</u> – The defendants have purported to loan TASER stock to their clients and others to complete short sales at times when defendants neither possessed, nor had any intention of obtaining, sufficient TASER stock to cover those loans.  The defendants' ability to engage in these phantom stock loans is the direct result of their knowing and willful decision to violate securities laws and regulations requiring them to deliver shares by the settlement date.  Indeed, if the defendants abided by the securities laws and regulations, the fact that they did not actually loan stock to the short seller would be revealed on the settlement date, when they are unable to deliver the loaned stock on the short seller's behalf.  However, since the defendants have conspired to violate the delivery requirement, and were assisted in this by the DTCC which made electronic entries that shares had been transferred to the buyer, the phantom stock loans are concealed.

(v)   <u>False Documentation</u> – In an effort to conceal their naked short sales, the defendants have created false documentation regarding their trading, loaning and ownership of TASER stock.  For example, defendants are required to complete an order ticket with respect to each securities

159367

transaction they engage in.  These order tickets, *inter alia*, permit securities regulators to determine the amount of short sales the defendant prime broker is engaging in with respect to a particular stock, and to whom the short sales are made.  The defendant brokers, however, have knowingly and intentionally mismarked order tickets to make transactions appear as "long" sales when, in fact, they are short sales.  Indeed, as stated above, the defendants have repeatedly been fined by securities regulators for that conduct.

(vi)    Concealment by Trading Off the Market – To conceal their naked short sales and failures to deliver, the defendants, as clearing brokers, have engaged in significant amounts of trading of TASER shares off of the NASDAQ market where TASER is listed.  Off market sales are made through various third markets and electronic communication networks, "which provide anonymity to traders wishing to conceal their identity from the market".[10]  This conduct facilitates naked short sales by allowing defendants to circumvent oversight from the NASDAQ stock market and permitting them to engage in naked short selling anonymously.

---

[10] United States District Court Southern District Of New York, Securities and Exchange Commission, Plaintiff,  v. Rhino Advisors, Inc. and Thomas Badian.

41

74.

In addition to the unlawful and illegal conduct cited above, the

defendants have also conspired to illegally utilize the DTCC's stock borrow

program to facilitate naked short selling as follows:

# [Continued on Next Page]

## Short Sale Through the DTCC Stock Borrow Program



A.   Purchaser Y seeks to purchase 1 million dollars in TASER

stock, and thus places a purchase order with Defendant Prime

Broker Y to purchase that stock.

B.   Defendant Prime Broker Y does not own 1 million dollars

worth of TASER and short sells the shares to Purchaser Y

*without first locating actual TASER shares to borrow and*

*deliver to Purchaser Y to complete the short sale.* Defendant

43

Prime Broker Y informs Purchaser Y that its purchase has been made, and collects 1 million dollars from Purchaser Y.

C.   Because Defendant Prime Broker Y did not and cannot locate actual TASER shares before making the sale to Purchaser Y, it cannot deliver the 1 million dollars in TASER shares on the settlement date.

D.   Defendant Prime Broker Y then seeks to obtain the shares through the DTCC's stock borrow program.

E.   When the request is made, the DTCC automated stock borrow program sees that in its borrowing pool, Prime Broker Z, holds 1 million dollars in TASER shares for Shareholder Z.

F.   The DTCC then takes 1 million dollars in collateral from Defendant Prime Broker Y and "temporarily" borrows the 1 million dollars in TASER shares from Prime Broker Z (who is holding Shareholder Z's shares), lending those shares to Defendant Prime Broker Y to deliver to Purchaser Y.

G.   Although the DTCC has lent Shareholder Z's TASER shares to Purchaser Y, Shareholder Z's brokerage account statement will continue to show that it holds 1 million dollars in TASER shares.

44

H.     Until Defendant Prime Broker Y delivers TASER shares to the

DTCC to return to Prime Broker Z, **both** Purchaser Y and

Shareholder Z account statements show that they hold 1 million

dollars in TASER stock in their broker's beneficial trading

records.[11]  In reality, however, 2 million dollars worth of

TASER stock show in brokerage account statements but only 1

million dollars worth of real TASER stock actually exists.

I.      If Defendant Prime Broker Y never delivers the TASER shares

to the DTCC, then both Purchaser Y and Shareholder Z will

perpetually show ownership of 1 million dollars in TASER

shares in the defendant prime brokers' beneficial trading

records.  Thus, both Purchaser Y and Shareholder Z will each

have the ability to trade and vote with respect to 1 million

dollars of TASER stock.  As a result, 1 million dollars in

TASER shares will have been counterfeited.

