# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| TASER INTERNATIONAL, INC., *et al.*, | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 1:10-cv-03108-JOF |
| v. | : | **DECLARATION OF** |
| MORGAN STANLEY & CO., INC., *et al.*, | : | **CHRISTINA J. HAYES** |
| Defendants. | : | |

I, CHRISTINA J. HAYES, declare as follows:

1.      I am an associate at the law firm of O'Melveny & Myers LLP ("OMM"), counsel for Merrill Lynch Professional Clearing Corp. ("Merrill Pro") in this matter.  I am over 18 years of age and have personal knowledge of the matters set forth in this declaration.  I submit this declaration in support of Merrill Lynch Professional Clearing Corp.'s Surreply in Further Support of Its Opposition to Plaintiffs' Motion for Remand.

2.      Attached to this declaration as Exhibit 1 is a true and correct copy of an *amicus* brief filed by the SEC in the action *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, No. 08-2114 in the U.S. Court of Appeals for the Eighth Circuit.

3.      Attached to this declaration as Exhibit 2 is a true and correct copy of relevant excerpts of Securities and Exchange Commission ("SEC") Release No. 34-48709, 68 Fed. Reg. 62,972 (Nov. 6, 2003).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 18th day of November, 2010, in New York, New York.

Christina J. Hayes

# EXHIBIT 1

No. 08-2114

_____

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

PET QUARTERS, INC., et al.,

Plaintiffs-Appellants,

v.

DEPOSITORY TRUST AND CLEARING CORP., et al.

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Eastern District of Arkansas (Western Division)

_____

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
*AMICUS CURIAE,* IN SUPPORT OF APPELLEE, URGING AFFIRMANCE
ON ISSUE ADDRESSED

_____

BRIAN G. CARTWRIGHT
General Counsel

ANDREW N. VOLLMER
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

MARK PENNINGTON
Assistant General Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9010
(202) 551-5189 (Pennington)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

INTEREST OF THE SECURITIES AND EXCHANGE
  COMMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLAINTIFFS' ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     Section 17A of the Exchange Act directs the Commission to
        oversee the national clearance and settlement system in
        accordance with the public interest and the protection of
        investors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     The Commission has approved the stock borrow program
        as being in compliance with the requirements of the
        Exchange Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ISSUE ADDRESSED BY THE COMMISSION . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.     Plaintiffs' case rests on an erroneous description of the legal regime
      governing how securities are held, settled and cleared. . . . . . . . . . . . . . . 9

      A.     The U.C.C. prescribes the terms under which the securities
        involved in this case are held . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.     Clearance and settlement of the securities involved in this
        case are governed by NSCC's Commission-approved rules,
        including the stock borrow program. . . . . . . . . . . . . . . . . . . . . . . . 12

**TABLE OF CONTENTS (CONTINUED)**

<u>Page</u>

1. The Continuous Net Settlement system reflects daily securities transactions by making net transfers among the broker-dealers' securities accounts at DTC. . . . . . . . . . . 12

2. At the option of the buyer, a buy-in may by used to satisfy delivery obligations when a seller fails to deliver securities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

3. When shares that have not been delivered are available to be borrowed, the stock borrow program provides that the shares are automatically borrowed by NSCC and delivered to buyers. . . . . . . . . . . . . . . . . . . . . . . 16

C. Plaintiffs incorrectly describe the operation of the U.C.C. and NSCC Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II. Plaintiffs' state law challenges to the stock borrow program are preempted by the Exchange Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. State laws that conflict with federal regulatory regimes are preempted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. Permitting state law liability for the conduct alleged in the complaint would conflict with the Exchange Act regulatory regime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1. Plaintiffs' direct challenges are preempted. . . . . . . . . . . . . . 22

2. Plaintiffs' so-called "misrepresentation" claims are also preempted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

a. Apparently abandoned claims. . . . . . . . . . . . . . . . . . . 24

b. The inefficiency claim. . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF CONTENTS (CONTINUED)**

                                                                          **Page**

      c.     The mis-accounting for lender shares claim. . . . . . . . 27

III.    The Commission is vigorously exercising its regulatory responsibility to prevent abusive short selling, but it has not suggested that defendants or the clearing and settlement system are responsible for any such abuses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ANTI-VIRUS CERTIFICATE

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page**

Bradford National Clearing Corp. v. SEC,
  590 F.2d 1085 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13

Credit Suisse First Boston Corp. v. Grunwald,
  400 F.3d 1119 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Crosby v. National Foreign Trade Council, 530 U.S. 363 (2000) . . . . . . . . . . . . 21

Levy v. Ohl, 477 F.3d 988 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Merrill Lynch, Pierce, Fenner & Smith v. Ware,
  414 U.S. 117 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Nanopierce Technologies, Inc. v. Depository Trust and Clearing Corp.,
  168 P.3d 73 (Nev. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 22, 24
                                                                                          passim

Savage v. Jones, 225 U.S. 501 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Whistler Investments, Inc. v. Depository Trust and Clearing Corp.,
  2008 WL 3876577 (9th Cir. Aug. 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                                                                          passim

**Commission Releases**

National Securities Clearing Corp.; Proposed Rule Change
  by Self-Regulatory Organization, SEC Rel. No. 34-16514,
  45 Fed. Reg. 5867 (Jan. 24, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

National Securities Clearing Corp.; Proposed Rule Change,
  SEC Rel. No. 34-17422, 46 Fed. Reg. 3104 (Jan. 13, 1981) . . . . . . . . . . . . . . . 7

In the Matter of the Full Registration as Clearing Agencies of
  The Depository Trust Co. et al., SEC Rel. No. 34-20221,
  48 Fed. Reg. 45167 (Oct. 3, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**TABLE OF AUTHORITES (CONTINUED)**

**Commission Releases (Continued)**                                      **Page**

Regulation SHO Proposing Release, SEC Rel. No. 34-48709,
  68 Fed. Reg. 62972 (Nov. 6, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Short Sales, SEC Rel. No. 34-50103,
  69 Fed. Reg. 48008 (Aug. 6, 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Amendments to Regulation SHO, SEC Rel. No. 34-5612,
  72 Fed. Reg. 45544 (Aug. 7, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Emergency Order, SEC Rel. No. 34-58166 (July 15, 2008),
  http://www.sec.gov/rules/other/2008/34-58166.pdf . . . . . . . . . . . . . . . . . . . . . 30

**Statutes and Rules**

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.

    Section 3(a)(23)(A), 15 U.S.C. 78c(a)(23)(A) . . . . . . . . . . . . . . . . . . . . . 5
    Section 3(a)(26), 15 U.S.C. 78c(a)(26) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 17A, 15 U.S.C. 78q-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4
                                                                           passim
    Section 17A(a)(1), 15 U.S.C. 78q-1(a)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 17A(a)(2), 15 U.S.C. 78q-1(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 17A(b), 15 U.S.C. 78q-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 17A(b)(1), 15 U.S.C. 78q-1(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 17A(b)(3)(A), 15 U.S.C. 78q-1(b)(3)(A) . . . . . . . . . . . . . . . . . . . . 5
    Section 17A(b)(3)(F), 15 U.S.C. 78q-1(b)(3)(F)  . . . . . . . . . . . . . . . . . . 6, 26
    Section 17A(b)(3)(I), 15 U.S.C. 78q-1(b)(3)(I)  . . . . . . . . . . . . . . . . . . . . . 6
    Section 19(b), 15 U.S.C. 78s(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8
    Section 19(b)(2), 15 U.S.C. 78s(b)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 19(b)(3), 15 U.S.C. 78s(b)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

