# EXHIBIT 5

# Clearing Arrangements

*By Henry F. Minnerop\**

## INTRODUCTION

Clearing arrangements and clearing brokers are integral parts of the securities industry. Approximately ninety percent of all broker-dealers registered with the Securities and Exchange Commission (SEC) hire clearing brokers and utilize clearing arrangements.[1] Although these broker-dealers, called "introducing brokers," are often small in size, they represent collectively a significant percentage of daily trading volume.[2] The total number of introducing brokers doing business with public investors has risen from 564 firms in 1975[3] to 4859 in 2001.[4] This increase of nearly 900% over twenty-six years is, in large part, the direct result of favorable regulatory treatment accorded clearing arrangements by the SEC. Much of the initial impetus for this treatment came in response to the "paper crunch" of the late 1960s, a crisis that nearly paralyzed Wall Street and led to the collapse of numerous New York Stock Exchange (NYSE) member firms. These firms were unable to process a rising volume of trades, causing a domino effect of failed settlements of securities transactions among brokerage firms. Acting under the mandate of Congress to address the crisis, the SEC encouraged the securities industry to develop a modern clearance and settlement system. This the industry did with great success. While trading volumes of fourteen to sixteen million shares a day had overwhelmed Wall Street during the "paper crunch," the securities

---

\*Henry F. Minnerop, a member of the New York bar and a partner of Sidley Austin Brown & Wood LLP in New York City, specializes in the law and regulation of clearing brokers. He represents clearing brokers and has acted as counsel to the Securities Industry Association, Inc. and its Clearing Firms Committee on various matters. This Article was prepared with the assistance of Kimberly A. Johns, an associate at Sidley Austin Brown & Wood LLP in New York City.

1. As of December 31, 2001, there was a total of 5493 broker-dealers registered with the SEC doing business with public investors. Of these 634 were self-clearing with the balance, 4859, utilizing clearing brokers. *See* SEC 2002 Annual Report, at tables 5, 7, & 8, *available at* http://www.sec.gov/pdf/annrep02/ar02full.pdf. In addition, as of December 31, 2001, 1509 broker-dealers registered with the SEC but not doing business with public investors also utilized clearing brokers. *See id.*

2. Bear, Stearns Securities Corp., a large, if not the largest, clearing broker, reportedly clears "an estimated 12% of all NYSE trades." *The Bank of New York Acquires SG Cowen's Clearing Business*, SEC. WK., Feb. 7, 2000, at 3.

3. Henry F. Minnerop & Hans R. Stoll, *Technological Change in the Back Office: Implications for Structure and Regulation of the Securities Industry, in* TECHNOLOGY AND THE REGULATION OF FINANCIAL MARKETS 31, 40 (Anthony Saunders & Lawrence J. White eds., 1986).

4. *See supra* note 1.

HeinOnline -- 58 Bus. Law. 917 2002-2003

industry now routinely processes over three billion shares a day and does so within a substantially shorter settlement cycle.

This Article follows on an earlier article by the author on the role and regulation of clearing brokers[5] and presents a current overview of the regulatory framework governing clearing arrangements, including a discussion of the regulatory initiatives undertaken in response to "micro-cap" or penny stock fraud during the bull markets of the 1990s. This Article also focuses on recent case law regarding the liability of clearing brokers to introduced customers under federal and state law, including the recently approved Uniform Securities Act (2002). In addition, this Article addresses a number of disparate issues and practices that are more or less unique to clearing arrangements, namely, "local cashiering" and "local check writing," and the continued relevance of common law agency principles to risk management practices employed by clearing brokers.

## An Overview of the Clearing Relationship

Clearing firms are hired by introducing firms to provide processing and administrative services in connection with securities transactions ordered by introducing firms for the account of their customers. An overview of the respective roles played by clearing firms and introducing firms may be gained by identifying key functions involved in the operation of customer accounts and the settlement and clearance of transactions in such accounts:

---

5. *See* Henry F. Minnerop, *The Role and Regulation of Clearing Brokers*, 48 Bus. Law. 841 (1993) [hereinafter Minnerop, *Role and Regulation*]. The following additional publications, listed in inverse chronological order, deal with clearing broker issues: Jonathan Kord Lagemann, *Overview of Clearing Broker Liability*, in Securities Arbitration ch. 32 (PLI Corp. Law & Practice Course, Handbook Series No. B-1327, 2002); Michael G. Shannon, *Clearing Firm Liability 2001–2002*, in Securities Arbitration ch. 33 (PLI Corp. Law & Practice Course, Handbook Series No. B-1327, 2002) [hereinafter Shannon, *Clearing Firm Liability*]; Michael G. Shannon, *Clearing Firm Liability Revisited 2000–2001*, in Securities Arbitration 527 (PLI Corp. Law & Practice Course, Handbook Series No. B-1264, 2001); Robert S. Banks, Jr., *Clearing Firms, The Uniform Securities Act and Koruga v. Fiserv Correspondent Services, Inc.*, in Securities Arbitration 565 (PLI Corp. Law & Practice Course, Handbook Series No. B-1264, 2001); Michael G. Shannon, *Clearing Firm Liability—Has the Dam Really Cracked?*, in Securities Arbitration ch. 19 (PLI Corp. Law & Practice Course, Handbook Series No. B-1196, 2000); Henry F. Minnerop, *Recent Developments in the Regulation of Clearing Brokers*, 1 J. Investment Compliance 27 (Summer 2000); John M. Bellwoar, *Notes, Bar Baron at the Gate: An Argument for Expanding the Liability of Securities Clearing Brokers for the Fraud of Introducing Brokers*, 74 N.Y.U. L. Rev. 1014 (1999); Norman S. Poser, *Broker-Dealers as Clearing Agents*, in Broker-Dealer Law and Regulation § 204[B] (3d ed. 1999); Jerry W. Markham & Thomas Lee Hazen, 23A *Broker-Dealer Operations Under Securities and Commodities Law* § 8.20 (2d ed. 2002); Philip M. Aidikoff et al., *Clearing Firm Liability: A Forward Looking Analysis*, in Securities Arbitration 113 (PLI Corp. Law & Practice Course, Handbook Series No. B-1062, 1998); Gerald B. Kline & Raymond L. Moss, *Liability of Clearing Firms: Traditional and Developing Perspectives*, in Securities Arbitration 139 (PLI Corp. Law & Practice Course, Handbook Series No. B-1062, 1998); Marilyn Blumberg Cane & Patricia A. Shrub, *Introducing Brokers and Clearing Brokers*, in Securities Arbitration Law & Procedure 313–19 (BNA, 1991); Minnerop & Stoll, *supra* note 3, at 31; The Committee on Commodities Regulation, *Regulation of Agents and Introducing Brokers in the Commodities Future Industry*, in 39 The Record of the Association of the Bar of the City of New York, No. 7, at 554 (Dec. 1984); William J. Fitzpatrick & Ronald T. Carman, *An Analysis of the Business and Legal Relationship Between Introducing and Carrying Brokers*, 40 Bus. Law. 47 (1984); Charles H. Meyer, The Law of Stockbrokers and Stock Exchanges § 124 (1931).

1. opening, approving, and monitoring customer accounts;
2. providing investment recommendations or accepting customer orders;
3. executing customer orders;
4. extending credit in margin accounts;
5. providing written confirmations of executed orders to customers;
6. receiving or delivering funds or securities from or to customers;
7. maintaining books and records that reflect transactions, including rendering monthly or periodic statements of account to customers;
8. providing custody of funds and securities in customer accounts; and
9. clearing and settling transactions effected in customer accounts.[6]

A brokerage firm that performs all of these functions within its own organization is a "self-clearing" firm. For example, Merrill Lynch, Morgan Stanley, Goldman Sachs, Charles Schwab—to mention but a few—are all "self-clearing" firms. Other brokerage firms, typically smaller in size, frequently become introducing firms by hiring clearing brokers to perform some of these functions for them. In entering into clearing agreements, introducing firms uniformly retain all customer contact functions (Functions 1 and 2) and frequently execute their customers' and their own orders themselves (Function 3), while out-sourcing the balance of functions (Functions 4–9) to a clearing broker.[7] These out-sourced functions are referred to as "back office" functions to distinguish them from the customer-contact "front-office" functions performed by the introducing firm. Contracting out for clearance and settlement services enables introducing firms to pay for such services out of current revenues, thus modulating their costs to reflect current business conditions and avoiding the fixed overhead expenses associated with back office technology and infrastructure.

The specific allocation of functions between an introducing firm and its clearing broker is a matter of contract and is generally determined by the business needs of the introducing firm and the scope of services offered by the clearing firm, although, as noted, customer-contact functions are retained uniformly by the introducing firm.[8] The party, be it the introducing firm or its clearing broker, to whom a specific function has been allocated in the clearing agreement has full

---

6. These functions are identified as key components of a securities account and transactions therein in New York Stock Exchange (NYSE) Rule 382, 2 N.Y.S.E Guide (CCH) ¶ 2382 (2002); American Stock Exchange (AMEX) Rule 400, Am. Stock Ex. Guide (CCH) ¶ 9429A (2000) [hereinafter AMEX Guide]; and Nat'l Ass'n of Sec. Dealers (NASD) Conduct Rule 3230, Nat'l Ass'n of Sec. Dealers Manual (CCH) 4923–24 (2002) [hereinafter NASD Manual].

7. With advances in electronic communication, the trend has been for introducing firms to execute their own and their customers' orders directly ("away" from the clearing firm) via electronic links to exchanges or NASDAQ markets provided by their clearing brokers. *See generally* Minnerop & Stoll, *supra* note 3.

8. NYSE Rule 382 and NASD Conduct Rule 3230 each sets out key functions and responsibilities that clearing agreements are required to allocate between the introducing and clearing firms. *See supra* text accompanying note 6. Further, the NYSE has enumerated specific tasks subsumed within the functions listed in NYSE Rule 382(b). Each such task must be "addressed" in the allocation of functions and responsibilities in the clearing agreement. THE N.Y. STOCK EXCH., INTERPRETATION HANDBOOK R. 382/02 (Basic Functions) (1979) [hereinafter NYSE INTERPRETATION HANDBOOK].

and exclusive regulatory responsibility for its performance and supervision.[9] Thus, the retention of all customer-contact functions by an introducing firm (e.g., soliciting customer accounts, determining the customer's investment objectives, recommending transactions in accord with such objectives) gives it full and exclusive regulatory responsibility for the sales practices of its brokers. Conversely, the clearing firm has no regulatory duty to supervise the brokers or monitor the sales practices of its introducing firms.

There are two types of clearing agreements involving transactions of public customers, namely, "fully disclosed" and "omnibus" agreements, the former being by far the more common form of agreement. Both types of agreements are required to be filed with and approved by the NYSE or the National Association of Securities Dealers, Inc. (NASD).[10] Under a fully disclosed clearing agreement, the introducing firm discloses the identity of each of its customers to its clearing firm. The clearing firm then establishes on its books and records an account in the name of each introduced customer and "carries" that account with its own net capital.[11] Moreover, the clearing firm prepares trade confirmations and monthly statements for each introduced customer. All introduced customers are required to be notified in writing that their brokerage firm has entered into a fully disclosed clearing agreement and that their accounts will be carried by the clearing firm.[12] These notices must be submitted to the NYSE for approval.[13]

---

9. NYSE INTERPRETATION HANDBOOK, *supra* note 8, R. 382/03 provides:

> To the extent that a particular function is allocated to one of the parties, the other party is to supply that firm with all appropriate data in its possession pertinent to the proper performance and supervision of that function. The agreement should acknowledge this obligation.
>
> Each organization will be accountable for actual performance of all functions performed by employees and other associated persons as well as for overall supervision of functions and activities performed by it pursuant to any carrying agreement.

10. *See* NYSE Rule 382, 2 N.Y.S.E Guide (CCH) ¶ 2382 (2002); NASD Rule 3230, NASD Manual (CCH) 4923–24 (2002). If the clearing broker is a NYSE member firm, the clearing agreement is required to be filed with the NYSE. If the clearing firm is not a NYSE member, then the clearing agreement is filed with NASD Regulation, Inc.

11. "Carrying" is a term of art under SEC regulations. A broker-dealer, whether self-clearing or clearing for others, "carries" customer accounts subject to SEC net capital and financial responsibility rules. In a nutshell, a "carrying" broker is required to possess specified levels of capital in relation to the value of customer assets in its custody. *See* Exchange Act Rule 15c3-1, 17 C.F.R. § 240.15c3-1 (2002).

12. *See* NYSE Rule 382(c), 2 N.Y.S.E Guide (CCH) ¶ 2382 (2002); AMEX Rule 400(c), AMEX Guide (CCH) ¶ 9429A (2000); NASD Rule 3230, NASD Manual (CCH) 4923 (2002). A so-called "Rule 382 Notice" informs the customers that their brokerage firm has entered into a clearing agreement with a specified clearing firm. The Notice also provides a summary of the allocation of functions and responsibilities between the introducing and clearing firm as set forth in their clearing agreement. The notice may be sent by either the clearing or the introducing organization, but the clearing agreement is required to identify the party responsible for providing the notice to the customers. *See* NYSE INTERPRETATION HANDBOOK, *supra* note 8, R. 382/03. Although both parties need to agree on the content of the notice, it is generally the notice developed by the clearing firm that is sent to introduced customers. The actual mailing of the notice, regardless of whose letterhead may be used, is generally done by the clearing organization as part of its allocated responsibilities. The Rule 382 Notice is a key disclosure document, particularly from the perspective of the clearing firm, whose role may otherwise not be understood by introduced customers.

13. NYSE INTERPRETATION HANDBOOK, *supra* note 8, R. 382/03. As a practical matter, these notices are generally submitted to NYSE along with a new clearing agreement.

Under an omnibus clearing agreement, the introducing firm typically neither discloses the identity of its customers to the clearing broker, nor are its customers informed of the existence of the omnibus clearing arrangement. An omnibus introducing firm usually maintains one "omnibus" account with its clearing broker. The omnibus introducing firm maintains its own records of its customers' trades, provides its own trade confirmations and monthly statements to its customers and performs all "customer-side" settlement functions. Omnibus introducing firms are generally large broker-dealers or other financial institutions that have opted to out-source all or part of their "street-side" settlement and clearance functions. Omnibus introducing firms retain full regulatory responsibility "customer-side" under SEC net capital and financial responsibility rules, thus, maintaining the ability to provide margin financing to their customers.[14] Although omnibus clearing services are an important part of the securities business, they raise few of the same regulatory or liability issues involved in fully disclosed arrangements.[15]

## CUSTOMERS

Introduced customers are the customers of the introducing firm. Their accounts are solicited and serviced by brokers employed by the introducing firm. The introducing firm is required to "know" its customers to determine their investment goals and the suitability of any recommendations made to them by its brokers. When an introducing firm changes clearing firms, its customer accounts are transferred as a group ("tape-to-tape" or electronically) to its new clearing firm. This transfer does not require the affirmative consent of the introduced customers.[16]

There are two exceptions to the general proposition that introduced customers are the customers of the introducing firm. First, introduced customers are deemed customers of the clearing firm under the Securities Investors Protection Act of 1970.[17] That Act provides insurance for customer accounts against the risk of insolvency of the broker-dealer *carrying* their accounts.[18] Second, introduced cus-

---

14. A broker-dealer may open an omnibus account with another broker-dealer for the "street-side" clearance and settlement of specific investment products, such as mutual fund shares, and remain self-clearing with respect to all other investment products. *See generally* Aidikoff et al., *supra* note 5.

15. Omnibus clearing arrangements are not the focus of this Article.

16. Introduced customers are informed of the impending transfer by "negative response" letters and are deemed to consent to the transfer unless they affirmatively object. *See* NASD, Notice to Members 02-57 (Sept. 2002); NASD Rule 2510(d)(2), NASD Manual (CCH) 4411 (1999). The NASD, however, requires "positive" customer consent when an individual broker moves from one introducing firm to another, even though both introducing firms utilize the same clearing broker. *See* Notice to Members 02-57, *supra*, at 562 & n.5 (citing Letter from the Office of General Counsel, NASD Regulation, Inc., to Merit Capital Associates, Inc. (Oct. 16, 2000)).

17. 15 U.S.C. §§ 78aaa–78lll (2000).

18. The SEC Division of Market Regulations has noted that:

[It] has interpreted the net capital rule and Rule 15c3-3 to require that, for the purposes of the Commission's financial responsibility rules and SIPC, the introducing firm's customers should be treated as customers of the clearing firm. . . . Furthermore, the clearing firm must issue account statements directly to customers. Each statement must contain the name and telephone

tomers are deemed to be customers of the clearing firm under SEC financial responsibility and net capital rules.[19] Under those rules, all broker-dealers that carry customer accounts are required to (1) maintain minimum levels of net capital for all accounts carried by them and (2) provide custody of the funds and securities in all such accounts, including introduced accounts.[20] Because a clearing broker has regulatory financial responsibility for introduced customer assets, introduced customers are obligated to pay the clearing firm directly for their purchases.[21] It is for this reason that trade confirmations—in addition to disclosing the name, quantity, and price of the securities bought or sold—direct introduced customers to remit payment to their brokerage firm's clearing broker.

