**State Court of Fulton County**
***FILED***
LexisNexis Transaction ID: 33246535
Date:  Sep 15 2010 12:56PM
Mark Harper, Clerk

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| TASER INTERNATIONAL, INC., DAVID BATCHELOR, NATALIE BATCHELOR, DR. THOMAS COLLENTINE, JUDITH COLLENTINE, CHARLES FAIRES, SANDRA FAIRES, MASAJI KELLY, KELLY KELLEY, STEPHEN LISENBY, PATRICIA LISENBY, RICHARD D. ALMEROTH, CONSTANCE L. ALMEROTH, JAMES BAKER, JR., ROBERT BAKER, WILLIAM BURNSIDE, DONNA C. CASH, as Personal Representative of the Estate of Dorothy A. Connelly, SOUTHEAST EYE SURGERY CLINIC, INC. EMPLOYEE PSP, JAMES DUNAGIN, JR., EMILY DUNAGIN, RICHARD C. HASKELL, SUSAN HASKELL, RICHARD C. HASKELL, JR., AMY HASKELL, MARY RICHARDSON, PAMELA LEWIS, JANE MAJ, MARGARET ROCHE, ROSEMARY SCOTT, as Personal Representative of the Estate of Chet Scott, JOHN SCOTT, PETER SCOTT, MICHELLE SCOTT, MARY ROSE STUCKER, MICHAEL BOYER, PHILLIPS WALLER SMITH, PATRICK W. SMITH, THOMAS P. SMITH, DEANNA M. SMITH, BRUCE CULVER, and DONNA T. CULVER, | JURY TRIAL DEMANDED CIVIL CASE NO. 2008-EV-004739-B **SEVENTH AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |
| MORGAN STANLEY & CO., INC., GOLDMAN, SACHS & CO., GOLDMAN SACHS EXECUTION & CLEARING, L.P., BEAR STEARNS & CO, INC., K/N/A/ JP MORGAN SECURITIES, INC., BEAR STEARNS SECURITIES CORP., K/N/A JP MORGAN CLEARING CORP., MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., DEUTSCHE BANK SECURITIES, | |

801481.1

INC., CREDIT SUISSE SECURITIES          :
(USA) LLC, BANC OF AMERICA              :
SECURITIES, LLC, UBS SECURITIES,        :
LLC, MERRILL LYNCH PROFESSIONAL         :
CLEARING CORPORATION, and JOHN          :
DOES 2-10,                              :
                                        :
                         Defendants.    :

## <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ......................................................................... 1

Parties, Jurisdiction and Venue ................................................................. 21

STATEMENT OF THE RELEVANT FACTS ............................................ 37

A.  Background of the Parties and Conspirators ................................. 37

B.  The Mechanics of Short Sales and Naked Short Sales.................. 41

C.  Naked Short Selling is Harmful and Illegal ................................. 46

D.  Mechanisms Through Which The Defendants Engage In
    and/or Conceal Naked Short Sales ................................................ 48

    (i)  Naked Short Selling On Behalf Of Clients ........................ 48

    (ii)  Naked Short Selling In the Defendants' Proprietary Accounts .......... 49

    (iii)  Giving and Receiving False Locates.................................... 49

    (iv)  Permitting Indefinite Delivery Fails ................................... 50

    (v)  Providing Artificial/Phantom Shares for Loans of TASER's
    Stock to Cover Short Sales.................................................. 50

    (vi)  False Documentation ......................................................... 51

    (vii)  Concealment by Trading Off the Market............................ 52

E.  Evidence of the Defendants' Conspiracy To Engage In,
    Facilitate and Profit From Naked Short Selling ............................ 57

F.  The Defendants' Naked Short Selling Has Injured Plaintiffs ...................... 66

COUNT ONE (Conspiracy and Endeavor to Violate § 16-14-4(a) of the
Georgia Racketeer Influenced and Corrupt Organization Act, in Violation of
O.C.G.A. § 16-14-4(c)).............................................................................. 68

The Pattern of Racketeering Activity ....................................................... 68

    a.  Securities Fraud (O.C.G.A. § 10-5-24).............................. 69

b.      Securities Fraud (15 U.S.C. § 78j, Reg SHO, Rule 15c3-3,
        and Rule 10b-5)................................................................................73

c.      Theft By Taking (O.C.G.A. § 16-8-2) ...............................................79

d.      Theft By Deception (O.C.G.A. § 16-8-3) ...........................................82

e.      Violation of The Georgia Computer Systems Protection Act
        (O.C.G.A. § 16-9-93) ........................................................................84

f.      Perjury (O.C.G.A. § 16-10-70) ..........................................................86

Relationship Between The Acts of Racketeering Activity .....................................94

Injuries To Plaintiffs Proximately Caused By Defendants' RICO Violations.........96

COUNT TWO (Violation of the Georgia Securities Act).......................................96

COUNT THREE (Violation of the Georgia Computer Systems Protection
Act) ......................................................................................................................97

COUNT FOUR (Conversion)................................................................................98

COUNT FIVE (Money Had and Received) ...........................................................99

Punitive Damages ...............................................................................................101

Prayer For Relief.................................................................................................101

## COMPLAINT

Plaintiffs hereby file their Complaint against the above-named defendants, and respectfully show the Court as follows:

## NATURE OF THE ACTION

1.

This is an action to recover damages incurred as a result of the defendants' conspiracy to reap enormous profits by creating and trading in unauthorized, artificial, and/or counterfeit shares[1] of the common stock of TASER International, Inc. ("TASER"), which is publicly traded on the NASDAQ stock market.

2.

The defendants' unlawful conduct occurs in the context of illegal short selling. In a typical legal short selling transaction, a party (known as a "short seller") speculates that the price of a stock will decline, and seeks to profit from that expected decline. To accomplish this, the short seller borrows shares of the subject company's stock, and sells those borrowed shares on the open market at the existing price. The short seller replaces the shares it borrowed by purchasing the subject company's stock at a later date, and returning the borrowed shares back to the lender. If the short seller's speculation that the stock price will decline is correct, the short seller will earn as profit the difference between the higher price at

---

[1] The term "shares" here and throughout the Complaint refers to shares and/or securities entitlements.

which it sold the borrowed shares and the lower price at which it subsequently replaced them.      As an illustrative example, a short seller speculates that Stock X is currently overvalued at $50/share, and expects the share price to decline.  The short seller (who doesn't own Stock X) borrows 100 shares of Stock X, and sells those shares on the open market at the existing $50/share price.  The borrowed shares are delivered to the purchaser to complete the proper settlement of the short sale.  The stock price later falls to $45/share, at which time the short seller purchases 100 shares of the stock to replace the shares the short seller borrowed.  As a result, the short seller earns $5/share, minus any fees, commissions and/or interest it incurred in completing the transaction.

3.

When conducted in accordance with securities and other laws and regulations, short selling is a legal and accepted trading strategy.  A critical requirement of a *lawful* short sale is that the short seller first makes an affirmative or reasonable determination that the shares are available and actually borrows or otherwise obtains the stock it initially sells at the (hoped for) higher price.  Indeed, securities laws and regulations require a short seller to borrow the stock it sold and deliver that borrowed stock within three days of the short sale (known as the "settlement date").  The logic of these laws and regulations is simple – if the short

seller never borrows or otherwise obtains the stock it sold short, the short seller

cannot convey authorized and issued stock to the purchaser.

4.

In those instances in which a short seller fails to borrow or otherwise obtain

the stock it sold short, the purchaser is not precluded from completing the sale and

obtaining the purchased stock.  Many settlements of securities trades today are

conducted electronically through a central depository, known as the Depository

Trust and Clearing Corporation ("DTCC")[2], which accounts for the buying and

selling of securities through electronic book entries (rather than transfer of physical

stock certificates).  In a typical securities transaction, the DTCC reflects in its

electronic trading records that the buyer "owns" the shares, and that the seller

"owes" the purchased shares, which the seller is supposed to deliver by the three-

day settlement date.  In a short sale, the DTCC still electronically transfers to the

buyer the stock it purchased ***even if the seller fails to deliver the shares it "owes"***

***to the DTCC*** (what is commonly referred to as a "fail").  If the short seller fails to

deliver the stock it owes to the DTCC, the short seller has, in effect, electronically

created and conveyed a new, artificial and/or counterfeit share of stock to the

buyer.  That is, the DTCC credits the buyer with owning shares that did not

---

[2] One of the primary subsidiaries the DTCC operates through is the National
Securities Clearing Corporation (NSCC).  Throughout this Complaint, "DTCC"
refers to both the DTCC and the NSCC.

previously exist.  The newly created shares are counterfeit shares because they were not authorized or issued by the company or registered for sale by the company with either the U. S. Securities and Exchange Commission ("SEC") or the market on which the shares trade.  Rather, they were created electronically by the short seller through an illegal short sale of a stock that the short seller did not own, deliver and/or intend on possessing for the settlement of the short sale.

5.

The practice of selling a stock short without borrowing or otherwise obtaining shares of that stock is commonly referred to as "naked short selling."[3]  Naked short selling is illegal.  Indeed, the SEC (which oversees federal securities laws substantially similar to some of the state laws at issue here) has found that naked short selling "can have a number of negative effects on the market."[4]  In November of 2007, former SEC Chairman Harvey Pitt stated: "Phantom shares created by naked shorting are analogous to counterfeit money."[5]  Similarly, during a February 14, 2008 Senate Banking Committee Hearing, Senator Robert Bennett noted that as a result of naked short selling it is becoming "increasingly…easier in this electronic world to give you counterfeit shares."[6]  In a release dated March 17,

---

[3] As described below, naked short selling can manifest itself in different forms, and include various actions and inactions that facilitate and conceal the conduct.

[4] www.sec.gov/spotlight/keyregshoissues.htm.

[5] www.financialsense.com/fsn/2007/HarveyPitt.pdf.

[6] www.cnbc.com/id/15840232?video=652216599&play=1.

2008, the SEC stated that abusive naked short selling refers to "selling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement cycle," and that such short selling "as part of a manipulative scheme is always illegal under the general anti-fraud provisions of the federal securities laws."[7]

6.

Naked short selling damages rightful shareholders of a company because it floods the market with artificial and/or counterfeit shares, thereby diluting the value of each legitimate share of stock, diluting the shareholder's right to a fixed percentage of ownership of the company and diluting the shareholder's voting rights.  As Chairman Pitt noted, these phantom shares of a company's stock "devalue an issuer's shares to the detriment of investors and [legitimate] issuers alike."[8]  Moreover, the SEC has recently issued a statement reiterating that naked short selling is an unlawful, manipulative and damaging practice:

> The Securities and Exchange Commission today took several coordinated actions to **strengthen investor protections against "naked" short selling** … "These several actions today make it crystal clear that **the SEC has zero tolerance for abusive naked short selling**," said SEC Chairman Christopher Cox.  … **[N]aked shorting can allow manipulators to force prices down far lower than would be possible in legitimate short-selling conditions.**"[9]

---

[7]  SEC Release No. 34-57511, p. 3, File No. S7-08-08 (Mar. 17, 2008).

[8]  www.financialsense.com/fsn/2007/HarveyPitt.pdf.

[9]  http://ftp.sec.gov/news/press/2008/2008-204.htm.

7.

For years, the defendants have damaged owners of TASER stock, including

the plaintiffs, by engaging in, facilitating or concealing naked short sale

transactions of TASER stock.  This conduct constitutes a knowing and intentional

violation of Georgia's Securities Act and other laws.

8.

The defendants have used several illegal methods to engage in and conceal

their naked short selling, including, but not limited to: (a) conspiring to manipulate

the DTCC stock borrowing program as a means to conceal naked short sales; (b)

failing to make legitimate or reasonable efforts to locate TASER shares or make

affirmative determinations prior to short selling them; (c) entering into fictitious or

sham option contracts to conceal naked short sales; (d) falsely marking short sales

as "long" on blue sheets, order tickets and other documents to conceal naked short

positions; (e) failing to properly or adequately supervise compliance with the laws

regarding short sales, long fails, proxy voting, NASD 3370/UPC71/Reg.

SHO/15c3-3 and short sale and short interest position reporting; (f) submitting fake

short interest and other reports to regulators; (g) concealing fails through washed

and matched trades; (h) transacting illegal stock sales off the primary market and

outside of the DTCC system to avoid NASDAQ oversight and to maintain

anonymity; (i) concealing their activity through falsely reporting nonexistent assets

of TASER on brokerage statements to investors as if these assets were representative of real TASER shares; (j) concealing their activity by issuing voting material to shareholders with nonexistent assets of TASER that have no corporate rights including the right to vote TASER shares; (k) conspiring to not comply with their responsibilities and duties to investigate and report suspicious transactions to regulatory authorities; (l) falsely representing that they either possessed the borrowed securities or had located them for borrowing and delivery; (m) giving false "locates," *i.e.*, falsely representing to other defendants that they had shares available for loan and delivery; (n) receiving false "locates," *i.e.*, conspiring to receive false representations from other defendants and non-party banks indicating that they had shares available for loan and delivery knowing that they in fact did not; (o) failing to buy-in failing securities; (p) conspiring to refuse to require buy-ins, *i.e.*, intentionally failing to enforce the requirement that other defendants deliver shares to stock purchasers in naked short transactions; (q) parking shares with affiliates; (r) facilitating, engaging in and/or permitting clients with a pattern or history of fails or other improper conduct to continue short sales or related transactions; (s) engaging in short sales with existing failure to deliver positions or when otherwise knowing that timely delivery would not occur; (t) falsely claiming that they or their clients are subject to the *bona fide* market maker or option market maker exception; (u) engaging in unlawful conversions, reverse conversions, flex

options, exits or other transactions and (v) upon information and belief, making false or misleading statements to regulators, the SEC and/or the Department of Justice to conceal their conduct.[10]

Securities regulators have sanctioned the defendants numerous times for their role in the preceding illegal conduct. The following table lists some of the sanctions assessed against the defendants:

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|--------|-----------------|---------------------|-----------------|-----------|
| Goldman Sachs Execution & Clearing, L.P | 4/17/07 | NYSE | $2,000,000 | Violated § 10(a) of Exchange Act and NYSE Rules 401 and 342 by marking shorts sales "long" and lending securities without reasonable basis for delivery; effecting short sales on minus and zero-minus ticks; and failing to supervise with respect to short sales |
| Goldman Sachs | 3/14/07 | SEC | $1,000,000 | Violated § 10(a) of Exchange Act by selling short in advance |

---

[10]     These are not the only mechanisms by which Defendants perpetrated and concealed abusive naked short selling in the securities of TASER and other publicly traded corporations. On May 6, 2010, the parties filed with the Court a Stipulation and Order in which Plaintiffs outlined the components and types of conduct they allege are involved with, relate to, or that constitute abusive naked short selling. *See* Ex. A to May 6, 2010 Stipulation and Order. Plaintiffs hereby fully incorporate that list herein as allegations in this Complaint and hereinafter refer to these allegations as the "Conduct at Issue."