---

[11] The DTCC inventory reported to TASER, however, show that only
Purchaser Y owns the shares since the DTCC lent Prime Broker Z's shares
to Purchaser Y.  For this reason, DTCC records do not accurately reflect true
share ownership and two holders now own the same share.

## Multiplying the Same 1 Million Dollars Worth of TASER Stock



> **Purchaser Y** and **Prime Broker Y** now possess the rights of the $1 million worth of TASER stock and the ability to lend the shares

> **Purchaser W** seeks to purchase $1 million of TASER stock

> **Prime Broker W** short sells the TASER shares to Purchaser W – Prime Broker W borrows shares from the DTCC

> **The DTCC Stock Borrow Program** loans the stock to Prime Broker W from Prime Broker Y who borrows from Purchaser Y

> **Prime Broker Y**

> **Purchaser Y**

> **Purchaser W's Brokerage Statement** shows $1 million worth of TASER stock

> $1 Million worth of TASER stock

> **Purchaser Y's Brokerage Statement** shows $1 million worth of TASER stock

> **Shareholder Z's Brokerage Statement** *still* shows $1 million worth of TASER stock

> The ownership rights are transferred to **Purchaser W** and **Prime Broker W**. They can now relend the same $1 million of TASER stock

46

159367

**E.    Evidence of the Defendants' Conspiracy To Engage In, Facilitate and Profit From Naked Short Selling**

75.

As discussed in detail below, there is significant evidence that the defendants have engaged and continue to engage in unlawful naked short selling of TASER stock, including, but not limited to: (i) the securities regulators repeatedly sanctioning of the defendants for illegal conduct in connection with short selling; (ii) the excessive number of "fails" of delivery of TASER stock; (iii) the exchange trading records which reveal that the defendants have traded TASER stock far in excess of their inventory or available shares; (iv) the beneficial trading records purporting to show defendants' own TASER stock far in excess of their inventory; and (v) the over voting of TASER shares at TASER annual meetings.

76.

**The Defendants Have Repeatedly Been Sanctioned By Securities Regulators** – As discussed above, securities regulators have repeatedly fined defendants for conduct that would be illegal under the Georgia Securities Act and other Georgia laws.  To cite several examples, securities regulators have sanctioned defendants for: (i) failing to ensure compliance that delivery be made on the settlement date; (ii) incorrectly netting short interest positions against longs; (iii) submitting inaccurate trade tickets; and

47

159367

(iv) failing to supervise compliance with law regarding short interest position reporting.

77.

**Excessive "Fails" Of Delivery Of TASER Stock** - Over the last approximately five years, the number of legitimate, outstanding shares of TASER stock has been as follows:

| Date | Number of Shares Outstanding | Reason for Change in Outstanding Shares |
|---|---|---|
| January 14, 2004 | 4,224,900 | Issued by company |
| February 27, 2004 | 14,066,688 | 3 for 1 stock split |
| April 30, 2004 | 28,321,612 | 2 for 1 stock split |
| November 30, 2004 | 59,296,388 | 2 for 1 stock split |
| January 1, 2008 | Approximately 60,000,000 | |

78.

The SEC has passed and implemented regulations to address the harm caused by abusive naked short selling. Under SEC regulations, a stock is considered a "threshold security" that is vulnerable to manipulation from short sales if there are "fails" (*i.e.*, instances in which a seller did not deliver the stock to the DTC by the three-day settlement date) of 10,000 shares and greater than 0.5% of its outstanding shares for five consecutive days. Using

48

the numbers above, the number of delivery fails that would have placed

TASER on the threshold list are approximately as follows:

| Date | Number of Shares to Make Threshold List | Calculation (outstanding shares x 0.005) |
|---|---|---|
| Jan. 14, 2004 to Feb. 11, 2004 | 21,125 shares | 4,224,900 x 0.005 |
| Feb. 12, 2004 to April 29, 2004 | 70,333 shares | 14,066,688 x .0.005 |
| April 30, 2004 to Nov. 29, 2004 | 141,608 shares | 28,321,612 x 0.005 |
| Nov. 30, 2004 to present | 300,000 shares | 60,000,000 x 0.005 |

79.