**TABLE OF AUTHORITIES (CONTINUED)**

**Statutes and Rules (Continued)**                                              **Page**

Uniform Commercial Code

Article 8-101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Article 8-102(a)(9)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Article 8-102(a)(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Article 8-102(a)(17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Article 8-501, Comment 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Article 8-501, Comment 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Article 8-501(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Article 8-501(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11


Federal Rule of Evidence

Rule 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


Rules Under the National Securities Clearing Corporation

Rule 11, Sec. 1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14
Rule 11, Sec. 1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Rule 11, Sec. 1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Rule 11, Sec. 1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Rule 11, Sec. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Rule 11, Sec. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15
Rule 11, Sec. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15
Rule 11, Sec. 7(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Rule 11-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


Procedure VII(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Procedure VII(C)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Procedure VII(C)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Procedure VII(C)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Procedure VII(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Procedure VII(J) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Procedure X(A)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**TABLE OF AUTHORITIES (CONTINUED)**

**Miscellaneous**                                                                **Page**

Responses to Frequently Asked Questions Regarding SHO,
  Question 7.1 (Jan. 3, 2005)
  www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm . . . . . . . . . . . . . . 12, 17

## INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION

The national clearance and settlement system for securities plays a crucial role in our nation's capital markets.  Congress requires clearing agencies to be registered with the Securities and Exchange Commission and subject to the Commission's comprehensive oversight under Section 17A of the Securities Exchange Act of 1934, 15 U.S.C. 78q-1. National Securities Clearing Corporation (NSCC), one of the defendants in this case, provides clearing services for virtually all broker-to-broker equity and corporate debt trades in the United States, clearing over 20 million equity transactions on an average trading day, while defendant Depository Trust Company (DTC) plays an important role in that system as a depository for securities.

Plaintiffs' lawsuit threatens to disrupt or to impose substantial and unwarranted costs on this system by seeking damages under state law against registered clearing agencies for operation of the NSCC stock borrow program pursuant to Commission-approved rules.  Plaintiffs allege that defendants are liable to them because the stock borrow program has facilitated manipulation of Pet Quarter's stock by naked short sellers.  Their complaint makes direct challenges to the program, alleging that operation of the program in accordance with the rules gives rise to damage claims, and also purported "misrepresentation" claims alleging that defendants have lied about the program's operation.  Both sets

of claims actually challenge the Commission's approval of the program, and both are therefore preempted by the Exchange Act.

As the regulator charged by Congress with overseeing the registered clearing agencies and ensuring that the national clearance and settlement system functions efficiently, in the public interest and for the protection of investors, the Commission has a strong and direct interest in seeing that the threats created by plaintiffs' lawsuit are ended by the affirmance of the district court's dismissal.

## PLAINTIFFS' ALLEGATIONS

The gravamen of plaintiffs' complaint is that the stock borrow program as operated by NSCC in accordance with Commission-approved rules facilitates stock manipulation by naked short sellers.  Thus, they begin the Summary section of the complaint by asserting that the Stock borrow program was "purportedly created to address SHORT TERM delivery failures by sellers of securities in the stock market" but that the "end result of the program has been to create tens of millions of unissued and unregistered shares to be traded in the public market," and that in some instances the program has "resulted in two or more shareholders who purchase shares in separate transactions owning the same shares." Complaint, ¶2.  After what purports to be a description of how the clearing system and the stock borrow program work (¶¶3-6), plaintiffs aver that in operating the

program, defendants have "permitted sellers to maintain open fail to deliver positions of tens of millions of shares for periods of a year and even longer and participated in a scheme to manipulate downward the price of the affected securities" (¶6).  As harms, plaintiffs allege that defendants' conduct

> has had the effect of creating millions of unregistered, illegal, free trading shares of the issuer, (1) artificially increasing the supply of an issuer's shares in the marketplace; (2) driving down the price of the stock of the issuer; (3) decreasing the value of the shareholders' holdings in an issuer's stock; and (4) causing multiple owners who purchased shares in separate transactions to own the same shares.  Complaint, ¶7.

The balance of their complaint expands on these allegations that the program has harmful effects, concluding with sixteen claims for relief for injuries supposedly caused by defendants' conduct (¶¶123-296).

## BACKGROUND

**A.**    **Section 17A of the Exchange Act directs the Commission to oversee the national clearance and settlement system in accordance with the public interest and the protection of investors.**

Congress enacted Section 17A of the Exchange Act in 1975 as part of the legislative response to the paperwork crisis of the late 1960s and early 1970s.  See generally In the Matter of the Full Registration as Clearing Agencies of The Depository Trust Co. et al., SEC Rel. No. 34-20221, 48 Fed. Reg. 45167, 45168 (Oct. 3, 1983) ("Final Approval Order"); Bradford National Clearing Corp. v.

-3-

SEC, 590 F.2d 1085, 1090-94 (D.C. Cir. 1978).  The statute is based on Congressional findings that the prompt and accurate clearance and settlement of securities "are necessary for the protection of investors;" that "[i]nefficient procedures for clearance and settlement impose unnecessary costs on investors;" that "[n]ew data processing and communications techniques create the opportunity for more efficient, effective, and safe procedures for clearance and settlement;" and that linking clearance and settlement facilities and developing uniform clearance and settlement standards and procedures "will reduce unnecessary costs and increase the protection of investors."  Section 17A(a)(1), 15 U.S.C. 78q-1(a)(1).

Congress directed the Commission, "having due regard for the public interest, the protection of investors, and the safeguarding of securities," to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities" in accordance with the statutory findings and objectives.  Section 17A(a)(2), 15 U.S.C. 78q-1(a)(2). Section 17A requires every clearing agency that acts in interstate commerce to be registered with the Commission.  Section 17A(b), 15 U.S.C. 78q-1(b). [1]

---

[1]     The term "clearing agency" includes entities like NSCC that act as an intermediary in making payments and deliveries in securities
(continued...)

-4-

Registration may not be granted unless the Commission finds that both the clearing agency itself and the clearing agency's rules meet specified statutory requirements (the "Requirements").  Section 17A(b)(1), 15 U.S.C. 78q-1(b)(1).

Among the Requirements are that the clearing agency be so organized as, and have the capacity, to be able to facilitate the prompt and accurate clearance and settlement of securities transactions, safeguard securities and funds in its custody or control or for which it is responsible, comply with the provisions of the federal securities laws, enforce compliance by its participants with the rules of the clearing agency, and carry out the purposes of Section 17A.  Section 17A(b)(3)(A), 15 U.S.C. 78q-1(b)(3)(A).  The clearing agency's rules must be designed, inter alia,  to promote the prompt and accurate clearance and settlement of securities transactions, to remove impediments to and perfect the mechanism of a national system for the prompt and accurate clearance and settlement of securities transactions, and, in general, to protect investors and the public interest.

------

[1](...continued)
transactions, as well as securities depositories such as DTC that act as a custodian of securities in a system under which all deposited securities of a particular class or series of an issuer are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates.  Section 3(a)(23)(A) of the Exchange Act, 15 U.S.C. 78c(a)(23)(A).

-5-

Section 17A(b)(3)(F), 15 U.S.C. 78q-1(b)(3)(F).  Also, the rules must not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.  Section 17A(b)(3)(I), 15 U.S.C. 78q-1(b)(3)(I).

Registered clearing agencies are self-regulatory organizations (SROs) under the Exchange Act.  Section 3(a)(26), 15 U.S.C. 78c(a)(26).  Therefore, changes to a clearing agency's rules after registration may only be made pursuant to Section 19(b) of the Exchange Act, 15 U.S.C. 78s(b).  That section provides that no change may take effect unless approved by the Commission under Section 19(b)(2), 15 U.S.C. 78s(b)(2), as being consistent with the Exchange Act, or unless permitted to take effect without prior approval pursuant to Section 19(b)(3), 15 U.S.C. 78s(b)(3).