## INTRODUCING FIRMS

Introducing firms come in many shapes and sizes, covering a wide spectrum of business activities. These activities extend from retail brokerage to underwriting of newly issued securities to making of markets in such and other securities.[22] Like self-clearing firms, introducing firms solicit prospective customers, approve the opening of new accounts, monitor their customers' transactions, and determine their customers' investment objectives and the suitability of recommendations made to their customers by their brokers. All customer-related data (e.g.,

---

number of a responsible individual at the clearing firm whom a customer can contact with inquiries regarding the customer's account. Finally, the account statement must disclose that customer funds or securities are located at the clearing broker-dealer, and not the introducing firm.

Net Capital Rule, Exchange Act Release No. 31,511, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 85,064, at 83,651, 83,571 (Nov. 24, 1992) (footnote omitted).

19. Exchange Act Rule 15c3-1, 17 C.F.R. § 240.15c3-1 (2002).

20. *Id.*

21. The introduced customer's obligation to pay the clearing firm is not abated if the underlying transaction was unauthorized by the customer. As a matter of law, the clearing firm is entitled to rely upon the instructions of the customer's agent, the introducing firm. *See* Mishkin v. Ensminger (*In re* Adler Coleman Clearing Corp.), 218 B.R. 689, 706 (Bankr. S.D.N.Y. 1998). Generally, the clearing firm will not, as a practical matter, proceed directly against a defaulting customer. Instead, the clearing firm will generally look to the introducing firm for payment under the indemnification provision of the clearing agreement. That provision, which is standard in clearing arrangements, generally calls upon the introducing firm to indemnify the clearing firm for all losses it incurs in connection with customer defaults. Where appropriate, the clearing firm may assign its collection claim against the customer to the introducing firm.

22. The SEC Division of Market Regulation has described introducing firms as follows:

An introducing broker-dealer is one that has a contractual arrangement with another firm, known as the carrying or clearing firm, under which the carrying firm agrees to perform certain services for the introducing firm. Usually, the introducing firm submits its customer accounts and customer orders to the carrying firm, which executes the orders and carries the account. The carrying firm's duties include the proper disposition of the customer funds and securities after trade date, the custody of customer securities and funds, and the recordkeeping associated with carrying customer accounts.

Net Capital Rule, Exchange Act Release No. 31,511, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 85,064, at 83,569 (Nov. 24, 1992).

name, address, social security number, investment experience, investment objectives, age, income, net worth) are gathered by personnel of the introducing firm.[23]

Introducing firms are legally independent broker-dealers, registered with the SEC and, generally, members of the NASD.[24] As registered broker-dealers and NASD members, introducing firms are required to maintain written compliance procedures and compliance staff to monitor and supervise the conduct of their employees, including that of their brokers.[25] Introducing firms are subject to examination and inspection by their Designated Examining Authority (DEA), generally NASD Regulation, Inc. (NASDR) (a separate, independent subsidiary of the NASD)[26] or, if they are NYSE members, by the latter. In addition, they are subject to the jurisdiction of the SEC. Introducing firms, similar to self-clearing firms, are required to register senior members of their management as "principals" and their brokers as "registered representatives" with their DEA. Finally, introducing firms and their registered representatives, similar to self-clearing firms, are required to be registered as broker-dealers with each state in which they do business.

## CLEARING FIRMS

A clearing firm is hired by an introducing firm to provide back-office services. It plays no role in the introducing firm's sales activities. It does not recommend the purchase or sale of securities to introduced customers. Rather, the clearing firm's involvement in any transaction commences only *after* a trade has been ordered or otherwise authorized by the customer. An order to purchase or sell a particular security may be executed by the clearing firm at the direction of its introducing firm, or, as is frequently the case, by the introducing firm itself. When the introducing firm executes by itself, it is said to be trading "away" from the clearing firm. When executing the trade directly with a market maker or on an exchange, the introducing firm "gives up" (i.e., identifies) its clearing firm to its counter-party for clearance and settlement of the trade.[27] In all events, after the execution of a trade, the clearing firm processes, settles, and clears the transaction

---

23. A clearing firm may store such customer data as custodian of records for the introducing firm. The clearing firm's role as custodian does not require it to examine the records to monitor or supervise the introducing firm's conduct.

24. Introducing firms may also be off-shore banks or other foreign financial institutions whose customers are active in American securities markets. Thus, NYSE Rule 382 speaks in terms of introducing and carrying (clearing) "organizations," not broker-dealers. *See* NYSE Rule 382, 2 N.Y.S.E Guide (CCH) ¶ 2382 (2002). Further, NASD Regulation approved of clearing agreements between an American clearing firm and German introducing firms that "allocate certain account opening, approval and monitoring functions with respect to customers of the German introducing firms to those firms." Interpretive Letter from Elliott R. Curzon, Assistant General Counsel, NASD (July 23, 1999) (discussing Applicability of Rule 3230(a) to Secondary or Sub-Clearing Arrangements with Foreign Securities Firms), *available at* http://www.nasdr.com/2910/3230-01.asp.

25. NASD Rule 3010, NASD Manual (CCH) 4831 (1999).

26. NASDR was established in 1996 as part of a restructuring of the NASD. "[A] major feature was to separate the regulation of the broker/dealer professional from the operation of The Nasdaq Stock Market." Profile of the NASD, NASD Manual (CCH) 151 (1996).

27. *See supra* note 7 and accompanying text.

and prepares an appropriate trade confirmation.[28] At the end of the month, the clearing firm issues a statement of account to the customer reflecting this and other trades that may have been done that month. The clearing firm also maintains custody of the customer's securities and funds upon receipt, and may provide margin financing if the introduced customer has signed a margin agreement with the clearing firm.[29]

Clearing firms are often subsidiaries or divisions of large self-clearing broker-dealer firms or other financial institutions. Clearing firms, separately or through their parent companies, are registered as broker-dealers with the SEC and with each state in which customers introduced to them reside. These registration requirements arise primarily from their activities in handling and processing customer funds and securities. Unlike the brokers of introducing firms, the back-office staff of clearing (and self-clearing) firms, performing clerical and ministerial functions, is not required to be registered.[30] The absence of this requirement

---

28. Trade confirmations, which are prepared by the clearing firm from its database, may be mailed to customers by the introducing firm, rather than the clearing firm. The introducing firm is often located geographically closer to its customers than the clearing firm. This facilitates timely payment by the customer by settlement date. Monthly statements, on the other hand, are required to be mailed to the customers directly by the clearing firm.

29. The services provided by clearing firms to introducing firms vary substantially and are determined generally by the needs of particular introducing firms and the range of services offered by clearing firms. Although many introducing firms engage in a simple securities business, buying and selling stocks and bonds, others deal, in addition, in options, derivatives, and other complex securities, the settlement and clearance of which are not within the competence of all clearing firms. Competition among clearing firms is characterized by their ability to offer sophisticated, state of the art technology platforms to introducing firms enabling such firms to access account and market information on a real time basis and to provide reliable clearance and settlement services for a wide array of financial products at competitive fees. In addition to providing basic back-office services, clearing firms generally offer their introducing firms a wide range of products and services for marketing by the introducing firms to their customers, including:

- full service asset management accounts with check writing and debit card
- fee-in-lieu of commission accounts with flexible billing options
- mutual fund wrap accounts
- separate account management with a choice of independent investment advisors
- complete retirement plan services
- securities research
- trust services
- alternative investment strategies for high net worth accounts
- home mortgages
- unlimited excess SIPC coverage

The introducing firm selects which, if any, of these products and services it will use and for whom, among its customers, these products and services may be suitable.

30. NYSE Rule 345 provides: "No member . . . shall permit any natural person to perform regularly the duties customarily performed by (i) a registered representative, (ii) a securities lending representative, (iii) a securities trader or (iv) a direct supervisor of (i), (ii) or (iii) above, unless such person shall have been registered with . . . the Exchange." NYSE Rule 345, 2 N.Y.S.E Guide (CCH) ¶ 2345 (2002). NASD Rule 1060 provides:

(a) The following persons associated with a member are not required to be registered with the Association: (1) persons associated with a member whose functions are solely and exclusively clerical or ministerial; (2) persons associated with a member who are not actively engaged in the investment banking or securities business . . . .

NASD Rule 1060, NASD Manual (CCH) 3261 (1999).

HeinOnline -- 58 Bus. Law. 924 2002-2003

reflects the fact that back-office personnel perform no customer contact or sales functions. As the SEC has noted:

> In the typical fully disclosed relationship between a customer, an introducing firm and a clearing firm, the clearing firm's contact with the customer is limited to transmitting confirmations, account statements and other correspondence such as proxy statements or Regulation T notifications. The introducing firm is responsible for accepting customer orders and other trading instructions. Under these circumstances, the clearing firm's primary (and frequently only) source of information about the customer is the introducing firm. Typically, the customer agreement between the clearing firm and the customer will authorize the clearing firm to accept instructions and orders from the introducing firm for the customer's account without inquiry or investigation, unless the clearing firm receives prior written notice from the customer to the contrary.[31]

## Local Cashiering and Check Writing

Although central cashiering functions—receipt, custody, and delivery of customer funds and securities—are generally allocated to the clearing firm, the clearing agreement may allocate aspects of these functions, such as "local cashiering" and "local check writing," to the introducing firm.

"Local cashiering" involves the receipt of customer funds by the introducing firm directly from its customers on a routine basis for prompt deposit into its clearing broker's account, typically at a bank near an office of the introducing firm.[32] Local cashiering facilitates payment by introduced customers of their purchases on a timely basis by settlement date.

"Local check writing" involves the practice by which a clearing firm authorizes specific officers of its introducing firms to write checks on the clearing firm's bank account payable to introduced customers. This practice facilitates the convenient and prompt payment of sales proceeds and other funds to introduced customers. Local check writing is initiated when the introducing firm informs its clearing firm of a customer's check request. The clearing firm responds by funding its zero balance bank account in the amount of the requested check. The introducing firm thereafter writes and delivers the clearing firm's check to the customer. It is noteworthy that local check writing, similar to (remote) check writing by the clearing firm itself, is triggered, from the clearing firm's perspective, by instructions from the introducing firm to the clearing firm on behalf of its customer. In either case,

---

31. *See In re* Bear, Stearns Sec. Corp., Exchange Act Release No. 41,707, 1999 SEC LEXIS 1551, at *15–*16 (Aug. 5, 1999).

32. Exchange Act Rule 15c3-1, 17 C.F.R. § 240.15c3-1(a)(2)(iv) (2002) (emphasis added) provides:

> A broker or dealer shall maintain net capital of not less than $50,000 if it introduces transactions and accounts of customers or other brokers or dealers to another registered broker or dealer that carries such accounts on a fully disclosed basis, *and if the broker or dealer receives but does not hold customer or other broker or dealer securities.*

the process does not require the clearing firm to inquire directly of the customer as to the authority of the introducing firm to request the check. If the check request, however, calls for payment to a person other than the customer, industry practice provides for the clearing firm to obtain the customer's letter of authorization (LOA) through the introducing firm for such third-party payment.[33]

NYSE Rule 382 and NASD Conduct Rule 3230, as amended July 1, 1999, specifically address local check writing practices:

> The [clearing] agreement may permit the introducing organization to issue negotiable instruments directly to its customers, using instruments for which the carrying organization is the maker or drawer, provided that the introducing organization represents to the carrying organization in writing that it maintains, and shall enforce, supervisory procedures with respect to the issuance of such instruments that are satisfactory to the carrying organization.[34]

Although both the NYSE and the NASD require that a clearing broker that grants check writing privileges to an introducing firm designate that firm as its agent for check writing purposes,[35] the NYSE has pointed out that local check writing "was not intended 'to impose supervisory obligations on the carrying organization that are not part of its contractual allocated responsibilities or part of its supervisory responsibilities pursuant to Rule 382.'"[36] In other words, where a clearing agreement allocates local check writing authority to the introducing firm, the clearing firm is not required to supervise the introducing firm's performance of that function. The clearing firm is, however, required to determine that the introducing firm's procedures for local check writing are "satisfactory." In approving the 1999 Amendments to Rule 382, the SEC stated with respect to local check writing that it "views the proposed requirement [that the introducing firm's supervisory procedures be 'satisfactory to the carrying organization'] as a supplement to, rather than a replacement for, any other obligation or legal liability

---

33. A "best practice" suggested by the NYSE recommends that the LOA be signed by the customers before a notary. Information Memorandum No. 99-33 from the NYSE, to Members and Member Organizations 3 (July 1, 1999) [hereinafter NYSE Information Memo No. 99-33], *available at* http://www.nyse.com/pdfs/lm9933.pdf. Moreover, even though not required, it may be prudent for a clearing firm to provide a notice to the introduced customer—similar to a trade confirmation—advising the customer promptly that his account has been debited in the amount of a check made payable to him or a third party. A number of firms already follow this procedure. Although all debits are recorded on the customer's month-end account statement, this notice may alert the customer promptly if a check or wire transfer was, in fact, unauthorized.

34. NYSE Rule 382(f), 2 N.Y.S.E Guide (CCH) ¶ 2383 (2002). NASD Conduct Rule 3230(d), NASD Manual (CCH) 4924 (1999), is substantially identical to NYSE Rule 382(f). "Local check writing" was an established practice well before the 1999 Amendments to NYSE Rule 382 and NASD Rule 3230 addressed the matter. *See* John Cabaniss, SEC No-Action Letter, 1981 SEC No. Act LEXIS 2761 (June 2, 1981) (spelling out the requirements for local check writing in the context of a particular clearing arrangement).

35. NYSE INTERPRETATION HANDBOOK, *supra* note 8, at 564; NASD GUIDE TO RULE INTERPRETATION 75 (1996).

36. Self-Regulatory Organizations, Exchange Act Release No. 34-41469, 1999 SEC LEXIS 1114, at *11 (June 2, 1999).

of the carrying firm as maker or drawer of the instrument."[37] The SEC thus appears to focus on the clearing firm's state law duties as drawer of negotiable instruments, rather than on its obligations as a clearing broker under SEC or self-regulatory organization (SRO) regulations.

### Agency Status of Clearing Firms

It is black letter agency law that a disclosed agent, including a disclosed clearing broker, is not liable for the acts or contractual commitments of its principal, the introducing firm.[38] The common law of agency, however, has been substantially modified by certain rules of industry organizations of which clearing firms are members. Specifically, both the NASD and the National Securities Clearing Corporation (NSCC)[39] impose principal status on clearing agents with respect to the settlement of transactions executed by their introducing firms with other broker-dealers. For example, NASD Rule 6120(b)(4)(A)—part of the Automated Confirmation Transaction Service (ACT) Rules—provides that "clearing brokers shall be obligated to accept and clear *as a party* to the transaction each trade that the [ACT] system identifies as having been effected by itself *or any of its correspondent [introducing] executing brokers.*"[40] Similarly, the NSCC requires that its participants are obligated as principals to settle all transactions executed by their introducing firms to whom they have granted "special representative consents."[41] Even without such consents, an NSCC clearing firm member is bound as principal upon completion of the comparison process with respect to all trades reported by its introducing firms or their contra-party broker-dealers to NSCC for settlement.[42]

Significantly, the NASD and NSCC rules apply only to "street-side" transactions, namely, transactions between two broker-dealers on an exchange or in the over-the-counter markets. Transactions involving only the brokerage firm and its own customers—"customer-side" principal transactions—are not subject to the ACT Rules; nor are such trades submitted to NSCC for settlement and clearance.[43] Accordingly, the common law of agency continues to govern these transactions and a clearing firm is under no legal or regulatory obligation to pay an introduced

---

37. *Id.* at *19.

38. Being the clearing agent of another broker-dealer does not make the clearing broker a sub-agent of the introduced customer. Courts have overwhelmingly held that clearing brokers are not the customers' fiduciary. *See infra* notes 159–62 and accompanying text.

39. The NSCC is now an operating subsidiary of DTC. *See infra* note 67.

40. NASD Rule 6120(b)(4)(A), NASD Manual (CCH) 6316 (2002) (emphasis added).

41. *See infra* note 67 and accompanying text.

42. *See* NAT'L SEC. CLEARING CORP., RULES & PROCEDURES R. 2, § 1 (2003) ("A Member who compares, settles or carries out through the [NSCC] any contract or transaction for a [non-member], shall, so far as the rights of the [NSCC] and all other Members are concerned, be liable as a principal . . . ."), *available at* http://www.nscc.com/legal/nsccrules-pdf; *see also* Mishkin v. Ensminger (*In re* Adler, Coleman Clearing Corp.), 247 B.R. 51, 67 (Bankr. S.D.N.Y. 1999) ("Under the NSCC's rules, [clearing firm] was contractually obligated to the NSCC to pay for [introducing firm's] trades with the Street; i.e., [clearing firm] guaranteed those trades.").