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| Execution & Clearing, L.P. | | | | of secondary offerings in prime broker accounts and by falsely marking short sales "long" |
| Deutsche Bank Securities Inc. | 2/6/04 | NYSE | $725,000 | Violated NYSE Rule 421 by, among other things, submitting inaccurate short interest reports |
| Banc of America Specialist, Inc. | 12/21/06 | NYSE | $500,000 | Violated § 10(a) of the Exchange Act and NYSE Rule 440B by executing short sales on minus or zero minus ticks (a tick refers to a change in a stock's price; e.g., a trade from a lower price to a higher price is an "uptick") |
| Morgan Stanley & Co. | 8/4/06 | NYSE | $500,000 | Violated NYSE Rules 421 and 342(a) by submitting inaccurate short position reports and failing to supervise short interest position reporting |
| Banc of America Securities LLC | 12/20/01 | NYSE | $290,000 | Violated SEC Rule 15c3-3(e) by recalling customer stock loans on Fridays and reinstating them shortly thereafter, circumventing the customer reserve account requirement |
| Bear Stearns | 4/30/07 | AMEX | $250,000 | Violated AMEX Rules 30 and 320 by submitting inaccurate reports of short interest positions and failing to ensure compliance with respect to short interest |

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|---|---|---|---|---|
| | | | | reporting |
| Bear Stearns | 2/20/07 | NASD | $250,000 | Violated NASD Rules 2110, 3010 and 3360 by submitting inaccurate short interest position data and failing to supervise compliance with law regarding short interest position reporting |
| Deutsche Bank Securities Inc. | 4/27/04 | NASD | $225,000 | Violated NASD Rules 2110, 3010 and 3360 by submitting inaccurate short interest report; incorrectly netting short interest positions against longs; and failing to correct inaccurate reporting |
| Credit Suisse Securities (USA) LLC | 11/10/06 | NASD | $110,000 | Violated SEC Rules 10B-10 and 604, and a variety of NASD Rules by, among other things, executing short sales at or below current inside bid that was below the preceding inside bid |
| Banc of America Securities LLC | 2/6/03 | NASD | $80,000 | Violated a variety of NASD Rules by, among other things, failing to accurately report its short positions |
| UBS Securities, LLC | 03/07 | NASD | $65,000 | Submitted reports to OATS that contained inaccurate, incomplete or improperly formatted data, and erroneously submitted Execution Reports it routed |

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|--------|----------------|---------------------|-----------------|-----------|
| | | | | away for handling and/or execution to OATS |
| Banc of America Securities LLC | 3/12/07 | NASD | $56,500 | Violated SEC Rule 10B-10 and a variety of NASD Rules by, among other things, failing to make affirmative determination it could borrow securities and failing to properly mark tickets as short |
| Deutsche Bank Securities Inc. | 3/12/07 | NASD | $45,000 | Violated NASD Rules 2110, 3010 and 3370 by failing to make affirmative determination that firm could receive or borrow securities underlying short sale for delivery by settlement date |
| Deutsche Bank Securities Inc. | 6/12/07 | NASD | $30,000 | Violated SEC Rule 10B-10, Reg. SHO, and NASD Rules 4632, 6130 and 6955 by, among other things, incorrectly marking long sales as short |
| Bear Stearns | 9/28/07 | FINRA (NASD) | $25,500 | Violated SEC Rule 10B-10 and NASD Rules 2110, 2320, 3370 and 4632 by failing to make an affirmative determination that securities underlying short sale could be delivered or borrowed |
| Deutsche Bank Securities Inc. | 9/9/05 | NASD | $15,000 | Violated SEC Rule 10B-10 and NASD Rules 3370 and 6130 by failing to make affirmative |

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|--------|-----------------|---------------------|-----------------|-----------|
| | | | | determination that firm could receive or borrow securities underlying short sale for delivery by settlement date |
| Merrill Lynch Professional Clearing Corp. | 6/26/07 | NASD | $12,500 | Violated SEC Rule 203(B)(3) and NASD Rules 2110 and 3010 by having a fail-to-deliver position in a threshold security for 13 consecutive settlement days and failing to timely allocate and close out its fail-to-deliver position |
| Banc of America Securities LLC | 12/31/07 | FINRA (NASD) | $12,000 | Violated NASD Rules 3370 and 6230(c)(6) by failing to make affirmative determination it would receive delivery of short sale securities |
| Deutsche Bank Securities Inc. | 4/27/04 | NASD | $10,000 | Violated NASD Rules 2110, 3010 and 3360 by submitting inaccurate short interest position report |
| UBS Securities, LLC | 10/04 | NASD | $10,000 | Submitting inaccurate and/or incomplete OATS data |
| Morgan Stanley & Co. | 3/13/07 | ASE | $10,000 | Violated ASE Rule 320 and §4(H) of ASE Constitution by failing to make affirmative determination prior to effecting short sales and failing to ensure |

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|--------|-----------------|---------------------|-----------------|-----------|
|        |                 |                     |                 | compliance that delivery be made on the settlement date |

Most, if not all, of this misconduct also constitutes violations of the Georgia Securities Act, and it also violates other securities laws, rules and regulations.

9.

Because the defendants have significant financial and other incentives to continue illegal short selling, the foregoing sanctions have failed to stop the defendants' impermissible conduct.

10.

While the SEC's and other securities regulators' sanctions are themselves strong evidence of defendants' violations of Georgia law, the defendants' own share ownership records further reveal their knowing, willfully and repeated participation in illegal naked short selling and their efforts to conceal that illegal conduct.

Because most securities trades are conducted electronically, actual paper shares are not transferred between a buyer and seller, but are rather held by DTCC. Because the DTCC's records reflect actual paper shares, and not electronic debits

and credits, the number of shares held by the DTCC generally reflects the number of authorized shares of a security that exists in brokerage accounts.

Beneficial share records, on the other hand, are maintained by prime brokers, like these defendants, and they reflect the number of shares the prime brokers claim to possess for themselves and their clients.

A comparison of the DTCC inventory records and the beneficially owned shareholder records reveals that the defendants claim ownership of TASER stock far in excess of the actual number of real shares they possess at the DTCC. The following table shows various reporting dates where the defendants claimed beneficial ownership of vastly more shares of TASER than they had actual inventory at the DTCC:

| DTCC Inventory Position v Beneficial Ownership Claims | | | | |
|---|---|---|---|---|
| **Date** | **Participant Name** | **DTCC Position** | **Beneficial Ownership Claims** | **Difference in Shares Reported Held** |
| October 24, 2007 | Banc of America | 126,442 | 269,528 | 143,086 |
| January 15, 2008 | Deutsche Bank | 47,275 | 760,588 | 713,313 |
| October 24, 2007 | Goldman Sachs | 3,475,453 | 5,039,387 | 1,563,934 |
| May 22, 2007 | Merrill Lynch | 1,443,995 | 2,809,889 | 1,365,894 |
| May 22, 2007 | Morgan Stanley | 2,646,970 | 11,767,234 | 9,120,264 |
| May 22, 2007 | UBS | 1,417,489 | 2,129,815 | 712,326 |

11.

An analysis of the volume of the defendants' trades in TASER stock further reveals their participation in unlawful naked short selling.  In particular, the volume of the defendants' trades in TASER stock reveals that they have traded TASER stock far in excess of their actual inventory.  For example, according to available DTCC data from March to May of 2004 and October to December of 2004, Defendant UBS held directly and/or beneficially a position under 1.5 million TASER shares, yet UBS traded 243 million shares of the stock from March to December 2004 (213 trading days).  The available DTCC data also shows that during that time Defendant Merrill Lynch held directly and/or beneficially under 2 million TASER shares, yet one of Merrill Lynch's clients, Knight Securities, traded 219 million shares of the stock from March to December 2004.  This volume of trading could not have been accomplished if the defendants had not conspired to engage in, facilitate and profit from their naked short sales.

12.

Objective shareholder voting data demonstrates that the defendants' unlawful selling of unregistered and unissued TASER shares flooded the market with counterfeit shares.  For example, at the time of TASER's 2005 annual vote,

TASER had approximately 61.1 million shares outstanding.  Yet, approximately 82 million shares voted, an additional over-vote of approximately 20 million shares.

The approximately 20 million over-voted shares is particularly compelling given that, as of the voting date, there were approximately 17.2 million TASER shorted shares.  Even if all of the TASER shares that were sold short were able to vote, the total number of votes would still only be 78.3 million  (61.1 million shares outstanding + 17.2 million short shares).  The fact that 82 million votes were received – 3.7 million more than the outstanding shares plus all shorted shares – indicates that there were at least 3.7 million shares (82 million – 78.3 million) that were undoubtedly counterfeit.  Moreover, this overvote occurred after many of the Defendants were already warned or sanctioned by regulators about the illegality of overvoting.

13.

Defendants' unlawful conduct was not isolated to TASER, but rather was part of a larger intentional and ongoing pattern and practice with respect to other securities.  Plaintiffs have set forth examples of additional unlawful conduct as to TASER and other securities in response to Defendants' Second Interrogatories.  Because Defendants have insisted that the information remain confidential and under seal, Plaintiffs cannot repeat it here.

14.

The defendants' conspiracy to engage in, facilitate and profit from naked short selling has caused and continues to cause owners of legitimate shares of TASER stock, like plaintiffs, substantial harm.  For one, by flooding the market with counterfeit TASER shares, the defendants have diluted the value of each legitimate share of TASER stock, including diluting the shareholder's right to a fixed percentage ownership of the company and associated voting rights.  As former SEC Chairman Harvey Pitt recently articulated in discussing naked short sales: "In a stock market corollary to Gresham's law, the more phantom shares of an issuer's stock that circulate the more they drive out or devalue an issuer's shares to the detriment of investors and issuers alike." *See* www.financialsense.com/fsn/2007/ HarveyPitt.pdf.

In addition, defendants' conspiracy has harmed TASER by, among other things, electronically issuing TASER treasury shares without authorization or compensation to TASER, limiting TASER's access to capital, lowering its market capitalization, damaging its perception in the market and making it more difficult for the company to expand and/or merge.

15.

Unlike the plaintiffs, who have suffered substantial harm as a result of the defendants' unlawful conspiracy, the defendants have and continue to reap enormous illicit profits in at least the following three ways:

(a)    <u>Proprietary Trades</u> – Upon information and belief, the defendants short sell TASER stock in their own proprietary accounts, giving them a financial interest in lowering the stock's price.  One mechanism through which the defendants can increase the likelihood and amount by which TASER stock will fall (increasing the profits from their own short sales) is to dilute TASER stock through the creation, loan and sale of counterfeit TASER stock, which artificially depresses its price.  The more TASER stock the defendants counterfeit, the greater the likelihood the stock will drop and the greater the profits the defendants will reap from their own short sales.

Further, the defendants have received the proceeds of naked short sales without giving up anything of value in exchange.  Indeed, they may never be called on to "cover" their short sales because they have not borrowed shares, and so long as customers who have paid for these artificial and/or phantom shares receive proxy and false account statements, they may not become aware of the fact that they do not own real shares authorized and issued by TASER.

sandwich

(b)  <u>Charging Fees for "Loans" of TASER stock</u> – Typically, when an investor sells TASER stock short, it borrows TASER stock from one of the defendants to deliver by the settlement date.  In a lawful transaction, the defendant has or arranges to borrow TASER stock, loans that stock to or on behalf of the short seller, and then charges the short seller a fee for the stock loan or for permitting the stock sale.  The defendants, however, often loan short sellers (either directly or on their behalf) TASER stock that they neither own nor have any intention of obtaining.  The defendants simply inform the short seller that the loan was made, even though the defendants deliver no actual stock (because they have none).  The defendants then charge the short seller fees for the "loan" of this "stock," including transaction fees, short sale fees, negative rebates and/or interest, thereby earning illicit profits.

The defendants' ability to engage in these non-bona fide loans is the direct result of their knowing and willful decision to violate securities regulations requiring them to deliver shares by the settlement date.  Indeed, if the defendants abided by the regulations, the fact that they did not actually loan stock to the short seller would be revealed on the settlement date when they are unable to deliver the loaned stock on the short seller's behalf.  However, since the defendants have conspired to violate, *inter alia*, the possession and delivery requirement, the non bona fide loans are concealed.

(c)    <u>Transaction Fees and Commissions</u> – Another object of the

conspiracy is to earn profits through unlawful transaction fees, including fees

relating to purchases, sales, loans, options and conversions.  For example, if a short

seller sought to make a short sale through one of the defendants, but that defendant

could not obtain TASER stock, the defendant would be unable to complete the

short sale (and thus would be unable to obtain and retain the fees and commissions

associated with that short sale).  However, by ignoring the need for the defendant

to locate stock before it completes the short sale, the defendant can complete the

transaction, thereby obtaining fees and commissions.  Similarly, by unlawfully

increasing the number of shares of TASER stock, the defendants have created

opportunities for further trades in that stock, earning them additional fees and

commissions.   At the same time, the defendants are diluting TASER stock,

injuring legitimate shareholders.