During the relevant time frame, the number of "fails" of TASER stock

well exceeded the amount necessary to characterize TASER stock as a

threshold security vulnerable to manipulative short sales.  As just some

examples:

| Settlement Date | Aggregate Fails |
|---|---|
| 4/5/2004 | 1,657,103 |
| 5/6/2004 | 1,772,792 |
| 8/3/2004 | 3,195,387 |
| 9/20/2004 | 5,490,327 |
| 12/6/2004 | 8,102,052 |
| 1/26/2005 | 5,452,323 |

49

| | |
|---|---|
| 3/9/2005 | 2,462,688 |
| 5/18/2005 | 2,403,592 |
| 8/5/2005 | 1,391,099 |
| 12/30/2005 | 2,239,667 |
| 3/10/2006 | 1,942,521 |
| 8/3/2007 | 2,355,709 |
| 8/6/2007 | 2,269,254 |

80.

The consistent presence of "fails" vastly in excess of the threshold minimum demonstrates that the defendants have simply made no real, legitimate effort to borrow or otherwise obtain TASER stock when facilitating or engaging in short sales. Instead, defendants – conspiring to violate securities laws, and agreeing to violate the requirement that they deliver actual shares by the three-day settlement date – have chosen to short sell TASER stock with no intention of ever obtaining that stock and delivering it to the DTCC.

81.

**Excessive Trading Volume For TASER Stock -** Trading activity further evidences the existence of and defendants' participation in naked short selling of TASER stock. Indeed, an examination of daily trading volumes reveals that TASER stock is frequently traded in excess of the outstanding shares at the time. For example, when approximately 14 million and 28 million shares were outstanding, daily trading volume was:

50

| Date | Number of Legitimate TASER shares (approx) | Number of TASER shares traded (approx) |
|---|---|---|
| April 20, 2004 | 14,247,806 | 32,400,000 |
| April 21, 2004 | 14,247,806 | 33,700,000 |
| June 25, 2004 | 28,321,612 | 42,000,000 |
| June 28, 2004 | 28,321,612 | 63,300,000 |
| June 29, 2004 | 28,321,612 | 30,200,000 |

When approximately 60 million shares were outstanding, trading grew to:

| Date | Number of Legitimate TASER shares (approx) | Number of TASER shares traded (approx) |
|---|---|---|
| January 11, 2005 | 60,000,000 | 64,700,000 |
| January 12, 2005 | 60,000,000 | 54,800,000 |
| January 13, 2005 | 60,000,000 | 69,900,000 |

82.

The volume of trading reflected above is an extraordinarily high volume of trading compared to the shares outstanding for any security. To compare the magnitude of this trading, the average *annual* turnover rate of the shares outstanding for a NYSE traded company from 2003 – 2006 was 1.03 times and for the same period the average *annual* turnover rate for

51

NASDAQ listed companies was 2.6 times per year. For TASER, the annual turnover rate during various periods was in excess of 100 times the outstanding shares. With stock unavailable for borrowing in significant amounts during this period, the frenetically high volume of trading activity is strong evidence that many trades were neither long transactions (actual delivery of shares) nor covered short sales (where borrowing had been arranged in advance of the sale for delivery). Simply put, the high volume reflects naked short sales that the defendants either engaged in or facilitated.

83.

The volume of short sales is inconsistent with the "fails" reported by the DTCC. On December 10, 2004, the DTCC reported TASER positions of approximately 57 million shares, which accorded with the records of TASER's transfer agent as all authorized and issued shares held in brokerage accounts. But there were an additional 30,083,868 shares, or over 50% of all of TASER's outstanding 59,296,388 shares, sold short. Actual "fails" within the DTCC amounted to 6,737,149 shares. These fails were not reported by the DTCC to TASER. During the 22 trading days from May 11, 2005 to June 10, 2005, TASER's trading volume was 122,303,795 shares, while short sales during this period were 26,070,820 shares, or 21% of the trading volume. Although 26 million shares were sold short during this

period, the short interest increased by only 196,336 shares to 17,617,644

shares. Despite this huge amount of short selling in a hard to borrow

security, the "fails" reported by the DTCC fell by 484,462 shares, from

1,196,227 to 711,765 shares.

84.

**The Defendants' Beneficial Trading Records Reveal Claimed**

**Ownership Well In Excess of Actual Shares** – As discussed in paragraph 8

above, the defendants claim on their beneficial records to own TASER

shares for themselves or their clients well in excess of their actual inventory.