**B.    The Commission has approved the stock borrow program as being in compliance with the Requirements of the Exchange Act.**

Defendants NSCC, DTC, and a number of other clearing agencies filed applications for registration with the Commission in 1976.  Final Approval Order, 48 Fed. Reg. at 45168-69.  The Commission granted each of these agencies conditional registration.  Id.  It then undertook a thorough review of each clearing agency's operations and rules to ensure that they met the statutory Requirements before granting full registration.  Id.  The Commission also published standards

-6-

(the "Standards") to be used by its Division of Market Regulation (now Division of Trading and Markets) in reviewing and making recommendations concerning whether each clearing agency should be granted full registration.  Id. at 45169.

NSCC adopted the stock borrow program by rule changes that took effect pursuant to Section 19(b)(3) during the time when it was operating under the conditional registration.  SEC Rel. No. 34-16514, 45 Fed. Reg. 5867 (Jan. 24, 1980) (notice of filing of NSCC proposed rule change adopting as a one year pilot program procedures for borrowing securities to meet system needs); SEC Rel. No. 34-17422, 46 Fed. Reg. 3104 (Jan. 13, 1981) (notice of filing of NSCC proposed rule change making pilot program permanent).

The Commission granted NSCC's application for full registration in 1983, nearly three years after the stock borrow program rules took effect.  48 Fed. Reg. at 45178.  After describing its review of NSCC's application and the extensive oversight it had exercised over NSCC during the pendency of that application, the Commission stated that it had determined "that NSCC's by-laws, rules, procedures, and systems, as amended, are consistent with the Requirements and

the Standards," and that accordingly, it "believe[d] that NSCC should be granted

full registration."  Id. [2]

## ISSUE ADDRESSED BY THE COMMISSION

Whether plaintiffs' state law damages claims against defendants for

operating the stock borrow program in compliance with Commission-approved

rules are preempted because they are inconsistent with, and stand as an obstacle to

the accomplishment and execution of the full purposes and objectives of, the

Exchange Act.

---

[2]     The Commission relied on each clearing agency's application, as well
as on the Commission's continuous monitoring and oversight of the
agencies, including its review of each proposed rule change filed with
it.  48 Fed. Reg. at 45170-71.  Specifically,

> in carrying out the Commission's general oversight
> responsibilities, the Commission has reviewed, pursuant
> to Section 19(b) of the Act, each of the many proposed
> rule changes filed by the clearing agencies.  Those rule
> changes have concerned most of the major services and
> systems of each clearing agency, all of the recent
> enhancements to clearing agency services, and all
> schedules of fees.

48 Fed. Reg. at 45171.

## ARGUMENT

The complaint in this case is virtually identical to the complaints filed in several other cases. All of the earlier cases have by now been dismissed, and every court that has considered the complaint, including the Nevada supreme court and the Ninth Circuit Court of Appeals, has concluded that it is preempted because it conflicts with the Exchange Act. See Nanopierce Technologies, Inc. v. Depository Trust and Clearing Corp., 168 P.3d 73, 82-85 (Nev. 2007); Whistler Investments, Inc. v. Depository Trust and Clearing Corp., 2008 WL 3876577 (9th Cir. Aug. 22, 2008). We urge this Court to reach the same result. Before turning to the preemption argument, however, we explain that the complaint misdescribes the operation of the Uniform Commercial Code (U.C.C.) and the NSCC Rules of Operation.

## I.   Plaintiffs' case rests on an erroneous description of the legal regime governing how securities are held, settled and cleared.

Plaintiffs seek to shield their erroneous description of the settlement and clearance system from scrutiny by asserting that the Court is bound by the allegations of their complaint (Br. 51-56), but they do not allege that defendants are acting inconsistently with either the U.C.C. or NSCC's Rules. The content of the U.C.C. and NSCC's Rules are matters of public record that may be ascertained

by judicial notice both at the district court and in this Court, and that may be

considered on a motion to dismiss, see Levy v. Ohl, 477 F.3d 988, 991-92 (8ᵗʰ Cir.

2007); Fed. R. Evid. 201.  The interpretation of these provisions raises issues of

law to be determined by a court, not questions of fact to be resolved by a factfinder

in a trial.  In other words, the Court may assume the truth of the well-pleaded facts

alleged in the complaint for purposes of this appeal, but it should not also assume

that plaintiffs' misdescriptions of the applicable law are true.  We therefore

describe the relevant aspects of the Code and the Rules.

> **A.     The U.C.C. prescribes the terms under which the securities involved in this case are held**.

Article 8 of the U.C.C., "Investment Securities," (U.C.C. 8-101) provides

that securities may be held either (1) directly  through possession of a certificate or

entry on the issuer's stock registry, or (2)  indirectly, by acquisition of a "security

entitlement," which is a form of property interest created by the Code to reflect the

fact that securities were increasingly being held through intermediaries such as

broker-dealers.  See generally Prefatory Note to Revised Article 8 (1994).[3]   In

essence, a security entitlement is a contractual undertaking in which a securities

---

[3]     The Official Comments to each section of the U.C.C. cited
*infra* provide further explanation of the meaning of the relevant
provisions.

intermediary such as a clearing corporation, bank or broker-dealer agrees to treat the entitlement holder as being entitled to exercise the rights that comprise the security.  <u>See generally</u>, U.C.C. 8-501, Comment 1. [4]  Thus, instead of a certificate or an entry in the issuer's stock registry, the holder of a security entitlement has contractual rights against an intermediary -- against DTC in the case of a broker-dealer, and against the broker-dealer in the case of broker-dealer's customers. Transfers of security entitlements are made on the books of the intermediary (the books of DTC for broker-dealers, the books of broker-dealers for their customers) rather than through delivery of a certificate or an entry on the issuer's registry. This arrangement facilitates efficient and safe transfers of large numbers of shares.

The intermediary may credit an account with a security entitlement even though the intermediary does not itself hold the security.  Section 8-501(c).  For

---

[4]    "Security entitlement" is defined as "the rights and property interest of an entitlement holder" with respect to a security (and other types of financial assets) as specified in Part 5 of Article 8 ("Security Entitlements").  U.C.C. 8-102(a)(17) (definition of security entitlement), 8-102(a)(9)(i)(definition of financial asset as including a security).  A security entitlement is created when an intermediary credits a security into the entitlement holder's "securities account," which is an account in which a security may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the entitlement holder as entitled to exercise the rights that comprise the security.  U.C.C. 8-501(a); <u>see also</u> U.C.C. 8-102(a)(14)(definition of "securities intermediary").

example, the U.C.C. commentary explains that it may do so when the seller of

securities has failed to deliver them:

> It is . . . entirely possible that a securities intermediary might make entries in a customer's account reflecting that customer's acquisition of a certain security at a time when the securities intermediary did not itself happen to hold any units of that security. *The person from whom the securities intermediary bought the security might have failed to deliver and it might have taken some time to clear up the problem . . . .* U.C.C. 8-501, Official Comment 3 (Emphasis added)

If an intermediary credits entitlements to customer accounts even though the

intermediary does not hold the security, the result may be that the total number of

securities entitlements credited to all customer accounts exceeds the number of

shares issued by the issuer. *See* Responses to Frequently Asked Questions

Regarding SHO, Question 7.1 (Jan. 3, 2005). [5]

**B.      Clearance and settlement of the securities involved in this case are governed by NSCC's Commission-approved Rules, including the stock borrow program.**

**1.      The Continuous Net Settlement system reflects daily securities transactions by making net transfers among the broker-dealers' securities accounts at DTC.**

The securities that are the subject of the complaint were deposited at DTC,

either by DTC's participants (broker-dealers and banks) or by the issuers of the

---

[5]      www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

securities.  These securities are registered on the books of the issuer in the name of

DTC's nominee, Cede & Co.  Thus, Cede & Co. is the only entity that holds these

securities directly, while the DTC participants hold only securities entitlements

created when DTC credits the securities deposited with it to participants' securities

accounts.  DTC reflects transactions among its participants by computerized book-

entry changes in those accounts in the following manner.