43. Customer-side trades are, however, required to be reported to ACT. *See* NASD Rule 6130(a), NASD Manual (CCH) 6317 (2002). This enables the NASD to publish market prices and trading volume of the securities in question on a daily basis for all customer-side and all street-side transactions.

customer the proceeds of his sale of securities to the introducing firm, unless the introducing firm has made funds available to the clearing firm to do so. Similarly, where an introduced customer buys securities from the introducing firm, the clearing firm is not required to pay the introducing firm the purchase price if the customer fails to pay the clearing firm.[44]

The clearing firm's status as common law agent in "customer-side" principal transactions between the introducing firm and its customers has been acknowledged by the SEC, stating that "[w]hen the purchaser and seller in a transaction both are accounts maintained by a clearing firm, the clearing firm does not commit to pay for the trade. Instead, it simply makes the appropriate entries on its books to reflect the transactions."[45] The same view was articulated in the *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*[46] SIPC liquidation proceeding. There, registered representatives of a rogue introducing firm arranged for favored customers to sell their previously acquired and soon-to-be worthless "house stocks" back to the introducing firm and, with the proceeds of such sales, to purchase blue chip stocks. At the time of these transactions, the introducing firm was insolvent. The resale of the "house stocks" and the purchase of the blue chips, were ordered by the brokers in anticipation of their firm's SIPC liquidation and the impending collapse of the "house stocks." The SIPC liquidation would leave the favored customers, now holding blue chip stocks, economically unscathed and free to transfer their accounts, including their blue chip positions, to their brokers' new firm. The SIPC trustee for the clearing firm, which had also collapsed under the weight of the fraud, moved to rescind the customers' resale of their "house stock" as fraudulent, alleging the brokers knew that the introducing firm was unable to pay for the repurchases. The introduced customers resisted the motion, claiming innocence and lack of knowledge of their brokers' fraud. The bankruptcy court, however, found that the fraudulent conduct of the introducing firm and its brokers fatally tainted the rights of the introduced customers.[47] The bankruptcy court stated:

> As a general rule, "[a] principal is liable for the frauds and misrepresentations of his agent within the scope of the authority or employment of the agent,

---

44. The issuance of a trade confirmation makes no difference to the customer's rights in this regard. A trade confirmation memorializes the particulars of a trade and calls for payment by the customer to the clearing firm with regard to a purchase or delivery of a security in case of a sale by the customer. In addition, a confirmation makes certain disclosures required by SEC Rule 10b-10. Issuance of a trade confirmation does not require the clearing firm to guarantee performance by the introducing firm to the customer or vice versa in a customer-side principal transaction because confirmations do not contain any promise of performance by the clearing firm to the customer or introducing firm. Under SIPA rules, the receipt of a confirmation by a customer only establishes a customer's standing under SIPA. *See Adler, Coleman Clearing Corp.*, 247 B.R. at 73.

45. *In re* Bear, Stearns Sec. Corp., Exchange Act Release No. 41,707, 1999 SEC LEXIS 1551, at *13 n.8 (Aug. 5, 1999). It should be noted that when an introducing firm buys or sells a security, as principal, to or from its customer, it does so for its own proprietary trading account carried by the clearing firm.

46. *See generally* 247 B.R. 51 (Bankr. S.D.N.Y. 1999).

47. Mishkin v. Ensminger (*In re* Adler Coleman Clearing Corp.), 218 B.R. 689, 704–07 (Bankr. S.D.N.Y. 1998).

even though he had no knowledge thereof and intended no fraud." As the Trustee contends, here [the customers] were the principals and [the introducing firm] was their agent.[48]

After trial, the bankruptcy court issued a lengthy opinion, granting judgment to the trustee. In discussing the law of agency, the court stated that:

> The [customers] acknowledge that they authorized their brokers to sell [the House Stocks]. Because the brokers committed fraud within the scope of their agency, the [customers] are liable for their fraud.
>
> As a matter of law, whenever the knowledge of an agent is important to the act that the agent is authorized to perform, we impute the agent's knowledge as of the time it carries out the authorized acts, to the principal. . . . Thus, even assuming that the [customers] only authorized Hanover to sell the House Stocks, and Hanover's fraudulent scheme was outside the scope of it's [sic] agency, we will impute to the [customers] Hanover's knowledge of its fraud at the time it sold the stocks.[49]

## Risk Management Practices of Clearing Firms

The NYSE requires its members that act as clearing brokers to answer a risk management questionnaire at the inception of each new clearing relationship.[50]

---

48. *Id.* at 706 (citation omitted) (alteration in original).
49. *Adler, Coleman Clearing Corp.*, 247 B.R. at 98 (internal citations omitted).
50. The following, substantially *in toto*, is the current form of the NYSE Risk Management Letter:

With respect to analyzing internal controls and risk management procedures at your [clearing] firm, please respond to the following questions:

|  | Yes | No |
|---|---|---|
| 1) Has a review of the correspondent's business mix and customer account activity been conducted? | —— | —— |
| 2) Is your operational staff familiar with the clearance and settlement of of [sic] the products and the associated risks? | —— | —— |
| 3) Has a review of the correspondent's proprietary (including error account) and customer positions been conducted to assess any potential or credit risks that may result from: | | |
|    –low priced securities? | —— | —— |
|    –concentrated securities? | —— | —— |
|    –control or restricted securities? | —— | —— |
| 4) Has a review been conducted of the correspondent's FOCUS or similar reports (if non-broker-dealer) for the past year (current financials if the correspondent is a start up firm)? | —— | —— |
| 5) Has a review of the correspondent's last audited Financial report been conducted? | —— | —— |
| 6) Has a review of the correspondent's disciplinary history been conducted including: | | |
|    –B/D disciplinary history? | —— | —— |
|    –CRD complaint history? | —— | —— |
|    –U-4 history for all persons named on Form B/D? | —— | —— |

The NYSE questionnaire concludes with the following statement addressed to the clearing firm: "With respect to the questions above, any 'no' answer must be accompanied by a written explanation from a senior partner or principal executive officer, indicating why management does not believe that the omission of this step does not represent an undue risk to your firm."

This questionnaire probes the clearing firm's operational capacity to process the volume and type of transactions contemplated by the proposed clearing arrangement. In addition, the questionnaire requires the clearing firm to focus on the financial and disciplinary history of the proposed introducing firm and assess the risk to itself in dealing with the introducing firm.[51]

A clearing firm faces credit risks in all transactions. Even in customer cash accounts, the clearing firm incurs credit risk because its settlement obligations "street-side" are independent of its receipt of customer funds or securities for any particular transaction.[52] In the context of margin lending, the clearing firm's risk lies in the potential decline of the market value of its margin collateral below the amount of the margin loan. To guard against this credit risk, the clearing firm, for example, monitors the concentration of securities positions in its margin accounts.

Although the clearing firm's credit risks are conceptually addressed by the introducing firm's promise of indemnification, that promise is only as good as the financial condition of the introducing firm.[53] Clearing agreements often provide for a cash deposit by the introducing firm to assure payment to the clearing firm under the indemnification provision. Further, clearing firms may require their introducing firms to maintain net capital at a level higher than the minimum mandated by the SEC net capital rules. In addition, clearing agreements usually provide that a clearing firm may reject any particular account or decline to execute and clear any particular trade.[54] This provision, although rarely invoked, enables the clearing firm to protect itself against introduced customers with a history of failed payment obligations.

The NASD ACT Rules also provide significant risk management tools to clearing firms. Under the ACT Rules, a clearing firm may establish a line of credit for each of its introducing firms and may reject any trade by the introducing firm with another broker-dealer in excess of its credit limit.[55] The amount of the credit limit is forwarded confidentially to the ACT Operations Center and is known only to the clearing firm and its introducing firm. The ACT system electronically alerts the clearing firm when one of its introducing firms has reached seventy percent

51. Several clearing firms have been financially punished by rogue introducing firms. For example, when Hanover Sterling collapsed after it lost its ability to manipulate the markets in its "house stocks," it took its clearing firm, Adler Coleman Clearing Corp., down with it into SIPC liquidation. More recently, the inability of an introduced customer to honor his stock loan commitments to the clearing firm, led to the latter's collapse and SPIC liquidation. *See* Maple Sec. U.S.A. Inc. v. Stephenson (*In re* MJK Clearing, Inc.), 286 B.R. 862, 870 (Bankr. D. Minn. 2002).

52. Some firms avoid this particular risk by requiring customers to have sufficient funds and long securities positions in their accounts at the time of the trade. All firms may have to consider such requirements, at least for retail customers, in the impending T + 1 environment.

53. Clearing agreements generally provide that the introducing firm shall indemnify the clearing firm for all losses resulting from customer defaults.

54. This contractual reservation to cancel executed trades was fully enforced by the court in *Mishkin v. Ensminger* (*In re Adler Coleman Clearing Corp.*), 218 B.R. 689, 708–09 (Bankr. S.D.N.Y. 1998).

55. NASD Rule 6120(b)(4)(B), NASD Manual (CCH) 6316 (2002); NASD Rule 6150(b), NASD Manual (CCH) 6319 (1999).

of its credit threshold and again when it has reached one hundred percent.[56] These alerts enable the clearing firm to take action, including ceasing forthwith to clear further ACT trades for an introducing firm that fails to adhere to credit limits. ACT also notifies the clearing firm of any trade of $1 million or more, giving the clearing firm fifteen minutes to decline the trade.[57] If a trade is declined, ACT notifies the contra-broker, which should take mitigating action. If the clearing firm fails to respond, the trade will be processed by ACT in the normal course and forwarded to NSCC for settlement and clearance. Further, ACT permits the clearing firm to establish a "super cap" credit limit of no less than $1 million with respect to any introducing firm.[58] If the introducing firm breaches the credit limit, ACT will broadcast the breach to all ACT participants (i.e., the O-T-C "street") and will not process any new trade in excess of $200,000 unless the clearing firm affirmatively approves such trade within fifteen minutes of receipt of notice of the trade.[59]

The risk management features of ACT are optional and apply only to "street-side" transactions. A clearing firm may choose not to impose credit limits or caps on an introducing firm with very substantial assets.[60] Moreover, if credit limits are established, the clearing firm may adjust them intra-day to deal with any unusual credit needs of its introducing firm. Finally, the clearing firm may cease to act for an introducing firm under ACT at any time "provided that notification has been given to, received, and acknowledged by the ACT Operation Center and affirmative action has been completed by the Center to remove the clearing broker from ACT for that correspondent executing broker."[61] The ACT Operation Center will electronically notify all ACT participants that the introducing firm has been "taken off the box." A clearing firm may take its introducing firm "off the box" without prior notice to the introducing firm or the trading community. Taking its introducing firms "off the box" constitutes a clearing firm's last ditch risk management tool.[62]

---

56. NASD Rule 6120(b)(4)(B), NASD Manual (CCH) 6316 (2002); NASD Rule 6150(c), NASD Manual (CCH) 6319 (1999).

57. NASD Rule 6120(b)(4)(C), NASD Manual (CCH) 6316 (2002); NASD Rule 6150(f), NASD Manual (CCH) 6319 (1999).

58. NASD Rule 6150(g), NASD Manual (CCH) 6319 (1999).

59. *Id.*

60. If a clearing firm fails or neglects to impose ACT credit limits with respect to one of its introducing firms, it may be required to clear trades that exceed the financial capabilities of such firm. The clearing firm may not be able to escape its obligations to its introducing firm's counter-party, unless it can show that the counter-party knew that the introducing firm was incapable of meeting its obligations to its clearing firm under the circumstances.

61. NASD Rule 6120(b)(4)(A), NASD Manual (CCH) 6316 (2002).

62. Ceasing to act under ACT is not the equivalent of terminating the clearing agreement. Although an introducing firm may find it difficult to function effectively "off the box," the clearing agreement remains in force until terminated according to its terms. After taking an introducing firm "off the box," the clearing firm is free to continue to clear transactions for the introducing firm on a restricted basis by, for example, requiring that all trades be executed by the clearing firm's own personnel, or that trades be limited to liquidations of existing securities positions in customer accounts or that purchases of new positions be limited to accounts with sufficient credit balances.

## REGULATORY FRAMEWORK

In 1975, Congress amended the Securities Exchange Act of 1934, finding that "[t]he prompt and accurate clearance and settlement of securities transactions . . . are necessary for the protection of investors."[63] Congress directed the SEC "[t]o facilitate the establishment of a national system for the prompt and accurate clearance and settlement of . . . securities."[64]

The 1975 Amendments to the Exchange Act were among a number of congressional responses to the "paper crunch" crisis of 1967–1970, a period of "the most prolonged and severe crisis in the securities industry in forty years."[65] During the height of the crisis, the exchanges curtailed their trading hours and closed their markets entirely on Wednesdays to permit brokerage firms to catch-up with their paperwork as Wall Street struggled with trading volumes of fourteen to sixteen million shares per day in the context of a five day settlement cycle. The severity of the crisis, now only a distant memory, is hard to exaggerate. Approximately 160 NYSE member firms closed their doors, eighty through merger and the other eighty permanently.[66]

Responding to this crisis, the SEC took a number of steps, including the creation of a new regulatory framework that governs clearing arrangements to this day.[67] This framework successfully encouraged the development of a highly effi-

---

63. Securities Act of 1934, § 17A(a)(i), 15 U.S.C. § 78q-1(a)(1)(A) (2001).

64. *Id.* § 78q-1(a)(2)(A)(i). As two leading commentators have noted: "One response to the 'back office' crisis of 1967–1970 [the 'paper crunch' crisis] was the Commission's being put for the first time into the business of regulating the securities transfer and clearance processes, *a subject previously left to state law.*" VI LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATIONS 2912 (3d ed. rev. 1990) (emphasis added).

65. WILLIAM J. CASEY, SEC CHAIRMAN, LETTER OF TRANSMITTAL, H.R. DOC. NO. 92-231, at 1 (1972) (transmitting and summarizing the SEC's Study of Unsafe and Unsound Practices of Brokers and Dealers). *See also* Study of Unsafe and Unsound Practices of Brokers and Dealers, H.R. DOC. NO. 92-31 (1971).

66. *See* VI LOSS & SELIGMAN, *supra* note 64, at 2912–22. The Congress created the Securities Investors Protection Corporation (SIPC) in 1970 to afford some protections against loss by investors resulting from broker-dealer failures.

67. The development of modern clearing firms is inseparably linked to the establishment of a centralized national clearing agency, the National Securities Clearing Corporation (NSCC), operating in tandem with a centralized securities depository, the Depository Trust Company (DTC). Clearing firms (and self-clearing firms) are indispensable participants of NSCC and DTC. The evolution of DTC and NSCC against the backdrop of the "paper crunch" crisis has been summarized as follows:

> DTC and NSCC were both established in response to the paperwork crisis in the securities industry that developed in the late 1960s. At that time, brokers still exchanged physical certificates and checks for each trade, while hundreds of messengers scurried through Wall Street clutching bags of checks and securities.
>
> With the NYSE handling 10 to 12 million shares daily, brokers were literally buried in paperwork and concern about risk was growing. The crisis was so severe that, in order to help reduce the backlog, the exchanges closed every Wednesday and shortened trading hours on the other days.
>
> Two separate and distinct approaches were developed by the industry to solve the paperwork problem. The first was to maintain (or immobilize) the physical certificates for stocks in a central location, and to record changes of ownership using "book-entry" (where no certificates change hands) accounting records. . . .
>
> The second approach to solving the paperwork crisis was called multilateral netting [as part of a continuous net settlement ("CNS") system.] One way of illustrating this concept is, if a broker

cient clearance and settlement system. The numbers tell the story: although an increase in trading volume to fourteen to fifteen million shares per day had thrown Wall Street into crisis in 1967, the securities industry currently trades and processes between two and three billion shares per day routinely without operational difficulties and during a shorter settlement cycle.[68]

The new regulatory framework consisted of three key planks: (1) the elimination of fixed commissions on May 1, 1975;[69] (2) the adoption of the first industry-wide Net Capital Rule on June 26, 1975;[70] and (3) the approval of amendments to NYSE Rule 382 and NYSE Rule 405 on February 19, 1982.[71]

## THE ELIMINATION OF FIXED COMMISSIONS

The modern era of securities clearing may be said to have begun on May 1, 1975. On that day, the SEC outlawed fixed brokerage commissions. To underscore the dramatic nature of the occasion, as perceived by the securities industry, the date was immediately called "May Day."[72] Prior to May Day, members of the NYSE and other national exchanges, including members acting as clearing brokers, were generally required by exchange rules to charge fixed minimum commissions and clearance charges for all but the largest transactions with non-members.[73] This requirement not only gave inefficient member firms an artificial and inflated level of revenues, but placed introducing firms—which were usually not NYSE members—at a competitive disadvantage. To realize a profit, introducing firms were forced to add an extra commission to the exchange-mandated minimum charged

bought 100 shares from one broker and sold 100 shares to that same broker later on, the two trades would be netted, and the net change would be no movement of shares between brokers (although brokers would have to account for the price differences). The problem with this was that brokers traded a single security with many different brokers during a trading day, and, as a result, there were few chances to net trades. Yet, if all brokers were required to clear and settle with a central clearance and settlement organization, all trades in a single security could be netted to one obligation daily. These trading obligations could then be further reduced across all securities traded by a firm in a given day to net—or reduce—them to one settlement obligation daily. Instead of hundreds or thousands of checks being written, a single net money figure could be computed and paid to or received from the central clearance and settlement organization for an entire day's trading.