Defendants' motive to engage in illicit short selling to reap profits from

proprietary trades, interest on stock loans, and fees and commissions was not

limited to TASER, but was the part of a larger intentional and ongoing pattern and

practice with respect to other securities.  Through the above mechanisms, and

others, the defendants have collectively reaped hundreds of millions of dollars, if

not billions, in illicit profits from unlawful trading in TASER and other stocks.

16.

For the reasons set forth in this Complaint, the plaintiffs are entitled to damages for the injuries they have suffered as a result of the defendants' unlawful conduct, and hereby bring this action for: (1) violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), O.C.G.A. §§ 16-14-1, *et. seq.;* (2) violations of the Georgia Securities Act; (3) violations of the Georgia Computer Systems Protection Act; (4) conversion; and (5) money had and received.

## Parties, Jurisdiction and Venue

17.

TASER International Inc. ("TASER") is a business corporation organized under the laws of Delaware with its principal place of business in Scottsdale, Arizona.

18.

Plaintiffs David Batchelor and Natalie Batchelor are individual citizens of the State of Georgia, residing in Gwinnett County, Georgia and bring these claims in their individual capacities.

19.

Plaintiffs Dr. Thomas Collentine and Judith Collentine are individual citizens of the State of Georgia, residing in Cobb County, Georgia and bring these claims in their individual capacities.

20.

Plaintiffs Charles Faires and Sandra Faires are individual citizens of the State of Georgia, residing in Fulton County, Georgia and bring these claims in their individual capacities.

21.

Plaintiffs Masaji Kelly and Kelly Kelley are individual citizens of the State of Georgia, residing in Cobb County, Georgia and bring these claims in their individual capacities.

22.

Plaintiffs Stephen Lisenby and Patricia Lisenby are individual citizens of the State of Georgia, residing in Fulton County, Georgia and bring these claims in their individual capacities.

23.

Plaintiffs Constance L. Almeroth and Richard D. Almeroth are individual citizens of the State of North Carolina, residing in Wilkes County, North Carolina.

Constance and Richard Almeroth are bringing suit in their respective capacities as the trustees of the Richard D. Almeroth and Constance L. Almeroth Living Trust.

24.

Plaintiff James Baker, Jr. is an individual citizen of the State of Arizona, residing in Maricopa County, Arizona and brings these claims in his individual capacity.

25.

Plaintiff Robert Baker is an individual citizen of the State of Florida, residing in Broward County, Florida and brings these claims as the trustee for the Robert M. Baker MD N. Broward Radiologists PA Employee Profit Sharing Plan and M/P Pension Plan.

26.

Plaintiff William Burnside is an individual citizen of the State of Tennessee, residing in Hamilton County, Tennessee and brings suit in his capacity as trustee for the Kellie Len Burnside Irrevocable Trust, the Helen C. Burnside Irrevocable Trust and on his own individual behalf.

27.

Plaintiff Southeast Eye Surgery Clinic, Inc. PSP is a resident of McAlester, Oklahoma.  James Dunagin, Jr. is the trustee of Plaintiff Southeast Eye Surgery Clinic, Inc. PSP.

28.

Plaintiff Donna C. Cash is the personal representative of the Estate of

Dorothy A. Connelly.  The Estate of Dorothy A. Connelly is administered in

Charleston County, South Carolina.  The Estate of Dorothy A. Connelly has

assumed the interests of the Estate of James Connelly.

29.

Plaintiffs James Dunagin, Jr. and Emily Dunagin are individual citizens of

the State of Oklahoma residing in Pittsburg County, Oklahoma.  Plaintiffs James

Dunagin, Jr. and Emily Dunagin bring suit in their capacity as trustees for the

James L. Dunagin Jr. Trust and the Emily B. Dunagin Trust.

30.

Plaintiffs Richard C. Haskell and Susan Haskell are individual citizens of the

State of Illinois, residing in Cook County, Illinois and bring these claims in their

individual capacities.

31.

Plaintiff Richard C. Haskell, Jr. and Amy Haskell are individual citizens of

the State of Illinois, residing in Cook County, Illinois and bring these claims in

their individual capacities.

32.

Plaintiff Mary Richardson is an individual citizen of the State of Illinois,

residing in Cook County, Illinois and brings these claims in her individual capacity.

33.

Plaintiff Pamela Lewis is an individual citizen of the State of Ohio, residing in Cuyahoga County, Ohio and brings these claims in her individual capacity.

34.

Plaintiff Jane Maj is an individual citizen of the State of Illinois, residing in Cook County, Illinois.  Plaintiff Jane Maj brings these claims in her capacity as the trustee for the Jane S. Maj Trust.

35.

Plaintiff Margaret Roche is an individual citizen of the State of Ohio, residing in Montgomery County, Ohio and brings these claims in her individual capacity.

36.

Plaintiff Rosemary Scott brings these claims in her capacity as the personal representative of the Estate of Chet Scott.   The Estate of Chet Scott is administered in the District of Addison in Middlebury, Vermont.

37.

Plaintiff John Scott is an individual citizen of the State of New York, residing in Rensselaer County, New York and brings these claims in his individual capacity.

38.

Plaintiffs Peter Scott and Michelle Scott are individual citizens of the State of New York, residing in Rensselaer County, New York and bring these claims in their individual capacities.

39.

Plaintiff Mary Rose Stucker is an individual citizen of the State of Illinois, residing in Cook County, Illinois and brings these claims in her individual capacity.

40.

Plaintiff Michael Boyer is an individual citizen of the State of Oklahoma, residing in Pittsburg County, Oklahoma and brings these claims in his individual capacity.

41.

Plaintiff Phillips W. Smith is an individual citizen of the State of Arizona residing in Maricopa County, Arizona and brings suit in his capacity as the trustee of the Phillips W. Smith Family Trust.

42.

Plaintiff Patrick W. Smith is an individual citizen of the State of Arizona, residing in Maricopa County, Arizona and brings suit in his individual capacity.

43.

Plaintiffs Thomas P. Smith and Deanna M. Smith are individual citizens of the State of Arizona residing in Maricopa County, Arizona and bring suit in their individual capacities.

44.

Plaintiffs Bruce and Donna T. Culver are individual citizens of the State of California residing in Ventura County, California, and bring suit in their individual capacities.

45.

Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") is a business corporation organized under the laws of Delaware with its principal place of business in New York, New York. Morgan Stanley is registered to conduct

business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, CT Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.  Morgan Stanley admits that during the relevant time period it has: (a) maintained an office in Georgia; (b) conducted business in Georgia; (c) purchased or sold TASER common stock on behalf of or as an agent of a person in Georgia; (d) borrowed TASER common stock from a person in Georgia; (e) sent or received correspondence regarding TASER stock or options from its Atlanta, Georgia office; (f) requested, facilitated or engaged in short sales of TASER common stock from its Atlanta, Georgia office; (g) sent or received information pertaining to a short sale of TASER common stock from its Atlanta, Georgia office; (h) received fees, commissions, interest or other monies from a person in Georgia in connection with the purchase or sale of TASER common stock; (i) purchased or sold TASER common stock from its Atlanta, Georgia office; (k) wired or otherwise electronically transferred money to Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options; (l) received a wire or other electronic transfer of money from Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options; (m) borrowed TASER stock from a person in Georgia; and (n) sent correspondence relating to TASER to the SEC's Atlanta, Georgia office.

46.

Defendants Goldman Sachs & Co. and Goldman Sachs Execution & Clearing, LP ("Goldman Sachs") are business corporations organized under the laws of Delaware with its principal place of business in New York, New York. Goldman Sachs is registered to conduct business in Georgia, conducts business in or that impacts Georgia and/or maintains an office in Fulton County, Georgia. Indeed, Goldman Sachs admits that during the relevant time period it has: (a) maintained an office in Georgia; (b) conducted business in Georgia; (c) purchased or sold TASER common stock on behalf of or as an agent of a person in Georgia; (d) received fees, commissions, interest or other monies from a person in Georgia in connection with the purchase or sale of TASER common stock; (e) wired or otherwise electronically transferred money to Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options; (f) received a wire or other electronic transfer of money from Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options; and (g) sent account statements or other documents reflecting the purchase, sale or ownership of TASER common stock or options to Atlanta, Georgia.

47.

Defendants Bear Stearns & Co., Inc. (k/n/a J.P. Morgan Securities, Inc.) and Bear Stearns Securities Corp. (k/n/a JP Morgan Clearing Corp.) (collectively, "Bear Stearns") are business organized under the laws of Delaware with their principal places of business in New York, New York.  Bear Stearns is registered to conduct business in Georgia, conducts business in or that impacts Georgia and/or maintains an office in Fulton County, Georgia.  Indeed, Bear Stearns admits that during the relevant time period it has: (a) maintained an office in Georgia; (b) conducted business in Georgia; (c) purchased or sold TASER common stock on behalf of or as an agent of a person in Georgia; (d) sent or received correspondence regarding TASER common stock or options from its Atlanta, Georgia office; (e) sent or receiving information pertaining to a short sale of TASER common stock from its Atlanta, Georgia office; (f) requested, facilitated or engaged in short sales of TASER common stock from its Atlanta, Georgia office; (g) received fees, commissions, interest or other monies from a person in Georgia in connection with the purchase or sale of TASER common stock and (h) purchaser or sold TASER common stock or options as an agent or broker for a person in Georgia.

48.

Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a business corporation organized under the laws of Delaware with its principal place of business in New York, New York. Merrill Lynch is registered to conduct business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, CT Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.  Merrill Lynch admits that during the relevant time period it has: (a) maintained an office in Georgia; (b) conducted business in Georgia; (c) purchased or sold TASER common stock on behalf of or as an agent of a person in Georgia; (d) received fees, commissions, interest or other monies from a person in Georgia in connection with the purchase or sale of TASER common stock; (e) purchased or sold TASER common stock from its Atlanta, Georgia office; (f) wired or otherwise electronically transferred money to Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options; (g) received a wire or other electronic transfer of money from Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options; (h) sent account statements or other documents reflecting the purchase, sale or ownership of TASER common stock or options to Atlanta, Georgia; (i)

submitted a TASER proxy vote on behalf or as broker for a person in Georgia and

(j) sent correspondence relating to TASER to the SEC's Atlanta, Georgia office.

49.

Defendant Merrill Lynch Professional Clearing Corporation ("ML

Professional Clearing Corp.") is a business corporation organized under the laws of

Delaware with its principal place of business in Chicago, Illinois.  ML Professional

Clearing Corp. wholly owns and operates the PAX Division of ML Professional

Clearing Corp, which provides clearing services for ML Clearing Corp and is

expressly included in this Complaint through the claims against ML Professional

Clearing Corp.  ML Professional Clearing Corp. is registered to conduct business

in Georgia, conducts business in or that impacts Georgia, and/or maintains an

office in Fulton County, Georgia.

50.

Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank") is a business

corporation organized under the laws of Delaware with its principal place of

business in New York, New York. Deutsche Bank is registered to conduct business

in Georgia, maintains an office in Fulton County, Georgia, and may be served with

process through its registered agent, CT Corporation System, 1201 Peachtree St.,

NE, Atlanta, Georgia.  Deutsche Bank admits that during the relevant time period

it has: (a) maintained an office in Georgia; (b) conducted business in Georgia; (c)

purchased or sold TASER common stock on behalf of or as an agent of a person in

Georgia; (d) sent account statements or other documents reflecting the purchase,

sale or ownership of TASER stock to persons in Georgia; (e) sent account

statements or other documents reflecting the borrowing, loaning or voting of

TASER common stock to Georgia; (f) submitted a TASER proxy vote on behalf of

or as broker for a person in Georgia; (g) sent correspondence to the SEC's Atlanta,

Georgia office relating to TASER.

51.

Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a

business corporation organized under the laws of Delaware with its principal place

of business in New York, New York.  Credit Suisse is registered to conduct

business in Georgia, conducts business in or that impacts Georgia and/or maintains

an office in Fulton County, Georgia.  Indeed, Credit Suisse admits that during the

relevant time period it has: (a) maintained an office in Georgia; (b) conducted

business in Georgia; (c) purchased or sold TASER common stock on behalf of or

as an agent of a person in Georgia; (d) borrowed securities traded on NASDAQ

from a person in Georgia; (e) sent or received correspondence regarding TASER

common stock from its Atlanta, Georgia office; (f) facilitated or engaged in short

sales of TASER common stock from its Atlanta, Georgia office; (g) sent or

received information pertaining to a short of TASER common stock from its

Atlanta, Georgia office; (h) received a wire or other electronic transfer of money from Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options; (i) sent account statements or other documents reflecting the purchase, sale or ownership of TASER common stock or TASER options to Atlanta, Georgia and (g) sent correspondence to the SEC's Atlanta, Georgia office relating to TASER.

52.

Defendant Banc of America Securities, LLC ("Banc of America") is a business corporation organized under the laws of Delaware with its principal place of business in San Francisco, California. Banc of America is registered to conduct business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, CT Corporation System, 1201 Peachtree St., NE, Atlanta, Georgia.  Banc of America admits that during the relevant time period it has: (a) maintained an office in Georgia; (b) conducted business in Georgia; (c) purchased or sold TASER common stock on behalf of or as an agent of a person in Georgia; (d) received fees, commissions, interest or other monies from a person in Georgia in connection with the purchase or sale of TASER common stock and (e) received a wire or other electronic transfer of money from Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options; (f) sent account statements or other documents reflecting

the purchase, sale or ownership of TASER common stock or TASER options to Atlanta, Georgia and (g) sent correspondence to the SEC's Atlanta, Georgia office relating to TASER.

53.

Defendant UBS Securities, LLC ("UBS") is a business corporation organized under the laws of Delaware with its principal place of business in Stamford, Connecticut.  UBS is registered to conduct business in Georgia, maintains an office in Fulton County, Georgia, and may be served with process through its registered agent, Corporation Service Company, 40 Technology Parkway South, #300, Norcross, Georgia 30092.  UBS admits that during the relevant time period it has:  (a) maintained an office in Georgia; (b) conducted business in Georgia; (c) purchased or sold TASER common stock on behalf of or as an agent of a person in Georgia; (d) received fees, commissions, interest or other monies from a person in Georgia in connection with the purchase or sale of TASER common stock and (e) received a wire or other electronic transfer of money from Georgia relating to the purchase, sale, loan or borrowing of TASER common stock or options.