85.

**Over Voting of TASER Stock** – Additional evidence of naked short selling

of TASER stock is the excessive amount of over votes the company receives

during its annual meeting. For example, in 2005, approximately 82 million

"shareholders" voted in conjunction with TASER's annual shareholder

meeting. But, at that time, the company had only authorized and issued 61.1

million shares and approximately 17.2 million shares were short. Even if all

of the TASER shares that were sold short were able to vote, the total number

of votes would still only be 78.3 million (61.1 million shares outstanding +

17.2 million short shares). The fact that 82 million votes were received – 3.7

million more than the outstanding shares plus all shorted shares – indicates

53

that there were at least 3.7 million shares (82 million – 78.3 million) that
were undoubtedly counterfeit. Those shares substantially dilute the value of
legitimate TASER shares.

**F.     The Defendants' Naked Short Selling Has Injured Plaintiffs**

86.

The defendants' unlawful conduct, described in part above, has and
continues to cause legitimate TASER shareholders, like plaintiffs, harm. In
particular, the defendants' persistent and unlawful naked short selling has
resulted in the creation and circulation of tens of millions of counterfeit
TASER shares, which dilute the value of legitimate, authorized TASER
stock, and thereby artificially depress the stock price. In addition, the
counterfeit TASER shares deprive legitimate, authorized TASER
shareholders of the economic trading value and their voting and other stock
rights. The defendants' unlawful conduct has also created uncertainty in the
market regarding the integrity of TASER stock, causing further stock price
depression. Finally, the defendants' unlawful conduct has harmed TASER
by, among other things, electronically issuing TASER treasury shares
without authorization or compensation to TASER, limiting TASER's access
to capital, lowering its market capitalization, damaging its perception in the

159367

market and making it more difficult for the company to expand and/or

merge.

87.

While plaintiffs have been harmed by the defendants' unlawful

conduct, the defendants have and continue to reap enormous illicit profits.

As described above, the defendants have reaped illicit profits through,

among other things, charging fees for "loans" of TASER stock that are never

made, obtaining greater profits on their own proprietary short sales and

charging transaction fees for trades that could not lawfully be accomplished.

<strong><u>COUNT ONE</u></strong>

<strong>(Conspiracy and Endeavor to Violate § 16-4-4(a) of the Georgia<br>Racketeer Influenced and Corrupt Organization Act,<br>in Violation of O.C.G.A. § 16-14-4(c))</strong>

88.

Paragraphs 1 through 97 are incorporated by reference as if set forth

fully herein.

89.

The defendants, together with others presently known and unknown to

the plaintiffs, conspired and endeavored to violate O.C.G.A. § 16-14-4(a)

with the object of obtaining personal property, including but not limited to

55

money, directly and indirectly, through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(c).

## The Pattern of Racketeering Activity

### 90.

Achieving the object of the conspiracy and endeavor contemplated and required the commission of more than two related acts of racketeering activity by each conspirator. Numerous related acts of racketeering activity were actually committed during the course of the conspiracy and endeavor and those acts of racketeering activity proximately caused injury to the plaintiffs. The acts of racketeering activity include, but are not limited to, those set forth below.

### a.   Securities Fraud (O.C.G.A. § 10-5-24)

### 91.

Each defendant has willfully violated, attempted to violate, solicited another to willfully violate, or has engaged in acts involving violations of the Georgia Securities Act of 1973. This conduct violated O.C.G.A. § 10-5-24(a).

### 92.

The defendants' violations of O.C.G.A. § 10-5-24(a) constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(xxi).

56

159367

93.

By knowingly and intentionally selling TASER stock short at times

when they neither possessed nor intended on obtaining TASER stock to

deliver by the settlement date, the defendants have counterfeited and sold

TASER stock that is not properly authorized, issued or registered in

violation of, *inter alia*, O.C.G.A. §§ 10-5-5, 10-5-12.

94.