Trades in these securities clear through NSCC's continuous net settlement

system.  See generally NSCC Rule 11, Sec. 1(a); Final Approval Order, 48 Fed.

Reg. at 45170 n.32; Bradford, 590 F.2d at 1091 n.2.  Under that system, NSCC

becomes the contra-party to each purchase or sale of securities.  NSCC assumes

the obligation of each member that is receiving securities to receive and pay for

those securities, and it assumes the obligation of each member that is delivering

securities to make the delivery.  Rule 11, Secs. 1(b), (c), (e); Procedure VII(A).

NSCC is also assigned the receiving party's right to receive securities and the

delivering party's right to receive payment.  Id.

The assumption of these obligations and the assignment of these rights by

NSCC place it between the delivering member and the receiving member – the

delivering member is obligated to deliver securities to NSCC; the receiving

member is obligated to accept and pay for securities delivered by NSCC; and

-13-

NSCC is obligated to receive and pay for securities from the delivering member, and to deliver securities to the receiving member.  Id.

All member purchases and sales of a given security are netted daily based on the trade date, so that each member is required to deliver to NSCC or receives from NSCC only the difference between the total amount of each security that it bought and the total amount that it sold during the trading period.  Procedure VII(C)(1).  A member that owes NSCC securities is described in NSCC Rules as having a short position, a member that is entitled to receive securities from NSCC has a long position, and a member that is neither obligated to deliver nor entitled to receive securities has a flat position.  Rule 11, Secs. 1(a), 2. [6]

For each member with a short position in a security at the close of business on settlement date, NSCC instructs DTC to deliver securities from the member's account at DTC to NSCC's account at DTC.  Rule 11, Secs. 3, 4; Procedure VII(C)(2).  NSCC then instructs DTC to deliver those securities from NSCC's

---

[6]   "Short position" in this context means only that the member has an obligation to deliver securities to NSCC.  It does not mean that the securities were sold short in the market.

-14-

account to the DTC accounts of members with long positions in the security.  Rule

11, Secs. 3, 4; Procedure VII(C)(3). [7]

> **2.** **At the option of the buyer, a buy-in may by used to satisfy delivery obligations when a seller fails to deliver securities**.

Sometimes, members do not have sufficient securities on deposit at DTC to

meet their delivery obligation to NSCC on settlement date.  Procedure VII(C)(3).

Fails to deliver may be caused by reasons other than naked short selling.  For

example, human or mechanical errors or processing delays can result from

transferring securities, thus causing a failure to deliver on a long sale within the

normal three-day settlement period.

When a delivery failure occurs, NSCC allocates the fails to members that

are due to receive securities according to NSCC Rules (Procedure VII(E)).  This

allocation may cause the receiving member to whom the fail is allocated to have a

long position, i.e., to be entitled to receive securities from NSCC.  (The receiving

member is not obligated to pay for the securities until their delivery.)

A member that has failed to receive securities has two options:  it may

either maintain that position and wait for delivery to be made to it as securities are

delivered to NSCC, or it may file a Notice of Intention to Buy-in with NSCC.

---

[7]     Details of the procedures for establishing each member's position on settlement date are set forth in Rule 11-5.

Rule 11, Sec. 7(a), Procedure VII(J).  In response to the filing of such a Notice,

NSCC takes a series of steps to facilitate the buy-in, including, if necessary,

executing the buy-in in the marketplace of its choice, through the agents of its

choosing.  (Typically it will instruct the buyer to make the purchase).  Procedure

X(A)(1).  When a buy-in is executed, any financial loss incurred in the purchase is

allocated in accordance with NSCC procedures to members with short positions in

the security.  Id.

> ### 3.   When shares of securities that have not been delivered are available to be borrowed, the stock borrow program provides that available shares are automatically borrowed by NSCC and delivered to buyers.

The stock borrow program is operated by NSCC as an alternative to the

buyer either waiting for the securities to be delivered by the seller or initiating a

buy-in.  The program  is intended to improve the efficiency of the clearance and

settlement system by increasing the likelihood that purchasers will receive

delivery of their securities on settlement date even though insufficient securities

have been delivered to NSCC on that day.  See NSCC Rules, Addendum C.  Under

the applicable Rules, the program is automated and operates without the exercise

of discretion by NSCC.

Members wishing to participate in the program as lenders notify NSCC of securities that they have on deposit with DTC that are available to be borrowed for delivery to receiving members. Id. NSCC will borrow those shares if it has unsatisfied delivery obligations on a particular settlement date. Id. Borrowed securities are transferred from the lending member's account to an NSCC account at DTC, and are then used to satisfy delivery obligations to members with long positions that would otherwise fail to receive.

The lending member is credited with the market value of the securities borrowed, and the long position in the member's account will reflect the borrowing of the shares until those shares are returned, i.e., the account will reflect that the member is owed shares. Id. Borrowed stock is returned to the lender through normal allocation in the continuous net settlement system as securities become available. Id. Alternatively, the lender, like any other member with a long position, may initiate buy-in procedures by submitting a Notice of Intention to Buy-in. Until the securities are returned to it, the lending member cannot sell or re-lend them. See Responses to Frequently Asked Questions Regarding SHO (Jan. 3, 2005). [8]

---

[8]   www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

**C.     Plaintiffs incorrectly describe the operation of the U.C.C. and NSCC Rules.**

The foregoing summary of the applicable U.C.C. provisions and NSCC Rules makes clear that plaintiffs' description of the continuous net settlement system and the stock borrow program that are created by NSCC's Rules is flawed in essential respects.  Among their erroneous allegations are that (1) the stock borrow program is the only way that fails to deliver can be cured, (2) NSCC is at fault for "permitting" fails to deliver to remain open, and (3) the continuous net settlement system or the stock borrow program results in the creation of "phantom shares."

(1) A member that has failed to receive securities can obtain those securities through a buy-in, which will not involve the stock borrow program at all.  Conversely, a member that receives securities from the stock borrow program will not have to initiate a buy-in, and will not be aware that the securities it receives are borrowed; rather, it will receive the borrowed shares from NSCC along with delivered shares..

(2) NSCC's job is to account for securities that are delivered into the system and to instruct DTC to make transfers among participants' accounts to reflect those deliveries.  It does not have the authority to require either delivery by

-18-

sellers that fail to deliver or buy-ins by buyers that have not received securities.

Moreover, it has no mechanism for determining whether particular fails to deliver

have occurred because of illegal naked short selling or for some legitimate reason,

and it does not have any standards that would guide it in deciding whether a  buy-

in should be made.

(3) While the operation of the U.C.C. may result in more shares being

credited to customer accounts in the form of security entitlements than have been

issued, that fact is a recognized feature of the statutory scheme, arising from the

fact that broker-dealers are permitted to credit accounts with security entitlements

even though the firm is not holding an equivalent number of shares.  In contrast, as

operated under NSCC Rules, the continuous net settlement system and the stock

borrow program do not result in more shares being credited to DTC participants'

accounts than have been issued by the issuer and are being held by DTC.