*How We Serve the Financial Services Industry,* THE DEPOSITORY TR. & CLEARING CORP. CAPABILITIES BROCHURE (DTCC, New York, N.Y.), 2000, at 6–9.

68. *What's News Business and Finance,* WALL STREET J., Jan. 29, 2003, at 1, col. 2 (reporting the following trading volume on the NYSE and NASDAQ markets for Jan. 28, 2003: NYSE: 1,454,243,000 shares; NASDAQ: 1,406,661,500 shares; Total: 2,860,904,500 shares).

69. Adoption of Securities Exchange Act Rule 19b-3, Exchange Act Release No. 11,203, 6 S.E.C. Docket 147-01 (Jan. 23, 1975).

70. Adoption of Amendments to Rule 15c3-1, Exchange Act Release No. 11,497, [1975–1976 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,212, at 85,437 (June 26, 1975) (codified at 17 C.F.R. § 240.15c3-1).

71. *In re* N.Y. Stock Exch., Inc., Exchange Act Release No. 18,497, 24 S.E.C. Docket 964 (Feb. 19, 1982).

72. LOUIS LOSS & JOEL SELIGMAN, FUNDAMENTALS OF SECURITIES REGULATION 745 (4th ed. 2001).

73. *Id.* Prior to the SEC's elimination of all fixed commissions on "May Day," the NYSE had gradually permitted its members to negotiate commissions for large transactions.

by their clearing firms. The elimination of fixed commissions enabled clearing and introducing firms to negotiate clearing fees that reflected the economic value of the services provided by the clearing firm. This allowed introducing firms to compete more effectively for customers with NYSE members firms.

## NET CAPITAL AND RELATED RULES

On June 26, 1975—shortly after outlawing fixed commissions on May 1—the SEC adopted its first uniform national Net Capital Rule, replacing various net capital rules issued by the NYSE and other exchanges and the SEC's own prior rule for non-exchange firms.[74] The new Net Capital Rule required only modest net capital for brokerage firms that introduced their accounts to clearing firms.[75] The new Rule encouraged the protection of customer funds and securities by motivating small brokerage firms to place these assets into the custody of well-capitalized clearing firms, subject to SEC's financial responsibility rules[76] and the protection of the Securities Investor Protection Act of 1970 (SIPA).[77] Finally, the new Net Capital Rule, by encouraging clearing arrangements, enhanced the quality of brokerage recordkeeping as the maintenance of such records would be the responsibility of clearing firms, which generally operated sophisticated data systems staffed by experienced back-office personnel.

---

74. Adoption of Amendments to Rule 15c3-1, Exchange Act Release No. 11,497, [1975–1976 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,212, at 85,437 (June 26, 1975) (codified at 17 C.F.R. § 240.15c3-1).

75. The original Net Capital Rule has been amended, but, even today, provides for lenient net capital treatment of introducing firms. *See* 17 C.F.R. § 240.15c3-1(a)(2). The current regulatory minimum net capital of introducing firms is, effectively, $50,000 although it is still possible to operate as an introducing firm with only $5000 in net capital if the firm has no involvement with the receipt or delivery of customer assets at any point. The clearing firms may contractually require a higher amount in its clearing agreement with the introducing firm. The current minimum net capital for clearing firms is $250,000. The operative minimum net capital for any given clearing firm is computed by reference to the value of the assets (funds and securities) actually carried by the clearing firm. Virtually all clearing firms have well in excess of the required minimum of $250,000 in net capital. Indeed, the magnitude of the net capital of a clearing firm should be of key concern to the introducing firm. The size of a clearing firm's net capital is critical to its ability to absorb and survive significant losses in the event of large customer defaults or massive fraud by one of its introducing firms or its introduced customers. Thus, Adler Coleman Clearing Corp., in 1995, and MJK Clearing, in 2001, were forced into SIPC liquidation because of net capital deficiencies caused, in Adler's case, by a massive penny stock fraud by one of its introducing firms, *see generally In re* Adler Coleman Clearing Corp., 198 B.R. 70 (Bankr. S.D.N.Y. 1996), and, in MJK's case, by a massive stock loan default by one of its introduced customers, *see generally* Maple Sec. U.S.A. Inc. v. Stephenson (*In re* MJK Clearing, Inc.), 286 B.R. 862 (Bankr. D. Minn. 2002). In both cases, as is standard practice, the accounts of all introduced customers at the insolvent clearing firms were frozen from the commencement of SIPC liquidation proceedings until the transfer of the accounts to new clearing firms weeks later. For the duration of the freeze, even fully SIPC insured customers were exposed to market conditions without being able to sell any or all of the securities in their accounts. Moreover, during the freeze the introducing firms were unable to operate normally.

76. *See, e.g.*, Exchange Act Rule 15c3-3, 17 C.F.R. § 240.15c3-3, *reprinted in* 2 N.Y.S.E Guide (CCH) ¶ 4482F (1999).

77. 15 U.S.C. §§ 78aaa–78lll (2000). The Securities Investors Protection Corporation, established under SIPA, was also a result of the "paper crunch" of the late 1960s.

## NYSE RULE 382

On February 19, 1982, the SEC approved amendments to NYSE Rule 382.[78] Rule 382, as amended, permitted clearing and introducing firms to contractually allocate between themselves responsibility for the performance and supervision of all functions related to transactions in customer accounts.[79] Significantly, amended Rule 382 relieved clearing firms from their prior regulatory duty under NYSE Rule 405 to supervise introducing firms, including their sales activities.[80] The continuation of that burden could no longer be justified after May Day as clearing firms were no longer receiving fixed commissions, which had permitted them to hire and maintain legal and compliance staff and systems to police introducing firms. Under amended Rule 382, "know your customer" responsibilities—establishing a customer's investment objectives, determining the suitability of recommended investments—remained only with the introducing firm.[81] Amended Rule 382 eliminated the heretofore duplicative responsibility of clearing firms to "know the customers" of introducing firms and to supervise the sales practices of such firms. In brief, under amended Rule 382, clearing brokers became responsible for the performance of only those functions outsourced and allocated to them under the clearing agreement.[82]

Amended Rule 382 encouraged the rational and efficient division of labor, a division in which each party, optimally, profits from the strength of its own and the other's organization. For introducing firms, this meant focusing on customer contact functions: soliciting customers, "knowing their customers," and providing investment recommendations, and, generally, serving their customer accounts. It also meant paying for clearing and settlement services out of current revenues and avoiding fixed back-office expenses. For clearing firms, it meant employing economies of scale to process transactions for many introducing firms on a low per trade cost basis. The savings realized from this division of labor benefited, not

78. *In re* New York Stock Exchange, Inc., Exchange Act Release No. 18,497, 24 S.E.C. Docket 964 (Feb. 19, 1982). Under section 19(b) of the Securities Exchange Act, as amended in 1975, a proposed SRO rule change must be filed with the SEC, along with "a concise general statement of the basis and purpose" of the proposed rule change. Securities Exchange Act of 1934, § 19(b)(1), *reprinted in* 2 N.Y.S.E Guide (CCH) ¶ 4607, at 6618 (1999). The SEC publishes notice of the new rule and gives interested parties an opportunity to comment. *Id.* The rule change may not go into effect until approved by the SEC. *Id.* at 6619. The SEC may approve an SRO rule only if it finds that the rule is "designed to prevent fraudulent and manipulative acts and practices." For the legislative history of the 1982 amendments to NYSE Rule 382, see Minnerop, *Role and Regulation, supra* note 5, at 848–50.

79. *See* Minnerop, *Role and Regulation, supra* note 5, at 850.

80. NYSE Information Memo No. 82-18 (Mar. 5, 1982), which announced the SEC's approval of the amendments to Rule 382, made it clear that Rule 405 had no further application to clearing brokers. Prior to 1982, NYSE Rule 405 was interpreted by the Exchange as requiring its member clearing firms to treat their introducing firms as one of their own branch offices. *See* Minnerop, *Role and Regulation, supra* note 5, at 848–49; *see also Adler Coleman Clearing Corp.*, 198 B.R. at 73 n.4; Minnerop, *Role and Regulation, supra* note 5, at 846–51 (summarizing the history of the 1982 Amendments to NYSE Rules 382 and 405).

81. *See* Minnerop, *Role and Regulation, supra* note 5, at 849.

82. As noted by the NYSE: "Each organization will be accountable for actual performance of all functions performed by employees and other associated persons as well as for overall supervision of functions and activities *performed by it* pursuant to any carrying agreement." NYSE INTERPRETATION HANDBOOK, *supra* note 8, R. 382/03 (emphasis added).

only introducing and clearing firms, but also introduced customers in the form of lower transaction costs.

Most importantly, Rule 382, as amended, advanced significant regulatory objectives of the SEC for the benefit of investors by encouraging minimally-capitalized brokerage firms to place investor assets into the custody of well-capitalized clearing firms that possessed the operational capacity to process and clear transactions promptly and accurately and maintain timely and accurate brokerage records. Each of these objectives addressed a substantial concern of Congress and the SEC in the aftermath of the "paper crunch" of 1967–1970.

### 1999 AMENDMENTS

Effective July 19, 1999, the SEC approved substantially identical amendments to NYSE Rule 382 and NASD Rule 3230.[83] The 1999 Amendments were the first to Rule 382 since 1982 and the first to Rule 3230 since its promulgation in 1994 and reflected the SEC's and SROs' response to the "micro-cap" fraud committed by a small, but highly visible, number of rogue introducing firms in the bull markets of the 1990s. Not only did these firms defraud their customers, but one such firm caused the collapse of its clearing firm in 1995.[84]

The 1999 Amendments imposed two new requirements on clearing firms: (1) to forward customer complaints received by them, relating to conduct by their introducing firms, promptly to the introducing firms' DEA (usually the NASD) to enable that DEA to investigate the introducing firms on a timely basis and (2) to offer the introducing firms "exception" reports pertaining to their proprietary and customer trading activities.[85] These reports, based upon raw data in the computer system of the clearing firm, organize information into various categories, such as commissions generated by salesperson in any or all securities bought or sold by customers. Utilization of these reports enhances the ability of introducing firms to supervise their own sales personnel.

The legislative history of the 1999 Amendments to NYSE Rule 382 and NASD Rule 3230 acknowledges the regulatory responsibility of SROs to supervise introducing firms.[86] Specifically, the NYSE noted that the amendments to Rule 382 are intended to "provide a reporting mechanism to SROs for complaints received by the carrying organization regarding functions or responsibilities of the introducing organization, and exception reports offered by carrying organizations and provided [by them] to introducing organizations."[87] NASDR observed that the amend-

---

83. NYSE Rule 382 was amended by adding sections (e) and (f). *See* NYSE Rule 382, 2 N.Y.S.E. Guide (CCH) ¶ 2382 (2002). NASD Conduct Rule 3230 was amended by adding new sections (b) through (d). *See* NASD Conduct Rule 3230, NASD Manual (CCH) 4923–24 (2002).

84. The introducing firm, Hanover Sterling & Co., brought down its clearing firm, Adler Coleman Clearing Corp. *See In re* Adler Coleman Clearing Corp., 195 B.R. 266, 271 (Bankr. S.D.N.Y. 1996).

85. NASD Conduct Rule 3230, NASD Manual (CCH) 4923 (2002); NYSE Rule 382, 2 N.Y.S.E Guide (CCH) ¶ 2382 (2002).

86. *See* Baty v. Pressman, Frohlich & Frost, Inc., 471 F. Supp. 390, 391 (S.D.N.Y. 1979) (finding that NYSE has duty to supervise its members' compliance with securities laws).

87. NYSE Rule 19b-4 Filing, Proposed Rule Change, Amendment No. 1 to File No. SR-NYSE-97-25, at 7–8 (Nov. 25, 1998).

HeinOnline -- 58 Bus. Law. 936 2002-2003

ments are intended "to provide [NASDR] with early warning indicators to generate a regulatory response to problems."[88] NASDR stated further that the "receipt by clearing firms of large numbers of complaints regarding introducing firms may be indicative of sales practice problems requiring prompt regulatory attention."[89] In approving the amendments, the SEC expressed a similar view:

> The NASDR proposes to revise NASD Rule 3230 to enhance the ability of the Association and other securities self-regulatory organizations . . . to monitor the activities of introducing firms . . . . The Commission believes that the proposed rule change, by assisting the NASD to better monitor the activities of introducing brokers, should help to prevent fraudulent and manipulative acts and practices.[90]

With respect to the new requirement to make existing exception and similar reports available to its introducing firms, the NYSE stated that "[t]he rule amendments are intended to benefit introducing and carrying organizations as well as the investing public by enhancing introducing organizations' ability to supervise activities relating to their customer accounts."[91] The SEC, in approving the amendments, noted that they "should help introducing firms to better monitor their customer accounts."[92] The SEC concluded by noting that "[t]he Commission believes that the [amendments] should significantly assist the efforts of introducing firms and their DEAs to fulfill their supervisory responsibilities."[93]

Significantly, the 1999 Amendments did not impose upon clearing firms a duty to analyze or investigate customer complaints about introducing firms or to monitor and investigate the conduct of introducing firms in light of such complaints or data reflected on exception reports provided to introducing firms.[94] To the contrary, in announcing the SEC's approval of the amendments, NASDR advised its member firms that the amendments "are *not* intended to change the fundamental nature of the relationship between introducing and clearing firms, or otherwise affect any existing rights, responsibilities, or liabilities under law or contract."[95] The NYSE articulated a *similar* position in advising its members of the SEC's approval of the amendments: "The Exchange believes that the amendments to Rule 382 will further clarify the relationship and responsibilities between introducing and carrying [i.e., clearing] organizations *without altering the fundamental carrying/clearing contractual relationship*."[96]

---

88. NASD, Notice to Members 99-57 (July 19, 1999), *available at* http://www.nasdr.com/pdf-text/9957ntm.pdf.

89. *Id.*

90. Self-Regulatory Organizations, Exchange Act Release No. 34-41468, 64 Fed. Reg. 31,024, 31,025–26 (June 2, 1999).

91. NYSE Information Memo No. 99-33, *supra* note 33, at 2.

92. Exchange Act Release No. 34-41468, 64 Fed. Reg. at 31,026.

93. *Id.* at 31,028.

94. Rule 382, as amended, permits the clearing firm to discharge its obligation to furnish exception reports by providing its introducing firms with direct access to its data bank to generate their own reports. *See* NYSE Rule 382, Supplementary Material .10, 2 N.Y.S.E Guide (CCH) ¶ 2382 (2002).

95. NASD, Notice to Members No. 99-57, *supra* note 88, at 363 (emphasis added).

96. NYSE Information Memo No. 99-33, *supra* note 33, at 4 (emphasis added).

INSITE

In further response to "micro-cap" fraud by a small but highly toxic group of rogue introducing firms, NASDR, in cooperation with the SEC and NYSE, began "developing a new business model regarding the surveillance and examination of NASD members [in 2000]. The new program's official title is Integrated National Surveillance and Information Technology Enhancements [INSITE]."[97] The SEC noted with approval that "INSITE will allow NASD Regulation to concentrate its examination on higher-risk segments of the industry."[98]

INSITE requires clearing firms to forward various raw data to NASDR. To formalize this obligation, NASDR adopted Rule 3150, entitled, "Reporting Requirements for Clearing Firms," effective December 10, 2001.[99] Although NASD Rule 3150 does not specify the data to be provided, the SEC noted that NASDR

> will produce reports that identify member "exceptions" based on historical and current comparisons of member data. The exceptions will trigger follow-up reviews and possible member examinations [and] . . . NASD Regulation currently expects to require [data] such as trade cancellations (T + 1 forward) and as-of trades, aggregate net liquidating equity in each [introducing] firms's proprietary accounts, and unsecured customer debits. . . .[100]

NASDR's surveillance of introducing firms under INSITE is expected to be refined as NASDR gains experience with the program. The SEC has emphasized that NASDR "will continue to work with its clearing firm members and the SEC staff in identifying the data that is needed in order to operate the surveillance component of INSITE."[101] Neither NASD Rule 3150, nor INSITE requires clearing brokers to review or analyze the data they forward to NASDR.[102] Indeed, INSITE, along with the 1999 Amendments to NYSE Rule 382 and NASD Rule 3230, emphasizes the responsibility of SROs, rather than that of clearing brokers, to inspect and examine introducing firms and to police their compliance with applicable securities laws and regulations.

---

97. Self-Regulatory Organizations, Exchange Act Release No. 34-44251, 66 Fed. Reg. 23,750, 23,751 (May 3, 2001) (seeking public comment on INSITE).

98. *Id.*

99. NASD, Special Notice to Members 01-84 (Dec. 10, 2001), *available at* http://www.nasdr.com/pdf-text/0184ntm.pdf.

100. Exchange Act Release No. 34-44251, 66 Fed. Reg. at 23,751.

101. *Id.*

102. INSITE does not impose a gatekeeper role on clearing firms. For a discussion of suggested gatekeeper responsibilities for clearing firms, see Bellwoar, *supra* note 5. This Note provides an excellent summary of the law governing clearing brokers and provides a detailed account of the reaction of various industry regulators to the micro-cap fraud committed by rogue introducing firms in the 1990s. The Note states that "[u]nder current law, clearing brokers enjoy virtual immunity from liability." *Id.* at 1017. The student author of the Note, however, finds current law inadequate to deal with fraud by introducing firms and argues in favor of a form of "gatekeeper" liability on the part of clearing firms.