54.

Defendants John Does 2-10 are affiliaties, subsidiaries, parents or other entities related to these defendants who engaged in the conduct set forth throughout this Complaint.

55.

On information and belief, each of the defendants currently conducts business in the state of Georgia.  On further information and belief, the defendants have either: (1) initiated short sale transactions of TASER stock in the state of Georgia; (2) engaged in a short sale of TASER stock in Georgia; (3) received funds from the short sale of TASER stock in Georgia; or (4) had customers in Georgia who requested that the defendants participate in short sales of TASER stock on their behalf.

56.

Jurisdiction is proper in this Court pursuant to Ga. Const. art. VI, § 3, ¶ 1 and O.C.G.A. § 15-7-4.

57.

Venue is proper in this Court pursuant to Ga. Const. art. VI, § 2, ¶ 6.

## STATEMENT OF THE RELEVANT FACTS

### A.   Background of the Parties and Conspirators

58.

Each of the plaintiffs currently owns, or has during the relevant time frame owned, TASER stock.  Each of the plaintiffs purchased and sold TASER stock during the time period at issue in this Complaint.  When the plaintiffs sold their TASER stock, it was sold at an artificially and unlawfully depressed price as a result of the defendants' unlawful conduct as more fully described herein.

59.

Plaintiffs' allegations relate to conduct that occurred in or affected persons in Georgia in at least the following ways: (1) many of the plaintiffs purchased TASER stock through brokers in Georgia; (2) many of the plaintiffs suffered damage in Georgia; (3) many of the plaintiffs live in Georgia; (4) unlawful naked short sale transactions were initiated in Georgia or were undertaken on behalf of Georgia residents; (5) on information and belief, artificial and/or counterfeit TASER shares were bought, sold or delivered in Georgia; (6) defendants sent money to or received money from Georgia in connection with the purchase, sale, loan or other transfer of TASER stock; (7) documents relating to TASER were sent to or received from Georgia; (8) TASER proxy votes were sent from Georgia or on

behalf of Georgia residents and (9) many of the defendants' Atlanta, Georgia offices were involved in the purchase, sale, loan or borrowing of TASER stock.

60.

The defendants are "clearing firms," "prime brokers" and purported "market makers" who, among other things: (a) loan or purport to loan stock, including TASER stock, to their clients and others to complete short sales; (b) engage in and facilitate trades of securities, including TASER stock, on behalf of their clients; (c) trade stock for their own proprietary accounts; (d) purport to be bona fide market makers, including in TASER stock; (e) conduct market making transactions in options, including options involving TASER stock; and (f) purport to give and/or receive "locates" to and/or from other defendants in order to engage in and facilitate short sales of securities, including TASER stock.

61.

The Depository Trust Company ("DTCC") and its subsidiary, the National Securities Clearing Corporation ("NSCC"), are relevant non-parties.

The DTCC is an electronic system for the clearance and settlement of securities transactions.  It was created in 1974 for, *inter alia*, "prompt and accurate

clearance and settlement of securities transactions" as "necessary for the protection of investors."[11]

Today, the DTCC is the country's only national clearance and settlement system.  Since 1999, the DTCC has controlled virtually all of the U.S. trade clearance and settlement processing of real stock issued by corporations that is held in brokerage accounts.

62.

In 1981, further efforts were made to increase the speed of the settlement trade process through the advent of the DTCC stock borrow program.  That program created a massive lending pool of shares from brokers' client margin accounts (*i.e.*, brokerage accounts in which the broker lends the customer cash to purchase securities, which are securitized by both securities and cash), which facilitated securities trades as follows:  If a prime broker is unable to deliver stock it sold within the three-day settlement date, the prime broker could obtain shares to

---

[11] Section 17(a) of the Securities Exchange Act states: "New data processing and communications techniques create the opportunity for more efficient, effective, and safe procedures for clearance and settlement.  ***The prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors*** and persons facilitating transactions by and acting on behalf of investors.  The linking of all clearance and settlement facilities and the development of uniform standards and procedures for clearance and settlement will reduce unnecessary costs and increase the protection of investors and persons facilitating transactions by and acting on behalf of investors." (emphasis added).

provide to the purchaser from the DTCC borrowing pool, allowing the trade to clear.  When operated properly, the prime broker who sold the stock will replace the shares it owes to the DTCC.  But, as described in detail throughout this Complaint, the defendants have conspired to violate the requirement that they actually deliver shares they owe to the DTCC.

63.

The defendants, as owners of the DTCC, have significant involvement and communication with, as well as influence over, the DTCC.  For example, the defendants act as "DTCC member clearing firms," meaning that they are informed by the DTCC of the clearing and settling of trades and purportedly they assure that paperwork associated with a securities transaction is accurate.  Further, all of the defendants are part owners of the DTCC, with the largest firms owning the greatest share of the DTCC.  The defendants also have involvement with and influence over the DTCC's Board of Directors.  For example, in 2006, Diane L. Schueneman of Merrill Lynch & Co. and Randolph Cowen of Goldman Sachs were members of the DTCC's board of directors.  Thus, the defendants directly communicate with and have influence over the DTCC regarding securities transaction settlements, including short sales.  Defendants are also able to process transactions outside of the DTCC to, *inter alia*, avoid the requirement that they deliver shares that otherwise would be owed.

64.

Collectively, the defendants control approximately 78% of the prime

brokerage market in the United States in terms of aggregate client assets.  Upon

information and belief, (i) Morgan Stanley is the largest prime broker, with 23.1%

of the prime brokerage market, (ii) Bear Stearns is the second largest prime broker,

with 20.9% of the prime brokerage market, (iii) Goldman Sachs is the third largest

prime broker, with 16.5% of the prime brokerage market, (iv) UBS is the fourth

largest prime broker, with 5.9% of the prime brokerage market, (v) Merrill Lynch

is the fifth largest prime broker, with 4.6% of the prime brokerage market, (vi)

Deutsche Bank is the eighth largest prime broker, with 2.5% of the prime

brokerage market, (vii) Credit Suisse is the ninth largest prime broker, with 2.2%

of the prime brokerage market and (vii) Banc of America is the tenth largest prime

broker, with 2.0% of the prime brokerage market.

### B.    The Mechanics of Short Sales and Naked Short Sales

65.

The defendants, as prime brokers, play an integral role in short sale

securities transactions.  Among other things, the defendants are responsible for

locating shares of the shorted stock, borrowing the shorted stock, and delivering

the shares by the three-day settlement date.

801481.1

66.

As discussed in the Nature of the Case section above, in a typical short selling transaction, a short seller speculates that the price of a stock will decline, and seeks to profit from that expected decline.  To accomplish this, the short seller borrows shares of the subject company's stock, and sells those borrowed shares on the open market at the existing price.  The short seller purchases the subject company's stock at a later date, and provides those purchased shares to the lender. If the short seller's speculation that the stock price will decline is correct, the short seller will earn as profit the difference between the higher price it sold its shares and the lower price it subsequently purchased them.

67.

Typically, a client seeking to engage in a short sale will contact one of the defendants and request to short sell, for example, TASER stock.  Because the short seller is required under securities regulations to obtain and deliver the TASER stock it is selling short by the settlement date, the short seller will often borrow the TASER stock from one of the defendants.  In a lawful transaction, the defendant will loan the short seller (either directly to the seller or on its behalf) TASER shares that it obtains from its own inventory or other prime brokers, and then the short seller will convey those borrowed shares through the DTCC to complete the

short sale transaction.  The defendants will charge the short seller a fee and interest

for the loan of the TASER stock.  The selling broker is required to mark the order

ticket as a short sale and document the source of the securities that will be

borrowed to complete settlement of the short sale transaction.

68.

Like all stock transactions, short sale transactions should be cleared and

settled through the DTCC.  The DTCC becomes the contractual counter party

(middleman) to each side of the transactions.  In other words, when a short seller

sells TASER stock to a purchaser, the seller does not owe the stock to the

purchaser.  Rather, the seller owes the shares it sold to the DTCC, and the

purchaser is owed the shares it purchased by the DTCC, the counter party.

69.

Significantly, purportedly to protect bona fide purchasers, the DTCC

provides the purchaser an electronic entry for the TASER stock it purchased, with

its full value and rights, ***regardless of whether the short seller delivers TASER***

***shares to the DTCC***.  If the short seller does not deliver TASER shares, the

transaction is marked by the DTCC as "open," awaiting delivery in the DTCC

system from the short seller, and the short sale is a naked short sale, which is not

backed by assets of TASER.

70.

When a purchaser requests delivery of shares and the DTCC cannot deliver because it has insufficient real shares of a security, then the DTCC records the shares as "fails to deliver" or "fail" in the DTCC system.

71.

This practice is evidenced in TASER stock when, for example, in mid December 2004, long-term reported short sales (*i.e.*, short interest[12]) had amassed to 30 million shares but fails to deliver were reported to be only 8.1 million shares. In other words, 22 million undelivered shares were awaiting delivery within the DTCC system and 8.1 million shares could not be delivered by the DTCC.

72.

When a "fail" occurs in the DTCC system, the short seller remains obligated to settle it by delivering the shares to the DTCC.  But, in many cases, the defendants simply leave the "fail" open indefinitely, a direct result of the defendants' conspiracy to not require each other to settle delivery failures.

---

[12] NASDAQ provides the following definition of short interest: "The total number of shares of a security that have been sold short by customers and securities firms that have not been repurchased to settle short positions in the market."

73.

In those instances where a short seller fails to deliver shares to the DTCC (*i.e.*, engages in a naked short sale), it has, in effect, created and sold unauthorized, artificial and/or counterfeit shares.

74.

By way of illustration using TASER stock:  Short Seller X sells 100 shares of TASER stock to Purchaser Y, but never delivers those shares to the DTCC. Because Purchaser Y receives electronic evidence of the transfer of the shares from the DTCC regardless of whether Short Seller X actually delivers them, Purchaser Y has received electronic evidence of the transfer of shares that, prior to the transaction, did not exist.  These shares have never been borrowed and cannot reasonably be "bought in" from a marketplace that is overly short sold, because there are not sufficient TASER shares available to loan or purchase to complete delivery.  Despite this fact, the 100 artificial and/or counterfeit TASER shares provided to Purchaser Y through an electronic entry in Purchaser Y's account remain tradable in the market, diluting the value of the authorized shares actually issued by TASER.  Indeed, these 100 artificial and/or counterfeit shares can be re-loaned and counterfeited continuously by the defendant brokers through the DTCC's electronic booking system, increasing the harm to TASER investors.  This

is evidenced by this SEC statement: "At times, the amount of fails to deliver may

be greater than the total public float."[13]

75.

Defendants' failures to deliver and/or receive the securities of TASER and

other publicly traded corporations were not limited to DTCC failures, but also

included ex-clearing fails outside of the DTCC system and other trades, including,

but not limited to, conversions, reverse conversions, flips and flex options.

**C.   Naked Short Selling is Harmful and Illegal**

76.

It is unlawful and illegal for a prime broker to engage in naked short selling.

Indeed, the SEC, which regulates federal securities laws that are substantially

similar to Georgia's Securities Act, has explicitly stated "selling stock short and

failing to deliver shares at the time of settlement with the purpose of driving down

the security's price" constitutes a "manipulative activity" that "in general, would

violate various securities laws." *See www.sec.gov/spotlight/keyregshoissues.htm*;

*see also* SEC Release No. 34-.57511, p. 3, File No. S7-08-08 (Mar. 17, 2008).

Prior to the adoption of Regulation SHO by the SEC in 2005, defendants' naked

short selling activities described herein violated, *inter alia*, Uniform Practice Code

---

[13] Federal Register, Vol. 68, No. 215, Thursday, November 6, 2003, Proposed
Rules Securities and Exchange Commission 17 CFR Parts 240 and 242 [Release
No. 34–48709; File No. S7–23–03] RIN 3235–AJ00 Short Sales.

Section 71, 17 C.F.R. 240.15c3-3, 15 U.S.C. § 78j, Rule 10b-5 and NASD Rules

3310, 3370, 11830.  Since 2005, defendants' naked short selling activities

described herein violated those rules and Regulation SHO.

77.

Naked short selling is unlawful and illegal for numerous reasons, as recently

articulated by the SEC:

> …we are concerned that large and persistent fails to deliver may have a
> negative effect on the market in these securities.  For example, large and
> persistent fails to deliver may deprive shareholders of the benefits of
> ownership, such as voting and lending.  In addition, where a seller of
> securities fails to deliver securities on trade settlement date, in effect the
> seller unilaterally converts a securities contract (which should settle within
> the standard 3-day settlement period) into an undated futures-type contract,
> to which the buyer may not have agreed, or that may have been priced
> differently.  Moreover, sellers that fail to deliver securities on trade
> settlement date may enjoy fewer restrictions than if they were required to
> deliver the securities within a reasonable period of time, and such sellers
> may attempt to use this additional freedom to engage in trading activities
> that deliberately and improperly depress the price of a security.
>
> In addition, many issuers and investors continue to express concern
> about extended fails to deliver in connection with "naked" short selling.  To
> the extent that large and persistent fails to deliver might be indicative of
> manipulative "naked" short selling, which could be used as a tool to drive
> down a company's stock price, fails to deliver may undermine the
> confidence of investors.  These investors, in turn, may be reluctant to
> commit capital to an issuer they believe to be subject to such manipulative
> conduct.  In addition, issuers may believe that they have suffered
> unwarranted reputational damage due to investors' negative perceptions
> regarding large and persistent fails to deliver.  Any unwarranted reputational
> damage caused by large and persistent fails to deliver might have an adverse
> impact on the security's price.

78.

One of the primary harms caused by naked short selling is the dilution of a company's legitimate, authorized stock.  These new shares dilute the value of authorized shares (including both the monetary value and voting rights), depressing the stock's price.