Further, by knowingly and intentionally selling TASER stock short

when they neither possessed nor intended to obtain TASER stock for

delivery by the settlement date, defendants made and continue to make

"untrue statement of a material fact or omitting to state a material fact

necessary in order to make the statements made, in light of the

circumstances under which they are made, not misleading." *See, e.g.,*

O.C.G.A. § 10-5-12.  Indeed, the SEC has expressly noted that naked short

selling involves the omission of a material fact:

> Inherent in the relationship between a dealer and his customer is the
> vital representation that the customer will be dealt with fairly, and in
> accordance with the standards of the profession. Duker & Duker, 6
> SEC 386, 388 (1939).  At a minimum, he represents that he will act in
> accordance with reasonable trade custom. Trade custom requires a
> dealer to consummate transactions with customers promptly, and in
> every transaction an implied representation to this effect is made,
> unless there is a clear understanding to the contrary. **If a dealer
> intends not to consummate a transaction promptly, and fails to
> disclose this intention to his customer, he omits to state to that**

57

> **customer a material fact necessary to make the above**
> **representation not misleading,** in violation of the anti-fraud
> provisions of the Securities Act and the Exchange Act.

Lewis H. Ankeny, 29 SEC 514, at p. 516 (emphasis added).

95.

The defendants, upon information and belief, have engaged in short

sale transactions of TASER stock in their own proprietary accounts. At the

same time, the defendants have created, loaned and sold counterfeit TASER

stock in an effort to manipulate the market for that stock, depress the stock's

price and reap profits from their short sales. Such conduct constitutes a

"deceptive or fraudulent device, scheme or artifice to manipulate the market

in a security," in violation of, *inter alia*, O.C.G.A. § 10-5-12(d)(6).

96.

The defendants have and continue to make phantom loans of TASER

stock to facilitate short sale transactions. Those phantom loans constitute,

*inter alia*, a "device, scheme or artifice to defraud in connection with an

offer to sell, sale, offer to purchase or purchase of any security, directly or

indirectly," a "deceptive or fraudulent device, scheme or artifice to

manipulate the market in a security" and "an act, practice or course of

business that operates or would operate as a fraud or deceit upon a person"

in violation of O.C.G.A. § 10-5-12.

58

159367

97.

The defendants also violated O.C.G.A. § 10-5-24 in at least the following ways:

(a)     Willfully employing a device, scheme or artifice to defraud in connection with an offer to sell, sale, offer to purchase or purchase of any security, directly or indirectly;

(b)     Willfully engaging in an act, practice or course of business that operates or would operate as a fraud or deceit upon a person;

(c)     Willfully effecting a transaction in a security which involves no change in the beneficial ownership of the security for the purpose of creating a false or misleading appearance of active trading in a security or with respect to the market for a security; and/or

(d)     Willfully misappropriating, converting or improperly withholding any funds or other property in connection with an offer or sale of any security.

**b.     Theft By Taking (O.C.G.A. § 16-8-2)**

98.

Each defendant committed, attempted to commit, solicited another to commit, or engaged in acts involving theft by taking of the property of

59

TASER and TASER shareholders, including plaintiffs.

99.

The defendants' violations of O.C.G.A. § 16-8-2 constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(ix).

100.

The defendants unlawfully took the property of others, including plaintiffs, with the intention of depriving them of that property.

101.

Plaintiffs had a property interest in their authorized, issued shares of TASER stock and the rights appertaining thereto within the meaning of O.C.G.A. § 16-8-1(3).

102.

Because at any point in time there is a finite universe of authorized and issued TASER shares, when the defendants created counterfeit shares of TASER stock through naked short sales, they necessarily took from each legitimate owner of authorized and issued TASER stock an amount proportionate to the amount of counterfeit TASER stock they created. George law prohibits the unlawful taking of property, regardless of the manner in which the property is taken or appropriated.

60

103.

The defendants also engaged in theft by taking by purporting to loan short sellers TASER stock that they neither owned nor had any intention of obtaining. The defendants then charged short sellers fees for these sham "loans" of stock which the defendants did not own and did not intend to obtain.

**c.    Theft By Deception (O.C.G.A. § 16-8-3)**

104.

Each defendant committed, attempted to commit, solicited another to commit, or engaged in acts involving theft by deception by obtaining property by deceitful means and artful practices with the intention of depriving the owners of their property.

105.

The defendants' violations of O.C.G.A. § 16-8-3 constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(ix).

106.

The defendants created or confirmed the impression that they had shares of TASER stock available to loan to short sellers when they knew that was not in fact the case.

61

107.

The defendants charged fees to short sellers of TASER stock for the

purported loans of TASER stock when in fact the defendants did not have

TASER stock available to loan, did not intend to obtain TASER stock for

purpose of making the loan, and, in many instances, knew there were not

authorized and issued shares of TASER stock available to them for purposes

of making purported loans.

108.