First of all, DTC (through its nominee) is shown on the issuer's books as the

record holder of the shares deposited with it, so DTC cannot hold more shares than

the issuer has issued.  DTC, in turn, credits its participants' accounts with

securities entitlements only up to the number of shares it has on deposit, so the

total number of entitlements in those accounts also will not exceed the number of

issued shares.

-19-

Next, as noted, the continuous net settlement system operated by NSCC is essentially an accounting system that records delivery and receive obligations among NSCC members. Under NSCC Rules, NSCC will not direct DTC to transfer more shares out of a selling member's account than the member has in that account. Instead, NSCC will show the seller as owing delivery (i.e., having a short position) to the extent that the account has an insufficient number of shares to cover all deliveries required that day, and it will allocate the resulting fails to deliver to purchasing members, who will be shown as being owed delivery (i.e., having long positions). As a result, there will not be more shares in NSCC members' accounts at DTC than are issued.

Finally, when shares are borrowed through the stock borrow program, NSCC will instruct DTC to transfer shares that are in a lender's account to NSCC's account, from where they will be transferred to buyers – a lender's DTC account will be debited the lent shares, and the buyer's DTC account will ultimately be credited with those shares. The seller will continue to have the same short position. All that the stock borrow program does is shift the *consequences* of the failure to deliver from a buyer that would otherwise be allocated a fail to receive to a lender that has indicated that it is willing to lend its shares and await delivery of replacement shares. This shift cannot possibly increase the number of

-20-

securities issued, any more than the buyer's decision to either wait or initiate a

buy-in can do so.

## II.   Plaintiffs' state law challenges to the stock borrow program are preempted by the Exchange Act.

### A.   State laws that conflict with federal regulatory regimes are preempted.

State laws are "naturally preempted to the extent of any conflict with a

federal statute." Crosby v. National Foreign Trade Council, 530 U.S. 363, 372

(2000).  A court will find conflict preemption "where it is impossible for a private

party to comply with both state and federal law, and where under the

circumstances of a particular case, the challenged state law stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of

Congress." Id. (internal citations, quotation marks, and brackets omitted).  "What

is a sufficient obstacle is a matter of judgment, to be informed by examining the

federal statute as a whole and identifying its purpose and intended effects." Id. at

373.  In Crosby (530 U.S. at 373), the Court quoted Savage v. Jones, 225 U.S. 501,

533 (1912):

> For when the question is whether a Federal act overrides a state law,
> the entire scheme of the statute must of course be considered and that
> which needs must be implied is of no less force than that which is
> expressed.  If the purpose of the act cannot otherwise be
> accomplished – if its operation within its chosen field else must be

-21-

frustrated and its provisions be refused their natural effect – the state law must yield to the regulation of Congress within the sphere of its delegated power.

SRO rules that are approved by the Commission preempt conflicting state law.  <u>Credit Suisse First Boston Corp. v. Grunwald</u>, 400 F.3d 1119, 1128 (9th Cir. 2005), <u>citing</u> <u>Merrill Lynch, Pierce, Fenner & Smith v. Ware</u>, 414 U.S. 117, 127 (1973).

**B.     Permitting state law liability for the conduct alleged in the complaint would conflict with the Exchange Act regulatory regime.**

**1.     Plaintiffs' direct challenges are preempted.**

Though one would scarcely know it from plaintiffs' brief, which mentions them only in a footnote (Br. 18, n.16), eight of their sixteen claims for relief directly challenge the stock borrow program by alleging that the program's operation *in compliance with Commission-approved rules* violates Arkansas law. Plaintiffs' brief offer no defense of these claims, presumably because it is obviously inconsistent with the federal regulatory regime to award damages against persons engaged in conduct that has been approved under that regime.  <u>See</u> <u>Nanopierce</u>, 168 P.3d at 84-85; <u>Whistler</u>, *6.

## 2. Plaintiffs' so-called "misrepresentation" claims are also preempted.

Plaintiffs stake their case in this Court entirely on so-called "misrepresentations" made by defendants, namely that (1) defendants claim that shares delivered through the stock borrow program are borrowed when the procedures created by NSCC Rules actually result in a purchase (Claims 1 and 5), (2) defendants claim that they efficiently clear and settle trades when in fact the clearance and settlement system is inefficient because fails to deliver may remain open for an extended period of time (Claims 2 and 6), (3) the way defendants account for borrowed shares misstates the number of shares held by lending members (Claims 3 and 7), and (4) defendants claim that if a buyer notifies NSCC of an intent to buy-in a failed to deliver security, NSCC will buy the shares when in fact it cures the fail to deliver with borrowed shares (Claims 4 and 8).

Similarly to the way it handled the direct challenges, plaintiffs' brief barely mentions the purchased-rather-than-borrowed claim or its mirror image, the borrowed-rather-than-bought-in claim (Br. 49-50), so perhaps they are abandoning those allegations as well. In any event, we will discuss first the apparently abandoned claims, then the efficient settlement claim and finally the mis-accounting claim.

-23-

       **a.  Apparently abandoned claims**.  With respect to the buy-rather-than-borrow claim, it is hard to see how plaintiffs would have been injured even had all the misrepresentations alleged in the complaint occurred, but it is particularly difficult to understand how plaintiffs could have been injured by whether transactions carried out under the stock borrow program are called loans rather than sales – the way the program works is described in the rules, and the name by which the transaction is called cannot harm plaintiffs.  Regardless, the claim is preempted because the Commission has approved the name "stock *borrow* program" as well as the description of the program in NSCC's Rules as involving the borrowing of shares, so a state law finding that the program does not involve borrowing would be inconsistent with the Commission's determination that it does.  See <u>Nanopierce</u>, 168 P.3d at 83; <u>Whistler</u>, *5.

       The borrow-rather-than-buy-in claim is contrary to the applicable rules, under which borrowed shares are delivered to receiving members automatically, so there would be no reason to initiate a buy-in when the stock borrow program is employed.  Even putting aside this substantial problem with the claim, the argument is simply that defendants committed fraud by acting in compliance with NSCC's Rules.  For the reasons we have discussed, that claim is preempted in

-24-

light of the Commission's approval of those Rules.  See <u>Nanopierce</u>, 168 P. 3d at

82-83; <u>Whistler</u>, *6.

        **b.  The inefficiency claim.**.  The complaint accuses defendants

of representing that "they efficiently clear and settle trades" when in fact they are

"not clearing and settling trades that result in open fail to deliver positions,

because these trades are processed through the Stock Borrow Program and

therefore remain unsettled for extended periods of time." ¶ 135. [9]  It further alleges

that plaintiffs are injured by defendants' representations with regard to efficiency

because "in fact" defendants "are not using the Stock Borrow Program to clear and

settle trades efficiently but rather to mask inefficiencies in their clearance and

settlement process by covering open fail to deliver positions with borrowed shares

for extended periods of time."  ¶ 146.

    In order to prove their allegation that defendants falsely claimed that "they

efficiently clear and settle trades" in order to "mask inefficiencies," plaintiffs

would first have to prove that defendants in fact do not "efficiently clear and settle

---

[9]    To buttress the inefficiency claim, plaintiffs allege that defendants have represented that they maintain an orderly flow of security and money balances, that members lend stock to cover temporary shortfalls in the continuous net settlement system, and that the securities loaned through the stock borrow program enable the NSCC to satisfy delivery obligations not filled through normal deliveries. ¶136.

trades;" otherwise, there would be nothing to mask.  Yet when the Commission

approved the rules as being consistent with the statutory Requirements and the

Commission-issued Standards, it thereby found that, among other things, the rules

were designed to promote the prompt and accurate clearance and settlement of

securities transactions, remove impediments to and perfect the mechanism of a

national system for the prompt and accurate clearance and settlement of securities

transactions, and, in general, to protect investors and the public interest.  See

Section 17A(b)(3)(F).   Those findings are not consistent with a finding, which

would be the essential premise of plaintiffs' claim here, that the system is

inefficient.