It is noteworthy that the NYSE has developed a form of gatekeeper policy by requiring clearing firms, upon submitting new clearing agreements to the NYSE under Rule 382, to indicate that they are operationally capable of handling the new business and, additionally, that they have examined the regulatory history of their new introducing firms. *See supra* note 50 and accompanying text.

HeinOnline -- 58 Bus. Law. 938 2002-2003

## USA PATRIOT ACT

The USA PATRIOT Act,[103] signed into law on October 26, 2001, imposes broad anti-money laundering requirements on U.S. financial institutions, including broker-dealers acting as clearing brokers.[104] Rulemaking authority over the Act's provisions is provided to the Secretary of the Treasury, the Federal Reserve Board, and several other federal agencies including the SEC.[105] The Act requires U.S. financial institutions to adopt a comprehensive anti-money laundering program that contains four key elements: (i) policies and procedures meant to detect money laundering; (ii) designation of a compliance officer to oversee the implementation and enforcement of anti-money laundering policies and procedures; (iii) ongoing employee training in the prevention and detection of money laundering; and (iv) adoption of an independent audit program to test the financial institution's overall compliance.[106]

On April 29, 2003, the Treasury Department and the SEC issued final customer identification and verification rules permitting clearing and introducing firms to allocate USA PATRIOT Act, section 326 anti-money laundering responsibilities between each other.[107] Specifically, the rules allow a broker-dealer to "rely on the performance by another financial institution" of the broker-dealer's customer identification program (CIP) procedures provided that: (1) such reliance is reasonable under the circumstances; (2) the other financial institution is subject to rule implementing 31 U.S.C. § 5318(h) and is regulated by a federal functional regulator; and (3) the parties enter into an agreement whereby the other financial institution agrees to annually certify that it has implemented its anti-money laundering program and that it will perform specified requirements of the broker-dealer's CIP.[108] According to the SEC release accompanying the new rules: "The broker-dealer will not be held responsible for the failure of the other financial institution to fulfill adequately the broker-dealer's CIP responsibilities, provided that the broker-dealer can establish that its reliance is reasonable and that it has obtained the requisite contracts and certifications.[109] Traditionally, clearing agreements have emphasized that introducing brokers are responsible for all "know your customer" or "KYC" requirements, as these parties have the direct customer contact. The new rules do not change the non-fiduciary nature of the relationship between introduced customers and clearing firms under current law. Nor do the new rules expand the existing scope of civil liability of clearing firms vis-à-vis introduced customers under federal or state securities laws and regulations or common law. The section 326 rules—unlike SEC or SRO rules—are simply not intended for the protection

---

103. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107-56, 115 Stat. 272 (2001).
104. *See* 31 U.S.C. § 5312(a)(2) (2000).
105. 31 U.S.C.A. § 5318A(a)(4) (2003).
106. 31 U.S.C. § 5318(h) (2000).
107. *See* Customer Identification Programs for Broker-Dealers, 31 C.F.R. § 103.122(b)(6) (2003).
108. *Id.*
109. Customer Identification Programs for Broker-Dealers, Exchange Act Release No. 34-47752, 68 Fed. Reg. 25,113, 25,123 (May 9, 2003).

of investors in connection with securities transactions. Rather, it is intended to provide law enforcement with new means to detect those persons engaged in money laundering or terrorist financing.

## CIVIL LIABILITY OF CLEARING BROKERS

Litigation by introduced customers against clearing brokers has historically focused on aiding and abetting liability under section 10(b) of the Securities Exchange Act of 1934.[110] In 1994, however, the Supreme Court in *Central Bank of Denver v. First Interstate Bank of Denver*[111] eliminated this form of liability in civil actions.[112] Consequently, claims against clearing firms shifted to allegations of primary liability under section 10(b) and to state statutory and common law theories of liability. And, although *Central Bank* eliminated federal aiding and abetting claims, the case law developed pre-*Central Bank* survives to inform post-*Central Bank* decisions under state common law theories of liability.

Much of the recent case law has been developed in response to the machinations of a handful of rogue introducing firms operating during the bull markets of the 1990s. These cases involved massive firm-wide fraud by introducing firms operating "boiler rooms" and "pump and dump" schemes of securities in the high-tech area that they themselves had underwritten in initial public offerings and sold to their customers. These cases bear few factual similarities to garden variety claims typically filed by individual introduced customers—claims that are generally arbitrated[113]—and that allege unsuitable recommendations or unauthorized

---

110. 15 U.S.C. §§ 78a–78ll (2000); *see also* Minnerop, *Role and Regulation, supra* note 5, at 859–65 (discussing aiding and abetting cases prior to 1993).

111. 511 U.S. 164 (1994).

112. *Id.* at 191. A similar fate has befallen other secondary liability theories under section 10(b). *See, e.g., In re* Faleck & Margolies, Ltd., [1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,642, at 91,952, 91,960 (S.D.N.Y. Jan. 27, 1995) ("'[t]o permit a private plaintiff to maintain an action for conspiracy to violate Rule 10b-5 would make *Central Bank of Denver* meaningless, since virtually every aiding and abetting claim can be alleged as a conspiracy claim'") (alteration in original); *see also* Interallianz Bank AG v. Nycal Corp., [1993–1994 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,227, at 99,548, 99,552–53 (S.D.N.Y. May 4, 1994) (dismissing aiding and abetting claims under section 10(b)); *In re* College Bound Consol. Litig., [1994–1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,310, at 90,133, 90,135–37 (S.D.N.Y. May 3, 1994).

Prior to *Central Bank*, a plaintiff needed to allege: (1) a primary violation by someone other than the alleged aider and abettor, (2) knowledge of the primary violation by the alleged aider and abettor, and (3) substantial assistance in the violation by the alleged aider and abettor. Dillon v. Militano, 731 F. Supp. 634, 638 (S.D.N.Y. 1990). Moreover, federal courts uniformly held that clearing firms, performing routine functions, did not give the "substantial assistance" necessary to sustain an aiding and abetting claim. *See* Connolly v. Havens, 763 F. Supp. 6, 11 (S.D.N.Y. 1991) (having no fiduciary relationship with introduced customers, "clearing broker's failure to disclose cannot constitute the requisite 'substantial assistance'"); *Dillon*, 731 F. Supp. at 639 ("inaction of a clearing broker is not enough to constitute . . . 'substantial assistance'"); Antinoph v. Laverell Reynolds Sec., Inc., 703 F. Supp. 1185, 1189 (E.D. Pa. 1989) ("mere inaction or silence does not amount to substantial assistance").

113. Much of the case law in this area, pre- and post-*Central Bank*, was developed in the context of class actions after 1987 when the Supreme Court in *Shearson/American Express v. McMahon*, 482 U.S. 220, 238 (1987), upheld the validity of pre-dispute arbitration agreements under the Securities Exchange Act of 1934. Although individual customer claims have generally been arbitrated after *McMahon*, class actions are not eligible for arbitration before panels of either the NYSE or NASD Dispute Resolution. *See* NYSE Rule 600(d)(i), 2 N.Y.S.E. Guide (CCH) ¶ 2600 (2001); NASD Rule 10301(d)(1), NASD Manual (CCH) 7571 (2002). Class members who opt out of the class, however, may arbitrate their claims under NYSE Rule 600(d)(ii) and NASD Rule 10301(d)(2).

transactions or churning. Few, if any, courts or arbitrators have found clearing brokers liable in those types of cases, holding, instead, that clearing firms owe no fiduciary duty to introduced customers and that it is not within their regulatory responsibility to supervise the sales practices of the introducing firm's brokers. Cases involving firm-wide fraud by rogue introducing firms, however, have tested traditional limits of clearing broker liability.

## PRIMARY LIABILITY UNDER SECTION 10(b)

Three opinions issued by a federal district court in *Blech Securities Litigation* ("*Blech I,*" "*Blech II,*" and "*Blech III*")[114] trace the evolution of one class action complaint alleging primary securities fraud by a clearing broker under section 10(b) of the Securities Exchange Act in a post-*Central Bank* context. This class action centered around the activities of an introducing firm, Blech & Co., and its manipulation of the market price of various securities that it had underwritten and in which it was the principal market maker (the "Blech Securities"). The alleged scheme was effected through transactions executed by Blech in Blech Securities with other broker-dealers and Blech-controlled accounts at prearranged prices and by selling Blech Securities to introduced customers without their authorization. In order to maintain the prices of Blech Securities at inflated levels, Blech allegedly refused to accept sell orders in Blech Securities from its customers or conditioned the acceptance of such orders on the customers' willingness to buy other Blech Securities. Blech and its scheme collapsed, leaving its customers with worthless Blech Securities. Blech pleaded guilty to criminal market manipulation.

The claims against Blech's clearing broker, Bear Stearns, were originally dismissed in *Blech I*.[115] The initial complaint alleged generally that Bear Stearns "engaged in and participated in a continuous course of conduct to artificially raise and maintain the market prices of the Blech Securities" in direct and primary violation of section 10(b) and the common law of fraud.[116] The court granted Bear Stearns' motion to dismiss, stating:

> The insufficiency of the allegations [under section 10(b)] is highlighted by the fact that the Complaint does not allege that Bear Stearns *caused* or *directed* trading by Blech & Co.'s customers or *solicited* or *induced* them to buy Blech Securities at inflated prices. Nor are there any allegations that Bear Stearns did anything in an attempt to affect the price of such securities.[117]

The class plaintiffs amended their complaint to allege that Bear Stearns had indeed "directed" Blech to engage in transactions that Bear Stearns knew or had reason to believe would cause Blech to engage in market manipulation. In an opinion issued in *Blech II,* the court sustained the amended complaint:

---

114. *In re* Blech Sec. Litig., 928 F. Supp. 1279 (S.D.N.Y. 1996) ("Blech I"); *In re* Blech Sec. Litig., 961 F. Supp. 569 (S.D.N.Y. 1997) ("Blech II"); *In re* Blech Sec. Litig., [2002 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,014 (S.D.N.Y. Oct. 17, 2002) ("Blech III").

115. *Blech I,* 928 F. Supp. at 1295–96.

116. *Id.* at 1295.

117. *Id.* (emphasis added).

> [T]he Complaint crosses the line dividing secondary liability from primary liability when it claims that Bear Stearns "directed" or "contrived" certain allegedly fraudulent trades. Under these circumstances, the Complaint adequately alleges that Bear Stearns engaged in conduct, with scienter, in an attempt to affect the price of the Blech securities.[118]

In the court's view, the amended complaint alleged conduct that "demonstrates that Bear Stearns was aware of Blech's previously manipulative conduct and gives rise to an *inference* that Bear Stearns knew or should have known that subsequent transactions were likely to be fraudulent."[119] The court relied upon the allegation (absent in the original complaint) "that Bear Stearns '*directed*' [Blech] to sell Blech Securities by demanding that Blech reduce its debit balance [in its proprietary accounts] with knowledge of Blech's history of sham trading [i.e., 'parking'], and that Blech, in response to Bear Stearns' pressure, engaged in manipulative parking transactions, which Bear Stearns cleared."[120] The court summarized its analysis of Bear Stearns' alleged primary liability under section 10(b) as follows:

> This course of conduct by Bear Stearns—the instigation of trading that Bear Stearns knew or should have known would result in fraudulent trades that would artificially inflate the price of the Blech Securities, and the subsequent clearing of the resultant fraudulent trades for its own pecuniary benefit—constitutes an attempt to affect the price of the Blech Securities. As a result, by participating at both the initiation and clearing stages of the allegedly fraudulent transactions, Bear Stearns knowingly engaged in a manipulative scheme to defraud under Section 10(b), which affected the market upon which Plaintiffs relied in purchasing the Blech Securities. The pressure exerted by Bear Stearns on Blech to reduce his debit balance, when combined with Bear Stearns' knowledge of Blech's sham trading and its clearing of such trades, does not "reflect . . . the standard practice of [a] clearing broker."[121]

Following completion of discovery proceedings, Bear Stearns moved for summary judgment. In denying that motion in *Blech III*, the court focussed on three areas of Bear Stearns' conduct in finding that there were genuine issues of fact that precluded the entry of summary judgment.[122]

First, the court looked at Bear Stearns' debit reduction demands. The court found that there was evidence that Bear Stearns repeatedly demanded that Blech reduce its debits in its trading accounts in order to fall within prescribed limits.[123] Plaintiffs "alleged that these demands forced parking and trading between Blech Accounts, and thereby constituted an affirmative act of manipulation."[124] Bear

---

118. *Blech II*, 961 F. Supp. at 584.
119. *Id.* at 583 (emphasis added).
120. *Id.* at 584 (emphasis added).
121. *Id.* at 584–85 (quoting *Blech I*, 928 F. Supp. at 1295) (alteration in original).
122. *In re* Blech Sec. Litig., [2002 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,014, at 90,913–18 (S.D.N.Y. Oct. 17, 2002).
123. *Id.* at 90,913.
124. *Id.*

Stearns, on the other hand, argued that its debit demands were consistent with the parties' clearing agreement and its rights as secured creditor and that "'executing trades in order to reduce "a loan of money under margin" is insufficient to create liability.'"[125] The court recognized that "margin calls by a clearing broker or a failure to make margin calls, even with suspicion or knowledge of impropriety on the part of the initiating broker, is an appropriate and essential part of the securities business."[126] Yet, the court added that "a margin call made with knowledge that it will *cause* the initiating broker to commit a securities fraud which must be cleared by the clearing broker, constitutes direct action in connection with a contrivance to manipulate a security."[127]

Second, the court examined Bear Stearns' actions in withholding Blech Securities from the market by restricting over $12 million in Blech Securities in its custody from being made available to short sellers.[128] Although the court acknowledged that "it is optional for a clearing broker to make securities available for lending to short sellers," it found that the withholding could have had the "intent and effect of supporting a known artificial market."[129]

Third, the court probed Bear Stearns' financing of Blech's transfer of illiquid securities from Blech's proprietary accounts to customer accounts known by Bear Stearns to be controlled by David Blech, the firm's principal owner.[130] These transfers had the effect of improving Blech & Co.'s net capital position. The court noted that in financing these transfers, it may be inferred that "Bear Stearns recognized and acted to continue the elements of a securities fraud, or alternatively simply a desire to eliminate a continuing capitalization problem."[131]

With respect to each of these areas of conduct, Bear Stearns argued that its actions should not lead to section 10(b) liability because they "were authorized and appropriate under its clearing agreement" with Blech.[132] The court recognized that the Bear Stearns clearing agreement gave

> the right to restrict trading in [Blech's] proprietary and customer accounts "to liquidat[e] orders only or cash transactions only, or to prohibit certain trading strategies or trading of certain types of securities" and a security interest in all property (i.e., cash and stocks) contained in [Blech] proprietary accounts as security for repayment of [Blech's] obligations to Bear Stearns.[133]

The court added, however, that "[a]n agreement to clear does not constitute an absolution from securities fraud liability."[134]

---

125. *Id.* (quoting Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 471 (S.D.N.Y. 2001)).
126. *Id.*
127. *Id.* at 90,913–14 (emphasis added).
128. *Id.* at 90,914.
129. *Id.*
130. *Id.* at 90,914–15.
131. *Id.* at 90,915.
132. *Id.* at 90,907.
133. *Id.*
134. *Id.* at 90,913.

The court in *Blech III* quotes with approval the proposition that "'[a] clearing broker may suffer liability exposure when it moves beyond performing its routine, clearing functions.'"[135] The unstated corollary of this proposition is, of course, that a clearing broker that engages only in routine clearing functions "may [*not*] suffer liability exposure." Be that as it may, the court did not, in fact, follow a "routine vis-à-vis non-routine" approach to analyze liability in either *Blech II* or *Blech III.* To the contrary, the court found that although Bear Stearns' risk management practices were routine and lawful,[136] their use, in the factual context of this case, nevertheless, raised factual issues to be resolved at trial: "[W]hether these functions were performed knowingly in such a manner as to *enhance* the Blech market manipulation scheme."[137]

The opinion in *Blech III* places clearing brokers on the horns of a dilemma. On the one hand, clearing brokers have an acknowledged contractual right—and indeed are encouraged by SRO regulators—to engage in prudent risk management practices; on the other, their very prudence may expose them to liability if they know or have reason to know that their introducing firms may engage in securities fraud in response to risk management demands.