**D.      Mechanisms Through Which The Defendants Engage In and/or Conceal Naked Short Sales**

79.

The defendants have and continue to knowingly, intentionally and willfully violate securities and other laws and regulations in connection with short sales of TASER stock and other securities.  The defendants' unlawful and illegal conduct includes, but is not limited to, the following:

(i)      <u>Naked Short Selling On Behalf Of Clients</u> – The defendants have knowingly and intentionally accepted and facilitated short sales of publicly-traded securities, including TASER stock, for their clients at times when the defendants neither possessed nor intended to obtain through borrowing sufficient stock to loan to those clients for delivery by the settlement date.  The defendants' decision to engage in and facilitate short sales while knowing and intending that they would not deliver that stock by the settlement date is a willful violation of, *inter alia*, securities laws and regulations.

(ii)   <u>Naked Short Selling In the Defendants' Proprietary Accounts</u> – The defendants maintain their own proprietary accounts, from which they conduct stock transactions on their own behalf.  Upon information and belief, the defendants have engaged in short sales of the securities of numerous publicly traded corporations, including TASER, at times during which they neither possessed nor intended to obtain sufficient stock to deliver by the settlement date (if ever).  The defendants have thus knowingly, willfully and intentionally sold short "without having stock available for delivery and intentionally failing to deliver stock within the standard three day settlement cycle," in willful violation of securities and other laws and regulations.

(iii)   <u>Giving and Receiving False Locates</u> – When a customer or prime broker seeks to sell a stock short, the prime broker or customer must first determine whether there are shares available for borrow.  When it does not itself have shares available for borrow, the prime broker must ask other prime brokers whether they have shares available to lend and deliver.  When one prime broker affirmatively states that it has shares available to lend and deliver, that is referred to as giving a "locate."  The defendants have conspired to give and receive false "locates" that they knew would not likely deliver the located shares if requested.  As an example, defendants improperly provided locates for TASER securities on the same dates for which they were failing to deliver TASER securities (*i.e.*,

defendants were saying they had TASER securities available for lend to facilitate additional short selling at the same time they did not even have sufficient TASER securities to cover past sales).  As another example, defendants claimed to receive locates from other defendants (or non-party banks) on dates when those other defendants (or non-party banks) did not possess sufficient TASER securities to cover the alleged locate.  Defendants also accepted locates they knew were unreliable.

(iv)   <u>Permitting Indefinite Delivery Fails</u> – When a short seller fails to deliver stock by the settlement date, the DTCC system indicates that a "fail" occurred.  Under DTCC rules, only the purchaser (or the defendant prime broker representing it) has the ability to force the short seller to deliver the shares and clear out the "fail" position.  The defendants, however, have conspired and agreed not to require each other to clear out "fails"; instead permitting "fail" transactions to remain unfulfilled indefinitely.  This practice facilitates naked short sales by eliminating the need for a defendant to actually locate TASER stock before loaning or selling TASER stock in conjunction with a short sale.

(v)   <u>Providing Artificial/Phantom Shares for Loans of TASER's Stock to Cover Short Sales</u> – The defendants have purported to loan TASER stock (and other companies' stock) to their clients and others to complete short sales at times when defendants neither possessed, nor had any intention of obtaining, sufficient

authorized stock to cover those loans.  The defendants' ability to engage in these phantom stock loans is the direct result of their knowing and willful decision to violate securities laws and regulations requiring them to deliver shares by the settlement date.  Indeed, if the defendants abided by the securities laws and regulations, the fact that they did not actually loan stock to the short seller would be revealed on the settlement date, when they are unable to deliver the loaned stock on the short seller's behalf.  However, since the defendants have conspired to violate the delivery requirement, the phantom stock loans are concealed.

(vi)   <u>False Documentation</u> – In an effort to conceal their naked short sales, the defendants have created false documentation regarding their trading, loaning and ownership of TASER stock.   For example, defendants are required to complete an order ticket with respect to each securities transaction they engage in. These order tickets, *inter alia*, permit securities regulators to determine the amount of short sales the defendant prime broker is engaging in with respect to a particular stock, and to whom the short sales are made.  The defendant brokers, however, have knowingly and intentionally mismarked order tickets to make transactions appear as "long" sales when, in fact, they are short sales.  Indeed, as stated above, the defendants have repeatedly been fined by securities regulators for that conduct. Defendants have also provided inaccurate and false blue sheets to regulators which conceals their unlawful conduct.

(vii)   <u>Concealment by Trading Off the Market</u> – To conceal their naked short sales and failures to deliver, the defendants, as executing and/or clearing brokers, have engaged in significant amounts of trading of TASER shares off of the NASDAQ market where TASER is listed.  Off market sales are made through various third markets and electronic communication networks, "which provide anonymity to traders wishing to conceal their identity from the market".[14]  This conduct facilitates naked short sales by allowing defendants to circumvent oversight from the NASDAQ stock market and permitting them to engage in naked short selling anonymously.[15]

80.

In addition to the unlawful and illegal conduct cited above, the defendants have also conspired to illegally utilize the DTCC's stock borrow program to facilitate naked short selling as follows:

---

[14] United States District Court Southern District Of New York, Securities and Exchange Commission, Plaintiff,  v. Rhino Advisors, Inc. and Thomas Badian.

[15] Plaintiffs have also described the "Conduct at Issue" in this case in a stipulation filed on May 6, 2010 and in their interrogatory responses.  *See* Ex. A to May 6, 2010 Stipulation and Order.  Plaintiffs fully incorporate herein and allege that each of the activities identified in those documents was used by each Defendant to engage in, facilitate, conceal or otherwise effectuate the unlawful conduct and conspiracy.

**Short Sale Through the DTCC Stock Borrow Program**



A.    Purchaser Y seeks to purchase 1 million dollars in TASER

stock, and thus places a purchase order with Defendant Prime

Broker Y to purchase that stock.

B.    Defendant Prime Broker Y does not own 1 million dollars worth of

TASER and short sells the shares to Purchaser Y *without first locating*

*actual TASER shares to borrow and deliver to Purchaser Y to*

*complete the short sale.*  Defendant Prime Broker Y informs

Purchaser Y that its purchase has been made, and collects 1 million dollars from Purchaser Y.

C.   Because Defendant Prime Broker Y did not and cannot locate actual TASER shares before making the sale to Purchaser Y, it cannot deliver the 1 million dollars in TASER shares on the settlement date.

D.   Defendant Prime Broker Y then seeks to obtain the shares through the DTCC's stock borrow program.

E.   When the request is made, the DTCC automated stock borrow program sees that in its borrowing pool, Prime Broker Z, holds 1 million dollars in TASER shares for Shareholder Z.

F.   The DTCC then takes 1 million dollars in collateral from Defendant Prime Broker Y and "temporarily" borrows the 1 million dollars in TASER shares from Prime Broker Z (who is holding Shareholder Z's shares), lending those shares to Defendant Prime Broker Y to deliver to Purchaser Y.

G.   Although the DTCC has lent Shareholder Z's TASER shares to Purchaser Y, Shareholder Z's brokerage account statement will continue to show that it holds 1 million dollars in TASER shares.

H.   Until Defendant Prime Broker Y delivers TASER shares to the DTCC to return to Prime Broker Z, **both** Purchaser Y and Shareholder Z

account statements show that they hold 1 million dollars in TASER stock in their broker's beneficial trading records.[16]  In reality, however, 2 million dollars worth of TASER stock show in brokerage account statements but only 1 million dollars worth of real TASER stock actually exists.

I.     If Defendant Prime Broker Y never delivers the TASER shares to the DTCC, then both Purchaser Y and Shareholder Z will perpetually show ownership of 1 million dollars in TASER shares in the defendant prime brokers' beneficial trading records.  Thus, both Purchaser Y and Shareholder Z will each have the ability to trade and vote with respect to 1 million dollars of TASER stock.  As a result, 1 million dollars in TASER shares will have been counterfeited.

---

[16] The DTCC inventory reported to TASER, however, show that only Purchaser Y owns the shares since the DTCC lent Prime Broker Z's shares to Purchaser Y.  For this reason, DTCC records do not accurately reflect true share ownership and two holders now own the same share.

801481.1

## Multiplying the Same 1 Million Dollars Worth of TASER Stock



**Purchaser Y** and **Prime Broker Y** now possess the rights of the $1 million worth of TASER stock and the ability to lend the shares

**Purchaser W** seeks to purchase $1 million of TASER stock

**Prime Broker W** short sells the TASER shares to Purchaser W – Prime Broker W borrows shares from the DTCC

**The DTCC Stock Borrow Program** loans the stock to Prime Broker W from Prime Broker Y who borrows from Purchaser Y

**Prime Broker Y**

**Purchaser Y**

**Purchaser W's Brokerage Statement** shows $1 million worth of TASER stock

$1 Million worth of TASER stock

**Purchaser Y's Brokerage Statement** shows $1 million worth of TASER stock

**Shareholder Z's Brokerage Statement** _still_ shows $1 million worth of TASER stock

The ownership rights are transferred to **Purchaser W** and **Prime Broker W**. They can now relend the same $1 million of TASER stock

**E.**  **Evidence of the Defendants' Conspiracy To Engage In, Facilitate and Profit From Naked Short Selling**

81.

As discussed in detail below, there is significant evidence that the defendants have engaged and continue to engage in unlawful naked short selling of TASER stock and other securities, including, but not limited to: (i) the securities regulators repeatedly sanctioning the defendants for illegal conduct in connection with short selling of scores of companies' securities; (ii) the excessive number of "fails" of delivery of TASER stock; (iii) the exchange trading records which reveal that the defendants have traded TASER stock far in excess of their inventory or available shares; (iv) the beneficial trading records purporting to show defendants' own TASER stock far in excess of their inventory; and (v) the over voting of TASER shares at TASER annual meetings.  Additional evidence is set forth in Plaintiffs' interrogatory responses.

82.

**The Defendants Have Repeatedly Been Sanctioned By Securities Regulators** – As discussed above, securities regulators have repeatedly fined defendants for conduct that would be illegal under the Georgia Securities Act and other Georgia laws.  To cite several examples, securities regulators have sanctioned defendants for: (i) failing to ensure compliance with the requirement that delivery be made on the settlement date; (ii) incorrectly netting short interest positions against longs;

(iii) submitting inaccurate trade tickets; (iv) failing to supervise compliance with laws regarding Reg. SHO, Rule 15c3-3, blue sheet reporting, locates/affirmative determinations and reporting.

83.

**Excessive "Fails" Of Delivery Of TASER Stock** - Over the last approximately five years, the number of legitimate, outstanding shares of TASER stock has been as follows:

| Date | Number of Shares Outstanding | Reason for Change in Outstanding Shares |
|---|---|---|
| **January 14, 2004** | **4,224,900** | **Issued by company** |
| **February 27, 2004** | **14,066,688** | **3 for 1 stock split** |
| **April 30, 2004** | **28,321,612** | **2 for 1 stock split** |
| **November 30, 2004** | **59,296,388** | **2 for 1 stock split** |
| **January 1, 2008** | **Approximately 60,000,000** | |

84.

The SEC has passed and implemented regulations to address the harm caused by abusive naked short selling. Under SEC regulations, a stock is considered a "threshold security" that is vulnerable to manipulation from short sales if there are "fails" (*i.e.*, instances in which a seller did not deliver the stock to the DTC by the three-day settlement date) of 10,000 shares and greater than 0.5%

801481.1

58

of its outstanding shares for five consecutive days.  Using the numbers above, the

number of delivery fails that would have placed TASER on the threshold list are

approximately as follows:

| Date | Number of Shares to Make Threshold List | Calculation (outstanding shares x 0.005) |
|---|---|---|
| Jan. 14, 2004 to Feb. 11, 2004 | 21,125 shares | 4,224,900 x 0.005 |
| Feb. 12, 2004 to April 29, 2004 | 70,333 shares | 14,066,688 x .0.005 |
| April 30, 2004 to Nov. 29, 2004 | 141,608 shares | 28,321,612 x 0.005 |
| Nov. 30, 2004 to present | 300,000 shares | 60,000,000 x 0.005 |

85.

During the relevant time frame, the number of "fails" of TASER stock well

exceeded the amount necessary to characterize TASER stock as a threshold

security vulnerable to manipulative short sales.  As just some examples:

| Settlement Date | Aggregate Fails |
|---|---|
| 4/5/2004 | 1,657,103 |
| 5/6/2004 | 1,772,792 |
| 8/3/2004 | 3,195,387 |
| 9/20/2004 | 5,490,327 |

| | |
|---|---|
| 12/6/2004 | 8,102,052 |
| 1/26/2005 | 5,452,323 |
| 3/9/2005 | 2,462,688 |
| 5/18/2005 | 2,403,592 |
| 8/5/2005 | 1,391,099 |
| 12/30/2005 | 2,239,667 |
| 3/10/2006 | 1,942,521 |
| 8/3/2007 | 2,355,709 |
| 8/6/2007 | 2,269,254 |

86.

In fact, TASER had such a large and persistent number of fails to deliver that it was on the threshold security list the first 379 trading days after the original list was published in January 2005.   Defendants' pattern of failing to deliver TASER's shares for proper settlement continued on virtually a daily basis through July 2008.

87.

The consistent presence of "fails" vastly in excess of the threshold minimum demonstrates that the defendants have simply made no real, legitimate effort to borrow or otherwise obtain TASER stock when facilitating or engaging in short sales.  Instead, defendants – conspiring to violate securities laws, and agreeing to violate the requirement that they deliver actual shares by the three-day settlement

date – have chosen to short sell TASER stock with no intention of ever obtaining that stock and delivering it to the DTCC.

88.