The defendants also failed to correct false impressions of existing

facts which they had preciously created or confirmed.  Specifically,

defendants failed to inform persons who wished to borrow TASER stock

from the defendants that the defendants did not have TASER stock available

to loan, did not intend to obtain TASER stock for the purpose of loaning

and, in many instances, could not have obtained TASER stock for purposes

of making a loan of that stock even if they had attempted to do so.

109.

The defendants also sold or otherwise transferred property consisting

of shares of TASER stock created as a consequence of naked short sales

while intentionally failing to disclose the fact that there were legal

impediments to the enjoyment of that property.  Those legal impediments

159367

included the fact that TASER stock purportedly sold by the defendants did

not actually exist as authorized issued shares of TASER stock.

110.

The defendants also promised to perform services which they did not

intend to perform and knew would not actually be performed.  These

services included lending shares of TASER stock which the defendants did

not actually possess, did not intend to obtain and, in many instances, knew

could not have been obtained even if the defendants had attempted to do so.

d.    **Violation of The Georgia Computer Systems Protection Act**

**(O.C.G.A. § 16-9-93)**

111.

Each defendant has violated, attempted to violate or solicited another

to violate the Georgia Computer Systems Protection Act.

112.

In the course of engaging in naked short selling, the defendants have

used computers, computer networks and electronic data to create, loan and

sell counterfeit TASER stock.  The defendants have also created and/or

altered electronic forms and data to falsely indicate their and their clients'

level and type of ownership of TASER stock.  For example, the defendants

have provided inaccurate and false reports on their electronic blue sheets

63

(*i.e.*, Responses to Request by the SEC) regarding the identity of an account holder for whom specific trades were executed and whether transactions were buys or sales, or longs or shorts.

113.

Among other things, the defendants have created, altered or deleted data in a computer or computer network in a manner such that if such creation, alteration or deletion occurred with respect to a tangible document, it would constitute forgery.

114.

The defendants have also used a computer to take or appropriate the property of another, obtained property through deceitful means or artful practice and/or converted property in violation of an agreement or other known legal obligation to make a specified application or disposition of such property, in violation of O.C.G.A. § 16-9-93(a).  In addition to the conduct alleged above, the deceitful means and artful practice employed by the defendants also include, but are not limited to:

(i) Engaging in short sales of TASER stock while knowing that they did not own, nor had any intention of obtaining TASER stock by the settlement date, if ever;

64

(ii) Facilitating short sales of TASER stock for clients while knowing

that they did not own, nor had any intention of obtaining TASER

stock by the settlement date, if ever; and

(iii) Claiming to loan TASER stock to clients and others for the

purpose of facilitating short sales while knowing they did not own,

nor had any intention of obtaining, sufficient TASER stock to cover

those loans.

### 115.

The defendants' violations of O.C.G.A. § 16-9-93 constitute

racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(xxviii).

**Relationship Between The Acts of Racketeering Activity**

### 116.

The acts of racketeering activity committed by defendants are related

in that they all involve transactions or purported transactions in or effecting

TASER stock.

### 117.

The acts of racketeering activity committed by defendants have the

same or similar intents in that they sought to obtain property, including but

not limited to money, for defendants through illegal means.

65

118.

The acts of racketeering activity committed by the defendants have

the same or similar results, in that defendants actually obtained personal

property, including but not limited to money, through illegal means.

119.

The acts of racketeering activity committed by defendants have the

same or similar victims, including TASER shareholders, who have been

victimized by defendants' conspiracy to manipulate the market in TASER

stock through deceptive or fraudulent schemes or artifices.

120.

The acts of racketeering activity committed by defendants have the

same or similar methods of commission in that they involve the

manipulation of the market in TASER stock in furtherance of a scheme to

obtain personal property, including but not limited to money, through illegal

means.

121.

The acts of racketeering activity committed by defendants are

interrelated by distinguishing characteristics and are not isolated incidents.

The acts involve the same or similar methods of commission,  the same or

66

similar benefits to the defendants and the same or similar efforts to conceal the defendants' misconduct.

### Injuries To Plaintiffs Proximately Caused By Defendants' RICO Violations

#### 122.

Plaintiffs' injuries flow directly from acts of racketeering activity that constitute part of the pattern of racketeering activity.

#### 123.

Plaintiffs have been injured by reason of the defendants' violation of O.C.G.A. § 16-14-4(c) and are entitled to recover three times the actual damages sustained.