Thus, plaintiffs seek to challenge the Exchange Act regulatory regime by

asking a state court, applying state law, to determine that a system that the

Commission has found to be efficient is not efficient, and then to find that

defendants' failure to disclose this "inefficiency" is a form of fraud, compensable

in damages.  If accepted, plaintiffs' theory of liability could be used to challenge

any aspect of the Commission-approved clearance and settlement system, or,

presumably, and other aspect of the securities markets governed by Commission-

approved rules, and it would make uniform regulation impossible.  That theory

would therefore impermissibly stand as an obstacle to the accomplishment and

-26-

execution of the full purpose and objectives of Congress in creating the Exchange Act's self-regulatory regime, and it is preempted.  See Nanopierce, 168 P.3d at 83-84; Whistler, *5. [10]

        **c.**    **The mis-accounting for lender shares claim**. Finally, the complaint alleges that the way the borrowed shares are accounted for in the "lending member's" account creates a misleading impression as to how many shares the lender holds.  This allegation rests on the erroneous premise, discussed above, that the lender's account continues to show the loaned shares as being still

---

[10]    In their brief, plaintiffs seek to make a new argument that is not reflected in the allegations of the complaint.  They now assert that defendants "misrepresented and misused the program so as to permit failures to deliver to remain uncured for months and even years" (Br. 15), and that they have "have permitted sellers to maintain fail to deliver positions of millions of shares for weeks, months, and years" while affirmatively misrepresenting to the public that they "operate the stock borrow program 'only to cover temporary' shortfalls in the delivery of shares sold in securities transactions" (Br. 18).  The alleged harm arises not from any misrepresentation, but purely from the alleged fact that fails are "permitted" to remain open longer than plaintiffs believe should happen.  But we have seen that defendants have not "permitted" this to occur – they have neither the authority nor the responsibility to close out open fails to deliver.  Rather, if fails persist it is because sellers have not delivered and buyers have not initiated buy-ins, presumably because they are content to await delivery.  Neither of these causes is subject to defendants' control.  In short, even the "misrepresentation" advanced in the brief, like the one alleged in the complaint, is nothing but another attack on how the program approved by the Commission operates.

available in the account even after they have been borrowed. Putting that difficulty

aside, the way in which borrowed shares are accounted for is established by the

applicable NSCC Rules, and a state law finding that the Rules themselves are

fraudulent is preempted. See Nanopierce, 168 P.3d at 84; Whistler, *5. [11]

---

[11]     Here again, plaintiffs' brief makes an argument not alleged in their
complaint (Br. 16-17), namely that defendants have been hiding the
fact that a buyer that receives borrowed shares may re-lend them
before the borrowed shares have been returned to the original lender,
and that the recipient of the re-lent shares may "likewise re-lend
them."  They also accuse the Commission of having deliberately
joined in this supposed deception by seeking to conceal the relevant
facts from the courts in which it has filed *amicus* briefs (Br. 52-53).
The fact that the recipient of borrowed shares may re-lend them is an
obvious feature of the program because a buyer that receives
borrowed shares (technically, whose DTC account is credited with a
securities entitlement for those shares) has exactly the same rights as
a buyer that receives shares delivered by a seller, and those rights
include the rights to sell or lend the securities.  (This aspect of the
program does not create more shares because, as explained above, the
shares are accounted for as being debited from the lender's account.)
Furthermore, whether a lender is lending borrowed shares or
delivered shares, the manner in which NSCC accounts for those
shares will be in accordance with the Commission-approved rules
governing the stock borrow program, so that this claim is merely
another impermissible attempt to hold that a federally approved
program is a form of fraud under state law.

**III.    The Commission is vigorously exercising its regulatory responsibility to prevent abusive short selling, but it has not suggested that defendants or the clearing and settlement system are responsible for any such abuses.**

Plaintiffs claim that the Commission has only  "now recognized" potential problems with naked short selling (Br.54), but this assertion ignores history.  The Commission adopted Regulation SHO in 2004 to address concerns with possible manipulative naked short selling.  See Regulation SHO Proposing Release, SEC Rel. No. 34-48709, 68 Fed. Reg. 62972, 62975-78 (Nov. 6, 2003) (discussing problems potentially caused by naked short selling); Short Sales, SEC Rel. No. 34-50103, 69 Fed. Reg. 48008,  48009 (Aug. 6, 2004) (adopting Regulation SHO and explaining that certain provisions of Regulation SHO are designed to reduce short selling abuses); 48013 n.53 (noting that most commenters welcomed the regulation as a means to address naked short selling manipulation).  Among other requirements, Regulation SHO (1) requires broker-dealers to locate securities that are available for borrowing prior to effecting a short sale in any equity security, and (2) requires clearing agency participants (such as broker-dealers) to close out fail to deliver positions by purchasing securities of like kind and quantity for securities that are identified by a formula established by the regulation as having a substantial amount of fails.  Short Sales, 69 Fed. Reg. at 48014, 48016-17.

-29-

The Commission revisited the issue in 2007, when it amended Regulation SHO to eliminate so-called "grandfathering," under which certain shares had not been covered by the close out requirement.  <u>See</u> Amendments to Regulation SHO, SEC Rel. No. 34-56212, 72 Fed. Reg. 45544 (Aug. 7, 2007).  And it recently adopted an emergency order temporarily requiring all persons to borrow or to arrange to borrow certain securities  prior to effecting an order for a short sale of those securities.  <u>See</u> Emergency Order, SEC Rel. No. 34-58166 (July 15, 2008). [12]

Thus, the Commission is not a latecomer to the effort to prevent abusive short selling.  Rather, it has been and remains quite active in carrying out its regulatory responsibilities.  However, in all of this, the Commission's focus has been on establishing sufficient assurances that short sellers have located, arranged to borrow,  or borrowed the shares they are selling in order to prevent market manipulation.  The Commission has not identified any cause for concern in this regard with respect to defendants or the clearing and settlement system, much less with the stock borrow program.

---

[12]        www.sec.gov/rules/other/2008/34-58166.pdf

## CONCLUSION

For the foregoing reasons, the ruling of the district court that plaintiffs'

claims are preempted should be affirmed.

Respectfully submitted,

BRIAN G. CARTWRIGHT
General Counsel

ANDREW N. VOLLMER
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

_____
MARK PENNINGTON
Assistant General Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9010
(202) 551-5189 (Pennington)

September 17, 2008

CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2008, I caused two copies of the brief *amicus curiae* of the Securities and Exchange Commission and a diskette containing a PDF version of the brief to be served on the following by overnight delivery.