There can be no doubt that a clearing broker that "directs" an introducing firm to engage in fraudulent transactions and then clears and settles those transactions commits primary securities fraud under section 10(b). The court in *Blech III,* however, fails to explain why otherwise legitimate and routine risk management demands of a clearing broker should metamorphose into perfidious "directions" to engage in illegal transactions and become actionable as primary fraud under section 10(b). Risk management practices, including those utilized by Bear Stearns, are *routine* among clearing brokers, a fact that the court explicitly acknowledged in *Blech III.*[138] And, the performance of *routine* functions by clearing brokers has been uniformly held, as a matter of law, not to constitute conduct that aids and abets the introducing firm's fraud, even where the clearing firm has knowledge of the introducing firm's fraud.[139] This proposition of law was also acknowledged by the court in *Blech III.*[140] Yet, by re-characterizing and re-labeling *routine* risk management practices as "directing" illegal transactions, the court converted conduct

135. *Id.* at 90,907–08 (quoting Gerald B. Kline & Raymond L. Moss, *Liability of Clearing Firms: Traditional and Developing Perspectives,* SECURITIES ARBITRATION 139, 144 (PLI Corp. Law & Practice Course, Handbook Series No. B-1062, 1998)).

136. The court reiterated this point in a subsequent opinion on various *in limine* motions—shortly before the case was settled. Summarizing NYSE Rule 382, the court noted that the Rule gives "recognition not only to a clearing broker's more ministerial activities but also to a clearing broker's *normal* function as a creditor." *In re* Blech Sec. Litig., 2003 U.S. Dist. LEXIS 4650, at *7 (S.D.N.Y. Mar. 26, 2003) (emphasis added).

137. *Blech III,* [2002 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 90,907 (emphasis added). The court has continued to emphasize the importance of this issue for trial. *In re* Blech Sec. Litig., No. 94 Civ. 7696 (RWS), 2003 WL 134988, at *2 (S.D.N.Y. Jan. 17, 2003) (denying Bear Stearns' motion for interlocutory appeal certification).

138. *See Blech III,* [2002 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 90,913.

139. *See id.*

140. *Id.*

HeinOnline -- 58 Bus. Law. 944 2002-2003

that would not rise to the level of aiding and abetting into potential primary fraud within the meaning of section 10(b).[141]

The court's holding in *Blech II* and *Blech III*, sustaining allegations of primary securities fraud against a clearing broker under section 10(b), appears to be unique. Being fully aware of *Blech II*, the court in *Goldberger v. Bear, Stearns & Co.*[142] granted Bear Stearns' motion to dismiss claims of primary section 10(b) violations involving introducing firms other than *Blech*, stating that:

> [T]he complaint does no more than allege that Bear Stearns performed the normal function of a clearing broker. Even if one accepts that the complaint sufficiently alleges that Bear Stearns did this with knowledge that these brokers were manipulating the securities at issue, the complaint does not establish Bear Stearns' primary liability under § 10(b).[143]

Another case that illustrates potential primary Rule 10b-5 liability for clearing brokers is *Berwecky v. Bear, Stearns & Co.*[144] In *Berwecky*, plaintiffs alleged that Bear, Stearns "engaged in a scheme to defraud investors of certain publicly-traded securities" in acting as a clearing broker for A.R. Baron & Company.[145] In approving class action status, the court summarized the complaint as follows:

> Harriton [then president of Bear, Stearns' clearing entity] and others at Bear, Stearns shed their role as a mere clearing broker for A.R. Baron, and with actual knowledge, directly participated in the heretofore described scheme. Moreover, plaintiffs allege that after Baron was sanctioned by the National Association of Securities Dealers ("NASD") defendants asserted control over Baron's trading operations by, *inter alia*, placing Bear, Stearns' employees at Baron's offices to observe Baron's trading activities, approving or declining to execute certain trades, imposing restrictions on Baron's inventory, and loaning funds to Baron. All of this was done, plaintiffs contend, in order to keep A.R. Baron a viable concern while Bear, Stearns and Harriton continued to reap their large profits that they received from their activities with A.R. Baron.[146]

The *Berwecky* opinion was issued on a motion for class certification in a section 10(b) primary fraud action. The court did not have occasion to rule on the legal sufficiency of the complaint, no motion to dismiss having been made.

---

141. Although the court denied Bear Stearns' summary judgment motion in *Blech III*, it is well to remember that the court did not grant summary judgment for plaintiffs. Rather, in denying summary judgment, the court held that there were material issues of fact, which pending resolution at trial, may lead to judgment for plaintiffs or for Bear Stearns. *Id.* at 90,913–18. Thus, should the case proceed to trial, which is unlikely—the case was settled in April 2003, subject to court approval under Rule 23—the jury would be charged to determine whether Bear Stearns' conduct, including its risk management practices, constituted fraud under section 10(b).

142. [2000–2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 91,287 (S.D.N.Y. Dec. 28, 2000).

143. *Id.* at 95,621.

144. 197 F.R.D. 65 (S.D.N.Y. 2000).

145. *Id.* at 67.

146. *Id.* (internal citations omitted).

## CONTROLLING PERSON LIABILITY

Courts have historically declined to hold clearing firms liable as "controlling persons" of their introducing firms under section 20(a) of the Securities Exchange Act of 1934.[147] The status of the law is unlikely to change in light of the unavailability of aiding and abetting liability under section 10(b). This point is reinforced in *Blech II*, where the court rejected a claim against a clearing firm under section 20(a) while, at the same time, sustaining allegations of primary liability under section 10(b) because the clearing firm had allegedly "directed" the introducing firm's fraudulent conduct.[148]

## SEC ENFORCEMENT PROCEEDINGS

In 1999, the SEC commenced an administrative proceeding, *Del Mar Financial Services, Inc.*,[149] against a small—and now defunct—clearing firm, alleging both primary and aiding and abetting violations under Rule 10b-5.[150] Specifically, the SEC alleged that the clearing firm had violated section 10(b) by directing its introducing firm to cancel and correct a substantial number of order tickets by averaging the prices originally reflected on these tickets. The SEC alleged that the clearing firm's direction was motivated by the desire to avoid its own street-side obligations.

The administrative law judge (ALJ) assigned to the case found after an evidentiary hearing that the evidence did not support the allegations against the clearing firm.[151] Rather, the ALJ found that the evidence showed that the clearing broker had acted in good faith in processing "corrected" order tickets submitted by the introducing firm, which had been overwhelmed by an unusual volume of trading.[152] The ALJ dismissed all claims against the clearing firm, noting that "[t]he limited precedent for holding a clearing broker liable for fraud is found in cases in which courts denied motions to dismiss complaints against clearing brokers

---

147. *See* Minnerop, *Role and Regulation, supra* note 5, at 854–59; *see also* Carlson v. Bear, Stearns & Co., 906 F.2d 315, 318 (7th Cir. 1990) ("[U]nder federal securities law, clearing agents performing operational or ministerial duties have not been considered controlling persons, nor subject to liability"); Dillon v. Militano, 731 F. Supp. 634, 638 (S.D.N.Y. 1990) (finding it "incongruous to hold that the clearing broker 'controlled' the introducing broker absent some sufficient allegations showing that the clearing broker could or did direct the actions of the introducing broker"); Baum v. Phillips, Appel & Walden, Inc., 648 F. Supp. 1518, 1533 n.18 (S.D.N.Y. 1986) (holding the "mere fact that a broker has acted as a clearing agent in circumstances where it is alleged, as here, that the registered representative of the introducing broker defrauded customers, is insufficient to impose controlling person liability on the clearing agent"), *aff'd*, Asch v. Phillips, Appel & Walden, Inc., 867 F.2d 776 (2d Cir. 1989); Cacciola v. Kochcapital, Inc., No. 36999-7-I, 1997 WL 407867, at *2–*3 (Wash. Ct. App. July 21, 1997) (affirming dismissal of claim that clearing firm "controlled a seller under RCW 21.20.430(3)"); Mars v. Wedbush Morgan Sec., Inc., 283 Cal. Rptr. 238, 242–43 (Ct. App. 1991) (affirming summary judgment where contract provided that clearing firm exercised no control over introducing firm).

148. *In re* Blech Sec. Litig., 961 F. Supp. 569, 587 (S.D.N.Y. 1997).

149. 75 S.E.C. Docket 1905 (Aug. 14, 2001).

150. The SEC—unlike private plaintiffs—may still seek to enjoin aiding and abetting claims under Rule 10b-5. *See* SEC v. Fehn, 97 F.3d 1276, 1282 (9th Cir. 1996).

151. *Del Mar Fin. Servs.*, 75 S.E.C. Docket at 1943.

152. *Id.*

that alleged long-running, egregious situations in which the clearing broker was a full partner in the introducing broker's wrongdoing."[153]

In 1999, the SEC also commenced an administrative proceeding against a major clearing broker. In *Bear, Stearns Securities Corp.*,[154] the SEC alleged that Bear, Stearns had violated Rule 10b-5 in connection with transactions executed by A.R. Baron & Co., a rogue introducing firm. Bear, Stearns settled the charges, without admitting or denying them. In its order approving the settlement,[155] the SEC noted that Bear, Stearns' conduct as clearing broker had "extended well beyond . . . routine clearing functions, and included approving and disapproving trades, providing working capital and, at times, preventing Baron from rescinding certain unauthorized trades."[156]

Bear, Stearns agreed to pay penalties and fines totaling $35 million in settlement of all SEC charges and to reimburse the Office of the District Attorney of New York County for its cost of investigation of Bear, Stearns. As part of its settlement, Bear, Stearns also agreed to retain an independent consultant to review its policies and practices as a clearing firm. In settling its charges, the SEC did not find that Bear, Stearns had violated the anti-fraud provisions of section 10(b) of the Exchange Act, either as primary wrongdoer or as aider and abettor. Rather, the Commission found that Bear, Stearns's "actions were *a cause* of Baron's fraud, as defined in Section 21C of the Exchange Act, and enabled Baron to defraud customers during its clearing relationship with [Bear, Stearns]."[157]

153. *Id.* at 1944. The ALJ's Initial Decision has been appealed by the Staff to the Commission.

154. Exchange Act Release No. 41,707, 1999 SEC LEXIS 1551 (Aug. 5, 1999).

155. As the "[SEC] has stressed many times, . . . settlements are not precedent." *Del Mar Fin. Servs.*, 75 S.E.C. Docket at 1944 n.61.

156. *Bear, Stearns Secs. Corp.*, 1999 SEC LEXIS 1551, at *18. And although the SEC did not characterize this conduct as improper, *per se*, it implicitly called the conduct into question by focusing attention on it as non-routine. Although the specific factual context of this conduct may have colored the SEC's finding of wrongdoing by Bear, Stearns, an examination of the three forms of conduct identified by the SEC shows that none of it is improper *per se*. There is no definition or consensus of what is "routine" conduct for clearing brokers. It may also be true that all clearing brokers engage in certain core functions—for example, clearing and settling trades, receiving and disbursing securities and funds, maintaining books and records—the ultimate question in determining liability for a clearing firm in a particular case, however, should be whether it proximately caused or substantially contributed to the introducing firm's violation of law. The SEC identified the following "non-routine" conduct:

*Approving and disapproving trades.* It is common in clearing agreements to provide for the clearing firm to decline to clear specific trades. This is a form of credit risk management. Clearing agreements containing this provision are routinely approved by the NYSE.

*Providing capital.* It is not unusual for clearing firms to provide additional capital to introducing firms, for example, to enable them to effect underwritings of securities. Such capital infusions are required to be documented on SRO-approved forms and are subject to SRO approval. *See, e.g.*, NYSE Rule 326(d), 2 N.Y.S.E. Guide (CCH) ¶ 2326.13 (2002); *see also* Satisfactory Subordination Agreements, 17 C.F.R. § 240.15c3-1d (2002).

*Declining to rescind trades.* It is within the contractual and legal rights of a clearing firm to decline to rescind a trade that has already been executed and cleared. The right protects the clearing firm—which is committed to settle the trade street-side with its own funds—from belated customer claims that the trade was unauthorized after the security purchased has declined in market value. Bear, Stearns' agreement with introduced customers authorized it to act on instructions of the introducing firm without prior inquiry of the customer. This provision—common in the clearing industry—reflects hornbook agency law: a customer, as principal, is bound by the instructions of his agent, the introducing firm. *See supra* notes 48–49 and accompanying text.

157. *Bear, Stearns Sec. Corp.*, 1999 SEC LEXIS 1551, at *41 (emphasis added). Interestingly, in

## COMMON LAW CLAIMS

In addition to proceeding under federal securities law, introduced customers may invoke various common law theories.[158] Common law theories—as well as theories based on state securities statutes—gained in popularity with plaintiffs after the Supreme Court in *Central Bank* made aiding and abetting claims unavailable under section 10(b) of the Securities Exchange Act.

### Fraud

Introduced customer claims against clearing brokers based upon common law fraud have largely failed on legal grounds. One decision, *Blech II*, however, sustained primary fraud claims under both New York common law and section 10(b) for "direct[ing]" the fraudulent sales of its introducing firm.[159] More typical, however, is the case of *Petersen v. Securities Settlement Corp.*,[160] where a California appellate court rejected plaintiff's claims of fraud and breach of fiduciary duty based upon an alleged obligation of the clearing broker to investigate the suitability of the customer's investments and to advise the customer of the risks of such investments. The *Petersen* court noted that its rejection of clearing broker liability was "consistent with the views expressed in a number of federal securities cases,"[161] stating:

> Although, as Petersen points out, these cases involve violation of federal securities laws, not the common law breach of fiduciary duty she has alleged, the cases are nonetheless helpful because they recognize that the scope of a broker's duty to disclose is delimited by the nature of the broker's relationship with the customer. Where, as here, that relationship is confined to the simple performance of transactions ordered by a customer or his investment advisor, [disclosure duties] do not arise.[162]

### Aiding and Abetting Fraud

Aiding and abetting of fraud claims against clearing firms under state common law have met with little success. In *Cromer Finance Ltd. v. Berger*,[163] a federal district court granted a clearing firm's motion to dismiss claims under New York

---

*Schwartz v. Bear, Stearns & Co.*, [1996–2002 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 74,200 (N.Y. Sup. Ct. N.Y. County Aug. 24, 1998), *aff'd*, 698 N.Y.S.2d 855 (1st Dep't 1999), a New York State trial and an intermediate appellate court rejected claims of common law negligence brought by A.R. Baron customers against Bear Stearns and arising from the same facts underlying the SEC proceeding. *See infra* notes 168–71 and accompanying text.

158. In addition to the specific theories of action discussed in this section, namely, fraud, aiding and abetting fraud, negligence, and breach of fiduciary duty, see Minnerop, *Role and Regulation, supra* note 5, at 865–68, for a survey of breach of contract actions—both direct and third party—brought by introduced customers against clearing brokers.

159. *In re* Blech Sec. Litig., 961 F. Supp. 569, 585–87 (S.D.N.Y. 1997).

160. 277 Cal. Rptr. 468 (Ct. App. 1991).

161. *Id.* at 473.

162. *Id.* (footnote omitted).

163. 137 F. Supp. 2d 452 (S.D.N.Y. 2001).