Defendants also turned a blind eye to other defendants' illegal short-selling activities.  Throughout the five-year period that defendants were failing to deliver TASER securities, there was a lack of supply of TASER shares to be borrowed or loaned for short selling in the public marketplace.  Despite being aware of this fact, defendants engaged in a pattern of permitting, facilitating or engaging in unlawful and manipulative abusive naked short sales of TASER securities.  These activities included not only executing unlawful short sales, but facilitating and aiding and abetting those sales by other defendants through, among other things, failing to locate or have reasonable grounds to believe that it could borrow or obtain securities for delivery by the settlement date, giving false or sham locates, mismarking tickets, failing to conduct buy ins and facilitating, permitting and/or engaging in conversions, reverse conversions, flips and/or flex options.

89.

Defendants permitted their clients with a history of failing to deliver (or otherwise acting unlawfully) to engage in short sales of TASER and other securities without reasonable grounds to believe the client could deliver the security.

90.

Throughout this time period, defendants took unlawful steps to conceal their illegal conduct through derivative swap contracts, conversions, reverse conversions, swaps, "exits" from CNS, wash trades, option contracts and other derivatives, moving fails out of the DTCC system without delivering shares for settlement, intracompany loans and other intracompany transactions, inter-subsidiary transactions, offshore trading that concealed short sales as long sales, and improper reliance on market maker exemptions.

91.

**Excessive Trading Volume For TASER Stock -**  Trading activity further evidences the existence of and defendants' participation in naked short selling of TASER stock.  Indeed, an examination of daily trading volumes reveals that TASER stock is frequently traded in excess of the outstanding shares at the time. For example, when approximately 14 million and 28 million shares were outstanding, daily trading volume was:

| Date | Number of Legitimate TASER shares (approx) | Number of TASER shares traded (approx) |
|---|---|---|
| April 20, 2004 | 14,247,806 | 32,400,000 |
| April 21, 2004 | 14,247,806 | 33,700,000 |
| June 25, 2004 | 28,321,612 | 42,000,000 |

801481.1

| June 28, 2004 | 28,321,612 | 63,300,000 |
| June 29, 2004 | 28,321,612 | 30,200,000 |

When approximately 60 million shares were outstanding, trading grew to:

| Date | Number of Legitimate TASER shares (approx) | Number of TASER shares traded (approx) |
| --- | --- | --- |
| January 11, 2005 | 60,000,000 | 64,700,000 |
| January 12, 2005 | 60,000,000 | 54,800,000 |
| January 13, 2005 | 60,000,000 | 69,900,000 |

92.

The volume of trading reflected above is an extraordinarily high volume of trading compared to the shares outstanding for any security.  To compare the magnitude of this trading, the average *annual* turnover rate of the shares outstanding for a NYSE traded company from 2003 – 2006 was 1.03 times and for the same period the average *annual* turnover rate for NASDAQ listed companies was 2.6 times per year.  For TASER, the annual turnover rate during various periods was in excess of 100 times the outstanding shares.  With stock unavailable for borrowing in significant amounts during this period, the frenetically high volume of trading activity is strong evidence that many trades were neither long transactions (actual delivery of shares) nor covered short sales (where borrowing

had been arranged in advance of the sale for delivery).  Simply put, the high

volume reflects naked short sales that the defendants either engaged in or

facilitated.

93.

**The Defendants' Beneficial Trading Records Reveal Claimed Ownership Well**

**In Excess of Actual Shares** – As discussed in paragraph 8 above, the defendants

claim on their beneficial records to own TASER shares for themselves or their

clients well in excess of their actual inventory.

94.

**Over Voting of TASER Stock** – Additional evidence of naked short selling of

TASER stock is the excessive amount of over votes the company receives during

its annual meeting.  For example, in 2005, approximately 82 million

"shareholders" voted in conjunction with TASER's annual shareholder meeting.

But, at that time, the company had only authorized and issued 61.1 million shares

and approximately 17.2 million shares were short.  Even if all of the TASER

shares that were sold short were able to vote, the total number of votes would still

only be 78.3 million (61.1 million shares outstanding + 17.2 million short shares).

The fact that 82 million votes were received – 3.7 million more than the

outstanding shares plus all shorted shares – indicates that there were at least 3.7

million shares (82 million – 78.3 million) that were undoubtedly counterfeit. Those shares substantially dilute the value of legitimate TASER shares.

95.

Defendants also acted improperly, unlawfully and illegally to the extent they acted as purported market makers and/or options market makers in TASER and other securities and to the extent they unlawfully allowed their clients to claim the bona fide market maker or options market maker exception. Defendants, as market makers and otherwise, have a duty to protect investors and issuers of stock from fraud and to protect the integrity of the self-regulated marketplace. Because of their positions as gatekeepers to the public markets, defendants have a responsibility to ascertain that they are not selling unregistered securities. Defendants also had a duty to inquire about, report and, where appropriate, prevent suspicious activity in the trading of TASER and other publicly traded securities. At a minimum, defendants were not permitted to allow facilitate and/or engage in trading that they knew was improper.[17]

---

[17] *See, e.g.,* SEC Press Release August 5, 1999 ("The Commission's Order finds that Bear Stearns took actions that directly facilitated Baron's widespread fraudulent activity. A firm's status as a clearing broker does not immunize it from the consequences of participating in a fraud. To the contrary, a clearing firm, or any other market participant, that engages in conduct enabling a boiler room like Baron to defraud investors or millions of dollars is fully responsible for its actions.").

96.

Moreover, defendants' illegal short selling activity is not limited to TASER securities, but rather is part of a pattern of unlawful and improper conduct of illegal naked short selling which includes improper transactions of the nature described above in the securities of other companies.  *See, e.g.*,  *SEC v. Goldman Sachs Execution & Clearing, L.P.*, File No. 3-12590 (2007); *Goldman Sachs Execution & Clearing, L.P. f/k/a Spear, Leeds & Kellogg, L.P.*, NYSE Hearing Board Decision: 07-033, March 14, 2007; NASD Fines Morgan Stanley Firms $2.9 Million for Widespread Violations of NASD Rules Number and Scope of Violations Indicate Extensive Reporting Problems at Both Firms, NASD NTM Disciplinary Actions October 2006; *In The Matter of Morgan Stanley & Co., Inc*., Case Nos. 05-185 (AMEX March 13, 2007).

**F.     The Defendants' Naked Short Selling Has Injured Plaintiffs**

97.

The defendants' unlawful conduct, described in part above, has and continues to cause legitimate TASER shareholders, like plaintiffs, harm.  In particular, the defendants' persistent and unlawful naked short selling has resulted in the creation and circulation of tens of millions of artificial and/or counterfeit TASER shares, which dilute the value of legitimate, authorized TASER stock, and

801481.1

thereby artificially depress the stock price.  In addition, the counterfeit TASER shares deprive legitimate, authorized TASER shareholders of the economic trading value and their voting and other stock rights.  The defendants' unlawful conduct has also created uncertainty in the market regarding the integrity of TASER stock, causing further stock price depression.  Finally, the defendants' unlawful conduct has harmed TASER by, among other things, electronically issuing TASER treasury shares without authorization or compensation to TASER, limiting TASER's access to capital, lowering its market capitalization, damaging its perception in the market and making it more difficult for the company to expand and/or merge.

98.

While plaintiffs have been harmed by the defendants' unlawful conduct, the defendants have and continue to reap enormous illicit profits.  As described above, the defendants have reaped illicit profits through, among other things, charging fees and interest for "loans" of TASER stock that are never made, obtaining greater profits on their own proprietary short sales and charging transaction fees for trades that could not lawfully be accomplished.

## COUNT ONE

**(Conspiracy and Endeavor to Violate § 16-14-4(a) of the Georgia Racketeer Influenced and Corrupt Organization Act, in Violation of O.C.G.A. § 16-14-4(c))**

99.

Paragraphs 1 through 98 are incorporated by reference as if set forth fully herein.

100.

The defendants, together with others presently known and unknown to the plaintiffs, conspired and endeavored to violate O.C.G.A. § 16-14-4(a) with the object of obtaining personal property, including but not limited to money, directly and indirectly, through a pattern of racketeering activity, in violation of O.C.G.A. § 16-14-4(c). Defendants have also aided and abetted each other in the conspiracy.

**The Pattern of Racketeering Activity**

101.

Achieving the object of the conspiracy and endeavor contemplated and required the commission, attempt to commit, or solicitation of more than two related acts of racketeering activity by each conspirator. Defendants committed, attempted to commit, aided and abetted, solicited, or engaged in numerous related acts of racketeering activity during the course of the conspiracy and endeavor and

801481.1

those acts of racketeering activity proximately caused injury to the plaintiffs.  The acts of racketeering activity include, but are not limited to, those set forth below.

### a.      Securities Fraud (O.C.G.A. § 10-5-24)

#### 102.

Plaintiffs are purchasers of TASER stock.  The plaintiffs either purchased their shares of TASER stock through brokers located in Georgia, initiated their purchases of TASER stock in Georgia, maintained their TASER stock, either personally or through a broker, in Georgia, suffered damage in Georgia or the conduct described below took place, in whole or in part, in Georgia.  All or virtually all of the plaintiffs' purchases of TASER stock were made in the United States.

#### 103.

The market for TASER stock is an efficient market.  Both the market and the plaintiffs have relied upon the assumption of a market for TASER stock that was free from manipulation.

#### 104.

Some of the facts relating to the defendants' scheme and conspiracy to violate the securities laws and/or intentionally manipulate the market in TASER stock are known only to the defendants and uniquely in their possession.

105.

Each defendant has willfully violated, attempted to violate, aided and abetted, solicited another to willfully violate, or has engaged in acts involving violations of the Georgia Securities Act of 1973.  This conduct violated O.C.G.A. § 10-5-24(a).

106.

The defendants' violations of O.C.G.A. § 10-5-24(a) constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(A)(xxi).

107.

By knowingly and intentionally engaging in the conduct described in this Complaint, including the Conduct at Issue (*e.g.,* selling TASER stock short at times when they neither possessed nor intended on obtaining TASER stock to deliver by the settlement date), the defendants have counterfeited and sold TASER stock that is not properly authorized, issued or registered in violation of, *inter alia*, O.C.G.A. §§ 10-5-5, 10-5-12.

108.

Further, by knowingly and intentionally engaging in the conduct described in this Complaint, including the Conduct at Issue (*e.g.,* selling TASER stock short when they neither possessed nor intended to obtain TASER stock for delivery by

the settlement date), defendants made and continue to make, attempted to make,

solicited, and aided and abetted an "untrue statement of a material fact or omitting

to state a material fact necessary in order to make the statements made, in light of

the circumstances under which they are made, not misleading." *See, e.g.,*

O.C.G.A. § 10-5-12.  Indeed, the SEC has expressly noted that naked short selling

involves the omission of a material fact:

> Inherent in the relationship between a dealer and his customer is the vital representation that the customer will be dealt with fairly, and in accordance with the standards of the profession. Duker & Duker, 6 SEC 386, 388 (1939).  At a minimum, he represents that he will act in accordance with reasonable trade custom. Trade custom requires a dealer to consummate transactions with customers promptly, and in every transaction an implied representation to this effect is made, unless there is a clear understanding to the contrary**. If a dealer intends not to consummate a transaction promptly, and fails to disclose this intention to his customer, he omits to state to that customer a material fact necessary to make the above representation not misleading**, in violation of the anti-fraud provisions of the Securities Act and the Exchange Act.

Lewis H. Ankeny, 29 SEC 514, at p. 516 (emphasis added).

### 109.

The defendants, upon information and belief, have engaged in short sale

transactions of TASER stock in their own proprietary accounts.  At the same time,

the defendants have created, loaned and sold counterfeit TASER stock in an effort

to manipulate the market for that stock, depress the stock's price and/or reap illicit

profits from their short sales knowing that there conduct would depress TASER's

price.  Such conduct constitutes a "deceptive or fraudulent device, scheme or

artifice to manipulate the market in a security," in violation of, *inter alia*, O.C.G.A.

§ 10-5-12(d)(6).

110.

The defendants have and continue to make phantom loans of TASER stock

to facilitate short sale transactions.  Those phantom loans constitute, *inter alia*, a

"device, scheme or artifice to defraud in connection with an offer to sell, sale, offer

to purchase or purchase of any security, directly or indirectly," a "deceptive or

fraudulent device, scheme or artifice to manipulate the market in a security" and

"an act, practice or course of business that operates or would operate as a fraud or

deceit upon a person" in violation of O.C.G.A. § 10-5-12.

111.

Each defendant also committed, attempted to commit, aided and abetted,

solicited another to commit, or engaged in acts involving violations of O.C.G.A. §

10-5-24 in at least the following ways:

(a)   Willfully employing a device, scheme or artifice to defraud in

connection with an offer to sell, sale, offer to purchase or purchase of any security,

directly or indirectly;

(b)   Willfully engaging in an act, practice or course of business that

operates or would operate as a fraud or deceit upon a person;

(c)     Willfully effecting a transaction in a security which involves no change in the beneficial ownership of the security for the purpose of creating a false or misleading appearance of active trading in a security or with respect to the market for a security; and/or

(d)     Willfully misappropriating, converting or improperly withholding any funds or other property in connection with an offer or sale of any security.

### b.     Securities Fraud (15 U.S.C. § 78j, Reg SHO, Rule 15c3-3, and Rule 10b-5)

112.

Plaintiffs are purchasers of TASER stock.  The plaintiffs either purchased their shares of TASER stock through brokers located in Georgia, initiated their purchases of TASER stock in Georgia, maintained their TASER stock, either personally or through a broker, in Georgia, suffered damage in Georgia or the conduct described below took place, in whole or in part, in Georgia.  All or virtually all of the plaintiffs' purchases of TASER stock were made in the United States.

113.

The market for TASER stock is an efficient market.  Both the market and the plaintiffs have relied upon the assumption that the market for TASER stock was free from manipulation.

114.

Some of the facts relating to the defendants' scheme and conspiracy to

commit securities fraud and/or intentionally manipulate the market in TASER

stock are known only to the defendants and uniquely in their possession.

115.

By directly or indirectly effecting a short sale of one or more securities

registered on a national securities exchange by the use of the means or

instrumentality of interstate commerce, the mails, or of any national securities

exchange, in contravention of rules and regulations prescribed by the Securities

and Exchange Commission, including, but not limited to, Regulation SHO, 17

C.F.R. § 242.203; Rule 15c3-3, 17 C.F.R. § 240.15c3-3; and Rule 10b-5, 17 C.F.R.