#### 124.

Pursuant to O.C.G.A. § 16-14-6(c), plaintiffs are also entitled to recover their attorneys' fees in the trial and appellate courts, and their costs of investigation and litigation reasonably incurred.

### COUNT TWO
#### (Violation of the Georgia Securities Act)

#### 125.

Paragraphs 1 through 134 are incorporated by reference as if set forth fully herein.

67

159367

126.

The defendants' violations of the Georgia Securities Act have

proximately caused plaintiffs injury, including, but not limited to, (i) lost

value of the stock; (ii) impairment of non-monetary rights; and (iii)

interference with the ordinary and intended operation of those rights.

## COUNT THREE
### (Violation of the Georgia Computer Systems Protection Act)

127.

Paragraphs 1 through 136 are incorporated by reference as if set forth

fully herein.

128.

The defendants' violation of the Georgia Computer Systems

Protection Act has proximately caused plaintiffs injury, including, but not

limited to, (i) lost value of the stock; (ii) impairment of non-monetary rights;

and (iii) interference with the ordinary and intended operation of those

rights.

## COUNT FOUR
### (Conversion)

129.

Paragraphs 1 through 138 are incorporated by reference as if set forth

fully herein.

159367

130.

Plaintiffs own or owned personal property in the form of TASER common stock.

131.

Through the unlawful conduct described above, the defendants have committed an unauthorized assumption and exercise of the right of ownership over personal property (*i.e.*, TASER stock) belonging to plaintiffs, and have unlawfully appropriated it. The defendants have also substantially and wrongfully interfered with the plaintiffs' right to possession of their property.

132.

The defendants' unlawful conversion of plaintiffs' TASER stock has proximately caused them injury, including, but not limited to, (i) lost value of the stock; (ii) impairment of non-monetary rights; and (iii) interference with the ordinary and intended operation of those rights.

**Punitive Damages**

133.

The defendants' actions show willful misconduct, breach of fiduciary duty, malice, fraud, wantonness, oppression, and an entire want of care that raises the presumption of conscious indifference to consequences and

159367

specific intent to cause harm, entitling plaintiffs to receive punitive damages sufficient to deter, penalize or punish defendants in light of the circumstances of the case.

### Prayer For Relief

WHEREFORE, Plaintiffs pray for the following relief:

(a)     Trial by jury on all issues so triable;

(b)     Judgment be entered in favor of plaintiffs and against defendants in the amount to be determined by the jury at trial;

(c)     Plaintiffs be awarded compensatory and punitive damages;

(c)     Plaintiffs be awarded their expenses of litigation, including reasonable attorneys' fees and costs; and

(e)     The Court award such other and further relief as the Court deems just and appropriate under the circumstances.

70

Respectfully submitted this 30th day of June, 2008.


John E. Floyd
Georgia Bar No. 266413
Steven J. Rosenwasser
Georgia Bar No. 614908
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
(404) 881-4100

JAMES W. CHRISTIAN
State Bar No. 04228700
Christian, Smith, & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas 77002
(713) 659-7616 Tel.
(713) 659-7641 Fax
(pro hac application to be filed)

John O'Quinn
State Bar No.15296000
The O'Quinn Law Firm
440 Louisiana St, Ste. 2300
Houston, Texas 77002
(713) 223-1000 Tel.
(713) 222-6903 Fax
(pro hac application to be filed)

*ATTORNEYS FOR PLAINTIFFS*

71

159367

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 30th day of June, 2008, a copy of the foregoing THIRD AMENDED COMPLAINT was served on the following counsel of record via Hand Delivery as follows:

    Goldman Sachs Group, Inc.
    Bear Stearns Capital Markets, Inc.
    Bear Stearns & Co., Inc.
    The Bear Stearns Companies, Inc.
    Merrill Lynch, Pierce, Fenner & Smith, Inc.
    Deutsche Bank Securities, Inc.
    Banc of America Securities, LLC
    c/o Their Registered Agent
    CT Corporation System
    1201 Peachtree St., NE
    Atlanta, Georgia

    Credit Suisse (USA) Inc.
    UBS Securities, LLC
    c/o Their Registered Agent
    Corporation Service Company
    40 Technology Parkway South, #300
    Norcross, Georgia 30092

                                    John E. Floyd
                                    Georgia Bar No. 266413
                                    Steven J. Rosenwasser
                                    Georgia Bar No. 614908

72