James W. Christian                Scott K. Attaway
Sean Greenwood                    David Federick
Scott R. Link                     KELLOGG, HUBER, HANSEN,
CHRISTIAN, SMITH & JEWELL LLP      TODD, EVANS & FIGEL, P.L.L.C.
2302 Fannin, Suite 500            1615 M St., N.W., Suite 400
Houston, TX 77002                 Washington, DC 20036
(713) 659-7617                    (202) 326-7900
Counsel for Plaintiff-Appellants   Counsel for Plaintiff-Appellants

John R. Knight
32 Morningside Place, Suite 1006
Memphis, TN 38104
(901) 454-0188
Counsel for Plaintiff-Appellants

Rex A. Staples
Stephen W. Hall
Lesley M. Walker
North American Securities
Administrators Association, Inc.
750 First St., NE, Suite 1140
Washington, DC 20002
(202) 737-0900
Counsel for Amicus Curiae NASAA

| | |
|---|---|
| Gregg M. Mashberg | Peter G. Krumpe |
| Charles S. Sims | WILLIMS & ANDERSON PLC |
| Karen D. Coombs | Twenty Second Floor |
| PROSKAUER ROSE LLP | 111 Center St. |
| 1585 Broadway | Little Rock, AR 72201 |
| New York, NY 10036 | (501) 396-8431 |
| (212) 969-3000 | (501) 372-6453 (facsimile) |
| (212) 969-2900 (facsimile) | Counsel for Defendants-Appellees |
| Counsel for Defendants-Appellees | |

I also caused 10 copies of the brief and a diskette containing a PDF version of the brief  to be delivered to the Clerk of this Court:

Michael E. Gans, Clerk of Court
Thomas F. Eagleton Courthouse
Room 24.329
111 South 10th St.
St. Louis, MO 63102

_____
Mark Pennington

CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C) and Eighth Circuit Rule 28A(c), the undersigned certifies that this brief complies with the applicable type-volume limitations.  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 6,890 words.  This certificate was prepared in reliance on the word-count function of the word-processing system (Wordperfect 11) used to prepare this brief.

_____

Mark R. Pennington

ANTI-VIRUS CERTIFICATE

The diskette has been scanned for viruses and is virus free.

_____
Mark Pennington

# EXHIBIT 2



**Thursday,**
**November 6, 2003**

**Part V**

# Securities and Exchange Commission

**17 CFR Parts 240 and 242**
**Short Sales; Proposed Rule**

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Parts 240 and 242**

**[Release No. 34–48709; File No. S7–23–03]**

**RIN 3235–AJ00**

**Short Sales**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Proposed rule.

**SUMMARY:** The Securities and Exchange Commission (Commission) is publishing for public comment new Regulation SHO, under the Securities Exchange Act of 1934 (Exchange Act), which would replace Rules 3b–3, 10a–1, and 10a–2. The Commission is also proposing amendments to Rule 105 of Regulation M. Proposed Regulation SHO would, among other things, require short sellers in all equity securities to locate securities to borrow before selling, and would also impose strict delivery requirements on securities where many sellers have failed to deliver the securities. In part, this action is designed to address the problem of ''naked'' short selling. Proposed Regulation SHO would also institute a new uniform bid test allowing short sales to be effected at a price one cent above the consolidated best bid. This test would apply to all exchange-listed securities and Nasdaq National Market System Securities (NMS Securities), wherever traded.

We are also seeking comment on a temporary rule that would suspend the operation of the proposed bid test for specified liquid securities during a two-year pilot period. The temporary suspension would allow the Commission to study the effects of relatively unrestricted short selling on market volatility, price efficiency, and liquidity.

**DATES:** Comments must be received on or before January 5, 2004.

**ADDRESSES:** To help us process and review your comments more efficiently, comments should be sent by hard copy or e-mail, but not by both methods. Comments sent by hard copy should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609. Comments also may be submitted electronically at the following E-mail address: *rule-comments@sec.gov*. All comment letters should refer to File No. S7–23–03. Comments submitted by E-mail should include this file number in the subject line. Comment letters received will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, NW., Washington, DC 20549. Electronically submitted comment letters will be posted on the Commission's Internet Web site (*http://www.sec.gov*).[1]

**FOR FURTHER INFORMATION CONTACT:** Any of the following attorneys in the Office of Trading Practices, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–1001, at (202) 942–0772: James Brigagliano, Assistant Director, or Gregory Dumark, Kevin Campion, Lillian Hagen, Elizabeth Sandoe and Marla Chidsey, Special Counsels.

**SUPPLEMENTARY INFORMATION:** The Commission is publishing for comment proposed Regulation SHO and a proposed temporary rule, Rule 202 [2], and proposed amendments to Regulation M, Rule 105 [3] under the Exchange Act.

## Table of Contents

I. Introduction
  A. Background and Current Short Sale Regulation
  B. Market Effects of Short Selling
  C. Market Developments
II. Naked Short Selling
  A. Background
  B. Current Regulatory Requirements
  C. Proposed Amendments
  1. Short Sales
  2. Long Sales
III. Current Market Structure and the Tick Test
IV. Proposed Bid Test
  A. Operation of the Uniform Bid Test
  B. Scope of the Uniform Bid Test
  1. Securities Subject to the Price Test
  2. Securities Not Subject to the Price Test
  C. Bid Test Flexibility in a Decimals Environment
  D. Bid Test Flexibility for Passive Pricing Systems
V. Pilot Program
VI. Rule 10a–1 Exceptions
  A. Exceptions Proposed to be Retained
  1. Long Seller's Delay in Delivery
  2. Error in Marking a Short Sale
  3. Odd Lot Transactions
  4. Domestic Arbitrage
  5. International Arbitrage
  6. Distribution Over-Allotment
  7. Equalizing Short Sales and Trade-Throughs
  B. Exception Proposed to Be Eliminated
VII. Prior Exemption Letters under Rule 10a–1
  A. Exchange Traded Funds
B. Short Sales Executed at the Closing Price
VIII. Market Maker Exception from Proposed Uniform Bid Test
IX. Proposed Changes to the Order Marking Requirement
  A. Marking Orders
  B. Marking Requirements for Riskless Principal Transactions
X. Rule 3b–3
  A. Unconditional Contracts to Purchase Securities
  B. Ownership of Securities Underlying Securities Futures Products
  C. Aggregation Units
  D. Block-Positioner Exception
  E. Liquidation of Index Arbitrage Positions
XI. Hedging Transactions
XII. Elimination of Current Subparagraphs 10a–1(a)(2) and (a)(3)
XIII. Exclusion of Bonds
XIV. After Hours Trading/Foreign Markets Issues
  A. After-Hours Trading
  B. Off-Shore Trading
XV. Limitations on Short Selling During Significant Market Declines
XVI. Rule 105 of Regulation M—Short Sales in Connection with a Public Offering
  A. Scope of Rule 105 of Regulation M
  B. Shelf Offerings
  C. Sham Transactions Designed to Give the Appearance of Covering with Open Market Securities
XVII. General Request for Comment
XVIII. Paperwork Reduction Act
XIX. Consideration of Proposed Regulation SHO's Costs and Benefits
XX. Consideration on Burden and Promotion of Efficiency, Competition, and Capital Formation
XXI. Consideration of Impact on the Economy
XXII. Initial Regulatory Flexibility Analysis
XXIII. Statutory Authority Text of Proposed Regulation SHO, Amendments and Temporary Rule

## I. Introduction

Congress, in 1934, directed the Commission to ''purge the market'' of short selling abuses, and in response, the Commission adopted restrictions that have remained essentially unchanged for over 60 years. Originally adopted in 1938, the Commission's short sale rule, Rule 10a–1, is designed to restrict short sellers from effecting short sales in an exchange-traded security when the price of that security is declining.[4]

Since its adoption, the Commission has engaged in studies, investigations, and reviews of the efficacy of the Rule.[5]

---

[1] Personal identifying information, such as names or e-mail addresses, will not be edited from electronic submission. Submit only information that you wish to make publicly available.

[2] 17 CFR 242.202.

[3] 17 CFR 242.105.

[4] 17 CFR 240.10a–1.