HeinOnline -- 58 Bus. Law. 948 2002-2003

common law for (1) aiding and abetting fraud and (2) aiding and abetting breach of fiduciary duty.[164] The court summarized the standards required by New York law under these theories of liability:

> New York law has defined both "substantial assistance" and "participation" to exist where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated. "But-for" causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct. Inaction is "actionable participation only when the defendant owes a fiduciary duty directly to the plaintiff."[165]

Relying upon aiding and abetting cases under section 10(b) decided prior to *Central Bank*, the court in *Cromer Finance* noted that "[a] clearing broker does not provide 'substantial assistance' to or 'participate' in a fraud when it merely clears trades."[166] In an effort to meet the pleading requirement of "substantial assistance" and "participation," plaintiffs also alleged that the clearing firm failed to enforce margin requirements and continued to execute trades despite margin violations. The court rejected these allegations as insufficient to constitute "substantial assistance" or "participation," noting that there is no private right of action for violation or margin regulations and that such an action could not be maintained simply by "recasting [it] as one based on common law fraud."[167]

### Negligence

The lack of liability of clearing firms to introduced customers under common law negligence standards is reflected in *Schwarz v. Bear Stearns Co.*,[168] which applied New York law. In *Schwarz*, a class action, the complaint alleged claims under New York's consumer fraud statute as well as common law negligence and negligent misrepresentation under New York (not federal) law. The court granted the clearing firm's motion to dismiss the complaint in the face of allegations that it knew its introducing firm, A.R. Baron & Co., was a "bucket shop" engaged in unauthorized trading of its clients' portfolios, the manipulation of the prices of stocks in which it made markets, and the parking of various securities.[169]

In granting the clearing firm's motion to dismiss, the court found that:

> Plaintiff and each of the proposed class members chose Baron ["the introducing firm"] to act as his broker. The transactions complained of were

164. *Id.* at 494–95.
165. *Id.* at 470 (citations omitted).
166. *Id.*
167. *Id.* at 472.
168. [1996–2002 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 74,200 (N.Y. Sup. Ct. N.Y. County Aug. 24, 1998), *aff'd*, 698 N.Y.S.2d 855 (1st Dep't 1999).
169. *Id.* at 77,910. Bear, Stearns' clearing relationship with A.R. Baron & Co. was also the focus of an SEC administrative proceeding. *See supra* notes 142–46 and accompanying text.

directly between each customer and Baron. Bear Stearns' [(the clearing firm)] only contact with plaintiff was the mailing of confirmation statements and monthly statements pertaining to plaintiff's trading account with Baron. Plaintiff expressly acknowledged his relationship, or lack thereof, with Bear Stearns. . . . [H]e signed a Customer Agreement which stated that Bear Stearns was acting as a clearing agent for Baron and could accept orders from Baron "without any inquiry or investigation" and without any "responsibility or liability to [plaintiff] for any acts or omissions of [Baron]." Plaintiff received Bear Stearns' Truth in Lending disclosure statement which provided that Baron was exclusively responsible for ensuring that his account transactions complied with the law.[170]

In a terse *per curiam* opinion, an intermediate New York appellate court affirmed the dismissal, noting that "as clearing brokers, [Bear Stearns] had no duty to disclose to the introducing broker's clients, and thus the statutory cause of action, as well as the negligence claim, were properly dismissed."[171]

Similarly, in *Cacciola v. Kochcapital, Inc.*,[172] introduced customers alleged, *inter alia*, that the clearing broker was liable for negligence under the common law of Washington in failing to warn them about SEC violations by their introducing firm. The negligence claims were dismissed.[173] Relying on the "substantial factor-proximate cause definition of 'seller' as used in the federal Securities Act of 1933," the court noted that, "appellants have not shown the function of the clearinghouse to be one which causes investors to invest. . . . The investors are unable to point to any common-law duty requiring a clearinghouse to monitor brokers and give warnings or disclosures to investors . . . ."[174]

### Breach of Fiduciary Duty

The courts have held repeatedly that clearing brokers owe no fiduciary duty under statutory or common law to introduced customers.[175] Nor are they required to monitor or investigate the conduct of their introducing firms for the benefit of

---

170. *Schwartz*, [1996–2002 Transfer Binder] Blue Sky L. Rep. (CCH) at 77,909 (citations omitted).
171. *Schwarz*, 698 N.Y.S.2d at 855 (citing *In re* Blech Sec. Litig., 928 F. Supp. 1279, 1295–96 (S.D.N.Y. 1996)).
172. No. 36999-9-I, 1997 WL 407867 (Wash. Ct. App. July 21, 1997).
173. *Id.* at *3.
174. *Id.* at *2–*3; *see also* Connolly v. Havens, 763 F. Supp. 6, 10 (S.D.N.Y. 1991) (dismissing section 10(b) and Rule 10b-5 claims because clearing broker "owed plaintiffs no duty of disclosure"); Antinoph v. Laverell Reynolds Sec., Inc., 703 F. Supp. 1185, 1186, 1189 (E.D. Pa. 1989) (dismissing fraud claim because "this court cannot find that [the clearing agent] had any other duty to speak"); Petersen v. Sec. Settlement Corp., 277 Cal. Rptr. 468, 474 (Ct. App. 1991) (rejecting misrepresentation claims under California Corporations Code sections 25400(d) and 25401 and ruling "as a matter of law that [clearing firm] had no duty to disclose").
175. *E.g.*, Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991); *Petersen*, 277 Cal. Rptr. at 473 (clearing firms are "'generally under no fiduciary duty to the owners of the securities that pass through its hands'") (quoting Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 484 (2d Cir. 1979)).

introduced customers.[176] Further, clearing firms are under no fiduciary duty to disclose to introduced customers material information that may come into their possession relating to the conduct of their introducing firms.[177] Although the possession of such information or knowledge may be an element of common law aiding and abetting liability,[178] the mere possession of such information or knowledge does not transform a clearing broker's non-fiduciary relationship into a fiduciary one.[179]

176. *See, e.g., Cacciola,* 1997 WL 407867, at *3 ("investors are unable to point to any common-law duty requiring a clearinghouse to monitor brokers"); *Stander v. Fin. Clearing & Servs. Corp.,* 730 F. Supp. 1282, 1287 (S.D.N.Y. 1990) (holding that clearing broker had no duty of inquiry as to the introducing broker's actions).

177. *See Cacciola,* 1997 WL 407867, at *3 ("investors are unable to point to any common-law duty requiring a clearinghouse to . . . give . . . disclosures to investors"); *In re* Blech Sec. Litig., 928 F. Supp. 1279, 1295–96 (S.D.N.Y. 1996) ("as a matter of law, a clearing broker owes no duty of disclosure to the clients of an introducing broker").

178. For example, knowledge of primary fraud is an element of aiding and abetting liability. *See* Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983).

179. A recent district court opinion has, however, muddied the waters on this point. In *A.I.A. Holdings v. Lehman Bros., Inc.,* 2 Comm. Fut. L. Rep. (CCH) ¶ 28,911, at 53,023 (S.D.N.Y. Jan. 23, 2002), the court initially recognized "the well established rule that clearing brokers owe no fiduciary duties to customers of introducing brokers." (The court cited *Flickinger,* 947 F.2d at 599; *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir. 1990); *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22 (S.D.N.Y. 1999); and *Blech* I, 928 F. Supp. at 1295–96). Nevertheless, the court denied the clearing brokers' motion for summary judgment, stating: "The Court holds that if [the clearing broker's] employees *had knowledge* of [the introducing brokers'] fraudulent scheme, [the clearing broker] may be liable to [the introduced customers] for breach of fiduciary duty." *A.I.A. Holdings,* 2 Comm. Fut. L. Rep. (CCH) at 53,023 (emphasis added). The court did not say how a clearing broker's mere possession of knowledge of the introducing firm's fraud had transformed the relationship from a non-fiduciary into a fiduciary one.

In reaching its conclusion, the court in *A.I.A. Holdings* cited two cases, neither of which, on analysis, supports the court's holding. In the first case cited, *Rozsa v. May Davis Group, Inc.,* 152 F. Supp. 2d 526 (S.D.N.Y. 2001), the court *granted* the clearing firm's motion to dismiss the introduced customer's breach of fiduciary duty claim, citing well-settled case law holding that clearing brokers owe no fiduciary duty to introduced customers. *Id.* at 531–32. The court in *Rozsa* then, however, veered onto a tangent of dicta, citing *Goldman v. McMahan, Brafman, Morgan & Co.,* [1987 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 93,354 (S.D.N.Y. June 17,1987), for the proposition that "[c]learing brokers may have a fiduciary duty to investors in certain extenuating circumstances." *Rozsa,* 152 F. Supp. at 531. *Goldman,* which is also the second case cited in *A.I.A. Holdings,* did not, however, involve a clearing broker. Rather, the case focuses on the liability of a broker-dealer that specialized in the purchase and sale of money market securities. The broker-dealer had entered into an agreement with one of its customers, an investment partnership, of which plaintiff was a limited partner. Pursuant to this agreement, the broker-dealer had allegedly "created fictitious bookkeeping entries and issued false confirmations of purchases and sales of securities to [its customer, the partnership] for a fee so as to create the false impression that the year-end 'tax straddles' had been accomplished." *Goldman,* [1987 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 96,804. Plaintiff sued the limited partnership and its broker-dealer for damages alleging, among other things, a breach of fiduciary duty. In moving to dismiss, the broker-dealer contended that its role was akin to that of a transfer agent "without fiduciary duty" to plaintiff. The court rejected this argument, finding that, although a mere transfer agent would owe no fiduciary duty to plaintiff, the broker-dealer in the instant action had allegedly "actively engaged with [the] general partners in creating fraudulent trading losses." *Id.* at 96,818 (citing Affiliated Ute Citizens v. United States, 406 U.S. 128, 152 (1972)). The court emphasized that "[t]hese further factual allegations form a sufficient basis for this Court to find that [the broker-dealer] owed a heightened duty, at least equal to that of a fiduciary, to [*the partnership*]." *Id.* (emphasis added). Finally, the court permitted plaintiff to assert the partnership's fiduciary duty claim against the broker-dealer under New York partnership law. *Id.*

## STATE BLUE SKY LIABILITY

State "blue sky" laws have historically been inhospitable to introduced customers seeking to hold clearing firms liable for the conduct of introducing firms. Claims by introduced customers against clearing brokers have typically been brought under a state's version of section 410 of the Uniform Securities Act of 1956.[180] Section 410(a) of the Act imposes liability upon "[a]ny person who . . . offers or sells a security by means of any untrue statement [or omission] of a material fact."[181] Section 410(b) imposes joint and several liability on "every broker-dealer or agent who materially aids in the sale . . . unless the [broker-dealer or agent] sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the [primary fraud]."[182] In *Hirata Corp. v. J.B. Oxford & Co.*,[183] the court observed that "those courts interpreting § 410 of the Uniform Act have not applied liability for 'materially aiding' [in a transaction] to one who merely performed 'ministerial functions.'"[184]

The leading federal appellate decision in this area is *Carlson v. Bear, Stearns & Co.*[185] There the court declined to impose liability upon a clearing broker under the Illinois Securities Act for performing only "ministerial or operational duties" in connection with securities transactions.[186] The clearing firm had processed and

180. 7C U.L.A. 102, 266 (2000).

181. *Id.* at 266.

182. *Id.* The Uniform Securities Act of 1956 has been adopted in whole or in part by thirty-three states, the District of Columbia and Puerto Rico. *See id.* at 102–03 (Table of Jurisdictions). It is to be noted that the standard of liability under section 410(b) is different from aiding and abetting liability, which requires the plaintiff to prove that the defendant had both (1) knowledge of the primary fraud, and (2) substantially participates in the fraud. Under section 410, plaintiff need only prove the second element and then place the burden on defendant to prove the inverse of the first element, namely, lack of knowledge.

183. 193 F.R.D. 589 (S.D. Ind. 2000).

184. *Id.* at 600. The court, however, declined to dismiss the action based upon allegations that the clearing firm had performed functions beyond routine clearing broker services, requiring a trial to determine the actual nature of the conduct. *Accord* Weisman v. Oliver Rose Sec., Inc., No. B-85-126 (EBB), 1987 U.S. Dist. LEXIS 16788 (D. Conn. Nov. 10, 1987) (under Connecticut's version of section 410 of the Uniform Act).

185. 906 F.2d 315 (7th Cir. 1990). The case involved Illinois's blue sky statute. Illinois, although not a signatory to the Uniform Securities Act, uses secondary liability language in its statute similar to the language of section 410(b) of the Uniform Securities Act. Indeed, the language of the Illinois Act is arguably broader than section 410(b). *Compare* 815 ILL. COMP. STAT. ANN. 5/13 (West 1993) (imposing liability on "each underwriter, dealer or salesperson who shall have participated or aided *in any way*") (emphasis added), *with* UNIF. SEC. ACT § 410(b), 7C U.L.A. 266 (2000) (imposing liability on any "broker-dealer . . . who *materially aids*") (emphasis added). In any event, a plain reading of section 410(b) suggests that liability should not be imposed on broker-dealer *qua* broker-dealer. Rather, liability is imposed under section 410(b) on "every broker-dealer . . . *who materially aids in the sale*" made by the seller in violation of section 410(a). *Id.* Thus, an organization that is registered as a "broker-dealer," but that does not "materially aid[] in the sale" itself, that is, a clearing broker, is outside the scope of section 410(b). This reading of section 410(b) is made explicit, for example, in California's phrasing of the statute: "every broker-dealer . . . *who materially aids in the act or transaction constituting the violation*." CAL. CORP. CODE § 25504 (West 1988) (emphasis added); *see* Stewart A. Smith Corp. Profit Sharing Trust v. Paine, Webber, Jackson & Curtis (*In re* Atlantic Fin. Mgmt. Inc. Sec. Litig.), 658 F. Supp. 380, 382 (D. Mass. 1986) ("[A] broker-dealer does not have any fiduciary responsibilities to an investor simply by virtue of its 'status as registered investment advisors or registered stockbrokers.'").

186. *Carlson*, 906 F.2d at 319.

cleared transactions on behalf of its New Jersey-based introducing firm, which had sold securities to its Illinois customers. Neither the introducing firm nor the securities in question had been registered in Illinois. The customers brought an action for rescission against both the introducing firm and its clearing firm.

In affirming judgment for the clearing firm after trial, the court of appeals analyzed the application of the Illinois Securities Act to clearing brokers:[187]

> The first clause of the statute [§ 13(A)] imposes joint and several liability on "the issuer, controlling person, underwriter, dealer, or other person *by or on behalf of who[m] said sale was made*." Beyond this, the second clause imposes this liability on "each underwriter, dealer, or salesperson *who shall have participated or aided in any way in making such sale*." Thus, the second, broader liability extends only to three specific classes of persons: *underwriters, dealers and salespersons*.[188]

The Seventh Circuit continued:

> Plaintiffs do not contend that Bear, Stearns acted in any of these roles *as clearing agent*, nor could they credibly raise such a contention. Bear, Stearns' responsibilities regarding the . . . stock transactions [in question] were, as the district court found, *ministerial* in nature. Bear, Stearns maintained records of the transactions, received payment for securities and delivered certificates, and printed and mailed statements and confirmations of the transactions. As the clearing agent, Bear, Stearns received a flat fee for each trade made by [the introducing broker] regardless of the overall volume. These duties were simple bookkeeping tasks. They were not the intimate functions performed by underwriters, dealers or salespersons.[189]

The Seventh Circuit concluded:

> [T]he clearing agent in these transactions, Bear, Stearns did not play a central or specialized role [in the sales]. Instead, *it performed a simple, albeit necessary, accounting function in order to process the orders*. We will not impose the broad liability reserved under the Illinois Act for underwriters, dealers or salespersons for the performance of such limited, ministerial tasks.[190]

Since its issuance in 1990, the Seventh Circuit's opinion in *Carlson* has stood for the principle that clearing brokers, performing routine functions, are not liable under state blue sky laws for the acts or omissions of introducing brokers.

Two decisions by California appellate courts under the California Securities Laws and common law have followed the reasoning of *Carlson*. In *Mars v. Wedbush*

---

187. At the time the Seventh Circuit decided *Carlson*, section 13(A) of the Illinois Act was codified at chapter 121 1/2, section 137.13 of the Illinois Compiled Statutes. Since that time, section 13(A) has been relocated as part of a technical revision to chapter 815, section 5/13 of the Compiled Statutes. *See* 815 ILL. COMP. STAT. ANN. 5/13 (explaining the "[v]alidity of prior law" in note 1).

188. *Carlson*, 906 F.2d at 317.

189. *Id.* (emphasis added).

190. *Id.* (emphasis added). The opinion in *Carlson* relied upon a number of federal court decisions applying the federal securities laws to assess the role of clearing brokers. *Id.* at 318.

*Morgan Securities, Inc.*,[191] the appellate court affirmed summary judgment in favor of the clearing broker, citing *Carlson*, and stating that a clearing broker's "duties with respect to [an introduced customer] account consisted of actions which were operational or ministerial in nature."[192] The complaint had alleged "breach of fiduciary duty, fraud, negligence, unauthorized trading of stock, and excessive trading of stock."[193] The court harmonized its holding under California law with the holdings of numerous federal court decisions.[194] Similarly, in *Petersen v. Securities Settlement Corp.*,[195] another division of the California appellate court affirmed summary judgment in favor of the clearing broker, noting that "the documents [the clearing broker] provided to its [introduced] customers . . . reiterate the limited and discrete role [it] plays in its customers' stock transactions."[196] The complaint had charged the clearing broker with fraud and negligent misrepresentation under the California Corporations Code.