§ 240.10b-5, each defendant has willfully violated, attempted to violate, aided and

abetted, solicited another to willfully violate, or has engaged in acts involving

violations of the Securities and Exchange Act of 1934, as amended.  *See* 15 U.S.C.

§ 78j(a)(1).

116.

Defendants have effected short sales of stock in violation of, *inter alia*,

Regulation SHO, Rule 15c3-3, Rule 10b-5, and 15 U.S.C. § 78j(a)(1), by engaging

in the Conduct at Issue in this case, including, but not limited to, in at least the following ways:

(a)      Knowingly and intentionally short selling securities of TASER and the securities of other publicly traded corporations when they neither possessed nor intended to obtain stock for delivery by the settlement date;

(b)      Knowingly and intentionally providing or relying on a false, fictitious, illegitimate, or inaccurate locates/affirmative determinations when the defendant does not have reasonable grounds to believe that the security can be borrowed or delivered on the date it is due, or failing to obtain locates or affirmative determinations altogether;

(c)      Knowingly and intentionally failing to deliver securities by the settlement date including (1) fails in the CNS system and (2) ex-clearing fails;

(d)      Knowingly and intentionally concealing short-sale transactions or violations of Regulation SHO, Rule 15c3-3, Rule 10b-5, and 15 U.S.C. § 78j(a)(1) by, among other things, mismarking order tickets, using derivative swap contracts; using "exits" from CNS, conversions or reverse conversions, flex options, flips or flipping; using pre-arranged washed and matched trading in order to appear to have covered short sales and restart settlement dates for fail to deliver positions; engaging in intra company transactions, including transactions with offshore entities; engaging in transactions with prime brokered hedge fund clients, both

801481.1

75

onshore and offshore; and relying on the bona fide market-maker exemption when it does not apply;

(e)     Knowingly and intentionally concealing failure-to-deliver positions, including but not limited to, moving fails out of the DTCC system without delivering shares for settlement and engaging in intra-company or affiliate/subsidiary flips, loans and other transactions including transactions with offshore entities;

(f)     Knowingly and intentionally concealing a fail to deliver position by making the appearance that like kind or quantity of securities were purchased to close-out the fail, thus restarting the settlement date of the fail to deliver position,

(g)     Knowingly and intentionally charging clients, customer, banks or others fees, commissions and/or interest for "loaning" securities that the defendant never loaned;

(h)     Knowingly and intentionally permitting a pattern of allowing failure to deliver or receive positions from the same counterparty or for the same customers/clients;

(i)     Knowingly and intentionally failing to conduct or request buy-ins from clients or counterparties;

(j)      Knowingly and intentionally continuing to accept, permit or facilitate short sales or other transactions (*e.g.*, flex options, conversions) for a customer or a prime broker that has failed to deliver on numerous occasions;

(k)      Knowingly and intentionally continuing to accept, permit or facilitate short sales of a stock that has repeated net failures to deliver or receive;

(j)      Knowingly and intentionally permitting, facilitating and/or engaging conversion, reverse conversion, flex option or other transactions that they knew were unlawful;

(m)      Knowingly and intentionally permitting, facilitating and/or engaging in transactions with customers/clients that it knew intended on violating or circumventing the law;

(n)      Knowingly and intentionally (for themselves and/or their clients) relying on the bona fide market maker and bona fide option market maker exceptions when they did not apply;

(o)      Knowingly and intentionally permitting, facilitating and/or engaging in transactions where they knew that stock would not be borrowed and/or delivered because of a negative rate (i.e., it would cost money to borrow the stock); and

(p)      Knowingly and intentionally engaging in the other Conduct at Issue as described in Exhibit A to the parties' Stipulation and Order dated May 6, 2010.

801481.1

117.

This conduct violated 15 U.S.C. § 78j(a)(1).

118.

The defendants' violations and acts involving violations of 15 U.S.C. §

78j(a)(1) constitute racketeering activity pursuant to O.C.G.A. § 16-14-

3(9)(A)(xxix) and O.C.G.A. § 16-14-3(9) (B).

119.

Further, by knowingly and intentionally engaging in the Conduct at Issue in

this case, including but not limited to, short selling securities of TASER and the

securities of other publicly traded corporations when they neither possessed nor

intended to obtain stock for delivery by the settlement date, defendants made and

continue to make, attempted to make, solicited, and aided and abetted a

"manipulative or deceptive device or contrivance,"  in contravention of rules and

regulations prescribed by the Securities and Exchange Commission as necessary or

appropriate in the public interest or for the protection of investors, including, but

not limited to, Regulation SHO, Rule 15c3-3, and Rule 10b-5.  This conduct

violated 15 U.S.C. § 78j(b).

120.

The defendants' violations and acts involving violations of 15 U.S.C. § 78j(b) constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(A)(xxix) and O.C.G.A. § 16-14-3(9) (B).

**c.    Theft By Taking (O.C.G.A. § 16-8-2)**

121.

Each defendant committed, attempted to commit, aided and abetted, solicited another to commit, or engaged in acts involving theft by taking of the property of TASER and TASER shareholders, including plaintiffs.

122.

The defendants' violations of O.C.G.A. § 16-8-2 constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(ix).

123.

The defendants unlawfully took the property of others, including plaintiffs, with the intention of depriving them of that property.

124.

TASER is the sole, original, legitimate source for shares of TASER stock..

125.

Only TASER can decide to offer additional shares of TASER stock into the marketplace.

126.

TASER's stock has value, and when TASER has introduced shares of its stock into the marketplace as part of a public offering, it has been paid for the shares of its stock that were sold in connection with the offering.

127.

As the sole, original, legitimate source of shares of TASER stock, TASER has the right to decide whether to offer additional shares of TASER stock into the marketplace, when to do so, and the price at which they will be offered.

128.

Because shares of TASER stock represent an ownership interest in the company, no one other than TASER has the right to offer additional shares of TASER stock into the marketplace.

129.

Defendants took, in whole or in part, shares of TASER stock, which TASER had not issued or authorized to be issued, and for which TASER was never paid. This misconduct deprived TASER of the right of exclusive possession and control

over its property and deprived it of any financial benefit from the introduction of its shares into the marketplace.

130.

The individual plaintiffs had a property interest in their authorized, issued shares of TASER stock and the rights appertaining thereto within the meaning of O.C.G.A. § 16-8-1(3).

131.

Because at any point in time there is a finite universe of authorized and issued TASER shares, when the defendants created artificial/counterfeit shares of TASER through naked short sales, they necessarily took from each legitimate owner of authorized and issued TASER stock an amount proportionate to the amount of artificial TASER shares they created.  Georgia law prohibits the unlawful taking of property, regardless of the manner in which the property is taken or appropriated.

132.

As part of the pattern of racketeering activity, the defendants also engaged in theft by taking by purporting to loan short sellers TASER stock that the defendants neither owned nor had any intention of obtaining.  The defendants then charged short sellers fees for these sham "loans" of stock which the defendants did not own, did not intend to obtain and never did obtain.

### d.    Theft By Deception (O.C.G.A. § 16-8-3)

133.

Each defendant committed, attempted to commit, aided and abetted, solicited another to commit, or engaged in acts involving theft by deception by obtaining property by deceitful means and artful practices with the intention of depriving the owners of their property.

134.

The defendants' violations of O.C.G.A. § 16-8-3 constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(ix).

135.

The defendants created or confirmed the impression that they had shares of TASER stock available to loan to short sellers when they knew that was not in fact the case.

136.

The defendants charged fees to short sellers of TASER stock for the purported loans of TASER stock when in fact the defendants did not have TASER stock available to loan, did not intend to obtain TASER stock for purpose of making the loan, and, in many instances, knew there were not authorized and issued shares of TASER stock available to them for purposes of making purported loans.

137.

The defendants also failed to correct false impressions of existing facts

which they had previously created or confirmed.  Specifically, defendants failed to

inform persons who wished to borrow TASER stock from the defendants that the

defendants did not have TASER stock available to loan, did not intend to obtain

TASER stock for the purpose of loaning and, in many instances, could not have

obtained TASER stock for purposes of making a loan of that stock even if they had

attempted to do so.

138.

The defendants also sold or otherwise transferred property consisting of

shares of TASER stock created as a consequence of naked short sales while

intentionally failing to disclose the fact that there were legal impediments to the

enjoyment of that property.  Those legal impediments included the fact that

TASER stock purportedly sold by the defendants did not actually exist as

authorized issued shares of TASER stock.

139.

The defendants also promised to perform services which they did not intend

to perform and knew would not actually be performed.  These services included

lending shares of TASER stock which the defendants did not actually possess, did

not intend to obtain and, in many instances, knew could not have been obtained even if the defendants had attempted to do so.

**e.    Violation of The Georgia Computer Systems Protection Act (O.C.G.A. § 16-9-93)**

140.

Each defendant has violated, attempted to violate, aided and abetted, or solicited another to violate the Georgia Computer Systems Protection Act.

141.

In the course of engaging in naked short selling, the defendants have used computers, computer networks and electronic data to create, loan and sell counterfeit TASER stock.  The defendants have also created and/or altered electronic forms and data to falsely indicate their and their clients' level and type of ownership of TASER stock.  For example, the defendants have provided inaccurate and false reports on their electronic blue sheets (*i.e.*, Responses to Request by the SEC) regarding the identity of an account holder for whom specific trades were executed and whether transactions were buys or sales, or longs or shorts.

142.

Among other things, the defendants have created, altered or deleted data in a computer or computer network in a manner such that if such creation, alteration or deletion occurred with respect to a tangible document, it would constitute forgery.

143.

The defendants have also used a computer to take or appropriate the property of another, obtained property through deceitful means or artful practice and/or converted property in violation of an agreement or other known legal obligation to make a specified application or disposition of such property, in violation of O.C.G.A. § 16-9-93(a) or O.C.G.A. § 16-9-93(d).  In addition to the conduct alleged above, the deceitful means and artful practice employed by the defendants also include, but are not limited to:

(i) Engaging in short sales of TASER stock while knowing that they did not own, nor had any intention of obtaining TASER stock by the settlement date, if ever;

(ii) Facilitating short sales of TASER stock for clients while knowing that they did not own, nor had any intention of obtaining TASER stock by the settlement date, if ever; and

(iii) Claiming to loan TASER stock to clients and others for the purpose of facilitating short sales while knowing they did not own, nor had any intention of obtaining, sufficient TASER stock to cover those loans.

144.

The defendants' violations of O.C.G.A. § 16-9-93 constitute racketeering activity pursuant to O.C.G.A. § 16-14-3(9)(A)(xxviii).

### f.    Perjury (O.C.G.A. § 16-10-70)[18]

145.

Each defendant committed, attempted to commit, aided and abetted, or

solicited another to commit perjury in violation of O.C.G.A. § 16-10-70.

146.

Perjury constitutes racketeering activity under O.C.G.A. § 16-14-

3(9)(A)(xv).

147.

Each defendant committed the offense of perjury in this lawsuit by

knowingly and willfully making false statements material to the issues or points in

question while under oath in a judicial proceeding.

148.

Specifically, each defendant verified Interrogatory Responses in this lawsuit

regarding the Conduct at Issue in this case that were false, including, but not

limited to, the false statement identified below.  Defendants have continued to give

false answers under oath to frustrate and prevent discovery of the true facts.

---

[18] For purposes of this section only, which alleges that Defendants committed acts
of racketeering by committing perjury in this lawsuit, Plaintiffs define "each
Defendant" as including all Defendants except Merrill Lynch Professional Clearing
Corporation, which is identified as a John Doe 1 in this Seventh Amended
Complaint and which was not previously named as a party to this lawsuit.

149.

For example, plaintiffs' Second Interrogatory No. 5(i) sought identification of each instance in which each Defendant failed to close out open fails that have persisted in violation of any rules or regulations.  Each defendant, through an authorized representative, responded to this Interrogatory by falsely stating, under oath, that it had disclosed all known instances in which it failed to close out open fails that have persisted in violation of rules or regulations:

    a.   Defendant Banc of America Securities LLC falsely stated that it "is not aware of any instance in which it failed to close out an open fail position in violation of any applicable law or regulation."

    b.   Defendant Bear, Stearns & Co. Inc. and defendant Bear, Stearns Securities Corp. falsely stated that they were "not aware of any instance in which they failed to close out an open fail position in common stock in violation of any applicable law or regulation."

    c.   Defendant Credit Suisse Securities (USA) LLC falsely stated that it had disclosed all known instances where it had knowingly failed to close out an open fail position in common stock in violation of an applicable law or regulation.

d.  Defendant Deutsche Bank Securities, Inc. falsely stated that it had disclosed all known instances where it had knowingly failed to close out an open fail position in common stock in violation of an applicable law or regulation.

e.  Defendant Goldman, Sachs & Co.'s and defendant Goldman Sachs Execution & Clearing, L.P. falsely stated that they had disclosed all known instances where they had knowingly failed to close out an open fail position in common stock in violation of an applicable law or regulation.

f.  Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. falsely stated that it had disclosed all known instances where it had knowingly failed to close out an open fail position in common stock in violation of an applicable law or regulation.

g.  Defendant Morgan Stanley & Co. falsely stated that it had disclosed all known instances where it had knowingly failed to close out an open fail position in common stock in violation of an applicable law or regulation.

h.  Defendant UBS Securities, LLC falsely stated that it was "not currently aware of any instance in which it failed to close out an open

fail position in any stock in violation of any applicable rule or regulation."

150.