[5] *See* 2 Securities and Exchange Commission, Report of Special Study of Securities Markets, H.R. Doc. No. 95, 88th Cong., 1st Sess. 247 (1963) (study to determine the relationships between changes in short positions and subsequent price trends); *see also* Short-Selling Activity in the Stock Market: Market Effects and the Need for Regulation (Part I)(House Report), H.R., Rep. No. 102–414 (1991), reprinted in CCH Federal Securities Law Reports Number 1483 Part II (1992).

number of Nasdaq securities trading away from the Nasdaq market (and thus not subject to any price test), the advent of security futures trading, and decimalization have caused the Commission to reexamine short sale regulation. At a minimum, the Commission believes that adjustments to short sale regulation are required to keep pace with these market developments.

## II. Naked Short Selling

### A. Background

Many issuers and investors have complained about alleged "naked short selling," especially in thinly-capitalized securities trading over-the-counter.[27] Naked short selling is selling short without borrowing the necessary securities to make delivery, thus potentially resulting in a "fail to deliver" securities to the buyer.

Naked short selling can have a number of negative effects on the market, particularly when the fails to deliver persist for an extended period of time and result in a significantly large unfulfilled delivery obligation at the clearing agency where trades are settled.[28] At times, the amount of fails to deliver may be greater than the total public float. In effect the naked short seller unilaterally converts a securities contract (which should settle in three days after the trade date) into an undated futures-type contract, which the buyer might not have agreed to or that would have been priced differently. The seller's failure to deliver securities may also adversely affect certain rights of the buyer, such as the right to vote. More significantly, naked short sellers enjoy greater leverage than if they were required to borrow securities and deliver within a reasonable time period, and they may use this additional leverage to engage in trading activities that deliberately depress the price of a security.[29]

The Commission recently brought an enforcement action against certain parties, alleging manipulative naked short selling, in a scheme sometimes

termed as a "death spiral." These schemes generally involve parties arranging financings in public companies that are unable to obtain more conventional financing in the capital markets due to their precarious financial condition. The party providing financing receives from a public company debentures that are later convertible into the stock of the issuer. The terms typically provide that the conversion ratio will be tied to a fixed value of the aggregate underlying shares (typically a discount from the market price of the security at the time of the conversion rather than a conversion price per share).[30] In some cases the parties providing financing have engaged in extensive naked short selling designed to lower the price of the issuer's stock, thus realizing profits when the debentures are converted to cover the short sales.[31]

Naked short selling has sparked defensive actions by some issuers designed to combat the potentially negative effects on shareholders, broker-dealers, and the clearance and settlement system.[32] Some issuers have taken actions to attempt to make transfer of their securities "custody only," thus preventing transfer of their stock to or from securities intermediaries such as the Depository Trust Company (DTC) or broker-dealers. A number of issuers have attempted to withdraw their issued securities on deposit at DTC, which makes the securities ineligible for book-entry transfer at a securities

depository.[33] Withdrawing securities from DTC or requiring custody-only transfers undermine the goal of a national clearance and settlement system, designed to reduce the physical movement of certificates in the trading markets.[34]

### B. Current Regulatory Requirements

The SROs have adopted rules generally requiring that, prior to effecting short sales, members must "locate" stock available for borrowing.[35] For example, NYSE Rule 440C.10 states that no NYSE member or member organization should "fail to deliver" against a short sale of a security on a national securities exchange until a diligent effort has been made by such member or member organization to borrow the necessary securities to make delivery.[36] An NYSE interpretation to the rule further states that member organizations effecting short sales for their own account or the accounts of customers must be in a position to complete the transaction. The interpretation states that no orders to sell short should be accepted or entered unless prior arrangements to borrow the stock have been made or other acceptable assurances that delivery can

---

[27] For example, *see* comment letters from John Henry Austin (2675), Bridget Thomas (2297), James McCaffery (492), Richard Ballard (507), and Ken Klaser (596).

[28] "Clearing agency" is defined in Section 3(a)(23)(A) of the Exchange Act, 15 U.S.C. 78c(a)(23)(a).

[29] The Commission issued a prior statement cautioning broker-dealers that where the broker-dealer has sold short, but did not, for a substantial period of time, effect the offsetting purchase transactions for purpose of delivery, this could generally involve violations of the anti-fraud provisions of the Federal securities laws. *See* Securities Exchange Act Release No. 6778 (April 16, 1962).

[30] For more information, *see* "Convertible Securities" on the Commission's Web site at *www.sec.gov/answers/convertibles.htm*

[31] The Commission recently settled a case against parties relating to allegations of manipulative short selling in the stock of Sedona Corporation, a Nasdaq Small Cap company. The action alleged that the defendants engaged in massive naked short selling that flooded the market with Sedona stock, and thus depressed its price. The defendants thereby profited by subsequently exercising the conversion rights under the debenture. *See* Rhino Advisors, Inc. and Thomas Badian, Lit. Rel. No. 18003 (February 27, 2003); *see also SEC* v. *Rhino Advisors, Inc. and Thomas Badian*, Civ. Action No. 03 civ 1310 (RO) (Southern District of New York).

[32] There have been press reports concerning the actions of some issuers, and questioning whether the cause of declines in their stock prices can be attributed to naked short selling, or to fundamental problems with the company. *See, e.g.,* Carol S. Remond, *Universal Blames Shorts, But What of Dilution?, Dow Jones Newswires* (October 6, 2003); Rob Wherry, *Wall Street's Next Nightmare?*, Forbes.com (October 6, 2003); *see also* Gretchen Morgenson, *If Short Sellers Take Heat, Maybe It's Time to Bail Out,* NY Times (January 26, 2003) (citing a study by Professor Owen A. Lamont that analyzed returns at companies that waged public battles with short sellers, and found that their stocks lagged the market by 2.34 percent in each of the twelve months after the battles began). As a matter of practice, the Commission does not opine on the content or accuracy of such reports.

[33] The Commission recently approved a DTC rule change clarifying that its rules provide that only its participants may withdraw securities from their accounts at DTC, and establishing a procedure to process issuer withdrawal requests. *See* Securities Exchange Act Release No. 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003) (File No. SR–DTC–2003–02).

[34] *See* Section 17A(e) of the Exchange Act. 15 U.S.C. 78q–1(e). The Commission noted in the order approving the DTC rule change that the use of certificates can result in significant delays and expenses in processing securities transactions and can raise safety concerns associated with lost, stolen, and forged certificates. *See, supra* n. 33.

[35] In 1976 the Commission proposed the adoption of Rule 10b–11. Rule 10b–11 would have prohibited any person from effecting a short sale in any equity security (*i.e.,* not just exchange-traded securities) for his own account or the account of any other person unless he, or the person for whose account the short sale is effected (i) borrowed the security, or entered into an arrangement for the borrowing of the security, or (ii) had reasonable grounds to believe that he could borrow the security so that, in either event, he would be capable of delivering the securities on the date delivery is due. Securities Exchange Act Release No. 13091 (December 21, 1976), 41 FR 56530 (December 28, 1976). In 1988, the Commission withdrew proposed Rule 10b–11, noting that since the time the rule was proposed, the NYSE and the NASD had adopted interpretations specifying that members should not accept or enter a short sale order unless prior arrangements to borrow the stock have been made, or other acceptable assurances that delivery can be made on settlement date have been obtained. The Commission also stated that it believed the general antifraud provisions of the federal securities laws were applicable to activity addressed by proposed Rule 10b–11. Securities Exchange Act Release No. 26182 (October 14, 1988), 53 FR 41206.

[36] *See* NYSE Rule 440C.10.