Likewise, in *Cacciola v. Kochcapital, Inc.*,[197] a Washington appellate court recognized that the routine functions of a clearing broker do not render it liable to customers based upon the wrongful conduct of its introducing broker under the state's version of the Uniform Securities Act. There, the court noted that the clearing broker "performed bookkeeping services" for the introducing broker that included (1) preparing and mailing confirmations and monthly statements to introducing customers; (2) settling contracts and transactions between the introducing broker and introducing customers; and (3) performing the cashiering function for the introducing customer accounts, which included "receipt, delivery and transfer of securities purchased and sold, making and receiving payments for securities, and providing custody and safekeeping of securities and cash."[198] The court held that the performance of these functions neither made the clearing broker a "seller" or a person who "controls" a "seller" under Washington blue sky law, nor did it give rise to a common law fiduciary duty to monitor the introducing broker or "give warnings or disclosures to investors about a broker's criminal acts or suspicious behavior."[199]

191. 283 Cal. Rptr. 238 (Ct. App. 1991).
192. *Id.* at 242.
193. *Id.* at 239.
194. *Id.* at 242.
195. 277 Cal. Rptr. 468 (Ct. App. 1991).
196. *Id.* at 471 (footnote omitted).
197. No. 36999-7-I, 1997 WL 407867 (Wash. Ct. App. July 21, 1997).
198. *Id.* at *1.
199. *Id.* at *2–*3; *see also* Riggs v. Schappell, 939 F. Supp. 321 (D.N.J. 1996) (dismissing New Jersey blue sky claim). Against this background of decisions, an extraordinary NASD arbitration award, *Koruga v. Fiserv Correspondent Services, Inc.*, NASD Arbitration No. 98-04276, was issued in 2000. In *Koruga*, an arbitration panel concluded—contrary to *Carlson* and all other judicial and regulatory decisions—that a clearing broker, performing routine functions (e.g., clearing and settling trades, issuing trade confirmations and monthly statements) "materially aid[ed]" in the fraudulent sale of securities by its introducing firm to customers and was jointly and severally liable with the introducing firm to the customers within the meaning of California's and Washington's versions of section 410(b) of the Uniform Securities Act unless it could prove that it had no knowledge of the introducing broker's fraud and "in exercise of reasonable care could not have known" of the fraud. *Koruga v. Fiserv Correspondent Servs., Inc.*, NASD Arbitration No. 98-04276 (2000).
The *Koruga* panel's interpretation of section 410(b) turned clearing broker liability under federal

The general concurrence of case law under both federal and state securities law with respect to the liability of clearing brokers reflects the reality that clearing brokers operate on a national or regional scale in interstate commerce and should not be subject to divergent standards of conduct and liability under federal and state law. In fact, the Uniform Securities Act of 1956 admonishes courts and regulators to avoid potential conflicts between state and federal regulation by giving deference to federal regulation. Specifically, section 415 provides that the 1956 Act "shall be so construed . . . to coordinate the interpretation and administration of [the statute] with the related federal regulation."[200]

This point has been emphasized in the new Uniform Securities Act (2002).[201] The Act explicitly recognizes "the increasingly interstate and international aspects of securities transactions" and "Section 608 [of the new Act] articulates in greater detail than the 1956 Act's Section 415 the objective[] of uniformity."[202] Significantly, the Official Comments to the new Act provide that clearing firms, performing contractual functions, without more, are not jointly liable with their introducing firms for the latter's fraudulent conduct. Specifically, Official Comment

and state case law and regulation on its head by transforming the routine functions of every clearing broker—functions which have been uniformly described as "ministerial" or "clerical"—into functions that, in the arbitrators' view, "materially aid[ed] in the sale" of the securities by the introducing firm. *Id.* Moreover, by applying section 410(b) to clearing firms, the arbitrators imposed a new duty upon clearing brokers, namely, the duty to monitor their introducing firms, so as to avail themselves of the statutory affirmative defense of lack of actual knowledge of the primary fraud or ability to discover it with due diligence.

The federal district court declined to vacate the award under the doctrine of manifest disregard of the law. Koruga v. Fiserv Correspondent Servs., Inc., 183 F. Supp. 2d 1245, 1247 (D. Or. 2001) ("The reviewing court should not concern itself with the 'correctness' of an arbitration award."). The Ninth Circuit affirmed. Koruga v. Fiserv Correspondent Servs., Inc., 40 Fed. Appx. 364, 365 (9th Cir. 2002) ("This stringent standard of review requires confirmation of an arbitration award 'even in the face of "erroneous . . . misinterpretations of law."'") (quoting Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1060 (9th Cir. 1991)) (alteration in original). The Ninth Circuit found that "[n]either party cited any direct authority" under the California or Washington blue sky statutes with respect to the joint liability of the clearing firm for the fraud of its introducing firm and that arbitrator did not manifestly disregard the law by declining to follow case law from outside the circuit in which the arbitrators sat. *Id.* at 366. To underscore the narrowness of its affirmance and, perhaps, to signal its unease with the arbitrators' opinion, the Ninth Circuit directed that its *per curiam* memorandum "is not appropriate for publication and may not be cited to or by the courts of this Circuit." *Id.* at 365 n.**. The author submitted an amicus brief on behalf of the SIA before the district and circuit court in *Koruga.* Significantly, the interpretation of section 410(b) by the *Koruga* arbitration panel has been rejected by the new Uniform Securities Act of 2002. *See infra* note 201 and accompanying text.

For a critical analysis of the *Koruga* award, see Shannon, *Clearing Firm Liability, supra* note 5, at 544–55; for a defense of the award by counsel for the prevailing claimants, see Banks, *supra* note 5, at 574–75.

200.  UNIF. SEC. ACT § 415, 7C U.L.A. 320 (2000) (emphasis added).

201.  The 2002 Act has not been published in the Uniform Laws Annotated (ULA) yet and may be found at the Uniform Law Commissioners Web site, *at* http://www.law.upenn.edu/bll/ulc/securities/ 2002final.htm. The Uniform Securities Act (2002) was approved by the National Conference of Commissioners on Uniform State Laws at their 111th Annual Meeting in Tucson, Arizona, July 26–August 2, 2002. The new Act "is designed to be consistent with current federal law." *See* Press Release, National Conference of Commissioners on Uniform State Laws, New Uniform Securities Act Approved: Law Governing Regulation of Securities by States Modernized (Aug. 5, 2002), *available at* http://www. law.upenn.edu/bll/ulc/securities/2002final.htm; *see also infra* text accompanying note 202.

202.  UNIF. SEC. ACT (2002), prefatory note, *available at* http://www.law.upenn.edu/bll/ulc/securities/ 2002final.htm.

11 to section 509 (Civil Liabilities) of the new Act provides that: "Under 509(g)(4), the performance by a clearing broker of the clearing broker's contractual functions—even though necessary to the processing of a transaction—without more would not constitute material aid or result in liability under this subsection. *See, e.g.,* Ross v. Bolton, 904 F.2d 819 (2d Cir. 1990)."[203] Official Comment 11 thus brings the civil liability provisions of the new 2002 Act in line with the overwhelming majority of judicial decisions on clearing broker liability.[204]

## LIMITED JUDICIAL REVIEW OF ARBITRATION AWARDS IN CLEARING CASES

Because most claims by introduced customers against clearing brokers are submitted to arbitration, a body of case law has developed in response to motions to confirm or vacate arbitration awards. These cases apply the doctrine of "manifest

203. *Id.* § 509, cmt. 11.

204. In *Ross v. Bolton*, 904 F.2d 819 (2d Cir. 1990), cited in Official Comment 11, the court of appeals affirmed the dismissal of claims alleging theories of "controlling person, aiding and abetting, and phantom seller/insider trading liability" under the Securities Exchange Act of 1934 against Bear Stearns, as clearing broker, by a purchaser of securities from one of its introducing firms, R.E. Bolton & Co. *Id.* at 822. The purchaser alleged that he was defrauded primarily by Bolton but that Bear Stearns was secondarily liable to him. He specifically asserted that Bear Sterns had "secondary or derivative trust liability . . . predicated on a 'special relationship' . . . between Bear Stearns and Bolton." *Id.* at 823. This "special relationship" allegedly arose as a consequence of Bear Stearns' involvement with Bolton, during which Bear Stearns "had concerns about Bolton's solvency, and insisted that Bolton reduce its inventory [of the stock sold to plaintiff], imposed trading restrictions, and limited its margin loans to Bolton." *Id.* at 821. The Second Circuit rejected the alleged secondary or derivative trust liability and explicitly noted its agreement with the district court's "rationale and . . . conclusion" in dismissing the complaint. *Id.* at 824. In addition, the court sustained Bear Stearns' *in pari delicto* defense, finding that plaintiff had entered into the trade with Bolton with the inducement that he could resell the stock to another brokerage firm at a pre-arranged profit. *Id.* at 825. That firm, however, reneged when Bolton became insolvent. As the court observed, plaintiff had "jumped imprudently onto Bolton's stock parking gravy train." *Id.* at 820. The Second Circuit found that:

> The clearing agency relationship is one arrived at by contract between the introducing firm (here Bolton) and the clearing or carrying firm (here Bear Stearns). Each agreement, according to Rule 382 of the New York Stock Exchange, 'shall specifically identify and allocate the respective functions and responsibilities of the introducing and carrying organizations. . . .' At a minimum the agreement must address (1) opening of accounts, (2) credit, (3) maintenance of records, (4) receipt and delivery of funds and securities, (5) safeguarding the same, (6) confirmation and statements, and (7) acceptance of orders and execution of transactions. In the instant case it is undisputed that Bolton initiated and executed its own trades. Bear Stearns was allocated the functions of maintaining records, receiving and delivering funds, and sending comparisons or confirmations. Thus, Bear Stearns' functions were limited merely to monitoring Bolton's trades and to ensuring that those records were accurately maintained.
>
> Bear Stearns did not open the account with Ross or for that matter have any relationship with investors other than collecting funds for sales of [the] securities [in question] which its records indicated were due on sales that had already occurred. It had no obligation to disclose information regarding these securities to potential investors. Moreover, it is established on this record that Bear Stearns performed its clearing functions without guilty knowledge of Bolton's wrongdoing. We recognize that the remedial purpose of the Exchange Act is to protect innocent investors. Here Bear Stearns did not act to deprive any investor of material information needed to make an informed decision. Its actions in this case were simply those of an innocent clearing agent conducting its ordinary business.

*Id.* at 825–26 (citations omitted).

disregard of the law." To vacate an award under the doctrine, more is required than a showing that the arbitrators reached a legally unsound result.[205] Rather, an award may be vacated only upon a showing "'both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'"[206]

No court to date seems to have vacated an arbitration award rendered in a dispute between an introduced customer and a clearing broker, regardless of the outcome of the arbitration and regardless of legal or factual grounds for attacking the award. Given the high hurdle of the "manifest disregard" doctrine, the lack of decisions granting vacatur is not particularly noteworthy. What is noteworthy, however, is the particular focus of opinions when applying the doctrine. Specifically, such opinions are not concerned with defining clearing broker liability. Instead, their purpose—whether they confirm an award in favor of a customer or in favor of the clearing broker—is to protect the finality of the award whenever possible. To that end, opinions grasp at jurisprudential fig leafs, no matter how small, to cover and confirm arbitration awards. The teaching of these opinions lies, thus, in their articulation of the narrow scope of the manifest disregard doctrine, *not* in articulating the courts' own view on clearing broker liability.[207]

The case law developed under the doctrine of "manifest disregard" should thus be viewed with caution when determining the contours of clearing broker liability. By confirming awards that are contrary to legal precedent, but which do not qualify for vacatur under the doctrine of manifest disregard, courts risk becoming unwitting accomplices in the development of a body of case law that bears no resemblance to a correct statement of the law.[208] This risk looms largest where

---

205. Thompson v. Tega-Rand Int'l, 740 F.2d 762, 763 (9th Cir. 1984) ("Manifest disregard of the law has been defined as 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.'") (quoting San Martine Campania de Navegacion v. Saguenay Terminal Ltd., 293 F.2d 796, 801 (9th Cir. 1961)).

206. Greenberg v. Bear, Sterns & Co., 220 F.3d 22, 28 (2d Cir. 2000) (quoting DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 821 (2d Cir. 1997)). Other courts have articulated the doctrine in similar language. *See, e.g.,* Advest, Inc. v. McCarthy, 914 F.2d 6, 9 (1st Cir. 1990); Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co., 44 F.3d 826, 832 (9th Cir. 1995).

207. *See* McDaniel v. Bear Stearns & Co., 196 F. Supp. 2d 343, 346 (S.D.N.Y. 2002) (although confirming an award in favor of an introduced customer under the manifest disregard doctrine, the court stated: "If I had . . . authority [to substitute my judgment for that of the panel of arbitrators], I might indeed have decided the case differently.").

208. *E.g.,* RPR Clearing v. Glass, No. 97 Civ. 0017 JSM, 1997 WL 460717 (S.D.N.Y. July 28, 1997). There arbitrators had found the clearing firm liable for failing to detect a fraudulent change of the introduced customer's address by an employee of the introducing firm. This fraud enabled the employee to withdraw funds from the customer's account without the latter's knowledge. The arbitrators gave no explanation of their award in favor of the introduced customer. In confirming the award, the court stated:

> While there is no case directly on point holding a clearing broker liable for a breach of ordinary care, that does not demonstrate a manifest disregard of the law. In fact in *Stander v. Financial Clearing & Services Co.,* 730 F.Supp. 1282, 1287 (S.D.N.Y. 1990), Judge Stanton rejected a clearing broker's duty to an investor, but suggested that if the clearing broker should have known that authorizations were improper, that broker may have had a duty of inquiry. Given the existence

arbitration awards are accompanied by erroneous explanations of the law by the arbitrators. These types of awards, although still few in number, should be carefully scrutinized and, where appropriate, the explanation, if not the result, corrected because such explanations have a tendency of being submitted to subsequent arbitration panels in the manner of judicial decisions although they are clearly not entitled to precedential value.[209]

## CONCLUSION

The clearance and settlement system, developed in the aftermath of the "paper crunch" crisis of 1967–1970, has been a resounding success. The system routinely processes the multi-billion share trading volumes that characterize current securities markets. Without this highly efficient clearance and settlement system, modern securities markets simply could not function. The structure and success of this system is no accident. Its regulatory contours, including the role and regulation of clearing brokers, have been shaped by federal regulatory actions and policies that have encouraged the non-duplicative allocation of operational and regulatory responsibilities for the ultimate benefit of investors. Such benefits have included lower commissions, fast and reliable clearance and settlement services, accurate and timely records of transactions, and secure custody of assets with well-capitalized clearing brokers.

A return to the regulatory and liability structure existing before 1982 and 1975 would, no doubt, provide defrauded customers of rogue introducing firms with

---

of Southern District case law that suggests the possibility of a duty, plaintiffs have failed to demonstrate the panel's manifest disregard of the law.

*Id.* at *2. The court in *Glass* did not explain why pure dicta from *Stander* rose to the dignity of "Southern District case law." No doubt, the opinion in *Glass* will be cited to arbitrators in future cases to support a claim that a clearing broker has a duty of inquiry, where, in fact, under the law, there is no such duty.

209. *See* IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 543 (7th Cir. 1998) ("[A]rbitrators' decisions are not intended to have precedential effect even in arbitration (unless given that effect by contract), let alone in the courts."); Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141, 147 (4th Cir. 1993) ("[A]rbitration awards have no precedential value."); El Dorado Tech. Servs., Inc. v. Union Gen. de Trabajadores de P.R., 961 F.2d 317, 321 (1st Cir. 1992) ("It is black letter law that arbitration awards are not entitled to the precedential effect accorded to judicial decisions."); E. Me. Med. Ctr., Inc. v. Me. State Nurses Ass'n, 866 F. Supp. 607, 611 (D. Me. 1994) ("Prior arbitration awards, however, are not conclusive or binding nor are they entitled to the precedential effect accorded judicial decisions."); Wyman-Gordon Co. v. United Steelworkers of Am., 613 F. Supp. 626, 629 (N.D. Ill. 1985) ("[A]rbitrators are not bound by arbitral precedent.").

Although it is black letter law that arbitration awards have no precedential value, two well-known commentators have publicized three highly unusual arbitration awards in the clearing broker area, namely, *Koruga, McDaniel,* and *National Family Care Life. See* Lewis D. Lowenfels & Alan R. Bromberg, *Beyond Precedent: Arbitral Extensions of Securities Laws,* 57 BUS. LAW. 999 (2002). The arbitration awards singled out were accompanied by lengthy opinions issued by the arbitrators. As these commentators recognized, these opinions expanded clearing broker liability in the face of "the overwhelming majority of court decisions." *Id.* at 1002. While the commentators acknowledge that these arbitration awards went, as the title of their article indicates, "beyond precedent," they nevertheless quote at length and with apparent satisfaction from these opinions. By doing so, they have given these awards-opinions not only wide circulation, but have, in effect, invited their submission to future arbitration panels, thereby conferring back-door *de facto,* if not *de jure,* precedential status to these awards.

an opportunity to assert claims against "deep pocket" clearing firms. The recovery of even very substantial sums in damages by those customers, however, would likely be dwarfed by the aggregate increase over time in clearing and commission charges that would, inevitably, be passed on to introduced customers as a group. Thus, the sins of a tiny fraction of rogue firms would be visited upon the universe of overwhelmingly honest introducing firms and their customers. The SEC seems to acknowledge the undesirability of this prospect. Indeed, in vigorously pressing its oversight and enforcement functions—as exemplified by its settlement in Bear Stearns/A.R. Baron in 1999 and its approval of amendments to NYSE Rule 382 in 1999 and NASD Rule 3150 (INSITE) in 2001—the SEC appears to have signaled its intention to stay the course. This regulatory and enforcement posture encourages the continued growth of clearing arrangements and, with such growth, the continued benefits to investors that flow from the efficient division of labor implicit in clearing arrangements.

The case law, both federal and state, defining the responsibilities of clearing brokers reflects these regulatory actions and policies. Civil liability is generally not imposed on a clearing broker for the fraud or other misconduct of an introducing firm as long as the clearing broker has engaged only in routine ministerial and contractual functions. The temptation to treat routine, albeit necessary, ministerial conduct as potentially actionable, has, however, not always been resisted by a small number of arbitrators in hard cases involving massive fraud by rogue introducing brokers.

In determining the scope of civil liability, federal and state courts alike have drawn on a national pool of federal and state decisions that recognize the federal regulatory structure governing clearing brokers. Attempts to apply different standards of civil liability under state blue sky laws have been unsuccessful, although a few arbitration awards have gone "beyond judicial precedent" in finding clearing brokers liable contrary to "the overwhelming majority of Court decisions."[210] In an implicit rebuke of these awards, the recently approved Uniform Securities Act (2002) emphasizes the importance of aligning state securities statutes with federal law to maintain national uniformity and consistency in defining clearing broker liability.[211]

---

210. *See supra* note 209 and accompanying text.
211. *See supra* notes 201–04.