Similarly, Plaintiffs' Second Interrogatory No. 5(j) sought identification of each instance in which each defendant failed to deliver shares in violation of its internal rules and regulations, including those identified and described in its applicable compliance manual(s).  Each defendant responded to this Interrogatory, through an authorized representative, by falsely stating, under oath, that it had disclosed all known instances in which it failed to deliver stock in violation of its internal rules and regulations:

    a.  Defendant Banc of America Securities LLC falsely stated that "it is not aware of any instance in which it failed to deliver shares in violation of its own internal rules and policies."

    b.  Defendant Bear, Stearns & Co. Inc. and defendant Bear, Stearns Securities Corp. falsely stated that they were "not aware of any instance in which they failed to deliver shares of common stock in violation of their own internal rules and policies."

    c.  Defendant Credit Suisse Securities (USA) LLC falsely stated that it was "not aware of any instance in which it failed to deliver shares of common stock in violation of its own internal rules and policies."

d.  Defendant Deutsche Bank Securities, Inc. falsely stated that it had disclosed all known instances where it had knowingly failed to deliver shares of stock in violation of its own internal rules and policies.

e.  Defendant Goldman, Sachs & Co.'s and defendant Goldman Sachs Execution & Clearing, L.P. falsely stated that it had disclosed all known instances where it had knowingly failed to deliver shares of stock in violation of its own internal rules and policies.

f.  Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. falsely stated that it had disclosed all known instances where it had knowingly failed to deliver shares of stock in violation of its own internal rules and policies.

g.  Defendant Morgan Stanley & Co. falsely stated that it had disclosed all known instances where it had knowingly failed to deliver shares of stock in violation of its own internal rules and policies.

h.  Defendant UBS Securities, LLC falsely stated that it was "not currently aware of any instance in which it failed to deliver shares of any stock in violation of its own internal rules and policies."

151.

Each of defendant's false responses to Plaintiffs' Second Interrogatory No. 5(i) and 5(j) was verified under oath by a corporate representative, acting in his or her capacity as an authorized representative of a defendant:

a. Defendant Banc of America Securities LLC's false response to plaintiffs' Second Interrogatory No. 5 was verified under oath by Shea Z. Wallon, acting in his capacity as an authorized representative of defendant Banc of America Securities LLC, on June 3, 2010.

b. Defendant Bear, Stearns & Co. Inc.'s and defendant Bear, Stearns Securities Corp.'s false response to plaintiffs' Second Interrogatory No. 5 was verified under oath by Gabriel Loubier, acting in his capacity as an authorized representative of defendant Bear, Stearns & Co. Inc. and defendant Bear, Stearns Securities Corp., on June 3, 2010.

c. Defendant Credit Suisse Securities (USA) LLC's false response to plaintiffs' Second Interrogatory No. 5 was verified under oath by John Fisher, acting in his capacity as an authorized representative of defendant Credit Suisse Securities (USA) LLC, on June 1, 2010.

d. Defendant Deutsche Bank Securities, Inc.'s false response to plaintiffs' Second Interrogatory No. 5 was verified under oath by Paul

D. Bray, acting in his capacity as an authorized representative of defendant Deutsche Bank Securities, Inc., on June 1, 2010.

e.  Defendant Goldman, Sachs & Co.'s and defendant Goldman Sachs Execution & Clearing, L.P.'s false response to plaintiffs' Second Interrogatory No. 5 was verified under oath by Christina Schulz, acting in her capacity as an authorized representative of defendant Goldman, Sachs & Co. and defendant Goldman Sachs Execution & Clearing, L.P., on June 1, 2010.

f.  Defendant Merrill Lynch, Pierce, Fenner & Smith Inc.'s false response to plaintiffs' Second Interrogatory No. 5 was verified under oath by Joseph Mastrianni, acting in his capacity as an authorized representative of defendant Merrill Lynch, Pierce, Fenner & Smith Inc., on June 3, 2010.

g.  Defendant Morgan Stanley & Co.'s false response to plaintiffs' Second Interrogatory No. 5 was verified under oath by Larry Hammond, acting in his capacity as an authorized representative of defendant Morgan Stanley & Co., on June 4, 2010.

h.  Defendant UBS Securities, LLC's false response to plaintiffs' Second Interrogatory No. 5 was verified under oath by Laurie Ingram, acting

in her capacity as an authorized representative of Defendant UBS

Securities, LLC, on June 1, 2010.

152.

As another example, plaintiffs' Third Interrogatory No. 1 to defendant

Deutsche Bank Securities, Inc. sought identification of every informal or informal

examination, inquiry or investigation of it by any agency, regulatory body or SRO

(including but not limited to NASDAQ, FINRA, SEC, NYSE, ARCA, CBOE, any

options trading board or similar self-regulatory agency) related to the Conduct at

Issue whether or not specifically related to TASER securities.  Defendant Deutsche

Bank Securities, Inc. responded to this Interrogatory by falsely stating that it had

disclosed all known informal or informal examinations, inquiries or investigations

of it by federal agencies and SROs, when it had not in fact disclosed all such

known instances.  In fact, defendant Deutsche Bank Securities, Inc. did not

originally identify a three-year investigation by FINRA concerning the conduct at

issue in this case, which resulted in defendant Deutsche Bank Securities, Inc.

consenting to an Acceptance, Waiver, and Consent order (FINRA No.

20080144505).

153.

Defendant Deutsche Bank Securities, Inc.'s false response to Plaintiffs'

Third Interrogatory No. 1 was verified under oath by Anthony J. Bosco, acting in

his capacity of an authorized representative of defendant Deutsche Bank Securities, Inc., on May 10, 2010.

### 154.

Each defendant's false statements under oath were made with the intention of concealing the Conduct at Issue in this case and with the ultimate aim of financial benefit to each defendant.

**Relationship Between The Acts of Racketeering Activity**

### 155.

The acts of racketeering activity committed by defendants are related in that they all involve transactions or purported transactions in or effecting publicly traded securities including TASER stock.

### 156.

The acts of racketeering activity committed by defendants have the same or similar intents in that they sought to obtain property, including but not limited to money, for defendants through illegal means.

### 157.

The acts of racketeering activity committed by the defendants have the same or similar results, in that defendants actually obtained personal property, including but not limited to money, through illegal means.

158.

The acts of racketeering activity committed by defendants have the same or similar victims, including TASER shareholders, who have been victimized by defendants' conspiracy to manipulate the market in TASER stock through deceptive or fraudulent schemes or artifices.

159.

The acts of racketeering activity committed by defendants have the same or similar methods of commission in that they involve the manipulation of the market in TASER stock in furtherance of a scheme to obtain personal property, including but not limited to money, through illegal means.

160.

The acts of racketeering activity committed by defendants are interrelated by distinguishing characteristics and are not isolated incidents.  The acts involve the same or similar methods of commission,  the same or similar benefits to the defendants and the same or similar efforts to conceal the defendants' misconduct.

**Injuries To Plaintiffs Proximately Caused By Defendants' RICO Violations**

161.

Defendants' behavior targeted TASER, its stock and its shareholders. Plaintiffs' injuries flow directly from defendants' acts of racketeering activity that constitute part of the pattern of racketeering activity.

162.

Plaintiffs have been injured by reason of the defendants' violation of O.C.G.A. § 16-14-4(c) and are entitled to recover three times the actual damages sustained.

163.

Pursuant to O.C.G.A. § 16-14-6(c), plaintiffs are also entitled to recover their attorneys' fees in the trial and appellate courts, and their costs of investigation and litigation reasonably incurred.

## COUNT TWO
### (Violation of the Georgia Securities Act)

164.

Paragraphs 1 through 163 are incorporated by reference as if set forth fully herein.

165.

Plaintiffs are purchasers of TASER stock. Many of the plaintiffs either purchased their shares of TASER stock through brokers located in Georgia,

initiated their purchases of TASER stock in Georgia or maintained their TASER stock, either personally or through a broker, in Georgia.

166.

The market for TASER stock is an efficient market.  Both the market and the plaintiffs have relied upon the assumption of a market for TASER stock that was free from manipulation.

167.

Some of the facts relating to the defendants' scheme and conspiracy to intentionally manipulate the market in TASER stock are known only to the defendants and uniquely in their possession.

168.

The defendants' violations of the Georgia Securities Act have proximately caused plaintiffs injury, including, but not limited to, (i) lost value of the stock; (ii) impairment of non-monetary rights; and (iii) interference with the ordinary and intended operation of those rights.

## COUNT THREE
**(Violation of the Georgia Computer Systems Protection Act)**

169.

Paragraphs 1 through 168 are incorporated by reference as if set forth fully herein.

801481.1

170.

The defendants' violation of the Georgia Computer Systems Protection Act

has proximately caused plaintiffs injury, including, but not limited to, (i) lost value

of the stock; (ii) impairment of non-monetary rights; and (iii) interference with the

ordinary and intended operation of those rights.

## COUNT FOUR
**(Conversion)**

171.

Paragraphs 1 through 170 are incorporated by reference as if set forth fully

herein.

172.

Plaintiffs own or owned personal property in the form of TASER common

stock and the rights attaching to the ownership of that stock, including but not

limited to the right to participate in the ownership and control of TASER.  Plaintiff

TASER owns property in TASER, including the ability to create and issue stock in

TASER to raise funds and the ability to exercise control and ownership over

TASER.

173.

Through the unlawful conduct described above, the defendants have

committed an unauthorized assumption and exercise of the right of ownership over

personal property (*i.e.*, TASER stock) belonging to plaintiffs, and have unlawfully appropriated it.  The defendants have also substantially and wrongfully interfered with the plaintiffs' right to possession of their property.  Defendants converted the plaintiffs' TASER stock and interest in the rights relating to the ownership of that stock or company to their own use or for others' use.

174.

The defendants' unlawful conversion of plaintiffs' TASER stock has proximately caused them injury, including, but not limited to, (i) lost value of the stock; (ii) impairment of non-monetary rights; and (iii) interference with the ordinary and intended operation of those rights.

<b><u>COUNT FIVE</u></b><br>
<b>(Money Had and Received)</b>

175.

Paragraphs 1 through 174 are incorporated by reference as if set forth fully herein.

176.

Through the unlawful conduct described above, the defendants have received monies, stocks, rights, benefits, and/or securities entitlements of which the defendants are not the true owners, and which, in equity and good conscience, the defendants should not be permitted to keep.

801481.1

177.

Plaintiff TASER is the true owner of monies, stocks, rights, benefits, and/or securities entitlements received by defendants in connection with unlawful conduct described above, including, but not limited to, the creation, issuance, and sale of stock and/or securities entitlements in TASER that the defendants neither legitimately owned nor had an intention of locating, receiving, or delivering to the purchaser.

178.

Plaintiff TASER has made a demand for repayment of the monies, stocks, rights, benefits, and/or securities entitlements received by the defendants in connection with the unlawful conduct described above.

179.

The defendants have refused Plaintiff TASER's demand for repayment.

180.

Plaintiff TASER is entitled to recover in legal damages from each defendant the sum of monies, stocks, rights, benefits, and/or securities entitlements received by that defendant of which the defendant is not the true owner, and which, in equity and good conscience, the defendant should not be permitted to keep.

Plaintiff TASER is also entitled to applicable interest and all other remedies available under this claim.

## Punitive Damages

### 181.

The defendants' actions show willful misconduct, breach of fiduciary duty, malice, fraud, wantonness, oppression, and an entire want of care that raises the presumption of conscious indifference to consequences and specific intent to cause harm, entitling plaintiffs to receive punitive damages sufficient to deter, penalize or punish defendants in light of the circumstances of the case.

## Prayer For Relief

WHEREFORE, Plaintiffs pray for the following relief:

(a)     Trial by jury on all issues so triable;

(b)     Judgment be entered in favor of plaintiffs and against defendants in the amount to be determined by the jury at trial;

(c)     Plaintiffs be awarded compensatory and punitive damages;

(d)     Plaintiffs be awarded their expenses of litigation, including reasonable attorneys' fees and costs; and

(e)     The Court award such other and further relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted on this 15th day of September, 2010.

/s/ *Steven J. Rosenwasser*
John E. Floyd
Georgia Bar No. 266413
Steven J. Rosenwasser
Georgia Bar No. 614908
Nicole G. Iannarone
Georgia Bar No. 382510
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
(404) 881-4100 Tel.
(404) 881-4111 Fax
James W. Christian
State Bar No. 04228700
Christian, Smith, & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas 77002
(713) 659-7616 Tel.
(713) 659-7641 Fax
(pro hac vice)

**ATTORNEYS FOR PLAINTIFFS**

801481.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of September, 2010, a true and correct copy of the foregoing **SEVENTH AMENDED COMPLAINT** was electronically filed with the Clerk of Court using the Court's electronic filing system which will automatically send an email notification of such filing to the following attorneys of record who are registered participants in the Court's electronic notice and filing system:

**Attorneys for Defendants:**
Richard H. Sinkfield, Esq.
Rogers & Hardin
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303-1601

**Attorneys for Banc of America Securities, LLC and Merrill Lynch, Pierce, Fenner & Smith, Inc.:**
Andrew J. Frackman, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, NY  10036

**Attorneys for Morgan Stanley & Co. Incorporated:**
Robert F. Wise, Jr., Esq.
William J. Fenrich, Esq.
Melissa T. Aoyagi, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY  10017

**Attorneys for Bear Stearns:**
Stephen L. Ratner, Esq.
Harry Frischer, Esq.
Brian L. Friedman, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY  10036

**Attorneys for The Goldman Sachs Group, Inc.:**
Richard C. Pepperman II, Esq.
Richard H. Klapper, Esq.
Tracy Richelle High, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

**Attorneys for Deutsche Bank Securities Inc.:**
Heather L. Fesnak, Esq.
Peter J. Isajiw, Esq.
Gregory A. Markel, Esq.
Martin L. Seidel, Esq.
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY  10281

**Attorneys for UBS Securities, LLC:**
Andrew B. Clubok, Esq.
Jeffrey G. Landis, Esq.
Daniel Gomez, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC  20005-5793

Maria Ginzburg, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

**Attorneys for Credit Suisse USA, Inc.:**
Fraser L. Hunter, Jr., Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY  10022

This 15th day of September, 2010.


/s/ *Steven J. Rosenwasser*
Steven J. Rosenwasser
Georgia Bar No. 614908

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA  30309-3417
Tel.: (404) 881-4100
Fax: (404) 881-4111

801481.1